171219tartaglioneC          Conference

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4          v.                          16 Cr. 832(KMK)

5   NICHOLAS TARTAGLIONE and
    JOSEPH BIGGS,
6
                  Defendants.
7
    ------------------------------x
8                                       United States Courthouse
                                        White Plains, N.Y.
9                                       December 19, 2017
                                        2:56 p.m.
10
    Before:
11
                    THE HONORABLE KENNETH M. KARAS,
12
                                             District Judge
13

14                          APPEARANCES

15
    JOON H. KIM
16       Acting United States Attorney for the
         Southern District of New York
17  MAURENE COMEY
         Assistant United States Attorney
18
    BRUCE BARKET, AIDA LEISENNING and ANTHONY RICCO
19       Attorneys for Defendant Nicholas Tartaglione

20  DAVID STERN
         Attorney for Defendant Joseph Biggs
21

22

23

24

25

171219tartaglioneC        Conference

1          (In open court)

2          THE CLERK:  In the matter of the United States v.

3   Nicholas Tartaglione and Joseph Biggs.

4          Will counsel please state your appearances for the

5   record, beginning with the government.

6          MS. COMEY:  Maurene Comey for the government.

7          MR. BARKET:  Bruce Barket, Aida Leisenning, and no

8   introductions needed, but Anthony Ricco for Mr. Tartaglione.

9          THE COURT:  Good afternoon to you all.

10          MR. STERN:  David Stern for Mr. Biggs.

11          THE COURT:  Good afternoon to you both.  Be seated,

12   everybody.

13          Is there anything by way of any update or anything

14   anybody wants to add in light of any other correspondence or

15   any since we last got together?

16          MS. COMEY:  Not from the government, your Honor.  I'll

17   just note for the record that we did make our in camera

18   submission to your Honor on December 1st per the Court's

19   request.  We also met with the counsel for Mr. Tartaglione on

20   December 12 and spent two hours together going through in

21   detail the Rule 16 discovery that was discussed in the papers

22   regarding the pending motion.  And I believe we answered any

23   questions they had about the Rule 16 discovery, though we

24   declined to go into any discussion of witness statements.

25          THE COURT:  Okay.

171219tartaglioneC          Conference

1          Mr. Barket.

2          MR. BARKET:  I'll agree with the event and demur on

3    the characterizations.

4          THE COURT:  Okay.  Well, to the extent that there were

5    questions asked and answered given regarding the Rule 16

6    discovery, I mean, does that in any way -- is there anything

7    from that, Ms. Comey, that you think alters the record in terms

8    of gaps being filled in, so on and so forth, or whether there's

9    redundancy in the discovery?

10          MS. COMEY:  No, your Honor.  I think that the purpose

11    of that particular meeting was the suggestion from Mr. Barket

12    that he wasn't sure what Rule 16 discovery the government was

13    referencing in its submissions and in its oral argument about

14    what it was relying on in part for the theory that it raised in

15    its correspondence.  And so we walked through surveillance

16    video, historical cell site, and toll records and pieced it

17    together essentially in the way that we see it fitting

18    together.  So that's one piece of what led to the government's

19    theory, which, as I've mentioned, is subject to ongoing

20    investigation, but that was one piece.

21          The other piece, which I think we've made clear, is

22    witness statements and inferences drawn by the government.

23          THE COURT:  Okay.  All right.  Then anything anybody

24    else wants to add substantively to what's already been

25    discussed at length and written about at length?

171219tartaglioneC      Conference

1          MR. BARKET:  No, not from this side, Judge.

2          THE COURT:  Ms. Comey.

3          MS. COMEY:  No, your Honor.

4          THE COURT:  And you're going to continue to be

5    agnostic, Mr. Stern, your team, on this one?

6          MR. STERN:  I'm sorry?

7          THE COURT:  You're going to continue to be agnostic on

8    this one?

9          MR. STERN:  Yes.

10         THE COURT:  Well, I had reviewed the government's *ex*

11   *parte* submission before our last conference, and then I

12   reviewed the entirety of what Ms. Comey submitted, which was a

13   fairly hardy collection of information.  Let me back up for a

14   second.

