UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------- x

IN THE MATTER OF THE APPLICATION :
OF THE UNITED STATES OF AMERICA :
FOR AN ORDER PURSUANT TO :           SEALED APPLICATION
18 U.S.C. §§ 2703(c) and 2703(d) DIRECTING :     16 MJ 3766
AT&T, SPRINT/NEXTEL, T-MOBILE, :
METRO PCS  AND VERIZON WIRELESS TO :
DISCLOSE CELL TOWER LOG INFORMATION :

-------------------------------------------------------------- x

MAURENE COMEY affirms as follows:

1.    I am an Assistant United States Attorney in the office of Preet Bharara, United States Attorney for the Southern District of New York, and, as such, I am familiar with this matter. I am an attorney for the Government as defined by Rule 1(b)(1) of the Federal Rules of Criminal Procedure, and therefore, pursuant to Title 18, United States Code, Sections 2703(c)-(d), I may apply for an order as requested herein.

2.    The Government is seeking an order, pursuant to Title 18, United States Code, Sections 2703(c) and 2703(d):

a.    Requiring AT&T, SPRINT/NEXTEL, T-MOBILE, METRO PCS and VERIZON WIRELESS, providers of electronic communication service within the meaning of 18 U.S.C. § 2510(15), to disclose historical cell tower log information, including records identifying any wireless telephone call (including the number of the locally-served wireless telephone and the number calling or called by it) utilizing the cellular towers servicing calls at and near the following addresses at the following times, including but not limited to calls initiated before or terminated after the specified time periods (the "Requested Cell Tower Log Information"):

1

S_NT_001533

SENSITIVE MATERIAL

   i.      69 Brookside Avenue, Chester, New York, at any point during the time period from 12:00 a.m. EST on April 11, 2016 to 11:59 p.m. EST on April 11, 2016.

   b.      Precluding the named providers from disclosing to the subscriber or customers or to any other person this Application, any order issued in connection with this Application, or the fact of disclosure of such records to the requesting governmental entities or the existence of this investigation, pursuant to 18 U.S.C. § 2705(b); and

   c.      Sealing this Application, the Court's Order, and any related documents.

## Section 2703 of the Stored Communications Act Provides Authority For Disclosure of Historical Cell Site Location Information From Cell Towers

3.      Title 18, United States Code, Section 2703 unambiguously states that the government may require "a provider of electronic communication service" to disclose "a record or other information pertaining to a subscriber to or customer of such service (not including the contents of communications)" pursuant to a 2703(d) order.  See 18 U.S.C. § 2703(c)(1).  As explained below, cell-site information satisfies each of the three elements necessary to fall within the scope of this provision.[1]

4.      First, a cellular telephone phone company is a provider of electronic communication service.  "Electronic communication service" is defined to mean "any service which provides to users thereof the ability to send or receive wire or electronic communications."

---

[1]      Although cell-site information is not defined by the Stored Communications Act ("SCA"), codified in 18 U.S.C. §§ 2701-2712, the SCA, like the Wiretap Act and the pen register statute, does not include definitions for specific technologies.   Instead, the SCA is based on certain technology-neutral categories of information, such as "contents" of communications and "records and other information . . . not including contents of communications."   The rules for compelled disclosure of such categories of information are the same regardless of the particular technology (such as e-mail or a cell phone) used by a customer.

2

S_NT_001534

SENSITIVE MATERIAL

18 U.S.C. §§ 2510(15) & 2711(1).  Cellular telephone service providers provide their customers with the ability to send wire communications, and thus they are providers of electronic communication service.  See 18 U.S.C. § 2510(1) (defining wire communications).

5.       Second, cell-site information constitutes "a record or other information pertaining to a subscriber to or customer of such service (not including the contents of communications)." Historical cell-site information is a record stored by the provider concerning the particular cell tower used by a subscriber to make a particular cell phone call, and it is therefore "a record or other information pertaining to a subscriber to or customer of cellular telephone service."  See In re Application of United States for an Order for Disclosure of Telecommunications Records, 405 F. Supp.2d 435, 444 (S.D.N.Y. 2005) (noting that prospective cell-site data is "information" and "'pertain[s]' to a subscriber to or customer of cellular telephone service").  Typically, cell-site records include, for each call made or received by a cellular telephone customer:   (a) the date and time of the call; (b) the telephone numbers involved; (c) the cell tower to which the customer connected at the beginning of the call; (d) the cell tower to which the customer was connected at the end of the call; and (e) the duration of the call.  See, e.g., In re Application of the United States for an Order for Prospective Cell Site Location Info., 460 F.Supp.2d 448, 459 (S.D.N.Y. 2006) (discussing availability of prospective cell-site information and noting the nature of the records provided).

