UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

| | |
|---|---|
| UNITED STATES OF AMERICA, | : |
| | : |
| | : |
| | : |
| -against- | :  **MOTION TO SUPPRESS** |
| | :  **STATEMENT** |
| | : |
| | :  **CASE: 16-CR-832(KMK)** |
| NICHOLAS TARTAGLIONE, | : |
| | : |
| Defendant. | : |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x


DEFENDANT NICHOLAS TARTAGLIONE' S MOTION TO SUPPRESS
STATEMENTS AND FOR AN EVIDENTIARY HEARING


**Counsel for Mr. Tartaglione:**

Barket Epstein Kearon Aldea & LoTurco, LLP
666 Old Country Road, Suite 700
Garden City, NY 11530

By: Aida Ferrer Leisenring, Esq.
    Bruce A. Barket, Esq.

INTRODUCTION

Defendant Nicholas Tartaglione, through undersigned counsel, respectfully moves this Court pursuant to Federal Rule of Criminal Procedure 12(b)(3)(c) and the Fifth and Sixth Amendments of the United States Constitution, for an Order suppressing any and all statements allegedly made by him to law enforcement agents in the course of a custodial interrogation as evidence against him in the prosecution's case-in-chief, as rebuttal evidence, and as impeachment evidence, as well as any evidence gathered as a result of those statements, or, in the alternative, for an evidentiary hearing.

Mr. Tartaglione (herein "Tartaglione") submits the following:

Tartaglione is charged with capital murder in the deaths of four individuals in connection with a conspiracy to distribute and possess with intent to distribute a controlled substance, in violation of Title 21, United States Code, Section 841(a)(1). The government is seeking the death penalty. Tartaglione is a 52-year-old married man and former police officer with no criminal convictions.

On December 19, 2016, a superseding indictment was filed under indictment number S1 16 Cr. 832 (KMK). On December 19, 2016, Tartaglione was arrested on the aforementioned indictment. The government seeks to use the following four statements made by Tartaglione to law enforcement on December 19, 2016.

**Statement 1:** ███████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████ ████████ [1].

**Statement 2:** The second statement, surreptitiously recorded by arresting officer, Investigator James Browne, and made to Investigator Brian Hammer, occurred shortly after ████ ████████████ and after a traffic stop of Tartaglione near the corner of Long Lane and Highway 17K in Bloomingburg, New York. The statement continued on inside of Investigator Brian Hammer's BCI police vehicle during Tartaglione's transportation to the Montgomery State Police Barracks. See Exhibit B, Audio Recording, & Transcript. Tartaglione was not issued *Miranda* warnings prior to this statement. The subject matter of the statement was the four missing victims, Tartaglione's contacts with them, and his contacts with other cooperating co-conspirators.

The government claims that just prior to making this statement, Tartaglione was advised by Investigator Hammer that his black Jeep may have been involved in a road rage incident on the previous night. Tartaglione allegedly responded, "Jesus, I hope no one was killed." See Exhibit C, BCI-21 Lead Worksheet. This statement was not captured by the audio recording. When his cell phones were taken by law enforcement, Tartaglione allegedly stated that the phone in his hand was his personal use phone and that the one in his pocket was his "Mexican" phone, to be used by Mexican workers. It is further alleged that, upon placing him in the passenger rear side seat, in the presence of Trooper Brad Natalisio, Tartaglione immediately stated, "This is about the missing Mexicans isn't it?" See Exhibit D, BCI-21 Lead Worksheet. This statement is also not captured by the audio recording.

---

[1] The transcripts for all audio or video recordings (attached as exhibits) are provided under separate cover as an aid to assist the Court in its review of the audio and video recordings. The transcripts are not a substitute to such audio and video recordings as they do not accurately reflect certain statements that are inaudible or difficult to discern. Accordingly, they are not exhibits.

**Statement 3:** The third statement was made at the Montgomery State Police Barracks just minutes after Tartaglione arrived and within minutes of making his second statement. This statement was taken by Investigators Hammer and Browne and video recorded. See Exhibit E, Video Recording & Transcript.  The subject matter of the statement was the four missing victims, Tartaglione's contacts with them, and his contacts with other cooperating co-conspirators. Mr. Tartaglione was issued *Miranda* warnings prior to making this statement.

**Statement 4:** The fourth statement occurred on the same day and while Tartaglione was being transported by Investigator Hammer from the barracks to his arraignment at 300 Quarropas Street, White Plains, New York. Tartaglione allegedly stated, "fucking Mexicans." See Exhibit F, BCI-21 Lead Worksheet. Prior to making this statement, Tartaglione had requested an attorney.

