


**The New York Times Company**

David McCraw
Vice President &
Deputy General Counsel

T 212 556 4031

mccraw@nytimes.com

620 8th Avenue
New York, NY 10018
nytimes.com

September 10, 2019

**MEMO ENDORSED**

**VIA FAX**

The Honorable Kenneth M. Karas
United States District Judge
The Hon. Charles L. Bricant Jr.
Federal Building and United States Courthouse
300 Quarropas St.
White Plains, NY 10601

*The Clerk is directed to docket this letter. So ordered.*

**SO ORDERED**

KENNETH M. KARAS, U.S.D.J.
9/10/19

Re: *United States v. Tartaglione*, 16-cr-832 – Unsealing of Judicial Records

Dear Judge Karas:

I write on behalf of The New York Times Company and reporter Benjamin Weiser (jointly, "The Times") regarding the Government's application to seal two recent filings in this case. The Times agrees with the *New York Post* and the *Daily News* (*see* Dkt. 155) that the application has no merit: the filings are judicial documents subject to the common law and First Amendment rights of access, and the high bar required for overcoming these rights has not been met.[1]

The Government has sought to seal records related to Mr. Tartaglione's August 20, 2019 application to "be moved from the [Metropolitan Correctional Center] and detained at another facility." Dkt. 147 at 1. As the basis for his application, Mr. Tartaglione's counsel cited the "constant and deplorable" conditions at the MCC and perceived threats to his client's safety from MCC guards. *Id.* at 2. Those threats, he says, arise from his client's speaking up about both the conditions at MCC and the attempted suicide of his former and now-late cellmate Jeffrey Epstein. *Id.* at 1-2. The Government submitted a sealed response to the application on August 23; Mr. Tartaglione responded in turn, also in a sealed

---

[1] The right of access is an affirmative, enforceable public right, and the standing of the press to enforce it is well settled. *See, e.g., Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 609 n.25 (1982); *Hartford Courant Co. v. Pellegrino*, 380 F.3d 83, 91 (2d Cir. 2004).

filing, on August 28. *See* Dkt. 152. On August 29, the Government belatedly filed applications to seal both documents. Dkts. 151, 152. The Government contends that the documents are not judicial documents subject to the right of access and that even if they were certain portions of each document should be redacted. *See* Dkts. 151, 152.

For reasons stated by the *Post* and *Daily News*, the Government is wrong on both counts. Under the Second Circuit's access jurisprudence, a "judicial document" is an item "relevant to the performance of the judicial function and useful in the judicial process." *United States v. Amodeo*, 44 F.3d 141, 145 (2d Cir. 1995). A common law presumption of access attaches to any judicial document, and an additional First Amendment right arises where public access to a document has been historically available (the "experience" prong) and would be valuable to the process in question (the "logic" prong). *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 119-20 (2d Cir. 2006). The weight of the common law presumption turns on "the role of the material at issue in the exercise of Article III judicial power" and "the resultant value of such information to those monitoring the federal courts." *Bernstein v. Bernstein Litowitz Berger & Grossmann LLP*, 814 F.3d 132, 142 (2d Cir. 2016) (citation and internal marks omitted). Once the right of access attaches, it is overcome only by "countervailing factors" (under the common law) or specific, on-the-record findings that sealing "is essential to preserve higher values and is narrowly tailored to serve that interest" (under the First Amendment). *Id.* at 143-45 (citations and internal marks omitted).

The Government contends that the papers filed in connection with Mr. Tartaglione's transfer application are not judicial documents because they have "no bearing on the charges contained in the pending indictment" and instead address a matter "ancillary to his criminal prosecution."[2] Dkt. 151 at 1. Not so. As an initial matter, what makes a record a "judicial document" is not whether it "directly affect[s]" a criminal prosecution, *id.* at 2, but what role it plays in the performance of a judicial function. Applying this standard, the courts have found the right of access to reach a wide range of records in criminal proceedings. *See, e.g., United States v. Suarez*, 880 F.2d 626, 630-31 (2d Cir. 1989) (First Amendment right of access to forms used for payments to court-appointed counsel); *United States v. Graham*, 257 F.3d 143, 151-53 (2d Cir. 2001) (common law right attaches to audio and video tapes played at pretrial detention hearing); *Applications of National Broadcasting Co.*, 828 F.2d 340, 344-45 (6th

---

[2] Though the Government articulated this reason only in its application to seal its own filing, its position on Mr. Tartaglione's filing is presumably based on the same reasoning.

