UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------x

UNITED STATES OF AMERICA          :
                                  :          S4 16 Cr. 832 (KMK)
          - v. -                  :
                                  :
NICHOLAS TARTAGLIONE,             :
                                  :
                    Defendant.    :

-------------------------------------------------------x


**OMNIBUS MEMORANDUM OF LAW OF THE UNITED STATES
IN OPPOSITION TO THE DEFENDANT'S PRETRIAL MOTIONS**



                                        GEOFFREY S. BERMAN
                                        United States Attorney for the
                                        Southern District of New York
                                        300 Quarropas Street
                                        White Plains, New York 10601



MAURENE COMEY
JASON SWERGOLD
Assistant United States Attorneys
- Of Counsel –

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ................................................................................................. 1

BACKGROUND ................................................................................................................... 1

ARGUMENT ........................................................................................................................ 3

   I.   The Defendant's Motion to Suppress Historical Cell Site Evidence Should Be Denied..... 3

       A.  Relevant Facts ................................................................................................. 3

       B.  Applicable Law ............................................................................................... 5

           1.  The Stored Communications Act .......................................................... 5

           2.  The Good Faith Exception ................................................................... 7

           3.  Standing ............................................................................................. 10

       C.  Discussion ..................................................................................................... 11

           1.  The Defendant Has Failed to Demonstrate that He Has Standing ............. 11

           2.  The Good Faith Exception Applies ........................................................ 12

           3.  The Defense's Textual Interpretation of the SCA Is Incorrect ................. 19

   II.   The Defendant's Motion to Suppress His Statements Should Be Denied ..................... 24

       A.  Relevant Facts ............................................................................................... 24

       B.  Applicable Law ............................................................................................. 28

           1.  Interrogation ....................................................................................... 28

           2.  *Miranda* Warnings ............................................................................. 31

           3.  Spontaneous Statements ....................................................................... 34

       C.  Discussion ..................................................................................................... 34

CONCLUSION.................................................................................................................... 38

# TABLE OF AUTHORITIES

**Federal Cases**

*Berkemer v. McCarty*, 468 U.S. 420 (1984) .............................................................. 29, 30, 31, 33

*Carpenter v. United States*, 138 S. Ct. 2206 (2018) ............................................................. passim

*Colorado v. Connelly*, 479 U.S. 157 (1986) ........................................................................... 32

*Colorado v. Spring*, 479 U.S. 564 (1987) ............................................................................... 32

*Cruz v. Miller*, 255 F.3d 77 (2d Cir. 2001) ............................................................................. 30

*Cucuta v. New York City*, 25 F. Supp. 3d 400 (S.D.N.Y. 2014) ............................................ 21

*Davis v. United States*, 564 U.S. 229 (2011) .............................................................. 8, 14, 18

*Green v. Scully*, 850 F.2d 894 (2d Cir. 1987) ....................................................................... 32

*Haynes v. Washington*, 373 U.S. 503 (1963) ......................................................................... 32

*Herring v. United States*, 555 U.S. 135 (2009) ....................................................................... 8

*Howes v. Fields*, 565 U.S. 499 (2012) ................................................................................... 29

*Illinois v. Krull*, 480 U.S. 340 (1987) ..................................................................................... 8

*In re Application*, 2009 WL 159187 (S.D.N.Y. Jan. 13, 2009) ...................................... 21, 22

*In re Application*, 42 F. Supp. 3d 511 (S.D.N.Y. 2014) .......................................................... 4

*In re Application*, 460 F. Supp. 2d 448 (S.D.N.Y. 2006) ....................................................... 21

*In re Application*, 620 F.3d 304 (3d Cir. 2010) ............................................................... 6, 14

*In re Application*, 724 F.3d 600 (5th Cir. 2013) .............................................................. 6, 14

*In re Application*, 849 F. Supp. 2d 526 (D. Md. 2011) .......................................................... 21

*In re Smartphone Geolocation Data Application*, 977 F. Supp. 2d 129 (E.D.N.Y. 2013) ........... 23

*Lynumm v. Illinois*, 372 U.S. 528 (1963) ............................................................................... 32

*Minnesota v. Murphy*, 465 U.S. 420 (1984) ........................................................................... 30

*Miranda v. Arizona*, 384 U.S. 436 (1966) ...................................................................... passim

*Missouri v. Seibert*, 542 U.S. 600 (2004) ......................................................................... 33, 34

*Oklahoma Press Publ'g Co. v. Walling*, 327 U.S. 186 (1946) ................................................. 6

*Oregon v. Elstad*, 470 U.S. 298 (1985) ............................................................................ 32, 34

*Oregon v. Mathison*, 429 U.S. 492 (1977) ............................................................................. 30

*Ortiz v. Artuz*, 09 Civ. 5533 (NRB), 2010 WL 3290962 (S.D.N.Y. Aug. 9, 2010) ................... 31

*Rakas v. Illinois*, 439 U.S. 128 (1978) .................................................................................. 10

*Rawlings v. Kentucky*, 448 U.S. 98 (1980) ............................................................................ 10

*Rhode Island v. Innis*, 446 U.S. 291 (1980) .......................................................................... 35

*Schneckloth v. Bustamonte*, 412 U.S. 218 (1973) ................................................................. 33

*Smith v. Maryland*, 442 U.S. 735 (1979) ..................................................................... 6, 14, 17

*Stansbury v. California*, 511 U.S. 318 (1994) ....................................................................... 29

*Tankleff v. Senkowski*, 135 F.3d 235 (2d Cir. 1998) ............................................................. 30

*United States v. Ackies*, 918 F.3d 190 (1st Cir. 2019) ...................................................... 16, 23

*United States v. Aguiar*, 737 F.3d 251 (2d Cir. 2013) ............................................................. 9

*United States v. Badmus*, 325 F.3d 133 (2d Cir. 2003) ......................................................... 31

*United States v. Blake*, 2018 WL 3974716 (D. Conn. Aug. 20, 2018) ...................................... 18

iii

*United States v. Bowden*, 45 F. App'x 61 (2d Cir. Sept. 6, 2002) ............................................... 35

*United States v. Carpenter*, 819 F.3d 880 (6th Cir. 2016)............................................................. 5

*United States v. Carpenter*, 926 F.3d 313 (6th Cir. 2019)........................................................... 16

*United States v. Chambers*, 751 F. App'x 44 (2d Cir. 2018) ....................................................... 17

*United States v. Chavez*, 894 F.3d 593 (4th Cir. 2018) ......................................................... 14, 15

*United States v. Cota*, 953 F.2d 753 (2d Cir.1992)..................................................................... 30

*United States v. Curtis*, 901 F.3d 846 (7th Cir. 2018) ................................................................ 15

*United States v. Davis*, 785 F.3d 498 (11th Cir. 2015)........................................................ 5, 14, 15

*United States v. Dore*, 586 F. App'x 42 (2d Cir. 2014)............................................................... 12

*United States v. Filippi*, 12 Cr. 604 (RA), 2013 WL 208919 (S.D.N.Y. Jan. 16, 2013) .............. 12

*United States v. FNU LNU*, 653 F.3d 144 (2d Cir. 2011)............................................................ 29

*United States v. Goldstein*, 914 F.3d 200 (3d Cir. 2019)............................................................ 16

*United States v. Graham*, 824 F.3d 421 (4th Cir. 2016)......................................................... 5, 14

*United States v. Guerrero*, 768 F.3d 351 (5th Cir. 2014) ........................................................ 6, 14

*United States v. Guillen*, 17 Cr. 412 (KMW), 2018 WL 5831318 (S.D.N.Y. Nov. 7, 2018)....... 18

*United States v. Gyamfi*, 16 Cr. 521 (CM), 2018 WL 6332902 (S.D.N.Y. Nov. 13, 2018)... 17, 23

*United States v. Haqq*, 278 F.3d 44 (2d Cir. 2002) .................................................................... 10

*United States v. Herron*, 762 F. App'x 25 (2d Cir. 2019) ........................................................... 18

*United States v. Jaswal*, 47 F.3d 539, 542 (2d Cir. 1995) ...................................................... 11, 32

*United States v. Jones*, 565 U.S. 400 (2012) .......................................................................... 9, 17

*United States v. Joyner*, 899 F.3d 1199 (11th Cir. 2018) ........................................................... 15

*United States v. Key*, 12 Cr. 712 (SHS), 2019 WL 2314693 (S.D.N.Y. May 31, 2019).............. 18

*United States v. Kirsh*, 54 F.3d 1062 (2d Cir. 1995) .................................................................. 30

*United States v. Korte*, 918 F.3d 750 (9th Cir. 2019) ................................................................. 16

*United States v. Leon*, 468 U.S. 897, 922 (1984)............................................................... 7, 8, 9, 15

*United States v. Lifshitz*, 03 Cr. 572 (LAP), 2004 WL 2072468 (S.D.N.Y. 2004)....................... 31

*United States v. Mazzara*, 16 Cr. 576 (KBF), 2017 WL 4862793 (S.D.N.Y. Oct. 27, 2017) ........ 9

*United States v. McCullough*, 523 F. App'x 82 (2d Cir. 2013) ........................................ 20, 21, 22

*United States v. Miller*, 425 U.S. 435 (1976)............................................................... 6, 13, 17

*United States v. Mitchell*, 966 F.2d 92 (2d Cir. 1992) .......................................................... 30, 31

*United States v. Montoya-Eschevarria*, 892 F. Supp. 104 (S.D.N.Y. 1995) ........................ 11, 12

*United States v. Newton*, 369 F.3d 659 (2d Cir. 2004) .......................................................... 29, 31

*United States v. Osorio*, 949 F.2d 38 (2d Cir. 1991) .................................................................. 10

*United States v. Padilla*, 508 U.S. 77 (1993)............................................................................. 10

