UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA,                   :

                                                                            :

       -against-                              :        REPLY TO GOVERNMENT
                                                                         OPPOSITION TO MOTION TO
                                                                :        SUPRESS STATEMENTS

                                                                :        **CASE: 16-CR-832(KMK)**

NICHOLAS TARTAGLIONE,                       :

                                                                            :

                          Defendant.                :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

## DEFENDANT NICHOLAS TARTAGLIONE'S REPLY TO GOVERNMENT'S OPPOSITION TO MOTION TO SUPPRESS STATEMENTS

**Counsel for Mr. Tartaglione:**

Barket Epstein Kearon Aldea & LoTurco, LLP
666 Old Country Road, Suite 700
Garden City, NY 11530

By: Aida Ferrer Leisenring, Esq.
     Bruce A. Barket, Esq.

1

Introduction

Defendant Nicholas Tartaglione, through undersigned counsel, respectfully submits that an evidentiary hearing is necessary to resolve Mr. Tartaglione's motion to suppress the statements he allegedly made to law enforcement agents in the course of his custodial interrogation. The defense agrees with the government that "there appear to be factual disputes regarding the circumstances surrounding the defendant's statements." <u>See</u> Government's Omnibus Memorandum of Law in Opposition to the Defendant's Pretrial Motions (herein "Opp."), P. 24. Accordingly, both the defense and the government concede that an evidentiary hearing to resolve this motion is necessary.

The defendant submits this Reply to the Government's Opposition, and maintains his request for all forms of relief previously enumerated in his Motion to Suppress. He further maintains all of his prior factual assertions, and addresses only certain factual disputes and cases, which the government has cited in their Opposition. Any argument made by the government that is not addressed in this Reply is not conceded.

Factual Disputes

Several material factual disputes in this matter have already been laid bare by Mr. Tartaglione's Motion to Suppress and the Government's Opposition, and a hearing, therefore, is necessary to resolve these disputes. However, with respect to any alleged factual disputes concerning Mr. Tartaglione's affidavit, the defense maintains that the assertions made by Mr. Tartaglione in his affidavit are based on Mr. Tartaglione's memory and his subjective perception of the events surrounding his arrest, which took place nearly three years ago. Moreover, it has likewise been years since Mr. Tartaglione has reviewed the relevant surveillance and audio recordings. Nevertheless, over all, Mr. Tartaglione's perception of the day's events is consistent

with the heavy presence of law enforcement agents and vehicles, with the seizure of his wife, their Jeep, his truck, his person, and his property, and with his inability to move about freely during the course of his interrogation, which began roadside on the morning of December 19, 2016.

Indeed, Mr. Tartaglione was aware that multiple law enforcement agents had stopped his wife, Ms. Virag Balint, just prior to his arrival at the scene of her vehicle stop. Ms. Balint first contacted Mr. Tartaglione on her cell phone to tell him that she was being pulled over by multiple law enforcement agents, and at the direction of law enforcement officials, Ms. Balint communicated to Mr. Tartaglione that investigators wanted him to come to the scene of the stop for questioning. On his way, Mr. Tartaglione received texts messages from Ms. Balint stating, "3 troopers came out too," and "and a volks came out." See Exhibit A, Text Messages Between Ms. Balint and Tartaglione on 12/19/16. Based on the communications he received from his wife, as well as the phone call he received from ▮▮▮▮▮▮▮ earlier that morning, wherein ▮▮▮▮▮ communicated that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, Mr. Tartaglione felt a strong presence of law enforcement at the intersection where his wife was stopped, and he perceived the influx of law enforcement, and their descendence upon him and his truck shortly after he was stopped, as immediate. In fact, within 43 seconds of arriving at the scene, pulling over, and exiting his vehicle, another law enforcement vehicle pulled up and parked behind Mr. Tartaglione; seven seconds later, another investigator exited his vehicle and approached the area; and four seconds later, a third law enforcement vehicle pulled up parallel to Mr. Tartaglione's truck, as more officers began exiting their vehicles and approaching Mr. Tartaglione as well.

