

666 OLD COUNTRY ROAD, SUITE 700
GARDEN CITY, NEW YORK 11530
516.745.1500 • [F] 516.745.1245
WWW.BARKETEPSTEIN.COM

ADDITIONAL OFFICES:
EMPIRE STATE BUILDING, NY, NEW YORK
HUNTINGTON, NEW YORK
ALL MAIL TO GARDEN CITY ADDRESS

January 21, 2020

**BY ECF**
The Honorable Kenneth K. Karas
United States District Judge
Southern District of New York
300 Quarropas Street
White Plains, NY 10601

Re:   **United States v. Nicholas Tartaglione, S4 16 Cr. 832 (KMK)**

Dear Judge Karas:

I write seeking an Order from the court granting defense counsel an opportunity to inspect and photograph the cell(s) and unit(s), and any outdoor space available to inmates, at the Metropolitan Correctional Center ("MCC") where Mr. Tartaglione has been incarcerated for over the past two years of the 37 months that he has been detained.[1]  I make this application pursuant to Rule 16(a)(1)(E)(i) and Rule 16(d)(2)(A) of the Federal Rules of Criminal Procedure, which require the Government, respectively, either upon the defendant's request, or pursuant to court order, to permit the defendant to inspect buildings or places, or portions thereof, if the building or place is within the government's possession, custody, or control, and the item is material to preparing the defense.  I also move to inspect the relevant portions of the MCC facility pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963) and *Skipper v. South Carolina*, 476 U.S. 1 (1986) on the ground that an actual physical inspection of Mr. Tartaglione's cell and housing unit is, in any event, necessary to effectuate Mr. Tartaglione's right under both the Eighth Amendment and the Due Process clause of the United States Constitution to present mitigation evidence at any future penalty proceeding.

---

[1] As I have advised the MCC's supervising attorney, Nicole McFarland, the defense will likewise be seeking an order granting counsel permission to inspect the relevant portions of the Metropolitan Detention Center, where Mr. Tartaglione was detained previously for nearly a year.

On or about November 27, 2019, I informed the MCC's then Supervising Staff Attorney, Adam Johnson, via email, that, consistent with the defense's obligation to prepare for the potential penalty phase of these proceedings, I was requesting an opportunity to view the cells (including those within the Special Housing Unit) and the common areas where Mr. Tartaglione was being held, and to also to take photographs.  In response, Mr. Johnson advised that "[i]n order to set up ground rules for a site visit," he needed to get an Assistant United States Attorney from the Civil Division ("wall counsel") "to help out in the site visit agreement process."  Then, between December 3, 2019 and January 1, 2020, I exchanged additional emails on the subject with Mr. Johnson's successor, Nicole McFarland, wherein I inquired further about setting up the visit and advised Ms. McFarland that, preferably, it was the defense's request that counsel be permitted to view the relevant portions of the facility outside of the presence of the prosecutors.[2] Overall, my communications with the MCC's supervising attorneys, which also included several telephone conversations with Ms. McFarland, led me to believe that my request for a site visit was not an unheard of request.  *See, e.g.*, *United States v. Loera*, 2017 WL 9481022 (E.D.N.Y. 2017) (discussing a July 6, 2017 site visit at the MCC conducted by the court, and counsel for both parties, to address defendant's claim that certain conditions  of his pre-trial detention violated his constitutional rights).  Indeed, Ms. McFarland asked about details of the proposed visit, such as whether the defense would object to the presence of the prosecutors; she advised that photographs would be taken by staff, and then reviewed for accuracy; and she discussed "conflict counsel," or "wall counsel," working out other details of the visit on behalf of the United States Attorney's Office.

