

666 OLD COUNTRY ROAD, SUITE 700
GARDEN CITY, NEW YORK 11530
516.745.1500 • [F] 516.745.1245
WWW.BARKETEPSTEIN.COM

ADDITIONAL OFFICES:
EMPIRE STATE BUILDING, NY, NEW YORK
HUNTINGTON, NEW YORK
ALL MAIL TO GARDEN CITY ADDRESS

August 28, 2020

<u>*By Email – Filed Ex Parte and Under Seal*</u>
The Honorable Kenneth M. Karas
United States District Court
Southern District of New York
300 Quarropas Street
White Plains, NY 10601

      Re:    *United States v. Nicholas Tartaglione*
                  **16 Cr. 832 (KMK)**

                **Tartaglione Prison Conditions**

Dear Judge Karas:

      We write to ask the Court to issue an Order directing that Nicholas Tartaglione be moved from the Metropolitan Correctional Center to the Nassau County Correctional Center or other pre-trial detention facility with humane conditions and that accommodates meaningful access to counsel, mitigation specialists and investigators. Over the course of the last 4 years the MCC has proven it cannot provide a safe, clean facility for Mr. Tartaglione while he awaits trial and either will not or cannot provide constitutionally-mandated access to counsel for an inmate facing a death penalty trial.

      The following are recurring problems Mr. Tartaglione has faced at MCC.

*Violence*

      In February of 2018, Mr. Tartaglione was assaulted by an inmate with an object, which caused an orbital fracture requiring surgery and hospitalization for a few weeks. Mr. Tartaglione experienced fear of death when the incident occurred and long-term side effects from his injuries, mainly recurring headaches, dizziness and aches. Upon his return from the hospital, he was placed in SHU without his personal property and remained alone in a cell 24 hours a day without materials

to read. He was denied access to medication, phone calls, utensils to eat, and his discovery during that time. Mr. Tartaglione has experienced other violent challenges, but none that required a hospitalization.

*Mail and Books*

Since his initial confinement in December of 2016, Mr. Tartaglione has experienced recurring and long delays in receiving his personal mail, newspapers, and books. His parents, other family members and friends have routinely ordered books and newspapers subscriptions for Mr. Tartaglione, and he rarely receives any of these orders in a timely fashion. This has a significant effect on Mr. Tartaglione's mental state as he often finds himself alone in a cell without any reading materials.

*Facility Conditions*

Over the course of the nearly 4 years Mr. Tartaglione has been confined, he has endured:

(a) Insect infestations, including cockroaches.
(b) Rodent infestations in his tier. Mice and rats have been seen every day in the cells, and frequently wake up the inmates by crawling on them at night. On one occasion Mr. Tartaglione woke up to find a mouse dead on his cot. Apparently he rolled over and unknowingly smothered it.
(c) Lack of temperature control. Recently the temperatures have been so cold that Mr. Tartaglione has been observed wearing a hat to stay warm in the attorney/ client video conference room. When it is not uncomfortably cold, it is uncomfortably hot.
(d) Standing water in cells/ toilet leaks.
(e) Laundry access. Sometimes inmates have been unable to wash their linens for well over a month.
(f) Limited access to regular showers. Currently, inmates are permitted showers 3 times a week a short time to shower and or make a call or send of check email.
(g) Virtually no outside recreation time.
(h) Black mold and/or mildew in showers and in the cells.
(i) The ventilation system has not worked in the past and the vents are covered with dirt and dust.
(j) The computers on the tier do not all work. Accordingly, there are less computers available for all inmates seeking to access them. One of the few working computers had missing letters on the keys, making it impossible to write
(k) Inmates sharing one cell are only given one roll of toilet paper once or twice a week. They are never given facial tissues or napkins.
(l) Misplaced, stolen or destroyed property when Mr. Tartaglione is transferred to a new cell or tier. Important attorney memos with sensitive disclosure materials, radios, batteries, and other personal items have been lost or stolen when Mr. Tartaglione has been required to move.

