UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
UNITED STATES OF AMERICA,      :
       :
       :
       :
    -against-      :
       :
       :
       :    **CASE: 16-CR-832(KMK)**
NICHOLAS TARTAGLIONE,      :
       :
    Defendant.      :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

**POST-EVIDENTIARY HEARING MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANT'S MOTION TO SUPPRESS STATEMENTS**

Attorneys for Mr. Tartaglione:

By:    Aida Ferrer Leisenring, Esq.
        Bruce A. Barket, Esq.
        Edward J. Rymsza, Esq.
        Karl Schwartz, Esq.
        Arielle Egan, Esq.
        Oliver Loewy, Esq.

**POST-EVIDENTIARY HEARING MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANT'S MOTION TO SUPPRESS STATEMENTS**

On May 27, 2022, a suppression hearing was conducted on the above-referenced action to litigate the admissibility of statements made by Nicholas Tartaglione ("Tartaglione") to law enforcement. The government presented two witnesses, New York State Police Investigators Brian Hammer ("Hammer") and James Browne ("Browne") and five exhibits containing a map (Exhibit GX-1), a digital recording (Ex. GX-2), drone video (Ex. GX-3), drone video with audio (Ex. GX-4), and the video and audio from the barracks interview (Ex. GX-5). The defense submitted as an exhibit text messages between Tartaglione and his wife[1]. The parties stipulated that all exhibits attached to the Defendant's Motion to Suppress Statements and Reply and the government's Opposition to Defendant's Motion to Suppress Statements are part of the hearing record.

For the reasons set forth herein, this Court should suppress all statements made by Tartaglione roadside during his traffic stop and during the car ride to the barracks because they were the product of custodial interrogation not preceded by the *Miranda* warnings. Tartaglione's statements in the barracks and in the car ride to his arraignment should also be suppressed because they were a product of a continuous unbroken chain of interrogation and the warnings were given mid-interrogation, after he gave an unwarned confession. Thus, the after-the-fact *Miranda* warnings administered to him were ineffective. Moreover, Tartaglione's statements during his transportation to the White Plains courthouse were a product of the series of constitutional violations, including his right to counsel, and should also be suppressed as they are the fruit of the poisonous tree. Lastly, the Court should suppress all of Tartaglione's statements because they were the fruit of the poisonous tree as police did not have reasonable suspicion or probable cause when they seized him roadside. Tartaglione incorporates, as if presented herein, all of the arguments

---

[1] The exhibit is attached to Defendant's Reply Brief.

contained in his Motion to Suppress Statements, Supplemental Motion to Suppress Statements and supporting briefs.

## I.     STATEMENT OF FACTS

On December 19, 2016, New York State Police Investigators Hammer and Browne were investigating the disappearance of four males from Chester, New York. At that time, they knew multiple agencies, including the FBI, were working on the investigation, that it was "a big federal case," and that Tartaglione was a suspect of murder. *Hearing Transcript* (herein *"Hr'g Tr."*) *at 70, 80, 88.* Specifically, Hammer and Browne were assigned to surveillance of 103 Long Lane, Crawford, New York. *Id. at 10.* The plan was to have uniformed troopers pull over Tartaglione and to get him to come back to the barracks to make a statement about the four missing men. *Id. at 11, 69.* Earlier that morning at approximately 9:05 AM, Tartaglione had received a controlled telephone call from a cooperating witness working on behalf of the government who told Tartaglione that state troopers and a Chester cop questioned him about one of the missing men and that Tartaglione was a person of interest. *See Defendant's Motion to Suppress Statements, Pages 4-6, Ex. A, and Ex. H, ¶4.* [2] Hammer and Browne surveilled the driveway for approximately five hours. *Hr'g Tr. at 12.* They were aware that the FBI was operating drone surveillance over the 103 Long Lane property all morning and the investigators were communicating in real-time with their contact at the command post. *Id. at 12, 72.* At approximately 10:45 AM, Hammer and Browne were informed by their contact at the command post that a Jeep was leaving the property. *Id. at*

---

[2] The parties stipulated that all exhibits attached to the motion papers were part of the hearing record. The Defendant's Motion to Suppress Statement Exhibit A contains audio recordings of the telephone conversations between Tartaglione and the cooperating witness and a transcript of the conversations. As indicated in Defendant's Motion to Suppress, the cooperating witness told Tartaglione that police asked him questions about Tartaglione and that Tartaglione was a person of interest in their investigation. The conversation lasted approximately 30 minutes. Throughout this discussion, Tartaglione made prejudicial admissions.

*13.* Hammer and Browne followed the blue Jeep. *Id. at 13.* The blue Jeep turned into a driveway and turned around and began driving back to Long Lane. Hammer "confronted the vehicle head on," activated the visor red lights and headlight flashers of his unmarked Chevy Impala and blocked the Jeep from moving further down the road, while a state trooper pulled up behind the Jeep to prevent it from backing out. *Id. at 14, 42, 57.* Hammer and Browne stepped out of their vehicle and approached the driver's side of the Jeep and observed that Tartaglione's wife, Virag Balint, and not Tartaglione, was driving it. *Id. at 14-15, 57.* Hammer advised Balint that they were law enforcement. *Id. at 57.*

Hammer observed that Balint was speaking on her cellphone and learned she was speaking to her husband, Tartaglione. *Id. at 16.* Hammer told Balint that he pulled her over because the Jeep was involved in a road rage incident the prior evening. The road rage story was a lie. Hammer devised this story as a ruse to draw Tartaglione off his property for purported "safety reasons," because Hammer was not familiar with Tartaglione's property, and he believed Tartaglione had access to weapons on his property as he used to be a police officer. *Id. at 15-16.* Hammer wanted to draw Tartaglione off the property to "control the narrative" and have "more control of the circumstances." *Id. at 16, 39.* Balint denied driving the Jeep the prior evening and told Hammer that Tartaglione said he had not driven the Jeep the evening before either. *Id. at 16.* Hammer told Balint, "I need to hear that from him." *Id. at 16.* By that, he meant he wanted Tartaglione to leave his property, come down the driveway, come to the street where police were, and talk to police. Balint communicated that information to Tartaglione. *Id. at 43.* During this interaction, Balint also texted Tartaglione, "3 troopers came out too," and "and a volks came out." *See Defendant's Reply to Government Opposition, Ex. A*, Text Messages Between Ms. Balint and Tartaglione on 12/19/16.

