UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------x

UNITED STATES OF AMERICA      :

      :     S4 16 Cr. 832 (KMK)

     - v. -      :

      :

NICHOLAS TARTAGLIONE,      :

      :

     Defendant.      :

-------------------------------------------------------x


**POST-HEARING MEMORANDUM OF LAW OF THE UNITED STATES
IN FURTHER OPPOSITION TO THE DEFENDANT'S
MOTION TO SUPPRESS STATEMENTS**


DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
300 Quarropas Street
White Plains, New York 10601


MAURENE COMEY
JASON SWERGOLD
JACOB R. FIDDELMAN
Assistant United States Attorneys
- Of Counsel –

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND ................................................................................................................... 2

   **I.**   **Investigation Leading up to December 19, 2016** ......................................... 2

   **II.**   **Initial Encounter on Long Lane on the Morning of December 19, 2016** .................. 3

   **III.**   **Drive to the NYSP Barracks** ................................................................... 6

   **IV.**   **Events at the NYSP Barracks** ................................................................. 7

   **V.**   **Drive to White Plains Federal Courthouse** ............................................... 8

ARGUMENT ......................................................................................................................... 9

   **I.**   **Law Enforcement Had Reasonable Suspicion to Stop and Probable Cause to Arrest the Defendant on the Morning of December 19, 2016** ......................... 9

      **A.**      **Applicable Law** ................................................................................. 9

      **B.**      **Discussion** ...................................................................................... 11

   **II.**   **A Reasonable Person in the Defendant's Position Would Not Have Understood the Circumstances on the Morning of December 19, 2016 to Amount to an Arrest** ............... 13

      **A.**      **Applicable Law** ................................................................................. 14

      **B.**      **Discussion** ...................................................................................... 16

   **III.**   **Two of the Defendant's Statements Were Spontaneous and Accordingly Should Not be Suppressed Even if the Defendant Was in Custody at the Time They Were Made** ..... 19

      **A.**      **Applicable Law** ................................................................................. 20

      **B.**      **Discussion** ...................................................................................... 21

CONCLUSION ...................................................................................................................... 22

## <u>TABLE OF AUTHORITIES</u>

Page(s)

Cases

*Atwater v. City of Lago Vista*,
532 U.S. 318 (2001).................................................................................... 9
*Berkemer v. McCarty*,
468 U.S. 420 (1984)............................................................................ 14, 16
*Brinegar v. United States*,
338 U.S. 160 (1949).................................................................................... 9
*Campaneria v. Reid*,
891 F.2d 1014 (2d Cir. 1989)................................................................... 15
*Cruz v. Miller*,
255 F.3d 77 (2d Cir. 2001)....................................................................... 15
*Florida v. Harris*,
568 U.S. 237 (2013).................................................................................. 10
*Illinois v. Gates*,
462 U.S. 213 (1983).................................................................................. 10
*Minnesota v. Murphy*,
465 U.S. 420 (1984).................................................................................. 15
*Miranda v. Arizona*,
384 U.S. 436 (1966)............................................................................ 20, 22
*Oregon v. Mathison*,
429 U.S. 492 (1977).................................................................................. 15
*Ortiz v. Artuz*,
09 Civ. 5533 (NRB), 2010 WL 3290962 (S.D.N.Y. Aug. 9, 2010) ....... 15
*Rhode Island v. Innis*,
446 U.S. 291 (1980).................................................................................. 20
*Stansbury v. California*,
511 U.S. 318 (1994).................................................................................. 14
*Tankleff v. Senkowski*,
135 F.3d 235 (2d Cir. 1998)..................................................................... 15
*Terry v. Ohio*,
392 U.S. 1 (1968)...................................................................................... 10
*United States v. Arvizu*,
534 U.S. 266 (2002).................................................................................. 10
*United States v. Badmus*,
325 F.3d 133 (2d Cir. 2003)..................................................................... 16
*United States v. Bowden*,
45 F. App'x 61 (2d Cir. 2002) ............................................................ 20, 21
*United States v. Butt*,
18 Cr. 87 (NSR), 2019 WL 479117 (S.D.N.Y. Feb. 7, 2019) ............... 18
*United States v. Choudhry*,
24 F. Supp. 3d 273 (E.D.N.Y. 2014) ....................................................... 20

iii

*United States v. Colon*,
   250 F.3d 130 (2d Cir. 2001)..................................................................... 11, 13

*United States v. Colon*,
   835 F.2d 27 (2d Cir. 1987)............................................................................ 20

*United States v. Cota*,
   953 F.2d 753 (2d Cir. 1992)......................................................................... 15

*United States v. Cruz*,
   834 F.2d 47 (2d Cir. 1987)....................................................................... 9, 10

*United States v. Glover*,
   957 F.2d 1004 (2d Cir. 1992)...................................................................... 10

*United States v. Gomez*,
   199 F. Supp. 3d 728 (S.D.N.Y. 2016)......................................................... 11

*United States v. Hensley*,
   469 U.S. 221 (1985)..................................................................................... 11

*United States v. Juwa*,
   508 F.3d 694 (2d Cir. 2007)........................................................................ 10

*United States v. Kirsh*,
   54 F.3d 1062 (2d Cir. 1995)........................................................................ 15

*United States v. Lifshitz*,
   03 Cr. 572 (LAP), 2004 WL 2072468 (S.D.N.Y. Sept. 15, 2004) ............. 16

*United States v. Long*,
   678 F. App'x 31 (2d Cir. 2017) ................................................................... 11

*United States v. Mitchell*,
   966 F.2d 92 (2d Cir. 1992).................................................................... 15, 16

*United States v. Montana*,
   958 F.2d 516 (2d Cir. 1992)................................................................... 20, 21

