UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

     v.

NICHOLAS TARTAGLIONE,

               Defendant.

No. 16-CR-832 (KMK)

<u>OPINION & ORDER</u>

<u>Appearances</u>:

Maurene R. Comey, Esq.
Jason M. Swergold, Esq.
Jacob R. Fiddelman, Esq.
United States Attorney's Office, S.D.N.Y.
White Plains, NY
*Counsel for the United States*

Bruce A. Barket, Esq.
Aida F. Leisenring, Esq.
Donna Aldea, Esq.
Alexander R. Klein, Esq.
Matthew B. Keller, Esq.
Barket, Marion, Epstein & Kearon, LLP
Garden City, NY
*Counsel for Defendant*

Karl D. Schwartz, Esq.
Arielle Egan, Esq.
Wiseman & Schwartz, LLP
Philadelphia, PA
*Counsel for Defendant*

Edward J. Rymsza, Esq.
Miele and Rymsza, P.C.
Williamsport, PA
*Counsel for Defendant*

Oliver W. Loewy, Esq.
Portland, OR
*Counsel for Defendant*

KENNETH M. KARAS, United States District Judge:

Nicholas Tartaglione ("Tartaglione" or "Defendant") brings several Motions to Suppress evidence (the "Motions") under the Fourth, Fifth, and Sixth Amendments to the United States Constitution.  First, Defendant seeks to suppress, on Fourth Amendment grounds, cell phone location data acquired pursuant to an application approved on June 24, 2016.  (*See* Def's Not. of Mot. (Dkt. No. 137); Def's Mem. of Law in Supp of Mot. To Suppress Cell Phone Tracking Data ("Def's Cell Site Mem.") (Dkt. No. 139).)  Second, Defendant moves to suppress statements made on December 19, 2016, the day of his arrest, based on violations of the Fourth, Fifth, and Sixth Amendments.  (*See* Def's Mot. To Suppress Statements ("Def's Statements Mem.") (Dkt. No. 149); Def's Supp'l. Mot. To Suppress Statements & Mem. of Law in Supp. ("Def's Supp'l. Statements Mem.") (Dkt. No. 302); Def's Post-Evidentiary Hr'g Mem. of Law in Supp. of Mot. To Suppress Statements ("Def's Post-Hr'g Mem.") (Dkt. No. 326).)  Finally, Defendant moves to suppress physical evidence recovered pursuant to search warrants granted on December 20 and 21, 2016 for violations of the Fourth Amendment.  (*See* Def's Mot. and Mem. of Law in Supp. of Mot. To Suppress Physical Evidence ("Def's Physical Evidence Mem.") (Dkt. No. 303).)

For the reasons set forth below, Defendant's Motions are granted in part and denied in part.  Specifically, the Court grants Defendant's Motion To Suppress the non-spontaneous statements he made on December 19, 2016 based on violations of the Fifth Amendment.  The Court denies Defendant's Motions To Suppress his statements based on violations of the Fourth and Sixth Amendments, the cell phone location data based on violations of the Fourth Amendment, and the physical evidence resulting from the December 2016 warrants based on violations of the Fourth Amendment.

<u>I.  Background</u>

<u>A.  Factual Background</u>

<u>1.  Indictment</u>

On April 16, 2019, a grand jury sitting in this District returned an indictment charging Defendant with various crimes related to the murders of Martin Luna ("Luna"), Urbano Santiago, Miguel Luna, and Hector Gutierrez (collectively, the "Victims") on April 11, 2016. (*See generally* Fourth Superseding Indictment (Dkt. No. 120).)  Count One charges Defendant with participating in a conspiracy to distribute and possess with the intent to distribute five kilograms or more of cocaine, from in or about 2015 up to and including in or about April 2016, in violation of 21 U.S.C. §§ 846 and 841.  (*Id.* at 1–2.)[1]  Counts Two through Five charge Defendant with the murders of each of the four Victims, respectively, in furtherance of the same narcotics conspiracy on or about April 11, 2016, in violation of 21 U.S.C. § 848(e) and 18 U.S.C. § 2.  (*Id.* at 2–4.)  Counts Six through Eight charge Defendant with the murders of three of the Victims—Urbano Santiago, Miguel Luna, and Hector Gutierrez—through the use of a firearm in furtherance of the same narcotics conspiracy on or about April 11, 2016, in violation of 18 U.S.C. §§ 924(j) and 2.  (*Id.* at 4–6.)  Count Nine charges Defendant with participating in a conspiracy to kidnap all four Victims on or about April 11, 2016, in violation of 18 U.S.C. § 1201(c).  (*Id.* at 6–7.)  Counts Ten through Thirteen charge Defendant with kidnappings resulting in the deaths of the Victims, respectively, on or about April 11, 2016, in violation of 18 U.S.C. §§ 1201(a)(1) and 2.  (*Id.* at 7–10.)  Counts Fourteen through Seventeen charge Defendant with the Travel Act murders of all four Victims, respectively, on or about April 11, 2016, in violation of 18 U.S.C. §§ 1952 and 2.  (*Id.* at 10–13.)

---

[1] The Court cites to the ECF-stamped page number at the upper right-hand corner of all documents unless otherwise noted.

### 2.  June 2016 Warrants for Cell Phone Location Data

On June 14, 2016, the Government submitted an application pursuant to the Stored Communications Act ("SCA"), *see* 18 U.S.C. § 2703 *et seq.*, for an order seeking "records identifying any wireless telephone call[s] (including the number of the locally-served wireless telephone and the number calling or called by it)" using the cellular towers at or near 69 Brookside Avenue in Chester, New York on April 11, 2016, (*see* Decl. of Alexander Klein, Esq. ("Klein Decl.") Ex. A ("Cell Tower Application") ¶ 2(a) (Dkt. No. 138-1).)  On June 16, 2016, Magistrate Judge Lisa Smith signed the order.  (*See* Klein Decl. Ex. B (Dkt. No. 138-2).)  On June 24, 2016, the Government submitted another application pursuant to the SCA (the "Cell Site Application"), seeking "all available historical cell site location information ["CSLI"] reflecting the cell towers . . . utilized in routing any phone, text, or data communication to or from" cell phone numbers connected to Defendant, among others, for the period from January 15, 2015 through the date of the orders.  (*See* Klein Decl. Ex. C ("Cell Site Application") ¶ 2 (Dkt. No. 138-3).)  On the same day, Magistrate Judge Paul Davison ("Judge Davison") signed the order (the "Cell Site Order").  (*See generally* Klein Decl. Ex. D ("Cell Site Order") (Dkt. No. 138-4).)

### 3.  Events of December 19, 2016

Early on the morning of December 19, 2016, New York State police investigators, including Investigator Brian Hammer ("Hammer") and Investigator James Browne ("Browne"; together the "Investigators") began conducting surveillance of the driveway to Defendant's residence, which was at the time located at 103 Long Lane in the town of Crawford, New York. (Evidentiary Hr'g (May 27, 2022 Hr'g) ("Hr'g Tr.") at 10:10–15; *see also* Gov't's Post-Hr'g Mem. of Law in Further Opp. to Def's Mot. To Suppress Statements ("Gov't's Post-Hr'g

Mem.") Ex. GX-1 ("Google Map").)[2,3]  The Investigators had been directed by their superiors to locate Defendant and "get [him] to come with [the Investigators] to a State Police barracks in Montgomery to discuss what may have happened regarding" the disappearance of Luna and the other Victims.  (Hr'g Tr. at 11:3–7.)  At that time, the Investigators were not aware of any charges pending against Defendant, did not have an arrest warrant, and did not plan to arrest him.  (*Id.* at 11:8–14; 55:18–25.)[4]  Throughout the day, the Investigators were in contact by cell phone with the command post, including New York State Police Senior Investigators Steven Hikade ("Hikade") and William Young ("Young").  (Hr'g Tr. at 40:18–19; 42:2–4; 71:8–11.)[5]

At approximately 9:05 AM, Defendant received a controlled call from cooperating witness Jason Sullivan ("Sullivan"), during which Sullivan informed Defendant he had been visited by police officers at his residence in Florida the day before concerning Luna's

---

[2] Both Browne and Hammer testified at the May 27, 2022 Evidentiary Hearing, and the Court found their testimony credible.

The Exhibits to the Government's Post-Hearing Memorandum have not been filed on ECF, so the Court does not provide a docket number or references to the ECF-stamped page numbers.

[3] Page citations to the May 27, 2022 Hearing transcript refer to the page numbers of the printed transcript, as the transcript has not been posted to ECF.

[4] The Investigators also testified that they were not personally aware of all aspects of the ongoing investigation, all of the evidence collected to date, or the status of the legal proceeding against Defendant.  (*See* Hr'g Tr. at 20:4–8; 24:12–17; 51:18–52:5; 55:12–17; 81:7–10.)

[5] From April 2016 through December 19, 2016, the Government's investigation was led by Young.  (Gov't Post-Hr'g Mem. at 6; *see also* Hr'g Tr. at 37:19–38:2.)  The Government also represents that Investigator Young assisted in gathering the evidence that was presented to the grand jury on December 14, 2016 and was aware of the evidence presented in a search warrant application (the "Warrant Application") providing probable cause to search Defendant's home submitted to and granted by Magistrate Judge Judith McCarthy on December 16, 2016.  (*Id.* at 6, 15–16; *see generally* Gov't Post-Hr'g Mem. Ex. GX-6 ("December 16 Warrant Application").)

disappearance. (Def's Statements Mem. Ex. A ("Call Transcripts") [Call No. 1] 2–24 (Dkt. No. 149-1).)[6] At approximately 9:40 AM, Defendant called Sullivan back and passed on some information concerning Luna and the other Victims that he said Sullivan could share with officers if they returned with more questions. (Call Transcripts [Call No. 2] at 2–14.)

At 10:45 AM, Virag Balint ("Balint"), Defendant's wife, got into a Jeep and drove out of Defendant's property onto Long Lane and turned onto State Route 17K. (Hr'g Tr. at 13:8–14:11.) She then made a u-turn on State Route 17K. (Hr'g Tr. at 14:4–6; Def's Statements Mem. Ex. G ("Aerial Video Surveillance") at 00:32 (Dkt. No. 149-7).) As Balint was turning back onto Long Lane, multiple law enforcement vehicles approached her Jeep with lights flashing and directed her to pull over. (*Id.* at 00:36.) Specifically, an unmarked car carrying the Investigators moved into the oncoming traffic lane on Long Lane so that their unmarked car was facing Balint's Jeep. (*Id.* at 00:30–45.) Two other marked police vehicles parked behind and next to the Jeep. (*Id.* at 00:49.) Five police officers then exited their vehicles. (*Id.* at 1:00.) Hammer approached the Jeep and identified himself; Balint was on the phone with Defendant as Hammer approached. (Hr'g Tr. at 15:9–13; 42:22–25.) Hammer told Balint that the license plate of the Jeep had been reported as part of a road rage incident the night before. (*Id.* at 15:15–17.) Hammer later testified that he made up this story "spur-of-the-moment . . . to draw [Defendant] out" so that he and the other officers could "have [Defendant] out in an area on the

---

[6] Exhibit A to Defendant's Post-Evidentiary Hearing Memorandum of Law includes transcripts of three calls that Defendant received on the morning of December 19, 2016 that each has separate pagination. (*See generally* Call Transcripts.) The transcripts have been filed under seal, so the Court's page references are to each of the separately paginated call transcripts, not to ECF-stamped page numbers. For ease of reference, the Court notes in brackets which call is being referenced. Call No. 1 began at approximately 9:05 AM. (*See* Call Transcripts [Call No. 1] at 2.) Call No. 2 occurred at approximately 9:45 AM. (*See id.* [Call No. 2] at 13.) Call No. 3 began at approximately 10:59 AM. (See *id.* [Call No. 3] at 2.)

street where [they] could control the narrative." (Hr'g Tr. at 38:10–12, 16:6–8; *see also id.* 38:13–17, 57:25–58:4, 71:21–72:17.)[7] When Balint responded that Defendant had not driven the Jeep the night prior, Hammer asked Balint if he could speak with Defendant. (*Id.* at 16:11–16.)

A few minutes later, Defendant got into a black truck, pulled out of the driveway, and approached the intersection where the Jeep was stopped. (Aerial Video Surveillance at 6:05–7:33.)[8] At approximately 10:57 AM, Defendant came to a stop across from Balint's Jeep. (*Id.* at 7:35.) From his arrival at Long Lane, Defendant was unable to speak to Balint, who remained seated in the Jeep until after Defendant left with the Investigators. (Aerial Video Surveillance at 13:32.) Hammer immediately approached the truck; Defendant rolled down the window and identified himself to Hammer as the owner of the Jeep. (Hr'g Tr. at 17:2–6.) Hammer asked Defendant if he was involved in a road rage incident the prior evening, which Defendant denied. (*Id.*).

Hammer asked Defendant to park on the side of the road and step out of the car. (*Id.* at 17:8–13; 45:20–25; 46:11–14.) Defendant complied. (*See* Aerial Video Surveillance at 7:50.) The Investigators' unmarked car was still parked in front of Balint's Jeep, and Defendant backed up and parked his truck behind the Investigators' car partially off the road against the direction of traffic. (*See id.* at 7:50; Hr'g Tr. at 46:1–4.) At this time, neither of the marked police vehicles was in Defendant's vicinity. (Aerial Video Surveillance at 7:50.) Upon exiting his truck,

---

[7] Hammer also testified that he felt that it was important that he meet Defendant on the road because Defendant was a former police officer and might have access to weapons in his home. (Hr'g Tr. at 15:21–16:8.)

[8] At 10:51 AM, after ending her call with Defendant, Balint reported additional information about the police presence to Defendant, informing him that "3 troopers came out too" and, then at 10:52, that "a volks came out." (*See* Def's Reply to Gov't's Opp. to Mot. To Suppress Statements ("Def's Statements Reply") Ex. A 1–2 (Dkt. No. 171-1).)

Hammer again approached Defendant and immediately began asking questions about the fictitious road rage incident.  (*Id.* at 8:17.)

Hammer told Defendant that he had further questions concerning the fictitious road rage incident and that, rather than discussing the incident on the street, he would like to do so back at the Montgomery State Police Barracks (the "Barracks").  (Hr'g Tr. at 17:25–18:6.)  During his testimony, Hammer admitted that if Defendant had refused to go to the Barracks with him, he would not have allowed him to leave until he made a call to a supervisor to confirm whether he should arrest Defendant.  (*See id.* at 19:14–20:3.)[9]

About a minute after Hammer began questioning Defendant outside his truck, an unmarked truck and a marked police car approached where Hammer and Defendant were standing.  (*See* Aerial Video Surveillance at 9:10; Hr'g Tr. at 46:7–10.)[10]  The unmarked truck parked with the flow of traffic approximately 25-30 ft. behind Defendant's truck, and the marked police car parked parallel to the unmarked vehicle on the other side of the road, such that it was blocking Defendant's truck from being driven away.  (*See* Aerial Video Surveillance at 9:10.)  At the same time, Browne, who had been seated in the unmarked vehicle, exited the vehicle, activated a recording device kept on his person, and approached Defendant and Hammer.  (*See id.*; Hr'g Tr. 46:15–18.)  About 20 seconds later, two uniformed officers exited the marked vehicle.  (*See* Aerial Video Surveillance at 9:29.)  There were then four officers—Hammer,

---

[9] Browne also testified that at all stages of the interaction with Defendant prior to his arrest, Browne would not have allowed Defendant to leave without first contacting a supervisor and receiving permission to release him.  (*See* Hr'g Tr. at 90:24–91:8; 94:9–96:1.)

[10] At some point during the next two minutes, the other marked vehicle parked just to the east of the intersection of Long Lane and State Route 17K.  (*See* Aerial Video Surveillance at 11:14; Google Map.)

