

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

*50 Main Street, Suite 1100*
*White Plains, New York 10606*

September 21, 2023

**BY E-MAIL**
<u>*REQUEST TO BE FILED UNDER SEAL*</u>

Honorable Kenneth M. Karas
United States District Judge
Southern District of New York
300 Quarropas Street
White Plains, NY 10601

    Re:    *United States v. Marcos Cruz*, 16 Cr. 832 (KMK)

Dear Judge Karas:

    The Government respectfully submits this letter in advance of the sentencing scheduled for October 3, 2023 in the above-captioned matter to advise the Court of the pertinent facts concerning the assistance that the defendant, Marcos Cruz, has rendered to the Government. In light of these facts, and assuming that the defendant continues to comply with the terms of his cooperation agreement, commit no additional crimes before sentencing, and appear for his sentencing as scheduled, the Government intends to move at sentencing, pursuant to Section 5K1.1 of the Sentencing Guidelines and 18 U.S.C. § 3553(e), that the Court sentence the defendant in light of the factors set forth in Section 5K1.1(a)(1)-(5) of the Guidelines.

## Background

    On April 11, 2016, Martin Luna, Urbano Santiago, Miguel Luna, and Hector Gutierrez were murdered in Orange County by Nicholas Tartaglione, Joseph Biggs, and Gerard Benderoth. Martin Luna was killed because Tartaglione believed Martin Luna had stolen over $200,000 meant for the purchase of cocaine, and the other three victims were killed because they witnessed Martin Luna's murder. Cruz had originally introduced Martin to Tartaglione in 2015 and assisted them in coordinating the purchase, transportation, and sale of cocaine. When a large sum of money meant for the purchase of cocaine went missing in January 2016, Cruz assisted Tartaglione in attempting to locate the money, including by pressuring Martin to repay the money. When those efforts failed, Tartaglione orchestrated a plan with Biggs, Benderoth, and Jason Sullivan (Martin's business partner who invested money in the cocaine venture) to lure Martin to a place where he would be held, beaten, and killed if he failed to return the missing money.

    On the day of the lure, Martin unexpectedly brought the three other men with him, who were killed to prevent them from informing law enforcement about Martin's murder. Tartaglione, Biggs, and Benderoth held all four men captive, and Tartaglione beat Martin repeatedly. When

Martin failed to disclose the location of the missing money, Tartaglione murdered Martin. After Martin was dead, Tartaglione directed Cruz to come identify the other captives, who were still alive. Cruz did so, recognizing the captives as two relatives and a friend of Martin's, and then left. Later that day, Tartaglione, Biggs, and Benderoth murdered the other three captives and put all four victims' bodies into a mass grave on Tartaglione's property in Otisville, New York. The next day, Cruz helped Tartaglione fill in the grave. The four victims remained missing for the next eight months as law enforcement investigated their disappearance.

On December 19, 2016, law enforcement approached Cruz, who agreed to a voluntary interview. During that interview, Cruz initially told a variety of lies claiming he did not know what happened to the victims or where they were. Later during the interview, however, Cruz admitted that he knew where Martin was buried, and he agreed to take investigators to the body. That same day, Cruz led investigators up the side of a mountain on Tartaglione's Otisville property and pointed out where Martin was buried. Federal investigators excavated that same area the next day and found all four victims' bodies.

Later in December 2016, Cruz was appointed counsel and began proffering with the Government. Over the next several weeks, Cruz participated in numerous hours-long proffers during which he admitted to participating in a conspiracy to distribute large amounts of cocaine with Tartaglione and others, and to helping to fill in the grave where Martin Luna was buried. During his first months of proffers, Cruz denied knowing that the other three victims were in the grave that he helped fill in with dirt. He explained that the grave was already partially filled in when he arrived, so he could not see bodies inside, and he insisted that at the time he filled in the grave, Cruz believed the other three victims had been allowed to go back to Mexico after Martin was killed.

On March 3, 2017, Cruz consented to the filing of an Information and pled guilty, pursuant to a cooperation agreement, to Information S2 16 Cr. 832 charging him with: (i) conspiring to distribute and possess with the intent to distribute various controlled substances, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A); and (ii) acting as an accessory after the fact to the murder of Martin Luna, in violation of 18 U.S.C. § 3. Cruz consented to detention that same day and has remained in custody since March 3, 2017.

