

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

*50 Main Street, Suite 1100*
*White Plains, New York 10606*

December 1, 2023

**BY E-MAIL**

Honorable Kenneth M. Karas
United States District Judge
Southern District of New York
300 Quarropas Street
White Plains, NY 10601

   Re: *United States v. Jason Sullivan*, S5 16 Cr. 832 (KMK)

Dear Judge Karas:

  The Government respectfully submits this letter in advance of the sentencing scheduled for December 14, 2023 in the above-captioned matter to advise the Court of the pertinent facts concerning the assistance that the defendant Jason Sullivan has rendered to the Government. In light of these facts, and assuming that the defendant continues to comply with the terms of his cooperation agreement, commits no additional crimes before sentencing, and appears for his sentencing as scheduled, the Government intends to move at sentencing, pursuant to Section 5K1.1 of the Sentencing Guidelines and 18 U.S.C. § 3553(e), that the Court sentence the defendant in light of the factors set forth in Section 5K1.1(a)(1)-(5) of the Guidelines.

### Background

  On April 11, 2016, Martin Luna, Urbano Santiago, Miguel Luna, and Hector Gutierrez were murdered in Orange County by Nicholas Tartaglione, Joseph Biggs, and Gerard Benderoth. Martin Luna was killed because Tartaglione believed Martin had stolen over $200,000 meant for the purchase of cocaine, and the other three victims were killed because they witnessed Martin's murder. Sullivan had invested several thousand dollars in the cocaine transaction, and at Tartaglione's direction, he lured Martin to a place where he would be held, beaten, and possibly killed. Unbeknownst to Sullivan, Martin brought the three other men with him, who were then killed to prevent them from informing law enforcement about Martin's murder. The four victims remained missing for the next eight months as law enforcement investigated their disappearance.

  On December 6, 2016, law enforcement approached Sullivan at his home in Florida, and Sullivan agreed to a voluntary interview. During that interview, Sullivan confessed to participating in a conspiracy to distribute more than five kilograms of cocaine and admitted to having information about the disappearance of the four victims. The next day, Sullivan voluntarily flew with FBI agents to New York, was appointed counsel, and began proffering with our Office. Over the next week, Sullivan participated in numerous hours-long proffers during which he admitted to

participating in a kidnapping plot with Tartaglione, which ultimately led to the deaths of the four victims.

Sullivan's cooperation provided a major break in the Government's investigation because he was the first participant in the kidnappings to provide truthful information about the victims' disappearance. Based on Sullivan's information, together with other pieces of evidence gathered in the investigation over the prior eight months, in December 2016, the Government obtained multiple search warrants and an indictment charging Nicholas Tartaglione with narcotics conspiracy and the murders of the four victims. The significance of Sullivan's cooperation is all the more remarkable because he voluntarily cooperated and admitted to his role in the kidnappings before any charges were pending against him.

On December 16, 2016, Sullivan consented to the filing of an Information charging him with narcotics conspiracy, in violation of 21 U.S.C. §§ 846, 841(b)(1)(A), and consented to detention. He has been detained since that day. On June 25, 2019, Sullivan pled guilty to a four-count information charging him with: (i) conspiring to distribute and possess with the intent to distribute various controlled substances, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A); (ii) conspiring to kidnap Martin Luna, in violation of 18 U.S.C. § 1201(c); (iii) kidnapping Martin Luna with death resulting, in violation of 18 U.S.C. § 1201(a)(1); and (iv) the Travel Act murder of Martin Luna, in violation of 18 U.S.C. § 1952. In March 2023, as the Court is aware, Sullivan testified at Tartaglione's trial for the narcotics conspiracy, kidnappings, and murders of the four victims. Tartaglione was convicted on all counts.

## Personal History and Offense Conduct

A. Personal History

Sullivan is fifty years old and married. He has two adult daughters, the younger of whom was in high school when Sullivan first began cooperating in this case. As a child, Sullivan was a ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ Around the age of eighteen, Sullivan began using steroids and training as a body builder. Over the next several years, he bounced around jobs—some legal and some illegal. His legal jobs included working as a stripper in the 1990s, and managing a strip club, also in the 1990s. In the 2000s, Sullivan transitioned into working construction, eventually opening his own construction company in Orange County, New York, which he continued to operate until his arrest on the instant case in December 2016. In 2015, Sullivan moved with his wife and younger daughter to Florida, where he remotely ran his construction business.

