

*U.S. Department of Justice*

*United States Attorney*
*Southern District of New York*

*50 Main Street, Suite 1100*
*White Plains, New York 10606*

February 9, 2024

**BY ECF**

The Honorable Kenneth M. Karas
United States District Judge
Southern District of New York
300 Quarropas Street
White Plains, New York 10601

    Re:    *United States v. Nicholas Tartaglione*, S4 16 Cr. 832 (KMK)

Dear Judge Karas:

    The Government respectfully submits this letter in response to defendant Nicholas Tartaglione's January 18, 2024 letter supplementing his motion for a new trial in the above-referenced case pursuant to Federal Rule of Criminal Procedure 33 (the "Supplemental Motion"). Raising seven disjointed claims with virtually no legal analysis, the Supplemental Motion continues the scattershot approach of Tartaglione's original motion for a new trial dated November 20, 2024 (the "Motion"). Because the Supplemental Motion presents no new law, the Government incorporates by reference the background and applicable law sections of its January 18, 2024 memorandum of law in opposition to the Motion. (Dkt. 559).

    The Supplemental Motion appears to suggest that Tartaglione's trial attorneys were ineffective for failing to raise seven categories of supposed discrepancies within the discovery and Jencks Act materials the Government produced to the defense. As to some of these categories, the Supplemental Motion also appears to accuse investigators of tampering with evidence and prosecutors of engaging in misconduct by misrepresenting facts related to these topics to the jury at trial. As was the case with the various theories hypothesized in the original Motion, several of the points raised in the Supplemental Motion rely on a misinterpretation of the record. As to all of the arguments raised in the Supplemental Motion, trial counsel were eminently reasonable in declining to pursue these seven far-fetched theories, and none of the points in the Supplemental Motion would have altered the jury's verdict had they been raised at trial. Accordingly, both the Motion and the Supplemental Motion should be denied in their entirety.

    *First*, the Supplemental Motion suggests that Senior Investigator William Young of the New York State Police tampered with cooperating witness Marcos Cruz's cellphone when it was in Young's custody in January 2017 because certain data files were allegedly listed in the cellphone extraction report as having been created or modified during the time the phone was in Young's custody. (Supplemental Motion at 2-3). This claim fails for several reasons. First, as discussed below, Young possessed the phone in January 2017 solely to review its contents, including with Cruz himself, who accessed the phone to show investigators potentially relevant information to their ongoing investigation seeking to identify other participants in the victims' murders. Second,

the data files created and modified during Young's possession of the phone appear on their face to be background data files that a smartphone creates when a user visits websites or accesses portions of the phone, and/or to entirely post-date the conduct charged in this case. None of the files highlighted in the Supplemental Motion were offered as Government exhibits at trial, and none were the type of file that the Government sought to introduce at trial (*i.e.*, none were contacts, messages, call logs, search history, location history, or Google Translate history). Third, the defense has offered no basis—such as an expert affidavit—to conclude that the data files created, modified, or deleted in 2017 were anything other than non-substantive data, such as they type of backup files that a smartphone automatically creates or modifies to reflect a user's activity on the phone accessing certain files or websites. Fourth, the defense fails to explain how trial counsel should have introduced these data files at trial, how these files exculpate Tartaglione, or what argument these files would have supported that would have undermined the overwhelming evidence of Tartaglione's guilt. For these reasons, further detailed below, this claim should be rejected without a hearing.

By way of background, Cruz gave written consent to search his cellphone on January 6, 2017, and the phone was provided to FBI analyst Samantha Slattery on January 10, 2017 for Slattery to perform a data extraction on the phone. (*See* 3523-14). After several days during which Slattery had not yet performed the requested extraction, Young took custody of Cruz's phone on January 17, 2017, and Special Agent Loris Caulfield returned the phone to Slattery's custody on February 10, 2017. (*Id.*). Approximately three weeks later, on March 2, 2017, Slattery performed a data extraction on the phone and generated a report. (*Id.*). The Government reviewed that report for discoverable material and produced portions of the report to defense counsel in May 2019 as part of Rule 16 productions. (NT_048205 - NT_048632). The remainder of the report, with redactions to protect the privacy of Cruz's minor family members, was produced to defense counsel as part of Cruz's Jencks Act material in January 2023. (3502-70).

