

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*50 Main Street, Suite 1100*
*White Plains, New York 10606*

June 3, 2024

**BY ECF**

The Honorable Kenneth M. Karas
United States District Judge
Southern District of New York
300 Quarropas Street
White Plains, New York 10601

    Re:    *United States v. Nicholas Tartaglione*, S4 16 Cr. 832 (KMK)

Dear Judge Karas:

    The Government respectfully submits this letter in advance of the June 10, 2024 sentencing of defendant Nicholas Tartaglione. As the Court is aware, the mandatory sentence is life imprisonment. For the reasons set forth below, the Government respectfully submits that the Court should impose life imprisonment on all counts, grouped so that the aggregate sentence is four consecutive life terms—one for each of the four lives that Tartaglione senselessly extinguished—to best serve the purposes of sentencing and the interests of justice.

**I.  OFFENSE CONDUCT**

    The Court is well-familiar with Tartaglione's monstrous offenses from presiding over this case since its inception, so the Government only briefly recounts the details of the quadruple homicide here. The following is drawn from the evidence adduced at trial. (*See generally* Presentence Report ("PSR") ¶¶ 24-55).

    On April 11, 2016, Nicholas Tartaglione orchestrated the kidnapping and murders of four men: Martin Luna, Urbano Santiago, Miguel Luna, and Hector Gutierrez. Martin was 41 years old when he died. Urbano was Martin's nephew by marriage and was 35 years old when he died. Miguel was Martin's nephew and was 25 years old when he died. Hector was a close family friend of all three and was 43 years old when he died. All four victims left behind a loving family, and many of their family members attended the trial in this case. (PSR ¶ 25).

    In carrying out these crimes, Tartaglione received assistance from Joseph Biggs, Gerard Benderoth (now deceased), Jason Sullivan, and Marcos Cruz. Martin was killed because Tartaglione believed Martin had stolen approximately $250,000 meant for the purchase of cocaine. Tartaglione tortured Martin by restraining him and beating him for over an hour, but when Martin did not provide the location of the missing money, Tartaglione strangled Martin to death with a zip-tie. Urbano, Miguel, and Hector were killed—each with a single gunshot to the back of the head, execution style—because they witnessed Martin's murder and were in the wrong place at the wrong time. Tartaglione buried all four victims in a mass grave on his remote property in

Otisville, New York. The four victims remained in the ground until the Federal Bureau of Investigation's Hudson Valley Safe Streets Task Force located the grave in December 2016. (PSR ¶ 25).

Tartaglione is a former police officer and body builder. Between approximately the early 2000s and his arrest in December 2016, Tartaglione sold steroids to body builders around the Hudson Valley area of New York. Biggs and Benderoth were two body builders who bought steroids from Tartaglione for their own personal use and to resell to their own customers. At times, Tartaglione also provided Biggs with marijuana and pills to resell. Between approximately 2013 and the April 11, 2016 murders, Biggs and Benderoth also assisted Tartaglione by collecting debts from steroid customers who owed Tartaglione money. Biggs and Benderoth collected these debts by intimidating the customers, threatening them with a handgun, and assaulting them. In exchange, Tartaglione paid Biggs and Benderoth with free steroids and/or a cut of the collected cash. (PSR ¶ 26).

In or around May 2015, Tartaglione hired Cruz to work on Tartaglione's ranch in Otisville, New York. Cruz worked on the property completing various tasks as a ranch hand and caring for the animals that Tartaglione kept on the ranch as part of an animal rescue. (PSR ¶ 27).

Shortly after Cruz began working on the ranch, Tartaglione asked Cruz if he knew anyone who would be interested in buying a car. Cruz subsequently introduced Tartaglione to Martin Luna, who Cruz knew from the Mexican immigrant community in Middletown, and who was interested in buying a car for his daughter. After Martin bought a car from Tartaglione, Martin asked Cruz if Tartaglione would be interested in growing marijuana on his ranch. When Cruz raised the idea, Tartaglione invited Martin to meet and discuss the proposition. During the summer of 2015, Martin, Tartaglione, and Cruz met two or three times on Tartaglione's ranch to discuss entering into the drug business together. During at least one of those meetings, Martin brought his nephew Urbano and Sullivan, who also happened to be a body builder and was Martin's close friend and partner in a construction business. At the time, Sullivan was living in New York, but he planned to move to Florida in or around the fall of 2015. The group initially discussed growing marijuana on Tartaglione's ranch, but at some point, Martin suggested that instead they obtain and sell cocaine. Tartaglione agreed that if Martin could locate a source of supply and arrange for the sale, he would invest the capital needed for an initial purchase of cocaine. (PSR ¶ 28).

