UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------x
UNITED STATES OF AMERICA,

                                    Case No. 16-cr-832

     -vs-

NICHOLAS TARTAGLIONE,

                    Defendant.

----------------------------------------x

                              United States Courthouse
                              White Plains, New York

                              August 21, 2019
                              12:21 p.m.

               ** PARTIALLY SEALED **

B e f o r e:

                         HONORABLE KENNETH M. KARAS

                         District Judge


A P P E A R A N C E S:

GEOFFREY S. BERMAN
     United States Attorney for the
     Southern District of New York
MAURENE COMEY
JASON SWERGOLD
     Assistant United States Attorneys

MICHAEL K. BACHRACH
     Attorney for Defendant

BARKET, MARION, EPSTEIN & KEARON, LLP
BRUCE A. BARKET
AIDA F. LEISENRING
     Attorneys for Defendant

JOHN DIAZ
     Attorney for Defendant

A P P E A R A N C E S:    (CONT.)

KOFFSKY & FELSEN, LLC
BRUCE D. KOFFSKY
     Attorney for Defendant


LAW OFFICE OF ANTHONY L. RICCO,
ANTHONY L. RICCO
     Attorney for Defendant

LAW OFFICES OF BOBBI C. STERNHEIM,
BOBBI C. STERNHEIM
     Attorney for Defendant


DAVID A. RUHNKE
     Attorney for Defendant

THE DEPUTY CLERK:  The Honorable Kenneth M. Karas presiding.  United States of America versus Nicholas Tartaglione, 16-cr-83.

Counsel, please state their appearances.

MR. SWERGOLD:  Good afternoon, Your Honor.  Jason Swergold and Maurene Comey for the government.

THE COURT:  Good afternoon to you both.

MS. COMEY:  Good afternoon, Your Honor.

MR. BARKET:  I'll just announce myself.  Bruce Barket for Nicholas Tartaglione.

MS. LEISENRING:  Aida Leisenring.  Good morning, Your Honor.  Or Good afternoon.

THE COURT:  Good afternoon.

MR. DIAZ:  Good afternoon, Your Honor.  John Diaz for Nicholas Tartaglione.

MR. BACHRACH:  Good afternoon, Your Honor.  Michael Bachrach for Mr. Tartaglione.

MR. KOFFSKY:  Good afternoon, Your Honor.  Bruce Koffsky.

MR. RICCO:  Good afternoon, Your Honor.  Anthony Ricco from Mr. Tartaglione.

THE COURT:  Good afternoon, everybody.  Please be seated.

MR. RICCO:  Just for the record, we do have the presence of David Ruhnke, who is resource counsel.  He is here.

THE COURT:  Good afternoon, Mr. Ruhnke.

MR. RUHNKE:  Good afternoon, Judge.

THE COURT:  All right.  So we've got a couple of things to discuss.  I think we have a couple of things to discuss.  I think what I would like to do is if I could start off by asking counsel for Mr. Tartaglione to meet me at the sidebar for a brief conversation.

(The following pages are under seal)

SEALED PROCEEDINGS

(Sealed proceedings at the side bar; defense counsel only)

THE COURT:  So I think it makes sense to start off with the correspondence, Mr. Ricco, that you submitted, and Mr. Barket, you respond.  Procedurally, how do you want to move forward?

MR. BARKET:  That was -- I agree, but that's without anybody else.

THE COURT:  Oh, okay.  So if you want, we can go into the conference room.

MR. BARKET:  We need Nick.

THE COURT:  You have to talk to the marshals about that because I think there is a preliminary question about whether or not this really does need to be ex parte, and I don't think we need your client for that.  If it is ex parte, then we probably just have to just clear the courtroom.

MR. BARKET:  Yeah, that's what I was thinking.

THE COURT:  Because I don't think the marshals are going to let him in chambers, and it's not personal.

MR. BARKET:  No, I know.

THE COURT:  Seriously.

MR. BARKET:  I would.  He's a good guy, I tell you.

THE COURT:  I mean, again, the marshals have their protocol.  So -- so if we want, we can at least start with just the lawyers in the back, and then we can have that conversation,

and then if we go from there, we can move --

MR. BARKET:  Sure.  Let me just tell him what's happening.  The first part is, should it be ex parte or not?

THE COURT:  Right.

MR. BARKET:  That's fine.

MR. RICCO:  And, Judge, I would request that the first part is ex parte.

THE COURT:  I respect that that's your view.  I just don't want you to go in there, and -- but let's do it in the back, and I don't believe you need Mr. Tartaglione for that piece, but of course let him know.

(Side bar concluded)

(In conference room, defense counsel only)

THE COURT:  All right.  So for the record, we are in a conference room that adjoins the courtroom, and the reason I wanted to have this conference with counsel for Mr. Tartaglione only is to address in the first instance the extent to which the letters that were filed.  Mr. Ricco, your letter was filed August 17th; Mr. Barket, your response August 20th, whether the conversation about these letters should remain ex parte.

So for now, we are going to have the transcript of this proceeding be made available only to counsel for Mr. Tartaglione until otherwise because I can understand the arguments I can anticipate are going to be made.  So whoever wants to address the issue?

MR. BARKET:  Well, I think the short answer is the substance of what the letters entail certainly touch upon the attorney-client privilege, and it may involve discussions beyond -- discussions of conversations with Mr. Tartaglione beyond what's been reported in the paper.  So to have that aired publicly in the presence of counsel for the government would be problematic.

And, secondarily, there's been no hint by the government so far that I know that any counsel for Mr. Tartaglione would become a witness.  I wouldn't want our free-flowing discussion of some of the topics here to give them any ideas.

THE COURT:  So the attorney-client privilege piece is the one that's obviously the most potentially problematic.  I mean, to begin whether it's ex parte or not, Mr. Tartaglione's attorney-client privilege is his, and it only gets waived if he wants to waive it or there is some other legal basis to think that it's waived beyond his own personal consent.  I am at a little bit of a loss in terms of the basis for all this.

So I don't know more about the -- I guess it would be useful to know more about what the potential conflict is, so I can figure out how much of this might touch upon the privilege because the flip side of it is, you know, Curcio hearings normally are done in the presence of the government because they don't typically involve attorney-client privilege, and the

government has a stake in making sure that the client's situation is either conflict free or the client knows about the potential conflict, and it's waivable, and the client waives it, right?  And oftentimes there is consultation with counsel and so on and so forth.  So I take it you don't disagree with what Mr. Barket says, Mr. Ricco?

MR. RICCO:  I do not disagree with that.

THE COURT:  So if you can maybe enlighten me a little bit as to what the potential conflict is so I understand the dots that are being connected here.

MR. RICCO:  Judge, in my -- I think what's problematic here is is that to fully lay out the circumstances we would be intruding way into revealing confidentialities that were discussed with counsel, and so we are trying to alert the Court to the -- not only the doorway issue, but --

THE COURT:  Yes.

MR. RICCO:  -- getting in the weeds on this.

THE COURT:  Yes.  Okay.

MR. RICCO:  And I believe by flushing it out, we would then be violating his confidentiality -- his confidence.

MR. BARKET:  Can I take a stab at it this way?

THE COURT:  Yeah.

MR. BARKET:  I think the fundamental question is, at least in part, whether or not counsel had authorization to make the statements that were reported in the press if they involved

disclosure of client confidences; and if so, then the client should say so, and if not, then the client should say not, and then we take it from there.

So that's kind of I think -- I think that's fair. I think that's kind of articulating Mr. Ricco's underlying motivation for writing this. Obviously, we wrote our letter and our view is our view.

THE COURT: Yes.

MR. BARKET: But I think that's the core issue, and then necessary in that discussion, whether he has it in open court with independent counsel, he's obviously had it with us, the answers to those questions are going to involve, by their definition, other discussions that counsel has had with Mr. Tartaglione.

THE COURT: Which he has to waive, right?

MR. BARKET: Right. So to the fundamental question I think is: Here is a set of statements, and there is an index that we all have which is of various articles that reported various comments that were attributed to me, frankly. And so Nick, did you authorize this? And do you adopt it? Is this okay with you? Or not.

THE COURT: But he also has to be advised that he doesn't have to answer the question. It's his privilege.

MR. BARKET: Well, I think what Mr. Ricco's idea was, and is that if you have an independent counsel go ask it, that

person's covered under the privilege, so he can talk to independent counsel.

