Corrected Copy

1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------x

UNITED STATES of AMERICA,

      -against-                    16 Cr. 832(KMK)
                                  Conference

NICHOLAS TARTAGLIONE,

          Defendant.

------------------------------------x

                           United States Courthouse
                           White Plains, New York

                           September 17, 2019

                SEALED PROCEEDINGS INCLUDED

BEFORE:
          THE HONORABLE KENNETH M. KARAS,
                     District Court Judge

            Angela O'Donnell, RPR, 914-390-4025

A P P E A R A N C E S:

GEOFFREY S. BERMAN
        United States Attorney for
        the Southern District of New York
BY:   MAURENE R. COMEY
      JASON M. SWERGOLD
            Assistant United States Attorneys

BARKET MARION EPSTEIN & KEARON LLP
            Attorneys for Nicholas Tartaglione
            666 Old Country Road
            Garden City, New York 11530
BY:   BRUCE A. BARKET
      AIDA F. LEISENRING
      DONNA ALDEA

LAW OFFICE OF ANTHONY RICCO
            Attorneys for Nicholas Tartaglione
            20 Vesey Street
            New York, New York 10007
BY:   ANTHONY L. RICCO

KOFFSKY & FELSEN LLC
            Attorneys for Nicholas Tartaglione
            1150 Bedford Street
            Stamford, Connecticut 06905
BY:   BRUCE D. KOFFSKY

MICHAEL K. BACHRACH
            Attorney for Nicholas Tartaglione
            276 Fifth Avenue
            New York, New York 10001
BY:   MICHAEL K. BACHRACH

DIAZ & MOSKOWITZ PLLC
            Attorneys for Nicholas Tartaglione
            225 Broadway
            New York, New York 10007
BY:   JOHN A. DIAZ

KENNETH J. MONTGOMERY PLLC
            Attorney for Nicholas Tartaglione
            198A Rogers Avenue
            Brooklyn, New York 11225

Also present:   DAVID A. RUHNKE
                BOBBI C. STERNHEIM
                MICHAEL S. ROSS

              Angela O'Donnell, RPR, 914-390-4025

3

Proceedings

THE CLERK:  The Honorable Kenneth M. Karas presiding. United States of America Nicholas Tartaglione, 16CR832.

Counsel, please state your appearances.

MS. COMEY:  Good morning, your Honor.  Maurene Comey and Jason Swergold for the government.

THE COURT:  Good morning to you both.

MR. BARKET:  Bruce Barket, Aida Leisenring and Donna Aldea are here for Mr. Tartaglione for this part of the proceeding.

THE COURT:  All right.  Good morning.

MR. RICCO:  Good morning, your Honor.  For Mr. Tartaglione, John Diaz, Michael Bachrach, Ken Montgomery, Bruce Barket.

MR. BARKET:  Bruce Koffsky.

MR. RICCO:  Bruce Koffsky.  The other Bruce.

And, Judge, just to let you know, resource counsel, Dave Ruhnke, is present.  And although she wasn't required to be here, *Curcio* counsel, Ms. Sternheim.

THE COURT:  Good morning to you both.

MR. RUHNKE:  Good morning.

MS. STERNHEIM:  Good morning, Judge.

THE COURT:  Good morning everybody.  Please be seated.

So we have a deceptively large to-do list.  I think what I'd like to do is start off by seeing Mr. Tartaglione's

Angela O'Donnell, RPR, 914-390-4025

4

SEALED PROCEEDINGS

counsel at the sidebar for a brief conversation, if that's okay with you all?

(Pages 5 through 16 sealed)

SEALED PROCEEDINGS

(Following discussion with defense counsel was held at sidebar:

MR. BARKET:  I didn't introduce him, but Michael Ross is here as professional ethics counsel.  He's been consulting with my firm several months.

THE COURT:  He's here?

MR. BARKET:  Yes.

THE COURT:  You'll say good morning for me.

MR. BARKET:  I will.

THE COURT:  So there are two issues that involve the defense team, one is the *Curcio* issue and the other is the recent correspondence I got from Mr. Tartaglione.

The former it seems to me maybe we can at least address how you all anticipate handling this.  The latter it seems to me we have to address today and we really can't feasibly do it in chambers.  I think we're going to have to clear the courtroom, which I do very reluctantly, but I don't see an alternative.

Do you all have a different view?

MR. KOFFSKY:  Yes.

THE COURT:  What's your different view?

MR. KOFFSKY:  My different view is neither need to be handled today, one might be based upon the other -- depending on the Court's *Curcio* ruling.  Letters might be withdrawn from the -- I think that the *Curcio* issue has raised the temperature

6

SEALED PROCEEDINGS

in the particular facility such that these letters have been drafted by the defendant but I think that if a different court decides, and this is just my opinion, if the --

THE COURT:  The generousness of the Office of Court Administration gave us a white-noise machine.  It's like going to a Guns and Roses concert.  We're not going to use it.

MR. BARKET:  I wouldn't know.

THE COURT:  So I'm told.

MR. KOFFSKY:  So my suggestion is that you -- the *Curcio* issue isn't ripe for the Court to consider until we've had an opportunity to talk to *Curcio* counsel.  She's still in the investigative, fact-finding stage.

THE COURT:  That's good to know.

MR. KOFFSKY:  If that's the case, I would ask the Court -- I haven't talked to anybody else about this, it's my opinion -- the Court not address the other issue until the *Curcio* issue is resolved.

THE COURT:  So maybe you know more than I do.  It's not clear to me from the letters that I have received from Mr. Tartaglione, which I'm assuming you all are going to try to dissuade him from writing.  I'm happy to have a pen pal, but I don't think this is in his interest writing these letters. That's a separate issue.  My concern is, I have two letters from --

MR. BARKET:  Sorry to interrupt.

Angela O'Donnell, RPR, 914-390-4025

SEALED PROCEEDINGS

THE COURT:  There's a third on the way.  And he's expressed some opinions about his representation.  I don't see how I let that fester, that's my only concern.  Okay, so maybe if we're not going to resolve the *Curcio* issue today, that's fine.  I'm not necessarily saying we resolve the issue of representation.  I don't see how we ignore it.

MR. RICCO:  Judge, let me take a time out.

THE COURT:  Yes.

(Defense counsel confer)

MR. BARKET:  Judge, can we do the easier part of today's proceedings, which is the matters with the government, and then give us a short break so we can chat and we can come back and do the more complicated parts?

MR. RICCO:  Judge.

THE COURT:  Or we can move this conversation inside.

MR. RICCO:  I would like us to move the conversation inside.  Thank you.

(Sidebar conference continued in robing room)

THE COURT:  All right.  Go ahead, Mr. Ricco.

MR. RICCO:  Okay, Judge, we want to be as cautious and careful as possible because we all recognize that this is a death authorized case.

What we would suggest today is not that the Court not address those issues, because we think probably that Mr. Tartaglione's concerns can probably be resolved, at least

8

SEALED PROCEEDINGS

temporarily, with a discussion with his retained counsel and staff; however, we believe the issues are interrelated, and the concern is that we do not want to disclose confidences and we agree with that, everyone agrees with that, and so we're trying to proceed in a way -- we asked Ms. Sternheim to be here today -- to proceed in a way that protects the confidences of a capital authorized defendant and also deal with the other issues of counsel, which are manageable.

And so I think that, if Mr. Tartaglione is okay, I agree with the Court that these letters have to be addressed. I think the wisdom of sending a letter to the *Daily News* gives counsel concern about what may be said on the record.

THE COURT:  He sent a letter to the *Daily News*?

MR. BARKET:  And the *New York Post*.

MR. RICCO:  Sorry, and the *New York Post*.

THE COURT:  And they have them?

Like he's told you they're en route.

MR. BARKET:  The *Daily News* sent me a copy of it, talked to me about it, published parts of it.  The *New York Post* letter hasn't surfaced yet in the sense of -- whatever. The *Daily News* apparently went to a specific reporter who's been covering the jail conditions.  The *New York Post* letter apparently went to the *New York Post*.  So one can speculate slash hope that it got lost in the massive amounts of mail they get.

