# LAW OFFICES OF BOBBI C. STERNHEIM

212-243-1100 • Main
917-306-6666 • Cell
888-587-4737 • Fax

33 West 19th Street - 4th Floor
New York, New York 10011
bc@sternheimlaw.com

December 30, 2019

**Ex Parte Submission Under Seal**
**For In Camera Review**

Honorable Kenneth M. Karas
United States District Judge
United States Courthouse
300 Quarropas Street
White Plains, NY 10601

Re: *United States v. Nicholas Tartaglione*
S4 16 Cr. 832 (KMK)

Dear Judge Karas:

This Report, prepared in connection with my appointment as *Curcio* counsel for Nicholas Tartaglione, is submitted *ex parte*, under seal, for *in camera* review by the Court. This capital case presents unique *Curcio* issues. This Report contains highly sensitive and privileged information, the inclusion of which is deemed necessary to provide the Court with relevant background and sufficient facts to make critical decisions that will impact the rights of a capital defendant. Statements contained herein do not constitute admissions on behalf of Mr. Tartaglione and are not admissible against him under Rule F.R.Cr.P. 11(e)(6) and F.R.E. Rule 410. Additionally, this Report is not a waiver of any of his rights as to self-incrimination.

The Court will provide defense counsel the opportunity to review this Report. The Court has yet to decide whether the contents of this Report will be provided to the Government and whether a *Curcio* hearing will be conducted *ex parte*. *Curcio* counsel requests the opportunity to confer with the Court prior to disclosing this Report to counsel in the first instance and to the Government, should the Court determine that disclosure to the Government is required.

Information contained herein is derived from various sources, including but not limited to consultations with defense counsel and Mr. Tartaglione, attorney work product, court records (public and sealed), miscellaneous documents, Internet sites,

1

case law and rules. Unless otherwise stated, assertions are based on information and belief. As discussed during my October 21st *ex parte* conversation with the Court, my investigation has revealed conflict-related categories beyond statements made to the media by Bruce Barket, Esq. Additional areas of inquiry include: removal of a document from the MCC, communications via contraband cellphone(s), and attempts to deter efforts to safeguard legal interests of Mr. Tartaglione in this this death-authorized case.

The Report focuses on areas that give rise to conflict without concluding that any issue is a potential, actual, *per se*, or waivable conflict. Because the Court will give defense counsel the opportunity to respond to this Report, I leave it to them to amplify, clarify, or otherwise respond to statements that follow.

I have had several meetings with Mr. Tartaglione. We discussed the areas detailed in this Report. I have responded to his questions and addressed his concerns. It is my belief that Mr. Tartaglione comprehends the issues. It is my understanding that he will knowingly and voluntarily waive any type of conflict in order to have Attorney Barket continue as his counsel of choice.

**Defense Counsel**

Attorney Barket and his firm, including Aida Leisenring, Esq., were chosen by Mr. Tartaglione and privately retained to represent him in this capital case. John Wieder, Esq. also provides private legal counsel to Mr. Tartaglione. As a defendant charged with death-eligible offenses, Mr. Tartaglione qualifies for a second counsel "learned in the law applicable to capital cases," as specified in 18 U.S.C. § 3005. The Court appointed "Learned Counsel" pursuant to the Criminal Justice Act. Learned Counsel for Mr. Tartaglione comprise a team of attorneys that includes Bruce Koffsky, Esq., Anthony Ricco, Esq., Michael Bachrach, Esq., Kenneth Montgomery, Esq., and John Diaz, Esq.

**Statements to Media**

Throughout the course of this capital case, Attorney Barket has made numerous statements to the media which have been widely reported in print and broadcast via television and Internet sites. The subject of his statements include but are not limited to: conditions at the Metropolitan Correctional Center ("MCC"), threats made by MCC personal against Mr. Tartaglione, denial of allegations that Mr. Tartaglione assaulted Jeffrey Epstein, mention of the amicable relationship

2

between Mr. Tartaglione and Epstein while cellmates, and assertion that Mr. Tartaglione has information pertinent to ongoing investigations concerning Epstein's attempted suicide on July 23, 2019 and death on August 10th.

