1

SEALED PROCEEDINGS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
UNITED STATES of AMERICA,

      -against-                16 Cr. 832(KMK)
                                 Curcio Hearing

NICHOLAS TARTAGLIONE,

          Defendant.
------------------------------------x
                          United States Courthouse
                          White Plains, New York
                          February 22, 2021

         (All parties appearing via telephone)


           THE HONORABLE KENNETH M. KARAS,
              District Court Judge


AUDREY STRAUSS
     United States Attorney for
        the Southern District of New York
BY:  MARGERY FEINZIG.
     ILAN GRAFF
        Assistant United States Attorneys


BRUCE A. BARKET
AIDA F. LEISENRING
DONNA ALDEA
MICHAEL K. BACHRACH
ANTHONY L. RICCO
BRUCE D. KOFFSKY
KENNETH J. MONTGROMERY
JOHN A. DIAZ
     Attorneys for Nicholas Tartaglione

Also Present:
BOBBI C. STERNHEIM, Curcio Counsel
DAVID RUHNKE, Resource Counsel
TAYNA GREENE, Resource Counsel
MELISSA LANG, Mitigation Specialist
BETH CAHIL, Mitigation Specialist
JIM DOWD, Investigtor
MICHAEL S. ROSS, Special Responsibility Counsel

SEALED PROCEEDINGS

SEALED PROCEEDINGS

THE CLERK:

THE COURT:  Good morning, everybody.

THE DEPUTY CLERK:  United States of America versus Nicholas Tartaglione, 16CR832.

Counsel for the government, please state your appearance.

MS. FEINZIG:  Good morning, your Honor, Margery Feinzig and Ilan Graff on behalf of the United States.

THE COURT:  Good morning.

THE DEPUTY CLERK:  *Curcio* counsel.

MS. STERNHEIM:  Good morning, Bobbi C. Sternheim.

THE COURT:  Good morning.

THE DEPUTY CLERK:  Mr. Rhunke and your team.

MR. RHUNKE:  I am joining as resource counsel, yes. Good morning.

THE COURT:  Good morning.

THE DEPUTY CLERK:  Ms. Greene.

MS. GREENE:  Yes, Tanya Greene, resource counsel for the defense.

THE DEPUTY CLERK:  Okay.

THE COURT:  Good morning.

THE DEPUTY CLERK:  Ms. Cahill.

MS. CAHILL:  Yes.  Good morning, Beth Cahill, mitigation specialist.

THE COURT:  Good morning.

SEALED PROCEEDINGS

THE DEPUTY CLERK:  Ms. Lang.

MS. LANG:  Good morning, Melissa Lang, mitigation specialist.

THE COURT:  Good morning.

THE DEPUTY CLERK:  And counsel for the defendant, starting with the Barket firm.

MS. LEISENRING:  Aida Leisenring.  Good morning.

THE COURT:  Good morning.

MR. BARKET:  And Bruce Barket.  Good morning, your Honor.

THE COURT:  Good morning.

MR. ROSS:  Good morning.  Michael Ross, special responsibility counsel to the Barket firm.

THE COURT:  Good morning.

MR. KOFFSKY:  Good morning, your Honor.  Bruce Koffsky, learned counsel for Mr. Tartaglione.

THE COURT:  Good morning.

MR. MONTGOMERY:  Good morning, your Honor.  Kenneth Montgomery, learned counsel for Mr. Tartaglione.

THE COURT:  Good morning.

MR. DIAZ:  Good morning, your Honor.  John Diaz learned counsel for Mr. Tartaglione.

MR. BACHRACH:  Good morning, your Honor, Michael Bachrach, learned counsel for Mr. Tartaglione.

THE COURT:  Good morning.

SEALED PROCEEDINGS

SEALED PROCEEDINGS

MR. RICCO: And good morning, your Honor. Anthony Ricco, learned counsel for Mr. Tartaglione.

THE COURT: Good morning. Anybody else?

MR. DOWD: Good morning, your Honor. James Dowd, investigator for the defense.

THE COURT: Good morning.

Anybody else? I feel like we need a separate speedy trial exclusion order just for the introductions.

All right, we are here to continue and I think hopefully resolve the remaining issues related to the *Curcio* proceedings. I have had a chance, of course, to read the supplemental papers that have been submitted since the last hearing.

Before we get to that, I want to just, Mr. Barket, start with you to address the issue of Mr. Tartaglione's waiver of his right to appear during this proceeding.

MR. BARKET: Yes, your Honor. I actually met with Mr. Tartaglione yesterday not knowing completely what was going to happen today. I kind of went over the different possibilities, and he gave us permission to move forward with the proceeding to any degree that the Court deems appropriate.

THE COURT: Okay, so he understands his right to participate in this hearing even if it's telephonically, and I'll state this for the record, we all know why it's so, because of the ongoing pandemic, and he's willing to waive his

SEALED PROCEEDINGS

right to proceed even telephonically at this proceeding; is that right, Mr. Barket?

MR. BARKET:  Yes, your Honor.

THE COURT:  And he understands that there are likely to be substantive matters that are discussed at this hearing and he's still willing to waive his appearance?

MR. BARKET:  Yes, I actually went over some of those with him, and he's hopeful that -- as I said, to move forward. So, yes, he's willing and has waived his right to be present.

THE COURT:  Okay, any other counsel want to weigh in on anything else that we should discuss in connection with Mr. Tartaglione's waiver of his right to appear here?

So I'll take the silence as acquiescence, as Judge Sand used to say.

All right, so in terms of following up with argument on the written submissions, I don't know who wants to go first, I don't have any strong preference.  So if there's somebody who wants to volunteer.

MR. BACHRACH:  Your Honor, I can go first.

THE COURT:  Okay.

MR. BACHRACH:  I think at this point the parties have briefed everything imaginable just about.

THE COURT:  Yes.

MR. BACHRACH:  And I think I could really rely on my papers significantly unless there are questions from your

SEALED PROCEEDINGS

Honor.  But it does remain, just so the record is clear, it does remain appointed counsel's position that with respect to the agency issue, which I think is where we left things off, that an agency relationship is established both by direct and circumstantial evidence in this case between Mr. Weider and the Barket law firm that even putting aside on the other conflicts that we've previously -- or potential conflicts we previously discussed with respect to the Barket law firm, that the conflicts relating to John Weider exist and therefore are not waivable in light of the fact that there is an agency relationship, in our view, your Honor.  And again, I don't want the repeat everything, it's been just such thorough briefing, unless there's a question from your Honor.

THE COURT:  I just want to give you a chance if there's anything you want to add to the papers that you have submitted.  I agree that this has all been briefed and we have over 20 people participating in this, we have lawyers who are representing lawyers who are representing lawyers, and I don't think any stone has been left unturned, but I still want to give anybody a chance to speak.

So I guess, I take it then it's obviously learned counsel's view that Mr. Weider has not only a conflict but a conflict that's unwaivable and therefore that's how we even get to the agency conversation, correct?

MR. BACHRACH:  That's correct, your Honor.

SEALED PROCEEDINGS

SEALED PROCEEDINGS

THE COURT: With respect to the agency issue, it seems as though the basis for this is the *Hempstead Video* case, unless I'm missing something.

MR. BACHRACH: That's our view, your Honor. Yes.

THE COURT: So in that case what the Circuit did is it rejected a *per se* rule that would impute conflicts between all of counsel attorneys and their firms; right?

MR. BACHRACH: Correct, your Honor.

THE COURT: And the Court explained that while maybe a rule would have the "virtue of clarity," it would ignore the caution that "when dealing with ethical principles, we cannot paint with broad strokes. The lines of fine and must be so marked." I think we can all agree that the Circuit was quite clear in that.

So what the Circuit said was, given the wide variation to the nature and substance of relationships lumped together under the title of "of counsel," a *per se* approach is ill-equipped to respect appropriately both the individual's right to be represented by counsel of his or her choice and the public's interest in maintaining the highest standards of professional conduct. And so therefore the Circuit adopted what it called a better approach for deciding whether to impute conflict to examine the substance of the relationship. So that's what we have to do here. Right?

And so naturally what the Circuit said was the closer

SEALED PROCEEDINGS

SEALED PROCEEDINGS

and broader the affiliation of an of counsel attorney with the firm, and the greater likelihood that the operating procedures adopted may permit one to become privy...to the pertinent client confidences of the other, the more appropriate will be a rebuttal imputation of the complex of one to the other.

So in that situation obviously the conflict arose from access to potentially privileged information involving different clients, right?  Which is not what we're dealing with here.

MR. BACHRACH:  Correct, your Honor.  The *Hempstead Video* case is distinguishable in that regard in the fact that the reason in *Hempstead Video* they found no imputation of conflict was because on the facts of that case, the quote unquote conflict was too attenuated and too remote for it to be attributed to the law firm.  But that's different here because here we have a situation where the conflicted attorney, in this case I'm referring to Mr. Weider, that Mr. Weider was acting specifically on behalf of the firm in relation to this case. He was reviewing discovery.  He reviewed discovery at the Barket law firm.  He then reviewed that discovery with the client on multiple occasions.  He reported back communications from the client to the Barket law firm.  He removed the Epstein note from the MCC after being asked to do so by Mr. Barket.  He continued to possess the note as far as we know even to this day to safeguard it at the request of Mr. Barket supposedly

SEALED PROCEEDINGS

SEALED PROCEEDINGS

under the position of to keep it -- to sort of attenuate the note from the Barket firm.  But what he's doing is he's in fact acting on the Barket firm's behalf by keeping it separate.  He was paid a check from Barket firm which listed him as a participation fee.  You know, he received I believe it was 1099, and the list goes on and on.  So it's quite distinguishable from *Hempstead Video* wherein *Hempstead Video* there wasn't -- it wasn't the same case that was involved.  It wasn't as close as the call is here.

THE COURT:  Well, okay, but the nature of the conflict in *Hempstead Video* is very different than the conflict that's at issue here, right?

MR. BACHRACH:  Yes.

THE COURT:  We can agree on that point.  Okay?

Then that's not irrelevant here because the nature of the conflict in *Hempstead Video* was such that the information, the privileged information that was the source of the conflict, to the extent that that information sort of had gone beyond the one of counsel attorney, then it's understandable how that could, in fact, conflict out an entire law firm, right?

Whereas here, I understand the argument, I mean, I think it's undeniable that you've been able to establish a connection between the Barket law firm and Mr. Weider, but the nature of Mr. Weider's conflict has to do with his own actions, for example, in deleting all of the messages that he got from

SEALED PROCEEDINGS

SEALED PROCEEDINGS

Mr. Tartaglione.  So I'm not sure how that conflict somehow permeates the Barket firm, even if he is of counsel through all the evidence that you've offered to make that connection.

MR. BACHRACH:  Well, I think there are various problems with Mr. Weider's involvement in the case.  Again, yes, he destroyed hundreds of text messages after I believe the *Curcio* proceedings had begun, and because of that we have no way of knowing whether or not those text messages one way or the other related to Mr. Barket's representation.

We do know, however, that Mr. Barket asserted attorney-client privilege over all text messages made between the client and members of his law firm and did so prior to those text messages being destroyed.  So I think an inference can be made, an adverse inference can be made that the destruction of the evidence related to the issue at hand.

