

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*United States Courthouse*
*300 Quarropas Street*
*White Plains, New York 10601*

March 3, 2020

**BY HAND – To Be Filed Under Seal**

Honorable Kenneth M. Karas
United States District Judge
United States District Court
300 Quarropas Street
White Plains, New York 10601

> Re:  *United States v. Nicholas Tartaglione*
> **S4 16 Cr. 832 (KMK)**

Dear Judge Karas:

We have been asked to provide the Government's view with respect to potential conflicts in the representation of Mr. Tartaglione by Bruce Barket, Esq.  As set forth below, we have not identified any unwaivable conflicts.  However, we have identified potential waivable conflicts that may arise.  Accordingly, we respectfully request that the Court hold a *Curcio* hearing so that the Court can determine whether the defendant wishes to waive any such potential conflicts.  In addition, we respectfully submit that a limited inquiry is appropriate to assess issues related to Mr. Barket's communications with the press.

### Background

As the Court is aware, the defendant has retained Mr. Barket and his law firm to represent him in this matter.  In addition, because this is a death penalty case, the Court has appointed several attorneys to represent the defendant as Learned Counsel.  Upon the request of Learned Counsel, the Court appointed Bobbi Sternheim, Esq., to explore whether Mr. Barket is subject to any actual or potential conflicts with the defendant and to represent the defendant in any *Curcio* proceedings.  After interviewing the defendant and reviewing defense materials, Ms. Sternheim issued a report (the "Report"), *ex parte* and under seal, which described three areas that possibly raise conflict issues but did not specifically identify actual or potential conflicts between the defendant and Mr. Barket.  The Report's three areas of concern are: (1) Mr. Barket made statements to the press indicating that the defendant had information about Jeffrey Epstein's suicide and conditions at the Metropolitan Correctional Center ("MCC"); (2)  Mr. Barket assisted in removing a note from the MCC that Epstein appears to have written before his first suicide attempt (the "Epstein Note" or "Note"); and, (3) Mr. Barket and another lawyer at his firm

communicated with the defendant over a contraband cellphone, which MCC staff later seized from the defendant.

We have reviewed the Report, a response submitted by Mr. Barket (the "Response"), and submissions to the Court and transcripts of Court conferences that defense counsel provided to us, which are listed in Anthony Ricco's February 2, 2020 letter to the Court. We have also discussed the issues addressed in the Report with Ms. Sternheim. We have specifically decided not to obtain and review internal communications among defense counsel (texts, emails, and basecamp communications) in order to avoid intruding further into attorney-client privileged material and because we have determined a review of those communications would not alter our analysis. Based on our review of all these materials and our conversations with Ms. Sternheim, we respectfully request the following as to each of the identified areas of concern.[1]

### Areas of Concern Raised

#### A. Statements to the Press

According to the Report, Mr. Barket has made various statements to the press. The statements related to conditions at the MCC and threats MCC personnel purportedly made against the defendant. They also involved denials of allegations that the defendant assaulted Epstein, mention that the defendant and Epstein had an amicable relationship while sharing a cell, and assertions that the defendant has information pertaining to Epstein's attempted suicide and death. The Report suggests that these statements could be used as adoptive admissions adverse to the defendant's interest during the penalty phase of this case, including by negatively affecting presentation of evidence of positive prison adjustment. The statements could also create the potential for Mr. Barket to be questioned regarding Epstein's suicide and death. The Report further suggests that certain statements may have contained attorney-client privileged material. (Report at 3).

We respectfully request a brief *Curcio* inquiry of the defendant into his consent to Mr. Barket's disclosure of information to the press. Based on our review of some of the statements, it does not appear that Mr. Barket necessarily disclosed attorney-client privileged information. In any event, Mr. Barket has asserted that the defendant authorized him to speak to the press and the Report indicates that the defendant is willing to waive the privilege to the extent it is implicated. Thus, we request that the Court advise the defendant that Mr. Barket has made statements to the press, which could have at least three negative effects on the defendant: First, Mr. Barket may have disclosed attorney-client privileged material. Second, Mr. Barket's statements could be used against the defendant and negatively affect the penalty phase of this case, including by undermining evidence of positive prison adjustment. Third, Mr. Barket's statements could lead to questioning of both Mr. Barket and the defendant by authorities about Epstein's suicide and death. After advising the defendant of these possible consequences of Mr. Barket's statements to the press, we further request that the Court ask the defendant whether he authorized Mr. Barket's disclosures to the press, as described in the Response (Response at 10-

---

[1] The Report discusses the applicable legal standard relating to conflicts and *Curcio* hearings. (Report at 13-16).

