**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*United States Courthouse*
*300 Quarropas Street*
*White Plains, New York 10601*

May 22, 2020

**BY EMAIL – To Be Filed Under Seal**

Honorable Kenneth M. Karas
United States District Judge
United States District Court
300 Quarropas Street
White Plains, New York 10601

> Re:   *United States v. Nicholas Tartaglione*
>       **S4 16 Cr. 832 (KMK)**

Dear Judge Karas:

The Government respectfully writes to supplement the assessment set forth in its letter to the Court on March 3, 2020 (the "March 3 Letter") concerning potential conflicts in the representation of the defendant by Bruce Barket, Esq. and other members of the retained counsel team ("Retained Counsel"). Based on the information available at that time, the Government concluded that there were no unwaivable conflicts.

Thereafter, the appointed counsel team ("Appointed Counsel") submitted a lengthy memorandum supported by exhibits, arguing that Mr. Barket and other Retained Counsel have potential and actual conflicts of interest requiring disqualification due to their illegal or improper conduct. They submitted additional facts, the most significant of which, in the Government's view, relates to Retained Counsel's conduct in connection with a contraband cellphone (the "Contraband Cellphone" or "Phone") seized from the defendant at the Metropolitan Correctional Center ("MCC"). Retained Counsel responded with their own memorandum and exhibits, and countered that they have no unwaivable conflicts of interest and have done nothing illegal or improper. In some respects, the accounts of each team of lawyers differ and, in certain areas, we believe these differences require further inquiry.

As the Court is aware, defense counsel – specifically Appointed Counsel – have raised the issues here, not the Government. Consequently, the Government, like the Court, is not privy to information beyond that which defense counsel have provided. We continue to be reluctant to weigh-in on factual disputes among defense counsel relating to the representation of their client, particularly where many of these disagreements appear to tread on strategic judgment calls. However, we recognize that the Government has an interest and a responsibility to assist the Court in the exercise of its discretion to balance the rights of the defendant both to representation of his choice and to conflict-free counsel, as well as to preserve the integrity of judicial proceedings. To that end, our intention is to highlight certain legal authority and assist in assessing factual developments that have occurred since our March 3, 2020 letter.

For the reasons described below, we continue to conclude that, at present, there are no necessarily unwaivable conflicts.  At most, there may be potential waivable conflicts and certain factual areas that we believe warrant further inquiry to determine whether they give rise to actual conflicts.

I.  <u>**Applicable Law**</u>

A.  <u>**District Courts' Authority in Making Sixth Amendment Determinations**</u>

Defense counsel and Ms. Sternheim have provided the Court with legal authority setting forth the contours of the defendant's right to counsel of his choice, conflict-free counsel, and the *Curcio* process.  While the facts here are unique, given the difficulties and the uncertainties involved whenever a conflict has yet to fully materialize, a district court needs to rely on its "instinct and judgment based on experience in making the [disqualification] decision." *Wheat v. United States*, 486 U.S. 153, 163 (1988).  Although judges "must recognize a presumption in favor of petitioner's counsel of choice," the evaluation of whether "the facts and circumstances" of a particular case evince a conflict so serious as to be unwaivable is a discretionary one that is best left "primarily to the informed judgment of the trial court."  *Id.* at 164.

Two important interests may impose limits on a defendant's right to waive attorney conflicts: (1) "the essential aim of the [Sixth] Amendment," which is "to guarantee an effective advocate for each criminal defendant," and (2) the "independent interest" of federal courts "in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them."  *United States v. Cain*, 671 F.3d 271, 294 (2012), *quoting Wheat,* 486 U.S. at 159-60.  These interests, as well as the "potential for gamesmanship" by a defendant who waives a conflict only to later claim ineffective assistance, weigh heavily in favor of affording the district court "substantial latitude in refusing waivers of conflicts of interest not only in those rare cases where an actual conflict may be demonstrated before trial, but in the more common cases where a potential for conflict exists which may or may not burgeon into an actual conflict as the trial progresses."  *United States v. Cain*, 671 F.3d at 294, *quoting Wheat*, 486 F.3d at 163.

"An attorney has an actual, as opposed to a potential, conflict of interest when, during the course of the representation, the attorney's and defendant's interests diverge with respect to a material factual or legal issue or to a course of action."  *United States v. Schwarz,* 283 F.3d 76, 91 (2d Cir.2002) (internal quotation marks omitted).  The category of unwaivable conflicts of interest is a "very narrow" one.  *United States* v. *Perez*, 325 F.3d 115, 126 (2d Cir. 2003).  The Second Circuit has observed that the Supreme Court's decision in *Wheat* "dictated" a "deferential approach," recognizing district courts' "broad latitude in making a decision whether to disqualify a defendant's chosen counsel."  *Cain*, 671 F.3d at 294, *citing United States v. Fulton,* 5 F.3d 605, 614 (2d Cir. 1993).[1]  A district court's disqualification of defense counsel for

---

[1] In discussing the deference accorded district judges, the Second Circuit observed:

> [C]onsistent with the deferential approach dictated by *Wheat*, we have identified only two post-*Wheat* cases in which we reversed a trial court's decision with respect to disqualification. Moreover, given the Court's admonition that `the essential aim

a conflict of interest is reviewed for abuse of discretion. *United States v. Zichettello*, 208 F.3d 72, 104 (2d Cir. 2000) (citations omitted).

As Judge Raggi explained in *United States v. Perez*, opinions in *United States v. Fulton*, and *United States v. Schwarz* illustrate the "very narrow" category of cases in which the Second Circuit has held attorney conflicts to be unwaivable. *Perez*, 325 F.3d at 126. In *Fulton,* a prosecution for conspiracy to possess and import heroin, a government witness had implicated the defendant's trial counsel in related heroin importation. *Id.* That accusation meant that the attorney needed to be concerned not only with the interests of the defendant but also with the attorney's own "'personal reputation, and more than that, the potential that he himself might be accused of a crime,'" *Perez*, 325 F.3d at 126, *citing Fulton*, 5 F.3d at 608 (internal quotation marks omitted). As a consequence, the Second Circuit concluded that there was an actual conflict of interest so severe as to amount to *per se* ineffective assistance. The attorney's self-interest in avoiding criminal charges or reputational damage was so powerful as to "affect virtually every aspect of [counsel's] representation of the defendant," and to be of "a different character than other conflicts." *Perez*, 325 F.3d at 126, *citing Fulton*, 5 F.3d at 613.

