**GOVERNMENT'S PROPOSED *CURCIO* HEARING QUESTIONS**

The Government respectfully requests the Court to include the following questions in its examination of defendant Nicholas Tartaglione, pursuant to the procedures outlined in *United States v. Curcio*, 680 F.2d 881 (2d Cir. 1982).  In addition, the Government respectfully requests that the Court address the defendant personally and seek to elicit narrative answers from the defendant.  *See, e.g.*, *United States v. Iorizzo*, 786 F.2d 52, 59 (2d Cir. 1986).

## A.  Introductory Questions

1. How old are you?

2. How far did you go in school?

3. What jobs have you held since you finished school?

4. Were you employed as a police officer?  Where?

5. For how long?

6. What were your positions within the police department?

7. Did you receive any training to be employed as a police officer?  What training?

8. Are you currently taking any medication?

9. Are you now under the care of a doctor for any physical or mental condition?

10. Within the past 24 hours, have you taken any alcohol, drugs, or medications of any kind?

11. Are you currently represented by attorney Bruce Barket?  Are you also represented by attorney Ada Leisenring?

12. Have you been satisfied with Mr. Barket's and Ms. Leisenring's representation so far in this case?

13. What is attorney John Weider's role in the defense in your criminal case?

14. Have you retained him to represent you in this case?

15. What is your understanding of Mr. Weider's professional relationship with Mr. Barket and Mr. Barket's firm?

16. Have you retained any other lawyers to represent you in connection with this case? What are their names? What is your understanding of their professional relationship with Mr. Barket and/or his firm?

17. Have you retained any paralegals to represent you in connection with this case? What are their names? What is your understanding of their professional relationship with Mr. Barket and/or his firm?

**B.     The Right to Conflict Free Counsel**

1.  Do you understand that, in every criminal case, including this one, you have a right to a "conflict free" attorney – that is an attorney who only has your best interest at heart in everything that they do in connection with their representation of you. And, since you are charged with federal crimes that carry a possible punishment of death, your right to a conflict free attorney is heightened. Do you understand that?

2.  I am not saying that Mr. Barket does not have your best interest at heart. However, to investigate properly the possibility of any conflicts and to ensure that you have a full understanding of those conflicts and to discuss the facts and legal issues related to those conflicts, I have appointed attorney Bobbi Sternheim, an attorney free of the conflict, to help you.

3.  Have you had an opportunity to meet with Ms. Sternheim at the Metropolitan Correctional Center, or, MCC? How many times? Have you also had the opportunity to confer with Ms. Sternheim by telephone? How many times?

2

4. Did you have an opportunity to discuss with Ms. Sternheim possible conflicts of interest from the conduct engaged in by Mr. Barket, Ms. Leisenring, and Mr. Weider?

5. Would you please explain, in your own words, what is your understanding of the legal issues regarding the possibility of a conflict with Mr. Barket?

6. Would you also please explain, in your own words, what is your understanding of the legal issues regarding the possibility of a conflict with Ms. Leisenring?

7. And, would you also please explain your understanding of the legal issues regarding the possibility of a conflict with Mr. Weider?

8. Under our law, you have the right to be represented at trial by an attorney of your choice. Do you understand that?

9. I now want to direct my questions to ensure that you have the necessary information to allow you to make an informed decision.   Do you understand what I am saying so far?

10. Let's first turn to the fact that this is a death authorized case.

## C.    This Case is Authorized for the Death Penalty

1. Are you aware that the Attorney General has authorized the United States Attorney for the Southern District of New York to seek the death penalty against you in relation to the deaths of Martin Luna, Urbano Santiago, Miguel Luna, and Hector Gutierrez?

2. Are you aware that in order for the Government to obtain a sentence of death, the Government is required to present evidence against you at a trial that is divided into two phases – a liability phase and a penalty phase?

3. The first phase establishes whether or not the Government can prove that you are guilty of the deaths of Martin Luna, Urbano Santiago, Miguel Luna and Hector Gutierrez.  That is called the liability or guilty phase.  Are you aware of that?

4.  If the jury returns a verdict of guilty on one or more of the counts related to the deaths of Martin Luna, Urbano Santiago, Miguel Luna, and Hector Gutierrez, that same jury then decides whether or not to impose the death penalty.  That second phase is called the penalty phase.  Do you understand that?  Would you explain your understanding of the two phases in your own words?

5.  At the penalty phase, you have a right to present evidence to persuade jurors to impose a sentence other than death.  Under our law, this is called mitigation evidence.  Do you understand that?

