1

SEALED PROCEEDINGS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
UNITED STATES of AMERICA,

      -against-              16 Cr. 832(KMK)
                                        Curcio Hearing

NICHOLAS TARTAGLIONE,

          Defendant.
------------------------------------x

                             United States Courthouse
                             White Plains, New York

                             July 29, 2020


THE HONORABLE KENNETH M. KARAS,
            District Court Judge


AUDREY STRAUSS
    Acting United States Attorney for
        the Southern District of New York
BY:  MARGERY FEINZIG.
    ILAN GRAFF
        Assistant United States Attorneys


BRUCE BARKET
AIDA LEISENRING
DONNA ALDEA
ANTHONY L. RICCO
STEVEN LEGON
MICHAEL BACHRACH
JOHN DIAZ
KENNETH MONTGOMERY
BRUCE KOFFSKY
    Attorneys for Nicholas Tartaglione

Also Present:
BOBBI C. STERNHEIM, Curcio Counsel
DAVID RUHNKE, Resource Counsel
TAYNA GREEN, Resource Counsel
BETH CAHILL, Mitigation Specialist
MELISSA LANG, Mitigation Specialist

        Angela O'Donnell, RPR, 914-390-4025

SEALED PROCEEDINGS

THE CLERK: The Honorable Kenneth M. Karas presiding. United States of America verse Nicholas Tartaglione, 13CR362.

Counsel, please state your appearances.

MS. FEINZIG: Good morning, your Honor. Margery Feinzig for the government.

THE COURT: Good morning, Ms. Feinzig.

MR. BARKET: Good morning, your Honor. Bruce Barket for Mr. Tartaglione.

THE COURT: Good morning.

MS. LEISENRING: Good morning. Aida Leisenring for Mr. Tartaglione.

THE COURT: Good morning.

MR. RICCO: Good morning, your Honor. Anthony Ricco, learned counsel appointed by the Court.

MR. KOFFSKY: Good morning, your Honor. Bruce Koffsky, also learned counsel and appointed by the Court.

MR. DIAZ: Good morning, your Honor. John Diaz appearing for Mr. Tartaglione.

MR. RICCO: And, your Honor.

THE COURT: Yes.

MR. RICCO: In the courtroom, seated to your left, is Leander Hardaway, who has been working on the case, victim outreach and mitigation development.

THE COURT: Okay. Thank you.

Mr. Barket, is that Mr. Ross?

SEALED PROCEEDINGS

MR. BARKET:  Yes.

THE COURT:  Good morning, Mr. Ross.

MR. ROSS:  Good morning, sir.

THE COURT:  And on the phone who do we have?

MR. GRAFF:  Good morning, your Honor.  Ilan Graff for the government with Ms. Feinzig.

MR. MONTGOMERY:  Good morning, your Honor.  Kenneth Montgomery, learned counsel for Mr. Tartaglione.

MR. BACHRACH:  Good morning, your Honor.  Michael Bachrach, also learned counsel for the Mr. Tartaglione.

I just want to note, your Honor, that for the people in the jury well or the in the audience, it's the incredibly hard for us to hear.  I could barely hear the appearances by Mr. Ricco and Mr. Koffsky.  I actually couldn't hear who else is being introduced.

THE COURT:  Yes, I mean, I think that's a consequence.  A couple of things.  We were just doing introductions, and there are so many microphones, and we can't have too many people close to the microphones for social-distancing reasons, but I guess what we'll try to do is when counsel who are not at a table want to speak, they can go to the podium where there is a microphone.  And if you can't hear, just let us know.

MS. STERNHEIM:  Good morning, Bobby Sternheim.  I'd like to get in, please, so I can make my appearance.  Bobbi C.

SEALED PROCEEDINGS

Sternheim, *Curcio* counsel, appointed by the Court for Mr. Tartaglione.

Your Honor, I had requested that I have direct phone contact with Mr. Tartaglione during these proceedings, and I would like to be able to initiate that call. I provided a phone number to Ms. Bordes, but I don't know if I'm required to call Mr. Tartaglione or the reverse.

THE COURT: Do we have a cellphone?

MR. BARKET: Yes, we can give Mr. Tartaglione one of ours, if that's okay.

THE COURT: Sure. All right, so we're going to be providing Mr. Tartaglione with a cellphone, and we'll make sure the marshals are okay with that.

MR. BARKET: They seem reluctant.

MR. RUHNKE: Your Honor, while we're completing appearances, this is David Ruhnke, resource counsel, attending today's *Curcio* hearing. Thank you.

THE COURT: All right. Good morning.

MS. ALDEA: Good morning, your Honor. Donna Aldea, Barket Epstein, retained counsel for Mr. Tartaglione.

THE COURT: Good morning.

MR. LEGON: Good morning, your Honor. Steven Legon, associate of Anthony Ricco appearing for Mr. Tartaglione.

THE COURT: Good morning.

MS. CAHILL: Good morning, your Honor. Beth Cahill,

SEALED PROCEEDINGS

mitigation specialist.

THE COURT:  Good morning.

MS. CAHILL:  For Mr. Tartaglione.  Good morning.

MS. LANG:  Good morning.  This is the Melissa Lang, mitigation specialist for Mr. Tartaglione.

THE COURT:  Good morning.

MS. GREENE:  And good morning, this is Tanya Greene, resource counsel for Mr. Tartaglione.

THE COURT:  All right, good morning.

So do we want to give Ms. Sternheim that number or do you want to call Ms. Sternheim's number from that phone?

MS. LEISENRING:  Yes, I can do that.  I wanted to take my face recognition and passcode off so if she --

THE COURT:  Got it.

MR. BARKET:  I think once the line is open, it will stay open.

MS. LEISENRING:  Oh, you mean to have it --

MR. BARKET:  Yes, just call.

THE COURT:  In theory, yes.

MS. LEISENRING:  I can call Ms. Sternheim right now.

THE COURT:  All right, Ms. Sternheim, we're going to call you on the phone.  Okay?

MS. STERNHEIM:  Thank you.

(Pause)

THE COURT:  You're going to have to keep that mask

Angela O'Donnell, RPR, 914-390-4025

6

SEALED PROCEEDINGS

on, okay, Mr. Tartaglione?

THE DEFENDANT:  Oh, I'm sorry.

THE COURT:  That's okay.  Thank you.

Okay, so you're able to talk to Mr. Sternheim, Mr. Tartaglione?

THE DEFENDANT:  Yes, your Honor.

THE COURT:  All right, so we are here to conduct a *Curcio* hearing.  I think Mr. Barket phrased it correctly in one of his letters, the long-awaited *Curcio* hearing that has been delayed because of the pandemic.  This is, in fact, the first in-person proceeding we've had since March 12th.

So before we get started, I just want to give counsel an opportunity, I guess we'll start, Ms. Feinzig, with the government.  If there's anything that you want to put on the record, anything you think we should be discussing before we get started.  And I have re-read all the relevant correspondence other than the ones asking me for adjournments.

MS. FEINZIG:  Your Honor, I have nothing beyond what is already in the government's submissions.  I have one minor request.

THE COURT:  Sure.

MS. FEINZIG:  That is to -- since Mr. Graff was unable to be here, if I could possibly be permitted to text him as needed or respond to a text.

THE COURT:  That's fine.

Angela O'Donnell, RPR, 914-390-4025

SEALED PROCEEDINGS

MS. FEINZIG:  Thank you.

THE COURT:  Ms. Sternheim, is there anything you want to add before I ask both retained and appointed counsel?

MS. STERNHEIM:  No, thank you, your Honor.

THE COURT:  Okay.

Mr. Barket.

MR. BARKET:  No, thank you, your Honor.

THE COURT:  Okay.

Mr. Ricco.

MR. RICCO:  No, your Honor, everything's been thoroughly briefed.  But like Ms. Feinzig, we have counsel, so if the Court sees us texting, we're communicating with each other to make sure we have a complete record.

THE COURT:  That's fine.  That's totally understandable under the circumstances.

MR. RICCO:  Thank you.

THE COURT:  Yes, and I'll note for the record that there are a number of counsel and others who are part of the defense team who are here, and there are a number of members of the defense team who are not here, and one member of the government team, firewall team, who's not here, and they're appearing by phone.  All of which was pre-approved by the Court because everybody had perfectly understandable reasons for either they couldn't be here in person or they would love to be here in person but can't for perfectly understandable reasons.

Angela O'Donnell, RPR, 914-390-4025

SEALED PROCEEDINGS

All right.  So what I propose to do is start the inquiry of Mr. Tartaglione, and as I see it, there are really three main issues that need to be addressed in terms of the potential conflicts.  Actually, I guess what I'll do is before we start the inquiry, just put a few things on the record so that everybody at least understands where I'm coming from with respect to the questions that are going to be asked.  So I'm certainly not going to burden the record with the detailed history, but the summary is that there was some issues raised by appointed counsel, learned counsel, regarding some concerns about potential conflicts arising from, among other things, certain media statements that were made by Mr. Barket.  And that led to the Court appointing Ms. Sternheim as *Curcio* counsel.  And then there were subsequent concerns that were raised after the initial appointment was done that led Ms. Sternheim, at the Court's request, to submit a report for *in camera* review in connection or in preparation for this hearing.  And Ms. Sternheim put together a very detailed report, and then, of course, counsel were allowed to, all counsel were allowed to respond to the report.  But the report highlights three general areas of potential conflict.

So, first, as I said, is the statements that Mr. Barket made to the media involving the circumstances surrounding Jeffrey Epstein's attempted suicide and ultimate death, and the concern that was raised in the report was the

SEALED PROCEEDINGS

extent to which some of these statements were based on information provided by Mr. Tartaglione himself. And the concern was both related to attorney-client issues, but also a concern that Mr. Barket's statements could be viewed as adoptive admissions against Mr. Tartaglione that could be used against him, particularly in a penalty phase.

The second area had to deal with the removal of a document from the MCC. And what we're talking about here is in the period between Mr. Epstein's suicide attempt, which was July 23rd of last year, and his death on August 10th, that Mr. Tartaglione allegedly found a handwritten document purportedly written by Mr. Epstein, which I'll call the note, which apparently expresses suicidal intentions. And the concern is that under BOP guidelines the note would qualify as contraband. And what happened with the note was that Mr. Tartaglione informed Mr. Barket of the note's existence, didn't have the note with him at the time. Ultimately, Mr. Barket contacted Mr. Weider, John Weider, who obtained the note from Mr. Tartaglione and removed it from the MCC.

And after the note's removal but before appointment of *Curcio* counsel, learned counsel became aware that Mr. Weider had removed the note. But learned counsel have expressed some concerns, and this is laid out in the very lengthy memorandum of law, that the learned counsel only learned of Mr. Barket's involvement in the removal of the note after Ms. Sternheim's

SEALED PROCEEDINGS

appointment as *Curcio* counsel.  And there's a little bit of back and forth about the extent to which Mr. Barket did not want that information disclosed to Ms. Sternheim.  And there's been a full briefing on that issue.

The third area has to do with communications between Mr. Tartaglione and some members of the defense team using contraband cellphones.  On July 3rd of last year, MCC officers confiscated a cellphone from Mr. Tartaglione's cell.  A few weeks later, on July 19, Mr. Barket informed the Court of the confiscation of the phone and sort of a good faith basis to believe that privileged material had been stored on the phone.  And in particular, there was concern about confidential or privileged material contained in text messages to members of the defense team.  And so those are the three general areas.

The Sixth Amendment, as we know, provides the right to counsel to all people charged with crimes, and that right comes with some sort of conflicting rights.  So the Sixth Amendment provides that normally a criminal defendant may be represented by anybody who will agree to take the case.  That's all laid out in *US versus Cunningham*, 672 1064, 1070, it's a Second Circuit decision from 1982.

But the Sixth Amendment also includes the right to representation that is free from conflicts of interest.  Supreme Court laid this out in *Wood versus Georgia*, 450 U.S. 261, 271.  And indeed, the Supreme Court has held that,

SEALED PROCEEDINGS

"erroneous deprivation of the right to counsel of choice" is structural error, and therefore "it is unnecessary to conduct an infectiveness or prejudice inquiry to establish a Sixth Amendment violation." That's from *US versus Gonzales-Lopez*, 548 U.S. 140, 148-50. But the Supreme Court has explicitly qualified this holding by emphasizing that this right does not extend to allowing a defendant to "demand that a Court honor his waiver of conflict-free representation," and trial courts retain "wide latitude in balancing the right to counsel of choice against the needs of fairness." That's from page 152.

The Second Circuit has further explained "the question of disqualification implicates not only the Sixth Amendment right of the accused but also the interests of the courts in preserving the integrity of the process and the government's interest in ensuring a just verdict and fair trial." That's from *US versus Locascio*, 6 F.3d 924, 931.

"Where the right to counsel of one's choice conflicts with the right to an attorney of undivided loyalty, the determination of which right is to take precedence must generally be left to the defendant who may make a knowing and intelligent waiver of his right to a conflict-free lawyer if he decides to continue the representation." That's from *US versus Cane*, 671 F.3d 271, 293.

Did anybody else jump on the call?

MR. RUHNKE: Your Honor, apologies. My call dropped

SEALED PROCEEDINGS

and I just dialed back in.

THE COURT:  That's fine.  I just want to make sure that the record is clear as to who's on.  So no problem at all, Mr. Ruhnke, as I said, I just want to make sure we know exactly who's on the call.

MR. RUHNKE:  Thank you.

MS. FEINZIG:  Now there are a narrow class of so-called per se conflicts that are not susceptible to waiver. Such conflicts can't be waived because "while the right to select and be represented by one's preferred attorney is comprehended by the Sixth Amendment, the essential aim of the amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that the defendant will inexorably be represented by the lawyer whom he prefers." That's from Wheat v US, 486 U.S. 153, 159.

Now, of course, there is no bright line as to how one determines a waivable or non-waivable conflict.  What the Second Circuit has said is "a trial court confronted with waiver issues is faced with an unenviable choice, no matter which way it rules, of being reversed on appeal.  Hence, the trial judge is caught in a daunting dilemma between what appears to be two choices, both of which are potentially negative from its standpoint.  If it agrees to allow the defendant to waive his right to conflict-free representation and that turns out to be detrimental to the defendant at trial

SEALED PROCEEDINGS

the defendant may on appeal successfully claim ineffective assistance of counsel. Ruling the other way, not allowing the waiver, the trial court is in effect depriving defendant of counsel of his choice." That's from *US versus Jones*, 381 F.3d 114, 120-21.

So the Second Circuit has helpfully described a two-part process for district courts confronting "the specter of conflicts of interest." That's from *US versus Levy*, 25 F.3d 146, 153.

"At the initial inquiry stage, the court must investigate the facts and details of the attorney's interests to determine whether the attorney in fact suffers from an actual conflict, a potential conflict, or no genuine conflict at all." That's from *Cain* at 293.

"In satisfying its inquiry obligation, the district court may rely on the representations of counsel as to his interest in the case and how any potential conflict might be cured." Same case, same page number. Now, in *US versus Zarrab*, 2017 WL 1753466, at *6, Judge Berman had asked non-conflicted counsel to confer with potentially conflicted attorneys and submit to the Court by affidavit/affirmation, along with supporting exhibits information related to possibly conflicting representations. And in that case he allowed the affidavits to be filed under seal for *in camera* review. Which is akin to what we did here. So I recognize that this is maybe

Angela O'Donnell, RPR, 914-390-4025

SEALED PROCEEDINGS

not the normal course, I think the course we've adopted here has been far more comprehensive, but given that this is a capital case and given, to say the least, that there have been a lot of I think accusations and then responses to those accusations, as I said, I think it is extremely helpful to have Ms. Sternheim's report.

Now the initial inquiry that the Second Circuit has described can produce one of three results.

So if the Court's satisfied that there's no actual or potential conflict, then that's it, there's no need for a hearing.

But where the Court determines that an actual or potential conflict exists but it would not fundamentally impair the lawyer's representation, the Court is to address the defendant directly and determine whether he wishes to make a knowing and intentional waiver of his right to conflict-free counsel in conformity with the procedure set out in *Curcio*.

And then the third possibility is if the inquiry establishes a conflict such that "no rational defendant would knowingly and intelligently desire the conflicted lawyer's representation," then the district court is duty bound at that point to disqualify the lawyer who suffers from the conflict. That is, no waiver of the conflict is possible. And in theory, there would be no need for a *Curcio* hearing in that situation.

Now, *Curcio*, as we all know, sets forth procedures to

SEALED PROCEEDINGS

be followed in situations in which a criminal defendant indicates a desire to waive the right to representation by any attorney without a conflict of interest. And *Curcio* in fact requires the Court to hold a hearing where it can advise the defendant of his right to representation by an attorney who has no conflict of interest, instruct the defendant as to the dangers arising from particular conflicts, permit the defendant to confer with his chosen counsel, but also encourage the defendant to seek advice from an independent counsel, which in this case is Ms. Sternheim, allow reasonable time for the defendant to make a decision, and then determine, preferably by means of questions that are likely to be answered in narrative form, whether the defendant understands the risk of representation by the lawyer who has the potential conflict and then chooses to maintain representation by that individual. This is all spelled out in *US versus Perez*, 325 115, 119.

So, specifically, *Curcio* obligates the trial court to alert the defendant to the substance of the dangers of representation by an attorney having potentially divided loyalties in as much detail as is permissible under the circumstances. And of course, if the defendant persists in the request, the Court can assess whether the request for joint representation is informed and whether the defendant has the capacity for making a rational decision.

And in assessing the level of the defendant's

SEALED PROCEEDINGS

comprehension of the risks of potential conflicted representation, there have to be questions that are designed specifically to elicit a narrative statement.  In other words, this is not a yes-or-no type of inquiry.  And that's because it's critical that the waiver be established by clear, unequivocal, and unambiguous language.  And the inquiry is really to take place only after the defendant has had a reasonable time to digest and contemplate the risks posed by joint representation.

So I guess I'll pause there.  Mr. Tartaglione, have you had enough time to -- you can stay seated during this, that's okay.  Thanks for standing.

Have you had enough time to contemplate the potential conflicts of continuing with Mr. Barket and his firm in representing you in this case?

THE DEFENDANT:  Yes, your Honor.

THE COURT:  And have you had enough time to talk to Ms. Sternheim, who the Court appointed to be your *Curcio* counsel, about the potential conflicts?

THE DEFENDANT:  Yes, your Honor, we've met several times.

THE COURT:  And has Ms. Sternheim answered any questions that you have had about the potential conflicts to your satisfaction?

THE DEFENDANT:  Yes.

