UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
UNITED STATES OF AMERICA,

                      Plaintiff,

       v.                           16 CR 832
                                  CURCIO HEARING
NICHOLAS TARTAGLIONE,          SEALED

                    Defendant.
------------------------------------x

                           United States Courthouse
                           White Plains, New York

                           September 11, 2020

B e f o r e:

                    HONORABLE KENNETH M. KARAS,
                    DISTRICT COURT JUDGE

A P P E A R A N C E S:

GEOFFREY S. BERMAN
     United States Attorney for the
     Southern District of New York
MARGERY FEINZIG
ILAN GRAFF (Appearing via Teleconference)
  Assistant United States Attorneys


BRUCE BARKET
AIDA LEISENRING
ANTHONY RICCO
BRUCE KOFFSKY
JOHN DIAZ
  Attorneys for Defendant

              Angela (Angie) Shaw-Crockett, CCR, CRR, RMR
               Official Court Reporter (914)390-4242

ALSO PRESENT:    (APPEARING VIA TELECONFERENCE)

BOBBI C. STERNHEIM, Curcio Counsel

Kenneth Montgomery, Learned Counsel for Mr. Tartaglione

Donna Aldea, Retained Counsel for Mr. Tartaglione

Tanya Greene

Melissa Lang, Mitigation Specialist

Beth Cahill, Mitigation Specialist

Steven Legon

David Ruhnke, Resource Counsel

Emma Greenwood, Mitigation Support Specialist

Michael Bachrach, Learned Counsel for Mr. Tartaglione

Angela (Angie) Shaw-Crockett, CCR, CRR, RMR
Official Court Reporter (914)390-4242

PROCEEDINGS

THE DEPUTY CLERK:  All rise.  The Honorable Kenneth M. Karas presiding.  United States of America versus Nicholas Tartaglione, 16 CR 832.

Counsel, please state your appearances.

MS. FEINZIG:  Good morning, your Honor.  Margery Feinzig for the government.

THE COURT:  Good morning, Ms. Feinzig.

MR. BARKET:  Good morning, your Honor.  Bruce Barket and Aida Leisenring for Mr. Tartaglione.

THE COURT:  Good morning to you both.

MS. LEISENRING:  Good morning.

MR. KOFFSKY:  Good morning, your Honor.  Bruce Koffsky, learned counsel for Mr. Tartaglione.

THE COURT:  Good morning.

MR. RICCO:  Good morning, your Honor.  Anthony Ricco, learned counsel for Mr. Tartaglione.

MR. DIAZ:  Good morning, your Honor.  John Diaz, learned counsel for Mr. Tartaglione.

THE COURT:  Good morning.

Anybody else on the phone?  Do you want to state your appearance?

MS. STERNHEIM:  Good morning.  Good morning. Bobbi C. Sternheim, Curcio counsel for Mr. Tartaglione.

THE COURT:  Good morning.

4

MR. BACHRACH:  Good morning, your Honor.  Michael Bachrach, learned counsel for Mr. Tartaglione.

I just wanted to note that besides your Honor, it's very difficult to hear anyone else on the phone right now.  I'm wondering if the microphones are on, besides speaker phone, that is.

THE COURT:  So the issue is there are more people than there are microphones.  So we will do our best to get people near microphones when they talk.

MR. RUHNKE:  Also on the phone, your Honor, David Ruhnke as resource counsel, and I will simply be on mute unless the Court has a question for me.  Good morning.

THE COURT:  All right.  Good morning.

MR. MONTGOMERY:  Good morning, your Honor.  Kenneth Montgomery, learned counsel for Mr. Tartaglione.

THE COURT:  Sounds like we have a special appearance in the background there.  Good morning.

MR. MONTGOMERY:  I know what you mean, your Honor.

THE COURT:  All right.  Good morning.

Anybody else?

MS. ALDEA:  Good morning, your Honor.  Donna Aldea, retained counsel for Mr. Tartaglione.

THE COURT:  Good morning.

MS. GREENWOOD:  Good morning, your Honor.  Emma Greenwood, the mitigation support specialist.

Angela (Angie) Shaw-Crockett, CCR, CRR, RMR
Official Court Reporter (914)390-4242

THE COURT:  Good morning.

MR. GRAFF:  Good morning, your Honor.  Ilan Graff for the government, along with Ms. Feinzig.

THE COURT:  All right.  Good morning.

Anybody else?

MS. CAHILL:  Good morning, your Honor.  Beth Cahill, mitigation specialist for Mr. Tartaglione.

THE COURT:  Good morning.

MS. LANG:  Good morning.  Melissa Lang, mitigation specialist.

THE COURT:  All right.  Good morning.

So I think if those who are on the phone could follow Mr. Ruhnke's lead and stay on mute.  Obviously, if you want to say something, you can unmute yourself, but that will help avoid any distractions from any background noise, including background noise created by critters with four legs.

(Reporter interruption)

THE COURT:  All right.  Angie has laid out an edict that must be followed.  If you're going to speak on the phone, please say your last name first.

All right.  Anything preliminary to take up?

Yes?

MS. LEISENRING:  Just minor.  Just in the event that we need to communicate with others on the phone, we can use our cell phones.

Angela (Angie) Shaw-Crockett, CCR, CRR, RMR
Official Court Reporter (914)390-4242

THE COURT: Yes.

MS. LEISENRING: And if Ms. Sternheim needs to communicate with Mr. Tartaglione, I can volunteer my phone.

THE COURT: Okay. All right. Ms. Sternheim, we have a way for you to communicate with Mr. Tartaglione.

MS. STERNHEIM: All right. May I have that phone number so I have it handy?

MS. LEISENRING: Yes. (917)474-4694.

MS. STERNHEIM: I'm just going to repeat that. (917)474-4694.

MS. LEISENRING: Yes.

MS. STERNHEIM: Thank you. I'll be on mute.

THE COURT: All right. Thank you, Ms. Sternheim.

All right. Anything that we need to take up preliminarily here? All right.

So I guess we're going to have Mr. Wieder come up and testify. We're going to have Mr. Wieder testify in the jury box. So I don't know if you want to maybe go to the back.

All right. Mr. Wieder, why don't you come up and take a back chair in the jury box.

Is he here?

MS. LEISENRING: You want me to get him? He might be outside.

MR. BARKET: He was sitting right here a moment ago.

(Discussion off the record)

(Witness enters)

THE COURT:  All right.  Mr. Wieder, you're going to sit in the back chair in the jury box here.  Yes, sir.  Right.

THE WITNESS:  Thank you, your Honor.

THE COURT:  Yes.  So why don't you please raise -- stand and raise your right hand and take the oath.  Please stand.

THE DEPUTY CLERK:  Please stand.

John Wieder, having been duly sworn, testified as follows:

THE DEPUTY CLERK:  Please state and spell your name for the record.

THE WITNESS:  John Wieder, W-I-E-D-E-R.

THE DEPUTY CLERK:  Thank you.

THE COURT:  My thought on this, by the way -- I'm happy to be told I'm wrong -- is I don't view myself as the only person to be asking questions.  If there's other people who want to ask questions -- and that's open to all of you -- I'm fine with that.

And if you object to each other's questions, I'm fine with that too and then I'll decide if the objection should be sustained or overruled.

So, Mr. Wieder, why don't you just give us a brief synopsis of your résumé, after you're done playing with your phone?

THE WITNESS:  No.  I was confirming -- making sure it

was completely turned off.

THE COURT:  Good idea.

THE WITNESS:  I was admitted to practice in January '93.  So 27 years ago or so.

THE COURT:  Okay.

THE WITNESS:  I started with a small litigation firm years ago in the '90s, but after -- since '95 I've been primarily real estate, transactional real estate.  I had my own firm in Yonkers for 15 years or so.  Wieder & Wieder.  It's --

THE COURT:  Which Wieder are you?

THE WITNESS:  I'm the first Wieder.

THE COURT:  Okay.

THE WITNESS:  I'm the founder.

THE COURT:  Got it.

THE WITNESS:  And I'm of counsel to that firm.

THE COURT:  Okay.  Okay.  What kind of law do you practice?

THE WITNESS:  It's real estate, mostly just transactional real estate.

THE COURT:  Okay.  And you've done other kinds of law?

THE WITNESS:  Yeah.  Initially, when I worked for a firm here in White Plains, I did civil litigation.

THE COURT:  And that was back in the '90s, early '90s?

THE WITNESS: Yeah, back in the '90s. I had a couple of trials, three in White Plains and one in Eastern District in Uniondale, federal court.

MR. BACHRACH: I'm sorry, your Honor. I'm sorry, your Honor. This is Michael Bachrach speaking.

Would it be possible to get a microphone closer to Mr. Wieder? It's very hard to hear.

THE COURT: Unfortunately, we don't have a free microphone that's mobile.

THE WITNESS: If it's permissible, I could take this off.

THE COURT: No. The mask is staying on.

THE WITNESS: Okay. I'll just leave it on.

(Discussion off the record)

THE COURT: For those on the phone, we're trying to see if we can get a microphone closer to Mr. Wieder.

MR. BACHRACH: Thank you, your Honor.

THE COURT: You should stay where you are, Mr. Wieder.

Is that helping at all? You can move the chair over and, Mr. Koffsky, Mr. Ricco. That'd be great. Thank you very much.

All right. So I think you were talking about some of your civil litigation experience.

THE WITNESS: Yeah. Decades ago I did some of that,

and then more recently I do a little bit of discovery work for some firms on the West Coast.

THE COURT:  You said recently?

THE WITNESS:  Currently, starting in probably 2018.

THE COURT:  Okay.  So when did you start Wieder & Wieder?

THE WITNESS:  Wieder & Wieder I started as a different firm known as Wieder, Mastroianni & Reda in 1995.

THE COURT:  Okay.  And you had stated that you are of counsel to that firm?

THE WITNESS:  Correct.  Yeah.  It's gone through different iterations of counsel, but the name remains Wieder & Wieder.

THE COURT:  Okay.  When did you become of counsel?

THE WITNESS:  I'm going to -- approximately 2010.

THE COURT:  Okay.  So you've been of counsel since 2010?

THE WITNESS:  I believe so, yes.

THE COURT:  Okay.  And the year, give or take approximately.  Sure, I understand.

And do you -- do you still do real estate transactional work with that firm?

THE WITNESS:  Yes, I do.

THE COURT:  Okay.  What kind of real estate deals?

THE WITNESS:  It's really just mostly residential,

the occasional commercial or things like that, but no landlord/tenant, nothing like that.  Just mundane but necessary real estate closings.

THE COURT:  Got it.  Do you have any other professional affiliations currently?

THE WITNESS:  Well, I, in effect, hung out a shingle. I live in Long Island now, in Long Beach.

THE COURT:  Okay.

THE WITNESS:  So I have my own firm there, which I just have in case, you know, something -- a neighbor or someone needs something.  So I have an affiliation with that entity because I started that law firm.

THE COURT:  So when you say "that law firm," does that law firm have a name?

THE WITNESS:  Yes.  Wieder Law Group, 218 East Park Avenue, Suite 321, Long Beach, New York.

THE COURT:  And is that strictly real estate transaction work?

THE WITNESS:  Yeah, more or less.  If someone needed a will or something, I can do something like that.  And the eDiscovery is with -- through Lincoln Discovery is the name of that entity.

THE COURT:  Okay.  So the eDiscovery is not with your Long Island firm.  It's called Lincoln Discovery?

THE WITNESS:  Correct.

12

THE COURT:  What is that?

THE WITNESS:  We provide -- we offer information governance services and eDiscovery services for corporations and law firms for litigation.

THE COURT:  And how long have you been working with Lincoln Discovery?

THE WITNESS:  I think it's 2017.

THE COURT:  Okay.  Since 2017.  And how long have you been -- when did you start this Long Island firm, this Long Island Wieder firm?

THE WITNESS:  I believe 2019.

THE COURT:  Okay.  Any other professional affiliations in the last five years?

THE WITNESS:  I have -- I'm a notary public.  I have a real estate broker's license.

THE COURT:  Do you do any -- are you of counsel or do any work with any other legal entity, law firms, organizations?

THE WITNESS:  No, nothing.

THE COURT:  Okay.  All right.  And do you know Mr. Tartaglione?

THE WITNESS:  Yes, I do.

THE COURT:  All right.  And how do you know Mr. Tartaglione?

THE WITNESS:  He and I went to Archbishop Stepinac in White Plains together in the early '80s.

THE COURT: Okay. So that's when you met. Have you stayed in touch with him since high school?

THE WITNESS: Correct. Yeah. We've stayed in touch over the last 30 years or so, whatever it is for, you know, regularly.

THE COURT: Okay. So you consider yourself a friend of his?

THE WITNESS: Correct. Yes.

THE COURT: Okay. And have you done stuff socially together before he was arrested in this case?

THE WITNESS: Yes. I think he was invited to my wedding. I don't know if he showed, but, you know, we've seen each other. He's good friends with my wife's brother. So he was at my brother-in-law's wedding, and, yeah, we've had social events together.

THE COURT: Okay. And have you ever done any legal work for Mr. Tartaglione?

THE WITNESS: Yes.

THE COURT: What kind of legal work have you done for him?

THE WITNESS: Over the last 20 years, all kinds of legal work. Real estate transactions being the first, starting his rescue -- he's has an animal rescue. That's his thing. And helping him set up the 501(c)(3) and then identifying which CPAs to use for that entity.

14

THE COURT:  So the 501(c)(3) was an animal rescue?

THE WITNESS:  Correct.

THE COURT:  Okay.  And when did you do that, roughly?

THE WITNESS:  I think it started going to 4051(c)(3) about five years ago.  He and I went in person to an accounting firm in Queens.  So it had to be at least five years ago.

THE COURT:  Okay.  Go ahead.  Sorry.  What other kinds of work have you done?

THE WITNESS:  After he's gotten arrested, I've done sort of a lot of work just trying to keep his rescue going, trying to keep the finances flowing.  He's the primary wage earner for his household.  So things like -- he's got -- I don't know how many acres, but I tried to negotiate -- I did negotiate a solar panel lease for his farm to create another stream of revenue for his wife and his rescue, that type of thing.

A little bit of estate -- not really estate work, but I've liaised with the State of New York for his disability pension, things like that.

THE COURT:  Okay.  And was this done through your law firm in Long Island?  Is that the legal entity that's doing this or you're just doing it on your own?

THE WITNESS:  Yeah.  It's -- all the real estate transactions that we did for him, that was all Wieder & Wieder. He had used Wieder & Wieder from -- he had purchased several

different properties. But more recently it's been on my own.

THE COURT: Okay. And so are you getting paid for any of this work?

THE WITNESS: Well, yes. I had deferred -- after he got arrested, obviously, the relationship I have with him, I did the work and put in the time for deferred compensation. But, yes, toward the end of last year, there was -- I helped his father obtain financing, and Nick indicated that he wanted me to start getting paid for what I was deferring my fees on. So I got paid by him at that time.

THE COURT: Okay. And that was the end of 2019?

THE WITNESS: I believe so, yeah.

THE COURT: Okay. And when you got paid, was it your Long Island firm or was it Wieder & Wieder or ...

THE WITNESS: I believe it came to John Wieder, Esquire. But I could -- there's -- I could find out.

THE COURT: Okay.

THE WITNESS: In fact, I know it did because I didn't deposit --

THE COURT: So -- so which legal entity?

THE WITNESS: Me personally.

THE COURT: You personally?

THE WITNESS: Yeah.

THE COURT: Is that part of the Long Island firm or is it neither?

Angela (Angie) Shaw-Crockett, CCR, CRR, RMR
Official Court Reporter (914)390-4242

THE WITNESS: Well, I guess it's independent 1099 income, if you will.

THE COURT: Okay.

THE WITNESS: But, yeah, it would be as my solo practitioner firm, but I don't think the check was made out that way.

THE COURT: It was made out to you?

THE WITNESS: Correct.

THE COURT: Okay. Okay. And have you gone to visit Mr. Tartaglione at the MCC in lower Manhattan?

THE WITNESS: I have, your Honor. But before we move on to that --

THE COURT: Yeah, please.

THE WITNESS: -- for purposes of -- to be complete, his mom and dad had dropped off two checks in my brother's Yonkers office, which I returned to them and then they dropped them off again and I returned to them.

So I also got paid by his parents for the work that I was doing trying to keep the farm afloat.

THE COURT: Okay. And when did they send you those payments?

THE WITNESS: That might have been 2019, but it might have been 2018.

THE COURT: Okay. December 2018, 2019?

THE WITNESS: Yes.

Angela (Angie) Shaw-Crockett, CCR, CRR, RMR
Official Court Reporter (914)390-4242

THE COURT:  Okay.

THE WITNESS:  I did visit him at MCC, yes.

THE COURT:  How many times do you think you visited him at MCC?

THE WITNESS:  It's dozens.  Definitely more than 50, probably less than 100.

THE COURT:  Somewhere between 50 and 100 times?

THE WITNESS:  Yes.

THE COURT:  Since his arrest?

THE WITNESS:  Correct.

THE COURT:  Okay.  And when was the last time you saw him in the MCC?

THE WITNESS:  I think I was the last person to see him.  They went on lockdown because like the guards sold a gun to an inmate or something.  So February -- January, February.

THE COURT:  Okay.  And when you went to visit him -- I don't want to have him -- I don't want to have you testify to conversations that he had with you in your capacity as lawyer, but did you visit him solely to conduct business or did you visit him for other reasons or was it both?

THE WITNESS:  It was both.

THE COURT:  Okay.  So there were times you would visit him to talk about legal business and there were times you would visit him just as a friend; is that fair?

THE WITNESS:  Correct.  I would imagine there's a

blend of both probably every time.

THE COURT:  I see, okay.  And at any point in the last -- since Mr. Tartaglione's arrest, have you had a professional relationship with Mr. Barket's law firm?

THE WITNESS:  No.

THE COURT:  Okay.  So at any point that you visited Mr. Tartaglione, even if some of those visits involved some conversations about legal business, it was not legal business on behalf of Mr. Barket's law firm?

THE WITNESS:  No.

THE COURT:  Okay.  Was there ever a point at which you went to visit Mr. Tartaglione because Mr. Barket asked you to?

THE WITNESS:  No.

THE COURT:  Okay.  Was there ever a point that you did something with Mr. Tartaglione at Mr. Barket's request?

THE WITNESS:  Yes.

THE COURT:  What was that?

THE WITNESS:  I was going to see -- visit Nick in, I think, July of 2019.  Anyway, he was in the SHU.  So I had told Bruce -- I always try and coordinate with him so there's no overlap.  I said, "I'm going to see Nick on Saturday because I'm going to be in Brooklyn and wanted to let you know so that I don't -- I didn't want to conflict with you."

Obviously, if he was going at the same time, I would

defer my visit to Sunday.

And Bruce indicated, "No, I'm going to be there in the morning. So if you go in the afternoon, that's fine."

So I was in Brooklyn and I got a text from Bruce asking me to call him. So I gave him a call. And he said, "Listen, I just left Nick, but he was supposed to give me something and he forgot to give it to me. So can you please pick it up for me?"

And I said, "Yeah."

THE COURT: Okay. And so did you do that?

THE WITNESS: Yes.

THE COURT: And what did you get for Mr. Tartaglione?

THE WITNESS: He had a letter that his cellmate had written to him.

THE COURT: Okay. And who was his cellmate?

THE WITNESS: Jeffrey Epstein.

THE COURT: Okay. And so Mr. Tartaglione gave you this letter?

THE WITNESS: Yes.

THE COURT: Okay. And what did you do with it?

THE WITNESS: I left. I told Bruce I got that thing from Nick and he said, "Take a picture of it and send it to me," which I did.

And I believe Bruce said, "I'll meet you on Monday to pick it up," or something like that. And then he said, "Just,

you know, keep it in a safe place."  I presume because he had a photo already.

