1

SEALED PROCEEDINGS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------x

UNITED STATES of AMERICA,

       -against-                16cr832(KMK)
                                 Status Conference

NICHOLAS TARTAGLIONE,

               Defendant.

-----------------------------------x

                          United States Courthouse
                            White Plains, New York
                            May 19, 2021

            THE HONORABLE KENNETH M. KARAS,
                    District Court Judge

AUDREY STRAUSS
    United States Attorney for
        the Southern District of New York
BY:  MARGERY FEINZIG
     ILAN GRAFF
        Assistant United States Attorneys


BRUCE A. BARKET
AIDA F. LEISENRING
DONNA ALDEA (by telephone)
MICHAEL K. BACHRACH
ANTHONY L. RICCO
BRUCE D. KOFFSKY
KENNETH J. MONTGOMERY (by telephone)
JOHN A. DIAZ
    Attorneys for Nicholas Tartaglione

Also Present:
BOBBI C. STERNHEIM, Curcio Counsel (by telephone)
DAVID RUHNKE, Resource Counsel (by telephone)
TANYA GREENE, Resource Counsel (by telephone)
MICHAEL S. ROSS, Special Responsibility Counsel (by telephone)

SEALED PROCEEDINGS

THE DEPUTY CLERK:  United States of America versus Nicholas Tartaglione, 16cr832.

Counsel, state your appearance.

MS. FEINZIG:  Good morning, your Honor.  Margery Feinzig for the government.

MR. GRAFF:  Good morning, your Honor.  Ilan Graff for the government.

THE COURT:  Good morning.

MS. LEISENRING:  Good morning.  Aida Leisenring for Mr. Tartaglione.

THE COURT:  Good morning.

MR. BARKET:  Bruce Barket for Mr. Tartaglione.  Good morning, Judge.

THE COURT:  Good morning.

MR. BACHRACH:  Good morning, your Honor.  Michael Bachrach for Mr. Tartaglione.

THE COURT:  Good morning.

MR. RICCO:  Good morning, your Honor.  Anthony Ricco for Mr. Tartaglione.  And your Honor, Mr. Koffsky is here and may be walking through that door any second.

(Mr. Koffsky entered the courtroom.)

THE COURT:  Okay.  Wow, that was good.  That's like when they do the flyover during the National Anthem.

MR. DIAZ:  Good morning, your Honor.  John Diaz for Nicholas Tartaglione.

SEALED PROCEEDINGS

THE COURT:  Good morning.

Hello, Mr. Koffsky.

MR. KOFFSKY:  Good morning, your Honor.  Bruce Koffsky for Mr. Tartaglione.

THE COURT:  Your timing was perfect.

MR. KOFFSKY:  I was waiting outside.

THE COURT:  Perfect.

All right.  And everybody else that's in here is allowed to be in here, right?

MR. RICCO:  Yes, your Honor.  That's Mr. Hardaway. He's from [indiscernible].

THE COURT:  Good morning.

And on the phone?

MS. STERNHEIM:  Good morning, Judge.  Bobbi C. Sternheim, Curcio counsel for [indiscernible] --

THE COURT REPORTER:  I can't hear.

MS. ALDEA:  Good morning, your Honor. [Indiscernible] Barket Epstein for Mr. Tartaglione.

THE COURT:  I'm sorry, say that again.

MS. ALDEA:  Donna Aldea, Barket Epstein for Mr. Tartaglione.

THE COURT:  Anybody else on the phone?

MR. RUHNKE:  Good morning, your Honor.  David Ruhnke as Resource Counsel.

THE COURT:  Good morning.

4

SEALED PROCEEDINGS

MS. GREENE:  Good morning, your Honor.  Tanya Green as Resource Counsel for the defense.

THE COURT:  Good morning.

MR. ROSS:  Michael Ross, outside professional responsibility counsel for the Barket law firm.

THE COURT:  Good morning.

MR. ROSS:  Good morning, sir.

THE COURT:  All right.  I think that's it.

All right.  So the main thing that I think we should do today is go through some of the follow-up questions that Mr. Bachrach submitted in his letter dated February 23, and then take up Mr. Ricco's request that came in yesterday.

Which I assume, Mr. Barket, you've seen?

MR. BARKET:  Yes, Judge.

THE COURT:  Do you have any objection to his --

MR. BARKET:  I actually do.

THE COURT:  All right.  Why don't we start with that, then.

MR. BARKET:  Sure.

In short, it's a piece of documentary potential evidence in the case that we may or may not make some use of at some point in the future.

THE COURT:  Okay.

MR. BARKET:  So as such, it's our responsibility to maintain it and use it if we see fit.  And it's also -- because

PAMELA GRIMALDI, CRR, CLR
914.390.4053

SEALED PROCEEDINGS

of the nature of it, and I don't have to explain that here, we want to keep close tabs on it. We have a photograph of it. There is a --

THE COURT: No one's saying you can't keep a photograph of it.

MR. BARKET: No, no. Right. But we have a photograph of it, so if there was an earthquake and it somehow vanished, we'd still have a record of exactly what it looked like and what it was.

THE COURT: Okay. So then what's the problem with, then, Mr. Ricco's suggestion?

MR. BARKET: Because it's not any different than any other piece of evidence that we have. We do our work, we --

THE COURT: Yeah. But my point is that the preservation argument -- I don't really understand that argument at all. You've preserved it by taking a photograph of it. So I don't understand the preservation point.

MR. BARKET: I'm saying to Mr. Ricco's concern that somehow it will be destroyed, we have a photograph of it, so there'll be a record if something were to happen to the original. But as a piece of documentary evidence that the defense has gathered, it sits in that category of material. There's not any reason --

THE COURT: But it's also beyond that, I mean, for reasons Mr. Ricco explained. It may very well be a piece of

SEALED PROCEEDINGS

evidence, but it's also a document that is relevant to what we've been doing here.

MR. BARKET:  Yes, it is.  And we've maintained it for I think coming up on two years now.

THE COURT:  Okay.

MR. BARKET:  And plan to continue to do that.

THE COURT:  Okay.

Mr. Ricco?

MR. RICCO:  Your Honor, the -- I laid out the reasons why this document should be docketed as a court record.  And we also should have a complete record of what that is.  And the testimony at this hearing raises a concern about who has this document, why they have had that document all this time, and the concerns are just -- are preservation.  We're hearing now that, We have maintained it, but that wasn't the testimony at the hearing.  The testimony at the hearing was he said that he maintains it.  Which is the reason why we have requested -- part of the reason why we requested that the document be possibly preserved as part of the record in this Curcio proceeding.

If Mr. Barket has a photograph of the completed document, he can use it for whatever purposes he mentioned.  If there's a reason why that document should be unsealed -- I don't think there'll be anything relevant -- to be used at the trial or the penalty phase, I don't think that this Court would

SEALED PROCEEDINGS

object to unsealing that document so it can be used for those purposes in this way, in a case where relevant evidence has mysteriously -- has not been made available.  I'll leave it like that.  Judge, I just think the prudent thing to do is to have that document as a part of the record and maintain it under seal to protect issues of confidentiality if defense may need it.  And should the actual document need to be unsealed and be introduced as evidence, I'm sure the Court would grant that --

THE COURT:  All right.  So the proposal is that the document effectively be provided to the Court, the Court will then seal the document, so it will be part of the Court record.  That addresses the concern Mr. Barket has of revealing some defense strategy, because I'm not going to tell the prosecution what the note says or doesn't say.  And then it's all preserved.

MR. RICCO:  Exactly.

THE COURT:  What's the problem with that?

MR. BARKET:  That's always the case, right?  We could always do that.  We could always say, Look --

THE COURT:  What's the problem with doing what Mr. Ricco suggested?

MR. BARKET:  Because it takes it out of the category that it's in.  It's simply a matter of principle.

THE COURT:  What category?  I don't understand.

SEALED PROCEEDINGS

MR. BARKET:  It's a defense exhibit.  It's something that belongs to --

THE COURT:  It's got going to be shown to the prosecution.  It's going to be kept under seal.

MR. BARKET:  I understand that, Judge, as -- the same is true for, I don't know --

THE COURT:  What is the downside of putting it in a sealed envelope and sealing it?  What is the downside?

MR. BARKET:  That it --

MS. STERNHEIM:  Judge, may I be heard?

THE COURT:  One second.

Mr. Barket --

MR. BARKET:  I think that -- I've gotten a few text that people can't hear anybody but the Court.  So I don't know --

MS. LEISENRING:  What's wrong with that?

THE COURT:  Well, no.  I think Mr. Ricco is not at a microphone is the problem.