15         As we discussed at the last conference at length,

16   everybody understands what the law is, both with respect to the

17   government's Rule 16 obligation and then in terms of what the

18   *Brady* obligation is.  And you know, we're in that position that

19   this is before the trial, right, so the *Brady* right's a trial

20   right.  And what's tricky for the government in every one of

21   these cases is that they have to be careful not to withhold

22   *Brady* material that could be material to the defense.  And they

23   have to therefore engage in almost, like, a prediction as to

24   what might be material to the defense.  And as we talked about

25   at length at the last conference, they're not necessarily in

171219tartaglioneC        Conference

1   the best position to make that determination, and that there

2   are various things that an individual representing a defendant

3   can look at a report, for example, and say, ah, the way this is

4   phrased or this particular fact is material to our defense in a

5   way that a well-meaning prosecutor would not be able to

6   necessarily ascertain.

7          But in any event, the *Brady* obligation is such that

8   the government has to disclose information where the

9   nondisclosure of that information would deprive the defendant

10  of a fair trial.  So the suppression of the evidence would have

11  to put the whole case in a different light such as to undermine

12  the confidence in the verdict, and that's right from the *Kyles*

13  case at page 435.  And, of course, materiality is to be

14  evaluated in the context of the entire record, including the

15  cumulative effect of all of the evidence, as well as the

16  absence of any suppressed evidence.

17         What's more, the government's *Brady* obligation,

18  there's a time component to it.  The government's obligation is

19  to provide so-called *Brady* material in time for its effective

20  use at trial.

21         Here, there has to be an asterisk to that because

22  there's also the mitigation process that's ongoing.  And we

23  went back and forth about the fact that there are two things

24  about this so-called *Brady* material with respect to the

25  mitigation process -- not the mitigation process -- the capital

1    review process.  Number one is, the government's aware of

2    what's in its own files, so to the extent that they had

3    information, including not only the Rule 16 material, but the

4    witness statements, or any other information, whether it's been

5    disclosed as Rule 16 or *Brady* or not.  And so the point that we

6    were discussing was the extent to which the defense needs to

7    tell the government what it already knows.

8         The counter to that point is, again, that there are

9    things that the defense can tell the government in terms of

10   dot-connecting; that there are things maybe that the government

11   doesn't know from its own information, including any witness

12   statements, that it might miss in terms of evaluating whether

13   or not to even seek the death penalty in this case.  And it's

14   not a *Brady* right, *per se*, but it's more a question of when it

15   involves a Court's determination, the exercise of the Court's

16   discretion into making sure that the discovery process comports

17   with due process in the context of a death penalty case.  So

18   all the death is different.  Case law, of course, has something

19   different to say in this regard.  But the cases do talk about

20   how the discovery obligations are not triggered by the Justice

21   Department's own, sort of, internal review.

22        The other piece of this is that the information we're

23   fighting over has to do with the whereabouts of Mr. Tartaglione

24   during the sequence of the relevant events.  And the issue

25   there is that the best source of information in that regard is

171219tartaglioneC          Conference

1    Mr. Tartaglione.  So it's not really a denial of *Brady*

2    information if the government isn't withholding information

3    that is available to Mr. Tartaglione.  In other words, the

4    *Brady* violation only happens when the suppression of the

5    evidence or information is of information or evidence that is

6    known to the government and not known or knowable to

7    Mr. Tartaglione.  And whether or not he was present for certain

8    people being killed is something that his counsel can consult

9    him on.

10          Now, the cases that are cited and relied upon by

11   Mr. Tartaglione's counsel nonetheless talk about how there can

12   be violations of the *Brady* right when, for example, the

13   government fails to produce evidence about a witness that would

14   expose the witness' information being contradicted by other

15   evidence in the case.  And some of the decisions that counsel

16   have relied on are on point to that very issue.  So I have

17   reviewed the material with that view in mind, as well.

18          But where I come out on all this is that, first of

19   all, there is nothing in the materials that I have reviewed

20   that is inconsistent with what the government has said about

21   the materials, nor is there anything in the materials that is

22   inconsistent with the government's theory of the case.  So,

23   that sort of base review I did.

24          I also reviewed it to see if there was, if you would,

25   lead information; that there might be something in the

1  materials that would lead to *Brady* information, because the

2  *Brady* right is not only exculpatory evidence but information

3  that could lead to exculpatory evidence, and especially in a

4  capital case, that's a broader review.  Relative culpability is

5  an issue, for example.  That's a mitigator.  There might be

6  other things that are relevant to sentencing, because the *Brady*

7  right in a capital context is not just about culpability, but

8  also potential responsibility by way of capital punishment.