6.       Third, cell-site information is non-content information, as it does not provide the content of any phone conversation the user has over the cell phone.  See 18 U.S.C. § 2510(8) (defining the "contents" of a communication to include information concerning its "substance,

3

S_NT_001535

SENSITIVE MATERIAL

purport, or meaning"). Thus, because historical cell-site information satisfies each of the three elements of § 2703(c)(1), its disclosure may be compelled pursuant to 2703(d) order.

7.      Though the statute is unambiguous and thus resort to the legislative history is unnecessary, the legislative history of § 2703(c)(1) further confirms that it encompasses cell-site information.   When the Stored Communications Act ("SCA"), including Section 2703, was first enacted as part of the Electronic Communications Privacy Act ("ECPA") in 1986, it permitted disclosure pursuant to 2703(d) order (or subpoena) of the same catch-all category of "record[s] or other information pertaining to a subscriber or customer of such service (not including the contents of communications)," now codified at 18 U.S.C. § 2703(c)(1). See ECPA § 201, P.L. 99-508, 100 Stat. 1848, 1862 (1986).   The accompanying 1986 Senate report emphasized the breadth of the "record or other information" category of information: "[t]he information involved is information about the customer's use of the service not the content of the customer's communications."   S. Rep. No. 541, 99th Cong., 2d Sess., at 38 (1986), reprinted in 1986 U.S.C.C.A.N. 3555, 3592 (1986).   Moreover, cellular telephones were one of the new technologies of particular importance to Congress when it enacted ECPA, so there is no basis to exclude cellular telephone usage records from the scope of § 2703.   See H.R. Rep. No. 647, 99th Cong., 2d Sess., at 20-21 (1986).

8.      When the SCA was initially enacted in 1986, the government could compel disclosure of all non-content "record[s] and other information pertaining to a subscriber or customer" pursuant to a subpoena or 2703(d) order, and the legal standard for obtaining a 2703(d) order was low:   2703(d) orders were issued based on a finding that the information sought by the

4

S_NT_001536

SENSITIVE MATERIAL

government was "relevant to a legitimate law enforcement inquiry."  See ECPA § 201, P.L. 99-508, 100 Stat. 1848 (1986).  However, in 1994, Congress modified § 2703(c) by creating a distinction between basic subscriber records (e.g., subscriber name, address, and identity information) and more detailed transactional data.  See CALEA § 207, Pub. L. No. 103-414, 108 Stat. 4279 (1994).  As a result of this change, the government is still permitted to subpoena basic subscriber information.  See 18 U.S.C. § 2703(c)(2).[2]  However, the government is now required to use a 2703(d) order or warrant to compel disclosure of more detailed non-content records, such as cell-site information or a log of the addressees of all past e-mail sent or received through an e-mail account.  In addition, Congress raised the standard for 2703(d) orders, requiring that 2703(d) orders be issued only if the government offers "specific and articulable facts showing that there are reasonable grounds to believe that the . . . records or other information sought are relevant and material to an ongoing criminal investigation."  See CALEA § 207, Pub. L. No. 103-414, 108 Stat. 4279 (1994).

9.      Accordingly, because the historical cell site location information requested herein satisfies the three elements necessary to fall within the scope of Section 2703, compelled disclosure is authorized under the Stored Communications Act.

## The Investigation

10.     The Federal Bureau of Investigation ("FBI") and the New York State Police ("NYSP") are conducting an investigation into NICHOLAS TARTAGLIONE, ███████████ ███████████ and others known and unknown (the "TARGET SUBJECTS") who are

---

[2] Although the government may use a subpoena to compel disclosure of basic subscriber information, use of a 2703(d) order or warrant is also permissible.  See 18 U.S.C. § 2703(c)(2).

5

S_NT_001537

SENSITIVE MATERIAL

believed to be participants in kidnapping and murder in aid of racketeering activity, in violation of Title 18, United States Code, Section 1959(a)(1), among other statutes (the "TARGET OFFENSES").