Tartaglione respectfully moves this Court to suppress statements two, three, and four as they were products of custodial interrogation in violation of *Miranda* and his Fifth and Sixth Amendment rights. See Exhibit H, Affidavit of Nicholas Tartaglione.[2]

STATEMENT OF FACTS

On December 19, 2016, ████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

---

[2] This Affidavit will be signed shortly. Although Mr. Tartaglione has authorized the filing of this affidavit we are scheduling for a notary to be a witness to his signature.



At approximately 10:45 AM that same day, Tartaglione's wife, Virag Balint, got into a black Jeep registered to Tartaglione and drove down Long Lane. Within ten minutes, on her way back up Long Lane, she was pulled over by two marked police vehicles and one unmarked law enforcement vehicle. The two marked cars blocked off the intersection. A fourth law enforcement truck and a fifth police vehicle also arrived. Some of the vehicles were flashing their police lights. See Exhibit G, Video Surveillance of Vehicle Stops.

Ms. Balint contacted Tartaglione and told him that she had been stopped by police. See Ex. C. Shortly thereafter, Tartaglione got into his black truck, drove out of his driveway, made a right-hand turn onto Long Lane, and then slowed down near the intersection where Ms. Balint's Jeep was stopped and where at least one law enforcement vehicle was stopped in front of her with its lights flashing. A law enforcement agent on foot approached Tartaglione's truck and directed Tartaglione to park his truck behind an officer's car, which had its police lights flashing. Tartaglione complied. He then exited his vehicle and was approached by an officer who spoke to him by the hood of Tartaglione's truck. A black truck belonging to a law enforcement agent then

---

[3] According to the government, ████████████████████████████████████████
████████

pulled up and parked directly behind Tartaglione's truck, so that both law enforcement vehicles were parallel parked directly in front of and behind Tartaglione's truck. A third marked police vehicle then pulled up and parked to the side of Tartaglione's truck, essentially blocking off all traffic and preventing Tartaglione from driving his truck away. A second officer approached Tartaglione on foot. A third and fourth officer stepped out of their vehicles and also approached Tartaglione. Tartaglione was cornered by four officers and three law enforcement vehicles. At least two of those officers were wearing law enforcement jackets and another one was in a suit[4]. A fifth officer also stood on the road nearby. During this entire time, Tartgalione's wife was one car's length away inside of her Jeep. See Ex. G.

As depicted by the video surveillance of Tartaglione's detainment that day, when Tartaglione stepped forward, the officers placed their hands on him, held his arm(s) up, and frisked him. At least two officers placed their hands on him and rummaged through his person, while the other two officers stood guard. Then, an investigator told him, "Tell you what, we're gonna have a seat in the back of the car over here."  See Ex. B, & Tr., P. 3. Next, approximately 3 to 4 officers physically escorted him to Investigator Hammer's vehicle and placed him in the backseat. The video surveillance also appears to depict an investigator getting into the vehicle, in the backseat next to where Tartaglione is seated. See Ex. G.  The other officers conferred outside among themselves and discussed whether to tow Tartaglione's truck, then Investigator Hammer got into the front seat of the vehicle in which Tartaglione sat and drove away.

During this police encounter and throughout the drive to the barracks, Investigators Hammer and Browne interrogated Tartaglione about his knowledge of and contacts with Luna. Investigator Hammer asked Tartaglione, "When was the last time you actually saw Martin…and those guys?" See Exhibit B, & Tr., P.5. Investigator Hammer also asked him what kind of work

---

[4] These officers appeared to be from a range of agencies.

Luna and others did for him, at which location they did the work, what kind of vehicle Tartaglione sold to Luna, what form of contact he had with Luna, whether Tartaglione knew the names of the other missing persons, how Tartaglione would get in touch with Luna, and who the liaison was between Tartaglione and the victims. They also questioned him about ███████ ████████████████████, about a cut-out tire indicative of drug trafficking belonging to a vehicle owned by Luna, what Luna's ties were to the cartel, how long Luna and others did labor for Tartaglione, and whether he knew when they went missing. In addition, they questioned him about his interactions with ██████, how much an investment ██████ had asked Tartaglione to make, the identity of the Chester Police Officer with whom Tartaglione discussed Luna, and what kind of work ████ did for him. Investigator Hammer also asked him about his knowledge of Luna's drug trafficking activities. <u>See</u> Ex. C.

Tartaglione responded to all of Investigator Hammer's inquiries. He divulged his contacts and relationships to Luna, ████, ██████ and other Mexican laborers, the date of his last contact with Luna, his knowledge of drug trafficking activity by Luna, his observation of a cut-out tire in one of the vehicles Tartaglione had sold to Luna, that ██████ requested he invest in an after-school program, that he met ██████ and Luna in person, and his knowledge that Luna was missing from the news. <u>See</u> Ex. B.