2

Cir. 1987) (First Amendment right of access to records related to motions for disqualification of judge and for inquiry into attorney conflicts of interest).

The filings sought to be sealed here easily meet the standard for judicial documents. In seeking a "court order" for his transfer from MCC, Dkt. 147 at 1, Mr. Tartaglione expressly called upon the Court to exercise its adjudicatory power over a matter within its purview. Though the Government characterizes its response to the application as nothing more than a "status report," Dkt. 151 at 2, its filing and Mr. Tartaglione's response both pertained to the application and were directed at guiding the Court's resolution of it.[3] That makes them judicial documents.

What's more, the weight of the common law presumption of access to these records is undeniably strong. In *Graham*, the Second Circuit found that the presumption of access for tapes played at a pretrial detention hearing was, at a minimum, "substantial": "The detention of criminal defendants pending trial is a quintessential exercise of a court's Article III judicial power, and the public has a legitimate interest monitoring a court's use of that power." 257 F.3d at 154. So too, here. Adjudicating a defendant's grievances about his pretrial confinement, which has apparently impacted the exercise of his constitutional rights, are matters at the heart of the judicial function. And the public has a considerable interest in monitoring how the court discharges that function. Perhaps more than anything, the public's confidence in the judiciary depends on openness of court records and proceedings. On this point, Chief Justice Burger's words in *Richmond Newspapers v. Virginia* are particularly apt:

> People in an open society do not demand infallibility from their institutions, but it is difficult for them to accept what they are prohibited from observing. When a criminal trial is conducted in the open, there is at least an opportunity both for understanding the system in general and its workings in a particular case.

---

[3] This is true regardless of the merits of Mr. Tartaglione's application. The Government asserts that "[a] pre-trial detainee does not have the right to be housed at the facility of his choice." Dkt. 151 at 2 (citation and internal marks omitted). The Times does not take the Government to be arguing that the conditions of Mr. Tartaglione's confinement or his personal safety are entirely outside the Court's purview or that the Court is without any power whatsoever to address those matters.

3

448 U.S. 555, 572 (1980) (plurality opinion).[4]

The seriousness of Mr. Tartaglione's alleged grievances here bear emphasis, too. As the *Post* and *Daily News* point out, the conditions of Mr. Tartaglione's confinement "relate to his ability to prepare for trial and present an adequate defense." Dkt. 155 at 1. His attorney claims that his client's opportunities to review legal documents have been limited, and that members of the legal team have sometimes waited "hours" to see him. Dkt. 147 at 1. Whether "direct[]" or not, Dkt. 151 at 2, the impact of a transfer on Mr. Tartaglione's prosecution is potentially significant.

On the question of whether the access right is overcome, the Government's arguments again fall short. It says that portions of Mr. Tartaglione's filing "restate the internal deliberations of the BOP" and that their disclosure would jeopardize the agency's "law enforcement functions and internal deliberative processes." Dkt. 152. It elaborates on these points in its application to seal its own filing. *See* Dkt. 151 at 3 (disclosing considerations that inform BOP decisionmaking would hamper candid communications and cause "inmates to alter their behavior and manipulate their housing assignments").

Though obviously not privy to these portions of the filings, The Times is skeptical that disclosure would cause the parade of horribles described by BOP. BOP suggests that the deliberative material in its filing would be exempt from disclosure under Exemption 5 of the Freedom of Information Act. *Id.* at 3. To begin with, FOIA – a right of access created solely by statute – has no bearing on the common law or constitutional right of access. FOIA, by its terms, does not apply to the judiciary, and public access to judicial documents is premised on the

---

[4] Both prongs of the First Amendment analysis are met, too: there is a history of public access to proceedings related to conditions of confinement, and openness of those proceedings and records would undoubtedly enhance the functioning of the process. *Cf., e.g., Newman v. Graddick*, 696 F.2d 796, 801 (11th Cir. 1983) (right of access to civil trials pertaining to confinement conditions); *Graham*, 257 F.3d at 154 ("The bail decision is one of major importance to the administration of justice, and openness will help to assure the public that the decision is properly reached.") (quoting *In re Globe Newspaper Co.*, 729 F.2d 47, 52 (1st Cir. 1984) (internal marks omitted)). And even if there were no history of openness, the mere "logic" of public access is a sufficient basis for the First Amendment right. *See, e.g., Suarez*, 880 F.2d at 631; *United States v. Index Newspapers LLC*, 766 F.3d 1072, 1094 (9th Cir. 2014) ("logic alone, even without experience, may be enough to establish the [First Amendment] right") (citation and internal marks omitted).