*United States v. Parrilla*, 13 Cr. 360 (AJN), 2014 WL 2111680 (S.D.N.Y. May 13, 2014) ......... 9

*United States v. Pascual*, 502 F. App'x 75 (2d Cir. 2012) ......................................................... 13

*United States v. Paulino*, 850 F.2d 93 (2d Cir. 1988)................................................................ 10

*United States v. Peltier*, 422 U.S. 531 (1975).............................................................................. 8

*United States v. Pizarro*, 17 Cr. 151 (AJN), 2018 WL 1737236 (S.D.N.Y. Apr. 10, 2018) ........ 12

*United States v. Rahme*, 813 F.2d 31 (2d Cir. 1987) .................................................................. 10

*United States v. Remache*, 201 F.3d 433, 1999 WL 1212535 (2d Cir. 1999) ............................. 30

*United States v. Ross*, 719 F.2d 615 (2d Cir. 1983).................................................................... 31

*United States v. Ruggiero*, 824 F. Supp. 379 (S.D.N.Y. 1993) .................................................. 10

*United States v. Ulbricht*, 858 F.3d 71 (2d Cir. 2017) .................................................................. 17

*United States v. Walker*, 16 Cr. 567 (JSR) (S.D.N.Y. Mar. 8, 2017) ........................................... 12

*United States v. Walsh*, -- F. App'x ---, 2019 WL 2361503 (2d Cir. June 4, 2019) .................... 18

*United States v. Watson*, 404 F.3d 163 (2d Cir. 2005) ........................................................... 10, 12

*United States v. Zodhiates*, 901 F.3d 137 (2d Cir. 2018) ............................................................ 16

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum of law in response to two motions filed by the defendant, Nicholas Tartaglione, in advance of trial.  First, the defendant seeks to suppress historical cell tower and historical cell site records obtained for certain phone numbers.  Second, the defendant seeks to suppress statements he made to law enforcement on December 19, 2016.  For the reasons set forth below, the defendant's motions should be denied in their entirety.

## BACKGROUND

Indictment S4 16 Cr. 832 (KMK) (the "Indictment") charges Nicholas Tartaglione (the "defendant" or "Tartaglione") with various crimes related to his participation in the murders of Martin Luna, Urbano Santiago, Miguel Luna, and Hector Gutierrez.  Count One charges the defendant with participating in a conspiracy to distribute and possess with the intent to distribute five kilograms or more of cocaine from in or about 2015 up to and including in or about April 2016, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A).  Counts Two through Five charge the defendant with the murders of each of the four victims, respectively, in furtherance of the same narcotics conspiracy on or about April 11, 2016, in violation of 21 U.S.C. §§ 848(e) and 2. Counts Six through Eight charge the defendant with the murders of Urbano Santiago, Miguel Luna, and Hector Gutierrez, respectively, through the use of a firearm in furtherance of the same narcotics conspiracy on or about April 11, 2016, in violation of 18 U.S.C. §§ 924(j) and 2. Count Nine charges the defendant with participating in a conspiracy to kidnap all four victims on or about April 11, 2016, in violation of 18 U.S.C. § 1201(c).  Counts Ten through Thirteen charge the defendant with kidnappings resulting in the deaths of all four victims, respectively, on or about April 11, 2016, in violation of 18 U.S.C. §§ 1201(a)(1) and 2.  Counts Fourteen through

1

Seventeen charge the defendant with the Travel Act murders of all four victims, respectively, on or about April 11, 2016, in violation of 18 U.S.C. §§ 1952 and 2.

The Government will establish at trial—through witness testimony, physical evidence, documentary evidence (including phone records and text messages), and surveillance videos—that the defendant arranged to lure Martin Luna to the Likquid Lounge, located at 69 Brookside Avenue in Chester, New York, on April 11, 2016 under false pretenses.  The defendant did so because he believed that Luna had stolen money from him that was intended for the purchase of cocaine.  The defendant planned to hold Luna at the Likquid Lounge, where he would attempt to force Luna to disclose the location of the stolen money and would kill Luna if he refused to return the money.  The defendant enlisted others to assist him with this plan.

Because Luna was unaware of the true nature of the meeting, he brought three companions with him on April 11, 2016:  his nephew Urbano Santiago, his nephew Miguel Luna, and his friend Hector Gutierrez.  The defendant and his co-conspirators did not expect the other three victims to accompany Luna to the Likquid Lounge.  When the victims arrived at the Likquid Lounge, all four were physically restrained and not permitted to leave the premises.  The defendant then hit Luna repeatedly and eventually put a plastic zip tie around Luna's neck and pulled it tight, choking Luna, and ultimately killing him.

The defendant then transported Luna's body to a ranch located in the vicinity of 419 Old Mountain Road in Otisville, New York where the defendant resided at the time (the "Otisville Property").  Meanwhile, the defendant's co-conspirators transported Urbano Santiago, Miguel Luna, and Hector Gutierrez—who were still alive and bound—to the Otisville Property.  Upon arriving at the Otisville Property, the three remaining victims were each shot in the back of the

head and killed.  The defendant personally shot one of those three victims himself.  All four of the victims' bodies were then buried together on the Otisville Property.

Later in 2016, the U.S. Attorney's Office opened an investigation, together with the Federal Bureau of Investigation ("FBI") and the New York State Police ("NYSP"), into the victims' disappearance.  On December 19, 2016, the FBI and NYSP arrested the defendant.  On December 20, 2016, the FBI and NYSP recovered the victims' bodies from a mass grave on the Otisville Property.

## ARGUMENT

### I.  The Defendant's Motion to Suppress Historical Cell Site Evidence Should Be Denied

The defendant seeks to suppress certain historical cell tower and historical cell site records on the basis that the evidence was acquired in violation of the Fourth Amendment.  As a preliminary matter, the motion must be denied because the defendant has not established that he has standing to challenge the introduction of this evidence.  In any event, because law enforcement obtained the challenged evidence in good faith pursuant to court orders consistent with then-existing law, the exclusionary rule does not apply to this evidence.  Accordingly, this motion should be denied without a hearing.

### A.  Relevant Facts

Pursuant to Title 18, United States Code, Section 2703(d)—a section of the Stored Communications Act ("SCA")—two types of orders, now challenged by the defendant, were issued by Magistrate Judges in this District.  First, on June 14, 2016, United States Magistrate Judge Lisa Margaret Smith signed an order directing cellphone service providers to provide historical cell tower log information, that is, information from specific cellular towers near 69 Brookside Avenue in Chester, New York on April 11, 2016 (the "Historical Cell Tower Order").

(Def. Ex. B.)  On June 24, 2016, United States Magistrate Judge Paul E. Davison signed an order directing cellphone service providers to provide, among other things, historical cell site information for specific cellular telephone numbers (the "Historical Cell Site Order," and collectively with the Historical Cell Tower Order, the "SCA Orders").   (Def. Ex. D.)  Both orders were issued based on Judge Smith's and Judge Davison's findings that the Government in its applications had shown there were reasonable grounds to believe that the historical cell tower information and historical cell site information sought were relevant and material to an ongoing criminal investigation, as is required under Title 18, United States Code, Section 2703(d).

The SCA Orders directed the relevant service providers to provide information gathered in the regular course of their business.  As Magistrate Judge Francis has previously summarized:

> [T]here are two ways to obtain historical cell site data. In the [application in support of the Historical Cell Site Order], the Government requests information connected to a particular cell phone number and (if the application is granted) retrieves a list of all calls to and from the telephone number, along with the locations and sectors (or faces) of the cell towers through which each call originated and terminated, thus providing information helpful in determining the approximate locations of cellular telephones during the sending and receipt of calls.
>
> [The Historical Cell Tower Order], on the other hand, centers not on a particular cellphone number, but on the cell towers in the area of an identified location.  The information sought consists of a list for a particular cell tower from the specified date and time period of the subscribers' cellular telephone numbers connecting to that tower, along with the times of the calls and the digits dialed or the call numbers of the telephones calling into the subscribers' cellular telephones connecting through the tower, information that can help establish that the listed cellular telephones were somewhere in the vicinity of that particular cell tower during that time period.

*In re Application*, 42 F. Supp. 3d 511, 512 (S.D.N.Y. 2014) (internal quotation marks omitted) (holding that no search warrant was required for the Government to obtain historical cell tower information).

The defendant now moves to suppress the historical cell tower and historical cell site records obtained pursuant to the SCA Orders prior to the Supreme Court's opinion in *Carpenter v. United States*, 138 S. Ct. 2206 (2018). The motion should be denied because the defendant has not established that he has standing to bring it and, regardless, law enforcement acted in good faith when it obtained the data pursuant to valid court orders.

**B.     Applicable Law**

**1.     The Stored Communications Act**

The Stored Communications Act ("SCA"), 18 U.S.C. §§ 2701 et seq., provides that "[a] governmental entity may require a provider of electronic communication service . . . to disclose a record or other information pertaining to a subscriber or customer of such service (not including the contents of communications)" if the entity obtains a warrant, obtains a court order, has the consent of the subscriber or customer, or if certain other specific conditions are satisfied. 18 U.S.C. § 2703(c). According to Section 2703(d), to obtain a court order, the governmental entity must "offer[] specific and articulable facts showing that there are reasonable grounds to believe that the contents of a wire or electronic communication, or the records or other information sought, are relevant and material to an ongoing criminal investigation." 18 U.S.C. § 2703(d).