Additionally, it bears emphasis that the "brief pat down" of Mr. Tartaglione went beyond merely checking for weapons, and, in this respect, the government's claim that "Investigator Hammer explained on the audio that the frisk was necessary before the defendant entered the law enforcement vehicle" is not supported by the audio recording at all. Investigator Hammer can be heard stating: "no weapons or anything like that," (Opp. Transcript Attachment, P. 2) but then, upon finding no weapons, Mr. Tartaglione's phones were seized -- and never returned to him -- and he was then escorted to and essentially placed inside the backseat of the investigator's vehicle.

The government also claims that Mr. Tartaglione is not heard on the audio recording inquiring about driving his own vehicle. However, the audio recording did not capture the entire exchange between Tartaglione and law enforcement, as the government itself concedes. See Opp., P. 26-27. In any case, Mr. Tartaglione was seated in the backseat of the investigator's vehicle while Investigators Hammer, Browne and others discussed what to do with Mr. Tartaglione's truck. And, according to the drone footage, this conversation took place at the rear of the vehicle, within earshot of Mr. Tartaglione, who was seated inside the vehicle for at least 22-25 seconds while the rear passenger door remained open. A reasonable person in Mr. Tartaglione's position, in other words, without access to his truck, without access to the keys to his truck, without access to his phones, seated in the backseat of an investigator's vehicle, his wife still stopped in their Jeep, would not have felt free to leave. In this respect, the conduct by the police made it sufficiently clear to Mr. Tartaglione that he was not free to drive his own truck, let alone make any phone calls, even to his wife, who sat throughout his seizure, in their Jeep, separated from Mr. Tartaglione.

Also absent from the audio recording is the alleged "spontaneous" statement made by Mr. Tartaglione in Investigator Hammer's vehicle ("this is about the missing Mexicans, isn't it?"), which was not at all spontaneous. Although Investigator Hammer originally employed the ruse of a road rage incident involving the Jeep to engage Mr. Tartaglione in conversation, he then told Mr. Tartaglione, "we got to talk to you about a *couple* of things." See Opp. Transcript Attachment, P. 2. Accordingly, Mr. Tartaglione was responding to the statements made by Hammer that Hammer needed to speak to him at the barracks, that it was about a "couple" of things, and "I'll tell you what, we're gonna have a seat in the back" of Hammer's vehicle. See Opp. Transcript Attachment, P. 2, 3. Moreover, the topic of the "missing Mexicans" had already been raised during Hammer's questioning of Mr. Tartaglione before Mr. Tartaglione even got into the vehicle. See Opp. Transcript Attachment, P. 2 ("▇▇▇ just called me about ▇▇▇▇▇▇▇▇▇▇▇

Ultimately, a reasonable person in Mr. Tartaglione's position would not have felt free to leave given the totality of the circumstances. Mr. Tartaglione was alerted to ▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇ earlier that morning, and then his wife was pulled over by multiple agents. Next, his wife called to apprise him of these events, police instructed her to have Mr. Tartaglione come down and speak with them, and when Mr. Tartaglione arrived, pursuant to law enforcement's request, his wife remained pulled over on the side of the road in the presence of a law enforcement vehicle with flashing lights. The officer directed Mr. Tartaglione to pull over, and when he complied and exited his vehicle, numerous law enforcements agents arrived, within a minute, surrounded him and his vehicle, frisked him, removed his property, and escorted him to the inside of a law enforcement vehicle, which Mr. Tartaglione clearly understood would transport him to the barracks for questioning.