Since that time, on January 9, 2020, I was advised by Ms. McFarland that the Bureau of Prisons denied my request to access and inspect the facility and is "unwilling to budge on this." I was further advised on January 17, 2020 by one of the prosecutors, Assistant United States Attorney Jason Swergold, that Ms. McFarland informed him that granting the defense's request for inspection poses a security risk, and that because the areas of the prison to which defense counsel has sought access would need to be "locked down" before permitting counsel to enter, access may not be granted absent *a very specific* and *pressing reason*.  Further, the prosecutor has advised,  Ms. McFarland indicated that in the event that the Court were to order that defense counsel be given access to inspect Mr. Tartaglione's cell and unit, MCC officials would set very specific conditions, and ask that a representative or representatives from the Government also be present.

Here, the reason for Mr. Tartaglione's request that counsel be given access to inspect his cell, and the unit where his cell is located, and to observe first-hand Mr. Tartaglione's conditions of confinement is specific; it is of constitutional dimension; and, in the context of this capital litigation, it could not be more pressing.  By the time this case goes to trial, Mr. Tartaglione will have been incarcerated for *four years* in a correctional facility that has been compared to that of a gulag[3] -- dirty, decrepit, vermin-infested, and hyper-isolating.  In the event that Mr. Tartaglione

---

[2]  In response, Ms. McFarland wrote: "[D]oes that mean they can't be involved in the details and/or know about the visit? Do you just not want them to be on the visit when you come? Can I tell them about the visit? Just trying to nail down exactly what you are looking for."

[3]  *See Female Detainees Are Freezing Inside Notorious Manhattan Jail, Attorney Says*, December 20, 2019, by Jake Offenhartz, *available at* https://gothamist.com/news/female-detainees-are-freezing-inside-notorious-manhattan-jail-attorney-says; *I Tried to Tell the World About Epstein's Jail. No One Wanted to Listen. The Metropolitan*

is convicted, the Government, in advocating for his execution, may cite to infractions that Mr. Tartaglione has incurred while incarcerated in support of an argument that his institutional adjustment has been poor or to rebut a defense argument that he has adjusted well in confinement, and that lifetime incarceration without the possibility of release, therefore, is not a viable alternative to the imposition of the death penalty.  To counter these contentions, Mr. Tartaglione must be able to argue that his ability to survive in such horrid conditions is evidence that, much to the contrary, his institutional adjustment has, on balance, been exemplary, that he does not pose a future danger to other inmates or corrections personnel, and that his punishment has been, and will continue to be severe.  Counsel's support for these arguments, however, must not be limited to reliance on reports from Mr. Tartaglione or on other second-hand accounts, such as those of other inmates, media outlets, and regulatory reports.  Rather, in order to most effectively, zealously, and persuasively show that Mr. Tartaglione can make a lifetime adjustment to prison, that he will be sufficiently punished by a sentence of lifetime incarceration without the possibility of release, and that execution, therefore, is not the appropriate punishment in this case, counsel must be permitted to observe Mr. Tartaglione's housing conditions at the MCC with his own eyes and to have his own sensory experience. Further, it is critical that counsel be able to provide the jury with photographs of the cell (or cells) and common areas where Mr. Tartaglione has been confined to live for four years, so that jurors, too, can appreciate his day-to-day reality.  Only then will counsel be able to accurately portray the facility to jurors, to truly convey to them what Mr. Tartaglione has endured, and, in turn, to argue that despite any rule infractions, he has made an appropriate adjustment to confinement.

Rule 16(a)(1)(E)(i) of the Federal Rules of Criminal Procedure provides that "upon a defendant's request, the government must permit the defendant to inspect . . . buildings or places . . . or portions [thereof], if the [building or place] is within the government's possession, custody, or control and the item is material to preparing the defense." Fed. R. Crim. P. 16(a)(1)(E)(i).[4]  Accordingly, a defendant moving to discover or inspect certain information pursuant to Rule 16, even where that information consists of a building or place, must

---

*Correctional Center has become notorious for decades of inhumane treatment*, August 16, 2019,  by Jane Theoharis, Distinguished Professor of Political Science at Brooklyn College, *available at* https://www.theatlantic.com/ideas/archive/2019/08/real-scandal-mcc/596257; Horror at MCC: "Gulag" Conditions at NYC Jail Were Known for Decades Before Jeffrey Epstein's Death, August 15, 2019, available at https://www.democracynow.org/2019/8/15/mcc_jail_conditions_jeffrey_epstein_death; Prisoners Endure A Nightmare 'Gulag' In Lower Manhattan, Hidden In Plain Sight, June 19, 2018, by Aviva Stahl, *available at* https://gothamist.com/news/prisoners-endure-a-nightmare-gulag-in-lower-manhattan-hidden-in-plain-sight.