*Access to Discovery*

Mr. Tartaglione has been unable to access his discovery for over 6 months, and generally, he has faced great obstacles to discovery review. Most of Mr. Tartaglione's discovery is on a hard drive and requires computer access to review. Mr. Tartaglione has been routinely denied access to computers, whether it is due to his quarantine, repeated lockdowns, lack of functioning computers, or insufficient time review it. In order to meaningfully participate in this death-authorizedcase, Mr. Tartaglione needs 15 to 20 hours per week to access and review his discovery materials, which are substantially in an electronic data format.

*Access to the Defense Team*

Mr. Tartaglione must be able to discuss sensitive facts with respect to mitigation and the liability phase of his trial. We previously estimated that mitigation specialists needed approximately 6 hours a week to investigate Mr. Tartaglione's background and mental state; investigators needed approximately 3-5 hours to discuss the facts of his case and potential leads and attorneys needed approximately 7 to 10 hours a week to discuss sensitive materials with Mr. Tartaglione. No one on Mr. Tartaglione's defense team has been able to see him in person at MCC since February of 2018. Before the Covid-19 closures of the facility, MCC experienced another lockdown due to security risks. In order to see Mr. Tartaglione via video conference we must make a request at least four and a half days in advanced and the typical wait time is 7-10 days. A video link from the jail is insufficient to discuss information that is highly sensitive in nature. As a result, we have not been able to have meaningful discussion about the liability phase of his trial let alone critical mitigation information since February of 2020 and have had very limited conversations about the penalty phase. All the state jails are now open for in-person visits. Nassau County Correctional Center, for example, has been open for approximately one month.

The MCC has not given any indication when they will permit in person visits on a regular schedule.

Further, the problems in access to counsel while significantly exacerbated by the pandemic are longstanding. There have been frequent and unpredictable lockdowns, visit closures and long delays in seeing Mr. Tartaglione once in the facility. The Court will no doubt recall the numerous problems that have arisen during Mr. Tartaglione's lengthy pre-trial detention.

In death-authorized cases, we are duty-bound to make every appropriate effort to establish a relationship of trust with the client," and to "maintain close contact with the client." *See* ABA Guideline 10.5(A). In addition, "Counsel at all stages of the case should engage in a continuing interactive dialogue with the client concerning all matters that might reasonably be expected to have a material impact on the case, such as: 1. the progress of and prospects for the factual investigation, and what assistance the client might provide to it; 2. current or potential legal issues; 3. the development of a defense theory; 4. presentation of the defense case; 5. potential

3

agreed-upon dispositions of the case; 6. litigation deadlines and the projected schedule of case-related events; and 7. relevant aspects of the client's relationship with correctional, parole, or other governmental agents (e.g., prison medical providers or state psychiatrists)." *See* ABA Guideline 10.5(B).

Moreover, counsel for a client in a death-authorized case is duty-bound to discuss a possible disposition and plea with the client, regardless of his initial refusals. ABA Guideline 10.9.1(E) states, "If a negotiated disposition would be in the best interest of the client, initial refusals by the prosecutor to negotiate should not prevent counsel from making further efforts to negotiate. Similarly, a client's initial opposition should not prevent counsel from engaging in an ongoing effort to persuade the client to accept an offer of resolution that is in the client's best interest." *See* ABA Guideliine 10.9.1(E).

In order for counsel to develop a relationship of trust with Mr. Tartaglione, maintain such a relationship, engage in a "continuing interactive dialogue with the client concerning all matters," and make "ongoing effort[s]" to persuade the client to accept or consider a resolution we must be able to see him in person with assurances of confidentiality, without unreasonable time restrictions, and with timely access as issues arise. A video connection for an hour every ten days is no substitute for the human connection one develops with a client in person. Trust is not earned on Skype. It is developed by spending real time with another. Under the current circumstances we being prevent from providing effective assistance of counsel in line with the ABA standards.