A few minutes later, Tartaglione appeared at the scene in a pickup truck. *Hr'g Tr. at 16-17*. His wife remained in the Jeep, and although the troopers had momentarily left, Hammer's Chevy Impala was on the scene with the emergency lights activated. Hammer approached Tartaglione before Tartaglione's pickup truck had reached his wife in the Jeep. *Ex. GX-4, at 7:25-7:58*. Hammer asked Tartaglione to identify himself, instructed him to back up his vehicle and move the car off the road, and ordered him out of the vehicle. *Hr'g Tr. at 17, 45-46, 74*. Tartaglione denied being involved in a road rage incident and also identified himself as a police officer. *Id. at 17, 45-46*. At this point, Hammer did not believe he had probable cause to arrest Tartaglione, nor even justification to conduct a traffic stop[3]. *Id. at 41, 49*. Tartaglione had not committed any traffic violations. *Id. at 43*. Hammer responded to Tartaglione, "that's fine," but that he still "really need[ed]" to speak to him about some details of the road rage incident and what happened the previous evening. *Id. at 17*. Tartaglione backed his pickup truck and parked it behind Hammer's vehicle partially on the shoulder and partially on the road. *Id. at 17, 74*. Tartaglione exited his pickup truck and walked a few feet to the front of his truck. *Ex. GX-4, at 8:10-8:21*. Hammer approached and spoke to Tartaglione by his truck and near the rear of Hammer's car. Hammer then told Tartaglione, "I need to talk to you about details of what may or may not have happened last night. Where you were. Where the Jeep was. Who may have been operating it if it wasn't you, and I would like to talk to you back at the barracks, I don't want to do it here on the street." *Id. at 17, 18*. Hammer stated he lied to Tartaglione about why he wanted to speak to him and that in fact he wanted to speak to Tartaglione about the missing men. *Id. at 48*.

---

[3] Additionally, Hammer testified that police had no arrest warrant for Tartaglione that morning, did not know whether charges were pending against him and had no plans to arrest him. *See Id. at 11*. Hammer was waiting for Tartaglione to come out so he could pull him over and question him. *See Id. at 39*.

During this discussion, Browne was in Hammer's vehicle activating a recording device to surreptitiously record Tartaglione's statements to Hammer. *Id. at 59*, *80, and Ex. GX-4, 9:05*. Within 43 seconds from of the moment Hammer first approached Tartaglione on the side of the road, a second law enforcement truck pulled up and parked behind Mr. Tartaglione's truck; a few seconds later, Browne exited the vehicle, with the now-activated recording device in his pocket to surreptitiously record Tartaglione, and stood next to Tartaglione and Hammer; eight seconds later, a third law enforcement vehicle pulled up with flashing lights and parked on the double yellow lines of the street between Tartaglione's and Hammer's vehicles, and more officers began exiting their vehicles and approaching Tartaglione, creating a close circle around him and inching closer and closer to him. *Ex. GX-4 at 8:19-10:00*. Specifically, two uniformed troopers, Joseph Nuzzo and Brad Natalisio, and two FBI agents, Jessica Miller and her partner, were present at the scene besides Hammer and Browne. *Hr'g Tr. at 40*. As they surrounded Tartaglione, all six law enforcement agents, two of whom were uniformed, were armed. *Id. at 69, 73*. A snow bank a few feet tall bordering the road from a field was directly behind Tartaglione. Tartaglione took a few steps forward and two officers stepped towards him and placed their hands on him while the other two repositioned themselves but remained within a few feet of Tartaglione. *GX- 4 at 9:57*.

Hammer patted Tartaglione down and told him he needed to make sure he did not have weapons on him. *Hr'g Tr. at 18*. During the pat-down, Hammer, Browne, and Trooper Natalizio were immediately surrounding Tartaglione, who had both his arms raised, and at least a second officer appeared to be making contact with Tartaglione's body as well. *Id. at 48, Ex. GX-4 at 10:19-10:28*. There was also a fourth officer in Tartaglione's close immediate vicinity. *GX-4, at 9:32*. Hammer acknowledged that Tartaglione had no weapons but nonetheless took possession of both of Tartaglione's cellphones after he was patted down and has never (to this day) returned

them. *Hr'g Tr. at 48-49, 75*. Browne and Trooper Natalizio then escorted Tartaglione to the backseat of Hammer's car. *Id. at 49*. Hammer walked behind them. *Id. at 49*, *Ex. GX-4 at 10:28*. They opened the rear passenger door of Hammer's vehicle and told Tartaglione to sit in the rear passenger seat, which he did. *Hr'g Tr. at 49, 76, Ex. GX-4 at 10:25-10:40*. An officer stood above Tartaglione, who remained seated, and held the car door. *Ex. GX-4, at 10:40 – 11:00*. Hammer then sat in the driver's side rear passenger seat. *Hr'g Tr. at 18*.

Inside the vehicle, Tartaglione said, "This is about the missing Mexicans, isn't it?" Hammer responded, "that's part of what we wanted to talk to you about." *Id. at 28*. This exchange was not captured on audio because Browne, who was wearing the recording device, was outside the vehicle discussing towing Tartaglione's pickup truck. *Id. at 61*. Police never gave Tartaglione the option of driving himself to the barracks to discuss the missing men. *Id. at 78*.