*United States v. Muhammad*,
   463 F.3d 115 (2d Cir. 2006)........................................................................ 10

*United States v. Newton*,
   369 F.3d 659 (2d Cir. 2004)........................................................... 14, 16, 17

*United States v. Patrick*,
   899 F.2d 169 (2d Cir. 1990).......................................................................... 9

*United States v. Peters*,
   18 Cr. 188 (VAB), 2019 WL 351261 (D. Conn. Jan. 29, 2019)................. 11

*United States v. Remache*,
   201 F.3d 433, 1999 WL 1212535 (2d Cir. 1999) .............................. 15, 17, 18

*United States v. Ross*,
   719 F.2d 615 (2d Cir. 1983)........................................................................ 16

*United States v. Santana*,
   485 F.2d 365 (2d Cir. 1973)........................................................................ 10

*United States v. Simmons*,
   560 F.3d 98 (2d Cir. 2009).......................................................................... 10

*United States v. Tehrani*,
   49 F.3d 54 (2d Cir. 1995) ............................................................................ 10

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum of law in further opposition to defendant Nicholas Tartaglione's motion to suppress statements the defendant made to law enforcement on December 19, 2016. Following an evidentiary hearing before the Court on May 27, 2022, the defendant filed a memorandum of law in further support of his motions to suppress.[1] The defendant argues that all of Tartaglione's statements on December 19, 2016 should be suppressed because (1) law enforcement lacked reasonable suspicion to stop Tartaglione's vehicle on the morning of December 19, 2016; (2) Tartaglione was in custody from the moment his vehicle stopped that same morning; and (3) none of Tartaglione's statements that morning were spontaneous. The motion should be denied. First, as demonstrated by the search warrants attached to the defense's own motion and the return of an indictment on the afternoon of December 19, 2016, law enforcement had probable cause to believe that Tartaglione had committed drug and murder offenses. Second, the evidence at the hearing supports the conclusion that a reasonable person in the defendant's position would not have understood the circumstances surrounding the car stop and drive to the barracks to be the equivalent of an arrest. Third, two of the defendant's statements were made spontaneously and not in response to any questioning, such that even if the Court concludes the defendant was in custody, those two statements should not be suppressed.

---

[1] The defendant also moves to suppress his statements on Sixth Amendment grounds, certain cell site evidence, and evidence seized during the execution of a search warrant at the defendant's residence. The Court did not hold a hearing on those issues. The Government addressed those claims in its memoranda of law dated September 20, 2019 and April 18, 2022 and its supplemental letters dated April 1, 2021 and May 16, 2022. The Government respectfully incorporates those aforementioned filings by reference herein.

**BACKGROUND**

At the evidentiary hearing on May 27, 2022, the Government called two witnesses from the New York State Police ("NYSP"): Retired Senior Investigator Brian Hammer and Captain James Browne. In addition, the Court received several exhibits from both parties in connection with the briefing and the hearing.[2] The evidence established the following:

**I.      Investigation Leading up to December 19, 2016**

Between April 11, 2016 and December 19, 2016, law enforcement conducted an investigation into the disappearance of the four victims in this case. (Tr. 51). The lead investigator coordinating the investigation was NYSP Senior Investigator William Young, who also worked as a Task Force Officer on the FBI Hudson Valley Safe Streets Task Force. (Tr. 37-38, 40). That investigation involved multiple steps, including the interviews of witnesses, review of surveillance videos, and analysis of various records, including phone records. (Tr. 51-52; *see also* DX-A to Motion to Suppress Search Warrant at S_NT_001683-87). On December 14, 2016, Government presented evidence to grand jury. (Comey Decl. ¶ 2). On December 19, 2016, the Government presented the grand jury with a proposed indictment, provided legal instructions, and answered grand jurors' questions. (Comey Decl. ¶ 3). In the early afternoon that same day, the grand jury returned a true bill indicting the defendant with one count of narcotics conspiracy and four counts of murder. (*Id.*).

On the morning of December 19, 2016, law enforcement engaged in multiple investigative steps, coordinated by Senior Investigator Young. (Tr. 20, 40-42). One of those steps included a confidential source placing recorded phone calls to the defendant. Another of those steps involved seeking to conduct a voluntary interview with the defendant by conducting a traffic stop. (Tr. 11,

---

[2] "Tr" refers to the transcript from the hearing held on May 27, 2022. "GX" refers to the Government's exhibits, and "DX" refers to the defendant's exhibits.

55). All of the various investigative steps that day were conducted under the direction of a command post, which conveyed instructions from the lead investigator, Senior Investigator Young. (Tr. 40-42).

## II. Initial Encounter on Long Lane on the Morning of December 19, 2016

On the morning of December 19, 2016, a team of law enforcement officers, including Hammer and Browne who were together in an unmarked car (the "Unmarked Car"), conducted physical and drone surveillance on the defendant's residence at 103 Long Lane. (Tr. 10, 12, 56). Shortly before 11:00 a.m., drone surveillance observed a blue jeep leaving the defendant's property, and the command post communicated that observation to the team conducting physical surveillance. (Tr. 13). Following instructions from the command post, Hammer and Browne initiated a stop of that blue jeep on Lone Lane, stopping the Unmarked Car in front of the blue jeep. (Tr. 13-14, 41-42). In addition to the Unmarked Car, two marked police vehicles with lights and sirens activated stopped behind the blue jeep. (Tr. 42; GX-4 at 00:40-00:50).