Browne, and two uniformed officers—within 6-10 ft. of Defendant and in his field of vision. (*See* Aerial Video Surveillance at 9:36; Hr'g Tr. at 60:13–22.)  All of the officers were armed. (*See* Hr'g Tr. at 69:11–12; 73:17–18; 91:9–12.)[11]

While surrounded by the officers, Defendant answered and immediately ended a third phone call from Sullivan at 10:59 AM.  (Aerial Video Surveillance at 9:36; Hr'g Tr. at 26:18–19; Call Transcripts [Call No. 3] at 2–3; Def's Statements Mem. Ex. B ("Browne Recording") at 00:55 (Dkt. No. 149-2); Gov't's First Omnibus Opp'n Ex. A ("Gov't's Browne Tr.") 1:32–33 (Dkt. No. 163-1).)[12]  After Defendant ended the call, Hammer said to Defendant, "[W]e got to talk to you about a couple things. . . , do you want to have a seat in the car for a second here . . ." to which Defendant responded, "Sure, absolutely."  (*See* Browne Recording at 1:16–21; Gov't's Browne Tr. at 2:44–48.)

Defendant stepped toward the Investigators' car, and the uniformed officers signaled for him to stop.  (Aerial Video Surveillance at 9:59.)  Defendant raised his arms to shoulder height, and Hammer and one of the uniformed officers patted Defendant down.  (Aerial Video Surveillance at 10:00–10:28; Hr'g Tr. at 18:7–9.)  An unidentified officer asked Defendant "No

---

[11] FBI agent Jessica Miller, and another agent, were also "in the general area, [or] down the road."  (*See* Hr'g Tr. at 60:16–22.)  Defendant asserts that the FBI agents were in Defendant's immediate vicinity.  (*See* Def's Post-Hr'g Mem. at 6.)  However, based on the Court's review of the surveillance video, the FBI agent or agents do not appear to have been near Defendant at any point before he left with the Investigators.  (*See generally* Aerial Video Surveillance.)

[12] Both the Government and Defendant have provided transcripts of Investigator Browne's recording of his and Investigator Hammer's interactions with Defendant.  (*See* Gov't's Browne Tr.; Def's Statements Mem. Ex. B ("Def's Browne Tr.") (Dkt. No. 149-2).  The Court has found some variation between the transcripts and provides parallel citations where both transcripts include the statements at issue.  Where the transcripts conflicted, the Court reviewed the audio recording to confirm which statement was, in fact, made.

The Court refers to the transcript page and line number for both the Government and Defendant's transcripts.

weapons or anything like that?", (Browne Recording at 1:21), and Defendant responded "No, absolutely not," (*see* Browne Recording at 1:22).

While being patted down, Defendant commented "Jason [Sullivan] just called me about the, those Mexican guys." (Browne Recording at 1:25–28; Gov't's Browne Tr. at 2:52.) Hammer took two cellphones from Defendant. (Hr'g Tr. at 18:14–16.)[13] Hammer then asked Defendant, "No weapons or anything like that?", (Browne Recording at 1:46), and Defendant again responded, "No, nothing," (Browne Recording at 1:47; Gov't's Browne Tr. at 2:71–3:74; Def's Browne Tr. at 3:7–9).

Hammer stated, "Tell you what, we're gonna have a seat in the back of the car over here," to which Defendant responded, "Ok." (Browne Recording at 1:48; Gov't's Browne Tr. at 3:80–83; Def's Browne Tr. at 3:10–12.) One of the uniformed officers guided Defendant to the Investigators' car and opened the rear passenger-side door. (Aerial Video Surveillance at 10:29–10:44.) Defendant sat down in the car, (*id.* at 10:39), and about a minute later Hammer opened the rear driver-side door and sat down, (*id.* at 11:29).

Hammer and Defendant were alone in the vehicle for approximately 50 seconds. (*Id.* at 12:22.) During that time, Defendant said, with no prompting from Hammer, "[T]his is about the missing Mexicans, isn't it?" (Hr'g Tr. at 28:15–24.)[14]

---

[13] In response to a question from an unidentified officer, Defendant said about one of the phones: "[T]hat's the Mexican's phone, actually . . . the Mexican guy, he uses it[.]" (Browne Recording at 1:35–39.)

[14] A Lead Sheet Hammer completed on the day after the incident stated "[u]pon placing [Defendant] in the passenger side rear seat, in the presence of Trooper Brad Natalisio, [Defendant] immediately stated 'this is about the missing Mexicans isn't it?'" (*See* Def's Statements Mem. Ex. D at 1 (Dkt. No. 149-4).)

When Browne entered the driver's side of the vehicle, Hammer was in the midst of questioning Defendant about Luna. (*See* Aerial Video Surveillance at 12:23; Browne Recording at 3:44.) Defendant and the Investigators began driving to the Barracks at approximately 11:02 AM. (*See* Aerial Video Surveillance at 12:44.) After Defendant left the scene in the Investigators' car, his truck remained parked partially off the road against the flow of traffic. (*See* Aerial Video Surveillance at 13:26; Hr'g Tr. at 47:23–48:2.) During this entire period, officers did not draw their firearms, handcuff Defendant, tell him he was under arrest, or tell him he was not free to leave. (*See* Hr'g Tr. at 18:25–19:4; 8–13.) Approximately five minutes elapsed between Defendant's arrival at Long Lane and his departure in the Investigators' car. (*See* Aerial Video Surveillance at 7:35–12:44.)

While driving to the Barracks, the Investigators asked Defendant about his knowledge of and contacts with Luna, including what kind of work Luna and others did for him, at which location they did the work, how long Luna and others worked for Defendant, what forms of contact he had with Luna, whether Defendant knew the names of the other Victims, how Defendant would get in touch with Luna, and who the liaison was between Defendant and the Victims. (*See* Browne Recording at 3:48–24:30; Gov't's Browne Tr. at 5:175–32:1145; Def's Browne Tr. at 5:23–34:11.)

Defendant answered Hammer's questions, discussing his contacts and relationships to Luna and other Mexican laborers, the date of his last contact with Luna, his knowledge of drug trafficking activity by Luna, his observation of a cut-out tire in one of the vehicles Defendant had sold to Luna, and his knowledge that Luna was missing from the news. (*See* Browne Recording at 3:48–24:30; Gov't's Browne Tr. at 5:175–32:1145; Def's Browne Tr. at 5:23–34:11.)

The Investigators and Defendant arrived at the police barracks at 11:23 AM.  (*See* Browne Recording at 25:07; Gov't's Browne Tr. at 33:1177; Def's Browne Tr. at 35:6–7.)  On arrival, Defendant and Hammer stood outside while Browne located an interview room.  (*See* Browne Recording at 24:46–24:53; Gov't's Browne Tr. at 32:1168–33:1175; Def's Browne Tr. at 35:1–4.)  When Browne returned, Defendant walked with Hammer and Browne to an interview room, which Defendant entered at 11:29 AM.  (*See* Browne Recording at 29:18–30:17; Gov't's Browne Tr. 33:1196–34:1229; Gov't's Post-Hr'g Mem. Ex. GX-5 ("Gov't's Interview Recording") at 1:56.)[15]  The small, windowless interview room was located in a secured area of the Barracks to which the public did not have access.  (*See also* Hr'g Tr. at 82:15–83:13.)  While Defendant was being interviewed, the door to the interview room was closed.  (*See* Gov't's Interview Recording at 6:37–39; 56:27–29.)

The Investigators entered the interview room at 11:33 AM and began asking Defendant for pedigree information.  (*See* Gov't's Interview Recording at 6:45; Gov't's Browne Tr. at 34:1238–37:1319; Def's Browne Tr. at 35:17–37:18.)  Hammer then stated, "Like we said, we want to pick your brain about . . . these guys, contacts who they may have gone with, . . . what their habits were, stuff like that."  (Gov't's Interview Recording at 7:49; Gov't's Browne Tr. at 37:1323–25; Def's Browne Tr. at 37:19–22.)  Defendant responded, "I really don't know much more than what I told you."  (Gov't's Interview Recording at 7:57; Gov't's Browne Tr. at 37:1327; Def's Browne Tr. at 37:23–24.)  Hammer replied:

> Well, I mean, the little bit that we talked about already is . . . definitely helpful . . . as far as the vehicle and . . . the fact that they cut a tire which means they may be involved in drugs and stuff like that, so we do wanna go through that. . . . so before

---

[15] Defendant and the Government have both provided video files of the Barracks Interview.  (*See* Gov't's Interview Video; Def's Statements Mem. Ex. E ("Interview Recording") (Dkt. No. 149-5).)  Because the Government's version includes sound, the Court will cite exclusively to that version, as the files are otherwise identical.

we get into that stuff there, uh, you've done this before many times.  We have to do it to cover ourselves and cover everybody else.

(Gov't's Interview Recording at 7:59; Gov't's Browne Tr. at 37:1329–36; Def's Browne

Tr. at 37:25–38:9.)

Defendant responded, "Well, for now, I'm not gonna ask for a lawyer" and added, "I mean, I don't know what these Mexicans are saying about me—you're trying to look at me."

(Gov't's Interview Recording at 8:19; Gov't's Browne Tr. at 37:1338, 1342–43; Def's Browne

Tr. at 38:10–11, 14–15.)  Hammer said:

> We're not accusing you.  Like I said, we're just trying to find a direction to go with in this. . . . so I'm gonna read it to you . . . . You could probably recite it to me . . . . [S]o we gotta go through that and then . . . we'll go back to . . . what their habits were, . . . who they hung around with or did you ever see anybody else in the car with them, that kinda stuff[.]

(Gov't's Interview Recording at 8:27; Gov't's Browne Tr. at 37:1345–46, 1350–55; Def's

Browne Tr. at 38:16–18, 38:20–39:1.)  Hammer read Defendant his *Miranda* warnings at

approximately 11:36 AM.  (Gov't's Interview Recording at 8:49; Gov't's Browne Tr. at

38:1363–73; Def's Browne Tr. at 39:8–21.)

Defendant indicated that he understood the warnings and wished to speak with the

Investigators.  (*See* Gov't's Interview Recording at 9:08; Gov't's Browne Tr. at 38:1375–80;

Def's Browne Tr. at 39:22–25.)  Hammer then began asking Defendant additional questions.

(*See* Gov't's Interview Recording at 9:10; Def's Statements Mem. Ex. E ("Def's Interview Tr.")

at 40:1 (Dkt. No. 149-5).)[16]  Hammer asked Defendant about his relationship to Luna and the

---

[16] Based on the pagination, Defendant's transcript of the interview between the Investigators and Defendant appears to be derived from Inspector Browne's recording, rather than the recording device in the interview room at the Barracks.  (*Compare* Def's Browne Tr. at 37:1 *with* Def's Interview Tr. at 37:1.)  As such, the Court will cite to both the Government's video recording and Defendant's transcript.

other three missing Victims, about his last contacts with Luna, about Luna's relationship to drug trafficking, and about Defendant's ties to the Likquid Lounge and when he had last gone there. (*See* Gov't's Interview Recording at 9:10–46:28, 56:24–1:08:32; Def's Interview Tr. 40:1–114:5.)

Defendant responded that he knew Luna, that Luna had worked for him, that he had sold Luna a vehicle, that he noticed the tire in that vehicle had been cut, that he was aware of his ties to drug trafficking, that he had followed the story of the four Victims in the news, and that he was told Luna and the other Victims had fled to Columbia or Mexico. (*See id.*) Defendant also told the Investigators that he had only been to the Likquid Lounge once when it first opened. (*Id.*)

Hammer testified that the Investigators took a short break during the interview at about 12:13 PM because:

> [He] realized that the questioning would have to become more direct regarding his involvement in the disappearance of the four men. So [during the break], [he] . . . made a phone call back to the command post to see if at that point [Defendant] was arrestable, so [he] knew what to do if [Defendant] did invoke his right to a lawyer[.]

(Hr'g Tr. at 32:23–33:6; *see also* Gov't's Interview Recording at 46:28–56:24.)[17] During the call to the command post, Hammer was told for the first time that he was authorized to arrest Defendant. (*See* Hr'g Tr. at 32:23–33:11; 33:24–34:3; 40:22–41:1.)[18]

At 12:27 PM, after the Investigators had resumed interviewing Defendant, the grand jury returned an indictment against him. (*See* Gov't's Letter to Court (May 16, 2022) ("Comey

---

[17] The break in the interview lasted almost exactly ten minutes. (*See* Gov't's Interview Recording at 46:20–56:24.)

[18] Browne also testified that he was unaware of any plan to have Defendant charged or arraigned prior to the interview at the Barracks. (*See* Hr'g Tr. at 81:2–10.)

Letter") 1 (Dkt. No. 312); Gov't's Interview Recording at 56:24.)  At 12:35 PM, Defendant

stated "I had nothing to do with them or their drugs or anything else and if somebody is trying to

implicate me, then I want my lawyer[.]"  (Gov't's Interview Recording at 1:08:32; Def's

Interview Tr. at 114:5–7.)  The Investigators then asked further questions, some of which

Defendant answered.  (Gov't's Interview Recording at 1:08:36–1:09:50; Def's Interview Tr. at

114:9–116:6.)  At 12:37, Defendant repeated "I want an attorney."  (Gov't's Interview Recording

at 1:09:56; Def's Interview Tr. at 116:7–8.)[19]  After the second invocation, the Investigators

informed Defendant that he was going to be arrested and arraigned in federal court.  (Gov't's

Interview Recording  at 1:10:06; Def's Interview Tr. at 116:14–117:6.)  In total, Defendant was

questioned in the interview room for approximately 53 minutes.  (Gov't's Interview Recording

at 6:45–1:10:30.)

 Hammer and Browne then escorted Defendant, who was now in handcuffs, to the federal

courthouse in White Plains for arraignment.  (*See* Hr'g Tr. at 34:2–35:6.)  During the drive to the

federal courthouse, Hammer and Browne engaged in small talk with Defendant but did not ask

him any further questions about the case.  (*Id.* at 35:9–10; 36:1–5.)  At some point during the car

ride, Defendant said "fucking Mexicans."  (*Id.* at 36:10–14; 66:23–67:1.)  The Investigators

testified that this statement was not made in response to any comment by either of them, and that

there was no further conversation after Defendant made this statement.  (*See* Hr'g Tr. at 36:15–

20, 67:2–12.)

---

  [19] Defendant's transcript reads "No, I don't - - an attorney." (Def's Interview Tr. at
116:7–8), but on the Government audio recording, Defendant can be clearly heard requesting his
attorney.  (Gov't's Interview Recording 1:09:56.)

### 4.  December 2016 Search Warrants

On December 20, 2016, Judge Davison signed a search warrant (the "First Warrant") for the premises at 103 Long Lane, Bloomingburg, New York (the "Subject Property"), which was Defendant's residence at the time.  (*See* Def's Physical Evidence Mem. Ex. A ("First Warrant") 2 (Dkt. No. 303-1).)[20]  The First Warrant authorized officers to search the outdoor portions of the Subject Property for "[t]race evidence, including bodily fluids, such as blood, hairs, fibers, and clothing," "[o]bjects, materials, or other items containing such trace evidence," and "[t]ools and machinery intended for digging."  (*See* First Warrant Attach. B.)

In support of its application for the First Warrant, the Government submitted an affidavit setting out the basis for probable cause.  A cooperating witness informed officers that on April 12, 2016—the day after the Victims disappeared—Defendant instructed the cooperating witness to use a large machine to fill in a hole on Defendant's former property located at 419 Old Mountain Road that was not there the day before.  (*Id.* at 8.)  The cooperating witness also informed officers that when Defendant moved from 419 Old Mountain Road to the Subject Property, he took the machine that the witness used to fill the hole with him.  (*Id.* at 9.)  On December 19, 2016, after being permitted by Defendant's wife to enter the Subject Property, officers observed machinery, including several tractors, an excavator, and a backhoe on the Subject Property.  (*Id.*)  Early in the day on December 20, 2016, officers found the remains of four human bodies at Defendant's former property on 419 Old Mountain Road.  (*Id.* at 8.)  Detective Gorr, the affiant, also stated that "based on [his] training, experience, [and] participation in other murder investigations . . . physical evidence such as bodily fluids, including blood, hair, and fibers can be recovered months after the underlying crimes have been completed

---

[20] Because Defendants filed the Warrants and applications under seal, the Court refers to the internal pagination of the affidavits in support of each application.