Following his guilty plea, Cruz continued meeting with the Government, and he eventually admitted that he had lied about how many bodies he understood were in the grave he filled in on Tartaglione's property. Cruz admitted that he knew at the time he filled in the grave that all four victims' bodies were in the hole. Cruz also disclosed certain events surrounding the murders that he had withheld during prior proffers to avoid admitting his knowledge that all four victims were in the grave. After Cruz made these admissions, he agreed to enter a second guilty plea, this time pursuant to a non-cooperation plea agreement, admitting to his role as an accessory after the fact to three additional murders. On September 20, 2019, Cruz pled guilty to Information S7 16 Cr. 832 charging him with: (i) acting as an accessory after the fact to the murder of Urbano Santiago, in violation of 18 U.S.C. § 3; (ii) acting as an accessory after the fact to the murder of Miguel Luna, in violation of 18 U.S.C. § 3; and (iii) acting as an accessory after the fact to the murder of Hector Gutierrez, in violation of 18 U.S.C. § 3.

Despite his failure to be fully forthcoming during the initial phase of his cooperation, Cruz's information proved extremely valuable to the Government. On the very first day he was approached by law enforcement, Cruz led investigators to the grave where the missing victims' bodies were buried, thus ending a months-long search with the recovery of their remains. Cruz then spent the next several months providing the Government with detailed information about the other participants in the cocaine conspiracy and the murders, which allowed the Government to definitively identify Biggs and Benderoth as the other two participants in the killings. Together with other evidence, Cruz's information allowed the Government to arrest Biggs and to attempt to arrest Benderoth (Benderoth committed suicide as the FBI attempted to place him under arrest). This early phase of Cruz's cooperation is all the more remarkable because he voluntarily met with the Government and provided this information before any charges were pending against him.

Although Cruz's decision to withhold information about the deaths of three of the four victims was a serious breach of trust, Cruz ultimately came clean about the full scope of his knowledge. The Government is confident that years before Cruz testified at Tartaglione's trial, he had fully disclosed everything he knew about the victims' murders and was completely forthcoming. In March 2023, as the Court is aware, Cruz testified over three days at Tartaglione's trial for the narcotics conspiracy, kidnappings, and murders of the four victims. Tartaglione was convicted on all counts.

## Personal History and Offense Conduct

A. Personal History

Cruz is 38 years old and was born in Mexico. He dropped out of school in the second grade to work. As a child in Mexico, Cruz worked a variety of jobs, including working in construction, selling clothing, selling food, working on a farm, and working in a factory. When he was about 15 years old, Cruz crossed the border into the United States without documentation. Cruz entered through the desert but was robbed by thieves, after which he had to seek out help from border patrol agents, who took him back to Mexico. On his second attempt, Cruz successfully made it through the desert and over the border at the age of 15.

After entering the country as a teenager, Cruz went to live with his sister in Warwick, New York. Cruz met his wife when he was 18 years old, and they have three children together, all of whom are United States citizens. Neither Cruz nor his wife have legal immigration status in the United States.

Since coming to the United States as a teenager, Cruz has worked at a variety of jobs, including at a car wash, cutting grass, at a factory making stockings, in onion fields, working construction, and at a Burger King. Eventually Cruz worked on a horse farm in Montgomery, New York, where he learned more about caring for horses. Thereafter, Cruz worked at a number of horse farms until he began working for Tartaglione in 2015 on his ranch in Otisville, which consists of several hundred wooded acres. As Tartaglione's employee, Cruz acted as a ranch hand, caring for the many animals Tartaglione kept on his property and handling a variety of projects, such as building and repairing fences. Cruz worked for Tartaglione until Tartaglione's arrest on December

19, 2016, after which Cruz stopped working until he consented to detention in this case on March 3, 2017.

### B. The Offense Conduct

Shortly after Cruz began working on the ranch, Tartaglione asked Cruz if he knew anyone who would be interested in buying a car. Cruz subsequently introduced Tartaglione to Martin Luna, who Cruz knew from the Mexican immigrant community in Middletown and who was interested in buying a car for his daughter. After Martin bought a car from Tartaglione, Martin asked Cruz if Tartaglione would be interested in growing marijuana on his ranch. When Cruz raised the idea, Tartaglione invited Martin to meet and discuss the proposition.

During the summer of 2015, Martin, Tartaglione, and Cruz met two or three times on Tartaglione's ranch to discuss entering into the drug business together. During at least one of those meetings, Martin brought his nephew, Urbano Santiago (who was married to Martin's niece), and Jason Sullivan, who was Martin's partner in a construction business. At the time, Sullivan was living in New York, but he planned to move to Florida in or around the fall of 2015. The group initially discussed growing marijuana on Tartaglione's ranch, but at some point, Martin suggested that instead they purchase and resell cocaine. Tartaglione agreed that if Martin could locate a source of supply and arrange for the sale, he would invest the capital needed for an initial purchase of cocaine.