B. The Offense Conduct

In or about December 2015, Sullivan participated in a conspiracy to distribute more than five kilograms of cocaine, together with Martin Luna, Urbano Santiago, Tartaglione, and Marcos Cruz (a day laborer who worked for Tartaglione). As part of that conspiracy, Tartaglione provided approximately $200,000 in cash to Martin Luna for the purchase of cocaine. The plan was for Martin to use his connections to a Mexican cartel to purchase several kilograms of cocaine with the cash in Texas. Martin's nephew, Urbano Santiago, would then sell the drugs in Florida. The

plan was to continue flipping cocaine to grow Tartaglione's initial investment and generate profits for the whole group.

Cruz initially introduced Martin to Tartaglione and attended the first meetings at Tartaglione's Otisville, New York ranch where the plan was hatched in or about the summer of 2015, one of which Sullivan also attended. Thereafter, Cruz acted as a liaison between Tartaglione and Martin by delivering cash from Tartaglione to Martin and keeping track of Martin's whereabouts as Martin carried out the plan. At some point in or about December 2015, Martin enlisted the assistance of Sullivan, who worked in construction with Martin and who had recently moved from New York to Florida. Martin asked Sullivan to hold cocaine in his Florida home. Sullivan agreed, and Martin sent Urbano with seven kilograms of cocaine to Sullivan's home, where Sullivan and Urbano hid the cocaine in the garage. Urbano sold the cocaine in the neighboring area and gave the cash proceeds to Sullivan, who hid the cash in his bedroom and counted the cash.

In January 2016, Urbano sold the last of the cocaine, at which point Martin instructed Sullivan to package the cash and hide it in the spare tire of a car that Urbano brought to Sullivan's home. The proceeds were approximately $260,000. Sullivan added $11,000 of his own personal funds as an investment in the enterprise, and Urbano added a few more thousand dollars, so the total amount was over $270,000. The plan was to transport the cash in the car from Florida to Texas, where Martin would again use his connections to a Mexican cartel to purchase cocaine. Shortly after Urbano left Sullivan's home with the cash, however, Martin contacted both Sullivan and Tartaglione to tell them that he had been robbed and that all of the cash was gone.

Over the next several weeks, Tartaglione engaged in an escalating campaign to pressure Martin to repay the missing money. At Tartaglione's request, Marcos Cruz, Joseph Biggs, and Gerard Benderoth helped pressure Martin to return the money. Throughout January and February 2016, Sullivan, who was still in Florida, learned from conversations with Martin and Tartaglione that Tartaglione was pressuring Martin to find the missing money. For example, Martin said that Tartaglione sent people to his house to intimidate him, and Tartaglione told Sullivan that he had paid for Martin to travel back to Texas to look for the missing money and had planned to kill the person who had stolen it. Tartaglione also told Sullivan that other people had contributed some of the money that was missing.

In March 2016, Martin went to Mexico to visit his sick mother. At that time, Sullivan was still in touch with Martin because they still worked together in their construction business and Martin had promised to repay Sullivan through their construction work. As a result, Sullivan learned that Martin had traveled ot Mexico to visit his mother in March 2016 but was expected to return in April 2016. While Martin was away, Tartaglione told Sullivan that he knew Martin had stolen the money and that Martin was avoiding him. Tartaglione asked Sullivan to help set up a meeting at which Tartaglione could confront Martin, and Sullivan suggested luring Martin to the meeting by telling him it was an estimate for Sullivan's construction business. Tartaglione instructed Sullivan to buy a burner phone for use in planning the meeting. Sullivan understood that Tartaglione intended to hold Martin at the meeting location and not permit him to leave until Martin returned the missing money. When Sullivan asked what would happen to Martin if he did

not return the money, Tartaglione said then he would be "gone," which Sullivan understood to mean Martin would be killed. Sullivan bought a burner phone but never used it. Instead, in early April, he communicated several times with one of Tartaglione's associates whose name Sullivan did not know (whom the Government has identified as Joseph Biggs), and that man gave Sullivan the address where the meeting would take place.