The Supplemental Motion misses crucial context to the chain of events surrounding Young taking custody of the phone on January 17, 2017. To clarify the record, the Government attaches hereto as Government Exhibit A an email chain from January 16, 2017, which explains why Young took custody of the phone the next day. On January 16, 2017, Young wrote to FBI Special Agent Caulfield explaining that Cruz was scheduled for a proffer the next day and requesting either the data extraction from Cruz's phone or the phone itself if the extraction was not complete so that the contents of the phone could be reviewed with Cruz. (GX A at 1 ("We have a scheduled proffer with Cruz for tomorrow. I believe you may have sent his phone up to Cart for dumping. I either need the phone itself if the report isn't done or the actual phone to be able to review with him.")). Notes confirm that Young in fact met with Cruz the very next day, January 17, 2017, for a proffer, which focused on the identities of the black male (later identified as Biggs) and white male (later identified as Benderoth) who participated with Tartaglione in the victims' kidnappings and murders. (3502-28). Indeed, at that point in the investigation, Biggs and Benderoth had not been arrested, and law enforcement was focused on identifying and, if possible, charging the remaining participants in the murders.

As a result, and as reflected in Cruz's Jencks Act material, on January 20, 2017, Cruz met again with investigators, including Young, to conduct a double-blind photo identification procedure during which he was shown photo arrays containing photographs of Benderoth and

Biggs. (3502-29, 3502-30). Young's report from the array reflects that after Cruz failed to identify any photograph in the array containing Biggs's photo, Cruz spoke with investigators and indicated that if he could see his cellphone, he could show investigators the Facebook page of the black male (*i.e.*, Biggs). (3502-29 ("Cruz stated that the second array, regarding the black male from the bar, did not have anyone he could recognize. However, Cruz was provided his cell phone because he stated that he could show law enforcement who this black male was via his Facebook page.")). Investigators then provided Cruz with his phone, and Cruz used the phone to access his Facebook account in the presence of investigators but was unable to locate Biggs's Facebook page. (*Id.* ("Cruz was unable to locate the page in Facebook while utilizing his phone.")).

These materials clarify that Young took custody of Cruz's phone for purely investigative purposes, which were primarily focused on Biggs and Benderoth, *not* Tartaglione (who had already been arrested and charged with the victims' murders in December 2016). When Slattery failed to complete the data extraction within the first week that Cruz's phone was in her possession, investigators elected to take the phone itself and access it manually so that they could move as quickly as possible to identify the other participants in the murder. Thus, Young took custody of the phone not for the nefarious purposes suggested in the Supplemental Motion, but in a sincere and warranted effort to identify suspects *other than* Tartaglione.

This background explains why the vast majority of files created or modified during Young's possession of the phone took place on January 17 and January 20, 2017: those were the two days when Cruz looked at the phone with investigators. (*See* Defense Ex. A (all except five files created or modified on January 18, 2017, were created or modified on January 17, 2017 or January 20, 2017)). Although the notes from the January 17, 2017 proffer do not specifically state that Cruz accessed his phone that day, Young's January 16 email indicating he needed the phone to review with Cruz during the proffer, the topic of the proffer (*i.e.*, Biggs and Benderoth), the types of files created and modified in Cruz's phone on January 17 (discussed further below), and Cruz's apparent awareness on January 20 that investigators had and were willing to show him his phone support the inference that investigators reviewed portions of Cruz's phone with him during the January 17 proffer in an effort to identify other participants in the murders. (*See* 3502-29 (indicating Cruz suggested looking in his phone on January 20, 2017, as opposed to investigators presenting the phone to him of their own accord)). Further, the report from Cruz's January 20, 2017 photo array and subsequent interview expressly state that Cruz accessed his cellphone to seek to locate Biggs's Facebook page, and the data files created and modified that day (discussed further below) appear on their face to be consistent with that activity.

That context alone undermines the core premise of the Supplemental Motion's argument on this score: there is no evidence that Young took custody of Cruz's phone in an effort to manufacture or tamper with evidence or to frame Tartaglione. To the contrary, the record makes clear that Young took custody of the phone to further the investigation of participants in the murders *other than* Tartaglione. The record further establishes that Young showed the phone to Cruz during proffers focused on Biggs and Benderoth and allowed Cruz to access the phone in investigators' presence as part of the ongoing investigation into those two subjects. In other words, investigators and Cruz accessed the phone's contents but did not affirmatively or intentionally create, modify, or delete new evidence within the phone.