In or around the fall of 2015, Martin identified a source of cocaine supply in Houston, Texas. After Martin identified the supplier, Tartaglione agreed to invest $200,000 with Martin for the initial purchase of cocaine. The two agreed that the cocaine would be transported from Texas to Florida, where Urbano would sell the cocaine at a higher price. After selling the cocaine in Florida, the proceeds would be transported back to Texas to purchase more cocaine to again resell in Florida. Cruz agreed to be the point of contact between Martin and Tartaglione to coordinate the trips between Texas and Florida. The plan was to continue flipping cocaine to grow Tartaglione's initial investment and generate profits for the whole group. (PSR ¶ 29).

After Martin and Tartaglione agreed on the terms of the cocaine business, Tartaglione went with Cruz to pick up the cash for the initial investment. Tartaglione provided Cruz with $200,000 in cash and a rental car, told Cruz that was Tartaglione's life savings, and then directed Cruz to

bring the cash and rental car to Martin. Cruz followed those instructions, after which Martin hid the $200,000 inside the rental car and brought the car to Tartaglione's ranch. Tartaglione then directed his brother to drive the car to Houston and drop it off in a hotel parking lot. The brother followed those instructions, and Martin flew to Houston, where he picked up the car and used the cash to purchase cocaine. (PSR ¶ 30).

This first trip to Texas for the purchase of cocaine took place in December 2015. After purchasing the cocaine using Tartaglione's $200,000 investment, Martin stashed the cocaine back into the same car, which Tartaglione's brother then drove from Texas to Florida. Urbano then picked up the cocaine in Florida and stashed it in Sullivan's new home in Florida. Over the next several weeks, Urbano sold the cocaine, storing the cash from those sales in Sullivan's home. (PSR ¶ 31).

In January 2016, Urbano finished selling the cocaine and worked with Sullivan to prepare the cash to be transported from Florida to Texas for the purchase of additional cocaine. The cocaine sales had generated approximately $250,000 in total, and Sullivan added in his own additional investment of about $11,000 as well. Sullivan and Urbano stashed the cash inside the spare tire of a car, which Tartaglione's brother then drove from Florida to Texas. Martin flew from New York to Texas, where he picked up the cash, which he told Cruz he planned to use for the purchase of more cocaine. (PSR ¶ 32).

Later that night, Martin called Cruz and Sullivan separately. During those calls, Martin claimed that he had been robbed and that all of the money—the $250,000 in profits from cocaine sales and Sullivan's $11,000 investment—was gone. Cruz immediately told Tartaglione, who was enraged at the loss of his life savings. Tartaglione insisted that Martin must find the missing money and repay Tartaglione. (PSR ¶ 33).

Over the next several weeks, Tartaglione engaged in an escalating campaign to pressure Martin to repay the missing money. At first, Tartaglione apparently believed that Martin had in fact been robbed and worked with Martin to try to locate the people who had stolen the money. For example, Tartaglione paid for Martin and Cruz to visit a private investigator to look for the people Martin claimed had stolen the money; and Tartaglione paid for Martin and Urbano to drive back to Texas to look for the people who had supposedly stolen the money. When those efforts did not turn up the missing money, Tartaglione insisted that Martin provide partial repayment by giving Tartaglione three cars Martin owned. (PSR ¶ 34).

Around this same time, Tartaglione asked Biggs to assist in questioning Martin about the missing money and pressuring Martin to return the money. Biggs agreed, and Cruz brought Biggs to meet with Martin on multiple occasions, during which Biggs questioned Martin about the missing money and threatened to harm Martin if he did not return the money. Despite Biggs's threats, Martin insisted he did not know where the money was. (PSR ¶ 35).

Around mid-February 2016, Martin stopped answering calls from Cruz, Tartaglione, and Biggs and avoided contact with them. Tartaglione came to believe that Martin had stolen the money for himself and switched tactics to hunt Martin down to force him to return the money. In furtherance of this goal, Tartaglione asked Benderoth to work with Biggs to find Martin. On

multiple occasions in February and March 2016, Biggs and Benderoth surveilled Martin's home in Middletown and searched for Martin, but they were unable to find him. (PSR ¶ 36).