THE COURT: Sure. Right.

MR. BARKET: And it would be -- it would be privileged.

THE COURT: Right. But when we get to the hearing aspect of this, there is no hearing unless he waives because how do you resolve --

MR. BARKET: Well, I think -- I think what we all anticipate -- I think what we all anticipate he is going to say -- I don't want to speak for him, but I think we all --

MR. RICCO: We can.

MR. BARKET: We can. He is going to say, I wish he had said more.

MR. RICCO: Well, certainly, he is going to waive.

MR. KOFFSKY: Your Honor, if I may?

THE COURT: Yes.

MR. KOFFSKY: I think the Court has to ask itself: Under these circumstances, can the Court appoint Curcio counsel simply based upon the representation of defense counsel that there is a potential conflict? And simply by making that statement, does the Court have authority to appoint counsel, Curcio counsel, who the Court believes is knowledgeable in the area of Fifth Amendment and conflict, to report back to the Court as to whether the issue of conflict and Fifth Amendment

rights has been explained to the defendant, and whether there is a knowing and valid waiver and whether the client -- whether the Court, without pulling back the curtain, can accept that and accept the waiver.

Because what I think what we are trying to tell the Court is that we don't -- in the first instance, since this is the Court that's sitting on the case, is going to be hearing evidence, is going to be addressing other issues, that maybe this Court isn't -- excuse me. Maybe in this instance, the Court isn't the correct forum to address the underlying facts of the conflict, but if the Court can feel comfortable in appointing learned counsel --

THE COURT: But I am almost -- what I am doing is I am almost appointing a special master to evaluate the issue, and that's pretty tricky.

MR. RICCO: Judge --

THE COURT: I understand the point, but that's what I am a little worried about is --

MR. RICCO: Judge, one of the interesting things about this is that different lawyers have different views on this based upon where they are.

Judge, my concern is that this is a death-authorized case, and I would like to see us err on the side of caution and protection.

THE COURT: Of course.

MR. RICCO:  And I think that I want to be able to say that we all agree that the best way to protect Mr. Tartaglione's interests here is to have Curcio counsel, have a full discussion with him about the matters that are of concern of counsel and to find out whether or not he is prepared to waive on this.  We believe that he will.  And --

THE COURT:  Are you done?

MR. RICCO:  No, I am not.

THE COURT:  Sorry.  Finish.

MR. RICCO:  And we believe that he will.

What we are hesitant to do is to have an open conversation more about in addition to what has been discussed in the paper because -- because we then have a greater exposure of confidence, and I did run across a case that troubled me because what happened was that the lawyers just went right in to discussing with the Court the conflict, and at the time everyone was comfortable about that, but it ended up in that conviction being reversed.

And so my sense is at the first instance we -- I think we are in agreement that this is limited to these statements in the paper and the context under which he is willing to adopt.

MR. BARKET:  Look, I am not -- I don't want to -- and Tony is looking at me, and Mr. Ricco is looking at me.

MR. RICCO:  For a reason.

MR. BARKET:  Right.  So I am assuming it's to say

something.

MR. RICCO:  No, it's not to say something.  It's to say nothing.

MR. BARKET:  My view I think I articulated in the letter that was sent to the Court.  If the Court is inclined to have somebody separate from all of us speak to Mr. Tartaglione to confirm what I wrote, that's fine with me.

THE COURT:  I certainly don't see the downside in that, and, you know, I think that that's just a conceptual matter.  I think picking the right person is important.  I think somebody that -- I think there can be consensus would be well-versed, I mean, in Fifth Amendment and conflicts, but also just well-regarded, good judgment, experienced, you know.

MR. BARKET:  I am assuming you have done that, right?

THE COURT:  Well, I have certainly tried.  So we are not going to pick rookie of the year to do this.  And so maybe what we do is, we can go ahead and appoint Curcio counsel.  The benefit to doing that is then, then we are done with this for now.  Give Curcio counsel time to talk to Mr. Tartaglione, and then we can schedule a conference that can just be ex parte, and then we won't have a packed courtroom to deal with.

MR. BARKET:  I think, speaking for everybody, we are hoping because we think this is so straightforward, and I think clean, that this can all happen today so we all can move beyond it.

THE COURT:  I appreciate that may be your view.  I don't want speed to be the guiding principle here.

MR. BARKET:  Well, neither do I.

THE COURT:  Right.

MR. BARKET:  Of course, but I think the one thing that -- maybe more than one thing -- but certainly this thing that we agreed upon --

THE COURT:  Yes.

MR. BARKET:  -- I think that we thought we would be able to have somebody appointed today.

THE COURT:  Yes.

MR. BARKET:  And have that person conduct a rather limited inquiry into the problems that exist or potentially exist or possibly exist; get some feedback from the client, and maybe she can report back and say, Judge, I need more time or you know what, Judge, this is not an issue.

THE COURT:  Fair enough.  But put yourselves in the shoes of the Curcio counsel.  You don't know anything about the case.  Maybe you've read some stuff, but basically you don't know about the case.  You don't know much about what the potential conflict is.  What you do know is that you have got a lot of lawyers on the case.  It's a capital case.  The stakes could not be higher.  You would not be inclined to say, sure, Judge.  Just I will be back to you in a half hour.

I think that that -- I would be -- I would be very

concerned just about the weightiness of the magnitude of what we are dealing with here and say, while the lawyers may want to get this resolved lickety-split, my obligation as Curcio counsel is to make sure that this is thoroughly reviewed, and as an officer of the court, I would want to take that obligation seriously and not rush -- not dawdle either for sure, but --

MR. BARKET:  If she said that, I would respect it.  I just don't know -- we have already had -- you have appointed her.

THE COURT:  I have not.  I have asked her to be here today because I didn't want to jump the gun.  I asked Bobbi Sternheim to be here today.

MR. BARKET:  We had understood that you had appointed her, and we had a lengthy confidential conversation with her --

THE COURT:  She is appointed, but no, I had not.

MR. BARKET:  -- nunc pro tunc to half an hour ago.

THE COURT:  I asked her to be here because, I mean, I took seriously what all the letters said.  I took seriously your concerns about the Curcio counsel.  So I did not appoint her.  I asked her to be here today in case I wanted to appoint her.

MR. BARKET:  Oh, I thought that ship had sailed or I would have addressed it.

THE COURT:  No.  No ships have sailed.

MR. BARKET:  Then -- well, then my position remains the same.  I mean, there are -- you can look at the statements

that are attached in the index.  And --

THE COURT:  Which I haven't seen.

MR. BARKET:  Right.  But -- and I have no doubt that Mr. Tartaglione authorized them, will authorize them, adopted them, is happy with them, and --

MR. RICCO:  And that's not the issue.  The issue is whether or not you have a waiver, and that needs to happen on the record.  And so I have no objection.  Ms. Sternheim is here. She was under the impression that the Court had appointed her and this is -- it's fine.  That's not a problem here.

And she could start today by interviewing him.  He is here in the building.  She is here.  I am sure she is going to want to get started.  I think that's a good way to proceed.

THE COURT:  Yeah, I think the prudent thing to do is appoint Ms. Sternheim, and I will put on the record I have a world of respect for Ms. Sternheim.  She has -- I have dealt with her as an adversary, and I have dealt with her in this job, and I think she is exactly the kind of lawyer that we can all trust to handle this with great professionalism and integrity, and so that's why I asked her to be here today.

I do think that if it's true, Mr. Barket, that this is a no-brainer, then this will be a no-brainer, but at least we have, I think, respected Mr. Tartaglione's right to make sure that this issue is thoroughly covered.  Again, given the magnitude of what he is facing, I just think it's the

SEALED PROCEEDINGS

appropriate thing to do.

MR. BARKET:  Sure.

THE COURT:  I don't think there is any downside in terms of the attorney-client relationship or certainly anything to having to do with his strategy going forward.  So --

MS. LEISENRING:  If I may?

THE COURT:  Sure.

MS. LEISENRING:  The only downside is any kind of statement that the quote-unquote potential or actual conflict has been waived is an assertion that an attorney violated the Rules of Professional Conduct.  So to the extent that that's not an assertion of that, then we are fine.

THE COURT:  It's not at all.  Getting back to the ship has sailed, the ship is in the port.  I have made no such finding, and by appointing Ms. Sternheim, it's not even a preliminary finding of anything of the sort.