Angela O'Donnell, RPR, 914-390-4025

SEALED PROCEEDINGS

THE COURT:  What's it say in the *Daily News* letter?

MR. BARKET:  I can give you a copy of it.

THE COURT:  All right.

MR. RICCO:  Issues that impact guilty phase and issues that could ultimately be converted into a non-aggravating statutory --

THE COURT:  Fact.

MR. RICCO:  -- aggravator.  And our concern is also sort of this say what you have to say may cause the Court to have an inquiry about matters that the Court should be addressing after the Court speaks with *Curcio* counsel who is very near the completion of her investigation.  She's spoken with Mr. Tartaglione.  She's spoken with us.  She's interviewed all of us.  She's here today.  She met with us earlier today. She's not finished yet.

THE COURT:  Okay.

MR. RICCO:  She's near there.  We believe that the Court will be taking action and we believe that that action will have certain components to protect the integrity of these proceedings, establish sort of like a firewall at the US Attorney's office, something like that.  We're not sure.

THE COURT:  Okay.

MR. RICCO:  We're working on that.  And we're also -- when I say "we," today we found out that there's an ethics counsel involved, Mr. Ross, and he always has great ideas how

10

SEALED PROCEEDINGS

to proceed with these things, and he makes perfect sense to me, and I'm confident that your Honor's going to have all of the information before him about this and it's going to be -- your Honor will decide what will happen, but we're all of the belief that additional steps will be taken.  I just think that we all agree that we're not there today.

THE COURT:  To resolve the letters.

MR. RICCO:  That's right, and certainly not the conflict.

THE COURT:  That I certainly understand. Ms. Sternheim should take all the time that she needs.  We all know she won't dawdle.  There's no concern there.

My concern is just more with these letters.  I want to make sure that we don't obviously -- no one is suggesting we ignore them, and I'm happy to wait if people think that the *Curcio* issue and this are related.  I just don't know that from the letters.

MR. BARKET:  I don't.  That's not my perception.

THE COURT:  Okay.

MR. BARKET:  My perception of this is -- I've had this discussion -- it's not the first time it came up, obviously.

THE COURT:  Yes.

MR. BARKET:  I've had this discussion with him continuously for a year and a half.

Angela O'Donnell, RPR, 914-390-4025

11

SEALED PROCEEDINGS

THE COURT:  Yes.

MR. BARKET:  Obviously, I've lost.  I mean, he wrote one letter, two letters, scolded me for like what's going on here.

MR. RICCO:  I think --

THE COURT:  Let Mr. Barket --

MR. RICCO:  -- you're going into attorney-client privilege.

THE COURT:  I do think that's fair that we have to be careful not to obviously compromise the privilege.

MR. BARKET:  And then apparently he's written a third letter.  I certainly believe --

THE COURT:  It's on its way here.

MR. BARKET:  Yes, he said he sent out last.week.  So I don't see them as related.  I don't think there's a cause and effect.  For whatever reason, this is his view, and I think the Court should hear from him on that or address that issue.

MR. RICCO:  And there are at least five lawyers in the room that don't take that position.

THE COURT:  All right, so can we agree on one thing?  Can I at least tell him to stop writing letters to people other than his family and his lawyers?

MR. RICCO:  Yes, your Honor.

THE COURT:  I don't want him writing the media.  I mean, nothing good is going to come from that.  Nothing good is

SEALED PROCEEDINGS

going to come from that.

MR. BARKET:  You can certainly tell him that.

THE COURT:  I mean, that's got to stop.  Like I said, I don't mind having a pen pal because we get lots of interesting mail, so his is -- you know, it's all personal, but it's not, that's not in his interest either, but I'm less worried about that than writing any newspaper and any media organization.

MR. BARKET:  I agree.  The timing of all this is interesting in some respects, and I think illuminating.  He spent three months in SHU.  We arranged for a special meeting with his mother last Friday.  It's the first time he had seen his mother since June.  No phone calls to his parents, virtually none, maybe one or two over the course of time.  Very little contact with any friends or family, if any, because the visits have been taken away from him as part of the punishment for the cellphone.  Death was authorized in March.  He hears the government announcing, we want a trial date, to which he thinks, great, let's do it tomorrow.  And he sees a tremendous amount of activity going on that he doesn't directly perceive as being helpful to him.  So he has -- and he's been incarcerated now for coming up on three years, and from his perspective without an end in sight.

So I don't agree, as I said to counsel, I don't agree with his letter writing campaign, but I can't say I don't

SEALED PROCEEDINGS

understand it.

THE COURT:  Yes.  Well, I don't think anybody here isn't sympathetic to whatever motives he has to feel the way he does, however he feels, and I don't want to know whatever he's telling you all.  We just have to make sure that the system maintains its integrity, so if there are representation issues, at some point that are going to have to be resolved, but the more immediate concern to me is he not write anybody that's going to publish his letters, which means he shouldn't be writing anybody in the media.

How about we do this, how about we go back out.  And for the record, we are here in the conference room just outside the courtroom.  I think there are a number of issues that we need to resolve.  I've got to deal with this issue with the government's sealing of the letters, and we'll talk about other stuff that should be out, of course, in the open, and then maybe at the end of the proceeding we can clear the courtroom and have a conversation where -- and we should put on the record that Ms. Sternheim has not yet finished her investigation, she's been working hard and she's almost done.  It's hasn't really been that long, honestly, so it's fair that she would need more time, but that should be on the record in public view, but that we then convene afterwards.

And all I really want to do, and I don't want to say this to Mr. Tartaglione, I don't want to get into a

14

SEALED PROCEEDINGS

conversation with him with everybody else there because his representation issues at this point it seems to me is not something that should be in the public view, but I really want to try to persuade him not to write letters anymore to anybody that's not his family, his lawyers.

Like I said, I don't care, but I don't see how his letters are helping him at all. I understand the outlet, they may be an outlet, and so I'm not going to tell him don't write me, I'm not going to do that, but I'm going to really strongly suggest he not write anybody else.

MR. BARKET: I think that makes sense, and can I ask for like a five or ten minute break between the proceeding so we can all chat?

THE COURT: Yes, 100 percent, and I also think that will give us time to clear the courtroom.

MR. BARKET: I'll talk to Nick as well.

THE COURT: Yes.

MR. RICCO: Judge, an unrelated but not necessarily easier issue.

THE COURT: Yes.

15

SEALED PROCEEDINGS

issues.

████████  ██  ██████████████

██████  ██  ████████████

██████████  ██  ████████████

██████  ████████████

THE COURT:  I signed something.

THE CLERK:  We took care of it.

THE COURT:  Yes, I signed something in the last day or two.

MR. RICCO:  Okay.

THE COURT:  It was not chump change.

MR. RICCO:  It's fine, Judge, the work has continued and will continue.

THE COURT:  You know my view.  You're going to get all the resources you need.  And if Jerry has an issue, he can call me.

MR. RICCO:  No, no, no.

THE COURT:  I signed it.

MR. RICCO:  We had a full discussion with, we had a full conference with Jerry, we itemized, went through every piece.

THE COURT:  Yes, I looked at it.

MR. BARKET:  We have with a little more work to do.

THE COURT:  Yes, I totally get it.  As soon as I saw it, I read it carefully, I said, all right, done.  So I signed

Angela O'Donnell, RPR, 914-390-4025

Proceedings

it.  And there's always a lag I guess between when it leaves here and --

MR. RICCO:  We're okay, Judge.

THE CLERK:  It's in transit.

THE COURT:  To your point about the mail, I'm not sure if it's BOP's mail or our mail, there's the delay, but there it is.

MR. RICCO:  The other issue, we can take this up with the government later on, is we have moved forward with the scheduling of the -- we have moved forward with the scheduling of the penalty phase pleadings, and we're going to be discussing that with the government and see if we can come to a mutual schedule to propose to the Court.

THE COURT:  Okay.

MR. RICCO:  We're close to accomplishing that.

THE COURT:  All right, so let's go out take care of other business, then we'll take a break and you can talk.

MR. RICCO:  Thank you very much.

THE COURT:  Thank you.