Various print and Internet articles contain statements by Attorney Barket which allude to information provided to him by Mr. Tartaglione. Other articles and interviews contain statements by Attorney Barket that could be used as adoptive admissions adverse to Mr. Tartaglione's interests if relied upon by the Government during the penalty phase. Such extra-judicial statements create the potential for Attorney Barket to be questioned in relation to Epstein's suicide attempt and death.

**Request for *Curcio* Counsel**

On August 21, 2019, in response to concerns that Attorney Barket's public statements may conflict with the interests of Mr. Tartaglione in this death-authorized case, the Court appointed the undersigned to serve as *Curcio* counsel.

By *ex parte* letter, dated August 17, 2019, Learned Counsel expressed concerns about conflicts arising from statements made to the media by Attorney Barket. Learned Counsel believed that certain statements contained information derived from Mr. Tartaglione that may constitute a breach of attorney-client privilege and statements regarding the MCC and prison staff that would negatively impact presentation of evidence during the penalty phase in support of positive prison adjustment. The request included the following qualification:

> *Undersigned counsel are constrained in providing more detail regarding the potential conflict and the substance of the many statements made in the media because of the need to preserve confidentiality.*

Ricco letter, 8/17/19.

In a separate *ex parte* letter, dated August 20th, Attorney Barket stated:

> *Contrary to learned counsel's representation, there is no actual, potential, or possible conflict caused by any of my communications with the press that would warrant assignment of Curcio counsel or a Curcio hearing. . .*

> *While I appreciated the need to be circumspect when dealing with these issues, I do not believe that the Court should direct a Curcio inquiry and*

3

*appoint Curcio counsel unless and until it has identified both a factual and legal basis establishing the existence of any possible or potential conflicts. If there are none, then no further inquiry should take place. . .*

*Mr. Tartaglione fully supports the statements I have made to the media, which I had full authority to make pursuant to Rules 1.6, 1.7, 1.8, and 3.6 of the New York Rules of Professional Conduct, as applicable to me pursuant to Rule 1.5(b)(5) of the Local Rules of the Southern and Eastern District Courts of New York.*

Barket letter, 8/20/19.

During an *ex parte* conference on August 21st, Attorney Barket stated:

*If the Court is inclined to have somebody separate from all of us speak to Mr. Tartaglione to confirm what I wrote, that's fine with me. . .I think, speaking for everybody, we are hoping because we think this is so straightforward, and I think clean, that this can all happen today so we all can move beyond it.*

8/2/19 Transcript, at 13.

Attorney Barket then agreed with the Court that speed should not be the guiding principle. *Id.* at 14.

Attorney Barket's statements to the Court seem to touch upon Learned Counsel's concern regarding conflict area beyond mere statements to the media and attorney-client privilege:

*MR. BARKET: Well, I think the short answer is the substance of what the letters entail certainly touch upon the attorney-client privilege, and it may involve discussions beyond discussions of conversations with Mr. Tartaglione beyond what's been reported in the paper. So to have that aired publicly in the presence of counsel for the government would be problematic.*

*And, secondarily, there's been no hint by the government so far that I know that any counsel for Mr. Tartaglione would become a witness. I wouldn't want our free-flowing discussion of some of the topics here to give them any ideas.*

*Id.* at 7 (underline added).

4

The Court astutely sensed a larger concern:

*So the attorney-client privilege piece is the one that's obviously the most potentially problematic ... I guess it would be useful to know more about what the potential conflict is, so I can figure out how much of this might touch upon the privilege.*

*Id.* at 7 (underline added).

*So if you can maybe enlighten me a little bit as to what the potential conflict is so I understand the dots that are being connected here.*

*Id.* at 7 (underline added).