Also, of course, he's taken other actions I've already stated that relate to -- that benefit Mr. Barket.  Taking the Epstein note out of the MCC.  He also has now held the Epstein note in a safe, safeguarded it so that the Barket firm doesn't have physical possession of it but he does.  He also testified in a manner that, to put it politely, was incredulous at best.  His testimony appeared to this listener at least, your Honor, to be littered with falsehoods.

And who he's protecting I don't know.  Is he protecting himself?  Is he protecting Mr. Barket?  I think an

SEALED PROCEEDINGS

SEALED PROCEEDINGS

inference can certainly be made that he is attempting to protect the Barket law firm.

THE COURT:  Well, why do you think that's a fair inference as opposed to him protecting himself?

MR. BACHRACH:  He knows the context in which the hearing was taking place.  He knows that the context of the hearing was to determine whether or not the Barket law firm needed to be disqualified based upon his conduct.  It's not whether or not Mr. Weider needs to be disqualified based upon his conflict, it's whether or not the Barket law firm does.

THE COURT:  Well, no, it's kind of -- it's both, right?  I mean, because the Barket firm only gets disqualified if Weider, A, has a conflict that, B, is unwaivable, right?

MR. BACHRACH:  Yes.

THE COURT:  And Mr. Weider knew --

MR. BACHRACH:  I'm sorry, your Honor, can you say that again?  I'm sorry, say that again, your Honor.

THE COURT:  The Barket firm only gets conflicted through Mr. Weider if, A, he's found to have himself an actual conflict that, B, is unwaivable.

MR. BACHRACH:  Through Mr. Weider, that's correct, your Honor.

THE COURT:  Okay, and it was also, I mean a lot of the testimony that was shall we say inconsistent, again, to be charitable, had to do in particular with his deletion of the

SEALED PROCEEDINGS

SEALED PROCEEDINGS

messages on his phone.  And I mean I think a fair inference is that the interests that were most at issue in giving his testimony were Mr. Weider's who after all has a prior relationship with Mr. Tartaglione, who testified that he helps him out on a number of legal matters, that Mr. Tartaglione wanted him to be sort of involved in this case, so it may very well be that there's an ancillary motive to shield the Barket firm, but I think a fair, a better inference is that he was trying to shield himself and make it so that he could still stay on the case.

MR. BACHRACH:  I think that's the primary motive.  I would not dispute that, your Honor.

THE COURT:  Okay.  So to the extent though that -- to the extent that the nature of the conflict has to deal with Mr. Weider's conduct, and in particular the decision he made to delete those messages, right?  So the other stuff about the Epstein note, we've already talked about that in the context of the extent to which Mr. Barket himself has a conflict.  We've already gone through the *Curcio* process.  I've already ruled that it's waivable, it's a potential conflict.

So what we're really talking about here is Weider's conduct especially in connection with deleting all those messages from Mr. Tartaglione.  And I guess what I'm trying to understand is even taking into account all the evidence that you have offered that I think does persuasively connect

SEALED PROCEEDINGS

13

SEALED PROCEEDINGS

Mr. Weider to the Barket firm, it's still not clear to me that conflict transmits to the Barket firm, and that's the link I'm trying to understand.

MR. BACHRACH: Well, I guess, your Honor, if you have an attorney who is connected -- let's assume for a second he's connected to the Barket law firm and he's acting as their agent in various respects to this case, knowing that there is a *Curcio* hearing afoot which could potentially disqualify the Barket law firm, he destroys text messages which could be relevant to this inquiry. That's a big problem.

Then he testifies, then he gets called as a witness, and he testifies, as your Honor put it, inconsistently. Those are problems that are so damming to the *Curcio* process that because his role is in relation to assisting in this case, I think the relation -- if he is an agent, if it was Mr. Barket, for example, that were doing this, then Mr. Barket would clearly be disqualified. So if he was acting as Mr. Barket's agent and he is destroying evidence or perjuring himself, then the agency relationship carries over, because agent is an agent. And these are very, very strong allegations against Mr. Weider, I understand. I'm not saying Mr. Barket perjured himself or destroyed evidence, but I'm saying his agent did. And if he's been established as his agent in relation to this case and he's done actions that are that severe, that's not the simple stuff that happens in *Hempstead Video*. I mean, this is

SEALED PROCEEDINGS

SEALED PROCEEDINGS

much, much worse.

THE COURT: Right, but to the extent that Weider operated on his own in deleting those messages, then I don't -- I guess I'm still not clear -- and therefore he should be viewed as having an actual conflict that I assume you would argue is unwaivable, so he's out based on his conduct. Then I'm trying to understand why his conduct is necessarily the Barket law firm's conduct just because he has this title of "of counsel."

MR. BACHRACH: It's not about the title, your Honor, it's about the relationship.

THE COURT: Okay.

MR. BACHRACH: I mean the law is clear titles don't matter. Sometimes you call a person of counsel, sometimes you don't. I mean, there are lots of different phrases. It's about the relationship, and the relationship was an attorney reviewing discovery with the defendant reporting back to the law firm on a regular basis. That seems to be his primary role was to visit the client, answer the client's question about discovery and otherwise, and report back. That's an intricate role. And that attorney who is so deeply indebted in this case destroys evidence and perjures himself. To me that would seem to implicate the entire firm because the question then becomes was it completely unknown, was it done for a benefit, does it protect Mr. Barket in one way or another regardless of whether

SEALED PROCEEDINGS

SEALED PROCEEDINGS

or not Mr. Barket knew about it, but if the actions taken to protect Mr. Barket in some way, then Mr. Barket receives the benefit of it.

Here, he receives the benefit because we don't know what's in those text messages. At the end of the day, we do not know. And we made so many requests to try to receive them, to get them right away, to have them preserved. We requested them. *Curcio* counsel requested them. Your Honor requested them.

THE COURT: I understand the argument that to the extent that Mr. Weider deleted these messages, assuming for the sake of argument anyway that that somehow, quote, benefits Mr. Barket's firm, I'm still not sure I understand how that means that Weider's conduct conflicts the Barket firm.

I mean, again, if Weider does this on his own and the Circuit had made clear in *Hempstead Video* that not every conflict of an of counsel attorney is amenable to the firm, then it still begs the question as to why this particular conflict can be attributed to the Barket firm.

I mean, I don't think you and I have a different opinion on the inappropriate conduct here by Mr. Weider, and I made clear right after he testified I was concerned about aspects of his testimony, but the evidence doesn't show that he deleted these messages at Mr. Barket's request, and to the extent that there might be some benefit, I'm not really sure

SEALED PROCEEDINGS

SEALED PROCEEDINGS

what that benefit would be. If Mr. Weider wasn't motivated to do that, and I'm not sure how we ascertain whether or not he was motivated at all to do that. I mean, it seems to me at this point it's speculation. Then okay, Weider is out, but I don't know why the Barket firm has to be out.

I mean, what do you do with Judge Furman, the whole saga, the *Davis versus Lempke* case where the Circuit sent it back and then on remand Judge Furman has a hearing and it's pretty clear that basically the second lawyer didn't really do anything, it was the first lawyer who had the conflict that basically continued with the advocacy, and so therefore that's an easy one to say that conflict sort of permeates.

MR. BACHRACH: You know, I think the problem, your Honor, is that there have just been so many shifting explanations as to Weider's role, and it begets the question of why. I mean, here we have an attorney who now Mr. Barket has attempted very hard to disavow himself from John Weider because he recognizes the problem with the conflict, but when it was to his benefit to associate himself with Mr. Weider, first he states on the telephone that there's an of counsel relationship, then he states in person amongst all present, including *Curcio* counsel, that there's, again, a written of counsel relationship.

I mean, I understand we're now assuming, yes, there is. But the point is, why the shifting explanations? I mean,

SEALED PROCEEDINGS

SEALED PROCEEDINGS

again, these are, yes, these are inferences that need to be made.  There's no smoking gun *per se*, I will acknowledge that.  But when an attorney says at one point one story, and the attorney is Mr. Barket I'm referring to, in an attempt to protect Weider's testimony, and then when he realizes the tide is shifting, he changes his story to try to argue it in another way, and he submits multiple affidavits, two affidavits in an attempt to now disassociate himself from Mr. Weider, the person he's previously was trying so hard to associate himself with, it begets the question, it begets the question, what's being hidden?  What's there to hide?  And I think the answer to that is in those text messages that were destroyed.

        And, yes, there is an element, there has to be an element of an inference here because we don't know what's in the text messages.  But that's what makes the destruction of those text messages so problematic.  We have no -- clearly the timing of it is just overwhelming.  And those text messages, if they truly were exonerating, they would have exonerated Mr. Barket, but we'll never know because they were destroyed.  And before they were destroyed, Mr. Barket asserted attorney-client privilege over text messages.  A little unclear if he included that or not, but there certainly was a reference prior to them being destroyed to an assertion of attorney-client privilege over text messages.

        And again, Mr. Barket gave it to us, by "us" I'm

SEALED PROCEEDINGS

SEALED PROCEEDINGS

including *Curcio* counsel, stated that there was a written, of counsel agreement. That's significant, and that's completely different from what he has then after that point stated in two of his declarations that exist.

I mean, I do think you have to look at the whole picture, and you can't look at any item in isolation here.

THE COURT: Okay, so in the case that Judge Furman had, in *Lempke*, one of the things that he cited or really relied on was the restatement, the third restatement of law governing lawyers which provides "One affiliated lawyer's personal interest that produced personal prohibition [will] disable an affiliated lawyer from representing the same client only when there is a significant risk that the interests of the first lawyer would materially and adversely impair the second lawyer's representation."

So I guess the question to you is how is it that Mr. Weider's conflict is going to invite a significant risk that would materially and adversely impair the Barket firm's representation of Mr. Tartaglione?

MR. BACHRACH: I think that goes back -- again, it's not one thing. I think it would be hard to introduce, I would acknowledge it would be hard to introduce, if the government were to attempt to do so, evidence of Mr. Weider destroying text messages. I don't really see how that would be relevant in itself to a penalty phase. But other of his conduct could

19

be.  Specifically with respect to the note, and his conduct with respect to the note is relevant to the penalty phase, either if the government were to introduce it as aggravating evidence, or if the defense were to attempt to introduce it as mitigating evidence.  We've discussed in the briefs ways in which you can do that.

So conduct by Mr. Weider, not the text messages, but other conduct by Mr. Weider is directly implicated, will be directly related to the penalty phase.  So if there is a conflict relating to him, I think it carries over.

THE COURT:  Right, but to the extent that the note is the source of conflict, and we've already covered the note in connection with Mr. Barket's potential conflict, I don't understand how Weider's conflict with regard to the note is any different than Mr. Barket's.

MR. BACHRACH:  It's not, your Honor.  I'm saying there's the conflict -- Mr. Weider gets conflicted out of this case because-- well, because more than anything I think the text messages cannot be waived.  We're in agreement that Mr. Weider is off because of that.  But this is other context that Mr. Weider did.  So an attorney who had an ~~unbelieve~~ *unwaivable* conflict also committed actions which present a conflict, both for not simply him but also Mr. Barket.