11), waived the attorney-client privilege as to any statements that may have implicated it, and agrees to waive any post-conviction argument, on appeal or otherwise, based on any potential conflict arising from those disclosures.

## B.  The Epstein Note

As recounted in the Report and Response, the defendant found the Epstein Note, which appears to contemplate suicide, in a book in his cell, after Epstein attempted suicide and was removed from the cell, and after MCC staff searched the cell and presumably failed to discover the Note.  The defendant told Mr. Barket about the Note and Mr. Barket instructed him to give it to the next lawyer who came to visit him.  Mr. Barket contacted another attorney on the team and that attorney met with the defendant and removed the Note from the MCC.[2]  The main concern is that Mr. Barket assisted in the removal of the Note, which may have violated MCC rules, and then failed to disclose the note to authorities, which may have other negative consequences for the defendant and Mr. Barket.[3]  Thus, there could be a conflict between Mr. Barket and the defendant if early disclosure of the Note was in the defendant's best interest and Mr. Barket decided not to disclose it (and continues to withhold it from co-counsel and the Government) because he was concerned he would be subject to investigation for assisting in its removal.

The Report—which identified the Epstein Note as "the crux of concern regarding conflict" (Report at 10)—cites various potential reasons why it was in the defendant's interest to disclose the Note, which give rise to the implication that Mr. Barket's failure to disclose it was to protect his own interests and not in the best interests of his client.  For example, the Report avers that the Note was relevant and material to investigations into Epstein's suicide attempt and subsequent successful suicide that this Office, the MCC, and other agencies were conducting. Thus, the Report suggests, the Note's removal and non-disclosure to investigators amounted to the withholding of relevant evidence and made Mr. Barket and other members of the defense team potential witnesses in those investigations.  The Report also observes that MCC staff could potentially argue that if the defense had disclosed the Note, they would have decided to keep Epstein on suicide watch, which could have prevented his death. Thus, the Report suggests that the decision not to turn over the Epstein Note could subject the defendant and Mr. Barket to wrongful death allegations and civil suits, as well as potential criminal liability for obstruction of justice.  (Report at 9-10).

In connection with the defendant's case, the Report suggests that the failure to disclose the Epstein Note was not in the defendant's interest and could negatively affect the penalty phase.  By contrast, disclosure of the Epstein Note to the Government could expose Mr. Barket to investigation by this Office and professional disciplinary authorities, creating a potential

---

[2] The Report considers the Note to be "contraband," but we do not think it falls clearly within that category.  Its removal from the MCC may have been a violation of MCC rules but that also does not appear to be clear-cut.

[3] There is also concern that Mr. Barket failed to inform co-counsel about his involvement in the removal of the Note from the MCC and that he did not want the defendant to disclose the Note to Ms. Sternheim.

conflict between the defendant and Mr. Barket. Further, the Report suggests Mr. Barket became an unsworn witness to events material to evidence that could be presented in the penalty phase concerning the defendant's prison adjustment. (Report at 9). In sum, the Report concludes that disclosure to the Government of the Epstein Note and the circumstances surrounding its removal invited a serious potential conflict between the defendant and counsel. (Report at 8-10).

The Sternheim Report recounted a reasonable explanation, which was in the interest of his client, for why Mr. Barket [and presumably the defendant] had a lawyer remove the Note from the MCC, rather than provide it to MCC authorities immediately. According to the Report, prior to telling Mr. Barket about the Note, the defendant informed an MCC officer about the Note and expressed the concern that if he gave it to MCC staff, they might not properly safeguard it. Apparently, the MCC officer tacitly agreed. (Report at 7). Further, Mr. Barket's Response to the Report explained why he did not turn over the Note to authorities immediately after he had it removed from the MCC. According to Mr. Barket, he made the strategic decision to try to verify that Epstein had written the Note, prior to turning it over to any authorities. (Response at 5). There can be little doubt that if he had turned over a Note claiming it to be an Epstein suicide note and it turned out not to have been written by Epstein, there would almost certainly have been negative consequences for his client. Thus, there appear to be reasons that are consistent with the defendant's interests, for removing the Note from the MCC and not immediately turning it over to authorities.