In *United States v. Schwarz*, defense counsel represented one of a number of police officers who were prosecuted in connection with the assaults of Abner Louima *en route* to and inside a police precinct. *Id.* Defense counsel's firm also represented the Policeman's Benevolent Association ("PBA"), a defendant in a civil suit filed by Louima, with which the firm had substantial financial arrangements. *Id.* Although the firm did not represent the PBA in the civil suit, the Second Circuit found that the firm's financial arrangements with the PBA gave defense counsel a powerful interest in his own financial preservation and a significant incentive to protect the PBA's interests, even where they conflicted with the interests of Schwarz. *Id.* at 126-27. The Second Circuit held that counsel's representation of Schwarz conflicted with his ethical obligations to the PBA and was against his own substantial self-interest. *Id.* at 127, *citing Schwarz*, 283 F.3d at 96. It further held that the conflict generated by counsel's self-interest was so severe as to give rise to "'the distinct possibility….that, at each point the conflict was felt, [counsel] would sacrifice Schwarz's interests for those of the PBA.'" *Id.* at 127, *quoting Schwarz*, 283 F.3d at 96. Thus, the Second Circuit concluded that "no rational defendant in Schwarz's position would have knowingly and intelligently desired [that attorney's] representation," and that "'*Fulton*'s rationale with respect to when an attorney's self-interest renders a conflict unwaivable'" was "'equally applicable to the unusual facts' of the *Schwarz* case." *Id. quoting Schwarz*, 283 F.3d at 96.

---

of the Amendment is to guarantee an effective advocate for each criminal defendant,' it is unsurprising that both of those cases arose in the context of a defendant's post-conviction challenge to the district court's *refusal* to disqualify the conflicted attorney. (Citations omitted). It thus appears that although we have considered challenges to the disqualification of counsel on the basis of a per se conflict in at least four cases since *Wheat,* we have never concluded that the trial court abused its discretion in disqualifying a conflicted attorney.

*Cain*, 671 F.3d at 294-95.

When an attorney engages in wrongful conduct related to the charge for which the client is on trial an unwaivable conflict occurs. *Fulton*, 5 F.3d at 609 (citation omitted); *see also United States v. Jones*, 381 F.3d 114, 120 (2d Cir. 2004) (finding an unwaivable conflict where representation would be tainted by attorney's own "self-interest in avoiding criminal charges" and by the possibility the government would subpoena the attorney to testify at trial regarding the illicit relationship between his two clients); *Gov't of the Virgin Islands v. Zepp*, 748 F.2d 125 (3d Cir.1984) (noting that despite no clear wrongdoing on lawyer's part, he had to withdraw because he was present for destruction of contraband in defendant's home and provided testimony against his client through a stipulation); *United States v. Elder*, 311 F. Supp. 3d 589, 596-97 (E.D.N.Y. 2018) (finding an unwaivable conflict where counsel was under investigation for helping his client avoid arrest); *cf. United States v. Anglin,* 470 F. App'x 511, 513 (7th Cir. 2012) (implicitly approving waiver where both attorney and defendant were being investigated for smuggling contraband around the prison). Allegations of wrongdoing must be supported by some credible evidence and disciplinary or criminal charges must be more than mere hypotheticals, such that the attorney has "reason to fear that vigorous advocacy on behalf of his client would expose him to criminal liability or any other sanction." *United States v. Schulte*, 2020 WL 534508, *4 (S.D.N.Y. Feb. 3, 2020), *citing Waterhouse v. Rodriguez*, 848 F.2d 375, 383 (2d Cir. 1988).

Using a case-by-case, fact specific approach, district courts may determine that lesser conflicts can be waived. Thus, in *Perez*, the Second Circuit rejected defendant's argument that his attorney's representation of both he and another defendant at separate trials created unwaivable conflicts. 325 F.3d at 128-29. Citing *Schwarz*, the defendant argued his attorney had unwaivable conflicts because, among other things, he was "blinded by his own substantial self-interest in that he stood to gain a considerable amount of monies if he remained counsel to both defendants." *Id*. at 127. The Second Circuit rejected the argument, finding "nothing whatever to indicate the sort of fiscal self-interest that was present in *United States v. Schwarz." Id.* It also rejected an argument that the attorney's status as a potential trial witness warranted disqualification because any possibility of the attorney testifying was eliminated well in advance of trial. *Id.* at 128-29.

Similarly, in *United States. v. Cunningham*, 672 F.2d 1064 (2d Cir. 1982), a government witness was in a position to testify about a possibly inculpatory statement for which defense counsel was present and the district judge disqualified defense counsel. The Second Circuit reversed, holding:

> In the circumstances, we believe that [defendant's] Sixth Amendment right to be represented by counsel of his own choice is too important to be denied on the basis of a mere, though substantial, possibility. If [counsel] is disqualified now and [witness] is not allowed to testify to [counsel's] alleged statement, [defendant] will have lost his constitutional right for no good purpose. We see no reason why a pretrial hearing cannot be held to determine the admissibility of [witness's] testimony, in order that the balancing task of the court may be done on the basis of a complete record and adequate information.
>
> Accordingly, we vacate the order of the district court disqualifying [counsel] from representing [defendant] at trial and remand the case for a hearing to

determine whether [witness's] testimony will be admissible. If the district court determines that the testimony will be admissible in the government's case-in-chief, it should adhere to its disqualification of [counsel] and his firm as [defendant's] trial counsel. If the court rules that [witness's] testimony would be admissible only in rebuttal of specific arguments that [defendant] might make at trial, [defendant] should be given the opportunity to make an appropriate waiver of his right to present such arguments.

*Id.* at 1075.

Courts have also found that representation by a lawyer with conflicts jeopardizes the integrity of judicial proceedings and that district courts have substantial latitude to reject a defendant's knowing and intelligent waiver on that basis as well. *See, e.g., United States v. Locascio,* 6 F.3d 924, 931-32 (2d Cir. 1993) (court's disqualification of counsel was justified where the attorney acted as "house counsel" to organized crime family, was intercepted on Government wiretaps such that his presence at trial would make him an unsworn witness, previously represented a government witness, and evidence showed he was a potential accomplice as well as a potential witness in one of the defendant's crimes); *United States v. Arrington,* 867 F.2d 122, 129 (2d Cir.1989) (affirming district court's refusal of waiver and disqualification of attorney when the Government informed the court of an alleged plot to silence witnesses and the possible involvement of co-defendant's counsel); *United States v. Ramos*, 350 F. Supp. 2d 413, 427-28 (S.D.N.Y. 2004) (district court disqualification of lawyer in a capital case, when the lawyer was indicted in an unrelated case, citing, among other reasons, the importance of the *appearance* of fairness). So long as the district court is correct in finding that the conflict is severe, *i.e.*, that "no rational defendant would knowingly and intelligently desire the conflicted lawyer's representation, the court is "obliged" to disqualify the attorney. *United States v. Levy*, 25 F.3d 146, 153 (2d Cir. 1994).