6.  The Government may present evidence at the penalty phase to support the imposition of a death sentence.  Under our law, this is called aggravating evidence.  Do you understand that?  Aggravating evidence can be presented by the Government during its direct case or in rebuttal to what the defense presents at the penalty phase.  Do you understand that?

7.  Would you please take a moment and explain to me, in your own words, your understanding of the process that I just explained in relation to aggravating evidence?

8.  I would like to go back to mitigation.  Would you please explain, in your own words, what mitigation evidence is?

9.  Do you understand that, under our law, an attorney representing you in a death penalty prosecution is obligated to prepare for your defense for the liability phase and the penalty phase?

10. This means that, under our law, an attorney is obligated to identify, develop, and prepare for the presentation of mitigation evidence in your defense.  Do you understand that?

11. This means that your attorneys have the responsibility to prepare for the presentation of evidence favorable to you, and prepare to defend against the evidence the Government will present against you, and in support of a sentence of death.  Do you understand that?

12. Can you accept that when lawyers are obligated to develop and present mitigation evidence, they are required to do so at a very high level of professionalism?

13. In this effort, attorneys must not engage in conduct that puts in jeopardy the ability to present evidence in mitigation at the penalty phase, or conduct that contributes to aggravating evidence that the Government could use against you at the penalty phase. Do you understand that?  Will you please explain?

14. Are you aware that positive prison adjustment and the ability to follow prison rules are important mitigation factors that defense attorneys investigate and could be presented on your behalf at the penalty phase of your case?

15. Are you also aware that the Government routinely presents the failure to comply with institutional rules to rebut evidence of positive prison adjustment?

16. Are you aware that when your attorney participates in conduct with you that violates prison rules, the attorney's interest may conflict and diverge from your interest?  As a result of that conflict, it is possible that the attorney could give you advice while he/she is looking out for his/her own interest first and putting your interests second. In other words, the attorney may be in the position of wanting to protect his/her own interests over yours.  Do you understand that?  Please explain.

17. Now, as we've discussed, you are entitled to a conflict free attorney.  I want to spend a little more time on what that means.  Are you aware that under our law, you are entitled

to an attorney who is conflict free – that is, an attorney who only has one interest and that is yours?  Do you understand what that means?  Please explain.

18. Let me give you an example:  if an attorney participated in conduct that could subject him/her to professional disciplinary proceedings and/or possible criminal proceedings, that attorney could be concerned about his/her own interests and has a conflict, and could give you legal advice that puts his own interest ahead of yours?  Do you understand that?  Please explain.

19. That same attorney could also engage in conduct to cover up or hide his involvement in conduct that could lead to disciplinary proceedings and/or criminal prosecution, and thereby put the development of your defense in jeopardy.  Do you understand that?  Please explain.

20. Do you understand that when an attorney engages in such conduct, and looks out for his/her own interest, the attorney creates a risk that a jury could return a sentence of death?  Do you understand that such a sentence could be returned?

21. Do you understand that you are in a more advantageous situation when you are represented by an attorney who has not engaged in such conduct and therefore does not have a conflict or a divergent interest?  If so, please explain to me your understanding.

22. Were this Court to find that one or more attorneys have engaged in conduct that could lead to disciplinary proceedings and/or criminal prosecution, would you be willing to waive any objection that the law says you have in relation to the attorneys' conduct, and keep that attorney on your team?  If so, please explain your reasons.

23. And, would you be willing to waive any objection to the attorney's conduct, so that you can keep that attorney, even if this Court were to find that the attorney has engaged in

criminal or improper conduct that compromised your ability to present mitigation evidence at the penalty phase of your case or your ability to defend against aggravation evidence presented by the Government?  If so, please explain.

**D.      Mr. Barket's Statements to the Press/Media**

1.   Are you aware that Mr. Barket made statements to the press and media in which he discussed conversations he had with you during interviews at the MCC?

2.   In particular, are you aware that Mr. Barket made statements to the press and media about your relationship with Mr. Epstein and that you possessed information about the attempted suicide and suicide of Mr. Epstein?

3.   Did you and Mr. Barket discuss the substance of the statements that he was going to make before he made the statements to the press and the media?

4.   Were you aware that Mr. Barket was going to make statements to the press and media, regarding your knowledge of Mr. Epstein's attempted suicide and suicide, before he spoke to the press and media?  What was your understanding of what Mr. Barket was going to say to the press and media?

5.   Did you give Mr. Barket consent to discuss Mr. Epstein's attempted suicide and suicide to the press and media?

6.   Whose decision was it to discuss Mr. Epstein's attempted suicide and suicide with the press and media?

7.   What was your understanding of why such statements were going to be made to the press and media?

8.   Are you aware that when you made statements to Mr. Barket during your interviews at the MCC, statements about your knowledge of Mr. Epstein's attempted suicide and

suicide, including your knowledge of the note that I am going to refer to as the Epstein Note, those statements were entitled to the protection of the attorney/client privilege? Please explain your understanding.