Angela O'Donnell, RPR, 914-390-4025

SEALED PROCEEDINGS

THE COURT: And what I mean by that is, to your satisfaction, do you understand what the potential conflicts are?

THE DEFENDANT: Yes, completely.

THE COURT: And how those potential conflicts could adversely affect you throughout this case?

THE DEFENDANT: Yes.

THE COURT: Ms. Sternheim, do you feel you've had enough time to talk to Mr. Tartaglione?

MS. STERNHEIM: Yes, I do.

THE COURT: And this is of course time you've had to talk to him before the pandemic shut everything down; is that right?

MS. STERNHEIM: That is correct, and since the pandemic we have spoken both telephonically and by videoconferencing.

THE COURT: All right. Well, my view is, I mean, I think it is obvious from the fact that we're here, is I don't think this is a situation where there are no conflicts. Because if there were no conflicts, even potential conflicts, there would be no need to have this hearing. And to the extent that there has been an argument, a strenuously argued point that has been made that these are unwaivable conflicts, I'm not inclined to think that that's the case. I mean, I do think that obviously I want to be very scrutinizing in the questions

SEALED PROCEEDINGS

I'm about to ask Mr. Tartaglione and the answers that he's going to give but -- and I'll explain more on that I guess later on -- but that's why I think the inquiry here is entirely appropriate because I do think that there are potential conflicts, at a minimum, and I'll lay those out.

So with respect to the media statements, Mr. Barket has made statements to the media concerning conditions at the MCC, and he's also made statements that suggest or hint that Mr. Tartaglione might have information that's relevant to the investigation that was done in the wake of Mr. Epstein's death. And these statements arguably do allude to information that Mr. Tartaglione himself provided to Mr. Barket. So based on that, the report that Ms. Sternheim prepared identifies two potential problems with these statements.

First, that they could constitute a breach of the attorney-client privilege; and

Second, that they could negatively impact the presentation of evidence, particularly during the penalty phase in support of a mitigator involving a positive prison adjustment.

And I think with respect to the first issue, you know Mr. Barket has contended, and I think Ms. Sternheim doesn't disagree in her report, that Mr. Tartaglione supports Mr. Barket's decision to make the relevant statements and would likely waive the privilege issue.

Angela O'Donnell, RPR, 914-390-4025

SEALED PROCEEDINGS

With respect to the second potential conflict, you know, I think that there are tactical decisions that lawyers make about what to reveal and what not to reveal. So it's not clear that their conflict really arises from that. Certainly reasonable minds can disagree, and I think they have in this case, about the wisdom of being so out front in the media, because I think as learned counsel have pointed out, there are a number of pitfalls in going down that road that the government could take advantage of some of these statements at the penalty phase to undercut the mitigation that Mr. Tartaglione might want to proffer regarding positive prison adjustment. So, but to the extent that there are at least the possibility that something like that could happen, I do think that that is arguably a waivable conflict. I don't think this is a situation where it could be said that no rational defendant would intelligently or knowingly desire to go forward with that type of a conflict. I think that is something that, if it can be properly explained by Mr. Tartaglione in terms of his comprehension of it, that is something that potentially could be waived.

The main sort of I think battle here has been really over what I guess I'll call the note, the Epstein note. And according to the report, the circumstances of the note's discovery and its removal potentially make Mr. Barket and Mr. Weider witnesses. And it could be that that testimony

SEALED PROCEEDINGS

there's sort of the attorney-witness problem and there's also potential conflict between what might be in Mr. Tartaglione's interest. Here, it's not only undermining a mitigating factor, again the positive prison adjustment, but it could be used by the government as an aggravating factor. So while the report, for example, acknowledges that it may have been in Mr. Tartaglione's interest to disclose the note, it also may be in Mr. Barket's and Mr. Weider's interest not to do so for fear of being investigated or disciplined, and that's one of the conflicts that is identified in the report.

The other potential conflict is that, as I said, Mr. Barket can become an unsworn witness. And so, to the extent that Mr. Tartaglione's conduct with respect to the note could become an issue during the penalty phase, either for mitigation or aggravation, then there's the possibility that Mr. Barket could be called to testify about these very same events, as well as Mr. Weider. The elusive Mr. Weider.

So I think in my view these lean a little bit towards more of potential rather than actual conflicts. At least with respect to Mr. Barket. Mr. Weider may be a different story, we can talk about him later.

With respect to the contraband cellphone, the report suggests that the attorneys who facilitated Mr. Tartaglione's use of the contraband cellphones could be potential witnesses during the penalty phase. Again, either in mitigation or

SEALED PROCEEDINGS

aggravation context. Again, they could themselves be subject to investigation regarding the use of these contraband phones.

And the report also highlights the possibility that, or actually, not the possibility, but the fact that not all defense team members have been given access to the contents of these text messages.

I guess this is a good place to pause and say that a lot of what has been briefed between the lawyers representing Mr. Tartaglione is clearly a sharp dispute or disagreement over defense strategy and why certain things should be done a certain way, why certain things should not be done at all. And as much as I understand that lawyers have strong opinions, and I certainly understand that learned counsel rely on their experience in capital cases, in my view, those don't go to the issue of conflicts because the only issue here is the extent to which Mr. Tartaglione's right to representation could be threatened by the conflicts that some of those he wants to represent him might have, but that does not amount to the Court getting involved in refereeing disputes among lawyers, in other word, the conflicts they have about how the representation should be done. It's not to say I don't have any views, I just think my views are irrelevant. And at the end of the day, lawyers are going to disagree. And you know, Mr. Tartaglione, to some extent, has to be his own referee as to what course he might want his lawyers to take. And I can understand why even

SEALED PROCEEDINGS

people viewing this from the outside they might have their own views on how some of the things should be done or shouldn't be done or if they're going to be done maybe in ways that they should be done, and they might even say that these things Mr. Tartaglione maybe he on some level has his choice but there's a choice that is not going to ultimately be in his benefit. But that's not what the purpose of *Curcio* is.

All right, so that's the sort of backdrop. I guess I'll pause here and see if there's anything anybody wants to add at this point, starting I guess starting with the government.

MS. FEINZIG: No, your Honor. Thank you.

THE COURT: Ms. Sternheim, anything you want to add?

MS. STERNHEIM: No, thank you.

THE COURT: Mr. Barket.

MR. BARKET: No, thank you, your Honor.

THE COURT: Mr. Ricco.

MR. RICCO: No, none other than --

THE COURT: Oh, do you want to -- actually do you want to go to the podium so they can hear you.

MR. RICCO: Your Honor, that there's the duty to investigate that capital counsel has. There's a duty to investigate that capital counsel has, and that rises in the context of the note. And so if an attorney is involved with that, that could affect his ability to perform as he's required

SEALED PROCEEDINGS

to do so under *Rompilla* and 10.7, which says that, in a capital case, there's an obligation to investigate. And in this particular case, that obligation to investigate has been impacted by the activity of counsel.

THE COURT: Well, hang on, so let me just follow up on that. Like I said, I read a couple of times the memorandum of law that you and the other learned counsel prepared, and I've also read Mr. Barket's response. And part of what he says with respect to the note is that, from his perspective, he had to sort of ascertain the *bona fides* of the note. Because if it turns out the note was not written by Mr. Epstein, then its usefulness in any investigations in the circumstances surrounding Mr. Epstein's death would not, I don't think they would exist. And so to the extent that his handling of the note was to preserve the possibility of its use in the investigation and maybe to the benefit of Mr. Tartaglione, he had to also be careful not to overplay that hand if it turns out the note was not from Mr. Epstein.

MR. RICCO: I don't agree with that point, but that was the point that learned counsel made to Mr. Barket.

And I would just say, Judge, that Mr. Barket has a right to conduct himself in a way which he thinks is in the best interest of the defendant. In a capital case that conduct is guided by the ABA guidelines and the authority *Rompilla versus Beard.* So at the end of the day, a decision may be made

24

SEALED PROCEEDINGS

not to use any of it, but capital counsel has an obligation to fully investigate those factors.

THE COURT: Right.

MR. RICCO: And in this particular case, the ability to investigate those factors were, in fact, obstructed and they were obstructed by a person who had an interest in maintaining that note.

THE COURT: So how do you think that the interest obstructed retained counsel's ability to investigate the potential use of the note?

MR. RICCO: I know how it affected learned counsel's ability to investigate the note.

THE COURT: Sure. But how would it affect Mr. Barket's ability to investigate and potentially make use of the note?

MR. RICCO: That I don't know because he would be investigating his own conduct. I mean, we have an obligation to investigate the facts. What are the facts? And what are the evidences that corroborate those facts? That's capital counsel's obligation. So it's not that it's the note itself that is a mitigator, it is the note plus what the note leads you to, and you're led to that development of mitigation from an investigation. And there's no question that the ability to do that was obstructed here.

THE COURT: So let's back up for a second. It seems

SEALED PROCEEDINGS

to me that the note and the handling of the note implicate both potential aggravating and mitigating factors; right? This is not a situation where it's either, it's potentially both. And you'll tell me if this is wrong, because I obviously don't view this case with the same sort of advocate's viewpoint that all of you do, right, because I'm the referee. But if I were representing Mr. Tartaglione, I would think that the note has a potential mitigating impact because it could be he could assist in the investigation of the circumstances surrounding Mr. Epstein's death, and the note might be something that could be useful, so the fact that he had the note and then potentially, let's say that it's determined the note, in fact, was written by Mr. Epstein, the note gets turned over to the appropriate government officials doing the investigation, and from Mr. Tartaglione's perspective, that's a good thing. It's a potential aggravating factor, I would think, also to the extent that the note was secreted out. Right? It was taken from the prison. And so the government could argue that this shows that Mr. Tartaglione doesn't follow sort of prison rules, and they could argue that that's a potential aggravating factor in terms of future dangerousness. The same argument the government could make, and I think you made this point to the cellphone, the contraband cellphone.

            Maybe there are other things, Mr. Ricco, but if you're representing Mr. Tartaglione, you have to consider that

SEALED PROCEEDINGS

and you have to do the investigation, as you say, which would start, I assume, with is the note legit. Is the note from Mr. Epstein. And so why would the potential conflict here obstruct counsel's ability to do that investigation?

MR. RICCO: Because in this particular case learned counsel, we don't have the note, and we may request to see the note.

THE COURT: Right, but that's going to -- that's what I was saying a little bit earlier, there are disagreements among you as to how things should be done and who should be doing what, but to the extent that the note gets investigated, whether it's by learned counsel or retained counsel, from Mr. Tartaglione's perspective, he just wants it investigated.

So the question is what is it about the potential conflict that would prevent Mr. Barket and other retained counsel from doing that inquiry?

MR. RICCO: Judge, I would say that when you phrase the question that way, like everyone together as long as it gets done there's no prejudice.

THE COURT: Yes.

MR. RICCO: Well, we're relying upon an individual in the capital representation to conduct an inquiry on his own and by himself. And he may have a right to do that. So, for example, Mr. Barket filed two affidavits saying that he hired some investigators, and they went out to do some work. Well,

SEALED PROCEEDINGS

that's a fact that none of us ever knew. The Court had five, four or five investigators.

THE COURT: Right.

MR. RICCO: We never knew about that.

THE COURT: Right.

MR. RICCO: Whether that actually happened or didn't happen, we've never been able to conduct that investigation. And so the development of mitigation is fluid, and so we take one piece of evidence and we compare it to another piece.

So the government invited us to the US Attorney's office to review some of the discovery around the events that took place on the evening of the attempted suicide and later on, and those documents that we had an opportunity to review shed an entirely different light on the representations about the note. And so that in turn caused us as learned counsel to want to know more about this.

THE COURT: Yes.

MR. RICCO: And more about the other circumstances, and we were not permitted, we were not put in a position to do that.

THE COURT: This is what I was saying earlier, I think that -- I guess I'm trying to understand why the conflict among counsel about how to treat the note or how to treat the press or how to treat any number of the myriad of issues that you all are dealing with is the subject of a *Curcio* hearing.

28

SEALED PROCEEDINGS

Because at the end of the day, it may be, as I said, that you disagree with how something is being handled, it may be that you think there should be more sharing of information so that all of you can work together, but the issue that we need to address here is the extent to which the potential conflict is going to undermine potentially Mr. Tartaglione's right to representation, because obviously the right is to conflict-free representation so that that way he can have confidence that the lawyer that he's picked can represent him even in the wake of the potential conflict.

MR. RICCO:  Judge, I don't view what happened here as a situation where everybody just needed to work towards a common goal.

THE COURT:  Yes.

MR. RICCO:  What we encountered in this case was an obstruction of the ability to represent a capital defendant and compliance with 10.7 and *Rompilla versus Beard.*

And the reason for that, what's the reason for that? The reason for it is because an individual, a potential person who has information about this is a member of the team.  So for example, your Honor, we contemplated subpoenaing the phone records so that we could find out for ourselves the inconsistencies between the statements that have been made, the information on the Bureau of Prisons' reports and what actually exists between the phones; the phone from in the jail and

SEALED PROCEEDINGS

whoever Mr. Tartaglione is allegedly communicating with.

But we thought at that juncture it was highly improper, for one, for learned counsel on a defense team to have to subpoena phone records of another lawyer so that we could conduct a routine investigation, a comparison of facts to determine whether or not they were mitigating or potentially aggravating. It's not that we gave up the idea that it should be done. It should be done.

THE COURT: Yes.

MR. RICCO: If it was just, Judge, at the time we felt that it was not appropriate to take such a strong measure. What the Court should understand is that that's how much -- this wasn't just, hey, if people just shared information. We were confronted with an individual who was withholding important information, important information related to the ability to responsibly and meaningfully develop mitigation or prepare for potential aggravators. So it wasn't, it's not just simply, well, you know, that issue. We found that we were being manipulated. Now when I say we being manipulated --

THE COURT: No, I know.

MR. RICCO: -- I mean the defendant's right to prepare for mitigation and potential aggravators was being manipulated, and it was being manipulated by a person who is a potential witness, who's involved in the facts. If that person wasn't a member of the team --

SEALED PROCEEDINGS

THE COURT: Right, but that's the heart of this. So if the potential conflict is Mr. Barket is a potential witness, the question is how has that potential, how has that potential, what's the connection, the causal connection between that and you think the potential consequences to Mr. Tartaglione from the fact that you were not brought in to that loop?

MR. RICCO: Judge, I'm not very far from your thinking on this. Because to me this comes down to whether or not a lawyer can stand before the Court and say that he is performing, that is, representing the defendant in accordance with the lawyer's obligation to develop mitigation.

THE COURT: Yes.

MR. RICCO: So in the absence of the information, we're not able to do it.

THE COURT: Right, but as long as Mr. Barket does it, I guess what I'm trying to understand is there has to be a causal connection between the conflict and the bad consequences to the person being represented. That's it. That's the only thing *Curcio* is meant to address.

MR. RICCO: That is correct, Judge. And so, for example, Mr. Barket can say, don't worry about it, Judge, I'm going the fully investigate this.

THE COURT: Right.

MR. RICCO: I'm going to get all the evidence together, regardless of how it comes out, if there's a problem,

SEALED PROCEEDINGS

I'll notify the Court. There's not an issue.

The problem that we have with that statement being made is that the conduct since July 29 has been just the opposite. Because every step along the way what we have discovered as attorneys for Mr. Tartaglione is that Mr. Barket makes decisions that are based on his interest. And it's not just our conversations but is what we've experienced, we've gone to training programs, the teams. We have discussed these issues.

And so my concern is just simply this, if someone is going to investigate probably one of the most important mitigators that a man in Mr. Tartaglione's position has, then that should happen. Because at the end of the day that's going to be the question. The question is going to be did the lawyers perform as required. And we, as learned counsel, have certainly lived up to that in every respect, and we have reached barriers, and we've reached barriers it's the reason why we notified the Court.

THE COURT: Yes. All right. Okay, anything else, Mr. Ricco?

MR. RICCO: No.

THE COURT: Mr. Barket, do you want to respond?

MR. BARKET: No, thank you, Judge.

THE COURT: All right. So what I want to do next is begin the inquiry, Mr. Tartaglione, of you. So I'm going to

SEALED PROCEEDINGS

ask you a bunch of questions. Please understand, the only purpose of these questions is to make sure that you understand the potential conflicts, that is, how these conflicts could adversely affect you. Because then I'm going to you the extent to which you want to continue with the representation. I have to make certain findings, and I can't make those findings until I hear your answers to the questions.

THE DEFENDANT: Yes, sir.

THE COURT: These questions are solely designed to make sure that your rights are being protected.

THE DEFENDANT: I understand.

THE COURT: All right. So we're going to start with some real basics. So we'll start with how old are you?

THE DEFENDANT: Fifty-two, unfortunately.

THE COURT: Okay, and how far have you gone in school?

THE DEFENDANT: I've gone -- I've got several courses, college courses related to law enforcement.

THE COURT: Okay. And what jobs have you held since you finished school?

Thank you for keeping the mask above the nose, by the way.

THE DEFENDANT: All were in law enforcement. I've been an investigator. I've been a canine handler. Basic patrol. I've been a supervisor.

Angela O'Donnell, RPR, 914-390-4025

SEALED PROCEEDINGS

THE COURT:  And you were employed as a law enforcement officer; where were you employed as a law enforcement officer?

THE DEFENDANT:  City of Mount Vernon, City of Yonkers, and Village of Briarcliff.

THE COURT:  Okay.  And how long were you a police officer?

THE DEFENDANT:  Total about 17 years.

THE COURT:  All right.  And so you've listed the various positions you've had in the various police departments?

THE DEFENDANT:  Yes.

THE COURT:  Are there any you didn't mention?

THE DEFENDANT:  I think I've covered them all.

THE COURT:  Okay.  Can you describe some of the training that you received in connection with being a police officer?

THE DEFENDANT:  I've been to -- I mean, for investigation I've been to -- for investigator I've been to several schools about investigating crimes.

For canine, I've studied being a handler and then a canine trainer.  You then switch over and you're teaching other police officers how to handle the dogs, how to use them for tracking, for patrol, for everything.

THE COURT:  Okay.  So you were a trainee and a trainer.

34

SEALED PROCEEDINGS

THE DEFENDANT:  Yes.

THE COURT:  Okay.  And then how long ago did you stop being a police officer?

THE DEFENDANT:  I was injured in 2005.  I was back and forth, I was off and on off the injury list, but then they retired me, I believe, in 2010, but then I was able to recuperate fully, and I didn't feel comfortable anymore receiving disability checks, so I was able to overturn the injury status, and I was fit for duty again, but before I was able to return to work, I was arrested and charged.