THE COURT:  Yeah.

THE WITNESS:  And then he shared the contents with the rest of the defense team.

THE COURT:  How do you know that?

THE WITNESS:  Well, I said to him, "I put it in a safe.  Do you want it?"

He said, "No, the picture is good enough."

THE COURT:  So how do you know what he did with the picture?

THE WITNESS:  Two things.  We had a conversation where -- when I asked him, "I put it in a safe.  What do you want me to do?"

He said, "We have to authenticate it.  So we're going to authenticate it."  I just assumed that meant the team.

THE COURT:  So you don't know who the "we" was?

THE WITNESS:  I don't.  He said, "We need to authenticate it."  I don't -- I think he doubted the validity of it.

THE COURT:  Okay.  So I didn't ask you that.  I'm just asking you how you know who he shared it with.

THE WITNESS:  No.  I'm saying it was my presumption when he said "we need to," I thought we were going to get a forensic handwriting specialist.

THE COURT: Okay. So you don't know who the "we" was?

THE WITNESS: I don't.

THE COURT: Okay. So then what happened to the original letter?

THE WITNESS: It's where it was the day I got it. It's in the safe.

THE COURT: So it's in your custody?

THE WITNESS: Correct.

THE COURT: Okay. When you got this letter from Mr. Tartaglione, did you tell anybody at the prison you had it?

THE WITNESS: No.

THE COURT: Did you -- what was your understanding of whether or not you were supposed to take that letter out without letting BOP officials know?

THE WITNESS: I didn't think it was an issue. I know that on occasion the attorneys take things out of there. I didn't think it would be an issue at all. It didn't even occur to me.

THE COURT: Okay. So you don't know whether or not it was appropriate for you to take that letter out?

THE WITNESS: I assumed it was. There were a couple of times prior to that where Nick would say, "I have something that I want to give to you," but when I arrived, he said, "The mitigation team took it," or something like that. So I just --

I didn't think it was an issue to take something out.

THE COURT:  Okay.  But you don't know what these other things were that the mitigation team might have taken, right?  They could have been legal documents that were part of, for example, his defense?

THE WITNESS:  Could have been anything.

THE COURT:  Could have been discovery materials that had been provided by the prosecution.

THE WITNESS:  Correct.  It could have been anything.

THE COURT:  When you got this letter, did you understand what it was?

THE WITNESS:  I did understand -- I did understand what it was.

THE COURT:  Okay.  And what was your understanding of what it was?

THE WITNESS:  It sort of dovetailed with conversations that I had with my client about his attempts to help his cellmate through a very difficult time.

THE COURT:  Okay.  So you just referred to Mr. Tartaglione as your client.

THE WITNESS:  Yes.

THE COURT:  Were you acting as his lawyer when you took this letter?

THE WITNESS:  That may be a question for someone else.

Angela (Angie) Shaw-Crockett, CCR, CRR, RMR
Official Court Reporter (914)390-4242

THE COURT: What was your understanding of it?

THE WITNESS: Yeah.

THE COURT: How did it relate to the shelter or any real estate transactions that you were doing on behalf of Mr. Tartaglione?

THE WITNESS: It didn't.

THE COURT: So how is it that you were having conversations in that this letter was a part of a attorney/client relationship in terms of the legal work you were doing for Mr. Tartaglione?

THE WITNESS: Well, at that time I had signed a protective order and I had been privy to the discovery in the case.

THE COURT: Okay. So --

THE WITNESS: Nick was speaking to me as his attorney. I'm not sure what his mindset was in his discussions.

THE COURT: All right. Have you done any work in connection with this criminal case?

THE WITNESS: No.

THE COURT: So why did you sign a protective order?

THE WITNESS: To the best of my recollection, Nick was insisting that he be able to discuss the discovery with me, and if I recall correctly, Bruce was resisting that for quite a while, but Nick was really insisting on it.

And at some point, a couple of years into it, I think, Bruce said, "Well, if this is going to happen, he's going to have to sign the protective order."

So I went to Barket Epstein in Garden City and I signed the protective order.

THE COURT: Have you seen any of the discovery in this case?

THE WITNESS: Yes.

THE COURT: Okay. And who showed you that discovery?

THE WITNESS: Well, after I signed the protective order and whatever was available at that time, I reviewed it in a conference room at Barket Epstein for approximately 90 minutes initially. And then since then, the only time I've ever seen any discovery is when I visit Nick.

THE COURT: So he would show you discovery?

THE WITNESS: Yeah. He's, you know, incessant about going over his discovery.

THE COURT: Okay. So when you went to visit Mr. Tartaglione that day and you got the letter, did you think you were acting as his legal representative in this case?

THE WITNESS: To be honest, I didn't formulate this is what I'm doing for this purpose.

THE COURT: Well, I'm almost asking looking back on it now.

THE WITNESS: Looking back on it now?

THE COURT: Yeah.

THE WITNESS: Honestly, it was more like doing a favor. I said, Bruce, hey, I visited him. I --

THE COURT: Because you referred to him as your client for the first time when you got to this subject, and I'm wondering why you did that. Why did you refer to Mr. Tartaglione as your client? Up until then it had been, "Nick, Nick, Nick, Nick." Now, it's "my client." And I'm trying to understand what the nature was of your legal relationship with him with respect to this case.

THE WITNESS: With respect to this case, he discusses discovery with me.

THE COURT: Yeah.

THE WITNESS: He didn't -- can I speak openly?

THE COURT: Well, I don't want you to tell us what Mr. Tartaglione said to you. Because for now I'm going to assume everything he said to you is privileged.

THE WITNESS: Okay.

THE COURT: So, of course, you should speak openly and truthfully, but I don't want you to compromise Mr. Tartaglione's attorney/client privilege. Okay?

THE WITNESS: Well, he didn't kill the four people he's accused of killing.

THE COURT: Okay. So, Mr. Wieder, you need to answer my questions, not give speeches. Okay?

THE WITNESS: Certainly. Okay. So he insisted I go over the discovery with him because he's frantically poring through it for that needle --

THE COURT: That wasn't my question. My question is: Looking back on it, do you think that when you visited Mr. Tartaglione that day, were you visiting him in your capacity as a lawyer representing him in this case?

THE WITNESS: I'm not working on the defense of this case.

THE COURT: But you signed the protective order, right?

THE WITNESS: Correct.

THE COURT: And presumably only people who are working on the defense team should be signing that protective order; otherwise, what's the purpose of you signing the protective order?

Let me ask you that. What's the purpose of having you sign a protective order? You didn't need it for the animal shelter work or the real estate transactions, right?

THE WITNESS: Correct.

THE COURT: So why did you sign the protective order?

THE WITNESS: So I can discuss with Nick the discovery in the case.

THE COURT: Okay. And then were you going to do anything with those discussions? Were you going to try to help

him in this case?

THE WITNESS:  I'm not sure what his expectations were when he insisted on it, but I have an opinion.

THE COURT:  I guess I'm trying to understand your role in this case.  I'm not interested in your opinions.  I'm interested in what you understood your role in this case to be.

THE WITNESS:  I've been his attorney for -- on and off for --

THE COURT:  Doing real estate transactions and maybe some other financial transactions.  Have you ever represented him in any criminal cases?

THE WITNESS:  No.

THE COURT:  Have you ever tried a criminal case?

THE WITNESS:  No.

THE COURT:  Have you ever worked on a capital case?

THE WITNESS:  No.

THE COURT:  So what was your understanding of your role as a lawyer in connection with this case?

THE WITNESS:  My understanding is that ultimately Nick wants me to be abreast of the entire case and all of the evidence.  Because if there ever comes a moment of truth, he might want my advice.

THE COURT:  Okay.  And in that role, what do you view as your relationship with Mr. Barket and his firm?

THE WITNESS:  Nothing.

THE COURT: Nothing?

THE WITNESS: Well, my feeling about -- I think Bruce finds my connection with Nick to be a little bit inconvenient and he doesn't look to discuss the case with me. So my role with Nick is to say, "You have to talk to your defense attorney. You have to talk to Bruce for the case. I'm not working on the case."

THE COURT: Okay. And do you share -- have you ever shared any conversations you had with Mr. Tartaglione with Mr. Barket? Like, "Hey, I spoke to Nick today about such-and-such. I just want you to know."

THE WITNESS: Certainly.

THE COURT: Okay. And any of the payments that you have received in this case -- any payments you received from Mr. Tartaglione and his family, are any of those compensation for your work on this case as distinct from your work on the shelter and the other real estate transactions you mentioned?

THE WITNESS: I think it's compensation for my time. So, for instance, there's been times when I had a three-hour visit with Nick, four-hour visit, seven-hour visit. My expenses alone traveling to Manhattan is, in fact, a four-hour round trip.

THE COURT: So do you send a bill to Mr. Tartaglione or his family stating, "This is how many hours I've spent with Mr. Tartaglione"?

THE WITNESS: I have not, no.

THE COURT: But you -- at least some of the payment you've received is meant to be compensation for the time you have spent with Mr. Tartaglione?

THE WITNESS: Yeah, I believe so. That may even have been verbalized to me.

THE COURT: Okay. And some of that time that you've spent visiting Mr. Tartaglione you've been discussing this case?

THE WITNESS: Absolutely.

THE COURT: Okay. Since Mr. Tartaglione was detained in this case, have you had conversations with him where he's been using a cell phone?

THE WITNESS: Yes.

THE COURT: And how many times do you think you had those kinds of conversations?

THE WITNESS: A handful maybe.

THE COURT: Okay.

THE WITNESS: Ten maybe.

THE COURT: Ten, okay.

MR. BARKET: I'm sorry, Judge. Was the question how many times has he had conversations over the cell phone?

THE COURT: Yes.

You understood that question?

THE WITNESS: I did, your Honor.

Angela (Angie) Shaw-Crockett, CCR, CRR, RMR
Official Court Reporter (914)390-4242

30

MR. BARKET:  You mean -- did you mean voice communications or text messages?

THE COURT:  So far I've just said conversations.

MR. BARKET:  Okay.  I just wasn't clear as to which it was.

THE COURT:  Okay.  So let's break that down, Mr. Wieder.  So how many times have you had actual conversations where you were speaking to Mr. Tartaglione and he was using a cell phone?

THE WITNESS:  I think that was a pretty -- estimate probably around ten.

THE COURT:  Okay.  Separate from that, did you have text exchanges with Mr. Tartaglione where he was using a cell phone from within the prison?

THE WITNESS:  Yes.

THE COURT:  And how many such text communications do you think you had with him?

THE WITNESS:  Hundreds.

THE COURT:  Hundreds.  Okay.  And is there a time frame during which you've had these texts and verbal communications with Mr. Tartaglione over this cell phone?

THE WITNESS:  As to verbal conversations, I think it was -- it was a really bad time frame in May, so I think it was primarily --

THE COURT:  May of what year?

Angela (Angie) Shaw-Crockett, CCR, CRR, RMR
Official Court Reporter (914)390-4242

THE WITNESS:  2019.

THE COURT:  Okay.  So in May 2019 you think you had -- it was like -- this is when most of these ten conversations took place?

THE WITNESS:  Yeah.  Yes.  Yeah, specific reason.

THE COURT:  Okay.  And the text communications, what time frame did those take place?

THE WITNESS:  That was over a longer period of time.  I think probably couple of months, starting with spring maybe.

THE COURT:  Of '19?

THE WITNESS:  Yeah.

THE COURT:  Okay.

THE WITNESS:  Maybe April through May, June.

THE COURT:  Okay.  So spring and going through roughly June, is that -- do you think that's the last time you had text communications with him?

THE WITNESS:  As best as I can recall, yeah.

THE COURT:  Okay.  No, I understand.

THE WITNESS:  Okay.

THE COURT:  And was it the same cell phone that Mr. Tartaglione was using?

THE WITNESS:  Yeah, I believe so.

THE COURT:  For both the verbal communications and the text messages?

THE WITNESS:  Yes, yes.

THE COURT: Okay. And did you have any understanding as to whether or not Mr. Tartaglione was supposed to be using a cell phone from within the prison?

THE WITNESS: My understanding was it was probably against the rules.

THE COURT: Okay. Had you had conversations with Mr. Tartaglione where he called you using a phone -- an authorized phone from within the MCC?

THE WITNESS: Yes.

THE COURT: Okay. So you knew that there's some times he was talking to you that way through a phone, or he would go through the MCC, and other times he was talking to you with a cell phone that he probably wasn't supposed to have?

THE WITNESS: Correct.

THE COURT: Okay. And without getting into the specifics, did any of these communications involve this case? I don't want to know the specifics of what was said, but did they involve this case?

THE WITNESS: I don't believe so. As I said, he texted me several hundred times. Whether or not he may have mentioned it, I have no idea. I didn't -- certainly not in any of my responses, I didn't respond as often to his text.

THE COURT: Okay. So were they more of a personal nature or did they involve other legal business you were having with Mr. Tartaglione?

Angela (Angie) Shaw-Crockett, CCR, CRR, RMR
Official Court Reporter (914)390-4242

THE WITNESS: Both. It's personal and something happened in his personal life that was extremely traumatic. So there was a lot of that and probably a little bit of --

THE COURT: Legal work?

THE WITNESS: -- legal work.

THE COURT: But not legal work in this case?

THE WITNESS: No. It was all about the rescue and, you know, the status of his animals.

THE COURT: Okay.

THE WITNESS: And which animals had died and his ASPCA and all that stuff.

THE COURT: Okay. When you had these communications, you had already signed the protective order in this case; is that right?

THE WITNESS: Yes, I had.

THE COURT: Okay. Did you inform Mr. Barket that you were having these conversations and these several hundred texts communications with Mr. Tartaglione using this cell phone?

THE WITNESS: No. Although I did have a discussion with him about it, I think, once.

THE COURT: With --

THE WITNESS: With Mr. Barket. Correct.

THE COURT: Okay. And when was this discussion?

THE WITNESS: In the spring, as I indicated earlier, I started getting texts from this strange number and it

indicated it was Nick. I didn't know if it was spam or not. So I think at that point I may have brought it up to Bruce. "Hey, I'm getting texts from this weird number and it's Nick."

I visited Nick at some point and he confirmed. He's like, "Yeah, it's me. Everyone has them. It's no big deal."

I was just like -- so at that point I mentioned to Bruce.

THE COURT: And what happened after you mentioned to Mr. Barket?

THE WITNESS: He was like, "He's not supposed to have that and I told him not to use that."

THE COURT: Okay. Did you honor that at least concept and say to Mr. Tartaglione, "You're not supposed to have a phone. We are not going to communicate anymore using this phone"?

THE WITNESS: Absolutely. I told him -- since my real concern for him was that I think he was using it to just speak to the entire world, all kinds of people, and I told him, "You got that from the guards. It's definitely tapped. You should consider that to be a recorded conversation. Don't use it and don't text me on it."

THE COURT: And did he stop texting you?

THE WITNESS: Not -- not even close, no.

THE COURT: And you kept texting him back?

THE WITNESS: No. I mean --

THE COURT:  You said you had several hundred texts.

THE WITNESS:  He would, like, sometimes text 15, 16, 18 times a day.

THE COURT:  Okay.

THE WITNESS:  So if I got ten on a Monday and another dozen on a Tuesday and another dozen on a Wednesday, I really was concerned about his mental state.

THE COURT:  Yeah.  But my question is:  Did you text him back?

THE WITNESS:  Yeah.  Yes.  About one out of every ten times I texted him back.

THE COURT:  Okay.  Did you speak with him on the phone after you had spoken to Mr. Barket about this?

THE WITNESS:  My best recollection is that I mentioned it to Bruce when it began.  So I think that would probably be around April, and then it was in March --

THE COURT:  All right.  So just answer the question, please.

THE WITNESS:  I spoke to him on the phone after I talked to Bruce.

THE COURT:  Okay.  By the way, have you had conversations with any of the learned counsel in this case?

THE WITNESS:  I've had one conversation with Bruce Koffsky.

THE COURT:  Okay.  And any of the other learned

counsel in this case?

THE WITNESS:  No.

THE COURT:  And when did you have a conversation with Mr. Koffsky?

THE WITNESS:  It was here in the courtroom.

THE COURT:  Okay.  And when was that?

THE WITNESS:  2018, 2019.

THE COURT:  Okay.  Here in this courtroom?

THE WITNESS:  Correct.

THE COURT:  How many proceedings did you come to watch here?

THE WITNESS:  Maybe ten.

THE COURT:  Okay.  All right.  I'll open the floor to others who might have questions.

Ms. Feinzig, do you have questions?

MS. FEINZIG:  If I could have a moment.

THE COURT:  Of course, take your time.

MS. FEINZIG:  If would you like to ask defense counsel first?

THE COURT:  All right.  Anybody else want to ask any questions?

Mr. Barket?

MR. BARKET:  No, Judge.  Actually, I don't.  I have a couple of comments, but no questions for him.

THE COURT:  Okay.  Well, time for comments will

37

certainly be allotted.

Learned counsel?

MR. RICCO:  Yes.

THE COURT:  Yes.  Maybe if you could, for everybody's benefit, Mr. Ricco, go to the podium so that way you're near a microphone.  That would be great.  Thank you.

MR. RICCO:  Your Honor, we are trying to work together.  So Mr. Bachrach is texting and --

THE COURT:  Sure.  Yeah, no problem.

MR. RICCO:  All right.

THE COURT:  There's no jury's time we're wasting here.

MR. RICCO:  Okay.

THE COURT:  So there's no need to be efficient and it's not like you have 3500 material to work with at the time or anything like that.

MR. RICCO:  Thank you, Judge.

THE COURT:  So take your time.

EXAMINATION

BY MR. RICCO:

Q    Mr. Wieder, you know that Mr. Tartaglione is facing the death penalty.  Correct?

A    I'm aware.

Q    You've been to court ten times, right?

A    I don't know if I've been to court ten times, but about

ten.

Q    That's what I'm asking.  You said you've been here about ten times, right?

A    Well, yeah.  You said ten specifically.

Q    And so you're fully aware that he's facing the death penalty.  Correct?

A    Do you want me to answer that question?

Q    You are fully aware that he is facing the death penalty.  Correct?

A    Yes.

Q    Have you ever discussed the death penalty Mr. Tartaglione?

A    Yes.

Q    Have you ever had any conversations with one of any of the appointed lawyers in this case about the death penalty?

A    Tangentially.

Q    Is that a yes or a no?

A    It's a maybe.

Q    Have you ever spoken to me -- my name is Anthony Ricco.  Have you ever spoken to me in your life?

A    I have not spoken to you ever, no.

Q    You see John Diaz sitting over there?

A    I do see that gentleman.

Q    Have you ever spoken to him before or met him?

A    I have not.

Q    Do you know the name Michael Bachrach?

A    I do.

Q    Have you ever spoken to Michael Bachrach in connection with this case about the death penalty or anything else for that matter?

A    I have not.

Q    And you said you spoke to Mr. Koffsky one time in this courtroom.  Correct?

A    Correct.

Q    And that was a formality.  "How are you doing?  You're John Wieder"?

A    No, it was not.

Q    You discussed the death penalty with Mr. Koffsky?

A    You might consider that.

Q    What did you consider the conversation that you had with Mr. Koffsky?

A    I can recount it for you.

Q    That's what I'm asking.  Tell us about it.

A    So he came over and introduced himself to me, and I said, "Well, I'm glad to speak with you."  Because Nick was extremely upset about the meeting they had the prior day, I believe it was, maybe two days before, wherein Bruce had tried to get him to take a guilty plea.  I think it was a few days --

THE COURT:  Okay.  Hang on.  Hang on.  I don't want to get into anything close to be considered privileged communication.

THE WITNESS: Okay.

THE COURT: Just answer the question.