MR. BARKET:  I asked if they could hear me, and I got a response no.

THE COURT REPORTER:  Can I just ask, who was the woman that said, Can I be heard?

THE COURT:  Who said, Can I be heard?

MS. STERNHEIM:  Bobbi Sternheim, Curcio counsel.

THE COURT:  All right.

SEALED PROCEEDINGS

THE COURT REPORTER:  If somebody speaks on the phone, could you instruct them to say their name first, Judge?  Thank you.

THE COURT:  So if you could, counsel on the phone, just make sure you state your name before you state whatever it is you want to state, so that way there's a clear record of who's speaking.

Go ahead, Ms. Sternheim.

MS. STERNHEIM:  Judge, as we all know, the Epstein note was a critical part of the Curcio proceeding.  I think it is appropriate that it be kept as a Court exhibit under seal, for posterity or for whatever purpose it may be needed in the future.  I do not see any downside whatsoever, and I think it is the proper course to be taken given the circumstances of the Curcio proceeding.

THE COURT:  Okay.  Thank you, Ms. Sterhnheim.

Anybody else on the phone want to be heard on this?

Okay.  All right.  Mr. Barket, go ahead.

MR. BARKET:  I don't have anything else to say, Judge.  It was simply a matter of we have -- I don't want to say dozens.  We have documents that we may or may not use during the course of the proceedings.  And we maintain them.  It's part of our responsibility as a lawyer.  And I would -- this document falls into that same category.

THE COURT:  Okay.  This document falls into a

SEALED PROCEEDINGS

different category given its importance in the Curcio proceedings here. And because the document's going to be filed under seal, there's no risk of any prejudice to the defense case in terms of the prosecution prematurely getting access to what we're calling the Epstein note. So I'm going to ask that the Epstein note be provided to the Court. It will be filed under seal.

Let's see, today is May 19. So can we get it by May 21?

MR. BARKET: I have to talk to Mr. Wieder. I'm assuming that he'll deliver it. But maybe the 25th, to be sure that -- and I haven't spoken to him in quite some time, so I don't know whether --

THE COURT: Let's say it's the 21st. If for some reason he's unavailable, then just let me know, Mr. Barket, and we'll figure out another time.

MR. BARKET: Okay. And just for chain of custody purposes, I -- he is going to deliver it to the Court, the Court will keep it under seal, and then if we need it at some point in the future --

THE COURT: We'll just unseal the envelope. All the sealed documents are kept in a very secure location in the clerk's office.

MR. BARKET: I don't distrust the court. I mean --

THE COURT: I'm just making a record in terms of

SEALED PROCEEDINGS

chain of custody.

All right.  Then I think what I would propose to do next, then, is to go through the questions that Mr. Bachrach submitted to go over with Mr. Tartaglione.  Are there any additions or subtractions from -- the letter's a little bit old, so I don't know if --

MR. BACHRACH:  No, your Honor.

THE COURT:  So it's just the same as what you proposed back in February?

MR. BACHRACH:  Yes, your Honor.

THE COURT:  All right.

And Ms. Sterhnheim, you, of course, have seen Mr. Bachrach's letter, right?

MS. STERNHEIM:  Yes.

THE COURT:  And you don't have any objection to going over these questions with Mr. Tartaglione?

MS. STERNHEIM:  No.

THE COURT:  Okay.

All right.  Mr. Tartaglione?

THE DEFENDANT:  Yes, sir.

THE COURT:  Good morning.

THE DEFENDANT:  Good morning.

THE COURT:  So you may recall, you and I, we've had a couple conversations --

THE DEFENDANT:  Yes.

SEALED PROCEEDINGS

THE COURT: -- where I've been asking you a series of questions that relate to the issue of the potential conflict, or in the case of Mr. Wieder, the actual conflict of some of the lawyers who have been associated with this case.

THE DEFENDANT: Yes, sir.

THE COURT: And the purpose of this, these questions, has been to many make sure you understand -- and some of the questions I've actually asked you to repeat back to me -- but to sort of broadly -- to help you understand, of course, you have a right to not only representation in this case, but the right to conflict-free representation. So what that means is that the lawyers who represent you are solely motivated to further your interests in this case. But to the extent that sometimes there arise potential conflicts, or even actual conflicts, that doesn't mean the lawyers can't continue to represent you, because you also have a right to choice of counsel. It's not an absolute right, but it is a right that you have.

And the law recognizes that there are some instances where the lawyer is dealing with a conflict that is not only actual, but it's so serious that it can't be waived. And that's a very narrow category of cases. And so, you know, we went over in great detail the potential and actual conflicts that have been brought to your attention and brought to my attention, and I'm not going to repeat all that, okay. What

SEALED PROCEEDINGS

we're going to do is go over some questions that maybe we didn't explicitly cover before. And so, as before, I ask you to pay careful attention to the questions. If you don't understand the questions, please, you know, say so.

THE DEFENDANT: Yes, sir.

THE COURT: If you want an opportunity to speak to Ms. Sterhnheim, who continues to operate as the so-called Curcio counsel in this case, who you may recall, of course, I appointed to be sort of an independent adviser to you -- because obviously it doesn't make sense for you to consult with the lawyers whose conflicts are at issue. The idea is to have some sort of independent lawyer not represent you in this case, but provide you some counsel with respect to Curcio issues.

THE DEFENDANT: I understand.

THE COURT: All right. So the first question is, do you understand that if you are convicted of any of the capital charges that have been brought against you in this case, that you face a minimum sentence of life imprisonment and a maximum of the death penalty?

THE DEFENDANT: Yes, I do.

THE COURT: Do you understand that if you are convicted of any of the capital charges, after the trial then what happens is there will be a penalty phase where the jury will then decide whether there -- you should be facing the death penalty?

SEALED PROCEEDINGS

THE DEFENDANT:  Yes.

THE COURT:  And at the penalty phase -- you know, it's called the penalty phase, but it's another piece of the trial, right?  So the lawyers are there, the jury's there. It's basically a continuation.  But the only question the jury's going to be asked to resolve at the penalty phase is whether or not you should receive the death penalty.  You understand that?

THE DEFENDANT:  Completely.

THE COURT:  Okay.  And at the penalty phase, of course, you have the right to -- you don't have the obligation, but you have the right to present evidence to persuade the jury not to impose the death penalty.  Do you understand that?

THE DEFENDANT:  Mitigation.  Mitigating evidence, yes.

THE COURT:  Well, there's a couple things that happen.  There can be advocacy as to why the government's aggravating factors are not aggravating factors.  And, again, just as is the case during the so-called liability phase of the trial, you don't have the obligation, right, the burden is on the government, but, of course, you have the right to defend yourself, right.  And that defense can involve, you know, rebutting the government's aggravating factors, but then also presenting evidence in mitigation, mitigating factors.  You understand that?

SEALED PROCEEDINGS

THE DEFENDANT:  Yes.

THE COURT:  Okay.  And starting with the government's side, so the aggravating factors that they can present, you know, they get to go first and they -- the aggravating factors are actually spelled out for the jury.  They are in, you know, what's called a death notice.  And the government can present evidence to support their claim of certain aggravating factors that the jury should consider in weighing whether or not to recommend a sentence of death.  You understand that?

THE DEFENDANT:  Yes.

THE COURT:  Okay.  And they can do this in their direct case, they can do this in their rebuttal case.  Do you understand that?

THE DEFENDANT:  Yes.

THE COURT:  So we discussed this a little bit before, but maybe if you could just articulate yourself how you understand aggravating factors, like what they are.

THE DEFENDANT:  Aggravating factors are anything that's going to lead a jury to sentence me to death.

THE COURT:  Okay.  So anything about you, anything about the crime that the government -- that they'll charge you with, things like that, right?

THE DEFENDANT:  Yes.

THE COURT:  And just to -- and counsel can correct me if this is wrong, because I'm going a little bit off script

SEALED PROCEEDINGS

here.

The concept here of aggravating factors is that the Supreme Court has said in a number of decisions that there has to be sort of a narrowing of the, sort of, category of cases where the death penalty might be appropriate. And it's those aggravating factors that are meant to distinguish some cases that, for example, might involve allegations of murder from one another. Right? So it's the aggravating factors that the government is going to say to the jury, This is why in this case, jury, you should recommend a sentence of death, because of these factors. And here's the evidence that the government says that they are going to point to say that they've proven these aggravating factors. Do you understand that?

THE DEFENDANT:  Yes.

THE COURT:  The flip side of aggravating factors is the Supreme Court has also said that a defendant who is facing a potential sentence of death has the right to present mitigating factors, to say even if the jury has decided that the person's committed the crimes charged in the indictment, there are mitigating factors, there are reasons not to impose the death penalty. Okay? Do you understand that?