9  And there are many mitigating factors that I think expand the

10 government's *Brady* obligation, clearly.  And even though this

11 has not been deemed a capital case, it's in a posture where

12 it's being reviewed as a potential capital case.

13         Again, there's nothing in the materials that I found

14 that Ms. Comey submitted that requires their disclosure.

15 There's nothing in there that's inconsistent with -- or

16 anything in there that requires disclosure, even with that

17 broad a lens, if there's anything in there that might be by way

18 of mitigating information, because what we're talking about

19 here is Mr. Tartaglione's whereabouts during the sequence of

20 events.  And, again, he's in a position to know those things.

21         Now, admittedly, what I'm not able to do at this

22 stage, at this stage, is do any kind of an analysis about how

23 the information Ms. Comey provided, should it come by way of a

24 witness or two or three testifying, and whether or not that is

25 inconsistent with what other people might testify to or what

1   other evidence in the case is, but I don't see how anybody can

2   do that at this point – even counsel for Mr. Tartaglione,

3   because they don't know what other witnesses the government is

4   going to call.  And the government doesn't have an obligation

5   at this point to disclose witness statements, especially those

6   statements that don't contain any *Brady* material.  And so, what

7   I would say is, is that, that's something that's going to have

8   to be continually looked at.

9        And the government understands, of course, that its

10  *Brady* obligation is a continuing obligation.  Ms. Comey has

11  acknowledged that on a number of occasions.  She's acknowledged

12  that the government's theory has evolved, which, if it

13  continues to evolve, might necessarily change the *Brady*

14  obligation, because the *Brady* obligation obviously has to

15  comport to what the case is about.  And if the case is that the

16  government's theory of the case changes, then so, too, might

17  its *Brady* obligation.

18       Now, I recognize that beyond whether or not there's a

19  *Brady* obligation to turn over or other sort of non-Rule 16

20  discovery rule obligation to turn over witness statements that

21  there is an exercise of discretion that courts have and that

22  they've exercised.  And I have viewed this material with the

23  understanding that even if some of this material is not

24  technically disclosable under Rule 16 and even if the

25  government doesn't think that it is *Brady* material, that if I

1   thought that it could lead to *Brady* material, then, in the

2   exercise of my discretion, I could press the government to turn

3   it over -- require the government to turn it over.  But based

4   on my review and based on the government's theory, as I

5   understand it, and after considering all of the arguments that

6   we had when we were last together, my view is that even in the

7   exercise of that discretion, there is no basis at this point or

8   need or justification to require the government to turn over

9   the information because it just doesn't rise to the level of

10  *Brady* material, in other words, anything beyond what the

11  government has already disclosed.

12      In reaching that conclusion, I didn't take into

13  consideration the safety issues.  I mean, I think that's

14  another layer to this, but I think there are ways to deal with

15  the safety issues.  So if I thought that there was something in

16  here that was disclosable, then I would then work with you all

17  to try to figure out some way to address any safety concerns

18  the government would have, so that's not the basis of this

19  ruling.  The basis of this ruling has to do with the content of

20  the materials.

21      But to be clear, this is without prejudice to an

22  ongoing review should circumstances change.  And I will, of

23  course, expect the government to continue to very carefully

24  consider its *Brady* obligations, recognizing that it is an

25  ongoing obligation.  And should the government's theory change,

171219tartaglioneC          Conference

 1  what might not have been *Brady* yesterday might very well be

 2  *Brady* tomorrow.

 3          And to the extent the government does develop

 4  additional information, whether it's by witness statements or

 5  any other information that then contradicts or later on is

 6  determined to contradict or could potentially contradict the

 7  information that was provided in the *ex parte* filing, then I

 8  would expect the government, first of all, to advise counsel of

 9  the *Brady* material, or if the government thinks it's a close

10  question but is not going to, to advise everybody that maybe

11  there's a need to have another *ex parte* submission to have me

12  review the material to determine whether or not there's a *Brady*

13  obligation to disclose either this material or anything else

14  that might be inconsistent with this material.  So that's the

15  ruling of the Court.