11.    It is believed that one or more of the TARGET SUBJECTS may have used cellular telephones in the vicinity of the location enumerated in paragraph 2(a) in connection with the TARGET OFFENSES.

12.    From speaking with an Investigator with the NYSP, I have learned, in substance and in part, among other things, specific and articulable facts that lead the Government to believe that the information likely to be obtained from the Requested Cell Tower Log Information is relevant and material to the ongoing criminal investigation into the TARGET OFFENSES. Specifically, at the location listed above in paragraph 2a, during the approximate time indicated, four males ("Victim-1," "Victim-2," "Victim-3," and "Victim-4," collectively, the "Victims") were last seen alive. The approximate times are known from, among other things, surveillance videos.

13.    I know from speaking with an NYSP Investigator that the Victims were reported missing after they all drove together to Chester, New York on April 11, 2016.[3]   That afternoon, surveillance videos captured the Victims driving a Chevy Equinox (the "Victims' Vehicle") to a parking lot and parking in the vicinity of 69 Brookside Avenue, Chester, New York.   Surveillance videos further captured the Victims exiting their vehicle and entering a bar/restaurant at that address called the Likquid Lounge, which is owned by ████████████████████   After the

---

[3] The Victims all reside in or around Orange County, New York.

6

SENSITIVE MATERIAL

Victims entered the Likquid Lounge, surveillance video captured an individual matching the description of NICHOLAS TARTAGLIONE driving a black Ford Explorer (the "TARGET VEHICLE")[4] into the Likquid Lounge parking lot, parking the TARGET VEHICLE, and entering the Likquid Lounge. Approximately one hour later, surveillance video captured the same individual believed to be NICHOLAS TARTAGLIONE exiting the Likquid Lounge, entering the TARGET VEHICLE, turning the TARGET VEHICLE around, backing into the same parking spot so that the trunk of the TARGET VEHICLE faced the entrance to the Likquid Lounge, opening the trunk of the TARGET VEHICLE, and reentering the Likquid Lounge. Subsequently, surveillance video captured the same individual believed to be NICHOLAS TARTAGLIONE, Victim-3, and an unidentified individual exiting the Likquid Lounge, walking to the open trunk of the TARGET VEHICLE, and looking inside it before reentering the Likquid Lound. Approximately thirty minutes later at approximately 6:08 p.m., the same individual believed to be NICHOLAS TARTAGLIONE and the same unidentified individual exited the Likquid Lounge again while carrying an unidentified large, heavy object.[5] The individual believed to be NICHOLAS TARTAGLIONE and the unidentified individual then placed the unidentified object into the trunk of the TARGET VEHICLE. Surveillance video further shows that the TARGET VEHICLE physically dropped lower with the weight of the unidentified object. Shortly after loading the TARGET VEHICLE, the individual believed to be NICHOLAS TARTAGLIONE drove it out of the Likquid Lounge parking lot. None of the Victims has been seen or heard from

---

[4] NICHOLAS TARTAGLIONE is the registered owner of a black Ford Explorer.
[5] The object was obstructed from view on the surveillance video by other parked vehicles and could not be identified.

S_NT_001539

SENSITIVE MATERIAL

since they last entered the Likquid Lounge on April 11, 2016.

14.    On April 15, 2016, the Victims were reported missing.   On April 16, 2016, the Victims' Vehicle was recovered in the same parking spot where the Victims parked it on April 11, 2016. ████████████████████████████████

15.    On prior occasions in relation to other investigations, local police officers in Chester, New York have previously requested surveillance video from inside the Likquid Lounge, which the management has voluntarily provided.   Based on this prior cooperation, on or about April 16, 2016, a local police officer investigating the Victims' disappearance entered the Likquid Lounge to request any surveillance video from inside the Likquid Lounge taken on April 11, 2016. In response, however, an unidentified employee stated that the video surveillance system was broken and escorted the officer off the premises.   As a result, the only available surveillance footage of the Likquid Lounge from April 11, 2016 is the external footage described above, which was provided by neighboring establishments.   On or about May 6, 2016, the Likquid Lounge closed for renovations.