When they arrived at the Montgomery State Police Barracks, at 11:23 AM, Investigator Browne told Tartaglione that they would be sitting down for a few minutes to go over everything they had just discussed. <u>See</u> Ex. B, & Tr. P. 33 ("We're just going to sit down for a few minutes. We'll talk about…basically everything you're just telling us now.") Tartaglione expressed that he was trying to get his job as a police officer back and how damaging it would be to his employment prospects to have his name associated with these missing individuals, or to have his

name linked to the hiring of illegal aliens. Investigator Hammer assured him that they were not looking to do damage his reputation with respect to illegal workers.

Tartaglione was placed in an interrogation room at 11:29 AM. Investigators Hammer and James Browne entered the room at 11:33 AM. They began questioning him about his address, and whether he had recently moved there. Investigator Hammer told Tartaglione, "Like we said, we want to pick your brain about, uh, these guys, contacts, who they may have gone with, you know, where--." Tartaglione responded, "I don't know much more than I told you." See Ex. E., & Tr. P. 37. Investigator Hammer stated, "the little bit that we talked about already is definitely, uh, yeah, definitely helpful, uh, as far as the vehicle and -- to the fact that they cut a tire which means they may be involved in drugs and stuff like that, so we do wanna go through that. Uh, uh, so before we get into that stuff there, uh, uh, you've done this before many times. We have to do it to cover ourselves and cover everybody else." See Ex. E, & Tr. P. 38-39. Before reading Tartaglione *Miranda* warnings, Investigator Hammer, once again, reiterated that he was going to go over the same information Tartaglione had already divulged but needed to recite *Miranda* warnings to him first: "So I'm gonna read it to you. Uh, you probably. You could probably recite it to me, you know. Uh, so we gotta go through that and then we'll go back to, you know, uh, what their habits were, uh, who they hung around with or did you ever see anybody else in the car with them, that kind of stuff." See Ex. E, & Tr. P. 38-39.

Investigator Hammer then read him *Miranda* warnings. Tartaglione indicated that he understood the rights and that he wished to speak. Investigator Hammer then questioned him regarding the same subject matters that they discussed in the vehicle on their way to the barracks. He asked him about his relationship to Luna and the other three missing victims, and to ███ and ██. He questioned him about his last contacts with Luna and about Luna's relationship to

drug trafficking. He also questioned him about his ties to the Likquid Lounge and when he had last gone there. Tartaglione repeated the information he had previously relayed to Investigators Hammer and Browne.

Mainly, Tartaglione admitted that he knew Luna, that Luna had worked for him, that he had sold Luna a vehicle, that he noticed the tire in that vehicle had been cut out, that he was aware of his ties to drug trafficking, that he had followed the story of the four missing persons in the news, that he was told they had fled to Columbia or Mexico. In addition, Tartaglione stated that he had only been to the Likquid Lounge once when it had first opened. The interview ended at 12:43 PM after Investigator Hammer told Tartaglione that he was being arrested for Murder and Conspiracy to Drug Traffic in federal court. <u>See</u> Ex. E.

After being told he was under arrest, Tartaglione promptly requested an attorney. <u>See</u> Ex. E, & Tr. P. 117 ("I need a lawyer in here.") Investigator Hammer said he would stop questioning him. Tartaglione asked a second time to speak to his attorney. <u>See</u> Ex. C, & Tr. P. 117. Investigator Hammer indicated that he was unsure whether Tartaglione could avail himself of counsel or make a phone call in the barracks or whether he had to wait until his arraignment because it was a federal case and Hammer was unfamiliar with federal protocol. <u>See</u> Ex. E, & Tr. P. 120. However, he promised, "whatever needs to be done, we'll …we'll make arrangements to get it done." <u>See</u> Ex. E, & Tr. P. 118. Tartaglione asked whether he could call his wife to request medication. He informed him that he takes painkillers and that he was in pain. Tartaglione was denied the opportunity to make any calls to his wife or to his lawyer. Tartaglione twice gave Investigator Hammer his attorney's name, "Andy Rubin." <u>See</u> Ex. E, & Tr. P. 121.  Investigator Hammer acknowledged that "he just lawyered up." <u>See</u> Ex. E, & Tr. P. 123. Nonetheless, Investigator Hammer continued to discuss the case with Tartaglione in the barracks and while

transporting him in a vehicle to his arraignment. During that car ride, while Investigator Hammer was still discussing the case with Tartaglione, Tartaglione allegedly stated, "fucking Mexicans."