4

public's historic need to monitor the functioning of the courts. *See, e.g., Eil v. U.S. Drug Enforcement Admin.*, 878 F.3d 392, 398 (1st Cir. 2017).

Even were that not so, and FOIA were relevant (it is not), there is no reason to think that the information contained in the BOP filing is genuinely deliberative,[5] or that the Government could show – as access jurisprudence requires it to – that disclosure poses some credible risk of harm. *See, e.g., Bernstein*, 814 F.3d at 143 (finding that disclosure would not "reveal details of an ongoing investigation, pose a risk to witnesses, endanger national security, or reveal trade secrets"). It seems unlikely that publicly disclosing the factors that BOP considered in deciding whether to transfer Mr. Tartaglione – matters that BOP was comfortable disclosing to Mr. Tartaglione himself and to this Court – would actually have a chilling effect on agency deliberations.

Nor is there serious reason to think that inmates, armed with this new information, would succeed in any effort to "manipulate their housing assignments." Setting aside the question of whether, as a general matter, inmates should be kept in the dark about the reasons for their assignment to a given facility, BOP has made clear that Mr. Tartaglione's case is "exceptional." Dkt. 151 at 3. Inmates "seeking to take advantage of similar accommodations," *id.*, would be on notice of that fact. And even if some inmates cynically tried to obtain those accommodations, The Times trusts that BOP, with its substantial expertise and experience in these matters, would see through those efforts. In short, BOP's proffered basis for sealing does not meet the high burden imposed by the common law, particularly in the face of a weighty presumption of access.[6] *See, e.g., Graham*, 257 F.3d at 154-55; *Bernstein*, 814 F.3d at 143-44.

On a final note, the immense public interest in these proceedings is worth highlighting. Even before Mr. Tartaglione became Jeffrey Epstein's cellmate, there was substantial public attention on his case because of the nature of the

---

[5] The deliberative process privilege in Exemption 5 is limited to material that is both "predecisional," *i.e.*, "prepared in order to assist an agency decisionmaker in arriving at his decision," and "deliberative," *i.e.*, "actually related to the process by which policies are formulated." *Hopkins v. U.S. Dep't of Hous. & Urban Dev.*, 929 F.2d 81, 84 (2d Cir. 1991) (citations, alteration, and internal marks omitted).

[6] Because the basis for sealing is insufficient to overcome the common law right of access, it also necessarily cannot defeat the First Amendment right. *See Lugosch*, 435 F.3d at 124.

5

charges against him and the prosecutors' decision to seek the death penalty.[7] Mr. Epstein's attempted suicide, which occurred while Mr. Tartaglione was his cellmate, roused even greater interest in his case.[8] Put simply, the public is watching this case. The public is aware of Mr. Tartaglione's claims that BOP correctional officers have sought to silence him.[9] The irony of the Government's efforts to keep records regarding those claims out of public view is surely not lost on it.

We thank the Court for its consideration.

Respectfully submitted,

*/signature/*

David E. McCraw

cc: All counsel of record (via e-mail)

---

[7] *See, e.g.,* Andrew Denney, *Prosecutors to seek death penalty for ex-cop in quadruple homicide*, New York Post (Mar. 21, 2019), https://bit.ly/2m7DJoL.

[8] *See, e.g.,* William K. Rashbaum *et al.*, *Jeffrey Epstein Is Found Injured in Jail Cell*, New York Times (July 25, 2019), https://nyti.ms/2kbOXbc.

[9] *See, e.g.,* Emily Saul, *Jail guards threatening former Epstein cellmate Nicholas Tartaglione: lawyer*, New York Post (Aug. 20, 2019), https://bit.ly/2m2hjFg.

6