As of June 2016, every circuit to have considered the issue of whether an order issued under Section 2703(d) was a constitutionally acceptable basis for obtaining historical cell site data had concluded that such orders were, in fact, sufficient. *United States v. Graham*, 824 F.3d 421, 424-26 (4th Cir. 2016) (*en banc*); *United States v. Carpenter*, 819 F.3d 880, 887, 890 (6th Cir. 2016), rev'd, 132 S. Ct. 2206 (2018); *United States v. Davis*, 785 F.3d 498, 511-13 (11th Cir. 2015) (en banc), cert. denied, 136 S. Ct. 479 (2015); *In re Application*, 724 F.3d 600, 614-15

(5th Cir. 2013); *United States v. Guerrero*, 768 F.3d 351, 358-59 (5th Cir. 2014); *In re Application*, 620 F.3d 304, 313 (3d Cir. 2010).

These decisions were consistent with Supreme Court precedent regarding the third party doctrine, which allows the Government to obtain business records through a subpoena, without either a warrant or a showing of probable cause.  *See Oklahoma Press Publ'g Co. v. Walling*, 327 U.S. 186, 194-95 (1946); *see also United States v. Miller*, 425 U.S. 435, 445-46 (1976).  The acquisition of a business's records does not constitute a Fourth Amendment "search" of an individual customer, even when the records reflect information pertaining to that customer.  *See Miller*, 425 U.S. at 440 (finding acquisition of defendant's bank records was not an "intrusion into any area in which [the defendant] had a protected Fourth Amendment interest" as they were "business records of the banks.").  Indeed, the Supreme Court has "held repeatedly that the Fourth Amendment does not prohibit the obtaining of information revealed to a third party and conveyed by him to Government authorities, even if the information is revealed on the assumption that it will be used only for a limited purpose and the confidence placed in the third party will not be betrayed."  *Id.* at 443; *see also Smith* v. *Maryland*, 442 U.S. 735, 742 (1979) (finding no Fourth Amendment search based on the Government's acquisition of the records of the defendant's dialed numbers).  "[A] person has no legitimate expectation of privacy in information he voluntarily turns over to third parties."  *Id.* at 743-744 (citing, *inter alia*, *Miller*, 425 U.S. at 442-44).

The Supreme Court extended its logic from *Miller* to data maintained by phone companies about their customers' phone activity in *Smith*, 442 U.S. 735, in which a telephone company installed a pen register at the request of the police to record numbers dialed from the defendant's telephone.  The Supreme Court held that (i) telephone users had no subjective

expectation of privacy in dialed telephone numbers, and (ii) any such expectation is not one that society is prepared to recognize as reasonable, because the users "voluntarily conveyed numerical information to the telephone company and 'exposed' that information to its equipment in the ordinary course of business."  *Id.* at 743-44.

Despite this precedent, in June 2018, the Supreme Court decided in *Carpenter* that an order issued under Section 2703(d) of the SCA was "not a permissible mechanism for accessing historical cell-site records."  138 S. Ct. at 2221.  The Court acknowledged that it had "previously held that 'a person has no legitimate expectation of privacy in information he voluntarily turns over to third parties,'" *Id.* at 2216 (quoting *Smith*, 442 U.S. at 743-44), and that cell site records "implicate[] [that] third-party principle" because "the individual continuously reveals his location to his wireless carrier," *id*. at 2216.  It reasoned, however, that cell site records were a "novel" category because they contained "detailed, encyclopedic, and effortlessly compiled" information regarding an individual's physical movements.  *Id*. at 2216-17.  The Supreme Court therefore concluded that the acquisition of historical cell site records was a Fourth Amendment search and that obtaining such records would generally require a warrant supported by probable cause.  *Id*. at 2221.

### 2. The Good Faith Exception

Under the "good faith" exception, the exclusionary rule and its remedy of suppression are inapplicable where evidence is "obtained in objectively reasonable reliance on a subsequently invalidated search warrant."  *United States v. Leon*, 468 U.S. 897, 922 (1984).  This is because the exclusionary rule is a "judicially created remedy," *id*. at 906, which is "designed to deter police misconduct rather than to punish the errors of judges and magistrates," *id*. at 916.  "As with any remedial device, application of the exclusionary rule properly has been restricted to

those situations in which its remedial purpose is effectively advanced." *Illinois v. Krull*, 480

U.S. 340, 347 (1987).  The rule therefore does not apply "where [an] officer's conduct is

objectively reasonable" because suppression "cannot be expected, and should not be applied, to

deter objectively reasonable law enforcement activity." *Leon*, 468 U.S. at 919.  For that reason,

"evidence obtained from a search should be suppressed only if it can be said that the law

enforcement officer had knowledge, or may properly be charged with knowledge, that the search

was unconstitutional under the Fourth Amendment." *Id.*  (internal quotation mark omitted)

(quoting *United States v. Peltier*, 422 U.S. 531, 539 (1975)).  Moreover, "[t]o trigger the

exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully

deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice

system." *Herring v. United States*, 555 U.S. 135, 144 (2009).

     The Supreme Court has ruled squarely that an officer's reasonable reliance on a statute—

even where a court concludes in hindsight that the statute is constitutionally infirm—bars

application of the exclusionary rule.  In *Krull*, 480 U.S. 340, the Supreme Court emphasized that

"'[p]enalizing the officer for the [legislature's] error, rather than his own, cannot logically

contribute to the deterrence of Fourth Amendment violations.'"  *Id.* at 350 (quoting *Leon*, 468

U.S. at 921).  Such reliance on a duly enacted statute is unreasonable only "if, in passing the

statute, the legislature wholly abandoned its responsibility to enact constitutional laws." *Id.* at

355.  Absent the patent unconstitutionality of a statute, an officer's good-faith reliance on that

statute may not be penalized through suppression of evidence.  Similarly, "[e]vidence obtained

during a search conducted in reasonable reliance on binding precedent is not subject to the

exclusionary rule." *Davis v. United States*, 564 U.S. 229, 241 (2011).  Indeed, the Supreme

Court has recognized that an officer who conducts a search in reliance on binding appellate

precedent "ac[ts] as a reasonable officer would and should act under the circumstances," and that the effect of excluding evidence obtained from such a search "can only be to discourage the officer from doing his duty." *Id.* (internal quotation marks omitted) (quoting *Leon* 468 U.S. at 920.).

The Second Circuit has held that "binding appellate precedent" within the meaning of *Davis* includes "the precedent of this Circuit and the Supreme Court." *United States v. Aguiar*, 737 F.3d 251, 261 (2d Cir. 2013). In *Aguiar*, the Second Circuit considered the warrantless use of a GPS tracking device on a defendant's vehicle, which had occurred prior to the Supreme Court's decision, in *United States v. Jones*, 565 U.S. 400, 404 (2012), that the use of a GPS device to track a target's vehicle constitutes a search within the meaning of the Fourth Amendment. Recognizing that "our Circuit [had] lacked occasion to opine on the constitutionality of using electronic tracking devices attached to vehicles," the Second Circuit reasoned that "law enforcement could reasonably conclude" from pre-*Jones* Supreme Court precedent—when "[t]aken together"—that the warrantless use of the GPS tracker did not violate the Fourth Amendment. *Aguiar*, 737 F.3d at 261. *Aguiar* thus "indicated approval of at least some extrapolation from current precedent" when considering whether law enforcement's actions were taken in good faith. *United States v. Parrilla*, 13 Cr. 360 (AJN), 2014 WL 2111680, *10 (S.D.N.Y. May 13, 2014); *see also United States v. Mazzara*, 16 Cr. 576 (KBF), 2017 WL 4862793, at *12-13 (S.D.N.Y. Oct. 27, 2017) (listing analogous precedent supporting conclusion that video surveillance was lawful regardless of duration). The Second Circuit further noted in *Aguiar* that its "conclusion that the officers here relied in good faith . . . is reinforced by the fact that several sister circuits reached similar conclusions" regarding the constitutionality of the warrantless use of GPS tracking devices. *Aguiar*, 737 F.3d at 262.

3.       **Standing**

"Fourth Amendment rights are personal rights . . . [that] may not be vicariously asserted."

*United States v. Haqq*, 278 F.3d 44, 47 (2d Cir. 2002) (quoting *Rakas v. Illinois*, 439 U.S. 128,

133-34 (1978)).  "In order to prevail on a contention that a search violated the Fourth

Amendment, an accused must show that he had a legitimate expectation of privacy in a searched

place or item."  *United States v. Rahme*, 813 F.2d 31, 34 (2d Cir. 1987) (citing *Rawlings v.*

*Kentucky*, 448 U.S. 98, 104 (1980)).  In other words, "a defendant can urge the suppression of

evidence obtained in violation of the Fourth Amendment only if that defendant demonstrates that

*his* Fourth Amendment rights were violated by the challenged search or seizure."  *United States*

*v. Padilla*, 508 U.S. 77, 81 (1993) (*per curiam*) (emphasis in original).

"When considering a claimed violation of Fourth Amendment rights, the burden is on the

defendant to establish that his own rights under the Fourth Amendment were violated."  *United*

*States v. Paulino*, 850 F.2d 93, 96 (2d Cir. 1988); *see also United States v. Osorio*, 949 F.2d 38,

40 (2d Cir. 1991).  To satisfy this burden, "a defendant must submit an affidavit from someone

with personal knowledge demonstrating sufficient facts to show that he had a legally cognizable

privacy interest in the searched premises at the time of the search."  *United States v. Ruggiero*,

824 F. Supp. 379, 391 (S.D.N.Y. 1993), *aff'd*, 44 F.3d 1102 (2d Cir. 1995) (citing *Rawlings v.*

*Kentucky*, 448 U.S. 98 (1980); *see also Rakas*, 439 U.S. at 130 n.1.  The fact that the

Government connects a defendant to the subject of a search does not suffice to establish

standing, absent an affidavit from someone with personal knowledge of the facts therein, which

affidavit would establish standing on its own.  *See United States v. Watson*, 404 F.3d 163, 166

(2d Cir. 2005) ("[The] defendant could not challenge the search of a residence merely because he

anticipated that the Government will link the objects recovered in that search to defendant at trial.").