Tartaglione Was In Custody

The government's reliance on *United States v. Cota*, 953 F.2d 753 (2d Cir. 1992), for the proposition that Mr. Tartaglione was not in custody is misplaced. The Circuit Court in *Cota* did not hold that the actions by multiple agents ordering a defendant out of her car at gunpoint were not custodial in nature, but rather that once agents determined that the fugitive they were looking for was not in the defendant's car, and after they uncuffed her, her decision to accompany and speak to police was voluntary and, after they assured her she was not under arrest, her questioning by police hours later was not custodial. The evidence at the hearing demonstrated that defendant Cota had agreed to come to the police station, and had voluntarily waited for hours to speak to DEA agents out of concern about getting the vehicle back.

Unlike in *Cota*, Mr. Tartaglione was not assured that he was not under arrest. Law enforcement officials did not seize him temporarily and then let him go, and Mr. Tartaglione did not voluntarily accompany law enforcement to the barracks. Rather, he was escorted into the investigator's car.

The court's decision in *Ortiz v. Artuz*, also relied upon by the government in support of their argument that Mr. Tartaglione was not in custody, is similarly distinguishable. See *Ortiz v. Artuz*, No. 09 CIV 5553 NRB, 2010 WL 3290962 (S.D.N.Y. Aug. 9, 2010). In *Ortiz*, although six officers were present at the defendant's apartment, the defendant conceded that the police did not specifically state that he had to travel to the precinct with them. Moreover, Ortiz was permitted to retrieve clothes prior to leaving, and he was allowed to call his common law wife to the scene. The testimony elicited at the hearing indicated that Ortiz's "mind was at ease" at that "juncture." See *Id*. Mr. Tartaglione, on the other hand, may have been permitted to answer his phone during his initial encounter with police, but he was not permitted to step

6

forward without police placing their hands on him and searching him and removing his cell phones. And, they escorted him to the police vehicle, clearly indicating that he was not permitted to drive to the barracks on his own.

Additionally, the government claims that an interview lasting an hour or less suggests that the interview is not custodial, and, in support of this claim, they cite *United States v. Lifshitz*, 03 Cr. 572 (LAP), 2004 WL 2072468 at *8 (S.D.N.Y. 2004). Mr. Tartaglione's interview, however, began roadside, and it continued in Investigator Hammer's vehicle and then in the interview room back at the barracks. There were no meaningful pronounced breaks in the interrogation, and the interview, therefore, lasted approximately 1 hour and 40 minutes.

### Mr. Tartaglione Did Not Voluntarily Waive *Miranda*

Lastly, the circumstances surrounding Mr. Tartaglione's interrogation are not similar to *Elstad*, and they do not render Mr. Tartaglione's *Miranda* waiver voluntary. In *Elstad*, the Supreme Court held "[t]he Self-Incrimination Clause of the Fifth Amendment does not require the suppression of a confession, made after proper *Miranda* warnings and a valid waiver of rights, *solely* because the police had obtained an earlier voluntary but unwarned admission from the suspect." See *Oregon v. Elstad*, 470 U.S. 298 (1985) (emphasis added). In *Elstad*, police briefly questioned the defendant and then read him *Miranda* warnings an hour later. A deliberate, two-step strategy was not used to obtain a confession. Here, by contrast, , the police purposefully questioned Mr. Tartaglione without administering *Miranda* warnings; without any meaningful pronounced break, they asked him to repeat what he had already told them; and only then did they administer the warnings. Regardless, the Government bears the burden of proving by a preponderance of the evidence that police did not employ a deliberate two-step strategy. See

7

*Capers*, 627 F.3d 470, 480 (2d Cir. 2010); *United States v. Williams*, 681 F.3d 35, 41 (2d Cir. 2012).  Here, they cannot meet that burden.

**WHEREFORE**, the Defendant, Mr. Tartaglione, respectfully requests that this Honorable Court, at a minimum, grant an evidentiary hearing to resolve existing factual disputes, and to grant Mr. Tartaglione's motion to suppress statements allegedly made by him while he was subjected to custodial interrogation.

Dated: October 25, 2019

                                              Respectfully submitted,

                                              Aida Leisenring, Esq.

cc via ECF: All Counsel