[4] As Judge Garaufis observed in *United State v. Wilson*, 493. F. Supp. 2d 348 (E.D.N.Y. 2006) the Federal Rules of Criminal Procedure, as a general rule, apply to sentencing hearings.  *See* Fed. R. Crim.  P. 1 ("These rules govern the procedure in all criminal proceedings in the United States district courts . . . ."). Additionally, while subsection (5) of Rule 1 explicitly excludes certain proceedings from the purview of the Federal Rules, sentencing hearings are not among those excluded, *see id.*, and 18 U.S.C. § 3593(c), which governs death penalty sentencing proceedings, expressly waives the presentence report requirement of Fed. R. Crim. P. 32(c), which "suggests the negative implication that the Rules of Criminal Procedure usually do apply to sentencing hearings under the FDPA."  *See United States v. Webster*, 162 F.3d 308, 346 (5th Cir.1998) ("The Federal Rules of Criminal Procedure apply to sentencing hearings); *United States v. Lorenzo-Catalan-Roman*, 376 F.Supp.2d 108,113-14 (D. Puerto Rico 2005) ("the penalty phase of a capital case is but the final phase of a single bifurcated [or trifurcated] trial"); *United State v. Wilson*, *supra* (stating the policies underlying Rule 16 are implicated in the penalty phase context; *United States v. Karake*, 370 F. Supp. 2d 275 (D.C. Dist. 2005) (stating the court need no resolve whether Rule 16 applies to penalty phase given the inherent authority of district courts to order discovery outside of the rules).

demonstrate first that the information sought is in the "possession, custody or control" of the government, and second, that the information is material to the case. *See, e.g.*, *United States v. Ahmad*, 53 F.R.D. 186 (M.D. Pa. 1971) (concluding defendants in conspiracy prosecution were entitled to inspect the underground tunnels in Washington, D.C., which were mentioned in the indictment). Here, Mr. Tartaglione makes the requisite two-prong showing.

First, with respect to the question of "possession, custody, or control," as a general matter, "the fact that the Bureau of Prisons and the United States Attorney's Offices are both branches of the Department of Justice . . . facilitate[s] access by federal prosecutors to prison files." *United States v. Santiago*, 46 F.3d 885, 894 (9th Cir. 1995). *See also United States v. Burnside*, 824 F. Supp. 1215 (N.D. Ill. 1993) (citing the close working relationship between the United States Attorney's Office and the Warden of the MCC in Chicago on issues relating to security and prison contraband); *United States v. Boyd*, 833 F. Supp. 1277, 1357 (N.D. Ill. 1993) (a subpoena for items from the Bureau of Prisons amounts to a request for discovery from the U.S. Attorney because of the "incestuous relationship between the two entities"); *United States v. Jackson*, 2006 WL 1993251 (S.D.N.Y. 2006) (stating that where prosecutors moved to quash subpoenas served by defendant upon the Bureau of Prisons, the government's legitimate interests are affected, beyond the need that prosecutors assist the Bureau of Prisons); *United States v. Baileaux*, 685 F.2d 1105 (9th Cir. 1982) (tape in possession of FBI was in the "custody" of the United States Attorney); *United States v. Jennings*, 960 F.2d 1488, 1490 (9th Cir. 1992) (noting that *Brady* requirements "cannot be evaded by claiming lack of control over the files and procedures of executive branch agencies"). In *United States v. Santiago*, 46 F.3d 885 (9th Cir. 1995), for example, a prison-murder case, the defendant requested files from the Bureau of Prisons on the inmates slated to testify against him in an effort to discover information that linked the inmates to rival gangs, which, the defendant asserted, might be relevant on the issue of bias. The district held that the "Bureau of Prisons [wa]s a separate governmental division with no responsibility for the investigation or prosecution of [the charged] crime," and denied the defendant's discovery request on the ground that the files were "not in the possession of the government." On appeal, however, the Ninth Circuit reversed the defendant's conviction, and rejected the notion that for Rule 16 purposes, the government has "possession and control" over the files of only those agencies that participated in the investigation against the defendant. Rather, the court explained, because the Bureau of Prisons had actually participated in the investigation and located much of the physical evidence, and because the United States had obtained the defendant's prison file, the United States Attorney's Office was simply not in a position to deny that it had knowledge of and access to the files of other inmates.