*Corrections Officers Retaliation*

Guards have threatened Mr. Tartaglione in the past when he has complained about the conditions of his confinement. For example, after a court appearance where such conditions were discussed, everyone on his tier was subjected to a cell search while Mr. Tartaglione was pulled into "the bubble" (visible to every other inmate) to speak to someone he believed was an Associate Warden. Mr. Tartaglione was then escorted around the area and asked to point out the problems listed in defense counsel's email. Mr. Tartaglione complied and for each problem he was given an excuse. When he pointed out the mold, he was told it was mildew. When he pointed to standing water, the inmates were blamed. When he mentioned the rodents and insects, he was told "it's New York City." When he pointed out the failure to deliver mail and newspapers, he was told he didn't understand the process. The unmistakable message to everyone on the tier was that they were subjected to a search because Mr. Tartaglione's made complaints through his lawyer. Worse, the next day, every inmate was patted down to search for contraband, but in a loud clear voice for everyone to hear the supervisor said, "Don't worry about Tartaglione. He is good." Mr. Tartaglione was the only inmate not searched. This treatment put Mr. Tartaglione at risk of inmate retaliation. In addition, Mr. Tartaglione's meal had feces in it.

*Quarantine Policy*

Under MCC's policy, Mr. Tartaglione must quarantine for at least 14 days after each court appearance. His last appearance was July 29th. He is still in quarantine. Some other inmates have been there for several months. The quarantine rules are more stringent than SHU. Mr. Tartaglione was, for the majority of his quarantine, alone in a cell with only 15 minutes a day out of the cell. He is unable to access his discovery, make legal or personal calls, have recreation time, exercise, or read, as his mail and books are not delivered to him while he is in quarantine.

For most of the last 4-plus weeks, Mr. Tartaglione has been forced to sit in his cell with no one to speak to, and nothing new to read. It has taken a predictable toll on his mental and emotional health. Mr. Tartaglione should not be forced to choose whether to attend his court appearances on a death-authorized case and be subjected to *de facto* solitary confinement as a result or forgo an in-person appearance and not be able to consult his attorneys in court as significant issues are being raised about his case.

The MCC has not given any indication when they will end this policy.

There shouldn't be any doubt that the Court has authority to act when a inmate's right to counsel is at stake. *See Falcon v. United StatesBureau of Prisons,* 52 F.3d 137, 139 (7th Cir.1995); Turner v. Safley,482 U.S. 78 (1987); Benjamin v Frazier 264 F.3d 175 (2nd Cir., 2001) and United States v. Martinez-Hernandez, No. 3:15-CR-00075 JAF, 2015 WL 6133050. Statutorily, the Court has authority pursuant to 18 U.S.C. § 3142(i)(3

Mr. Tartaglione facing a death penalty prosecution and is therefore situated differently from almost every other inmate. That entitles him heightened protection of his right to counsel. See. States v. Pedersen, No. 3:12-CR- 00431-HA, 2013 WL 3187208, at x2 (D. Or. June 20,2013) ("Defendants held in pretrial confinement are guaranteed the Sixth Amendment's right to the assistance of counsel … both defendants stand accused of capital crimes and face a possible sentence of death. As such, they are afforded rights and benefits atypical of a defendant [charged with other crimes]"): Basciano v. Martinez- 2007 WL 2119908. F.Supp.2d 138,144 (D.P.R. 2004) The proposition that 'death is different' is central to the Supreme Court's death penalty jurisprudence." Thus, the Court should evaluate Mr. Tartaglione's Sixth Amendment rights under this heightened consideration and order his transfer from the MCC.

The issues of confinement raised in this letter, along with other conditions addressed over the course of the last 4 years by way of letter or in court have occupied much of our litigation in this case. A considerable amount of time has been spent by defense counsel, the Government, and the Court in addressing these issues. We are grateful to the Court and to the Government for its efforts. However, addressing this constant obstacle not only takes time away from investigating the liability and penalty phase and possible plea negotiations, but unconstitutionally impairs our ability to effectively represent Mr. Tartaglione as we are denied reasonable access to him, he is denied reasonable access to his discovery, and his mental health suffers from the

5

ongoing inhumane conditions he is subjected to. Accordingly, we respectfully request this Court order Mr. Tartaglione's transfer to Nassau County Correctional Center.

                                  Respectfully,

                                  _____/s/ Bruce A. Barket___
                                  Bruce A. Barket