If Tartaglione would have refused to go to the barracks voluntarily, Hammer would have called the command post for instructions on whether he had authority to arrest Tartaglione at that point. *Id. at 19*. Browne testified that if Tartaglione had not agreed to accompany them back to the barracks from the traffic stop, he would have detained Tartaglione and called his supervisor to get further instructions and that, in the meantime, Tartaglione would not be free to leave. *Id. at 90-91*. During this entire interaction with Tartaglione on the street, Balint remained seated in the Jeep. *Ex. GX-4, generally*. Police concluded that Tartaglione's wife could leave after they had Tartaglione in custody and he had left the scene. *Id. at 72-73*.

When they drove to the barracks, police told Tartaglione when he could exit the vehicle. *Id.* at 78. During the 15-20 minute drive to the barracks, Hammer sat in the back seat next to Tartaglione, Browne drove, the front passenger seat was empty, and Hammer questioned Tartaglione about the missing men. *Id. at 62*, *Ex. GX-3*. Hammer intentionally sat in the backseat

with Tartaglione because he was the larger of the two investigators. *Hr'g Tr. at 90*. No *Miranda* warnings were provided to Tartaglione during the drive to barracks. *Id. at 80*. Police never advised Tartaglione that he was a suspect in a murder case, even though the police knew it at that time. *Id. at 80*. Browne testified that Tartaglione was not *Mirandized* during the ride because the questioning in the vehicle was not interrogation. *Id. at 96*.

When they arrived at the barracks, Browne or Hammer directed Tartaglione to exit the car. Tartaglione and Hammer then stood outside in the parking lot and continued discussing the missing men, and Browne entered the barracks  *Id. at 30, Ex. GX-3*. When Browne returned, he and Hammer brought Tartaglione inside and into an interview room. *Hr'g Tr. at 30-31*. Police told Tartaglione where to go, what room to go into, and to take a seat. *Id. at 83-84*. The interview room was inaccessible to the public and in a secured area. *Id. at 82*. It was windowless. Other than a desk and chairs, there was no furniture.  The walls were bare, and there was no telephone. *Id. at 83*.

Outside the interview room, Browne and Hammer briefly discussed whether to read Tartaglione *Miranda* warnings and concluded it was appropriate to do so at that point, as opposed to on the street or in the car, because they were "going to begin to interrogate him on an audio and video recording." *Id. at 95-96*. Hammer read Tartaglione *Miranda* warnings. *Id. at 31, 64*. They then interrogated Mr. Tartaglione. *Ex. GX-5*. Although the interview was recorded, they did not tell Tartaglione that his statements were being recorded. *Hr'g Tr. at 83*. But Hammer did tell Tartaglione that they needed him to restate everything he had just said during the car ride.  *See Defendant's Motion to Suppress Statements*, P. 9.  Hammer covered the same topics regarding the missing men that he covered during the car ride. *Hr'g Tr. at 97*.

Hammer testified that if Tartaglione had indicated he wished to leave, he (Hammer) would have contacted a supervisor to receive further direction. Until then, they would not have let Tartaglione leave. *Id. at 95*. The police controlled every aspect of the interrogation process, including the location of the questioning, the length of the questioning, what questions they would ask Tartaglione, and they never told Tartaglione that he was free to leave. *Id. at 78-79*. In fact, he was not free to leave until and if police received the sign-off from a supervisor. *Id. at 95*.

Forty-five minutes into the interrogation, Hammer and Browne took a brief break and called the command post to find out whether Hammer was authorized to arrest Tartaglione. *Id. at 33*. Hammer then learned he had authority to arrest Tartaglione for murder and conspiracy and that Tartaglione would be charged that day. Hammer and Browne then returned to the room and continued to question him. *Id. at 34, Ex. GX-5, at 56:20*. Police were acutely aware that it was important to speak to Tartaglione before he was arraigned and had access to an attorney. *Hr'g Tr. at 81*. After being told he was under arrest, Tartaglione promptly requested an attorney. *See Defendant's Motion to Suppress Statement, Ex. E, Tr. P.117* ("I need a lawyer in here.") Investigator Hammer said he would stop questioning him. Tartaglione asked a second time to speak to his attorney. *See Id., Tr. P.117*. Investigator Hammer indicated that he was unsure whether Tartaglione could avail himself of counsel or make a phone call in the barracks or whether he had to wait until his arraignment because it was a federal case and Hammer was unfamiliar with federal protocol. *See Id., Tr. P.120*. Tartaglione asked whether he could call his wife to request medication. He informed him that he takes painkillers and that he was in pain. Tartaglione twice gave Investigator Hammer his attorney's name—"Andy Rubin." Investigator Hammer acknowledged that "he just lawyered up." *See Id., P. 121-123*. Nonetheless, Investigator Hammer continued to discuss the case with Tartaglione in the barracks.

Tartaglione was then formally arrested, processed, and brought to White Plains courthouse by Hammer and Browne. *Hr'g Tr. at 34*. Tartaglione was shackled and handcuffed during the car ride to White Plains. *Id. at 35*. Hammer and Browne made small talk with Tartaglione, then Tartaglione began talking to himself and said, "I could get the needle for this[4]," and later, "Fucking Mexicans." *Id. at 35-36*.

## II.   <u>MOTION TO SUPPRESS STATEMENTS</u>

### A. Tartaglione's Statements Roadside and During Drive to Barracks Should be Suppressed Because They Were the Product of Custodial Interrogation Without the Advisement of His *Miranda* Rights

*Miranda* warnings are required prior to custodial interrogation, and a statement obtained in violation of this doctrine must be suppressed. *See Miranda v. Arizona*, 384 U.S. 436 (1966). When the authorities deprive an individual of his freedom in any significant way and interrogate him, the privilege against self-incrimination is jeopardized, and *Miranda* warnings must be given. *See Id. See also Stansbury v. California,* 511 U.S. 318, 322, 114 S. Ct 1526, 1528 (1994) ("An officer's obligation to administer *Miranda* warnings attaches ... 'only where there has been such a restriction on a person's freedom as to render him in custody.'") (quoting *Oregon v. Mathiason,* 429 U.S. 492, 495, 97 S.Ct. 711, 714 (1977)).