After the blue jeep pulled over on the side of Long Lane, Hammer and Browne approached the driver's side on foot, where they found that the defendant's wife was the driver and only occupant. (Tr. 14-15, 56-57). By the time Hammer and Browne approached the vehicle, the defendant's wife was already on the phone with the defendant. (Tr. 15-16, 58). In a ruse meant to draw the defendant out from his residence, Hammer told the defendant's wife that the vehicle she was driving had been used in a road rage incident the night before and asked who was driving the car the other night. (Tr. 15, 57-58). The defendant's wife then asked the defendant over the phone whether he was driving the jeep the prior night. (Tr. 16). She conveyed to Hammer that the defendant was not driving the jeep the prior night. (*Id.*). In response, Hammer said he would need to hear from the defendant himself. (Tr. 16, 43). The defendant's wife indicated that the defendant was on his way. (Tr. 58).

At that point, Hammer and Browne repositioned the Unmarked Car to be directly behind the blue jeep, while the remaining law enforcement cars drove away out of sight. (Tr. 22-23; s*ee also* GX-4 at 01:40-01:58, 07:18-07:30). After approximately five minutes, the defendant drove in a pickup truck to the area of Long Lane where the Unmarked Car and the blue jeep were stopped on Long Lane. (Tr. 16-17, 58-59). At that time, Browne was in the Unmarked Car, while Hammer was standing outside the car. (Tr. 58-59). The defendant stopped his truck in the middle of the road, rolled down the driver's side window of the truck, and spoke to Hammer from within the truck while Hammer stood on the side of the road. (Tr. 16-17, 24, 58-59; s*ee also* GX-4 at 07:30-07:43). During the ensuing conversation, the defendant identified himself by name, stated he was a police officer, and indicated that he did not drive the blue jeep the previous night. (Tr. 16-17). In response, Hammer told the defendant "that's fine, but I still need to talk to you," and asked the defendant to move his truck out of the roadway and step out of his car. (Tr. 17, 45). The defendant then moved his truck to the side of Long Lane behind the Unmarked Car and stepped out of the truck. (Tr. 17-18, 24-25 46).

During that initial conversation with the defendant, Hammer was the only officer interacting with the defendant, and the only visible law enforcement vehicle was the Unmarked Car. (*See* GX-4 at 07:18-08:20). At no point during that initial conversation did Hammer draw his weapon. (*See id.*).

After the defendant exited his truck, Hammer engaged him in conversation. During that conversation, Hammer stated that he needed to speak with the defendant regarding a road rage incident. (Tr. 17-18). Hammer explained, "I would like to talk to you back at the barracks, I don't want to do it out here on the street." (Tr. 18). In response, the defendant agreed to travel to the barracks with Hammer. (*Id.*). At approximately the same time, Browne was inside the unmarked

4

car, where he turned on an audio recording device. (Tr. 25, 59). After the device was turned on, Browne got out of the Unmarked Car and joined Hammer to speak with the defendant on foot. (Tr. 26, 59-60).

After the defendant had been speaking with Hammer for approximately one minute, two marked police cars approached the scene, where one parked behind the defendant's pickup truck, and the other parked in the road next to Hammer and Browne's unmarked car. (*See* GX-4 at 08:00-09:25; Tr. 46, 60-61). At that point, Hammer, Browne, and two uniformed troopers were standing on the side of the road near the defendant. (*See* GX-4 at 09:30-09:50). After the other law enforcement officers arrived at the scene, the defendant received an incoming call on his cellphone, which he answered without interference by law enforcement. (Tr. 26-27; s*ee also* GX-4 at 09:30-09:50). Shortly thereafter, Hammer asked the defendant if he would get into the Unmarked Car, to which the defendant responded, "absolutely," and began walking toward the Unmarked Car. (*See* GX-4 at 09:50-10:02). As the defendant walked toward Hammer and Browne's unmarked car, Hammer asked the defendant if he had any weapons, and Hammer and the other officers patted the defendant down. (Tr. 18, 61; GX-4 at 09:55-10:40). At that time, Hammer took one cellphone out of the defendant's hand and a second cellphone out of the defendant's pocket. (Tr. 18).

Hammer, Browne, and the two uniformed officers then walked with Tartaglione to the rear passenger door of Hammer and Browne's unmarked vehicle, where Tartaglione sat down. (GX-4 at 10:25-10:40). Tartaglione never asked to drive his own vehicle to the barracks. (Tr. 19). Throughout this entire interaction, no law enforcement officer drew a weapon, placed the defendant in handcuffs, told the defendant he could not leave, or told the defendant he was under arrest. (Tr. 18-19, 61).

After Tartaglione entered the Unmarked Car, Hammer spoke briefly with the other law enforcement officers outside of the car and then entered the rear driver's side seat of the Unmarked Car. (*See* GX-4 at 10:40-11:32; Tr. 27-28, 61-62). Immediately after Hammer entered the vehicle, without prompting, the defendant looked at Hammer and said "this is about the missing Mexicans, isn't it." (Tr. 28). That statement, which followed an approximately 50-second break during which the defendant was in the car alone, was not in response to any question or statement made by Hammer or any other law enforcement officer. (Tr. 28; *see also* GX-4 at 10:40-11:32). About one minute later, Browne entered the front driver's seat of the Unmarked Car, at which point he began driving to the NYSP barracks in Montgomery (the "NYSP Barracks"). (Tr. 62; *see also* GX-4 at 11:32-12:50).