. . . .[and] that tools used to move or carry human remains may maintain trace evidence . . . for many months after the human remains have been removed."  (*Id.* at 9.)

Officers began their search of the Subject Property on December 21, 2016, at 12:15 PM. (*See* Def's Physical Evidence Mem. Ex. D ("Search Warrant Execution Log") (Dkt. No. 303-4).) While officers were executing the First Warrant, they filed applications for two additional search warrants.  (Def's Physical Evidence Mem. at 2; *see also* Gov't's Omnibus Mem. of Law. in Opp'n to Def's Supp'l. Pretrial Mots. ("Gov't's Second Omnibus Opp'n") 14–16 (Dkt. No. 305).)  At 1:43 PM on December 21, 2016, Judge Davison signed a second search warrant (the "Second Warrant"), authorizing officers to search inside the Subject Property and all outside structures located on it and seize any "[f]irearms," "[a]mmunition for firearms," and "[d]ocumentation reflecting the ownership or purchase of firearms and/or ammunition."  (*See* Def's Physical Evidence Mem. Ex. B ("Second Warrant"), Attach. B (Dkt. No. 303-2).)

In support of its application for the Second Warrant, the Government submitted an affidavit setting forth the basis for probable cause that included the following facts: Defendant was the registered owner of multiple firearms, (*id.* at 9); Defendant's wife told officers on December 19, 2016 that he kept firearms at the Subject Property, (*id.*); and, on December 20, 2016, the Orange County Medical Examiner's Office conducted a preliminary examination of the four bodies found on Defendant's former property at 419 Old Mountain Road, during which "the medical examiner found projectiles, believed to be bullets, in the skulls of three of the bodies," (*id.* at 8).

At 5:06 PM on December 21, 2016, Judge Davison signed a third search warrant (the "Third Warrant"), authorizing officers to seize "duct tape," "[z]ip ties," "[a]ny security cameras, DVR, or other recording device containing surveillance video from April 11, 2016," and a "[b]ag

of white powder with the words 'Provar Blend' handwritten in black marker."  (*See* Def's

Physical Evidence Mem. Ex. C ("Third Warrant") Attach. B (Dkt. No. 303-3).)

Law enforcement officials completed their search of the Subject Property at 5:15 PM on

December 21, 2016.  (*See* Search Warrant Execution Log.)  Officers seized the following items

from the Subject Property:

- o  a Cimmaron Repeating Arms 12-gauge shotgun,
- o  an American Tactical AT-47 with loaded clip,
- o  a Colt M4 Carbine with loaded clip,
- o  a German Sport Guns .22 caliber firearm,
- o  a black Husky toolbox containing assorted ammunition,
- o  33 rounds of .357 ammunition, 1 round of 7.62 ammunition, 22 rounds of .335 caliber ammunition, 213 rounds of Winchester .22 caliber ammunition,
- o  a magazine with an unknown amount of ammunition,
- o  a bag of Cambridge multipurpose cable ties,
- o  zip ties,
- o  four rolls of duct tape, and
- o  a Case backhoe.

(*See id.*)

B.  Procedural History

On August 2, 2019, Defendant filed a Motion To Suppress cell site location data and

accompanying papers.  (*See* Not. of Mot.; Klein Decl.; Def's Cell Site Mem.)  On August 23,

2019, Defendant filed a Motion To Suppress statements Defendant made to law enforcement

officers on the day of his arrest, December 19, 2016.  (*See* Def's Statements Mem.)  On

September 20, 2019, the Government filed an Omnibus Opposition to Defendant's Motions To

Suppress the cell site location data and the statements made on the day of his arrest.  (*See*

Gov't's First Omnibus Opp'n.)

On October 28, 2019, Defendant filed a Reply in support of his Motion To Suppress

statements.  (*See* Def's Statements Reply.)  On November 8, 2019, Defendant filed a Reply in

support of his Motion To Suppress cell site data.  (*See* Def's Reply Mem. in Further Supp. of

Mot. To Suppress Cell Phone Tracking Data ("Def's Cell Site Reply") (Dkt. No. 173).)  On April 4, 2022, Defendant filed a Supplemental Motion To Suppress his statements.  (*See* Def's Supp'l. Statements Mem.)  On the same day, Defendant also filed a Motion To Suppress physical evidence seized by officers pursuant to search warrants on December 20 and 21, 2016.  (*See* Def's Physical Evidence Mem.)

On April 18, 2022, the Government filed an Omnibus Opposition to Defendant's Supplemental Motion To Suppress Statements and Defendant's Motion To Suppress physical evidence.  (*See* Gov't's Second Omnibus Opp'n.)  On April 25, 2022, Defendant filed an Omnibus Reply in support of his Supplemental Motions To Suppress statements and physical evidence.  (Def's Omnibus Reply Mem. of Law in Supp. of Supp'l. Mot. To Suppress Statements and Suppress Physical Evidence ("Def's Omnibus Reply") (Dkt. No. 306).)  On May 27, 2022, the Court held an evidentiary hearing at which Hammer and Browne testified as to their involvement in the events leading up to Defendant's arrest on December 19, 2016.  (*See* Hr'g Tr.)  On July 13, 2022, Defendant filed a Post-Hearing Memorandum of Law in Support of his pending Motions.  (*See* Def's Post-Hr'g Mem.)  On August 3, 2022, the Government filed a Post-Hearing Memorandum in Further Opposition.  (*See* Gov't's Post-Hr'g Mem.)

On November 10, 2022, the Court heard further oral argument on Defendant's Motion to suppress his statements made on December 19, 2016.  (*See* Dkt. (minute entry for November 10, 2022).)

## II.  Discussion

### A.  Historical Cell Site Location Information

Defendant argues that the Court should suppress the cell site location information ("CSLI") that the Government obtained pursuant to the Cell Site Order because that information was obtained without a warrant in violation of the Fourth Amendment.  (*See* Def's Cell Site

Mem. at 2.)  The Government responds that Defendant has failed to establish standing or, in the alternative, that the good faith exception to the exclusionary rule applies, so the evidence should not be suppressed.  (*See* Gov't's First Omnibus Opp'n at 12–28.)

Under § 2703 of the SCA, a law enforcement agency "may require a provider of electronic communication service . . . to disclose a record or other information pertaining to a subscriber to or customer of such service" pursuant to a court order upon a "showing that there are reasonable grounds to believe that . . . the records or other information sought, are relevant and material to an ongoing criminal investigation."  *Id.* § 2703(c), (d).  The term "electronic communication service" is defined as "any service which provides to users thereof the ability to send or receive wire or electronic communications."  18 U.S.C. § 2510(15).  The statute defines "wire communication" as "any aural transfer made in whole or in part through the use of facilities for the transmission of communications by the aid of wire, cable, or other like connection . . . ."  *Id.* § 2510(1).  An "electronic communication" is defined as "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system . . . but does not include . . . any wire or oral communication . . . . [or] any communication from a tracking device . . . ."  *Id.* § 2510(12)(A)–(B).  Finally, the term "tracking device" is defined as "an electronic or mechanical device which permits the tracking of the movement of a person or object."  18 U.S.C. § 3117(b).

At the time that the Government submitted the Cell Site Application in 2016, the Circuits which addressed the issue had found that historical CSLI acquired through court orders issued under § 2703(d) fell under the third-party doctrine, and thus did not require a warrant under the Fourth Amendment.  *See*, *e.g.*, *United States v. Carpenter*, 819 F.3d 880, 890 (6th Cir. 2016)

("[W]e hold that the government's collection of business records containing cell-site data was not a search under the Fourth Amendment."), *rev'd*, 132 S. Ct. 2206 (2018); *United States v. Graham*, 824 F.3d 421, 437–38 (4th Cir. 2016) (en banc) ("Applying the third-party doctrine, consistent with controlling precedent, we can only conclude that the Fourth Amendment did not protect [the service providers'] records of [t]he [d]efendants' CSLI.  Accordingly, we hold that the Government legally acquired those records through § 2703(d) orders."); *United States v. Davis*, 785 F.3d 498, 511–13 (11th Cir. 2015) (en banc) ("Based on the SCA and governing Supreme Court precedent, we [] conclude the government's obtaining a § 2703(d) court order for the production of [the service provider's] business records did not violate the Fourth Amendment."); *United States v. Guerrero*, 768 F.3d 351, 361 (5th Cir. 2014) ("The district court [] properly admitted the historical cell site location data [obtained pursuant to § 2703(d)] at trial."); *In re Application of U.S. for an Ord. Directing a Provider of Elec. Commc'n Serv. to Disclose Recs. to Gov't*, 620 F.3d 304, 319 (3d Cir. 2010) (vacating magistrate judge's order denying the government's application under § 2703(d) for failure to show probable cause because "[a] review of the statutory language suggests that the Government can proceed to obtain records pertaining to a subscriber . . . [through] an order under § 2703(d)," which did not require a showing of probable cause).[21]  Although the Second Circuit had not addressed § 2703(d) directly, it had held in *United States v. Ulbricht*, 858 F.3d 71, 97 (2d Cir. 2017) that

---

[21] Under the third-party doctrine, the Government may obtain information that an individual voluntarily provided to a third party, without a showing of probable cause.  *See United States v. Miller*, 425 U.S. 435, 445–46 (1976) ("[T]he Fourth Amendment does not prohibit the obtaining of information revealed to a third party and conveyed by [that party] to Government authorities, even if the information is revealed on the assumption that it will be used only for a limited purpose and the confidence placed in the third party will not be betrayed.").

the Government "did not need to obtain a warrant to collect IP address routing information" pursuant to 18 U.S.C. §§ 3121–27, a related statute. *Id.* at 97.

In 2018, the Supreme Court found in *Carpenter v. United States*, 138 S. Ct. 2206 (2018) that "[g]iven the unique nature of cell phone location information, the fact that the Government obtained the information from a third party does not overcome [the defendant's] claim to Fourth Amendment protection." *Id.* at 2220. Thus, the Court held that "[t]he Government's acquisition of the cell-site records [pursuant to an order under § 2703(d)] was a search within the meaning of the Fourth Amendment" and "the Government must generally obtain a warrant supported by probable cause before acquiring such records." *Id.* at 2220–21.

The Supreme Court has held that "[w]hen evidence is obtained in violation of the Fourth Amendment, the judicially developed exclusionary rule usually precludes its use in a criminal proceeding against the victim of the illegal search and seizure." *Illinois v. Krull*, 480 U.S. 340, 347 (1987). However, there are exceptions to the exclusionary rule. For example, under the good faith exception, the exclusionary rule does not apply when law enforcement officers "act with an objectively reasonable good-faith belief that their conduct is lawful." *Davis v. United States*, 564 U.S. 229, 238 (2011) (quotation marks omitted); *see also United States v. Aguiar*, 737 F.3d 251, 259 (2d Cir. 2013) (noting that the good faith exception covers "searches conducted in objectively reasonable reliance on binding appellate precedent" existing at the time of the search). In *United States v. Zodhiates*, 901 F.3d 137 (2d Cir. 2018), the Second Circuit found that the good faith exception applied to historical call data that revealed the owner's location produced pursuant to the SCA prior to the Supreme Court's decision in *Carpenter*, because the search was made in "objectively reasonable reliance on appellate precedent existing at the time of the search." *Id.* at 143.

1.  Standing

The Government argues that Defendant lacks standing to bring a motion to suppress the evidence recovered from the Cell Site Order because he has failed to submit an affidavit from an individual with personal knowledge establishing a privacy interest in any of the cell phone numbers.  (*See* Gov't's First Omnibus Opp'n at 16.)

"The Supreme Court has held that 'capacity to claim the protection of the Fourth Amendment depends . . . upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place.'"  *United States v. Watson*, 404 F.3d 163, 166 (2d Cir. 2005) (alteration in original) (quoting *Rakas v. Illinois*, 439 U.S. 128, 143 (1978)).  "[T]he burden is on the defendant to establish that his own rights under the Fourth Amendment were violated."  *United States v. Paulino,* 850 F.2d 93, 96 (2d Cir. 1988) (citation omitted).  To satisfy this burden, "[t]he defendant. . . 'must submit an affidavit from someone with personal knowledge demonstrating sufficient facts to show that he had a legally cognizable privacy interest in the searched premises at the time of the search.'"  *United States v. Lauria*, No. 19-CR-449, 2020 WL 5743523, at *6 (S.D.N.Y. Sept. 25, 2020) (quoting *United States v. Ruggiero*, 824 F. Supp. 379, 391 (S.D.N.Y. 1993), *aff'd*, 44 F.3d 1102 (2d Cir. 1995)).  Additionally, the defendant must rely on only "sworn evidence, in the form of an affidavit or testimony, from the defendant or someone with personal knowledge[;] [a] defendant's unsworn assertion of the Government's representations does not meet this burden."  *United States v. Montoya-Escheverria*, 892 F. Supp. 104, 106 (S.D.N.Y. 1995).  The Government's efforts to connect a defendant to the subject of a search do not suffice to establish standing.  *See Watson*, 404 F.3d at 166 (explaining that a "defendant [can] not challenge the search of a residence merely because he anticipate[s] that the Government will link the objects recovered in that search to [him] at trial." (citation omitted)).

Defendant has submitted an unsigned declaration from Defendant alleging a personal interest in the phone numbers.  (*See* Def's Cell Site Reply Ex. A ¶ 3.)  However, because the declaration is unsigned, the Court finds that it does not provide Defendant with standing to challenge the orders.  *See Montoya-Eschevarria,* 892 F. Supp. at 106; *United States v. Santini*, No. 21-CR-64, 2022 WL 575474, at *6 (D. Vt. Feb. 25, 2022) (finding defendant lacked standing where defendant relied on unsigned affidavit alleging interest in property that had been subject of search); *United States v. Sykes*, No. 92-CR-392, 1992 WL 315652, at *1 (S.D.N.Y. Oct. 16, 1992) (same).

The Government has represented that it will argue at trial that some of the phone numbers "belong to [D]efendant," (*see* Gov't's First Omnibus Opp'n at 16), but, as noted, that is insufficient to provide Defendant standing.  *See United States v. Pizarro*, No. 17-CR-151, 2018 WL 1737236, at *7 (S.D.N.Y. Apr. 10, 2018) (denying motion to suppress historical CSLI because "[d]efendants [had] not submitted an affidavit demonstrating their privacy interest"); *United States v. Dore*, 586 F. App'x 42, 46 (2d Cir. 2014) (summary order) (holding defendant lacked standing to suppress historical cell-site records where "he did not submit an affidavit establishing that the cell phones in question belonged to him or . . . assert a privacy interest in the cell phones in some other manner"); *United States v. Filippi*, No. 12-CR-604, 2013 WL 208919, at *6 (S.D.N.Y. Jan. 16, 2013) (holding that "efforts made by the Government to link [the defendant] to [a] phone" are insufficient to establish the defendant's standing to challenge a warrant permitting the tracking of that phone).  As a result, the Court finds that Defendant lacks standing because he has failed to establish that he has a reasonable expectation of privacy in any of the cell phone numbers.

2.  Statutory Interpretation

Even if Defendant had standing, his motion would fail.  Defendant first argues that the

Cell Site Order is invalid because the plain text of the SCA does not authorize the collection of

CSLI.  (*See* Def's Cell Site Mem. at 10–12.)  Defendant points out that § 2703(d) of the SCA

allows the Government to request "electronic communications" and information related thereto;

however, the statute specifically excludes "any communication from a tracking device" from its

definition of electronic communication.  *See* 18 U.S.C. § 2510(12)(C).  Thus, when the

Government requests CSLI from a cell phone, Defendant claims, that phone qualifies as a

tracking device because it falls within the statutory definition of "an electronic . . . device which

permits the tracking of the movement of a person."  (Def's Cell Site Mem. at 10.)  *See* 18 U.S.C.