In or around the fall of 2015, Martin identified a source of cocaine supply in Houston, Texas. After Martin identified the supplier, Tartaglione agreed to invest $200,000 with Martin for the initial purchase of cocaine. The two agreed that the cocaine would be transported from Texas to Florida, where Urbano would sell the cocaine at a higher price. After selling the cocaine in Florida, the proceeds would be transported back to Texas to purchase more cocaine to again resell in Florida. Cruz agreed to be the point of contact between Martin and Tartaglione to coordinate the trips between Texas and Florida. The plan was to continue flipping cocaine to grow Tartaglione's initial investment and generate profits for the whole group.

After Martin and Tartaglione agreed on the terms of the cocaine business, Tartaglione went with Cruz to pick up the cash for the initial investment. Tartaglione provided Cruz with $200,000 in cash and a rental car and directed Cruz to bring the cash and rental car to Martin. Cruz followed those instructions, after which Martin hid the $200,000 inside the rental car and brought the car to Tartaglione's ranch. Tartaglione then directed his brother, Michael Tartaglione, to drive the car to Houston and drop it off in a hotel parking lot. Michael followed those instructions, and Martin flew to Houston, where he picked up the car and used the cash to purchase cocaine.

This trip to Texas for the purchase of cocaine took place in or around December 2015. After purchasing the cocaine using Tartaglione's $200,000 investment, Martin stashed the cocaine back into the same car, which Michael then drove from Texas to Florida. Urbano then picked up the cocaine in Florida and stashed it in Sullivan's new home in Florida. Over the next several weeks, Urbano sold the cocaine, storing the cash from those sales in Sullivan's home.

In January 2016, Urbano finished selling the cocaine and worked with Sullivan to prepare the cash to be transported from Florida to Texas for the purchase of additional cocaine. The cocaine sales had generated approximately $250,000 in total, and Sullivan added in his own additional investment of about $11,000 as well. Sullivan and Urbano hid the cash inside the spare tire of a car, which Michael then drove from Florida to Texas. Martin flew from New York to Texas, where he picked up the cash, which he told Cruz he planned to use for the purchase of more cocaine.

Later that night, Martin called Cruz and Sullivan separately. During those calls, Martin claimed that he had been robbed and that all of the money—the $250,000 in profits from cocaine sales and Sullivan's $11,000 investment—was gone. Cruz immediately told Tartaglione, who was enraged at the loss of his investment. Tartaglione insisted that Martin must find the missing money and repay Tartaglione.

Over the next several weeks, Tartaglione engaged in an escalating campaign to pressure Martin to repay the missing money. At first, Tartaglione apparently believed that Martin had in fact been robbed and worked with Martin to try to locate the people who had stolen the money. For example, Tartaglione paid for Martin and Cruz to visit a private investigator to look for the people Martin claimed had stolen the money; and Tartaglione paid for Martin and Urbano to drive back to Texas to look for the people who had supposedly stolen the money. When those efforts did not turn up the missing money, Tartaglione insisted that Martin provide partial repayment by giving Tartaglione three cars Martin owned.

Around this same time, Tartaglione asked Biggs to assist in questioning Martin about the missing money and pressuring Martin to return the money. Biggs agreed, and Cruz brought Biggs to meet with Martin on multiple occasions, during which Biggs questioned Martin about the missing money and threatened to harm Martin if he did not return the money. Despite Biggs's threats, Martin insisted he did not know where the money was.

Around mid-February 2016, Martin stopped answering calls from Cruz, Tartaglione, and Biggs and avoided contact with them. Tartaglione came to believe that Martin had stolen the money for himself and switched tactics to hunt Martin down to force him to return the money. In furtherance of this goal, Tartaglione asked Benderoth to work with Biggs to find Martin. Cruz brought Benderoth and Biggs to look for Martin on one occasion, but they could not locate him. Thereafter, on multiple occasions in February and March 2016, Biggs and Benderoth surveilled Martin's home in Middletown and searched for Martin, but they were unable to find him.

At some point during the efforts to locate Martin, Tartaglione told Cruz that he had spoken with Sullivan, who was still living in Florida, and learned that Sullivan had also invested money with Martin that had been stolen. Tartaglione and Sullivan agreed to work together to confront Martin about the missing money. Sullivan was still in touch with Martin because they still worked together in their construction business and Martin had promised to repay Sullivan through their construction work. As a result, Sullivan learned that Martin had traveled to Mexico to visit his sick mother in March 2016 but was expected to return in April 2016.