Sullivan arranged the meeting for April 11, 2016. Because Sullivan had not been involved in Tartaglione's attempts to collect money, Martin did not perceive Sullivan as a threat and remained in communication with Sullivan about the construction business. Carrying out the plan, Sullivan called Martin from Florida and instructed Martin to meet with three potential clients for construction estimates on April 11, 2016. The first two meeting locations were legitimate, but the third was actually the address that Biggs had provided to Sullivan: a bar in Chester, New York called the Likquid Lounge, which was owned by Tartaglione's brother. Tartaglione planned to kidnap Martin at that bar with the help of Biggs and Gerard Benderoth, both of whom agreed to hold Martin captive and force him to return the missing money. Sullivan remained in Florida throughout both the planning and the execution of this lure and was not physically present for any of the actions his co-conspirators took in furtherance of this kidnapping scheme.

Unbeknownst to Sullivan, Martin decided to bring three of his relatives and friends—his nephew Urbano Santiago, his nephew Miguel Luna, and his friend Hector Gutierrez—along with him to the three estimates on April 11, 2016. That day, Sullivan spoke with Martin before 2:00 p.m., and Martin told Sullivan he was running late. Shortly before 3:00 p.m., Sullivan received a call from Martin saying he was lost and could not find the location of the third estimate. Sullivan told Martin to ask someone in one of the stores in the Plaza. Sullivan never spoke with Luna again. Meanwhile, Sullivan spoke with Biggs on the phone to provide information about Martin's whereabouts and the timing of his expected arrival.

Surveillance video shows that a few minutes after Sullivan's last call with Martin, all four victims entered the Likquid Lounge. When the four arrived at the Likquid Lounge, Biggs and Benderoth were waiting for them. Because Benderoth had never met Martin face-to-face, he lured the victims into the bar. Once they were inside, Biggs and Benderoth held the victims at gunpoint, bound their hands with duct tape, and held them captive. While Urbano, Miguel, and Hector were kept in the bar's office, Benderoth placed Martin in a chair from the bar's office and wheeled him into the men's bathroom, where Biggs beat Luna about the face.

A few minutes later, Tartaglione arrived at the bar. Biggs and Benderoth showed Tartaglione the three extra people in the office who had unexpectedly accompanied Martin. After seeing that those three were bound, Tartaglione then went to Martin in the bathroom. Over the next two hours or so, Tartaglione beat Martin while demanding to know where the missing money was. Later that afternoon, Tartaglione called Cruz and asked him to come to the Likquid Lounge. That same afternoon, Sullivan, who was in Florida, received a call from Tartaglione during which Tartaglione screamed about Martin stealing the money. When Martin tried to speak in the background, Sullivan heard Tartaglione shout, "Sit there and shut the fuck up." At some point, Tartaglione brought one of Martin's nephews from the office into the bathroom to watch as his uncle continued to be beaten. When all of these efforts failed to produce the location of the missing

4

money, Tartaglione put a plastic zip tie around Martin's neck and pulled it tight until Martin choked to death and fell off the chair. Martin collapsed in a pool of his own blood and died on a bathroom floor in front of his nephew.

After Martin died, Tartaglione retrieved a blue tarp from his car, Benderoth and Tartaglione wrapped Martin's body in the tarp, and Biggs used a mop to clean up Martin's blood. At about 5:42 pm, Cruz arrived at the Likquid Lounge. When Cruz arrived, he saw Martin's body was laying on the floor of the bar wrapped in a tarp. Tartaglione took Cruz to look at the two victims in the office and identify them. Cruz informed Tartaglione that they were a nephew and friend of Martin's, and Cruz also saw a second nephew of Martin's in the bathroom.

At around 5:45 pm, Tartaglione left the bar, turned his car around, re-parked the car so that the rear faced the bar, and reentered the bar. At about 6:00 pm, Biggs and Tartaglione carried Martin's wrapped body out of the bar and placed it into the back of Tartaglione's Ford Explorer, and at approximately 6:10 pm, Tartaglione permitted Cruz to leave the bar in order to go work on a different ranch where he was expected.