The characteristics of the vast majority of the files that the Supplemental Motion flags as created or modified during Young's possession of the phone appear, on their face, to be consistent with a user simply accessing the phone's contents.  At a high level, most of the files raised in this portion of the Supplemental Motion appear to be consistent with data files reflecting access to applications or the Internet on the phone, such as the creation of thumbnail images from Facebook or other applications on the smartphone.  A layperson can infer this simply by looking at the category into which each piece of data highlighted in the Supplemental Motion falls within the extraction report.  And to the extent some of the files flagged in the Supplemental Motion fall within categories that may facially appear substantive, those files were all created months after the April 11, 2016 murders charged in this case and thus have no conceivable bearing on the outcome of Tartaglione's trial.

Below is a summary of where each file flagged in the Supplemental Motion as being created or modified on January 17, 2017 or January 20, 2017 originated within the phone:

- The line from page 404, which was accessed on January 20, 2017, falls within the category "Cookies," and reflects the phone accessing "google.com." (*See* 3502-70 at 306, 404).  On its face, this appears to be a non-substantive data file reflecting a website the phone accessed on January 20, 2017.  There is no discernable content within this file and nothing to connect this file with any piece of evidence offered at trial from Cruz's phone.
- The lines from pages 2322, 2324, 2325, 2334, 2336, 2368, and 2569, which were created or modified on January 17, 2017 or January 20, 2017, all fall within the category "Data Files" and subcategory "Applications." (*See* 3502-70 at 5, 2262).  On their face, these appear to be non-substantive data files created within applications (or "apps") on the smartphone.  There is no discernable content within these files and nothing to connect these files with any piece of evidence offered at trial from Cruz's phone.
- The lines from pages 2602, 2606, and 2607, which were created or modified on January 20, 2017, all fall within the category "Data Files," and subcategory "Configurations." (*See* 3502-70 at 5, 2602).  On their face, these similarly appear to be non-substantive data files.  There is no discernable content within these files and nothing to connect these files with any piece of evidence offered at trial from Cruz's phone.
- The lines from pages 2608, 2610, 2611, 2612, 2614, 2616, 2617, 2618, 2620, 2621, 2622, 2623, 2624, 2626, 2627, 2628, 2631, 2633, 2634, 2635, 2636, 2637, 2639, 2640, 2641, 2642, 2643, 2644, 2645, 2647, 2675, 2684, 2685, 2688, 2689, 2696, 2701, 2705, 2708, 2711, 2714, 2715, 2716, 2717, 2720, 2721, 2727, 2730, 2733, and 2734, which were created or modified on January 17, 2017 or January 20, 2017, all fall within the category "Data Files," and subcategory "Databases." (*See* 3502-70 at 5, 2608).  On their face, these similarly appear to be non-substantive data files. There is no discernable content within these files and nothing to connect these files with any piece of evidence offered at trial from Cruz's phone.
- The line from page 2737, which was created, modified, and deleted on January 20, 2017, falls within the category "Data Files," and subcategory "Documents." (*See* 3502-70 at 5, 2736).  Although the name of this category suggests it could include potentially substantive files (though, notably, the other files in this category do not

> have any apparent content), this file was created and then deleted on January 20, 2017, long after the crimes at issue in this case, and has no apparent content.
> - The lines from pages 5065, 5066, 5072, 5073, 5074, 5080, 5081, 5083, 5084, 5089, 5115, 5116, 5117, 5118, 5124, 5125, 5126, 5127, 5128, 5129, 5130, 5134, 5137, 5140, 5141, 5142, 5143, 5145, 5148, 5154, 5157, 5158, 5163, 5164, 5166, 5173, 5176, 5178, 5187, 5192, 5193, 5197, 5198, 5199, 5201, 5205, 5206, 5207, 5208, 5209, 5210, 5214, 5215, 5219, 5221, 5222, 5226, 5227, 5230, 5235, 5238, 5240, 5243, 5245, 5247, 5249, 5251, 5252, 5253, 5254, 5255, 5256, 5257, 5258, 5259, 5260, 5271, 5272, 5273, 5277, 5280, 5281, 5302, 5307, 5313, 5314, 5315, 5316, 5317, 5320, and 5321, which were created or modified on January 17, 2017 or January 20, 2017, all fall within the category "Data Files," and subcategory "Text."[1] (*See* 3502-70 at 5-6, 5063). On their face, these similarly appear to be non-substantive data files. There is no discernable content within these files and nothing to connect these files with any piece of evidence offered at trial from Cruz's phone.
> - The lines from pages 5327, 5342, 5446, 5352, 5353, 5363, 5364, 5373, 5381, 5413, 5433, 5436, 5444, 5447, 5460, 5471, 5472, 5481, and 5485, which were created, modified, and/or deleted on January 17, 2017 or January 20, 2017, fall within the category "Data Files," and subcategory "Videos." Although this category's title indicates it may contain potentially substantive files, all of the files flagged in the Supplemental Motion within this category were created on December 18, 2016, January 17, 2017, or January 20, 2017, long after the victims' murders on April 11, 2016. Indeed, many of these files contain the word "facebook" within their "Path," and those with visible thumbnails appear to be videos one would expect to see on a social media application such as Facebook. Those factors would suggest these were videos that appeared on Facebook when Cruz accessed his Facebook account via the Internet with investigators during the above-discussed proffers. But in any event, the creation date of these files long after the victims' murders undermines any suggestion that these files would have changed the outcome of the trial.