At some point during the efforts to locate Martin, Tartaglione spoke on the phone with Sullivan, who was still living in Florida, and learned for the first time that Sullivan had also invested money with Martin that had been stolen. Tartaglione and Sullivan agreed to work together to confront Martin about the missing money. Sullivan was still in touch with Martin because they still worked together in their construction business and Martin had promised to repay Sullivan through their construction work. As a result, Sullivan learned that Martin had traveled to Mexico to visit his sick mother in March 2016 but was expected to return in April 2016. (PSR ¶ 37).

Sullivan and Tartaglione came up with a plan to trick Martin into going to a location where Tartaglione could trap him and confront him about the missing money. Sullivan agreed to send Martin on a fake construction estimate for their company. Martin would believe he was showing up to complete the estimate, when in fact Tartaglione would be waiting for him. Tartaglione planned to grab Martin and force him to return the money. If Martin failed to return the money, Tartaglione planned to kill Martin. Tartaglione recruited Biggs and Benderoth to help in this plan by joining Tartaglione to confront Martin at the location of the fake estimate. Biggs and Benderoth believed they would both receive a cut of the money when it was recovered in exchange for their efforts. (PSR ¶ 38).

In preparation for the plan, Tartaglione instructed Biggs and Sullivan to each purchase a burner phone to use when planning the lure for Martin. Tartaglione decided to lure Martin to a bar in Chester, New York called the Likquid Lounge, which was owned by his brother Michael Tartaglione. On April 9, 2016, Martin returned from Mexico. On April 10, 2016, Sullivan told Martin that he had scheduled three construction estimates for the next day. The first two were real estimates, but the third was the trap where Tartaglione would be waiting at the bar in Chester. After confirming the estimates with Martin, Sullivan called Tartaglione to confirm that Martin would be at the bar the next day as planned. (PSR ¶ 39).

On April 11, 2016, the plan went into motion. Biggs drove with Benderoth to the bar in Chester, where Tartaglione met them. Once at the bar, Tartaglione locked the emergency exit, and the three agreed on their plan to grab Martin, restrain him, and force him to return the missing money. Tartaglione then left the bar so that Martin would not see and recognize his car upon arriving. Sullivan spoke on the phone with Martin to confirm he was heading to the final estimate, and Sullivan spoke with Biggs on the phone to inform him that Martin was on the way. (PSR ¶ 40).

Because Martin believed he was just going to an ordinary construction estimate and did not know he was walking into a trap, he brought two family members and a close friend with him that day. Martin's nephew Urbano, his nephew Miguel, and his friend Hector all joined Martin for his estimates on April 11, 2016. They drove together in one car, parked nearby, and then walked over to the bar. (PSR ¶ 41).

When the four victims entered the bar, Benderoth led them toward the office in the back of the bar, where Biggs was waiting. When Martin saw Biggs, he tried to run out the back door, but the exit was blocked. Benderoth then pulled out a handgun and directed all four victims to get on

the ground. Biggs and Benderoth then restrained all four by binding their hands with duct tape. Biggs placed Urbano, Miguel, and Hector on the floor of the office in the back of the bar. Biggs and Benderoth bound Martin's hands and placed him in a chair, which they then took into the bathroom across the hallway from the office. Inside the bathroom, Biggs beat Martin about the face at least twice. Benderoth searched the victims and took their wallets, keys, and cellphones from their pockets. (PSR ¶ 42).

A short time later, Tartaglione returned. After seeing that there were three unexpected captives, Tartaglione elected to continue with the plan. Tartaglione went into bathroom and proceeded to beat Martin while screaming at him insisting that he reveal the location of the missing money. While Martin was still alive, Tartaglione called Sullivan to confirm that Martin stole money from him too, then hung up the phone. At some point, Tartaglione brought one of Martin's nephews into the bathroom to sit on the toilet and watch the beating. After Martin still had not provided any information about the missing money, Tartaglione put a zip-tie around Martin's neck and strangled him to death in front of his nephew. Martin's dead body collapsed in a pool of his own blood on the bathroom floor. (PSR ¶ 43).

Tartaglione and Benderoth dragged Martin's body out of the bathroom and wrapped it in a tarp. Biggs cleaned up the blood with a mop. Tartaglione then called Cruz to come identify the captives Tartaglione did not recognize. Cruz arrived at the bar and saw Martin's dead body on the floor of the bar wrapped in a tarp, two captives in the office, and one captive in the bathroom. Cruz told Tartaglione who each captive was. In response, Tartaglione asked Cruz whether he wanted to take the captives home. Cruz responded no because they would just call the police. Tartaglione then allowed Cruz to leave alone. (PSR ¶ 44).