MR. RICCO:  And, Judge, that's right.  We have made that clear.

THE COURT:  To be prudent here.

MS. LEISENRING:  I want that on the record.

MR. RICCO:  We made that clear to all counsel and also Mr. Tartaglione.  They understand that this is a protocol.  This is the protocol that the circuit has said these matters are to be resolved, and everyone understands that the ultimate decisions are made by the Court, not by us as counsel.  We don't

get to say what conflicts are and aren't.

THE COURT:  That's true.

MR. RICCO:  We have to discuss those with Curcio counsel, and the Court decides whether or not there is a waiver or nonwaiver of conflict here.

MR. BARKET:  I am sure the Court understands that it's from our perspective, and when I say "ours," my firm, out of the tremendous respect we have for Mr. Ricco and the other attorneys here, we moderated our response.  If the government had made this application, our response would have been much different.  But, you know, they are experienced at this.  They understand this.  He is fantastic resource, so --

THE COURT:  Yes.

MR. BARKET:  You know.  So we tried to tread lightly here.  Even if I --

THE COURT:  You are lucky this is going to be ex parte right now, taking a shot at the government.

MR. BARKET:  Even if I think -- well, I am just saying.

THE COURT:  The gloves would be off.

MR. BARKET:  All that will come in a few minutes, but the -- you know.

THE COURT:  Okay.  I appreciate that.  Look, again, I think it should be clear from the letters that there is nothing but professionalism here.  I mean, all the way around, and

everybody's concern is, as it should be, what's in Mr. Tartaglione's interests and how do we protect his rights and interests here --

MR. BARKET:  Of course.

THE COURT:  -- consistent with the law.  So I think that that goes without saying, and I think the fair point -- and that's why there is no findings here other than I think it's prudent to under the circumstances to have Ms. Sternheim be appointed Curcio counsel, and then she can -- either you all can talk to her about wanting to get this resolved as quickly as possible, but then I think we let her do her thing and do what she thinks she needs to do to perform the role of Curcio counsel, and then if we have to come back another day and have an ex parte conference, then so be it.

MR. BARKET:  Okay.

MR. RICCO:  Makes sense, Judge.

THE COURT:  So again, the transcript of this proceeding is going to be sealed for now because I am satisfied based on the representation of counsel that the Curcio issue about which there have been no findings made, could involve sensitive issues about attorney-client confidences, and so therefore, there is no reason at this point to have the government, let alone the public, learn about this.  Whatever First Amendment and common law right of access there is, and of course there is such rights to grant access to transcripts of

criminal proceedings, they are outweighed by the compelling interests of Mr. Tartaglione's attorney-client privileged communications with his attorneys, which, based on the representations of counsel, are potentially at issue here.

So counsel for Mr. Tartaglione can get a copy of this transcript, but at this point nobody else can.

MR. BARKET:  Please.  Thank you.

THE COURT:  Okay.  Anything else?

MR. BARKET:  No.

MR. RICCO:  No, Judge.

THE COURT:  So, again for the record, I am appointing Ms. Sternheim to be Curcio counsel if you want to be the messengers to let her know that, and then I can talk to her afterwards, but I think in terms of how we transition back to the courtroom, I think that might be the smoothest thing to do. She already thinks she is the Curcio counsel.

MR. BARKET:  I just want it clear that it goes back and encompasses the conversations we have had before --

THE COURT:  Fair.  Nunc pro tunc.

MR. BARKET:  Right.

MR. RICCO:  Yes.  And those conversations only included what's in the newspapers anyway.  So but I think that we are okay.  It's always good to be overly cautious in a capital case on everything.

THE COURT:  Hear, hear.  Okay.

(In open court)

THE COURT:  All right.  Have a seat.  Does it make sense to address the issue about conditions at the prison next?

Mr. Barket?

MR. BARKET:  I am --

THE COURT:  Sorry.

MR. BARKET:  Sure.  I am happy to.

THE COURT:  Okay.

MR. BARKET:  I shouldn't say I am happy to.  I am actually dismayed with having to come back to this over and over and over again to the point where I am asking the Court to order that Mr. Tartaglione be detained in some other facility.

The only concerns I have about the other facilities is that it be local enough where he has access to the people that he needs to have access to, his attorneys.

So Valhalla really isn't maybe further in miles from MCC than our office, but certainly not further in time on most business days; and then you can kind of draw a circumference around New York City and imagine all of the facilities that exist, many of which house inmates who are charged federally and inmates who have been -- are facing a death penalty as well.

So and my reasons for that, and I think I state in the letter, as much as we tried to get things right at MCC, I think it should be apparent to everybody now that MCC has ingrained, longstanding issues that go well beyond being able to provide

reasonable conditions for Mr. Tartaglione and ordinary access to his attorneys, which has been a problem even when we have engaged in this process, which is highly unusual, but much appreciated where we can, in essence, call the jail or write to the jail a few days ahead of time and have an appointment for one of the two rooms available to see Mr. Tartaglione.

Even when we have done that, it's worked about -- I haven't taken a statistic on it -- but about 30 or 40 percent of the time. Even with that in place, people wait -- and I say "people," we are talking about lawyers, some of whom are being paid by the government, hours, and investigators and mitigation people before they are allowed to see him.

And also my concern more recently is, given the events at MCC and Mr. Tartaglione's proximity to them, he is in a particularly vulnerable position. One of the things that occurred that I just found out about this morning that I did not put in the letter to the Court is that Mr. Tartaglione received a correspondence, a note from a friend, three, and my understanding is that those letters were cut up with razor blades, which I have never heard of before happening. He had to piece them together to read them, and he's never received a letter like that. I haven't heard from any other clients having that ever happen. I took a straw poll among counsel. We haven't as well.

And I understand there are people's jobs on the line,

perhaps more than that, and they recognize pretty clearly that we have been complaining about the conditions and their treatment of my client for I think it's been more than a year before Your Honor; and then, obviously, more poignantly over the last month or so, and certainly over the last couple of weeks, it has been something that we have complained about quite vociferously, and they are telling him in the comments that I wrote in the letter, you know, tell your lawyer to shut up, which he takes as a specific threat to him, stop complaining. Stop talking.

At this point, it just doesn't seem appropriate that he be housed and guarded by the very people that are under investigation given his proximity to the events that are being investigated, regardless of whether or not he is ever called as a witness, talked to by those investigators, and whether or not it's to specific people or the colleagues or friends or co-workers, the same principle applies.

There are multiple jails in the metropolitan area that hold inmates charged with homicides. They are all secure and safe. I would ask the Court to please put him in another one, and we should not have to deal with these issues in a capital case; should not have trouble reaching a client. I shouldn't have a client who is fearful for extraneous reasons of the people that are guarding him. We shouldn't have to deal with the conditions that exist, and the conditions is -- the books is

a silly thing, sort of, except if you are locked in a cell 24 hours a day and then being able to read a book is the difference between insanity and sanity; and the way he's gotten books is the lawyers for the facility, who have been above and beyond courteous, professional, accommodating, to us and to the concerns, literally are bringing him the books themselves. So you have the attorney for MCC being the very person to deliver books to make sure that Mr. Tartaglione has the books that other people are buying for him and sending to the facility.

Sooner or later, I don't want to have a hearing about MCC, necessarily. I don't want to have this ongoing conversation with the Court. It is an unbelievable distraction to the preparation of his case. It takes time when I meet with him. It takes time to write the letters. It takes time to make the appointments even to go see him.

At this point, I am simply asking the Court direct that he be housed someplace else, and I mean, obviously, Nassau would be simple for me because it's 15 minutes from our local office and no further from his family, but I am happy to drive to Valhalla or wherever.

THE COURT: Okay. Who wants to respond from the government?

MR. SWERGOLD: Thank you, Your Honor. So with respect to the overall position regarding moving him out of the MCC, the government's view is that we defer to the U.S. marshals on this.

They are the ones who have the expertise in determining where defendants should be housed, what are the appropriate facilities. I know in prior conversations with the marshals, and Stuart Smith is here as well, that given the nature of the charges --

THE COURT: For the record, Stuart Smith is the --

MR. SWERGOLD: From the marshals.

THE COURT: -- from the marshals and is the person who runs the White Plains marshals office.