End of robing room conference with defense counsel)

(Continued on next page in open court)

Angela O'Donnell, RPR, 914-390-4025

(In open court)

THE COURT:  All right.  So the first thing that I think we should address, sounds like it might be a brief conversation, is the *Curcio* issue I had alerted the government that there is -- a *Curcio* issue has arisen.  I had appointed Ms. Sternheim to be *Curcio* counsel.  She's here.

MS. STERNHEIM:  Yes.

THE COURT:  But my understanding -- Ms. Sternheim, you'll let me know if I'm wrong about this -- that we're not yet ready to address all the issues.  I know you've been working diligently on it, but we're not quite done; is that right?

MS. STERNHEIM:  That is correct, Judge.  And I can contact the parties and your Honor as to a schedule if that is helpful, but I do not have that in place.

THE COURT:  Okay.  That's fine.  That sounds like a good suggestion, and we can go from there.  So I'll thank you again for taking on this assignment.  I thank you for being here today and for the update.

The next issue, I think it makes sense to address, is this question of sealing the correspondence with regard to prison conditions, prison designation and then I think we have to resolve the issue of Mr. Tartaglione's housing.  So I've read all the letters.

I don't know, Ms. Comey, if you want to add anything.

Angela O'Donnell, RPR, 914-390-4025

MS. COMEY:  No, your Honor.  I have nothing to add. We'll rest on our papers.

THE COURT:  Okay.

And I take it that counsel for Mr. Tartaglione remain agnostic on this issue; is that right?

MR. BARKET:  Yes.

THE COURT:  Okay.  All right.  So what we're talking about here is the government's request to seal letters that have been docketed.  There have been redacted versions filed, but we're talking about Docket Numbers 150 and 153.

And the background of this is that back on August 21st there was a conference where we discussed, among other things, issues related to Mr. Tartaglione's housing in the MCC, and what I had asked the government to do is inquire about options for housing Mr. Tartaglione at either the MCC or MDC because those are the only two Bureau of Prisons facilities in the New York metropolitan area.  Because it turns out that the other facilities, whether they were in Nassau County or here in Westchester County or in other counties, those are not federal facilities and those facilities either didn't have contracts with the Southern District Marshals, or otherwise had advised that they were not going to house Mr. Tartaglione.  So the particular question was whether or not MDC would be willing to take Mr. Tartaglione back, and we had had a pretty fulsome discussion about the issues that had led to Mr. Tartaglione's

transfer from MDC to MCC.

The government followed up, as I had asked it to, with a letter dated August 23rd, and that's the letter, the first letter the government ask be placed under seal that addressed the issue about housing Mr. Tartaglione at MDC and MCC, and the government, as I said, asked that the letter be sealed. The Court, on August 26th, temporarily filed it under seal, but then asked the government to further explain its reasons for permanently sealing that letter.

On August 28th, counsel for Mr. Tartaglione filed a letter which addressed the merits of the government's housing options as presented in the August 23rd letter and counsel had asked that that letter be filed under seal because it was responsive to the government's letter which had been filed under seal.

On August 29th, the government filed a letter arguing that its August 23rd letter or at least a portion of it should be filed under seal because it addressed Bureau of Prisons' reasoning for either why it was that certain things had been considered and certain steps that the Bureau of Prisons thought would be necessary to house Mr. Tartaglione, and also the government filed a letter stating that the August 28th letter should remain under seal, that is, counsel for Mr. Tartaglione.

On September 5th, the *New York Post* and the *New York Daily News* filed a letter arguing for the unsealing of the

letters.  They were joined by the *New York Times* on September 10th.

The government, as the Court had previously asked, had submitted a response to I guess the first letter from *The Post* and the *Daily News* explaining why and really reiterating its argument for sealing and that's when counsel for Mr. Tartaglione announced their agnosticism on the issue.

So the question actually has a couple of layers to it.  So the first question is whether or not the government's letters are considered judicial documents.  And a judicial document is an item that is, "relevant to the performance of the judicial function and useful in the judicial process," and that's from the Second Circuit's decision in *Bernstein v Bernstein Litowitz Berger & Grossmann LLP*, 814 F.3d 132, 139, quoting from an earlier Second Circuit's decision in a case called *Lugosch v Pyramid Company of Onondaga*, 435 F.3d 110, 119.  The mere filing, however, of anything, whether it's some kind of a document or a letter with the court by itself doesn't render such a document a judicial document.  That's from the Second Circuit's decision in *US versus Amodeo*, 44 F.3d 141, 145.  But if an item is a judicial document, then the public has a presumptive right of access to it under both the common law and the First Amendment.  Also from Amodeo.  The purpose of this right is to ensure that courts are held accountable and that the public has "confidence in the administration of

justice."  Also from *Amodeo*.

Under the common law analysis, the Court is to determine the weight of the presumption of access.  "Generally, the information will fall somewhere on a continuum from matters that directly affect an adjudication to matters that come within the court's purview solely to ensure their irrelevance."  That's from the second *Amodeo* case, 731 F.3d at 1049.

"Finally, after determining the weight of the presumption of access, the Court must 'balance competing considerations against it.'"  *Lugosch* at page 120.

Competing considerations include both "the danger of impairing law enforcement or judicial efficiency," or "the privacy of interests of those resisting disclosure."

The first Amendment analysis requires two different approaches.  The first considers "experience and logic," that is, "whether the documents have historically been open to the press and general public" and "whether public access plays a significant and positive role in the function of the particular process in question."  That's from *Bernstein* at page 141.

The second approach which applies when the judicial proceedings themselves are covered by the First Amendment considers whether the documents are "derived from or a necessary corollary of the capacity to attend the relevant proceedings."  That's from *Lugosch* at 120.

Under either approach, the moving party has to

22

demonstrate that sealing is "essential to preserve higher values and is narrowly tailored to serve that interest." *Bernstein* at 134. Further, the Court has to make "specific, on-the-record findings...demonstrating that closure is essential to preserve higher values and is narrowly tailored to serve that interest." *Lugosch* at 120.

So the Government's argument is that the August 23rd letter, in the first instance, is that the August 23rd letter doesn't qualify as a judicial document because it has no bearing on the charges contained in the pending indictment" and "the location where [Mr. Tartaglione] is to be detained pending trial is ancillary to this criminal prosecution." So in the Government's view, its August 23rd letter is status report about the BOP's "internal deliberations."

The government argues in the alternative that even if it is a judicial document, that redacting certain information, including most specifically BOP's explanation of Mr. Tartaglione's housing options, is appropriate. And that's because, according to the government "the BOP maintains that the public filing of those paragraphs would jeopardize its law enforcement functions and inappropriately hamper its interim deliberative processes." I guess the BOP is arguing that any presumption of access is overcome because the letter also, to the extent it's even a judicial document, it still addresses what BOP considers an ancillary matter. And so a public filing

23

would "hinder the internal deliberative process of the MDC and thereby jeopardies the BOP's ability to carry out its function of securing pretrial defendants," because the letter provides details that were "taken into account to make an appropriate housing decision for a defendant charged with multiple murders."  Also, the assertion is the public filing of the document, the letter, would "risk circumvention of the law" because "the public revelation of internal deliberations" would "enable all inmates to alter their behavior and manipulate their housing assignments to cause harm to others or engage in illicit behavior."

The aforementioned media organizations argue that the letter, the letter of August 23rd, is a judicial document because it was submitted to the Court for purposes seeking or opposing an adjudication, and also that there's significant public interest in the conditions in BOP facilities, and finally the conditions of Mr. Tartaglione's confinement are relative to his case and his rights.

So addressing the threshold question about whether the August 23rd and August 28th letters are judicial documents, the Court concludes that they are.  While the letters themselves may not directly address the actual charges filed against Mr. Tartaglione, that is not the governing standard. The correct standard I've already mentioned is broader than that, and therefore, in my view, the letters are "relevant to

the performance of a judicial function and useful in a judicial process."  First of all, the letters were filed in response to a court order.  So calling them a nonjudicial document seems anomalous as they were directed as part of the judiciary's overseeing of this case.