*MR. RICCO: Judge, in my -- I think what's problematic here is that to fully lay out the circumstances we would be intruding way into revealing confidentialities that were discussed with counsel, and so we are trying to alert the Court to the -- not only the doorway issue, but -- . . . -- getting in the weeds on this... And I believe by flushing it out, we would then be violating his confidentiality -- his confidence.*

*Id.* at 8.

*And we believe that he will [waive privilege]. What we are hesitant to do is to have an open conversation more about in addition to what has been discussed in the paper because we then have a greater exposure of confidence . . .*

*Id.* at 12 (underline added).

Defense counsel are in general agreement that Mr. Tartaglione will likely waive the privilege issue and, as previously stated, Mr. Tartaglione intends to do so before the Court. However, Attorney Barket's statements to the media do not merely pose a conflict issue involving privilege. While the majority take issue with deplorable conditions in the MCC, a few target Mr. Tartaglione's knowledge of circumstances pertaining to Jeffrey Epstein. The following two statements in particular give rise to concerns that survive waiver of privilege:

> '*Nick knows a heck of a lot about what went on*,' Barket said. '*He was there during the first attempt and he was there when he actually killed himself — he just wasn't in the same cell.* ' (underline added).

https://www.nbcnews.com/news/us-news/nearby-inmate-heard-nothing-when-jeffrey-epstein-died-lawyer-says-n1041646.

> '*Whether or not the investigators into the suicide chose to interview Mr. Tartaglione about the attempted suicide to which he was witness or about how the facility is run and the conditions under which the inmates are forced to live, the correction officers know he has information potentially very damaging to the very people now charged with guarding him or their coworkers*' (underline added).

https://www.lohud.com/story/news/crime/2019/08/20/tartaglione-epstein-death/2066257001/.

Any alleged breach of attorney-client privilege may be resolved by Mr. Tartaglione's waiver of privilege or a declaration that he authorized Attorney Barket to make such statements. However, the above-cited statements give rise to the specter of conflict between client and counsel.

Imbedded in these statements is information concerning a document removed from the MCC that is material to investigations focused on the attempted suicide and subsequent death of Epstein. As such, these statements spark a greater concern for conflict.

At the time of his August 20th letter and August 21st statements to the Court, Attorney Barket had knowledge of a handwritten document allegedly written by Jeffrey Epstein ("Epstein Note"; "Note") that had been removed from the MCC prior to Epstein's death on August 10th. Mr. Tartaglione and Mr. Epstein shared a cell at the time of Epstein's alleged suicide attempt on July 23d. Epstein was removed from the cell but some of his property remained. The Bureau of Prisons ("BOP") commenced an investigation and questioned Mr. Tartaglione.

During the period after Epstein's attempted suicide but prior to his death, Mr. Tartaglione found the Note in his cell. During a legal visit, he gave it to John Wieder, Esq. Attorney Wieder removed the Note from the MCC. Attorney Barket informed Learned Counsel of the existence of the Note, stating the Note had been removed

from the MCC by Attorney Wieder. Attorney Barket instructed Mr. Tartaglione not to discuss the Note with anyone unless Attorney Barket was present. Attorney Barket requested that Learned Counsel not disclose information concerning the Note to *Curcio* counsel. Only after appointment of *Curcio* counsel did Attorney Barket disclose his personal involvement in removal of the Note.

At a defense meeting attended by *Curcio* counsel on August 23d, Attorney Barket provided the following details concerning discovery and removal of the Note, including his personal involvement in removal of the Note from the MCC:

During a legal conference at the MCC, Mr. Tartaglione told Attorney Barket that he had found a handwritten note in a book belonging to Epstein in the cell they shared prior to Epstein's alleged suicide attempt. The Note was discovered after Epstein's alleged suicide attempt. Attorney Barket asked to see the Note but Mr. Tartaglione had left it in his cell. Following this legal conference, Attorney Barket contacted Attorney Wieder. Attorney Wieder went to the MCC, met with Mr. Tartaglione in the Attorney Visiting Room, obtained the Note from Mr. Tartaglione, and removed the Note from the MCC. Attorney Wieder showed the Note to Attorney Barket. Attorney Barket told Attorney Ricco about the Note.