THE COURT:  We've already covered this and you can disagree with me, but I thought that that, for purposes of this

SEALED PROCEEDINGS

case, that is a potential conflict that I found to be waivable as with respect to Mr. Barket. So I don't see how it could be different with Mr. Weider.

MR. BACHRACH: No, I guess my point is, I guess my point on that is if there is a conflict with -- excuse me. If Mr. Weider is terminated, is conflicted out, our position would be that all of his conflicts -- it would also rise to a greater level I guess is the best way to put it.

THE COURT: Why? Especially if some of what Mr. Weider did was at Mr. Barket's direction and that that act itself was deemed to be a potential conflict that was waivable, then I don't see how Weider's carrying out that directive somehow converts it to an actual conflict that require Mr. Barket, who I already found would not be out, to use your phrase, based on that particular conduct in the first instance.

MR. BACHRACH: No, I think you're right. I think you're right about that, your Honor. I have to confess when I'm going down the wrong avenue.

But I will say this. Getting back to the text messages, which is really the heart of it --

THE COURT: Yes.

MR. BACHRACH: -- which is an unwaivable conflict. You know, these are text messages that were requested prior to being destroyed. Mr. Barket asserted privilege over them and then they were destroyed. And I just, it just goes back to the

SEALED PROCEEDINGS

SEALED PROCEEDINGS

texts.  Something was clearly trying to be protected at all costs, and I don't know what that something is, your Honor.  I certainly do not.  All I know is that first Mr. Barket attempted to keep it out, then Mr. Weider makes certain it would be kept out.

If there's something in there that implicates the penalty phase, then there you have it.  I understand that it's a bit of -- there is a bit of guesswork here because we'll never see what's destroyed.  That's the problem.

THE COURT:  No, I understand.  Look, I agree.  I don't think that there should be a finding in Mr. Weider's favor because of the unknown in the texts, because I think that the conduct itself is what creates the conflict not the substance of the messages themselves.  But I guess it goes back then to what I was asking before, what is -- because of Mr. Weider's conduct and the conflict that it triggers, how is that going to create a significant risk that will, that there will be -- that Mr. Barket's representation will be materially and adversely impaired because of Weider's conduct?  That's what I'm trying to understand.  That's how Judge Furman put it, right, in the *Lempke* case in citing the restatement.  That seems correct.  I think that is the right way to look at it.

So how does, applying that paradigm here, how does that yield a conflict to Mr. Barket's firm?

MR. BACHRACH:  I think the conflict occurs because

SEALED PROCEEDINGS

SEALED PROCEEDINGS

you have to look at what were Mr. Barket's actions with respect to the text messages. So, like I said, he first asserts the attorney-client privilege over them. Then he objects to the *Curcio* hearing being expanded to include the text messages at all. He didn't want this aspect of the case being included in the *Curcio* examination. That's two attempts then by him, not by his agent but by him to not expand -- to try to prevent this Court from looking into this issue.

And I think your Honor has you have to look at a holistic examination of everything that occurred and ask yourself why, why was he trying to keep this out. And then what happens, text messages get destroyed by his agent. And you know, under *Perez*, I believe it is, your Honor, even if there isn't one individual issue, you can still look at the entire, the entire whole and determine whether or not the conflict jeopardizes the integrity of the judicial proceeding when you look at it from a whole.

And again, here, I think, your Honor, when you take Barket trying as he could to keep the examination -- excuse me, to keep anyone but his own firm from knowing what's in those text messages, because if you remember, your Honor, he didn't simply object, he didn't simply assert privilege against the government and the Court, he wanted appointed counsel to also not know what was in those text messages. That was part of his application, that appointed counsel could not. And we

SEALED PROCEEDINGS

represent Mr. Tartaglione.  Why keep us from seeing text messages that our own client is on that could be potentially relevant to the penalty phase of this case?

THE COURT:  As I recall, I think there's an answer to that, which is, as I recall, Mr. Barket's point was that this came at the direction of Mr. Tartaglione himself, so that this was not something that Mr. Barket was motivate to do to protect his firm or himself but to respect what he said was Mr. Tartaglione's wish.

MR. BACHRACH:  Yes, your Honor.  And I believe we have -- I mean, there's never been on a ruling on this issue as far as I recall but --

THE COURT:  It got mooted out by the destruction of the texts.

MR. BACHRACH:  Right, but we did brief it on both sides.

THE COURT:  Yeah, yeah, yeah.  I'm not saying -- forgetting whether or not the assertion of that is legally viable, but my only point is, in terms of why it was that the privilege was asserted.  To the extent that can be attributed to Mr. Tartaglione and not to anything that was -- any motive in terms of the Barket firm, then that's the answer to your sort of point, isn't it?

MR. BACHRACH:  If that's what occurred, if that's actually the reason, yes.  But then why object to expanding the

SEALED PROCEEDINGS

*Curcio* hearing to examine the text messages at all?  Because Mr. Barket objected to that as well.  My point --

THE COURT:  Well -- go ahead.

MR. BACHRACH:  My point being, first you assert privilege.  When maybe that's not going to work, then you expand the *Curcio*, you object to expanding the *Curcio* hearing to look at the area where there's a dispute over privilege, right?  And then when we're not sure how that's going, magically everything gets destroyed by the other person.

It's like the dominoes.  They just continue to fall.  The question is I guess is there a domino that's errant and goes aside and maybe breaks the chain or not?  But I think it's just -- your Honor, respectfully, learned counsel believes the chain is too close.  The chain just continues one after the other in a manner that benefits the Barket firm and keeps appointed counsel, the government, and the Court from knowing what's going on.

THE COURT:  And so how does that translate into materially and adversely affecting Mr. Barket's firm's representation of Mr. Tartaglione?

MR. BACHRACH:  Your Honor, you know, we've already made an extensive record as to why we believe this establishes that Mr. Barket's law firm has been obstructing the *Curcio* proceedings at every turn.  Why would you do that?

How is that to the benefit of the defendant to take

actions that could interfere with the Court's ability to ensure conflict-free counsel? At so many turns Mr. Barket's law firm, Mr. Barket specifically, has done that.

THE COURT: But in terms of going forward, I guess, how do you see it as materially adversely affecting the representation of Mr. Tartaglione?

MR. BACHRACH: Well, I think Mr. Barket, for starters, would have to be concerned that an action that he took could adversely affect him from a professional responsibility standpoint. Obviously he has that concern otherwise he wouldn't have his professional responsibility attorney as part of this phone call. Mr. Ross does not represent Mr. Tartaglione. He represents Mr. Barket and the Barket law firm. I never heard of such a thing in the context of a *Curcio* proceeding.

Why would you have your professional responsibility attorney on the phone in the *Curcio* hearing unless it's to ensure that your interests are protected? And that, again, how would you go forward representing a client conflict free if you have to do so proverbially looking over your shoulder the whole time to make sure that your ethics are in line, to ensure you're not doing something that is going to get you in front of a disciplinary proceeding?

Now, these things are fairly simple, if you don't break the law, you don't do anything wrong, you don't lie, you

26

SEALED PROCEEDINGS

don't destroy evidence, and you don't endorse anyone to do any of those things, then you don't need a professional responsibility lawyer. You don't need to worry because there's nothing to worry about. There's the old maxim, an innocent person doesn't need a lawyer. Well, there's a reason for that. And Mr. Barket has his ethics attorney here.

Again, he's looking over his shoulder while trying to represent Mr. Tartaglione. Is he going to continue to have Mr. Ross looking over his shoulder as he continues to represent Mr. Tartaglione at the penalty phase of these proceedings?

Is he going ensure that his conduct at the penalty phase -- let me phrase it an another way. Are the decisions he's going to be making going to be made with a concern for his own interest in avoiding disciplinary proceedings or are those decisions going to be made with the client first?

Appointed counsel has no ethics attorney. We need none here. That's why we don't have one here. And a defendant who is in a -- a death authorized defendant potentially in a penalty phase in an authorized case needs an attorney who is free of conflict so that that attorney can go wherever the evidence takes him free of concern, and you can't -- I don't know how you can say that with a law firm that finds the need to show up to *Curcio* hearings with a lawyer.

THE COURT: Okay. Anything else, Mr. Bachrach?

MR. BACHRACH: On this note, although if my arguments

SEALED PROCEEDINGS

SEALED PROCEEDINGS

are rejected there is one issue on the waiver, it's a small issue, but it should be addressed, if these issues are rejected, if these arguments are rejected.

THE COURT: Sure. Whatever you want to say, go ahead and say it.

MR. BACHRACH: So this is a slightly different point. Again, your Honor, I do think --

MR. RICCO: Mike.

MR. BACHRACH: -- where there's smoke there's fire. But let me switch on the other point, if you'd like, your Honor.

THE COURT: Sure.

MR. RICCO: Michael, can you hold on a second? I'll send you a text, please.

(Pause)

MR. BACHRACH: You would you like to add something? I saw the text. Unless I'm not getting it.

MR. RICCO: This is very simple.

MR. BACHRACH: Oh, okay. Mr. Ricco, just to clarify, you're referring to the other point I'm about to raise?

MR. RICCO: Yes.

MR. BACHRACH: Okay. All right. So this is a separate point, and this assumes for sake of argument now that the conflict is deemed waivable, all right, or any and all of the conflict are deemed waivable. So we were looking over, we

SEALED PROCEEDINGS

SEALED PROCEEDINGS

have been doing so many times, the transcripts of the prior -- the prior transcripts of these *Curcio* proceedings.  And with respect to the defendant's knowing and voluntary waiver, I think your Honor asked some very good questions, some very thorough questions, and there is no question in my mind that the language from a guilt phase, from the trial phase perspective, or the liability phase perspective, I don't think there's any question that there is a sufficient basis to establish that if it's waivable, it's a knowing and voluntary waiver.

Specifically, your Honor asked the defendant, I'm not slighting your attorneys in any way, but I think the fact that you and I could agree -- you essentially are asking him, notwithstanding the potential conflicts, are you willing to waive them.  And Mr. Tartaglione states, referring to Mr. Barket and Ms. Leisenring, I don't agree that someone else can be do a better job.  We've been together for four years.  They know me.  They know who I am.  They know the case better than anybody in my opinion.  They're my best chance to proving the truth and going home.

And then your Honor says, but even recognizing they're dealing with some potential conflicts.  Again, he doubles down, the impetus is important.  Yes, even with potential conflicts, they're my best shot, like I said, of proving the truth, proving that I'm innocent and going back to

SEALED PROCEEDINGS

SEALED PROCEEDINGS

my family.

I think, your Honor, I think that's clear, your Honor, the defendant is focused on the liability phase of these proceedings, and I think that's an excellent explanation as to why there is a knowing and voluntary waiver, assuming it's waivable, with respect to the liability phase of these proceedings. But there's a follow-up question that's never addressed, and that's whether or not he understands the implications it could have with respect to the penalty phase. That is, what is his position going to be if the Barket law firm is unsuccessful in, quote, proving his innocence and helping him get back to his family? If they're unsuccessful, and is the case in most authorized death penalty cases, including nearly every one ever tried in this district, I think there was only one exception before Judge Owen, where the defendant is found guilty of every single count of the indictment, including most importantly, the capital counts.