While Mr. Barket has not explained why he continues to withhold the Epstein Note from co-counsel and the Government, other than the implication that his client does not want him to do so, the Note appears to have little value to the defense, given the timing of the events surrounding Epstein's attempted suicide and suicide. First, it seems unlikely that early disclosure of the Note would have prevented Epstein's death or had a material impact on the investigations surrounding his attempted suicide and later death. By the time the defendant discovered the Note and gave it to his lawyer, Epstein had already tried to kill himself. Epstein's attempted suicide was likely to be a far more substantial warning that he might try to kill himself again than the Note he wrote before that attempted suicide. Thus, it does not seem likely that the Note would have changed anyone's decision to take Epstein off suicide watch, a controversial decision that ultimately led up to Epstein's successful suicide. However, the fact that the Note does not appear to be a significant piece of evidence in any investigation of Epstein's death does not foreclose the possibility that an investigation would take place or that lawsuits could be filed and that Mr. Barket's and the defendant's interests could diverge. For example, in administrative or civil litigation, including wrongful death litigation, the defendant could take the position that he relied on Mr. Barket's legal advice and Mr. Barket – not the defendant – was at fault for not disclosing the Note. Mr. Barket could argue that his client refused to authorize him to release it.

Further, to the extent it has been suggested that there could be a criminal investigation of Mr. Barket relating to Mr. Barket's involvement in the removal of the Epstein Note, which could create a conflict between the defendant and Mr. Barket, this Office has determined that the facts, as presently known, do not support such an investigation. However, the Report also suggests Mr. Barket could be subject to disciplinary proceedings relating to the Note's removal from the MCC and his failure to disclose it sooner. In that circumstance, Mr. Barket could have an incentive to blame the defendant, thereby creating divergent interests between the two of them.

In addition, under these circumstances, consciously or otherwise, Mr. Barket could seek the goodwill of the Office for his own benefit, which may not always be in the best interest of the defendant.

In light of these potential conflicts related to the Epstein Note, the Government respectfully requests that the Court advise the defendant of these potential conflicts and determine whether the defendant wishes to waive any conflicts arising from the above matters knowingly and voluntarily.

In connection with the penalty phase of this case, as noted above, the Epstein Note appears to have limited value to the defense. In theory, turning it over promptly may have helped in the determination that Epstein had attempted suicide and not that the defendant had assaulted him. But that fact was established a short while later. Turning over the Epstein Note prior to Epstein's death might also have supported an argument in the penalty phase that the defendant tried to save Epstein's life. The defendant already has a more compelling argument to that effect, though, since he found Epstein after his first suicide attempt and alerted MCC staff (and Mr. Barket's apparent strategic judgment was to verify the Note's authenticity first). Thus, whatever evidentiary value the Epstein Note has for the penalty phase – possibly in arguing that Epstein and the defendant had a warm relationship – it does not appear that the timing of the disclosure of the Note will have much, if any, impact. Moreover, it appears unlikely that the Note will become a significant factor in the penalty phase, but if the defense decides to present it, an "unsworn witness" issue may arise. In that circumstance, it seems that the parties could address Mr. Barket's role then, by, among other things, the use of stipulations or the participation of one of the several other attorneys participating in the defense.

## C. **The Contraband Cellphone**

Finally, it has been suggested that there might be a criminal investigation relating to the source of the contraband cellphone that was seized from the defendant, which could potentially create a conflict between the defendant and Mr. Barket. This Office has determined that the facts, as presently known, do not support such an investigation. Thus, we do not believe there is an actual or potential conflict between the defendant and Mr. Barket in connection with the defendant's possession and use of the cellphone.[4]

---

[4] The Report also cites a failure by Mr. Barket to share text messages with the defendant on a contraband cellphone with Learned Counsel. Although it notes potentially applicable ethical guidelines, the Report does not identify how—if at all—that disagreement among counsel presents a conflict issue, and we do not believe that it warrants *Curcio* inquiry beyond that described above.

## Conclusion

In sum, as set forth above, we have not identified any unwaivable conflicts in connection with Mr. Barket's representation of the defendant.  However, we have identified potential conflicts that may arise in connection with the handling of the Epstein Note.  Accordingly, we respectfully request that the Court hold a *Curcio* hearing so that the Court can determine whether the defendant wishes to waive any such potential conflicts.  In addition, we respectfully submit that a limited inquiry is appropriate to assess issues related to Mr. Barket's communications with the press. We will be prepared to provide a proposed series of questions for the Court to ask the defendant should the Court decide to hold a *Curcio* hearing.

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney

By: _____

Margery B. Feinzig/Ilan T. Graff
Assistant United States Attorneys
(914) 993-1903/(212) 637-2296

cc:  Bruce A. Barket, Esq. (By email)
    Anthony L. Ricco, Esq. (By email)
    Michael K. Bachrach, Esq. (By email)
    John A. Diaz, Esq. (By email)
    Bruce D. Koffsky, Esq. (By email)
    Kenneth J. Montgomery, Esq. (By email)
    Bobbi C. Sternheim, Esq. (By email)