Pretrial disqualifications of defense counsel in criminal prosecutions are not immediately appealable. *Flanagan v. United States*, 465 U.S. 259, 269-70 (1984). The Second Circuit has held that, correspondingly, an order denying a disqualification motion is also not immediately appealable. *United States v. Camisa*, 969 F.2d 1428, 1429-30 (2d Cir.1992).

## B. Rule 3.7 of the New York Rules of Professional Conduct

Rule 3.7 of the New York Rules of Professional Conduct, entitled "Lawyer As Witness," addresses conflicts involving lawyers as witnesses and provides:

(a) A lawyer shall not act as advocate before a tribunal in a matter in which the lawyer is likely to be a witness on a significant issue of fact unless:

(1) the testimony relates solely to an uncontested issue;

(2) the testimony relates solely to the nature and value of legal services rendered in the matter;

(3) disqualification of the lawyer would work substantial hardship on the client;

(4) the testimony will relate solely to a matter of formality, and there is no reason to believe that substantial evidence will be offered in opposition to the testimony; or

(5) the testimony is authorized by the tribunal.

(b) A lawyer may not act as advocate before a tribunal in a matter if:

(1) another lawyer in the lawyer's firm is likely to be called as a witness on a significant issue other than on behalf of the client, and it is apparent that the testimony may be prejudicial to the client; or

(2) the lawyer is precluded from doing so by Rule 1.7 or Rule 1.9.

## II.  Discussion

### A.  Statements to the Press

Defense counsel have not provided materially new information regarding Mr. Barket's statements to the press that would change the Government's analysis in its March 3 Letter.  As Appointed Counsel recount, after Epstein's suicide attempt and subsequent suicide, there were news stories focused on each event, some of which contained statements attributed to Mr. Barket relating to poor conditions at the MCC, retaliation against the defendant due to his complaints about MCC conditions, the defendant's relationship with Epstein, and denials of any involvement by the defendant in Epstein's attempted suicide.  These statements may have violated the attorney-client privilege, and thus create a potential conflict that is waivable.  (AC Memo 9-12, 16-20, 64-65).[2]  As we advised in our March 3 Letter, we agree with this assessment.

The one statement that Appointed Counsel argue may not be waivable is Mr. Barket's representation that the defendant "certainly has information that would be very valuable to the investigation [of Epstein's suicide attempt] if they want access to it."  Appointed Counsel believe this statement may pose an unwaivable, *per se* conflict because it may open the door to the Government trial team's learning of the existence of the note the defendant found in the cell he shared with Jeffrey Epstein (the "Epstein Note" or the "Note") after Epstein's suicide attempt but before his eventual suicide, its content, and Mr. Barket's role in removing it from the MCC.  (AC Memo 65-66).  They argue a *per se* conflict may arise if the Government supersedes the indictment to charge the defendant in connection with the removal of the Note and unless the Government is precluded from offering evidence relating to the Note at any phase of the trial, an actual conflict will exist for Mr. Barket.  *Id.*  For the reasons described in the March 3 Letter, and in the next section, we do not believe there is a *per se* or actual, unwaivable conflict with respect

---

[2] Ms. Sternheim came to the same conclusion.  (Report 6).  Retained Counsel contends that he did not breach the privilege or otherwise act inconstant with his client's best interests—and that the issue is instead a matter of personal and strategic disagreement between and among counsel.  (RC Reply 6-7).

to the removal of the Epstein Note from the MCC.  Thus, we do not believe Mr. Barket's statement to the press about the defendant's having "valuable information" about Epstein's suicide attempt creates an actual conflict.  Like the other press statements, it may create a potential waivable conflict, which should be addressed at the *Curcio* hearing.

### B. <u>Removal of the Epstein Note From the MCC</u>

Appointed Counsel argue that the removal of the Epstein Note from the MCC presents both potential and actual conflicts of interest.  They urge that a potential conflict exists because the defendant and counsel together violated Bureau of Prisons ("BOP")/MCC Rules.  In doing so, they assume that: (1) the defendant took the Epstein Note from a book belonging to Epstein, (2) the Note is therefore contraband as defined by BOP/MCC rules and regulations, and (3) the defendant's possession of contraband and its removal from the MCC both violate BOP/MCC rules and regulations.  (AC Memo 67-70).  They further argue that if the BOP finds out about the Note and its removal, it will take the position that the removal adversely impacted its official investigation of Epstein's attempted suicide and contributed to a decision-making process that enabled Epstein's eventual suicide.  Consequently, there is a possibility that this incident could result in criminal charges against the defendant—and the attorneys who removed the Note—for obstructing an agency investigation, in violation of 18 U.S.C. §1505.  In that circumstance, Mr. Barket could not continue to represent the defendant, because their interests would diverge as co-conspirators who could be potential witnesses against each other.  Appointed Counsel posit that since no decision to charge has yet been made, Mr. Barket has a potential conflict.  (AC Memo 70-71).

Appointed Counsel further argue that the defendant's removal of the Epstein Note, with the assistance of his attorneys, directly impacts the penalty phase of the case and creates an actual conflict because, again, the interests of the defendant and Retained Counsel diverge.  According to Appointed Counsel, during the penalty phase, the defendant's lack of future dangerousness, expressed through positive prison adjustment, may be one of his strongest mitigating factors.  (AC Memo 71-72).  Thus, compliance with institutional rules will necessarily be a part of the defense presentation and the Epstein Note may have been a piece of evidence the defense could use to demonstrate such compliance.  The Government, on the other hand, routinely presents the failure to comply with institutional rules to rebut evidence of positive prison adjustment.  *E.g.*, *United States v. Wilson*, 493 F.Supp.2d 512, 513-14 (E.D.N.Y. 2012) (denying defendant's motion to preclude evidence of prison disciplinary violations during the penalty phase of his capital trial).  If the removal of the Note violated the rules, the Government could use it to show the defendant's non-compliance (depending on whether the Government decides to amend its Notice of Intent to include the non-statutory factor of dangerousness) and the lengths the defendant engaged in to break the rules.  Alternatively, the Government could use the evidence to rebut a defense argument that the defendant does not present a risk of future danger because he follows MCC rules.  Therefore, according to Appointed Counsel, the defendant is now at a disadvantage, since the defense will have to argue that the defendant did not abide by prison rules and possibly violated criminal law, but that his conduct was because of the advice Mr. Barket gave him.  (AC Memo 66, 72-73).