9. Were you aware that appointed Learned Counsel advised Mr. Barket not to make statements to the press and the media concerning his discussions with you in relation to Mr. Epstein's attempted suicide and suicide? Please explain.

10. Are you aware that the statements Mr. Barket made to the press and the media in relation to your knowledge of Mr. Epstein's attempted suicide and suicide could have a negative impact on the penalty phase of your case, including undermining evidence of positive prison adjustment? Please explain.

11. Did you specifically discuss with Mr. Barket how the statements he made to the press and the media on your knowledge of Mr. Epstein's attempted suicide/suicide and other matters could impact the penalty phase of your case?

12. If so, what was your understanding of how those statements could impact the penalty phase of your trial? Please explain.

13. Are you aware that, based upon Mr. Barket's statements to the press and media about your relationship with Mr. Epstein and knowledge about Mr. Epstein's attempted suicide and suicide, both you and Mr. Barket may be questioned by authorities regarding Mr. Epstein's suicide and the Epstein Note?

14. Did Mr. Barket inform you that both of you could be questioned by investigators and/or prosecutors? If so, when?

15. You have already said that when you made statements to Mr. Barket during your interviews at the MCC, including your statements about your knowledge of Mr. Epstein's

attempted suicide and suicide, and your knowledge of the Epstein Note, you were aware that those statements were entitled to the protection of the attorney/client privilege. Is that so? Explain.

16. Have you had an opportunity to discuss with *Curcio* counsel, Ms. Sternheim, your right to confidentiality and to not have your discussions with counsel disclosed to the press and the media?

17. Have you had an opportunity to discuss with Ms. Sternheim the negative impact that Mr. Barket's statements to the press and media could have on the development of your penalty-phase defense?

18. Did you have an opportunity to discuss with Ms. Sternheim the concept of an "adoptive admission"? That is, have you discussed with Ms. Sternheim the potential consequences when an attorney makes a public statement on your behalf? What is your understanding of those consequences?

19. Did you discuss with Ms. Sternheim that when Mr. Barket made statements about your relationship with Mr. Epstein and that you possessed information about the attempted suicide and suicide of Mr. Epstein, that Mr. Barket could potentially be called to testify and give information that may be harmful to your defense at the penalty phase? Explain your understanding of what Ms. Sternheim told you.

20. Do you now waive any objection that you have, or might have, regarding Mr. Barket's disclosures to the press and media of information he obtained during attorney/client privileged communications with you?

9

21. Do you now waive any post-conviction arguments, on appeal or otherwise, based on any potential conflict arising from Mr. Barket's disclosures to the press and media of information he obtained during attorney/client privileged communications with you?

**E.      Removal of the Epstein Note from the MCC**

1. It has been represented that you discovered a suicide note that I will refer to as the Epstein Note, and, upon Mr. Barket's instruction, gave the Note to Mr. Weider, who removed it from the MCC.  Is that your understanding of the facts?

2. Do you understand that during an investigation into the circumstances surrounding Mr. Epstein's attempted suicide and suicide, Mr. Epstein's personal notes could become an item of material interest to investigators?

3. Do you understand that the removal of the Epstein Note from the MCC could be viewed as a violation of rules of the Bureau of Prisons, which I will refer to as "BOP" and/or "the MCC," or simply as improper conduct?

4. In particular, do you understand that investigators could take the position that the removal of the Note violated BOP/MCC rules?

5. Are you aware that the conduct of individuals who participated in the removal of the Epstein Note – you, Mr. Weider, and Mr. Barket – could therefore become a subject of interest of those investigators?

6. Do you understand that as a result of their participation in the removal of the Note from the MCC, Mr. Barket's and Mr. Weider's interests could be different from yours?

7. Do you understand that, to the extent that investigators take the position that the removal of the Epstein Note from the MCC violated rules, Mr. Barket's interest may be different

from your interest?  Would you please explain, in your own words, your understanding of how Mr. Barket's interest may be different from your interest?

8. Did you have the opportunity to discuss this divergence of interest with Ms. Sternheim?

9. Are you also aware that the removal of the Epstein Note from the MCC could result in Mr. Barket becoming a witness during the penalty phase of your case or in a subsequent civil or administrative proceeding? Did you discuss this with Ms. Sternheim?

10. Do you understand that if Mr. Barket were to become a witness during the penalty phase of your case, he would not also be able to represent you during the penalty phase?