THE COURT:  Okay.  In the last two days have you had medicine at all, I mean like any prescribed medication, any other medicine?

THE DEFENDANT:  No, sir.

THE COURT:  Have you had any drugs or any alcohol?

THE DEFENDANT:  No, sir.

THE COURT:  Okay.  Do you feel clearheaded today?

THE DEFENDANT:  Yes.

THE COURT:  You feel like you understand what's going on?

THE DEFENDANT:  Yes.

THE COURT:  Now you're currently represented by Mr. Barket and Ms. Leisenring and their firm; is that right?

THE DEFENDANT:  Yes, sir.

THE COURT:  Okay.  And generally speaking, have you

SEALED PROCEEDINGS

been satisfied with their representations of you?

THE DEFENDANT:  Very.

THE COURT:  Okay.  With respect to Mr. John Weider, what is his role in this case?

THE DEFENDANT:  In this case officially?  None.

THE COURT:  When you say, officially, what does that mean?

THE DEFENDANT:  Well, he's -- John Weider has been one of my best friends since high school.  He's also an attorney, and he's represented me in many endeavors over the years.

THE COURT:  Yes.

THE DEFENDANT:  I trust Mr. Weider, and I often confide in him and ask his opinion, but Mr. Weider has no actual association with my defense.  He makes no decisions.  He is not part of my defense at all.

THE COURT:  To your knowledge, is anybody paying him to be your lawyer in this case?

THE DEFENDANT:  No, not at all.

THE COURT:  To your knowledge, has he been doing work on your behalf in this case?

THE DEFENDANT:  No.

THE COURT:  So you don't know if he's had meetings with the attorneys that have been hired to represent you about this case?

SEALED PROCEEDINGS

THE DEFENDANT:  I know he's spoken with Bruce over my family, my mental health, things like that, but I don't think he's discussed anything as far as the actual defense, no.

THE COURT:  Okay.  Do you have any knowledge of a professional relationship between Mr. Weider and Mr. Barket's firm?

THE DEFENDANT:  There is none.

THE COURT:  Okay.  Have you retained any other lawyers or has your family retained any other lawyers to represent you in connection with this case?

THE DEFENDANT:  No.

THE COURT:  Okay.  Have you retained or has your family retained any paralegals to help you in this case?

THE DEFENDANT:  No.

THE COURT:  All right.  We're now going to discuss your right to conflict-free counsel.  All right?

I really want you to pay attention to this, okay, because this is the heart of what we're here to inquire about.

THE DEFENDANT:  Yes, sir.

THE COURT:  So in every criminal case.  Obviously including this one, you, just like any other defendant, have a right to a conflict-free attorney.

What do I mean by that?  A conflict-free attorney is an attorney who only has your best interest at heart in everything that they do no connection with representing you in

Angela O'Donnell, RPR, 914-390-4025

SEALED PROCEEDINGS

the case. Do you understand that?

THE DEFENDANT: Yes.

THE COURT: And because this is a capital case, it should go without saying, but it needs to be made clear to you, that the right to a conflict-free attorney is heightened in a capital case.

THE DEFENDANT: Of course.

THE COURT: So you want to make sure that your lawyers have only one thing this mind, which is to achieve the best possible result for you, starting with an acquittal, and if there's no acquittal, then making sure you don't get the death penalty. Do you understand that?

THE DEFENDANT: Absolutely.

THE COURT: Now, to be clear, in doing this inquiry, I'm not trying to suggest to you that to the extent that there are potential conflicts, and I have explained a little bit about those conflicts and we'll talk more about it in a minute, I'm not making accusations against Mr. Barket, Ms. Leisenring, or their firm. Okay?

THE DEFENDANT: I understand.

THE COURT: I am duty bound to make sure that everything is done to protect your right to representation, including conflict-free representation. So it's important that you have a full understanding as to the potential conflicts in this case.

Angela O'Donnell, RPR, 914-390-4025

SEALED PROCEEDINGS

And by the way, conflicts happen all the time for reasons having nothing to do with fault. All right? And so why it's very important. Sometimes they do, and sometimes a lawyer in a completely different case might be greedy. Might be trying to do something that's all about lining their pockets. None of that is here, which is why I use that as an example. And that's the reason why I appointed Ms. Sternheim to be your *Curcio* counsel because she's not going to represent you if there's a trial or a hearing or a sentence or any of that. Her sole representation in this case is to make sure you understand your rights with respect to conflict-free counsel, and so she's your lawyer for that purpose. Do you understand that?

THE DEFENDANT: Yes, sir.

THE COURT: All right. And I've asked you this before, I want to ask you again. Have you had opportunity to meet with Ms. Sternheim in person?

THE DEFENDANT: Yes.

THE COURT: Okay. And do you know how many times roughly you met with her in person?

THE DEFENDANT: It's several. I'd say more than three times.

THE COURT: Okay. And I take it that was before the pandemic.

THE DEFENDANT: Before the pandemic.

Angela O'Donnell, RPR, 914-390-4025

SEALED PROCEEDINGS

THE COURT: Yes. Okay, so sometime in 2019 and up through maybe early 2020?

THE DEFENDANT: Yes.

THE COURT: And did you also have occasion to speak with her on the telephone?

THE DEFENDANT: Yes. Since then we've spoken several times on the phone, and even once on the videoconference.

THE COURT: Okay. And during those conversations, I don't want to get into the details of those conversations, but did you have occasion to discuss or enough of an opportunity to discuss with Ms. Sternheim the potential conflicts of interest that Mr. Barket, Ms. Leisenring, and Mr. Weider might have in this case?

THE DEFENDANT: Yes.

THE COURT: Okay. Well, let me ask you, if could describe, pretend like you're just describing this to a family member, what it is you think the potential conflicts are.

THE DEFENDANT: Okay, if I was going to describe it to a family member?

THE COURT: Yes.

THE DEFENDANT: I would have to say, the lawyers in the case, the potential conflicts would be that Bruce, for instance, could be tempted to advise me in a way that puts priority on his benefit over mine, either to preserve his reputation or to spare him criminal charge or repercussions or

SEALED PROCEEDINGS

reprimand, he could advise me in a way, he could testify in a way that's harmful to me. There's several different things he could do there.

THE COURT: Okay, so when you say he could testify in a way that could be harmful to you, can you think, in the context of what we've been talking about here with respect to the statements of the press, with respect to the note, and with respect to the contraband cellphones, where do you see, let's talk about Mr. Barket for a minute, where the potential testimony could be adverse to your interests?

THE DEFENDANT: Well, he could testify that I was the one who said to take the note out. He could testify that I was the one who said make the statements to the press. He could put all -- any conflicts, if there's found any wrongdoing was done, he could put that wrongdoing on me.

THE COURT: Okay. Maybe what we should is break this down. So with respect to the statements to the press about the conditions at the MCC, about your relationship with Mr. Epstein, you know, to the extent that Mr. Barket was trying to make clear that you were not the cause of Mr. Epstein's injuries and that the two of you got along, and so on and so forth, how do you understand that potential conflict?

THE DEFENDANT: Possible conflict? If I was lying about -- I don't really understand what you're saying.

THE COURT: Well, let me put it this way. So two of

Angela O'Donnell, RPR, 914-390-4025

SEALED PROCEEDINGS

the concerns that have been raised is that to the extent that Mr. Barket has conveyed certain information publicly, through the media --

THE DEFENDANT: Right.

THE COURT: -- that it would be arguably obvious that the source of the information would be things you said to him. So he takes what would be otherwise privileged communications -- because you understand, when you were talking to your lawyers, anything you say to them, and there are certain exceptions that don't apply here, so anything that you might say to your lawyers in connection with this case --

THE DEFENDANT: Is privileged.

THE COURT: -- in connection with their representations of you in this case, they're privileged.

THE DEFENDANT: Right.

THE COURT: They're not supposed to tell anybody about those conversations. Do you understand that?

THE DEFENDANT: Yes.

THE COURT: So to the extent that Mr. Barket gave statements the source of which could only come from you, then the one potential concern is that he would be waiving the attorney-client privilege on your behalf. Do you understand that?

THE DEFENDANT: Yes.

THE COURT: Okay.

Angela O'Donnell, RPR, 914-390-4025

SEALED PROCEEDINGS

THE DEFENDANT:  But, I mean --

THE COURT:  Okay.  I just want to make sure you understand that conflict.

THE DEFENDANT:  Yes.

THE COURT:  We'll talk about your reaction to that, but the only way we could even get to that part of the conversation is if you and I are on the same page as to what the conflict is.  If you're not, please --

THE DEFENDANT:  No, I understand.  I just -- we decided to speak to the press for three reasons.

THE COURT:  Okay, you don't need to go into that just now, we'll talk about that.

So why don't you say it to me, how do you understand conflict with respect to the attorney-client privilege?

THE DEFENDANT:  That anything I say to Bruce, to Mr. Barket, is privileged information so, therefore, if he says it to the press, it's being construed as being said by me.

THE COURT:  Right, it could be construed; right?

THE DEFENDANT:  Right.

THE COURT:  And therefore is a waiver of the attorney-client privilege.

THE DEFENDANT:  Right.

THE COURT:  Right?  What that means is that the government, for example, could try to say they get to then do inquiry as to other statements that might be related, and

SEALED PROCEEDINGS

Mr. Barket wouldn't be able to say, no, I'm sorry, that's privileged.

THE DEFENDANT:  Right.

THE COURT:  Do you understand that?

THE DEFENDANT:  Yes.

THE COURT:  All right, with respect to the note, all right, so now it's a different topic.  Right?  There have been a couple of concerns that having raised, but why don't you see if you could tell me where you think that the -- how you understand the potential conflicts there.

THE DEFENDANT:  With the note, I would imagine it's the removal of the note.  I mean, some people could say it was a violation of BOP policy to remove the note.  I didn't believe it was a violation of BOP policy but --

THE COURT:  Okay.

THE DEFENDANT:  -- if it could be interpreted as a violation, then Bruce, if it came, if it came down to being charged with a violation or criminal charges or anything negative, Bruce could be tempted to testify in a way that puts the blame on me.  He could say, you know, I was the one who ordered the note be taken out or whatever, and that could become an aggravating factor in my, I guess in my ability to follow rules or adapt to prison.

THE COURT:  So the government could use that against you at the penalty phase.

Angela O'Donnell, RPR, 914-390-4025

SEALED PROCEEDINGS

THE DEFENDANT: Yes, as an aggravating factor.

THE COURT: Okay. And that Mr. Barket might have an interest, because he might worried about himself being investigated --

THE DEFENDANT: Yes, if he worried about criminal charges, his reputation, a bunch of things.

THE COURT: Okay. And with respect to the cellphone, how would you describe the conflict?

THE DEFENDANT: The conflict, again --

THE COURT: Potential conflict.

THE DEFENDANT: I used a cellphone, a contraband cellphone to speak with people outside of the -- you know, outside. And that, again, is a violation of BOP rules and regulations. So if Mr. Barket broke those rules, he could, again, put the blame on me, and that again would be an aggravating factor at the penalty phase.

THE COURT: Okay. Okay. All right. So with respect to Ms. Leisenring, what's your understanding of a potential conflict she has in representing you?

THE DEFENDANT: That would be with the contraband cellphone.

THE COURT: So same issue --

THE DEFENDANT: Same conditions that, if it's deemed that Ms. Leisenring violated BOP policy and procedure by speaking with me on that phone, again, she could be tempted to,

Angela O'Donnell, RPR, 914-390-4025

SEALED PROCEEDINGS

you know, put any blame, whatever, towards me. Again, creating an aggravating factor at the penalty phase.

THE COURT: The other thing I mentioned earlier. So, right, there's the potential conflict of interest, right, that she could think she could be under investigation --

THE DEFENDANT: Right.

THE COURT: -- so she might be a little bit, even a little more concerned about her own interests --

THE DEFENDANT: Sure.

THE COURT: -- not being charged or having -- lawyer's not only, it's not just criminal charges, but we have to live by a certain set of ethical rules, and if we don't, then we can be referred to grievance committees, right, we could be sanctioned. And so even if a lawyer doesn't commit a crime, a lawyer could do something -- and, again, I'm not trying to suggest that happened here, but to the extent that there are rules and lawyers break them, then they're subject to inquiry by, for example, a grievance committee.

THE DEFENDANT: Right.

THE COURT: Okay, with respect to Mr. Weider, what do you understand the potential conflict with him being involved in this case would be?

THE DEFENDANT: I don't see one because he's not part of my defense. So in regards to this case, in fact, the charges that are against me here, I don't see as there really

SEALED PROCEEDINGS

is a potential because he's not part of my defense team.

THE COURT:  Okay.  You do understand that he could be called as a witness.  Right?

THE DEFENDANT:  Yes.

THE COURT:  So if the government wanted to press as an aggravating factor non-compliance with BOP rules, they could call him as a witness to have him testify that he worked with you to get the note out of the prison.

THE DEFENDANT:  Right, I understand.

THE COURT:  Okay.  To the extent he's not representing you, that makes it arguably different, but the same thing could be said of Mr. Barket with respect to the note and with respect to Mr. Barket and Ms. Leisenring with respect to the cellphone, if those become issues at the trial, either the liability phase or the penalty phase, they could become potential witnesses.  And the law is that a lawyer who is an advocate in a trial can't also be a witness.  So you can't have a circumstance where Mr. Barket would and at one point in the trial Ms. Leisenring would be at the podium asking witnesses questions, and then later on in the same proceeding all of a sudden they're called as witnesses.

THE DEFENDANT:  Right.

THE COURT:  I could bore you with why that's true.

THE DEFENDANT:  No, I understand.

THE COURT:  If you'll accept my representation,

47

SEALED PROCEEDINGS

that's not allowed.

THE DEFENDANT:  I understand.

THE COURT:  So you understand that that's another potential conflict here.  You could lose your lawyers if they are deemed to be necessary witnesses.

THE DEFENDANT:  Yes.

THE COURT:  Do you understand that?

THE DEFENDANT:  I do.

THE COURT:  Now we've talked about your constitutional right to conflict-free representation.  You also have a right to your choice of representation.  Do you understand that?

THE DEFENDANT:  Yes, I do.

THE COURT:  Okay.  Now there may be limits to the choice, but as a general matter, you get to choose who you want to represent you.  Do you understand that?

THE DEFENDANT:  Yes, sir.

THE COURT:  Okay.  So now I want to talk a little bit about the death penalty in this case because it is one things, of course, that makes this case different than the average case.

So I assume you are aware that the Attorney General of the United States has authorized the US Attorney for this district to seek the death penalty in this case in relation to the deaths of four individuals; Martin Luna, Erbano Urbano

Angela O'Donnell, RPR, 914-390-4025

48

SEALED PROCEEDINGS

Santiago, Miguel Luna and Hector Gutierrez.

THE DEFENDANT:  Yes, sir.

THE COURT:  And are you aware that in order for the government to obtain a sentence of death, it is required to present evidence against you at a trial and that there are two phases of that trial.  There's the so-called liability phase --

THE DEFENDANT:  Penalty phase.

THE COURT:  -- where the question whether the government has met its burden of proving your guilt of the charges beyond a reasonable doubt, right, so the jury will return a verdict, guilty or not guilty, on the charges.  Do you understand that?

THE DEFENDANT:  Yes.

THE COURT:  If the jury returns a guilty verdict on any of the capital counts, then the next phase of the trial would be the penalty phase of the trial.  And again, that would be before the jury.  Do you understand that?

THE DEFENDANT:  Yes, I understand.

THE COURT:  And it's at that phase of the case where there is the presentation of the aggravating factors by the government and the mitigating factors by you before the jury. Do you understand that?

THE DEFENDANT:  Yes.

THE COURT:  So what that means is that the government obviously can present evidence in support of its aggravating

Angela O'Donnell, RPR, 914-390-4025

SEALED PROCEEDINGS

factors, and then you would have the right, through your counsel, to present evidence in support of whatever mitigating factors they want to offer on their behalf. Do you understand that?

THE DEFENDANT: Yes, completely.

THE COURT: And so I'm sure you've gone over this with your lawyers, and I've tried to give you a summary of it here, but why don't you try to explain to me, again imagine you're explaining this to a family member, so not a lawyer, this is how the death penalty case works, there are two phases and so forth. So why don't you describe it.

THE DEFENDANT: First I'm going to have my trial, that's where we're going to present evidence to prove my innocence, or if the jury decides otherwise. If the jury comes back with a guilty verdict on me, then we would go to the penalty phase. The penalty phase the jury would decide on whether to execute me or give me life in prison.

THE COURT: Okay. So let's back up for a second. So at the liability phase you mentioned that this is your chance to present evidence, as you say, to prove your innocence.

Do you understand also that your lawyers also have the opportunity to contest the government's case; right? So the government goes first, and the government --

THE DEFENDANT: Right.

THE COURT: -- presents its evidence in support of

SEALED PROCEEDINGS

its claim that you're guilty of the charges brought against you. And your lawyers can prepare to defend against those witnesses or any other evidence. Do you understand that?

THE DEFENDANT: Yes, of course.

THE COURT: So it's not just that you get to present evidence through your lawyers, but your lawyers get to contest the government's evidence.

THE DEFENDANT: Cross examine their witnesses.

THE COURT: Sure, right. They could cross examine the witnesses, right, they can cross examine the witnesses. They can object. They can say, this evidence should not be offered, this testimony should not be offered. Do you understand that?

THE DEFENDANT: Yes.

THE COURT: Okay. So, again, it's not just that you get to go on offense, if you will, you get to present your own case. You have the right to do that through your lawyers, but even before that phase of the trial begins, your lawyers will play defense in the sense that they will try to, like you say, cross examine the government's witnesses. But even before the witnesses take the stand, they might try to argue that their testimony should not be allowed or certain portions of it shouldn't be allowed, or certain exhibits that the government might want to introduce should not be brought before the jury. Do you understand all that?

SEALED PROCEEDINGS

THE DEFENDANT:  Yes, completely.

THE COURT:  Okay.  So then you mentioned -- if the jury returns a not-guilty verdict, then obviously there's no penalty phase; right?  On the capital counts.

If the jury returns a guilty verdict, then how would you describe the penalty phase?

THE DEFENDANT:  Penalty phase is now basically another trial, if you will, that's going to decide whether I'm worth keeping alive or should they kill me.

THE COURT:  And so at that trial, what's your understanding as to what the government will be presenting?

THE DEFENDANT:  The government's going to present aggravating factors.  They're going to present reasons why you should kill me.

THE COURT:  Okay.  And what's your understanding of what your lawyers get to do in the face of the government presenting that evidence?