A    I said, "He was very upset about the fact that you talked him into taking a guilty plea."

He said to me, "Well, I'm like a cancer doctor. Sometimes I have to give the bad news and the patient doesn't like it."

And I told him, "Well, that's what you'd like," I said, "but you're actually an attorney and you're trying to tell this man that he's guilty, he's a murderer. So you might want to consider --"

(Discussion off the record)

A    "You're trying to tell this man, your client, to plead guilty to a murder he didn't commit."

BY MR. RICCO:

Q    Okay. That was the extent of your conversation with Mr. Koffsky?

A    That was it.

Q    And you were telling him, that is, Mr. Koffsky, what his ethical responsibilities were in connection with the representation?

MR. BARKET: I'd object to the characterization.

THE COURT: Overruled.

You can answer the question.

A    Without getting into the discussion of what I had with Nick --

Angela (Angie) Shaw-Crockett, CCR, CRR, RMR
Official Court Reporter (914)390-4242

BY MR. RICCO:

Q   I didn't ask you about the discussion with Nick.

A   Okay.

Q   I asked you was it you, who never tried a criminal case, was giving Mr. Koffsky -- and telling him what he should be doing in connection with his representation of a person facing the death penalty?  That was you?

A   I was telling him to listen to his client.

Q   Okay.

A   Not give testimony.

Q   And you never represented a person in a criminal case, have you?

A   I -- you know, possibly on a -- I don't know -- no, certainly not at trial.

Q   You don't know anything about a lawyer's legal obligation to a person facing the death penalty, do you?

A   I think I know what a lawyer's obligation to his client is.

Q   I didn't ask you that.  I asked you --

A   I don't think they're separable.

Q   You don't think that they're separate?

A   I'm answering your question, yeah.

Q   Okay.  Now, you told us that you've gone to the jail.

THE COURT:  Mr. Tartaglione, if you could keep your mask above your nose.  Thank you.  Go ahead.

Angela (Angie) Shaw-Crockett, CCR, CRR, RMR
Official Court Reporter (914)390-4242

42

BY MR. RICCO:

Q    Between 50 to 100 times, right?

A    Correct.

Q    And every time you went in that jail, you had to sign a declaration, didn't you?

A    You signed in.

Q    Excuse me?

A    I signed in.

Q    No, no, no.  There's a form BP-A0224 down in the lobby?

A    Yes.

Q    You had to sign a declaration; isn't that correct?

A    Yes.

Q    And you know the difference between signing in as a lawyer and signing the declaration, don't you?

A    Yes.

Q    And when you entered the jail, you were required to answer a series of questions.  Correct?

A    I haven't read the Word form, but, yes, it asks if you have certain items on you, and then you respond yes or no.

Q    And there's other information on that form also, isn't it?

A    There's a couple of paragraphs above that, yeah.

Q    One of those paragraphs talks about prohibited activity.  Correct?

A    I haven't read it.

Q    You signed it between 50 and 100 times and you never read

Angela (Angie) Shaw-Crockett, CCR, CRR, RMR
Official Court Reporter (914)390-4242

it?

A    We could get the form.

THE COURT:  That's not the question.

A    Yes.  Correct.

BY MR. RICCO:

Q    Okay.  And at the bottom when you sign it, it says that you hereby agree to follow the above conditions under the penalties of perjury, doesn't it?

A    It may say that.

Q    It also says that you've read each of the conditions in the form, doesn't it?

A    It may say that.

Q    And what you're telling Judge Karas is that between 50 and 100 times you went to that jail and you signed the bottom as a lawyer and you never read any of the prohibited activities and objects that you agree you would not engage in at that jail. Correct?

A    No, not correct.

Q    You're telling us now that you did read it?

A    You said I hadn't read any of it.  You said "any."

Q    The form talks about prohibited activities.  Do you know that?

A    The primary focus of the form when I --

THE COURT:  That's not the question.

A    Do I know that?  No.

Angela (Angie) Shaw-Crockett, CCR, CRR, RMR
Official Court Reporter (914)390-4242

BY MR. RICCO:

Q    Because you never read it, right?

A    I read the part about what I'm not supposed to bring in, and I check it off and confirm that I don't have any of those things.

Q    Did you read that you are not supposed to engage in any activities that can jeopardize the Bureau's ability to ensure the safety, security, and orderly operations of the Bureau facilities?

A    I don't recall that specifically.  I'm not saying it's not on the form.

Q    Prohibited objects.  Did you read that part of the form?

A    If that's the part that prohibits objects, yes, I've read it and I check it off each time.

Q    Tell Judge Karas which one of the prohibited objects and activities that you're not supposed to engage in at the jail.

A    It asks if you have cash, if you have a phone, if you have weapons, those types of things.  Maybe 15 or 20 of them, and you have to go through them and check them off that you do not have those items.

Q    Judge Karas asked you a question and said, "Did you think that it was like improper for a detainee to have a cell phone?" And you said, "I think probably," right?

A    I'm not sure about exactly what I said.

Q    Well, tell us if it's your understanding at the time you

were texting and having phone calls with a detainee in a Bureau prison facility via cell phone, that that was permissible activity? Yes or no.

A    That it was permissible or impermissible?

Q    You tell us.

A    I think I answered before that it was probably against the rules.

Q    You said "probably against the rules," right?

A    Correct.

Q    And that form that you fill out that you sign at the bottom your name to, right?

A    Correct.

Q    That form says that if you give a false statement in connection with this, you could be prosecuted criminally, right?

A    Yeah, I think so.

Q    Does it say "18 United States Code, Section 1001" above where your name is signed?

A    I have to refresh my recollection of the document.

Q    Okay. But one thing for sure we know based on your own testimony, that that document that you need to refresh your recollection has been signed by you between 50 and 100 times, right?

A    Correct.

Q    Okay. Now, you said that you had a conversation with

Mr. Barket, okay, about the use of that cell phone in April is what you said, right?

A    That was my best estimation, yeah.

Q    All right.  Now, and after April of 2019 you're talking about, right, or you're talking about April of 2018 or do you know?

A    Is that a question?  You said after -- you have to ask the question again.

Q    Sure.  That conversation that you had with Mr. Barket where you said you told him about the use of the detainee with a cell phone, you said it happened in April, spring, right?

A    Correct.

Q    Spring of what year?

A    I thought it was 2019.

Q    Okay.  And after that time period, you continued to receive and respond to text messages, right?

A    Yes.

Q    After the time you said Mr. Barket told you you shouldn't be doing that, right?

A    Yeah.  He said he told Nick that as well.

Q    I didn't ask you about what he told Nick.  I'm talking what he told you.

A    Yeah.

Q    But you, a member of the bar, a lawyer, right?

A    Correct.

Angela (Angie) Shaw-Crockett, CCR, CRR, RMR
Official Court Reporter (914)390-4242

47

Q    Continued to do it anyway, right?

A    Yes.

Q    And you continued to go to the jail and sign in that you had complied with all of the rules and regulations about prohibited activities and prohibited objects, correct?

A    Yes, correct.

Q    Of those hundreds of text messages -- sorry, Judge -- that you say that you had, let me see, how many of them are still around to be viewed by someone other than you?

A    I don't know.

Q    What happened to the hundreds of text messages that you say you engaged in even after the time you were told to stop?

A    You mean on my phone?

Q    Did you text and receive texts on somebody else's phone to the jail?

A    Theoretically could you do that?

Q    Did you do that in this case?

A    I'm sorry.  I'm not trying to be obtuse.  What I'm saying is:  Are you asking me if there are copies of those text messages?  And I don't know.

Q    Did Mr. Barket ever communicate to you that the Court appointed an attorney to discuss with him something called "conflict"?

A    Did the Court ever appoint an attorney?  Yes, I think so. If you're referring to Bobbi?

Q    I'm going to ask you:  Did you ever have a conversation with Mr. Barket that the Court had appointed an attorney to address the issues of conflict?

A    Yeah, I believe so.  I don't know if it was specifically that he told me that, but ...

Q    When did that conversation take place?

A    September of last year, I think, September 2019.

Q    What was the circumstances under which you, a person that had nothing to do with this case, was having a discussion with Mr. Barket about this Court appointing a lawyer to address issues of conflict?  Tell us.

A    I'm not sure if I object to that characterization, but he called me about the conflicts, I think, roughly September of 2019.

Q    "He" meaning who?  Who is "he"?  Who is the "he" who called you?

A    Bruce, I believe, is the first one who indicated that --

          MR. BARKET:  Just to be clear, which Bruce?

          THE WITNESS:  Barket, I think, told me that the Curcio hearing or something had begun and Bobbi Sternheim had been appointed.  Is that what we're talking about?

BY MR. RICCO:

Q    Is that what you were talking about with Mr. Barket?  That's my question.

A    Yes, I think so, yeah.

Q    Now, as a lawyer that had nothing to do with this case, can you tell Judge Karas what was the circumstances under which you were having a discussion with Mr. Barket about the appointment of Ms. Sternheim?

A    Again, the characterization of lawyer had nothing to do with this case.  I'm not sure if I should answer the question.

Q    I'll rephrase the question.

A    Certainly.  Thank you.

Q    Tell Judge Karas why you was talking to Bruce Barket about the appointment of Curcio counsel.

A    So, your Honor, to the best I can recall, Bruce called me and said there's a Curcio counsel who's been appointed looking at the conflicts, and during that conversation, he asked me if I had any text messages with Nick Tartaglione.

Q    Did Mr. Barket tell you -- it's a question -- that the Curcio counsel, Ms. Sternheim, was requesting that you provide text messages?  Did he tell you that?

A    He didn't tell me specifically.  What I believe I said to Bruce was -- just because I wanted to know, I said, "What's the story with this?"

He said, "I'm not able to share with you any of the court rulings or court proceedings or anything."

But -- so I don't know who was asking for it, but he asked me if I had the text messages.

Q    My question is:  So the answer is, no, Mr. Barket never

communicated to you that the attorney appointed by the Court, Ms. Sternheim, was requesting that you provide the text messages.  Is that what you're telling Judge Karas?

A     He requested that from me, and I don't recall if he indicated who he was forwarding the request from or if the request was coming directly from him.

Q     When you were in court on the day in July 2019 when Mr. Barket mentioned to Judge Karas in open court the issue of the text messaging to the jail?  Yes or no.

A     No.

Q     Were you told about that?  Yes or no.

A     Yes.  At some point Bruce asked me for the text messages.

Q     I'm not asking you about the conversation you had in September.  Because that would be one -- two months later.

A     Okay.

Q     I want to stay focused on the day when Judge Karas raised in this courtroom the issue of the lawyers text message -- text messaging Mr. Tartaglione.

Were you aware that Judge Karas had raised that issue?

A     No, I don't believe so.

Q     Were you present in court that day?

A     I think I would recall that -- that I was present, but I do not believe I was present in court.

(Court reporter clarification)

A     I believe I wasn't.  To the best of my recollection, I was

Angela (Angie) Shaw-Crockett, CCR, CRR, RMR
Official Court Reporter (914)390-4242

not in court.

BY MR. RICCO:

Q    So from -- so the first time you become aware that someone is interested -- someone is interested in those text messages is not until September of 2019.  Is that your testimony?

A    That's the best of my recollection, yeah, September.

Q    And you're unable to provide those text messages because something happened, right, to them?

A    Could you ask -- I don't understand the question.

Q    Where are the text messages?

A    I don't have them.

Q    Why?

A    I don't recall specifically, but I assume I deleted most of them.

Q    Why?

     Let me ask the question.

     Why did you sit at your phone and delete hundreds of text messages?

A    I didn't.

Q    You didn't?

A    No.

Q    So then what happened to the text messages?

A    Well, I had said I probably deleted some or all.

Q    Okay.  So that's my question.  You probably sat at your phone and deleted hundreds of text messages to the jail and

back and forth, right?

A    That's not correct.

Q    Then what happened to them?

A    I believe I deleted some or all of them.

Q    Okay.  Where are the ones that you didn't delete and how did you decide -- well, let's take it a step at a time.

How did you decide which messages to delete and which messages to keep?  Tell the judge.

A    There was no decision.  I get hundreds of text messages a day.  Sometimes, as I said, I might be in a closing and I'd be getting excessive text messages from Nick and I would just swipe left, and that's not -- I have an iPhone that deletes everything to date.  So I'm sorry to tell you that I was ignoring most of his texts.

Q    You weren't ignoring the ones you were responding to, were you?

A    I was ignoring most of them.

(Court reporter clarification)

BY MR. RICCO:

Q    I didn't ask you that.  You weren't ignoring the text messages that you were responding to, were you?

A    No.

Q    And you deleted most, if not all, of those too, didn't you?

A    Most of which --

Angela (Angie) Shaw-Crockett, CCR, CRR, RMR
Official Court Reporter (914)390-4242

Q    The text messages you responded to, Counselor.

A    It's a stream.  It's a number.  And if you delete the text from that number, as I did before I walked into court today, it's a half dozen numbers.

Q    So the answer is yes?

A    What's that?

Q    The answer is yes?

A    I'm not -- you have to rephrase the question.  I'm sorry.

Q    So you deleted most of all of the text messages you responded to?

A    Yes.

Q    How did you decide which of the text messages you responded to that you would delete and which ones you decided to keep?

A    Are you asking me how I decided which ones to reply to?

Q    No, Counselor.  I'm asking you:  How did you decide which of the text messages you responded to that you decided to keep or delete?

A    I don't really have any specific recollection of how and when.  I do recall a specific time I was in a closing in Manhattan and he was blowing up my phone.  So at that time I remember just looking down and just deleting, bing, bing, bing. I just deleted, swiped left.

Q    Okay.  Thank you.

A    Otherwise, I don't remember specifically when it happened.

Angela (Angie) Shaw-Crockett, CCR, CRR, RMR
Official Court Reporter (914)390-4242

54

Q    Thank you.  I want to go to the note that you said you took out of the jail that you think -- I think you characterized it as a letter written to Mr. Tartaglione from his cellmate.  That was your testimony this morning, right?

A    Correct, yes.

Q    You stand by that?

A    That's what I thought it was.

Q    What made you think that what you took out of the jail was a letter written from his cellmate to Mr. Tartaglione?  What made you think that?

A    Nick told me that --

Q    Excuse me?

A    Nick told me that Epstein was downstairs eight hours a day, but that he would write him these notes and put them in his book.

Q    Did the document that you took out that jail, right, did you read that document before you decided to take it out that jail?  Yes or no.

A    I don't recall.  I definitely read it when I took a picture of it.

Q    Well, you didn't have your phone inside this jail, did you?

A    Yeah.  So I don't recall.

Q    So you don't know, right?

A    Correct.

Q    You just took it out, right?

A    Yeah.  He said this is the thing -- I said, "Bruce told me you're supposed to give me something," and he said, "This is it."

Q    He didn't say, "This is it.  This is a note from my cellmate to me"?

A    He did.  He said --

Q    He said that?

A    Yeah.  He said, "Epstein left this in my book."

Q    And, Counselor, the jail is a secured facility, right?

A    Correct.

Q    And you have obligations inside that secure facility, don't you?

A    Yes.

Q    And that obligation is to ensure your protection, right?  Right?

A    Presumably, yeah.

Q    And the protection of staff?

A    I would assume so.

Q    And the protection of the detainees that are in that jail, correct?

A    Again, I would assume, yes, for all three of them.

Q    And so you took the letter out, didn't read it, and walked out the jail?

A    I don't recall if I read it.

Angela (Angie) Shaw-Crockett, CCR, CRR, RMR
Official Court Reporter (914)390-4242

56

Q    But you do recall you walked out the jail with it, right?

A    Absolutely do.

Q    You're inside a jail.  You're a lawyer who signed a declaration.  What's contraband?

A    I mean, I would defer to the legal definition of "contraband."

Q    I can't -- I don't understand your answer.

     Do you know what contraband is in the context of a Bureau of Prisons facility?

A    Specifically, no.

Q    Okay.  Do you know if a detainee, if you know, is allowed to possess contraband?  Yes or no.

A    It's kind of a slippery slope.  I'm not sure what they define as contraband.

Q    I'm sorry?

A    I don't know what they define as contraband.  I'm not sure what he's allowed to possess.

Q    And so not knowing what he was allowed to possess, your testimony to Judge Karas is you took an item out of that jail without even reading it?

A    That's not my testimony.

Q    What's your testimony then?  You read it or didn't read it?

A    I read it that day.  I don't recall if I read it inside or outside.

Q    Where is that document today?  Right now.  Today.

A    It's in a safe.

Q    Whose safe?

A    My safe.

Q    Why?

A    Why is it specifically there?  I think what happened was Bruce asked me to pick up the document.  So I picked up the document, and then he told me to put it in a safe place.  That's what I did.

Q    Did Mr. Barket ever tell you that that lawyer that was appointed by the Court requested a copy of that note that's in your safe?  Did he ever tell you that?  Yes or no.

A    I don't think so.

Q    Because if he had, you certainly would have turned it over, correct?

A    I think I did turn it over.  I took a picture of it and sent it over.

Q    No, I didn't ask you about a picture, Counselor.  I'm talking about --

A    The physical note.

Q    If the lawyer that was appointed by the Court had requested that you turn that note over, would you have turned it over out of the safe?

A    Absolutely.

Q    So nobody ever told you that that note was required; isn't

that correct?  By the attorney appointed by the Court, right?  Ms. Sternheim.

A   That's correct.

Q   You said that's correct?

A   Yes.

Q   Okay.  I want to ask you about your relationship with Mr. Barket.

How is it that Mr. Tartaglione decided to hire Mr. Barket?  Was that based on your recommendation?

A   Yes, it was.

Q   And did you have a prior relationship with Mr. Barket --

A   No.

Q   -- in selecting him as counsel?

A   I never met him before.

Q   Did you receive any kind of fee or compensation in connection with that referral?

A   No.

Q   And you were at the jail discussing with Mr. Tartaglione his discovery in a case where he's facing the death penalty, right?

A   Yes.

Q   And during that entire time period of hundreds of visits, at no time did you ever share your thoughts or opinions with the lawyers that were appointed by the Court to represent him in a connection with that death penalty prosecution other than

your conversation with Mr. Koffsky in this courtroom, correct?

A    That's kind of all-encompassing.  Nick often would say, "Tell Bruce X or tell him that."

So I wasn't giving my opinion to Bruce.  I'm sorry.  I thought that was the question.

Q    That's not the question.  I didn't ask you about his private counsel, the person that you recommended.

Out of all of the conversations that you had with Mr. Tartaglione, you were aware that he was facing the death penalty, right?

A    Yes, I was.

Q    And you come to this court.  You were aware that there had been several lawyers with death penalty experience appointed in this case, right?

A    Yes, DeMarco and then you guys.

Q    And at no time did you ever have a conversation with any of those appointed lawyers?

A    I apologize.  I'm remembering now I -- not really about the case, but I had a couple of conversations with DeMarco.

Q    We're talking about the case, not side conversation.

A    Okay.

Q    At no time did you ever discuss, Counsel, your review of that discovery with any of those lawyers appointed to represent him in connection with this case; isn't that correct?

A    No.  I think that's too broad.

Angela (Angie) Shaw-Crockett, CCR, CRR, RMR
Official Court Reporter (914)390-4242

60

Q    Okay.  Break it down for us.  You don't have to break it down.  Let me break it down.

THE WITNESS:  Can I say what my client said to me?

THE COURT:  No, no, no.  You don't want to go there.

BY MR. RICCO:

Q    You never had no conversations with me, Anthony Ricco, about your discussions?

A    I was instructed not to.

Q    Who instructed you not to speak to me?

A    Nick Tartaglione.

Q    Okay.  And remember you were telling Mr. Koffsky about what his job is as a lawyer, right?

A    I don't know if I was telling him what his job is.  I was telling him what how Nick felt about ...