THE DEFENDANT:  Yes, completely.

THE COURT:  So why don't you, in your own words, then, describe what you think mitigating factors are.

THE DEFENDANT:  Just what you said, mitigating

PAMELA GRIMALDI, CRR, CLR
914.390.4053

SEALED PROCEEDINGS

factors are anything that's going to lead the jury to not ask for the death penalty.

THE COURT: Okay. So mitigating factors about you --

THE DEFENDANT: About me, about the crime, about the situation. All of it.

THE COURT: Okay. So the things that -- having to do with you and your background, or things having to do with the crime, you know, which includes everything from, you know, potential role in the offense to information -- you know, sometimes the prosecution relies on, you know, victim impact, and sometimes there can be mitigation in response to victim impact. So there are -- sometimes they mirror the aggravating factors, but they don't have to, right. There can any number of mitigating factors that a defendant can proffer to the jury, and the lawyers can introduce evidence to support those mitigating factors. Do you understand that?

THE DEFENDANT: Yes, completely.

THE COURT: Okay.

Now, under the law, an attorney representing a client in a death penalty case is obligated to prepare for the defense of the case in both phases. They have to consider, okay, there are these charges in the indictment, and that's like in any case, right? So even if you were charged and there was no possibility of the death penalty, the lawyers would be charged with the responsibility of preparing for the trial to persuade

SEALED PROCEEDINGS

the jury that there's reasonable doubt.

THE DEFENDANT: Yes.

THE COURT: When you have a capital case, there is this distinction between the liability and the penalty phase, right, because we only get to the penalty phase if the jury returns --

THE DEFENDANT: I'm convicted.

THE COURT: -- a guilty verdict on what we call the capital count. Do you understand that?

THE DEFENDANT: Yes, sir.

THE COURT: Okay. So where we are right now, you know, obviously the trial hasn't started. All we have is the government's indictment. We have the government's notice that the government wants to seek the death penalty. Motions have been filed in this case directed towards evidence that your lawyers think the government may want to rely upon at trial that they should not be allowed to. So you've already seen the preparation. And, of course, that preparation goes to both phases, because if the government shouldn't be allowed to use certain evidence, they shouldn't be allowed to use it at all, right?

THE DEFENDANT: Yes, sir.

THE COURT: But at the same time, the lawyers have to prepare for the possibility that the jury would return a guilty verdict on any of the capital counts and, therefore, be ready

SEALED PROCEEDINGS

to defend you at the penalty phase.  Because, just so you know, it's not as if what happens is, if there's a guilty verdict on any of the capital counts, then we just call a big time-out and come back a year later.  That's not how it works.

THE DEFENDANT:  I understand.

THE COURT:  Because we get the same jury for both the guilt and penalty phase.

THE DEFENDANT:  I understand.

THE COURT:  And sometimes judges say, Okay, we have a verdict Wednesday at 10:24.  We'll see you tomorrow morning and we'll start the penalty phase.  Sometimes they might take a day or two off to let the lawyers prepare.  But the point is, almost from the minute the case is indicted and there's even the possibility of the death penalty, let alone when there's a certification or authorization of the death penalty by the Attorney General, the lawyers have an obligation to prepare your case to defend you in both phases, the guilt and the penalty phase.  Do you understand that?

THE DEFENDANT:  Yes.

THE COURT:  And that means doing legal research, that means doing exhaustive investigative work to think of any mitigating factors or find any evidence that could rebut any possible aggravating factors that the government might seek to introduce in the case.  Do you understand that?

THE DEFENDANT:  Yes.

20

SEALED PROCEEDINGS

THE COURT:  Okay.  And, of course, I'm sure you would accept this notion, but tell me if for seem reason you don't, that when the lawyers do this in a capital case, their obligation, of course, is to effectively represent you, to be as professional as they possibly can be in unearthing whatever evidence could support any possible mitigating factor, and any evidence that could be used to rebut any aggravating factor.  Do you understand that?

THE DEFENDANT:  Yes.

THE COURT:  So now this gets a little bit more to the core of what these proceedings have been all about, which is that part and parcel of that sort of professional obligation is to make sure that the lawyers don't do anything that's going to disrupt their ability to investigate or develop and then ultimately present evidence to rebut aggravating factors or to support mitigating factors on your behalf at the penalty phase.  Do you understand that?

THE DEFENDANT:  Yeah.  They have no conflicts.

THE COURT:  Yeah.  Or to make sure the conflicts don't affect their ability to do that.

THE DEFENDANT:  Right.  Right.

THE COURT:  So, again, it goes to rebut potential aggravating factors and then to support potential mitigating factors.  Do you understand that?

THE DEFENDANT:  Yes.

SEALED PROCEEDINGS

THE COURT: Okay. So one of the things that often comes up in capital cases is, you know, the defendant's adjustment to prison and the prospect for that going forward, because sometimes prosecutors, you know, they might cite, for example, a defendant's misbehavior in prison as an aggravating factor to say to the jury, This person is a potential danger to each inmates at facilities and other corrections --

THE DEFENDANT: Staff.

THE COURT: Right. Exactly. And so if the prosecution thinks that they have evidence that shows a disregard for prison rules, they might seize upon that and argue that as an aggravating factor to the jury, to say to the jury, you know, Ladies and gentlemen, if you vote no on the death penalty, you could be putting at risk prison officials and other inmates where this person could be designated in the future. Do you understand that?

THE DEFENDANT: Yes.

THE COURT: Okay. And to the extent, for example, that there are at least the possibility that the prosecution could cite your what they would say noncompliance with certain prison rules having to do, say, with regard to the contraband cell phone, they could use that in support of an aggravating factor regarding future danger while in prison. Do you understand that?

THE DEFENDANT: Yes.

SEALED PROCEEDINGS

THE COURT:  And to the extent that some of the lawyers in this case themselves were -- they knew about your, you know, use of the phone, to the extent that the phone was used to contact them, that that means that they sort of have a potential conflict because to the extent that they participated in that, then there could be some concern that they might have about people saying that they should face some kind of a sanction for violating prison rules or assisting you in violating prison rules.  Do you understand that?

THE DEFENDANT:  I understand.

THE COURT:  And that's where there could be a potential divergence --

THE DEFENDANT:  Correct.

THE COURT:  -- that they -- at that moment, then, maybe they won't be solely focused --

THE DEFENDANT:  On me.

THE COURT:  -- on your legal interests.  Do you understand that?

THE DEFENDANT:  Yes.

THE COURT:  Okay.  So why don't you try to describe it back to me, the extent to which you understand this conflict about your compliance with prison rules and at least some of the lawyers' in this case noncompliance with --

THE DEFENDANT:  Specific facts or just in general?

THE COURT:  Yeah.  Just how it potentially could play

PAMELA GRIMALDI, CRR, CLR
914.390.4053

SEALED PROCEEDINGS

out and create a potential conflict of interest.

THE DEFENDANT: Okay. The fact that I had a cell phone and used it to try to contact my attorneys, and my attorneys, because they are involved somewhat, they may take actions to kind of protect their own butt rather -- over mine.

THE COURT: Right. And then to the extent that their interest in protecting their own --

THE DEFENDANT: And then my defense would suffer.

THE COURT: Potentially could suffer. Not would suffer. May or may not.

THE DEFENDANT: May not. Right.

THE COURT: There's a potential conflict there.

THE DEFENDANT: I understand.

THE COURT: Okay. You understand that?

THE DEFENDANT: Completely.

THE COURT: Okay. Then same thing with the Epstein note that we talked about earlier this morning. So to the extent that, you know, there's been testimony, and I think there's even been findings about the role that Mr. Barket and Mr. Wieder played in facilitating the removal of the so-called Epstein note, do you understand what the potential conflict there could be?

THE DEFENDANT: Yes.

THE COURT: So why don't you describe it, if you could.

24

SEALED PROCEEDINGS

THE DEFENDANT:  There's been claims that taking the note out of the jail was a violation of MCC policy and procedure.  So, therefore, the lawyers would be complicit in that also and, again, they would possibly take action to protect themselves over my benefit.

THE COURT:  Because the government could use the Epstein note --

THE DEFENDANT:  As an aggravating factor.

THE COURT:  Right.  And say that to the jury, This is yet another example, ladies and gentlemen of the jury, of, you know, Mr. Tartaglione not complying with certain prison regulations, and then use that to support an aggravating factor regarding any potential future danger.  And to the extent that your lawyers also are caught up in that, that defending you could expose them, right?  And that's where the potential conflict --

THE DEFENDANT:  Right.  Their interest may diverge from my own.