16          Other issues to take up?

17          Mr. Ricco, good to see you.

18          MR. RICCO:  Yes.  I did have one observation.

19          THE COURT:  Please.

20          MR. RICCO:  Though I do not disagree with the Court's

21  analysis or its conclusion, I would share with the Court that

22  while the Court is correct in its view that, to some extent,

23  this is about the whereabouts of Mr. Tartaglione, and he's in

24  the best position to know that, there is an area of

25  investigation in this case that is outside of that.  But

171219tartaglioneC        Conference

1   included in your order and in your decision, because much of

2   what we reviewed with the government at the meeting on the

3   12th is information that is certainly not about the

4   whereabouts of Mr. Tartaglione.  And there was much to observe

5   and much to discover about things that he would not have been

6   aware of because he was not present at that time and place, but

7   I think that your Honor addressed that when you talked about

8   the broader concept of mitigation for equally-culpable

9   participants.  And then that takes us to why.  What was that

10  role of those equally-culpable people if they existed outside

11  of his knowledge or outside of his presence?

12          But I'm satisfied with the Court's analysis of the

13  events as I sit here and think about the information that we

14  shared by the two of us, by the government.  It included it

15  anyway.  It certainly went well beyond his whereabouts and more

16  about information that's along the lines that the Court has

17  discussed.

18          THE COURT:  Absolutely.  You know, we had a very hardy

19  discussion the last go-around, and I mean that.  I thought it

20  was not only excellent advocacy, but it was very helpful to

21  have the viewpoint and to express the need to have the review

22  of this material done with a very broad lens.  But the genesis

23  of all of this was the government saying, you know, its theory

24  had evolved and that Mr. Tartaglione was not the person

25  directly responsible for the deaths of all the individuals

171219tartaglioneC          Conference

1   because he wasn't there, and so the core of it was really that

2   piece of the information.

3            And to the extent that, as this case evolves and takes

4   shape, the government's theory about the relative roles of

5   individuals develops in a way that is inconsistent with the

6   materials that I reviewed, for example, then the relative

7   culpability piece of this is going to become potentially very

8   different.  And that's why I'm saying what I'm telling myself

9   and I'm telling you all is that this is not the end of the

10  review; it's the beginning.  And it's not the end of the

11  government's obligation as to this topic; it's only the

12  beginning.

13           And, as I mentioned, the cases that your co-counsel

14  cited rightly so and relied on, talk about not only the *Brady*

15  obligation, but even a Court's obligation in the exercise of

16  its discretion to make sure that its *Brady*, its *Giglio* -- to

17  the extent that there are going to be -- if there were

18  statements from person X that directly contradicted statements

19  from person Y, you all should know about that before X and Y

20  testify.

21           MR. RICCO:  Right.

22           THE COURT:  But I don't have X, Y and Z to compare,

23  right, so, again, because of where we are in the process.  And

24  I can't tell the government give me all your files now for *ex*

25  *parte* review.  Some of that is to be practical, right, and some

1   of it is because we, as a matter of law, the *Brady* obligation

2   starts with the government.  The *Brady* obligation isn't on the

3   Court, because otherwise the law would be, okay, prosecutor,

4   give me all your files, let me do the *Brady* review.  And if it

5   means I don't do E.R.I.S.A. cases for a while, I'd be happy to

6   do it, but that's not how the law works.

7          But given the nature of this case and the potential

8   punishment the government is going to seek, I'm all for

9   thinking creatively about how to make sure that there is a

10  check on whether or not the government is honoring its *Brady*

11  obligation, broadly defined.

12         Anything else aside from this issue that we need to

13  take up?  Does anybody have a suggestion about when we should

14  next get together?

15         MR. BARKET:  This is kind of a point of increasing

16  concern for us.

17         THE COURT:  Okay.

18         MR. BARKET:  Just coincidentally, I don't think

19  anybody thought about it when we set the date, but I believe

20  this is the date of Mr. Tartaglione's arrest, so it's been

21  literally a year since he's been incarcerated.  And we don't

22  have, obviously, a decision on authorization.  We don't really

23  even have a schedule for it.  We don't even have a time frame

24  for it.  We're just, "We'll let you know when we let you know."

25         We submitted our package back on August 27.

171219tartaglioneC       Conference

1          THE COURT:  So it's been hanging around for almost

2    four months.

3          MR. BARKET:  So, you know, the process, as I

4    understand it, hasn't -- the package and the kind of decision

5    hasn't made it very far within the government's own structure.

6          THE COURT:  Can I just interrupt.

7          One quick question on that point, Ms. Comey.  I don't

8    know if, down at the Justice Department, if there are waiting

9    for Mr. Biggs' counsel to present the package, or are they

10   going to evaluate Mr. Tartaglione's package separate and apart,

11   and whenever Mr. Biggs' team gets their package there is

12   whenever they get it there?  Do you know?