16.    I know from speaking with an Investigator of the NYSP that two of the Victims and two of the TARGET SUBJECTS have previously been identified engaging in activity that appears related to drug trafficking.   Specifically, as early as April 8, 2011, Victim-1 and Victim-2, who reside in the Middletown, New York area, were stopped for speeding while heading southbound in Sulfur, Louisiana in a rental vehicle with $126,000 cash.   More recently, in or around December 2015 and January 2016, ████████████████████ and Victim-1 checked into the Residence Inn in Houston, Texas.   Subsequently, on February 9, 2016, Victim-1 and Victim-2 were stopped

8

S_NT_001540

SENSITIVE MATERIAL

for speeding while heading southbound in Mississippi in a Nissan Armada registered to NICHOLAS TARTAGLIONE. That same day, Victim-1 and Victim-2 checked into the Residence Inn in Houston, Texas, checking out the next morning. The next day, February 10, 2016, Victim-1 and Victim-2 were again stopped for speeding in Houston, Texas. During the February 10 stop, law enforcement found a hollowed out tire inside the vehicle with Victim-1 and Victim-2. The tire was so tightly secured to the undercarriage of the vehicle that law enforcement required the assistance of a mechanic to remove the tire from the Nissan Armada.



On March 22, 2016, Victim-1 departed from JFK airport to Mexico. Victim-1 returned to New York from Mexico April 9, 2016, two days before the Victims were last seen alive at the Likquid Lounge.[6]

17.     I know from speaking with an Investigator from the NYSP and from reviewing law enforcement reports that since at least in or about 2015, the NYSP has been investigating potential

---

6



S_NT_001541

SENSITIVE MATERIAL

drug trafficking and money laundering activity by NICHOLAS TARTAGLIONE.   The investigation revealed that NICHOLAS TARTAGLIONE received multiple steroid deliveries to his residence in Carmel, New York, increasing in quantity from 2013 through in or about 2015. Additionally, investigators learned that NICHOLAS TARTAGLIONE owns multiple luxury vehicles and regularly makes a large amount of cash deposits at various ATMs as well as cash used at Connecticut casinos, totaling tens of thousands of dollars in cash from unknown sources. NICHOLAS TARTAGLIONE is presently on disability and owns a pet grooming store, the reported income from which does not explain the source of these various cash deposits. Additionally, during the course of this investigation, the NYSP conducted two controlled purchases of anabolic steroids from NICHOLAS TARTAGLIONE:

a.



10

S_NT_001542

SENSITIVE MATERIAL



b.

11

S_NT_001543

SENSITIVE MATERIAL

18.     Based on the forgoing, I respectfully submit that there is reason to believe that the TARGET SUBJECTS engaged in the TARGET OFFENSES by participating in the murder and/or kidnapping of the Victims in order to maintain or increase position in an ongoing drug trafficking enterprise on or about April 11, 2016 in and around the Likquid Lounge, which is located at 69 Brookside Avenue, Chester, New York.

19.     Once the Requested Cell Tower Log Information is obtained, the FBI and NYSP will analyze it and determine telephone numbers that match telephone number information that the FBI and NYSP learns and has learned during the investigation concerning the TARGET SUBJECTS from subpoenas, pen register and trap and trace orders and other methods, and therefore are likely to be telephone numbers used by the TARGET SUBJECTS during the commission of the TARGET OFFENSES.   Additionally, the FBI and NYSP intend to analyze the Requested Cell Tower Log Information from the date of the Victims' disappearance in order to identify potential witnesses who may have observed the Victims and/or the TARGET SUBJECTS at the Likquid Lounge on April 11, 2016.   Accordingly, the Requested Cell Tower Log Information is relevant and material to the ongoing investigation into the TARGET OFFENSES.

20.     The Government requests that the above-referenced service providers or anyone who has been authorized to provide assistance to the applicant be ordered, pursuant to 18 U.S.C. § 2705(b), not to disclose the provision of subscriber information, toll records, and cell site information to the subscribers of any cellphone that utilized the above-referenced cell towers or to any other person, unless and until otherwise ordered by the Court.   Pursuant to § 2705(b), such disclosure would severely jeopardize this investigation because it would reveal the existence of the

12

S_NT_001544

SENSITIVE MATERIAL

investigation being conducted by the FBI and the NYSP.

    21.    This is the first application for the relief sought herein.

    22.    The foregoing is affirmed under the penalties of perjury, pursuant to Title 28,

United States Code, Section 1746.

Dated: White Plains, New York
        June 14, 2016

                Maurene Comey
                Assistant United States Attorney
                Southern District of New York
                (914) 993-1933

13

SENSITIVE MATERIAL