ARGUMENT

**I.    Tartaglione's pre-*Miranda* statements should be suppressed
       as the product of custodial interrogation**

The Supreme Court has firmly established that *Miranda* warnings are required prior to custodial interrogation, and that a statement obtained in violation of this doctrine must be suppressed. <u>See</u> *Miranda v. Arizona*, 384 U.S. 436 (1966). A suspect is "in custody" for purposes of *Miranda* "when placed under formal arrest or when a reasonable person in the suspect's position would have understood the situation to constitute a restraint on freedom of movement of the degree which the law associates with formal arrest." <u>See</u> *United States v. Bengivenga,* 845 F.2d 593, 596 (5th Cir. 1988). When a subject is not under formal arrest, the "test used in determining whether a defendant was in custody is an objective one that (a) asks whether a reasonable person would have understood herself to be subjected to restraints comparable to those associated with a formal arrest, and (b) focuses upon the presence or absence of affirmative indications that the defendant was not free to leave. An accused is in custody when, even in the absence of an actual arrest, law enforcement officials act or speak in a manner that conveys the message that they would not permit the accused to leave." <u>See</u> *United States v. Kirsh,* 54 F.3d 1062, 1067 (2d Cir. 1995) (internal quotation marks and citation omitted), *cert. denied,* 516 U.S. 927 (1995). <u>See</u> <u>also</u> *Tankleff v. Senkowski*, 135 F.3d 235, 243–44 (2d Cir. 1998); *Thompson v. Keohane,* 516 U.S. 99, 112 (1995)(custody exists for *Miranda* purposes if a reasonable person in that position would "have felt he or she was not at liberty to terminate the interrogation and leave.")

Factors relevant to determining whether a suspect is in custody include "whether a suspect is or is not told that she is free to leave; the location and atmosphere of the interrogation; the language and tone used by the police; whether the suspect is searched, frisked, or patted down; and the length of the interrogation." See *Tankleff v. Senkowski*, 135 F.3d 235, 244 (2d Cir. 1998) (citations omitted). In *United States v. Butt*, the Southern District held that, although the defendant was in his home, "the conditions in his home made it a police controlled setting akin to a station that is cut off from the outside world….[defendant] was outnumbered by officers from a range of agencies who separated him from his spouse, dispersed throughout his home, and did not permit him to freely move about during the search.") See *Butt*, No. 18-CR-00087 (NSR), 2019 WL 479117, at 17 (S.D.N.Y. Feb. 7, 2019). See also *United States v. Tirado*, No. 1:17-CR-668-GHW, 2018 WL 3432040, at 15 (S.D.N.Y. July 16, 2018). Custody is also established when law enforcement directs a suspect into a police vehicle and takes him back to a precinct. See *United States v. Cebello*, 812 F.2d 42, 45 (2d Cir. 1987)(setting was custodial where law enforcement agents refused to allow a defendant to follow them in his own car).

With respect to Tartaglione's second pre-*Miranda* statement to law enforcement, which began on Long Lane at approximately 11 AM and continued on in Investigator Hammer's police vehicle during the drive to the barracks, Tartaglione was clearly in custody. First, the circumstances leading up to the initial police encounter were intimidating and communicated to Tartaglione that he was the focus of a police investigation. Prior to his contact with police, Tartaglione ████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ██████████████████████. Although Tartaglione was not in custody ██████████████████████████

Tartaglione had been de facto interrogated ████████████████████████████

███████████████████████████████████████████████████████████████ .

Then, within ███████████████████████████ , Tartaglione learned from his wife

that she had been pulled over by police. See Ex. D. When Tartaglione arrived to assist his wife,

an officer approached his vehicle, directed him to park on the side of the road, and then law

enforcement officers surrounded Tartaglione's vehicle with three police vehicles and a fourth

vehicle nearby at the intersection, making it impossible for Tartaglione to drive away in his

truck. Approximately 2 police vehicles' lights were flashing, and other police vehicles had

blocked off traffic. Meanwhile, his wife was a car's length away seated in a Jeep, separated from

Tartaglione. When Tartaglione stepped out of his vehicle, he was immediately surrounded by

law enforcement and physically cornered by four different officers and a fifth officer nearby.

When Tartaglione took one step forward, police placed their hands on him, held his arm, frisked

him, removed his cell phones and then physically escorted him and placed him into the back of

one of their vehicles. No reasonable person in Tartaglione's position would have felt free to

leave under those circumstances. As in *Butt*, where officers were from a range of agencies,

outnumbered the defendant, separated him from his wife, and did not permit him to move freely

about, here, the number of officers (at least 5) from what appeared to be a range of agencies,

number of police vehicles (5), and the officers' conduct—pulling over his wife, separating

Tartaglione from her, surrounding him with police vehicles, blocking off traffic, placing their

hands on him, taking custody of his cell phones, taking custody of his truck, and placing him in a

police vehicle—conveyed a very clear message: Tartaglione was not free to leave.