### C.    Discussion

#### 1.    The Defendant Has Failed to Demonstrate that He Has Standing

The defendant has not established that he has standing to challenge the SCA Orders because he has not submitted an affidavit from someone with personal knowledge establishing a privacy interest in any of the cellphone numbers whose information was seized pursuant to the SCA Orders.  Indeed, he has not specified any particular phone numbers covered by the SCA Orders to which he claims any privacy interest.  The defendant's decision is possibly a tactical one: because of the incriminating nature of the historical cell tower and historical cell site data in this case, submission of an affidavit would effectively restrict the defendant's ability to pursue a theory at trial contrary to that contained in his affidavit.  *See, e.g.*, *United States v. Montoya-Eschevarria*, 892 F. Supp. 104, 106 n.2 (S.D.N.Y. 1995) (noting, in finding that a defendant failed to establish standing to attack a Title III wiretap interception because he did not submit an affidavit averring that his voice was intercepted, that "[d]efendant's reluctance to testify to the presence of his voice on the surveillance tapes is understandable [because] prior inconsistent suppression hearing testimony may be used to impeach the defendant during trial"); *see also United States v. Jaswal*, 47 F.3d 539, 543 (2d Cir. 1995) ("Prior inconsistent suppression hearing testimony may properly be used to impeach a defendant during trial.").

Although the Government will argue at trial that certain of the phone numbers identified in the SCA Orders belong to the defendant, that does not suffice to give the defendant standing. A defendant does not have standing to challenge a search "merely because he anticipate[s] that the Government will link the objects recovered in that search" to him "at trial."  *Watson*, 404

11

F.3d at 166.  Courts routinely reject efforts by defendants to establish standing in this fashion.

*See*, *e.g.*, *United States v. Filippi*, 12 Cr. 604 (RA), 2013 WL 208919, at *6 (S.D.N.Y. Jan. 16,

2013) (holding that "efforts made by the Government to link [the defendant] to [a] phone" are

insufficient to establish the defendant's standing to challenge a warrant permitting the tracking of

that phone); *Montoya-Escheverria*, 892 F. Supp. at 106 (holding that "defendant's unsworn

assertion of the Government's representations does not meet this burden" of establishing

standing).  In fact, the Second Circuit and district courts addressing this precise issue as it relates

to historical cell site information have held that standing must be established by the defendant

himself.  *See, e.g.*, *United States v. Dore*, 586 F. App'x 42, 46 (2d Cir. 2014); *United States v.*

*Pizarro*, 17 Cr. 151 (AJN), 2018 WL 1737236, at *7 (S.D.N.Y. Apr. 10, 2018) (denying motion

to suppress historical cell site data because "[d]efendants have not submitted an affidavit

demonstrating their privacy interest in the subject numbers" whose data was seized); *United*

*States v. Walker*, 16 Cr. 567 (JSR), Mem. Op. at 3-4 (S.D.N.Y. Mar. 8, 2017) (holding that a

defendant seeking to assert that he has a protectable privacy interest in cell site location

information "must demonstrate that he owned or had exclusive use of the cell phone during the

period in question," and finding that a defendant lacked standing because "[a]t most, the

defendant has demonstrated non-exclusive and sporadic use").  Although the Government

expects to connect certain cellphone numbers to the defendant at trial, that fact alone cannot

establish his standing to bring the instant suppression motion.  Accordingly, the defendant's

motion must be denied on this ground alone.

### 2.    The Good Faith Exception Applies

Even if the defendant were able to establish standing to bring the pending suppression

motion, however, his motion should nevertheless be denied because law enforcement acted in

good faith when obtaining the challenged records in June of 2016.  Specifically, the Supreme

Court's prior decisions regarding the third party doctrine, the unanimity of circuits to consider

the validity of 2703(d) orders, and the indication of the Second Circuit in a summary order all

supported law enforcement's good faith belief that the SCA Orders were lawful.  Indeed, post-

*Carpenter* decisions have uniformly concluded that similar historical cell site records seized

pursuant to 2703(d) orders were obtained in good faith, rendering the exclusionary rule

inapplicable.

    As discussed above, prior to *Carpenter*, every circuit to have considered whether an order

issued under Section 2703(d) was a constitutionally acceptable basis for obtaining historical cell

site data concluded that such orders were, in fact, sufficient.  Although the Second Circuit had

not directly opined on the issue of whether an individual had a reasonable expectation of privacy

in historical cell site information, before *Carpenter* the Second Circuit had strongly indicated

that no such expectation of privacy existed.  Specifically, in *United States v. Pascual*, 502 F.

App'x 75, 80 (2d Cir. 2012), the Second Circuit had stated that "no governing precedent from

this Court or the Supreme Court required exclusion" of historical cell site information obtained

without a warrant or a showing of probable cause.  And in fact, the Second Circuit went on to

note that "the general principles adopted by those courts point[] the other way"—*i.e.*, toward the

sufficiency of a Section 2703(d) order and against the idea of requiring a warrant or probable

cause to obtain historical cell site records.  *Id.*

    Indeed, the relevant Supreme Court precedent at the time the historical cell site

information was obtained in this case provided a clear basis for a reasonable law enforcement

officer to conclude that obtaining those records from a customer's cellular service provider was

not a search because that data had been shared with a third party.  In *Miller*, 425 U.S. at 443, the

Supreme Court had established that "the Fourth Amendment d[id] not prohibit the obtaining of information revealed to a third party and conveyed by him to Government authorities . . . ." And in *Smith*, 442 U.S. at 744, the Supreme Court had specifically addressed the issue in the context of records maintained by telephone companies, and concluded that an individual has no reasonable expectation of privacy in dialed telephone numbers conveyed to the telephone company.

Based on the above precedent, law enforcement here had every reason to believe that they were acting lawfully when they obtained historical cell tower information and historical cell site information—which had been revealed to and collected by third-party cellular service providers—pursuant to the SCA Orders. The objective reasonableness of that belief, and law enforcement's good faith, is further demonstrated by the opinions of every circuit to consider the issue, which, at that time, had held that a warrant was not required to obtain historical cell site information. *See Graham*, 824 F.3d at 424-26; *Carpenter*, 819 F.3d at 887, 890; *Davis*, 785 F.3d at 511-13; *In re Application*, 724 F.3d at 614-15; *Guerrero*, 768 F.3d at 358-59; *In re Application*, 620 F.3d at 313.

Furthermore, law enforcement's objective good faith belief that it could acquire the historical cell site data without a warrant was not based solely on then-existing precedent. That belief was reinforced by Congress's then-valid judgment as to the proper procedure for obtaining such records, as embodied by the SCA. "Objectively reasonable good faith includes 'searches conducted in reasonable reliance on subsequently invalidated statutes.'" *United States v. Chavez*, 894 F.3d 593, 608 (4th Cir. 2018) (quoting *Davis*, 564 U.S. at 239). Here, the orders obtained by the Government fully conformed to the requirements of the SCA, and the defense does not dispute that the Government's applications satisfied the factual threshold of "reasonable

14

grounds to believe" that the records sought would be "relevant and material to an ongoing

criminal investigation."  18 U.S.C. § 2703(d).  Similarly, Judge Smith and Judge Davison both

acted reasonably and lawfully in compliance with the SCA when they issued the orders

authorizing the collection of this evidence, and law enforcement thus acted reasonably and in

good faith when it executed those orders.  *See Chavez*, 894 F.3d at 608 (concluding that though

"*Carpenter* is obviously controlling going forward," the good-faith exception applies to

historical cell site information obtained using Section 2703(d) order); *Davis*, 785 F.3d at 518

n.20 (concluding, pre-*Carpenter*, that even if 2703(d) were unlawful, good-faith exception would

apply).

     Moreover, since *Carpenter* was decided, every circuit court to address this issue has held

that the good faith exception applies to historical cell site location information obtained via the

SCA pre-*Carpenter*.  *See Chavez*, 894 F.3d at 608 (holding that *Carpenter* "can have no effect

on" cases where law enforcement acted in "[o]bjectively reasonable good faith," including

"searches conducted in reasonable reliance on subsequently invalidated statutes" (internal

quotation marks omitted) (quoting *Leon*, 468 U.S. at 239)); *United States v. Joyner*, 899 F.3d

1199, 1205 (11th Cir. 2018) (affirming district court's decision to deny motion to suppress cell

site evidence, and noting that "the fact that the *Carpenter* Court agreed with [the defendant's]

Fourth Amendment theory does not affect the applicability of the *Leon* good faith exception in

this case. . . . Here, the Government complied with the requirements of the SCA in obtaining the

orders to compel cell site records, and when they did so in June 2015, that warrantless procedure

was, under this Court's precedent, within the bounds of the Fourth Amendment."); *United States

v. Curtis*, 901 F.3d 846, 849 (7th Cir. 2018) ("[E]ven though it is now established that the Fourth

Amendment requires a warrant for the type of cell-phone data present here [seized pursuant to

2703(d)], exclusion of that information was not required because it was collected in good faith."); *United States v. Carpenter*, 926 F.3d 313, 317-18 (6th Cir. 2019) (concluding that "it was not unreasonable for the FBI agents who acquired [defendant's cell site data] to rely on § 2703(d)," and suppression was therefore unwarranted "because the FBI agents relied in good faith on the SCA when they obtained the data"); *United States v. Goldstein*, 914 F.3d 200, 204 (3d Cir. 2019) ("The good faith exception applies to the government's search in this case because the government acted upon an objectively reasonable, good faith belief that obtaining [the defendant's cell site data] under Section 2703(d) was legal."); *United States v. Korte*, 918 F.3d 750, 758 (9th Cir. 2019) ("Because we find the Government reasonably relied on the SCA when it obtained [the defendant's cell site data], we affirm the district court's application of the Fourth Amendment's good-faith exception."); *United States v. Ackies*, 918 F.3d 190, 202-03 (1st Cir. 2019).