The same is true in this case. Prosecutors have access to Mr. Tartaglione's prison file; and in the event that Mr. Tartaglione is convicted will use any relevant information contained within that file to argue that death penalty in this case is appropriate; they have an established line of communication with attorneys and legal staff both at the MCC and the Bureau of Prisons with respect to issues of visitation, inmate discipline, evidence preservation, and security; and just as they could not, therefore, be heard to argue that they do not have custody or control over documents and photographs possessed by the MCC, they likewise should not be heard to argue that the MCC facility is not within their custody or control for Rule 16 purposes.

4

Second, the evidence defense counsel seeks to access and inspect -- the actual physical conditions under which Mr. Tartaglione has been confined -- is clearly material to the issue of punishment at any future potential penalty phase of these proceedings.  Indeed, while a defendant's conclusory allegations that the requested evidence is material will never suffice, *see United States v. Ashley*, 905 F.Supp. 1146, 1168 (E.D.N.Y.1995) (internal quotations omitted), Rule 16's materiality standard is normally not a heavy burden, and the evidence sought will be material "as long as there is a strong indication that it will play an important role in uncovering admissible evidence, aiding witness preparation, corroborating testimony, or assisting impeachment or rebuttal.  *United States v. Stein*, 488 F.Supp.2d 350 (S.D.N.Y. 2007).  *See also United States v. Stevens*, 985 F.2d 1175, 1180 (2d Cir.1993) (An object sought to be inspected is material if "it could be used to counter the government's case or to bolster a defense."); *United States v. Maniktala*, 934 F.2d 25, 28 (2d Cir.1991) ("Materiality means more than that the evidence in question bears some abstract logical relationship to the issues in the case. There must be some indication that the pretrial disclosure of the disputed evidence would have enabled the defendant significantly to alter the quantum of proof in his favor.") (quoting *United States v. Ross*, 511 F.2d 757, 762–763 [5th Cir. 1975]); *Bisby v. Garza*, 2008 WL 656900 (S.D. Tex. 2008) (acknowledging, in the context of s prisoner civil rights action, that plaintiff's motion to inspect the conditions in his prison cell and his unit might establish relevant evidence of prison conditions and defendant's knowledge of them); *Soler v. County of San Diego*, 2016 WL 3460255 (S.D. Cal. 2016) (granting plaintiff's request, in action for wrongful arrest and detention, to inspect and photograph areas of the San Diego Central Jail).

Here, the conditions of Mr. Tartaglione's confinement, and the institutional setting to which he has, for the past three years, adjusted, are relevant and material to the jury's determination of punishment considerations at any potential penalty phase.  In fact, with respect to punishment, as explained more fully below, they are potentially exculpatory.  *See Brady v. Maryland*, *supra* (the government has a constitutional duty to disclose favorable evidence to the accused where such evidence is material either to guilt *or punishment*).  Accordingly, pursuant to Rule 16(a)(1)(E)(i) and Rule 16(d)(2)(A), an Order granting the defense permission to inspect Mr. Tartaglione's cell and housing unit should be granted.