A person is in custody for *Miranda* purposes if, under the circumstances, a reasonable person "would have understood himself to be subjected to the restraints comparable to those associated with a formal arrest" (*United States v. Ali,* 68 F.3d 1468, 1472 (2d Cir.1995) (internal quotations omitted)) or "would have understood the situation to constitute a restraint on freedom

---

[4] The government does not intend to introduce this statement.

of movement of the degree which the law associates with formal arrest." *See United States v. Bengivenga*, 845 F.2d 593, 596 (5th Cir. 1988).

When a subject is not told he is under arrest, the "test used in determining whether a defendant was in custody is an objective one that (a) asks whether a reasonable person would have understood herself to be subjected to restraints comparable to those associated with a formal arrest, and (b) focuses upon the presence or absence of affirmative indications that the defendant was not free to leave. An accused is in custody when, even in the absence of an actual arrest, law enforcement officials act or speak in a manner that conveys the message that they would not permit the accused to leave." *See United States v. Kirsh*, 54 F.3d 1062, 1067 (2d Cir. 1995) (internal quotation marks and citation omitted); *Thompson v. Keohane*, 516 U.S. 99, 112 (1995)(custody exists for *Miranda* purposes if a reasonable person in that position would "have felt he or she was not at liberty to terminate the interrogation and leave.")

In evaluating whether an individual is in custody for *Miranda* purposes, a court must consider "the circumstances surrounding the interrogation; and ... [whether] given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." *United States v. Romaszko,* 253 F.3d 757, 760 (2d Cir.2001) (quoting *Thompson v. Keohane,* 516 U.S. 99, 112, 116 S.Ct. 457, 465 (1995)); *accord, e.g., Parsad v. Greiner,* 337 F.3d at 181-82. Factors relevant to determining whether a suspect is in custody include "whether a suspect is or is not told that [he] is free to leave; the location and atmosphere of the interrogation; the language and tone used by the police; whether the suspect is searched, frisked, or patted down; and the length of the interrogation." *Tankleff v. Senkowski*, 135 F.3d 235, 244 (2d Cir. 1998) (citations omitted).

In *United States v. Butt*, the Southern District held that, although the defendant was in his home, "the conditions in his home made it a police controlled setting akin to a station that is cut off from the outside world….[defendant] was outnumbered by officers from a range of agencies who separated him from his spouse, dispersed throughout his home, and did not permit him to freely move about during the search.") *See Butt*, No. 18-CR-00087 (NSR), 2019 WL 479117 at 17 (S.D.N.Y. Feb. 7, 2019). *See also United States v. Tirado*, No. 1:17-CR668-GHW, 2018 WL 3432040 at 15 (S.D.N.Y. July 16, 2018). Custody is also established when law enforcement directs a suspect into a police vehicle and takes him back to a precinct. *See United States v. Cebello*, 812 F.2d 42, 45 (2d Cir. 1987)(setting was custodial where law enforcement agents refused to allow a defendant to follow them in his own car). Other relevant factors to determine if defendant is in custody include (i) whether the detention was only "temporary and brief" or was "prolonged" (*Berkemer v. McCarty*, 468 U.S. at 437-38, 441) (ii) whether the defendant was subjected to only a "modest number of questions" or was subjected to "persistent questioning" (*id*. at 442 & n.36, 438); and (iii) whether the questioning took place in a public location where "exposure to public view both reduces the ability of an unscrupulous policeman to use illegitimate means to elicit self-incriminating statements and diminishes the [suspect's]  . . . fear that, if he does not cooperate, he will be subjected to abuse" (*id*. at 438).

### i.       <u>Defendant Was in Custody</u>

The hearing record supports a finding that Tartaglione was in custody for purposes of *Miranda* during his traffic stop and transport to the barracks. From the moment Tartaglione interacted with Hammer on Long Lane, he was seized, and the restrictions on his movement increased quickly thereafter such that "a reasonable person in [Tartaglione's] position would have understood the situation to constitute a restraint on freedom of movement of the degree which the

law associates with formal arrest." *Bengivenga*, 845 F.2d 593, 596 (5th Cir. 1988). Before Tartaglione even arrived on scene, a cooperating witness had alerted him that police were asking questions about him with respect to one of the missing men, and his wife had told him that (1) police had pulled her over and that she was not free to leave, (2) there was a strong police presence there ("three troopers and a volks"), and (3) police wanted to speak to him at the scene. His wife also told him that police said that they were investigating a road rage incident involving his Jeep and "needed" Tartaglione to come down to the scene. This was the first instruction by law enforcement Tartaglione received, albeit through a third party.

Then, as Tartaglione was approaching his wife, Hammer immediately approached him (cutting him off from access to her), identified himself as law enforcement, and gave a series of commands to him. Hammer directed him to (1) back his car up, (2) park his vehicle off the road behind Hammer's and Browne's car with light still flashing, and (3) step out of his vehicle. The "language and tone used by police" was authoritative and controlling. *Tankleff v. Senkowski*, 135 F.3d at 244. Indeed, as Hammer had planned, he controlled the narrative. Responding to Tartaglione's expected denial of involvement in the fabricated road-rage incident, Hammer repeatedly instructed that he "needed" to speak to Tartaglione. Once Tartaglione complied with all of Hammer's commands, Hammer approached him on the street and told him once more that he needed to speak with him about what may have happened the previous night and that he wanted to have that conversation at the barracks rather than on the road. Within a minute of Hammer having confronted Tartaglione on the side of the road, and while Tartaglione's wife remained in the Jeep, an influx of law enforcement officers and vehicles descended upon Tartaglione. His vehicle was effectively blocked by three police cars that encircled it, and one of those police vehicles was in the middle of the road, impeding traffic. At least two of those vehicles had their emergency lights

activated. Tartaglione was suddenly surrounded by four armed officers, two uniformed, and a total of six agents were on the scene from at least two different law enforcement agencies. When Tartaglione tried to take a few steps forward, approximately two officers placed their hands on him while the other two repositioned themselves relative to Tartaglione but remained surrounding and facing him. Tartaglione was patted down and physically held and/or handled by at least two officers. Refuting any possible claim that the pat-down of Tartaglione was for the safety of the officers, police took possession of both of his cell phones and never returned them to him. Three to four officers then escorted him closely—as officers do with an arrestee—to Hammer's vehicle, opened the rear passenger door, and surrounded him as he complied with their directive to sit in the backseat. One officer, standing above Tartaglione, held and continued to guard the door while others discussed whether to tow Tartaglione's vehicle.