### III. Drive to the NYSP Barracks

The drive to the NYSP Barracks lasted approximately twenty-two minutes. (*See* GX-3 at 3:50-25:14). During that time, Hammer asked the defendant about the victims in this case. Throughout the drive, the tone remained conversational and nonconfrontational. (*See id.*). The conversation covered when the defendant last saw the victim named Martin; how the defendant knew Martin; work that Martin did for the defendant on his ranch; the defendant's suspicions that Martin was involved in drug dealing based on a hole that was cut out of the spare tire in a vehicle the defendant gave to Martin and then received back; rumors the defendant had heard about where the victims were; the defendant's employment history as a police officer; and the defendant's animal rescue efforts. (*See id.*). Hammer indicated that law enforcement was seeking the defendant's help to locate the four victims. (GX-3 at 21:15-21:20). Hammer, Browne, and the defendant arrived at the NYSP Barracks at approximately 11:23 a.m. (*See* GX-3 at 25:00-25:14).

## IV.     Events at the NYSP Barracks

Once at the Barracks, the defendant and Hammer stepped out of the car and stood in the parking lot while Browne went inside to find an available interview room.  (Tr. 30, 62-63).  During that time, the defendant remained unrestrained: he was standing alone with Hammer, he was not handcuffed, he was not told that he was under arrest, Hammer did not draw his weapon, and the defendant did not ask to leave.  (Tr. 30-31, 63-64).  After approximately five minutes, Browne returned to the parking lot and then walked with Hammer and the defendant to an interview room inside the NYSP Barracks.  (Tr. 31; *see also* GX-3 at 25:00-30:20).  Tartaglione entered the interview room at approximately 11:29 a.m. (*See* GX-5 at 01:57).

After about five minutes, Hammer and Browne joined the defendant in the interview room.  (GX-5 at 06:35).  After Browne collected pedigree information from the defendant, such as his address, phone number, and full name, Hammer began providing the defendant with *Miranda* warnings, but the defendant interjected that was not going to ask for a lawyer now.  (GX-5 at 06:35-09:15).  Hammer nevertheless completed the *Miranda* warnings, and Tartaglione indicated that he was willing to talk with Hammer and Browne.  (*See id.*).

Hammer and Browne then questioned Tartaglione for approximately 47 minutes.  (Tr. 32).  During that time, the questioning transitioned from the conversational tone that had taken place in the car, to a more confrontational interrogation.  (*See* GX-5 at 09:15-1:08:34).  During the interview, the defendant briefly discussed some of the topics that came up on the drive to the NYSP Barracks, such as the work that Martin did for the defendant; the car that the defendant sold to Martin; the defendant's suspicion that Martin was involved in drug dealing; when the defendant last spoke with Martin; and a rumor that the victims had left the country.  (*See* GX-5 at 09:15-46:22; 56:22-1:08:34).  In addition, the defendant discussed new topics that had not come up during the drive to the NYSP Barracks, including: Martin hiring a private investigator to find

someone who owed Martin money; Martin's suggestions to the defendant of ways to make money, including by growing marijuana on the defendant's property; a rumor that a cartel took a truck from Martin over money Martin owed; where Martin's house was located in Middletown; where the defendant saw Martin in person; other people who drove the defendant's cars; cars registered to the defendant; the defendant's connection to the Chester area where the victims disappeared; and the last time the defendant went to his brother's bar, the Likquid Lounge. (*See id.*).

At approximately 12:13 p.m., Hammer and Browne stepped out of the interrogation room, and remained outside of the room for approximately ten minutes, during which they learned that the defendant was to be arrested that day. (Tr. 32-34, 64; *see also* GX-5 at 46:15-56:30). At approximately 12:23 p.m., Hammer and Browne reentered the interrogation room and resumed questioning the defendant. (GX-5 at 56:30). At approximately 12:35 p.m., the defendant invoked his right to counsel. (GX-5 at 1:08:30).

After the termination of the interview, law enforcement processed Tartaglione as an arrestee. (Tr. 34, 64-65). Hammer and Browne then transported the defendant in their same Unmarked Car to the federal courthouse in White Plains. (Tr. 34, 65).

## V.    Drive to White Plains Federal Courthouse

During the drive from the NYSP barracks to White Plains, Tartaglione was handcuffed. (Tr. 34-35). Hammer and Browne engaged in some small talk, but they did not question the defendant. (Tr. 35-36, 66). At some point as the car neared White Plains, the defendant looked at Hammer and, without prompting, stated "fucking Mexicans." (Tr. 36, 66-67). That statement was not in response to any question or statement by law enforcement. (*Id.*).

## ARGUMENT

### I. Law Enforcement Had Reasonable Suspicion to Stop and Probable Cause to Arrest the Defendant on the Morning of December 19, 2016

In a late-breaking claim not raised in his initial or supplemental papers, the defendant now suggests that law enforcement lacked a lawful basis to stop the defendant on the morning of December 19, 2016. This claim ignores the fact that the grand jury returned an indictment charging the defendant with narcotics conspiracy and murder that same day based on evidence that had already been presented several days earlier. In other words, the grand jury found that the evidence law enforcement had gathered to date was sufficient to establish probable cause that Tartaglione committed multiple federal crimes. Although Hammer and Browne were not personally aware of all that evidence, Senior Investigator Young, the lead investigator in the case, certainly was, and the instructions conveyed to Hammer and Brown via the command post were based on that full knowledge. Thus, under the collective knowledge doctrine, Hammer and Browne had not only reasonable suspicion to stop the defendant for questioning, but also probable cause to arrest the defendant on the same charges returned by the grand jury that same day. Accordingly, the defense's Fourth Amendment claim fails.