§ 3117; *In re Application of U.S. for an Ord. Authorizing the Use of a Pen Reg. with Caller

Identification Device Cell Site Location Auth. on a Cellular Tel.*, 2009 WL 159187, at *3

(S.D.N.Y. Jan. 13, 2009) (concluding that because"[a] cell phone has the ability, by use of

electronic signals, to track the movement of an object (the phone itself), and by extension, of a

person . . . [,] [it] falls within the literal definition of the term 'tracking device' as used in the

SCA.")[22]

---

[22] Defendant also cites to two out-of-circuit cases that reached the same conclusion based on similar reasoning.  *See In re Application of U.S. for an Ord. Authorizing Disclosure of Location Info. of a Specified Wireless Tel.*, 849 F. Supp. 2d 526, 574 (D. Md. 2011) ("[T]he precise location information sought falls squarely within the definition of communications from a tracking device[.]"); *In Re U.S. for an Ord. Directing a Provider of Elec. Commc'n Serv. to Disclose Recs. to the Gov't*, 534 F. Supp. 2d 585, 604 (W.D. Pa. 2008), *aff'd*, No. 07-524M, 2008 WL 4191511 (W.D. Pa. Sept. 10, 2008), *and vacated sub nom. In re Application of U.S. for an Ord. Directing a Provider of Elec. Commc'n Serv. to Disclose Recs. to Gov't*, 620 F.3d 304 (3d Cir. 2010).  However, as the Government points out (Gov't's Second Omnibus Opp'n at 27–28), the Third Circuit later vacated the decision in *In Re United States*, 534 F. Supp. 2d 585, as an incorrect reading of the SCA, *see In Re Appl. Of United States*, 620 F.3d at 309–310.

However, Defendant's reading of the statute appears to misapprehend the statutory scheme and the provisions the Government relied upon in the Cell Site Application.  The Government made its request to Judge Smith pursuant to 18 U.S.C. § 2703(c), which allows the Government to request "record[s] or other information pertaining to a subscriber" of a "provider of electronic communication service" through several methods, including an order issued pursuant to § 2703(d).  § 2703(c).  (*See also* Cell Site Application at 2.)  The definition of "electronic communication service" includes "any service which provides to users thereof the ability to send or receive *wire or electronic* communications."  § 2510(13) (emphasis added).  The statutory definition of wire communication includes "any aural transfer made in whole or in part through the use of facilities for the transmission of communications by the aid of wire, cable, or other like connection between the point of origin and the point of reception."  *Id.* § 2510(1).  Thus, even if Defendant's interpretation of the statute is correct, the Government's request for the CSLI for "any phone [or] text . . . communication" would be unexceptionable because it would derive from wire communication, not electronic communication.  (Cell Site Application ¶ 2.)  *See In Re Application of U.S.*, 620 F.3d at 310 (explaining that "even if the record of a cell phone call does indicate generally where a cell phone was used when a call was made, so that the resulting CSLI was information from a tracking device, that is irrelevant here because the CSLI derives from a wire communication and not an electronic communication." (quotation marks omitted)); *United States v. McCullough*, 523 F. App'x 82, 84 (2d Cir. 2013) (summary order) (citing *In Re Application of U.S.*).  Thus, Defendant's argument simply does not reach the "phone [or] text communication" records the Government requested.

As to Government's request for "data communication" records, the Court finds that Defendant's argument that a cell phone qualifies as a tracking device when the Government

requests historical CSLI misreads the scope of the statutory definition of "tracking device."

When § 3117 is read in its entirety, it is clear that the definition of "tracking device" is more

limited than appears based on the definition provided in § 3117(b).  *See generally* 18 U.S.C.

§ 3117.   The title of § 3117 is "mobile tracking devices" and § 3117(a) discusses the

jurisdictional reach of a "warrant or other order for *the installation of* a mobile tracking

device[,]" § 3117(a).  Thus, as other courts in this District have noted, it is obvious that a

"tracking device" as defined in § 3117 refers to a class of items that exist primarily to "permit the

tracking of the movement of a person or object," and it is indisputable that cell phones do not

exist primarily to permit the tracking of the movement of their users and would not fall within

the definition.  *Id.* § 3117(b); *see In Re Smartphone Geolocation Data Application*, 977 F. Supp.

2d 129, 149–50 (E.D.N.Y. 2013) (discussing the text of the SCA and relevant legislative history

before concluding that § 3117 "is aimed at devices installed specifically to track someone or

something, as opposed to cell phones which, incidental to their intended purpose, can be tracked

or traced"); *United States v. Caraballo*, 963 F. Supp. 2d 341, 361 n.7 (D. Vt. 2013) (rejecting

defendant's assertion that "the acquisition of cell tower site information effectively converts an

individual's cell phone into a tracking device which requires a warrant" (quotation marks

omitted)), *aff'd*, 831 F.3d 95 (2d Cir. 2016).[23]

### 3.  Good Faith Exception

Defendant also argues that the good faith exception does not apply to the cell site records.

(*See* Def's Cell Site Mem. at 12–14; Def's Cell Site Reply at 8–11.)  However, the Second

Circuit in *Zodhiates* held otherwise, *see Zodhiates,* 901 F.3d at 143, and has since affirmed that

---

[23] Because the Court finds that Defendant's contention that the request for CSLI converted his cell phone into a tracking device within the meaning of the SCA misreads the statute, the Court will not address Defendant's arguments that derive from that premise.  (*See* Def's Cell Site Reply at 4–6.)

holding specifically in the context of historical CSLI obtained pursuant to an order under the SCA prior to *Carpenter* being decided.  *See United States v. Felder*, 993 F.3d 57, 75 (2d Cir. 2021), *cert. denied*, 142 S. Ct. 597 (2021) (holding that district court did not err in finding good faith exception applied to "historical [CSLI] obtained pursuant to a court order supported by less than probable cause"); *United States v. Canada*, 858 F. App'x 436, 440 (2d Cir. 2021) (summary order) ("[O]ur Court has declined to exclude cell site evidence when a search of records was made without a warrant pre-*Carpenter* where the cell site information was obtained through a subpoena issued in conformity with the [SCA]."); *United States v. Miller*, 807 F. App'x 90, 96 (2d Cir. 2020) (summary order) ("[W]e conclude that although *Carpenter* does apply to the cell-site location information at issue in this case, the good-faith exception also applies, and this evidence did not need to be suppressed."), *cert. denied sub nom. Mack v. United States*, 141 S. Ct. 2806 (2021); *United States v. Herron*, 762 F. App'x 25, 31 (2d Cir. 2019) (summary order) (applying *Zodhiates* to a case in which information was obtained pursuant to the SCA's order requirement and concluding that the good faith exception applied and that suppression of the cell-site records at issue was not required); *United States v. Walsh*, 774 F. App'x 706, 708 (2d Cir. 2019) (summary order) (citing *Zodhiates* and finding that counsel was not ineffective for failing to bring motion to suppress cell site data, because the good faith exception would have applied); *United States v. Chambers*, 751 F. App'x 44, 46–47 (2d Cir. 2018) (summary order) (applying *Zodhiates*).  Lower courts within the Second Circuit have uniformly followed suit, finding that cell site data obtained without a warrant—either through an SCA order or subpoena—falls within the good faith exception.  *See*, *e.g.*, *United States v. Smith*, No. 16-CR-346, 2021 WL 2634914, at *1 n.1 (E.D.N.Y. June 25, 2021); *Figueroa v. United States*, No. 17-CV-09505, 2019 WL 6338420, at *6 (S.D.N.Y. Nov. 26, 2019); *Rubin v. Lamanna*, No. 18-CV-

1924, 2019 WL 3557693, at *15 (E.D.N.Y. Aug. 5, 2019); *United States v. Key*, No. 12-CR-712, 2019 WL 2314693, at *4 (S.D.N.Y. May 31, 2019); *United States v. Posey*, No. 16-CR-87A, 2019 WL 5073624, at *7–8 (W.D.N.Y. May 17, 2019), *report and recommendation adopted*, 2019 WL 4409333 (W.D.N.Y. Sept. 16, 2019); *Brown v. Sprint Corp. Sec. Specialist*, No. 17-CV-2561, 2019 WL 418100, at *4–5 (E.D.N.Y. Jan. 31, 2019); *United States v. Pirk*, No. 15-CR-142, 2018 WL 6629679, at *21 (W.D.N.Y. Dec. 19, 2018); *United States v. Gyamfi*, No. 16-CR-521, 2018 WL 6332902, at *2 (S.D.N.Y. Nov. 13, 2018); *United States v. Carrano*, 340 F. Supp. 3d 388, 397 (S.D.N.Y. 2018); *United States v. Guillen*, No. 17-CR-512, 2018 WL 5831318, at *15 (S.D.N.Y. Nov. 7, 2018); *United States v. Williams*, No. 10-CR-622, 2018 WL 4623017, at *5 (E.D.N.Y. Sept. 26, 2018); *United States v. Blake*, No. 16-CR-111, 2018 WL 3974716, at *2 (D. Conn. Aug. 20, 2018) (collecting cases).  Every other Circuit to address this issue has also reached the same conclusion.  *See, e.g.*, *United States v. Reed*, 978 F.3d 538, 542 (8th Cir. 2020); *United States v. Ackies*, 918 F.3d 190, 202–03 (1st Cir. 2019); *United States v. Goldstein*, 914 F.3d 200, 203–04 (3d Cir. 2019); *United States v. Beverly*, 943 F.3d 225, 234–36 (5th Cir. 2019); *United States v. Carpenter*, 926 F.3d 313, 317–18 (6th Cir. 2019); *United States v. Korte*, 918 F.3d 750, 758 (9th Cir. 2019); *United States v. Chavez*, 894 F.3d 593, 608 (4th Cir. 2018); *United States v. Curtis*, 901 F.3d 846, 848–49 (7th Cir. 2018); *United States v. Joyner*, 899 F.3d 1199, 1204–05 (11th Cir. 2018).  Defendant does not cite—nor is the Court aware of— any federal case in which the court did not apply the good faith exception to historical CSLI obtained pursuant to the SCA prior to the *Carpenter* decision.  (*See generally* Def's Cell Site Mem; Def's Cell Site Reply.)

The Second Circuit has similarly found, albeit in several summary orders, that the Supreme Court's decision in *United States v. Jones*, 565 U.S. 400 (2012), in which the Court

held that the use of a GPS device to track a target's vehicle constitutes a search within the meaning of the Fourth Amendment, does not apply to historical CSLI because its collection does not involve a physical intrusion. *Id.* at 404; *see, e.g.*, *Walsh*, 774 F. App'x at 708 ("*Jones* was decided based on the Government's physical intrusion on private property. The collection of CSLI does not involve physical intrusion. Therefore, a reasonable officer acting after *Jones* could have reasonably and in good faith believed that CSLI collection pursuant to 18 U.S.C. §§ 2703(c)(1)(B) and (d) did not require a warrant." (citation omitted)); *Chambers*, 751 F. App'x at 47 ("The warrantless GPS tracking in *Jones* was unconstitutional because placement of the tracker on defendant's vehicle constituted a physical trespass . . . . Here, the government did not trespass onto any property, and certainly not onto [the defendant's] property. It obtained the data at issue by requesting it from the third party in possession of the data. This crucial difference means that, even after *Jones*, officers could have reasonably believed that the third-party doctrine meant a warrant was not required to obtain cell-site data.").

Thus, in keeping with the Second Circuit, the District Courts within it, and the other Circuits to address this issue, the Court finds that although CSLI was obtained without probable cause and a warrant, because it was obtained pursuant to a § 2703(d) order prior to the issuance of the *Carpenter* decision, it falls under the good faith exception to the exclusionary rule. Thus, Defendant's Motion To Suppress the CSLI is denied**.**

### B. Defendant's Statements on December 19, 2016

#### 1. Fourth Amendment Claim

Defendant argues that his statements on the day of his arrest should be suppressed because the Government lacked probable cause or a reasonable suspicion to stop and seize him as required by the Fourth Amendment. (*See* Def's Post-Hr'g Mem. at 22–26.) The Government appears to concede that Defendant was seized within the meaning of the Fourth Amendment, but

argues that the Investigators had probable cause based on the collective knowledge doctrine. (*See* Gov't's Post-Hr'g Mem. at 13–17.)

An officer "may arrest an individual without violating the Fourth Amendment if there is probable cause to believe that the offender has committed [] a . . . criminal offense." *Atwater v. City of Lago Vista,* 532 U.S. 318, 322 (2001). Probable cause exists "if [an officer], on the basis of the totality of the circumstances, has sufficient knowledge or reasonably trustworthy information to justify a person of reasonable caution in believing that an offense has been or is being committed by the person to be arrested." *United States v. Hawkins*, 37 F.4th 854, 858 (2d Cir. 2022) (per curiam) (citations omitted). Probable cause is satisfied by "the kind of fair probability on which reasonable and prudent people act." *Id.* at 858 (alteration omitted) (quoting *Florida v. Harris*, 568 U.S. 237, 244 (2013)).

When a law enforcement officer does not have probable cause, that officer may conduct a *Terry* stop of an individual based on a "reasonable suspicion" that "the individual has engaged in or is about to engage in criminal activity." *Id.* at 857 (citation omitted). "In reviewing the reasonableness of a *Terry* stop, [a court] ask[s] whether there was a particularized and objective basis for suspicion of legal wrongdoing under the totality of the circumstances." *United States v. Simmons*, 560 F.3d 98, 103 (2d Cir. 2009) (quotation marks omitted) (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)). A court should be mindful that an officer "may draw on [his/her] own experience and specialized training to make inferences from and deductions about the cumulative information available to [him] that might well elude an untrained person." *United States v. Muhammad*, 463 F.3d 115, 121 (2d Cir. 2006) (second alteration in original) (quotation marks omitted).

When evaluating whether officers had probable cause or a reasonable suspicion, the analysis must take into account not just the personal knowledge of the officers making the stop, but also the collective knowledge of other members of law enforcement with whom the arresting officers were in contact.  *United States v. Colon*, 250 F.3d 130, 135 (2d Cir. 2001) ("[An] arresting officer might not be aware of all the underlying facts that provided probable cause or reasonable suspicion, but may nonetheless act reasonably in relying on information received by other law enforcement officials.").  Even when unaware of all relevant information, the arresting officers may have probable cause or a reasonable suspicion when they were relying on instructions from officers who "had information that would provide reasonable suspicion or probable cause to search or arrest the suspect."  *Id*. at 135–36; *see also United States v. Babilonia*, 854 F.3d 163, 178 (2d Cir. 2017) ("[E]ven if the law enforcement officer actually conducting the search lacks the relevant facts to support probable cause, the search may nonetheless be permissible if the officer acted on the assessment or instructions of other officers who did have such facts.").

While the Investigators were not aware of all aspects of the investigation and thus likely did not personally have probable cause or even a reasonable suspicion to stop Defendant (*see*, *e.g.*, Hr'g Tr. at 20:4–8; 24:12–17; 51:18–52:5; 55:12–17; 81:7–10.), the Court credits their testimony that they were acting under instructions from Young and Hikade, who did have knowledge of the entire investigation, (*see* Hr'g Tr. at 40:18–19; 42:2–4; 71:8–11).  In particular, Young had led the investigation into the disappearances of Luna and the other Victims from April 2016 through December 19, 2016.  (Gov't's Post-Hr'g Mem. at 6; *see also* Hr'g Tr. at 37:19–38:2.)  The Government has represented, and Defendant does not dispute, that Young was aware of the evidence presented to the grand jury on December 14, 2016, which served as the

sole basis for the grand jury returning an indictment against Defendant on December 19.

(Gov't's Post-Hr'g Mem. at 15–16.)  The Government has also represented, and the Court

accepts, that Young was aware of the evidence supporting probable cause to search Defendant's

cars and other property presented in the warrant application granted by Judge McCarthy on

December 16, 2016.  (*id*. at 6, 15–16; *see generally* December 16 Warrant Application.)[24]  Thus,

under the collective knowledge doctrine, the Investigators had probable cause to stop Defendant.