5

Tartaglione told Cruz that he and Sullivan came up with a plan to trick Martin into going to a bar in Chester, New York called the Likquid Lounge, which was owned by his brother Michael Tartaglione. There, Tartaglione could trap Martin and confront him about the missing money. Sullivan agreed to send Martin on a fake construction estimate for their company. Martin would believe he was showing up to complete the estimate, when in fact Tartaglione would be waiting for him. Tartaglione told Cruz he planned to grab Martin and force him to return the money. If Martin failed to return the money, Tartaglione planned to kill Martin. Tartaglione recruited Biggs and Benderoth to help in this plan by joining Tartaglione to confront Martin at the location of the fake estimate. Cruz asked if he should also be present and participate in this plan, but Tartaglione told Cruz that he was not needed and that Martin might recognize Cruz's car if Cruz was at the location of the lure.

On April 11, 2016, the plan went into motion. That morning, Cruz saw Tartaglione leave the Otisville ranch. As he left, Tartaglione told Cruz he was going to see Martin, leading Cruz to understand that Tartaglione planned to trap and confront Martin that same day. Tartaglione then met Biggs and Benderoth at the bar in Chester. Once at the bar, Tartaglione blocked the emergency exit, and the three agreed on their plan to grab Martin, restrain him, and force him to return the missing money. Tartaglione then left the bar so that Martin would not see and recognize his car upon arriving. Sullivan spoke on the phone with Martin to confirm he was heading to the final estimate, and Sullivan spoke with Biggs on the phone to inform him that Martin was on the way.

Because Martin believed he was just going to an ordinary construction estimate and did not know he was walking into a trap, he brought two family members and a close friend with him that day. Martin's nephew Urbano, his nephew Miguel, and his friend Hector all joined Martin for this estimate on April 11, 2016. They drove together in one car, parked nearby, and then walked over to the bar.

Surveillance video shows that a few minutes after parking their car, all four victims entered the Likquid Lounge. When the four arrived at the Likquid Lounge, Biggs and Benderoth were waiting for them. Because Benderoth had never met Martin face-to-face, he lured the victims into the bar. Once they were inside, Biggs and Benderoth held the victims at gunpoint, bound their hands with duct tape, and held them captive. While Urbano, Miguel, and Hector were kept in the bar's office, Benderoth placed Martin in a chair from the bar's office and wheeled him into the men's bathroom.

A few minutes later, Tartaglione arrived at the bar. Biggs and Benderoth showed Tartaglione the three extra people in the office who had unexpectedly accompanied Martin. After seeing that those three were bound, Tartaglione then went to Martin in the bathroom. Over the next two hours or so, Tartaglione beat Martin while demanding to know where the missing money was. At some point, Tartaglione brought one of Martin's nephews from the office into the bathroom to watch as his uncle continued to be beaten. When all of these efforts failed to produce the location of the missing money, Tartaglione put a plastic zip tie around Martin's neck and pulled it tight until Martin choked to death and fell off the chair. Martin collapsed in a pool of his own blood and died on a bathroom floor in front of his nephew.

After Martin died, Tartaglione retrieved a blue tarp from his car, Benderoth and Tartaglione wrapped Martin's body in the tarp, and Biggs used a mop to clean up Martin's blood. Around this time, Tartaglione called Cruz and asked him to come to the Likquid Lounge. At about 5:42 pm, Cruz arrived at the Likquid Lounge. When Cruz arrived, he saw Martin's body was laying on the floor of the bar wrapped in a tarp. Tartaglione took Cruz to look at the two victims in the office and identify them. Cruz informed Tartaglione that they were a nephew and friend of Martin's, and Cruz also saw a second nephew of Martin's in the bathroom. After Cruz identified the captives, Tartaglione asked Cruz whether he wanted to take the three still-living victims home. Cruz told Tartaglione, in substance, no because they would just call the police.

At around 5:45 pm, Tartaglione left the bar, turned his car around, re-parked the car so that the rear faced the bar, and reentered the bar. At about 6:00 pm, Biggs and Tartaglione carried Martin's wrapped body out of the bar and placed it into the back of Tartaglione's Ford Explorer, and at approximately 6:10 pm, Tartaglione permitted Cruz to leave the bar in order to go work on a different ranch where he was expected.

Tartaglione drove Martin's body to his ranch in Otisville. At about 6:15 pm, Benderoth left the Likquid Lounge, got in his suburban, and drove to the back entrance of the Likquid Lounge. Biggs and Benderoth then ushered the remaining three victims, whose hands were still bound, out of the bar's back entrance and forced them to enter the suburban at gunpoint. At about 6:30 pm, Benderoth drove with Urbano, Miguel, Hector, and Biggs to Tartaglione's ranch. They met Tartaglione at a wooded area of his ranch on the side of a mountain.