Tartaglione drove Martin's body to his ranch in Otisville, which consists of several hundred wooded acres. During the drive, Tartaglione spoke with Sullivan on the phone and told him that Martin was dead. At about 6:15 pm, Benderoth left the Likquid Lounge and got in his Chevy Suburban. He drove to the back entrance of the Likquid Lounge, which is out of view of the video camera. Biggs and Benderoth then ushered the remaining three victims, whose hands were still bound, out of the bar's back entrance and forced them to enter the Suburban at gunpoint. At about 6:30 pm, Benderoth drove away from the Likquid Lounge and called Tartaglione. Benderoth then drove the car with Miguel, Urbano, Hector, and Biggs inside to Tartaglione's ranch in Otisville. They met Tartaglione at a wooded area of his ranch up a hill from the residence on the property.

Once the Suburban arrived and parked behind Tartaglione's car, Benderoth got out of the Suburban and spoke with Tartaglione. After Benderoth and Tartaglione finished speaking, they opened the car doors, letting Biggs out and instructing Miguel, Urbano, and Hector to exit the Suburban. While Benderoth held them at gunpoint, the three victims, whose hands were still bound, walked a short distance from the Suburban and kneeled to the ground in the middle of the woods. Benderoth then presented Biggs with a black revolver and told him to kill one of the victims, telling Biggs that he could "either leave with us or stay with them." Biggs took the gun from Benderoth and fired a single shot into the back of one victim's head, killing him instantly. Immediately after Biggs killed the first of the three kneeling men, Tartaglione took the gun from Biggs's hand. Tartaglione then shot the second kneeling man, and Benderoth shot the third. Urbano, Miguel, and Hector died on their knees with their hands bound in the middle of the woods.

Tartaglione, Biggs, and Benderoth then buried all four victims' bodies in a mass grave on Tartaglione's property. Tartaglione and Sullivan spoke several more times by phone that evening, during which calls Tartaglione told Sullivan that Urbano had accompanied Martin and was also killed because he was in the wrong place at the wrong time. This was the first time Sullivan learned that anyone other than Martin had been kidnapped or killed that day. Also that evening, Tartaglione instructed Sullivan to destroy his phone and lie to law enforcement if he were ever

questioned. The next morning, Cruz helped completely fill in the hole where the bodies were buried, and Sullivan smashed and disposed of his personal phone, which he had used to communicate with Martin to set up the meeting. When Sullivan later saw news reports of four missing men, including Martin and Urbano, he realized for the first time that there were in fact four victims killed in total as a result of the kidnapping scheme he helped carry out. In the next couple months, when local law enforcement and the Luna family asked Sullivan about the victims' disappearance, Sullivan lied and claimed he had no idea what had happened to the victims.

On December 19 and 20, 2016, law enforcement executed a search warrant at Tartaglione's ranch. On the property, law enforcement found a mass grave containing the decomposed bodies of Martin Luna, Urbano Santiago, Miguel Luna, and Hector Gutierrez.

### C. Other Criminal Conduct

In addition to his participation in the cocaine conspiracy, kidnapping conspiracy, and murder of Marin Luna, Sullivan has also committed a variety of less serious crimes during his adulthood. That additional criminal conduct is summarized below. With the exception of Sullivan's steroid use, employment of undocumented immigrants, and prior arrests, the Government was unaware of all of the other criminal conduct described in this section until Sullivan disclosed it during proffers.

#### Drug-Related Conduct

Sullivan first started using steroids around the age of 18 and continued his steroid use as a body builder on and off for years until his arrest in this case. Sullivan has also used marijuana, cocaine, and ecstasy recreationally throughout his life. Additionally, Sullivan has sold marijuana, cocaine, and steroids.

On July 31, 1997, Sullivan was arrested in Orange County, New York, and charged with various narcotics offenses after introduced someone who turned out to be an undercover officer to a cocaine dealer at a club where Sullivan worked. Sullivan and ultimately pled guilty to attempted criminal possession of a controlled substance in the fifth degree. Sullivan spent a few months in jail while the case was pending and then received a sentence of probation.