As to the five files created or modified on January 18, 2017, all fall within facially non-substantive categories of the extraction, which appear consistent simply with accessing the Internet or applications on the phone:
- The lines from pages 2700 and 2713, which were modified on January 18, 2017, both fall within the category "Data Files," and subcategory "Databases." (*See* 3502-70 at 5, 2608). On their face, these once again appear to be non-substantive data files. There is no discernable content within these files and nothing to connect these files with any piece of evidence offered at trial from Cruz's phone.
- The lines from pages 5175, 5252, and 5255, which were created or modified on January 18, 2017, each fall within the category "Data Files," and subcategory "Text." (*See* 3502-70 at 5, 5063). On their face, these similarly appear to be non-

---

[1] To clarify, this category does not refer to text messages. The categories within the extraction of data from Cruz's phone containing messages are entitled "Chats," "Emails," "Instant Messages," "MMS Messages," "SMS Messages," and "Timeline." (*See* 3502-70 at 5, 121, 912, 971, 1027, 1127, 1505).

substantive data files. There is no discernable content within these files and nothing to connect these files with any piece of evidence offered at trial from Cruz's phone.

Based on the lack of any relevant data on the face of the files flagged in the Supplemental Motion, it appears that they all amount to backup data that a smartphone automatically saves when a user accesses the Internet or particular apps within the phone. But the Court need not decide exactly what these data files are or how they were created to deny the defense motion. That is both because the defense has not met its burden of establishing the relevance of these data files or proving that they were intentionally tampered with, and because the defense has not met is separate burden of establishing that the introduction of these files at trial would have altered the jury's verdict. *See United States v. Bayuo*, No. 15 Cr. 576 (JGK), 2019 WL 430260, at *8 (S.D.N.Y. Feb. 4, 2019) ("To prevail on a motion for a new trial based on Government misconduct or fabricated evidence, the defendant must provide more than just speculation.").

In this vein, none of the created or modified files flagged in the Supplemental Motions are contacts, messages, call logs, location history, search history, or Google translate history. That fact is fatal to the defense motion because it makes clear that none of the data files created, modified, or deleted after law enforcement took custody of Cruz's phone fell into any of the categories from which the Government introduced evidence at trial. The Government exhibits from Cruz's phone introduced at trial came from the extraction's Device Information, Call Log, Contacts, Searched Items, SMS Messages, and Timeline sections. (*See* GX 621-A to 621-L). Thus, none of the creations, modifications, or deletions the Supplemental Motion complains about could have impacted the Government's evidence presented at trial.

Although not included in Defense Exhibit A, the one portion of the phone that the defense claims has some bearing on the Government's evidence at trial comes from the Images portion of the phone extraction. (Supplemental Motion at 3; NT_048348-49). That image file appears to be a thumbnail image of the Messages app within Cruz's phone, showing three messages from different contacts. (NT_048348). The top message within the thumbnail appears to be a message with the contact "Nikki Polis," which appears to be dated December 19, 2016. (*Id.*). In other words, this appears to be a thumbnail image created when the user of the phone (here, Cruz in a proffer with investigators) opened the Messages app within the phone on January 17, 2017. This file does *not* reflect that any messages were sent or deleted that day, and this file does *not* suggest that the contact entry "Nikki Polis" was created on January 17, 2017. Indeed, the "Nikki Polis" contact entry, which the Government offered in evidence at trial from the Contacts portion of the extraction, reflects that Cruz last contacted that entry on October 11, 2016. (*See* GX 621-D). There is thus nothing exculpatory about the apparently auto-generated thumbnail image the Supplemental Motion identifies.