At some point after Martin was dead, Tartaglione forced one of Martin's nephews to make a phone call using Martin's phone to one of Martin's adult daughters. Tartaglione instructed the nephew to tell Martin's daughter in Spanish that there was a problem and the victims had to go to Mexico. Biggs observed the call to make sure the nephew followed the script because Biggs understood Spanish. The nephew followed the instructions and spoke with Martin's daughter on the phone, following the script. (PSR ¶ 45).

Tartaglione and Biggs loaded Martin's body—still wrapped in a tarp—into the back of Tartaglione's car. Tartaglione drove Martin's body to a remote part of his ranch in the woods on the side of a mountain. On the way, he called Sullivan, informed Sullivan that Martin was dead, and told Sullivan that Urbano had shown up with Martin and would soon be dead too. (PSR ¶ 46).

Meanwhile, Biggs and Benderoth led the three remaining captives—who were still bound—out the back of the bar into Benderoth's car. Benderoth drove them to Tartaglione's ranch and met Tartaglione on the mountainside. Benderoth and Tartaglione escorted three captives out of Benderoth's car and had them kneel in the middle of the woods. Benderoth provided Biggs with a gun and directed him to shoot one of the captives, telling Biggs he could stay on the ranch with the captives or leave with Benderoth and Tartaglione. (PSR ¶ 47).

Biggs took the gun and shot one of the three captives in the back of the head. Tartaglione then took the gun from Biggs and shot another of the captives in the back of the head. Finally,

Benderoth took the gun and shot the final captive in the back of the head. Urbano, Miguel, and Hector died on their knees in the middle of the woods. (PSR ¶ 48).

Tartaglione then used a backhoe that he kept on his property to dig a hole near the victims' bodies. After the hole was several feet deep and wide, the backhoe broke and was no longer able to lift dirt. Tartaglione, Biggs, and Benderoth then threw the four victims' bodies into the hole. Tartaglione and Biggs used shovels to fill in the hole by hand until the bodies were covered but the hole was not completely filled in. (PSR ¶ 49).

Tartaglione, Biggs, and Benderoth then went to the bottom of the mountain on Tartaglione's property, where Tartaglione burned the victims' wallets and cellphones in a furnace. Tartaglione then instructed Biggs and Benderoth to take the car key they had recovered from the victims, pick up Cruz at Cruz's house, and search for the victims' car at the bar in Chester. Following those instructions, Biggs and Benderoth picked Cruz up in Benderoth's car and drove to the bar in Chester, where they used the key fob to search for the car in the bar parking lot. As it turned out, the victims had gotten lost when arriving at the bar and parked in a nearby business's parking lot, so Biggs, Benderoth, and Cruz were unable to locate the car when they only looked for it around the bar. Biggs and Benderoth then dropped Cruz off at home and returned to Tartaglione's ranch, where Tartaglione threw the victims' car key into the furnace. Tartaglione, Biggs, and Benderoth agreed not to tell anyone what had happened, after which Benderoth and Biggs drove back to their homes. (PSR ¶ 50).

That night, Tartaglione called Sullivan to tell him not to speak to the police and to destroy the phone he used to speak with Martin that day. Tartaglione also called Cruz and instructed him to come to the ranch alone the next morning. Cruz went to the ranch, where Tartaglione instructed him to fill in the mass grave on the side of the mountain. Cruz did as he was instructed and filled in the hole by hand. Tartaglione then rented a bulldozer to finish filling in the hole. Tartaglione told Cruz how the four victims had died and instructed Cruz that if anyone asked questions, Cruz should say the four victims went back to Mexico. (PSR ¶ 51-52).

After Martin, Urbano, Miguel, and Hector had been missing for several days, their family members filed a missing persons report with local police, who eventually referred the case to the FBI task force. On December 20, 2016, law enforcement investigators dug up the grave on Tartaglione's property and recovered the bodies of Martin Luna, Urbano Santiago, Miguel Luna, and Hector Gutierrez. (PSR ¶¶ 53-55).