MR. SWERGOLD: Yes. Thank you. Your Honor.

THE COURT: Okay.

MR. SWERGOLD: Given the nature of the charges here, quadruple homicide, Mr. Tartaglione's former profession in law enforcement, certain actions that occurred at the MDC, the position is that he is not a suitable candidate for a local or contract facility; that it is only a BOP facility, and the fact that he is facing the death penalty, that it is only a BOP facility that is appropriate.

THE COURT: Do you know if there are local facilities that are even an option? Because they are not federal facilities. So Valhalla is run by the County of Westchester. Right? I assume Nassau is run by -- if I could finish the question. Is Nassau County the one you are referring to? Is that run by the federal government?

MR. BARKET: No. The Nassau County Jail, Valhalla is

a Westchester County jail, but those are I guess contract facilities, so there are federal inmates in both facilities.

THE COURT: Right.

MR. BARKET: Some of whom are facing the death penalty.

THE COURT: Right. But as I understand it -- and maybe I am wrong about this -- that there is a contract, but the contract doesn't require these facilities to take whatever inmate the marshals say go there because I just know this from other cases; that we have had other cases where for a variety of reasons, maybe sometimes there's been a particular inmate has been at a county facility, and then there was a misbehavior problem, and they said, that's it. We want them out, and the marshals have to take them out, and they don't get to say, no, no, you must take them per paragraph whatever of the contract.

MR. BARKET: I don't know. You know better than I about what the contract is. If we get to the point where they go to Valhalla, and Valhalla says, we can't have him here because of X, Y and Z --

THE COURT: Yeah.

MR. BARKET: -- that's different than in the first instance the government or the marshal service saying, MCC is the only place we are putting him. I don't care if ten other facilities --

THE COURT: That's not what I am hearing.

MR. SWERGOLD:  Your Honor, so --

MR. BARKET:  That's what -- I think that's what the position is, that MCC --

THE COURT:  Okay.  Well, let's find out.

Yes.  Go ahead.

MR. SWERGOLD:  So a couple of things, Your Honor. First of all, you are correct that with respect to these local facilities, the marshals in the Southern District of New York have a contract with some of the facilities.  They -- the S.D.N.Y. marshals do not have a contract, my understanding is, with Nassau.  Those are local facilities.  They determine who they are going to take.  Your Honor's experienced the same as the experience we have had in other cases where when we seek to put in a defendant in a particular local facility, they may either just be rejected out of hand, or they may get there and do something that requires them to be kicked out, and the marshals have to accept that and put them into another facility. They don't get a final say on it.

My understanding is that the determination was made, based on all of the factors that I discussed, that a contract facility is not an appropriate place to house this defendant; and one other thing I would just point out, Your Honor, is Mr. Barket has mentioned a number of times that these other facilities are housing defendants facing the death penalty.  I am not aware of any.  I know that there are two cases in this

district, including this one, where the government is seeking the death penalty. Both of those defendants are detained at the MCC. I am not aware if there is any from the Eastern District, and that would be in a contract facility that they have, and I don't know -- I don't think that would apply to any state inmates because there is no death penalty in New York right now.

So the position of the government, again, is that we would defer to the marshals on what their determination is as to the best place to house --

THE COURT: So when you say the marshals have said that the local facilities are not appropriate, is there a particular reason? In other words, is this a situation where the marshals are making that decision or the local facilities are saying, we are not going to entertain housing this particular individual? I just want to be clear on that.

MR. SWERGOLD: Your Honor, in my conversations with the marshals, and in particular with Mr. Smith, we have talked about some of the reasons -- the marshals have talked about some of the reasons why a BOP facility is the only appropriate facility. I would defer to him as to whether there have been conversations with local facilities; what the marshals' experience has been with local facilities with similarly situated defendants to be able to provide the Court with that kind of context.

THE COURT: Okay. So let's put that issue to the

side.

So with respect to MDC, because that's the other BOP facility that's in the New York metropolitan area.

MR. SWERGOLD:  Sorry, Your Honor.

THE COURT:  That's okay.  With respect to MDC, which is the only other BOP facility in the New York metropolitan area, the issue there as I understand was that Mr. Tartaglione was housed there before MCC, but there was some kind of a disciplinary issue, and that that led MDC to say that they didn't want to house Mr. Tartaglione.  Is that correct?

MR. SWERGOLD:  That's correct, Your Honor.

THE COURT:  And has anybody gone back to MDC and asked if it would revisit the issue?

MR. SWERGOLD:  We would have to defer to the marshals on that, Your Honor.

THE COURT:  Okay.

MR. SWERGOLD:  As to whether or not MDC is willing to take him back.

THE COURT:  Okay.  Okay.  Anything else you want to add?

MR. SWERGOLD:  I mean, I am happy to, and I think the government should respond to some of the -- to the conditions arguments raised in the letter.

THE COURT:  Sure.

MR. SWERGOLD:  So the record is clear on them.

THE COURT:  Yes.

MR. SWERGOLD:  I think one of the overall issues here, Your Honor, is that, as Your Honor knows from prior conferences, the government and MCC legal have been working very diligently taking this very seriously to address any of these concerns that are raised by Mr. Barket in his letters.

One issue that we see in the most recent letter is that things are being sort of held close to the vest and then only told to us on the eve of a conference when we are trying to keep an open communication because most of the things that he raises, we reach out to MCC right away, and then they get fixed.

A lot of the things that are in this letter have already been addressed or have never been raised before or members of the staff went and spoke to Mr. Tartaglione, and he did not raise any of these issues, and so that becomes a little bit difficult for the government to be able to stay on top of these things because if Your Honor recalls, back maybe three conferences ago before the defendant was moved to the SHU because of the cell phone, we stood up in court and everybody sort of agreed that the conditions had reached a point where there were no complaints.  Everybody was working to make sure we keep them that way.

So we would ask again that defense counsel sort of keep us in the loop on this stuff and let us know in a timely fashion if things are happening that they would like us to look

into; and that's I think also particularly important with respect to the allegations in this letter on the second page that there are -- that there is some retaliation going on --

THE COURT:  Yes.

MR. SWERGOLD:  -- or some comments that Mr. Tartaglione is interpreting as threats.

THE COURT:  Yes.

MR. SWERGOLD:  So, again, as we have told Mr. Barket, it is helpful for him to let us know with as much specificity as possible, and in a timely fashion, when something like this happens.

So, for example, on Friday of last week, we had a call with Mr. Barket in which he said that -- he said that guards were retaliating against Mr. Tartaglione because of what occurred with respect to one of his former cellmates.  We said, okay, please give us specifics.  Tell us the names of the guards.  Tell us when this happened, what they said, and do it soon because the sooner you can do it and the more specific, we can follow up with MCC legal.  We can investigate.  We can try to corroborate the investigations.  We can look into them.  We have not been provided with those specifics.  The letter itself also is incredibly vague, and so it just makes it very difficult.  We have told the MCC legal.  They have told their staff repeatedly there is to be no retaliation whatsoever for the fact that Mr. Barket and Mr. Tartaglione are raising issues

in court with respect to conditions.  They are fully aware of that fact.  And we -- these types of allegations are difficult for us to look into.  We want to be able to look into them to the extent they are happening because it's incredibly serious, and we understand that none of this should be taking place to the extent that it is.

And I think, understandably, there might be some frustration from the staff, though I am not saying it justifies making any kind of comments if those are being made, but they interact with Mr. Tartaglione on a daily basis.  He is not telling them about any particular problems, then it gets raised in court, and the first they are hearing about it is MCC legal or the U.S. Attorney's Office saying something to them.

So, again, this is what we talked about at a prior conference.  If there are particular issues, if -- if a newspaper didn't arrive.  If he wants access to another book, just ask the staff.  Ask, and if he is not getting the responses that he wants, tell his attorney.  Have him tell us right away, and we immediately follow up.  I think in almost every circumstance that we have received a call or an email or a letter from Mr. Barket, we immediately get on the phone with MCC legal, and they immediately start looking into it.

There is a number of things that MCC legal has been doing, for example, with respect to the newspapers where they now get daily updates in the legal department about what is

coming into the mailroom to see if there are any newspapers. They then follow up that night with the SHU staff to ensure that whatever came in that day from the post office is being delivered to him. So while there are some days, for example, where nothing comes in from the post office, then there are days where they find out, okay, there are three newspapers. I think today actually three arrived. We saw the emails confirming that. They then follow up with SHU staff to make sure that it's getting to Mr. Tartaglione. So as long as there is open communication, we can continue to address any of these issues that exist.