Second, the letter is related to an issue, that is, Mr. Tartaglione's conditions of confinement, that could substantially impact his ability to mount a defense and thus are directly related to his trial rights, his constitutional rights, among other things, to defend himself.

Indeed, the housing issue has been repeatedly raised by counsel for Mr. Tartaglione precisely on that ground, and I think understandably so, and so the relevance of the letters follows from the relevance of Mr. Tartaglione's conditions, and of course it's not irrelevant that this is a capital case.

The proof of that is that the issues that are addressed in the letters have been addressed here in open court really from the very first time that these issues have been raised.

So put it in the language of the Second Circuit, the specific contents of the letters are "relevant to the nature of the proceeding," that is, how Mr. Tartaglione is being housed in connection with his ability to defend himself in this capital case.  And I think it certainly is the case that access, public access to the letters "would materially assist

in the public's understanding of these housing issues before the Court in evaluating the fairness and integrity of the Court's proceedings."  That's from Second Circuit's decision in *Newsday LLC County of Nassau*, 730 F.3d 156, 166-67.  And of course all this, in the Court's view, is consistent with holding those of us in the criminal justice system accountable for what it is we do.

So given the letters are judicial documents, the Court proceeds to consider the weight of the presumption of access and whether any competing interest overcomes the weight of access such that portions of the letters may be redacted.

There is, I think, at the outset a waiver issue, because a lot of even the deliberative process of the MDC has been discussed before.  So, for example, some of the disciplinary issues that Mr. Tartaglione had they have been discussed.  There's been a great deal of discussion involving conversation with counsel for MCC all the various things MCC has had 20 do to accommodate Mr. Tartaglione's concerns, and there's been a great deal of discussion, for example, about conversations for Mr. Tartaglione and MCC officials and counsel for the government and MCC officials, but in any event, the weight of the presumptive right of access here is heavy.  This is a capital case.  Given the obvious stakes involved, the public has a deep interest in ensuring judicial accountability in all aspects of the case, including adjudicating any

grievances related to pretrial confinement that might affect Mr. Tartaglione's ability to defend himself in the case. Of course that goes to the very fairness of the proceedings. Also the public has an interest in the conditions of confinement in BOP facilities in general. Anything that would suggest to the contrary would be Kafkaesque. And Mr. Tartaglione's conditions in particular, and in ensuring that BOP's decision-making on inmate housing is reasonable seems to me precisely the kind of thing that should be accessible to the public. So I think BOP's argument in that regard falters.

To the extent BOP is arguing that its deliberative process in this case satisfies the sort of compelling interest that could justify sealing the portions of the letters that it wants sealed, it bears noting that the parties seeking sealing that wants to overcome this presumption has to show that sealing will further a compelling interest, such as a law enforcement concern, a national security concern, a public safety concern. Obviously privilege is certainly a valid concern, as are privacy interests. And the burden, of course, is on BOP to make that showing. But I don't think BOP has done that here. The deliberative processes that BOP is talking about are not protocols, for example, that it never publicizes as to how it is that it might secure inmates at a facility. That would be different. That could very well be a situation where disclosure of how BOP addresses specific security

concerns could alert people to then circumvent those concerns and put not only BOP officials at risk but also other inmates at risk. That's not what we're talking about here. We're talking about the deliberative process that BOP says it engaged in in evaluating where to house Mr. Tartaglione and how in particular it would do so at MDC and MCC.

So, for example, to the extent that Bureau of Prisons has some concerns about housing Mr. Tartaglione in the general housing and explains why, a lot of the things that letters that the BOP had the government put in its letter are things that people know. So the fact that Mr. Tartaglione is facing the death penalty, the fact that he used to be in law enforcement, the fact that there's been this whole public scrutiny over what happened with Mr. Epstein and Mr. Tartaglione being involved in that, these are things that are commonly known. So to the extent that the BOP took factors that were commonly known into its so-called deliberative process in evaluating how it is that he could be housed at the two facilities, including, by the way, the fact that there have been prior disciplinary issues, that's also been publically discussed here in Court, and it's been the subject of letters. So the cellphone thing, for example, and other prior disciplinary issues, that's all been publicly discussed, and to the extent BOP took all those things into consideration, I think it's hard for BOP to argue that taking into consideration factors that were publicly known

about how it is best to house Mr. Tartaglione is the type of discussion of security protocols that otherwise aren't public. So I think it distinguishes between what BOP has done here and what it maybe does in coming up with very specific protocols, either as to a particular individual or as to how it is it houses people generally at its facilities.

So I just don't see how unsealing the letters and revealing the deliberative process is something that's going to uniquely publicize certain things that are going to jeopardize BOP officials or other inmates. For example, to the extent BOP argues a disclosure could lead to bad behavior, that inmates could manipulate their housing assignments, I just don't see that here.

There are certain things about Mr. Tartaglione that he has no control over. He has no control over the fact that -- in terms of things he can change. He was a law enforcement officer. The fact that BOP took that consideration, I don't see how somebody can manipulate that to somehow pretend that, for example, they weren't a law enforcement officer. You can't change your history. So I just don't understand how that's going to somehow lead to circumvention of security protocols.

So I just don't think BOP has made the case that the public disclosure is going to risk harming anybody, and so give given the BOP'S, in my view, failure to establish a compelling

interest to overcome the presumption of public access, I'm going to order the letters be unsealed.

If BOP wants to have you go to the Second Circuit, can you let me know.  I mean, I'll wait a day, Ms. Comey, if they're that concerned, but you'll let me know by the end of business tomorrow?

MS. COMEY:  Yes, your Honor.

the ocurt:  Okay, thank you.

All right, any updates from the government?

MS. COMEY:  Your Honor, we remain in the same place we were last time, the government is ready for trial.  We would ask the Court to set a trial date.

THE COURT:  Okay.

Mr. Barket.

MR. BARKET:  Well, I mean, before I get to the trial date part, we actually have something to say about that today.

THE COURT:  Yes.

MR. BARKET:  I'm curious about the issue concerning the telephone which has been stewing for some while.

MS. COMEY:  The government will not be seeking a warrant for that phone.

THE COURT:  Okay.

MR. BARKET:  I guess, less work.

On the issue of the trial date, we have had some discussions among counsel as to laying out what we think is a

30

reasonable schedule among us.  We've had a preliminary conversation about it with Mr. Tartaglione.  We are still in the process of kind of finalizing that.  So what I'm going to suggest to the Court is that you allow that process to continue internally, and that before the next Court date we'll have completed it, met with the government, proposed it to them and hopefully gotten their agreement on it and then we can come back with a joint scheduling order all the way through to the trial.

Okay, last issue is, from our perspective, is the jail conditions.  Obviously I think I left off in the letter that we'll kind of wait and see where we end up.  Where we've ended up is that Mr. Tartaglione's time in SHU is over.

THE COURT:  And this is related to the phone issue.

MR. BARKET:  For the phone.  His possession or use of a telephone.

THE COURT:  Right.

MR. BARKET:  So his time in SHU is over and the question is what's going to happen to him, where is he going to be detained going forward.

I've been in regular contact with Mr. Johnson from MCC because obviously we don't want him to go to SHU MDC for an indefinite period of time, and I thought their position there was unreasonable.  But leave that aside, if he can be safely housed in MCC with conditions that are humane where he has

reasonable access to his attorneys and regular contact with his family, that's all we've been complaining about. That's all we've asked for.

So where we are is that last night he was taken to the unit where he was and then removed from that unit and put in another unit within a few hours.

Mr. Johnson, just as you were reading your decision, actually sent me an email back clarifying from his perspective why. I'm not sure that matters that much. What matters is the specific unit where Mr. Tartaglione is assigned to affects his safety in the short term, perhaps the long-term. Each place he has gone to over the last nearly three years he has had difficulty because of his status as a former police officer. And what has happened each time is there's been problems, if you will, and concerns that get alleviated as the other inmates get to know him and realize that they've got more in common than they have -- than there are differences between them. In other words, they're all, at this point, inmates being charged by the government. And the fact that Nick was a law enforcement officer a number of years ago really isn't relevant to them.