*Curcio* counsel later learned that prior to telling Attorney Barket about the Note, Mr. Tartaglione had told an MCC officer about the Note but expressed concerns to the officer that if given to MCC officials, the Note would not be properly safeguarded. The officer tacitly agreed.

During the August 23d defense meeting, Attorney Barket showed *Curcio* counsel a screenshot of the Note and offered a copy provided it was not further disclosed. *Curcio* counsel declined the offer. Recently, *Curcio* counsel requested a copy of the Note for inclusion in this Report. Attorney Barket declined the request on the ground that Mr. Tartaglione does not want it shared and on advice of ethics counsel, Michael Ross, Esq.[1]

---

[1] During an *ex parte* proceeding on November 21st, Attorney Barket took issue with a statement made by *Curcio* counsel during an *ex parte* conference with the Court on October 21st. While being circumspect about issues under examination in this unusual matter, *Curcio* counsel made reference to the fact that "even counsel is represented by counsel". The context for that statement follows:

*Curcio* counsel arranged to meet with defense counsel in the jury room before commencement of the status conference on September 17th. To the surprise of all except members of the Barket Firm, Michael Ross, Esq., a prominent ethics lawyer, was present. At that meeting, Attorney

The content of the Note is reprinted from *Curcio* counsel's personal notes. *Curcio* counsel believes the underlined portion, in particular, is relevant to the ongoing investigations regarding Epstein:

> *They investigated me for months – Found nothing!!!*
> *So 15 year old charges resulted.*
> <u>*It is a treat to be able to choose ones time to say goodbye.*</u>
> *Watcha want me to do –*
> *Bust out crying!!!*
> *No fun – Not worth it.*

Epstein Note (underline added).

According to BOP Guidelines, the Epstein Note qualifies at contraband:

*Contraband is defined as any item or thing not authorized or issued by the institution, received through approved channels, or purchased through the commissary. . . Any item in an inmate's personal possession must be authorized and a record of the receipt of the item should be kept in the inmate's possession.*

https://www.bop.gov/locations/institutions/spg/SPG_aohandbook.pdf    (revised November 2012), at 15.

The Epstein Note did not belong to Mr. Tartaglione. More importantly, its content is relevant, and material, to the investigations being conducted into Epstein's suicide attempt and death. Its removal from a scene under investigation, its retention by counsel, and its non-disclosure to investigators casts Mr. Tartaglione, Attorney Barket and Attorney Wieder as potential witnesses in ongoing investigations and prosecutions. Disclosure to the Government of the Note and circumstances of its recovery and removal invites a serious potential for conflict between client and

---

Barket stated that he had retained Attorney Ross "a couple of months before." Attorney Ross had attended each status conference since September 17th.

Mr. Barket has not revealed the reason for retaining ethics counsel. With the exception of declining *Curcio* counsel's request for a copy of the Epstein Note, it is unknown whether Attorney Barket retained ethics counsel as a result of decisions and actions discussed in this Report or whether such decisions and actions were made on advice of counsel.

8

counsel.

In addition to any internal investigation being conducted by BOP Special Investigative Services, the Office of the Inspector General and local United States Attorney's Office ("SDNY") are conducting investigations into the circumstances which led to Epstein's return from suicide watch and his subsequent death. In connection with those investigations, several BOP officers and BOP staff have criminal exposure and risk termination from employment by the BOP. A number have already been indicted by SDNY. The Epstein Note is relevant and material to these investigations.

As a result of his involvement in the removal of the Note, his decision to conceal it, and the untimely death of Epstein, Attorney Barket is a witness to events related to the Epstein suicide and may become embroiled in these ongoing investigations. BOP medical staff and supervisory officers who previously relied upon statements by Epstein's lawyers in the decision to remove Epstein from suicide watch will likely claim that had they been in possession of the Note, it would have been relevant to their assessment of Epstein and may have prevented his death.