Now you're in the position where he hasn't been proven innocent, he's not going back to his family. His mandatory minimum sentence is life, whereas he's facing a maximum of the death penalty, and he hasn't stated on the record that under those circumstances putting his head in that place that he would still be willing to waive the conflict, which of course does include waiving defenses related to the conditions of confinement, positive adjustment to prison, lack

SEALED PROCEEDINGS

SEALED PROCEEDINGS

of future danger, and specifically the Epstein note. He would pretty much have to waive all of that for Mr. Barket to be able to continue to represent him at the penalty phase. And there has been no discussion of whether he understands that and whether or not he's willing to waive it.

Your Honor probably doesn't need to go into that much detail, but I think your Honor should assure, if not today, obviously, but before, before everything is concluded, should ensure a simple question or two to make sure he understands with respect to the penalty phase, he understands the consequences of the decision to continue with Mr. Barket and his firm and is willing to waive them. He probably will say that he is willing to waive them. Quite frankly, I'm certain he will say it, but he hasn't said it, and I think that record needs to be made.

THE COURT: So I think -- I'm not sure he needs to waive those defenses. I think it needs to be explained to him how the potential conflicts implicate those defenses. Is that a better way to approach it?

MR. BACHRACH: Yes, your Honor, I agree. I was listing them, but that's what I meant by you don't have to go into such detail. I agree. It's just to explain to him what's implicated and assure with respect to the penalty phase that he waives it. I do think he needs to be --

THE COURT: That's a fair point. No, I think that's

SEALED PROCEEDINGS

SEALED PROCEEDINGS

a fair point.  I mean, I'll certainly hear from Mr. Barket.

I assume, Ms. Sternheim, you agree with that point in terms of continuing the conversation with Mr. Tartaglione about implications of the potential conflict as it relates solely on the penalty phase.

MS. STERNHEIM:  Yes.

THE COURT:  Okay.  Mr. Bachrach, I appreciate you raising that point.  Anything you want to address?  Before you say no, you should check your phone and see if there are anymore text messages.

MR. BACHRACH:  Let me check, your Honor.  Thank you.

So there is some disagreement on one of the things I said, and I'll just clarify it.

MR. RICCO:  No, there's no disagreement.

MR. BACHRACH:  Never mind.  The problem, your Honor, with text messaging, sometimes it goes slow.

Nothing further, your Honor.  Thank you.

THE COURT:  Okay.  Ms. Sternheim, is there anything you want to add as *Curcio* counsel Mr. Barket and the government?

MS. STERNHEIM:  Not at this time, Judge, but I may ask for an opportunity.  Thank you.

THE COURT:  And if I neglect to invite that opportunity, don't be shy, please.

MS. STERNHEIM:  I will not.

SEALED PROCEEDINGS

SEALED PROCEEDINGS

THE COURT:  Okay, good.

Mr. Barket.

MR. BARKET:  I didn't know that we were going to get to this waiver point, so I didn't review the transcript from the 29th, I guess, and maybe subsequent to that to see how it addresses Mr. Bachrach's point.  My overall memory of it is that your Honor was very thorough and that the emphasis included explicitly discussions of the penalty phase and how that might affect things, and as I recall, I'm happy to glance at the transcript quickly as others are chatting, but as I recall it, discussion went along the lines of everybody says they want to go home, but everybody says they don't care about the death penalty until they're facing it.  And you covered these things in that context.  And the question that you asked dealt with that explicitly, I believe.  And the fact that Mr. Tartaglione's decision-making process, why he's willing to waive that in the context of the penalty phase in his mind is because our firm gives him the best chance to be acquitted doesn't vitiate the question that you asked or the waiver. He's just giving -- kind of saying more than he needs to.  He could have just said yes.  He gave you yes and said here's why I'm willing to make that trade.  And of course it's his absolute right to put the emphasis where he wants and to have the goal or objective of the case to seek an acquittal, even if that makes it a greater chance that he would be executed or

SEALED PROCEEDINGS

sentenced to death if he's not acquitted.  And that rub, if you will, I think is part of the core of the disagreement he's had with appointed counsel over time.

And when we started, I was perfectly happy to have him waive because I assumed that everybody, including appointed counsel, didn't believe there's going to be any further questioning of him necessary.

THE COURT:  Why don't we do this, because I've learned not to trust my memory, and like you, Mr. Barket, I didn't know we were going to address this, so I haven't re-read the transcript with that particular focus.  So at the end of this, why don't we discuss how we want to handle this?

Maybe I could invite appointed counsel an opportunity to submit something both citing the transcript where they think the inquiry fell short and give you a chance to respond and explain why you think the inquiry was sufficient, but also invite appointed counsel, learned counsel an opportunity to in addition to explains where they think the inquiry fell short to suggest follow-up questions which you, of course, can respond to.  Does that make sense rather than having anybody operate off memory?

MR. BARKET:  Sure.  I didn't suggest we guess or operate off memory, but I do think it's preferable, and one of the reasons Mr. Tartaglione said, go ahead without me, was to expedite a process that has taken a considerable amount of

34

SEALED PROCEEDINGS

time.  And kind of while people continue to work on different parts of the case, it would be hard for us to say it hasn't interrupted the natural flow of the litigation here.  And that's something he is looking to move forward on.

And I think the second most disappointing thing he would hear today besides potentially losing the attorneys he's had for four plus years is no decision was made, we're going to have to come back in another month for more questions to be asked and more papers to be submitted.  So I would hope that we could address this now.  Now appointed counsel has obviously taken some time to look at it, so they should have their thoughts clear.  We have a couple of different attorneys here, so as we're chatting about other things, it may be that we can kind of focus in on the questions or the issues that Mr. Bachrach has raised and resolve them today without relying on memory or doing so hastily.

THE COURT:  Okay, well, so why don't we then go ahead and you can address the points that Mr. Bachrach has made and any other points you want to --

MR. BARKET:  Sure.  I don't want to belabor our papers, we did submit a significant amount of factual detail to your Honor.  Just to kind of go backwards in the points he made.  The point he made about us having ethics counsel because somehow we're in fear and if you're innocent you don't need a lawyer, is just a mind boggling statement from a criminal

SEALED PROCEEDINGS

SEALED PROCEEDINGS

defense lawyer.

I mean, there's a Supreme Court case on asserting the Fifth that says innocent people can assert the Fifth and at times they should, and of course from the record we know that's not what happened here. It's not as if Mr. Ross came into this case because of the -- forgive me, but the false allegations about my conduct. He was brought into this case well before any hint of a problem for the very reasons that I have -- I don't want to say I, but our firm has Ms. Leisenring involved, Ms. Klein at times, Ms. Aldea, and another lawyer who entered a notice here, because as smart as my mother thinks I am, I don't think I'm that smart. And so the issues that come up are complex. This is a death penalty case. I'm not going to wander through the forest thinking I can find my own way when there are experts in the area that can help me. So I brought Mr. Ross in early on in the process to advise me on ethical issues that came up and that would come up in the future, and that's what he's done. I don't have any fear at all of being brought before the ethics committee or that I've done something wrong. As I stated in my papers, I very clearly don't, and the statement that we have ethics counsel advising us is somehow evidence of my consciousness of guilt is really just wrong, I'll put it that way. It's just simply wrong.

With respect to the sequencing that Mr. Bachrach has articulated several times, I don't know when the text messages

SEALED PROCEEDINGS

SEALED PROCEEDINGS

were destroyed, and I don't know that any of us do. It wasn't clear from Mr. Weider's testimony. Was it because of his phone? Did he do it later on? Did he do it earlier? And if we go back through the record, I think your Honor may recall that the accounts of what happened to the text messages from Mr. Weider that I reported to the Court varied, to put it -- as we had put it politely.

So the idea that, A, we asserted a privilege, B, we tried to stop the Court from looking at it, and, C, the text messages were then destroyed is just sequentially false. And it may be true.

THE COURT: We don't know.

MR. BARKET: We don't know. We don't know when they were destroyed for sure. We know the testimony about the phone, and that was on the very day we discussed it, on the 22nd or 23rd of July 2019. So we don't know. But it's certainly not consciousness of our guilty or somehow an attempt to hide what was there. I've never seen the text messages. I don't know what's on them other than accounts that Mr. Weider and Mr. Tartaglione had provided. And the timing of the text messages coincides to the attempt of him to contact Ms. Leisenring and myself, and I know what those topics were about. So I have a good suspicion as to what went on here and why, but I don't know. I don't know what was in them. I don't know when they were destroyed for sure or deleted or how they

SEALED PROCEEDINGS

were deleted or what took place with them.  I just don't.  But certainly they weren't deleted at my instruction.  There's not a hint of evidence along those lines, and if there were, that would just be false.

The one fact that I think Mr. Bachrach forgets is that Mr. Weider's texting with Mr. Tartaglione was directly contrary to my explicit instructions to him, to family members, to people that work for my law firm not to text for the reasons that are -- obviously it was improper to do so, not because we were worried about some kind of future conflict that we couldn't possibly have foreseen at that point in time.  It simply was wrong, and I knew it would lead to trouble for the individuals involved.  And yes, I've asserted the privilege at my client's instruction with respect to the text messages -- and I believe the argument at that point and the papers that were submitted on that were related to the text messages between Mr. Tartaglione and Ms. Leisenring and Mr. Tartaglione and me.  I didn't make any argument about the privilege of the text messages with Mr. Weider because at the time we had that discussion, I believe that was in the fall of 2019, my understanding was the text messages were already gone, his were, and they were destroyed.  So I wasn't arguing about them.  And they were mooted, your Honor, not because the text messages were destroyed, I think they were mooted because we disclosed to your Honor in camera the text messages that Mr. Tartaglione

SEALED PROCEEDINGS

SEALED PROCEEDINGS

sent myself and Ms. Leisenring, and I believe your Honor concluded that they weren't -- I don't want to put words in your Honor's mouth, of course, but my memory is they weren't relevant for the *Curcio* instance, and that ended that inquiry.

So that's my overall kind of response to Mr. Bachrach's factual recitation and the -- I'll rely on our extensive papers with respect to the arguments that we made and why whatever Mr. Weider did should not result in the disqualification of our firm.

And of course we all have to remember that Mr. Weider's not in the case, right?  He's not an attorney who's filed a notice of appearance.  An order disqualifying him will be I think novel because he's not in and he was never going to be in.  He was never going to file a notice.  And he hasn't yet.

THE COURT:  But you know what, lots of lawyers don't file notice of appearances who are still in cases because they neglect to file a notice of appearance, but he signed the protective order, he's reviewing discovery.  He is in the case, notice of appearance or not.  And to say he's not in the case I find perplexing.

MR. BARKET:  Not in the case formally.  He's got not going to examine witnesses.  He's not going to stand up in front of the jury.  He's not been privy to the sealed proceedings other than the ones he directly participated in.

SEALED PROCEEDINGS

SEALED PROCEEDINGS

He's not had access --

THE COURT: Which means he has a limited role. That doesn't mean he's not in. He signed the protective order. If he's not in the case, why on God's green earth is he signing the protective order?

MR. BARKET: Well, in my view, he signed the protective order because I wasn't permitted to give him the discovery without him signing it.