In either case, according to Appointed Counsel, Mr. Barket has an unwaivable conflict because he possesses first-hand knowledge and is a potential witness who could be called to

testify by the defense or the Government.  (AC Memo 65-66, 67-71).  In addition, even if he were not called to testify, he would be an unsworn witness.  Appointed Counsel argue that this creates a conflict that cannot be waived, because an attorney cannot be permitted to be an unsworn witness to material facts related to an important mitigation factor.  (AC Memo 74).  Appointed Counsel argue that Mr. Barket's advice and advocacy are permeated by his own self-interest and that no rational defendant would knowingly and intelligently be represented by a lawyer guided largely by a desire for self-preservation.  Even short of that, they argue, the Court has the discretion to disqualify him based on its independent interest in ensuring the integrity of trials.  In their view, no rational defendant would want to be represented by an attorney who, with respect to the Epstein Note, exposed his client to potential further prosecution, cannot participate in critical aspects of his client's penalty phase, and is conflicted from advising his client on whether to abandon or forgo critical penalty phase defenses.  (AC Memo 77-78).

Retained Counsel's reply argues that Appointed Counsel are wrong on the facts and the law, because their analysis is based on their faulty assumption that the defendant stole the Epstein Note out of a book belonging to Epstein.  Retained Counsel assert that the defendant found the Note in his *own* book, presumably left there for him by Epstein.  The Epstein Note therefore does not meet the definition of "contraband" and its removal from the MCC did not violate criminal law or administrative agency rules.[3]  Thus, there is no actual or potential conflict due to the possibility of prosecution.  (RC Reply 8-20).

Retained Counsel further argue that the claim that Retained Counsel has an unwaivable conflict at the penalty phase also fails because it is based on the faulty assumption that Mr. Barket's advice regarding the removal of the Epstein Note would constitute failure to comply with institutional rules and require the defendant to blame Retained Counsel.  Retained Counsel asserts that because his conduct did not involve criminal or improper conduct, the defendant will not be in a position of having to blame Retained Counsel and Retained Counsel will not be in a position of either having to testify or being an unsworn witness, thereby avoiding any unwaivable penalty-phase conflict.  (RC Reply 19).  Retained Counsel concedes the possibility of a waivable conflict, about which the defendant should be questioned and permitted to waive if he so chooses.  (RC Reply 20).

While the arguments relating to the Epstein Note have become more focused, the facts have not materially changed since our previous submission.  As we advised in the March 3 Letter, we do not believe there is an actual conflict with respect to the possibility of a criminal prosecution relating to the Epstein Note.  (March 3 Letter 4).  Appointed Counsel and Retained Counsel dispute whether the defendant found the Note in a book belonging to Epstein or in his own book.  Since the defendant is the only person who has first-hand knowledge of the Note's provenance, we do not believe further factual inquiry is appropriate.  But, even if Appointed Counsel's account is correct and the defendant took the Note from Epstein's book, we do not believe that, based on a reasonable reading of the BOP/MCC rules presented, the Note can be considered contraband.  For the reasons already stated in the March 3 Letter, we also do not believe the facts support a prosecution under 18 U.S.C. §1505 for obstruction of an agency

---

[3] Retained Counsel also argue that the *mens rea* necessary to be guilty of obstruction was not present here.  (RC Reply 12-15).

investigation or that it is likely that there would be disciplinary or other proceedings against the lawyers in connection with the Epstein Note.  However, because we cannot predict every possible potential inquiry that might take place, as we advised in the March 3 Letter, there may be a remote possibility of some kind of disciplinary inquiry at some point that might create a potential, waivable conflict. (March 3 Letter 5).

With respect to the penalty phase of the case, we do not think Mr. Barket has an actual conflict, because we do not believe it is likely that he would be called to testify or be placed in the position of being an unsworn witness.  Counsel all agree that at the penalty phase the defense may decide to present evidence establishing that the defendant is not a future danger in that he complies with institutional rules.  And, to the extent the Government has evidence to the contrary, it might wish to present that evidence either in its case in chief or in rebuttal to defense evidence.  As recounted in the March 3 Letter, the defense never turned over the Epstein Note to authorities.  Thus, it is difficult to see how the Note could be used by the defense as positive evidence of prison adjustment, regardless of how it was removed from the MCC.  (March 3 Letter 4).  However, even if the defense were to determine that the Note could be helpful to the defense during the penalty phase, the defense would not need to call Mr. Barket as a witness.[4]

It also seems highly unlikely that the Government would seek to offer the Epstein Note at the penalty phase as evidence of future dangerousness.  Theoretically, the Government would have to argue that, although not strictly improper, the way the defendant obtained the Epstein Note (assuming he took it from Epstein's book) and the covert method through which it was removed from the MCC, show the defendant's failure to follow institutional rules.  There is no actual evidence however, that the defendant obtained the Note in an improper manner.  The question of where the defendant found the Note has arisen out of counsel's differing recollections of attorney-client privileged conversations with the defendant.  Thus, even if the Government trial team were to find out about the Note, the conversations between the defendant and counsel are privileged and, short of establishing some crime/fraud or other exception, these conversations with counsel would not be accessible to the Government trial team, let alone admissible at trial.  Further, as described above, the removal of the Note from the MCC does not seem to have violated institutional rules.  Accordingly, on its own, the Epstein Note does not appear to be probative of the defendant's compliance with institutional rules.  In sum, because we do not believe it is likely that Mr. Barket would be called as a witness at the penalty hearing or become an unsworn witness in connection with the Epstein Note, we do not believe he has an unwaivable conflict on those grounds.[5] *Cf. Cunningham*, 672 F.2d at 1075 ("[Defendant's] Sixth Amendment right to be represented by counsel of his own choice is too important to be denied on the basis of a mere, though substantial, possibility.").

---

[4] Throughout the defense submissions, counsel raise factual and interpretive disputes that appear to us to be more in the category of disputes as to defense strategy than conflict issues. We do not address those issues because we do not believe it is appropriate for us to weigh in on them.  One such issue relates to Mr. Barket's decision not to provide the Epstein Note to authorities.