11. Do you understand that, because of his involvement in the removal of the Epstein Note from the MCC, Mr. Weider's conduct could also become a subject of interest in an investigation relating to the Epstein Note?

12. Are you also aware that, to the extent that investigators take the position that the removal of the Epstein Note from the MCC violated BOP/MCC rules, Mr. Weider's interest may be different from your interest?  Would you please explain your understanding of what that means?

13. Are you also aware that the removal of the Epstein Note from the MCC may also result in Mr. Weider becoming a witness during the penalty phase of your case or in a subsequent civil or administrative proceeding?

14. Do you understand that you, Mr. Barket, and Mr. Weider could be exposed to potential liability in civil litigation, in other words to monetary penalties, relating to the Note, its removal from the MCC, and any possible connection between those events and Mr. Epstein's suicide?  Do you understand that if that occurs, again, you, Mr. Barket and Mr. Weider may have interests that diverge from your interests?

11

15. Did you discuss this with Ms. Sternheim?  What is your understanding of those diverging interests?

16. Are you aware that your removal of the Epstein Note from the MCC, with the assistance of your attorneys, may harm your defense at the penalty phase?

17. In particular, do you understand that, if the removal of the Note violated the rules or was improper, the Government could use it to show your non-compliance with institutional rules and the lengths you would go to break the rules, including involving your attorneys in such conduct?

18. Are you also aware, in the alternative, that the Government could use the evidence to rebut a defense argument that you do not present a risk of future danger because you follow MCC rules?

19. Did you discuss these consequences with Ms. Sternheim?  Would you explain your understanding of the harm that could be caused at the penalty phase of your trial?

20. Do you waive any possible conflict that presently exists or may arise due to Mr. Barket's and/or Mr. Weider's participation in the removal of the Epstein Note from the MCC?

21. Do you also now waive any post-conviction arguments, on appeal or otherwise, based on any potential conflict arising from Mr. Barket's and/or Mr. Weider's participation in the removal of the Epstein Note from the MCC?

### F.    Possession and Use of Contraband Cellphone

1. It has been represented that you possessed a cellphone in the MCC and that you used that cellphone to communicate with attorneys Barket, Leisenring, and Weider.

2. Are you aware that a detainee's possession of a cellphone, which I will refer to as a Contraband Cellphone, is a crime?

3. Are you also aware that a detainee's possession of a Contraband Cellphone is a violation of BOP/MCC rules?

4. Consequently, are you aware that your possession and use of a Contraband Cellphone can be used against you at the penalty phase of your trial by, in particular, negatively impacting the presentation of mitigation evidence?   In other words, similar to the issues surrounding the removal of the Epstein Note, the Government could use evidence of your possession and use of a Contraband Cellphone as aggravating evidence: it could be presented as evidence of your refusal to follow institutional rules and the lengths you would go to, such as involving your attorneys, in violating those rules.  The Government could also use Contraband Cellphone evidence to rebut mitigation evidence presented by your attorneys.  Do you understand how the Government could use your conduct surrounding the Contraband Cellphone against you?

5. Are you aware that your text communications with Mr. Barket, Ms. Leisenring, and Mr. Weider using the Contraband Cellphone, in particular, may be used against you and negatively impact the penalty phase of your case?  Did you discuss how these communications could negatively impact the penalty phase with Ms. Sternheim?  Would you explain your understanding of how this could negatively impact the penalty phase?

6. Do you understand that if the attorneys you communicated with over the Contraband Cellphone solicited or fostered your use of the Contraband Cellphone, their conduct, arguably, could be a crime or, at a minimum, inappropriate and/or a violation of BOP/MCC rules, and they could, therefore, have a conflict with you?  In other words, their interest in not being implicated in a crime or otherwise improper conduct could diverge from yours.  Please explain your understanding.

13

7. Do you waive any possible conflicts that may arise from the fact that Mr. Barket, Ms. Leisenring, and Mr. Weider have exchanged text messages with you over the Contraband Cellphone?

8. Do you also now waive any post-conviction arguments, on appeal or otherwise, based on any potential conflict arising from the fact that Mr. Barket, Ms. Leisenring, and Mr. Weider have exchanged text messages with you over the Contraband Cellphone?

**G.    Final Overall Waiver**

1. Do you have any questions that you want to ask me about the possible conflicts of interest or the decision you are making concerning these possible conflicts of interest?

2. Would you like more time to think about these matters?

3. Are you dissatisfied in any way with Mr. Barket's representation of you in this case up to this point?

4. Do you understand that the greatest danger is the inability to foresee all the conflicts that may arise?  Sitting here now, neither I nor anyone else can predict all the ways in which having conflicted counsel could hurt your interests.