THE DEFENDANT:  They're going to try to present mitigating factors to basically try to persuade the jury that I'm still worth being kept alive.

THE COURT:  So before your lawyers get a chance to present mitigating evidence though, what's your understanding what your lawyers get to do in response to the government's aggravating -- presentation of evidence in support of the aggravating factors?

SEALED PROCEEDINGS

THE DEFENDANT: They can impeach that evidence. They can object to it, they can try to diminish it. You know, a bunch of ways.

THE COURT: Do you understand that they, again, they can try to argue that some of the evidence shouldn't be considered.

THE DEFENDANT: Sure. Yes.

THE COURT: Testimony shouldn't be allowed or allowed for a very specific purpose. Do you understand all that?

THE DEFENDANT: Yes.

THE COURT: Yes, they get to cross examine witnesses. Right? The purpose of that is maybe attack the credibility of the witnesses or limit the impact of the witness' testimony. Do you understand all that?

THE DEFENDANT: Yes, sir.

THE COURT: Again, this is before any mitigation is even presented.

THE DEFENDANT: Right.

THE COURT: So the one thing I think is important for you to know, and you're a law enforcement officer, so you probably know this quite well, but at the liability phase the government has all the burden. Right? The government has the burden of proving guilty beyond a reasonable doubt. You do not have to prove your innocence. Do you understand that?

THE DEFENDANT: Yes.

Angela O'Donnell, RPR, 914-390-4025

SEALED PROCEEDINGS

THE COURT: So in theory, your lawyers don't have to present any evidence on your behalf. They don't have to do anything. But they certainly don't have to present evidence on your own behalf. Do you understand that?

THE DEFENDANT: Yes.

THE COURT: Of course they can, and the same with respect to the penalties phase. It's the government's burden to establish that the appropriate sentence is the death penalty. Do you understand that?

THE DEFENDANT: Yes, sir.

THE COURT: All right. Your lawyers may want to be quite aggressive in attacking the government's presentation of the evidence in support of the aggravating factors, and they might want to be equally aggressive in the presentation of evidence in support of mitigating factors on your behalf. Do you understand that?

THE DEFENDANT: Yes.

THE COURT: Again, why don't you take another shot at explaining how you understand the penalty phase works.

THE DEFENDANT: The penalty phase is going to be another sort of a trial where the government is going to present aggravating factors while the defense team is going to try to diminish the aggravating factors, attack their witnesses or any evidence they have that's going to try to persuade the jury to execute me. Then they're also going to present

SEALED PROCEEDINGS

mitigating factors that will hopefully further convince the jury to not kill me.

THE COURT: Okay. Now we've talked about what your lawyers can do at the liability phase and what they can do at the penalty phase. Right? They can try to keep evidence out, they can --

THE DEFENDANT: Right.

THE COURT: Right? Cross examine witnesses, present evidence on your behalf.

Do you understand, to do all that, to be ready to answer the government's case, both at the liability and the penalty phase, and to be ready to present a case on your behalf, the lawyers have to engage in a great deal of preparation.

THE DEFENDANT: Yes.

THE COURT: Do you understand that?

THE DEFENDANT: Yes.

THE COURT: That means that they are going to want to have investigators on your behalf do everything they can to find out facts.

THE DEFENDANT: Yes.

THE COURT: Find out facts that could help you in your defense case but also find out facts they could use to impeach the credibility of the government's witnesses or otherwise poke holes in the government's case. That might

Angela O'Donnell, RPR, 914-390-4025

SEALED PROCEEDINGS

include collecting documents. Do you understand that?

THE DEFENDANT: Yes.

THE COURT: Interviewing lots of witnesses. Right?

It also includes doing lots of the legal research because they want to be ready to make any motions they can on your behalf; motions to dismiss the case, motions to keep certain evidence out, motions to allow certain evidence to come in on your behalf. That's just with respect to the liability phase. Do you understand that?

THE DEFENDANT: Yes, sir.

THE COURT: And then, with respect to the penalty phase, they also need to do lots of work to get -- hire experts to do lots of work and other people practiced in the field to do lots of work. So, again, there's investigative work, right, and because --

Well, let me ask you a question. Do you understand the mitigating factors -- how would you describe mitigating factors to somebody, again, a non-lawyer?

THE DEFENDANT: As far as the penalty phase?

THE COURT: Yes.

THE DEFENDANT: Mitigating factors are anything that puts me in a positive light to persuade the jury I'm worth keeping alive, anything from my childhood to my career as a police officer, for example. Anything that puts me in a positive light or shows that I'm not a criminal or an animal.

Angela O'Donnell, RPR, 914-390-4025

SEALED PROCEEDINGS

THE COURT: So, in other words, facts that might relate to the case, but facts about you that have nothing to do with the case.

THE DEFENDANT: Yes.

THE COURT: Right. Your family history, your current family situation, your health, your education, your employment, anything about your life they could potentially use as a mitigating factor.

THE DEFENDANT: Who I am as a person.

THE COURT: Right. So you understand that that means they need to do a tremendous amount of investigation about you as a person.

THE DEFENDANT: Yes.

THE COURT: And the government can present aggravating factors, sometimes those aggravating factors have to do with how the alleged crimes are carried out, and sometimes they have to do with the victims, victim impact is one aggravating factor.

THE DEFENDANT: Right.

THE COURT: So your lawyers and those working with your lawyers have to do a great deal of work to be ready to rebut those types of claims. That, again, don't necessarily don't have directly to do with the case but might have to do with the victims and their lives and the people that they leave behind. Right?

SEALED PROCEEDINGS

THE DEFENDANT: Right.

THE COURT: So maybe there would be surviving family members that would testify. And so your lawyers would need to be prepared to answer those types of arguments and address those types of exhibits and that type of testimony. Do you understand that?

THE DEFENDANT: Yes.

THE COURT: Okay. And, in fact, you understand that it's the obligation of a lawyer to do the best that she or he can to prepare the defense?

THE DEFENDANT: Yes.

THE COURT: On behalf of any criminal defendant. Do you understand that?

THE DEFENDANT: Yes, sir.

THE COURT: And that that obligation gets heightened in a capital case such as this one.

THE DEFENDANT: Yes.

THE COURT: Okay. I think you and I can agree that it's right to expect that the lawyers who represent us in capital cases should work at the very highest levels of effort and professionalism. Right?

THE DEFENDANT: Absolutely, yes.

THE COURT: And so we don't want lawyers to engage in any conduct that might affect their ability to either rebut aggravating factors or to prevent the best presentation of

SEALED PROCEEDINGS

mitigating factors.

THE DEFENDANT: Yes. Their concern should be 100 percent about me.

THE COURT: At the penalty phase and of course at the liability phase.

THE DEFENDANT: Yes.

THE COURT: Ad I don't want to get into all the potential aggravating or mitigating factors because that's up to the lawyers, but do you understand that prison adjustment, I'll just say that generally, is something that is often the subject of both aggravating factors and mitigating factors?

THE DEFENDANT: Yes.

THE COURT: How would you describe that, like what would be an aggravating factor related to prison adjustment?

THE DEFENDANT: An aggravating factor?

THE COURT: Yes.

THE DEFENDANT: Well, for example, with the phone, the fact that I engaged in use of a contraband phone, the prosecution could use that to say I am not -- I don't respect the prison rules and regulations or I'm not adjusting to prison life well and then therefore I could be a future problem to a prison staff, other inmates, I could be a danger, things like that.

THE COURT: Right, to but it bluntly, a prosecutor could argue Mr. Tartaglione has shown he does not respect

Angela O'Donnell, RPR, 914-390-4025

SEALED PROCEEDINGS

prison rules, and if you impose -- if you allow there to be a sentence other than death, he could be a future danger --

THE DEFENDANT: Right.

THE COURT: -- to prison staff or other inmates because of what he has demonstrated thus far; right?

THE DEFENDANT: Yes.

THE COURT: You understand that could be something the prosecution could argue?

THE DEFENDANT: Oh, yes.

THE COURT: Conversely, how would you describe prison adjustment as a possible mitigating factor for you?

THE DEFENDANT: Something I've done you mean in prison to be mitigating?

THE COURT: Yes.

THE DEFENDANT: I mean, I've helped -- you know, they could --

THE COURT: I don't want to you present your particular mitigating factor, by hypothetically, how could prison adjustment be a mitigating factor for you?

THE DEFENDANT: Oh, that I have family that loves me, I have people that still care about me, that putting me to death wouldn't bring those people back, things like that, I guess.

THE COURT: Could you also argue that, hey, I've been a model inmate, I've -- if somebody had the facts to back that

SEALED PROCEEDINGS

up, is it possible that their lawyers would say, that's a mitigating factor? He's not a future danger. He's been a model inmate. He's had to endure horrible prison conditions so far. There's been a pandemic.

THE DEFENDANT: Being --

THE COURT: His cellmate committed suicide, and yet he hasn't harmed a flee.

THE DEFENDANT: Being a police officer in general population is no day at the beach.

THE COURT: Okay. You can see how prison adjustment can be used both as a mitigator factor on your behalf --

THE DEFENDANT: Right.

THE COURT: And as an aggravating factor for the government.

THE DEFENDANT: Yes, both, of course.

THE COURT: All right, so we've talked about your right to conflict-free attorney. And again, that means that the attorney has only one person's interest at heart and that's yours. Do you understand that?

THE DEFENDANT: Yes, sir.

THE COURT: That is just a real simple definition of what it means to have a conflict-free attorney. So if an attorney participated in conduct, we've covered this a little bit, but I want to make sure it's crystal clear, that broke some rule, not even talking about committing a crime, just

61

SEALED PROCEEDINGS

breaking a rule.

THE DEFENDANT:  Okay.

THE COURT:  And the breaking of the rule could have it be that they were worried about their interests in a way that would be contrary to your interest.  Do you understand that that's a possible situation of a conflict?

THE DEFENDANT:  Yes.

THE COURT:  Okay.  I'll give you an example that has nothing to do, again, with this case.  You know, if a lawyer -- well, let's say if a lawyer was -- real simple example.  If a lawyer was somehow involved in the criminal conduct that is the same conduct that the person they're representing was charged with, then they might be worried that the prosecutor will go after them as much as they will be going after the person being represented.

THE DEFENDANT:  Right.

THE COURT:  And they might want to then be careful to present a defense in a way that only implicates the client and not the lawyer.

THE DEFENDANT:  Right.

THE COURT:  Right?  That's a real stark, clear example, that has nothing to do with this case.  But do you understand that that's a pretty extreme example of a conflict?

THE DEFENDANT:  Yes.

THE COURT:  Okay.  So the lawyer could have the

SEALED PROCEEDINGS

incentive not only to make sure they ask questions in a way that would not implicate them, they also may be careful in terms of the investigation that they do, the arguments they make to the judge, or to the jury. All of that would be something that last person they'd be thinking about is the person they're supposed to only be thinking about.

THE DEFENDANT: Yes.

THE COURT: Okay. And, of course, it's in that situation the represented person, their interests are very much undermined. The chances of being convicted go up. And in this case, in a capital case, or in any capital case, the chances of them getting the death penalty go up, if the lawyers don't think about their interests, the client's interest. Do you understand that?

THE DEFENDANT: Yes.

THE COURT: So would you agree with me, and if you don't want to agree with me then just say that, that all things being equal, it would be better to have a lawyer representing you whose only interest is your interest.

THE DEFENDANT: Of course.

THE COURT: Okay. So the extent that -- again, I want to underscore this, to purpose of this hearing is not impugn anybody's integrity. There are cases that does happen. I've had them. That's not this case. I'm not here to say that any lawyer representing you has committed a crime or done

SEALED PROCEEDINGS

anything of the sort. But to the extent that there is the possibility, for example, that the note being taken out of the prison, and maybe not even shared with prosecuting authorities, or getting messages over a contraband cellphone, to the extent that those acts could be contrary to Bureau of Prisons' regulations, do you understand how it is that that could potentially create a conflict of interest between Mr. Barket, Ms. Leisenring and you?

THE DEFENDANT: Yes.

THE COURT: Why don't you, again, summarize how you see that potential conflict.

THE DEFENDANT: If they were in fear now of becoming a subject of investigation, or reprimanded, or even their reputation being damaged, there's a danger of Mr. Barket and Ms. Leisenring acting in a way that puts their own -- themselves over me. You understand? So they could advise me incorrectly, they could testify in a way against me, they could withhold information that would be helpful to me. There's a gamut of things they could do that would favor themselves over me or their own, you know.

THE COURT: But if I were a lawyer that was worried, for example, that even a trial might shed light on my misconduct, I could advise my client --

THE DEFENDANT: Take a plea.

THE COURT: -- you should plea. Right?

Angela O'Donnell, RPR, 914-390-4025

SEALED PROCEEDINGS

THE DEFENDANT: Right.

THE COURT: If I had that kind of a conflict. You understand that?

THE DEFENDANT: Absolutely.

THE COURT: All right, so let's talk about some of the specifics. Let's get into the weeds a little bit. So let's talk about the statements that Mr. Barket made to the media.

So as a general matter, are you aware of the statements that Mr. Barket -- you may not remember every detail, but are you aware about statements that he made to the media?

THE DEFENDANT: Yeah, I've read them all.

THE COURT: Okay. And do you understand that there's a possibility that somebody reading those statements or listening to them would think that he's actually relaying stuff that you said to him?

THE DEFENDANT: Yes, an adoptive admission.

THE COURT: Okay. And also that that could potentially be him sharing privileged communications that he had with you.

THE DEFENDANT: Yes.

THE COURT: Okay. So in particular, Mr. Barket made statements. Did you notice that he made statements about your relationship with Mr. Epstein?

SEALED PROCEEDINGS

THE DEFENDANT:  Yes.

THE COURT:  Again, there are other pieces to these statements, right, they're about cleanliness conditions and so forth.

THE DEFENDANT:  I understand.

THE COURT:  But those are really not the focus of what we're talking about here.

And do you understand Mr. Barket made statements in particular that you possessed information related to the attempted suicide and the ultimate death of Mr. Epstein?

THE DEFENDANT:  Yes.

THE COURT:  Did you discuss with Mr. Barket the substance of those statements before he shared them with the media?

THE DEFENDANT:  Yes.

THE COURT:  Were you aware that he was going to make such statements regarding your knowledge about Mr. Epstein and your relationship with him and your knowledge about his attempted suicide and ultimate death?

THE DEFENDANT:  Yes.

THE COURT:  What was your understanding as to your agreement with him about what he was going to say to the media?

THE DEFENDANT:  We were going to rebut the claims.  I mean, the media was saturated out there, media saying I attacked Mr. Epstein, and I did no such thing.  I never laid a

Angela O'Donnell, RPR, 914-390-4025

SEALED PROCEEDINGS

hand on him.  In fact, I was pounding on the door, I woke the guards up to come and help the guy.  But before Mr. Barket made those statements, we discussed it and we discussed, you know -- let me rewind.  I mean, since I was arrested I've been asking Bruce to make comments to the press because I'm being called a killer.  There's a lot of lies that are being said about me. I've always asked Bruce to speak in the press, and he always advises against it.  This time, however, he agreed that we should say something to the press because, I mean, I had friends even that were in England that wrote me a letter saying, you're on the front page in England for attacking Epstein.  So I really wanted to get it out there that I didn't attack him.  I mean, I don't know how effective we were at the time, but we both agreed that something should be done to rebut what they were saying.

THE COURT:  Okay.  So ultimately whose decision was it to have Mr. Barket talk to the media about your relationship with Mr. Epstein and your interactions with him before his death?

THE DEFENDANT:  I would say both of ours.

THE COURT:  Okay.  And do you feel looking back on it -- I want you to listen very carefully -- do you feel like you specifically gave Mr. Barket permission to say the things he said to the media?

THE DEFENDANT:  Yes.

Angela O'Donnell, RPR, 914-390-4025

SEALED PROCEEDINGS

THE COURT: Okay. So you consented to him making the specific statements about Mr. Epstein's attempted suicide, his ultimate death, and your interactions with him before those events?

THE DEFENDANT: Yes.

THE COURT: Okay.

THE DEFENDANT: There were three reasons that we decided to speak to the press.

THE COURT: Okay.

THE DEFENDANT: That was to rebut the claims that I attacked Epstein. I wanted to shed some light on the conditions of MCC, which are, and still are, horrendous. And the third, we were hoping that we could maybe persuade the Feds to come to the table and maybe we could trade --

THE COURT: Okay, all right, we don't need to get anymore into that. I understand.

But the bottom line is so that was a decision that you made to authorize Mr. Barket to give those statements.

THE DEFENDANT: Yes.

THE COURT: And did you understand that you also had the right to say to Mr. Barket, anything I tell you stays between you and me, these are privileged communications?

THE DEFENDANT: Of course.

THE COURT: So you're okay with him sharing communications, information you gave to him in his capacity as

SEALED PROCEEDINGS

your lawyer but to share that information with the public through the media?

THE DEFENDANT:  Yes.

THE COURT:  So do you understand then how it could be argued you have waived the attorney-client privilege, at least with respect to that sort of subject of your relationship with Mr. Epstein and any interactions you had with him before his death?

THE DEFENDANT:  I understand how somebody could maybe make that claim.  I don't agree that I've waived it.

THE COURT:  But you understand that's at least a possibility?

THE DEFENDANT:  Yes.

THE COURT:  And do you understand that the whole subject of your sort of interactions with Mr. Epstein and how you handled -- excuse me, how you handled the events before and after his death could also be used in the whole subject of prison adjustment?

THE DEFENDANT:  Yes.

THE COURT:  Why don't you explain how you think they could affect, either as a mitigating or aggravating factor, the whole subject of prison adjustment.

THE DEFENDANT:  Mitigating could be used to say I helped the man, I've never hurt the man.  The fact that when Epstein was first brought in, prison staff came and took me out

69

SEALED PROCEEDINGS

of a cell, I was in with somebody else, and they said, come on, we need you to go in another cell. I asked why. They said, well, you're the only guy we know that we're sure isn't going to hurt Epstein or extort him. I said, okay, fine. So that could be a mitigating factor, I would imagine.

THE COURT: Did you and Mr. Barket discuss how his statements to the press could be either an aggravating or mitigating factor at the penalty phase?

THE DEFENDANT: I don't remember if he discussed, he used those terms exactly. I mean, like I said, I remember we discussed the reasons why we wanted to -- I mean, like I said, I've been asking Mr. Barket to go to the press for a long time, he usually advises against it. This was the first time he agreed that we should speak to the press.

THE COURT: Okay. So do you understand also that aside from the attorney-client privilege waiver possibility, the other potential consequence of Mr. Barket making statements to the media that reflect information you gave him is that his statements almost become your statements, the adoptive admission that you mentioned earlier?