Q    You were telling him how you felt about it.

A    Well, I was telling him Nick was enraged.  I'm not allowed to get into what he was saying.

Q    I'm talking about what you testified to here this morning.  You told that to Mr. Koffsky, right?

A    I relayed Nick's feelings to Mr. Koffsky, yes.

Q    And your own feelings?

A    Well, I thought it was a little trite, the cancer doctor analogy.  So I said to the attorney, "You have a duty to your client."

Q    Did you ever offer up your opinions, having reviewed the

discovery with Anthony Ricco?  Yes or no.  Easy question.

A    Nick has instructed me not to do that.

Q    I didn't ask you what Nick instructed you to do.  I asked you what you did.

A    I have not, no.

Q    You never had a conversation about the review of that discovery with Bruce Koffsky, right?

A    I have not.

Q    Nor John Diaz?

A    Correct.

Q    Nor Michael Bachrach?

A    That's correct.

Q    Nor Ken Montgomery?

A    Correct.

Q    That's all of the appointed lawyers in this case, right?

A    I assume.

Q    And so when I asked you if you ever had any conversations about the review of discovery with any of the appointed lawyers, you said the question was too broad.

A    I didn't hear the word "appointed."

Q    Okay.

A    That's why I said that Nick would tell me to relay things to Bruce, which on occasion I would try to do it.

Q    Okay.  Did you -- I'm not asking you what Mr. Tartaglione told you.  Did you engage Mr. Tartaglione in questions about

62

your views about the job and work that the appointed lawyers were doing in this case? Yes or no.

A    He would -- Nick's highly intelligent and very intuitive.

THE COURT: Can you just answer the question, please.

THE WITNESS: Nick would constantly tell me that the appointed lawyers didn't believe in him, constantly tell me that they never visited him, constantly tell me that they didn't review the evidence, constantly telling me that he was just sort of a widget to them, you know, he was just the next guy who you try to talk into pleading guilty.

So I may have, in Nick's -- in reply to Nick's frustration, say I can understand where you're coming from or something like that. So whether I gave my opinion of his complaints, probably.

Q    Okay. Now, do you know what the term "mitigation specialist" is?

A    I do.

Q    What's a mitigation specialist? How do you know?

A    I know it mostly from what Nick has recounted to me.

Q    What's a mitigation specialist? Tell the judge.

THE COURT: Not what Mr. Tartaglione said, but what you --

BY MR. RICCO:

Q    That's right.

A    They try and come up with a reason why the finder of fact

shouldn't apply a certain sentence to a defendant by coming up with reasons or excuses why he may have done such a thing.

Q    That's your understanding, right?

A    Yeah, that's my understanding.

Q    And you just told Judge Karas that people wasn't meeting with him and all the rest of them, right?

A    He said that.

Q    You communicated that to Judge Karas, right?

A    I indicated that Nick was extremely frustrated that he wasn't being visited by appointed counsel.

Q    Okay.  Did you discuss with him the mitigation specialist?

A    Yes, many times.

Q    All right.  And did you ever communicate one of your opinions or thoughts about that with either one of the mitigation specialists in this case ever?

A    My thoughts about what?

Q    Your discussions that you had about the mitigation specialist.

A    I may have bumped into one of them once.  Whether or not -- I -- I did speak on the phone, actually, with one or two of them, yes.

Q    Suppose I tell you Ms. Cahill never had a conversation with you other than just say hello going in and out of the jail?  Would that be an inaccurate?

A    My recollection is that would be inaccurate.  I think they

called me to find, like, other people that they could speak to for Nick.

Q    All right.  And did you find them?

A    Well, I said he's been good friends with my brother.  I thought that was with the mitigation people.  I'm fairly certain they were, actually.  This was when he was at MCC, and I said, you know, my brother-in-law was friends with him for a long time, and she asked about Stepinac.  I'm not sure.

Q    You're not sure?

A    I'm not sure, but I do believe I had at least one telephone call with one of the mitigation people.  Other than that, it would be just bumping into them as you described.

Q    So let's be clear.  All right.  Mr. Tartaglione has been in jail a long time, right?

A    Correct.

Q    And out of that time period, you've had many conversations with him about the mitigation specialist, correct?

A    Yes.

Q    Other than bumping into them coming in and out of the jail, your testimony is that you had one phone conversation with either one.  Did you know that there were two?

A    Yes.

Q    Did you have a conversation with either one of them other than that one telephone conversation that you claim you had?

A    I think I said one or two telephone conversations, but,

no, I never met with them or anything.

Q    Okay.

MR. RICCO:  All right, Judge.  I'm about done.  I just want to check with my colleagues to see --

THE COURT:  Yeah, no problem.

MR. RICCO:  I do want to go back to something, Judge, I see in my notes.

BY MR. RICCO:

Q    I just want to follow up on something that Judge Karas asked you about.

You said you signed a protective order in this case, right?

A    Yes.

Q    It's a death penalty case, right?  It's a death penalty case, right?  You signed a protective order in connection with it, right?

A    Are you asking me if this is a death penalty case?

Q    Counsel, I'll ask it to you the way you'd like.  You signed --

A    But you're asking me --

Q    You signed -- you signed a protective order, right?

(Court reporter clarification)

BY MR. RICCO:

Q    Are you ready?

A    Yes, I'm ready for the question.

Q    You signed a protective order in this case.  Yes or no.

THE WITNESS:  You can read it back or I'll say "yes" again.

THE COURT:  Yes or no.

MR. RICCO:  Your Honor, can you ask the witness not to engage in that type of behavior?  He's a lawyer.  He knows better.

THE COURT:  Yes.  Just answer the question.

A    Okay.  Yes.

BY MR. RICCO:

Q    You do know better, don't you?

A    I thought the question was asked and answered six or seven times.

THE COURT:  I'll worry about that.

THE WITNESS:  Thank you, your Honor.

THE COURT:  You can just answer the question.

THE WITNESS:  I'm sorry.  Thank you.

BY MR. RICCO:

Q    You know that a man's life is at stake in this case?

A    His life is at stake every day.

Q    I'm going to ask my question.  I didn't ask you about every day, Counselor.  I asked you:  Are you aware that a man's life is at stake in this case?  That's a yes or no.

A    It's a death penalty case.

Q    That's your way of saying "yes"?

A    Yes.

Q    And you signed a protective order so that you could discuss with him the discovery in the case, correct?

A    Yes.

Q    And in order to have an understanding of that discovery in the context of a death penalty case, did you ever talk to one of the death penalty lawyers?  Yes or no.

A    Other than what I previously testified to, I have not spoken to the death penalty appointed attorneys, no.

Q    And when you were reviewing the discovery in this case with Mr. Tartaglione, in order to get a better understanding -- withdrawn.

In order to have an understanding of how that discovery would apply to a death penalty case, did you ever have a discussion with the mitigation specialists in this case?  Yes or no.

A    No, not unless -- except as I had previously testified.

MR. RICCO:  Okay.  Judge, that's it.  Check with Mr. Koffsky.

THE COURT:  Sure.  Check with co-counsel.

MR. KOFFSKY:  Your Honor, may I have a minute?

(Discussion off the record)

THE COURT:  Three, two, one, go.

MR. KOFFSKY:  Your Honor, may I inquire?

THE COURT:  Yes.

EXAMINATION

BY MR. KOFFSKY:

Q    Mr. Wieder, I just want to go back and ask a couple of questions and follow up both on the Court's questions to you and Mr. Ricco's.

A    Certainly.

Q    You indicated that you knew Mr. Tartaglione going back to Stepinac.  That's a parochial school here in White Plains, right?

A    Yes, high school.

Q    And you described having a very long relationship with him.

     Now, in addition to your position as his personal lawyer --

A    Yes.

Q    -- have you received a power of attorney to handle his effects and his affairs?

A    I believe he signed a power of attorney to me, yes.

Q    Okay.  And with regard to the animal rescue in the 501(c)(3) that you created, do you have access and the ability to do banking for Mr. Tartaglione?

A    No.  I think in the 501(c)(3) the banking can only be done by the board of directors, the board members.  I'm not a board member.

Q    Okay.  Now, am I -- I'm recalling somewhere that the

animal rescue was the recipient of some funds from a bequest; am I correct?

A    I believe that's true, yes.

Q    Several million dollars.  Somebody passed away and left several million dollars in a fund for the animal rescue, correct?

A    I don't think that's correct.  I don't think those numbers are correct, but, yes, someone passed away and there was --

Q    And you have the ability to identify where some of those funds go; am I correct?

A    I'm not sure what you mean by identify where they go.

Q    Well, let's -- you have access to Mr. Tartaglione's banking and investments as a result of his disability, correct?

A    No.

Q    Who has that?

A    I believe his wife still has that.

Q    Now, you indicated to the Court that you were the referral source to the Barket law firm for Mr. Tartaglione some three or four years ago; am I correct?

A    Yes.

Q    And did you help facilitate the payment of that firm's retainer?

A    I discussed it.  Possibly I could describe for the most --

Q    Did you help facilitate the payment of that retainer?

A    Yes.  I would say yes.

Q     Yes.  That's a yes, correct?

A     Yes, correct.

Q     And when Mr. Barket has an invoice, you facilitate the payment of that invoice, correct?

A     Not really, no.

Q     I'm not sure what you mean by "not really."  You no longer -- you no longer play a part in making sure his invoices get paid?

A     Well, not directly.  I don't see the invoices.  I believe he's invoicing either Nick's wife or Nick's mom?  And the schedule upon which they pay him, I am not privy to specifically.

Q     All right.  So you don't take an active role in making sure that Mr. Barket's law firm gets paid?

A     No.

Q     He doesn't send you a copy of his invoice?

A     No.

Q     And when you have an invoice, I think you indicated at least at a minimum it's 50 visits, maybe up to 100 visits, to MCC.

     And you're coming from Rockland County; is that correct?

A     No.  Nassau County.

Q     Excuse me?

A     Nassau County.

Q     Nassau County.  And you would you average around a

five-hour trip back and forth?

A     Yeah.  With the train, it's an hour, and then the subway is 20, 25 minutes, and then there's a walk.

Q     So you've got several hundred hours of visits.

Now, how is that paid?  You indicated -- when the Court asked you whether his mother and father paid you, I don't recall a clean answer.

How is it that you -- you're paid?  And do you pay yourself through funds that you control with Mr. Tartaglione?

A     No.  I've never done that.

MR. KOFFSKY:  Thank you, your Honor.  Nothing further.

THE COURT:  Okay.

Folks who are on the phone, Ms. Sternheim, in particular, any questions that you would like to ask or have asked?

MR. RICCO:  Judge, we -- sorry.  We double-checked with Mr. Bachrach and Mr. Montgomery.  No.

THE COURT:  All right.  So, Ms. Sternheim, I don't know if there's anything you want to ask.

MS. STERNHEIM:  Thank you, Judge.  No questions.

THE COURT:  Okay.             .

Ms. Feinzig?

MS. FEINZIG:  Could I just clarify one or two things, your Honor?

Angela (Angie) Shaw-Crockett, CCR, CRR, RMR
Official Court Reporter (914)390-4242

THE COURT:  Sure.

EXAMINATION

BY MS. FEINZIG:

Q     Just going back to compensation, have you ever received any compensation from either Mr. Barket or his law firm?

A     I received a check from the Barket law firm.

Q     When was that?

A     I think 2019.

Q     What was that for?

A     Well, Nick's dad was trying to get financing -- additional financing for the case, and there was a loan of, I think, 100,000.  At that time Nick had indicated that he had wanted me to start getting paid.  His dad certainly was doing the same.  So when the check came, I believe it was made out to Barket, and it was $100,000 even.

      Am I allowed to give specifics?

      So the check went to Barket and then he cut me a check for my fees.

Q     But when you say the check came, where did the check come from?

A     It was interim financing.

Q     Who?

A     I think it was from either Key Bank or possibly Sterling.

Q     But whose account was it drawn on?

A     Oh, from Nick Tartaglione's dad.

Q    His father?

A    Yes.

Q    And that check was for compensation for what?

A    It went to Barket Epstein to pay some of their legal fees. It hadn't been able to break it up.  I think he would have sent two checks, one to me, one to them.  But it went to them for their fees, but they directed him to cut me a check.

Q    So when you say it went to them for their fees, the $100,000 was for entirely fees that were created because of work that was done by Mr. Barket's law firm?

A    I'm not sure what the status of the billing was between the clients at that time and Mr. Barket, you know, what the open balance was per se, but I do know that a portion of that money was allocated to me for the work I've been deferring since 2016.

Do you understand what I'm saying?  I don't know if they owed him all of that money at that time or not.  I'm not sure if that paid the balance or had an overage or ...

Q    So they paid Mr. Barket's firm $100,000?

A    Correct.

Q    A portion of that was for services that you had rendered to Mr. Tartaglione?

A    A portion of the money that they sent to him was allocated to me, yes.

Q    So how much was that?

A    25,000.

Q    And how did that money eventually get to you?  You're saying it came from the Barket firm?

A    Correct.  They deposited the one certified check and then they cut me a check.

(Court reporter clarification)

A    They deposited one certified check.  They deposited the certified check and then cut me a check after it cleared.

BY MS. FEINZIG:

Q    And how were the services invoiced in order for them to pay that $100,000?

A    I don't know.  I think they get periodic invoices from Barket's firm.

Q    Did you issue an invoice?

A    I haven't issued an invoice, to be honest, Counsel.  It would be well over $100,000, but, you know, in his current circumstances, I'm not going to bill him.

Q    But you are keeping track of the time that you are spending with him with the -- with the thought that eventually they're going to be invoiced?

A    Not really.

Q    I thought you said earlier when the judge asked you that you were spending a lot of time, you were keeping track of it, and previously they had paid you for time you were spending with Mr. Tartaglione.

Angela (Angie) Shaw-Crockett, CCR, CRR, RMR
Official Court Reporter (914)390-4242

A    If that's what I said, it may be, but I don't think I was keeping track.  I'm not sure I said I was.  I was spending a ton of time, hundreds and hundreds of hours, but I'm not specifically keeping track.

Q    So but how do they know how much of the $100,000 should be directed to you out of the check?

A    How did the parents know or --

Q    How did anybody know?  How did the parents know and how did Mr. Barket's law firm know that they should be handing $25,000 -- $25,000 over to you as opposed to keeping it themselves?

A    I think I had a conversation with Nick, Sr., that he had dropped off two small checks, I believe, the prior year, and I said, all right, I'm -- I think he sent me 25,000 because, you know, he said, "Johnny, you've spent years on this, working, helping Nick."

       And I said, "All right.  You can send me $25,000."  I don't have a bill and didn't bill him specifically, but it would certainly be a lot more than that.

Q    So then what's your understanding of how it came to be that they actually sent $100,000 to Mr. Barket's firm instead of sending you $25,000 if that's what was owed to you?

A    I think when he got the -- I believe there was a loan or something like that from Key Bank.  If I recall, they gave me a $100,000 certified check.  I know it was a certified check and

it was just one check.

Q    Over what time period did you provide services that added up to the $25,000 that came out of that $100,000 check?

A    From 2016 to 2019.

Q    So does that cover the entire time period that this case has been going on?

A    Well, not the time since then, but, yes, pretty much exactly.

Q    And is there any overtime or amount outstanding that you either believed you were owed or the family believes you were owed for services that you provided during the course of this representation -- or not the representation, but during the course of this case?

A    They -- I think they believe that there is something outstanding.  I told them I'm never going to bill them, so they don't have to pay me a penny.

Q    What's your understanding of how much they believe to be outstanding?

A    I may have said to Nick, Sr., in a conversation, "I'm not going to give you a bill.  It would be over $100,000."

Q    So is -- is it your understanding that they think that there's a further $75,000 that could potentially be owed?

A    No.  I -- I was explicit with him and said, "I'm not going to bill you it.  So when Nick gets out, you can pay me if you want."

Q    Are there any other times where they have paid you?

A    Yes.

Q    How much?

A    On two occasions.  They left a $5,000 and a $2,500 check, and I think that that was either in 2019 or 2018.

Q    And when you say they "left" those checks, how did they leave those checks?

A    They would drop them at my brother's firm in Yonkers. Because they live close by, and Nick, Sr., would call me and be like, "There's a check there and you better cash that check." Or, you know, he'd be furious or something.

Q    And, again, how would they know how much that they should pay you when they dropped off those checks?

A    They just -- I didn't bill them and I didn't ask for the money, and they would just -- they drop it off with a figure that they unilaterally arrived at.  I know it sounds unconventional, but I told them I was never going to bill them.

Q    Well, did you ever discuss an hourly rate with them?

A    No.  I don't believe I did.

Q    Did you ever discuss an hourly rate with Mr. Barket?

A    No.

Q    Did you ever have any discussions with Mr. Barket at all about formalizing your relationship with his firm or having a formal relationship with his firm?

A    No.  I'm personal friends with his partner.  That's how I

met Bruce at the beginning of this, but there's no -- I never formalized the relationship or had a conversation about formalizing it.

Q    Have you ever received any compensation from any other partners from Mr. Barket's firm?

A    From any of the partners?  No, no.

Q    And it's your understanding that the $100,000 that was paid by the family to Mr. Barket's firm was a loan?

A    No.  I think that they secured a loan.

Q    To pay --

A    To pay the -- I believe, yes.  That's what the dad told me specifically.  Whether that -- I don't know where he got the hundred.  I don't know if it was secured against deposit, but it was a loan, as he described it.

Q    Have you ever seen any documentation of the amount that was paid, the 25,000 to you from Mr. Barket's firm and how that was documented to you?

A    I got, I believe, a 1099 for the year 2019.  Is that what you were asking?

Q    Yeah.

A    Yeah.  So I got the check.  I didn't get any documentation with the check, maybe a letter that said here's a check, and then I got a 1099.

Q    When you got the check from Mr. Barket's firm, was there any kind of stub attached to the check indicating what it was

for or a letter indicating what it was for?

A    I don't think it was a stub.

Q    What about a letter or other documentation of why they were paying you $25,000?

A    No.  If the check wasn't certified, it could be found.

Q    Oh, was the check to you certified or was it --

A    I don't think so.

Q    -- or the other $100,000 check was a certified check?

A    Yes.  I think the check to me -- what I'm saying is if it's not certified, you can get a copy of it today.

Q    All right.  Was it drawn off of Mr. Barket's firm account?

A    Yes.  I'm sorry.  I was saying the memo may have something written.  I have no idea.

Q    But you remember having a memo -- that there was a memo attached to the check?

A    I don't.  I'm just saying, you know ...

Q    Well, I'm not asking you to speculate.

A    Yes.  He sent me a check, I think, a check with maybe a letter that said here -- like literally a one-sentence letter, and maybe, Here's the check I was asked to forward you, something like that.  And then after that, I got a 1099 in January of this year for 2019.

Q    And do you -- do you specifically remember what the letter said or you're just guessing?

A    I don't know.  I'm sorry.  I'm sorry.

Q    Do you still have the letter?

A    Probably not.

MS. FEINZIG:  I think if he has the letter, your Honor, it might be helpful.

THE COURT:  I agree.  Can you look for the letter and produce it?

THE WITNESS:  Certainly.  If I have the letter, I'll look for it and produce it within 48 hours.

THE COURT:  Okay.

MS. FEINZIG:  Thank you.

BY MS. FEINZIG:

Q    To be clear, that's the only check you've received from Mr. Barket, from Mr. Barket's firm --

A    Right.

Q    -- or any other partner at Mr. Barket's firm?

A    Correct.

MS. FEINZIG:  May I have a moment, your Honor?

THE COURT:  Yes.

(Discussion off the record)

MS. FEINZIG:  I have nothing further, your Honor.

THE COURT:  Okay.

MR. RICCO:  Judge, there were three very short questions.