THE COURT:  Right.  Okay.

There's also been some testimony, and, again, some findings, you know, Mr. Wieder -- I know Mr. Wieder is somebody you've had a long-standing relationship with.

THE DEFENDANT:  He's a good friend of mine, yes.

THE COURT:  Yeah.  Exactly.  And you've relied on him for legal advice in matters unconnected to --

PAMELA GRIMALDI, CRR, CLR
914.390.4053

SEALED PROCEEDINGS

THE DEFENDANT:  He's handled --

THE COURT:  Sure.

THE DEFENDANT:  Since my incarceration, he's been very, very helpful to me.

THE COURT:  Sure.  Like I said, in other matters having nothing to do with this case.

THE DEFENDANT:  Right.

THE COURT:  But he's also had some role in this case, too, and he's had some relationship with Mr. Barket's law firm. You know, he's not a full-fledged member of the firm, but he has had some -- you know, the lawyers call it like an agency relationship.  You understand that?

THE DEFENDANT:  Yes.

THE COURT:  And then with Mr. Wieder -- we've already talked about the cell phone, but the one thing we didn't talk about is that Mr. Wieder made -- I mean, his conduct wasn't just that he got messages from you, but he deleted some of the messages he got from you.  And, you know, the finding I made on that was that was already evidence of him acting potentially to protect his own interests.  The deletion of those texts might have been against your interests, because depending -- I don't know what the texts said.  But that's the point.  And so to the extent that the substance of those texts could have been used in mitigation, right, or at least to rebut the government's claim of aggravation from the use of this cell phone, then to

SEALED PROCEEDINGS

the extent that those messages are deleted, then that's an example of where he might have deleted them to protect his own interests, but in so doing, he might have undermined your interests in denying your ability to use the substance of those messages, as I said, either to rebut claims of aggravation by the prosecution or mitigation on your behalf. Do you understand that?

THE DEFENDANT: Yes.

THE COURT: Okay. And that was a big part, as I said, why my view was that the conflict that Mr. Wieder was operating under was an actual conflict and one that rationally could not be waived. And I understand you may not agree with that, and I'm not asking you to tell me whether you agree with it or not, but do you understand that that is the finding of the Court with respect to Mr. Wieder?

THE DEFENDANT: Yes, sir, I understand.

THE COURT: Okay. Now, I stopped short of finding that as a result of Mr. Wieder's conflict, and even though he's had a relationship with the Barket firm, that that conflict, then, is attributed to the Barket firm, but it doesn't change in any way the potential conflicts that we've talked about. Do you understand that?

THE DEFENDANT: Yes.

THE COURT: So back in July you said yes to the question of whether, quote, you are 100 percent comfortable

SEALED PROCEEDINGS

knowing about the potential conflicts that we discussed, both -- we did it a couple times, including on July 29 of last summer. And you described going forward with Mr. Barket, Ms. Leisenring, and the people in their law firm to represent you going forward in the case, that -- closed quote. And the reason you gave at the time was that you believed, quote, They are my best chance in proving the truth and going home. Even with potential conflicts, they are my best shot, like I said, of proving the truth, proving that I'm innocent, and going back to my family, closed quote.

So you may not remember the exact quote, but do you remember generally --

THE DEFENDANT: I remember.

THE COURT: Okay. So the question I guess I have now is do you feel the same way with regard to Mr. Barket and the Barket law firm?

THE DEFENDANT: Yes, sir.

THE COURT: Okay. And you understand that to the extent that Mr. Barket and his firm continue to represent you with these potential conflicts hanging out there, that that could potentially impact their representation of you during both the guilt and the penalty phase of the case?

THE DEFENDANT: Yes, sir.

THE COURT: Okay. And so to, I guess, put it more succinctly, assuming -- I know that you should -- please

PAMELA GRIMALDI, CRR, CLR
914.390.4053

SEALED PROCEEDINGS

understand, I have to do this -- make these certain assumptions okay. I'm not predicting anything. The jury may come back and acquit you on every count, or they may acquit you on the capital counts and then there will be no penalty phase, right? And I understand that's your goal, and I understand that.

THE DEFENDANT: Hope for the best, plan for the worst.

THE COURT: Exactly.

So assuming that you are convicted of one or more of the capital counts, and so then you're at the penalty phase, are you still willing to waive the potential conflicts that Mr. Barket and his law firm are operating under --

THE DEFENDANT: Yes.

THE COURT: -- and be prepared to go forward to the penalty phase?

THE DEFENDANT: Yes.

THE COURT: Okay. And then I guess sort of maybe one last time, can you describe, using your own words, how you see the potential conflicts playing out in any potential penalty phase?

THE DEFENDANT: How will the conflicts --

THE COURT: Could play out.

THE DEFENDANT: Well, if I am convicted and it does go to a penalty phase and I'm given the death penalty, I can't use potential conflicts in order to appeal anything that

SEALED PROCEEDINGS

happened in that procedure.

THE COURT: Okay. So you're sort of -- you're one step ahead of me. That's --

THE DEFENDANT: Sorry.

THE COURT: Hold on to that thought.

But how is it that you understand the potential conflicts could -- putting aside the impact of the waiver, which we'll get to in a minute, how do you see the potential conflicts -- how would you describe them? Let's say you were describing them to a family member and the two of you were just talking, What's up with these conflicts? How would you describe the conflicts that Mr. Barket and his firm are operating under and how they could affect you at the penalty phase?

THE DEFENDANT: They may act in a way that is detrimental to me in order to put themselves in a more positive light.

THE COURT: And how, in particular -- what particular potential conflict would cause them potentially to do that?

THE DEFENDANT: The Epstein letter, phone. What else is there? I don't know what other conflicts they said. The mail that time when he said it -- Tony Ricco said I snuck the letter out or whatever, when he thought I gave the letter to Bruce. That wasn't true.

THE COURT: Okay. So any one of those potentially

SEALED PROCEEDINGS

could involve a situation where the interests of counsel and the interests of you could diverge because their own potential complicit conduct in contravening prison rules could cause them to be more protective of their own legal interests and not be solely focused on yours, which is to rebut aggravating factors and present mitigating factors.

THE DEFENDANT:  Yes.

THE COURT:  Okay.  So to the extent that you're prepared to waive those potential conflicts and proceed with the representation by the Barket firm, and maybe it's the same thing you said before, but you've had some time to think about it.  Can you sort of describe why it is you're willing to go forward notwithstanding these potential conflicts?

THE DEFENDANT:  I trust the Barket firm.  I have complete faith in them.  My relationship with them is as solid as can be.  I've been with them now four and a half years, and they've always done right by me.  I have faith in them.  And I'm willing to take it to the end with them.

THE COURT:  Okay.  And so now let's talk about the impact of the waiver.  So if you continue with the waiver that you offered before, and it sounds like you are willing to do that, and if you are convicted -- let's just start with that.  If you are convicted but there's no death penalty, then there won't be an argument on appeal to challenge that conviction based on the --

31

SEALED PROCEEDINGS

THE DEFENDANT: Based on the potential conflicts.

THE COURT: You understand that?

THE DEFENDANT: Completely.

THE COURT: Okay. So you're going to be giving up that argument?

THE DEFENDANT: Yes, sir.

THE COURT: Okay. And if you are convicted and receive the death penalty, then you also understand that the conflict waiver will also operate to prevent you from making an argument that the death penalty itself should be vacated or taken off the table because of the potential conflicts?

THE DEFENDANT: Yes.

THE COURT: Okay. And there are a number of different ways somebody can challenge an unfavorable criminal judgment, whether it's death penalty or not, but certainly including death penalty. One is, of course, direct appeal. But the other is by way -- it's called a collateral attack or a habeas corpus petition. And you understand that the conflict waiver covers any type of legal challenge, whether it's by way of direct appeal or habeas corpus petition or any other type of so-called collateral attack? You understand that?

THE DEFENDANT: Yes. Yes.

THE COURT: Okay. And so let me just -- to sort of make the point crystal clear to you, that the reason we spent so much time on this is because, as a general matter, and I

SEALED PROCEEDINGS

think not even as a general matter, I think just common sense would tell you that you're in a better position if you have a lawyer representing you that has no conflicts, actual or potential, than one who does. Do you understand that?

THE DEFENDANT: Completely.

THE COURT: Okay. And so I'll ask it one last time: Are you 100 percent sure you're willing to waive your ability to have conflict-free counsel in this case?

THE DEFENDANT: Yes, 100 percent sure, your Honor.

THE COURT: Okay. And as a result of that waiver, you're going to be giving up any argument to challenge the conviction, and if there is a death sentence, any death sentence, because of the conflict or anything that happens as a result of those conflicts?