13         MS. COMEY:  I'm waiting for an answer on that

14   question, your Honor.

15         THE COURT:  Okay.

16         Go ahead, Mr. Barket, because I thought maybe that

17   would help --

18         MR. BARKET:  To that point -- just one of the things I

19   was going to mention, to that point, we have kind of asked that

20   they make the decision.  We don't -- Mr. Biggs was arrested

21   six, seven months after Nick was, so, we don't want to -- we

22   made that point, obviously, to the government.

23         So when we meet next is, I would think, the same block

24   of time that we've been doing, 30 to 45 days is probably not

25   inappropriate.  And there's still some discovery out there that

1    we haven't gotten back, or they haven't gotten back, which is

2    the DNA out of Mr. Benderoff's truck, I think the DNA or fiber

3    analysis out of Nick's truck, and a few other miscellaneous

4    things.

5          So, we still have some discovery issues to clean up,

6    but we're actually starting to discuss and think about motion

7    practice, which I know is wildly different depending on the

8    authorization decision, but I don't want to see another huge

9    amount of time go by and have Nick be sitting, waiting for

10    this.  If there's a time limit on it, I suppose, except for us

11    at some point becoming absolutely unable to wait any longer and

12    really forcing the issue.

13          I don't know if there's anything the Court can do or

14    if there's anything that can happen here to move this along a

15    little bit.  It's not like it just came upon them, right?  The

16    December 19 arrest date was itself several months, four or five

17    months after the date of the incident or the disappearance.

18          THE COURT:  Right, but the question about whether or

19    not the Justice Department is going to authorize seeking the

20    death penalty has nothing to do with that, right?  So, it seems

21    to me your argument in terms of the clock ticking starts when

22    you submit your package, and then they have it, and they need

23    to start reviewing.

24          But, for example, to the extent that the people who

25    are involved in the decision-making process in the Department

1    of Justice want to wait to see what package is presented on

2    behalf of Mr. Biggs, I'm not sure that's any less rational than

3    our Second Circuit waits sometimes for related cases to catch

4    up to one another so they can consider them together.  I don't

5    know the answer to that.  I have no idea how that process

6    works.  I used to know, and that was a long time ago.

7          But I think if there is motion practice to be done

8    that has nothing to do with whether or not the Justice

9    Department is going to authorize, then we should get to that,

10   because I'm sure there are some motions that are tee'd off of

11   that decision and there are others that are not.  A motion to

12   suppress might be something that would have nothing to do with

13   whether or not they're going to authorize.

14         So, I agree with you in terms of continuing to meet at

15   regular intervals, at short intervals.  And I also agree with

16   you that if there is motion practice that we can get going,

17   let's get going on it.  And I also agree with you that if you

18   want to explore, you know, how it is that there's a time limit

19   put on the Justice Department, I'll read anything you submit.

20   If you think that there's something that can be done by way of

21   Court intervention, I'm not making any promises, except I will

22   read what you submit, because you're right, this cannot go on

23   indefinitely.  I don't think anybody is predicting that.

24         Ms. Comey gave us a time frame when we were last

25   together that presumably is a time frame she was given by

171219tartaglioneC       Conference

1  somebody in the Justice Department.  So, if they said four to

2  six months and we're 14 months into it, then somebody was not

3  telling us the truth.

4          I'm not saying we wait until then to say, oh, wait a

5  minute, you weren't telling us the truth, but when we bump into

6  the outer edges of that time estimate, then I think it's fair

7  to start not just asking questions, but asking questions with a

8  little emphasis.  And if there's more to be done --

9          MR. BARKET:  I think at this stage, I raise this now

10 without anything the defense is going to do now because we

11 don't yet have the discovery completed.  So whatever steps we

12 would take in a case absent that, we would still be waiting for

13 the discovery to be complete.  So that's probably the next

14 event that we would like to kind of have that wrapped up so

15 that there's not any other DNA or forensic testing that's out

16 there.

17         THE COURT:  But if, for example, and I'm not

18 suggesting that this is the case, but if, for example, you

19 wanted to suppress, you know, fruits of a search, you wanted to

20 suppress post-arrest statements, I don't know why we would wait

21 to get that tee'd up.

22         MR. BARKET:  Yes.  There actually are some reasons,

23 depending on the context.  It's not something we haven't

24 thought about.