Moreover, Tartaglione did not voluntarily accompany investigators to the police barracks.

He had been searched and physically handled by numerous law enforcement agents. Investigator

Browne did not ask Tartaglione whether he was willing to accompany them to answer more questions back at the barracks. Rather, he stated, "Tell you what, we're gonna have a seat in the back of the car over here." <u>See</u> Ex. B, & Tr., P. 3[5]. Tartaglione was not permitted to drive his own truck to the barracks. To the contrary, investigators discussed out loud whether they would tow Tartaglione's truck or drive it to his home. This conversation occurred just moments after Tartaglione was physically escorted by four officers who then placed him in the backseat of the police vehicle. Every act and statement by law enforcement, from the moment Tartaglione drove to meet his wife to the moment he was placed in the police vehicle, conveyed to Tartaglione that he was not free to walk or drive away or move freely about.

Tartaglione was subjected to custodial interrogation without advisement of his *Miranda* rights. A person is deemed "interrogated" when he "is subjected to either express questioning or its functional equivalent" and his statements are "the product of words or actions on the part of the police" that "were reasonably likely to elicit an incriminating response." <u>See</u> *United States v. Familetti*, 878 F.3d 53, 57 (2d Cir. 2017)(citing *Rhode Island v. Innis*, 446 U.S. 291, 300 (1980)). There is no question that Tartaglione was subjected to "interrogation" when he was questioned by police immediately following his car stop. Although police initially told Tartaglione that the Jeep had been involved in a "road rage" incident, their interrogation of him began long before that ███████████████████████████, and then resumed within the hour when police began asking Tartaglione questions concerning the missing victims. Investigators asked Tartaglione about the missing victims shortly after he got out of his truck and before Tartaglione got into the police vehicle. Law enforcement questioned Tartaglione about Mexican workers on his farm, and requested the name of one of the workers, specifically Luna,

---

[5] Here is an instance where the audio recording and transcript of the recording differ. In the audio recording, Investigator Browne is overheard stating, "we're gonna have a seat in the back of the car over here," (ex. B at minute 1:38-1:49) whereas the transcript erroneously reflects, "you wanna have a seat in the back over here?"

and asked Tartaglione if he had any weapons. When Tartaglione got into the police vehicle, investigators asked him about his last contacts with Luna and the other three missing persons, his contacts and communications with other cooperating co-conspirators, about vehicles Tartaglione sold to Luna and a hollowed-out tire in Luna's vehicle, about drug-trafficking activity involving the missing persons, and other questions relating to the allegations in the indictment.

Accordingly, Tartaglione's pre-*Miranda* statements to law enforcement beginning on Long Lane and continuing on in the police vehicle on the way to the police barracks should be suppressed because they were a product of custodial interrogation.

II.    **Tartaglione's post-Miranda statements should be suppressed because they were part of a continuous interrogation**

Tartaglione's post *Miranda* statements (see Ex. E) should be suppressed because they were a product of a 'deliberate, two-step strategy, predicated upon violating *Miranda* during an extended interview.' See *United States v. Tirado*, No. 1:17-CR-668-GHW, 2018 WL 3432040 (S.D.N.Y. July 16, 2018); *Missouri v. Seibert*, 542 U.S. 600 (2004).

*Miranda* warnings given mid-interrogation, after a defendant has given an unwarned confession, are ineffective. Accordingly, any subsequent confession repeated by the defendant after warnings are given is inadmissible. See *Missouri v. Seibert*, 542 U.S. 600 (2004). The Supreme Court of the United States has stated that, when a defendant has made a statement without having been issued prior *Miranda* warnings, and *Miranda* warnings are then administered, "the admissibility of any subsequent statement should turn ... solely on whether it is knowingly and voluntarily made." See *Oregon v. Elstad*, 470 U.S. 298 (1985). However, the Supreme Court has also acknowledged that such a rule may be abused by officers who deliberately withhold *Miranda* warnings in an effort to obtain a confession, obtain a confession, then administer *Miranda* warnings and then obtain a second confession. See *Missouri v. Seibert*,

542 U.S. 600, 621 (2004). Therefore, prior to evaluating the voluntariness of a second statement given after *Miranda* warnings, courts "must address whether the officers employed a 'deliberate, two-step strategy, predicated upon violating *Miranda* during an extended interview,' and if so, whether 'specific, curative steps' were taken to obviate the violation that occurred." See *United States v. Capers*, 627 F.3d. 470, 477 (2d Cir. 2010) (quoting *Seibert*, 542 U.S. at 621).