Following this trend, in *United States v. Zodhiates*, 901 F.3d 137 (2d Cir. 2018), the Second Circuit addressed a situation in which the Government obtained a significant volume of information (albeit via a subpoena) under the SCA in 2011, well before the *Carpenter* decision was issued.  In *Zodhiates*, the Government had obtained, among other things, 28 months' worth of billing records.  *Id.* at 141.  Although the Government did not specifically request cellphone location information, the service provider sent records showing the phones' "service location," *i.e.*, the general vicinity from which each call was made or received.  *Id.*  The defendant moved to suppress this evidence before trial, arguing that a warrant was required; given the state of the law at the time, the district court denied that motion.  *Id.*  On appeal, the Second Circuit affirmed that decision, reasoning:

> During the pendency of this appeal, the Supreme Court decided *Carpenter v. United States* . . . However, [the defendant] is not

> entitled to have the records suppressed because, under the "good
> faith" exception, when the Government "act[s] with an objectively
> reasonable good-faith belief that their conduct is lawful," the
> exclusionary rule does not apply. This exception covers searches
> conducted in objectively reasonable reliance on appellate
> precedent existing at the time of the search.

*Id.* at 143 (citations omitted). The Second Circuit went on to note that under appellate precedent

prior to *Carpenter*, the third party doctrine permitted the Government to obtain such records by

subpoena as opposed to by warrant. *Id.* at 143-44 (citing *Miller*, 425 U.S. at 443; *Smith*, 442

U.S. at 743; and *United States v. Ulbricht*, 858 F.3d 71 (2d Cir. 2017)). Accordingly, the Second

Circuit held that suppression was not required in light of the good faith exception.

The Second Circuit subsequently clarified in a summary order that historical cell site

orders obtained pre-*Carpenter* but after the Supreme Court's decision in *United States v. Jones*,

565 U.S. 400 (2012), which required a warrant for the placement of a GPS tracking device on a

vehicle, were similarly obtained in good faith. *United States v. Chambers*, 751 F. App'x 44, 45-

48 (2d Cir. 2018). Because orders for historical cell site records do not involve physical trespass

onto any property, but rather rely on a request to "the third party in possession of the data,"

"even after *Jones*, officers could have reasonably believed that the third-party doctrine meant a

warrant was not required to obtain cell-site data." *Id.* at 47. The Circuit therefore "conclude[d]

that even after *Jones*, but before *Carpenter*, it was objectively reasonable for authorities to think

that if they complied with the SCA, no warrant based on probable cause was constitutionally

required to obtain cell-site information from a third party." *Id.*

Similarly, since *Carpenter*, several Judges in this District have concluded that the good

faith exception applies to historical cell site information gathered pre-*Carpenter* pursuant to

Section 2703(d) orders. *See, e.g.*, *United States v. Gyamfi*, 16 Cr. 521 (CM), 2018 WL 6332902,

at *1-2 (S.D.N.Y. Nov. 13, 2018); *United States v. Guillen*, 17 Cr. 412 (KMW), 2018 WL

5831318, at *15 (S.D.N.Y. Nov. 7, 2018); *United States v. Key*, 12 Cr. 712 (SHS), 2019 WL 2314693 at *4 (S.D.N.Y. May 31, 2019); *United States v. Pizarro*, 17 Cr. 151 (AJN) (S.D.N.Y. Aug. 31, 2018) (Final Pretrial Conference Tr. at 37-42) (denying motion for reconsideration of suppression motion because good faith exception applies).  Additionally, the Second Circuit has issued two more summary orders confirming that the good faith exception applies to pre-*Carpenter* 2703(d) orders for historical cell site data.  *See United States v. Walsh*, -- F. App'x ---, 2019 WL 2361503, at *1-2 (2d Cir. June 4, 2019); *United States v. Herron*, 762 F. App'x 25, 30-31 (2d Cir. 2019).  Indeed, the Government is unaware of any decision by any federal court holding that good faith is inapplicable to a historical cell site order obtained pre-*Carpenter* pursuant to 18 U.S.C. § 2703(d), and the defense cites none.  *See United States v. Blake*, 2018 WL 3974716, at *2 (D. Conn. Aug. 20, 2018) (noting that every court to consider post-*Carpenter* motions as of the date of the court's decision "has declined to suppress evidence arising out of a pre-*Carpenter*, routine acquisition of cell site location information pursuant to the Stored Communications Act").

The same logic applies here.  As the above makes clear, under these circumstances—where the law enforcement agents relied in good faith on the SCA, judicial precedent regarding the third party doctrine, and on Judge Smith's and Judge Davison's orders—there can be no serious question that the agents acted in good faith and in compliance with then-existing law.  Thus, no exclusionary remedy is appropriate; the deterrence benefit of suppressing the historical cell site data obtained under the SCA is inapplicable.  "[T]he harsh sanction of exclusion should not be applied to deter [this] objectively reasonable law enforcement activity."  *Davis*, 564 U.S. at 241(citation and quotation marks omitted).

### 3.      The Defense's Textual Interpretation of the SCA Is Incorrect

In the face of this overwhelming weight of authority supporting the conclusion that the good faith exception applies to historical cell site records obtained through pre-*Carpenter* SCA orders, the defense claims that the text of the SCA precludes the use of SCA orders to obtain historical cell site information at all.  This argument is belied by both the text of the SCA and the cases considering that text, including a Second Circuit summary order expressly rejecting the reading the defense advances.

Section 2703 permits law enforcement to "require a provider of electronic communication service . . . to disclose a record or other information pertaining to a subscriber or customer of such service" pursuant to a court order issued upon a showing of "reasonable grounds to believe that . . . the records or other information sought, are relevant and material to an ongoing criminal investigation."  18 U.S.C. §§ 2703(c), (d).  The term "electronic communication service" is defined as "any service which provides to users thereof the ability to send or receive wire or electronic communications."  18 U.S.C. § 2510(15).  A "wire communication" is defined as "any aural transfer made in whole or in part through the use of facilities for the transmission of communications by the aid of wire, cable, or other like connection . . . ."  18 U.S.C. § 2510(1).  An "electronic communication" is defined as "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system . . . but does not include . . . any wire or oral communication . . . . [or] any communication from a tracking device . . . ."  18 U.S.C. § 2510(12).  Finally, a "tracking device" is defined as "an electronic or mechanical device which permits the tracking of the movement of a person or object."  18 U.S.C. § 3117(b).

The defense acknowledges that the plain language of the statute permits the Government to obtain records from cellphone companies upon a showing less than probable cause pursuant to an order under Section 2703(d).  The defense argues, however, that historical cell site information transforms a cellphone into a tracking device, meaning that such data cannot constitute an electronic communication and therefore is not obtainable under 2703(d).  As the Second Circuit has previously noted, however, this interpretation "misreads the statute."  *United States v. McCullough*, 523 F. App'x 82, 84 (2d Cir. 2013).  Section 2703 does not govern the disclosure of "electronic communications," but rather any "record or other information" maintained by an "electronic communication service."  *See id.* ("Section 2703(c) refers to records pertaining to a subscriber or customer of an 'electronic communication *service*.'" (emphasis in original)).  The question at issue is therefore *not* whether the records constitute or refer to electronic communications, but whether the requested records were maintained by an electronic communication service.

It is undisputed that the service providers at issue in the SCA Orders (AT&T, Sprint, T-Mobile, Metro PCS, and Verizon) all provide their customers the ability to receive wire communications (*i.e.*, voice calls) on their cellphones.  Accordingly, each of the service providers in the SCA Orders constituted an "electronic communication service" as defined by the statute.  *See id.*  It is further undisputed that these same service providers maintain historical cell site information regarding their subscribers and customers.  As such, the historical cell site information sought by the SCA Orders were indeed records and information of an electronic communication service that the text of the SCA permitted the Government to obtain through a 2703(d) order.

20

In arguing for its tortured reading of the statute, the defense points to a supposed split within this District, referring to two cases—*In re Application*, 460 F. Supp. 2d 448 (S.D.N.Y. 2006) (LAK) (finding that prospective cell site location information was obtainable under the SCA) (the "Judge Kaplan Decision") and *In re Application*, 2009 WL 159187 (S.D.N.Y. Jan. 13, 2009) (CM) (finding that prospective cell site location information was not obtainable under the SCA) (the "Judge McMahon Decision")—which reached conflicting decisions regarding the proper interpretation of the SCA.  Notably, both of the District Court decisions emphasized by the defense pre-date the Second Circuit's summary order in *McCullough* squarely rejecting the same interpretation the defense now advances.  In light of *McCullough*, any theoretical intra-District split was resolved by 2013, several years before the SCA Orders were issued in this case.

In any event, both the Judge Kaplan Decision and the Judge McMahon Decision are distinguishable from the instant case because both addressed applications for SCA orders permitting the Government to obtain *prospective* cellphone location data.  *See In re Application*, 460 F. Supp. 2d at 450; *In re Application*, 2009 WL 159187, at *1.[1]  Indeed, Judge Kaplan contrasted the application for prospective data pending before him with an application for historical cell site, noting that "[a] number of the magistrate judges to address this question have held that Section 2703, although it might cover historical cell site data, does not authorize the disclosure of such data on a 'real-time' or forward-looking basis."  *In re Application*, 460 F. Supp. 2d at 459.  In the context of seeking prospective—or real time—location data, Judge

---

[1] The same is true of the decision the defense cites resolving a § 1983 lawsuit, which similarly involved "real-time location data conveyed by [the plaintiff's] cellphone . . . where law enforcement affirmatively pings a phone to determine its location," a distinct type of data from the historical information covered by the SCA Orders here.  *Cucuta v. New York City*, 25 F. Supp. 3d 400, 416 (S.D.N.Y. 2014).  Similarly, the District of Maryland decision cited by the defense also concerned prospective GPS location data, and it therefore inapplicable to the issue here.  *In re Application*, 849 F. Supp. 2d 526, 530 (D. Md. 2011).