However, even if the Court disagrees that the MCC is a building or place in the custody or control of the prosecution, and that a motion for inspection pursuant to Rule 16 is, therefore, misplaced, Mr. Tartaglione, as a capital defendant, nevertheless has a constitutionally protected Eighth Amendment right to provide the jury with mitigating evidence, *Williams v. Taylor*, 529 U.S. 362, 393 (2000), and a court order directing that the defense be permitted to inspect Mr. Tartaglione's cell and housing unit is, therefore, nevertheless appropriate.

The Supreme Court has made clear that the exclusion at a capital sentencing hearing of evidence that tends to mitigate punishment runs afoul of the Eighth Amendment's protection against cruel and unusual punishment.  *Skipper v. South Carolina*, 476 U.S. 1 (1986) (excluding from capital defendant's sentencing hearing testimony of jailers and a regular visitor regarding the defendant's good behavior during the seven months that he spent in jail awaiting trial deprived defendant of his right to place before the sentencing jury relevant evidence that mitigated his punishment).  *See also Lockett v. Ohio*, 438 U.S. 586, 604 (1978) and *Eddings v. Oklahoma*, 455 U.S. 104 (1982).  Accordingly, both due process and the Eighth Amendment

require that the defendant be able to present to the jury *all relevant mitigating evidence* during the penalty phase of a capital case.

The penalty of death, after all, in its finality, is fundamentally different than any other sentence that may be imposed by the Government, and "this qualitative difference between death and other penalties calls for a *greater degree of reliability* when the death sentence is imposed." *Locket*, 438 U.S. at 603.

> From the point of view of the defendant, [execution] is different in both its severity and its finality. From the point of view of society, the action of the sovereign in taking the life of one of its citizens also differs dramatically from any other legitimate state action. It is of vital importance to the defendant and to the community that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion.

*Gardner v. Florida*, 430 U.S. 349, 357-58 (1977).  In this respect, any possible burden on jail operations, and on the privacy of other inmates that counsel's inspection might present is far outweighed by the overriding priority that the penalty ultimately imposed in this matter is reliable and that Mr. Tartaglione's constitutional rights be vigilantly and scrupulously guarded. Further, given that the MCC is subject to routine inspections and audits to ensure compliance with federal regulations and policy directives, MCC staff are certainly not unaccustomed to making necessary accommodations for official on-site visits and tours of the facility. Accordingly, as part of counsel's effort to save Mr. Tartaglione's life, and to ensure that the jury's determination with respect to punishment is reliably made after deliberation upon all relevant information, counsel must be permitted to inspect the relevant portions of the prison, and to take photographs, conditioned upon any reasonable conditions set by the MCC staff and the Bureau of Prisons, and directed by the Court.  *See, e.g.*, *Ambrose v. Malcolm*, 414 F. Supp. 485 (S.D.N.Y. 1976) (in evaluating whether overcrowding of inmates at Bronx House of Detention constituted an unconstitutional deprivation of due process and cruel and unusual punishment, court conducted visual inspection of prison day rooms); *Pope v. Ricotta*, 1992 WL 30581 (S.D.N.Y. 1992) (ordering New York State Department of Correctional Services to permit counsel, prisoner-plaintiff, and photographer to inspect and tour certain areas of Sing Sing Correctional Facility, accompanied by security personnel as DOCS, in its discretion, deems appropriate).

In sum, even if the Court concludes that Rule 16 is not applicable to Mr. Tartaglione's request that defense counsel be permitted to inspect his cell and unit at the MCC, due process and the Eighth Amendment otherwise compel that his motion be granted, and that an Order granting an inspection, with any reasonable and necessary conditions, be permitted.

Respectfully submitted;

    /s/
Bruce Barket

6

**cc via FedEx to**:

   M. Licon-Vitale
Acting Warden
Metropolitan Correctional Center
150 Park Row
New York, NY 10007

**cc via email to**:

   Nicole McFarland
Supervising Attorney
Metropolitan Correctional Center
150 Park Row
New York, NY 10007
nmcfarland@bop.gov