Based on the number of commands, the number of armed officers from different agencies, the fact that at least two of the armed officers were uniformed (so, with visibly available weapons), the number of officers physically surrounding him, the number of police vehicles, the flashing lights of those vehicles, how those vehicles were positioned to block Tartaglione's truck and also impede traffic, the fact that officers stepped towards him when he took one step forward, restricting his movement, blocking him from moving forward, the number of officers present and participating in the pat-down, the seizure of Tartaglione's cellphones, the manner in which they escorted him to the police car and into the backseat, and the fact that he was kept from his spouse, "a reasonable person would have understood himself to be subjected to restraints comparable to those associated with a formal arrest." *United States v. Kirsh*, 54 F.3d at 1067. Indeed, this was a "restraint on freedom of movement of the degree associated with a formal arrest." *Stansbury v. California*, 511 U.S. 318, 322 (1994). Notably, the officers themselves testified that they

understood Tartaglione to be subject to restraint for at least as long a period as it would take to get a supervisor's approval to relax that restraint.

In addition to the unquestionable and overwhelming restraint on Tartaglione's freedom of movement, Tartaglione was "outnumbered by officers from a range of agencies who separated him from his spouse…and did not permit him to freely move." *United States v. Butt*, No. 18-CR-00087 (NSR), 2019 WL 479117 at 17 (S.D.N.Y. Feb. 7, 2019). Tartaglione's wife remained in the Jeep during this entire encounter and Tartaglione was not permitted to approach her, let alone text her that he was being brought to the barracks for questioning. Before his truck reached her in the Jeep he was told to back up. Further, he was "not told that he was free to leave," and he was searched, touched, and his personal belongings—his cell phones and truck—were seized. *Tankleff v. Senkowski,* 135 F.3d at 244.

After being directed into a police vehicle and while being driven to the barracks by police (*United States v. Cebello,* 812 F.2d at 45) under guard in the backseat by the larger of the two officers (a decision made by law enforcement based on physical presence), officers continued what had started at the scene and developed into "prolonged" and "persistent" questioning, further amplifying the restraint on his freedom of movement. *Berkemer v. McCarty*, 468 U.S. at 437-38, 441, 442. Given the totality of all these circumstances, a reasonable person would have "understood the situation to constitute a restraint on freedom of movement of the degree which the law associates with formal arrest." *United States v. Bengivenga*, 845 F.2d at 596. Indeed, Tartaglione did not feel he was at liberty to terminate the interrogation and leave (*Thompson v. Keohane*, 516 U.S. at 112).

Lastly, and as explained in more detail below, the police-engineered interrogation of Tartaglione by the cooperating witness earlier that morning who told Tartaglione he was a target

of an investigation and that police were looking through telephone records, and by his wife who told him that police wanted to speak to him in person, coupled with the heightened police presence for what was purportedly a minor road rage incident, strongly conveyed to Tartaglione that he was the sole target of the police activity. All three police vehicles and all six law enforcement agents were dispatched to that location specifically for him. His wife was seized in the Jeep to get to Tartaglione. This was not just "prolonged" and "persistent" questioning that began when the cooperating witness called him. *Berkemer v. McCarty*, 468 U.S. at 438. This was about him. The police's focus on him was yet another factor that impacted his perspective and magnified his reasonable belief that he was not free to leave.

### ii.       Defendant Was Interrogated

Tartaglione's interrogation began well before his roadside encounter with police. It began at 9:05 am when the cooperating witness, at the government's direction, called Tartaglione and spoke to him about one of the missing persons. He may not have been in custody at that time, but that is when the first of the series of his interrogations began, and when the subject matter of the allegations was brought to his attention. As indicated in Defendant's Motion to Suppress Statements and attached exhibits, the cooperating witness told Tartaglione that two state troopers and a "Chester cop" came to his residence in Florida and began asking questions about Martin Luna (one of the four deceased victims). He told Tartaglione police had checked his phone records, were returning for further questioning the following day, that police had asked him questions about Tartaglione, and that Tartaglione was a person of interest in their investigation. *See Defendant's*

*Motion to Suppress Statement, Pages 4-6, and Exhibit A*. Throughout this discussion, Tartaglione made prejudicial admissions[5]. *See Id.*

Shortly thereafter, Tartaglione received a call from his wife who told him police wanted to question him and questioned him on behalf of police about whether he had been driving the Jeep the previous night. When Tartaglione arrived at the scene, police told him they needed to speak to him about the road rage incident. During this interaction, as state troopers and the FBI arrived on scene, the cooperating witness called Tartaglione once more. This series of police-choreographed interrogations by a cooperating witness, his wife, and police, coupled with the multi-agency police presence, similar to what the cooperating witness had claimed to have also experienced, intentionally prompted Tartaglione's attention to the missing men. Tartaglione's statement that "[t]his [was] about the missing Mexicans," was not spontaneous, nor was it a 'revelation,' but rather the product of a three-tiered strategy of police questioning through the cooperating witness, his wife, and only then the police. Hammer then proceeded to question him in the car about the missing men, and Tartaglione's relationship to them, all of which induced Tartaglione to make admissions connecting him to the men and the crime. Within minutes of arriving at the barracks, police continued to question Tartaglione about the missing men and various locations that were materially relevant to the government's proof. There is no question that Tartaglione was interrogated by law enforcement beginning with the call by the cooperating witness and concluding at the end of Tartaglione's questioning at the barracks and during the drive to the courthouse.