#### A. Applicable Law

When there is probable cause to believe that an individual has committed a criminal offense, then law enforcement "may, without violating the Fourth Amendment, arrest the offender." *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001); *see also United States v. Cruz*, 834 F.2d 47, 50 (2d Cir. 1987). Probable cause requires "sufficient knowledge or reasonably trustworthy information to justify a person of reasonable caution in believing that an offense has been or is being committed by the person to be arrested." *United States v. Patrick*, 899 F.2d 169, 171 (2d Cir. 1990) (citing, *inter alia*, *Brinegar v. United States*, 338 U.S. 160, 175-76 (1949) and

*Illinois v. Gates*, 462 U.S. 213, 230-32 (1983)). At bottom, all that is required to establish probable cause is "the kind of 'fair probability' on which 'reasonable and prudent [people,] not legal technicians, act.'" *Florida v. Harris*, 568 U.S. 237, 244 (2013) (alteration in original) (quoting *Gates*, 462 U.S. at 238 ); *see also United States v. Juwa*, 508 F.3d 694, 710 (2d Cir. 2007) (probable cause is a lower standard than preponderance of the evidence).

Short of an arrest, a law enforcement officer may conduct a brief "investigative detention"—also known as a "*Terry* stop"—by stopping a person to investigate possible criminal behavior, so long as at the time the officer effects the stop, the officer has "'reasonable suspicion' to believe that criminal activity has occurred or is about to occur." *United States v. Tehrani*, 49 F.3d 54, 58 (2d Cir. 1995) (citing *United States v. Glover*, 957 F.2d 1004, 1008 (2d Cir. 1992)). The test for reasonable suspicion is a "rather lenient" one and requires less than probable cause. *United States v. Santana*, 485 F.2d 365, 368 (2d Cir. 1973). "In reviewing the reasonableness of a *Terry* stop, [the Court] ask[s] whether there was a 'particularized and objective basis' for suspicion of legal wrongdoing under the totality of the circumstances." *United States v. Simmons*, 560 F.3d 98, 103 (2d Cir. 2009) (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)). While the officer may not rely on an "inchoate and unparticularized suspicion or 'hunch,'" *Terry v. Ohio*, 392 U.S. 1, 27 (1968), he is entitled to "draw on [his] own experience and specialized training to make inferences from and deductions about the cumulative information available to [him] that might well elude an untrained person." *United States v. Muhammad*, 463 F.3d 115, 121 (2d Cir. 2006) (quoting *Arvizu*, 534 U.S. at 273 (alterations in original, internal quotation marks omitted)).

A probable cause or reasonable suspicion determination is to be made on the basis of all the information collectively known to law enforcement at the time; it is not limited to the observations of the arresting officer. *See Cruz*, 834 F.2d at 51. "Under the 'collective knowledge'

doctrine," whether the law enforcement official conducting a stop "had developed a reasonable suspicion based on what he observed is of no moment." *United States v. Peters*, 18 Cr. 188 (VAB), 2019 WL 351261, at *9 (D. Conn. Jan. 29, 2019). Indeed, "an arrest or search is permissible where the actual arresting or searching officer lacks the specific information to form the basis for probable cause or reasonable suspicion but sufficient information to justify the arrest or search was known by other law enforcement officials initiating or involved with the investigation." *United States v. Colon*, 250 F.3d 130, 135 (2d Cir. 2001) (citing *United States v. Hensley*, 469 U.S. 221, 230-33 (1985)); *see also United States v. Long*, 678 F. App'x 31, 33-34 (2d Cir. 2017); *United States v. Gomez*, 199 F. Supp. 3d 728, 743 n.13 (S.D.N.Y. 2016). Although "an officer cannot simply rely on the collective knowledge of the department generally, it is well-settled that it is reasonable to impute specific knowledge to the searching or arresting officer where the law enforcement officers initiating the search or arrest, on whose instructions or information the actual searching or arresting officers relied, had information that would provide reasonable suspicion or probable cause" justifying an investigative stop. *Peters*, 2019 WL 351261, at *9 (internal quotation marks omitted) (quoting *Colon*, 250 F.3d at 135-36).

**B.     Discussion**

The record establishes that by December 14, 2016—the only date when evidence was presented to the grand jury in support of the S1 16 Cr. 832 (KMK) Indictment—law enforcement had gathered probable cause to believe that the defendant had committed multiple federal crimes. Indeed, as the defense is aware from the discovery in this case, law enforcement obtained search warrants for multiple locations and vehicles on December 16, 2016. The application for those warrants set forth probable cause to believe that the defendant had committed the crimes charged in the S1 Indictment based on evidence that included surveillance videos, witness statements,

phone records, and vehicle records. In other words, multiple days before December 19, 2016, law enforcement had gathered evidence demonstrating probable cause to believe that the defendant had participated in a narcotics conspiracy and the murders of all four victims. The application for those December 16, 2016 search warrants, which sets forth probable cause to believe the defendant had committed multiple federal crimes, is being submitted to the Court as Government Exhibit 6 under seal with this memorandum as a supplement to the hearing record.[3]

Although Hammer and Browne were not aware of all this evidence, the case agent, Senior Investigator Young, was. Hammer and Browne both understood that other investigators were fully aware of the evidence gathered in the investigation and were charged with making decisions based on that evidence regarding what steps other investigators could and should take. Indeed, Hammer confirmed that Senior Investigator Young was providing "instructions" to him on the morning of December 19, 2016. (Tr. 42). In advance of the initial car stop, the investigative team had determined that Tartaglione would be stopped in his vehicle. That decision was based on the evidence gathered in advance of December 19, 2016, which provided at the very least reasonable suspicion to believe Tartaglione had committed a crime that was under investigation. Hammer and Browne carried out that initiative and conducted a lawful investigative stop seeking to question the defendant.