*See United States v. Peters*, No. 18-CR-188, 2019 WL 351261, at *8–10 (D. Conn. Jan. 29,

2019), *aff'd*, 843 F. App'x 369 (2d Cir. 2021)) (finding officer had probable cause to pull

defendant over where officer had been informed by a federal agent that defendant lacked a valid

driver's license); *United States v. Midyett*, No. 07-CR-874, 2009 WL 363905, at *8 (E.D.N.Y.

Feb. 6, 2009) (holding that officer had probable cause to arrest defendant based on description

from undercover officer who had bought drugs from defendant fifteen minutes earlier); *United

States v. Long*, 678 F. App'x 31, 33–34 (2d Cir. 2017) (summary order) (holding arresting officer

had probable cause where he had been informed by investigator that defendant had sold illegal

narcotics during a controlled buy several days earlier), *as amended* (Feb. 3, 2017).

Defendant's Motion To Suppress his statements for lack of probable cause or a

reasonable suspicion to detain him is denied.

## 2.  Fifth Amendment Claims

Defendant next argues that his statements must be suppressed based on violations of the

Fifth Amendment.  Specifically, Defendant claims that his statements after he was placed in the

---

[24] Young is not mentioned by name in the December 16 Warrant, but a "Senior Investigator of the [New York State Police]" is repeatedly referenced as a source of evidence establishing probable cause.  (*See* December 16 Warrant at ¶¶ 12–14, 16–17.)  The Court credits the Government's representations concerning Young's knowledge and presumes that these statements refer to Young.

Investigators' car and prior to the Investigators giving him his *Miranda* warnings in the interview room should be suppressed because Defendant was subject to an unwarned custodial interrogation during that period.  (Def's Statements Mem. 11–15; *see also* Def's Statements Reply 6–7; Def's Post-Hr'g Mem. 10–17.)  Defendant claims that his post-*Miranda* statements also should be suppressed because those statements were the result of a deliberate two-step strategy to circumvent *Miranda*.  (Def's Statements Mem. 15–19; *see also* Def's Statements Reply 7–8; Def's Post-Hr'g Mem. 18–22.)

The Government concedes that Defendant was interrogated by the Investigators but argues that the interrogation was not custodial and, as such, *Miranda* warnings were not required.  (*See* Gov't's First Omnibus Opp'n 40–42; Gov't's Post-Hr'g Mem. 17–23.)  The Government also argues that even if the Court finds Defendant was subjected to a custodial interrogation in violation of *Miranda*, two of Defendant's statements were spontaneous and so should not be suppressed.  (*See* Gov't's First Omnibus Opposition 43; Gov't's Post-Hr'g Mem. 23–26.)

"To protect the Fifth Amendment right against self-incrimination, the Supreme Court in *Miranda v. Arizona* ruled that police may not interrogate a suspect who has been taken into custody without first warning the person 'that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.'"  *United States v. Newton*, 369 F.3d 659, 668 (2d Cir. 2004) (quoting *Miranda v. Arizona*, 384 U.S. 436, 479 (1966)).  "The purpose of the *Miranda* warning is to ensure that the person in custody has sufficient knowledge of his or her constitutional rights relating to the interrogation and that any waiver of such rights is knowing, intelligent, and

voluntary." *United States v. Carter*, 489 F.3d 528, 534 (2d Cir. 2007) (citing *Miranda*, 384 U.S. at 444–45, and *Terry v. LeFevre*, 862 F.2d 409, 412 (2d Cir. 1988)).  However, "[a]n interaction between law enforcement officials and an individual generally triggers *Miranda*'s prophylactic warnings [only] when the interaction becomes a 'custodial interrogation.'" *United States v. FNU LNU*, 653 F.3d 144, 148 (2d Cir. 2011); *Georgison v. Donelli*, 588 F.3d 145, 155 (2d Cir. 2009) ("*Miranda*'s warning requirements . . .  apply only to 'custodial interrogation.'" (citation omitted)).  Determining whether a custodial interrogation occurred involves "two parts: (a) there must be an interrogation of the defendant, and (b) it must be while [the defendant] is in 'custody.'" *FNU LNU*, 653 F.3d at 148 (citation omitted).

"On a motion to suppress in a criminal trial, the defendant bears the burden of demonstrating . . . that he was subject to custodial interrogation." *United States v. Wilson*, 100 F. Supp. 3d 268, 277 (E.D.N.Y. 2015).  "Once a basis has been established, 'the prosecution has the burden of establishing by a preponderance of the evidence that a suspect waived his *Miranda* rights, and that his confession is truly the product of free choice.'" *Id.* at 278 (quoting *United States v. Anderson*, 929 F.2d 96, 99 (2d Cir. 1991)).

a.  Custody

"[C]ustody for *Miranda* purposes is not coterminous with . . . the colloquial understanding of custody." *FNU LNU*, 653 F.3d at 152–53 (quotation marks omitted).  "The test for determining custody . . . asks (1) whether a reasonable person would have thought he was free to leave the police encounter at issue and (2) whether a reasonable person would have understood his freedom of action to have been curtailed to a degree associated with formal arrest." *United States v. Faux*, 828 F.3d 130, 135 (2d Cir. 2016) (citations and quotation marks omitted).  This test is an objective one.  *See id.* ("An individual's subjective belief about his or her status generally does not bear on the custody analysis."); *Stansbury v. California*, 511 U.S.

35

318, 323 (1994) ("Our decisions make clear that the initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by . . . the person being questioned.")[25]

Even if a defendant is not formally told he is under arrest, he is nevertheless in custody for purposes of this analysis if "law enforcement officials act or speak in a manner that conveys the message that they would not permit the accused to leave." *United States v. Kirsh*, 54 F.3d 1062, 1067 (2d Cir. 1995) (quotation marks omitted) (quoting *Campaneria v. Reid*, 891 F.2d 1014, 1021 n.1 (2d Cir. 1989)). "Factors to be considered include 'whether a suspect is or is not told that []he is free to leave; the location and atmosphere of the interrogation; the language and tone used by the police; whether the suspect is searched, frisked, or patted down; and the length of the interrogation.'" *United States v. Kamaldoss*, No. 19-CR-543, 2022 WL 1200776, at *6 (E.D.N.Y. Apr. 22, 2022) (alteration in original) (quoting *Tankleff v. Senkowski*, 135 F.3d 235, 244 (2d Cir. 1998)).

---

[25] While the test for a custodial interrogation is objective and does not depend on the subjective beliefs of the officers interrogating a defendant, the Second Circuit has considered evidence that officers would not have allowed a defendant to leave if the defendant had attempted to do so. *See United States v. Ali*, 86 F.3d 275, 276–77 (2d Cir. 1996) (finding that defendant was in custody at an airport when he "was asked to step away from the boarding area, his travel documents were removed, [ ] he was surrounded by seven officers with visible handguns," and "law enforcement officials testified that they would not have allowed [defendant] to leave had he tried"); *United States v. Simmonds*, 641 F. App'x 99, 103 (2d Cir. 2016) (summary order) (distinguishing *Ali* in part based on the officers' testimony in *Ali* that they would not have allowed the defendant to leave).

These cases appear to be in some tension with the Supreme Court's holding in *Stansbury* that "a police officer's subjective view that the individual under questioning is a suspect, if undisclosed [to the suspect], does not bear upon the question whether the individual is in custody for purposes of *Miranda*." *Stansbury*, 511 U.S. at 324. However, a conflict is avoidable, as the Second Circuit has considered such testimony only in determining whether an officer would allow an individual to leave the scene, not whether an officer considered an individual to be a suspect in the first instance. *See Ali*, 86 F.3d at 276–77.

The Government has conceded that Defendant would not have been free to leave once he arrived at Long Lane.  (Gov't's Post-Hr'g Mem. 20.)[26]  Thus, the Court must only analyze whether a reasonable person in Defendant's position "would have understood his freedom of action to have been curtailed to a degree associated with formal arrest." *Faux*, 828 F.3d at 135 (quotation marks and citation omitted).  The Second Circuit has explained that "where a person formerly at liberty is subjected to formal arrest or arrest-like restraints[,] specific coercive pressures need not be proved to establish *Miranda* custody; rather, coercive pressures are presumed from the fact of such custody." *Newton*, 369 F.3d at 670; *see also New York v. Quarles*, 467 U.S. 649, 654 (1984) ("The *Miranda* Court . . . presumed that interrogation in certain custodial circumstances is *inherently coercive* . . . ." (footnote omitted) (emphasis added)).[27]

The Investigators have testified that they employed a ruse to compel Defendant to leave his home and come out to the public road so that they could "control the narrative."  (Hr'g Tr. at 16:6–8.)  As soon as Defendant arrived at Long Lane, Hammer acted to cut him off from

---

[26] From his first interaction with Hammer, Defendant was never told that he was free to leave by the Investigators or uniformed officers.  (*See generally* Browne Recording; Gov't's Interview Recording.)  Moreover, the Investigators have both testified that they would not have allowed Defendant to leave at any point if he had asked to do so.  (*See* Hr'g Tr. at 19:14–20:3; 90:24–91:8; 94:9–96:1.)  *See also Ali*, 86 F.3d at 277 (finding that the defendant was in custody where law enforcement officials testified that they would not have allowed [defendant] to leave had he tried").

[27] The Second Circuit has observed that the presence of actual coercive measures is, of course, relevant, but has emphasized that "application of [*Miranda]*'s prophylactic rule has largely focused on the custodial status of the person interrogated rather than on the coercive pressures of the particular interrogation means or setting . . . [because of] a practical recognition that any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime." *Newton*, 369 F.3d at 672 (alterations and quotation marks omitted).

communicating with others and control his movement by stepping between Defendant and his wife and asking him to park his vehicle so that Defendant would talk to him on the road.  (*See* Aerial Video Surveillance at 7:35; Hr'g Tr. at 17:8–13; 45:20–25; 46:11–14.)  Defendant complied.  (*See* Aerial Video Surveillance at 7:50.)  A minute and a half after exiting his truck, Defendant was surrounded by four armed officers and his truck was boxed in.  (*See* Aerial Video Surveillance at 7:50, 9:36.)  Hammer then asked Defendant "do you want to have a seat in the car for a second here[?]"  (*See* Browne Recording at 1:16–21; Gov't's Browne Tr. at 2:44–48.) Defendant agreed.  (*See* Browne Recording at 1:16–21; Gov't's Browne Tr. at 2:44–48.)  When he moved toward the unmarked car, an officer signaled to Defendant to stop.  (*See* Aerial Video Surveillance at 9:59.)  Defendant was then patted down by two officers who asked Defendant if he had any weapons and who also took both of his cell phones.  (*See* Browne Recording at 1:22, 1:46.)  Once the officers had confirmed Defendant was weaponless, Hammer issued a directive instead of asking a question: "Tell you what, we're gonna have a seat in the back of the car over here[.]"  (*See id.* at 1:48; Gov't's Browne Tr. at 3:80–83; Def's Browne Tr. at 3:10–12.) Defendant complied and was guided to the car by a uniformed officer.  (*See* Browne Recording at 1:48; Gov't's Browne Tr. at 3:80–83; Def's Browne Tr. at 3:10–12; Aerial Video Surveillance at 10:29–44.)

Once Defendant was in the car, he was joined by Hammer and was questioned for approximately 22 minutes until the Investigators brought him to the Barracks.  (*See* Browne Recording at 3:48–24:30; Gov't's Browne Tr. at 5:175–32:1145; Def's Browne Tr. at 5:23–34:11.)  Browne then left to locate a room, and Defendant was left with Hammer until both Investigators escorted him into the Barracks placed in a small, windowless interview room in an area of the station inaccessible to the general public.  (*See* Browne Recording at 24:46–30:17;

Hr'g Tr. at 82:15–83:13.)  When the Investigators rejoined him and closed the door to the interview room, Defendant's *Miranda* rights were read to him, and he was then questioned for a further forty minutes before a 10-minute break.  (*See* Gov't's Interview Recording at 6:45–46:28.)  After the break, Defendant was questioned for another 14 minutes until he invoked his right to counsel and was informed he was being arrested.  (*See id*. at 56:24–1:10:06.)

Under these circumstances, the Court finds that a reasonable person in Defendant's position would perceive that he was subject to conditions that approximated actual arrest.  *See Faux*, 828 F.3d at 135 ("An individual's subjective belief about his or her status generally does not bear on the custody analysis.").  The Investigators have admitted they tricked Defendant into leaving his home so that they could "control the narrative" on the public road.  (Hr'g Tr. at 16:6–8.)  *See also Faux*, 828 F.3d at 135 (noting that "the home is the most constitutionally protected place on earth" (citation and quotation marks omitted)).  They have also admitted that they would not have allowed Defendant to leave without first confirming whether he should be arrested.  (*See* Hr'g Tr. at 19:14–20:3; 90:24–91:8, 94:9–96:1.)  From the moment Defendant arrived, the Investigators were in clear control at Long Lane and efficiently took steps to curtail Defendant's movement, cut off potential routes of escape, frisk him for weapons, remove all means of communication, and confine him in the unmarked car so that they could interrogate him.  *See Ali*, 86 F.3d at 276–77 (finding that the defendant was in custody at an airport when he "was asked to step away from the boarding area, his travel documents were removed, [] he was surrounded by seven officers with visible handguns," and "law enforcement officials testified that they would not have allowed [the defendant] to leave had he tried").  Once in the police car, Defendant was questioned about the Victims in detail by Hammer while on the way to the station and then subjected to further questioning on many of the same topics once he arrived at the

Barracks before being told that he was under arrest.  *See United States v. Valentine*, 657 F. Supp. 2d 388, 400–01 (W.D.N.Y. 2009) (holding that a defendant was in custody where he was "removed from the vehicle he was driving, frisked for weapons, escorted by the police to the rear of a marked police car where he was directed to sit, [] thereafter subjected to repeated questioning (both in the back of the police car and later at the police station)[,]" and "where he was subjected to additional interrogation before finally being told he was under arrest").

The Government argues that Defendant was not in custody by highlighting that the Investigators and other officers were congenial, never raised their voices, did not draw their weapons, allowed Defendant to answer a phone call, and did not place Defendant in handcuffs prior to formally arresting him.  (*See* Gov't's First Omnibus Opp'n 40–42; Gov't's Post-Hr'g Mem. 21–23.)[28]  The Court agrees that the Second Circuit has pointed to the facts that the Government highlights as relevant to the custody analysis, *see*, *e.g.*, *Newton*, 369 F.3d at 676 (noting that "[h]andcuffs are generally recognized as a hallmark of a formal arrest"), but their absence is not dispositive because this Court has been directed to "look at *all the circumstances* surrounding the interrogation," *United States v. Badmus*, 325 F.3d 133, 139 (2d Cir. 2003) (quotation marks and citation omitted) (emphasis added).  The undisputed evidence shows that the Investigators acted to curtail Defendant's freedom of movement to a degree akin to formal arrest at Long Lane, on the drive, and at the Barracks, that they accomplished their objective

---

[28] The Government also claims that Defendant's agreement to go to the Barracks for a further interview and failure to request to drive his own car do not support finding that he was in custody.  (Gov't's First Omnibus Opp'n 41.)  However, Defendant's subjective response to the circumstances he faced is irrelevant to the analysis.  *See Berkemer v. McCarty*, 468 U.S. 420, 422 (1984) ("[T]he only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation."); *FNU LNU*, 653 F.3d at 151 ("[T]he test is . . . objective with respect to the personal attitudes and knowledge of . . . the person questioned.  It depends on how a *reasonable person* in the suspect's position would view the situation." (emphasis in original)).

through subterfuge instead of naked force does not alter that analysis.  *See Newton*, 369 F.3d at 671 ("[W]here a person formerly at liberty is subjected to . . . arrest-like restraints[,] specific coercive pressures need not be proved to establish *Miranda* custody . . . .").