Once the suburban arrived and parked behind Tartaglione's Ford Explorer, Benderoth got out and spoke with Tartaglione. After Benderoth and Tartaglione finished speaking, they opened the car doors, letting Biggs out and instructing Urbano, Miguel, and Hector to exit the Suburban. While Benderoth held them at gunpoint, the three victims, whose hands were still bound, walked a short distance from the car and kneeled to the ground in the middle of the woods. Benderoth then presented Biggs with a black revolver and instructed him to kill one of the victims, telling Biggs that he could "either leave with us or stay with them." Biggs took the gun from Benderoth and fired a single shot into the back of one victim's head, killing him instantly. Immediately after Biggs killed the first of the three kneeling men, Tartaglione took the gun from Biggs's hand. Tartaglione then shot the second kneeling man, and Benderoth shot the third. Urbano, Miguel, and Hector died on their knees with their hands bound in the middle of the woods.

Tartaglione then used a backhoe that he kept on his property to dig a hole near the victims' bodies. After the hole was several feet deep and wide, the backhoe broke and was no longer able to lift dirt. Tartaglione, Biggs, and Benderoth then threw the four victims' bodies into the hole. Tartaglione and Biggs used shovels to fill in the hole by hand until the bodies were covered but the hole was not completely filled in.

Tartaglione, Biggs, and Benderoth then went to the bottom of the mountain on Tartaglione's property, where Tartaglione burned the victims' wallets and cellphones in a furnace. Tartaglione then instructed Biggs and Benderoth to take the car key they had recovered from the victims, pick up Cruz at Cruz's house, and search for the victims' car at the bar in Chester.

Following those instructions, Biggs and Benderoth picked Cruz up in Benderoth's car and drove to the bar in Chester, where they used the key fob to search for the car in the bar parking lot. As it turned out, the victims had gotten lost when arriving at the bar and parked in a nearby business's parking lot, so Biggs, Benderoth, and Cruz were unable to locate the car when they only looked for it around the bar. Biggs and Benderoth then dropped Cruz off at home and returned to Tartaglione's ranch, where Tartaglione threw the victims' car key into the furnace. Tartaglione, Biggs, and Benderoth agreed not to tell anyone what had happened, after which Benderoth and Biggs drove back to their homes.

That night, Tartaglione called Cruz and instructed him to come to the ranch alone the next morning. The next morning, Cruz went to the ranch, where Tartaglione told him to fill in the mass grave on the side of the mountain. Cruz did as he was told and filled in the hole by hand. Tartaglione then rented a bulldozer to finish filling in the hole. Tartaglione told Cruz how the four victims had died and instructed Cruz that if anyone asked questions, Cruz should say the four victims went back to Mexico.

After Martin, Urbano, Miguel, and Hector had been missing for several days, their family members filed a missing persons report with local police, who eventually referred the case to the Federal Bureau of Investigation's Hudson Valley Safe Streets Task Force. On December 19, 2016, law enforcement approached Cruz, who ultimately agreed to lead investigators to the grave on Tartaglione's Otisville property. The next day, investigators dug up the grave and found the bodies of Martin Luna, Urbano Santiago, Miguel Luna, and Hector Gutierrez.

C. Other Criminal Conduct

In addition to his participation in the cocaine conspiracy and his role as accessory after the fact to the murders of Martin Luna, Urbano Santiago, Miguel Luna, and Hector Gutierrez, Cruz has also committed a handful of less serious crimes in his life. That additional criminal conduct is summarized below. With the exception of Cruz's illegal entry into the United States, driving without a license, and undocumented employment in this country, the Government was unaware of all of the other criminal conduct described in this section until Cruz disclosed it during proffers.

As described above, Cruz attempted to illegally enter the United States twice: first unsuccessfully and then successfully, both when he was 15 years old. On several occasions after entering this country, Cruz used false identification documents to obtain work. Cruz also leant those false documents to a friend to use when seeking employment at least once. Cruz paid taxes when he worked at the onion fields and at one of the horse farms, but otherwise he has not paid taxes on any of his income. Cruz has smoked marijuana a handful of times, has previously been to a brothel where he paid adult women to have sex with him, and has driven repeatedly without a license.

## Cruz's Assistance and Analysis of Section 5K1.1 Factors

Cruz's decision to cooperate immediately after being approached by federal law enforcement provided vital assistance to the Government. Before he admitted to his involvement in the cocaine conspiracy and filling in the mass grave, the Government did not know anywhere near the full scope of Cruz's involvement in those crimes. Although law enforcement had gathered some evidence implicating Cruz in criminal activity, the Government did not learn all the details of Cruz's role until he disclosed them during his interview and subsequent proffers.