During the 2000s and 2010s, Sullivan worked in the construction business with Martin Luna. Sullivan knew that Martin was also involved in drug distribution and occasionally invested in Martin's drug business by providing payments for cocaine, marijuana, and heroin that Luna was planning to import and sell.

#### Burglaries & Larcenies

In the 1990s, Sullivan was occasionally involved in schemes to sell stolen goods and once burglarized a house. As a result, on one occasion he was arrested and ultimately pled guilty to petit larceny in 1998.

#### Additional Criminal Conduct

6

On approximately two occasions, Sullivan was arrested for domestic violence charges. Those charges arose out of arguments with a prior girlfriend during which the girlfriend hit Sullivan, and he threw her to the ground.

In the late 1990s, Sullivan ran an escort service in which Sullivan essentially acted as a pimp for adult women who prostituted themselves and gave Sullivan a cut of their income.

Sullivan has engaged in fraudulent activity. In the late 1990s, he provided fake pay stubs and tax returns to a landlord in order to obtain a lease for an apartment. In or around 2015, Sullivan showed a potential construction client a fake worker's compensation insurance document. Between 2015 and 2016, Sullivan paid construction workers off the books, regularly failed to pay his taxes, and submitted applications for at least two loans with false information regarding his actual income. In addition, Sullivan regularly employed undocumented workers in order to lower costs on construction projects and make more money.

### **Sullivan's Assistance and Analysis of Section 5K1.1 Factors**

Sullivan's decision to cooperate immediately after being approached by federal law enforcement provided assistance to the government that was not only substantial but extraordinary. Before he admitted to his involvement in the cocaine conspiracy, kidnapping conspiracy, and murder, the Government did not know anywhere near the full scope of Sullivan's involvement in those crimes. Although law enforcement had gathered some evidence implicating Sullivan in those crimes, the Government did not learn the details of Sullivan's role in the drug conspiracy until he admitted to them during his voluntary interview, and the Government did not know the details of Sullivan's involvement in the kidnapping conspiracy and murder until Sullivan disclosed them during proffers. Sullivan's willingness to proffer and admit to his role in a gruesome murder without any pending charges against him created a crucial turning point in the Government's investigation. It is not an exaggeration to say that Sullivan's cooperation led to the recovery of the victims' remains and the arrest of Tartaglione. Although it is possible that the Government still would have been able to prosecute this case and find the victims' bodies without Sullivan's cooperation, the Government certainly could not have brought charges as quickly as it did without Sullivan's assistance.

In deciding to cooperate, Sullivan dramatically upended his life and exposed himself to significant danger. His family had to be relocated for their safety, he was housed by the U.S. Marshals under an alias so that Tartaglione could not use his law enforcement connections to intimidate or harm Sullivan, and he walked himself into serious federal charges. Although it is possible that the Government would have eventually been able to prosecute Sullivan for his role in the cocaine and kidnapping schemes even absent his cooperation, that is not a foregone conclusion. The fact remains that Sullivan's decision to cooperate resulted in his incarceration and separation from his family for years.

Beyond his assistance during the investigation, Sullivan also provided substantial assistance through his trial testimony against Tartaglione. Sullivan spent many hours preparing his testimony and withstood aggressive cross-examination on the witness stand. Through his

truthful testimony, Sullivan assisted the Government in obtaining a conviction of Tartaglione on all counts at trial.

Given the breadth of Sullivan's assistance, the Government believes that he has more than satisfied each and every factor outlined in Section 5K1.1 of the Guidelines. As discussed below, Sullivan's assistance was significant and extremely useful, he was credible and reliable, his assistance provided a crucial break in the Government's investigation, he and his family faced significant danger as a result of his cooperation, and his cooperation was remarkably timely.

### 1. "[S]ignificance and usefulness" of assistance (Section 5K1.1.(a)(1))

Sullivan's cooperation was extremely significant and useful to the Government in three different respects.