In this post-trial posture, the defense bears the burden to support their claims that evidence was tampered with or fabricated. *See United States v. Boyd*, 401 F. App'x 565, 566 (2d Cir. 2010) (affirming denial of Rule 33 motion where defendant "failed to identify any evidence supporting his claims" that the Government fabricated evidence). Here, it is telling that the defense fails to offer any expert analysis of the files created and modified during Young's custody of the phone. They instead rely simply on the dates of those creations and modifications, but as discussed above, those dates, without more, are consistent with investigators accessing the phone to review its

contents. The defense has offered no basis for the Court to find that the created or modified files reflect intentional actions of a phone's user, rather than backup files created automatically by a smartphone when a user accesses the phone. On that basis alone, the Court can and should reject this claim.

Finally, and perhaps most importantly, the defense utterly fails to explain why any of these created or modified files could have possibly mattered at Tartaglione's trial in this case. Although the Supplemental Motion complains trial counsel should have called a cellphone data expert at trial, (*see* Supplemental Motion at 10), the defense fails to proffer what such an expert's testimony would have been, what conclusions such an expert would have drawn, or the basis to conclude such testimony would have been admissible at trial. The defense similarly fails to articulate how any of the files they identify in their Supplemental Motion exculpates Tartaglione in any way. The Supplemental Motion thus fails to carry the defendant's burden of establishing that the allegedly tampered with evidence was material to the outcome of the trial. *See United States v. Corley*, Nos. 13 Cr. 48 (AJN), 18 Civ. 5050 (AJN), 18 Civ. 9280 (AJN), 2020 WL 4676650, at *7 (S.D.N.Y. 2020) ("For purportedly new evidence to be material, the defendant must show that it would probably have produced a different verdict if it were introduced at trial. This inquiry overlaps with another requirement for a Rule 33 motion to succeed: the new evidence must be likely to result in an acquittal." (internal quotation marks, citations, and brackets omitted) (quoting *United States v. Viertel*, No. 01 Cr. 571 (JGK), 2005 WL 1053434, at *5 (S.D.N.Y. May 5, 2005); *United States v. Owen*, 500 F.3d 83, 88 (2d Cir. 2007))).

Nor does the Supplemental Motion explain how defense counsel should have used the files it flags to undermine the Government's evidence at trial. At best, trial counsel might have used these files to cross-examine Slattery and suggest that portions of Cruz's phone were created or modified after Cruz surrendered the phone to law enforcement. But the jury would have seen that none of those files had any connection to the handful of excerpts the Government offered from Cruz's phone at trial or were created anywhere near the time of the narcotics conspiracy, kidnappings, and murders that were central to the case. Even if those files could have somehow called into question the reliability of the rest of Cruz's phone—which for the reasons discussed above, is a far-fetched theory at best—those pieces of evidence were minimally probative. The Government exhibits from Cruz's phone primarily consisted of contact entries for certain phone numbers, text messages and Google translate history regarding the narcotics conspiracy, and a timeline showing that Cruz spoke with Tartaglione on April 11, 2016. None of that evidence went to the heart of the case proving Tartaglione's guilt. Although it corroborated other pieces of testimony, its absence from the trial would have done nothing to weaken the powerful testimony of three cooperators, the victims' bodies on the defendant's property, the surveillance videos, the DNA evidence, the cell site evidence, the phone records, and the various other evidence proving the defendant's guilt. There is simply no likelihood that the introduction of these data files at trial or witness testimony about those files would have changed the outcome of the trial. *See United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992) ("we have indicated our reluctance to approve the granting of a new trial unless we can say that the jury probably would have acquitted" absent the error identified by the defendant).