## II. CHARGES AND SENTENCING GUIDELINES

The defendant was arrested on December 19, 2016 and has been detained since that time. The defendant stands convicted after trial of the following offenses: one count of narcotics conspiracy, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A); four counts of murder in furtherance of a drug crime, in violation of 21 U.S.C. § 848(e); three counts of murder through use of a firearm, in violation of 18 U.S.C. § 924(j); one count of conspiracy to commit kidnapping, in violation of 18 U.S.C. § 1201(c); four counts of kidnapping resulting in death, in violation of 18 U.S.C. § 1201(a)(1); and four counts of Travel Act murder, in violation of 18 U.S.C. § 1952.

All counts carry a statutory maximum of life imprisonment. The mandatory minimum terms of imprisonment, if any, vary by count, with the four counts of kidnapping resulting in death (Counts Ten through Thirteen) each carrying a mandatory term of life imprisonment. The Court has discretion to impose concurrent or consecutive sentences on each count. *See* 18 U.S.C. § 3584.[1]

The Government concurs in the United States Sentencing Guidelines calculation set forth in the Presentence Report, which results in an applicable Guidelines sentence of life imprisonment. (*See* PSR ¶¶ 67-115, 149).[2]

### III. DISCUSSION

#### A. Applicable Law

Although this case involves a statutorily required sentence of life imprisonment, the Court is still required to calculate and consider the sentence called for by the Sentencing Guidelines, which are only advisory after *United States v. Booker*, 543 U.S. 220 (2005). Because the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall v. United States*, 552 U.S. 38, 46 (2007), district courts must treat the Guidelines as the "starting point and the initial benchmark" in sentencing proceedings. *Id.* at 49.

After making that calculation, the Court must consider the factors outlined in 18 U.S.C. § 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) the four legitimate purposes of sentencing, as set forth below; (3) "the kinds of sentences available"; (4) the Guidelines range itself; (5) any relevant policy statement by the Sentencing Commission; (6) "the need to avoid unwarranted sentence disparities among defendants"; and (7) "the need to provide restitution to any victims," 18 U.S.C. § 3553(a)(1)-(7). *See Gall*, 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the Court must "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
(B) to afford adequate deterrence to criminal conduct;

---

[1] The three counts of conviction under 18 U.S.C. § 924(j) previously carried mandatory consecutive sentences but no longer do. *See Lora v. United States*, 599 U.S. 453 (2023).

[2] The Presentence Report accurately calculates the adjusted offense level for Group Two (the murder of Martin Luna) as 45 (*see* PSR ¶ 84), but then incorrectly lists that offense level as 47 in the chart set forth in paragraph 103. This typographical error has no impact on the substance of the Guidelines calculation. In addition, the Presentence Report mistakenly lists Urbano Santiago's name as "Urban" Santiago on page 3 (description of Count 9) and in paragraphs 64 and 70. The Government respectfully requests that the Court direct correction of these typographical errors at sentencing.

    (C)    to protect the public from further crimes of the defendant; and

    (D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

Although the Court may not presume the reasonableness of a within-Guidelines sentence, the Second Circuit has recognized that "[i]n the overwhelming majority of cases, a Guidelines sentence will fall comfortably within the broad range of sentences that would be reasonable in the particular circumstances." *United States v. Fernandez*, 443 F.3d 19, 27 (2d Cir. 2006); *see also Kimbrough v. United States*, 552 U.S. 85, 108-09 (2007) ("We have accordingly recognized that, in the ordinary case, the Commission's recommendation of a sentencing range will reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." (quotations omitted)).

**B. The Court Should Impose a Sentence of Life Imprisonment on All Counts, Grouped to Result in an Aggregate Sentence of Four Consecutive Life Terms**

In this case, four counts of conviction (Counts Ten through Thirteen) carry a mandatory term of life imprisonment. But the Government submits that the Section 3553(a) factors strongly support sending a clear message to Tartaglione, to the community, and to the victims' families by imposing life imprisonment on *all* counts, not just those for which it is mandatory, and structuring those sentences to result in an aggregate of four consecutive life terms—one for each victim that Tartaglione brutally and senselessly executed. Specifically, the Government respectfully suggests the following:

- Life imprisonment on each of Counts One, Two, Nine, Ten, and Fourteen (the narcotics conspiracy, kidnapping conspiracy, and kidnapping and murder counts as to Martin Luna), to run concurrently to one another;

- Life imprisonment on each of Counts Three, Six, Eleven, and Fifteen (the kidnapping and murder counts as to Urbano Santiago), to run concurrently to one another;

- Life imprisonment on each of Counts Four, Seven, Twelve, and Sixteen (the kidnapping and murder counts as to Miguel Luna), to run concurrently to one another;

- Life imprisonment on each of Counts Five, Eight, Thirteen, and Seventeen (the kidnapping and murder counts as to Hector Gutierrez), to run concurrently to one another; and

- The four concurrent groups of life sentences to run consecutively to one another.