The one thing I would also just say with respect to the legal visits. So Mr. Barket alluded to the fact --

THE COURT: Yes.

MR. SWERGOLD: -- that MCC legal has created a system for this defense team where if they notify them in advance, even morning of, that they are coming, they are moving Mr. Tartaglione in advance of the time that his lawyers are getting there to one of the attorney visiting rooms to ensure that one of them is available for him because I think Your Honor may remember that at a prior conference there was a concern that some inmates were spending all their time in it with a legal team 12 hours a day, and it was cutting down access to the rooms.

So they made that accommodation. He is then given his

discovery so that he can -- while he is in that room, he can make use of the time and look at the discovery while he is waiting for his attorneys.

They have also told defense counsel, Mr. Barket repeatedly, if you are waiting downstairs and you don't feel like you are being brought up quick enough, tell the guards to call Adam Johnson or Stephanie Scannell at MCC legal or if you have your cell phone on you, do it yourself, or if you don't and you want to grab it and step out, just call us. Let us know so that we can follow up on it as it's happening.

And our understanding from MCC legal is that in almost all of the circumstances where there is -- we later learn of a delay that Mr. Barket has raised as an issue, they did not avail themselves of that procedure. So MCC has put a procedure in place, and there's only been actually two instances our understanding from MCC legal where they were notified by Mr. Barket of delays. In the first one, one of the members of the legal staff ran into Mr. Barket and another member of the defense team, as they were leaving, Mr. Barket mentioned that he had to wait a while and said I think in substance, that he didn't have anywhere to be that day, so it was okay. That's why he didn't call. They reminded him, ask the guards to call us or call us yourself while you are there so that we can come down and get you up faster.

In the second instance, there was a special count that

was taking place in light of the ongoing investigation at MCC right now, and MCC legal staff emailed Mr. Barket ahead of time to let him know this special count was going to be happening; it might delay the time that the inmates are brought down for attorney visits.  My understanding is that that count cleared by about 5:30 p.m., and although MCC legal doesn't know exactly what time Mr. Tartaglione was able to start meeting with Mr. Barket, MCC legal staff went up to the SHU at around 6:30, so just about one hour after the count cleared, and Mr. Tartaglione was not in his cell.  He was already in an attorney conference room.  So yes, there was a slight delay there.  It was caused by the fact that a special count was being done, and they were given advance notice of it.

So I think with respect to all of the conditions that are raised in this letter, Your Honor, as long as we know about it in time, we are working very diligently with the MCC legal staff, and they are working very diligently and coming up with accommodations and new procedures to help the team have more access to their client, to make sure that they can get in there, and to make sure that any little issue that Mr. Tartaglione raises with respect to his cell, his mail, anything at all, is addressed in a timely manner.

THE COURT:  Okay.  Hang on, Mr. Barket.

So with respect to alternatives, I think everybody agrees that the only other BOP facility in the New York

metropolitan area is MDC, and I guess if we can get an answer to the question, if there is somebody here who knows, that MDC has been asked and they have already said we are not taking Mr. Tartaglione back or can they be asked?

MR. SWERGOLD: Can we have one moment, Your Honor?

THE COURT: Sure. Of course.

(Pause)

MR. SWERGOLD: All right. Thank you, Your Honor.

THE COURT: Sure.

MR. SWERGOLD: So a couple of things: With respect to MDC, it's our understanding that the decision to move him out of MDC in the first place was one that was made by MDC, not by the marshals. Within the last year, however, the marshals did ask MDC if they would take him back, and the answer was no. But the marshals will follow up again and ask them.

THE COURT: That was my memory because we had, I think, explored this alternative before.

MR. SWERGOLD: Right.

THE COURT: So I appreciate the marshals inquiring again.

MR. SWERGOLD: They will inquire again, and then with respect to the contract facilities that the Southern District has, the answer has actually come from the contract facilities, no. They will not accept him. And then with respect to Nassau, that's, again, not a contract facility that the marshals here

have a contract with. We admit the Southern District marshals have never housed inmates there, and so they don't have any basis to ask them to do it.

THE COURT: Yes, as far as I understand it, there is a contract with Valhalla, and then in the past there's been some -- there have been a few federal inmates at Orange County, and I think those are the only two --

MR. SMITH: Putnam as well, Your Honor.

THE COURT: Putnam.

MR. SWERGOLD: All three have said no.

THE COURT: Have said no.

MR. SMITH: Yes, Your Honor.

THE COURT: Okay. Mr. Barket?

MR. BARKET: I know that Nassau houses federal inmates because I see them.

THE COURT: But they may not do it -- right, but that's the thing. It may not be -- there is no contract with the Southern District marshals.

MR. BARKET: Okay.

THE COURT: So --

MR. BARKET: That's what it is, that's what it is. I just -- they house inmates there regularly.

THE COURT: It may be, but it sounds like they are Eastern District cases.

MR. BARKET: Right.

THE COURT:  So --

MR. BARKET:  I'm not privy to the contracts, so I don't know how --

THE COURT:  Neither am I, but it stands to reason that the Eastern District marshals office would be the one that has a contract with facilities in the Eastern District.

MR. BACHRACH:  Sorry, Your Honor.  May I?

THE COURT:  Yes, of course.  Try to be near a microphone if possible.

MR. BACHRACH:  Sure.

THE COURT:  Thank you.

MR. BACHRACH:  Thank you, Your Honor.  Just so the record is clear, there have been exceptions where, even though the facility is not contracted with a specific district, the inmate was able to -- the marshals were able to make arrangements so the inmate could be housed there.  For example, Your Honor, in *United States versus Farad Roland*, which was an authorized death penalty case in the District of New Jersey, there was an issue as to needing to find a new facility for him, and he was placed at the MDC, which was not contracted with the New Jersey marshals.

THE COURT:  But the MDC is a Bureau of Prisons facility.  It's a federal facility.  I mean, what we are talking about here is having a federal judge try to fiat a county facility to take a federal inmate, even though that facility

doesn't have a contract with the marshals service that is responsible for housing the defendant. So the New Jersey case is different. That's why, if there were -- if there were a third federal facility in the New York metropolitan area, this would be a lot easier, right? And I imagine we don't want to call up Philadelphia and say, do you have room, right? So -- so that's the issue is that how we manage with respect to the fact that there is only two federal facilities. One of which, you know, said to Mr. Tartaglione, we don't want to house you here anymore because there was some discipline issue, and the other which is being complained about. So that's the problem we have.

MR. BACHRACH: Understood, Your Honor.

THE COURT: Okay. Mr. Barket?

MR. BARKET: Just to -- some of the problems have been addressed. The books sort of. But just as an example of what goes on at that facility.

THE COURT: Yes.

MR. BARKET: Mr. Ricco, I believe, was in to see Mr. Tartaglione on the 15th of this month, and got in pretty quickly, and he got in pretty quickly because maybe the point is one of, in my view, 30 or 40 percent of the time the system worked.

THE COURT: Right.

MR. BARKET: And Johnson came down with a fistful of -- armful of books, and I got books for you, Nick, and I will

bring them upstairs. And sure enough, he did. And they sat there for a day and a half until the guards felt like giving them to him. This kind of thing goes on over and over again.

For the government to say that Nick should ask the staff for a shower? He does, constantly. He asks for books, constantly. He asks for legal calls, constantly. And he is routinely ignored. He was supposed to have a shower on Monday. Yesterday he asked the guard, can I have a shower?

THE COURT: For the record, today is Wednesday. Go ahead.

MR. BARKET: Sorry. Asked the guard, can I have a shower? And he says, I didn't get one yesterday. I was supposed to get one. And the guard said, you didn't get one yesterday, and you are not getting one today.

This morning when he woke up, the guard said, give this guy a shower. I don't want to read my name in the paper, and so he got a shower this morning.

The access to the -- by the lawyers every time I go there, or virtually every time I go there, I write a note, and as does all the people in the team because we are aware of the system and try to make an appointment. What I am saying is that about 40 percent of the time it works. The other 60 percent of the time people wait hours, and it's not waiting downstairs. It's you go upstairs to the room, and you sit in the room for hours at times. Sometimes an hour. Sometimes two. Sometimes

three.  And it's not a function of the legal staff not doing what they are supposed to because I know they do.  I have dealt with them for years.