So he has made peace, if you will, had made peace with the individuals in the unit where he was, and evidence of that, the last time that he was there that we had an update, everybody reported that we had reached somewhat of an

equillibrium. They had addressed some of the conditions. They took a team in and cleaned out the mold, sprayed the insect repellant, moved him from the cell with standing water, gotten him mail and so forth.

The unit they're going to put him in next, or where they propose to put him next, when he went there last night, apparently was greeted with cat calls of "That's the cop", "That's Mr. Tartaglione," from other inmates. And it raised a concern about his safety from his perspective and I gather also from the perspective of the guards.

So he is now back in SHU while they're looking for another place to put him. I've asked, pleaded, short of begged Mr. Johnson to put him back in the unit where he was, where he felt safe. The reason I was given that he was not supposed to go there is that you have -- that's where he got caught with the cellphone, so he's not allowed to go back there. I'm not -- I mean, that's what was said. We have some anecdotal evidence that that's not always the case.

THE COURT: They haven't always refused to return people to the scene of the infraction, if you will?

MR. BARKET: Correct.

THE COURT: What would be the connection between the unit and the cellphone?

MR. BARKET: I don't know. I mean, it is -- I just don't know.

THE COURT:  Yes.

MR. BARKET:  And just when Nick went back to this unit where he was, the people were largely the same and greeted him and said kind of welcome back.

THE COURT:  Yes.

MR. BARKET:  And the peace that he had made in that unit where he had been for a while was evident by him going back and, okay, I don't want to be here, but it's the best of all these bad options.

THE COURT:  Can I ask, Ms. Comey, if you could reach out to Mr. Johnson.  Because, you know, obviously we don't have Mr. Johnson to get his perspective, so I don't want to prejudge anything, but this is not like returning the alcoholic to the bar.  I mean this is -- just because there was a cellphone that Mr. Tartaglione shouldn't have had, I don't know why that means that returning him there means he's more likely -- and some of the other concerns Mr. Barket raises I think are fair.

MS. COMEY:  Yes, your Honor.  I'll clarify.  I don't believe it's Mr. Johnson's decision.  I believe it's --

THE COURT:  I understand.  Right, but he's the person giving the rationale, so he can at least inquire as to whose decision it is and why and see if there's any way to address the concerns.

MS. COMEY:  Yes, your Honor.  We will see whether there's any way to address the concern, and if not, we will

gather the reasons why that might be.

THE COURT:  All right.  Thank you, Ms. Comey.

And obviously you'll put that at the top of your to-do list.

MS. COMEY:  Absolutely, your Honor.  I'll do that this afternoon.

THE COURT:  All right, thank you.  Because obviously there is some time sensitivity given what Mr. Barket has represented.

MR. BARKET:  Yes, I'm sorry.  Related to this --

THE COURT:  Yes.

MR. BARKET:  -- is one of the things I consider particularly -- ironic might not even be the right word, but troubling with the punishment.  Right.  You have an individual that's been incarcerated for an extended period of time, detained pretrial an extended period of time, with limited contact with his family and friends.  At most he gets one hour of private time, private being in a room full of other people, but at least the government is not directly monitoring what's being said the way they do with email and the jail phones.

THE COURT:  Right.

MR. BARKET:  Once a week is ambitious.  It never has happened.  It's been a couple of times a month because inevitably something happens where one of the visits get canceled or perhaps the family members just can't make it at

the specific time that they're allowed to go.  They're not allowed to go whenever they want, they're assigned times.  For example, in SHU he can only see people on Fridays, in his old unit it was only on Thursdays.

So what they did in punishing him, obviously he spent 75 days or so in SHU.  Good time was taken from him, which I'm not sure it's going relevant in this case or not.  Presumably if he had a jail sentence or prison sentence he lost some good time.  And they said you can't see family and friends.  No social visits at all for a year.  Which, you know, the reason why he had the cellphone in part is to have some connection with his family and friends.  I mean, presumably.

So I've raised that with them.  He's taken the administrative steps, so we have to go through the administrative appeal.  And I raised with both the government and with MCC that in this particular case denying him visits with his family is troubling for a whole host of reasons, some of which I'm sure is obvious to the Court, discussing this case, discussing the status of it, and just simple mitigation to have some contact with his family as we lead up into the trial.

So what they've done, what Mr. Johnson has said is, okay, if there's a specific thing that's going on, if you need a special -- something's happening, write to us and the warden will, from time to time, approve visits, despite the

disciplinary proceeding.  So we did that probably as soon found out that was an option.  We had the first visit was arranged on Friday for an hour with his mother.

I'm simply presenting this to the Court because, as we go forward, we're going to continue to need to have his family see him for all the reasons that are pretty apparent to us and just if that doesn't happen or if it takes weeks and weeks for it to occur like it did here, that's something that we're going to come back to the Court with maybe in the form of a writ of some sort.  Waiting for the administrative appellant process to ripen to the point where I can bring that action before a judge is lengthy and kind of defeats the purpose of it.

MS. COMEY:  Your Honor, I'm familiar with this issue because we've discussed it at length with Mr. Barket and with Mr. Johnson.  We did a little research about how common this type of penalty is at the MCC for inmates who are caught with contraband cellphones.  Approximately 70 percent of inmates who are caught with contraband cellphones receive this very sanction.  So it is consistent with the majority of cases. Some receive more time where they don't get social visits, some receive less.  So this is not a situation which Mr. Tartaglione has been singled out.

THE COURT:  No, I didn't hear Mr. Barket suggesting singled out.  What he's saying is given how long

37

Mr. Tartaglione has been detained to date, given the prep that needs to be done, including mitigation prep, and given the stakes of the case that maybe the MCC could consider a downward variance from its guidelines.

MS. COMEY:  Well, your Honor, I think the MCC has been responsive to the concerns about this unique case --

THE COURT:  Yes.

MS. COMEY:  -- and agreed to consider written requests on a need-be basis for visits that are directly related to preparation for Mr. Tartaglione's defense.  And I don't think it's a high bar.

THE COURT:  Yes.

MS. COMEY:  I don't know exactly what took so long, I don't know exactly what the issue was with the first request because we don't want to be involved in discussions between defense counsel and the MCC about preparation of defense.

THE COURT:  Sure.

MS. COMEY:  We've not been involved in those particular communications, but my understanding from speaking with Mr. Johnson is that the MCC is very aware of the importance of the defendant's ability to prepare his defense in this case, and they are willing to make exceptions as long as the request is made in writing and there is some sort of reason given.

So my understanding is that the MCC is willing to

Angela O'Donnell, RPR, 914-390-4025

work with defense counsel on this issue.

MR. BARKET:  All I can say is what I said which is, as soon as I found out that was an option, we took advantage of it or tried to.  It took several weeks.  I'm hoping, in fairness to the MCC, they've had, as was publicly reported, kind of a change in the guard there.  No pun intended.

THE COURT:  Yes.

MR. BARKET:  So processes, whatever they are, may have taken longer.  Some of this came as Mr. Tartaglione --

THE COURT:  Was transitioning out of SHU.

MR. BARKET:  Right.  I don't know why it took so long, we'll find out.

I'm not asking the Court to do anything now, I'm just fronting the issue because, when we come back, if it continues to be a problem we're going to --

THE COURT:  Some of this may also be a little bit more smooth once it's determined where Mr. Tartaglione, which unit he's going to be in because then there are identifiable people that can facilitate that kind of --

MR. BARKET:  Getting him out of SHU is a big difference for a number of different factors; the conditions are better; there's access to reading material; the number of books he can keep in his cell, for example; access to commissary; and, frankly, visits with his attorney or legal team, which I have to say have largely been addressed with the

39

appointments.  Even as I was driving in one day, not while I was driving, but I emailed that morning saying I'm going to be there at eight, sorry for the late notice, something came up, and they had him waiting for me when I got in at 8:30.  So that was -- it's been good.  Still, SHU there's only two rooms.

THE COURT:  Right, but hopefully we can --

MR. BARKET:  Hopefully he'll be out.

THE COURT:  Some of which is in Mr. Tartaglione's control.

MR. BARKET:  Point I've made, Judge.