BOP Protocols specifically require a Suicide Risk Assessment when "an inmate's *written* or verbal *behavior is suggestive of suicide*" to "determine the appropriate intervention that best meets the needs of the inmate" and bear directly on decisions whether to return a detainee from suicide watch or place him alone in a cell. *See* BOP Suicide Prevention Program Statement, Number 5324.08, at 10 (emphasis added). https://www.bop.gov/PublicInfo/execute/policysearch?todo=query&series=5000#.

Whether or not in violation of BOP institutional rules, removal and concealment of the Note poses serious concerns for both defendant and defense counsel. Failure to timely disclose the Note may impact the penalty phase. Should the Court feel obliged to disclose the Note to the Government, this could expose Attorney Barket to investigation by the very office prosecuting Mr. Tartaglione, in addition to professional disciplinary proceedings. As a result of his personal involvement in removal and retention of the Note, Attorney Barket becomes an unsworn witness to events material to evidence to be presented at the penalty phase (by either the defense or the prosecution) concerning prison adjustment.

Attorney Barket's personal involvement exposes him to professional disciplinary proceedings, administrative and criminal investigations, and wrongful

9

death claims, predicaments that raise conflict concerns. Disclosure of the Note combined with public statements suggesting that Mr. Tartaglione has information concerning the alleged suicide attempt and subsequent death of Epstein could further implicate Mr. Tartgalione in ongoing investigations.

The Epstein Note is the crux of concern regarding conflict.

**Contraband Cellphone**

By letter dated, July 19th, Attorney Barket informed the Court that on or about July 3d, MCC corrections officers confiscated a cellphone found in Mr. Tartaglione's cell, a violation of MCC institutional rules. (The cellphone is contraband as defined in the BOP Inmate Information Handbook.) Attorney Barket asserted "a good faith basis to believe that privileged material exists within the communications stored on that telephone."

By letter dated July 22d, the Government informed the Court and counsel that "[a]ccording to MCC legal staff, the cellphone is a mini-cellphone that is only capable of making voice calls and *does not have the ability to send or receive text or other written messages*" (emphasis added).

During the July 22d status conference, Attorney Barket clarified that Mr. Tartaglione was asserting both a legal and marital privilege to communications stored in the contraband cellphone. *See* 7/22/19 Transcript, at 5 - 11. In response to questioning by the Court, Attorney Barket confirmed that "on information and belief there were text messages sent from the phone to members of the defense team." *Id.* at 14-15. The Government reiterated that the seized phone does not have text messaging capabilities. *Id.* at 24.

On October 31st, the Government provided a log of the call history extracted from the seized cellphone. Names corresponding to call numbers include Attorney Wieder and other members of the Barket Firm team. Neither Attorney Barket's nor Attorney Leisenring's phone numbers appear on the phone log.

In compliance with obligations to investigate and prepare for the penalty phase by developing mitigation evidence in support of adjustment to incarceration (*see Skipper v. South Carolina*, 476 U.S. 1 (1989)) and to defend against the Government's presentation of aggravating evidence (*see Rampilla v. Beard*, 545 U.S. 374 (2005)), Learned Counsel asked all defense team members to disclose

10

critical information from their cellular phones: incoming telephone number and screen shots of text messages from contraband cellphones. Not all defense team members have responded.

*Curcio* counsel requested copies of any text messages received or sent via contraband cellphones. Attorney Leisenring confirmed that she received text communications from a cellphone but does not believe she responded to them, and she provided copies of screenshots. Attorney Barket believed he had not received any text communications via the contraband cellphone but confirmed that other defense team members, including Attorney Wieder, had texted with Mr. Tartaglione via a contraband cellphone. No information has been provided from Attorney Wieder's phone.