THE COURT: Why is he reviewing the discovery if he's not, quote, in the case?

MR. BARKET: Well, because Mr. Tartaglione wanted him to.

THE COURT: Then that means he's in the case.

MR. BARKET: Over our --

THE COURT: Whatever, over our, it doesn't matter over your objection.

MR. BARKET: Over our objection, or I won't say objection, but over our counsel to the contrary.

THE COURT: But whatever, he signed the protective order, he's in the case.

MR. BARKET: Okay. I don't disagree with kind of the broader view of it. My point was simply he's not a -- he's not -- he hasn't filed a notice, and there was never anyone contemplating that he would appear in front of the jury. And he's, from our perspective, not done any substantive work for

SEALED PROCEEDINGS

SEALED PROCEEDINGS

us at all.  The idea that he's consulting with Mr. Tartaglione and coming back and consulting with us is not -- doesn't encompass the nature of what's going on here.

We have to step back for a second and look at what the true nature of the relationships are.  We have a client who's facing a death penalty.  That client has a lifelong friend who's a lawyer who he trusts more than anybody else because he's a lifelong friend, and that lawyer has no, no experience in this matter, this kind of thing at all. Virtually no criminal experience whatsoever.  Never handled a homicide.  Never handled a federal case.  I'm not even sure he's admitted to practice in the Southern District of New York or any of the federal districts.  Yet, the client, kind of like his parents, are involved because they're his parents.  So we have to talk -- it's not a burden for us, but we talk to them, discuss things with them that are not sealed or privileged, include them as much as we can in the process.  Same is true for his wife for several years.  And the same was true for Mr. Weider who was in a slightly different position because he's a lawyer, and was able to meet with Mr. Tartaglione on his own and discuss with that.  So part of the interplay or part of the politics, if you will, or the -- kind of the client relationship is I have to maintain or we have to maintain a relationship with his parents, with his friends, with his wife, and in this case with Mr. Weider.  So we get legal advice from

SEALED PROCEEDINGS

SEALED PROCEEDINGS

his father on a regular basis. His mother asks us questions. Other family members and friends have over time, as does Mr. Weider. To say that he's somehow consulting with us and involved in our decision-making processes is just not true. It just isn't. We've done what we thought was best for this case given our own thought process and meetings. We don't include him in meetings or discussions or memos or anything of the sort. But when he calls up and like the father does and says, what about this, what about that, you know, we have to be polite and courteous and chat.

That's all I would address, I think, your Honor.

THE COURT: This gets back to what is, I think, an underlying theme in this whole *Curcio* situation, that the Constitution protects the right to counsel and the right to choice of counsel. Obviously, the right to choice of counsel, the qualified right, we all know that. And I've had this conversation with Mr. Tartaglione on any number of occasions, and if he thinks that having Mr. Weider do any legal work in this case is good for him, he's mistaken.

And to your point, Mr. Barket, Mr. Weider, as far as you know, as far as I know, has never tried a federal case, never tried a criminal case, he certainly hasn't handled a capital case, but you know, so much of what has been driving this whole thing is what Mr. Tartaglione wants even if it's clear that what he wants is not in his best legal interest.

SEALED PROCEEDINGS

SEALED PROCEEDINGS

And I think part of the thing that has been very difficult for a lot of people in this process, including obviously learned counsel, is the concern, that the vindication of his right to certain choices is going to come back to haunt him. Whether it's at the guilt phase, or if there is a penalty phase, at the penalty phase. And that is not to say that the way this should come out with Mr. Weider is informed by his limited experience. The issue here is whether or not he has a conflict, if so, if it's an actual conflict, and if so, whether it's waivable, period. That's it. That's the inquiry we are at with Mr. Weider.

I don't get to say to Mr. Tartaglione, okay, there's no conflict but I'm kicking him off the case because he frankly has no business being in a case with these stakes involved. That's not something the law gives any judge the authority to do. But it is something that I think everybody, including you, Mr. Barket, wrestles with in this situation. Because I don't disagree with you, I'm at a loss to understand how Mr. Weider could advance the defendant's case in this situation. But there it is.

All right, anything else, Mr. Barket, before I hear from Ms. Feinzig? And then I'll let Mr. Bachrach reply.

MR. BARKET: No, just one note, Judge. You reminded me of something.

There's another individual in this legal

SEALED PROCEEDINGS

representation is this woman Kim Tinsley I think her name is. Your Honor may recall she stirred up some trouble by sending Mr. Ricco a note, a letter or something that Mr. Ricco brought to the Court's attention back I think in January of 2020, but it's just, I think -- it provides an example that Mr. Tartaglione being who he is, being in the situation he is is -- as much good advice as he gets from other lawyers, is going to continue to perhaps, hopefully not, but perhaps be his own worst enemy by bringing people in to represent him in various capacities where it may not otherwise be helpful. If there's a way for that to end, I don't know it.

THE COURT: I share your concern. You know that I've had very frank conversations with your client about why, in addition to having you and your firm and all the good lawyers of your firm represent him, he should absolutely take full advantage of all the other appointed lawyers to represent him because they have an unbelievable amount of experience in capital cases. They're the anti-Weiders in this situation. And yet he is hell bent with the back of the hand saying, no, thank you, I don't want lawyers who are nationally renowned as being the best in capital defense. But there again, that's my point. It's the choice of counsel, the right to choice of counsel, but at some point Mr. Tartaglione he can ignore the advice, and then he's going to have deal with the consequences of it. It is what it is.

SEALED PROCEEDINGS

SEALED PROCEEDINGS

Anything else, Mr. Barket?

MR. BARKET: No. Thank you, your Honor.

THE COURT: Ms. Feinzig.

MS. FEINZIG: Your Honor, the government doesn't have anything additional to add.

THE COURT: Okay, so the government's fine with saying Weider has an unwaivable conflict, but that's as far as it goes.

MS. FEINZIG: Yes, your Honor.

THE COURT: Okay.

Mr. Bachrach.

MR. RICCO: Your Honor, this is Anthony Ricco.

THE COURT: Hi, Mr. Ricco.

MR. RICCO: Yes. Your Honor, we choose not to respond to Mr. Barket's remarks at this point. We think that there's a more than adequate factual record that has been made.

Your Honor, just like when we initially decided to notify the Court of potential conflict, there was an objection to it. On the day we brought it to the Court's attention, Mr. Barket was insisting that we just go downstairs, bring Mr. Tartaglione up, let him waive and the issue would be over.

This issue, Judge, with respect to the waiver of a penalty phase is something that we thought about quite a bit as we are supposed to as representatives of the defendant in a death penalty case. This is a critical part of the case. And

SEALED PROCEEDINGS

SEALED PROCEEDINGS

so, so much work is invested in this that Mr. Barket -- I mean, Mr. Bachrach and myself, and to a certain degree Mr. Koffsky thought about the state of the record. And we are all very confident with the fact Mr. Tartaglione is going to come up and say yes, yes, yes to everything, but that's not the end of the story. And we thought about all of the work that was done in this case, and we felt as though it needed a greater waiver. If your Honor was going to waive it, then we didn't want the record to exist the way it is because we just felt it was -- it needed to be complete. And that's not to the benefit of -- that's not -- so, your Honor, we thought about this issue that Mr. Bachrach brought up because we thought it was important and we thought that the Court can say we believe a full record has been made.

Judge, this is all about the penalty phase. This whole *Curcio* inquiry is about the penalty phase, and this whole idea that we constantly hear when these issues come up, we just want to get this over with, let's just keep it going, it's just not the proper way to protect the defendant's rights. And so, we believe, Judge, appointed counsel, we all believe that the Court should take a couple of minutes and ask Mr. Tartaglione a couple of questions. There's no one in the room who's going to believe that he's going to say no, but we felt that so much time and effort has been contributed to this by the Court, by all counsel, that we didn't want to turn the other way, oh,

SEALED PROCEEDINGS

let's just leave it the way it is.  We felt that the Court should have our perspective on it, and we think that the record should be a little more beefed up around the penalty issue. And that's it.

Judge, the other factual stuff, you know, I'm from the old school, my position is keep talking.  And more people talk, the more issues are raised.  And it doesn't make sense to even address them at this point.  We're so find beyond that. Right now we're concerned your Honor has a complete record in a death authorized case.  That's a part of our responsibility as learned counsel in a death penalty case to make sure that it's the best record, and the Court generally expects that of us, not to hide it, not to look the other way, but to be frank with the Court about these issues.  And we want to be.  We've always wanted to be that way, and it's just a minor issue that's being raised now.

And that's it, Judge.  We don't have anything further to add with respect to the *Curcio* proceeding.

THE COURT:  All right, so on that point, and I'm addressing not only Mr. Ricco but all counsel, as I've said to Mr. Barket, I think what makes sense is to, on a fairly short timeframe, because I am not at all insensitive to Mr. Tartaglione's concern that this has dragged on for very long.  Of course, there's a lot of reasons, largely having to do with the pandemic.  But if you all want to make the point

SEALED PROCEEDINGS

that the *Curcio* waiver that was done last summer was wanting in terms of an inquiry focused on the penalty phase and make the case that that is so and then also to offer suggested questions, how quickly can you get that letter in?  This is addressed to learned counsel.

MR. RICCO:  Judge, we can get that letter in today, it's a one-page letter.

THE COURT:  Why don't we say tomorrow.  I'm imagining peoples' blood pressure when you said "today."

MR. RICCO:  We're pretty much prepared for this, but we can have it in by tomorrow, Judge.  It's a very simple issue.

THE COURT:  Okay, so that's fine.

Mr. Barket, Ms. Feinzig, how long would you like to respond?

MR. BARKET:  I don't mean to cut off Ms. Feinzig. Judge, we're not going to respond at all.  If the Court wants to ask more questions.

THE COURT:  Okay.

MR. BARKET:  That I think is preferable to having kind of a debate over whether or not we've asked enough questions first.

THE COURT:  Fair enough.

MR. BARKET:  So if the Court is not satisfied with the record so far, it just wants to in an extreme abundance of

SEALED PROCEEDINGS

48

SEALED PROCEEDINGS

caution make sure the record is clear, and I'm perfectly happy to move to the questioning, and if they can get the letter in today, that's great, we'll make ourselves available the next day to have Mr. Tartaglione ready to answer them.

THE COURT:  All right.

Ms. Feinzig.

MS. FEINZIG:  I suspect we will not need a lot of time either, so I would just say a day or two, just time to review.

THE COURT:  We'll just say, we'll say Friday.

MS. FEINZIG:  Okay.

MR. BACHRACH:  So just to clarify so I have my marching orders correctly.  With respect to the letter that you'd like, given Mr. Barket's statement just now that he prefers to simply go straight to the questioning --

THE COURT:  The questions.

MR. BACHRACH:  The questions.  Would your Honor prefer we just propose questions because --

THE COURT:  Yes.

MR. BACHRACH:  -- what I think -- is that okay?

THE COURT:  Yes.

MR. BACHRACH:  Okay.

THE COURT:  And I understand Mr. Barket's position. It actually makes sense.  If people think the record needs to be tightened, then go ahead and submit proposed questions and

SEALED PROCEEDINGS

SEALED PROCEEDINGS

then we'll go from there.