[5] The defense would likely need the testimony of Mr. Weider, though. Thus, his relationship with Mr. Barket's firm is relevant to this inquiry and we discuss it below with respect to the Contraband Cellphone.

### C. Possession and Use of a Contraband Cellphone

MCC staff confiscated a cellphone from the defendant (the "Contraband Cellphone" or "Phone"). Although a forensic report of the Phone's content does not reveal communications with defense counsel, Retained Counsel disclosed that they had certain text communications with the defendant. Appointed Counsel assert that Mr. Barket, Ms. Leisenring, and Mr. Weider all have unwaivable actual conflicts with respect to the defendant's use of the Contraband Cellphone. (AC Memo 79). They argue that the defendant committed a crime (18 U.S.C. § 1791) by possessing and using the Phone. (AC Memo 79-80). Therefore, Mr. Barkett, Ms. Leisenring, and Mr.Weider, all of whom received texts from the defendant over the Phone, aided and abetted the offense by either facilitating the phone's use or not immediately ending it. Consequently, Appointed Counsel assert, all three could be subject to prosecution or other adverse consequences and therefore have an unwaivable actual conflict, because their interests diverge from the defendant's. (AC Memo 79-82).

Appointed Counsel further argue that any attorney who communicated with the defendant over the Contraband Cellphone also has an actual conflict, because he/she will be needed as a witness at the penalty phase of the trial. Similar to the Epstein Note, if called by the Government, he/she will be needed to establish future dangerousness. If called by the defense, he/she will be needed to rebut the claim of future dangerousness and to establish the defendant's conduct was the result of poor judgment of his lawyers because they fostered or encouraged the defendant's use of the phone. (AC Memo 82-83).

Retained Counsel dispute Appointed Counsel's view of both the law and the facts. According to Retained Counsel, 18 U.S.C. § 1791 does not criminalize the *use* of a contraband phone, only its possession. Further, since there is no evidence that Retained Counsel aided and abetted the defendant's *possession* of the Contraband Cellphone, there is no potential for accomplice liability. (RC Reply 21-22). Even assuming, *arguendo*, that anyone who received a communication from a contraband cellphone could be criminally liable under §1791, Retained Counsel did not aid and abet any crime or misconduct because they did nothing to foster the defendant's use of the Phone, which they promptly sought to end. In particular, they advised him not to use it, ignored text messages, refused to respond, and otherwise attempted to terminate such communications. They point out that they were effective since, other than one text on June 22, 2019, the defendant did not text Ms. Leisenring for the 47 days prior to when it was seized. (RC Reply 22-23). Thus, Retained Counsel claim that there is no unwaivable conflict tied to the accusation that Retained Counsel aided and abetted a crime with respect to the Contraband Cellphone. (RC Reply 24).

Retained Counsel also dispute that either the Government or the defense would need to call them as witnesses at the penalty phase in connection with the Contraband Cellphone, claiming that since the Government could establish the defendant's use of the Phone through the Phone and records, there would be no need to call people who simply received communications. Further, to the extent the defense would want to counter the Government's evidence, it simply would not make any sense for him to try to distance himself from the recipients of the calls and he would likely explain his reasons for having the phone. (RC Reply 24).

Preliminarily, the Government previously indicated that this Office had determined that the facts, as known at that time, did not support a criminal investigation of the defendant. (March 3 Letter 5). We agree that Title 18, United States Code § 1791 criminalizes the possession of the Contraband Cellphone but we have not found a case in which anyone, much less a defendant's attorney, has been prosecuted for aiding and abetting the *use* of a Contraband Cellphone. Thus, on the present facts, it does not appear that Retained Counsel are implicated in a crime. Accordingly, we continue to believe that the facts do not support a criminal investigation of the defendant or Retained Counsel and that Retained Counsel's interests do not diverge with the defendant's so there is no actual conflict on that score.

Assuming, *arguendo*, that encouraging or fostering the defendant's use of the Phone could constitute a violation of § 1791, or that the Government could simply argue at the penalty phase that it is inappropriate conduct, or that the defendant manipulated Retained Counsel into using the Phone, the record does not support those arguments as to Ms. Leisenring or Mr. Barket. There is, however, insufficient information to determine whether Mr. Weider could theoretically be liable under that theory, or the focus of a Government argument of impropriety and an open question regarding whether his conduct could be imputed to the lawyers at Mr. Barket's firm.

As to Ms. Leisenring, there does not appear to be evidence to establish that she solicited or fostered the defendant's use of the Contraband Cellphone or that the defendant manipulated her into using the Phone. In her affirmation, she identifies the only texts she received from the Phone, asserts that she did not respond to any texts, never solicited or encouraged communications from the Phone, and advised the defendant not to possess or use the Phone to contact her or anyone else. (RC Exh. 40, ¶¶ 1-5). Moreover, she provided redacted screen shots of the text messages received on her phone from the Contraband Cellphone and they show no responses from her phone. (Attachment to RC Exh. 40). Other than the presently unknown content of the text messages, there is no evidence that she encouraged the defendant to use the Phone or was manipulated by him to use the Phone. Nevertheless, to be certain, the Government respectfully submits that the Court should conduct an inquiry and make findings of fact as to whether the content of the text messages reflect evidence that Ms. Leisenring encouraged or solicited the defendant's use of the Phone or that the defendant manipulated Ms. Leisenring into using the Phone.[6]

---

[6] While we have not found a case squarely on point in this Circuit, we do not believe that the attorney-client privilege protects text messages sent or received over a contraband cellphone. The Second Circuit has held that prisoners do not have a Fourth Amendment right of privacy in their cells. *Willis* v. *Artuz,* 301 F.3d 65, 68-69 (2d Cir. 2002). Applying that same principal, in *United States v. Boyce*, 2015 WL 856943, *5-6 (D.Vi. Feb. 26, 2015), the Court held that a prisoner did not have a reasonable expectation of privacy in the contents of a contraband cellphone, including the incoming and outgoing text messages. *See also United States v. Nava*, 2018 WL 5624731, at *4 (N.D. Ga. Aug. 9, 2018) ("If there is no reasonable expectation of privacy in statements made (and recorded) in the back seat of a police car, there surely can be no expectation of privacy in statements made on a contraband phone from a prison cell.") (citing *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984)); *United States v. York*, 2017 WL 5068143, at *4 (E.D.Cal. Sept. 29, 2017) (no expectation of privacy for communications over contraband cellphone); *United States v. Savala*, 2015 WL 468352, *1 (S.D.Cal. Feb. 3, 2015) (no