5. Do you understand that the Court, having presided at many trials in this Courthouse, believes that representation by an attorney with a conflict of interest may be ill-advised?

6. Having considered the ways in which Mr. Barket's restrictions on his representation of you may affect his representation of you, do you still wish to proceed in this case with Mr. Barket as your attorney, despite the potential conflicts that I have described today?

7. Do you understand that, if you proceed with Mr. Barket as your attorney, you will not be able to claim later on that you were prejudiced in any way because of Mr. Barket's restrictions on his representation of you?

14

8. What do you understand your waiver today to mean?

9. Have you received any inducement or promise that may have influenced your decision on your choice of counsel in this case?

10. Have you been threatened, in any way, concerning your decision on this issue?

11. Having agreed to keep Mr. Barket as your lawyer, do you understand that you will be waiving any right to claim at a later date, on appeal or at any other proceeding, that you were prejudiced in this case based on your representation by a lawyer who has the potential conflicts I have described?

The Government respectfully requests the Court to include the following questions in its examination of Jonathan Weider, Esq.**:**

1.  Where do you work?

2.  How long have you been an attorney?

3.  What type of law have you practiced?

4.  Do you represent the defendant, Nicholas Tartaglione, in any way, in connection with this criminal case?

5.  Did the defendant retain you to represent him in connection with this criminal case?

6.  Do you have a written retainer agreement with the defendant?

7.  Do you have an oral retainer agreement with the defendant?

8.  Has the defendant paid you anything in connection with this criminal case?  If yes, what services did you provide?

9.  What is your professional relationship with Mr. Barket's law firm?

10. Have you been employed by Mr. Barket's law firm?

11. Are you *of counsel* to the firm in connection with this case?  If so, when did you become *of counsel*?

12. Do you have any written agreements with Mr. Barket's law firm in connection with the representation of Mr. Tartaglione?

13. Do you have any oral agreements with Mr. Barket's law firm or Mr. Barket in connection with the representation of Mr. Tartaglione?

14. Has Mr. Barket or his law firm paid you anything in connection with representing the defendant or work you have performed in connection with this case?  [If so, what?]

15. What is your role in connection with Mr. Tartaglione's defense?  Do you attend team meetings?  Do you perform work in connection with this case under the direction or instruction of Mr. Barket or anyone else at Mr. Barket's law firm?

16. Were you involved in the removal of the Epstein Note from the MCC?

17. How did you become involved? What did you do?

18. It has been represented that you exchanged hundreds of text messages with the defendant over a contraband cellphone smuggled into the MCC.  Is that the case?

19. How did you become involved in exchanging text messages with the defendant?

20. Were you aware that cellphones smuggled into the MCC are considered contraband and possessing such a contraband cellphone is both a violation of criminal law and BOP rules?

21. Did you have any role whatsoever in assisting the defendant in obtaining a contraband cellphone?

22. Did you give the defendant any advice about using or possessing a contraband cellphone? If so, what advice?

23. Did you receive text messages from the defendant over a contraband cellphone as represented to the Court?

24. Did you respond to text messages from the defendant over a contraband cellphone?

25. Did you encourage the defendant to communicate with you over a contraband cellphone?

26. Did you ever advise the defendant not to communicate with you over a contraband cellphone?

27. Did you ever advise the defendant that he was violating the criminal law and BOP rules by possessing the contraband cellphone?

28. Did you ever advise him to stop sending you text messages over a contraband cellphone?

29. Why did you continue to respond to the defendant's text messages?

30. What, in substance, was the content of the text messages?

31. Did the text messages contain any threats to anyone? [If so, additional questions will be warranted]

32. What happened to these text messages?

33. Is there a back-up copy of the text messages?  [For example, on your computer?  In the "Cloud," if an iPhone?]

34. Do you presently have any text messages to or from the defendant?

35. Did anyone ever instruct you to preserve your text messages with the defendant?

36. Did anyone ever instruct you not to preserve your text messages with the defendant?

37. Why did you fail to preserve your text messages with the defendant?

38. Did the defendant encourage or insist, in any way, that you communicate with him over a contraband cellphone?  If so, in what ways?

39. Did anyone, including attorneys or other members of the defense team, direct, instruct, or encourage you, in any way, to communicate with the defendant over a contraband cellphone?

Dated:   White Plains, New York
         June 17, 2020

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney

By:    _____
       Margery B. Feinzig/Ilan T. Graff
       Assistant United States Attorneys
       (914) 993-1903/(212) 637-2296