THE DEFENDANT: Yes, sir.

THE COURT: Can you describe your understanding of what the concept of adoptive admissions is.

THE DEFENDANT: Adoptive admission in this case would be anything Mr. Barket says to the media could be interpreted

SEALED PROCEEDINGS

as if coming directly from me.

THE COURT: So for example, do you understand that, if you were to testify at trial, the liability or the penalty phase, and if you say something that is different from what Mr. Barket said to the media, that the prosecution could use that to impeach your credibility?

THE DEFENDANT: Yes, sir.

THE COURT: Do you understand that?

THE DEFENDANT: Yes.

THE COURT: So the consequence of an adoptive admission is that you have to live with those statements as your own.

THE DEFENDANT: Yes.

THE COURT: Do you understand that?

THE DEFENDANT: Yes, absolutely.

THE COURT: You can see how that might therefore have made statements to the media potentially problematic for you.

THE DEFENDANT: I didn't really view it is as a problem because if I'm going to tell -- the truth doesn't change, so if I'm going to tell the truth here, I'm going to tell the truth there.

THE COURT: Okay. I'm just saying, putting aside the specifics of this case.

THE DEFENDANT: Yes.

THE COURT: The potential problem there is that it's

SEALED PROCEEDINGS

akin to you now locking in on a particular version of events.

THE DEFENDANT:  They could use those statements later to -- if I said something that varied, they could use it to impeach my testimony.

THE COURT:  Okay.  All right, so you understand.

THE DEFENDANT:  Absolutely.

THE COURT:  Now, did you and Mr. Barket talk about the potential implications of his statements being adoptive admissions?

THE DEFENDANT:  I don't remember.

THE COURT:  Okay.  Have you had enough time to talk to Ms. Sternheim generally about this particular issue, about the statements Mr. Barket made to the media?

THE DEFENDANT:  Yes.

THE COURT:  And did you talk to her about the potential attorney-client privilege waiver implications of his statements?

THE DEFENDANT:  Yes.

THE COURT:  And did you talk to her about the potential implications of his statements being adoptive admissions?

THE DEFENDANT:  Yes.

THE COURT:  And do you feel comfortable Ms. Sternheim adequately explained to you how both of those could result in potential conflicts of interest between Mr. Barket and you?

SEALED PROCEEDINGS

THE DEFENDANT: Yes.

THE COURT: So, for example, if it turns out that, again, I'll give you a hypothetical example, I'm not saying that that's what's happening here.

Let's say Mr. Barket said something that it turns out later on the government was very clever in using against you. Right? You're like, oh, boy, maybe I shouldn't have told them that, maybe he shouldn't have said that. So you might be inclined to say, I didn't say that to Mr. Barket.

THE DEFENDANT: Right.

THE COURT: And then Mr. Barket, his memory may be, yeah, he did. You understand that there could be a potential conflict there.

THE DEFENDANT: Sure.

THE COURT: Right?

THE DEFENDANT: Ah-huh.

THE COURT: Okay. So let me ask you this, in light of what you have described as the potential conflicts from Mr. Barket's statements to the media, are you prepared to waive any objection you might have regarding Mr. Barket's disclosures to the media, that they were obtained as a result of any privileged communications between the two of you?

THE DEFENDANT: Yes.

THE COURT: And are you also prepared to waive any objections you might have from the potential conflict resulting

Angela O'Donnell, RPR, 914-390-4025

SEALED PROCEEDINGS

from the adoptive admission implications of the statements Mr. Barket gave to the media?

THE DEFENDANT:  Yes, sir.

THE COURT:  And do you waive any arguments that you might make, assuming there's a conviction, that would include on appeal, or habeas corpus petition, or any post-conviction argument that would be based on the conflicts, potential conflicts arising from Mr. Barket's statements to the media?

THE DEFENDANT:  Yes, I do.

THE COURT:  Including the attorney-client privilege and the adoptive-admission problems.

THE DEFENDANT:  Yes, sir.

THE COURT:  All right.

Is there anything else on this subject that counsel wants me to inquire?

MR. RICCO:  There was, Judge.

THE COURT:  Sure.  Mr. Ricco.

MR. RICCO:  Judge, I do want to say that I think the inquiry that the Court is doing is precisely the type of inquiry that should be done in this type of case, it's very thorough.

Judge, I would like your Honor to ask of Mr. Tartaglione the following.  And your Honor couched the note and the phones and the statements in the context of aggravating.  I wanted to go back to this point.  As learned

Angela O'Donnell, RPR, 914-390-4025

SEALED PROCEEDINGS

counsel, our responsibility is to investigate the texting to determine whether or not they could be potentially be mitigating.

MR. BARKET:  I'm sorry, I didn't hear the word, investigate the --

MR. RICCO:  Text messages with the contraband phones.

THE COURT:  I haven't gotten to that yet.  So just in terms of the statements to the media, is there any other inquiry that you want me to do?

MR. RICCO:  No, Judge, except as we address each point, it is also the ability to use those statements as a mitigator also.

THE COURT:  I agree.

MR. RICCO:  And an obligation for us to investigate it for that purpose.

THE COURT:  So I think in the context, and correct me if I'm wrong, this is to everybody, including counsel on the phone, I thought I had sort of gone through how the prison adjustment argument could be, prison adjustment subject could be used as a mitigating factor in terms of the conditions of confinement that Mr. Tartaglione has had to lived with, in terms of the positive ways in which he interacted with Mr. Epstein.  In terms of -- he, for example, talked about the reason why they were roomed together, and then any, to the extent that he provided any helpful information, any

Angela O'Donnell, RPR, 914-390-4025

SEALED PROCEEDINGS

investigation.  All of that could be potential mitigating evidence for him.

MR. RICCO:  I think that you did that, your Honor.

THE DEFENDANT:  Okay, I --

MR. RICCO:  I think what just came to my mind is that as we are preparing, we are thinking exactly the way the Court is thinking.  Our approach is exactly that.  But then the skill set is how do you take that information, investigate it, and make it a mitigator?  And it sounds like Mr. Tartaglione understands that.  I think that he does.  And that's the only thing that I would add.

THE COURT:  Okay.  And please continue to remind me if I fall down on that.  Because as I said at the outset, I understand I don't have the advocate's creativity you all have, so I try as best I can to explain the concepts and have Mr. Tartaglione explain them back to me.  But if there are nuances that you want to make sure he's aware of, by all means, speak up.

MR. RICCO:  Thank you, your Honor.

THE COURT:  Thank you, Mr. Ricco.

Ms. Feinzig, anything else you want me to add to this?

MS. FEINZIG:  No, thank you, your Honor.

THE COURT:  Counsel on the phone, anything else you want me to add?

Angela O'Donnell, RPR, 914-390-4025

SEALED PROCEEDINGS

MR. BACHRACH: Not on this, your Honor.

THE COURT: Thank you, Mr. Bachrach.

Ms. Sternheim, is there anything else that you want me to inquire with respect to the statements to the press?

MS. STERNHEIM: No, thank you.

THE COURT: All right. So, Mr. Tartaglione, let's move on to the Epstein note.

My understanding, you'll tell me if this is wrong, is that you discovered I guess what we'll call a suicide note, and that you discussed this with Mr. Barket, and then subsequently the two you had conversation, and based on that conversation, it was your understanding that you were instructed to give the note to Mr. Weider so that he could remove it from the MCC; is that right?

THE DEFENDANT: Yes. I was told to give it to the next attorney who came in. So he didn't specifically mention Mr --

THE COURT: Then it just happened to be Mr. Weider.

THE DEFENDANT: Yes.

THE COURT: Thank you for clarifying that.

THE DEFENDANT: You're welcome.

THE COURT: And is it your understanding or was it your understanding at the time that there was an investigation into the circumstances surrounding Mr. Epstein's attempted suicide and ultimate death?

Angela O'Donnell, RPR, 914-390-4025

SEALED PROCEEDINGS

THE DEFENDANT:  Yes.

THE COURT:  Would it be fair to say, and if it's not fair to say, please indicate that, that any of Mr. Epstein's personal notes would be relevant to that investigation?

THE DEFENDANT:  Yes.

THE COURT:  Okay.  Tell me whether or not you think it's fair to say that the removal of the note could be seen as a violation of either MCC or Bureau of Prisons' rules?

THE DEFENDANT:  I understand how it could be, but when certain things took place here, I didn't think it would be.

THE COURT:  Okay.  So why don't you go ahead and explain that.

THE DEFENDANT:  Well, I found the note, the note was in my book, one of my books that I had in the cell.  It was written on paper that was from my legal pad.  I had a yellow pad, Mr. Epstein didn't.  Then once I found the note, I brought it to the attention of a guard, and we discussed should I give it to him or -- and I said, well, I mean, as you remember even MCC even lost the video of the cell.  So I said, you know, if you give it to these guys, they're going to lose it.  He's like, yeah, you're right.  I said, I'm going to give it to my lawyer.  He said, yeah, give it to your lawyer.

THE COURT:  So if somebody didn't know that fact -- or if they did know that fact, that might affect their

SEALED PROCEEDINGS

perception as to whether or not you comply with BOP rules or MCC rules.

THE DEFENDANT: Right.

THE COURT: Right? So if somebody said, oh, okay, so you bounce this off the guard, the guard said, yeah, you should give it to the lawyer if you ever want it to see the light of day.

THE DEFENDANT: Right.

THE COURT: And if somebody didn't know that fact, then they might say --

THE DEFENDANT: They could see it as a violation, yes.

THE COURT: All right. So to the extent either people didn't know the fact about your conversation with the guard or didn't believe it, right, if the investigators go interview the guard, the guard decides it's not in his or her interest to say that they authorized you to go give it to your lawyer --

THE DEFENDANT: Right.

THE COURT: I don't know what he's talking about. Right? It's conceivable. Again, I'm not trying to impugn the guard.

THE DEFENDANT: Right.

THE COURT: But it's conceivable that the facts would at least suggest that no such conversation existed.

Angela O'Donnell, RPR, 914-390-4025

SEALED PROCEEDINGS

THE DEFENDANT:  Right.

THE COURT:  In that scenario then, again, it could be perceived that you violated BOP or MCC rules regarding contraband.

THE DEFENDANT:  Right.

THE COURT:  And to the extent that Mr. Barket instructed you to give the note to the next lawyer who came to see you to get it out of the MCC, then so, too, could Mr. Barket and whoever it was in this case, Mr. Weider, could be viewed as violating MCC or BOP rules.

THE DEFENDANT:  Yes.

THE COURT:  Do you understand that?

THE DEFENDANT:  Of course.

THE COURT:  Okay.  Again, I'm not saying they did but certainly somebody investigating it --

THE DEFENDANT:  It could be interpreted that way.

THE COURT:  Correct.  And so do you see how there could be a potential conflict in that situation between you and say and Mr. Barket?

THE DEFENDANT:  Absolutely.

THE WITNESS:  How would you describe the potential conflict?

THE DEFENDANT:  The conflict is Mr. Barket could blame it on me or he could testify in a way that hurts me or he could advise me to testify in a way that puts him in a

Angela O'Donnell, RPR, 914-390-4025

SEALED PROCEEDINGS

favorable light and throws me under the bus.

THE COURT:  Why would he have the incentive to do any of those things?

What would generate the motive?

THE DEFENDANT:  To either protect his own reputation, to protect him from any kind of ramifications, any kind of punishment, anything.

THE COURT:  Right.  So there could be the possibility of -- the possibility that Mr. Barket might fear criminal prosecution.

THE DEFENDANT:  Right.

THE COURT:  He might fear an ethics complaint with the Grievance Committee, or he might even fear that MCC would revoke his visitation privileges, for example.  Right?  So that he would have reason to be concerned for his own interests and therefore an incentive to try to avoid any blame himself.

THE DEFENDANT:  Put it on me.

THE COURT:  And one way he could do that is to say, to potentially say, I didn't authorize him to do that.

THE DEFENDANT:  Right.

THE COURT:  Right.  Okay.  Do you also understand that separate from that conflict of interest, there's the possibility that he, again, as we talked about before, he could become a witness.  Right?  Just to testify as to the chain of custody, if you will, of the note and how it came to be from

SEALED PROCEEDINGS

your book to his hands.

And that that would potentially create a problem, again, because of the advocate-witness rule because you're not allowed to be a lawyer and a witness in the same case.

THE DEFENDANT:  Right.

THE COURT:  Do you understand that?

THE DEFENDANT:  Yes, sir.  Absolutely.

THE COURT:  You should know, I made this clear early, just because somebody is a potential witness doesn't mean that they actually have to be a witness.  So I was very careful earlier on, I should have emphasized this to say a necessary witness.  So it may be that Mr. Barket could avoid having to testify because somebody else could be a witness to the events and he would not therefore be necessary, or there could be a stipulation, an agreement, that you were authorized by Mr. Barket to hand over the note to the next lawyer, and that happened to be Mr. Weider.  There may be ways to deal with that, but there's still the potential that Mr. Barket would be a necessary witness and that that would breach the advocate witness rule.  Do you understand that?

THE DEFENDANT:  Yes, I do.

THE COURT:  Okay.  Now with respect to Mr. Weider, what would your understanding be of the potential conflict of interest with him?

THE DEFENDANT:  Along the same lines.  Mr. Weider was

SEALED PROCEEDINGS

the one who took, who actually took the note out of MCC and then sent an image of the note to Mr. Barket so he could be implicated in being a part of the whole violation of BOP rules and regulations.

THE COURT: Okay. And also Mr. Weider could himself be a witness.

THE DEFENDANT: Right, the same thing, and he could testify.

THE COURT: Right. So if he were your advocate, it sounds like he's not, he's not your lawyer in this case --

THE DEFENDANT: Right.

THE COURT: -- but if he were part of your defense team, then he would suffer from the same possible conflict with the advocate witness rule. Do you understand that?

THE DEFENDANT: Yes, sir.

THE COURT: Okay. So did you discuss Mr. Barket's and Mr. Weider's potential conflicts with Ms. Sternheim?

THE DEFENDANT: Yes, I did.

THE COURT: Okay. And did you feel that after your conversation with her you understood the potential conflicts?

THE DEFENDANT: Yes.

THE COURT: Okay. Now, let's talk about how the passing of the note could play out as either an aggravator or a mitigator factor.

So what's your understanding of how -- let's just say

Angela O'Donnell, RPR, 914-390-4025

SEALED PROCEEDINGS

not only the note but how the note fits into the whole post-Epstein-death investigation that was done and may still being done, I don't know, how that could be used as an aggravator against you.

THE DEFENDANT: An aggravating factor, it could be, they could say, look, he's breaking BOP's rules and regulations again, he's obstructing an investigation, he doesn't care about a possible -- a man who's suicidal. Along those lines.

THE COURT: And what's your understanding of how it could potentially be used as a mitigating factor?

THE DEFENDANT: Mitigating factor, they look, Epstein wrote a suicide note. He didn't attack the guy. He tried to kill himself.

THE COURT: Okay. Now there's the other point that Mr. Ricco made a little earlier today that to the extent the note has the potential to be a significant piece at the penalty phase in particular, and let's assume the worst case scenario as an aggravator where the government says, as you point out, that this is proof Mr. Tartaglione does not play by the rules.

THE DEFENDANT: Yeah.

THE COURT: You know, he got this note out of there. He made sure that it didn't get to the investigators.

But Mr. Ricco's point is, separate from that, there's the fact that the note needs to be fully investigated by the lawyers representing you to be -- to make sure they're prepared

Angela O'Donnell, RPR, 914-390-4025

SEALED PROCEEDINGS

to either answer any potential aggravating implications of the note or to explore potential mitigation use of the note.

THE DEFENDANT: Right.

THE COURT: And maybe that hasn't happened because of the conflict that Mr. Barket is operating under, he doesn't want to share the note or use the investigators that had otherwise been hired and court authorized by the team because of the conflict. How would you --

THE DEFENDANT: Well that --

THE COURT: Do you understand what that point is?

THE DEFENDANT: I do and I don't because to my knowledge Bruce sent Mr. Ricco an image of the note, a picture of the note after he got it. So that I'm confused, as far as along those lines he didn't share the note.

THE COURT: Okay.

THE DEFENDANT: He told Mr. Ricco about it, and again, to my knowledge, Mr. Ricco is the one who told Mr. Barket not to say anything to anybody about it and then Mr. Ricco went and told everybody about it.

THE COURT: Okay, so in that version, I take it you got from conversations with Mr. Barket.

THE DEFENDANT: What's that?

THE COURT: That version of what happened with the note and the image being shared and Mr. Ricco saying --

THE DEFENDANT: I got that information from reading

SEALED PROCEEDINGS

the *Curcio* submissions.

THE COURT:  From Mr. Barket.

THE DEFENDANT:  Yes.

THE COURT:  Okay.  Have you discussed not only the potential conflicts but have you discussed the potential impact on you from the potential conflicts arising from how the note gets from your possession to Mr. Barket's with Ms. Sternheim?

Did you discuss all that?

THE DEFENDANT:  Yes, that could be used as an aggravating factor.  It could possibly be used as an aggravating factor to say, again, I have no concern for BOP rules and regulations.

THE COURT:  Right.

THE DEFENDANT:  I don't care about their investigation, I don't care about a man who's suicidal, that kind of thing.

THE COURT:  And then the government could present you as a future danger and therefore --

THE DEFENDANT:  Yes, yes, exactly.

THE COURT:  And then also Mr. Barket might be operating under a conflict for reasons we talked about in terms of his incentives to try to shift blame from himself to you.

THE DEFENDANT:  Yes.

THE COURT:  And same with Mr. Weider.

THE DEFENDANT:  Right.  Mr. Barket could say, look, I

SEALED PROCEEDINGS

didn't tell him anything, you know what I mean, he did what he did on his own, I've got nothing to do with it.

THE COURT:  Also the attorney-advocate witness problem; right?

THE DEFENDANT:  Right.

THE COURT:  All right.  And do you waive any possible conflict that arises potentially from Mr. Barket instructing you to remove the note?

THE DEFENDANT:  Yes, sir.

THE COURT:  And again do you waive any post-conviction arguments, again, on appeal, habeas corpus petition in any form based on the potential conflict arising out of Mr. Barket's instructions to you and how to handle the note?

THE DEFENDANT:  Yes, sir.

THE COURT:  I don't know that I need to ask Mr. Tartaglione the same questions with respect to Mr. Weider because it sounds to me like he's not Mr. Tartaglione's lawyer in this case.

Do you have a different view, Ms. Feinzig?