THE COURT:  Okay.  Go ahead.

MR. RICCO:  And, your Honor, thank you for allowing

me to.

THE COURT: No problem.

FURTHER EXAMINATION

BY MR. RICCO:

Q    Just three short questions.

A    I won't hold you to that, but if it's three, it's three.

Q    I'd just like you to stay focused on telling the truth. Okay?

A    Of course.

Q    All right.  Do you know who Michael Ross is?

A    Yes.

Q    Have you ever met with him?

MR. BARKET: I'm sorry.  What was the name?

MR. RICCO: Ross.

THE COURT: Michael Ross.

BY MR. RICCO:

Q    Have you ever met with him?

A    I have never met with him.

Q    Have you ever spoken to him?

A    Yes, I have.

Q    Have you spoken to him how?  By telephone?

A    Telephone.

Q    And what was the sum and substance of your discussions with him?

A    It was around that time in September when Bruce asked me

about the phone, and he asked me to speak to Michael Ross.

(Court reporter clarification)

A    I'm sorry.  And Michael Ross called me, I believe, and I spoke to him.

Q    What did you talk about?

A    He asked me kind of about what we're talking about today. He asked me to think about the letter -- he asked me about the letter definitely, and I think that was it actually.

THE COURT:  "The letter" being the Epstein letter?

THE WITNESS:  Correct.

THE COURT:  Go ahead.

BY MR. RICCO:

Q    He just said about the letter?  What was the conversation? Help us out.

A    Certainly, yeah.  So he said, "Could you just tell me what happened with regard to the Epstein letter?"

And I recounted to him that Bruce said, "If you're going to be there this afternoon, Nick forgot to give me something. Can you pick it up for me?"

And I told him, "Yes."

He said, "What did you do with it after that?"

I told him I took a picture and sent it to Bruce and then I put it in my safe and it's been there ever since.

Q    And have you -- you told us that you reviewed the discovery, right?

A     Yes.

Q     Have you reviewed any of the documents filed in this case by any of the lawyers other than the discovery?

A     PACER system, that type of thing?  But nothing, no.

Q     Anything off of PACER that's not on PACER, have you -- have you reviewed any documents related to this case filed in this case that's not on PACER?

A     I asked -- no.  I tried to get those documents from Bruce, and even though he said the judge wouldn't allow it.

Q     Why were you trying to get those documents?

A     Bruce said there was going to be a hearing and they might want to speak to me.  Bruce said there would be a hearing and they might want to speak to me.  And I said, "Well, what about?"

He said, "Well, it's the Curcio thing."

I said, "Well, can I see the request or what it is?"

And he said, "I'm precluded from giving that to you."

Q     But you wanted him to, right?

A     I wanted to see what the topic of discussion was, yes.

Q     You wanted to see what the appointed lawyer was saying, correct?

A     Yes, I did.  Correct.  Exactly.

MR. RICCO:  Your Honor, this is right from my cell phone from Mr. Bachrach.

Angela (Angie) Shaw-Crockett, CCR, CRR, RMR
Official Court Reporter (914)390-4242

84

BY MR. RICCO:

Q    You told the Court that you signed a protective order, correct?

A    Yes.  I signed a protective order.

Q    Do you recall in paragraph 5 of the protective order says, quote, "Disclosure material shall not be disclosed by the defendant or defense counsel, including any successor counsel (for defense) other than set forth herein and shall be used by the defense solely for the purposes of defending this action."

Do you remember that paragraph being there?

A    I do remember the paragraph that -- yeah.

Q    And you signed it with the understanding that you would be reviewing these documents solely for the purpose of defending this case, this action, correct?

A    Correct.

Q    And the last question is:  You're aware that under the First Department rules, are you admitted to practice in the First Department?

A    Southern District and Eastern District.

Q    Do you know what the First Department is?  Do you know what state -- for the First Department?

(Court reporter clarification)

MR. RICCO:  I'm sorry.

BY MR. RICCO:

Q    What department were you -- well, first of all, are you

Angela (Angie) Shaw-Crockett, CCR, CRR, RMR
Official Court Reporter (914)390-4242

licensed to practice in New York?

A    Correct, yes.

Q    And which of the judicial departments -- which -- withdrawn.

Which judicial department did you apply for admissions?

A    I believe just for the Third Department.

Q    Is that a question you're asking me?

THE COURT:  Do you remember where the court was that you --

THE WITNESS:  I was sworn in Brooklyn.

THE COURT:  Brooklyn, okay.

BY MR. RICCO:

Q    Maybe that might be the Second Department?

A    Okay.  Sure.  Second Department.

Q    You don't know, do you?

A    No idea.  I don't -- really, I don't do any appellate work and I think of it that way.

Q    When you get admitted into practice by the appellate division, that's not for purposes of appellate work, is it?

A    No, it's not.  But the concept of department hasn't been sort of relevant to me since '93 when I got sworn in.

Q    All right.  You're required that the -- the First and Second Departments require you, as an attorney, to provide a written retainer agreement with a client before you collect fees.

Angela (Angie) Shaw-Crockett, CCR, CRR, RMR
Official Court Reporter (914)390-4242

Are you aware of that?

A    Yeah.

Q    Did you do that, follow that rule for the Court in this case?

A    I have a retainer agreement with Nick, yeah.

Q    You do?

A    Uh-huh.

Q    Could we get a copy of that also?

A    Sure.

THE COURT:  Do you have a retainer agreement with Mr. Tartaglione for this case?

THE WITNESS:  Oh, for this case, no.

MR. RICCO:  That was my question.

THE COURT:  That's why I wanted to clarify.

BY MR. RICCO:

Q    Well, Counsel, I want this to be very clear.  Okay?  You do not have retainer agreement to collect fees in connection with the work that you did in connection with this case, correct?

A    Yes.  To be clear, that is absolutely correct.

Q    And that protective order says that when you're reviewing that information, it only has -- it must be done in connection with defending this case, correct?

A    Correct.

Q    And you accepted payment for that work in connection with

things that you did in connection with this case, right?

A    I don't really look at it that way, no.

Q    I'm sure you don't. But the question is: You don't have any such retainer agreement for this, do you?

A    I don't have a retainer agreement for this case.

Q    And you do know that you're required to have that, aren't you?

A    I think if I'm going to bill him on this case, yes.

THE COURT: Bill him or collect fees? Whether or not you bill somebody, you need to have a retainer to collect fees for work on a case, no?

THE WITNESS: Yes.

THE COURT: And yet you got $25,000.

THE WITNESS: Yes. But I wouldn't consider that for work on this case per se.

THE COURT: What do you mean "per se"? If it's not for work on this case per se, what was -- what were you getting $25,000 from Mr. Barket's firm for then?

THE WITNESS: Well, I probably had $10,000 of unbilled work on the 501(c)(3). I probably had 20 --

THE COURT: No, no, no. That's not -- I mean, Ms. Feinzig was very thorough in her questions. So let's give you one last chance for this. What was the $25,000 for?

THE WITNESS: My understanding was that it was --

THE COURT: No, not what your understanding was.

What was it for?

THE WITNESS:  It was for all the work I did for Nick from 2016 --

THE COURT:  Which included work on this case?

THE WITNESS:  No.

THE COURT:  No?

THE WITNESS:  I think the fees are for the work I'm doing for the rescue, for the farm, for the parents.

THE COURT:  So you might be -- maybe we'll give you the transcript of what you said earlier and see if you want to stick with that answer, Mr. Wieder.

You think you've given the same answer to that question throughout this proceeding?

THE WITNESS:  Well, I think I said it was for the time that I was visiting with Nick.

THE COURT:  Which included the time you spent advising him in this case, right?

THE WITNESS:  Well, discussing his discovery with him.

THE COURT:  And you spent time reviewing the discovery, correct?

THE WITNESS:  Correct.

THE COURT:  And you said to Mr. Tartaglione's father, "Look, I mean, roughly it's over $100,000, but you pay me when you can," right?

Angela (Angie) Shaw-Crockett, CCR, CRR, RMR
Official Court Reporter (914)390-4242

THE WITNESS: I did. I said, "You can pay me if you want."

THE COURT: Yeah. And you got $25,000?

THE WITNESS: Correct.

THE COURT: That came from Mr. Tartaglione's father to Mr. Barket --

THE WITNESS: Yes.

THE COURT: -- and that was $100,000 that was payment for work that Mr. Barket's firm had done in the case, right?

THE WITNESS: Yes.

THE COURT: Okay. And then $25,000 of that came to you.

THE WITNESS: Yes. I don't think that that was -- I don't know what the payment was for -- what the balance of their fees due to Barket was at that time.

THE COURT: Can you produce that retainer agreement that you have with Mr. Tartaglione in connection with the 501(c)(3)?

THE WITNESS: Yes, I think --

THE COURT: Okay. Let's add that to your homework.

THE WITNESS: Okay. Thanks.

THE COURT: All right? As well as the retainer that you have for any real estate transactions that you were doing on behalf of Mr. Tartaglione during the period after his arrest in this case. All right?

Angela (Angie) Shaw-Crockett, CCR, CRR, RMR
Official Court Reporter (914)390-4242

THE WITNESS:  Okay.  Yeah.

MR. RICCO:  Judge, Mr. Bachrach has no further questions.  No questions from Mr. Montgomery.

THE COURT:  Thank you very much.

I want to be clear on a couple things, Mr. Wieder. Were you asked by anybody to produce the Epstein letter that was in the safe?

THE WITNESS:  No.

THE COURT:  Were you told that Ms. Sternheim might want the letter?  Yes or no.

THE WITNESS:  No.

THE COURT:  Were you asked to produce the text messages from and to Mr. Tartaglione that you still had? Whether or not you still had it, were you asked to produce those?

THE WITNESS:  No.  I was asked if I had them.  And I didn't.

THE COURT:  You don't have any of them?

THE WITNESS:  No.

THE COURT:  You deleted every single one of the messages?

THE WITNESS:  Well, I don't know if I deleted every single one of them.

THE COURT:  Then where are they?

THE WITNESS:  I replaced my phone -- I may have

deleted every single one of them.

THE COURT:  Which is it?

THE WITNESS:  I've -- I've -- I've replaced my phone since then.  So --

THE COURT:  When you replaced your phone, what phone did you have when you were texting with Mr. Tartaglione?  What brand?

THE WITNESS:  IPhone 7S.

THE COURT:  And what was the new phone you got?

THE WITNESS:  The same.

THE COURT:  Okay.  And when you got the new phone, you didn't transfer all of the data from your old phone?

THE WITNESS:  I think I did.

THE COURT:  Okay.  And that would include any text messages you had, right?

THE WITNESS:  Yes.

THE COURT:  So where are the text messages you didn't delete?

THE WITNESS:  Then I may have deleted them all.

THE COURT:  Which is it?  Did you delete them all or not?

THE WITNESS:  I presume I did, yeah.

THE COURT:  What do you mean you presume?  Yes or no.  Did you delete all of the text messages?  Yes or no.

THE WITNESS:  I was asked several months after --

THE COURT:  Answer the question.  Did you delete all of the text messages?  Yes or no.

THE WITNESS:  Yes.

THE COURT:  When?

THE WITNESS:  I don't recall.

THE COURT:  Did you delete any of them after you learned that there was a Curcio inquiry being done in this case?

THE WITNESS:  No.

THE COURT:  So you're saying, under oath, every text message you deleted you deleted before you found out there was a Curcio inquiry in this case?

THE WITNESS:  Absolutely, yes, your Honor.

THE COURT:  Okay.  Any other questions from anybody?

MR. BARKET:  Can I have a moment to chat?

THE COURT:  Yes.  Ms. Sternheim?

MS. STERNHEIM:  I have some brief questions and I apologize if I may not have heard if these were asked.

EXAMINATION

BY MS. STERNHEIM:

Q    But, Mr. Wieder, very briefly, were you ever asked by Mr. Barket or anyone in his firm to be of counsel to his firm?

A    No, I wasn't.

Q    Did you at any time ever sign an agreement with Mr. Barket or his firm concerning any involvement in representation of

Mr. Tartaglione in connection with this criminal case?

A    No.

Q    Are you aware of whether Mr. Barket ever told members of the defense that you were of counsel or becoming of counsel to his firm?

A    I'm not aware of that.

Q    Are you aware if Mr. Barket or any members of his firm ever told any members of the defense that you had entered into an agreement with the Barket firm concerning this case?

A    No.

Q    Did you ever discuss the note out of the pres -- with Mr. Tartaglione out of the presence of Mr. Barket?

A    I believe so, yes.

Q    Are you aware that Mr. Barket did not want Mr. Tartaglione to discuss the note with any members of the defense out of Mr. Barket's presence?

A    I'm not aware of that.

Q    Are you aware that Mr. Barket did not want Curcio counsel to know about the note?

A    To the contrary.  I assumed the defense team was aware of it.

Q    That's not what I asked you, sir.  I asked you:  Did you ever learn that Mr. Barket did not want Curcio counsel to know about the note at any time?

A    No.  I didn't know that.

MS. STERNHEIM:  Thank you, Judge.

THE COURT:  All right.  No problem, Ms. Sternheim.

Mr. Barket, you wanted to speak?

MR. BARKET:  Yeah.  Let me just chat, if I can, Judge.

THE COURT:  Yeah, of course.

(Brief pause in proceeding)

MR. BARKET:  For once my answer is correct.  I'm good.  I will tell the Court, once we're done with Mr. Wieder, I have a few things.

THE COURT:  Sure, of course, yeah, yeah.

All right.  There's quite a stir over on that side of the courtroom.  Are there any questions that you-all want to ask?

MR. RICCO:  No additional questions.  I think that Mr. Bachrach is suggesting that we provide the Court with the BP -- the BP-0224 form.  That's it.

THE COURT:  Yeah.  We can talk about all of that.  I just want to -- if we're done with asking questions of Mr. Wieder, I want to let him go.  I know Mr. Barket wants to state a few things and I'm sure a lot of other people do too and we can have that conversation.

MR. RICCO:  We're done.

THE COURT:  Okay.

Ms. Feinzig, are you done?

MS. FEINZIG:  I am.

THE COURT:  All right.  Mr. Wieder, you're excused. Thank you.

THE WITNESS:  Thank you, your Honor.

(Witness excused)

THE COURT:  All right.  Mr. Barket.

MR. BARKET:  Well, one thing I wanted to note, which is his view of what was personal with respect to text messages and what's case related --

THE COURT:  Yeah.

MR. BARKET:  -- diverges with mine and I assume with learned counsel as well.  The conversations he would have been having with Mr. Tartaglione concerning the course of Mr. Tartaglione's marriage we think relate directly to potential mitigation, and so if he may not view it as --

THE COURT:  Yeah.

MR. BARKET:  -- discussion about the case, I certainly do think that that's relevant.

THE COURT:  Since we don't have the texts, I guess we won't know.

MR. BARKET:  Well -- right.  We won't know exactly, right.  So I just wanted to make that note that I didn't agree with that part of his -- his legal characterization.

THE COURT:  Fair enough.

MR. BARKET:  And with respect to the letter from our

firm, my memory was that we just -- he picked up the check, that we didn't send it to him.

THE COURT: Okay.

MR. BARKET: After he gave us a -- I forget what the -- 1099 is what we give him, but before we give a 1099, we have to get something from him.

THE COURT: Yes.

MR. BARKET: I forget the IRS form number. So that would have happened afterwards.

I emailed my firm to say we have a letter that would accompany that. Let me have it now so I can produce it right now. And I got a note back that said there was no letter. The check was just cut.

THE COURT: You can double-check?

MR. BARKET: I'll definitely -- I was going to say, I'll verify --

THE COURT: Yes.

MR. BARKET: -- that when I get back to the office myself, but that's -- I think that's my understanding of how it happened.

THE COURT: Okay.

MR. BARKET: You can't hold me to it, but I think that's what took place.

THE COURT: All right. So certainly you should feel free to go back to your folks and see if they can verify

anything about, you know, the pickup or the delivery or the transfer.

MR. BARKET: Yeah, and I -- I will. We normally -- if it was sent, normally there'd be a cover letter with it and we would have saved that, but I think he just came by and picked it up.

THE COURT: Okay.

MR. BARKET: That's what I think happened.

THE COURT: Okay. Mr. Ricco?

MR. BARKET: Oh, I'm sorry.

THE COURT: Yeah, go ahead.

MR. BARKET: There's a factual matter, kind of a clarification.

I don't really want to get into the details of the finances with my client, but I will suggest this, that the fees that we've collected so far are much greater than the $75,000 we received last year. So I don't want anyone to be left with the impression --

THE COURT: No. I certainly didn't interpret it that way.

MR. BARKET: And 25,000 was not 25 percent of what we received. It's nowhere near that.

THE COURT: I got it. Okay.

Mr. Ricco.

MR. RICCO: Yes, sir. My remarks are pretty much

prepared remarks.

THE COURT:  Let me ask you this:  There's some materials that Mr. Wieder is going to try to produce for everybody and, you know, the -- those records or the absence of those records, but are certainly material here, unclear.

So, I mean, I'm happy to listen to your prepared remarks, but I guess I'm just wondering if there's -- if you -- if you have other -- because the prepared remarks don't necessarily take into consideration the actual testimony.

So if you want to have an opportunity to supplement the record based on the testimony here, I will give you an opportunity -- brief opportunity to do that.

MR. RICCO:  Judge, I think that I sort of anticipated what we heard this morning.

THE COURT:  Okay.

MR. RICCO:  I will start by something that we anticipated.

Mr. Barket filed a declaration with this Court on March 23rd, 2020, pages 2 and 3 of his declaration.  What he said about what happened to the text messages is not even close to what this witness said.  He said that Wieder's phone was cracked and that he replaced it and that Wieder did not transfer the funds.

THE COURT:  Transfer?

MR. RICCO:  The text messages.  I'm sorry.  That's a

signed declaration to influence these proceedings. The basis of that allegation is not anything that this person testified to. He testified to just the opposite. He said he transferred all of the text messages.

THE COURT: It's a little unclear. I mean, he certainly didn't mention a cracked phone, and he did give, I would say, varied answers. And the transcript will speak for itself and maybe we should read it. But my recollection is -- and please tell me if I'm wrong because I don't remember what I had for breakfast this morning -- it's a cliche -- is that he might have deleted them at the time, he might have deleted later, maybe he got a new phone and they might have been transferred. I mean, there was a lot of hedging.

MR. RICCO: Judge, I'm in complete agreement with you. But what I do believe is that when you take his testimony and compare it to that declaration --

THE COURT: He doesn't mention -- he certainly doesn't mention a cracked phone, and among the varied answers, there's no mention of a cracked phone.

MR. RICCO: But it was clear that he transferred the messages. Because your Honor asked him that specifically at the end of the hearing and he said that --

MR. BARKET: I'm sorry. Transferred them to his new phone? I don't think that was clear.

THE COURT: That's not clear. What Mr. Koffsky I

believe got a clean answer --

(Multiple parties speaking)

MR. RICCO:  Judge, I did hear that.

THE COURT:  Like I said, the transcript will speak for itself.

MR. RICCO:  Right.  That's okay.  So let me just --

THE COURT:  But I do think it's fair in his answers, plural, he never mentioned a cracked phone.

MR. RICCO:  That's for sure, Judge.

THE COURT:  Right.

MR. RICCO:  So, Judge, under ABA Guideline 10.7, there's an obligation to investigate a capital case even without the consent of the defendant.  That's 10.7(A)(1) and (2) of the ABA Guidelines.  And ABA Guideline Section 10.7(B)(2) says that there's an obligation for capital counsel to satisfy themselves independently that the official record of the proceedings is complete and to supplement as appropriate.

That's also echoed in ABA guideline 10.8(B)(2).