THE DEFENDANT: Yes.

THE COURT: All right. Mr. Bachrach, any other follow-up to --

MR. BACHRACH: One moment, your Honor.

THE COURT: Sure.

And I'll be asking the same, Mr. Barket, of you.

And also, Ms. Sterhnheim, same question to you, if there's any other questions you want me to ask.

And government, I'll be asking you the same question too.

MR. BACHRACH: No additional questions.

PAMELA GRIMALDI, CRR, CLR
914.390.4053

SEALED PROCEEDINGS

THE COURT:  Okay.  Ms. Sterhnheim, any other questions that you want me to ask Mr. Tartaglione?

MS. STERNHEIM:  No thank you, Judge.

THE COURT:  Okay.  Ms. Feinzig?

MS. FEINZIG:  No, thank you, your Honor.

THE COURT:  Mr. Barket?

MR. BARKET:  No thank you, Judge.

THE COURT:  All right.  Well, my finding is that, for reasons I've already explained, I think that other than Mr. Wieder's conflicts, the conflicts that have been identified, potential conflicts involving Mr. Barket and Ms. Leisenring and their firm, are potential conflicts, and that even if they were actual conflicts, that they are the type that can be waived, and that Mr. Tartaglione understands the conflicts, he understands how the conflicts could adversely affect him, both at the guilty phase and at the penalty phase, he understands the consequences of waiving the conflicts in terms of his inability to use these potential conflicts to legally challenge any unfavorable judgment that might result from this case, including a potential death sentence, and he has had the opportunity to have the advice of Curcio counsel, Ms. Sterhnheim, who is court-appointed.  And in my view he has knowingly and voluntarily waived the conflicts in this case that, as I said earlier, are waivable.  And so I will accept Mr. Tartaglione's waiver, and the Barket firm can continue

SEALED PROCEEDINGS

representing Mr. Tartaglione in this case.

THE DEFENDANT:  Thank you.

THE COURT:  Mr. Wieder, however, cannot, because I think his conflicts are actual and nonwaivable.  You can have whatever legal relationship you want with Mr. Wieder on other things, but I really mean this, Mr. Tartaglione --

THE DEFENDANT:  I understand.

THE COURT:  -- he is conflicted in representing you in this case.

THE DEFENDANT:  No.  He was -- I don't want get into it.  But I understand, yes.

THE COURT:  Okay.  But I just want that to be made crystal clear to you.

THE DEFENDANT:  Crystal clear.

THE COURT:  Okay.

MR. BARKET:  Judge?

THE COURT:  Mr. Barket?

MR. BARKET:  On the Mr. Wieder point --

THE COURT:  Yes.  Careful.

MR. BARKET:  Sorry.  I think I tripped over the "Place chair here."

THE COURT:  I'm making you sign a waiver.

MR. BARKET:  I've been texting him right after we spoke.  He asked if he could overnight it with a tracking number.  I said that might be an issue.

SEALED PROCEEDINGS

THE COURT:  Yeah.  I mean, I defer to you and your concerns about --

MR. BARKET:  Between you and me and, I guess, everybody else here, I don't love that.

THE COURT:  Then tell him that's not acceptable.

MR. BARKET:  Okay.  Without getting into the reasons, he has some personal issues with the health of his family.

THE COURT:  Okay.

MR. BARKET:  So I don't think Friday -- he didn't think he'd be able to do that.

THE COURT:  Did he say when he could do it?

MR. BARKET:  I'll ask and get back to you as we continue.

THE COURT:  Fair enough.

So let me say this for the record, by the way. Obviously in any case, Curcio issues have to be taken very seriously.  That is particularly true in a capital case.  For all the reasons every lawyer in this room and every lawyer that has anything to do with a capital case knows, death cases are different.  We all know that.  And so I think this has been a particularly involved process.  It's taken a lot longer than it would have because of the pandemic.  You know, Mr. Barket has, I think, made a record about all the complications of bringing Mr. Tartaglione here:  You know, he had to be quarantined, and there's all kinds of inconveniences to him, which, of course,

SEALED PROCEEDINGS

were all to protect his health and the health of the other inmates at the facility. This pandemic has wreaked havoc on everybody's lives.

But I want to say this, and I guess I'm saying this mostly to Mr. Tartaglione: This is extremely important, to get the representation issues right in this case because it is a capital case. And this has all been done to safeguard your rights and your interests, even if I know you're 100 percent convinced at the end of the day that waiving the conflict is something you're prepared to do, and I respect that. From my perspective, I wanted to be able to have this conversation where I can look you in the eye, not have it be over the phone, not have it be over Zoom, and that's why we've done what we've done here.

THE DEFENDANT: I appreciate that, your Honor. Thank you.

THE COURT: All right. So where do we go from here? Mr. Barket?

MR. BARKET: Well, I think next up, as Mr. Ricco pointed out in his letter, is Mr. Tartaglione's request to discharge appointed counsel.

THE COURT: Okay. So is that still your request, Mr. Tartaglione?

THE DEFENDANT: Yes, sir.

THE COURT: If you could indulge me for a little bit

SEALED PROCEEDINGS

on this point. We've talked about this before. You do have the right to choice of counsel. You have assembled an incredible team of lawyers to represent you in this case. Obviously the lawyers sitting with you at counsel table are included in that characterization. I have tried a case with Mr. Barket. It was longer ago than he or I wants to admit. But I've also done work with learned counsel, both in this job and in my prior job. And as is true of your retained counsel, the appointed counsel in this case are excellent. And they are not just excellent lawyers; they are excellent death penalty lawyers. Nationally renowned. They are the ones who instruct at conferences. They are the ones who are brought in to represent clients in some of the most difficult cases in districts around the country, precisely because of their experience and their expertise. And the expertise includes everything from understanding the nuts and bolts of the death penalty authorization process, understanding the preparation of motions that are directed both to guilt phase issues and penalty phase issues. Their expertise includes developing strategies for optimal success for their clients at the guilt phase and the penalty phase, jury selection, you know, legal motions that should be filed.

The jurisprudence of the death penalty is its own world, just like the bankruptcy laws are their own world, and bankruptcy lawyers, boy, they are one happy bunch of humans.

SEALED PROCEEDINGS

They teach bankruptcy law better than anybody. And if you were facing a bankruptcy, you might want a bankruptcy lawyer, right?

THE DEFENDANT: I might need one after this.

THE COURT: Yeah. Well, fair enough. But you would not want a, you know, slip-and-fall lawyer when you can have a bankruptcy lawyer. You would not want a lawyer who is an expert on antitrust law, maybe the world's -- the expert on antitrust law, which is a very complicated area of the law, but they don't have expertise in bankruptcy.

THE DEFENDANT: Yes.

THE COURT: And so what you want, of course, is you want lawyers who are good in the courtroom, good on their feet. You want lawyers who are really good at written submissions. You want lawyers who are really good with juries and with judges, who can work effectively to represent your interests, zealously represent your interests, and do so in a professional manner with respect to the U.S. Attorney's Office and the justice department.

And, you know, your interests here are -- could not be higher. The stakes for you could not be higher. And every lawyer in this room who is representing you understands it is their obligation as lawyers and as operatives of the Court, and they take the obligation seriously. Every single one of the lawyers is here in the court to represent your interests to defeat this case: To defeat it at the guilt phase, if

SEALED PROCEEDINGS

necessary; to defeat it at the penalty phase, if necessary; to defeat it by way of legal arguments and by way of factual arguments; by way of investigation; by way of making all kinds of tactical and strategic decisions.

And the fact that you have this team that has so many -- so much broad experience, as criminal lawyers, as trial lawyers. You know, each lawyer brings his or her own set of experiences and expertise to represent you. It's really an incredible team. And I understand you have a great deal of trust in the Barket firm, and that's obviously very important for any client to have that trust. And it's not just personal, but you trust their experience. And as I said, there's no doubt of their experience and their expertise. But so, too, I'm going to tell you it's the same with the learned counsel in this case.

I'm not trying to talk you out of anything. I'm just trying to explain to you -- just give you a different perspective.

THE DEFENDANT: I understand.

THE COURT: It's your choice at the end of the day. But I just want you to understand that, you know -- you're a baseball fan?

THE DEFENDANT: I used to be.