25         THE COURT:  All right.  I'm sure that's true.

171219tartaglioneC        Conference

1      MR. BARKET:  But for now, I wanted to raise the time

2  issue because it really is becoming increasingly concerning to

3  us, especially the context.  It's not as if we just have --

4  we're just waiting on us.  Now we have somebody who is several

5  months, a number months, half a year or more behind us, and

6  looking at that and then whatever take place afterwards.

7  Hopefully, the forensics, the discovery can be -- we can let

8  known that discovery will be done, and then come back and check

9  some more.

10      THE COURT:  Okay.

11      Ms. Comey.

12      MS. COMEY:  A most recent message from Quantico is

13  that a draft report is finished, we are waiting on a supervisor

14  to review it, and I've been told that it's been moved to the

15  top of that supervisor's stack.  So the hope is that we'll get

16  that soon and then we'll not have anything else from Quantico

17  that we're waiting on.

18      THE COURT:  So as in "soon" as in weeks soon?

19      MS. COMEY:  They were not willing to commit.

20      THE COURT:  Okay.  It doesn't sound like it's -- I

21  mean, it's a good thing that it's at the top of the pile, so

22  one would hope that does mean weeks.  And maybe, when we agree

23  on a conference date, you could suggest to them that it would

24  be really, really, really bad if something on the top of the

25  pile didn't move between now and well before that next

171219tartaglioneC        Conference

1  conference.

2          MS. COMEY:  Yes, your Honor.

3          THE COURT:  Right?  If there's anything else you want

4  me to do, you'll let me know.

5          MR. BARKET:  I appreciate it, Judge.  We're not asking

6  for anything else at this point.

7          THE COURT:  I appreciate the heads up.  All right.

8          So a conference date 30 to 45 days out is what you all

9  are looking for?

10          MR. BARKET:  Yes.

11          THE COURT:  How about February 5 at 10:30?

12          MR. BARKET:  Is that a --

13          THE COURT:  That's a Monday.

14          MR. BARKET:  I'm actually --

15          THE COURT:  You're on trial, not available that day?

16          MR. BARKET:  Not available that day.

17          THE COURT:  Are you available that week?

18          MR. BARKET:  Yes, I'm actually -- I think I'm back in

19  the state on the fifth or sixth of that week.

20          THE COURT:  Okay.

21          THE CLERK:  The seventh?

22          MR. BARKET:  The seventh is fine.

23          THE COURT:  At 10:00.

24          Ms. Comey, does that work for you?

25          MS. COMEY:  Yes.  Thank you, your Honor.

171219tartaglioneC      Conference

1              THE COURT:  Mr. Stern.

2              MR. STERN:  It does.

3              THE COURT:  Does that work?

4              MS. LEISENNING:  That works.

5              THE COURT:  February 7 at 10:00 o'clock.  Don't give

6    them that date.  Give them an earlier date, because that seems

7    like too far away.  It seems like two months away.

8              Any objection to excluding time from now until

9    February 7?

10             MS. COMEY:  No.

11             MR. BARKET:  I'm sorry, Judge.  What was what?

12             THE COURT:  Any objection to excluding time between

13   now and February 7?

14             MR. BARKET:  No.

15             MR. STERN:  No.

16             THE COURT:  Then I will prospectively exclude time

17   from today until February 7 of 2018, because I find it's in the

18   interest of justice to do so.  That finding is based on the

19   fact that counsel need time to review the discovery, prepare

20   whatever submissions need to go to the Justice Department, and

21   then also review discovery for any potential motions that might

22   be filed, and it gives the government one last chance to get

23   the forensic report done.  And so now that it's at the top of

24   the pile, we have every reason to think it's going to be

25   forthcoming soon.

171219tartaglioneC        Conference

1              I find that the interest of justice from this

2    exclusion outweighs each defendant's and the public's interest

3    in a speedy trial.  The finding is made pursuant to 18 U.S.C.

4    Section 3161(h)(7)(A).

5              Anything else?

6              MS. COMEY:  Not from the government, your Honor.

7              THE COURT:  Anything else?

8              MR. BARKET:  Not from us.  Thank you.

9              MR. STERN:  Nothing.

10             THE COURT:  We're adjourned.

11             Thank you.  Happy holidays.

12                  - - -

13   Certified to be a true and correct

14   transcript of the stenographic record

15   to the best of my ability.

16   _____

     U.S. District Court
17   Official Court Reporter

18

19

20

21

22

23

24

25