In *Seibert*, an officer questioned the defendant, Seibert, without *Miranda* warnings for 30 to 40 minutes, resulting in the defendant's confession. The arresting officer testified that the investigator deliberately withheld the issuance of *Miranda* warnings to Seibert before questioning her and that the practice was promoted within his department and by national police training organizations. After a 20 minute break, the officer then turned on a tape recorder, recited *Miranda* warnings to the defendant, and obtained a signed waiver from her. The officer then resumed questioning, confronting Seibert with her pre-*Mirandized* statements and getting her to repeat the information.

In holding that the post-*Miranda* warnings were inadmissible in *Seibert*, Justice Souter explained:

> The unwarned interrogation was conducted in the station house, and the questioning was systematic, exhaustive, and managed with psychological skill. When the police were finished there was little, if anything, of incriminating potential left unsaid. The warned phase of questioning proceeded after a pause of only 15 to 20 minutes, in the same place as the unwarned segment. When the same officer who had conducted the first phase recited the *Miranda* warnings, he said nothing to counter the probable misimpression that the advice that anything Seibert said could be used against her also applied to the details of the inculpatory statement previously elicited. In particular, the police did not advise that her prior statement could not be used. Nothing was said or done to dispel the oddity of warning about legal rights to silence and counsel right after the police had led her through a systematic interrogation, and any uncertainty on her part about a right to stop talking about matters previously discussed would only have been

> aggravated by the way Officer Hanrahan set the scene by saying "we've been talking for a little while about what happened on Wednesday the twelfth, haven't we?" The impression that the further questioning was a mere continuation of the earlier questions and responses was fostered by references back to the confession already given. It would have been reasonable to regard the two sessions as parts of a continuum, in which it would have been unnatural to refuse to repeat at the second stage what had been said before. These circumstances must be seen as challenging the comprehensibility and efficacy of the *Miranda* warnings to the point that a reasonable person in the suspect's shoes would not have understood them to convey a message that she retained a choice about continuing to talk.

*Seibert* at 2612-13.

Because, as Justice Souter pointed out, "the intent of the officer will rarely be as candidly admitted as it was [in Seibert]" (see *Id.*), to determine if a deliberate, two-step strategy was employed, courts must "review the totality of the objective and subjective evidence surrounding the interrogations in order to determine deliberateness, with a recognition that in most instances the inquiry will rely heavily, if not entirely, upon objective evidence." See *United States v. Capers*, 627 F.3d 470, 479 (2d Cir. 2010). The prosecution bears the burden of disproving deliberateness by a preponderance of the evidence. See *Id.* at 479.

There are five factors to be weighed when analyzing the effectiveness of the warning: (1) "the completeness and detail of the questions and answers in the first round of interrogation," (2) "the overlapping content of the two statements," (3) "the timing and setting of the first and second" interrogation, (4) "the continuity of police personnel," and (5) "the degree to which the interrogator's questions treated the second round as continuous with the first." See *United States v. Capers*, 627 F.3d 470, 479 (2d Cir. 2010)(citing *Seibert* at 615.)

In the instant matter, all five factors were present. First, the questions and inculpatory responses concerning Luna and the other 3 missing victims were detailed in both rounds of

questioning. Second, the content of the two interrogations and answers given by Tartaglione almost entirely overlapped. Third, the timing from the end of the first statement to the start of the second statement was a matter of mere minutes—there was no sufficiently pronounced break. The fourth factor was present—Investigators Hammer and Browne were the interrogating officers in both pre- and post-*Miranda* interrogations—and, the fifth factor is met, as the investigators explicitly treated the second round of questioning as continuous with the first by explicitly stating they wanted to go over everything they had previously discussed.

The initial interrogation conducted by investigators aware of the obvious need for a *Miranda* warning, followed just minutes later by a second, post-*Miranda* interrogation by the same investigators, on the same subject matter, under similar circumstances and with no curative language amounted to a deliberate, two-step interrogation technique designed to undermine Tartaglione's *Miranda* rights. Initially, Investigator Hammer interviewed Tartaglione concerning his knowledge of the whereabouts of Luna and others. His questions were designed to elicit incriminating information, including Tartaglione's contacts with the missing persons and other cooperating coconspirators, and his knowledge of drug trafficking activity by Luna, and information about a cut-out tire. This questioning went on for 20 to 30 minutes, during which time Tartaglione made a series of admissions. The interrogation was intentional, and conducted with the knowledge that an indictment had been filed on a capital-eligible quadruple homicide against Tartaglione and after the arrest of two co-conspirators, ███ and ███. This was not, by any means, a good-faith *Miranda*-mistake.