McMahon focused on "movement/location information" and concluded that a cellphone in that context constitutes a tracking device. *In re Application*, 2009 WL 159187, at *3. In other words, the "raging" debate to which the defense points surrounded Section 2703(d) applications for *prospective* cell site records allowing law enforcement to see a phone's location in real time, *not* the historical cell site records obtained in this case.

Moreover, even if the Judge Kaplan Decision and the Judge McMahon Decision did apply in the context of historical cell site (which they do not), the defense cites no authority to support its suggestion that a within-district split is sufficient to undermine good faith, and the Government is aware of none. And, as already mentioned, by the time the Government sought the SCA Orders in this case, the Second Circuit had already provided guidance on the very statutory interpretation question raised by the defense and had concluded that a plain reading of the statute permits the Government to obtain historical cell site information pursuant to a 2703(d) order. *McCullough*, 523 F. App'x at 84. Similarly, the circuit decisions upholding the use of 2703(d) orders to obtain historical cell site all post-dated the Judge McMahon Decision, but importantly, predated the SCA Orders in this case.

Moreover, other circuits to consider a similar question of statutory interpretation reached the same conclusion. For example, in 2010, the Third Circuit issued an opinion, which reversed the Western District of Pennsylvania decision cited on page 10 of the defense memorandum of law, concluding that the text of the SCA does in fact permit the Government to obtain historical cell site information through a 2703(d) order. *In re Application*, 620 F.3d at 310. More recently, the First Circuit rejected a similar argument, concluding that "a cell phone used for obtaining precise location information does not fit within the definition of a 'tracking device'" because the statute "refers to the '<u>installation</u> of a mobile tracking <u>device</u>," which involves "the physical

22

placement of some hardware or equipment" not applicable when retrieving historical cell tower or cell site data.  *Ackies*, 918 F.3d at 199 (emphasis in original).  Other district courts had reached the same conclusion before the SCA Orders in this case were issued.  *See, e.g.*, *In re Smartphone Geolocation Data Application*, 977 F. Supp. 2d 129, 150 (E.D.N.Y. 2013) ("[G]athering geolocation information about a cellular telephone does not convert the phone into a 'tracking device' for the purpose of [§ 3117].").

Given the plain meaning of the SCA's text, the inapplicability of the Judge McMahon Decision to historical records such as those at issue here, as well as the decisions from the Second Circuit and the Third Circuit rejecting the defense's proposed interpretation of the SCA, law enforcement reasonably relied upon the plain meaning of the statute when obtaining the SCA Orders in this case.  Those actions were all the more reasonable in light of the unanimity of circuit courts affirming the lawfulness of 2703(d) orders to obtain historical cell site records, together with the Supreme Court's third party doctrine jurisprudence.  Indeed, Judge McMahon herself seems to have implicitly embraced this conclusion when she recently held that the exclusionary rule does not preclude the introduction of historical cell phone location records obtained pursuant to a Section 2703(d) order.  *See Gyamfi*, 2018 WL 6332902, at *2 ("Here, the law enforcement agents who collected [the defendant's] cell-site data did so in accordance with a statute, § 2703(d), that told them how to go about collecting such data.  That process required the agents to obtain orders from judges, which they did.  The judges who issued those orders, in turn, did so in accordance with the decisions of every circuit court to consider the question.  Excluding the cell-site evidence in this case would in no way deter Fourth Amendment violations." (citations omitted)).   Accordingly, the defense motion should be denied without a hearing.

23

II.     **The Defendant's Motion to Suppress His Statements Should Be Denied**

The defendant also seeks to suppress statements he made to law enforcement on December 19, 2016.  In support of his motion, the defendant submitted an affidavit regarding the events of December 19, 2016, as well as audio and video recordings of portions of his interactions with law enforcement that day.  Because there appear to be factual disputes regarding the circumstances surrounding the defendant's statements, the Government respectfully requests that the Court hold an evidentiary hearing to resolve this motion. Following such a hearing, the Government respectfully submits that the motion should be denied in its entirety.

A.     **Relevant Facts**

The Government expects the facts at a hearing, including witness testimony, audio and video recordings, and drone footage, would reflect the following: On the morning of December 19, 2016 investigators from the NYSP, including Investigator Brian Hammer and Investigator James Browne, conducted surveillance of the driveway to the defendant's residence at the time on Long Lane in Crawford, New York.  Meanwhile, the FBI had a drone recording aerial footage of the investigative team and the surrounding area.  (Def. Ex. G.)

At approximately 10:45 AM, the investigative team observed a blue Jeep exiting the defendant's driveway, turn onto Long Lane, and then a short time later turn around and drive back toward the defendant's residence.  In response, the investigative team pulled the Jeep over, and multiple law enforcement vehicles approached the Jeep.  After stopping the Jeep, Investigator Hammer approached on foot and found a single female occupant, who was later identified as the defendant's wife, in the driver's seat.  The defendant's wife was holding a cellphone to her ear and speaking into the phone as though on a call.  Investigator Hammer

24

identified himself and told her that the license plate on the Jeep had been reported as part of a road rage incident the prior night involving a male driver.[2]  In response, the defendant's wife said, in sum and substance, that her husband was not driving the Jeep the prior night. Investigator Hammer then asked her to have her husband come down and speak with law enforcement.  After the defendant's wife said that her husband was on his way, all of the other law enforcement vehicles—except Investigator Hammer's—pulled away from the Jeep and out of view.

A few minutes later, the defendant drove out of his driveway in a black truck and pulled up to the portion of Long Lane where Investigator Hammer's vehicle was parked behind the Jeep.  The defendant stopped the truck near Investigator Hammer, rolled down his window, identified himself as the owner of the Jeep, and stated "I'm a cop."  In response, Investigator Hammer asked the defendant to pull out of the lane of traffic and speak with him.  The defendant then pulled over behind Investigator Hammer's car and, without instruction, stepped out of his truck.  At that time, Investigator Hammer was the only officer standing on Long Lane, and his car was the only law enforcement vehicle visible on the road.

After the defendant stepped out of his truck, Investigator Hammer obtained his pedigree information and asked the defendant, in substance, whether he was involved in a road rage incident the prior night.  The defendant denied any involvement.  Investigator Hammer stated, in substance, that he would like to discuss the road rage incident with the defendant but did not want to have the conversation on the street and would rather do so back at the NYSP barracks.

---

[2] This story was a ruse in order to facilitate speaking with the defendant.  The investigative team had previously decided that if they spoke with the defendant or anyone driving the defendant's vehicle that morning, they would describe a road rage incident to explain law enforcement's interest in speaking with the defendant.

In response, the defendant agreed to accompany Investigator Hammer back to the NYSP barracks.

After approximately one minute of speaking with Investigator Hammer, additional law enforcement vehicles pulled onto Long Lane and parked near the defendant's and Investigator Hammer's vehicles.  Investigator Browne, who was inside of Investigator Hammer's vehicle, activated an audio recording device, which he kept on his person.  (Def. Ex. B).[3]  Investigator Browne then approached the defendant, who was engaged in conversation with Investigator Hammer.  Shortly thereafter, the defendant received a phone call, which he was permitted to answer.  After the defendant finished his phone call, Investigator Hammer told the defendant that law enforcement wanted to "talk to [him] about a couple things," and then asked the defendant "do you want to have a seat in the car for a second here?"  The defendant responded "Sure, absolutely."  At that time, the defendant began to walk toward Investigator Hammer's vehicle, and other officers conducted a brief pat down of the defendant and took two cellphones from his person.  Investigator Hammer then asked the defendant to have a seat in the back of Investigator Hammer's car, and the defendant walked over to the vehicle and got into the back seat.   At no time did the defendant ask whether he could drive his own car to the NYSP barracks.

For approximately fifty seconds, the defendant was alone in the back seat of Investigator Hammer's vehicle (with the door open for the first twenty seconds), while Investigator Hammer,

---

[3] The defense motion included transcripts of the audio recordings that law enforcement made on December 19, 2016.  By their own admission, however, those transcripts contain inaccuracies. (*See* Def. Mem. 3 n.1.)  Accordingly, the Government has created its own transcript of a portion of audio from Investigator Browne's recording device.  In particular, the Government's transcript covers the beginning of that recording through the administering of *Miranda* warnings.  That transcript is attached as Government Exhibit A hereto.  The Government respectfully submits that its transcript fairly and accurately reflects the contents of those portions of the audio recording.

Investigator Browne, and other members of law enforcement discussed what to do with the defendant's vehicle.  Investigator Hammer then got into the back seat with the defendant. Immediately after Investigator Hammer entered the car and without prompting, the defendant spontaneously stated, "this isn't about road rage, this is about the missing Mexicans, isn't it."  In response, Investigator Hammer informed the defendant, in sum and substance, that there were a lot of topics he wanted to discuss, including the one the defendant had just mentioned.  The two then engaged in a brief preliminary conversation in which Investigator Hammer asked the defendant to help with the investigation into the victims' disappearance.

Approximately fifty seconds after Investigator Hammer entered his vehicle, Investigator Browne then entered the driver's seat of the vehicle.  Because Investigator Browne was still wearing the audio recording device, the remainder of the conversation is captured on audio recording.  That recording demonstrates that the conversation remained respectful, calm, and non-confrontational throughout the approximately 22 minute drive from Long Lane to the NYSP barracks.  Throughout the drive, the defendant remained unrestrained in the car as he answered questions about his own background and his interactions with the victims and the circumstances of their disappearance.  Also throughout the drive, law enforcement did not draw their weapons, did not tell the defendant he was under arrest, and did not tell the defendant that he was not free to leave.