Accordingly, Tartaglione's un-*Mirandized* statements while he was in custody—in his pickup truck, roadside, in the police car on the way to the barracks, and at the barracks—must be suppressed because they were a product of custodial interrogation.

---

[5] At approximately 9:40 am, Tartaglione called the cooperating witness who continued to functionally interrogate him, soliciting further admissions from Tartaglione. *See Defendant's Motion to Suppress Statements.*

### B.  Tartaglione's Statement at the Barracks Must be Suppressed Because It Was a Product of a Previous Unwarned Interrogation.

*Miranda* warnings given mid-interrogation, after a defendant has given an unwarned confession, are ineffective. Accordingly, any subsequent confession repeated by the defendant after warnings are given is inadmissible. *See Missouri v. Seibert*, 542 U.S. 600 (2004). In *Oregon v. Elstad*, a case where the police intentionally conducted an un-*Mirandized* custodial interrogation to obtain a full confession, and then gave *Miranda* warnings to secure a *Mirandized* reiteration of the earlier confession, the Supreme Court of the United States held that when a defendant has made a statement without the benefit of *Miranda* warnings, and *Miranda* warnings are then administered, "the admissibility of any subsequent statement should turn ... solely on whether it is knowingly and voluntarily made." *Oregon v. Elstad*, 470 U.S. 298, 309 (1985).

*Missouri v. Seibert* re-examined *Elstad* and held that this "question-first" interrogation technique at issue overcame the suspect's waiver of his rights and violated the suspect's Fifth Amendment rights. *See Missouri v. Seibert*, 542 U.S. 600, 604, 611 (2004). In distinguishing *Elstad*, the *Seibert* plurality relied on five factors. "The contrast between *Elstad* and this case [i.e., *Seibert*] reveals a series of relevant facts that bear on whether *Miranda* warnings delivered midstream could be effective enough to accomplish their object: the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and the second, the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first." *Id. at 615.  See also United States v. Capers*, 627 F.3d 470, 479 (2d Cir. 2010)(citing *Seibert*  at 615) (adopting the *Seibert* "five factor" test of effectiveness of the warnings); *Harris v. Woods*, No. 05 CIV. 5582 PAC AJP, 2006 WL 1140888, at 20 (S.D.N.Y.

May 1, 2006), <u>report and recommendation adopted,</u> No. 05 CIV. 5582 PAC AJP, 2006 WL 1975990 (S.D.N.Y. July 10, 2006).

Accordingly, prior to evaluating the voluntariness of a second statement given after *Miranda* warnings, courts "must address whether the officers employed a 'deliberate, two-step strategy, predicated upon violating *Miranda* during an extended interview,' and if so, whether 'specific, curative steps' were taken to obviate the violation that occurred." <u>See</u> *United States v. Capers*, 627 F.3d. 470, 477 (2d Cir. 2010) (quoting Justice Kennedy's concurrence in *Seibert*, 542 U.S. at 621). However, because "the intent of the officer will rarely be as candidly admitted as it was [in Seibert[6]]" (see *Id*.), to determine if a deliberate, two-step strategy was employed, courts must "review the totality of the objective and subjective evidence surrounding the interrogations in order to determine deliberateness, with a recognition that in most instances the inquiry will rely heavily, if not entirely, upon objective evidence." *See United States v. Capers*, 627 F.3d 470, 479 (2d Cir. 2010). The prosecution bears the burden of disproving deliberateness by a preponderance of the evidence. *Id*. at 479.

Here, the government cannot disprove the deliberateness of police conduct by the preponderance of the evidence. In the instant matter, the totality of the circumstances overwhelmingly support that an improper, deliberate, two-step strategy was employed. Police set out to obtain a confession from Tartaglione about his involvement in the disappearance of the four men through surreptitiously-recorded controlled calls by the cooperating witness, made at the direction of the government. They then set out to obtain a confession by luring Tartaglione out of his home through the use of his wife and a ruse. They then seized him (*see section "Defendant was in Custody," above*) and questioned him specifically about the missing men in the car ride to

---

[6] In *Seibert*, the arresting officer testified that they deliberately withheld *Miranda* and that such a practice was promoted within the department.

the barracks without the advisement of *Miranda* warnings. Tartaglione made multiple admissions. Police admitted that there were no change of circumstances from the time Tartaglione was being questioned in the police vehicle to when he was questioned at the barracks. From the inception of both interrogations, there was no arrest warrant for Tartaglione. Browne claimed that the failure to issue *Miranda* warnings in the car ride was because the questions they asked Tartaglione in the vehicle did not amount to interrogation. However, Hammer covered the same topics with regard to the missing men in the barracks that he covered during the car ride. But critically, and just prior to issuing *Miranda* warnings to Tartaglione in the barracks, Hammer emphasized to Tartaglione that they needed Tartaglione to re-state everything he had just said in the vehicle. *See Defendant's Motion to Suppress Statement, P. 9* ("Just remember, we're just gonna sit down for a few minutes. We'll talk about…basically everything you're just telling us now…." "the little that we already talked about already is definitely…helpful…as far as the vehicle…and the fact that they cut a tire which means they may be involved in drugs and stuff like that….")