Tellingly, the defense does not attack the factual basis for the probable cause findings in any of the warrants sworn out before December 19, 2016, or that underly the grand jury's vote that

---

[3] The Government maintains that the current record, as supplemented by GX-6, is sufficient to find that law enforcement had reasonable suspicion to stop and probable cause to arrest the defendant before December 19, 2016. Because the defense did not raise this Fourth Amendment claim until after the May 27, 2022 hearing, however, the Government did not specifically focus on presenting evidence on this issue at the hearing or in its prior briefing. Should the Court have any doubt about the existence of probable cause in advance of December 19, 2016, the Government respectfully requests that it be permitted to supplement the record further.

day. The defense's Fourth Amendment claim appears based solely on the fact that the law enforcement officers who interacted with the defendant that day—Hammer and Brown—did not personally know the details of that factual basis. (*See* Def. Post-Hearing Brief at 24). But the law does not require that every law enforcement officer assisting in an operation be fully versed in the evidence gathered by other investigators before taking law enforcement operation. So long as the investigators who convey the instruction or request to initiate a stop or arrest are aware of sufficient facts to justify that action, the officers who fulfill that request may do so lawfully without receiving a full briefing regarding the details of the evidence gathered to date. *See Colon*, 250 F.3d at 135. That is precisely what happened here.

Senior Investigator Young knew the full evidence gathered against the defendant, and he knew that evidence amounted to probable cause to believe the defendant had committed multiple federal crimes. Thus, when he conveyed instructions to stop the defendant for questioning, he did so with a lawful basis of both reasonable suspicion justifying a *Terry* stop and probable cause to arrest the defendant. The Fourth Amendment requires nothing more.

## II. A Reasonable Person in the Defendant's Position Would Not Have Understood the Circumstances on the Morning of December 19, 2016 to Amount to an Arrest

The record establishes that both on Long Lane and on the drive to the NYSP Barracks on the morning of December 19, 2016, several factors prevented the defendant's interactions from rising to the level of an arrest such that *Miranda* warnings would have been required. No law enforcement officers ever drew their weapons or pointed them at the defendant, the defendant was never placed in handcuffs, the defendant was never told he was under arrest, the defendant was never told that he was not free to leave or was required to submit to the interview, and the conversation with Hammer prior to the reading of *Miranda* warnings remained conversational and nonconfrontational. Taken together, those circumstances outweigh the factors emphasized by the

defense—the uniformed troopers who briefly interacted with the defendant, the brief pat down of the defendant, and the seizure of the defendant's cellphones—and prevented the situation from rising to the level of an arrest requiring *Miranda* warnings. As a result, the defendant's motion to suppress his statements should be denied.

### A.     Applicable Law

The Government's September 20, 2019 memorandum or law set forth the governing law on this issue, and is respectfully incorporated herein by reference. As explained therein, and in summary, a court's analysis of whether a defendant was in "custody" for *Miranda* purposes looks beyond a simple inquiry of whether a reasonable person would have felt free to leave during questioning. Instead,

> it makes sense for a court to begin any custody analysis by asking whether a reasonable person would have thought he was free to leave the police encounter at issue. . . . [I]f a reasonable person would not have thought himself free to leave, . . . a court must ask whether, in addition to not feeling free to leave, a reasonable person would have understood his freedom of action to have been curtailed to a degree associated with formal arrest.

*United States v. Newton*, 369 F.3d 659, 672 (2d Cir. 2004). A defendant is in custody for purposes of *Miranda* analysis only if *both* questions are answered in the affirmative. *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984); *Newton*, 369 F.3d at 672. The answer to both questions "depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *Stansbury v. California*, 511 U.S. 318, 323 (1994). In considering these two questions, the second captures the "ultimate inquiry" because a "free-to-leave inquiry reveals only whether the person questioned was seized." *Newton*, 369 F.3d at 672.

Under this two-part test, "to be considered 'in custody' a defendant must have 'understood himself to be subject to restraints comparable to those associated with a formal arrest.'" *United States v. Remache*, 201 F.3d 433, 1999 WL 1212535, at *1 (2d Cir. 1999) (quoting *United States v. Mitchell*, 966 F.2d 92, 98 (2d Cir. 1992)). Even if a defendant is not formally told he is under arrest, he is nevertheless in custody for purposes of this analysis if "law enforcement officials act or speak in a manner that conveys the message that they would not permit the accused to leave." *United States v. Kirsh*, 54 F.3d 1062, 1067 (2d Cir. 1995) (internal quotation mark omitted) (quoting *Campaneria v. Reid*, 891 F.2d 1014, 1021 n.1 (2d Cir. 1989)). The core question is whether the circumstances of the questioning "convey[ed] to the suspect a message that he has no choice but to submit to the [interrogating] officers' will and to confess." *Minnesota v. Murphy*, 465 U.S. 420, 433 (1984). In applying this test, courts consider "whether a suspect is or is not told that she is free to leave; the location and atmosphere of the interrogation; the language and tone used by the police; whether the suspect is searched, frisked, or patted down; and the length of the interrogation." *Tankleff v. Senkowski*, 135 F.3d 235, 244 (2d Cir. 1998).

Even where an interview occurs "in a coercive environment," including a police station, *Miranda* warnings are not required so long as the suspect arrives voluntarily. *Cruz v. Miller*, 255 F.3d 77, 81-82 (2d Cir. 2001) (internal quotation marks and citations omitted); *see also Oregon v. Mathison*, 429 U.S. 492, 497 (1977). Similarly, interactions with multiple law enforcement officers in a public area, such as a roadside, do not necessarily indicate that a suspect is in custody for purposes of this analysis. *See, e.g.*, *United States v. Cota*, 953 F.2d 753, 758-59 (2d Cir. 1992) (defendant ordered out of car at gunpoint, handcuffed, then voluntarily accompanied law enforcement to police station inside police vehicle while unrestrained, and waited for six hours at station to be questioned, was not in custody for purposes of *Miranda*); *Ortiz v. Artuz*, 09 Civ. 5533

(NRB), 2010 WL 3290962, at *9 (S.D.N.Y. Aug. 9, 2010) (although six police officers "surrounded" suspect, state court not unreasonable in determining suspect was not in custody for purposes of *Miranda* because suspect was not handcuffed and was not specifically told that he was required to travel to the police station).  Similarly, it is irrelevant whether interviewing officers intend to arrest a suspect at the end of an interrogation, so long as that intent is not communicated to the suspect during questioning.  *See Berkemer*, 468 U.S. at 442.