The cases the Government cites in support of its position that Defendant was not in custody are readily distinguishable from the facts present here.  The defendant in *United States v. Badmus* was in his own home when he was questioned, and the agents conducting the search told him that he and his wife could leave at any point if they chose.  *Badmus,* 325 F.3d at 138–39.  Here, the Investigators employed a ruse to draw Defendant from his home for the sole purpose of interviewing him and never informed him that he could leave.  (*See* Hr'g Tr. at 38:10–11; 38:13–17; 57:25–58:4; 71:21–72:17.)  Similarly, in *United States v. Ross*, 719 F.2d 615 (2d Cir. 2003), the defendant was told that he was free to leave while agents searched his restaurant and also told that he could move around the restaurant while the search was conducted if an agent accompanied him.  *Id.* at 622.  In the case at bar, it is undisputed that Defendant was never told he was free to leave or given permission to move about freely, whether or not accompanied by an officer; in fact, the record reflects that from the moment he arrived at Long Lane, one or more officers were near Defendant up until the time he was formally arrested.

Finally, the Government points to *United States v. Lifshitz*, No. 03-CR-572, 2004 WL 2072468 (S.D.N.Y. Sept. 15, 2004), to suggest that the length of Defendant's interrogation may have been insufficient to support finding he was in custody.  *Id.* at *8 (finding that an interview "lasting approximately 45 minutes to one hour" did not support that defendant was in custody).  However, the Court notes that Defendant was questioned for about an hour and a half over the course of the morning, a period which has been found sufficient to support a finding that a defendant was in custody.  *See*, *e.g.*, *United States v. McDow*, 206 F. Supp. 3d 829, 837, 848

(S.D.N.Y. 2016) (finding defendant was in custody during approximately five minute encounter with police where he was detained, searched, and then questioned concerning his possession of illegal drugs); *United States v. Abbas*, 418 F. Supp. 2d 280, 285–86 (W.D.N.Y. 2006) (holding that defendant was in custody during an interrogation that lasted no more than an hour); *Tankleff*, 135 F.3d at 244 (finding defendant was in custody where he was subjected to a two-hour interview both inside a police car and later in a windowless room at a police station).

The Court thus holds that Defendant was in custody from the time he was placed in the Investigators' car until he was formally arrested.

### b.  Interrogation

"[T]he term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response." *Acosta v. Artuz*, 575 F.3d 177, 189 (2d Cir. 2009) (quoting *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980)).  "[W]hile the analysis is properly focused on what the officer objectively should have known to be reasonably likely to elicit an incriminating response, . . . the subjective intent of an officer in asking a question is a relevant, though not conclusive, part of that inquiry." *United States v. Carr*, 63 F. Supp. 3d 226, 238 (E.D.N.Y. 2014) (citing *Innis*, 446 U.S. at 302 and then *Rosa v. McCray*, 396 F.3d 210, 222 (2d Cir. 2005)).  As a "general rule[,] . . . pedigree questioning does not fall under the strictures of *Miranda*."  *Rosa*, 396 F.3d at 221.  Similarly "questions necessary to secure [officers'] own safety or the safety of the public" are not prohibited by *Miranda*.  *Quarles*, 467 U.S. at 658–59.  "[V]olunteered information or spontaneous statements, even if made when an individual is in custody, [also] do not implicate *Miranda*."  *Carr*, 63 F. Supp. 3d at 237.

42

Here, the Government has apparently conceded that Defendant was subject to interrogation. (*See* Gov't's First Omnibus Opp'n 40–42; Gov't's Post-Hr'g Mem. 20–23.) Thus, the Court will not evaluate in detail the questions posed by Hammer throughout the morning of December 19, 2016.[29]

The Court thus holds that Defendant was the subject of an unwarned custodial interrogation from the time that he brought up the Victims in the Investigators' car until he was provided with *Miranda* warnings at the Barracks and that his statements to the Investigators during this period must be suppressed.

### c. Effectiveness of Defendant's *Miranda* Waiver

The Court now turns to the question of whether Defendant's post-*Miranda* statements should also be suppressed. As noted above, Defendant claims that his post-*Miranda* statements must be suppressed because they were a product of a "deliberate, two-step strategy, predicated upon violating *Miranda*" prohibited by the Supreme Court in *Missouri v. Seibert*, 542 U.S. 600 (2004). (*See* Def's Statements Mem. at 15.) *See also Siebert*, 542 U.S. at 610–11 (describing the "question-first practice").

*Seibert* "prohibits police interrogators from intentionally withholding *Miranda* warnings as a tactic to aid in obtaining an incriminating statement, and then re-eliciting the same statement after giving the warnings." *Bracey v. Graham*, No. 16-CV-7919, 2020 WL 12178000, at *30 (S.D.N.Y. Apr. 27, 2020), *report and recommendation adopted*, 2021 WL 4950890 (S.D.N.Y. Oct. 25, 2021). When confronted with this two-step strategy, the Second Circuit has joined the

---

[29] However, several of the officers' questions and Defendant's responses prior to his *Miranda* warnings being read would be admissible because they relate to Defendant's pedigree or to securing officer safety. (*See* Browne Recording at 1:21–22, 1:46–47; Gov't's Interview Recording at 6:45–7:49.)

Eleventh, Fifth, Ninth, Third, and Eight Circuits in adopting Justice Kennedy's approach in his *Siebert* concurrence.  *See United States v. Capers*, 627 F.3d 470, 476 (2d Cir. 2010).  "Under Justice Kennedy's approach, the first question [is] whether law enforcement officers used a 'deliberate two-step strategy' in 'a calculated way to undermine the *Miranda* warning,' . . . and 'to obscure both the practical and legal significance of the admonition when finally given' . . . ."  *Id.* (quoting *Siebert*, 542 U.S. at 620, 622 (Kennedy, J., concurring)).  If a finding is made that officers did engage in such a strategy, the second inquiry is "whether any curative measures were taken 'to ensure that a reasonable person in the suspect's situation would understand the import and effect of the *Miranda* warning and of the *Miranda* waiver.'"  *Id.* (quoting *Siebert*, 542 U.S. at 620 (Kennedy, J., concurring)).

Where a finding has been made that a defendant's "initial statement was obtained in violation of the defendant's *Miranda* rights," "[t]he prosecution bears the burden of disproving by a preponderance of the evidence that the government employed a deliberate two-step strategy to deprive the defendant of the protections afforded by the Fifth Amendment."  *United States v. Moore*, 670 F.3d 222, 229–30 (2d Cir. 2012).  In determining whether the Government has met its burden, the Court must "'review the totality of the objective and subjective evidence surrounding the interrogations,' guided by—but not limited to—the factors identified by the plurality in *Siebert*."  *Id.* at 229 (quoting *Capers*, 627 F.3d at 479).  The factors identified by the *Siebert* plurality include: "(1) 'the completeness and detail of the questions and answers in the first round of interrogation,' (2) 'the overlapping content of the two statements,' (3) 'the timing and setting of the first and second' interrogation, (4) 'the continuity of police personnel,' and (5) 'the degree to which the interrogator's questions treated the second round as continuous with the first.'"  *Capers*, 627 F.3d at 475 (quoting *Siebert*, 542 U.S. at 615 (Souter, J., concurring)).

Even where there is evidence of a deliberate two-step strategy, the Court should consider evidence of any curative measures the Government applied "to ensure that a reasonable person in the suspect's situation would understand the import and effect of the *Miranda* warning and of the *Miranda* waiver." *Moore*, 670 F.3d at 228 (quoting *Siebert*, 542 U.S. at 622 (Kennedy, J., concurring)). Such curative measures may include "(1) 'a substantial break in time and circumstances between the prewarning statement and the Miranda warning['] . . .; [or] (2) 'an additional warning that explains the likely inadmissibility of the prewarning custodial statement.'" *Capers,* 627 F.3d at 476 (quoting *Siebert*, 542 U.S. at 620 (Kennedy, J., concurring)).

Because the Court has found that Defendant's initial statements were obtained in violation of *Miranda*, the Government bears the burden of demonstrating that the Investigators did not engage in a deliberate two-step strategy. *See Moore*, 670 F.3d at 229–30. Evaluating the totality of the evidence and guided by the factors identified by the plurality in *Seibert*, the Court finds that the Government has failed to meet its burden because significant objective and subjective evidence supports the existence of a deliberate strategy. First, the initial questioning by Hammer was systematic and covered a number of topics related to Defendant's relationship with Luna and the other Victims, including Defendant's knowledge of and contacts with Luna, his knowledge of their whereabouts, and his knowledge of their involvement in the drug trade. (Browne Recording at 3:48–24:30; Gov't Browne Tr. at 5:175–32:1145; Def's Browne Tr. at 5:23–34:11.) *See also Seibert*, 542 U.S. at 615 (noting "questioning [that] was systematic, exhaustive, managed with psychological skill" as relevant evidence of a two-step strategy). Second, there was considerable overlap in Defendant's statements during the two interrogations: Hammer again asked Defendant about his relationship to Luna and the other three missing

Victims, his last contacts with Luna, and Luna's relationship to drug trafficking.  (Gov't's Interview Recording at 9:08–1:10:09; Def's Interview Tr. at 40:1–114:5.)  *See United States v. Robinson*, 833 F. Supp. 2d 406, 413 (D. Vt. 2011) (finding partial overlap of statements in both rounds as evidence of a deliberate strategy).  Third, there was complete overlap of personnel, as Hammer questioned Defendant both before and after he was given the *Miranda* warnings.  (*See generally* Browne Recording; Gov't's Interview Recording.)  *Robinson*, 833 F. Supp. at 413 (D. Vt. 2011) (noting that the same officer asked questions during both rounds of interrogation suggested a deliberate strategy).  Fourth, there was only a short lapse of about ten minutes between the two interrogations.  (Browne Recording at 24:30–35:06.)  *See also Capers*, 627 F.3d at 484 (finding gap of ninety minutes between rounds of questioning while Defendant remained in custody was evidence of deliberate strategy).  Finally, once the Investigators began the interview in the police barracks, Hammer stated that they wanted to continue talking about the same topics, (*see* Gov't's Interview Recording at 7:49), and Defendant replied, "I really don't know much more than what I told you," indicating that he believed that Hammer had covered the subjects already, (*id.* at 7:57).  *See also United States v. Barro*, No. 12-CR-160, 2013 WL 3992405, at *6 (E.D.N.Y. Aug. 2, 2013) (noting that "the Second Circuit has read *Seibert* broadly to call for suppression even where there is minimal overlap between the pre-warning and post-warning statements").  The Court therefore finds that the Government has not met its burden to disprove deliberateness.

The Court similarly finds that the Investigators did not employ any measures to cure the issues created by the mid-stream *Miranda* warning.  First, the rounds of questioning were part of one continual process: they occurred only a matter of minutes apart and addressed the same topics.  *See Capers*, 627 F.3d at 484 ("[A]lthough approximately 90 minutes passed between the

first and second interrogations, the two rounds of questioning bracketed one continual process."); *cf. Delesline v. Conway*, 755 F. Supp. 2d 487, 503 (S.D.N.Y. 2010) (finding sixteen-hour break between statement served as curative measure). Second, neither Hammer nor Browne provided an "an additional warning that explain[ed] the likely inadmissibility of the prewarning custodial statement." *Seibert*, 542 U.S. at 622 (Kennedy, J., concurring).[30] In fact, Hammer's statements to Defendant actually downplayed the importance of the *Miranda* warnings: he said, in part, "[w]e have to do this to cover ourselves and cover everybody else," (Gov't's Interview Recording at 7:59) and "[Y]ou could probably recite it to me. . . [S]o we gotta go through that[,]" (*id.* at 8:27).

Thus, the Court finds that Defendant's post-*Miranda* statements should also be suppressed as the product of an interrogation in violation of the Fifth Amendment.

### d.  Spontaneous Statements

The Government asserts that even if Defendant's statements during the interrogations by Hammer and Browne are suppressed due to *Miranda* violations, two of Defendant's statements should still be admitted because they were made spontaneously without any questioning from any officer. (*See* Gov't's First Omnibus Opposition 43; Gov't's Post-Hr'g Mem. 23–26.) Specifically, the Government argues that Defendant's question, "[T]his is about the missing Mexicans, isn't it[?]" should not be suppressed. (*See* Hr'g Tr. at 28:15–24.) The Government also asserts that Defendant's statement on the ride to the courthouse—"fucking Mexicans," — should also be admissible. (*Id.* at 36:10–14; 66:23–67:1.)

---

[30] Defendant has separately claimed that his post-*Miranda* statements should be suppressed because Hammer minimized the importance and impact of the *Miranda* warnings, rendering them ineffective. (*See* Def's Statements Mem. 20–21.) As the Court addresses the sufficiency of those warnings in curing the *Seibert* violation, this claim is not separately considered.

*Miranda* applies to statements that are "the product of interrogation[.]"  *United States v. Colon*, 835 F.2d 27, 31 (2d Cir. 1987).  The term "interrogation" refers to "express questioning and its 'functional equivalent,' including 'any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect.'"  *Id.* at 30 (omission in original) (quoting *Innis*, 446 U.S. at 300-01).  Even where a defendant has invoked his right to counsel or refused to answer officers' questions, a "spontaneous and unsolicited declaration" by a defendant after invoking his *Miranda* rights will not be suppressed.  *United States v. Montana*, 958 F.2d 516, 519 (2d Cir. 1992); *see also United States v. Choudhry*, 24 F. Supp. 3d 273, 280 (E.D.N.Y. 2014) ("If the arrestee begins to spontaneously make statements, no matter how long after or how far from the arrestee's invocation of his right to counsel, those statements will not be suppressed at trial.").  "The Government has the burden of proving by a preponderance of the evidence that a defendant made his statements spontaneously and not as the result of custodial interrogation."  *United States v. Annucci*, No. 06-CR-982, 2007 WL 1310156, at *4 (S.D.N.Y. May 3, 2007) (citing *Anderson*, 929 F.2d at 99).

As to the first statement, the Government argues that Defendant said "this is about the missing Mexicans, isn't it[?]" without any questioning from Hammer or any other officer after Hammer sat down in the car with him.  (Gov't Post-Hr'g Mem. 25.)  As the Government explains events, prior to Defendant's statement, "Hammer had simply told [Defendant] that he wanted to ask [Defendant] questions, but he wanted to do so at the . . . Barracks and not the side of the road.  [Defendant's] statement was immediately preceded by nearly a full minute during which [Defendant] was sitting alone in the [Investigators'] [c]ar while law enforcement officers were talking among themselves outside of his hearing."  (*Id.*)  The Court finds that the record

supports the Government's recounting.  There is no evidence that Hammer or another officer spoke to Defendant, and Defendant himself had brought up the Victims immediately prior to entering the car when he commented to the officers, without any question being posed to him, that Sullivan had "just called me about the, those Mexican guys."  (*See* Browne Recording at 1:25–28; Gov't's Browne Tr. at 2:52.)  Thus, the Government has met its burden to establish that this statement is spontaneous and should not be suppressed.  *See Annucci*, 2007 WL 1310156 at *5–6 (holding that "agents did not solicit or 'lure' [the d]efendant into conversation" and that spontaneous statements made by defendant were admissible as volunteered statements resulting from "a conversation initiated by the [d]efendant").

Defendant concedes that there was no immediate impetus for his statements but argues that he made this statement because of a "series of police-choreographed interrogations by [Sullivan], [Balint], and police . . ., coupled with the multi-agency police presence . . . intentionally prompted [Defendant's] attention to the missing men."  (Def's Post-Hr'g Mem. 17.) However, this argument fails because the relevant inquiry is whether Defendant was responding to any act of interrogation by officers at the scene, not whether he was responding to the entire milieu that he had experienced that day.  The undisputed evidence establishes that none of the officers at the scene had mentioned Luna or the Victims before Defendant himself mentioned them while being patted down.  *See United States v. Colon*, 835 F.2d 27, 30 (2d Cir. 1987) (holding statement was spontaneous where defendant was "not questioned, confronted with evidence, or even encouraged to be honest and tell the facts" by officers before making the statement to them).