Cruz's willingness to admit to his role in a cocaine conspiracy and in covering up a gruesome murder without any pending charges against him provided crucial assistance to the Government's investigation. In particular, Cruz's assistance led to the discovery of the mass grave, the attempted arrest of Gerard Benderoth, and the arrest of Joseph Biggs. Although it is possible that the Government would have found the victims' bodies without Cruz's cooperation, the Government almost certainly could not have arrested Benderoth or Biggs without Cruz's assistance.

Cruz's initial decision to minimize his culpability by withholding information about everything he knew surrounding the victims' murders almost derailed his cooperation. Despite those missteps, Cruz ultimately admitted everything he knew and did so long before his testimony at trial. To his credit, Cruz ultimately accepted full responsibility for his role in covering up all four victims' murders, and he pled guilty to three additional crimes with the understanding that the Government would ask the Court to impose sentence for those offenses without regard to the factors in U.S.S.G. § 5K1.1.

Because Cruz fully admitted everything he knew and did, the Government felt comfortable calling him to testify at Tartaglione's trial. As a result, Cruz provided substantial assistance through both his proffers and his trial testimony against Tartaglione. Cruz spent many hours preparing his testimony and withstood aggressive cross-examination on the witness stand. As the Court saw firsthand, reliving the events surrounding the victims' murders was excruciating for Cruz, who vomited every time he recounted what he witnessed, including while testifying at trial. Nevertheless, Cruz pushed through the physical difficulty of reliving these events and provided a truthful account both during multiple prep sessions and at trial. Through his truthful and detailed testimony, Cruz assisted the Government in obtaining a conviction of Tartaglione on all counts at trial.

Given the breadth of Cruz's assistance, the Government believes that he has satisfied the factors outlined in Section 5K1.1 of the Guidelines. Accordingly, the Government respectfully requests that the Court take those factors into account when imposing sentence on the charges contained in the S2 Information (namely, the cocaine conspiracy and accessory after the fact to Martin Luna's murder). Because Cruz did not admit to the three crimes contained in the S7 Information (namely, accessory after the fact to the murders of Urbano Santiago, Miguel Luna, and Hector Gutierrez) until after he had already entered into a cooperation agreement, the Government does not ask the Court to apply the 5K1.1 factors when imposing sentence for those three crimes.

### 1. "[S]ignificance and usefulness" of assistance (Section 5K1.1.(a)(1))

Cruz's cooperation was extremely significant and useful to the Government in three different respects.

First, during his voluntary interview on December 19, 2016, Cruz ultimately agreed to take law enforcement to the location of Martin Luna's body. Cruz did so despite genuine fears that he would be killed for betraying Tartaglione and revealing the location of the grave. Indeed, immediately after leading investigators to the gravesite, Cruz told the investigators that they could kill him. Although law enforcement had already obtained a warrant to search Tartaglione's Otisville property by December 19, 2016, investigators did not know for certain whether the victims were buried on the property or where their remains might be. Cruz's assistance focused the search on the particular area of the large property that contained the gravesite, thus expediting the search efforts.

Second, the information Cruz provided during his proffer sessions strengthened the Government's case against Tartaglione and contained other avenues of investigation that allowed the Government to continue to identify participants in the kidnappings and murders. Cruz's information filled in substantial gaps in the Government's understanding of the events surrounding the victims' murders, including what happened inside the Likquid Lounge on April 11, 2016. Indeed, Cruz was the first person who had been inside the Likquid Lounge on the day of the murders who provided information to the Government. As a result, Cruz provided vital insights to the victims' final hours, including details about how they were restrained and the timings of their deaths. Cruz also provided additional details about the operation of the cocaine conspiracy and identified Biggs and Benderoth as participants in the scheme to force Martin to return the money and, ultimately, the kidnappings and murders of all four victims. In addition to providing all of this information, Cruz also consented to the search of his personal cellphone, which contained corroborating evidence of both the cocaine conspiracy and the kidnappings.

Cruz's information not only strengthened the Government's evidence against Tartaglione, but it also helped the Government build sufficient evidence to arrest both Biggs and Benderoth for their roles in the kidnappings and murders. Although Benderoth killed himself before law enforcement could apprehend him, Cruz's information nevertheless allowed the Government to identify Benderoth as a key participant in the murders. Cruz's information, together with other evidence, also allowed the Government to successfully arrest Biggs. Indeed, had Cruz not cooperated, it is highly unlikely that the Government ever could have charged Biggs.