First, during the voluntary interview at his home on December 6, 2016 and his subsequent proffers over the next few days, Sullivan provided critical information that linked Tartaglione to the disappearance and murder of Martin Luna. Prior to Sullivan's decision to cooperate, law enforcement did not have any first-hand witness account of Tartaglione's role in the kidnapping and murder. Based in part on Sullivan's information, the Government was able to secure multiple search warrants, including the warrant to search Tartaglione's Otisville property where the victims' bodies were found. Sullivan's information also played a crucial role—together with other corroborating evidence—in the grand jury presentation that resulted in the first indictment against Tartaglione. Without Sullivan's information, it is highly unlikely that the Government could have obtained an indictment as early as it did in December 2016.

Second, the information Sullivan provided during his proffer sessions contained other avenues of investigation that allowed the Government to continue to identify participants in the kidnappings and murders, as well as to fully understand the motive behind the murders. Sullivan consented to the search of his home so that the Government could obtain corroborating physical evidence—such as a money counter, heat sealer, and burner phone—and Sullivan also consented to the search of his personal cellphone. All of that information ultimately helped the Government identify Cruz, Biggs, and Benderoth as the other three participants in the victims' disappearance.

Third, Sullivan provided important testimony at the *Tartaglione* trial that set the stage for the jury to understand why the four victims were kidnapped and executed. Throughout his testimony, Sullivan credibly testified on both direct and cross-examination about his involvement in the murders as well as other crimes he had committed in his life, never minimizing what he had done and accepting responsibility in front of the jury. As evidenced by the swift verdict, the jury found Sullivan (and the Government's other witnesses) highly credible.

### 2. "[T]ruthfulness, completeness, and reliability" of information and testimony (Section 5K1.1(a)(2))

As the Court knows from Sullivan's testimony during the *Tartaglione* trial, during his first couple proffer sessions, Sullivan initially minimized his knowledge that Martin would be killed if

he did not have the missing money. Sullivan, however, quickly admitted the full extent of his knowledge within days of the initial minimization. As a result, the minimization was corrected before the Government relied on Sullivan's information in search warrants or the grand jury. Other than that initial minimization, Sullivan was completely open and truthful during all of his meetings with the Government.

Over the course of dozens of proffers, many of which lasted multiple hours, Sullivan provided truthful, complete, and reliable information about the cocaine conspiracy, the plan to kidnap Martin, and what he knew of Martin's murder. In addition, Sullivan detailed his own participation in the victims' disappearance and other crimes for which he had not been previously charged. That included a large swath of information that the Government did not know before Sullivan disclosed it during proffers. As discussed above, the Government was unaware of the majority of Sullivan's past uncharged criminal conduct before he admitted to it during proffers. Similarly, although the Government had evidence of Sullivan's involvement in the cocaine and kidnapping conspiracies, the Government did not know the details of Sullivan's role in those offenses or any of the conversations Sullivan had with his co-conspirators during the course of those schemes. Sullivan's willingness to implicate himself in these crimes demonstrates his complete candor and reliability throughout the cooperation process.

Most notably, Sullivan did all of this prior to facing any federal charges. The Government did not have sufficient evidence to charge Sullivan with any offense before his voluntary interview on December 6, 2016. Even after that voluntary interview, the Government only had sufficient evidence to charge Sullivan with participation in a cocaine conspiracy and likely could not have charged him with kidnapping or murder offenses until much later in its investigation after using leads developed by Sullivan's proffer statements. Sullivan's decision to reveal his involvement in a variety of very serious crimes before ever being charged reflected his complete candor and reliability throughout the cooperation process. The Government also gained confidence in Sullivan's credibility because he was fully corroborated by phone records, hotel records, cellphone location data, surveillance video, and other witnesses, among other pieces of evidence.

For all of these reasons, the Government assesses that Sullivan's proffer statements and trial testimony were truthful, complete, and reliable.

### 3. "[N]ature and extent" of assistance (Section 5K1.1(a)(3))

In addition to voluntarily speaking with law enforcement at his home on December 6, 2016, Sullivan met with prosecutors and law enforcement agents on twenty-three occasions either to provide information during proffer sessions or to prepare for his testimony in the *Tartaglione* trial. In addition, before Tartaglione's arrest on December 19, 2016, Sullivan made recorded phone calls to Tartaglione at the direction of the Government in an effort to discuss the victims' disappearance and develop additional evidence. Although those recordings did not ultimately play a significant role in the Government's case, they corroborated portions of Sullivan's account about his relationship with Tartaglione and Martin, and they exposed Sullivan's cooperation as soon as Tartaglione received discovery after his arrest.