As a result, the Court need not resolve precisely what a hypothetical expert that has not been proffered in the Supplemental Motion would say about these data files, because this defense

theory about Cruz's phone would not have changed outcome of Tartaglione's trial. Trial counsel cannot be faulted for declining to dive down this tedious rabbit hole with minimal bearing on the other overwhelming evidence of Tartaglione's guilt. *See United States v. Luciano*, 158 F.3d 655, 660 (2d Cir. 1998) ("The decision not to call a particular witness is typically a question of trial strategy that [reviewing] courts are ill-suited to second-guess. . . . Similarly, the conduct of examination and cross-examination is entrusted to the judgment of the lawyer, and [a reviewing] court on a cold record should not second-guess such decisions unless there is no strategic or tactical justification for the course taken."). This is especially so when there is a good faith and reasonable explanation for Young's possession of the phone in January 2017, none of the modified or created files were introduced at trial, none of the exhibits from Cruz's phone introduced at trial were essential to conviction, and the other evidence of guilt was simply devastating. Accordingly, the Court should reject this aspect of the Supplemental Motion without a hearing.

*Second*, the Supplemental Motion complains that the Government introduced an exhibit at trial from Tartaglione's phone suggesting that Cruz began working for Tartaglione in May 2015, when another entry in Tartaglione's phone suggested Cruz began working for Tartaglione in January 2016. (Supplemental Motion at 4). Cruz testified at trial that he began working for Tartaglione for between approximately eighteen months and two years until December 2016. (Tr. 1324). That testimony was consistent with the entry in Tartaglione's phone indicating Cruz began working for him in May 2015. (GX 651-H). It was entirely reasonable for the prosecution to argue that the jury should credit that testimony, notwithstanding the defense suggestions otherwise. *See United States v. Zackson*, 12 F.3d 1178, 1183 (2d Cir. 1993) ("The government has broad latitude in the inferences it may reasonably suggest to the jury during summation.").

Contrary to the suggestion of the Supplemental Motion, Tartaglione's trial counsel in fact argued in summation that Cruz and Tartaglione did not meet until the summer of 2015 based on toll records showing that their phones first communicated in July 2015. (Tr. 3179). It was not unreasonable of trial counsel to rely on the toll records to make this argument instead of relying on a screenshot from Cruz's phone suggesting that Cruz did not begin working for Tartaglione until January 2016 months after their phones were already in regular communication. *See United States v. Aguirre*, 912 F.2d 555, 560 (2d Cir. 1990) ("[T]here are countless ways to provide effective assistance in any given case and . . . even the best criminal defense attorneys would not defend a particular client in the same way."); *see also Strickland v. Washington*, 466 U.S. 668, 689-90 (1984). Accordingly, this claim should be rejected.

*Third*, the Supplemental Motion complains that the jury was not shown a November 17, 2015 advertisement in Cruz's phone from the Marriott in Houston, Texas where Michael Tartaglione also stayed. (Supplemental Motion at 4). In fact, a very similar portion of Cruz's phone *was* admitted as a Government Exhibit at trial, reflecting a text message in Spanish apparently from the Marriott in Houston to Cruz dated November 17, 2015. (GX 621-I). The Government offered this exhibit because it supported the prosecution's theory that Cruz helped coordinate the trips to Texas to obtain cocaine in the fall of 2015. A screenshot of essentially the same advertisement would have been cumulative of the Government's evidence and would have, if anything, supported the inference that Cruz worked with Martin, Tartaglione, and Michael Tartaglione to coordinate trips to Texas where both Michael Tartaglione and Martin would stay at

the Marriott in Houston.[2] There was thus nothing misleading about the absence of this additional evidence from trial, and defense counsel was entirely reasonable in declining to introduce this cumulative and inculpatory evidence.

*Fourth*, the Supplemental Motion complains that certain data files within Cruz's cellphone were created, modified, and/or accessed on March 2, 2017, the same day the FBI performed a data extraction of the phone. (Supplemental Motion at 4-7). Once again, these files all appear on their face to be contentless data files simply reflecting the fact that a user accessed the phone; here, that was Slattery, who accessed the phone on March 2, 2017 in order to extract data from it. None of these files come from the categories of data that the Government introduced as evidence at trial, and none of these files were created anywhere near the time of the cocaine conspiracy or the kidnappings and murders. There is thus no reason to believe that these files impacted the evidence introduced at trial or exculpated Tartaglione.

Once again, the defense fails to offer anything other than speculation to support the claim that these files constitute fabricated evidence or that their introduction at trial would have led to an acquittal. Absent any showing from the defense that these files are in fact fabricated evidence that somehow compromised the integrity of the evidence introduced at trial, there is no basis to grant a new trial or to find that trial counsel was unreasonable in declining to point out the existence of these data files. *See Boyd*, 401 F. App'x at 566; *Luciano*, 158 F.3d at 660.