Tartaglione's conduct ranks among the most horrific, vile crimes imaginable. Tartaglione led and coordinated a premeditated plot to kidnap, torture, and murder Martin Luna over money. When three innocent witnesses unexpectedly accompanied Martin into the trap, Tartaglione did

not hesitate to move forward with his brutal plan, then direct and participate in the cold-blooded executions of the three additional victims. The defendant inflicted inconceivable pain and terror on each of his four victims. He acted as the driving force behind all four murders, directing and leading his co-conspirators at every step. The suffering and senseless loss of each victim merits its own life sentence.

Martin Luna was a beloved father, brother, uncle, son, and grandfather. Tartaglione tortured Martin by beating Martin bloody with his own hands. When Martin remained silent, Tartaglione murdered him in cold blood, putting a zip-tie around Martin's neck, pulling it tight, and keeping it in place while Martin asphyxiated. Tartaglione then wrapped Martin's body in a tarp, drove it to his secluded ranch, and threw Martin's body into the dirt.

Urbano Santiago, Miguel Luna, and Hector Gutierrez were beloved husbands, fathers, cousins, nephews, and sons. They woke up on April 11, 2016 planning to join their uncle and friend on construction jobs, and they found themselves in a nightmare of Tartaglione's making by the afternoon. Tartaglione held each of them captive for hours, bound and laying on the floor of a small office. When Tartaglione's brutality failed to reveal the information he sought, he turned to a more depraved method by bringing one of Martin's nephews in to watch the beating. That nephew sat bound on a toilet and watched his uncle beaten bloody by Tartaglione before seeing the life leave his uncle's body after Tartaglione tightened a zip-tie around Martin's neck. After multiple hours in captivity, Urbano, Miguel, and Hector were forced into a car at gunpoint and taken on the most petrifying drive conceivable. Urbano, Miguel, and Hector found themselves in the middle of the woods on a mountainside with nowhere to run. Under Tartaglione's direction, Urbano, Miguel, and Hector were forced out of the car and onto their knees at gunpoint. Then one by one, each was executed. The terror the last victim to die must have felt borders on the incomprehensible.

Tartaglione then threw each victim's body into a hole in the ground, as though these four human beings were nothing more than trash. He not only extinguished each victim's life, but he also left their families to suffer months of anguish wondering what happened to Martin, Urbano, Miguel, and Hector. Each individual life lost as a result of Tartaglione's actions merits its own life sentence. The pain each suffered and the hole each left within a loving family can never be repaired, but it can be acknowledged through this Court's sentence. In furtherance of that aim, the Government urges the Court to impose four consecutive life sentences: one for Martin, one for Urbano, one for Miguel, and one for Hector.

## IV. CONCLUSION

For the reasons set forth above, the Government respectfully requests that the Court impose a sentence of life imprisonment on all counts, structured so that the aggregate sentence is four consecutive life terms.[3]

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

by: _____
Maurene Comey
Jacob R. Fiddelman
Assistant United States Attorneys
(212) 637-2324/-1024

cc: All counsel of record (by ECF)

---

[3] The Government also respectfully requests that, to protect the public, the Court impose a life term of supervised release on Counts One through Five (and the maximum of five years on each of the remaining counts) in the unlikely event that Tartaglione is ever released from prison through an unexpected change in the law. In light of recent Second Circuit decisions, the Government also respectfully requests that, for each special condition of supervised release that the Court intends to impose, the Court briefly state its reasons for concluding that each such special condition is "reasonably related" to at least one of the factors set forth in U.S.S.G. § 5D1.3(b). *See, e.g., United States v. Sims*, 92 F.4th 115 (2d Cir. 2024) (vacating special condition and remanding for district court to provide sufficient explanation for imposition of condition); *United States v. Oliveras*, 96 F.4th 298 (2d Cir. 2024) (same); *United States v. Jimenez*, No. 22-1022, 2024 WL 1152535 (2d Cir. Mar. 18, 2024) (summary order) (same).