THE COURT:  I understand.

MR. BARKET:  They are fantastic.  And the government has been accommodating.  It's that the -- a disconnect between what's supposed to happen and what happens; and this should not be a surprise given how this facility is run, how the hands-on, what actually goes on.

The silly example I repeat over and over again, there were, you know, 12 clocks in 12 different visiting rooms, including the SHU.  For years none of them worked because nobody put a 10 cent AA battery, and they just shrug.

THE COURT:  Forgive my facetiousness having been in the government for many years.  Do you think that's an MCC-only problem or do you think if we were to send audit teams around to BOP facilities around the country, we wouldn't find a substantial number of clocks also battery-less?

MR. BARKET:  They pulled that facility up as the preeminent place to house the worst of the worst; is it supposed to run this way?  It is the worst facility I have ever experienced.  Inmate after inmate who have been there and at Rikers Island who have said, send me to Rikers.

THE COURT:  I read articles that are very critical of MDC as well.  They -- MDC was also --

MR. BARKET:  MDC --

THE COURT:  Hang on.  Please let me finish.

MR. BARKET:  I'm sorry.

THE COURT:  I let you finish.  MDC has certainly earned its headline stories as well, and I suppose if we were to do, you know, searches, we might find similar things about BOP facilities in other parts of the country.

I'm not -- and I don't mean to sound facetious, but I do think, you know, it may be that moving Mr. Tartaglione to get away from some of these things of course is the right answer, but it may be that at the other BOP facility that he will have some of the similar issues.

MR. BARKET:  It may be, and some of the conditions at MDC -- MDC got a lot of publicity because the power went out, and rightfully so, right?  So there's an incident that took place there.

One of the big differences between MCC and MDC is that there are a limited number of attorney conference rooms at MDC like there are at MCC.

THE COURT:  Yes.

MR. BARKET:  But MDC permits the lawyers to visit with the clients in the general population area.  So clearly, you can't get every bit of work done, right, if you have a real intense or important -- but you can get some work done.

THE COURT:  Sure.

MR. BARKET:  So if you go there, you are not stuck waiting for hours for a room to open up.  They will put you in the room.

THE COURT:  Do they do that regardless of the -- what the inmate is charged with?

MR. BARKET:  Yes.  I have seen Mr. Tartaglione when he was at MDC.

THE COURT:  Okay.

MR. BARKET:  If you recall, he was actually MCC first.

THE COURT:  And then MDC and then --

MR. BARKET:  Then MDC.  And the disciplinary problem that they talk about didn't result in any discipline at all to him.  It was -- we all know what it was because I think we talked about it.  They just said, get him out of here, but there was no formal charges brought against him.  So it's difficult for us to respond to it to say, what's the problem?  You know, they just said we don't want him anymore, and this is the vague allegation of what the problem was.

So MDC has that ability to go over and you sit, and they have a separate area where the attorneys meet in the -- in a much bigger room --

THE COURT:  Okay.

MR. BARKET:  -- probably a little bigger than the courtroom perhaps, and so that's one big difference between the two places.  But whatever other problems I am sure exist at

jails and prisons around the country, we are not saying put him up at the Four Seasons.

THE COURT: I understand.

MR. BARKET: This particular place is acutely a problem and has been a problem over and over and over again really with the same issues.

THE COURT: Okay.

MR. BARKET: As much as we address them, we come back, it's the same thing.

THE COURT: All right. So I -- sort of my reaction to this is that to the extent we want to explore transferring Mr. Tartaglione, our options are fairly limited because I don't think, you know, if a county facility says no, we are not going to let him in, I don't know what the authority would be for a federal judge to say, no, you have to take this person, including Nassau, which isn't even in our district; doesn't have a contract with Southern District marshals. So it seems to me our options are: We try to improve the situation at MCC or we see if MDC can be accommodating. If not, whether their unwillingness to be accommodating can be somehow basically overruled.

So if you could do this, government, if you could have the marshals, and maybe you should be involved in this conversation as well, because I don't want to put this all on the marshals. They are dealing with BOP just like you are

dealing with BOP.  At the end of the day, you know, the issues here that are being raised are problematic, right?  They go to Mr. Tartaglione's ability to live, but also his ability to defend himself and his lawyers' ability to help defend him.

So either you are going to have to come up with some solution that is better than what we have now, and have to consider the probability of doing that, or we are going to have to get MDC to take Mr. Tartaglione back.  If it's really the view that the local facilities won't take him, then those are our options, and the status quo really isn't acceptable.

You know, these -- the fact that counsel are waiting too long; the fact that there are these other issues that affect Mr. Tartaglione's, as I said, ability to prepare his defense. That can't be.  So, you know, I am not asking for an immediate answer, but if you could work with the marshals and talk to MDC officials because if the answer really is no, and by the way, judge, you don't have the authority to order that he be transferred to MDC, which I would be curious to read that authority, then we are going to have to make life very uncomfortable for MCC officials, and I will start having hearings, and I will start throwing around contempt, and so on and so forth because I have no beef with MCC legal.  They have been responsive in other cases where we have people housed. They are very good.  I agree with you, Mr. Barket, but there has to be a full translation between what MCC legal wants done and

what actually gets done.

So if you could, expeditiously review those options, and then if you could send a letter by close of business on Friday, and if you can't do it for some reason, let me know why you can't and when you will be able to get some answers. Because I think part of the problem is sort of a, well, you know, I accept that Mr. Barket doesn't quarrel with the notion that your office has been on top of this issue, and from where I sit, that's true. From where I sit, it seems like MCC legal is on top of the issue; but factually, there is a disconnect, and to the extent you think some of it's communication related, maybe that's true, but some of it seems to me is not communication related; and there just seems to be a problem in terms of implementing what we agreed to here, what MCC legal says they are going to do, and what actually happens. So that's what has to be addressed.

And MDC may be the way to go, but again, I don't want to speak for the marshals. I don't want to speak for the BOP at this point, and then I will entertain whatever options we have at that point. Okay?

MR. SWERGOLD: And, Your Honor, just on this issue, before we, I guess, maybe move on to something else, there is just one other thing in the letter I wanted to address just so the record is clear.

THE COURT: Please.

MR. SWERGOLD: We haven't put in an opposition letter.

There is an allegation here that Mr. Tartaglione is only able to -- permitted to review his discovery prior to and after legal visits in the attorney visiting room. So we have never heard that complaint before. This is the first time raised here. The time he is talking about is actually the time that they set up so that he could get that room and make sure that his lawyers get into a room.

THE COURT: Right.

MR. SWERGOLD: And MCC legal confirmed that the drives are in the SHU library. They spoke with staff at the SHU. He is not -- there's not been an instance where he has requested it and not been given it. He hasn't been requesting it. We sent another drive into the facility. We are happy to send as many drives as he wants with full copies of the discovery so that they are in every place where he could possibly be, but I wanted to make sure the record was clear on that point since this is the first time that it's being raised.

MR. BARKET: Just to put a final button on that. The computers in the SHU are broken, and so the only place he can --

THE COURT: Right. But do you know how long they have been broken?

THE DEFENDANT: Since I have been there.

THE COURT: Okay. But have you been told that?

MR. SWERGOLD: No. That's the first time we have

heard about it.

THE COURT:  So I also think it's very important that there be full disclosure of all the grievances on behalf of Mr. Tartaglione.  I don't want this to become a game of "gotcha," and to the extent that there are issues like broken computers, that seems to me to be an issue that's easily reported; doesn't involve any retaliation by any MCC officials.

MCC legal should want to know that, not just for this case, but for all the others.  And again, given the history of the U.S. Attorney's Office being extraordinarily responsive to the points that have been raised, that's one that can be raised and addressed.  So I do -- I am going to put on you, Mr. Barket, to the extent that these types of issues, the government should not be learning about these the first time that there is a letter that gets filed.  Okay?  You need to let them know. Those are the kinds of --

MR. BARKET:  I just assumed that BOP knew that the computers were broken since they have staff there to do it.

THE COURT:  Well, whether BOP knows, the U.S. Attorney's Office needs to know.

MR. BARKET:  I take your point.

THE COURT:  All right.  Anything else?