THE COURT:  I'm sure you have.  So I'll make it, too.

Other issues we need to address?

Anything from the Government's checklist?

MS. COMEY:  No, your Honor.  Thank you.

THE COURT:  Anything else from Mr. Tartaglione's counsel?

MR. BARKET:  No.

THE COURT:  Then our next conference you want to do another 30 days out?

MR. BARKET:  Okay.

THE COURT:  How about October 17 at 10:30?

MR. BARKET:  I don't want to jinx us, but Thursday is the visiting day for the unit where he was.

THE COURT:  Okay.

MR. BARKET:  Hopefully we'll go back.

THE COURT:  We don't want to jinx.

MR. BARKET:  I may just have done that.

THE COURT:  Well, I'll take it back.

How about the 21st at 10:30?

MR. BARKET:  That's fine.  It's okay with our firm.  There's five others.

THE COURT:  October 21, does that work for other counsel 10:30.

MS. COMEY:  Your Honor, that date works for the government.  Just to clarify, by that point the defense suppression motions will be fully briefed.

THE COURT:  Okay.

MS. COMEY:  There may need to be an evidentiary hearing on one of them.

THE COURT:  We can talk about scheduling that.

MS. COMEY:  Okay, talk about scheduling.  We don't need to have our witnesses for the hearing on that day?  Okay.

THE COURT:  No.

MS. COMEY:  Thank you, your Honor.

THE COURT:  All right, any objection to excluding time from now to October 21?

MR. BARKET:  No.

THE COURT:  Okay, I will prospectively exclude time from today until October 21.  The time is already excluded because of the motions, but I'll independently exclude time

Angela O'Donnell, RPR, 914-390-4025

finding it's in the interest of justice to do so.  That finding is based on the fact that there are more motions to be filed, much more preparation going on, and I find that the interests of justice from this exclusion outweigh Mr. Tartaglione's and the public's interest in a speedy trial.  The finding is made pursuant to 18 U.S.C., Section 3161(h)(7)(A).

Anything else, Ms. Comey?

MS. COMEY:  No.  Thank you, your Honor.

THE COURT:  Anything else in terms of this phase, Mr. Barket?

MR. BARKET:  One second, Judge.  Sorry.

(Defense counsel and defendant confer)

MR. BARKET:  Nothing else, Judge.

THE COURT:  All right.

So, marshals, if we could keep Mr. Tartaglione here, I actually need to have a conference with counsel for Mr. Tartaglione and his presence is required and we just can't do that back in the conference room.  So we're going to do it here in the courtroom because it's going to some defense strategy and other attorney-client issues, it can't be publically accessible at this point.  Here the compelling interests do outweigh, and I can make more of a record on that when we convene.

So we're going to take about a ten-minute recess, but we're going to bring Mr. Tartaglione back, and I'm going to ask

42

SEALED PROCEEDINGS

everybody else to vacate the courtroom.

We're adjourned for now.

Thank you marshals.

(Recess taken)

(Pages 43 through 61 sealed)

43

SEALED PROCEEDINGS

(The following discussion held with defense counsel)

THE COURT:  Anybody who's here is okay to be here?

MR. RICCO:  Everybody is on the defense team or counsel for one of the lawyers that's present, and we have lawyer who's not.

MR. BARKET:  His parents are still outside, I want to tell them we'll talk to them after we're done here.

THE COURT:  All right.

(Pause)

THE COURT:  So we are in the courtroom but the courtroom has been vacated by everybody except those who are connected with Mr. Tartaglione's defense team.  So Mr. Tartaglione is here, his attorneys are here and those who are working with them are all here and that is it.  The reason for this is because we are about to discuss some matters of the attorney-client relationships and that could involve conversations affecting defense strategy and so, while the First Amendment common law right of access certainly applies to this case I just got done pontificating about with regard to the government's submission, certain compelling interests can outweigh access to court proceedings, and this is one of those interests, when you're talking about a capital defendant's defense strategy, which is complicated in multi-layers, to say the least, that is not the kind of thing that the First Amendment right or common law right of access should

Angela O'Donnell, RPR, 914-390-4025

44

SEALED PROCEEDINGS

compromise.

So I find that the reasons for sealing are compelling and they're narrowly tailored to the extent that there's really no other way to have this conversation except to do it in the courtroom and only to do it with people who are part of Mr. Tartaglione's team.  If it turns out that defense strategy doesn't get discussed and there's nothing that may compromise Mr. Tartaglione's defense, then I can and will reconsider whether this transcript should be sealed.  But I'm going to seal it now except copies can be made available to those representing Mr. Tartaglione and those working with them.

All right, did you all have a chance to have a conversation?

MR. BARKET:  Yes.

THE COURT:  Okay.

MR. BARKET:  We did.

THE COURT:  Okay.  And?

MR. BARKET:  Thank you for the opportunity.

THE COURT:  Okay.  And is there anything anybody wants to add to the conversation?

I assume Mr. Tartaglione was filled in on the conversation we had in the robing room.

MR. BARKET:  He was.  I had a brief conversation with him because that's all that was required.

THE COURT:  Yes.

Angela O'Donnell, RPR, 914-390-4025

45

SEALED PROCEEDINGS

MR. BARKET:  His position is his position so...

THE COURT:  Okay.

Anything else, Mr. Ricco, that you want to add?

MR. RICCO:  No, your Honor.

THE COURT:  So, Mr. Tartaglione -- you can have a seat, it's all right.

You have written me a couple of letters.

THE DEFENDANT:  Yes.

THE COURT:  Two that I received, and you have expressed some concerns about having some individuals represent you in this case, and obviously I take very seriously any defendants' concerns about representation issues.  I don't really know the reasons why the letters are a little short on explanation, and I'm not saying we're going to resolve this today, but I do want to give you an opportunity if you want to be heard on this issue.  So go ahead.

THE DEFENDANT:  Do you want reasons?

I mean, that's what you're asking me for?

THE COURT:  Well, if you want to provide them.  I'm not compelling you to say anything.  You could say nothing.  You can just say, I stand by my letters.  But if you want to explain to me your concerns, I will listen to you, of course.

THE DEFENDANT:  I just -- about a year and a half ago I believe we addressed the same issue of having Mr. Ricco removed and we decided to stay the course, but now at this

Angela O'Donnell, RPR, 914-390-4025

SEALED PROCEEDINGS

point, I just feel like I really would like him removed from my team.

THE COURT:  Okay.  So what's changed or what's --

THE DEFENDANT:  Nothing's changed, I think that's probably the problem, nothing -- it's the same as it's been and my trust has just eroded even more.

THE COURT:  Okay.  So why don't you, as best you can, explain what the issue is that's been lingering for this past year and a half.

THE DEFENDANT:  I don't trust him, your Honor.  I don't mean to insult him or anything, but I don't trust him and I don't want him on my team.

THE COURT:  Why don't you trust him?

THE DEFENDANT:  He's been dishonest.  He's misrepresented a meeting he had with me in the past.  In the almost three years I've been incarcerated, I think he's seen me one-on-one three times.

THE COURT:  Yes.

THE DEFENDANT:  We never discuss the facts of the case.  You know, we never get into anything and that's --

THE COURT:  Well, you have a large defense team.

THE DEFENDANT:  Yes.

THE COURT:  And any good defense team, which this is, would want to divide up the labor.  We had this conversation before.  I was on legal teams where I would be the person who

Angela O'Donnell, RPR, 914-390-4025

47

SEALED PROCEEDINGS

would be in charge of brief writing, for example, so I would not be in touch with the facts of the case.  It would just be, all right, you handle the law stuff.  And so you don't want to have, as many lawyers as you have representing you, all doing the same thing because that's not --

THE DEFENDANT:  No, I understand that, I do.  I understand that completely, but I still, I just -- I do not want him on my team.

THE COURT:  Right, but I don't understand what's generating -- the fact that he may not have discussed the facts of the case maybe because that's how the labor has been divided.  And I don't want to know.

THE DEFENDANT:  That's just a small, that's just one of the small reasons.

THE COURT:  So what are some of the other small reasons?