## John Wieder, Esq.

Attorney Wieder regularly visits with Mr. Tartaglione in the MCC's Attorney Visiting Room. Descriptions of Attorney Wieder's role in relation to this case have varied: a commercial lawyer and long-term friend who visits Mr. Tartaglione to discuss transactional issues but knows not to discuss criminal issues; an attorney retained by the Barket Firm to assist with the criminal defense of Mr. Tartaglione.

It appears that Attorney Wieder's relationship to the Barket Firm was formalized after his removal of the Epstein Note from the MCC. Following appointment of *Curcio* counsel, Attorney Barket informed Attorney Bachrach that the Barket Firm had retained Attorney Wieder to assist in the criminal defense of Mr. Tartaglione. At the August 23d defense meeting, Attorney Barket announced that his firm had entered into an agreement with Attorney Wieder concerning his role in this case. Learned Counsel's request for a statement confirming the nature of Attorney Wieder's relationship with the Barket Firm remains pending.

Attorney Wieder's conduct regarding the Epstein Note and his text communications via the contraband cellphone, each violations of BOP policy, make him a potential witness during the penalty phase and in connection with ongoing BOP and DOJ investigations, and a potential subject of disciplinary proceedings

Attorney Wieder's participation in removal of the Epstein Note heightens the need for review of his text communications with Mr. Tartaglione to assess their bearing on the penalty phase: whether texts contain information related to Epstein, mitigating evidence supporting positive prison adjustment and/or classification, or

aggravating evidence subject to disclosure to and use by the Government during its penalty phase rebuttal.

## Penalty Phase Obligations

Capital proceedings are governed by reciprocal discovery obligations. Any text messages between Mr. Tartaglione and others via contraband cellphones are potentially subject to disclosure by the defense to the Government. *See* Commentary to ABA Guidelines 10.7; 2008 ABA Supplementary Guideline 4.1(D). In addition, defense experts must have complete information in order to provide reliable testimony as credible witnesses during the penalty phase. The requested text messages must be disclosed and provided to Learned Counsel and defense experts, even if Mr. Tartaglione objects. Failure to provide information and evidence pertinent to the defense is a dereliction of professional standards required of capital counsel in preparation of a capital trial. *See* ABA Guidelines 10.7, 10.8, 10.10.1 and 10:11. To date, the requested information has not been provided to Learned Counsel.

## Obstacles to Effective Representation

Defense of Mr. Tartaglione is compromised when Attorney Barket justifies decisions by asserting that he is following the wishes of Mr. Tartaglione in compliance with ethical rules. Attorney Barket has made this assertion regarding issues that impact Learned Counsel's obligations to prepare for the penalty phase. In addition, the following decisions and actions conflict with interests of a defendant facing the death penalty:

- making statements to the press
- resisting appointment of *Curcio* counsel
- withholding information pertaining to the Epstein Note
- directing Mr. Tartaglione to withhold information
- attempting to persuade Learned Counsel to conceal the Epstein Note from *Curcio* counsel
- declining to provide a copy of the Note to *Curcio* counsel.

Regardless of underlying reasons or motivations, such actions diverge from and can compromise legitimate interests of a death-authorized defendant.

Attorney Barket's claim of compliance with ethical rules should not shield

12

him from disclosure of information requested by Learned Counsel nor should it support an attorney-client privilege for the Barket Firm separate and distinct from Learned Counsel in the joint representation of a single capital defendant. Rule 1.6 of the New York Rules of Professional Conduct does not apply to attorneys on the same defense team. Counsel joined in the representation of one defendant share a single privilege which serves to protect the confidences of their mutual client. Mr. Tartaglione's communications which form the basis of developing a capital defense are subject to one single attorney-client privilege that should not exclude Learned Counsel.