MR. BACHRACH:  Okay, thank you, your Honor.

THE COURT:  With respect to Mr. Weider, I'm not going to go through as if this were a written opinion all the procedural history, we all know it, and it's quite complicated.

So with respect to the inquiry or obligation with Mr. Weider, as everybody knows, Mr. Weider's role in this sort of became a little more prominent when we had the first hearing back in the summer, and it came up obviously in the context of what we were focused on at the time, which was the potential conflicts involving Mr. Barket and Ms. Leisenring, so obviously Mr. Weider wasn't the focus of that hearing because it wasn't clear what his role was in this case.  So we were talking about him in the context, for example, of getting the Epstein note out of the MCC, and this was all in the context of trying to explain to Mr. Tartaglione the potential conflict in terms of having Mr. Barket and Ms. Leisenring represent Mr. Tartaglione because of their role in getting the Epstein note out of the MCC.  But of course Weider was very much involved in that.  And Mr. Tartaglione was prepared back in the summer to waive any conflict involving Mr. Weider on the assumption that Mr. Weider was acting as an attorney representing him.  But I thought it made sense to conduct further inquiry, especially given Mr. Weider's role in deleting the text messages, hundreds of them, that he had received from Mr. Tartaglione on the

SEALED PROCEEDINGS

SEALED PROCEEDINGS

so-called contraband phone.

And learned counsel added some, I think, helpful context explaining that Mr. Weider had, in fact, failed to transfer these text messages and/or had deleted them. And it looks like they may have been deleted as far back as July 23rd of 2019, which was in a few days of when counsel provided notice to the Court that privileged material might exist on the contraband cellphone.

And so a second hearing was held on September 11th of 2020, and Mr. Weider at this hearing did confirm that he had communicated with Mr. Tartaglione while Mr. Tartaglione was using the contraband cellphone within the MCC. Mr. Weider appeared to acknowledge that there were hundreds of text communications over a period of several months from about April through June of 2019. Mr. Weider's testimony was that most of these text messages pertained either to personal matters that Mr. Tartaglione was dealing with or to Mr. Weider's legal work on matters unrelated to this case.

Mr. Weider was specifically asked whether he had any understanding as to whether Mr. Tartaglione was supposed to be using a cellphone from within the prison and Mr. Weider acknowledged that it was his understanding it was "probably against the rules." And then, in fact, he represented or he testified that he advised Mr. Tartaglione not to use the phone, but that notwithstanding his admonition, Mr. Tartaglione

SEALED PROCEEDINGS

continued to send text messages to Mr. Weider sometimes 15 to 18 times a day. And Mr. Weider testified that he would text Mr. Tartaglione back about one out of every ten times.

As we've talked about in the course of the argument here today, I think it's fair to say that Mr. Weider's testimony was inconsistent, it shifted, regarding specifically the fate of the missing text messages. And I do think that it, in this Court's view, raised very serious concerns about his credibility.

So at one point he was asked how many of the hundreds of text messages still existed. Mr. Weider said he didn't know. This is from a transcript at page 47, line 7 through 10.

And then just a few minutes later when he was asked where the text messages were, Mr. Weider said "I don't have them." Page 51 line 11.

When asked why he didn't have them, he said, "I don't recall specifically, but I assume I deleted most of them." Page 51 line 13 and 14.

And then right after that he when he was asked why he would have deleted the messages, he said he didn't. Page 51 line 17 to 19.

So given this shall we say confusion, there was a follow-up question to which Mr. Weider said, "Well, I had said I probably deleted some or all." Page 51 line 22 and 23.

So Mr. Weider appeared to concede that he deleted

SEALED PROCEEDINGS

most of the messages, but then later on in the hearing when I asked whether he had any of the text messages, Mr. Weider said no. And then I asked whether or not he deleted every single one of the messages, to Mr. Weider responded, "Well, I don't know if I deleted every single one of them." And then soon after he said he may have deleted every single one of them. This is all on page 90 spilling over to 91 of the transcript.

And I think finally reading the room, Mr. Weider confirmed that he had deleted the text messages. So the penultimate question, as I said to him, "Answer the question. Did you delete all the text messages? Yes or no." Mr. Weider said "Yes."

So given Mr. Weider's grudging reluctance to admit but ultimately admitting that he did, in fact, delete the messages, this is what creates the conflict. So both retained and appointed counsel have acknowledge that the text messages Mr. Tartaglione sent to Mr. Weider could have contained mitigation evidence, that it could help Mr. Tartaglione especially during the penalty phase of this trial.

Mr. Barket, for example, observed "The conversions [Mr. Weider] would have been having Mr. Tartaglione concerning the course of Mr. Tartaglione's marriage, we think relate directly to potential mitigation."

Mr. Ricco observed that "the text messages could shed light on Mr. Tartaglione's isolation and his desperation" in

SEALED PROCEEDINGS

SEALED PROCEEDINGS

prison, which Mr. Barket concurred with.

So I think there's really no disputing that these text messages, had they been preserved, could have been used in Mr. Tartaglione's defense. Again, especially at a penalty phase proceeding.

But preserving these messages was not in Mr. Weider's own interest. He recognized that Mr. Tartaglione should not have been using the cellphone. He claims he told him that he shouldn't be doing it. And so from Mr. Weider's perspective, it could be potentially problematic that he was regularly communicating with Mr. Tartaglione using a contraband cellphone, which could be something that could get Mr. Weider in trouble in terms of any disciplinary proceedings.

So it's at that point Mr. Weider's personal interest in destroying or failing to preserve the text messages diverge from Mr. Tartaglione's interest in having those messages preserved. So that's the conflict.

Now there are a number of flares to me. So the first question is whether or not Mr. Weider, in fact, represents Mr. Tartaglione in this case or has represented him in this case, because if he hasn't then, as Mr. Barket points out, if someone's not in, you can't kick him out.

So there's no dispute that Mr. Weider has provided legal service to Mr. Tartaglione on issues unrelated to this case. All right? But that's not what drives it. Because the

SEALED PROCEEDINGS

54

SEALED PROCEEDINGS

attorney-client relationship is obviously subject-matter specific. So if Mr. Weider is helping Mr. Tartaglione on some commercial transaction, then the fact that he might have stepped in it with the cellphone is really neither here nor there in terms of whether he has an attorney-client relationship in connection with this case.

So as one court has said, the existence of the attorney-client relationships on one matter does not mean that the attorney represents the person for any and all subsequent unrelated matters. And that's from *Secured Worldwide LLC versus Kinner*, 2015 WL 4111325, at *4.

Now, on this point Mr. Tartaglione has himself stated Mr. Weider does not represent him in connection with this case. So at the first hearing, for example, in July, page 35, Mr. Tartaglione said "Mr. Weider has no actual association with my defense. He makes no decisions. He is not part of my defense at all." There were other statements that were similar in substance to that statement.

And it wasn't even clear, frankly, to the government or to *Curcio* counsel as to whether or not Mr. Weider represented Mr. Tartaglione. When we turn to Mr. Weider's testimony, we get the same we got from him before, which is confusion and delay.

So on the one hand, Mr. Weider seemed to testify that he did not affirmatively consider himself as one of the lawyers

SEALED PROCEEDINGS

SEALED PROCEEDINGS

in the case. So when I ask asked, "Looking back on it, do you think that when you visited Mr. Tartaglione," and this is in connection with the day he got the Epstein note out, "were you visiting him in your capacity as a lawyer representing him in this case?" Mr. Weider said, "I'm not working on the defense of this case."

Then elsewhere in the hearing I asked "When you went to visit Mr. Tartaglione that day and you got the letter, did you think you were acting as his legal representative in this case?" Mr. Weider said, "To be honest I didn't formulate this is what I'm doing for this purpose."

And then I asked, "Well, I'm asking you to look back on it now." Mr. Weider said "It was more like I was doing a favor. I said, Bruce, hey, I visited him."

And then I asked, "So what was your understanding of your role as a lawyer in connection with this case?" Mr. Weider said "My understanding is that ultimately Nick wants me to be abreast of the entire case and all the evidence. Because if there ever comes a moment of truth, he might want my advice."

Now appointed counsel, of course, pressed the view that Mr. Weider is acting as one of Mr. Tartaglione's lawyers in this case, and you know this is, obviously this goes way back to the first hearing and of course it's been thoroughly briefed since then. And it turns out I think appointed

SEALED PROCEEDINGS

SEALED PROCEEDINGS

counsel's initial -- I don't want to say suspicion but belief back in the summer I think has been borne out by the evidence. So we've since learned that Mr. Weider has signed the protective order in this case which entitles him to review the discovery, that he's discussed the case with Mr. Tartaglione. And so there was testimony about Mr. Weider's signing of the protective order discussing the review of the discovery and his role as an advisor to Mr. Tartaglione in the case.

So I think the record portrays Mr. Weider as a, to put it charitably, a jack-of-all-trades who certainly has a very long running and personal relationship with Mr. Tartaglione, who has represented him on other matters, but is also somebody who it sounds like much more at Mr. Tartaglione's behest than anybody else's is part of the defense team, and of course there is the other documents that have been introduced in evidence. There's the $25,000 payment, which not only places Mr. Weider in the case but also establishes a relationship with the Barket firm, which I'll talk more about in a second.

So in terms of looking at it very legalistically as to what forms an attorney-client relationship, there is no single test to determine whether a relationship exists. That's spelled out in *Ello v. Singh*, 2006 WL 2270871. So instead the courts view the formation of an attorney-client relationship as hinging upon the client's reasonable belief that the client is

SEALED PROCEEDINGS

consulting a lawyer in that capacity and the manifested intention to seek professional legal advice. That's from *Merck Eprova AG v. ProThera, Inc.*, 670 F. Supp. 2d 201, 210.

So in our district there are six factors that are considered in assessing whether an attorney-client relationship has formed:

Whether a fee arrangement has been entered into or a fee paid;

Whether a written contract or retainer exists;

Whether there was an informal relationship whereby the attorney performed legal services gratuitously;

Whether the attorney represented the client in one aspect of the matter like, for example, a deposition;

Whether the attorney excluded the individual from some aspect of the litigation, in other words, to protect another client's interests; and

Whether the purported client believes that the attorney was representing the client and whether that belief was reasonable.

This is all spelled out in *First NBC Bank v Murex LLC*, 259 F.Supp. 3d 38, 62.

So the fee arrangement, that could, of course, suggests an attorney-client relationship.

The retainer agreement that Mr. Weider produced in response to a request by the Court purports to cover "general

SEALED PROCEEDINGS

legal services," and discusses an hourly rate of $275, but this agreement only covers legal services provided on or after January 15 of 2020.  So it doesn't obviously cover any legal services before that date.  It does seem as though the record, I think you can infer from the record the absence of any prior agreement that Mr. Weider did not appear to have a formal fee arrangement with Mr. Tartaglione either in relation to this case or his other representation more generally.  So for example, at the hearing I asked Mr. Weider whether he sends a bill to Mr. Tartaglione or the family, and specifically saying, here's the hours I've spent working on the legal matters.  And Mr. Weider said he had not submitted such a bill.