The evidence suggests Mr. Barket also did not solicit or foster the defendant's use of the Contraband Cellphone. His affirmation states that he has never encouraged a client in jail to communicate with him on a contraband phone and did not do so here. (RC Exh. 41, ¶ 48). Once he learned of the defendant's use of the Contraband Cellphone, he told him "in the strongest terms to stop and to discard the phone." (RC Exh. 41 ¶ 50). He also warned the defendant that he would get caught, and described the adverse consequences he would suffer, including that it would harm his penalty phase defense. He further told the defendant not to contact him on the Phone. The defendant did so on one date; they spoke shortly after and the defendant never did so again. (RC Exh. 41 ¶ 50). According to his affirmation, Mr. Barkett has text messages received on his cellphone from the defendant that he is willing to share with "anyone who wants to see it." (RC Exh. 41, ¶ 54). He further states that there was "one very brief exchange on June 3, 2019" and the defendant never texted or called him before or after that. (RC Exh. 41 ¶ 55). Mr. Barket claims that he has not turned over the texts because they are privileged and his client has not given him permission to reveal their content. (RC Exh. 41, ¶¶ 56, 59). However, he also offers to share them. (RC Exh. 41, ¶ 54). Consistent with our request with respect to Ms. Leisenring's undisclosed texts, the Government respectfully submits that the Court should also conduct an inquiry and make findings of fact as to whether the content of the text messages on Mr. Barket's phone reflect evidence that he encouraged or solicited the defendant's use of the phone or that the defendant manipulated him into using the Phone.

There is insufficient information to determine whether Mr. Weider encouraged or solicited the defendant's use of the Contraband Cellphone or whether the defendant manipulated him into using the Phone. Retained Counsel have chosen not to submit an affirmation from Mr. Weider. In a letter to the Court, Mr. Barket advised that Mr. Weider received text messages from the Phone. However, Mr. Weider replaced his own cellphone on July 23, 2019 and the text

---

expectation of privacy in content of contraband cellphone); *United States v. Rodriguez*, 2015 WL 468358, at *1 (S.D. Cal. Feb. 3, 2015) ("No court has ruled that a prison inmate has a reasonable expectation of privacy for communications he makes by cellular telephone."); *cf. United States v. Stanishia*, 687 F. App'x. 183, 186 (3d Cir. 2017) ("[A] cell phone in a prison poses serious institutional security risks.").

In *Williams v. Raynor Rensch & Pfieffer*, 2015 WL 2127095, *12 (D. Neb., May 6, 2015), in the context of civil litigation relating to a criminal prosecution, the court held that a prisoner had no expectation of privacy in calls to his attorney over a contraband cellphone. There, the court balanced the prisoner's interest in privacy and the institution's need for security and specifically found that the defendant's interest in privacy was outweighed by the institution's security interests in not having prisoners using cellular phones. In *United States v. Mejia*, 655 F.3d 126, 134 (2d Cir. 2011), when analyzing the factors that establish whether a communication should be protected, the Second Circuit found that where the defendant was aware his calls were being recorded and there was no indication he could not have contacted his attorney without being monitored, he had no reasonable expectation of confidentiality in his communications. Here too, the defendant knew his possessions, including the Contraband Cellphone, could be confiscated and, by contrast, that at the MCC, prisoners can make legal calls without being recorded. Thus, the defendant had no reasonable expectation that the text messages he elected to send to attorneys over the Contraband Cellphone would remain private.

messages "did not transition to Mr. Weider's new cellphone.  The old cellphone was traded in when the new phone was obtained."  (RC Exh. 38, 2-3).  Thus, presently, the only information in the record about whether Mr. Weider encouraged the defendant to use the Contraband Cellphone or was manipulated by the defendant into using the Phone is in Mr. Barket's statement to Appointed Counsel that the defendant and Mr. Weider had texted each other "probably hundreds of times," (AC Memo 42-43, 94), and Mr. Barket's representations to the Court.  Unlike Mr. Barket and Ms. Leisenring, Mr. Weider clearly responded to the defendant's texts.  Mr. Weider may be the only one, other than the defendant, who could shed light on this question.

The Court should conduct an inquiry of Mr. Weider in connection with his use of the Phone.  The information he can provide may affect his status in the case as well as the status of Retained Counsel.  Presently, Mr. Weider's relationship with Mr. Barket's firm is not clear.   In a letter to the Court on March 13, 2020, Mr. Barket represented that Mr. Weider was "not a member or an employee" of his firm and "never has been."  He further represented that Mr. Weider signed the protective order governing discovery in this case and "[w]hile he has not played any formal role in the defense, he has been consulting with [the defendant] about his case since it has commenced."  (RC Exh. 38, 2 n. 2).  In his Affirmation, Mr. Barket states that Mr. Weider does not work for Mr. Barket's firm.  (RC Exh. 41, ¶ 31).  Appointed Counsel assert, however, that Mr. Barket told them Mr. Weider was "of counsel" to his law firm in relation to this case although he did not have a written "of counsel" agreement.  (AC Memo 28-30, 41-42, 81, n.19; *see also* Report 11).

Mr. Weider's relationship with Mr. Barket's law firm is relevant to the inquiry because, among other things,  Rule 3.7(b)(1) of the New York Rules of Professional Conduct bars a lawyer from acting as an advocate before a tribunal in a matter if another lawyer in the lawyer's firm is likely to be called as a witness on a significant issue other than on behalf of the client, and it is apparent that the testimony may be prejudicial to the client.  Consequently, if Mr. Weider has information about the communications over the Contraband Cellphone that could result in his being called as a witness during the penalty phase, he would have a conflict with the defendant that could be imputed to Mr. Barket and to Ms. Leisenring.  Accordingly, the Government respectfully submits that the Court should conduct an inquiry and make factual findings to clarify Mr. Weider's relationship with Mr. Barket's firm and determine whether he has additional information about his text communications with the defendant.

In sum, because the record currently suggests that Mr. Barket and Ms. Leisenring are not implicated in the crime of aiding and abetting possession of a Contraband Cellphone or of aiding and abetting the use of that Phone, we do not believe they have actual conflicts based on divergent interests with the defendant.  There also does not appear to be evidence to support an argument that they acted improperly with respect to the Phone.  We cannot, however, make that assessment regarding Mr. Weider without more information about his texts with the defendant.