MS. FEINZIG:  No, your Honor, I don't.

THE COURT:  Ms. Sternheim, do you have a different view?

MS. STERNHEIM:  No, I do not.

THE COURT:  Okay.

SEALED PROCEEDINGS

Mr. Ricco.

MR. BACHRACH: Your Honor, may I speak?

THE COURT: Sure.

MR. RICCO: Your Honor, we've been texting on this point.

THE COURT: Okay, sure, of course, Mr. Bachrach. Go ahead. Just make sure you speak clearly and slowly so we can make sure it gets taken down by the court reporter.

MR. BACHRACH: Of course, that does tend to be a problem of mine.

THE COURT: Me, too.

MR. BACHRACH: I do think a little bit additional inquiry is necessary with respect to John Weider's role. I understand that Mr. Tartaglione --

THE COURT: Are you on speakerphone?

MR. BACHRACH: Sorry, took it off.

I do believe some inquiry is necessary with respect to John Weider's role. I understand that Mr. Tartaglione has stated that it was his understanding that John Weider has no role in this case and no role or relationship with the Barket law firm. That may be true to the extent that that is Mr. Tartaglione's subjective understanding. But his subjective understanding does not answer whether there is a conflict issue involved for any particular lawyer. To say it another way, just because Mr. Tartaglione doesn't realize that Mr. Weider

SEALED PROCEEDINGS

may have some role with the Barket Epstein law firm, that doesn't mean that conflict doesn't exist, that just simply means that's what he understands. So I think it's necessary to inquire essentially in the event that there is a conviction.

I say that because of some conflicting facts in the record. So I think it's necessary to cover this in an abundance of caution.

THE COURT: Okay.

MR. BACHRACH: Just to give your Honor some background, obviously, Mr. Barket in his declaration and in his papers has stated, like Mr. Tartaglione, that there is no involvement from Mr. Weider. That is contrary to what Mr. Barket had represented to me personally on August 22nd, and to the entire team, including *Curcio* counsel, on August 23rd. On both days it was represented that Mr. Weider had an of-counsel relationship with the firm in relation to this case.

The reason why that is relevant, well, one of the reasons why that is relevant has to do with the text messages that were -- not the text messages that were disclosed by Mr. Barket to the Court *ex parte in camera*, but rather the text messages that were not maintained by Mr. Weider.

On July 19th defense counsel, all defense counsel, provided notice to the Court that privileged material might exist on the phone. There's a dispute as to what privilege we were talking about, but besides that, putting that aside, the

Angela O'Donnell, RPR, 914-390-4025

SEALED PROCEEDINGS

issue of privilege was raised on July 19th.

On July 22nd, a status conference was held, and Mr. Barket specifically asserted both privileges and there was a discussion of the attorney-client privilege. It was not identified at the time who might have been texting with Mr. Weider -- I mean, with Mr. Tartaglione, simply that they were members -- people associated with the defense.

We've since learned that there are only four people that we know of -- possibly more, actually. We've since learned that there were minimal texts, according to Mr. Barket --

MR. BARKET: I'm sorry.

THE COURT: Say it again, Mr. Bachrach, there were what? Minimal...

MR. BACHRACH: Text messages.

THE COURT: Okay.

MR. BACHRACH: That had been disclosed that went between Mr. Barket and Mr. Weider, as well as -- I should say, I apologize. That went from Mr. Tartaglione to Mr. Barket, as well as several that went to Ms. Leisenring from Mr. Tartaglione. But there were also hundreds apparently of additional text messages between Mr. Weider and Mr. Tartaglione that on the very next day, on July 23rd, were, quote, not transferred to the new phone. Where essentially the day after attorney-client was raised -- issue was raised in court, which

Angela O'Donnell, RPR, 914-390-4025

SEALED PROCEEDINGS

is the same day your Honor pointed out that there are against communicating on a contraband cellphone, the very next day John Weider apparently purchased a new phone and didn't transfer those text messages over to the new phone.

Now, if he truly has no involvement with the Barket law firm, great, then there's no conflict issue. There may be other issues involved there, but there's certainly no conflict issue. But I still think an inquiry needs to be made on this issue in relation to this. Because to the extent there is an of counsel relationship between the firm, as has been told to myself on August 22nd, and to the entire defense team on August 23rd, then that relationship would be attributable to the entire Barket firm, and the actions of Mr. Weider arguably would as well. That's the conflict I do believe, assuming it's waivable, there should be inquiry to ensure that it is made.

THE COURT: Okay.

You want to respond to that?

MR. BARKET: No.

THE COURT: Okay.

You know, I actually agree with that. I think that, and this is a point that's underscored in the memorandum of law that was submitted by learned counsel, and I wrestled with the extent to which Weider should be brought here to testify about his relationship with this case, because you're right, that cellphone, that mysterious cellphone purchase and the not being

SEALED PROCEEDINGS

transferred over is -- I'll use the word interesting for now to be diplomatic.

But it does, Mr. Bachrach -- the question is whether we cover that maybe at the end of the cellphone inquiry which we're about to get to, and then we can cover Mr. Weider both with respect to the note and the cellphone.  Is that okay?

MR. BACHRACH:  Wherever you think it's appropriate is fine, your Honor.  Thank you.

THE COURT:  So when we get to that, to the extent you think I have under-covered certain things, by all means, speak up.  Okay?

MR. BACHRACH:  Thank you, your Honor.

THE COURT:  All right, let's talk about the cellphone, Mr. Tartaglione.  So as I understand it the representation is that you came into possession of a contraband cellphone, we'll call it that for now.

THE DEFENDANT:  Yes.

THE COURT:  And that you used this to communicate with Mr. Barket, Ms. Leisenring, and Mr. Weider.

THE DEFENDANT:  With Mr. Weider, yes, but I never really used it to communicate -- I sent text messages to Ms. Leisenring one night.

THE COURT:  Okay, but that's a form of communication.

THE DEFENDANT:  No, no, but she never responded.

THE COURT:  Okay, but you sent it to --

Angela O'Donnell, RPR, 914-390-4025

SEALED PROCEEDINGS

THE DEFENDANT: Oh, yes, I sent it to her. It wasn't dialogue.

THE COURT: Right. And did you text messages to Mr. Barket?

THE DEFENDANT: The same thing, basically. I think he responded once, he didn't know who it was, then after that that was it, we never --

THE COURT: So you used the phone to reach out to them. Ms. Leisenring didn't respond at all. Mr. Barket responded not realizing it was you.

THE DEFENDANT: The next day he responded.

THE COURT: All right, so with respect to just the possession of the cellphone, you understand you were not supposed to be in possession of the cellphone?

THE DEFENDANT: Yes. Could I --

THE COURT: Per BOP or MCC regulations.

THE DEFENDANT: Right. I just -- I mean, and I mean this really doesn't have much to do with it. The reason I had the phone, because like I said before, being a police officer --

MR. RICCO: You shouldn't do this.

THE COURT: You don't need to go into this.

THE DEFENDANT: No, all right. Okay.

THE COURT: I don't want you to cut off, but if your lawyers are telling you to stop.

SEALED PROCEEDINGS

THE DEFENDANT: All right, I just --

THE COURT: And this is an issue which, by the way, they all agree.

MR. RICCO: And I agree. It's not necessary.

THE COURT: When they agree, you should listen to them.

THE DEFENDANT: All right, I will, I just --

THE COURT: Okay. So, again, there may be mitigating circumstances as to why you had the phone.

THE DEFENDANT: That's what I was going to get into.

THE COURT: But at least on the face -- let me phrase it to you this way. You could add least understand why somebody might conclude that your possession of the phone was not compliant with the rules.

THE DEFENDANT: Yes, absolutely, yes. Yes.

THE COURT: You know, whether it's a crime or it's an administrative violation, I'll leave it to smarter people, but at least there is the possibility that someone would conclude that you should not have had the phone.

THE DEFENDANT: No, I agree.

THE COURT: Okay. All right, and again, why don't you describe how you think just -- so far just your possession of the phone could play out as an aggravating factor in the prison adjustment context.

THE DEFENDANT: It's an obvious violation of the

SEALED PROCEEDINGS

rules and regulations, and again it could be -- prosecution could argue, look, he has no respect for rules and regulations, he went out of his way to obtain an illegal cellphone.

THE COURT: Okay. And to the extent you not only possessed the phone but you used it, then you understand that that also --

THE DEFENDANT: That's --

THE COURT: -- could be used --

THE DEFENDANT: Yes, that even goes further. Not only did I possess it, but I used it to speak with people.

THE COURT: Okay. So to the extent that you had communications with Mr. Weider using that phone, how would you describe the potential conflict with him?

THE DEFENDANT: That he could say it was -- that it was just me calling him, that -- I mean, I don't know because he -- I don't really know how he could --

THE COURT: Well, could he say, for example, that he didn't know you were using an illegal phone, even though he might have known you were using an illegal phone?

THE DEFENDANT: Yes, yeah.

THE COURT: He might have an interest -- because if he acknowledges he knows he is communicating with you on a phone you're not supposed to have, then he's admitting to facilitating somebody else either committing a crime or breaking the rule.

Angela O'Donnell, RPR, 914-390-4025

SEALED PROCEEDINGS

THE DEFENDANT:  Right.

THE COURT:  And so he might, therefore, have the conflicted interest of making sure to not blame himself and put all the blame on you.

THE DEFENDANT:  Put it on me, right.

THE COURT:  For the use of that phone.  Do you understand that?

THE DEFENDANT:  Yes, he could say I lied to him and said I was on a prison phone.

THE COURT:  Exactly.  And he also could again be a witness, and so he's your advocate and he's your witness at the same time, that's potentially problematic for you.

THE DEFENDANT:  Right.

THE COURT:  And I think added to this is the point Mr. Bachrach made you probably don't have firsthand knowledge of, but what happened to the messages he got from you in the sequence of the new phone and the messages don't get transferred over could be further proof of how he might handle the conflict.

THE DEFENDANT:  Right.

THE COURT:  Right?  Somebody can view that as him trying to wash his hands of any involvement with you using that phone, and that could be a precursor as to how he would handle things as a potential advocate for you.

THE DEFENDANT:  At a penalty phase, yes.

Angela O'Donnell, RPR, 914-390-4025

SEALED PROCEEDINGS

THE COURT: Do you understand that?

THE DEFENDANT: Yes, I do.

THE COURT: And that certainly would not be in your interest.

THE DEFENDANT: Right.

THE COURT: Now with respect to Ms. Leisenring, so you texted her once and she didn't respond.

THE DEFENDANT: Right.

THE COURT: Okay. So the potential conflict there would be what, how would you describe it?

THE DEFENDANT: Like you just said, that she could testify, whatever, in a way that puts all the blame on me to say that I was texting her, that I broke BOP rules and regulations by using the phone, by contacting her, and that could be detrimental at a penalty phase.

THE COURT: Okay. And with respect to Mr. Barket who did respond, you say not knowing it was you, how would you describe the potential conflict there?

THE DEFENDANT: It's the same, same circumstance, that he could be tempted to testify in a way or to act in a way that's detrimental to me at a penalty phase.

THE COURT: Okay. And did you discuss these potential conflicts with Ms. Sternheim?

THE DEFENDANT: Yes, I did.

THE COURT: Okay. Do you feel that she adequately

SEALED PROCEEDINGS

explained these potential conflicts to you?

THE DEFENDANT: Yes, she did.

THE COURT: And how these potential conflicts could undermine your interests in this case?

THE DEFENDANT: Yes.

THE COURT: I don't want you to get into the details, but do you understand that there is a scenario which your possession of the phone could be part of a narrative in support of a mitigation factor?

THE DEFENDANT: Yes, that's what I was foolish --

THE COURT: I don't want you to get into the details.

THE DEFENDANT: Right.

THE COURT: But there is that possibility, and to the extent that there might be a conflict of interest that your ability to present that mitigation evidence could be undermined by the conflicts, potential conflicts that Mr. Weider, Ms. Leisenring, and Mr. Barket are dealing with?

THE DEFENDANT: Yes.

THE COURT: Okay. All right, so let's talk a little more about Mr. Weider.

You say you've read the submissions that have been filed in advance of today's long-awaited hearing; right?

THE DEFENDANT: Yes.

THE COURT: So then I assume you're aware of the information in some of these submissions that suggest that

SEALED PROCEEDINGS

there is some ambiguity potentially about Mr. Weider's relationship with Mr. Barket's firm.

THE DEFENDANT: Yes.

THE COURT: Okay. So that there's some basis to believe that he has a professional relationship with Mr. Barket's firm as it relates to this case.

THE DEFENDANT: Yeah, I remember reading that but I -- I mean, I am well aware of the actual relationship between Mr. Weider and Mr. Barket and myself. I mean, I've read it, but Mr. Weider is not part of my defense at all. He's somebody I trust. He's somebody I've -- he knows about the case. I've told him details about the case. I've spoken to him. I've asked for his advice. He handles a lot of things for me outside right now as far as real estate, as far as my family.

THE COURT: Yes.

THE DEFENDANT: Things like that. But he has no --

THE COURT: So to the extent that he's not your lawyer in this case, is that what you're saying?

THE DEFENDANT: Yes.

THE COURT: So he's done no legal work on your behalf in connection with this case.

THE DEFENDANT: None.

THE COURT: None. And as far as you know, he does not have a professional relationship with Mr. Barket's firm as it relates to this case.

Angela O'Donnell, RPR, 914-390-4025

SEALED PROCEEDINGS

THE DEFENDANT: Yeah. No. No.

THE COURT: So to the extent that you've had conversation was Mr. Weider, to the extent you sent him texts about this case, then there's the possibility that they're not privileged. Do you understand that?

THE DEFENDANT: Yes.

THE COURT: I'm not saying they are or they are not. I'm just saying that is a possibility here. Right? So if he's not your lawyer, things you shared with him --

THE DEFENDANT: Only thing I can say is that my texts with Mr. Weider were not about this case.

THE COURT: Okay, I'm not -- I don't have them because apparently they didn't transfer.

THE DEFENDANT: Right.

THE COURT: But my point is is that to the extent that they were about this case -- and you may view something as not about this case, but other people might have a very different view --

THE DEFENDANT: Right.

THE COURT: -- about what's about this case, then you can see the potential conflict there.

THE DEFENDANT: Absolutely, yeah.

THE COURT: Right? So to the extent there are, let's just say worst cares scenario, there are incriminating statements in there, they would not be privileged.

Angela O'Donnell, RPR, 914-390-4025

SEALED PROCEEDINGS

THE DEFENDANT: So anything that's texted in there they might be able to use later to show my particular demeanor or my propensity for something. I understand what you're saying.

THE COURT: Okay.

THE DEFENDANT: They could be used as an aggravating factor later against me in the penalty phase.

THE COURT: On top of the --

THE DEFENDANT: On top of --

THE COURT: -- potentially improper use of the phone to begin with.

THE DEFENDANT: Right.

THE COURT: So I guess what I'm trying to understand is that, if Mr. Weider was a lawyer representing you, I don't know how you could live with that conflict, potential conflict. Think about that. If there are text messages you sent to him -- let's assume he is your lawyer, so they are privileged communications, but then there's an argument about a waiver of them by using somebody else's cellphone. And, again, I'm not here to rule on those issues, but you can see where there's a potential problem for you.

THE DEFENDANT: Yes. Yes.

THE COURT: Not only is he a witness to you potentially improperly using a cellphone, but then if there are communications on there that could be used against you, there's

Angela O'Donnell, RPR, 914-390-4025

SEALED PROCEEDINGS

a question as to whether or not you can prevent them from being used against you.

THE DEFENDANT:  Right.

THE COURT:  And even if he doesn't have them, he could be asked to remember what was in them.

THE DEFENDANT:  Sure, I understand.

THE COURT:  Right?

THE DEFENDANT:  Yes.

THE COURT:  So you know, I've asked you, and I'll ask you with respect to Ms. Leisenring and Mr. Barket with respect to the waiver on the cellphone issue in a minute, but to the extent Mr. Weider is representing you, would you be prepared to waive any conflict that he has with respect to the cellphone?

THE DEFENDANT:  Yes.  Yes.

THE COURT:  Really?

THE DEFENDANT:  Yes.

THE COURT:  Because you understand it's categorically different than -- Ms. Leisenring didn't respond; right?

THE DEFENDANT:  No, I understand, yes, I do.  But I'm confident that if my texts or whatever were to be revealed, it would show -- the majority of my texts were about the welfare of my animals.

THE COURT:  Yes, I know, all it takes is one bad text though.

THE DEFENDANT:  I don't have any.

Angela O'Donnell, RPR, 914-390-4025

102

SEALED PROCEEDINGS

THE COURT: All right. You understand the point?

THE DEFENDANT: I do.

THE COURT: Even if there are 100 text messages and 99 of them are about cats and dogs, and one of them is super incriminating, all you need is that -- all the government needs is that one.

THE DEFENDANT: I understand, yes. I'm not worried.

THE COURT: All right.

So, Mr. Bachrach, if you could hang on one second because I want to return to the subject of Mr. Weider, but I want to just get back to Mr. Barket and Ms. Leisenring.

So my question to you, you mentioned, Mr. Tartaglione, you discussed the potential conflicts with Ms. Leisenring and Mr. Barket, you say you discussed these with Ms. Sternheim. So my question to you is are you willing to waive any possible conflicts that might arise with respect to Ms. Leisenring and Mr. Barket regarding the text messages that you sent and the one that was responded to?

THE DEFENDANT: Yes, I am.

THE COURT: Are you willing to waive any post-conviction arguments, again on appeal or by way of habeas the petition or any other means based on the potential conflict arising from the fact that Mr. Barket and Ms. Leisenring received and/or in one case exchanged text messages with you involving that cellphone?

Angela O'Donnell, RPR, 914-390-4025

SEALED PROCEEDINGS

THE DEFENDANT: Yes.

THE COURT: Okay.

So, Mr. Bachrach, with respect to Mr. Weider, you know, I guess -- I don't know, I guess I'm all ears as to how you think we should resolve the question of his representation of Mr. Tartaglione, because if he is representing him, then I need to make a finding whether the conflict is waivable, if he's not representing him, then I don't.

MR. RICCO: Judge, can I have a text with Mr. Bachrach.

THE COURT: Hang on. Mr. Ricco wants to text with you before you answer the question.

MR. RICCO: Thank you, Judge.

THE COURT: Sure, no problem.

(Pause)

MR. BACHRACH: I received a text message from Mr. Koffsky.

THE COURT: I think you're waiting for one from Mr. Ricco.

MR. RICCO: He texts a lot faster.

THE COURT: Yes.