Judge, the purpose of these obligations is to ensure that a capital defendant is represented by a non-conflict attorney to investigate mitigation, to conduct and develop evidence, and to present that evidence that's in the best interest of the defendant later on.  The obligation to ensure also is the obligation to ensure that the record is complete.

These obligations are designed to save the life of a

person whose life is in jeopardy. An obligation to investigate, to develop, cannot be waived by the defendant. The defendant cannot waive an attorney's obligation to conduct a mitigation investigation and guilt phase investigation in a capital case, period.

At some point, an observation was made that what was presented in this hearing appears to be a conflict over strategy, and I would say, Judge, that there has been no disagreement of any kind over any strategy to investigate, develop, or present information of either guilt or the penalty phase as required under the guidelines.

Every single expert, every single request for investigation requested by the Barket firm, every single idea presented by his firm has been embraced and funds to accomplish those included in a budget that's been authorized by this Court.

But there's more. There have been, Judge, many meetings among the entire team, multiple meetings among team members, multiple meetings with team members in our resource counsel. Some of those meetings took place at Mr. Barket's office. Many of those meetings took place at my office, at Mr. Bachrach's office, and multiple meetings were at resource counsel's offices in Montclair, New Jersey. Those would be the offices of Mr. Ruhnke. With all team members and our lead investigator present and where every single idea offered has

been embraced and planned for investigation and development fully reviewed.

We've also attended meetings with the government prosecutors in this case. At the government's office -- and I say "we," the team -- they always -- well, some of Mr. Barket's firm and some of the private lawyer -- appointed lawyers, and at the government's offices we reviewed documents, videotape, and other evidence related to the development of evidence for the presentation at the guilt phase and a review of prison records relevant to the development of presentation of mitigation evidence related to prison adjustment and process (indiscernible), either directly related to affirmative duty in the case or as rebuttal to the government's case at the penalty phase.

There has been zero conflict over the development of ideas, zero conflict over embracing Mr. Tartaglione's desires and/or the interest of his private firm. Zero. None.

There are several experts that your Honor has authorized that none of the appointed counsel in this case have ever met. Mr. Koffsky has submitted requests for memoranda as to what is going on. We have to know what's happening. These are public funds. Please let us know what you're doing. Nothing. So there's no conflict there. They had the authorization to do it, so they're going to do it. They have been doing it.

Angela (Angie) Shaw-Crockett, CCR, CRR, RMR
Official Court Reporter (914)390-4242

First, so what has there been a conflict about here? I don't mean conflict in the terms of the legal definition of it, but what are we talking about here?

First, you know, Judge, this is very difficult to do with a mask on.

THE COURT: Yeah, I know. I understand.

MR. RICCO: I find myself --

THE COURT: I know.

MR. RICCO: I'm almost done, Judge.

THE COURT: Take your time.

MR. RICCO: First, there's no conflict, your Honor, over the removal of the contraband note from MCC. Why? Because that contact took place and was completed without the knowledge, consent, or involvement of any appointed counsel.

Second, there was no conflict over communicating with the defendant at the MCC over a contraband and illegal cell phone because all of the unlawful communications took place and were completed without the knowledge, consent, or involvement of any of the appointed counsel. None of us have ever had them, and with the exception of one, never seen them.

Judge, our good names, appointed counsel, and reputations have been used here to promote some agenda that we're not aware of. Why do I say that? Well, Judge, one thing has happened here. Your Honor has equipped Mr. Tartaglione with a tremendous team of experts and lawyers. The work that

each one of them has done has been like at the highest expectations that this Court would have.

The mitigation specialists in this case, Ms. Cahill, Ms. Lang, we've been crying over frustrations that they've had here. And hindsight is clear that our appointment was just used as a pretext to get access for public funds to support a private investigation so that the lawyers can just put more money in their pocket.

Now, that was similar to what happened in a case called *Stitt versus the United States*, 369 F. Supp. 2d 679 (E.D. Va. 2005). It happens in these cases. But what we found out only as a result of this conflict hearing that, notwithstanding the fact that your Honor authorized in this case payment for at least four investigators, both here and in other jurisdictions, private counsel claimed that he hired his own investigators to investigate what he says was the authenticity of the Epstein note.

It's unclear why some private investigators had conducted that investigation that he claims was for that purpose, why they were used, when this team of investigators in this case are top ranked, top rate, a distinguished retired detective of New York City Police Department, totally unaware that these individuals were doing any work whatsoever on this case.

That's not a disagreement over a strategy, Judge. It's

just a fact. And what does the fact mean? Well, what it means is pretty apparent to me. Something was going on here, if it happened, and just because somebody filed something in this case and said it happened, unfortunately, doesn't mean that it happened.

See, the record -- if you rely on the record, you say, well, hey, you know, if I take all of these things at face value, I don't see a problem here. But what you can see when you put these individuals under oath and you start asking questions, what was said in the papers and what actually happened is two different things.

After these conflict proceedings were contemplated, private counsel tried to trick -- my word -- appointed counsel into requesting that this Court pay for a conflicts attorney. Mr. Koffsky objected. He wanted to know why we are hiring a conflicts lawyer. And we discussed it. And we made a decision that that was not something that we were going to put in front of your Honor to sign because we didn't know why a conflicts lawyer needed to be paid for by public funds to represent Mr. Tartaglione's defense. And still don't. And we refuse to do it.

Again, private firm trying to use our good name and reputation to pay for something that, in our view, was unrelated to this -- to the representation of the defendant in this case. We did become aware that a conflicts lawyer had

been involved in the case. We didn't know that. But to represent the interest of the private firm, not the defendant.

So what -- so what was the disagreement over strategy? Judge, there was a disagreement over the strategy to go to the press. Ethical rules, this Court's rules, all support that the defense is not supposed to try to influence potential jurors in the press. It's the appointed lawyers who asked Mr. Barket not to disclose this to the press because it wasn't authenticated. We didn't know what it was, and it's dangerous to do it.

We had a disagreement about that, and the reason why he wanted to go to the press -- so he told us -- is because that note proved that Nicholas Tartaglione did not assault Mr. Epstein and that the papers was full of it and he wanted to put a counter-narrative in the papers. And we asked him not to do that because, number one, what he read to us over the phone didn't sound like it supported that conclusion; and, secondly, you better authenticate not only who this note is from but how did it get here.

And when those questions were asked in the presence of appointed lawyers and our resource counsel, he never told me -- the private firm never told us that they asked him or were involved in any way of the removal of the note.

And so, again, private counsel wanted to use this to go to press. I asked them, Mr. Bachrach asked them, Mr. Koffsky asked them, Mr. Montgomery asked them, and our resource

107

counsel, David Ruhnke, pleaded with him, the private firm, not to go to the press.

That had been interpreted and presented to you, your Honor, that we told him to hide the letter. That's tricknology. That's playing with the truth when a man's life hangs in the balance. Some of it he listened to. He didn't go to the press with the note, but we were stunned to turn on our television sets and to see private counsel on "60 Minutes" promoting himself at the expense of a man facing the death penalty.

We were concerned about adoptive admissions around this issue, and based upon the information that Mr. Bachrach and I reviewed at the government's office in November of 2009, I was concerned about the adoptive admissions was well-founded as the interviews as recorded by Mr. Epstein as to who attacked him was completely contrary to the statements that Mr. Barket was making in the papers.

Now, I'm not getting into whether it did or didn't happen. What I'm getting into is that it was our responsibility to thoroughly investigate independently the conclusion. So where do I get that from? Well, ABA Guideline 10.8 obligates capital counsel to, quote, thoroughly investigate the basis of each potential claim before reaching a conclusion as to whether it should be asserted.

The rule doesn't say run to the press and get your name in

the papers.  We don't litigate death penalty cases in the papers.  But the information that is in the government's file about what Mr. Epstein said happened to him and who gave it to him must be thoroughly investigated in this case.

So what happened here?  There was a disagreement over whether or not we should bring the conflict issue to the Court.  That was a disagreement.  That's not a disagreement over strategy.  That's our obligation to ensure that Mr. Tartaglione is properly represented and compliant for Constitutional standards.

There was a disagreement over that.  There was a letter filed that says there was no conflict, that everything was done properly and, unfortunately, your Honor got these letters back and forth.  It pained us as much to write them as I'm sure they were for your Honor to read.  That under the guidelines we have an obligation to make sure that your Honor is not being deceived in the way which we were.

THE COURT:  And we talked about this the last time that we were here.  I don't think there's any real disagreement with that.

MR. RICCO:  All right.

THE COURT:  I mean, and I don't necessarily agree with you, which is why I appointed Ms. Sternheim to serve her -- for counsel.  And she, to her credit, did something that is, as far as I know, is virtually unprecedented by doing this

inquiry and doing this report and interviewing and collecting as much information as she could.

I think that the issue that we need to focus on is the extent to which there is a waivable conflict, and I've already done some preliminary findings on this and we were holding off to see what Mr. Wieder had to say. But the one thing that Curcio doesn't involve is an inquiry as to, you know, whether counsel has made wise, strategic decisions or not.

The issue is whether there is a conflict, an actual or potential conflict, and whether it's waivable and whether it's been waived by the defendant, right?

And so to the extent that there is a disagreement about strategy among counsel, that's not really addressed by Curcio.

MR. RICCO: I completely agree, your Honor, because I'm not raising this to say was that what the disagreement is. It's not the disagreement, Judge.

THE COURT: But I also don't think there's any disputing that -- not just capital counsel, but it's certainly especially capital counsel. But all counsel have a duty to investigate. It's, of course, magnified in a capital case because of the stakes that are at issue, but also mitigation is such a bigger piece of a capital case than non-capital cases where rebutting aggravating evidence, of course, is just as

important.

And so the issue here is whether the potential conflicts or any actual conflicts are somehow going to inure to the detriment of Mr. Tartaglione, and if so, does he understand that and is he willing to waive the potential or actual conflict?

So, anyway like I said, at least as it was extensively phrased now with respect to Mr. Barket's actions, including going to media, and we held off to wait for Mr. Wieder's testimony.

MR. RICCO: Judge, I'm almost through. I don't disagree with your Honor. I'm very much on the same page --

THE COURT: Okay.

MR. RICCO: -- with your Honor about that.

THE COURT: Okay.

MR. RICCO: A supplemental letter was filed by us the last time.

THE COURT: Yes. August 24, I think Mr. Bachrach's letter.

MR. RICCO: Yes. And it was just to address some concerns because we wanted to make sure that we were being very clear in terms of what we were saying to --

THE COURT: And I do want to -- I want to address that letter, for sure.

MR. RICCO: So, Judge, if I may, I'm like the last

111

paragraph.

THE COURT: Sure. Go ahead.

MR. RICCO: And the reason why we raised it and the reason why we're talking about these incidents is because these incidents reveal true conflict here, and the true conflict here relates to the capital lawyers' ability to prepare the defense, the capital defense, and that is something that Mr. -- no defendant can waive.

And so we wanted to make sure the record was clear because of a case that comes out of the 11th Circuit. We wanted it to be clear because in a case called Kemp -- *Smith versus Kemp*, 715 F.2d 1459 (11th Circuit 1983), two people went to trial. They both received the death sentence. One of the defendants clearly put forth to the Court with what the defendant thought was the issue at hand, Constitutional violation in connection with the jury.

The co-defendant, your Honor, did not raise that issue. Failed to make the record accurate. Smith, the co-defendant, *Machetti, M-A-C-H-E-T-T-I, versus Linahan,* *L-I-N-A-H-A-N*, 678 F.2d 236 (11th Circuit 1982) was executed. The co-defendant who clarified the record did not get the relief below, but got the relief at the 11th Circuit because the lawyers just took an extra moment to make sure that they were being clear with the Court.

And I know -- and my involvement with capital cases

is that we struggle with trying to get it right. We struggle with being as transparent with the Court as possible because of the long-term consequences, the immediate consequences of these cases.

So, Judge, forgive me for backtracking a little bit. I'm not going to backtrack at all, but we did want to make clear that the essence and core of capital work is investigation and development. It's not the presentation. The presentation is the end result. And the ability to do that in this case has been obstructed. Not conflicted over, but obstructed. And that obstruction is based upon an attorney looking out for their own interest and not the interest of the defendant.

And that's it, Judge.

THE COURT: So let's pick up on that part because I think that is the heart of this. I think what Mr. Bachrach's letter was addressing was the extent to which -- and I'm just going back through it. I read it a few times. I don't see the 11th Circuit case.

MR. RICCO: That case is not in Mr. Bachrach's letter.

THE COURT: Right. So the point of Mr. Bachrach's letter is that there is this duty to investigate, right? It may be that the investigation will yield insufficient evidence to support a mitigator or whoever it is, but, of course, that's

not the point, right?  The point is that capital counsel have a duty to investigate.

Apply it to this case, as I understand it, his argument is that -- that the issue with the Epstein note, the issue with the cell phone, these are potential aggravators and/or mitigators that require capital counsel to fully investigate to maximize the potential value of the mitigation evidence or to thwart or rebut any potential aggravating evidence that the government might seek to introduce at a penalty phase.

MR. RICCO:  And if your Honor has that understanding, then we've accomplished our concerns that we're asking.

THE COURT:  Okay.  So let's take it one step farther. So to the extent that the conflicts that are at issue here might compromise counsel's ability to honor the obligation to fully investigate, then that would be sort of the heart of what is the impact of the potential conflict, right?

MR. RICCO:  Yes, Judge.

THE COURT:  Okay.  So as applied to Epstein -- let's play that out.  I think we've done all of this, but I just wanted to make sure there's nothing new to the argument.  To the extent the argument is that Mr. Barket facilitated a violation of prison policies by secreting the letter -- having the letter secretly taken out and that somehow that would compromise his ability to fully investigate this whole episode

as a potential litigator or thwart evidence that is a navigator, how is that going to play out in ways that we haven't already discussed?  What's the particular concern?

MR. RICCO:  Judge, there's nothing additional to what we discussed other than to simply say that the fact that he -- in his involvement from the team, the investigator --

THE COURT:  Yeah, yeah.

MR. RICCO:  -- is a reflection that something happened here that caused him to put his interest above Mr. Tartaglione's.

THE COURT:  No.  I don't know if I agree with that. There may be a difference in strategy as to what to do with the letter.  So, for example, to the extent that there are concerns about the bona fides of the letter and that that explains why it is that Mr. Barket, for example, you know, he didn't assume that the letter was legit because he wanted to make sure he didn't get himself boxed in by taking that position and then it turns out that it's not, then that could be problematic, right?

So to the extent that there maybe was a difference of opinion upon appointed and retained counsel, I'm not sure how that is something that is a Curcio-based conflict.

MR. RICCO:  Exactly, Judge.

THE COURT:  The conflict is Mr. Barket's ability or willingness to investigate being compromised by his role in getting the letter out the way he did, right?

MR. RICCO: Yes, Judge.

THE COURT: Okay. And to the extent, for example, that Mr. Barket is, among other things, took the view he wasn't going to share the letter because his client didn't want him to share it with appointed counsel, I don't think that spills into the Curcio issue.

MR. RICCO: It does, Judge.

THE COURT: Why?

MR. RICCO: Because the client does not control mitigation development. That is specifically addressed by the ABA Guideline.

THE COURT: That may be right, but that -- I don't understand how that is -- that's a result of the conflict. It may be that Mr. Barket and you disagree about the extent to which he should honor the client's wishes. Because Mr. Tartaglione has made it clear for some time that he wants, initially, one of the appointed counsel and, more recently, all appointed counsel to be relieved from this case.

But to the extent that Mr. Tartaglione is of that view and you don't want any of that view, that is a serious issue, but it is separate from whether or not Mr. Barket is somehow compromised and Mr. Tartaglione understands or doesn't understand the potential conflict from the potential compromise in terms of how the letter was taken out of the prison.

MR. RICCO: Well, Judge, we would not be in a

position for you to make that finding had we followed Mr. Barket. It wasn't that he just didn't tell us about his involvement in taking the letter out of the court, he wanted us not to tell the Court about it, not to report it to Curcio counsel, and I can think of no legitimate strategy reason that that would be made in a proceeding where the Court has to make the determination as to whether or not an individual was conflicted unless they are, in fact, conflicted, where they believed that they're conflicted, and we would not have known that, Judge, had we not disagreed with Mr. Barket and his strategy and followed the court of appeals' obligation accounts.

THE COURT: Yeah, yeah.

MR. RICCO: And so it's the taking it out. It's the "Don't tell Bobbi Sternheim about it. Don't bring it up. Let's try to sweep this under the rug."

THE COURT: Or -- or -- or it's actually whether or not because I don't think there's a conflict. You know, Mr. Barket to say to you, "I don't think it's a conflict." Okay? It's not like we snuck out of there with drugs or weapons or anything like that. It was a letter. Mr. Barket, doesn't even know if it's a legitimate letter. So how it got out is really not the point. So there's no need to go to the Court with it. It's not --

MR. RICCO: But that respect, Judge, that was never

said to us.

THE COURT: Okay. All right.

MR. RICCO: So that -- so that was never said to us. If that was said to us, then we would have had a discussion about that.

THE COURT: Yeah.

MR. RICCO: And we would have resolved that. Because we've looked at ways to resolve this.

To me, these are facts. The inferences to be drawn from these facts is for the finder of fact. Our responsibility is to make sure that the record is not sort of after the fact, let me see what people are going to file and respond to that.

THE COURT: Yeah, yeah.

MR. RICCO: And so I ask, keep it real tight, Judge.

THE COURT: Yeah.

MR. RICCO: If this was a full team, this issue could be resolved. Because it would just simply mean that Mr. Barket wouldn't be involved in the investigation.

THE COURT: Okay. So -- and that's the point that gets made. So the conclusion in Mr. Bachrach's letter is the way to avoid the conflict is just to go ahead and let appointed counsel do the inquiry, right?

MR. RICCO: Yes.

THE COURT: And that starts with getting the letter.

MR. RICCO: Right.

Angela (Angie) Shaw-Crockett, CCR, CRR, RMR
Official Court Reporter (914)390-4242

118

THE COURT:  Let's play that out.  Let's play that out.  Let's assume that you get the letter that's in the safe.  Okay?

MR. RICCO:  Yes.

THE COURT:  So let's play it out.  You have some of your top-notch investigators look at it or let's assume just look for another decision here.  Let's assume they come to you and they say, "Not -- that's not Epstein's writing.  That's not a legitimate letter.  It's not Epstein's writing."

MR. RICCO:  Okay.

THE COURT:  So then what?  What does that mean?

MR. RICCO:  That means that we do not continue -- that means that down the road it doesn't look like this is something that we will present in mitigation.

THE COURT:  Okay.  Fair point.  Let's say it is a bona fide letter.  You say what?

MR. RICCO:  Then what you do, Judge, is you take the letter and along with the text messages that were missing or destroyed and you develop them into mitigation.

THE COURT:  Well, how do we know there's a link between the text messages and the letter?

MR. RICCO:  We don't.  And that's the problem that any lawyer would have in this case.  And so you would want to take the text messages.  And people think that it hurts them, so they start deleting them.  And oftentimes what people are

doing is deleting evidence that an experienced lawyer says, "Stop.  Don't do that.  That can help us."

THE COURT:  Yeah.  The text messages are gone.

MR. RICCO:  They're gone.

THE COURT:  Right.  So -- and really the person who got apparently hundreds of these is Mr. Wieder.  So -- so I don't understand how Mr. Barket operated as some kind of a conflict to get the text messages that Wieder -- by the way, Wieder's testimony is Mr. Barket said we shouldn't be using the phone.  So he stopped, you know.

So putting that aside, I want to understand what Wieder -- we will talk about that in a minute.  Okay?  Talk about him in a minute.

But in terms of Mr. Barket's conflict, these will be Wieder's collection and deletion of these text messages.  I'm not sure how Mr. Barket has a conflict with Wieder's conduct.