THE COURT: Used to be. But you understand the concept of, you know, the five-tool player: The person who can

SEALED PROCEEDINGS

hit and run, hit for power, hit for average. That's what you've got here. That's what you have here. And not only that; people who are the very best at their position. Because representing capital defendants is its own language, is its own experience, is its own law. And it's complicated, and it is something that -- obviously it could not be more important. I've always thought this. From when I clerked there was a capital case that my judge tried, and I think that the amount of pressure on capital defense lawyers is as great as it could be on any lawyer in any kind of proceeding. And you're facing the death penalty, the ultimate form of punishment that the law sanctions in our country. And I would think you would want to make sure you have the very best representation. You could designate people to have limited roles. That's fine.

Counsel on the phone, I think there's some background noise that's complicating things for our court reporter. I don't know if it's candy wrappers or paper shuffling. I don't want to assume anything. But it's just a little loud, okay? So if you could just mute. Thank you.

That's what I wanted to say to you, Mr. Tartaglione.

THE DEFENDANT: I understand. I appreciate your concern.

THE COURT: Okay. So I don't know if you want to think about it some more. I know you've had a chance to think about it a lot.

SEALED PROCEEDINGS

THE DEFENDANT:  No.  Yeah, I've had a long time to think about it.

THE COURT:  Okay.  Well, let me ask you this.  I don't think I have any choice but to grant your application.  As I said, you have the right to choice of counsel.  Would you be willing to consider the appointment of additional different learned counsel?

THE DEFENDANT:  Sure.

THE COURT:  Okay.  So can I -- I'll talk to Mr. Barket and I'll talk to -- there's a person sort of designated to be the head of the Federal Defender Service.  He's an outstanding lawyer, human being, and he's involved in helping to manage the appointment of learned counsel because, as I think you know, we've talked about this before, the panel of lawyers who are part of the Criminal Justice Act, so they are the lawyers who are appointed to represent people who can't afford attorneys, not everybody on that panel can be appointed to represent a client in a capital case.  They have to be learned counsel.

THE DEFENDANT:  Right.

THE COURT:  And it's such a good rule.  For all the reasons I gave to you before.  All the lawyers in the panel -- if I were charged with a crime, I would be very, very comfortable to be represented by any lawyers on that panel.  If I were facing a capital charge, I certainly would want the

SEALED PROCEEDINGS

learned counsel.  I'm not impugning anything about the non-learned counsel.

THE DEFENDANT:  I understand.

THE COURT:  They don't have the experience and the expertise, right?

THE DEFENDANT:  It's not their specialty.

THE COURT:  Right.

The other analogy I gave you before, if you were facing, you know, some major heart ailment, you would want the best open heart surgeon out there, not the best orthopedist.  And, again, not impugning the orthopedist.  It's just not what they do.  Okay?

So I will explore this a little bit.  As I said, I'll be in touch with Mr. Barket.

THE DEFENDANT:  Thank you.  Thank you very much.

MR. BARKET:  Sorry.  Can I --

THE COURT:  Yeah, go ahead.

MR. BARKET:  I hate to backtrack.  But back to the Wieder?  He's telling me that he'll cancel some things today and bring it here by 5:00.  The details of where he goes, does he come to the courtroom?

THE COURT:  He can -- I don't know.  Is he in a position to interact with people?  Has he been vaccinated?

MR. BARKET:  I don't know.  I assume he can get through the -- I had trouble this morning.  The machine wasn't

SEALED PROCEEDINGS

working correctly.

THE COURT:  Is that right?

MR. BARKET:  Several other people did too.  It kept telling me I had a fever.  Eventually I was cured in the five minutes I stood there.  So no, I'm assuming he can get into the courthouse.

THE COURT:  Okay.  So if he can get into the courthouse, then what he can do, I guess, is call chambers and we'll figure out a way -- maybe Christian can meet him in a socially distant way and retrieve the document.

MR. BARKET:  Okay.  Can I have a number?

THE COURT:  Just the number for chambers.  390-4145.

MR. BARKET:  One second.  (914)390 --

THE COURT:  4145.

MR. BARKET:  4145.  Okay.  Thank you.

One other backtrack, if you will.  I've been getting a series of texts from counsel from my office.  And I didn't hear it this way, but maybe I missed it, that when you were doing the colloquy of Mr. Tartaglione concerning the waiver and the potential conflicts, they were concerned that it sounded like you had made findings that we had engaged in misconduct.  I didn't hear that.  That's an assumption that perhaps somehow --

THE COURT:  The only finding I made was with respect to Mr. Wieder's deletion of the text, in my view creating an

SEALED PROCEEDINGS

actual conflict.  And I wasn't saying -- I wasn't offering an opinion on whether that was, you know, actual misconduct or not, but to me that's what created the actual conflict.

MR. BARKET:  That's how I accepted it.  But just to clarify.

THE COURT:  No, no.  I'm always happy to be called out on my misstatements.

All right.  So to learned counsel, I don't think I have a choice but to grant Mr. Tartaglione's request.

Please, Mr. Ricco.

MR. RICCO:  Your Honor, I agree with your Honor's conclusion.  We'll brief this issue.  However, Mr. Tartaglione mentioned something today that changes when that order will go into place.  And so I would ask that rather than us try to squeeze into chambers with Mr. Tartaglione present, I would ask that the government step out for a moment.  This has to do with continued funding and work that's ongoing in relation to this case.

THE COURT:  Okay.  Do you mind stepping out, government?

MS. FEINZIG:  Not at all.

(Government counsel left the courtroom.)

MS. STERNHEIM:  Judge, is my role concluded?

THE COURT:  I think it is, Ms. Sterhnheim.  Sorry.  Are you eager to get off the phone?

45

SEALED PROCEEDINGS

MS. STERNHEIM:  No, no, no.  I just wanted some closure, and I didn't want to -- just took this opportunity to request that now, because it appears that the proceeding concerning Curcio has concluded, and I just wanted the Court's decision with regard to that.

THE COURT:  So you have closure.  You also have the profound thanks of the Court for work that was way above and beyond the typical Curcio appointment.  And I really appreciate, Ms. Sterhnheim, and I know I speak for Mr. Tartaglione, all of your work in this case in representing him in this rather complicated Curcio matter.  So thank you, thank you, thank you.

MS. STERNHEIM:  Thank you, Judge.

THE COURT:  All right, Mr. Ricco.  And maybe, Mr. Ricco, if you want to get to the microphone so that way counsel on the phone can hear you.

MR. BARKET:  And he gets to take off his mask.

THE COURT:  Yeah.  Once you're in the bubble, that's a mask-free zone, Mr. Ricco.

MR. RICCO:  It's an echo chamber, too, Judge.

THE COURT:  It is that.

MR. RICCO:  Okay.  So it was good news to hear that Mr. Tartaglione would be willing to accept perhaps some other learned counsel based upon your Honor's interaction with our fellow defender, which is the protocol in our district.  I will

SEALED PROCEEDINGS

tell the court that I've certainly -- I'm a man of practice. If you think it's going to rain, take your raincoat.  Be prepared.

So this potentiality is something that was prepared for, has been discussed with the Federal Defender for quite some time, because to identify a person with the necessary skill set can come into this case without causing delay to Mr. Tartaglione, who is very desirous of getting to trial, really requires the finding of a small universe of talented and competent learned counsel who are available to do that.  So that process has already begun, and several different individuals have been identified.  At the end of the day it's your Honor's decision and, of course, the Federal Defender's decision.  But the Court should know that that process has gone forward.

Secondly, your Honor, this is an important issue, because the government -- at this point -- withdrawn.

Your Honor, this is an important issue, because at this point your Honor has authorized approximately $1.7 million towards the development of Mr. Tartaglione's defense.  With the removal of appointed counsel, there have been -- several of the mitigation specialists and other experts, who are aware of and have been following this process, have already indicated that they have no interest in proceeding in this kind of circumstance.  They are concerned with their professional

PAMELA GRIMALDI, CRR, CLR
914.390.4053

47

SEALED PROCEEDINGS

reputations and their ability to properly prepare for a capital trial.

So one of the things that will have to happen, and it will have to happen in this case, is that those attorneys that are coming in will have to assemble certain aspects of the team.  But I think that will be accomplished.  That's just timing.  The issue of timing is important for our discharge because of the continuity of counsel.  If at the end of the day Mr. Tartaglione decides, I don't want publicly funded counsel, then the protocols say that then in order for him to continue to receive these benefits of public funding, a proper application has to be made to the Court to ensure that what is really going on here is a true private retained situation that has the capability of the funding to accomplish the task at hand.

And so while we're all prepared to abide by the Court's order, we would ask that that order not be executed until such time as that there is -- until such time that there is either an appointment of learned counsel under 3005 or an application is made for public funding.

THE COURT:  Okay.  I understand.