When Tartaglione arrived at the barracks he was re-interviewed just minutes later by the same investigators and on the exact same topic. The "impression that the further questioning was a mere continuation of the earlier questions and responses was fostered by references back" to

the statements already given. *Seibert* at 2612-13.  Investigator Browne told Tartaglione as they arrived at the barracks "Just remember, we're just gonna sit down for a few minutes. We'll talk about…basically everything you're just telling us now…." See Ex. E, & Tr. P. 33. When Tartaglione stated, "I don't know much more than I told you," Investigator Hammer stressed, "the little that we already talked about already is definitely…helpful…as far as the vehicle…and the fact that they cut a tire which means they may be involved in drugs and stuff like that…." See Ex. E, & Tr. P. 37-38. Tartaglione's pre-*Miranda* statements were clearly a product of custodial interrogation, requiring their suppression. His *Miranda* waiver, just minutes after he had been interrogated and he had already made multiple admissions, was ineffective.

Tartaglione's post-*Miranda* statement was actually the product of what was in essence his third round of interrogation. Tartaglione was subjected to interrogation and gave statements on an overlapping topic twice before being issued *Miranda* warnings. ████████████████████ ████████████████████████████████████████████. Police then questioned Tartaglione shortly after ███████████████ on the very same topic. By the time Tartaglione was issued *Miranda* warnings, he had already undergone two rounds of continuous questioning about the missing persons and their ties to drug trafficking and to Tartaglione as well as about Tartaglione's contacts with co-conspirators.

Accordingly, Tartaglione's post-*Miranda* statement should be suppressed because, even putting aside ██████████████, it was part of one continuous interrogation beginning when he was placed in the back seat of a police car and extending – without a pronounced break – into the police interrogation room, rendering his *Miranda* warnings inadequate.

### III.   Tartaglione's post-Miranda statements should be suppressed because the investigator's "preamble" invalidated the warnings.

*Miranda* warnings critically safeguard the Fifth Amendment privilege against self-incrimination and are "fundamental to our system of constitutional rule." See *Miranda v. Arizona,* 384 US 436, 467-68 (1966). The warnings are deliberately designed to ensure that an individual taken into custody by law enforcement is made aware in "clear and unequivocal terms" of his or her right to remain silent, the consequences of foregoing the right, and his or her right to consult with an attorney. See *People v. Dunbar*, 24 NY3d 304, 313-14 (2014), *citing Miranda v. Arizona,* 384 US 436, at 467-69, 473 (1966). These warnings are an "absolute prerequisite to interrogation. See *Miranda v. Arizona* at 471.  As stated in *Seibert*, "it would be absurd to think that mere recitation of the litany suffices to satisfy *Miranda* in every conceivable circumstance." See *Missouri v. Seibert*, 542 US 600, 611 (2004). Accordingly, a perfect recitation of *Miranda*, under circumstances that compromise the meaning of the rights, may require suppression.

Courts have held that any embellishments of the *Miranda* warnings or attempts to minimize them with a "scripted preface," which misleads or confuses the meaning of the rights, render the subsequent *Miranda* warnings ineffective. See *People v. Dunbar*, 24 NY3d at 316, affirming 102 AD3d 986 (2d Dept. 2013). Although not controlling, *Dunbar* is persuasive on the issue.

Here, the investigator's "preamble" to the warnings minimized their efficacy. Before reading the warnings, investigators attempted to reduce them to a mere formality by telling Tartaglione what information Tartaglione had already relayed that they wanted him to repeat, that "before we get into that stuff there, uh, uh, you've done this before many times," and that they "have to do it to cover ourselves and cover everybody else." See Ex. E, & Tr. P. 37-38.

They downplayed the importance of the warnings when they explained to him that they were being issued as a formality merely to "cover ourselves." Investigator Hammer treated the warnings like a procedural afterthought, not a substantive right, and made the reading akin to a checkmark in a box, which was provided to protect the police as opposed to protecting Tartaglione. Investigator Hammer reiterated, "So I'm going to read it to you. Uh, you probably, you could probably recite it to me, you know. So we gotta go through that and then we'll go back to, you know, uh, what their habits were, uh, who they hung around with or did you ever see anybody else in the car with them, that kind of stuff…." <u>See</u> Ex. E, & Tr. P. 39. Investigators repeatedly communicated to Tartaglione that they just wanted Tartaglione to repeat what he had already told them, they gave him examples of information he had already relayed that they wanted him to restate, and then they essentially communicated to him that before they went over that information again they had to read him his rights as an almost unnecessary formality since he was not being accused of anything. <u>See</u> Ex. E, & Tr., P. 38 ("We're not accusing you.")