Upon arriving at the NYSP barracks, the defendant walked—again unrestrained—with law enforcement to an interview room.  Because the room was equipped with a camera, the entirety of the defendant's interactions with law enforcement in that room were audio and video recorded.  (Def. Ex. E.)   The defendant remained alone in the room for approximately four minutes, after which Investigator Hammer and Investigator Browne entered the room. The

investigators offered the defendant water, but he declined.  After Investigator Browne obtained

the defendant's pedigree information, Investigator Hammer read the defendant his *Miranda*

warnings.  In response, the defendant indicated that he understood his rights and wished to

answer questions at that time.  The defendant proceeded to answer questions regarding his

interactions with the victims and the circumstances of their disappearance.  After approximately

47 minutes of questioning (with an approximately 10 minute break near the end), the defendant

invoked his right to counsel and declined to answer further questions.   Investigator Hammer

then placed the defendant under arrest and escorted him out of the interview room for processing.

From that point forward, law enforcement ceased all questioning of the defendant

because he had invoked his right to counsel.  After processing the defendant, Investigator

Hammer and Investigator Browne transported the defendant, who was now restrained in

handcuffs, from the NYSP barracks to the federal courthouse in White Plains for his

presentment.  During the drive to White Plains, Investigator Hammer and Investigator Browne

engaged in small talk with the defendant but did not question him or discuss his case.  As the car

entered White Plains and neared the courthouse, the conversation came to a lull, and the

occupants were silent.  After this period of silence, the defendant spontaneously and without

prompting stated "fucking Mexicans."  Neither Investigator Hammer nor Investigator Browne

responded to the defendant's statement, and they did not engage in further conversation with the

defendant.

### B.    Applicable Law

### 1.    Interrogation

Under the Fifth Amendment, statements made by an individual in response to

interrogation while in custody generally must be suppressed if they were made in the absence of

*Miranda* warnings.  *Miranda v. Arizona*, 384 U.S. 436, 444 (1966); *United States v. Newton*, 369

F.3d 659, 669 (2d Cir. 2004).  Not every seizure of a person by law enforcement constitutes custody under a *Miranda* analysis.  *Berkemer v. McCarty*, 468 U.S. 420, 439-40 (1984) (motorist questioned at roadside during traffic stop not in custody for *Miranda* analysis); *Newton*, 369 F.3d at 672.  "[C]ustody" for *Miranda* purposes "is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion."  *Howes v. Fields*, 565 U.S. 499, 508-09 (2012).  The definition of "custody" in the context of *Miranda* is so limited because the purpose of *Miranda* warnings is to "temper the 'potentiality for compulsion' that exists when an individual is 'cut off from the outside world' and subjected to 'incommunicado interrogation . . . in a police-dominated atmosphere.'"  *United States v. FNU LNU*, 653 F.3d 144, 154 (2d Cir. 2011) (ellipses in original) (quoting *Miranda*, 384 U.S. at 457).

A court's analysis of whether a defendant was in "custody" for *Miranda* purposes therefore goes beyond a simple inquiry of whether a reasonable person would have felt free to leave during questioning.  Instead,

> it makes sense for a court to begin any custody analysis by asking whether a reasonable person would have thought he was free to leave the police encounter at issue. . . . [I]f a reasonable person would not have thought himself free to leave, . . . a court must ask whether, in addition to not feeling free to leave, a reasonable person would have understood his freedom of action to have been curtailed to a degree associated with formal arrest.

*Newton*, 369 F.3d at 672.  A defendant is in custody for purposes of *Miranda* analysis only if both questions are answered in the affirmative.  *Berkemer*, 468 U.S. at 440; *Newton*, 369 F.3d at 672.  The answer to both questions "depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned."  *Stansbury v. California*, 511 U.S. 318, 323 (1994).

"This inquiry focuses upon the presence or absence of affirmative indications that the defendant was not free to leave," and depends on a number of factors. *United States v. Mitchell*, 966 F.2d 92, 98 (2d Cir. 1992). For example, courts consider "whether a suspect is or is not told that [he or] she is free to leave; the location and atmosphere of the interrogation; the language and tone used by the police; whether the suspect is searched, frisked, or patted down; and the length of the interrogation." *Tankleff v. Senkowski*, 135 F.3d 235, 244 (2d Cir. 1998) (internal citations omitted). "To be considered 'in custody' a defendant must have 'understood himself to be subject to restraints comparable to those associated with a formal arrest.'" *United States v. Remache*, 201 F.3d 433, 1999 WL 1212535 at *1 (2d Cir. 1999) (quoting *Mitchell*, 966 F.2d at 98). Even if a defendant is not formally told he is under arrest, he is nevertheless in custody for purposes of this analysis if "law enforcement officials act or speak in a manner that conveys the message that they would not permit the accused to leave." *United States v. Kirsh*, 54 F.3d 1062, 1067 (2d Cir. 1995) (internal quotation mark omitted) (quoting *Campaneria v. Reid*, 891 F.2d 1014, 1021 n.1 (2d Cir. 1989)). The core question is whether the circumstances of the questioning "convey[ed] to the suspect a message that he has no choice but to submit to the [interrogating] officers' will and to confess." *Minnesota v. Murphy*, 465 U.S. 420, 433 (1984).

Even where an interview occurs "in a coercive environment," including a police station, *Miranda* warnings are not required so long as the suspect arrives voluntarily. *Cruz v. Miller*, 255 F.3d 77, 81-82 (2d Cir. 2001) (internal quotation marks and citations omitted); *see also Oregon v. Mathison*, 429 U.S. 492, 497 (1977). Similarly, interactions with multiple law enforcement officers in a public area, such as a roadside, do not necessarily indicate that a suspect is in custody for purposes of this analysis. *See, e.g., United States v. Cota,* 953 F.2d 753, 758–59 (2d Cir.1992) (defendant ordered out of car at gunpoint, handcuffed, then voluntarily accompanied

30

law enforcement to police station inside police vehicle while unrestrained, and waited for six hours at station to be questioned, was not in custody for purposes of *Miranda*); *Ortiz v. Artuz*, 09 Civ. 5533 (NRB), 2010 WL 3290962, at *9 (S.D.N.Y. Aug. 9, 2010) (although six police officers "surrounded" suspect, state court not unreasonable in determining suspect was not in custody for purposes of *Miranda* because suspect was not handcuffed and was not specifically told that he was required to travel to the police station).  Similarly, it is irrelevant whether interviewing officers intend to arrest a suspect at the end of an interrogation, so long as that intent is not communicated to the suspect during questioning.  *See Berkemer*, 468 U.S. at 442.

Though an extended interview session is indicative of custodial interrogation, interviews of an hour or less suggest that the interview was noncustodial.  *United States v. Lifshitz*, 03 Cr. 572 (LAP), 2004 WL 2072468 at *8 (S.D.N.Y. 2004) (45 minute to hour-long interview held not custodial).  In the absence of an arrest, the Court of Appeals has "emphasized that  . . . an interrogation is not 'custodial' unless the authorities affirmatively convey the message that the defendant is not free to leave."  *Mitchell*, 966 F.2d at 98.  "Handcuffs are generally recognized as a hallmark of a formal arrest."  *Newton*, 369 F.3d at 676.  Moreover, temporary restrictions on a defendant's movement are not custodial for purposes of *Miranda*.  *United States v. Badmus*, 325 F.3d 133, 139 (2d Cir. 2003) (defendant not in custody even where told to stay seated in his living room and not allowed to move freely in apartment during execution of search); *United States v. Ross*, 719 F.2d 615, 622 (2d Cir. 1983) (fact that defendant told he would be escorted by an agent if he moved about office while search underway not custodial).

### 2.    *Miranda* Warnings

When a statement is obtained through interrogation of a defendant who is in custody, the Government must demonstrate that the defendant was informed of, and validly waived, his Fifth Amendment rights.  To prove a valid waiver of *Miranda* rights, the Government must show, by a

preponderance of the evidence, that the defendant had a full awareness of the rights he was waiving and the consequences of waiving those rights, and that the defendant relinquished those rights voluntarily.  *See Colorado v. Connelly*, 479 U.S. 157, 167-69 (1986); *Jaswal*, 47 F.3d at 542.  A defendant need not "know and understand every possible consequence of a waiver of the Fifth Amendment privilege." *Colorado v. Spring*, 479 U.S. 564, 574 (1987).  Rather, the accused need only be aware that his statements may be used against him in future prosecution, and that "he may choose not to talk to law enforcement officers, to talk only with counsel present, or to discontinue talking at any time." *Id.*

A related but distinct requirement is that a defendant's statement must be voluntary.  A statement is not voluntary within the meaning of the Fifth Amendment if it is obtained by "'techniques and methods offensive to due process' or other circumstances in which the suspect clearly had no opportunity to exercise 'a free and unconstrained will.'" *Oregon v. Elstad*, 470 U.S. 298, 304 (1985) (*quoting Haynes v. Washington*, 373 U.S. 503, 514-15 (1963)).  "No single criterion controls whether an accused's confession is voluntary: whether a confession was obtained by coercion is determined after a careful evaluation of the totality of the surrounding circumstances." *Green v. Scully*, 850 F.2d 894, 901 (2d Cir. 1987).  The critical issue relevant to voluntariness looks to whether the defendant's will was "overborne" by the conduct of law enforcement officers such that his statements cannot be deemed to be the "product of a rational intellect and a free will." *Lynumm v. Illinois*, 372 U.S. 528, 534 (1963) (internal quotation marks omitted).  "In applying the totality of the circumstances test, those factors that a court should consider to determine whether an accused's confession is voluntary center around three sets of circumstances: (1) the characteristics of the accused, (2) the conditions of interrogation, and (3) the conduct of law enforcement officials." *Green*, 850 F.2d 901-02.  The age of the accused,

education level, intelligence, advice regarding constitutional rights, length of detention, repeated and prolonged questioning, and the use of physical punishment are some of the criteria that courts consider when further evaluating the totality of the circumstances. *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973). Compliance with *Miranda*, although not dispositive, is a significant factor weighing in favor of a finding of voluntariness. *Berkemer*, 468 U.S. at 433 n.20.