In addition, all five *Seibert* factors are present here. First, the questions and inculpatory responses concerning the missing men were thorough and detailed in both rounds of questioning. Second, the content of the two interrogations and answers given by Tartaglione almost entirely overlapped, as conceded by Browne and evident in the audio (GX-3) and video recordings (GX-5). *See Defendant's Motion to Suppress Statements, Pgs. 7-10* (summarizing interrogations and responses) and *Ex. B, E* (recordings and transcripts). Third, the timing from the end of the first statement to the start of the second statement was a matter of mere minutes—there was no sufficiently pronounced break—and each interview was lengthy, the first amounting to approximately 30 minutes, the second at the barracks lasting over 45 minutes. Fourth, Investigators Hammer and Browne were the interrogating officers in both pre- and post-*Miranda* interrogations,

thus, the 'continuity of police personnel' is met. And fifth, the investigators explicitly treated the second round of questioning as continuous with the first by explicitly stating they wanted to go over everything they had just discussed during the car ride to the barracks. *See Defendant's Motion to Suppress Statement, P. 9* and attached *Ex. E, Pgs. 33-38* ("the little bit that we talked about already is definitely, uh, yeah, definitely helpful, uh, as far as the vehicle and -- to the fact that they cut a tire which means they may be involved in drugs and stuff like that, so we do wanna go through that." "So I'm gonna read [Miranda warnings] to you. Uh, you probably. You could probably recite it to me, you know. Uh, so we gotta go through that and then we'll go back to, you know, uh, what their habits were, uh, who they hung around with or did you ever see anybody else in the car with them, that kind of stuff.")

The initial interrogation conducted by investigators aware of the obvious need for a *Miranda* warning, followed just minutes later by a second, post-*Miranda* interrogation by the same investigators, on the same subject matter, under similar circumstances and with no curative language amounted to a deliberate, two-step interrogation technique designed to undermine Tartaglione's *Miranda* rights. The interrogation was intentional, and conducted with the knowledge that Tartaglione was not, in fact, free to leave until and unless their supervisor said so. When Tartaglione arrived at the barracks he was re-interviewed just minutes later by the same investigators and on the exact same topic. The "impression that the further questioning was a mere continuation of the earlier questions and responses was fostered by references back" to the statements already given. *Seibert* at 2612-13.  In fact, with the exception of a few minutes, the interrogation never stopped. It began roadside, continued on the drive to the barracks, while waiting at the parking lot of the barracks, as they were walking inside to the interview room and then resumed a few minutes later in the interview room. If there was any question that the interview

in the barracks was not a continuation of the previous thirty minutes of questioning, Hammer put the question to rest by stressing that they were going to go through everything Tartaglione had just admitted.

Tartaglione's post *Miranda* statements should be suppressed because they were a product of a 'deliberate, two-step strategy, predicated upon violating *Miranda* during an extended interview.' <u>See</u> *United States v. Tirado*, No. 1:17-CR-668-GHW, 2018 WL 3432040 (S.D.N.Y. July 16, 2018); *Missouri v. Seibert*, 542 U.S. 600 (2004). The government cannot sustain the burden of disproving the deliberateness by a preponderance of the evidence. *See United States v. Capers* at 479.

### III.  TARTAGLIONE'S STATEMENTS SHOULD BE SUPPRESSED BECAUSE THEY WERE THE FRUIT OF THE POISONOUS TREE AS POLICE LACKED PROBABLE CAUSE TO DETAIN TARTAGLIONE

The traffic stop of Tartaglione in his pickup truck was unsupported by reasonable suspicion or probable cause. Because he was seized within the meaning of the 4th Amendment, all statements made by Tartaglione after he was stopped should be suppressed. *See Wong Sun v. United States*, 371 U.S. 471, 485 (1963) (holding that the government is not entitled to use either physical or testimonial evidence acquired only as a result, whether directly or indirectly, of an unlawful search or seizure).

When law enforcement "accosts [the] individual and restrains his freedom to walk away, he has 'seized' that person" within the meaning of the 4th Amendment.  *See Terry v. Ohio*, 392 U.S. 1, 16 (1968); *Brown v. Texas*, 443 U.S. 47, 50 (1979); *Brendlin v. California*, 551 U.S. 249, 254-55 (2007). Police may make a "seizure" by a show of authority without force as long as there is actual submission by suspect.  *See Brendlin v. California*, 551 U.S. at 254-55, 262.

Restraint may be physical.  *See Sibron v. New York*, 392 U.S. 40, 67 (1968). Restraint may also be in the form of a command or any gesture or expression indicating that the person is not free to go as they please.  *See Dunaway v. New York,* 442 U.S. 200, 203, 207 n.6 (1979); *Florida v. Royer*, 460 U.S. 491, 501-03 n.9 (1983) (seizure by show of official authority when police approached suspect in airport, identified themselves as narcotics agents, told defendant he was suspected of transporting drugs, asked him to accompany him to police room while retaining his airplane ticket and driver's license, and never indicated to him he was free to leave); *California v. Hodari D.*, 499 U.S. 621, 625-26 (1991); *see also United States v. Ricardo D.*, 912 F.2d 337, 340 (9th Cir. 1990) (custodial arrest occurred when officer patted down unarmed juvenile, gripped his arm ordered him not to run and directed him to sit in back of patrol car).

Seizure of person occurs when a reasonable person: (1) would believe that he/she is not free to leave" [(*United States v. Mendenhall*, 446 U.S. 544, 554-55 (1980) (Court considers several factors including threatening presence and number of officers, physical touching, language or tone implying compliance will be compelled)]; *see also United States v. Washington*, 490 F.3d 765, 772-73 (9th Cir. 2007) (seizure although defendant voluntarily submitted to search of his person, involved two uniformed officers and officers requested to search in authoritative tone without informing defendant of his right to refuse); or (2) would not feel free to decline the officers requests or otherwise terminate the encounter (*See Florida v. Bostick*, 501 U.S. at 436; *United States v. Espinoza*, 490 F.3d 41, 49-50 (1st Cir. 2007) (seizure when officer approached defendant's parked but idling car, displayed badge, and commanded defendant to turn off engine).

When officers concede that they would not have permitted the suspect to leave if the suspect had attempted to do so a seizure has likely occurred.  *See Florida v. Royer*, 460 U.S. at 503 (state conceded that Royer would not have been free to leave the interrogation room had he

asked to do so.  Moreover, the Court interpreted the testimony of the officers at the suppression hearing that if Royer refused to consent to the search of his luggage, the officers would have held the luggage and sought a warrant); *Dunaway v. New York*, 442 U.S. at 203, 212 ("although . . . [Dunaway] was not told he was under arrest, he would have been physically restrained if he had attempted to leave" and he "was never informed that he was 'free to go'; indeed, he would have been physically restrained if he had refused to accompany the officer or had tried to escape their custody.")