Though an extended interview session is indicative of custodial interrogation, interviews of an hour or less suggest that the interview was noncustodial.  *United States v. Lifshitz*, 03 Cr. 572 (LAP), 2004 WL 2072468, at *8 (S.D.N.Y. Sept. 15, 2004) (45 minute to hour-long interview held not custodial).  In the absence of an arrest, the Court of Appeals has "emphasized that . . . an interrogation is not 'custodial' unless the authorities affirmatively convey the message that the defendant is not free to leave."  *Mitchell*, 966 F.2d at 98.  "Handcuffs are generally recognized as a hallmark of a formal arrest."  *Newton*, 369 F.3d at 676.  Moreover, temporary restrictions on a defendant's movement are not custodial for purposes of *Miranda*.  *United States v. Badmus*, 325 F.3d 133, 139 (2d Cir. 2003) (defendant not in custody even where told to stay seated in his living room and not allowed to move freely in apartment during execution of three-hour search by six officers in small apartment with holstered guns); *United States v. Ross*, 719 F.2d 615, 622 (2d Cir. 1983) (fact that defendant told he would be escorted by an agent if he moved about office while search underway not custodial).

B.    **Discussion**

The Government agrees that the defendant would not have *in fact* been free to leave either the roadside or the barracks had he asked to do so on the morning of December 19, 2016.  But that does not end the inquiry.  The intentions within the investigators' minds do not determine whether

the defendant was in custody for Fifth Amendment purposes. Rather, the inquiry is whether a reasonable person in the defendant's position would have understood himself to be under arrest. *See Newton*, 369 F.3d at 672; *Remache*, 1999 WL 1212535, at *1. Here, the lack of handcuffs, the lack of any drawn weapons, the lack of any express statement prohibiting the defendant from leaving, and the demeanor of the investigators who spoke with the defendant combined to convey to a person in the defendant's position that he was not in fact under arrest. Indeed, the lack of handcuffs, which the Second Circuit has recognized as "a hallmark of a formal arrest," weighs heavily against finding that the defendant was in custody such that *Miranda* warnings were required. *Newton*, 369 F.3d at 676.

Although the defense complains about the number of law enforcement officers on scene at Long Lane, the record makes clear that the defendant primarily interacted with Hammer alone. When the defendant first arrived on Long Lane, only the Unmarked Car was present behind the blue jeep, and Hammer was the only law enforcement officer standing outside of the car. Hammer remained the only law enforcement officer who spoke with the defendant from the time the defendant arrived at the scene, parked his car behind the Unmarked Car, and got out of his car. After that initial interaction, three other officers—Browne and two uniformed troopers—approached the defendant on foot, but none drew their weapons, and the defendant continued to have a calm and cordial conversation with Hammer even as those other officers approached. Of particular note, even when all four officers were present, the defendant felt comfortable answering a phone call on his cellphone, and none of the officers made any attempt to prevent him from answering the phone or gave him any directive to hang up the phone. That dynamic conveyed to the defendant that he was not under arrest and retained his freedom of movement.

Those facts also stand in contrast to the *United States v. Butt* case highlighted by the defense, in which sixteen agents conducted a full raid of the defendant's home, where they found firearms and then openly jeered in front of the defendant that they had "hit the motherload," thereby conveying to the defendant that he was about to be arrested for gun possession. 18 Cr. 87 (NSR), 2019 WL 479117, at *13, 15 (S.D.N.Y. Feb. 7, 2019). Even in that situation, Judge Roman considered the question of whether the defendant in that case was in custody for *Miranda* purposes to be a "close call." *Id.* at *13. Here, there were only four law enforcement officers visible ot the defendant on Long Lane, none of whom suggested that the defendant was about to be arrested or that they had gathered new incriminating evidence against the defendant.

The defense's suggestion that a brief pat down of the defendant somehow escalated the interaction to an arrest is misplaced. A pat down for safety is a common safety precaution that does not indicate an arrest. Although Hammer took the defendant's cellphones from him at that time, it is not uncommon for law enforcement to seize phones for evidentiary purposes without a coinciding arrest.

In any event, Hammer's tone and demeanor strongly conveyed to the defendant that law enforcement was simply seeking his voluntary assistance in an investigation. Throughout the interactions on Long Lane and on the drive to the NYSP Barracks, Hammer remained conversational, not commanding. He never raised his voice, and instead approached conversation with the defendant as seeking assistance to straighten out a situation and assist an investigation. Hammer explained to the defendant that he wanted to speak with the defendant but did not want to do so on the side of the road, and Hammer asked the defendant if he would be willing to drive back to the NYSP Barracks with Hammer. The defendant enthusiastically responded, "absolutely," and the defendant's remarks throughout the car ride suggested that he understood

that Hammer was seeking his assistance with an investigation. Hammer's tone and demeanor, together with the lack of handcuffs, the lack of any drawn weapons, and the lack of any affirmative statement that the defendant was under arrest or not free to leave, conveyed that law enforcement was seeking the defendant's assistance and that the defendant was free to terminate the interaction.