As to the second statement, the Government asserts that while in transit to White Plains, Defendant said, "fucking Mexicans" during a lull in small talk with the Investigators.  (Gov't's

Post-Hr'g Mem. 25.)  The Court finds that the Government has also met its burden to establish that Defendant made this statement spontaneously.  The Investigators credibly testified that they stopped questioning Defendant after he invoked his right to counsel and was arrested.  (*See* Hr'g Tr. at 35:9–10; 36:1–5.)  *See also Montana*, 958 F.2d at 519 (holding defendant's statement was spontaneous where "[t]he statement was volunteered . . . [and] made in [] non-threatening surroundings").

Defendant contends that his statement during his trip from the Barracks to the courthouse should be suppressed because it was obtained in violation of his Sixth Amendment right to counsel after that right had attached.  (*See* Def's Statements Mem. 21–23.)  However, a spontaneous statement is admissible regardless of when the defendant's right to counsel attached. *See United States v. Laster*, No. 06-CR-1064, 2007 WL 2872678, at *5 (S.D.N.Y. Sep. 28, 2007) ("A defendant's statements which are spontaneous are not violative of the Sixth Amendment." (citation, quotation marks, and alteration omitted)); *United States v. Escobar*, 842 F. Supp. 1519, 1526 (E.D.N.Y. 1994) ("A defendant must demonstrate that the police and their informant took some action, beyond merely listening, deliberately designed to elicit incriminating remarks." (quoting *Kuhlmann v. Wilson*, 477 U.S. 436, 459 (1986), *abrogated on other grounds* by statute)).

Thus, the Court declines to suppress these statements because the record demonstrates that they were made spontaneously.

### 3.  Sixth Amendment Claims

Defendant argues, in the alternative, that all of his statements made to cooperating witness Sullivan and to the Investigators on the morning of December 19, should be suppressed because they were obtained in violation of Defendant's Sixth Amendment right to counsel or that, at the very least, Defendant's pre-*Miranda* statements should be suppressed for essentially

the same reason.  (*See* Def's Supp'l. Statements Mem. 2–7; Def's Omnibus Reply 6.)  Defendant also argues that his statements should be suppressed because the Government acted in bad faith to violate Defendant's Sixth Amendment rights by interrogating Defendant in the hours before the indictment came in, immediately before his Sixth Amendment right to counsel attached. (Def's Omnibus Reply 3–5.)

The Government responds that Defendant's statements should not be suppressed because his right to counsel did not attach until the indictment was returned, (*see* Gov't's Second Omnibus Opp'n 5–10), which occurred at 12:27 PM, (*see* Comey Letter at 1).  The Government also argues that Defendant has failed to point to any evidence of bad faith on the part of the Government in its questioning Defendant while simultaneously seeking his indictment on December 19.  (*See* Gov't's Second Omnibus Opp'n 10–12.)

### a.  Questioning in Violation of Defendant's Right to Counsel

The Sixth Amendment right to counsel attaches at the initiation of judicial proceedings against a defendant, "whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." *Kirby v. Illinois*, 406 U.S. 682, 689 (1972).  "[T]he clear rule of *Massiah* [*v. United States*, 377 U.S. 201 (1964)] is that once adversary proceedings have commenced against an individual, he has a right to legal representation when the government interrogates him." *Brewer v. Williams*, 430 U.S. 387, 401 (1977).

"'Interrogation' for Sixth Amendment purposes may be defined differently than it is under the Fifth Amendment." *Quintero v. Heath*, No. 10-CV-8709, 2012 WL 4747181, at *9 (S.D.N.Y. Aug. 20, 2012), *report and recommendation adopted*, 2012 WL 4747213 (S.D.N.Y. Oct. 4, 2012).  "For Sixth Amendment purposes, 'interrogation' occurs when law enforcement officers 'deliberately elicit' information from an individual in this absence of counsel after the right has attached." *Id.* (quoting *Massiah*, 377 U.S. at 206 (1964)).

The sequence of events on December 19, 2016 is clear.  Defendant arrived at the Barracks with Hammer and Browne at approximately 11:23 AM.  (*See* Browne Recording at 25:07; Gov't Browne Tr. at 33:1177; Def's Browne Tr. at 35:6–7.)  Defendant was placed in an interrogation room at around 11:29 AM (*see* Browne Recording at 29:18–30:17; Gov't Browne Tr. 33:1196–34:1229; Gov't Interview Recording at 1:56), and the Investigators began interviewing Defendant at 11:33 AM, (*see* Gov't Interview Recording at 6:45; Gov't Browne Tr. at 34:1238–37:1319; Def's Browne Tr. at 35:17–37:18).  Hammer read Defendant his *Miranda* rights at approximately 11:36 AM.  (*See* Gov't Interview Recording at 8:27; Gov't Browne Tr. at 37:1350–55; Def's Browne Tr. at 38:20–39:1.)  The Government alleges that, at approximately 12:15 PM, the grand jury voted a true bill.  (*See* Gov't Second Omnibus Opp'n 6.)  From 12:13–12:23, Hammer and Browne took a break in interrogating Defendant, and Hammer called their superiors to confirm whether Defendant could be arrested.  (*See* Gov't Interview Recording at 46:28–56:24.)  The indictment was returned at 12:27 PM.  (*See* Comey Letter at 1.)[31]  Defendant invoked his right to counsel at 12:35.  (*See* Gov't Interview Recording at 1:08:32.)  The Investigators then asked further questions, some of which Defendant answered. (*Id.* at 1:08:36–1:09:50.)  At 12:37, Defendant repeated that he wanted an attorney.  (*Id.* at 1:09:56.)  After the second invocation, the Investigators informed Defendant at 12:37 PM that he was going to be arrested and arraigned.  (*Id.* at 1:10:06.)[32]

---

[31] In an earlier submission to the Court, the Government had represented that the indictment was not returned until 12:55 PM (*see* Gov't Second Omnibus Opp'n 6; Decl. of Maurene Comey, Esq. in Supp. of Opp'n ("Comey Decl.") (Dkt. No. 305-1)), but revised its account in its May 16, 2022 Letter to the Court, (*see* Comey Letter).

[32] Defendant appears to argue, based on *Massiah*, that his statements to Sullivan and to the Investigators before he was given *Miranda* warnings should be suppressed on the theory that an indictment had already been returned against Defendant when he made those statements. (Def's Supp'l. Statements Mem. 6–7.)  However, because the record is clear that Defendant's

According to the timeline, Defendant was questioned for about ten minutes after his indictment was returned and his right to counsel attached.  However, the Second Circuit has held that "giving an indicted defendant *Miranda* warnings is sufficient to make 'knowing and intelligent' his waiver of the [S]ixth [A]mendment right to counsel, even if the defendant has not been expressly informed of the indictment pending against him."  *United States v. Charria*, 919 F.2d 842, 848 (2d Cir. 1990); *see also United States v. Bing Yi Chen*, 433 F. App'x 14, 15 (2d Cir. 2011) (summary order) ("[E]ven if [the defendant] had been indicted at the time he gave the statements, the law in this jurisdiction does not require that an indicted defendant be given notice of the indictment at the time of questioning."); *United States v. Noorzai*, 545 F. Supp. 2d 346, 355 (S.D.N.Y. 2008) ("The fact that [the defendant] was not advised that he was under arrest or informed that he was under indictment when he was read his *Miranda* rights does not undermine the validity of his Sixth Amendment waiver.").[33]  Defendant's acknowledgement of the *Miranda* warnings and statement that "for now, I'm not gonna ask for a lawyer" were sufficient to waive

---

right to counsel had not attached until several hours after these statements were made, the Court finds this argument unpersuasive.  *See Brewer*, 430 U.S. at 401 ("[T]he clear rule of *Massiah* is that once adversary proceedings have commenced against an individual, he has a right to legal representation when the government interrogates him.").

[33] Defendant cites to *United States v. Brown*, 699 F. 2d 585 (2d. Cir. 1983), in support of the argument that his statements should be suppressed under the Sixth Amendment.  (*See* Def's Supp'l. Statements Mem. 5.)  However, the approach to waiver of the Sixth Amendment right to counsel developed in *Brown* has since been rejected by the Second Circuit based on the Supreme Court's holding in *Patterson v. Illinois*, 487 U.S. 285 (1988).  *See Charria*, 919 F.2d at 847 ("*Patterson*'s pragmatic approach supersedes previous rulings of this circuit which, based on the concept of a hierarchy of constitutional rights, called for a higher 'knowing and intelligent' standard for [S]ixth [A]mendment waivers than for other waivers."); *United States v. Lewis*, 322 F. Supp. 3d 579, 586–87 (M.D. Pa. 2018) ("The Second Circuit has retreated from the *Brown* holding . . . .  In [*Charria*], [the Second Circuit] held that an indicted defendant was given *Miranda* warnings but not informed of an indictment against him could effectively waive his right to counsel. Although *Charria* did not explicitly overrule *Brown*, it did overrule the cases upon which *Brown* relied.").

his right to counsel during the ten-minute period after it had attached, even though Defendant was unaware that there was an indictment being entered against him as he sat speaking to the Investigators.  (*See* Gov't's Interview Recording at 8:19, 9:08.)  Thus, the Court finds that none of Defendant's statements should be suppressed on Sixth Amendment grounds.  *See United States v. James*, No. 02-CR-778, 2005 WL 8161682, at *17 (E.D.N.Y. Nov. 10, 2005) (report and recommendation) ("[B]ased on the evidence presented, . . . [the defendant] was advised of his right to counsel and agreed voluntarily to answer questions.  It was not until the end of the interview that [the defendant] first requested an attorney at which time the questioning ceased. Thus, there is no basis on which to find a violation of [the defendant's] right to counsel as a result of his . . . interrogation by the agents.").

### b.  Pre-Indictment Delay

Defendant also alleges that the Government acted in bad faith on December 19 "to gain tactical advantage, in violation of [Defendant's] Sixth Amendment right."  (Def's Omnibus Reply 3; *see also* Def's Supp'l. Statements Mem. 4 n.3.)[34]  In particular, Defendant argues that the "temporal convergence of [the] culmination of the indictment process and the taking of the statements" raises the possibility that the Government was manipulating the indictment process to extract statements from Defendant before his right to counsel attached.  (Def's Omnibus Reply at 4.)  The Government asserts that it was acting within its lawful discretion to interview

---

[34] Defendant's suspicion appears to be based partly on the Government's earlier representation, (*see* Gov't's Second Omnibus Opp'n 6; Comey Decl.), that the Indictment was returned at 12:55 PM, (*see* Def's Omnibus Reply 4 (asserting that "it was only after [Defendant] asserted his right to silence [at 12:37 PM] that the indictment was actually returned").  The Government has since submitted a letter establishing that the indictment was returned at 12:27 PM. (*See* Comey Letter at 1.)  However, the Court will address Defendant's argument because the primary concern—that the Government was attempting to manipulate the timing of the Indictment for advantage—could arguably still be inferred from the revised timeline of events.

Defendant before his right to counsel attached while simultaneously pursuing the indictment. (Gov't's Second Omnibus Opp'n 10–11.)

Based on Defendant's citation to *United States v. Marion*, 404 U.S. 307 (1971), the Court construes Defendant's argument as a challenge to the validity of the indictment due to pre-indictment delay, a challenge which implicates his Fifth Amendment right to due process, not his Sixth Amendment right to counsel. *Id.* at 324 (explaining that "the Due Process Clause of the Fifth Amendment" requires dismissal of an improperly delayed indictment).[35]

An indictment brought within the statute of limitations is presumed valid. *See United States v. Cornielle*, 171 F.3d 748, 752 (2d Cir. 1999) (noting the statute of limitations is "'the primary guarantee against bringing overly stale criminal charges.'" (quoting *Marion*, 404 U.S. at 322)). A defendant who seeks to challenge an indictment brought within the statute of limitations must prove "both that he suffered actual prejudice because of the alleged pre-indictment delay and that such delay was a course intentionally pursued by the government for an improper purpose." *Id.* (emphasis omitted).

To establish actual prejudice, a defendant must demonstrate the "sort of deprivation that impairs a defendant's right to a fair trial," such as "the loss of documentary evidence or the unavailability of a key witness." *Id.* at 752. "[A] defendant must [also] show how the loss of evidence or unavailability of witnesses is prejudicial, relying on proof that is 'definite and not speculative.'" *United States v. Berry*, No. 20-CR-84, 2021 WL 2665585, at *2 (S.D.N.Y. June 29, 2021) (quoting *United States v. Birney*, 686 F.2d 102, 105–06 (2d Cir. 1982) (citations

---

[35] The Supreme Court has specifically held that the Sixth Amendment right to counsel is not generally implicated by pre-indictment delay, explaining that "the mere 'possibility of prejudice [to a defendant resulting from the passage of time] . . . is not itself sufficient reason to wrench the Sixth Amendment from its proper context.'" *United States v. Gouveia*, 467 U.S. 180, 191 (1984) (alterations in original) (quoting *Marion*, 404 U.S. at 321–22).

omitted)).  To establish improper government conduct, a defendant must show that "the delay was an intentional device to gain [a] tactical advantage over the accused." *Cornielle*, 171 F.3d at 752 (quotation marks and citation omitted) (alteration in original).

The Court finds that Defendant has failed to demonstrate actual prejudice, as he has not established that the delay resulted in the loss of evidence or rendered witnesses unavailable. Defendant argues that "the timing of the grand jury proceedings alone, raise[s] questions of whether the process was manipulated for the sole purpose of obtaining a statement or statements from [Defendant]" and speculates that "if . . . an Assistant United State Attorney was in contact with police during the period between the true bill vote and the return [of the indictment,]" that would be grounds for a finding that Defendant was prejudiced.  (*See* Def's Omnibus Reply 4–5.) However, mere speculation that Defendant has sustained some prejudice is insufficient to show actual prejudice.  *See United States v. Washington*, No. 05-CR-558, 2006 WL 8439748, at *2 (E.D.N.Y. Oct. 27, 2006) (finding no actual prejudice where "defendant merely speculate[d]" as to prejudice resulting from delay).

The Court finds that Defendant has also failed to establish that the Government acted improperly to gain a tactical advantage.  Reviewing the record, it is clear that the Government acted in a calculated fashion to interrogate Defendant without an attorney present in the final moments before his right to counsel attached, but the Government is within its rights to do so. As Judge Cote pointed out in deciding a similar claim in *United States v. Frank*, 8 F. Supp. 2d 284 (S.D.N.Y. 1998), the bright line rule that the Sixth Amendment right to counsel attaches when the indictment is returned provides the Government clear guidance on how to proceed as it brings a prosecution.  *Id.* at 306 (noting that a more complex requirement would "invite utter chaos into the activities of law enforcement personnel, who would be left to guess at what point a

contemplated prosecution had developed such that the Government was at the initiation of formal proceedings." (quotation marks omitted)).

The Indictment was returned while the Investigators were still interviewing Defendant, which supports the inference that there was no intentional delay. Additionally, the somewhat slapdash manner in which the Investigators obtained their interview with Defendant—which this Court has already found violated Defendant's Fifth Amendment rights on a different basis— supports the lack of an intentional plan. Thus, the Court finds that Defendant has failed to establish that the Government acted to intentionally delay the indictment for tactical advantage. *See United States v. Delacruz*, 970 F. Supp. 2d 199, 202 (S.D.N.Y. 2013) (rejecting pre-indictment delay claim where defendant had "not made any showing that the . . . delay was an intentional device designed by the Government to gain a tactical advantage").