Third, Cruz provided important testimony at Tartaglione's trial that detailed the operation of the cocaine conspiracy, Tartaglione's many efforts to recover the missing drug money, Tartaglione's plan to kidnap Martin, the kidnappings and murders on April 11, 2016, and the efforts to cover up the murders thereafter. Throughout his testimony, Cruz credibly testified on both direct and cross-examination about his involvement in the murders as well as other crimes he had committed in his life, never minimizing what he had done and accepting responsibility in front of the jury. Cruz did so even when the subject matter of his testimony made him physically ill and caused him to vomit repeatedly. Despite that physical challenge, Cruz never asked for a break and

10

pushed through to deliver his testimony honestly and thoroughly. As evidenced by the swift verdict, the jury found Cruz (and the Government's other witnesses) highly credible.

### 2. "[T]ruthfulness, completeness, and reliability" of information and testimony (Section 5K1.1(a)(2))

As the Court knows from Cruz's testimony during Tartaglione's trial, Cruz lied repeatedly during his initial voluntary interview on December 19, 2016 and continued to mislead the Government about the full scope of his criminal culpability for months. Cruz's initial lies during his voluntary interview are understandable: Cruz was genuinely terrified that he would be killed if he told the truth, and Tartaglione had specifically instructed Cruz to lie if questioned by law enforcement. After Cruz began proffering and it became clear that the federal investigators posed no threat to him, however, Cruz should have been fully forthcoming. At that point, though, Cruz's motives shifted from fear of death to fear of prison.

In an effort to minimize his own culpability and potential exposure, Cruz came up with the misguided idea to claim that he only believed Martin Luna's body was in the grave when Cruz filled it in with dirt. To make this false story convincing, Cruz had to withhold pieces of information that would otherwise make clear Cruz must have known all four victims were in the grave. Cruz lied and said he did not leave his home again on the night of April 11, 2016, when in fact he went with Biggs and Benderoth to look for the victims' car in the parking lot of the Likquid Lounge. Cruz also lied and said Tartaglione never told him how the victims died, when in fact Tartaglione told him that Tartaglione strangled Martin with a ziptie, Tartaglione shot one of the other victims, Biggs shot another one of the victims, and Benderoth shot the fourth victim. Cruz also withheld the details of the conversation he had with Tartaglione at the bar during which Tartaglione asked if Cruz wanted to take the three still-living captives home and Cruz refused because they would call the police.

Cruz stuck with this incomplete story until the Government confronted him in or about December 2017 by demanding that he explain where he went on the night of April 11, 2016 and tell the Government anything else that he had held back.[1] In response, Cruz came clean about all of his lies and admitted the full scope of his knowledge and culpability.

Although Cruz provided a wealth of other, truthful information about the cocaine conspiracy, kidnappings, and murders during his earlier proffers, his lies to minimize his culpability withheld very important details of the crimes. As a result, Cruz's cooperation was somewhat less impactful than it otherwise could have been if he had been fully forthcoming during his first few months of proffers. Had Cruz been fully truthful from the start, the Government would have had a fuller understanding of the crimes, and Cruz would have been an even more valuable witness. Fortunately, Cruz ultimately admitted everything he knew and accepted responsibility for the full scope of his conduct well in advance of Tartaglione's trial. Given his

---

[1] Although the Government did not disclose the basis for this inquiry to Cruz or his counsel, this question was prompted by information Joseph Biggs provided the Government during his first proffer in December 2017.

11

decision to come clean, as well as the ample corroboration the Government identified to support Cruz's entire account, the Government ultimately felt comfortable that Cruz would provide complete and truthful testimony if called as a witness.

Over the course of six years, Cruz met with the Government for dozens of proffers, many of which lasted multiple hours, and most of which induced Cruz to vomit when recalling the details of what he witnessed. With the exception of the above-described lies to minimize his own culpability during his first few months of proffers, Cruz provided truthful, complete, and reliable information about the cocaine conspiracy, the plan to kidnap Martin, and what he knew of the victims' murders. In addition, Cruz detailed his own participation in the victims' disappearance and other crimes for which he had not been previously charged. That included information that the Government did not know before Cruz disclosed it during proffers. As discussed above, the Government was unaware of the majority of Cruz's past uncharged criminal conduct before he admitted to it during proffers. Similarly, although the Government had evidence of Cruz's involvement in the cocaine conspiracy and his role as an accessory after the fact, the Government did not know the details of Cruz's role in those offenses. Cruz's willingness to implicate himself in these crimes demonstrates his complete candor and reliability throughout the cooperation process.