Sullivan thereafter testified over the course of several hours at the *Tartaglione* trial, providing the jury with critical insight into the cocaine conspiracy and the plan to kidnap and murder Martin. His cooperation was thus extensive in time and in substance. In terms of time, Sullivan spent dozens of hours over six years with prosecutors assisting their investigation and trial preparation. In terms of substance, Sullivan provided crucial details that significantly advanced the Government's investigation and essential information that provided context to the jury at trial for the Government's other evidence.

### 4. "[A]ny injury suffered, or any danger or risk of injury to the defendant or her family" resulting from assistance (Section 5K1.1(a)(4))

Sullivan's initial decision to cooperate came at great risk to himself and his family. In the first instance, the offense conduct here involved the murder of three individuals simply because they witnessed a crime. Of all the individuals involved in the crimes here, Sullivan was the only one outside of Tartaglione's inner circle and therefore most likely to be viewed as a loose end. Sullivan thus reasonably feared that he might be killed if Tartaglione ever suspected Sullivan might report what he knew to law enforcement. Moreover, Tartaglione made multiple statements to Sullivan throughout their interactions suggesting that he had connections to organized crime and to law enforcement, which reasonably led Sullivan to deeply fear that he would be killed if he cooperated against Tartaglione.

Despite those risks and fears, Sullivan elected to cooperate, including by making controlled phone calls to Tartaglione during the Government's investigation in December 2016, which ensured that Tartaglione would quickly become aware of Sullivan's cooperation upon receiving discovery. In light of these risks, the Government took steps to protect Sullivan, including relocating his family and having Sullivan housed under an alias within the Bureau of Prisons. Thanks to Sullivan's courage in the face of what he believed to be mortal danger, the Government was able to recover the victims' bodies, indict Tartaglione, and develop additional evidence identifying every participant in the victims' murders.

### 5. "[T]imeliness" of assistance (Section 5K1.1(a)(5))

Sullivan's cooperation was by far the most timely in this case. Sullivan was initially contacted by local law enforcement by phone within a month of the murder, but lied to the detective out of fear that he was being tested by Tartaglione, who had extensive law enforcement contacts. But when investigators working on the Government's federal investigation travelled to Sullivan's home on December 6, 2016, Sullivan began to provide truthful information to the investigators prior to facing any charges. He then continued to provide information in the following days while still not facing any charges. Thus, prior to facing any charges, Sullivan provided extensive information that significantly contributed to this Office's ability to charge and arrest Tartaglione.

Sullivan was also the first participant in these crimes to cooperate with law enforcement. His proffers began about two weeks before Marcos Cruz first agreed to speak with investigators and about a year before Joseph Biggs agreed to proffer with the Government. As the first cooperator in this case, Sullivan provided essential information that helped the Government's

investigation take a huge leap forward in the form of search warrants and, ultimately, and indictment charging Tartaglione.

## Conclusion

For the reasons set forth above, the Government respectfully submits that Jason Sullivan provided significant and useful assistance to the Government. In light of the information set forth above, and assuming the defendant's continued compliance with the terms of his cooperation agreement, the Government intends to move at sentencing, pursuant to Section 5K1.1 of the Sentencing Guidelines, that the Court sentence Jason Sullivan according to the facts stated above and the factors set forth in Section 5K1.1(a)(1)-(5) of the Sentencing Guidelines. The Government further intends to move, pursuant to 18 U.S.C. § 3553(e) that the Court sentence Sullivan without regard to the otherwise applicable mandatory minimum sentence.

Because of the sensitive nature of the information contained in this letter, the Government understands that defense counsel may wish to seek its sealing. Accordingly, the Government is submitting this letter by email in the first instance to allow defense counsel the opportunity to request a sealing order from the Court.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By: _____
Maurene Comey
Jacob R. Fiddelman
Assistant United States Attorneys
(212) 637-2324

cc:   Jason Ser, Esq. (by email)

11