*Fifth*, the Supplemental Motion suggests that certain files within cooperating witness Joseph Biggs's cellphone were modified after Biggs was arrested but before he turned his cellphone over to the FBI, others were modified on the day Biggs provided his cellphone to the FBI, and others reflect texts with Tartaglione dated 2005 years before Tartaglione began using the texted number. (Supplemental Motion at 7-9). This claim suffers from the same defect as those raised regarding Cruz's phone.

As to the modified files, the Supplemental Motion offers no reason to believe that the modifications of these files in Biggs's phone reflect anything other than a user of the phone (whether Biggs, one of his family members, one of his attorneys, or an investigator) accessing a particular part of the phone. The Government did not offer any of these modified files, which appear to all be images and videos, as exhibits at trial. (*See* GX 631-A to 631-U (complete set of Government Exhibits excerpts from Biggs's phone and admitted at trial, which consist entirely of entries from the "Contacts," "SMS Messages," and "Timeline" sections of the extraction)). As to the messages within the extraction that are dated from the year 2005, the Government did not offer any of those messages at trial and did not attempt to use them to suggest that the jury should believe Biggs's testimony that he had known Tartaglione since the early 2000s.

Because these files were never introduced at trial, there is no reason to believe that they impacted the evidence introduced at trial or could have exculpated Tartaglione. The defense again offers only speculation, without any evidentiary support or expert analysis, to suggest that these

---

[2] The Supplemental Motion incorrectly suggests that Cruz stayed at the Marriott, when the records introduced at trial reflect that Martin Luna and Michael Tartaglione stayed at the Marriott. (*See* GX 960).

files were somehow fabricated. But that speculation alone is insufficient to warrant a new trial. *See Boyd*, 401 F. App'x at 566. That is especially so when the defense does not even attempt to suggest that these files somehow exculpate Tartaglione or would have changed the outcome of the trial. *See Sanchez*, 969 F.2d at 1414. At best, the defense suggests these files might have been used to undermine the reliability of Biggs's phone extraction. Even if that were so—which is speculative at best—the evidence the Government offered from Biggs's phone primarily corroborated peripheral details of witness testimony, such as by showing contact entries of relevant players, messages with Tartaglione about steroids, and messages about Biggs's searches for Martin in early 2016. The absence of that evidence from trial would not have undermined the overwhelming proof of the defendant's guilt from the mass grave on his property, the cooperating witness testimony, the surveillance videos, the cell site evidence, the phone records, the DNA evidence, and the various other evidence offered at trial. This claim should thus be rejected.

*Sixth*, the Supplemental Motion complains that cooperating witness Jason Sullivan's cellphone extraction contained emails dated before the date when Sullivan testified he obtained a new cellphone. (Supplemental Motion at 9). This argument ignores the commonsense notion that when a user accesses an email account, which is stored on the servers of the email provider, on a new smartphone the account will continue to possess all emails previously held therein because its content was stored with the email provider, not on the physical phone itself. Sullivan testified that he destroyed his physical phone after April 11, 2016, *not* that he deleted his email account. (Tr. 1077). Phone records confirm that Sullivan deactivated one cellphone device on April 12, 2016 and activated a new device on April 13, 2016. (GX 510 at 17). There was thus ample reason to credit Sullivan's testimony on this score, and Sullivan's apparent ability to access older emails on his new phone does nothing to contradict his account.

Given the records corroborating Sullivan's account and the patent silliness of the argument the Supplemental Motion raises on this point, the Government did not engage in misconduct by declining to offer these emails as exhibits at trial. *Zackson*, 12 F.3d at 1183. Similarly, defense counsel was entirely reasonable in declining to make this argument, especially when, at best, these emails would hypothetically undermine a very minor point of Sullivan's testimony with minimal bearing on Tartaglione's guilt. *Luciano*, 158 F.3d at 660. This claim should thus be rejected.