MR. SWERGOLD:  No.  Not on that letter.  Thank you, Your Honor.

THE COURT:  Okay.  All right.  The other issue with

respect to the motions --

MR. BARKET: One thing before we get to that, should be quick.

THE COURT: Please.

MR. BARKET: The cell phone, we were supposed to report back to the Court on that issue.

THE COURT: Yes.

MR. BARKET: I don't want to speak for the government, but perhaps they can address it. We talked about it on Friday. I just --

THE COURT: Okay.

MR. SWERGOLD: Your Honor, we -- so BOP still has custody of the cell phone, and we are still deciding internally whether to have a search warrant, to apply for a search warrant so no review has been done. And we understand Your Honor's directive from last time and Mr. Barket's concern, and if we make the decision to apply, then we will speak with Mr. Barket and the defense team about setting up the proper taint protocol.

THE COURT: Okay. Do you have a sense, rough sense of when you might make a decision on that?

MR. SWERGOLD: We also -- we also need to get the phone because we don't know whether it even has the capability to have something on it that searching it would be worthwhile.

THE COURT: And I assume you know where the phone is or is that the wrong assumption?

MR. SWERGOLD:  It's in BOP custody, but we don't know physically whether it's still down in the central location or back in the MCC, and we will add that --

THE COURT:  So that's a no.

MR. SWERGOLD:  -- to follow up.  That's right, Your Honor.

THE COURT:  Okay.  So when do you think you are going to try to get an answer to that question so you can get an answer to the question of the search?

MR. SWERGOLD:  We will try to find out from MCC counsel today where it is.  I will say that that -- we are doing some additional investigating coupled with that --

THE COURT:  Sure.

MR. SWERGOLD:  -- so what the phone has, plus some more, but we should have a decision soon.

THE COURT:  Okay.  All right.  All right.  So with respect to the motions, the one of the two suppression motions has been filed.  One is not yet; is that correct?

MR. BARKET:  I don't know.  When you say "filed," we have -- the government has copies of all the motions unredacted.

THE COURT:  Right.

MR. BARKET:  The Court --

THE COURT:  So there is one that's not been filed; it's been produced or shared?

MR. BARKET:  Right.

THE COURT: But we have the issue with the redactions.

MR. BARKET: Correct. So I don't think it's actually been --

THE COURT: Got it. So the answer is yes.

MR. BARKET: -- on the docket yet, but Ms. Leisenring is going to address the issue of sealing.

THE COURT: Right. Because that's why it hasn't been filed because we have to resolve the issue about what should remain under seal.

MS. LEISENRING: That's correct. I am asking Your Honor not to redact the entirety of the motion, but merely what would otherwise fall under Rule 16 discovery statement that's contributed to our client.

In other motions that have been filed we have agreed to certain redactions that have been requested by the people in this case.

THE COURT: Well, it's covered by a protective order, right?

MS. LEISENRING: Correct, but we agreed as part of our discovery agreement that we would sign the -- we would agree to the protective order. We wouldn't object to it.

THE COURT: Yes.

MS. LEISENRING: And then, Your Honor, understanding that agreement, signed the protective order. In this case, I am arguing that filing the statement without redactions and having

that publicly accessible before Your Honor has made a ruling on a motion to suppress that we believe is meritorious --

THE COURT:  Yes.

MS. LEISENRING:  -- will have a prejudicial effect in a death-authorized case, especially if Your Honor were to ultimately suppress the statement.

THE COURT:  Okay.  I mean, I guess do you have any legal authority that says that that interest outweighs the First Amendment or common law right of access to court filings?

MS. LEISENRING:  I would -- I have reviewed Your Honor's opinion on *United States versus Malcolm Smith*, and I would argue, yes, in this case, what's at issue, what's important in terms of a judicial administration of justice is issues that pertain to law enforcement conduct, whether or not our client was under custody, whether or not our client was interrogated, whether or not our client was advised his Miranda warnings.

THE COURT:  Right.  So I guess -- but I guess so *Smith* is not authority that supports the application.  It really kind of cuts the other way.

MS. LEISENRING:  Well, in terms of the appreciation that matters that are already under the headlights of the media, having a disclosure of the defendant's statements that in general are deemed presumptively prejudicial insofar as the ethical guidelines don't permit us to make extrajudicial

statements about them as well as the government.

THE COURT:  Right.

MS. LEISENRING:  In this particular case, given the fact that every time we file a document, it's immediately broadcast by the media what the underlying documents are to the public in a death-authorized case where the statements are very, very lengthy and could be taken piecemeal out of context; it would ultimately prejudice Mr. Tartaglione.

THE COURT:  But just so I understand, the motion to suppress is premised on the notion that the government did some things that were inappropriate or should have done certain things and they didn't, and so therefore, evidence should be suppressed, right?

MS. LEISENRING:  Correct.

THE COURT:  So there is a full area of grievances and things that the government does wrong.  That gets -- to use your phrase -- immediately broadcast by the media, which, by the way, is kind of how the First Amendment works, right?  So that's kind of how our system of justice operates.  We are all under the headlights of public scrutiny, whether it's through the media or otherwise.  That's what the First Amendment is all about.

You want to say, it's okay for you to be critical of the government and its investigative techniques, but you don't want the statements that the government got as a result of the its investigative techniques because that might be prejudicial

to you, but it's okay to bash the government?

MS. LEISENRING: I actually would have no objection to the entire contents.

THE COURT: So then all criminal cases would be litigated under seal? And where is your authority for that? That is so contrary to how we operate and all the case law that applies to the First Amendment. You have to identify very specific compelling interests that can't be protected other ways.

So the government says, for example, that's what voir dire is for. Right? If there is somebody who is somehow prejudiced by something they may have read or listened to or watched, then we can inquire of them at voir dire, and if that person turns out to have some predisposition that makes it so they can't be fair and impartial, then they are out, and they go sit in a bankruptcy trial instead of this case.

MS. LEISENRING: Well, first -- first of all, Your Honor, I am not asking that you indefinitely redact part of our motion. I am asking that it is put on hold until Your Honor has issued on our motion -- issued a -- rendered a decision on our motion.

Second of all --

THE COURT: Well, hang on. Just so I understand because -- so if the motion is denied, then the motion would be publicly filed, but what about your point that, oh, well, people

might -- the statements are long, and they might be taken out of context, and so even though the full statement is available, there might be people who misread it, and I mean, all of those -- if that's true, that would argue for sealing everything.

MS. LEISENRING:  Well, that is my position, Your Honor; that we have a very lengthy statement.

THE COURT:  Yes.

MS. LEISENRING:  Statements generally are presumptively prejudicial.

THE COURT:  Yes.

MS. LEISENRING:  Here, where we know the contents of the statement would be revealed to the public, and we know that it is so lengthy that they would not be revealed in their entirety.

THE COURT:  What if the statements were part inculpatory and part exculpatory?  What if the statement was exculpatory?  Would the government be allowed to seal the exculpatory portions of the statement that might be prejudicial to us?

MS. LEISENRING:  I believe that the government has, at least in many trials, argued that self-serving statements should not come in.

THE COURT:  Shouldn't come in as evidence, but they don't seek to keep them from public knowledge.

MS. LEISENRING: Well, I am not personally aware of it.

THE COURT: Yes.

MS. LEISENRING: I can't state that they never have.

THE COURT: I just think if this were as straightforward of a legal proposition as you are proposing, there would be some case law that says that that interest that you have identified somehow outweighs the First Amendment or common law right of access, and I just don't see any case law that says that.

MS. LEISENRING: Well, Your Honor, I think what the case law says, if doing so can result in a substantial risk of prejudice to the defendant, and if we can narrowly tailor the Court's decision to redact only a limited portion, then -- then it absolutely can be done.

THE COURT: Why doesn't voir dire fix any potential prejudice?

MS. LEISENRING: Well, we know that in good faith a juror -- first of all, a jury pool here is going to be automatically narrowed and more difficult to obtain because we have to find jurors that believe in administering the death penalty, right? And in this case, a juror may have read a portion of Mr. Tartaglione's statement that didn't mean anything in a vacuum and claims in good faith that they can absolutely be fair and impartial, but then when the rest of the evidence is

presented before that juror, they recall that statement, and it changes how they feel even though the Court may have deemed that statement inadmissible.

THE COURT:  So is there any case that says voir dire is not sufficient to address this kind of prejudice?