THE DEFENDANT:  He's misrepresented meetings he's had with me and totally changed what was said, what was talked about, and even how long we were in the meeting together or when he spoke to the rest of my team.  So my trust is just not there.  I don't want to meet with him.  I don't want to discuss -- I don't want the rest of my team talking with him anymore, and I feel bad, you know, I don't want to insult him.

THE COURT:  Mr. Ricco is a professional.  All the lawyers who are part of your team are professionals.

Angela O'Donnell, RPR, 914-390-4025

48

SEALED PROCEEDINGS

THE DEFENDANT:  Okay.

THE COURT:  For better or for worse, we criminal lawyers are -- you know, we're used to this kind of stuff so -- and no one is going to make this about them, this is about their professional obligation to represent you; right?  So you should understand that.

Well, look, I don't want to get into -- because they're all privileged, every consideration you have with every attorney is privileged, so I don't really know what to say. Sounds like there's a meeting where you think Mr. Ricco misrepresented what was said at the meeting?

THE DEFENDANT:  Absolutely.

THE COURT:  And he misrepresented how long the meeting lasted?

THE DEFENDANT:  That, too, yeah.

THE COURT:  Okay.  I mean --

THE DEFENDANT:  I just feel like --

THE COURT:  Why would somebody misrepresent how long a meeting lasted really matter over the course of an attorney-client relationship that has spanned, as you point out, many years now?  Not many years, but a few years.

THE DEFENDANT:  Because if you're talking to the rest of team and you're saying I spoke with him for three hours when it was 45 minutes --

THE COURT:  Yes.

Angela O'Donnell, RPR, 914-390-4025

SEALED PROCEEDINGS

THE DEFENDANT:  -- you make it sound like we had a much deeper conversation.

THE COURT:  You know, when I looked at the clock when we were finishing with the conference, I would have thought the conference lasted ten minutes, it lasted an hour ten minutes.

I don't know what you think Mr. Ricco would have to gain out of misrepresenting the length of a meeting and why it would --

THE DEFENDANT:  That's just one.  I'm just trying to give you an example of just some things but I just -- I don't trust the man.  I don't trust him at all.  I just don't want him to be part of my team.

THE COURT:  I'm just trying to understand the basis for the mistrust.  So he didn't accurately reflect how long a meeting lasted or maybe some things that were said?

THE DEFENDANT:  Just he doesn't listen to me when -- you know, he doesn't go over the facts when he's with me.

THE COURT:  That may not be his role in the case to go over the facts with you.  I don't know, and I'm not going to ask counsel to articulate the roles each person has in the case, but any large case team in any kind of case is going to divide up the labor.

THE DEFENDANT:  Well, I mean, maybe -- many people on this team don't come and see me, your Honor.  Many.

THE COURT:  Right.  It may be that that's not their

Angela O'Donnell, RPR, 914-390-4025

SEALED PROCEEDINGS

role.

THE DEFENDANT:  Right, but him I would have expected to play more of an active role, and that's just one reason.

THE COURT:  But an active role can mean many things that don't necessarily involve coming to meet with you.

THE DEFENDANT:  But three times in three years?

THE COURT:  It's not inconceivable.  It's not inconceivable.  As I say, you have a very large team, which I'm glad for you that you have a large team, and any good set of lawyers is going to divide up the work.

Mr. Barket has gone, as you know, to great lengths to make a record about the difficulties to visit you at the MCC; right?  So, the idea that four or five lawyers would all go these difficulties when one or two can some see you and the other one or two can be doing something else in your case, that seems to me to be actually logical.

THE DEFENDANT:  I just don't want him on my team, your Honor.

THE COURT:  I know, but I don't understand.

THE DEFENDANT:  I know, but do I have to have him?

THE COURT:  That's something I'm going to ponder.

THE DEFENDANT:  All right.  I really -- I'm not going to speak with him anymore, I'm not going to meet with him anymore, and I'm going to ask the other members of my team not to meet with him anymore.  I don't know if I have the authority

Angela O'Donnell, RPR, 914-390-4025

SEALED PROCEEDINGS

to do that.

THE COURT:  Before I forget, you know, you wrote this letter to the *Daily News*.

THE DEFENDANT:  Right.  I didn't get to read what they -- how much --

THE COURT:  Let me say a couple of things, and this is legal advice you're not paying for, so it may be worth what you're paying for.

THE DEFENDANT:  Okay.

THE COURT:  Don't do that.

THE DEFENDANT:  Already got yelled at by Mr. Barket.

THE COURT:  Mr. Barket is right, and he's right to yell at you.

THE DEFENDANT:  I just --

THE COURT:  Mr. Tartaglione, listen.

THE DEFENDANT:  All right.

THE COURT:  The stakes for you could not possibly be higher.  The prosecutors on this case, their job is see you convicted and see you get the death penalty.  That's what they're going to come into the courtroom and advocate for.

THE DEFENDANT:  I just got frustrated.

THE COURT:  Hang on.  Within their legal bounds and ethical bounds they're going to do everything they can --

THE DEFENDANT:  To get me.

THE COURT:  Well to get the result they are

Angela O'Donnell, RPR, 914-390-4025

52

SEALED PROCEEDINGS

authorized to seek.  They will read your letters.  They are statements by you.  Right?  Proving that will not be hard.  Then the only question is whether or not they can find something creative to use in those letters legitimately to say that it's evidence against you in some way, shape or form.

And by the way, just so you understand what that means, it's not just.  You say to yourself, as long as I don't talk about my case, how am I harming myself?

There are two phases to this case, potentially.  One is the guilt phase where they're going argue based on the evidence that you are guilty of the charges they brought against you.  If the jury agrees with them, then it goes to a penalty phase.

THE DEFENDANT:  Right.

THE COURT:  Where then the debate is over what's called aggravating factors -- I'm sure the lawyers explained this to you -- and mitigating factors.  So if there is anything in any letter that they get their hands on lawfully -- sending it to the *Daily News* it's a lawful -- they can use that; right?  Potentially.  I'm not prejudging any rulings, but they're going to argue, we didn't seize it, we didn't get a search warrant, he sent this.  And it's Mr. Tartaglione's statement and we want to introduce it for the following reason.  And it may be something you can't even imagine that could hurt you.

THE DEFENDANT:  No, I understand.

Angela O'Donnell, RPR, 914-390-4025

53

SEALED PROCEEDINGS

THE COURT:  But it can hurt you.

THE DEFENDANT:  I appreciate you telling me that.

THE COURT:  Just hear me out.  Imagine, just imagine for a moment, a juror, not that you would have a conversation, but imagine for a moment the jury says, I was really on the fence about whether or not to vote on the death penalty, but what Mr. Tartaglione said in the letter to the *Daily News*, that was the aggravating factor that tipped the scales for me.  I want you to try and close your eyes and imagine that.

THE DEFENDANT:  I understand.  I already saw that I shouldn't have done it.

THE COURT:  You write me, that's fine, I'm not going to go to the *Daily News* or anybody with your letters, but you really, really, really can't be writing --

THE DEFENDANT:  I understand.  I got very frustrated at being called a killer and everything else.

THE COURT:  Okay.  There are many frustrations that you're dealing with, I'm sure, and I understand that, and I don't understand.  Obviously, I can't feel it the way you feel it.

THE DEFENDANT:  Right.

THE COURT:  The single greatest frustration you want to avoid is doing anything by yourself that's going to hurt you.  That's going to lead you to the worst form of frustration that you can imagine.

Angela O'Donnell, RPR, 914-390-4025

54

SEALED PROCEEDINGS

THE DEFENDANT:  All right.  Thank you.

THE COURT:  Don't make other peoples' jobs easier for them.

THE DEFENDANT:  I will not do it again.  Thank you.  Thank you for that.

THE COURT:  All right.  Anything else on this issue, Mr. Tartaglione?

THE DEFENDANT:  Just that, if he stays, I would really feel uncomfortable and, I mean, either replace him or remove him, but I can't work with him anymore.

THE COURT:  You understand, we've had this conversation before, Mr. Ricco is one of the most --

THE DEFENDANT:  I understand that.