Attorney Barket has asserted objections by Mr. Tartaglione to justify decisions to withhold information needed to develop penalty phase evidence. Capital counsel have an obligation, recognized by Supreme Court authority, to investigate all existing and potential aggravating evidence which may be introduced by the Government on its direct and rebuttal cases during the penalty phase. *See Rompilla.* Capital counsel are obligated to conduct such an investigation even if the defendant vehemently opposes (ABA Guidelines §§10.7, 10.8, 10.10.1 and 10.11) and even where the defendant is of the view that there is no basis or reason to conduct such an investigation. *See Rompilla.*

**Legal Considerations**

The right to effective assistance of counsel has been interpreted to guarantee that counsel is conflict-free. *See United States v. Curcio*, 680 F.2d 881 (2d Cir. 1982); *Wood v. Georgia*, 450 U.S. 261, 271 (1981). It has long been recognized that while the right to select counsel of one's own choice is entitled to deference, that right is not unlimited, unfettered, or absolute. *See, e.g., United States v. Schmidt*, 105 F.3d 82, 89 (2d Cir. 1997); *United States v. Brumer*, 528 F.3d 157, 160 (2d Cir. 2008) (*per curiam*).

While conflicts of interest most often occur when one attorney is representing two or more defendants who themselves have conflicting interests, conflicts may occur between counsel and an individual client in various factual settings and may not be readily apparent. Such is the situation presented in this case.

Certain ethical rules require client consent, and with it, a defendant's waiver should be entitled to significant weight. "Where the right to counsel of one's choice conflicts with the right to an attorney of undivided loyalty, the determination of which right is to take precedence must generally be left to the defendant, who may

13

make a knowing and intelligent waiver of his right to a conflict-free lawyer if he desires to continue the representation." *United States v. Cain*, 671 F.3d 271, 293 (2d Cir. 2012), citing *United States v. Perez*, 325 F.3d 115, 124-25 (2d Cir. 2003). "The courts do, of course, retain discretion to reject a defendant's knowing and intelligent waiver when his attorney's conflict jeopardizes the integrity of judicial proceedings. But absent such institutional concerns, courts will not 'assume too paternalistic an attitude in protecting the defendant from himself,' and although the defendant's choice of counsel 'may sometimes seem woefully foolish' to the court, the choice remains his." *Perez at* 125 (citations omitted).

If the Court determines that counsel is laboring under a conflict, it "has a 'disqualification/waiver' obligation... If the conflict is so severe that no rational defendant would waive it, the court must disqualify the attorney..." *United States v. Kliti*, 156 F.3d 150, 153 (2d Cir 1998).

A defendant may not receive the full effort of his attorney if counsel's decisions are influenced by obligations owed to person's other than the defendant, including counsel's self-interest. The Court needs to ascertain whether Attorney Barket's decisions and actions have placed him in a position inherently conducive to divided loyalties divergent to the interests of Mr. Tartaglione in this capital case. Where a defense attorney is prevented from considering a particular tactical option by obligation to another or to self-interest, there is a conflict even if another tactical route remains viable. *See, e.g., United States v. Mazzariello*, 2014 U.S. Dist. LEXIS 620, at *17 (W.D.N.Y. Jan 3, 2014).

Conflicts may also arise when defense counsel prevents or hinders protective measures for his client or becomes an actual or "unsworn" witness. A conflict may arise in a situation where a defendant's interests in zealous and effective representation may come into conflict with counsel's own interests. When an attorney faces the possibility of criminal or disciplinary proceedings, the threat or power of charges and sanctions can create an actual conflict by influencing an attorney's conduct and compromising the attorney's ability to comply with his legal and ethical obligations to represent his client with undivided loyalty.

The Court has an obligation to preserve public trust in the scrupulous administration of justice and the integrity of the bar, a responsibility ever more heightened in a capital case. The Court has an "independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them." *Wheat v. United States*, 486

14

U.S. 153, 160 (1988). Further, the Court has an institutional interest in assuring that its judgment remains intact on appeal.