Ms. Feinzig asked similar questions about whether, for example, Mr. Weider had kept track of the time that he had been spending with Mr. Tartaglione with the thought of the eventually sending an invoice to the family to which Mr. Weider said "Not really."  And Ms. Feinzig followed up, "I thought you said earlier when the Judge asked you that you were spending a lot of time, that you were keeping track of it, and previously [Mr. Tartaglione's family] had paid you for time you were spending with Mr. Tartaglione."  Mr. Weider responded, "If that's what I said, it may be, but I don't think I was keeping track.  I'm not sure I said I was.  I was spending a lot of time, hundreds and hundreds of hours, but I'm not specifically keeping track."

SEALED PROCEEDINGS

SEALED PROCEEDINGS

So while Mr. Weider did not appear to have had a formal fee arrangement with Mr. Tartaglione for much of the time that he might have been reviewing and discussing the discovery, it is important to note that this factor is framed in the disjunctive asking whether or not there was a fee arrangement or whether a fee was paid.  And on that latter point it's clear that Mr. Weider did, in fact, receive payment for his legal services during the relevant period which includes work that at least -- or the time period that pertained to Mr. Tartaglione's criminal case.

So at the hearing Mr. Weider explained that Mr. Tartaglione's family had given him two checks, one for $5,000, one or $2,500 sometime in either 2018 or 2019, and that these amounts were "figures that Mr. Tartaglione's family unilaterally arrived at."

Also at the hearing Mr. Weider explained that initial $25,000 he had received from Mr. Tartaglione's family which had been funneled to him through Mr. Barket's firm covered his legal services from 2016 to 2019 which he confirmed "covers the entire time period that this case has been going on."

Now, in the interest of full disclosure, Mr. Weider also testified that the $25,000 related solely to noncriminal legal representation, but he didn't really provide much of the basis for the distinction.

And as I said, given my view that Mr. Weider's

SEALED PROCEEDINGS

SEALED PROCEEDINGS

testimony was wanting in credibility, I don't think the best testimony is really dispositive cutting of the other way.

So in the Court's view, there's sufficient evidence to find Mr. Weider did receive some payment for the time he spent reviewing discovery and otherwise discussing this case with Mr. Tartaglione and that weighs in favor of finding an attorney-client relationship.

As for the second factor, whether a contract or retainer agreement exists, it seems as though the answer to that is no, at least before January 15 of 2020, which obviously cuts against finding an existence of an attorney-client relationship, at least with respect to any legal consultation that preceded January 15 of last year. But that doesn't end the inquiry because courts have repeatedly observed "An attorney-client relationship does not depend on the existence of a formal retainer agreement." That's from *Abraham v. Leigh,* 2019 WL 425639 at *6.

So where there's no written agreement, it's necessary to look at the words and actions of the parties to ascertain if there was an attorney-client relationship and that's from *Kleeberg v. Eber,* 2019 WL 2085412 at *13. In that scenario, certain factors are highly relevant in ascertaining whether an attorney-client relationship has been formed. Of particular relevance here courts can consider whether, for example, the client and attorney exchange regular communications relating to

SEALED PROCEEDINGS

SEALED PROCEEDINGS

the subject matter of the representation and whether they took part in activity in furtherance of the objective of the retention.  That's from *Kleeberg* at *13.

Here, the record demonstrates that Mr. Weider visited Mr. Tartaglione in prison between 50 and 100 times, but now while Mr. Weider did testify that he would visit Mr. Tartaglione in his capacity both as a friend and as a lawyer, and while sometimes the legal discussions would involve legal matters completely unrelated to this case, other parts of Mr. Weider's testimony suggest that this case was still a topic of discussion.  And there are a couple of times, for example, where Mr. Weider acknowledge "To the best of my recollection, Nick" referring to Mr. Tartaglione "was insisting that he," he, Mr. Weider, "be able to discuss the discovery" -- he, Mr. Tartaglione, be able to discuss the discovery with Mr. Weider.

So under similar circumstances, courts within the Second Circuit have taken a functional approach often finding the existence of an attorney-client relationship where a lawyer provided the client with legal advice despite the absence of the formalities such as a retainer agreement.

There are many cases.  The one I'll just note here is *CQS ABS Master Fund*, 2013 WL 3270322 at *9 where the court there found the existence of an attorney-client relationship despite the absence of a formal retainer agreement because the

SEALED PROCEEDINGS

attorneys had performed legal services on the client's behalf which included "generally advising" the client with respect to a particular transaction.

So as Mr. Tartaglione confronted the possibility that he could face the death penalty, he turned to Mr. Weider, who is his friend, as Mr. Barket has noted, and long-time, legal confidant for confidential advice regarding this case. So while they may have had legal relationship on other matters as well, there clearly was a legal relationship here.

And so in a case called *Devery*, 1995 WL 217529, the court in a very similar circumstance found that there was a attorney-client relationship.

I think on this point to me what's dispositive is the fact that Mr. Weider signed the protective order and in fact reviewed discovery in the case. So while he has not filed a notice of appearance, as I said, there was no a formal agreement that covered legal services before January of 2020, Mr. Weider's participation in this case is formalized through the signing of that protective order. If he wasn't working on the case, he should not have been allowed to have signed the protective order. And the fact it was Mr. Tartaglione who was driving Mr. Weider's work in this case isn't really the point, that Mr. Tartaglione viewed him, Mr. Weider, as being part of his defense team. So it really doesn't matter that Mr. Weider hasn't detailed a specific legal advice. In fact, that would

SEALED PROCEEDINGS

63

SEALED PROCEEDINGS

be inappropriate to probe into the attorney-client conversations.  There is the fact Mr. Weider has consulted with Mr. Tartaglione, he has reviewed the discovery, he has signed the protective order.  So the words and actions of the parties I think speak pretty clearly that there was an attorney-client relationship.

The third factor is whether there was an informal relationship where the legal services were performed gratuitously.  Mr. Weider has received some compensation.  It's nowhere near probably as much as all the hours he has spent working with Mr. Tartaglione, but as I said, he has received some compensation and he has formalized his work in other ways.  So this factor cuts in favor as well.

The fourth factor is whether the attorney actually represented the client in one aspect of a matter, for example, in a deposition.  As Mr. Barket pointed out, Mr. Weider did not file a formal notice of appearance.  That obviously weighs against finding an attorney-client relationship.  But obviously a formal appearance is not required to have an attorney-client relationship, nor is it required to have an attorney work on the case.  So the factor is, I guess at best, neutral.

The fifth factor is whether the attorney excluded the individual from some aspect of litigation to protect another client's interest.  Here, there's no suggestion that Mr. Weider jointly represented another party in this case.  So this factor

SEALED PROCEEDINGS

SEALED PROCEEDINGS

really doesn't apply.

The last factor is the client's understanding. Obviously, the fact that somebody believes that the client is represented does not make for an attorney-client relationship, but it certainly is relevant to the conversation, and the evidence here is that Mr. Tartaglione -- is that he did not consider Mr. Weider to be his lawyer for purposes in this case. So, for example, at the hearing back in July he testified Mr. Weider has no actual association with my defense, he makes no decisions, he's not part of my defense at all. That's page 35 lines 14 to 16.

So the question is that sort of belief reasonable under the circumstances. "Indeed, most courts have acknowledged that an attorney-client relationship exists if the party divulging confidences and secrets to an attorney believes that he is approaching the attorney in a professional capacity with the intent to secure legal advice." That's from *Toussaint* 2003 WL 21738974.

So here, despite Mr. Tartaglione's assertion that Mr. Weider was not one of his attorneys, there's no way to ignore all the other facts that indicate the formation of an attorney-client relationship. Mr. Weider's testimony is that he did consult with Mr. Tartaglione about this case, that he did so specifically at Mr. Tartaglione's request. As I said, he signed a protective order that entitled him to review the

SEALED PROCEEDINGS

SEALED PROCEEDINGS

confidential discovery material, which he did.  And while there was no formal arrangement or retainer until January of 2020, Mr. Tartaglione -- I mean, Mr. Weider has been paid at least some amount of money for his services on Mr. Tartaglione's behalf.

Even if, for example, Mr. Tartaglione had placed Mr. Weider in a category different than the lawyers at the Barket firm or learned counsel, that doesn't mean that Mr. Weider was not representing or had not formed an attorney-client relationship in this case with Mr. Tartaglione. So Mr. Tartaglione's stated belief at the hearing in my view is not objectively reasonable.

So the next issue then is the extent to which Mr. Weider has a potential or actual conflict.  An actual conflict happens when during the course of the representation the attorney's and defendant's interests diverge with respect to a material, factual, or legal issue, or to a course of action.  That's from a Circuit decision in *Perez* 325 F.3d at 125.

I don't think it's a close call.  Mr. Weider's personal interests already have diverged from Mr. Tartaglione's interest with respect to a particular course of action, and that is whether to preserve or delete the text messages.  I've already explained, and I think there's really unanimous agreement on the point, that the text messages were potentially

SEALED PROCEEDINGS

SEALED PROCEEDINGS

valuable to Mr. Tartaglione's defense, especially at the penalty phase, because they could provide mitigating evidence related to family matters, related to his difficulties in prison, and a whole host of other things that we will never know because the messages are gone. And when Mr. Weider had the choice to preserve or delete, he deleted, and in that moment he erased the possibility of these messages being used on Mr. Tartaglione's behalf. He may have preserved his own interest in not getting himself caught up in some disciplinary hearing or having any other legal consequence from communicating with somebody using a contraband cellphone. But in terms of whether this is an actual potential conflict of interest, it's a historical fact, it's an actual conflict of interest because the interests have already diverged.

The Second Circuit's decision in US v. Levy I think is particularly instructive here. In that case there was a lawyer who was jointly representing two criminal defendants. The lawyer who was representing two criminal defendants had been implicated in one defendant's flight from the country and had become a target of the Grand Jury's investigation. And so what the Second Circuit observed is "Many courts have found an actual conflict of interest when a defendant's lawyer faces possible criminal charges or significant disciplinary consequences as a result of questionable behavior related to his representation of the defendant."

SEALED PROCEEDINGS

SEALED PROCEEDINGS

And one of the cases that the Circuit cited here was *Government of Virgin Islands v. Zepp*, which is a Third Circuit decision back in the 80s in which the Third Circuit found the existence of an actual conflict where a criminal defense lawyer was "potentially liable for aiding or abetting or encouraging the destruction of evidence" in the case, in that case by flushing cocaine down the toilet. And so in that case the Third Circuit concluded that it was unrealistic for the court to assume that the defense attorney would vigorously pursue the client's interest, best interest entirely free from the influence of his concern to avoid his own incrimination.

So relying on *Zepp*, among other cases, the Circuit concluded that counsel in *Levy* suffered from an actual conflict of interest. So that's what we have exactly here. The potential legal consequences to Mr. Weider place him in a conflict with what's in Mr. Tartaglione's interest.