Absent evidence that Retained Counsel fostered or encouraged the defendant to use the Contraband Cellphone, should the Government trial team decide to offer evidence of the defendant's possession and use of the Contraband Cellphone during the penalty phase, it can establish those facts through phone records, testimony relating to the forensic investigation of the Phone, and testimony of the official that found and seized the Phone.  Similarly, absent evidence that the defendant manipulated Retained Counsel into using the Phone, the Government will not

be able to make that argument and there is no reason for the Government to call the attorneys as witnesses.  If the Government does not argue that the defendant manipulated Retained Counsel into using the Phone, the defense will not have to counter that Retained Counsel fostered or encouraged the use of the Phone and the defense will have no need to call them as witnesses to establish the contrary. Thus, there does not appear to be a conflict relating to their status as potential witnesses or their becoming unsworn witnesses.

If it turns out, however, that Mr. Weider encouraged or fostered the defendant's use of the Contraband Cellphone and Mr. Weider is in fact associated with Mr. Barket's firm, Retained Counsel may have a potential conflict, arising from Mr. Weider's status as a possible penalty-phase witness.[7]  Determination of whether that conflict is waivable would turn on the particulars of Mr. Weider's encouragement with respect to the Contraband Cellphone.

## D.  Undisclosed Text Messages

Appointed Counsel argue that Mr. Barket may possess a conflict with respect to the substance of text messages transmitted using the Contraband Cellphone.  However, Mr. Barket has refused to disclose them to Appointed Counsel so they cannot determine whether the text messages contain information that could form the basis of a conflict.  (AC Memo 89-90).  Retained Counsel is concerned for several reasons. First, Appointed Counsel provided them with certain screen shots of texts that, at the time, counsel believed were texts between the defendant and his wife.  In one text, the defendant appeared to be threatening his wife and referenced the name "Bruce," which could possibly refer to Mr. Barket, and could signal that Mr. Barket was involved in threats against the defendant's wife.  Second, in connection with their attempts to gather evidence relating to the Contraband Cellphone in preparation for the penalty phase, Appointed Counsel have repeatedly asked Retained Counsel to provide them with any texts they have received from the defendant.  Retained Counsel have refused to turn over their texts with the defendant on the ground that the defendant has instructed them not to turn them over to Appointed Counsel.  Third, Appointed Counsel learned from Mr. Barket and Ms. Leisenring that Mr. Weider had had hundreds of text communications with the defendant and these messages are not available.  The combination of these events have given rise to suspicion that text messages Retained Counsel are refusing to disclose to Appointed Counsel may implicate the defendant and Retained Counsel in criminal activity, thereby creating an actual conflict.  (AC Memo 90-94).

Retained Counsel counter that they cannot disclose the texts because they are protected by the attorney-client privilege and their client has expressly instructed them not to share them.  (RC Reply 21, n.19).[8]  Further, they urge that Retained Counsel's argument is premised on a mistake because the text Appointed Counsel allege implicates Mr. Barket in misconduct was sent to the defendant's wife by the defendant's mother, not the defendant.  (RC Reply 21, n.19).  In addition to arguing that this renders Appointed Counsel's "argument and speculations meritless,"

---

[7] If Mr. Barket or Ms. Leisenring encouraged Mr. Weider to communicate with the defendant via the Contraband Cellphone, their conduct could be the basis for disciplinary proceedings, which proceedings would themselves present a waivable potential conflict.

[8] For the reasons described above, *see supra* n.6, we do not believe the texts are protected by the attorney-client privilege.

Retained Counsel cite this error as another example of how Appointed Counsel are pursuing an agenda against Retained Counsel, rather than identifying true conflicts.  (RC Reply 21, n.19).

As described above, the Court should conduct an inquiry to determine if any text messages reveal that Retained Counsel encouraged or fostered the use of the Contraband Cellphone.  Further, the text message that refers to "Bruce" and appears to threaten the defendant's wife, seems to have been sent by the defendant's mother, not the defendant, as was originally believed.  However, that confusion alone does not establish that the "Bruce" referred to in the text is not Mr. Barket or that he is not engaged in improper threatening conduct.  This uncertainty provides further basis for inquiry of Mr. Barket, Ms. Leisenring, and Mr. Weider regarding the undisclosed texts' contents.

### E.  Alleged Obstruction of the *Curcio* Proceedings

Finally, Appointed Counsel argue that Mr. Barket has been engaged in a pattern of attempts to obstruct the *Curcio* proceedings and such conduct creates an actual conflict of interest, because it demonstrates that Mr. Barket's interests in remaining on the case have diverged from the defendant's interest in being represented by conflict-free counsel.  (AC Memo 83-84).  Relying on *United States v. Schwarz*, they urge that Mr. Barket's advice and advocacy are so permeated by self-interest in remaining on the case, that no rational defendant would knowingly and intelligently desire to be represented by him and as such, the conflict cannot be waived.  (AC Memo 88).

Appointed Counsel identify the following twelve examples of allegedly obstructive conduct: (1) hiding from Appointed Counsel Retained Counsel's role in the removal of the Epstein Note from the MCC; (2) hiding from Appointed Counsel Mr. Weider's "of counsel" agency relationship with Mr. Barket's firm, or lying to Appointed Counsel and *Curcio* counsel about the existence of such a  relationship if it does not exist; (3) hiding the fact that Mr. Weider removed the Epstein Note at Mr. Barket's request; (4) attempting to convince Appointed Counsel not to request *Curcio* counsel; (5) attempting to delay Appointed Counsel from requesting *Curcio* counsel; (6) filing objections to the appointment of *Curcio* counsel; (7) attempting to convince Appointed Counsel to refrain from informing *Curcio* counsel about the Epstein Note; (8) attempting to convince Appointed Counsel to refrain from opening any door that might lead to the Court learning about the Epstein Note; (9) attempting to reframe the narrative related to his actions and motivations related to the Epstein Note, including his recent claim that the Note was only removed to authenticate it; (10) attempting to convince *Curcio* counsel and Appointed Counsel that he should be the first one to describe to the Court events related to the Epstein Note and the conflict issues, not *Curcio* counsel; (11) claiming to the Court that the defendant has lost trust in Appointed Counsel as a result of Appointed Counsel thwarting or countermanding the strategic decisions of Retained Counsel; and (12) poisoning the defendant's understanding of the *Curcio* process by leading him to believe the request for *Curcio* counsel was anything other than an attempt to protect his Sixth Amendment right to conflict-free counsel.  (AC Memo 84-88).