Hang on. Mr. Ricco and Mr. Koffsky, they're consulting and they're breaking social distancing rules, but I guess there's nothing to be done about that.

(Pause)

Angela O'Donnell, RPR, 914-390-4025

104

SEALED PROCEEDINGS

MR. BACHRACH:  I just texted a response to Mr. Ricco which I need a response.

THE COURT:  Okay, he's looking at his phone now.

MR. BACHRACH:  Complications of remote communication.

MR. RICCO:  All right.

(Pause)

THE COURT:  All I can tell you, Mr. Bachrach, three of yours colleagues are in the jury box and I'll contemplating an Allen charge.

MR. RICCO:  Thank you, your Honor.

THE COURT:  Who's going to speak?

MR. BACHRACH:  So two points.

THE COURT:  Yes.

MR. BACHRACH:  One, and actually -- well, one is directly to answer the question and one --

THE COURT:  You've got to slow down.

MR. BACHRACH:  Two points, the first directly relates to what you asked and then something else that I think need to be raised.

THE COURT:  Okay.

MR. BACHRACH:  I do think -- I do think --

THE COURT:  Say it again.  You do think that...

MR. BACHRACH:  Sure.  I just want to make sure my phone is - so, two points, your Honor.

THE COURT:  Yes.

Angela O'Donnell, RPR, 914-390-4025

SEALED PROCEEDINGS

MR. BACHRACH: One that directly relates to your question and then something slightly separate but still relevant.

THE COURT: Okay.

MR. BACHRACH: With respect to your direct question, I do believe a determination needs to be made, because if Mr. Weider is in some way associated as of counsel to Barket Epstein law firm, I do not believe this issue can be waived. So I do think a determination needs to be made on that point for purposes of preserving the issue for appeal assuming your Honor believes it is -- well, regardless which way your Honor believes.

And that leads to the second point I want to raise, your Honor, which is that I know you've asked Mr. Tartaglione a couple of times whether or not he is willing to waive with respect to these various waivers for all purposes including appeal and post-conviction. I'm not certain that that is actually a waiver that he can make, particularly not in a death penalty case, particularly not in the context of what would be an ineffective assistance of counsel claim.

So my understanding is that his waivers today are only for purposes of trial but not further on, otherwise, he would not, as your Honor said in the very beginning of these proceedings, he would not have the ability to appeal no matter what your Honor's ruling is. That is the reason why no matter

Angela O'Donnell, RPR, 914-390-4025

SEALED PROCEEDINGS

what your Honor does, unfortunately, this will not be the end of this issue.  Maybe a couple of years before we return to this issue, but it won't be the end, because no matter what your Honor rules, it's an issue that can be raised on appeal if there's a conviction and a death penalty in this case.

THE COURT:  So then what's the point of the proceeding?

What's the point of the waiver?

MR. BACHRACH:  The point of the waiver is to be able to proceed for trial purposes to be able to continue.  This is not an issue that could be litigated on interlocutory appeal, only on direct appeal.  There are many issues throughout a trial that a Court is required to rule upon even though ultimately it could be a determining factor later on in trial.  I mean later on in appeal.  But only very few issues are actually allowed to be appealed at this time, in the Second Circuit at least, not in all circuits, but in the Second Circuit at least this is something that can only be raised on direct appeal.

THE COURT:  Ms. Feinzig, I assume you want to respond to that.

MS. FEINZIG:  He is correct that in the Second Circuit this cannot be raised before trial.  I always thought that this was a waiver for post-conviction purposes.  There is the tension there.  I'm going to have to think it through.

Angela O'Donnell, RPR, 914-390-4025

SEALED PROCEEDINGS

THE COURT:  Okay.

MS. FEINZIG:  I don't have an answer at the moment.

THE COURT:  All right, that's fine.  We can discuss it afterwards.

What's your proposal as to how we determine Mr. Weider's role in this case, we bring him here and have another one of these masked gatherings?

MR. BACHRACH:  Your Honor, my hope had been that he would have been here today.  Unless your Honor feels that you're confident to be able to rule on the papers on the submission --

THE COURT:  No, no, I want to hear from him in person.  If there needs to be an inquiry, I'm not deciding it on paper.

MR. BACHRACH:  Then my view, your Honor, would be that he would need to testify.

THE COURT:  Okay.

Mr. Barket, do you want to respond to that?

MR. BARKET:  No, except that obviously I have the same information Mr. Weider does so...

THE COURT:  Which is that he's not connected to your firm.

MR. BARKET:  Correct.  I don't want to say anything unless I'm asked, but I'm happy to provide the information that people are asking about.  I thought I did in the affidavit, but

108

SEALED PROCEEDINGS

I'll do it again orally if people want.

THE COURT:  I guess, Mr. Bachrach, here's the question.  To the extent that even if Mr. Weider had some professional connection to Mr. Barket's firm but he's going to have no role going forward, I'm not sure what the purpose would be of a *Curcio* ruling on --

MR. BACHRACH:  Sure.  Your Honor, if Mr. Weider has a role in Mr. Barket's firm, of counsel role that Mr. Barket had represented to us on multiple occasions that he had, then there's an agency relationship between the two, and the conduct that Mr. Weider did, may have done prior to this point, is attributable to retained counsel.

THE COURT:  Okay, that's a fair point.

MR. BACHRACH:  And the conduct in question is, of course, most prominently the missing text messages.

THE COURT:  Okay, fair point.

All right, so why don't we do this, why don't we -- I'd like to finish up, if I can.  There's a few more questions I'd to ask Mr. Tartaglione, and then I'll take input on any other questions anybody else wants me to ask, and then at the end let's talk about how we handle the issue with Mr. Weider.  Okay?

MR. BACHRACH:  Thank you, your Honor.

THE COURT:  Okay.  And then also the issue about the scope of the waiver here.  So it would give Ms. Feinzig a

Angela O'Donnell, RPR, 914-390-4025

SEALED PROCEEDINGS

chance to do some research, and then she can share research, and you can either tell her she's right or she's wrong or maybe the two of you will agree.

Fair enough?

MR. BACHRACH: Yes, your Honor.

THE COURT: Okay.

So, Mr. Tartaglione, let me just get back to you for a second. The first thing I want to ask you is whether or not you have any questions for me.

THE DEFENDANT: No.

THE COURT: Do you have any questions for Ms. Sternheim? We have an ability to have you two talk just the two of you. She's your *Curcio* counsel.

THE DEFENDANT: I have a clear understanding of the issues. Ms. Sternheim has been very helpful. I know where I'm at.

THE COURT: Do you want more time to think about all this?

THE DEFENDANT: No.

THE COURT: Okay. Are you dissatisfied in any way with the representation you've received from Mr. Barket, Ms. Leisenring, and the Barket law firm?

THE DEFENDANT: None whatsoever. Very happy with them.

THE COURT: And you understand what we've all tried

Angela O'Donnell, RPR, 914-390-4025

SEALED PROCEEDINGS

to do here in preparation for today, and what I've tried to do with you here today is do the best we can at anticipating the potential conflicts from certain things that have been done by your retained lawyers but that it's really impossible at this point to predict all the ways in which those potential conflicts might arise and how they might play out.  Do you understand that?

THE DEFENDANT:  Yes, I do.

THE COURT:  And that's why I think anybody, certainly I've been doing this for a while, and you know, I can tell you that it's -- everything else being equal, it's better to be represented by lawyers that have no conflicts --

THE DEFENDANT:  Right, I understand.

THE COURT:  -- than ones that have even just potential conflicts.

THE DEFENDANT:  I understand.

THE COURT:  I'm not slighting your attorneys in any way, but that's, I think, a fact that you and you I could agree on.  If you don't agree, please feel free to speak.

THE DEFENDANT:  I agree in the concept.

THE COURT:  Okay.

THE DEFENDANT:  But I don't agree that someone else can do a better job, Mr. Barket, Ms. Leisenring.  We've been together now four years.  They know me.  They know who I am.  They know the case better than anybody, and in my opinion

Angela O'Donnell, RPR, 914-390-4025

SEALED PROCEEDINGS

they're my best chance in proving the truth and going home.

THE COURT:  Okay.  But even recognizing that they are dealing with some potential conflicts.

THE DEFENDANT:  Even -- yes, even with potential conflicts, they're my best shot, like I said, of proving the truth, proving that I'm innocent and going back to my family.

THE COURT:  Okay.  So that I guess answers the next question I was going to ask, but I'm going to ask it anyway so the record is clear.  So you are 100 percent comfortable knowing about the potential conflicts we discussed here today and you've described going forward Mr. Barket, Ms. Leisenring, and the people in their law firm to represent you going forward in this case?

THE DEFENDANT:  Yes, I am.

THE COURT:  So in answering the questions you've answered, in particular with respect to the waiver, has anybody tried to threaten you to say that you're waiving --

THE DEFENDANT:  No.

THE COURT:  -- the conflicts?

THE DEFENDANT:  Nobody.

THE COURT:  Has anybody otherwise tried to induce you to say that you want to waive the conflicts?

THE DEFENDANT:  No, no, your Honor.

THE COURT:  So you're making this choice of your own free will and not because something that somebody else, whether

SEALED PROCEEDINGS

it's a family member, whether it's any of the lawyers, whether it's Mr. Weider, who's not here.  Again, I'm not trying to impugn anybody, but I have to ask.

THE DEFENDANT:  I understand.  No, my decisions are made just by me.  There's been no outside influence at all.

THE COURT:  Okay.  And I think the other questions I was going to ask I'm going to hold off on until we -- I mean, I think I've already asked the question about the scope of the waiver.  If it turns out that that is not as prophylactic a waiver as the law allows, then the question will be moot.  If it's appropriate, the question has been answered, I.  Don't see the point in asking it a third time.

Do you have a different opinion, Ms. Feinzig?

MS. FEINZIG:  I don't, your Honor.

THE COURT:  Is there any other inquiry that -- yes, Mr. Ricco, you're shaking your head.  Yes.

MR. RICCO:  Just to add, Judge.

THE COURT:  Yes, sure.

MS. FEINZIG:  Your Honor, I just would like to reserve the ability to, if we do determine that it is a full waiver today, I suspect it's something in between where the Court of Appeals can review the *Curcio* hearing to assure that --

THE COURT:  To see if it covered the conflicts --

MS. FEINZIG:  Exactly.  Exactly.  I want to just make

Angela O'Donnell, RPR, 914-390-4025

113

SEALED PROCEEDINGS

sure that that's the case, but if we do need to do an additional few questions to make sure the waiver is on record, I request we be able to do that after we research the issue.

THE COURT:  Sure.

Mr. Ricco.

MR. RICCO:  Okay thank you very much, your Honor.  I really just have a very narrow point, but I think it's very important, Judge, to see the narrow point in context.

THE COURT:  Okay.

MR. RICCO:  First of all, all of the actions that have been taken by appointed counsel in this case, none of it was done to hurt Mr. Tartaglione.  What we did was is what the law says.  We're supposed to notify the Court when we become aware of a conflict for the Court to resolve that.  That application is not made to hurt Mr. Tartaglione.  That application is to help him.  That application is to make sure that he gets home and it is done in a way so he can keep his counsel.  So that context is very important.  And it's important because, as the Court heard, Mr. Tartaglione's understanding that a copy of the note was sent to me, which it was not, and that I told Mr. Barket not to mention it anyone, and that I went out and told everyone else, quote.

Judge, Mr. Barket was told not to take that note to the press, that more information had to be discovered about that before you use it in the press.  That wasn't said to hurt

Angela O'Donnell, RPR, 914-390-4025

SEALED PROCEEDINGS

Mr. Tartaglione, nor was it said to clip Mr. Barket's wings, though I'm sure that was his impression, but it was to ensure the *bona fides* of any type of statement that we would be locked into at such an early stage of a mitigation investigation. In the context of a death penalty case, your Honor, such a decision can have very big consequences.

And so that everyone else that Mr. Tartaglione says that we said this to is his attorneys and the investigators and the mitigation experts so that we could do what it is we're obligated to do, which is to investigate the note.

Judge, the greatest skill set of a capital defense attorney is to take that fact that people believe is an aggravator and turn it into what? A mitigator. And our work, Judge, oftentimes facts that the untrained lawyer has in his hands that he hides or misrepresents is something he should never do in a death penalty case. Because the skilled death penalty defense lawyer doesn't stop with the fact that there was a cellphone and there were text messages. For the skilled death penalty lawyer the question is why. And we believe that there are many mitigating reasons that Mr. Tartaglione could present on that issue.

The question for some would be the note could be used as an aggravator. For the skilled and experienced capital lawyer, that lawyer looks to why the note was removed and then turns that very serious, potentially aggravator into part of

SEALED PROCEEDINGS

the mitigation narrative.

And so some of the things that Mr. the Bachrach is alluding to, your Honor, is that the defendant cannot waive the obligation of his counsel to investigate these matters and to prepare for the penalty phase. He can say, I want to go with the lawyer who has said, and said to us, this issue is dead.

Appointed counsel's response is, no, this issue is not dead, we have to investigate it so that we could determine whether or not the fact that you are afraid of that because you were involved in it could very well be a powerful part of a mitigation case.

And so what happened here, Judge, is that the representation of good work, the work that a capital lawyer is supposed to do was interpreted to the client in such a way that we're out telling everyone else. None of us held press conferences. None of us were on *60 Minutes*. Our conversations were amongst each other, as they are supposed to be, relying upon the skill set and experience of each person, including our mitigation experts, so we can see if we can find a silver lining, so to speak, in sometimes what appears to be a bad fact.

I think Mr. Tartaglione has plenty of them, plenty of them that need to be thoroughly investigated, and they should not be investigated, Judge, by people who are afraid and then all of a sudden the evidence that we need to investigate is

SEALED PROCEEDINGS

gone.

We don't find out, Judge, that those messages are no longer available until long after Ms. Sternheim has issued a report. And that's why, Judge, I go back to the point of this is not a question of what's the best way to proceed, this is a question of us having the information so that we could do our jobs in compliance with the standards. And so Mr. Bachrach is raising such an interesting point because that's exactly why we're here, and that's exactly why the Court was notified, because as experienced counsel in consultation, yes, I mean, the lawyer says that we violated privilege by discussing this predicament with resource counsel. Not in the death penalty world, your Honor. It's our responsibility to discuss these issues with resource counsel. It's our obligation to discuss it with resource counsel. It's the reason why the Defender Services Organization funds almost a billion dollar federal program so that Mr. Tartaglione's perception of how these facts could be used against him are in the hands of a learned, experienced attorney who needs the information in order to present it as a part of his mitigation narrative or to prepare the other way.

So, Judge, when Mr. Bachrach says to you as an officer of the court that he was told by another lawyer that Mr. Weider was a part of the firm, he was associated with the firm in connection with this case, and that representation was

Angela O'Donnell, RPR, 914-390-4025

117

SEALED PROCEEDINGS

made the next day in front of all of us, including *Curcio* counsel, well, Judge, we're concerned because a year prior to that we were told he was just a friend who handled some real estate matters. And so we are concerned, just like your Honor expressed here, wow, these statements are really out there. If he's not counsel, he's subject to a subpoena. He's going to have to testify. We need to see this stuff and be prepared. So we were told, well, he's a part of the firm. That impacted the next steps, not to be made for us against Mr. Tartaglione but what we are trying to do for Mr. Tartaglione.

So that's the context to this last point. Because, Judge, I don't think a defendant can waive ABA standard 10.7. He cannot waive the performance of his counsel. He cannot say, I am prepared to keep a lawyer or have a lawyer who is not going to conduct the investigation that 10.7 has to be investigated and *Rompilla* says must be investigated even when the defendant says he doesn't want it.

And so, if Mr. Tartaglione is a part of this record, he should understand that a part of the inquiry, and your Honor's touched on this, is the -- in developing his mitigation case, his lawyers would be responsible for investigating why he's texting and be prepared to fully investigate that and present that. If he's aware of that.

Is he aware that his lawyers are obligated? And your Honor's touched on this. His lawyers would have to investigate

Angela O'Donnell, RPR, 914-390-4025

SEALED PROCEEDINGS

why did he take the note from the jail. There could be many, many factors in this case, and they exist, but, Judge, we can't investigate them when we're not told the truth or when we're told in a meeting with all of us together one thing on one date and then two weeks later something else. And we're relying upon this information to perform, to be competent capital counsel. It is capital's counsel's obligation, and your Honor said this, to look at everything. And you know what, maybe there's some mitigation here. Well, it takes trained, skilled counsel to do that. This is why this entire team, Judge, was invited to all of the training programs that the Defender Services Organization has to offer, and our resource counsel has worked very hard with this entire team in developing that. And so if -- you know, Mr. Tartaglione is aware, for example, that the lawyers should be looking at this for mitigation, and he's saying he's going to waive it, that just gives your Honor a sense as to whether a rational defendant in that situation would do it, notwithstanding his waiver. And I think that's the point that Mr. Bachrach is ultimately going to.

And that's it, Judge. I think that, you know, this is very important, Judge. It's very important because for Mr. Tartaglione, not against Mr. Tartaglione, many, many hours have been devoted towards developing mitigation in this case, and sometimes I think people don't like the package that other people come in, or they don't understand it, but you know what,

SEALED PROCEEDINGS

the guidelines speak to that, ABA guidelines speak to that, and the authorities speak to that.

And so if he's saying, look, I know that the lawyers could, you know, he could be involved and I'll be subject to those representations, he's making some type of statement, and that statement is something that your Honor would consider in a larger context about whether or not a rational person would make that decision given his age and his background and what his mitigation evidence is. If he's throwing away the best mitigator he has to offer in the mindset of the lawyers who are trained and appointed to find that, then the question becomes why.

THE COURT: So I think that's a good segue to the last thing I wanted to do, which is to talk about the waivability of the conflicts.

I think starting with the press issues, statements Mr. Barket had made in the press, I do think it's a waivable conflict. I think it's waivable for a couple of reasons.

First is Mr. Tartaglione has unequivocally stated that he authorized, he met with Mr. Barket before the statements were given to the media, and he authorized him to do so. He explained why, because he wanted people to know the conditions that he was living in in the MCC. He wanted to people to know, including people in England, to know that he was not responsible for Mr. Epstein's ultimate death, and he

120

SEALED PROCEEDINGS

also wanted to know that he was willing to cooperate with any investigation.

Certainly reasonable minds, Mr. Ricco, can differ as to the utility of making trial points or penalty phase points in the press. I think you know where I come out on that. But that's not the inquiry. The inquiry here is whether or not the potential conflict from Mr. Barket's statements in the media is waivable, and I think it is because of what Mr. Tartaglione has said, and I take him at face value what it is that he authorized Mr. Barket to do, the conversations they had beforehand, and he understands the potential impact of the potential conflict on himself and I think has waived it. I don't think it could be said that no rational defendant would waive it under those circumstances.