MR. RICCO:  Because in the course of investigating whether or not it is ultimately mitigation, you want to have a full and thorough understanding of all of the facts, whether you think they cut to you or against you.

THE COURT:  Right.

MR. RICCO:  Because what we find is oftentimes the inexperienced lawyer who thinks that the fact cuts against them hides evidence that the experienced lawyer wants to see.

So in the context of a capital defense --

120

THE COURT:  Yes.

MR. RICCO:  -- we would be asking a jury not to execute Mr. Tartaglione because of the note or because of the text messages because these were the things that the lawyers decided to do.  These were the things that lawyers made decisions about.

THE COURT:  I understand that, but to the extent that the experienced/inexperienced claim you've evoked here, that's not a Curcio issue.

MR. RICCO:  It is not, but it is a fact.

THE COURT:  I don't understand how a Curcio inquiry resolves that question.

MR. RICCO:  It doesn't resolve that question.  It resolves -- the Curcio issue should resolve the question of whether or not Mr. Tartaglione is represented by a person who can conduct that thorough investigation without any conflict, any diversion of interest.

THE COURT:  Right.

MR. RICCO:  And with a fresh set of eyes.

THE COURT:  Good.

MR. RICCO:  I believe, Judge, and appointed counsel believed and we always believed that we could take that note and those text messages and talk about his isolation and his desperation --

THE COURT:  Yes.

Angela (Angie) Shaw-Crockett, CCR, CRR, RMR
Official Court Reporter (914)390-4242

121

MR. RICCO:  -- and present it as --

THE COURT:  How does Mr. Barket's conflict somehow impair his ability to let those know it's a bona fide note or not?

MR. RICCO:  I don't know that he did it.

THE COURT:  What's that?

MR. RICCO:  He didn't ask them.  But he didn't.

THE COURT:  Okay.  So I guess I'm trying to understand how was the investigation compromised, how would it be compromised?

MR. RICCO:  It's compromised because we don't have the note, and we should have it a year after it was --

THE COURT:  Okay.  But whether or not you have the note, if it turns out the note was not a legitimate note --

MR. RICCO:  It doesn't matter, Judge.

THE COURT:  I don't understand.  We went down this decision tree and I thought you were like, oh, if it's not a legitimate note, then we're not going to go down that route or it's a bad argument.

MR. RICCO:  If it's not a -- if it's not a legitimate -- if it's something that was created for the purposes of going to the press to say, "I didn't assault somebody" --

THE COURT:  Yeah.

MR. RICCO:  -- then we would want to investigate that

122

and utilize that as mitigation.  But this is a different type of mitigator.  If it's a legitimate note, then a desperate person wants to get out.  They both act with desperation.  Under either circumstance, you -- a capital defense would take that information and convert it into mitigation.  And it can be done.  But there's actors involved in the note and actors involved in the text messages.

THE COURT:  I want you to stay with the note.

MR. RICCO:  I will stay with the note.

THE COURT:  The text messages and the note linkage I'm still a little confused about, but the note itself -- hang on.  The note itself is in Mr. Barket's possession.  He's very capable of turning in an expert to evaluate the bona fides of the note.  Get the experts to say, there's three things:  Yes, it's a legitimate note; no, it's not; or we don't know.  Okay?  If that inquiry -- I don't understand how that inquiry is compromised by the conflict created by how it was Mr. Barket got the note out of the BOP.

MR. RICCO:  Mr. Barket said in a meeting to us, "Well, I guess this mitigator is dead.  We're not going to be able to utilize this mitigator proof for judgment"--

THE COURT:  Wait a minute.  Assuming that's the case --

MR. RICCO:  I disagreed with it.

THE COURT:  Okay.  But the fact you disagree with it

doesn't mean its conclusion is somehow tainted by a potential conflict. There's a difference of opinion, and it could be based on experience, inexperience, or just viewpoints or the law. Whatever it is, Curcio isn't meant to referee someone. Counsel will have different opinions about how a client should be represented.

MR. RICCO: Judge, I think that the issue is more nuanced than that. Because I don't disagree with the Court. I'm not here just trying to spend time, tell you there's a different dis -- or how you utilize the note.

THE COURT: Yes.

MR. RICCO: What I'm saying to you is that we ultimately have to present that part to the jury. The person who was involved with the removal of the note from the trial can't make himself an unsworn witness in front of a jury.

THE COURT: But -- but the chain of custody of the note, I'm clear that can be an issue and that can be resolved --

MR. RICCO: It very well may -- could be, but that's a decision to be made by a person who doesn't have any interest in --

THE COURT: But as long as Mr. Tartaglione understands that potential conflict and he's knowingly and voluntarily waiving it, then that's what Curcio says. Now, if you're going to read a little bit in to what Ms. Feinzig says

Angela (Angie) Shaw-Crockett, CCR, CRR, RMR
Official Court Reporter (914)390-4242

in her letter I asked her to submit, then the only issue if there is an unfavorable verdict and an unvariable sentencing or an unfavorable verdict, it would be two things. Whether the conflict was waivable, and if it was, whether it was waived knowingly, voluntarily. And if it was, then Mr. Tartaglione has waived -- if it's waivable and he knows it voluntarily, if he waives his right to object any ineffective-assistance claim based on how the note was presented or not presented, even if it was tainted by a potential conflict. Because he was told of it and he waived it and that's the end of the story.

MR. RICCO: Judge, that analysis is based upon a premise that that is the extent of how that note would fit into a mitigation.

THE COURT: No. That analysis is based on how it is Mr. Barket's potential conflict would affect the inquiry of the note and the use of the note at the trial with the counsel.

MR. RICCO: So, Judge, I don't want to -- I don't -- I'm trying to just express something to you.

THE COURT: That's fine. I'm listening.

MR. RICCO: Okay. We're talking about litigating mitigation and waiver of it as if it's a static, like a decision could be made today as to how that note should be used. Mr. Tartaglione should not be in that position because we need to thoroughly investigate all of the facts and circumstances of that note before there's a determination of

how it's going to --

THE COURT: But if you're right, what's the purpose of having a Curcio hearing? Because your argument then would be, well, we can't have a Curcio hearing because we can't knowingly, voluntarily waive something if he doesn't know all the facts about it.

MR. RICCO: I'm not saying that, Judge. I'm saying he can't waive an obligation of the ABA Guidelines to conduct that thorough investigation.

THE COURT: Okay. But hang on. He's entitled to have a lawyer representing him conduct a thorough investigation.

MR. RICCO: Yes.

THE COURT: Okay. Why is it that Mr. Barket can't do that through investigation? That's the ultimate question. If the answer is because of his conflict, then maybe the conflict isn't waivable, right? And that's really the main thing because I think Mr. Tartaglione has made it awfully clear he's going to waive. But he's been advised there's a potential conflict and not even an actual conflict, so why would it not be waivable? I'm still not sure I understand the conflict that's going to come of it.

MR. RICCO: No, no, Judge. He can waive the conflict with his lawyer, but he cannot waive the obligation of the lawyer to develop it to -- wait, Judge.

126

THE COURT: Go ahead. You are repeating yourself.

MR. RICCO: So then I'll stop.

THE COURT: Go ahead. Go ahead.

MR. RICCO: Because mitigation is a fluid, evolving process that results from conversations with the defendant as we get information. So I'm able to talk to you about the letter in a certain way because I went to the government's office and I saw stuff in the discovery that makes me think about how this letter could be used to help Mr. Tartaglione, and I'm able to do that based upon my understanding of what the facts are.

That understanding comes from my ability to investigate, to think about it. We have been unable to investigate it and think about it because the information about it has been hidden from us.

THE COURT: I know, but that doesn't mean Mr. Tartaglione's right to counsel has been compromised. Because if Mr. Barket thoroughly investigates it, then Mr. Tartaglione's interest has been represented. His rights have been protected.

To the extent -- hang on. To the extent that it turns out after the fact Mr. Barket was ineffective in fully investigating this -- hang on. To the extent that he is, there's two issues. One would be because of the conflict. And let's assume not because of conflict. Let's just assume

because he just misses the issue and doesn't do a good job. Okay? That issue, the latter point has nothing to do with Curcio. If there's no conflict, a lawyer's ineffective assistance then is obviously something that a convicted person can say is a basis to undo a conviction. Hang on. Let me finish.

MR. RICCO: I'm with you, Judge.

THE COURT: My point here is that we're talking hypotheticals, and to the extent that Mr. Barket understands that he's going to abide by the same ABA rules that you and the other lawyers in this case would abide by, the only question for Curcio purposes is: Would his commitment to honor that duty be compromised by the potential conflict? And if so, okay, let's assume the answers that it could be. Then if so, if Mr. Tartaglione is fully advised of that and, nonetheless, waives his right to object to ineffective assistance based on the operation of that potential conflict on the duty to investigate, then the Curcio inquiry is at an end.

I don't say that lightly. I get it. It's a capital case. You know that.

MR. RICCO: Judge, if I may?

THE COURT: Yes.

MR. RICCO: I don't necessarily disagree with your Honor about what you just said. I don't necessarily disagree with your Honor about what you just said. What we wanted to

do, I understand how your Honor has arrived at where the Court has arrived. We just wanted to make sure that these facts were a part of this record. Because if there is a guilty verdict, no death sentence or death sentence, these issues would be reviewed and, Judge, I'm strictly saying that we wanted to make sure that we put these issues squarely before you to determine that, and I think that we are satisfied that we have done that.

So if at the end of the day your Honor takes the view that you just expressed, then I think we'll move on.

THE COURT: Well, so what I'd like to do is talk about Mr. Wieder, because I think there's some very real questions for Mr. Wieder, whether any conflicts regarding him are waivable. So I'd like to get some thoughts on that from everybody.

MR. BARKET: You know, I -- I hesitate to do this, Judge, but I think I have to just back up a bit.

THE COURT: Yeah.

MR. BARKET: Just because of -- I certainly agree with your Honor's -- I don't want to say conclusion, but thoughts. However, there's certain factual things that have -- keep being asserted. And just like Mr. Ricco wants to be clear that the record is complete, we have that equal obligation. And I don't want to get into a back-and-forth now. We've done that a lot, and I think much of what Mr. Ricco said I've addressed in either letters or -- or in my declaration, as he

described it.  Some, I don't think I have.  I need to -- I need to address that.  I'll do it briefly.

The idea that we didn't think -- "we" being retained counsel -- didn't think that we could take the -- take the cell phone issue and turn it into mitigation is belied by a base camp post that I put up back in the summer of 2019 expressing the very thought that Mr. Ricco had just expressed to your Honor, which is that it relates to his isolation.  And I think I said as much to the Court when we first discussed this.

So that proposition that somehow this has eluded me is just wrong, and that it's something that I brought up, I think, initially when I first heard about it when we discussed the cell phone usage before it was discovered by the BOP.  We all knew it was wrong.  We're all telling him to stop.  And to be clear with Mr. Wieder, I was as emphatic with him as I was with people in my own office and with Mr. Tartaglione about not texting him.

There is no link between the letter and the text messages because chronologically the text messages all took place before.  So there can't be that kind of link.

The records that Mr. Ricco referred to several times from the BOP about what Epstein said happened during his first attempted -- I shouldn't say "first attempted," but during his attempted suicide, those are records that we first reviewed.  Those are records that were made available to us because I

demanded it.

The idea we're not investigating the Epstein episodes is ridiculous and belied by the letters that we've written to the Court demanding a hearing over the disappearance of the videotape and the numerous emails and letters written to the government demanding records. We looked at those records as well, but when they were finally made available to us, they wouldn't give us copies of them. They only allowed us to go in and read them and take notes.

And one of things that Mr. Ricco didn't tell the Court that I think is important, whether or not those records ever become part of this, is that the records themselves say the BOP did not believe Epstein's assertions. They thought he was lying. One comment from the person interviewing him was, "He seems like he's making this up as he's going along."

And, of course, the BOP, after hearing from Mr. Epstein, who didn't want to be on suicide watch, who didn't want it known or didn't want people to think he was going to commit suicide, I think because he ultimately really wanted to -- wanted the opportunity again -- clearly, Mr. Tartaglione the day before Epstein killed himself, we have an email from the lawyer, Adam Johnson, saying that Nick won't be charged at all criminally or in violation of any of BOP rules for the incident that took place on July 22nd into the 23rd, which was the -- literally the evening that we were in court.

Angela (Angie) Shaw-Crockett, CCR, CRR, RMR
Official Court Reporter (914)390-4242

The idea that I wanted to use the note to go to the press is just false, and I've addressed that, I think, in the letter. But I'll say it again. I've protected that letter from disclosure for the reasons that, God forbid, it was a forgery. Talk about an aggravator, right? Consciousness and guilt and so forth. If that was a forgery, it would be devastating to Mr. Tartaglione.

I never suggested it would go to the press with that. I never suggested it should go anywhere. I kept very close, as close as I could, tabs on it. But as has been acknowledged, within a day or two we read the contents of it to Mr. Ricco and had two extensive conversations with him, one with Ms. Leisenring and myself. We had a joint call on the evening of July 29. Ms. Leisenring then had another call with him later that day -- that evening on July 29. And I had a longer conversation with him on July 30. All 2019.

We had phone records if we need to verify the calls and the length of the calls. Answered every question he had, talked to him extensively about it. The idea that we were hiding this from him is ridiculous and offensive.

Maybe the most offensive thing that was just said, and false thing, is that somehow we're trying to trick the Court into providing public funds for Mr. Tartaglione to put money in the pocket of a private firm. While it's true that we've received a substantial gross sum of money in this case,

the number of hours that we put in makes that not de minimis but very small.

And, chronologically, appointed counsel came first. So they were in the case first. Mr. DeMarco was appointed. Mr. Ricco was appointed. Then Mr. Tartaglione hired us. And I remember when that happened, Mr. DeMarco was dismissed by the magistrate, saying he now has retained counsel. He's entitled statutorily to learned counsel. There had already been a determination made that he was entitled to public funds for investigators and experts.

And once we entered the case, we had a discussion with your Honor, with everybody here, and you said -- asked the very question in the first court appearance, "I see no reason why Mr. DeMarco shouldn't stay."

And I remember saying "No. Of course, the more -- the more we have, the better." And in that context, we're not trying to manipulate anybody. I welcomed the help, embraced it, asked for more.

So the idea that we were trying to manipulate people to get public funds for Nick while we enrich ourselves is factually false and personally offensive. Again, we disagree on whether or not the note is contraband. That's used constantly by appointed counsel, but we've written extensively about that.

THE COURT: And to lead into: What about the point

about you didn't want to share this with Ms. Sternheim, the Curcio counsel?

MR. BARKET:  It wasn't part of the inquiry initially. So what happened chronologically -- and I think I laid this out pretty clearly or at least I tried to -- is that their allegation was there's somehow a conflict from the press they listed.

THE COURT:  Yes.

MR. BARKET:  I thought that was absurd then and I still do.  I thought it was ridiculous.  We have an absolute right to rebut press that we didn't initiate.  And what happened here was I learned about what took place with Mr. Epstein on July 23rd on the 24th with a phone call from Mr. Tartaglione.  I didn't go to the press that day.

The next day, Wednesday, Ms. Leisenring met with him, had an extensive conversation with him.  I didn't go to the press then.  We had no desire to go to the press.

And on that evening of July 24, that Wednesday, I got a phone call from somebody from NBC News, local affiliate, telling me they're going to run a story that Nick assaulted Epstein.  I made a decision to rebut that, push back on it hard, and I did.  And that, I thought, was perfectly legitimate and still do.  Had conversations with Mr. Tartaglione about it. The idea that there was a conflict over the press I always believed to be not accurate or not correct.

Angela (Angie) Shaw-Crockett, CCR, CRR, RMR
Official Court Reporter (914)390-4242

So when the issue came what we should tell -- we should include the note as part of the inquiry, my first reaction is nobody should know about this, right? They should be kept close, as close as we can, and I didn't know. Mr. Ricco told Ms. Leisenring and I not even to tell other members of the team and we went along with that.

What I didn't know is that Mr. Ricco went ahead and told other members of the team and they were all -- had full knowledge of it. We were left in the dark. It was really an odd situation where we were told not to discuss it, went to conferences, had meetings about mitigation. They all knew, but we didn't think they knew because we were told not to discuss it with them.

After -- within a day of Ms. Sternheim being appointed, I thought about the note, thought about its potential conflicts, and agreed it should become part of the inquiry. And said so. My own view about why it was a potential conflict is that it could affect everybody on the team who knew about the note. That if it came out publicly that this note was there and one could describe it as a suicide note, that there could be criticism or derision, "How could you have hid this note? You cost this man his life if you'd only turned over the note," even though I think that argument is absurd because he tried to kill himself.

THE COURT: Right. The idea that the BOP didn't know

that he was suicidal.

MR. BARKET: Right. I recognize that. So then do you disclose the note or do you not?

THE COURT: Right.

MR. BARKET: There's a little bit. I had conversations with people on the defense team who were very strongly fearful -- and I mean appointed counsel -- about that kind of allegation being made about that. And I shared that I get that. And so I thought there was a -- there was a reason for Ms. Sternheim to go ahead and investigate that.

And we read her the note, showed her a copy of it on my phone, and that was on -- within a day or two of her being appointed and said, "I'll give you a copy of it if you promise not to disclose it further." Because what I had learned had happened at that point is I told Mr. Ricco about it and everybody within the capital defense community from all the appointed counsel, all the resource counsel, all the mitigators, and people who were not connected to the case at all, David -- there was David Patton, head of the defense organization.

THE COURT: Is he the person who is involved in the appointment of learned counsel?

MR. BARKET: Right. So that was my only -- and she never came back and said, yes, no, or maybe to that. She read it and we made it available to her. If she asked for it to

read it again, we would have given it to her again.  She knew what the contents of the note were.  Mr. Ricco knew about what the contents of the notes were early on.

THE COURT:  I got you.

MR. BARKET:  To lead into Mr. Wieder, Mr. Ricco is 100 percent correct.  His testimony was different than what I wrote and what I wrote is --

THE COURT:  -- what he told you?

MR. BARKET:  Obviously.

THE COURT:  Yeah.

MR. BARKET:  So, I mean -- and if you recall, let's be clear on the sequence here.  Initially, I told the Court -- because this is what I was told -- the note -- the text messages weren't saved.  And you said -- excuse me -- the Court said, "Weren't saved?  You don't have to save them.  They just stay there."

Which is, I think, now I learned partially true depending in the setting of your phone.

THE COURT:  That's right.

MR. BARKET:  So I went back to Mr. Wieder and said, you know, "What happened here?  What do you mean they weren't saved?"

And that's when I got the cracked phone, and I don't doubt that because he actually had some documentation that he got a new phone on July 23rd, which as people pointed out is

coincidental to when we first disclosed that there were these communications. But he apparently has documentation of that. So that's --

THE COURT: Well, he might have documentation that the phone was cracked, but querry how the phone got cracked and needed to be replaced.

MR. BARKET: Well, all I know is he has some documentation that he put an insurance claim in or says he does. I believe him, but haven't seen it. That the phone was lost, destroyed, cracked, or something. He got a new phone and he doesn't have the text messages.

So what he said today, that he deleted some or all, whatever his varying answers were?

THE COURT: Let me put it to you this way: If the affidavit that you submitted was from Mr. Wieder --

MR. BARKET: Well, I'm not --

THE COURT: Let me finish. Let me finish. And I'm not -- I got no beef with you. If you're recording that he said it to you and you don't have any reason to doubt it, you've done nothing wrong.

My only point is if that was his affidavit and then he testified to what he testified to today, one of those isn't true. One of those isn't true. And that's not, I think, subject to much debate. And so that means either he would have lied in the affidavit or he would have lied under oath here,

and that would be very problematic for an attorney.