MR. RICCO:  In the absence of that, Judge, I would ask -- leaving the case means that the core group, not just the lawyers, have also decided that they also want to exit the case.  So it creates a situation that, you know, a lawyer is

48

SEALED PROCEEDINGS

prepared to handle.  It happens in capital cases.  But it has to happen.  And what we don't want to have is any lapse in any aspect of a death-authorized case.

THE COURT:  So it seems to me that a couple things can be done here.  One is that I need to get on the phone with Mr. Patton ASAP and see who's available to jump on to this case in a way that does not delay it.  We do have motions that now are fully submitted and I think need to be resolved.  And so we can press ahead with the motions that have been filed.  And I think to avoid the issue about the funding, maybe -- there may be a way to thread the needle as follows:  Where I will hold off on issuing an order that relieve learned counsel representation officially in this case, but learned counsel, I think, need to just stand down out of respect to Mr. Tartaglione's wishes, so that you're not going to be doing any more work on the case, but you're not relieved.

It's not unlike a situation --

Mr. Barket, you may know this as well.

That in a typical case involving a CJA lawyer where there's a conflict that arises, like a personality conflict, so there's irreconcilable conflicts between lawyer and client, what I will often do is ask the outgoing lawyer to just hang on until a new lawyer is appointed, and then effect -- then issue an order saying, This person is relieved.  This person is appointed.

SEALED PROCEEDINGS

So Mr. Tartaglione, from your perspective, learned counsel won't be doing anything on the case, but there won't be any issue about you getting the funding to continue to do the capital work in this case. And then it gives me an opportunity to appoint new counsel so that your wish will be granted to the extent that learned counsel will no longer be doing any work on this case, but we'll do it in a way that doesn't disrupt the flow of funding for your defense.

THE DEFENDANT: But does --

THE COURT: I'm not trying to have a conversation with you. I'm just letting you know. You speak with counsel.

Wait for them to finish, Mr. Ricco.

MR. BARKET: I think I understand what the Court's saying, and that's fine. We actually have a status conference -- status call with the government -- I don't want to say the real government, but the people --

THE COURT: Not Curcio counsel.

MR. BARKET: I have to reacquaint myself -- with Ms. Comey and Mr. Swergold tomorrow afternoon. So that's -- and they wanted to wait until after the Court has ruled on all this. So, for example, that's a call we're going to handle on our own.

THE COURT: Exactly.

MR. BARKET: And that was one of Mr. Tartaglione's concerns.

PAMELA GRIMALDI, CRR, CLR
914.390.4053

SEALED PROCEEDINGS

THE COURT:  Yep.

MR. BARKET:  And he raised another one that I'll raise for him -- and I don't want the Court to assume that I'm endorsing it.  I'm actually not -- that he's worried that Mr. Ricco will pick the other five.

THE COURT:  No.  That's the Court's call.

Just so you know, the way it works, Mr. Tartaglione -- again, I'm not asking to you respond because you have a lawyer.  You can speak to your lawyer.  The Curcio thing is kind of unusual because in that situation I have to hear from you.  But going forward you should obviously speak through your lawyers.

THE DEFENDANT:  Okay.  Thank you.

THE COURT:  But the way it works is the decision to appoint counsel under the Criminal Justice Act, whether it's in a capital case or noncapital case, is solely the Court's call.

And in a capital case, the way it works in our district is that the judge that's assigned to a capital case consults with the head of the Federal Defender Service who helps oversee the Criminal Justice Act handled and all the sort of workings.  And I will tell you that, you know, Mr. Patton is very responsive and he really has his finger on the pulse of, you know, who's available and so on so forth, and I -- you know, I've been a criminal lawyer pretty much all of my adult life, so there's a very high chance I'm going to know the

SEALED PROCEEDINGS

lawyers quite well, and I really am going to do my best to pick somebody who's available, so we don't delay things, that I think would be a good fit to work with the Barket firm and to represent you, okay. It's not Mr. Ricco's call. It's not the call of any of learned counsel.

THE COURT: To the extent that they've alerted Mr. Patton to their impending -- well, being relieved from this case, that was actually responsible and, frankly, acted in your interests because it helps avoid delay.

THE DEFENDANT: Thank you, your Honor. Thank you very much.

MR. RICCO: Just so that --

THE COURT: Mr. Barket, did you want to say something?

MR. BARKET: I just wanted to say obviously we're available to help in that process if somebody wanted to speak with us about --

THE COURT: I'm going to -- as I said, I'm going to reach out to you and obviously try to facilitate getting this done as quickly as possible. I think you have to be part of this process.

MR. BARKET: Okay. Thank you.

MR. RICCO: So, Judge, certainly we are -- the appointed counsel in this case, and all of the experts in this case that have been appointed and the Court has endorsed in

52

SEALED PROCEEDINGS

this case have been made aware of this eventuality.  Some have decided to stay and others have not.  Those are their professional decisions to make.  With respect to us as appointed counsel, when we walk out of the door today, we will have officially stood down from our responsibility in this case.  And notwithstanding Mr. Tartaglione's understanding of capital representation, we have never stood down.  But we will do so now.  And it is -- and as the Court --

THE COURT:  I don't know why it's doing that.  We had a hearing yesterday and it didn't do that.

MR. RICCO:  How about that?  I turned it down a little bit.

THE COURT:  That sounds better.  Thank you.

MR. RICCO:  And, Judge, you know, listen, sometimes in life perspective is everything.  Reality is a different situation.  There's a tremendous responsibility for a case of this magnitude, the number of authorized cases for the death penalty, and also to accommodate a defendant who eagerly wants to get to trial.  That's a small universe of individuals who can parachute right in and meet the responsibility and expectations of the Court around that.  Also the budgetary issues and everything else.  And also the ability to assemble experts that have been identified and worked on this case.  That's going to be -- that's going to take an undertaking.  And the earlier they can get involved with that, the better for

SEALED PROCEEDINGS

Mr. Tartaglione.

THE COURT:  Okay.

MR. RICCO:  But it is encouraging to hear that he is willing to have other learned counsel appointed.  That certainly makes the five of us feel at ease.

Thank you.

THE COURT:  All right.  Thank you, Mr. Ricco.

So can we bring the government back in?  And I'm going to let -- I'm going to let them know that the upshot is is that learned counsel are going to stand down, eventually being relieved, I'm going to seek appointment of additional learned counsel.  I don't see there's any reason they can't be told that.

MR. BARKET:  One additional item, Judge.

THE COURT:  Please.

MR. BARKET:  I'm assuming this won't be a problem, but because it hasn't happened yet despite our requests... There was a series of motions that were supposed to be filed over the course of time, right.  We had sort of a schedule laid out informally.  And I've been asking for the work product from appointed counsel to see what it is that they've done, and they -- I don't want to characterize it in any way other than they said, Well, let's see what happens with the Curcio, in essence.  And maybe it's more subtle than that.

So at this point in time can the Court facilitate the

PAMELA GRIMALDI, CRR, CLR
914.390.4053

SEALED PROCEEDINGS

transfer of those motions, the work that's been done, drafts, completed motions, anything like that?  Because I will inform -- and if that could happen today, actually, because I have a call with the government tomorrow, I'd like -- I know they are going to want a schedule.  I know Mr. Tartaglione does.  I'd like to have some idea of what's been done and what still needs to be done.

THE COURT:  Okay.  Counsel?  You're getting a workout, Mr. Ricco.

MR. RICCO:  That's okay.  Judge, it's such a good feeling to be back in court, I'd get out of my seat 100 times if I could.

Judge, that issue is a little more complicated than the way in which Mr. Barket chooses to present it, but that's his style.

The bottom line, Judge, is that the file belongs to the client, not the lawyers.  We discussed the transition of our exit from the case.  There are hundreds, if not thousands of reports, notes, documents, et cetera, et cetera, and we will get those to the new learned counsel and/or Mr. Barket now that the waiver has been executed as soon as possible.  Today? That's impossible.

THE COURT:  All right.  But maybe just start with the motion papers.

MR. RICCO:  We could start anyplace, Judge.

SEALED PROCEEDINGS

THE COURT:  Can we prioritize those?

MR. RICCO:  As I've represented, the work in this case continued.

THE COURT:  No.  I understand.

MR. RICCO:  And that's a great benefit to Mr. Tartaglione and the Court.

THE COURT:  I don't doubt any of that for a minute. I think Mr. Barket's request is to -- he's obviously -- when he meets tomorrow with the prosecution team and not the Curcio team for the government, one of the things he wants to do is maybe set up a schedule for briefing of additional motions.

MR. BARKET:  Or at least have some idea of when that's going to happen.

THE COURT:  And I think that makes perfect sense. And so maybe if there's a way to prioritize that, that would be great.  And the rest of it you can work out with Mr. Barket as to when you can get the rest of the materials.