Accordingly, the *Miranda* warnings issued in this case were ineffective and Tartaglione's post-*Miranda* statement should be suppressed.

**IV.   <u>Tartaglione's statement during transport to his arraignment must be suppressed as a violation of his right to counsel.</u>**

Once the right to counsel has been invoked, law enforcement officials may not initiate interrogation without counsel present, whether or not the accused has spoken with his attorney. *Minnick v. Mississippi,* 498 U.S. 146 (1990). <u>See</u> <u>also</u>, *Edwards v. Arizona,* 451 U.S. 477 (1981)("an accused having expressed his desire to deal with police only through counsel, is not subject to further interrogation until counsel has been made available to him"). The underlying Constitutional rights implicated are found in the Fifth and Sixth Amendments to the

United States Constitution. See also, *Arizona v. Roberson,* 486 U.S. 675, 681 (1988) and *McNeil v. Wisconsin,* 111 S.Ct. 2204 (1991).

In order to protect an accused's Fifth Amendment privilege, police must terminate interrogation if the accused requests the assistance of counsel. See *Miranda v. Arizona,* 384 U.S. 436, 474 (1966). Once an accused requests a lawyer, law enforcement officials may not reinitiate questioning of the accused "until counsel has been made available" to the accused. See *Edwards v. Arizona,* Supra. The Supreme Court in *Edwards* held, "When an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights...having expressed his desire to deal with the police only through counsel, [defendant] is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges or conversations with the police." See *Edwards v. Arizona,* 451 U.S. 477 (1981).

The Supreme Court has repeatedly stated that *Edwards* is a bright-line rule for law enforcement officers. See *Arizona v. Roberson,* supra. Even where an accused has consulted an attorney, and thus counsel "has been made available to him", police may not thereafter reinitiate questioning.  In *Minnick v. Mississippi,* the Supreme Court clarified, "Whatever the ambiguities of our earlier cases on this point, we now hold that when counsel is requested, interrogation must cease, and officials may not reinitiate interrogation without counsel present, whether or not the accused has consulted with his attorney." See *Minnick v. Mississippi,* 498 U.S. 146 (1990).

After being formally arrested and told that he was going to be arraigned for murder and drug trafficking, Tartaglione requested to speak with his attorney. See Ex. C, & Tr. P. 117 ("I

need a lawyer in here.") Investigator Hammer stated that he would refrain from questioning him. Tartaglione stated once again "I'd like to speak to my lawyer then." <u>See</u> Ex. C, & Tr. P. 117. Hammer told him that he was unsure of the procedure for getting him his attorney, and whether it was something available to him at the barracks or whether he had to wait until the arraignment. Nonetheless, he promised, "whatever needs to be done, we'll …we'll make arrangements to get it done." <u>See</u> Ex. C, & Tr. P. 118. Hammer continued to discuss the case with him, and told him he was unsure if he would get to make a phone call because it is a federal case and they are state investigators unfamiliar with the process. <u>See</u> Ex. C, & Tr. P. 120. Tartaglione asked whether he could call his wife to request medication. He informed him that he takes painkillers and that he was in pain. Tartaglione was denied the opportunity to make any calls to his wife or to his lawyer. Tartaglione twice gave Investigator Hammer his attorney's name "Andy Rubin." <u>See</u> Ex. C, & Tr. P. 121.  Investigator Hammer acknowledged that "he just lawyered up." <u>See</u> Ex. C, & Tr. P. 123. Nonetheless, Investigator Hammer continued to discuss the case with Tartaglione on his way to his arraignment in the vehicle. Tartaglione's fourth statement "fucking Mexicans" was a product of Investigator Hammer's statements to Tartaglione in violation of his right to counsel.

Tartaglione requested more than mere appointment of counsel, he asserted his desire for counsel at all subsequent interviews. Tartaglione named his counsel by name. He requested to use the phone. He requested his attorney be made available to him at the barracks. He clearly asserted both his Fifth and Sixth Amendment right to counsel prior to the statement at issue, had not initiated any such statement, and was induced to make the statement in violation of the *Edwards* line of cases. Therefore, Tartaglione's statement must be suppressed.

**WHEREFORE**, the defendant, Tartaglione, respectfully requests this Honorable Court suppress from evidence in this cause, the statements made by Tartaglione from his initial

roadside interview by police to his statement during transport to his arraignment including all recordings of such statements, both audio and video, and any evidence obtained in derivation therefrom.

Respectfully submitted,

Aida Leisenring, Esq.
Bruce A. Barket, Esq.

cc via ecf: all counsel