Where law enforcement engages in custodial interrogation, the Supreme Court has prohibited a deliberate two-step technique involving questioning both before and after providing *Miranda* warnings as an end-run around the *Miranda* requirement. *Missouri v. Seibert,* 542 U.S. 600, 611 (2004). In particular, the plurality in *Seibert* "h[e]ld that a statement repeated after a warning in such circumstances is inadmissible." *Id.* at 604. An impermissible two-step interrogation technique, also known as "question first strategy," takes place when officers deliberately ask questions of a suspect in custody to retrieve a confession prior to communicating the *Miranda* warnings, and then refer back to the earlier confession in a separate, successive interrogation. *Id.* at 611.

Specifically, the *Seibert* plurality found that an explicit policy of questioning a suspect in custody until obtaining a confession, then providing *Miranda* warnings, and then asking the suspect to repeat the same confession violated the suspect's Fifth Amendment rights. *Id.* at 605, 609-10. In order to address this issue, *Seibert* directs courts to inquire "whether the warnings" given after a defendant has already been interrogated "advise the suspect that he had a real choice about giving an admissible statement at that juncture," and whether "they reasonably convey that [the defendant] could choose to stop talking even if he had talked earlier." *Id.* at 612.

Notably, an officer's failure to provide *Miranda* warnings prior to receiving a voluntary admission from the defendant does not necessarily render the later statements inadmissible. *See Elstad,* 470 U.S. at 318 (suspect who confessed during uncoercive, pre-*Miranda* questioning is nonetheless permitted to waive his rights and confess after being given the *Miranda* warnings). "A careful and thorough administration of *Miranda* warnings serves to cure the condition that rendered the unwarned statement inadmissible." *Id.* at 310-11.  An officer's good faith mistake in failing to provide *Miranda* warnings, absent any coercion to obtain a confession, should not undermine later, voluntary statements. *Id.* at 309. The key question is whether the statement was voluntary, which requires analyzing the circumstances and police conduct. *Id.* at 318.

### 3.    Spontaneous Statements

The Supreme Court in *Miranda* made clear, however, that "by custodial interrogation, we mean *questioning* initiated by law enforcement officers . . . ."  *Miranda*, 384 U.S. at 444. Accordingly, "[v]olunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected" by the *Miranda* decision.  *Id.* at 478.  Accordingly, where a defendant makes statements "spontaneously" and not in response to police questioning, they are admissible regardless of whether the defendant is in custody or has received his *Miranda* warnings.  *United States v. Bowden*, 45 F. App'x 61, 64 n.1 (2d Cir. Sept. 6, 2002); *see also Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980).

### C.    Discussion

The defendant seeks to suppress all of the statements he made to law enforcement on December 19, 2016, claiming that he was in custody from the moment he first met law enforcement on the road and therefore should have been provided his *Miranda* warnings

immediately, instead of upon his arrival at the NYSP barracks.[4]  Because the defendant was

unrestrained when he first spoke with law enforcement and because he voluntarily travelled to

the NYSP barracks with investigators, he was not "in custody" and no *Miranda* warnings were

required until he was placed under arrest at the NYSP barracks.  Accordingly, all of the

defendant's statements are admissible at trial.  In the alternative, even if the defendant was in

custody at an earlier point on December 19, 2016, his spontaneous statements to law

enforcement, which the defendant made without any prompting or questioning, are nevertheless

admissible at trial.

As an initial matter, the defendant's roadside interactions with Investigator Hammer did

not amount to placing him in custody for purposes of *Miranda*.  The aerial video footage makes

clear that after the defendant pulled over to the side of the road and got out of his car, he was free

to move about and unrestrained as he spoke with Investigator Hammer.  That footage also makes

clear that no weapons were drawn during the interaction, and the defendant was not placed in

handcuffs.

The footage also belies the claims made by the defendant in his affidavit.  For example,

the defendant claims that "[a]s I approached the intersection of Long Lane and Highway 17K, I

saw multiple marked and unmarked law enforcement vehicles blocking off the intersection."

(Def. Aff. ¶ 2).  The defendant then claims that after pulling over, but before exiting his truck,

"[a] couple of police vehicles then pulled up and parked behind and next to my truck so that my

truck was surrounded by police vehicles."  (Def. Aff. ¶ 3).  The defendant further claims that

---

[4] Although the defense motion papers reference controlled calls made by a confidential source to
the defendant earlier in the morning on December 19, 2016, the defense does not appear to be
seeking to suppress the statements the defendant made during those phone calls.  Indeed, because
those calls took place before the defense claims the defendant was in custody on December 19,
2016, there is no conceivable basis for suppressing those statements.

"[w]hen I stepped out of my vehicle, I was immediately approached by multiple officers who surrounded me." (Def. Aff. ¶ 4). None of these claims are true. As the footage makes clear, (i) there were no vehicles blocking the intersection when the defendant approached that intersection (Def. Ex. G at 7:15 – 7:50); and (ii) the defendant was out of his vehicle and speaking with Investigator Hammer for a full minute before any other law enforcement vehicles or personnel arrived on the scene (Def. Ex. G at 8:10 – 9:10). And although additional vehicles and law enforcement personnel eventually approached the defendant during his conversation with Hammer, the defendant maintained his freedom of movement, as demonstrated by his ability to answer a phone call. The audio recording of the conversation from the point Investigator Browne joined the group makes clear that the defendant's exchange with Investigator Hammer was relaxed and cordial.

The audio of the roadside conversation similarly supports the conclusion that the defendant voluntarily agreed to travel with Investigator Hammer to the NYSP barracks to answer questions. Contrary to the defendant's claim that after he was directed to get into the back of the police vehicle to travel to the police station, he "specifically asked if [he] could drive [his] own vehicle and [] was told no" (Def. Aff. ¶ 7), at no time on the audio does the defendant ask whether he can drive his own car. Rather, when Investigator Hammer asked the defendant "do you want to have a seat in the car for a second," the defendant calmly replied "Sure, absolutely."[5] Although the defendant was briefly patted down, he was still not placed in restraints, and

---

[5] In support of his motion, the defendant provided a transcript of Investigator Browne's audio recording. (Def. Ex. B). Notably, the transcript completely omits this interaction between Investigator Hammer and the defendant, even though the interaction is clearly audible in the recording at 1:16 to 1:22. (Def. Ex. B.)

Investigator Hammer explained on the audio that the frisk was necessary before the defendant entered the law enforcement vehicle.

Once in the vehicle, the defendant was not restrained, and the car itself did not have any barrier between the back seat and the front seat.  As the audio recording from the drive to the NYSP barracks demonstrates, the interactions during the brief drive remained conversational and non-confrontational.  Upon arriving at the NYSP barracks, the defendant remained unrestrained as he walked to the interview room.  Given the tone of the conversation, the lack of physical restraints, and the defendant's willingness to assist law enforcement and travel to the NYSP barracks, an objective view of the circumstances makes clear that the defendant was not in custody during the drive to the NYSP barracks.

Once in the interview room, Investigator Hammer clearly described the defendant's *Miranda* rights.  The audio/video recording of that interaction demonstrates that the defendant understood those rights and agreed to waive them.  This conclusion is bolstered by (i) the fact that, after Investigator Hammer alluded to *Miranda* warnings but before providing them, the defendant told investigators that he was not going to ask for a lawyer,[6] and (ii) the defendant's confidence at a later point in the interview when asserting his right to counsel and refusing to answer questions.  Because the defendant was not in custody on the roadside or during the drive to the NYSP barracks, law enforcement was not required to provide him with *Miranda* warnings during those interactions.  Accordingly, there is no "two-step" problem with Investigator Hammer providing those warnings upon arrival at the NYSP barracks, and all of the defendant's post-*Miranda* statements are admissible.

---

[6] *See* Gov't Ex. A at 37 (Hammer: Uh, um, so before we get into that stuff there, uh, uh, you've done this before many times. We have to do it to cover ourselves and cover everybody else. Defendant: Well, for now, I'm not gonna ask for a lawyer.).

Finally, even if the Court concludes that the defendant was in custody at an earlier point in the day on December 19, 2016, two of the defendant's statements were spontaneous and therefore admissible because they were not the product of interrogation.  First, immediately after Investigator Hammer got into the back seat of the car with him, the defendant spontaneously stated, unprompted by any interrogation, "this isn't about road rage, this is about the missing Mexicans, isn't it."  Second, near the end of the drive from the NYSP barracks to the White Plains federal courthouse, the defendant spontaneously stated "fucking Mexicans."  That statement was made at the end of a car ride during which the defendant was not questioned about this case, immediately followed a period of silence in the car, and was not in response to any questioning by law enforcement.  Accordingly, both of these statements constitute a spontaneous statement not subject to *Miranda* and are admissible at trial.

## CONCLUSION

For the foregoing reasons, the Government respectfully requests that the Court deny the defendant's motion to suppress historical cell site evidence, and following an evidentiary hearing, deny the defendant's motion to suppress his statements.

Dated:          White Plains, New York
                September 20, 2019

                                              Respectfully submitted,

                                              GEOFFREY S. BERMAN
                                              United States Attorney for the
                                              Southern District of New York

                                    By:      _/s/_____.
                                              Maurene Comey
                                              Jason Swergold
                                              Assistant United States Attorneys
                                              (212) 637-2324 / 1023

cc:     *All Counsel of Record (by ECF)*

38