Courts must "tak[e] into account all of the circumstances surrounding the encounter."  *See Bostick* 501 U.S. at 437. In doing so, courts have considered the transportation of a suspect in a police vehicle. Police transporting defendant from location of stop turns *Terry* stop into arrest.  *See Dunaway; Royer*, 460 U.S. at 503 (one of the factors that transformed a consensual inquiry in a public place into a full arrest was the transportation of the defendant some 40 feet away to a small airport room for questioning). The nature of the setting where detention occurs is also relevant. Detention of a suspect in a "police dominated" setting (*Berkemer v. McCarty*, 468 U.S.420, 439 (1984), where no members of the public are "present to witness officers' conduct" (*United States v. Drayton*, 536 U.S. 194, 204 (2002) may transform a *Terry* stop into an arrest requiring probable cause. Courts also consider whether the detention was for purposes of interrogation.  *See Dunaway v. New York*, 442 U.S. at 212 (when the police transported the suspect to the police station for purpose of interrogation, the "detention  . . . was in important respects indistinguishable from a traditional arrest"); *Kaupp v. Texas*, 538 U.S. 626, 630 (2003) ("involuntary transport to a police station for questioning" is  . . . "sufficiently like arres[t] to invoke the traditional rule that arrests may constitutionally be made only on probable cause.")

### A. Police Did Not Have Reasonable Suspicion or Probable Cause to Detain Tartaglione.

Investigators Hammer and Browne admitted that they did not have authority to conduct a traffic stop of Tartaglione. Hammer did not believe he had probable cause to arrest Tartaglione and had no justification to conduct this pretextual traffic stop as Tartaglione had not committed any traffic violations or crimes and had no contraband in plain view. They testified at the hearing that they had no arrest warrant for him that morning, did not know whether charges were pending against Tartaglione and had zero plans to arrest him. Their plan was to wait until Tartaglione came out of his property and on to the street and then pull him over and question him. These circumstances do not support the reasonable suspicion necessary to temporarily seize an individual. Accordingly, Tartaglione's seizure (explained below) was unlawful and all statements he made thereafter should be suppressed because they were the fruit of the poisonous tree.

### B.  Tartaglione Was "Seized" at the Time of the Traffic Stop Within the Meaning of the Fourth Amendment.

Tartaglione was seized within the meaning of the Fourth Amendment. He was subjected to a "police-dominated setting" (*Berkemer v. McCarty*, 468 U.S.420, 439 (1984) on a rural road with limited to no traffic. He was lured out of his property and shortly thereafter on the roadway, with his wife held hostage in the Jeep, and, almost immediately, was surrounded by multiple police vehicles and law enforcement agents. Hammer testified that he set up the very scene Tartaglione was subjected to so that he could "control the narrative" and have "more control of the circumstances." Hammer swiftly achieved that goal.

Police made gestures consistent with a seizure, by giving Tartaglione a series of commands and within minutes, patting him down, searching his pockets and taking away his cell phones (*United States v. Mendenhall* at 554-55). He was not told that he was free to go, and although he

was not told that he was under arrest, police would have physically restrained him had he attempted to leave the scene (*Florida v. Royer*, 460 U.S. at 503). And when the police transported Tartaglione to the police station for purpose of interrogation, the "detention . . . was in important respects indistinguishable from a traditional arrest." *See Dunaway v. New York*, 442 U.S. at 203, 212. Indeed, Tartaglione was escorted by multiple officers into the backseat, while an officer stood guard over the car door, Hammer –the larger of the two investigators—sat in the back with Tartaglione, while the front passenger seat remained empty.

Any argument by the government that police did not use force, that Tartaglione voluntarily agreed to go back to the barracks, agreed to travel there in a police vehicle and leave his truck behind illegally parked on the side of a road, and that he voluntarily submitted to questioning by the police are unsubstantiated. Tartaglione demonstrated "actual submission" to the apparent show of authority by police. *See Brendlin v. California*, 551 U.S. at 254-55, 262.

But for the illegality of the police conduct—here, seizing Tartaglione without probable cause or reasonable suspicion—police would not have obtained Tartaglione's recorded and unrecorded statements. *Wong Sun v. United States*, 371 U.S. at 485. Accordingly, all of Tartaglione's statements must be suppressed as they were the fruits of his illegal seizure.

## CONCLUSION

All Tartaglione's statements to the police should be suppressed: his statements on the road, in the police vehicle, at the barracks should be suppressed, and during his transport to the White Plains courthouse. His statements roadside and in the police vehicle were the product of custodial interrogation without the benefit of *Miranda* warnings. His statement at the barracks was a product of a 'deliberate, two-step strategy, predicated upon violating *Miranda* during an extended

interview,' and no 'specific, curative steps' were taken to obviate the violation that occurred.' Remarkably, steps were taken to maintain this violation—police stressed to Tartaglione that he should restate his recent admissions. When Tartaglione was finally advised of the charges pending against him, he unequivocally requested a lawyer. Police continued to question him in violation of his right to counsel during his transportation to the White Plains courthouse in violation of his Fifth and Sixth Amendment rights.  All Tartaglione's statements should be suppressed as well because police lacked reasonable suspicion or probable cause to seize him roadside. But for the multiple violations made by a sophisticated army made up of multiple law enforcement agencies— well acquainted with a suspect's Fourth, Fifth, and Sixth Amendment rights—Tartaglione would not have made the statements he allegedly made on his way to court.

Dated: July 13, 2022
Garden City, New York

Respectfully submitted,

_____
Aida Leisenring, Esq.
Bruce Barket, Esq.
Edward J. Rymsza, Esq.
Karl Schwartz, Esq.
Arielle Egan, Esq.
Oliver Loewy, Esq.
*Attorneys for Mr. Tartaglione*

26