Although not determinative in this analysis, it also bears noting that the defendant himself did not appear to believe he was under arrest until Hammer informed him of the charges against him after the defendant invoked his right to counsel. Indeed, the defendant seemed genuinely shocked when Hammer informed him that he was being arrested. It further bears noting that Tartaglione was perfectly capable of asserting his rights—he acknowledged his right to counsel *before* Hammer read the *Miranda* warnings, and he invoked his right to counsel later on in the interview. In other words, there is no indication here that Tartaglione's will was in fact overborne.

Viewed as a whole, the circumstances of law enforcement's interactions with the defendant on Long Lane and on the drive to the NYSP Barracks did not amount to the type of restraint that requires the provision of *Miranda* warnings prior to questioning. As a result, there is no basis to suppress the defendant's statements on Long Lane or on the drive to the NYSP Barracks. Although the circumstances at the NYSP Barracks were more restrictive, with the defendant placed in a windowless interrogation room alone, even if he was sufficiently restrained to be considered in custody at that point, he knowingly and voluntarily waived his *Miranda* rights prior to being questioned in the interrogation room. Thus, his post-*Miranda* statements also should not be suppressed, and the defense motion should be denied in its entirety.

## III.	Two of the Defendant's Statements Were Spontaneous and Accordingly Should Not be Suppressed Even if the Defendant Was in Custody at the Time They Were Made

Even if the Court determines that the defendant's statements made in response to questioning by Hammer and Brown must be generally suppressed, two of the defendant's

statements should be excluded from such a ruling. The record demonstrates that the defendant made two statements on December 19, 2016 spontaneously and not in response to any questioning by law enforcement. Because those two statements were not the result of interrogation, they should not be suppressed regardless of the Court's determination regarding the constitutionality of law enforcement's questioning on December 19, 2016.

## A. Applicable Law

The Supreme Court in *Miranda* made clear that "by custodial interrogation, we mean *questioning* initiated by law enforcement officers . . . ." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). Accordingly, "[v]olunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected" by the *Miranda* decision. *Id.* at 478. Where a defendant makes statements "spontaneously" and not in response to interrogation, they are admissible regardless of whether the defendant is in custody or has received his *Miranda* warnings. *United States v. Bowden*, 45 F. App'x 61, 64 n.1 (2d Cir. 2002); *see also Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980). In this context, "interrogation" refers to "express questioning" or its "'functional equivalent,' including 'any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect.'" *United States v. Colon*, 835 F.2d 27, 30 (2d Cir. 1987) (omission in original) (quoting *Innis*, 446 U.S. at 301). Even where a defendant has invoked his right to counsel, a "spontaneous and unsolicited declaration" by the defendant after invoking his *Miranda* rights will not be suppressed. *United States v. Montana*, 958 F.2d 516, 519 (2d Cir. 1992). "If the arrestee begins to spontaneously make statements, no matter how long after or how far from the arrestee's invocation of his right to counsel, those statements will not be suppressed at trial." *United States v. Choudhry*, 24 F. Supp. 3d 273, 280 (E.D.N.Y. 2014).

## B.    Discussion

Two of the defendant's statements on December 19, 2016 qualify as spontaneous statements.  First, the defendant stated to Hammer, "this is about the missing Mexican's isn't it" without any preceding question or statement from Hammer.  Prior to making that statement, law enforcement had not begun to question or interrogate the defendant at all.  To the contrary, at that point, Hammer had simply told the defendant that he wanted to ask the defendant questions, but he wanted to do so at the NYSP Barracks and not the side of the road.  Further, this first statement was immediately preceded by nearly a full minute during which the defendant was sitting alone in the Unmarked Car while law enforcement officers were talking among themselves outside of his hearing.  Hammer did nothing other than get into the car—an action that has no conceivable translation into interrogation—before the defendant made this first statement.  Under those circumstances, even if the Court finds that any interrogation at that point required *Miranda* warnings, this first statement was not the product of any interrogation and therefore constitutes a spontaneous statement.  *See Bowden*, 45 F. App'x at 64 n.1.

Second, on the way to White Plains, the defendant stated "fucking Mexicans" without any preceding question or statement from Hammer or Browne.  Although the defendant made that statement after invoking his right to counsel, it was sufficiently removed from Hammer and Browne's prior questioning to constitute a spontaneous statement.  *See Montana*, 958 F.2d at 519.  By the time the defendant made that statement, he had been processed as an arrestee and had driven most of the way from Montgomery to White Plains—a drive that takes approximately one hour.  Further, both Hammer and Browne testified that there was only limited small talk in the car, with multiple periods of silence.  The defendant made this second statement after one such period of silence, spontaneously.

Both statements were clearly spontaneous in the truest sense. They were made in response to nothing. No one asked the defendant a single question in the lead up to those statements. No one even said anything immediately before the defendant made those statements. Both statements followed breaks in conversation, and both statements were initiated entirely by the defendant. The first was the defendant's apparent attempt to glean information from Hammer. The second was an apparent remark of frustration and anger. Absent any interrogation, there can be no constitutional violation. *See Miranda*, 384 U.S. at 478. Accordingly, even if the Court grants the defense motion with respect to the remainder of the statements the defendant made on December 19, 2016, those two spontaneous statements should not be part of such a ruling.

## CONCLUSION

For the foregoing reasons, the Government respectfully requests that the Court deny the defendant's motion to suppress his statements.

Dated:      White Plains, New York
            August 3, 2022

                             Respectfully submitted,

                             DAMIAN WILLIAMS
                             United States Attorney for the
                             Southern District of New York

                By:     /s/_____.
                             Maurene Comey
                             Jason Swergold
                             Jacob R. Fiddelman
                             Assistant United States Attorneys
                             (212) 637-2324
                             (914) 993-1963
                             (212) 637-1024

cc:     *All Counsel of Record (by ECF)*