C.  Physical Evidence Recovered from December 2016 Warrants

"To be valid under the Fourth Amendment, a search warrant must (1) be based on probable cause, (2) be supported by oath or affirmation, (3) describe with particularity the place to be searched, and (4) describe with particularity the things to be seized." *Green v. City of Mount Vernon*, 96 F. Supp. 3d 263, 286 (S.D.N.Y. 2015) (citing *Groh v. Ramirez*, 540 U.S. 551, 557 (2004)). Defendant disputes the first and fourth elements—that the warrants were based on probable cause and described with particularity the things to be seized. (Def's Physical Evidence Mem. at 5–8; *see also* Def's Omnibus Reply at 6–9.)[36]

---

[36] Defendant does not dispute the second or third elements—i.e., that any of the warrants were supported by oath or affirmation and that Government described with particularity the place to be searched. (*See generally* Def's Physical Evidence Mem.; Def's Omnibus Reply.)

### 1.  Probable Cause

Defendant argues that the First and Second Warrants were not supported by probable cause.  (Def's Physical Evidence Mem. at 5–8; *see also* Def's Omnibus Reply at 6–9.)  "Probable cause for a search exists 'where the known facts and circumstances are sufficient to warrant a [person] of reasonable prudence in the belief that contraband or evidence of a crime will be found.'"  *United States v. Feng Ling Liu*, No. 12-CR-934, 2014 WL 101672, at *3 (S.D.N.Y. Jan. 10, 2014) (alteration in original) (quoting *Ornelas v. United States*, 517 U.S. 690, 696 (1996)).  "[T]he issuance of a warrant by a neutral magistrate, which depends on a finding of probable cause, creates a presumption that it was objectively reasonable for the officers to believe that there was probable cause . . . ."  *Golino v. City of New Haven*, 950 F.2d 864, 870 (2d Cir. 1991) (citation omitted); *see also United States v. Murtaugh*, 382 F. App'x 83, 85 (2d Cir. 2010) (summary order) ("Warrant-based searches are presumptively reasonable."); *Vaher v. Town of Orangetown, N.Y.*, 133 F. Supp. 3d 574, 589 (S.D.N.Y. 2015) (citing *Murtaugh*, 382 F. App'x at 85).  "To rebut that presumption, a [defendant] must make a substantial preliminary showing that the affiant knowingly and intentionally, or with reckless disregard for the truth, made a false statement in his affidavit and that the allegedly false statement was necessary to the finding of probable cause."  *Lynch ex rel. Lynch v. City of Mount Vernon*, 567 F. Supp. 2d 459, 466 (S.D.N.Y. 2008) (citation and quotation marks omitted).

### a.  First Warrant

Defendant claims there the Government's affidavit in support of the First Warrant exhibited several deficiencies.  First, Defendant argues that the affidavit failed to establish the requisite nexus between alleged criminal activity and the Subject Property because the information relied upon was "in great measure vague and temporally remote."  (Def's Physical Evidence Mem. at 5).  However, "[a] showing of nexus does not require direct evidence and may

be based on reasonable inference from the facts presented based on common sense and experience." *United States v. Singh*, 390 F.3d 168, 182 (2d Cir. 2004) (citation and quotation marks omitted).  That is, probable cause "does not demand certainty but only a 'fair probability' that contraband or evidence of a crime will be found." *United States v. Gaskin*, 364 F.3d 438, 457 (2d Cir. 2004) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)).  "Further, courts recognize that experience and training may allow a law enforcement officer to discern probable cause from facts and circumstances where a layman might not." *Id.*

Here, a cooperating witness informed law enforcement officers that a large machine was used to fill in a hole on Defendant's former property, where officers had recently recovered human remains buried.  (*See* First Warrant at 8.)  The cooperating witness also told officers that Defendant took the machine with him when he moved to the Subject Property.  (*See id.*)  Officers then observed large machinery on the Subject Property in plain view.  (*See id.*)  Detective Gorr averred that, based on his experiencing and training, "tools and vehicles used to move or carry remains may contain trace evidence . . . for many months after the human remains have been removed." (*Id.* at 9.)  The Court finds that, based on these facts and the law enforcement officers' experience, there was a fair probability that evidence of the alleged crimes, including tools or machinery and trace evidence, could be found on the Subject Property.

Second, Defendant alleges that the affidavit did not support a finding of probable cause because the statements from Detective Gorr that, based on his training and experience, evidence of the crime could be found at the Subject Property were "essentially one-size-fits-all boilerplate." (Def's Omnibus Reply at 8.)  A warrant may be supported by the expert opinion of law enforcement officials.  *See United States v. Brown*, 676 F. Supp. 2d 220, 228 (S.D.N.Y. 2009) ("[A] Government agent's expert opinion 'is an important factor to be considered by the

judge when making a probable cause determination.'" (quoting *United States v. Benevento*, 836 F.2d 60, 71 (2d. Cir. 1987))); *United States v. Fama*, 758 F.2d 834, 838 (2d Cir. 1985) (noting that "an agent's expert opinion is an important factor to be considered by the judge reviewing a warrant application."). Detective Gorr stated that "based on [his] training, experience, [and] participation in other murder investigations . . . physical evidence such as bodily fluids, including blood, hair, and fibers can be recovered months after the underlying crimes have been completed . . . .[and] that tools used to move or carry human remains may maintain trace evidence . . . for many months after the human remains have been removed." (First Warrant at 9.) The opinion Detective Gorr offered here was not boilerplate and, with the other evidence discussed in the affidavit, directly supported a finding of probable cause to seize tools and machinery at the Subject Property, because it is reasonable to believe that those items could have been used to move or bury the Victims' bodies at Defendant's former property before he moved. *See*, *e.g.*, *Brown*, 758 F.2d at 838 (denying a suppression motion because the court was "entitled to rely on [an agent's expert] opinion, as well as" common sense).[37]

Finally, Defendant argues that the First Warrant did not contain adequate information about the cooperating witness's past reliability or the basis for that knowledge. (*See* Def's

---

[37] The cases Defendant cites in support of his position that an agent's expert opinion can be insufficient to support probable cause are readily distinguishable from the case at bar. *See United States v. Loy*, 191 F.3d 360, 365–67 (3d Cir. 1999) (finding probable cause was not established where agent's expert opinion concerning the general behavior of sex offenders was directly contradicted by defendant's statements in the record); *United States v. Schultz*, 14 F.3d 1093, 1097 (6th Cir. 1994) (holding probable cause had not been established where officer's unsupported assertion was the only piece of evidence linking the premises to be searched to criminal activity); *United States v. Rios*, 881 F. Supp. 772, 775 (D. Conn. 1995) (finding probable cause was not present where agent's expert opinion concerning general practices of drug dealers was the only piece of evidence presented in support of request to search defendant's residence for evidence of drug dealing).

Omnibus Reply at 6–7.)  "[W]hen the warrant is based upon information obtained through the use of a confidential informant, courts assess the information by examining the 'totality of circumstances' bearing upon its reliability."  *United States v. Smith*, 9 F.3d 1007, 1012 (2d Cir. 1993) (citing *Gates*, 462 U.S. at 230-31 and *Rivera v. United States*, 928 F.2d 592, 602 (2d Cir. 1991)).  "The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place."  *Gates*, 462 U.S. at 238.  Defendant does not point to any specific evidence that suggests that the confidential witness's statements should not be credited as reliable, so, taking into account the totality of the circumstances, the Court finds that those statements supported a finding of probable cause.  *See United States v. Barnaby*, No. 18-CR-33, 2021 WL 2895648, at *13 (E.D.N.Y. July 8, 2021) (holding testimony from confidential witnesses corroborated specific details concerning the charged crimes and supported finding of probable cause); *United States v. Gosy*, No. 16-CR-46, 2019 WL 948179, at *8 (W.D.N.Y. Feb. 27, 2019) (determining confidential witnesses' statements supported finding of probable cause where defendant failed to provide evidence that undermined their credibility).

### b.  Second Warrant

Defendant argues that the Second Warrant was not supported by probable cause because law enforcement officers did not investigate the precise type of firearms Defendant legally possessed or whether "the [V]ictims were shot, and if so, the caliber of bullet employed."  (Def's Omnibus Reply at 9; *see also* Def's Physical Evidence Mem. at 7.)  However, officers knew that Defendant was the registered owner of multiple firearms, that he kept firearms at the Subject

Property, and that the medical examiner found projectiles, believed to be bullets, in the skulls of three of the [Victims'] bodies." (*See* Second Warrant at 8–9.)

Based on these facts and the law enforcement officers' experience, there was a fair probability that a firearm potentially used to shoot the Victims could be found at the Subject Property. The probable cause determination is ultimately a "flexible, common-sense" inquiry based on the totality of the circumstances. *Texas v. Brown*, 460 U.S. 730, 742 (1983); *see also United States v. Saipov*, No. 17-CR-722, 2019 WL 3024598, at *4 (S.D.N.Y. July 11, 2019) (same). And, as discussed, a magistrate judge's probable cause determination should be given "great deference." *Gates*, 462 U.S. at 236 (quotation marks and citation omitted). "[S]o long as the magistrate had a 'substantial basis for . . . conclud[ing]' that a search would uncover evidence of wrongdoing, the Fourth Amendment requires no more." *Id.* (alteration in original) (citing *Jones v. United States*, 362 U.S. 257, 271 (1960)). Thus, the Court will not disturb Judge Davison's determination that the Second Warrant was supported by probable cause.

### 2. Particularity

Defendant argues that the First Warrant was "insufficiently particularized" because it "either fail[ed] to limit the items to be seized to those which are evidence of the alleged crimes or entirely fail[ed] to provide adequate guidance to . . . officers," (Def's Physical Evidence Mem. at 7; *see also* Def's Omnibus Reply at 6–8), and "fatally overbroad" because it "required the seizure of virtually anything, regardless of whether or not it was used as an instrument of the alleged offense or contained evidence," (Def's Physical Evidence Mem. at 6). Defendant also claims that the Second Warrant was overbroad because it requested authorization to seize firearms, ammunition, and any related documentation. (*Id.* at 7.)

The Second Circuit has explained that to satisfy the particularity requirement, a warrant must have "three components": (1) "[the] warrant must identify the specific offense for which

the police have established probable cause[,]" (2) it must "describe the place to be searched[,]" and (3) it must "specify the items to be seized by their relation to designated crimes." *United States v. Galpin*, 720 F.3d 436, 445–46 (2d Cir. 2013) (citations and quotation marks omitted); *see also Ulbricht*, 858 F.3d at 101 (explaining that a warrant "plainly satisfies the basic elements of the particularity requirement" where it "lists the charged crimes, describes the place to be searched, and designates the information to be seized in connection with the specified offenses"); *United States v. Levy*, No. 11-CR-62, 2013 WL 664712, at *5 (S.D.N.Y. Feb. 25, 2013) ("By specifically identifying the statutes and conduct that gave rise to the search and seizure, the [] [w]arrant sufficiently identified the suspected crimes for which there was probable cause, and which the materials to be seized evidenced."), *aff'd*, 803 F.3d 120 (2d Cir. 2015). When specifying the items to be seized, a warrant may list particular categories of items to be seized as evidence of the crimes designated in the warrant. *See United States v. Robinson*, No. 16-CR-545, 2018 WL 5928120, at *17 (E.D.N.Y. Nov. 13, 2018) (rejecting particularity challenge to warrant that set out "the particular categories of property to be seized which 'constitute[d] evidence, instrumentalities, contraband or fruits of the Subject Crimes,'" and where the warrant only authorized the seizure of property to the extent that it related to the crimes described in the supporting affidavit).

A warrant is overbroad if its "description of the objects to be seized . . . is broader than can be justified by the probable cause upon which the warrant is based." *Galpin*, 720 F.3d at 446 (citation and quotation marks omitted). However, "the Fourth Amendment does not require a perfect description of the data to be searched and seized." *Fonville v. Yu*, No. 17-CV-7440, 2021 WL 3145930, at *7 (E.D.N.Y. July 26, 2021) (citation and quotation marks omitted). Nor does the Fourth Amendment "require that every item or document to be seized be specifically

identified in the warrant; generic terms may be used to describe the materials to be seized." *Levy*, 2013 WL 664712, at *5. "[T]he particularity requirement is not usually interpreted to mean the officers must be left with no discretion whatsoever . . . ." *United States v. Ukhuebor*, No. 20-MJ-1155, 2021 WL 1062535, at *4–5 (E.D.N.Y. Mar. 19, 2021) (citation and quotation marks omitted). Rather, "[p]articularity concerns arise when a warrant's description of . . . the items to be seized 'is so vague that it fails reasonably to alert executing officers to the limits' of their search and seizure authority." *Levy*, 2013 WL 664712, at *5 (quoting *United States v. Clark*, 638 F.3d 89, 94 (2d Cir. 2011)).

The Court finds that the First Warrant included all of the elements required to comply with the particularity requirement. *See Ulbricht*, 858 F.3d at 101. The First Warrant (1) listed the crime charged—murder in connection with drug trafficking in violation of 21 U.S.C. § 848(e); (2) described in detail the place to be searched—the Subject Property; (3) and described the items to be seized—trace evidence and tools and machinery intended for digging. (*See generally* First Warrant.)

Defendant's overbreadth challenge to the First Warrant also fails. Courts within the Second Circuit have consistently upheld search warrants as not overbroad where they authorize seizure of categories of items related to the subject crimes. *See e.g.*, *United States v. Clark*, 565 F. Supp. 3d 381, 387, 389–90 (W.D.N.Y. 2021) (upholding search warrant that authorized search for "tarps, adult clothing, children's clothing, sneakers, shoes, gasoline, gas cans, bags, gloves, lighters, hair, [and] fiber trace evidence"); *United States v. Moody*, No. 20-CR-6070, 2021 WL 202698, at *9 (W.D.N.Y. Jan. 19, 2021) (concluding that a warrant that "authorized the search for and seizure of specified evidence relevant to drug trafficking, such as, narcotics, drug records, photographs and video tapes depicting individuals involved in narcotics violations, and

bank records" was "precisely the type of warrant that courts routinely uphold against overbreadth challenges"), *report and recommendation adopted*, 2021 WL 1054372 (W.D.N.Y. Mar. 19, 2021).

Finally, Defendant's overbreadth challenge to the Second Warrant is unpersuasive.  Law enforcement officials provided sufficient detail about the categories of items to be seized—firearms, ammunition, and any documentation related to ownership of either of the foregoing categories—based on their knowledge at the time that some of the Victims may have been shot. (*See generally* Second Warrant.)  The Court therefore concludes that the Second Warrant was sufficiently particular and not overbroad.  *See*, *e.g.*, *United States v. Washington*, 48 F.3d 73, 77–78 (2d Cir. 1995) (upholding a warrant which authorized seizure of "[a]ny and all firearms and ammunition used to facilitate and/or protect the illicit drug dealing and records [of] firearms purchases," because the warrant "described with sufficient particularity the criminal instrumentalities to be found at their premises" (second alteration in original)); *United States v. Yusuf*, 461 F.3d 374, 395 (3d Cir. 2006) ("[T]he breadth of items to be searched depends upon the particular factual context of each case and also the information available to the investigating agent that could limit the search at the time the warrant application is given to the magistrate.").

### 3.  Third Warrant

As for the Third Warrant, Defendant argues that, because the "prior warrants were defective, this subsequent warrant was tainted by the two prior illegal searches and constitute the fruits of those illegal searches."  (Def's Physical Evidence Mem. at 8; Def's Omnibus Reply at 9–10.)  However, having found that the First and Second Warrants were both valid, the Court finds that the items seized under the Third Warrant are not the fruits of illegal searches. Thus, finding all three search warrants to be valid, Defendant's Motion To Suppress the physical evidence seized as a result of these searches is denied.

65

### III.  Conclusion

The Court grants Defendant's Motion To Suppress his non-spontaneous statements made after entering the Investigators' car on the morning of December 19, 2016 because those statements were procured in violation of the Fifth Amendment.  The Court denies Defendant's Motion To Suppress his statements based on violations of the Fourth and Sixth Amendments, to suppress the CSLI secured pursuant to the Cell Site Order based on violations of the Fourth Amendment, and to suppress the physical evidence resulting from the December 2016 warrants based on violations of the Fourth Amendment.

SO ORDERED.

Dated:    February 27, 2023
          White Plains, New York

_____
        KENNETH M. KARAS
     United States District Judge

66