Most notably, Cruz led investigators to the grave site and attended many hours of proffers implicating himself in serious crimes prior to facing any federal charges. The Government did not have sufficient evidence to charge Cruz with any offense before his voluntary interview on December 19, 2016. Cruz's willingness to implicate himself in a variety of very serious crimes before ever being charged demonstrate his candor. The Government also gained confidence in Cruz's credibility after he admitted his prior lies because he was corroborated by phone records, hotel records, cellphone location data, surveillance video, and other witnesses, among other pieces of evidence.

For all of these reasons, the Government assesses that all of Cruz's proffer statements after December 2017 and trial testimony were truthful, complete, and reliable.

### 3. "[N]ature and extent" of assistance (Section 5K1.1(a)(3))

In addition to voluntarily speaking with law enforcement on December 19, 2016 and leading them to the mass grave that same day, Cruz met with prosecutors and law enforcement agents on 37 occasions either to provide information during proffer sessions or to prepare for his testimony at Tartaglione's trial. During these meetings, many of which lasted multiple hours, Cruz recounted every detail he knew about the cocaine conspiracy, kidnappings, murders, and efforts to coverup the murders. As referenced above, Cruz frequently became physically ill and vomited during these meetings as he recounted emotionally fraught and disturbing details of what he witnessed. Cruz's detailed information proved exceptionally useful to the Government, which used his information—together with other evidence—to obtain additional search warrants, to attempt to arrest Benderoth, to arrest Biggs, and to obtain a superseding indictment bringing additional charges against Tartaglione.

Cruz thereafter testified over the course of three days at Tartaglione's trial, providing the jury with critical insight into how Tartaglione and Martin met, the cocaine conspiracy, Tartaglione's various efforts to recover the missing money, the kidnapping scheme, some of the events inside the bar on April 11, 2016, the burial of the four victims on Tartaglione's property, and Tartaglione's admission detailing how each victim died. Cruz's cooperation was thus extensive in time and in substance. In terms of time, Cruz spent dozens of hours over six years with prosecutors assisting their investigation and trial preparation. In terms of substance, Cruz provided crucial details that significantly advanced the Government's investigation and essential information that provided devastating proof of Tartaglione's guilt to the jury at trial.

### 4. "[A]ny injury suffered, or any danger or risk of injury to the defendant or her family" resulting from assistance (Section 5K1.1(a)(4))

Cruz's initial decision to cooperate came at great risk to himself and his family. Tartaglione made multiple statements to Cruz throughout their interactions suggesting that he had deep connections to law enforcement, and Cruz knew that Tartaglione had executed three of the victims in this case simply because they witnessed Martin's murder. Those events reasonably led Cruz to deeply fear that he would be killed if he cooperated against Tartaglione. As referenced above and in Cruz's trial testimony, Cruz genuinely believed that the investigators were going to shoot and kill him after he led them to the gravesite. Cruz showed tremendous courage when he elected to cooperate, despite his deep fears of retaliation.

### 5. "[T]imeliness" of assistance (Section 5K1.1(a)(5))

Cruz's cooperation was notably timely because he agreed to assist law enforcement before any charges were filed against him. When investigators working on the Government's federal investigation approached Cruz on December 19, 2016, Cruz began to provide truthful information to the investigators prior to facing any charges. He then continued to provide information in the following weeks while still not facing any charges. Thus, before facing any charges, Cruz provided extensive information that significantly contributed to the Government's ability to locate the victims' remains, obtain additional search warrants, attempt to arrest Benderoth, arrest Biggs, and obtain a superseding indictment adding charges against Tartaglione.

### Conclusion

For the reasons set forth above, the Government respectfully submits that Marcos Cruz provided significant and useful assistance to the Government. In light of the information set forth above, and assuming the defendant's continued compliance with the terms of his cooperation agreement, the Government intends to move at sentencing, pursuant to Section 5K1.1 of the Sentencing Guidelines, that the Court sentence Marcos Cruz for the offenses contained in the S2 Information according to the facts stated above and the factors set forth in Section 5K1.1(a)(1)-(5) of the Sentencing Guidelines. The Government further intends to move, pursuant to 18 U.S.C. § 3553(e), that the Court sentence Cruz without regard to the otherwise applicable mandatory minimum sentence for Count One of the S2 Information.

Because of the sensitive nature of the information contained in this letter, the Government respectfully requests that it be filed **under seal**.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By: _____
Maurene Comey
Jacob R. Fiddelman
Assistant United States Attorneys
(212) 637-2324

cc: Domenick Porco, Esq. (by email)