*Seventh*, the Supplemental Motion points out that toll records reflect that Biggs and Sullivan's cellphones had contact with the same eight phone numbers, which the defense hypothesizes could mean that Biggs and Sullivan in fact knew each other and had a prior relationship before Tartaglione connected them. (Motion at 9).[3] Tellingly, the Supplemental

---

[3] To the extent the Supplemental Motion suggests that the so-called "discrepancies" identified within the extractions from cellphones belonging to Biggs, Cruz, and Sullivan could have supported a motion to suppress, (*see* Supplemental Motion at 10), the defense fails to explain how Tartaglione could have standing to suppress the fruits of a search of cellphones that he never possessed and over which he has not privacy interest. *See United States v. Watson*, 404 F.3d 163, 166 (2d Cir. 2005); *United Sates v. Paulino*, 850 F.2d 93, 96 (2d Cir. 1988) ("[T]he burden is on the defendant to establish hat his own rights under the Fourth Amendment were violated" to establish standing.); *see also United States v. Tartaglione*, No. 16 Cr. 832 (KMK), 2023 WL 2237903 at *10-11 (S.D.N.Y. Feb. 27, 2023). Nor does the defense explain how law enforcement

Motion fails to explain who those phone numbers belong to, when those phone numbers were in contact with Biggs' and Sullivan's phones, or whether any of that contact occurred around the same times. Even setting those deficiencies aside, the defense does not dispute that Biggs and Sullivan's phones never communicated *with each other* before April 2016, just as the two testified.

This defense theory thus amounts to little more than speculation that Biggs and Sullivan must have secretly known each other because their phones happened to have contact with eight of the same phone numbers at some point during the many months for which the Government obtained their phone records. There is no reason to believe that this speculative theory would have caused the jury to question the other overwhelming evidence of the defendant's guilt, including the compelling testimony of all three cooperating witnesses. Indeed, had this point been raised at trial, the Government could have pointed out that Sullivan and Biggs were both body builders and steroid users in the vicinity of Westchester County around the same time. It is therefore unsurprising that their phones might have contact with some of the same phone numbers. Trial counsel cannot be faulted for declining to make such a speculative argument at trial. Because it was entirely reasonable for trial counsel to forgo this theory, the Supplemental Motion's ineffectiveness claim on this score fails. *See Aguirre*, 912 F.2d at 560 ("[T]here are countless ways to provide effective assistance in any given case and . . . even the best criminal defense attorneys would not defend a particular client in the same way.").

*Finally*, as was the case with the various complaints raised in the defense's original Motion, even if trial counsel were ineffective for failing to raise these seven points—which they were not for the reasons above—the Supplemental Motion cannot satisfy *Strickland*'s prejudice prong. *Strickland*, 466 U.S. at 694. Thus, even if the Court determines that it cannot assess the reasonableness of trial counsel's actions without expanding the record, the Court can and should nevertheless deny the motion without further factfinding because none of the defendant's claims would have changed the outcome of the trial. *See Richter*, 562 U.S. at 112 ("The likelihood of a different result must be substantial, not just conceivable.").[4]

The evidence of the defendant's guilt was so overwhelming that there is no reason to believe, not to mention a "substantial" likelihood, that any of the speculative theories raised in the Supplemental Motion would have convinced the jury to reach a different verdict. *Id.* The victims' bodies were on the defendant's property in a mass grave. Those same victims were last seen alive at a bar belonging to the defendant's brother, where the defendant can be seen on video entering the bar, remaining inside with the victims for over two hours, and then carrying a large, heavy

---

accessing a phone for which voluntary consent to search has been given could possibly give rise to a suppression remedy.

[4] As the Government noted in its opposition to the defendant's first Motion, the record as it stands is sufficient for the Court to deny both the Motion and the Supplemental Motion without further supplementation. Should the Court disagree and assess that the record is currently insufficient to reject the defendant's ineffective assistance claims, the Government respectfully requests the Court set a supplemental briefing schedule that affords the Government the opportunity to obtain a written attorney-client privilege waiver from the defendant and affidavits from the defendant's trial counsel to supplement the record. *See Sparman v. Edwards*, 154 F.3d 51, 52 (2d Cir. 1998).

object to his car with a co-conspirator who testified that the object was Martin Luna's dead body. Three of the defendant's co-conspirators testified that the defendant orchestrated the victims' kidnappings and murders with those witnesses' help. Surveillance video, cell site records, phone records, physical evidence from the gravesite, DNA testing, and a variety of other evidence corroborated those witnesses' testimony. Given this simply devastating evidence, there is still zero likelihood that an innocent person was convicted at this trial. *Sanchez*, 969 F.2d at 1413.

      For the foregoing reasons, both the Motion and the Supplemental Motion should be denied in their entirety without a hearing.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

by: _____
Maurene Comey
Jacob R. Fiddelman
Assistant United States Attorneys
(212) 637-2324/-1024

cc:    All counsel of record (by ECF)