MS. LEISENRING:  I am not aware of any case.  I have not done an exhaustive search, but not --

THE COURT:  Okay.  Fair enough.

All right.  Anything else you want to add on this point?

MS. LEISENRING:  No.  Not at this time.

THE COURT:  Who wants to address this for the government?

MR. SWERGOLD:  I will, Your Honor.  And unless -- if the Court has specific questions, I am obviously happy to address them.  I think we have set forth our basis in the letter that we filed on August 19th.

Again, basically, just in three parts:  That there is no -- the statements are not covered by the protective order; there is no other rule that requires them to be redacted in court filings.  We agree that certainly with respect to the Rules of Professional Conduct governing defense counsel and prosecutors, as well as the DOJ regulations that are cited, those apply to extrajudicial statements.  They don't apply to court filings, and I think that the rule -- the argument here

that because this case has generated media attention, it somehow should go into a separate category. I mean, that sort of swallows the limitation on extrajudicial statements, and Your Honor has already pointed out the fact that we note that there is the possibility to address this issue through voir dire.

THE COURT: Yes. All right. So, as I said, there is a First Amendment common law right of access to court filings even in criminal cases, and that those interests and those rights can be outweighed by certain compelling interests, and, of course, any sealing of information would have to be narrowly tailored, but the types of information that the defense wants to keep from the public is not something that involves an interest that outweighs the First Amendment right of access.

The fact that the case may generate a lot of public attention is really the point. You know, we don't sort of calibrate First Amendment and you only protect the First Amendment rights of people in cases that don't generate a lot of attention. There is no sliding scale. And to the extent that there is some potential for prejudice to Mr. Tartaglione, and that certainly can be addressed during voir dire, which will be, I have no doubt, quite rigorous in this case.

So the application to seal the statements or keep them under seal is denied. All right.

MR. SWERGOLD: And, Your Honor, on that point --

THE COURT: Please.

MR. SWERGOLD:  -- and I am sure defense counsel would do this, but we would ask just as what took place with the first motion that's been filed, we ask that defense counsel just send us a copy with the proposed redactions because we have agreed that the material covered by the protective order in this second motion needs to be redacted, and we will review it and make sure that it looks fine before it's filed on the public docket.

THE COURT:  So avoid any further inadvertent disclosures.

MR. SWERGOLD:  Exactly.  Which is what Your Honor saw with the first one.

THE COURT:  Inadvertence can happen once.  So let's not have it happen again.

MS. LEISENRING:  Your Honor, to that end, I will provide a copy with our agreed-upon final redactions to the government for their approval, and once I have received their approval, we will e-file it to Your Honor tomorrow.

THE COURT:  Fair enough.  Okay.  All right.  Other issues to take up?

MR. SWERGOLD:  Your Honor, the government is happy to provide a general update on the case --

THE COURT:  Sure.

MR. SWERGOLD:  -- as we do at each conference.

No new discovery has been produced since the last conference in this case.  We do continue to make duplicate

drives, as requested by defense counsel. As Your Honor knows, there is a discovery coordinator, so we have sent drives to MCC. Any time a request comes in to make another set for defense counsel, we are more than happy to do it, but there has been nothing new since the last conference; and so from the government's position, again, we are ready for trial. We would ask that the Court set a schedule for the remaining non-capital motions, and for a trial date so that the parties can start working together on a more robust scheduling order that addresses all of the disclosure deadlines that need to take place for both the guilt and penalty phase that are typically seen in a death penalty case.

THE COURT: Okay. Thank you very much.

MS. LEISENRING: And actually, just to rewind a moment, I think we have to have a new motion schedule for the people's response to our motions since -- okay.

THE COURT: Right. So.

MS. LEISENRING: Okay. Withdrawn.

THE COURT: So it may not have been publicly filed. They have had access. The schedule is still on.

MR. BARKET: Still on.

MR. SWERGOLD: We have the schedule.

THE COURT: Okay.

MR. BARKET: We are not in a position to offer the trial date.

THE COURT:  I mean, and everybody's positions remain the same as do -- as does mine.

MR. BARKET:  We are working.

THE COURT:  Yes.  I said this.  I have no doubt about the diligence of all of the lawyers in this case, and I think that the interests that have been expressed by counsel for Mr. Tartaglione in the current schedule, as is, in my view, are the ones that are most compelling, and so we are going to continue on the current path, and then we will obviously continue to have these conferences where we can address other issues.

So on that point, when would you like to get together again to have another one of our regular --

MR. BARKET:  Well, we have an interim event, don't we?

THE COURT:  Yes.  But do you want to have another status conference on the calendar?

MR. BARKET:  Sure.

THE COURT:  Okay.  When would you like it?

MR. BARKET:  We have been doing about 30 days or so.  So --

THE COURT:  Okay.

MR. BARKET:  Sometime in mid September?

THE COURT:  Okay.

(Pause)

THE COURT:  How about September 17th?

MR. SWERGOLD:  That works for the government.

THE COURT:  At 11:00?

MR. BARKET:  I'm sorry?

THE COURT:  Sure.

MR. BARKET:  I am having difficulty with the phone with the calendar, the phone rings.

THE COURT:  It's difficult if you are popular, and you clearly are, Mr. Barket.

MR. BARKET:  September, Tuesday at what time?

THE COURT:  At 11:00.  Is that okay?

MR. BARKET:  That's fine.

THE COURT:  Any objection to excluding time until then?  The motions are pending anyway, but --

MR. SWERGOLD:  Right.

MS. LEISENRING:  No.

THE COURT:  Okay.  Then I will prospectively exclude time from today until September 17, 2019, finding it's in the interests of justice to do so.  That finding is based on the fact that motions are being prepared, being responded to.  There is review of discovery, and I therefore find that the interests of justice in this exclusion outweigh Mr. Tartaglione's and the public's interest in a speedy trial.  The finding is made pursuant to 18 U.S.C. Section 3161(h)(7)(A).

If I could see counsel for Mr. Tartaglione at the side bar real quickly, please?

(At the side bar; defense counsel only)

THE COURT:  All right.  Circling back on the issue with respect to appointing Ms. Sternheim as Curcio counsel, there is two issues:  One is, I am assuming that we know that she does not have a conflict in this case as she isn't representing anybody who is connected to this case; do you know that?  I didn't ask her that when I talked to her.

MR. RICCO:  I believe that she does not, and nor has the government raised any.  Maybe we can take that extra step to ask the government affirmatively, but they haven't raised it.

THE COURT:  Which is my second point, which is I am not sure I am comfortable with the government not knowing -- with the government not knowing what the potential conflict is at this point because of the attorney-client issues, but I am not sure I am comfortable with the government not knowing Ms. Sternheim is going to be appointed as Curcio counsel without getting into the issues as to why.

MR. RICCO:  Judge, I think that it's entirely consistent for the government to know that Curcio counsel has been appointed.

THE COURT:  Okay.

MR. RICCO:  Yes.

THE COURT:  So I would -- and I would ask you to make sure there is no conflict, but also I just want to let them

know.

MR. RICCO:  Yes.

THE COURT:  I am not going to get into why at this point for reasons I have already -- I made that finding on the record, and that they are going to have to live with that.  So that's how I want to end this conference.  Okay?

MR. RICCO:  Yes, that would be fine.  Thank you, Your Honor.

(In open court)

THE COURT:  All right.  The last bit of business is that for reasons I have explained on the record in the portion of the transcript that for now is sealed, I am appointing Ms. Sternheim to be cursio counsel.  So I thank you, Ms. Sternheim, for being here today and for being willing to accept the appointment.  That appointment is on the condition that Ms. Sternheim has no conflicts in this cause.  So if there is a conflict, government can speak now or whatever.

MR. SWERGOLD:  No.  There is no conflict.

THE COURT:  Again, the particular issues that are being addressed for right now are going to remain under seal, but I want the government to be aware of that appointment. Okay?

So is there anything else?

MR. SWERGOLD:  Not from the government.

MR. BARKET:  Not from the defense, Judge.  Thank you.

THE COURT:  Okay.  Again, I thank you, Mr. Ruhnke, for being here.

Ms. Sternheim, thank you for accepting the appointment.

Marshals, thank you, not only for today, but for helping out on the issues.  We are adjourned.

(Time noted:  1:51 p.m.)