THE COURT:  Let me finish my sentence, okay?  One of the most well-regarded lawyers in the country, especially when it comes to death penalty work.  You understand that?

Like if there were a draft, somebody's drafting capital defense teams, Mr. Ricco would be one of the first people picked in that draft.  Okay?

THE DEFENDANT:  I understand.

THE COURT:  And that's based on his long track record of representing clients all over the country in really difficult, really complicated capital cases.  Okay.

THE DEFENDANT:  No, I understand.

THE COURT:  That means he knows the law.  That means

Angela O'Donnell, RPR, 914-390-4025

55

SEALED PROCEEDINGS

he knows how the Justice Department works.  That means he understands the different phases of these cases, and there are many different phases.  So not even talking about trial yet, we'll get to that in a minute.  But there are so many things that have to be done to represent a capital defendant that Mr. Ricco has done and done and done and done over and over again.

And then there's the trial.  Okay?  I've personally seen him try the most difficult high-stakes cases out there.  All right?

Mr. Ricco is outstanding.  He's a 12 out of 10.  And I say that as someone who has watched him and has actually been an adversary of his.  And everything about trials he knows how to do.  He knows how to cross examine witnesses, he knows how to direct examine witnesses, he knows how to give jury addresses, he knows how to handle legal motions, he knows how to handle difficult judges and not difficult judges.  That's not something that is true of every lawyer in this country.

As I said, you have a great team, and I'm not denigrating anything of the others because they're all excellent attorneys, because I've seen a number of your attorneys in action.  Okay?  So, again, you have a great team, but I'm telling you, Mr. Ricco is a phenomenal lawyer, in particular, a phenomenal capital defense lawyer.

THE DEFENDANT:  I know, I appreciate his attributes,

Angela O'Donnell, RPR, 914-390-4025

56

SEALED PROCEEDINGS

and that's what made this decision take this long but I still --

THE COURT:  I guess what I'm saying is is that you're fighting for your life and you would -- anybody rationally would want to have the best people available to fight for your life.  And even if you don't personally get along with them, they're not going to be your best friend, and I'm not trying to say you and Mr. Ricco need to be best friends, of course not, but there's a sort of the ends justify the means here.  Your life is at stake, and you need the best advocates representing you to maximize your chances to beat this case.

THE DEFENDANT:  Proving my innocence is priority for me over the death penalty.

THE COURT:  And you have a great team that will help you do that.  Mr. Ricco would be an outstanding part of that team, but if the jury ends up coming back with a guilty verdict, then the stakes will have gone up to their highest level.

And if there was any other phase in your life, if you were looking at somebody saying to you, you have this heart ailment and you need surgery and there are only a handful of people in the country that can do this surgery, you wouldn't say, well, I don't really like that person.

You wouldn't; right?

THE DEFENDANT:  You're right.

Angela O'Donnell, RPR, 914-390-4025

SEALED PROCEEDINGS

THE COURT:  You would say, get me the best heart surgeon in the world to do this surgery.  And so that's something I really want you -- that analogy is entirely appropriate here, and I really want you to think about that.

THE DEFENDANT:  I have, your Honor.

THE COURT:  Well, hang on.  But you need to think about it some more because it's real.  It's real.  And you would never say to your family, no, I don't want that surgeon because I don't like them.  Your family would say, get the best surgeon you could get, who cares if you like him.  All right.  And we've all been there.  Doctors are not unlike lawyers, some of them out there are prima donnas, but who cares if they're going to save your life.

THE DEFENDANT:  I understand, I just -- I've thought about it a lot.

THE COURT:  I'm going to ask you to think about it some more.

THE DEFENDANT:  Okay, but I think my decision is still going to be the same.

THE COURT:  I'm going to ask you to think about it some more.

THE DEFENDANT:  All right.  Thank you, your Honor.

THE COURT:  I have no personal stake in this.  Doesn't matter to me who's representing you in terms of individuals.  What I want for you is to give you an opportunity

Angela O'Donnell, RPR, 914-390-4025

58

SEALED PROCEEDINGS

to present the best case you can present.

THE DEFENDANT:  For me my priority is the trial.

THE COURT:  I understand that.

THE DEFENDANT:  Okay?  If I'm found guilty it's --

THE COURT:  Okay.

THE DEFENDANT:  All right.

THE COURT:  I understand.  I understand.

So at a minimum let's agree no more letters to the media.  Okay?

THE DEFENDANT:  Yeah.

MR. BARKET:  Just a second, Judge.

THE COURT:  Of course.

(Defense counsel and defendant confer)

THE DEFENDANT:  Your Honor, how much time do you want me to think about this?

THE COURT:  Why don't we at least give it to the next conference.

THE DEFENDANT:  I just want it done.  I'm not going to change my mind, your Honor.

THE COURT:  All right.  Neither am I at this point.

We've got to resolve this *Curcio* issue because that may have certain ramifications.  I have no idea.

THE DEFENDANT:  Regardless of if Barket stays or not --

THE COURT:  Please hear me out, Mr. Tartaglione.

Angela O'Donnell, RPR, 914-390-4025

59

SEALED PROCEEDINGS

I want that process to play out, and I really do want you to think about this.  Okay?

THE DEFENDANT:  Thank you.

THE COURT:  I don't think there's going to be any prejudice to you for another 30 days or so giving this some thought.  Okay?

MR. BARKET:  Judge, I'm not advocating one way or the other here, but at some point, and I don't think 30 days is an appropriate number, the client's choice about this has to be protected.  He is crying now and is upset about this.  I'm not saying there's prejudice.  As his lawyer I can't just say, okay, he said this, and not that your Honor is saying, who cares, of course not, but we'll kick it down the road for another 30 days.  And I do this in part based upon the -- this is not a new topic for any of us, and what nobody in the room knows or nobody in the room knows to a great detail is the number of times we've had this discussion.

So, I can't have my client sitting here saying this is what I want to have happen, have him literally in tears, which I've only seen occasionally, rarely, over the last three years, and then there's no prejudice to him.  He gets to make this decision at some point, and I think the record should be clear about that.  I mean, it's his choice.

THE COURT:  I'm comfortable with the record as it is, Mr. Barket.  Mr. Ricco is one of the best capital defense

SEALED PROCEEDINGS

attorneys in the country.

MR. BARKET:  I fully agree.

THE COURT:  Let me finish.  I let you finish.

And I have a sworn obligation to make sure Mr. Tartaglione gets a fair trial and that includes the best representation he can get, and I'm going to fulfill that obligation, and I'm comfortable with the record as it is.

There's no prejudice to Mr. Tartaglione.  I think he's upset by a lot of things.  A lot of things.  And I totally respect that and understand it, but I have a role to play here, too, and I'm going to play it, and I want Mr. Tartaglione to give this some thought, I want the *Curcio* issue to be played out, and then we will take it from there.

All right, anything from anybody else?

MR. BARKET:  Once again, Judge.

THE COURT:  Yes.

(Defense counsel and defendant confer)

THE COURT:  Anything else?

MR. BARKET:  No, Judge.

THE COURT:  Anything else from anybody else?

MR. KOFFSKY:  Nothing.  Thank you, your Honor.

MR. RICCO:  No.

THE COURT:  We are adjourned.

Marshals, thank you very much.

Hang on counsel, one last thing.

Angela O'Donnell, RPR, 914-390-4025

61

SEALED PROCEEDINGS

I just want to put on the record that the transcript of the conference we had in the robing room also should be sealed because we addressed also defense strategy issues, and so I find that the First Amendment right of access, common law right of access are outweighed by the risk to Mr. Tartaglione of defense strategy being revealed publicly.

So the transcript of that proceeding also is to be sealed, except copies can be made available to counsel, and the sidebar conversation also.

That's it.  We're adjourned.  Thank you.

(End of sealed discussion)

(Proceedings concluded)

CERTIFICATE:  I hereby certify that the foregoing is a true and accurate transcript, to the best of my skill and ability, from my stenographic notes of this proceeding.
                _____
Angela A. O'Donnell, RPR,Official Court Reporter, USDC, SDNY

Angela O'Donnell, RPR, 914-390-4025