The Supreme Court has defined actual conflict to mean, in the Sixth Amendment context, as one that adversely affects counsel's performance. *Mickens v. Taylor*, 535 U.S. 162, 172 n.5 (2002). For Sixth Amendment purposes, an actual conflict of interest should not be confused with the mere existence of a conflict as defined by a particular jurisdiction's ethical rules. The Second Circuit has drawn a distinction between actual conflicts and *"per se"* conflicts. "[A]n actual conflict of interest exists when, 'during the course of the representation, the attorney's and defendant's interests diverge with respect to material factual or legal issues or to a course of action." *Maxwell v. Racette*, 2018 U.S. Dist. LEXIS 148552, at *25-26 (S.D.N.Y. Aug. 29, 2018) (citations omitted). A *per se* conflict of interest exists where certain facts about a defense attorney's status prompts a disabling conflict that raises the possibility that the attorney will be unwilling or unable to effectively represent the defendant. *See, e.g., Cardoza v. Rock,* 731 F.3d 169, 183 (2d Cir. 2013). "We have observed that the *per se* rule applies 'when an attorney is implicated in the crimes of his or her client' because 'the attorney cannot be free from fear that a vigorous defense should lead the prosecutor or the trial judge to discover evidence of the attorney's own wrongdoing.'" *Id.*, quoting *United States v. Fulton*, 5 F.3d 605, 611 (2d Cir. 1993).

A criminal defense attorney is typically in the best position to make the initial decision as to whether a conflict of interest exists or is likely to develop in the course of trial. Once a potential conflict has been identified, the defendant must be informed of the relevant facts surrounding the conflict and advised of the likely consequences of the perceived conflict. In addition, the defense attorney (and/or prosecutor) is expected to promptly advise the court of the existence and nature of any conflict which has the potential to impede defense counsel's ability to properly defend his client.

Informed by Learned Counsel of the specter or existence of an actual or potential conflict of interest, the Court appointed independent *Curcio* counsel who conducted an inquiry summarized in this Report. The Court now must determine whether any actual conflicts or potential for conflict have arisen and whether continued representation by conflicted counsel are likely to impede the fairness and integrity of this capital case.

Should the Court conclude that defense counsel's representation is affected by an actual conflict or a serious potential for one, the Court must conduct a *Curcio* hearing and inquire into whether the conflict is one that may be waived. The Court must inquire whether Mr. Tartaglione has been informed of the conflict, whether he has a full understanding of the nature of the conflict, and whether he is aware of his constitutional right to conflict-free counsel. The Court must question Mr. Tartaglione to determine whether he will proffer a waiver of that conflict and then determine whether such waiver is made knowingly, intelligently, and voluntarily. Finally, the Court must then decide whether to accept Mr. Tartaglione's proffered waiver or disqualify and remove conflicted counsel. *See, e.g., United States v. Rivera*, 571 Fed. Appx. 55, 60 (2d Cir. 2014), *cert denied*, 190 L. Ed. 2d. 352 (2014); *United States v. Zarrab*, 15 Cr. 867, 2017 U.S. Dist. LEXIS 51762, at *14 (S.D.N.Y. Mar. 28, 2017); *United States v. Lussier*, 71 F.3d 456, 461 (2d Cir. 1995).

**Conclusion**

*Curcio* counsel has met with Mr. Tartaglione numerous times. *Curcio* counsel has discussed the conflict areas with Mr. Tartaglione, advised him of the implications and potential risks in being represented by conflicted counsel, informed him of his right to proceed with other counsel and his right to waive such conflicts. *Curcio* counsel had explained what is likely to occur during a *Curcio* hearing in this case and the nature of questions the Court may ask him.

The Court has given Mr. Tartaglione ample time to meet with *Curcio* counsel and to digest the risks of proceeding with conflicted counsel. Mr. Tartaglione is prepared to elicit a narrative statement reflecting his understanding of the conflict areas and his right to effective representation by conflict-free counsel and to respond to questioning by the Court.

Mr. Tartaglione has informed *Curcio* counsel that he intends to waive any conflict and wishes to proceed with representation by Attorney Barket, his retained counsel of choice.

Please contact me with any questions or requests for further information.

Respectfully submitted:

BOBBI C. STERNHEIM

16