So the question is whether this conflict is waivable or not, and the Second Circuit has explained that if the Court "determines that counsel has an actual conflict that is so severe as to indicate *per se* that the rendering of effective assistance will be impeded or is analogous to such a conflict in breadth or depth," the court has no choice but to disqualify counsel. That's from *Perez* page 125. And then concurring opinions as Judge Raggi clarified that "only actual conflicts are unwaivable and, even then, only if they are so severe as

SEALED PROCEEDINGS

SEALED PROCEEDINGS

to, A, indicate *per se* ineffective assistance of counsel, or, B, be analogous to *per se* ineffectiveness in the conflict's breadth and depth."

So these conflicts are described as being a category "such that no rational defendant would knowingly and intelligently desire the conflicted lawyer's representation." I think that's important here because it may very well be that a client is willing to waive, but the Court's task is to determine whether a rational person would knowingly and intelligently go forward given the conflict that's at issue.

The Circuit has recognized that district courts have broad latitude in deciding whether or not to disqualify a defendant's chosen counsel. Obviously this is particularly true in light of the *Wheat* decision, which we all know about.

In terms of the unwaivable conflicts in our circuit, while the Circuit says that district courts have broad discretion, the Circuit has also emphasized "that the class of cases which an attorney conflict is truly unwaivable is a very narrow one." And that's from *Cain* 671 F.3d at 294.

And the two sort of stand-out cases are *Fulton*, and *Schwarz*. I'm not going to recite the facts, you all know what the facts and the holdings in those cases are, but what they do suggest is that unwaivable conflicts tend to arise in a rare case where a lawyer's self interest, whether it's legal, whether it's reputational, whether it's financial, so permeate

SEALED PROCEEDINGS

SEALED PROCEEDINGS

the representation that no rational defendant would knowingly and intelligently waive the conflict.

So in the wake of *Fulton* and *Schwarz*, the Court has found seven district court decisions finding unwaivable conflicts. So they are: *US v. Elder*; *US v. Binday*; *US v. Scala*; *US v. Yanotti*; *US v. Schlessinger*; and, *US v. Massino*. With the exception of *Massino*, these cases I think clearly demonstrate that district courts have extended the rationale under *Fulton* and *Schwarz* to a variety of situations where the lawyer suffers from a disabling personal conflict.

The Second Circuit "consistent with the deferential approach dictated by *Wheat*" has recognized district courts' latitude to make these determinations based obviously on the unique facts of each case. And in fact, the Court has not identified a single case out of nearly two decades since *Schwarz* came down in which the Second Circuit has reversed a district court's decision to disqualify a lawyer after finding unwaivable conflict.

So after studying these cases and of course following the Second Circuit's instructions, the Court's finding is that Mr. Weider's conflict is, in fact, unwaivable. And I think *Fulton*, the rationale in *Fulton* applies with particular force to this case. Here, as in *Fulton*, the conflicted lawyer's conflict "involves a bias arising out of powerful self interest in avoiding criminal charges or reputational damage and is thus

SEALED PROCEEDINGS

of a different character than other conflicts." That's from page 613.

It also appears that, in fact, perhaps because of their long-standing friendship, Mr. Tartaglione places a special trust in Mr. Weider's counsel. And yet, as in *Fulton*, the conflicted lawyer's ability to advise the defendant has been irredeemably compromised. In the Court's view, Mr. Weider's judgment about, for example, potential defense strategies could easily be affected by fear that the evidence concerning his involvement might come out.

There's obviously, as I said, tension between the value of these text messages to Mr. Tartaglione and the value to Mr. Weider in his role in not preserving them being the focus of any inquiry. So an *Elder, Binday, Yanotti, Schlesinger, Massino, Jones,* and *Cain,* all of those involved unwaivable conflict that presented the potential for harm. These cases did not involve any indication that the conflicted representation had already produced the harm. But that's what we have here. The harm has been inflicted by Mr. Weider's decision to delete or not preserve those text messages. So this is not a question of potential. The mitigating evidence is gone because of Mr. Weider's very poor judgment in deleting those messages and it's, I think, fair to infer that he did that to preserve his own interests.

So for these reasons, the Court finds that Mr. Weider

SEALED PROCEEDINGS

SEALED PROCEEDINGS

has an unwaivable conflict and therefore has to be disqualified from further representation in this case. And I'll note, again, Mr. Tartaglione's own view is Mr. Weider wasn't a lawyer in this case, but in any event, I find that that belief was itself not reasonable. But I think, given this unwaivable conflict, Mr. Weider can no longer represent Mr. Tartaglione in this case. All right. obviously, I'm not going to prevent him from representing him in other cases. But Mr. Weider is to be advised that he should not take this ruling as being limited in this case as a license to informally represent Mr. Tartaglione. He shouldn't be reviewing discovery in this case, and he shouldn't be doing anything in the representation in this case. The one thing we can say is that Mr. Tartaglione is not facing a shortage of lawyers representing him on this case.

Now, whether or not Mr. Weider's conflict can be imputed to the Barket firm I'm going to reserve on that issue, and I'm going to try to give you an answer as soon as possible.

It is my intention, by the way, counsel, to issue an opinion that formalizes the rationale that I've given here, but being sensitive to not holding up the case, I wanted to at least give you that ruling. As I said, I will try to get you the ruling on the implications or lack of implications of Mr. Weider's conflict as it relates to Mr. Barket's firm as soon as I can.

Anything else that we should be addressing today?

SEALED PROCEEDINGS

SEALED PROCEEDINGS

MR. BACHRACH:  Your Honor, with that silence, I'm going to move on to something administrative.

THE COURT:  Sure.

MR. BACHRACH:  Defense counsel have -- while you were speaking, your Honor, I requested via the eVoucher system an authorization, a CJA-24 authorization for a transcript of these proceedings.  Since I know that eVoucher process takes going through the Clerk of the Court, there are going to be delays, if you could just orally authorize the court reporter to provide us with a transcript as soon as possible, I would appreciate it, your Honor.

THE COURT:  That's done.  Of course.

MR. BARKET:  Your Honor, in light of the Court reserving on the question of all our continued representation, would it make sense to get that before we engage in the process of questioning Mr. Tartaglione?  Because obviously, if we're disqualified, there's nothing for him to waive, and if Mr. Weider's disqualified, which he is now -- that might save some time in this process.

THE COURT:  Well I think that's fair.  I also think realistically having Mr. Tartaglione produced in person is going to take some time anyway.  And so, in the meantime, what I could at least do, Mr. Barket, is probably just give you my answer, as I said, and I'll say for reasons that will be explained in a forthcoming opinion and not have you wait for

SEALED PROCEEDINGS

the opinion for the answer.  Does that seem fair?

MR. BARKET:  Sure.

THE COURT:  Okay.

Anything else?

MR. RICCO:  No, Judge.  Thank you very much.

MR. BARKET:  Are we going to try to schedule an appearance for Mr. Tartaglione?  Whether or not we're disqualified, he's still going to have to appear in court again following that ruling.  That should probably happen as quickly as it can following the ruling, so he can either waive or do whatever he wants to if we're disqualified.

THE COURT:  I don't disagree with you.  Rather than try to do this through the background noise of this call, why don't we just say we'll reach out to you all and get a date on a calendar.  You can tell us now if there's particularly bad weeks, we can do that, but I think, as you know, there is some lead time between when we want someone to be produced and when we have to let the powers that be know.  Obviously it's a whole new world with the pandemic.

MR. BACHRACH:  Just on scheduling.

THE COURT:  Yes.

MR. BACHRACH:  I hope it doesn't go out this far, obviously, but just to alert you, I do have a trial before Judge Crotty scheduled to begin on April 5th that will last two-to-three weeks.  Obviously, if it needs to overlap with

that -- well, I would hope it wouldn't need to overlap with it, but if it did, maybe you could arrange with Judge Crotty for me to still be able to appear before your Honor. Otherwise, I have a conflict after April 5th.

THE COURT: Okay. And is that trial date actually set in stone? Because my understanding was that the second-quarter trials, and that would be a second-quarter trial, have not been resolved just yet.

MR. BACHRACH: You know, we haven't heard from the *ad hoc* scheduling committee, but our understanding when it was chosen was that it was a firm date. That was sort of the message from chambers.

THE COURT: Yes.

MR. BACHRACH: Obviously, it's pending, but I think the sense I get is that this case is a priority case in the sense that it was previously scheduled for trial in the first quarter of January as well as in the fourth quarter of December. It just keeps getting delayed because of the pandemic. But I have no reason to think, if there is a trial in April, I have no reason to think that this won't be one of them.

THE COURT: That may be right, but I will tell you that a lot of trials adjourned from fourth quarter '20, the first quarter '21, and they're going to get kicked again the second quarter '21, because when we made the schedule, we

didn't assume all the holiday spikes, so we had to suspend trials, and they were suspended from the week after Thanksgiving until last week.  And so there's a lot of trials in the pipeline.  That's why I ask.  But you'll find out one way or the other hopefully soon whether that's going.

MR. BACHRACH:  Yes, your Honor.

THE COURT:  If you could let us know if it's not going forward, that would be helpful to know.

MR. BACHRACH:  Of course.  Your Honor, do you know when the committee announces the new slate of cases?  I know there's a deadline --

THE COURT:  Yes, we had to get them in, and I know that White Plains and Manhattan operate differently.  So the White Plains judges just do it among ourselves, and the Manhattan situation is sort of like they go behind a secret curtain and figure it out.

MR. BACHRACH:  Okay.  Thank you, your Honor.

THE COURT:  I wish I had more for you, Mr. Bachrach, but that's what I know.  And it is very frustrating, of course, for everybody that we're not able to guarantee trial dates until they go through this process.

All right, yes, please let us know.  We will try to schedule something before April.  But I've learned the hard way not to over-promise.  So we're going to do our best.  We'll be in touch.  It sounds like there are no major conflicts between

now and the end of March. But we'll do our best to get it before then. If not, it will have to be early April, unless Mr. Bachrach has a conflict, then we'll have to figure it out.

MS. FEINZIG: Your Honor, I know this drives everyone crazy, and that this has already been deemed a complex case, and I guess this motion could be considered still unsubmitted, but does it make sense to set an outside control date so that we can have a date certain for excluding the time between now and when this reconvenes under the speedy trial clock?

THE COURT: Sure. Let's say a month from today. So we'll say March 22nd.

MS. FEINZIG: Okay.

THE COURT: Any objection to excluding time from now to March 22nd, even though time is excluded, you're right, Ms. Feinzig, for a number of reasons. Any objection to excluding time till March 22nd?

MR. BARKET: No.

THE COURT: Then I'll prospectively exclude time in addition to all the other reasons because it's in the interest of justice to do so. Those interests of justice are, number one, the submission of potential follow-up questions for Mr. Tartaglione, and number two, the resolution of the issue of conflict or potential conflict to Mr. Barket's firm. I find that the interest of justice from this exclusion outweigh the public's and Mr. Tartaglione's interest in a speedy trial.

That finding is made pursuant to 18 U.S.C. Section 3161(h)(7)(A).

Anything else?  All right.  Please stay healthy everybody.  We will be in touch on another date.  We are adjourned.

(Proceedings concluded)

CERTIFICATE:   I hereby certify that the foregoing is a true and accurate transcript, to the best of my skill and ability, from my stenographic notes of this proceeding.

----------------------------------------

Angela A. O'Donnell, RPR, Official Court Reporter, USDC, SDNY

SEALED PROCEEDINGS