Retained Counsel deny that Mr. Barket's actions were motivated by an improper desire to conceal his own misconduct or prevent his removal from the case, submit their own account of the events, explain why Mr. Barket thought that the appointment of *Curcio* counsel was unnecessary, and provide additional communications among counsel to support their position.

First, they argue that, consistent with his current position, Mr. Barket believed that Appointed Counsel's arguments that he had violated the attorney-client privilege when he spoke with the press, were incorrect. He also thought Appointed Counsel's insistence on the appointment of *Curcio* counsel was disingenuous and motivated by a desire to either force Retained Counsel to "fall in line" or to find a way to eliminate him. (RC Reply 26-29). Further, the defendant opposed the instant proceeding because, among other things, he was unhappy with Appointed Counsel and worried the proceeding would cause delays. (RC Reply 28).[9]

Second, Retained Counsel argue that Mr. Barket did not believe there was anything improper about his actions with respect to the Epstein Note, he had legitimate strategic reasons for not wanting to disclose it, and Appointed Counsel's account of their communications is inaccurate and logically unsound. (RC Reply 29-32). They also refute the argument that Mr. Barket attempted to "reframe the narrative" relating to his motivations regarding the Epstein Note, including that he wished to authenticate it before disclosing it. (RC Reply 32).

Third, Retained Counsel dispute that the defendant's view of Appointed Counsel is the product of being "poisoned" by Retained Counsel. (RC Reply 33). They argue that that the defendant is not a "naïve and confused man, who does not know what is best for him" as Appointed Counsel view him. He is a "mature and well-educated former police officer, who is fully capable of understanding the issues in this case and is well-equipped to make his own assessments of various attorneys' motives, interests, and sincerity – or lack thereof." (RC Reply 33-34). According to Retained Counsel, the defendant has "read the submissions and is angry by the factual misrepresentations they contain – in contravention to his own accounts – and their conclusions that he engaged in misconduct and criminality, which the submissions not only surmise, but affirmatively *urge* the Court to adopt." (RC Reply 34).

In sum, Retained Counsel contend that no rational defendant would want to be represented by Appointed Counsel, because: they take a view of the facts contrary to their client's representations and against his interests; they baselessly accuse their client of crimes and urge the Court to find he could be prosecuted for them; they vehemently argue that their client has violated BOP protocols and regulations when a contrary view is "not only available but far more plausible;" they "persistently ignore the client's expressed directives and wishes; they persistently refuse to cooperate and work with the client's chosen and retained counsel; and, they devoted hundreds of hours of time and an extraordinary amount of resources to attempt to "denigrate, discredit and disqualify" Retained Counsel, while not taking time to visit the client or discuss the substantive case with him. (RC Reply 34-35).

Appointed Counsel's claim that Retained Counsel's conduct amounts to nothing short of attempts to obstruct the *Curcio* proceeding appears to us to be a catch-all argument that assumes the accuracy of the facts they have presented and their interpretation of those facts.[10] It also

---

[9] He also avers that he did not actually object to the appointment of *Curcio* counsel. (RC Reply 29, n. 23).

[10] There appears to be at least one error in Appointed Counsel's recitation of the facts. They recount communications among defense counsel, exchanged after counsel learned of the seizure of the Contraband Cellphone, in which they discuss whether the Phone had texting capability. They incorrectly quote a message from an attorney at Mr. Barket's firm as stating: "I do not

assumes that the Court will find conflicts in every issue they have presented, which it may not. Thus, we assume that the Court's determinations regarding the individual issues presented will dictate the determination of this argument and do not see a need to address it individually now.

Further, throughout their memorandum, Appointed Counsel argue that *United States v. Schwarz* compels the conclusion that Mr. Barket's advice and advocacy is "so permeated by self-interest in remaining as counsel to the defendant, that no rational defendant would knowingly and intelligently desire to be represented by him and as such, the conflict cannot be waived." But as the Court noted in *Schwarz*, that case involved "unusual facts." 283 F.3d at 96. And, in *United States v. Perez*, the defendant attempted to apply *Schwarz* to make a somewhat similar argument that his attorney had a conflict because he represented him and another defendant at separate trials and stood to gain substantial revenue if he remained counsel to both. The Second Circuit rejected that argument, finding that it was "conclusory" and that there was "nothing whatever to indicate the sort of fiscal self-interest that was present in *United States v. Schwarz*." *Perez*, 325 F.3d at 127. Here, Appointed Counsel also have assembled a long list of conduct that certainly warranted their attention and now the Court's scrutiny. However, no evidence has arisen that suggests that Mr. Barket has any financial interest beyond that usually associated with being retained counsel in a criminal case. Indeed, Appointed Counsel tend to rely on the notion that the only explanation for Mr. Barket's conduct is that he is motivated by a desire to remain on the case (and therefore to hide his improper conduct) to the detriment of the defendant. But that is not a substitute for particular evidence of financial incentives. Thus, we do not think that under *Schwarz* or any other case that is a sufficient basis to establish an unwaivable conflict.

## Conclusion

In sum, as set forth above, we do not presently believe Retained Counsel have actual conflicts of interest. However, further factual development is needed regarding the content of undisclosed text messages and Mr. Weider's relationship with Mr. Barket's law firm. Furthermore, at the *Curcio* hearing, the Court should inquire of the defendant and make findings, as to whether he waives potential conflicts as described above and in our previous filing.

---

recall Nick stating that he texted with the phone when Bruce and I met with him last Wednesday." (AC Memo 36). In fact, the message states the opposite: "I do recall Nick stating that he texted with the phone when Bruce and I met with him last Wednesday." (AC Exh 4-2).

We understand the Court has also requested that we submit proposed *Curcio* questions. We have reviewed the proposed questions Appointed Counsel has submitted, which may cover areas that the Court determines are not warranted. Since the Court has not had the opportunity to set the parameters of the *Curcio* hearing, we respectfully request that the Government be permitted to submit additional proposed questions after the Court has done so, to the extent that the Government's proposed questions differ from Appointed Counsel's.

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney

By: _____
Margery B. Feinzig/Ilan T. Graff
Assistant United States Attorneys
(914) 993-1903/(212) 637-2296

cc:  Bruce A. Barket, Esq. (By email)
     Anthony L. Ricco, Esq. (By email)
     Michael K. Bachrach, Esq. (By email)
     John A. Diaz, Esq. (By email)
     Bruce D. Koffsky, Esq. (By email)
     Kenneth J. Montgomery, Esq. (By email)
     Bobbi C. Sternheim, Esq. (By email)