With respect to the note, I think the note is a little bit more complicated, but I think even Ms. Sternheim's report acknowledges that the decision on the disclosure of the note or even getting it out of the prison is again something that reasonable minds can differ on. So there certainly is the point that the fact that the note was taken from the prison could be problematic, it could be an aggravating factor. Mr. Tartaglione himself explained the reasons why it could be an aggravating factor, and how it is that Mr. Barket can be operating under a conflict, certainly Mr. Weider, for facilitating the surreptitious exit of the note from the MCC.

Angela O'Donnell, RPR, 914-390-4025

SEALED PROCEEDINGS

But also Ms. Sternheim's report offers an explanation for this, which is that Mr. Barket made the judgment that he wanted to get the note out so that if there was any potential use at least he could control that use.  He was aware of the fact that Mr. Tartaglione had talked to an MCC person about this who basically said, yeah, if you want to use it, you probably should get it out, because if I give it to somebody, who knows what happens to it.  And then that Mr. Barket wanted to try to evaluate the *bona fides* of the note.  Because if it turns out it wasn't written by Mr. Epstein, then that has certain implications as to opposed to if it was.

Now, to address head on your point about how Mr. Tartaglione can't waive a lawyer's obligation to investigate in 10.7.  I think that conflates the issue of the extent to which Mr. Barket's potential conflict is waivable with whether or not other things Mr. Barket is doing, irrespective of any conflict, might be ineffective assistance. And it's that latter point that this proceeding doesn't concern itself with.  I'm not here to police lawyers in the preparation before trial to determine ahead of time whether their work has been constitutionally effective.

You know, I have said before, and I got myself in trouble with Mr. Barket saying this before, that I like the fact that Mr. Tartaglione has this multi-faceted team of trial lawyers and capital lawyers and people who are really good at

SEALED PROCEEDINGS

litigating on paper these issues and trying them in a courtroom and investigating and thinking creatively about both a penalty phase and liability phase defense.  And I've told Mr. Tartaglione before that, if I were facing heart surgery, I'd want a really good anesthesiologist, and a good heart surgeon, and a good, professional physicians' assistants, you name it, the whole panoply, however you can analogize to what we do as lawyers.  And I continue to believe that, and I encourage Mr. Tartaglione to heed that suggestion.

But he is not being asked to waive 10.7.  The only question is whether -- to the extent Mr. Barket has any potential conflicts, whether those potential conflicts are waivable.  And to the extent that you disagree with things Mr. Barket is doing or not doing with the note, unless that can be tethered to the conflict, which I don't hear how it has been, then there's nothing for Mr. Tartaglione to be asked about waiving.  The only issue is whether he's willing to waive the potential conflict from Mr. Barket's role in making sure that the note got from Mr. Tartaglione's cell to him and using Mr. Weider to do that.

MR. RICCO:  Your Honor, can I ask a question?

THE COURT:  Let me just finish.

And so I think that that is waivable, and I think Mr. Tartaglione has explained the conflict, he understands the conflict, he understands its impact on him.  It's not nothing,

Angela O'Donnell, RPR, 914-390-4025

SEALED PROCEEDINGS

potentially, but it's, I think, waivable. Because, as I said, there are circumstances that explain why Mr. Barket wanted to get it out. There were reasons why it was not turn over from Mr. Tartaglione to the MCC. He's explained that. And so I think under the circumstances that's waivable.

Go ahead, Mr. Ricco. I don't know if you want to go to podium again.

MR. RICCO: No, Judge, I just oftentimes --

MR. BARKET: The podium, the people --

THE COURT: He's going.

MR. RICCO: You know, Judge, in my professional life as a capital lawyer, I have found that the relationship between counsel and the Court, counsel even with the government is sometimes instructive and informative. It is not necessarily adversarial. In many of these cases it's a process of finding the right place to be. And in my mind, in my mind, the difficulty for me is I see the tethering of the removal of the note to the abandonment of the investigation of prison adjustment. And a lawyer can make that decision. A defendant can make that decision. Now when they make it, that's a different story, but it can be made. But if the reasons are being made that that mitigator has been abandoned is because the investigation of it means we should be looking at the text messages, we should be looking at the BOP reports about what happened that night, and we should be evaluating that in the

124

SEALED PROCEEDINGS

context of what the defendant is saying happened and then moving forward.

The tethering, to me, is when a lawyer is involved and then he says, and has said to us, this mitigator is dead. And that, Judge, is -- I completely agree, the Court can't involve itself prospectively in whether or not the defendant is being represented, but in the context of a *Curcio* inquiry where we're saying something happened here that we think creates a conflict, a divided interest, we see that divided interest directly impacting counsel's responsibility to conduct that thorough investigation.

THE COURT:  There's a difference between -- we're kind of going around in circles -- but there's a difference between -- and I don't take lightly your concern, believe me, I don't, I really don't.  But there's a difference between saying we don't agree with how you're handling that and the reason that this is not being handled the right way is because of the conflict.

There's a lot of disagreement here among the lawyers, there's certainly a lot more than I know about and I want to know about, but my only point is that Mr. Barket, while he may not share -- whether or not he shared the note with you, the point is he's told you about the note, the record is clear as to how the note got to him from Mr. Tartaglione.  The record is clear as to things Mr. Tartaglione said and instructions, the

Angela O'Donnell, RPR, 914-390-4025

125

SEALED PROCEEDINGS

answer he got from the BOP official, the MCC official. And Mr. Barket has been clear as to why he was concerned about establishing the *bona fides* of the note.

Again, all of this -- we're going around and around -- there's just a difference between having the Court say, no, Mr. Barket, you need to do the following with the note, and the Court saying that the conflict from how to note got out is waivable or not.

MR. RICCO: Judge, I do not disagree with your Honor's point. I don't disagree with that point.

I would say to your Honor that the obligation of a capital defense lawyer is just one step higher.

THE COURT: I agree. I've said that.

MR. RICCO: And the height of that is I'm not disagreeing with -- if Mr. Barket said he was going to check the *bona fides*, he should have. I suggested that he just do that. I suggested him not to go to the press with the note. He didn't go to the press with the note. So it's not I disagree with his handling of the note, because he didn't go to the press with the note, and he claims that he hired two separate investigators, he wanted to do that, that's fine. Maybe he had his reasons. Maybe he didn't trust the Jim Dowd, whatever, it doesn't matter. It's irrelevant.

When we notified that -- when there's the death happens here, then we recognize that this piece of evidence,

Angela O'Donnell, RPR, 914-390-4025

SEALED PROCEEDINGS

whether it be a mitigator or aggravator is in a different posture than it was in before. And we with that heightened responsibility have to then go about conducting an investigation such that we're not viewed as the enemy trying to expose Mr. Barket or expose somebody just to get the information, we still haven't seen them, so that we can do what death penalty lawyers do, to me that's still --

THE COURT: And that is why I have said before on the record not only from Mr. Tartaglione's perspective do I like the fact that he's got this team who each lawyer brings a strength different than the other lawyer. This is not a team of people who bring the same skill set. And that I have described, I've used words like "sad" and "tragic," that there has been this bickering.

And you are 100 percent right, Mr. Ricco, the only, the big loser in all that, it's not you, it's not Mr. Barket, it's not Ms. Leisenring, it is Mr. Tartaglione. And I also am sensitive to the fact that there are certain personal dynamics that may be having an impact on Mr. Tartaglione's perception of the value of this multifaceted team. But, again, unless you can find me any authority that says that a judge has some basis to say, team, come in chambers, we're going to revolve our differences, that's not my job.

MR. RICCO: Judge, I agree. I do know that -- I do know that we have an obligation here to the Court, to the

SEALED PROCEEDINGS

defendant, to the process, and that is to make sure that the most accurate record could be made to --

THE COURT:  Sure.

MR. RICCO:  -- protect Mr. Tartaglione's life.  It has always been made absolutely clear that no one is trying to take his counsel from him.  That has been said in meetings.  It has been put in writing.  It has been to ensure that he gets to keep his lawyer.  And that's fine.  But at the same time -- I'm repeating myself -- the case has to be developed, and it has to be developed by someone, and my advice and recommendation is that whose ever developing mitigation in this case they have neutral eyes, that they don't have any specter of fear, that they go after this evidence and find the mitigation in it and present it.

THE COURT:  Yes.

MR. RICCO:  I don't have anything else further to add.

THE COURT:  Let me just say one other thing, and this is nothing you're going to need to respond to.  Because I was going to say, I also want to make it very clear for the record that what you said at the outset I agree with that counsel had an obligation to bring these issues to the Court's attention and so that I could appoint somebody of to caliber of Ms. Sternheim to counsel Mr. Tartaglione with these potentially very thorny issues.

SEALED PROCEEDINGS

And you are 100 percent right that the only reason for officers of the Court such as yourselves to do that is because it was in Mr. Tartaglione's interest. And that's not immediately apparent to clients. And that's why I think it's important that you said that and that I agree with you.

And before I forget, I want to make sure I'll thank Ms. Sternheim, and I'm sure I'll thank her again may other times for the work that she has done in her role as Curcio counsel. Because as *Curcio* counsel goes, this is probably one of the biggest and most burdensome because of all the work she had to do to prepare that report, and I hope Mr. Tartaglione appreciates the professionalism that Ms. Sternheim brings to this equation.

I think we're good, right, Mr. Ricco?

MR. RICCO: Yes, your Honor. I just wanted to say thank you.

THE COURT: Okay.

Finally, with respect to the cellphone and the potential conflict there, it's similar with the note to the extent that there is this specter of violating rules. Mr. Tartaglione and his lawyers are going to have an explanation, I gather, but in any event, the government has represented that there is no basis to believe there's going to be an investigation in terms of any criminal conduct here, and so I think that takes away a big piece of what otherwise would

129

SEALED PROCEEDINGS

have been a potential conflict. And the rest of it I think is waivable for the same reasons that the note is, that there are explanations for how this was handled. Moreover, Ms. Leisenring didn't respond to the text. Mr. Barket responded to one of them not knowing it was Mr. Tartaglione. So I think it's on a whole different level than the note. And so I think the conflict with regard to the cellphone is waivable as well.

And that's all I want to say at this point because I think we need to hear from Mr. Weider, we need to get -- we need to make sure we're all on the same page about the scope of the waiver before I make my final findings. So I'm going to shut up, and we've been at this for over three hours, but if there's anything anybody else wants to say, I don't want to silence anybody.

MR. RICCO: Judge, I just wanted to say thank you. My experience has capital counsel, you know, the Court of Appeals talks about a thorough narrative. I think what we saw here this morning is an example of that.

THE COURT: Well, we'll see when it gets to the Court of Appeals if they agree with you.

Mr. Barket, anything else?

MR. BARKET: No, your Honor, just in terms of process, you don't want to make any inquiries of me with respect to Mr. Weider?

Angela O'Donnell, RPR, 914-390-4025

130

SEALED PROCEEDINGS

THE COURT:  Not right now, I might later, but I think I'd rather hear from Mr. Weider, because he's, pardon the pun, he's a little bit more in the weeds.

MR. BARKET:  I'm sorry?

THE COURT:  A little more in weeds.

MS. LEISENRING:  Pun intended.

THE COURT:  Pun intended.

MR. BARKET:  I deliberately remained mostly silent today.  In light of a number of things that were said, I just don't want the Court to interpret that --

THE COURT:  I know.

MR. BARKET:  -- discretion on the advice of a whole host of people to less is more that I in any way agreed with a number of things that were said.

And I just on a factual matter, I just want to make sure that we're -- I submitted papers on this.

THE COURT:  Yes.

MR. BARKET:  So that the record, I think, is clear, but we end up kind of saying things, and that may become part of this record, and I think we should just clear it up as we can.  I think he said that -- three points.  Mr. Ricco alluded to one; that we sent him a copy of the note.  That did not happen.  Ms. Leisenring read him or recited to him the words in the note during a phone call.  That was part of our original papers.

Angela O'Donnell, RPR, 914-390-4025

131

SEALED PROCEEDINGS

THE COURT: Yes, I remember that, yes.

MR. BARKET: I think that's what Mr. Tartaglione is referring to. And we showed the note to Ms. Sternheim.

THE COURT: Yes. I remember that's in the record. Yes.

MR. BARKET: And then we -- I did respond to him initially on the text that he sent me.

THE COURT: Yes.

MR. BARKET: I didn't know who it was. And then later I realized who it was, I responded in substance. Your Honor has had an opportunity to read it.

THE COURT: That's right.

MR. BARKET: So it wasn't I just said that I don't know who you are. I actually responded to the substance of what he had said.

THE COURT: So when I said responded, what I really should have been clear on is I viewed the second response as really the only response.

MR. BARKET: Right.

THE COURT: The first one was you didn't who you were to responding to, so that to me makes that piece of it irrelevant. You had the one response knowing that it was Mr --

MR. BARKET: Literally I wake up early in the summer with the dawn, so I literally look at the phone before I had coffee, so to speak.

Angela O'Donnell, RPR, 914-390-4025

SEALED PROCEEDINGS

THE COURT:  Okay.

MR. BARKET:  And the last one, I'm sure we're clear about this, he didn't text Ms. Leisenring once, there were -- I think we submitted --

THE COURT:  She didn't respond.

MR. BARKET:  She didn't respond at all.

THE COURT:  Right.

MR. BARKET:  There wasn't one text.

THE COURT:  If I said that, then I misspoke.

MR. BARKET:  I think Mr. Tartaglione did.

THE COURT:  Okay.

MR. BARKET:  As far as facts go, I just wanted to make sure we were clear about that.

MR. RICCO:  And we are clear because as to those facts just stated by Mr. Barket, there's no disagreement.

THE COURT:  Okay.

Ms. Feinzig, anything else from you?

MS. FEINZIG:  No, thank you, your Honor.

THE COURT:  Counsel on the phone, anything else?

MR. BACHRACH:  No, your Honor.

THE COURT:  Ms. Sternheim, anything else?

MS. STERNHEIM:  No, thank you, but if the Court would allow me to have a one-minute chat with Mr. Tartaglione before he relinquishes at the cellphone at the conclusion, I'd appreciate that.

133

SEALED PROCEEDINGS

THE COURT:  Sure, I think you should go ahead and do that now.

MS. STERNHEIM:  Okay.

(Pause)

THE COURT:  Okay, Ms. Sternheim, so have you had enough time to talk to Mr. Tartaglione?

MS. STERNHEIM:  Yes, I did, Judge, and there's just one question that I have at the moment.

Would Mr. Tartaglione need to appear again should the Court continue this with Mr. Weider?  That's the request he's asking.

THE COURT:  Yes.  I mean he has a right to be here, and then I might have follow-up inquiry after Mr. Weider would testify.  So even if he wanted to waive his right, I would still want him here, and there's also the issue that Ms. Feinzig is going to be researching, we have to close the loop on that.

MS. STERNHEIM:  I understand.  I just ask the Court to be mindful of the quarantine requirement every time he does appear apparently he needs to be quarantined for two weeks.

THE COURT:  Yes.

MS. STERNHEIM:  And to the extent we can do a one-time appearance as to a multiple going forward, that would accommodate him.  That's all I need to say.

THE COURT:  I agree, and I think that -- I'll say two

Angela O'Donnell, RPR, 914-390-4025

134

SEALED PROCEEDINGS

things. One is, I agree, and so hopefully the next time we do this will be the last time with respect to this issue, and I'm hopeful that the BOP or MCC will change its protocols. I hear rumors that they might. So that hopefully will happen. I don't have any control over it, and I know I was mindful of Mr. Barket's request, but I'm also mindful of the fact that the MCC has taken a lot of incoming fire for how it's handled the pandemic, and so I don't want to feel like I know better than they do about how to manage the ways to reduce the risk to both people that are housed there and people who work there.

MS. STERNHEIM: Understood. Thank you very much, Judge.

THE COURT: So on that score, I'm unavailable for the next couple of weeks. I can tell you the week of the 17th is already booked, so I'm thinking maybe the week of August 24th. I'm mindful what time of the year that is, some people may be on vacation, even in the COVID world. Of course we have no idea when Mr. Weider is available.

MR. BARKET: I can try to find out.

THE COURT: Can you find out?

MR. RICCO: We'll make ourselves available at any time to the Court.

THE COURT: Okay.

So, Mr. Barket, if you could see if Mr. Weider is available the week of the 24th. Maybe get a couple of days and

Angela O'Donnell, RPR, 914-390-4025

135

SEALED PROCEEDINGS

we'll see what we can do.

MR. BARKET:  I know he lives up here, Judge, if I could bring him back this afternoon?

THE COURT:  Sorry, not available this afternoon.

MR. BARKET:  Just give me -- I'm sorry.  It will just take a minute, I'm texting him.

THE COURT:  Okay.

MR. BARKET:  I assume you want him to testify, is that right, or appear and at least answer the Court's inquiry.

THE COURT:  Here to answer some questions.

MR. BARKET:  We're looking for the week of the 24th, Judge?

THE COURT:  Correct.

(Pause)

MR. BARKET:  The 24th or 25th, Judge?

THE COURT:  Ten o'clock on the 25th.  Yes.  Okay.

Does that work for everybody else?

MS. LEISENRING:  Yes.

MR. KOFFSKY:  I have a sentencing in front of your Honor at 11:00 o'clock.

THE COURT:  That's not going to start at 11:00 o'clock.  So we'll be in touch.

MR. KOFFSKY:  All right.

THE COURT:  Because one of the things that problematic is that there's only so many people that are

Angela O'Donnell, RPR, 914-390-4025

136

SEALED PROCEEDINGS

allowed to be produced per day, and obviously I've made the point that this case gets top priority, so your client may have to wait, Mr. Koffsky --

MR. KOFFSKY:  Okay.

THE COURT:  -- to another day.

Anything else?

MR. RICCO:  No.

THE COURT:  Good to see you all healthy.  Please stay that way.

MS. LEISENRING:  Thank you, Judge.

MR. KOFFSKY:  Thank you, your Honor.

MS. LEISENRING:  First time in a courtroom, it's nice.

THE COURT:  First time I think for a lot of us.

(Proceedings concluded)

CERTIFICATE:  I hereby certify that the foregoing is a true and accurate transcript, to the best of my skill and ability, from my stenographic notes of this proceeding.

Angela A. O'Donnell, RPR, Official Court Reporter, USDC, SDNY

Angela O'Donnell, RPR, 914-390-4025