So to the extent that your declaration -- and I accept your representation -- is based solely on what he told you, that what he told you is not consistent with what he said today under oath.

MR. BARKET:  I agree 100 percent, Judge, on that -- on that point.  And he almost tried to go there again by saying he replaced the phone.  But when pushed, he just said he deleted them, which is different than what I heard previously.

THE COURT:  I have some real concerns about Mr. Wieder.  I have real concerns about the veracity of his testimony today, which I think heightens the conflict.  Because to the extent that he's -- I think was dishonest today and evasive at best, then that element is proof that the conflict affects his ability to do whatever it is he's doing on this case.  Because I don't even know.  I guess we'll see what the retainer is that he says he has or doesn't have.

He gave completely inconsistent answers to the question of what he was paid for.  Ms. Feinzig was very patient and thorough.  And he commits to one set of answers.  And then when he's pressed again after Mr. Ricco explains to him the obligation of having a retainer before you collect fees, which is sort of like Lawyering 101, all of a sudden we get different answers.

MR. RICCO:  So, Judge.

THE COURT: Yeah.

MR. RICCO: Mr. Bachrach texted me a text that's too long for me to read, but he wants to address the issue of Wieder that your Honor just focused in on that Mr. Barket agrees with as to why that is a conflict in this case.

THE COURT: Yeah, but I'm not sure it's waivable. I do want some input, and I'd ask that Ms. Feinzig get to weigh in.

MR. RICCO: And so Mr. Bachrach would like to be heard on that. He'd like to be heard and addressed directly.

THE COURT: That's fine. Mr. Bachrach?

MR. BACHRACH: I'm sorry. Did you want me to address this now or after Ms. Feinzig has an opportunity to speak?

THE COURT: I'll listen to you.

MR. BACHRACH: Okay. Obviously, when I was -- you wanted to come back to me, and obviously you are the ultimate decider of this issue. But if this Court determines that Wieder entered as Mr. Barket's agent in relation to the defense of this case, our position is that the Wieder conflicts are, therefore, not waivable and that those conflicts are submittable to the Barket law firm as well through the agency relationship.

That brings up the question of what is the proof of the agency. Now, obviously, I'm just listening here, taking notes as quickly as I can. I don't have the full transcript

yet to go through everything.  But the bullet points that I jotted down is that I think established proof of agency when listening to testimony are as follows:  First, Wieder removed the note to Barket at Barket's request.

Second, Wieder stored the note in perpetuity, if he still has it, through Barket, again at Barket's request.

Third, Wieder signed a protective order in this case at Mr. Barket's office so that he could review the discovery as part of the defense team.  And the reason why I say it's because of part of the defense team, if you read -- if you review the protective order, it clearly makes clear that there's no other legal basis upon which an individual can review the discovery in this case unless they are part of the defense team.

Mr. Wieder then reviewed that discovery at Mr. Barket's office for 90 minutes.  Mr. Wieder then further reviewed the discovery with Mr. Tartaglione on numerous occasions at the MCC and related some of those conversations back to Mr. Barket.  We didn't ask which ones.  Obviously, that would be privileged.  But the point here, he related some of those few conversations back.

Six, Mr. Barket paid Mr. Wieder through a portion of a check that he had received from Mr. Tartaglione's father, which had been given to the Barket law firm for legal purposes in this case for their attorney fees.  So a portion of

Mr. Barket's attorney's fees were then used to pay Mr. Barket.

Seven, the payments of Wieder by Mr. Barket were done with a 1099, which your Honor knows confirms a contractual relationship irrespective of any existence of any form of contractual relationship --

(Court reporter clarification)

MR. BACHRACH:  Seven, the payments of Wieder by Barket was done with a 1099.  The 1099 confirms a contractual relationship between the person who provided the 1099 and who received the 1099, irrespective of the existence of any form of counsel agreement.  The purpose of a 1099 is to pay a person for services rendered who is not otherwise paid on a W-2 as a direct employee.

So those are -- just those are seven examples which I heard today which I think established a -- an agency relationship between Mr. Wieder and the Barket law firm.

Hold on one second, your Honor.

THE COURT:  Sure.

MR. BACHRACH:  Ms. Sternheim has noted to me that in preparation of her Curcio report, she requested a copy of the note, asking that for inclusion in her report, and the request was declined by Mr. Barket, stating that, quote, "Mr. T didn't want to share on the advice of ethics counsel loss."  Again, ethics counsel for the firm.  Again, it seems to me that this is something that they're asking Mr. Wieder to do something at

the advice of the counsel whose role is to be retained to deflect the ethical observation of the Barket law firm.

MR. BARKET:  Hang on.  I'm sorry.  I missed it.  Did he say that Ms. Sternheim asked me for the note?

THE COURT:  Mr. Wieder.

MR. BARKET:  She asked Mr. Wieder for the note?

THE COURT:  She asked Mr. Wieder for the note.

MR. BACHRACH:  I'm sorry?  I've misspoken.  I meant you asked Mr. Barket.  And I was present when Mr. Barket was asked for the note because he did it in my office on August 23rd, 2019.

Also present at that meeting was Ms. Leisenring, Mr. Koffsky.  And Mr. Ricco was on the phone, and I don't remember if he was on the phone at that point or not.  I don't remember if there was anyone else present for the request, but we were all present.  The quote that I read, I'm not sure where that quote comes from.  I think it's from the email, but I'm not positive, again, listed in her report -- in the Curcio report by Ms. Sternheim at page 7.

I should also just note that, as pointed out to me, that it may still be possible that the text messages are recoverable.  I know Mr. Wieder said during his testimony that it was originally on his old phone and now he has the new phone.  And there's certainly been a lot of different testimony as to why and when those phones were changed.

Angela (Angie) Shaw-Crockett, CCR, CRR, RMR
Official Court Reporter (914)390-4242

But one thing I heard -- and, again, I don't have the transcript in front of me.  I heard him say that he transferred all of the messages to the new phone before he deleted them. If that's the case, if that's the case, then a forensic analysis of his present phone may be able to recover those text messages.

Additionally, regardless if it occurred before or after, if the records still exist, a subpoena of his cell phone provider might also -- might -- I do stress "might" -- it may be too long, that too much time has passed -- but might also be a way of recovering those text messages.  I just wanted to note that as well.

And, of course, your Honor, on a number of occasions, although it's not been denied now by Mr. Wieder and it's been denied in Mr. Barket's declaration and I think again today -- but Mr. Barket did say on at least two occasions that there was an of-counsel agreement between Mr. Wieder and Mr. Barket's law firm.  He told it to me on the phone on August 22nd, 2020 -- 2019, although at the time he said it was -- there was no written agreement, but he was of counsel in relation to this case.

And the next day, on August 23rd, he corrected that and said, no, there was, in fact, a written of-counsel agreement.  So, again, he said repeatedly that there was.  So maybe there was; maybe there wasn't.  But what we do know is

that he paid Mr. Wieder.  At the end of the day, he paid Mr. Wieder for services rendered in relation to this case on a 1099.

And that, your Honor, I think -- I think that case in point establishes that there was an agency relationship.  And if there's an agency relationship, it's appointed counsels' view that all of Mr. Wieder's conduct that relates to this case is attributable to the Barket law firm through their agency relationship.

THE COURT:  Okay.  Thank you, Mr. Bachrach.

Ms. Feinzig?

MS. FEINZIG:  Your Honor, I think there is a set of facts here that I think we need to consider carefully, and I think we need to look at the law and whether or not an agency relationship is sufficient to establish that the conduct of the -- firm --

(Court reporter clarification)

MS. FEINZIG:  I think the long and the short of it is we do have a set of facts.  We do not have -- none of us have researched the law specifically as to whether or not an agency -- whether this is an agency relationship.  I trust Mr. Bachrach has an idea and some education on that.  And -- but whether that's sufficient under the ABA rules to impute his conduct to Mr. Barket's firm.

THE COURT:  Well, we don't have all of the facts,

clearly. So Mr. Wieder is going to produce some stuff which will be interesting to see. And if you define his testimony as part of the facts, then you have to sort of figure out which pieces of the testimony that contradict are the facts.

So I think everybody can benefit from studying the transcript. I know for one I was a little surprised at the inconsistency in the answers. And Mr. Bachrach has not had the benefit -- he wasn't here. So there may have been pieces of it he just couldn't hear.

So I have to say I agree with that point. I think that this was -- this was enlightening and important that we did this with Mr. Wieder today, and I think that this does potentially affect the analysis. How much so, we have to wait and see and I want everybody's input. So we just need to get the transcript ordered and get you all to review it and do whatever legal analysis you want to do.

How much time, appointed counsel, do you want?

And the same question for you, Ms. Feinzig.

MR. BARKET: Judge, may I?

THE COURT: No. I just want to get an answer to this question first.

(Discussion off the record)

MR. BACHRACH: Hold on one second, your Honor.

THE COURT: I think you're getting texted by your colleagues.

Angela (Angie) Shaw-Crockett, CCR, CRR, RMR
Official Court Reporter (914)390-4242

MR. BACHRACH: Yeah. Let me read the text. I'm sorry.

Your Honor, I would ask -- I think two weeks should be sufficient, two weeks from the time we receive the transcript.

THE COURT: Yeah.

MR. BACHRACH: There are -- there could be some delays on that. So what I would suggest is two weeks, but then the second I receive it or all appointed counsel receive it, we'll inform the Court and retained counsel and government's firewall team that we will, in fact, know when the two-week clock begins.

THE COURT: All right. That's fair. So within two weeks when you get the transcript, so when you get the transcript, why don't you all get together and then somebody will just send a letter so there's a record of -- of the deadlines. Okay?

MR. BACHRACH: I can do that. Thank you.

THE COURT: Sure.

Mr. Barket?

MR. BARKET: What Ms. Feinzig said is correct, that we need the law and we actually did do quite a bit of research on this in preparation for today. I gather other people haven't. So, really, arguing the point wouldn't be very useful.

THE COURT: Yeah. No, I think save your ammo and when you see what they say, you can supplement whatever research you've done.

MR. BARKET: We've -- not surprising, we've concluded, I think, it's a clean and clear question that -- or answer that he is not -- does not have a relationship with our firm.

THE COURT: No. To the extent that you did this research that you think it's clean and clear, I'm sort of perplexed at that, given that it wasn't clean and clear in Wieder's testimony today. So the facts, I think, are very much open to question.

MR. BARKET: The facts about his conduct are certainly open.

THE COURT: Which includes his conduct in his relationship with your firm.

MR. BARKET: That I have personal knowledge about.

THE COURT: Okay. Maybe you're going to testify.

MR. BARKET: Maybe I will. But on that point, I have -- that's what I'm basing it on.

THE COURT: Okay. But you have submitted a declaration based on information Mr. Wieder gave you that turned out to be inconsistent with what he said today.

MR. BARKET: Not on the question of --

THE COURT: I don't know. I have no idea what other

information he's provided before. Mr. Wieder's got serious credibility questions.

MR. BARKET: Not -- not on the question of his relationship with the firm.

THE COURT: Yes, he does. His answers to Ms. Feinzig's questions and Mr. Ricco's questions on the payment were not consistent and they were troubling, right?

And so let me finish. You want to defend Mr. Wieder's credibility? Go right ahead.

MR. BARKET: I don't.

THE COURT: Okay.

MR. BARKET: I don't and I don't not want to defend his credibility. What I want to do is say the issue of whether or not he is an agent or somehow that his conduct may be imputed to us for conflict purposes, the question is about his relationship with our firm.

THE COURT: Yeah.

MR. BARKET: And on that, those factual questions: Did he do work for us? Is he of counsel to us in a way that would disqualify us if he did something wrong or had his own conflict?

On those factual questions, those are all things that I have personal knowledge of.

THE COURT: Okay.

MR. BARKET: And on that point, I'm perfectly

comfortable. And I think your Honor picked up on the -- what he was saying understated it. He wanted to review the discovery in the case, and we went back and forth on this for months. And he reviewed it. He signed the form in October of 2019. I believe that's the date and --

THE COURT: Why is he signing a protective order in this case if he's not going to do some work on it?

MR. BARKET: He is -- we've all done work on the case.

THE COURT: Yeah.

MR. BARKET: Right? So --

THE COURT: So we've got to be real clear. Let's just be clear about this. We've got a real estate lawyer, okay, who's got different law firms and he's doing house closings, in a capital case. Okay? And he comes to court here today and gives some really shitty testimony and he's getting paid $25,000 with your firm with a 1099 and he's "humina, humina, humina" on the retainer agreement and how much money and how did they know how much to pay him and everything else. That's just the start. He is the Rasputin of this case. He doesn't have -- he shouldn't be in this case.

MR. BARKET: Judge, I didn't pick him.

THE COURT: Well, no, but you sent him to get the letter out.

MR. BARKET: I didn't send him.

150

THE COURT: You asked him to get the letter out.

MR. BARKET: Right.

THE COURT: You let him sign the protective order and you paid him $25,000.

MR. BARKET: Well, we cut him a check for $25,000.

THE COURT: Yes.

MR. BARKET: The money came from --

THE COURT: The 1099.

MR. BARKET: I don't know what else to do. We don't give out money -- we don't give out money without -- without forms. So I agree with your characterization 100 percent. It was not my choice to have him review the discovery, to have him have conversations and so forth.

THE COURT: You say, "No, you're not going to review any discovery."

MR. BARKET: I have a client who says, "This man is my lawyer. I trust him. I want to discuss this with him."

THE COURT: You -- you have the responsibility to defend somebody who's charged with serious crimes and facing the death penalty and you have an obligation, I think, to say to your client, "Look, you want a real estate lawyer representing you? Fine. I'm a criminal defense lawyer and I'm good at what I do."

MR. BARKET: And those conversations, Judge.

THE COURT: Okay. They resulted in a real estate

151

lawyer who gives dodgy testimony in federal court getting access to discovery in this case after he signs a protective order. Look, we can belabor this later on. I think we all have a plan to see where we go next.

So when the transcript comes out, I'll get a letter saying, okay, the two-week clock has started. And, Mr. Barket, I'll give you your one or two weeks to respond afterwards?

MR. BARKET: Sure. I'll take two. It might be less.

THE COURT: Of course, of course.

So, Mr. Bachrach, if you can put that in your letter that, okay, we have a transcript so our submission will be on this date, and then Mr. Barket's response will be on two weeks -- the day two weeks thereafter.

MR. BACHRACH: Yes, your Honor, I'll do that. Thank you.

THE COURT: Okay.

Yes, Ms. Feinzig.

MS. FEINZIG: Your Honor, should we set some kind of control date so that we can -- the government can request some time between now and the date excluded?

THE COURT: I think we should. Especially in the world of this pandemic, we have boxes to check before people can be produced, and it has to be done two weeks in advance, and, yes, I think that's an excellent idea.

So let's assume that -- Angie, I don't want to put

152

any pressure.  But let's assume the transcript comes out in a week.  So that that would mean it's the 18th.  We'll go extra time.  That means in theory the first round of submissions would be due the 2nd.  The next round would be due the 16th.  So maybe if we scheduled something before the third or fourth week of October and it turns out the transcript takes a little longer and we don't have to move the conference.  Maybe if you look at the last week of October, we get the 26th.

MR. BARKET:  The last week of October, I have a trial scheduled in the Eastern District, a jury trial, but we got a call for a conference next week.  So I don't think it's going to go.

THE COURT:  Why don't we set a date today?  If it turns out you're on trial that week, then we'll obviously accommodate you.

MR. BARKET:  So what date are we looking at, Judge?

(Discussion off the record)

THE COURT:  28th at 11:00?

MR. RICCO:  Judge, if I may.  I've been told that to have the defendant present, that they're asking that present -- for a defendant present should be scheduled on a Friday.  I just want you to know.

THE COURT:  I don't think that's true.  That may be true in our satellite courthouse in Manhattan.

MR. RICCO:  Oh, that's right.  I'm sorry.

Angela (Angie) Shaw-Crockett, CCR, CRR, RMR
Official Court Reporter (914)390-4242

153

THE COURT:  But you're in the mother ship, we're good.

MR. RICCO:  Thank you.

THE COURT:  If I'm wrong, we'll obviously get in touch with you.  But does the 28th work, again, with the asterisk that Mr. Barket may be on trial?

MR. BARKET:  Just on a separate track.

THE COURT:  Yes.

MR. BARKET:  So the jail conditions continue to be --

THE COURT:  The government is supposed to respond today, right?

MR. BARKET:  Correct.  We didn't.  We didn't communicate with the Court and I guess I should have.  I had communications with Ms. Comey and Mr. Swergold indicating we had no problem with the 11th and suggested that we pick a date after that to come back and discuss this.

THE COURT:  Yeah.

MR. BARKET:  And we just said, "Let's see what happens on the 11th.  We'll see what your submission looks like."

I can update the Court a bit on some of the conditions, which my writing and complaining results in, you know, when I write to the Court.  If I just write to them, I don't even get an email back.  If I write to the Court.  So I think yesterday he received, like, 27 newspapers and nine books

154

that were just sitting in the facility for an extended period of time.

But I do want to -- so whatever date we pick for this, that's fine, but I expect we will be back once we get a response from them on an earlier date where --

THE COURT: Right. But that at least doesn't necessarily require Mr. Tartaglione to be here personally. So if you're worried about the quarantine complications, I'm much more comfortable if he's comfortable. If he's participating, it's his choice. If he wants to appear in person, fine. If he wants to avoid the hassle and try to do it by telephone, that's also fine.

MR. BARKET: Yeah. Unfortunately, as it relates to that because he has intimate knowledge of what's going on and his representations are made, my ability to communicate with him privately is much more important.

THE COURT: The other reason I'm saying that is it may be that we can't just say, okay, let's do a conference tomorrow. In fact, it can't be that way.

MR. BARKET: Right.

THE COURT: It is a very complicated system because there's a limited number of people that can be produced in each courthouse per day. That's the problem.

MR. BARKET: What I was told is that visiting will take place again. Legal visiting will start on September 21st.

155

THE COURT:  Okay.

MR. BARKET:  So if that's true, I'm hopeful that the quarantine will end then as well.  They can't quarantine everybody who sees their lawyer.

THE COURT:  Well, you would imagine.

MR. BARKET:  Well, one would hope or imagine.  So I think we'll be back before the 26th.

THE COURT:  I'll just wait to hear from you on the issue after you get the government's response.

MR. BARKET:  Okay.

THE COURT:  October 28 at 11:00 is good for everybody?

MS. FEINZIG:  Yes, Judge.

MR. KOFFSKY:  Good for us.

MR. BACHRACH:  Your Honor, I'm having trouble hearing the date.  You said October 28?

THE COURT:  Yes, two eight.  Sorry.  Yes.

MR. BACHRACH:  Great.  Thank you very much.

THE COURT:  And then even though there are motions pending and I view this as a complex case, I'm going to independently -- unless there's objections -- exclude time from now until October 28, finding in the interest of justice to do so.  That finding is based on the fact that we really do need additional briefing in light of Mr. Wieder's testimony today on the very important issue of conflict of counsel.  I find in the

156

interest of justice from this exclusion outweighs the public's and Mr. Tartaglione's interest in his speedy trial.  The finding is independently made pursuant to 18 U.S.C. Section 3161(h)(7)(A).

Anything else?

MR. RICCO:  No, your Honor.  Thank you.

THE COURT:  Please stay healthy, everybody.

(Proceedings concluded)

I N D E X

Examination of:                                      Page

John Wieder
Examination by MR. RICCO ......................37
Examination by MR. KOFFSKY ....................68
Examination by MS. FEINZIG ....................72
Further examination by MR. RICCO ..............81
Examination by MS. STERNHEIM ..................92

Angela (Angie) Shaw-Crockett, CCR, CRR, RMR
Official Court Reporter (914)390-4242