MR. RICCO:  And, Judge, we started that process.

THE COURT:  Okay.  All right.

MR. RICCO:  We asked all of the experts to get their notes together.  That process began months ago.

THE COURT:  Gotcha.  All right.

Then I think what might make sense, Mr. Barket, tell me if you disagree --

Well, tell the government they can come back in.

PAMELA GRIMALDI, CRR, CLR
914.390.4053

SEALED PROCEEDINGS

I think we should calendar the case for a status conference so that the prosecution case can be brought back into this. Maybe we'll have some progress to report on the appointment of new learned counsel, and then you and the government can by then maybe have some type of a briefing schedule on other motions that --

(Government counsel returned to the courtroom.)

MR. BARKET: Yeah. Absolutely, Judge. I was going to ask for that, as quickly as we can, not because speed should matter more than getting the work done, obviously, but I just want to be able to --

THE COURT: Yeah, I know. We've got to get the train on the tracks. I gotcha.

MR. BARKET: Get back to --

THE COURT: All right. So I don't know. Ms. Bordes is looking at the calendar here.

What does your last week of June look like, the week of June 28? Especially the first half. How about Tuesday the 29th?

MR. BARKET: One second. Sorry.

THE COURT: No problem.

MR. BARKET: Tuesday the 29th is fine with us.

THE COURT: Obviously we'll have to notify the prosecution team.

If you can do that, Ms. Feinzig, on your way out the

SEALED PROCEEDINGS

door as Curcio counsel for the government.

What time, Dawn, 10:00?

10:00. All right. So we know that works for the defense team. And Ms. Feinzig, if you could just let your colleagues know, and if that does not work, to let us know.

MS. FEINZIG: Yes, Judge. And that's for a conference?

THE COURT: Yes. For A status conference.

Are there any other issues?

Mr. Bachrach, you're raising your hand. Okay.

MR. BACHRACH: Thank your Honor. I've actually tried a case in one of these cubicles already.

THE COURT: So you're comfortable.

MR. BACHRACH: It's an interesting experience to be back inside of one again.

It's a very simple issue, your Honor.

THE COURT: Yeah. Please.

MR. BACHRACH: And the issue is that we'd like to request that a public order be docketed indicating the conclusion of these proceedings. I don't believe it would be appropriate to go into the details of the sealed proceedings as to what the various allegations were. I wouldn't want to prejudice anyone in that regard. But I think for appellate purposes there needs to be a placeholder on the docket so that if appellate counsel, God forbid, has to come in, they see, Oh,

SEALED PROCEEDINGS

there was a Curcio hearing.  It reached a conclusion.  The Curcio hearing had been -- had raised potential issues against Mr. Barket and the Barket firm, and that the Court concluded that Mr. Wieder had an actual conflict that required his disqualification in the case, but that with respect to all other members of the Barket law firm, the Court found the potential conflicts, if any, to be waivable.  No details beyond that.  But do I think that's necessary, because while your Honor is correct, absolutely, that Mr. Tartaglione cannot raise on appeal the waiver and the fact that he waived, the question of whether or not it was a waivable issue, that any of these conflicts were themselves waivable, can be raised.

So appellate counsel, and ultimately if it gets that far, 2255 counsel, needs that placeholder to know what happened and where did -- you know, what concluded, and also so that the public record, since the public has a right -- there is a right to public access, so the public isn't misled into believing that there was a Curcio hearing against appointed counsel.  Because at the end of the day, we spent a year and a half, two years, and now there is no public record that there had been a request to relieve appointed counsel for different reasons than were the subject of the Curcio hearing.  And so I think there needs to be some clarity as well, your Honor.  But, again, without details that would in any way reveal attorney-client privileges.

SEALED PROCEEDINGS

THE COURT:  Okay.  Stay right there for a sec.

Mr. Barket, you can respond.

MR. BARKET:  I don't know.  I can't say that I love the idea, just because it seems to be walking into a minefield that I'm not sure we need to walk into.  There's not --

THE COURT:  I think we're walking out of the minefield.

MR. BARKET:  Walking into another smaller one.

But the wording of it -- Mr. Bachrach was kind of detailing what he wanted to have happen.

THE COURT:  Yes.

MR. BARKET:  All of this has been sealed and will remain so.  There's an adequate appellate record for it.  We don't think we need -- not that we would respond to it, but we certainly don't need inquiries into, Oh, what happened?  What was Mr. Wieder -- speculation.  And it just can't -- I just don't think it can go anywhere good for anybody.

THE COURT:  Let me say this.  I was trying to think, you know, of -- I've done a fair number of Curcio proceedings.  The proceedings themselves are often sealed because they get into representation issues.  But an order is usually not sealed.  And there is a First Amendment issue here.  And the fact that somebody, you know, might have their feelings bruised -- and I'm not referring to you -- is not, frankly, a compelling interest, you know, from the First Amendment's

SEALED PROCEEDINGS

perspective. And there is, obviously, a fair amount of public interest in the case. Shoot, 60 Minutes did a story about it.

So Mr. Bachrach, can you draft a proposed order, send it to Mr. Barket and to the government, and then they can weigh in on how they want it to be reworded. I think conceptually, I don't think you're wrong. I feel a little bit more strongly about the First Amendment aspect of this than I do appellate counsel, because Mr. Barket's right, there is a record, and any appellate counsel can get access to the record if they wanted to challenge that legal point about, you know, waivability.

So if you could -- you know, I know you're supposed to stand down. But this is more about completing this record, if you could do that and, as I said, provide a draft to the government and to Mr. Barket's firm.

MR. BACHRACH: Yes, of course, your Honor. And just for clarification, by "the government," you are still referring to --

THE COURT: Curcio counsel.

MR. BACHRACH: Thank you very much, your Honor. That's fine. Absolutely, your Honor, I can do it.

THE COURT: I was pointing to them, but the record doesn't reflect that I was pointing to them.

MR. BACHRACH: Thank your Honor. I can do that, yes.

THE COURT: Okay. Thank you very much.

All right. Anything else?

SEALED PROCEEDINGS

MS. FEINZIG:  Your Honor, just a small matter, but along the same lines.  Do we have permission to inform the trial team which lawyers are remaining on the --

THE COURT:  I don't see why not.

Anybody have a different view?

Mr. Barket's going to be meeting with the trial team tomorrow anyway.  He's going to be telling them that.

MR. BARKET:  Not meeting with.  A call.

THE COURT:  Meeting --

MR. BARKET:  Hopefully we'll get back to meetings soon enough.

THE COURT:  A pandemic meeting.

MR. BARKET:  Right.

THE COURT:  All right.  And then there are motions pending, and time is excluded.  But any objection to excluding time from now until June 29?

MR. BARKET:  No.

THE COURT:  All right.  Then I'll respectfully exclude time from today until June 29.  I've already found this to be a complex case.  As I said, there are motions pending.  But independently, I think it's in the interests of justice to exclude time to allow Mr. Barket to meet with the government's trial team to work out a schedule for briefing of additional motions, and for the Court to undertake efforts to see if there's a way to appoint learned counsel as expeditiously as

SEALED PROCEEDINGS

possible. I find that the interests of justice in this exclusion outweigh the public's and Mr. Tartaglione's interests in a speedy trial. That finding is made pursuant to 18 U.S.C. § 3161(h)(7)(A).

Anything else, Ms. Feinzig?

MS. FEINZIG: Nothing. Thank your Honor.

THE COURT: Mr. Barket?

MR. BARKET: No, your Honor. Thank you.

THE COURT: Learned counsel?

MR. RICCO: No, sir.

THE COURT: Let me say a couple things. Thanks to government Curcio counsel. It's a thankless task, but it's an extremely important one, so I want to thank you both for your patience and your contributions here.

And to learned counsel, I know that there have been some issues with the defense team. But I will say you have the profound thanks from the Court for your work in this case. You know I meant what I said to Mr. Tartaglione. I have the highest regard for each one of you, for counsel on the phone. I know if I were charged with capital crimes, I would be oh, so comfortable having you represent me or anybody in my family. I think you are the topnotch lawyers in the field of criminal law and capital punishment. I know you've worked extremely hard to protect Mr. Tartaglione's interests. And I look forward to having you represent clients in other cases.

SEALED PROCEEDINGS

Please stay healthy.  And with that we are adjourned.

CERTIFICATE:  I hereby certify that the foregoing is a true and accurate transcript, to the best of my skill and ability, from my stenographic notes of this proceeding.

Pamela L. Grimaldi, RPR, CRR, CLR
Official Court Reporter, USDC, SDNY