

# BARKETEPSTEIN
### BARKET EPSTEIN KEARON ALDEA & LoTURCO, LLP

666 OLD COUNTRY ROAD, SUITE 700
GARDEN CITY, NEW YORK 11530
516.745.1500 • [F] 516.745.1245
WWW.BARKETEPSTEIN.COM

ADDITIONAL OFFICES:
EMPIRE STATE BUILDING, NY, NEW YORK
HUNTINGTON, NEW YORK
ALL MAIL TO GARDEN CITY ADDRESS

January 16, 2020

**BY HAND**

**TO BE FILED EX PARTE AND UNDER SEAL**

The Honorable Kenneth M. Karas
United States District Court Judge
United States District Court for
the Southern District of New York
The Hon. Charles L. Brieant Jr.
Federal Building and United States Courthouse
300 Quarropas Street
White Plains, New York 10601

Re:     *United States v. Tartaglione*;
        No. 7:16-cr-00832 (KMK).

Your Honor,

I write in response to the Court's directive to articulate our position about what portions of *Curcio* Counsel's report may be provided to the Government.[1]  On behalf of my client, Nicholas Tartaglione, whom I have consulted on this matter, I cannot join appointed counsel in their position that the report, in its present form and in its entirety, should be disclosed to the Government. I oppose disclosing the report in its present form – and particularly the sections of the report pertaining to the Epstein note – for three broad reasons, which are further detailed below: (1) the report contains significant factual errors, which form the basis for, and taint, the report's conclusions; (2) the report contains, and its conclusions are based upon, incorrect statements of law and clearly inapplicable rules or regulations; and (3) the disclosure of the portions of the report pertaining to the Epstein note would prejudice Mr. Tartaglione.

---

[1] To be clear, we write now to answer the Court's specific question, and will write to address the report and its conclusions in greater detail once the Court rules on this preliminary question and once a full record of the alleged potential or actual conflicts is developed.

1

While I agree that the Government has an interest in protecting the validity of any conviction it obtains in this case, there is no justification for furnishing the Government with a report premised on clear factual and legal errors, which form the foundational underpinnings for its conclusions of the existence of "areas of conflict."[2]  Indeed, prior to this Court's determination that there is an actual or potential conflict in this case – which should not be made on the basis of the report in its present form, and prior to full briefing by counsel -- disclosure of the report to the Government simply cannot be justified, as it would result in the disclosure of confidential and privileged information, against Mr. Tartaglione's express direction and, potentially, to his detriment, while serving no countervailing interest.[3]

I.     THE *CURCIO* REPORT CONTAINS SIGNIFICANT FACTUAL ERRORS THAT UNDERMINE THE VALIDITY OF ITS CONCLUSIONS AND MILITATE AGAINST ITS DISCLOSURE TO THE GOVERNMENT IN THIS FORM.

*Curcio* counsel's report contains several significant misstatements of fact, specifically discussed and detailed below.  Because the report's conclusions are, then, premised on these inaccurate facts, they too are incorrect.  Prior to any disclosure to the Government, these factual errors – and the conclusions based upon them – must be corrected.

A.     THE REPORT CONTAINS SIGNIFICANT MISSTATEMENTS OF FACT ABOUT THE CIRCUMSTANCES UNDERLYING THE DISCOVERY, REMOVAL, AND NON-DISCLOSURE OF THE EPSTEIN NOTE

In her report, *Curcio* counsel states, as fact, that: (1) "during a legal conference at the MCC, Mr. Tartaglione told Attorney Barket that he had found a handwritten note *in a book belonging to Epstein* in the cell they shared prior to Epstein's alleged suicide attempt" (*Curcio* Report at 7, emphasis added); (2) that the Epstein note was removed "from a scene under investigation" (*Curcio* Report at 8); and (3) that I thereafter took measures to "conceal" the note.   These "facts" are then used by *Curcio* counsel, in a series of escalating inferences, to draw conclusions that I engaged in improper conduct, that I had improper motives, and that this exposes me to possible ethical, civil, or criminal consequences that create potential or actual conflicts between me and my client.

Specifically, based on her statement that Mr. Tartaglione told me that he had found the Epstein note in "a book belonging to Epstein" (*Curcio* Report at 7), *Curcio* counsel concludes that (a) the note "did not belong to Mr. Tartaglione" (*id.*), (b) the note was, therefore, contraband, as it was not "received

---

[2]  The attached report of Michael Ross (attached as Exhibit A) underscores this point.  Addressing the same issues as *Curcio* counsel, but based upon verifiably correct facts, the current MCC rules and regulations, and well-settled interpretations of the relevant Rules of Professional Conduct, Mr. Ross reaches opposite conclusions.  This is not just a common disagreement between experts.  Where the correct facts and law are unassailable, all counsel must base their conclusions and arguments upon them.

[3]  While the Government is generally involved in *Curcio* issues from their inception, as they are usually the party that brings the issue to the Court's attention and requests a hearing, the posture of this case – where the allegation of conflict is levied by co-counsel – appears to be unprecedented.

through approved channels" (*id.* at 8), (c) since Mr. Tartaglione "told" me that he found the note in Epstein's book, I knew or should have known, that removal of the note from MCC was improper,[4] and (c) my involvement in the note's improper removal creates a conflict, as it makes me "an unsworn witness to events material to evidence to be presented at the penalty phase concerning prison adjustment" and "exposes [me to professional disciplinary proceedings, administrative and criminal investigations, and wrongful death claims" (*id.* at 9-10).

Similarly, *Curcio* counsel's factual claim that the note was removed "from a scene under investigation" (*Curcio* Report at 8), further buttresses her assertion that its removal was improper, and, more significantly underlies her assumptions that, (a) but for its removal, the note would have been found by BOP staff, (b) that it constituted "written ... behavior suggestive of suicide" that "bear[s] directly on decisions whether to return [Epstein] from suicide watch or place him alone in a cell" (*id.* at 9, citing BOP Suicide Prevention Program Statement, Number 5324.08, at 10), and (c) that BOP medical staff and supervisory officers "will likely claim that had they been in possession of the Note, it would have been relevant to their assessment of Epstein and may have prevented his death" (*Curcio* Report at 9).

Finally, *Curcio* counsel's repeated factual recitation of my supposed attempts to "conceal" the note – first from BOP staff, then from *Curcio* counsel (*Curcio* report at 9, 12) – not only buttresses her conclusion of wrongful conduct by suggesting the existence of an improper motive, but also directly forms the basis for her conclusion that my "decisions and actions conflict with interests of a defendant facing the death penalty" and "diverge from and can compromise legitimate interests of a death-authorized defendant" (*Curcio* Report at 9).

But because all three of the key factual assertions underlying *Curcio* counsel's discussion of the Epstein note are flatly incorrect, the series of escalating conclusions she premises upon these factual errors are fatally compromised, and collapse like a house of cards. The relevant, and correct, facts underlying the discovery, removal, and non-disclosure of the Epstein note are as follows:

Jeffrey Epstein was arrested on July 6, 2019, and, within a few days, was placed in Mr. Tartaglione's cell. On July 23, at approximately 1:30 a.m., Epstein tried to hang himself, but the noose fashioned from bedsheets apparently broke and he fell. Mr. Tartaglione, who had been sleeping, woke up, and found Epstein unresponsive but with a noose around his neck.  Mr. Tartaglione immediately alerted BOP personnel, who removed Epstein and Mr. Tartaglione from the cell. Mr. Tartaglione was interviewed immediately thereafter, and told BOP personnel some of what he had observed.  BOP personnel then searched the cell and, I believe, took photographs of it.[5]  During this search and investigation, Mr. Tartaglione was kept out of the cell for several hours. At some point later that day,

---

[4] *Curcio* counsel does not directly state this proposition, but it is suggested by her analysis.

[5] The guards were observed entering the cell with hand held cameras, something I believe would have been depicted had the surveillance video been preserved. The MCC, however, has denied that any hand held cameras were used.

Mr. Tartaglione was allowed to return to the cell. He stayed there alone for a few days, and then was given a new cellmate. Mr. Tartaglione discovered the note *long after the guards had completed their search of the cell*, days after he had been returned to it, and after the BOP had already placed Epstein on suicide watch. Notably, BOP personnel *never* returned to search the cell at any time thereafter – either before or after Epstein's suicide.

On July 24th at about 10:45 p.m., I received several messages from NBC news channel 4 saying that they were going to run a story based on information from "law enforcement sources" that Mr. Tartaglione had attacked Epstein. I told them that the story was false, but declined to provide any details about what took place. By the morning of July 25, this story was headline news, and was being widely reported on TV and in print. I had already discussed the matter with Mr. Tartaglione, and I believed the story to be false and very damaging to my client. I decided to refute the account without revealing the details I learned from Mr. Tartaglione, and to use the opportunity to bring public attention to the ongoing terrible conditions at MCC. Learned Counsel strongly disagreed with my decision, but I concluded that it was in Mr. Tartaglione's best interest to respond to the stories in the press which were going to run with or without my comments.

On July 27, 2019, at 8:00 a.m., during a visit at MCC, Mr. Tartaglione told me, "Epstein left me a note." When I inquired further, he described it as "not really a suicide note" but a note that "talks about suicide," and said he found it in "one of *my* books." But Mr. Tartaglione forgot to bring it down from his cell to the legal visiting area. Mr. Tartaglione expressed to me that he believed Epstein had written the note before he attempted suicide on July 23, and left it for Mr. Tartaglione. I believed that this assumption would have been reasonable under the circumstances Mr. Tartaglione described to me, because Epstein placed the note *inside Mr. Tartaglione's book* – a place he would have expected Mr. Tartaglione, rather than BOP personnel, to find it – and, presumably, Epstein did not expect to survive the attempt. However, under the circumstances – and given the timing of the note's discovery in the midst of widely-reported allegations that Mr. Tartaglione had assaulted Epstein – I also had serious concerns about the note's authenticity. Thus, while I believed that the note might provide evidence to counter these serious allegations against Mr. Tartaglione, and might therefore be beneficial to him, I was also afraid that the note was a forgery. Under these circumstances, I determined that I needed to see the note to authenticate it.

Accordingly, during our meeting on July 27, Mr. Tartaglione and I asked the guards to allow Mr. Tartaglione to go upstairs and get it, but they denied the request. So I told Mr. Tartaglione to give it to the next lawyer who visited him. Once I left the jail, I texted John Weider and asked him to call me. I knew that Weider was planning to visit Mr. Tartaglione later that day, and so I told Weider to expect Mr. Tartaglione to give him a document; I don't recall if I told him what it was, but I probably did. Whether the note was genuine or not, I believed that it was important to safeguard it[6] and not yet disclose it to

---

[6] Indeed, I was concerned that if the note remained at MCC among Nick's legal paperwork, it might be lost or discarded by staff at the jail. Just a few days earlier, I had alerted the Court that important legal work (a timeline based on the discovery) had been lost when Nick was moved to the SHU. Further, at that same Court appearance,

authorities – if genuine, it would be powerful evidence that could be used to clear Mr. Tartaglione of widely-spread allegations that Epstein's injuries were a product of Mr. Tartaglione's assault rather than a suicide attempt; and if a forgery, its disclosure to authorities investigating Epstein's injuries would not only subject him to additional criminal charges, but would be damning evidence at the penalty phase of his capital trial.

Later that day, Weider sent me a photograph of the note, and I forwarded a copy to co-counsel, Aida Leisenring. We immediately began trying to authenticate it, conducting research and, over the next two days, enlisting the assistance of investigators to attempt to locate documents containing Epstein's handwriting. In that regard on July 28th I contacted William Flanagan and on July 29th I contacted Jay Salpeter, both retired police offices and private investigators, with whom I had worked on a number of matters over the years. I asked each of them to try to locate a sample of Epstein's handwriting. Neither was able to do so (attached as Exhibit "B" and "C" respectively are their affidavits).[7]

On July 29, at approximately 6 p.m., Ms. Leisenring and I called Tony Ricco and advised him of the note, and discussed what to do with it. Later that evening, Ms. Leisenring spoke to Mr. Ricco again, and read him the note over the phone. On July 30, Mr. Ricco called me and we spoke for over thirty minutes during two calls. We again discussed the note and the circumstances of how it was found in detail. Mr. Ricco never advised me to disclose the note and, among other comments and instructions, raised his own concerns about its authenticity.

From August 2 to August 6, Ms. Leisenring and I were in California with the team at a death-penalty conference. The note was not discussed. On August 9, we learned that Mr. Tartaglione had been cleared in the investigation into Epstein's injuries (*See* Exhibit D, email from Adam Johnson in reply to an inquiry I made about the status of the investigation). On the morning of August 10th, Epstein – who had been on suicide watch from July 23 until July 29 – was found dead in his cell. At that time, an investigation into Epstein's suicide began.

Thus, the three key "facts" underlying all of *Curcio* counsel's conclusions relating to the Epstein note are simply wrong. First, Mr. Tartaglione found the note, and told me he found the note, in *his own* book – not in Epstein's – under circumstances where he reasonably believed it had been left for him by Epstein. Second, the note was not removed "from a scene under investigation" (*Curcio* Report at 8); rather, at the time the note was found by Mr. Tartaglione and removed from MCC, the investigation of the "scene" had been over for four days. In fact, that cell was never searched again. Third, I never

---

I told the Court that Nick was threatened by a guard and told, in sum and substance, that things will get worse if his lawyer keeps complaining about the jail conditions. Then, on July 24th I was told that "law enforcement" sources, presumably officials from the MCC, had leaked the false accusation that Nick assaulted Epstein.

[7] Since that time, but well after Epstein's death, I became confident that the note is authentic and that it was written by Jeffery Epstein. Ms. Leisenring has reached the same conclusion, but came to that belief only in the last two weeks.

attempted to "conceal" the note from BOP personnel, or from *Curcio* counsel. When I advised Mr. Tartaglione to give the note to the next attorney that visited him, I had not yet seen it, but believed, based on Mr. Tartaglione's description of its contents, that it would need to be safeguarded and investigated. At no point thereafter did I "conceal" the note from anyone – I simply did not take the affirmative step of *disclosing* it, under circumstances where I had no legal obligation whatsoever to do so (*see* Ross Report at fn. 21), and where I believed it was in the best interests of my client not to disclose it.[8] Indeed, the suggestion that I "concealed" the note from other counsel is perplexing under the circumstances. While there is no doubt that I was cautious about its dissemination because it was a highly confidential item, I nevertheless did disclose and discuss the note with Mr. Ricco less than two days after I learned of it, and I similarly disclosed and discussed the note with *Curcio* counsel upon her appointment and the expansion of the inquiry.[9]

While I also have other strong objections to the disclosure of the Epstein note to the Government on ethical and legal grounds (*see infra, Points II and III*), the existence of these serious factual errors in the report, and their tremendous impact on the validity of *Curcio* counsel's conclusions, is, even standing alone, sufficient reason not to disclose this portion of the report, in its present form, to the Government.

**B.    THE REPORT CONTAINS SIGNIFICANT MISSTATEMENTS OF FACT ABOUT THE CIRCUMSTANCES RELATING TO THE CONTRABAND TELEPHONE**

*Curcio* counsel identifies, as an "area of conflict" what she perceives to be an incomplete disclosure by me, Ms. Leisenring, and/or Mr. Weider of "critical information from [our] cellular phones" relating to communications with any contraband cell phone(s) possessed by Mr. Tartaglione (*Curcio* Report at 10-11). In this regard, *Curcio* counsel suggests that I revealed confidential information during the July 22, 2019 court appearance by disclosing the fact the Mr. Tartaglione used the contraband cell phone to text members of the defense team, despite the fact that Government believed at that time that the phone was not capable of texting. She also seems to imply that the existence of text messages from Mr. Tartaglione to me, Ms. Leisenring, and Mr. Weider supports the conclusion that Mr. Tartaglione may have possessed a *second* contraband phone – other than the one recovered from him by BOP on July 3, 2019 – because the Government represented in July that the recovered phone was a "mini-cellphone that … *does not have the ability to send or receive text or other written messages*" and because neither my phone number nor Ms. Leisenring's appear on the log of the call history extracted

---

[8] Underlying the concealment argument is *Curcio* counsel's suggestion that if the note had remained at the jail, it would have been found by jail personnel. But this is refuted by the simple fact that no one at the jail searched the cell between the time Nick gave the note to Mr. Weider and the date of Epstein's suicide weeks later. Had Nick kept the note exactly where Epstein left it, it still would have remained "concealed" from jail officials.

[9] Notably, the suggestion that the "conceal[ment]" of the note from BOP personnel potentially subjects me to ethical, civil, or criminal liability, and thereby creates a conflict of interest – because had BOP known about the note, they might not have taken Epstein off suicide watch and might, thereby, have averted his death – is an argument that applies equally to Tony Ricco and any other member of the defense team who learned of the note prior to Epstein's suicide, and did not alert BOP. If this is a conflict, then we are all conflicted counsel.

from the seized phone (*Curcio* Report at 10, emphasis in original). While *Curcio* counsel does not elaborate on the specific nature of any potential conflict that might be implicated, she concludes that disclosure of all information regarding the contraband phone(s) to learned counsel is essential to permit him to prepare for the penalty phase by defending against the Government's presentation of aggravating evidence (*Curcio* Report at 10).

She also states that Mr. Weider's text communications via the contraband cellphone "make him a potential witness during the penalty phase and in connection with ongoing BOP and DOJ investigations, and a potential subject of disciplinary proceedings" and that his "participation in removal of the Epstein Note heightens the need for review of his text communications with Mr. Tartaglione to assess their bearing on the penalty phase" for various reasons, including that these texts might "contain information related to Epstein" (*Curcio* Report at 11).

*Curcio* counsel's analysis of this issue is premised on several serious factual errors. First, *Curcio* counsel's belief that the confiscated phone was either incapable of texting, or that but for my disclosures and assertion that the texts were privileged, the Government would not have learned of its texting capabilities, is simply incorrect. The Government had the phone and the ability to obtain the phone's records, which would have revealed data transmissions as well as phone calls. It was my judgment that risk of the Government obtaining the privileged communications greatly outweighed the hope that they would never discover that the phone was capable of texting. Whatever information the Government had received in July about the texting-capacity of the contraband phone recovered from Mr. Tartaglione, the objectively verifiable facts disclosed to *Curcio* counsel by myself and Ms. Leisenring – and, presumably, by *Curcio* counsel's conversations with Mr. Tartaglione – was that the phone could be used, and was used, to text. In this regard, all of the text messages sent by Mr. Tartaglione to both myself and Ms. Leisenring came from the phone number of the confiscated contraband phone recovered from Mr. Tartaglione, and were sent during the time he possessed that phone. So there is no conflict engendered by my on-the-record "disclosures" in court that Mr. Tartaglione had sent texts.[10] It was a strategic decision and in my view the right one.

Second, *Curcio* counsel's statement about what information she had, and had not, received in response to her request for information on the texts is wholly inaccurate. In this regard, while *Curcio* counsel states that I told her that I believed that I "had not received any text communications via the contraband cellphone" this is untrue; in response to *Curcio* counsel's inquiry, Ms. Leisenring and I sent her an email outlining the communications, and explaining that I had received a single text from Mr. Tartaglione and that I had briefly responded (*see* Exhibit F). Conversely, while *Curcio* counsel reports being provided with copies of screen shots of texts from Mr. Tartaglione to Ms. Leisenring, this is also untrue. We declined to provide those for the reasons stated in the same email. *Curcio* counsel's conclusions about the existence of possible conflicts due to incomplete disclosure are seriously undermined when her report reveals her lack of knowledge of the materials in her possession.

---

[10] Recently, the Government has indicated that the BOP has forensic reports from the phone and its SIM card (*see* an email attached as exhibit "E" from Jason Swergold).

Third, *Curcio* counsel's conclusion that the text messages between Mr. Weider and Mr. Tartaglione via the contraband cell phone may contain references to Mr. Epstein, and thus create heightened concern for conflict, is based on a fundamental factual impossibility: these texts could not possibly contain any reference to Mr. Epstein because the contraband phone was seized, and Mr. Tartaglione was placed in SHU, *before* Mr. Epstein was even arrested.

Thus, while I do not object conceptually to the disclosure to the Government of the portions of a report by *Curcio* counsel pertaining to the contraband cellphone, as, indeed, the Government already has all the substantive information concerning the phone, I do object to the disclosure of *this report*, which is premised on significant and verifiable misstatements of fact.

## II.      THE *CURCIO* REPORT CONTAINS SIGNIFICANT ERRORS OF LAW THAT UNDERMINE THE VALIDITY OF ITS CONCLUSIONS AND MILITATE AGAINST ITS DISCLOSURE TO THE GOVERNMENT IN THIS FORM.

In addition to its factual errors, the *Curcio* report is also tainted by significant misstatements of governing law, which further undermine the validity and reliability of its conclusions, and further militate against its disclosure to the Government in this form.

## A.      IN CONCLUDING THAT THE EPSTEIN NOTE WAS "CONTRABAND" THE REPORT RELIES ON AN OUTDATED AND INAPPLICABLE REGULATION FOR THE SPRINGFIELD MISSOURI MEDICAL FACILITY, RATHER THAN THE CURRENT REGULATIONS OF THE MCC.

Key to *Curcio* counsel's conclusions that the Epstein note "invites a serious potential for conflict between client and counsel" and is the "crux of concern regarding conflict" (*Curcio* Report at 8-9, 10) is her assertion that "according to BOP Guidelines, that the Epstein Note qualifies as contraband" (*Curcio* Report at 8). Problematically, however, the definition of "contraband" provided in the report cites to a segment of a regulation from an outdated handbook for the medical facility in Springfield, Missouri (*id.*, citing https://www.bop.gov/locations/institutions/spg/SPG_aohandbook.pdf, 2012 edition). The current edition is at https://www.bop.gov/locations/institutions/spg/spg_ao_handbook050917.pdf, and became effective in 2017. Notably, the current edition *removed* the definition of contraband cited by *Curcio* counsel. Neither version, however, applies to the MCC in 2019.

As carefully detailed in the annexed Report of Michael Ross, and directly contrary to *Curcio* counsel's assertion, the outdated Missouri handbook cited by *Curcio* counsel does not constitute or contain any "BOP Guidelines" – to the contrary, it specifically states in its introduction that the handbook "is *not* a specific guide to the detailed policies of the Bureau" (*See* Ross Report at 12, citing Handbook at p.1, emphasis added). Nor is the Missouri handbook applicable to the MCC, which publishes its own handbook of rules for inmates housed at its facility (*See* Ross Report at 11, citing MCC

8

Manual, at https://www.bop.gov/locations/institutions/nym_aohandbook.pdf).[11] Notably, neither the applicable BOP Regulations nor the MCC handbook contain the definition of "contraband" cited by *Curcio* counsel in her report, and, indeed, as explained in the annexed report of Michael Ross, pursuant to the applicable rules and regulations, the Epstein Note was not contraband  (Ross Report at 9-11).

With this glaring misstatement of law forming the foundation of its conclusions regarding the potential conflicts engendered by the Epstein note, the Report, in its present form, should not be disclosed to the Government.

**B.     IN CONCLUDING THAT AN AREA OF CONFLICT IS CREATED BY RETAINED COUNSEL'S ABIDING BY MR. TARTAGLIONE'S INSTRUCTIONS TO NOT DISCLOSE CERTAIN INFORMATION TO CO-COUNSEL, THE *CURCIO* REPORT RELIES ON A MISSTATEMENT OF RULE 1.6**

*Curcio* counsel asserts that the "[d]efense of Mr. Tartaglione is compromised when Attorney Barket justifies decisions by asserting that he is following the wishes of Mr. Tartaglione in compliance with ethical rules" (*Curcio* Report at 12).  According to the *Curcio* report, my "claim of compliance with ethical rules should not shield [me] from disclosure of information requested by Learned Counsel nor should it support an attorney-client privilege for the Barket Firm separate and distinct from Learned Counsel in the joint representation of a single capital defendant" (*id.* at 12-13).  *Curcio* counsel's conclusion in this regard is premised on her assertion – unsupported by any authority or case law – that "Rule 1.6 of the New York Rules of Professional Conduct does not apply to attorneys on the same defense team" (*Curcio* Report at 13).  The *Curcio* report's understanding of Rule 1.6 is, simply, wrong.

Contrary to the *Curcio* report's statement of the law, Rule 1.6 contains no limitation or exception for "attorneys on the same defense team" and explicitly prohibits a lawyer from knowingly revealing "information that the client has requested be kept confidential" unless disclosure is required by the Rules, some other law, or court order (*see* Rule 1.6).  Here, given Mr. Tartaglione's explicit directive that certain confidential information not be disclosed to Learned Counsel, I am ethically bound to follow his wishes.

*Curcio* counsel's reasoning suggests that she believes that Learned Counsel is necessarily exempted from the rule pursuant to Rule 1.6(a)(2), which authorizes disclosure where it is "impliedly authorized to advance the best interests of the client *and* is either reasonable under the circumstances or customary in the professional community" (emphasis added).  According to the *Curcio* Report's reasoning, this exception would be satisfied here because sharing information with Learned Counsel is in the best interest of Mr. Tartaglione –indeed, a failure to do so "diverge[s] from and can compromise legitimate interests of a death-authorized defendant" (*Curcio* Report at 12) – and such cooperation of

---

[11] Indeed, it is curious that *Curcio* counsel did not find the MCC manual, as it is located on the same main bop.gov website, under the list of "locations" and then by selecting "New York MCC" rather than "Springfield MCFP" from the list provided.

co-counsel, particularly in a capital case, is both reasonable and customary in the community (*id.* at 13, explaining obligations and responsibilities of capital counsel).

However, this reasoning is premised on a fundamental oversight by *Curcio* counsel: disclosure cannot be "impliedly authorized" where it has been *explicitly forbidden* as a result of the client's specific request that it be kept confidential. This common sense principle is not just evident from the plain language of the Rule, but also from other authorities and comments interpreting it and analogous provisions (*see* Ross Report at 16-20, collecting and discussing authorities). Indeed, Comment 5 to Rule 1.6 clearly articulates that even in circumstances where lawyers can share client information with each other as a matter of practice –such as when they are part of one firm, equally bound by privilege and confidentiality – they may not do so if the "client has instructed that particular information be confined to specified lawyers." This proposition is equally applicable here, and directly contradicts the *Curcio* Report's assertion that the sharing of a "single attorney-client privilege" by two attorneys – which occurs when lawyers are on the same defense team, just as it does when they are in the same law firm – would obviate the applicability of the Rule.

Thus, because this portion of the report is premised on a significant error of law, it should not be disclosed to the Government in its present form.[12]

**C.    AT ITS CORE, THE REPORT IS PREMISED ON A FUNDAMENTAL MISUNDERSTANDING OF THE ROLE AND RIGHT OF MR. TARTAGLIONE'S RETAINED COUNSEL TO MAKE STRATEGIC DECISIONS ON HIS BEHALF, AND IMPROPERLY FINDS "CONFLICT" IN EVERY STRATEGY WITH WHICH APPOINTED COUNSEL DISAGREES.**

The Report at its foundation misunderstands the role of Mr. Tartaglione's counsel of choice and thereby converts sound strategic decisions (which should not be shared with anyone, particularly the Government) into "conflicts" simply because the strategy is not shared by appointed counsel. Much of the report criticizes me, Mr. Tartaglione's retained counsel, for making strategic choices, and because they are different from the choices Learned Counsel advised, structures these decisions as conflicts.

For example, the report describes certain statements I made to the media, and in conclusory fashion asserts that the statements conflict with Mr. Tartaglione's interests (*Curcio* Report at 12, 6-7). However, it is beyond cavil that pursuant to Rule 1.6(a)(2), I had both express and implied authority to

---

[12] Additionally, it should be noted that the report contains numerous statements attributed to Nick concerning the Epstein note which were initially made to me, then shared with Learned Counsel (who in turn apparently shared them with all appointed counsel, resource counsel, and others), and, ultimately with *Curcio* Counsel, under the *explicit understanding* that those statements were protected by Rule 1.6. Nonetheless, *Curcio* Counsel shared them with the Court, and now appointed counsel is advocating that they be distributed to the Government. Nick strongly objects to this. If some version of the report is ultimately shared with the Government, we would urge the construction of a "hypothetical" that provides the Government with the facts necessary to participate meaningfully in any hearing, but still protects the privileged statements.

disclose to the press that Mr. Tartaglione possessed a great deal of information about the death of Mr. Epstein, and to use the press to advance Mr. Tartaglione's interests (*see* full discussion in Ross Report at 5-8). In this regard, the *Curcio* report's suggestion that my statements to the press somehow create a conflict between me and Mr. Tartaglione because "imbedded in these statements is information concerning [the Epstein note]" is simply puzzling. My statement that "Mr. Tartaglione knows a heck of a lot about what went on" – highlighted by *Curcio* counsel as implicating the Epstein note – does no such thing. Indeed, the very next quoted line explains that this knowledge is derived from the fact that Mr. Tartaglione "was there during the first attempt and he was there when he actually killed himself – he just wasn't in the same cell" (*see Curcio* Report at 6, citing article). So too, my statement that "the correction officers know [Mr. Tartaglione] has information potentially very damaging to the very people now charged with guarding him or their coworkers" (*see id.*, citing article) makes no hint or allusion to the existence, or content, of the Epstein note. Indeed, it too is informed by the context of the line above it, stating that Mr. Tartaglione's basis of knowledge is "the attempted suicide to which he was witness," and his direct knowledge "about how the facility is run and the conditions under which the inmates are forced to live." (*id.*).

Instead of being buttressed upon any reasoned analysis of Rules 1.6, 3.6, or the advocate-witness rule, the report's conclusions about the existence of a possible conflict as a result of my communications with the media are, as with other identified areas of conflict, actually premised on the *Curcio* counsel's concern that my strategic decisions conflicted with the opinion and advice of appointed counsel.

The report lays bare the true source of its concern on page 12, where it lists the various "obstacles" to effective representation, and thereby reveals the inherent misunderstanding that *Curcio*, like other appointed counsel, has with respect to retained counsel's role. Contrary to their understanding, and in direct response to *Curcio* counsel's list:

1. I have the right to either speak to the press, or not, in an attempt to forward my client's interests. Here, I thought it imprudent to allow the false allegation that Mr. Tartaglione assaulted Mr. Epstein to go unrebutted. Appointed counsel vehemently disagreed and voiced their views. I evaluated their opinions and rejected them.

2. I have the obligation to articulate a good faith position regarding the appointment of *Curcio* counsel, which I have done. Suggesting that the only reasonable, conflict-free, position is that of the appointed counsel (something that is at the heart of virtually all the issues dividing counsel) ignores the obligations I have as Mr. Tartaglione's lawyer.[13]

---

[13] Indeed, the assignment of *Curcio* counsel, and the resulting inquiry – which is far from over, according to Learned Counsel, who expects it to continue even into an interlocutory appeal – has not only resulted in the disclosure of confidential information against Mr. Tartaglione's express instruction and contrary to his interests, but has also consumed hundreds of hours of all counsels' time that, Mr. Tartaglione believes, would have been better spent working on his defense, and threatens to delay Mr. Tartaglione's trial, which upsets him greatly.

11

3. It is simply inaccurate to say I "withheld" information about the Epstein note. *All* of the information about the note was disclosed by *me*, first to Learned Counsel, then to *Curcio* Counsel.

4. Following my client's directive and my own best judgment to withhold confidential information (the Epstein note) from individuals who refused to promise to keep it confidential, or unless ordered to disclose it by the court, is not a conflict or potential conflict. Further, *Curcio* counsel has not articulated any purpose in obtaining a copy of the note nor any shortcoming in her report because she was only shown the note and permitted to precisely copy its contents, but was not given a physical copy to take with her and then to disseminate as she saw fit.

Indeed, the depth of the report's fundamental misunderstanding of my role as retained counsel is crystalized on page 13, when *Curcio* counsel criticizes me for "withholding information [presumably text messages, the Epstein note and other information] needed to develop penalty phase evidence" and states that "capital counsels are obligated to conduct an investigation..." into penalty phase evidence. Contrary to *Curcio* and appointed counsels' understanding, this is a nonsensical statement; for *I* am Mr. Tartaglione's lawyer and I am "obligated to conduct," and am actively conducting, the investigation into penalty phase evidence while we prepare to vigorously contest his guilty in the liability phase. I cannot "withhold" information needed, because I have the information. That I have decided to share or not to share any part of the confidential information with any of the lawyers in my office, or with appointed counsel—either because I am obligated to do so or not to do so at Mr. Tartaglione's direction, or simply because I think it is appropriate under the circumstances—is part of the responsibility I carry as Mr. Tartaglione's lawyer. I am not the lawyer for a part of the case, as the *Curcio* report suggests; I am the lawyer for all of the case.

## III. DISCLOSURE OF THE PORTIONS OF THE REPORT RELATING TO THE EPSTEIN NOTE WOULD PREJUDICE MR. TARTAGLIONE

While the factual and legal errors permeating the report militate against its disclosure in its present form, the disclosure of the Epstein note to the Government suffers an additional problem – it would irreparably prejudice Mr. Tartaglione.

Lost in the avalanche of words about "protecting Mr. Tartaglione's interests" which underlie this report and accompany the last five months of this inquiry, is the need to actually *act* to advance Mr. Tartaglione's objectives.

The Epstein note has a value to the Government that increases with each new conspiracy theory about how Jeffrey Epstein died. Demonstrating that Epstein had suicidal thoughts before his suicide attempt on July 23, coupled with other information Mr. Tartaglione possesses, it is the type of

information in this political atmosphere that can be used to try to negotiate a benefit for our client.[14] The proposition that we should just hand it over to the Government – contrary to Mr. Tartaglione's express wishes, with no legal or ethical obligation to do so, and without thereby obtaining any conceivable benefit to Mr. Tartaglione – because of the flawed view that it may represent "an area of potential conflict" is, in my view, unwise.

## CONCLUSION

I recognize that this preliminary letter does not address many of the questions that the Court may have, and I specifically did not address a number of factual errors and legal errors which may be the subject of dispute between retained counsel and appointed counsel. I simply tried to present enough facts to give an accurate context of the events. The Court should not assume that we adopt or agree with the facts or conclusion reached by *Curcio* counsel beyond those we discussed.

In sum, the report in its present form should not be provided to the Government.

Respectfully submitted,

_____/s/_____

Bruce Barket
BARKET EPSTEIN KEARON ALDEA & LOTURCO, LLP
Attorneys for Nicholas Tartaglione

---

[14] In fact, I have begun, although thus far not successfully, to try and persuade the prosecutors investigating Epstein's suicide to speak to Mr. Tartaglione (of course with the appropriate protections). Even if ultimately unsuccessful, it would be a dereliction of my duty not to try.

13

# EXHIBIT A

# EXHIBIT A

LAW OFFICES OF
MICHAEL S. ROSS
ONE GRAND CENTRAL PLACE
60 EAST 42ND STREET
FORTY-SEVENTH FLOOR
NEW YORK, NY 10165

TELEPHONE
(212) 505-4060
FACSIMILE
(212) 505-4054
E-MAIL
michaelross@rosslaw.org

January 16, 2020

**BY HAND**

**TO BE FILED EX PARTE AND UNDER SEAL**

The Honorable Kenneth M. Karas
United States District Court Judge
United States District Court for
the Southern District of New York
The Hon. Charles L. Brieant Jr.
Federal Building and United States Courthouse
300 Quarropas Street
White Plains, New York 10601

> Re:   *United States v. Tartaglione*;
>        No. 7:16-cr-00832 (KMK).

Dear Judge Karas:

### A.   INTRODUCTION.

I am submitting this letter in connection with the December 30, 2019 Report of Bobbi C. Sternheim, Esq. (the "Report"), who was appointed by this Court to serve as Curcio Counsel to Mr. Tartaglione. As Your Honor is aware from statements made by various counsel, my firm's practice has focused on issues relating to attorney ethics and professional responsibility for many years,[1] and I was retained as special professional responsibility counsel to represent Bruce Barket, Esq., and his firm, Barket Epstein Kearon Aldea & LoTurco, LLP (collectively the "Barket Firm") to assist them in addressing issues which arose and have continued to arise in connection with their representation of Mr. Tartaglione. The Report focuses on certain issues as to which I have views which support the notion that Mr. Barket acted ethically.

---

[1] My background and experience in the field of attorney ethics and professional responsibility are set forth in my *curriculum vitae*, a copy of which is attached hereto as "Exhibit A."

LAW OFFICES OF
MICHAEL S. ROSS

Honorable Kenneth M. Karas
January 16, 2020
Page 2

I advised Mr. Barket early on that he was limited in providing information to the Court to address many of the statements and concerns raised by his co-counsel in this case.[2] No formal accusation of misconduct had been made against Mr. Barket and it was clear that he would eventually be expected to address a Report to be issued by Curcio Counsel. It was only then that Mr. Barket would be permitted, pursuant to Rule 1.6(b)(5)(i) of the New York Rules of Professional Conduct (the "Rules"),[3] to reveal confidential information. See, e.g., ABA Formal Opinion 10-456 (July 14, 2010) (ABA expressed the view that a criminal defense attorney whose ex-client brings an ineffective assistance claim may not *unilaterally* provide information about the client's case to the prosecution); Azzara v. United States, 2011 U.S. Dist. LEXIS 10971, at *5-6 (S.D.N.Y. 2011) (adopting the position of the ABA Opinion); Virginia State Bar Standing Committee on Legal Ethics Opinion 1859 (Jun. 6, 2012) (adopting the ABA Opinion's position).

This letter is not intended to serve as a comprehensive response to the Report; rather its purpose is to provide the Court with an overview of key issues, which, in my view, provide a broad and supportive view of Mr. Barket's ethical conduct in this matter.

In particular, I will be addressing certain issues that have been raised by the Report and Mr. Barket's co-counsel concerning Mr. Barket's conduct with respect to:

- Mr. Barket's statements to the press, including statements acknowledging that Mr. Tartaglione possessed a great deal of information about the death of Jeffrey Epstein, his cellmate at the New York City Metropolitan Correction Center ("MCC"); and

---

[2]Curcio Counsel's Report at pp. 7-8, n.1, notes that Mr. Barket did not "reveal" why I had been retained as ethics counsel. I have been advising Mr. Barket on aspects of this case which have *not*, and are *not*, focused on issues of whether he has personal exposure in any respect. Rather he consulted me on issues relating to matters which are privileged as between him and Mr. Tartaglione and, derivatively, with me. However, when the issue surrounding Mr. Barket's statements to the media arose in the context of the Epstein note and related issues, I began my work to examine the issues raised by co-counsel.

[3]The New York Rules of Professional Conduct apply to the conduct of attorneys appearing before the United States District Court for the Southern District of New York. See Rule 1.5(b)(5)(i) of the Local Rules of the Southern and Eastern District Courts of New York. Rule 1.6(b)(5)(i) provides that: "A lawyer may reveal or use confidential information to the extent that the lawyer reasonably believes necessary … to defend the lawyer or the lawyer's employees and associates against an accusation of wrongful conduct."

Law Offices Of
Michael S. Ross

Honorable Kenneth M. Karas
January 16, 2020
Page 3

- Mr. Barket's involvement in having Mr. Tartaglione provide to his civil counsel who visited him at the MCC a note that was given to Mr. Tartaglione by Mr. Epstein (the "Epstein note"), and then having John Weider, Esq., remove the Epstein note from the MCC.

It appears that the Report suggests that Mr. Barket was not ethically permitted pursuant to Rule 1.6 of the New York Rules of Professional Conduct (the "Rules")[4] to make statements to the press, including information that Mr. Tartaglione possessed regarding Mr. Epstein; and Mr. Barket's conduct was improper and contrary to prison rules and regulations.

As I demonstrate below:

- Mr. Barket had both express and implied authority pursuant to Rule 1.6(a) to speak to the press about information which Mr. Tartaglione possessed in connection with Mr. Epstein's attempted suicide and his ultimate suicide; and

- Mr. Barket was bound by Rule 1.6 to follow Mr. Tartaglione's directive not to share with his co-counsel all of the information he learned in the case.

**B.    THE FACTS RELEVANT TO MY VIEWS EXPRESSED IN THIS LETTER.**

The facts most relevant to my views as set forth in this letter can be described briefly[5] as follows:

---

[4]For purposes relevant here, Rule 1.6(a) provides that: "A lawyer shall not knowingly reveal confidential information, as defined in this Rule, or use such information to the disadvantage of a client or for the advantage of the lawyer or a third person, unless: (1) the client gives informed consent, as defined in Rule 1.0(j); (2) the disclosure is impliedly authorized to advance the best interests of the client and is either reasonable under the circumstances or customary in the professional community...."

[5]I am disclosing in this letter *only* the information necessary to address the suggestion that Mr. Barket acted improperly, pursuant to Rule 1.6(b)(5)(i), which permits lawyers to reveal confidential information of a client only to the extent necessary to defend the lawyer against accusations of misconduct.   As one court explained, "the right to part the curtain of confidentiality [in the context of Rule 1.6's self-defense provision] must be sparingly applied. It extends only to the bare minimum 'necessary to accomplish [its] purpose.'"   Helie v. McDermott, Will & Emery, 18 Misc. 3d 673, 682 (Sup. Ct. N.Y. Co. 2007) (citations omitted).

LAW OFFICES OF
MICHAEL S. ROSS

Honorable Kenneth M. Karas
January 16, 2020
Page 4

On July 27, 2019, following Mr. Epstein's suicide attempt on July 23, 2019, and before his death on August 10, 2019, Mr. Tartaglione advised Mr. Barket that Mr. Epstein had given him a note personally written by Mr. Epstein (by placing the note in one of Mr. Tartaglione's books), and the contents of that note indicated that Mr. Epstein was despondent and expressing thoughts about suicide.    This information seemed to Mr. Barket to be relevant to his representation of Mr. Tartaglione because Mr. Barket understood at the time that:  1) the MCC was conducting an internal investigation into the circumstances of how Mr. Epstein became injured on July 23rd and that the media coverage of the incident stated or implied that Mr. Tartaglione had assaulted Mr. Epstein; 2) Mr. Barket had been advised by at least one news outlet that the story regarding Mr. Tartaglione had come from a source within the MCC; and 3) Mr. Tartaglione had advised Mr. Barket that, in fact, he (Mr. Tartaglione) had found Mr. Epstein unconscious and nonresponsive on July 23rd and had alerted the guards, saving Mr. Epstein's life.

Mr. Barket wanted to ensure that the Epstein note – which, as discussed below, was not contraband and was not otherwise prohibited from being removed from the MCC by Mr. Tartaglione's counsel:  1) was authentic; and 2) would be protected from loss or destruction, especially in light of the fact that Mr. Barket had been advised that MCC had previously lost important documents belonging to Mr. Tartaglione, including portions of a time-line prepared by Mr. Barket's office.   Furthermore, Mr. Barket had been advised that a source within the MCC had previously leaked a false story about to the press concerning Mr. Tartaglione.

Mr. Barket understood that the Epstein note could be highly relevant in countering any allegations that Mr. Tartaglione had attacked Mr. Epstein, as the Epstein note would – if authentic – support the conclusions that Mr. Epstein's relationship with Mr. Tartaglione was not hostile, and that Mr. Epstein's injures were sustained in a suicide attempt, and not an assault. Therefore, he asked Mr. Tartaglione's civil counsel, John Wieder, Esq. (who was already planning to visit Mr. Tartaglione that day), to view the Epstein note and take the note from Mr. Tartaglione during his upcoming visit.  Mr. Wieder then photographed the Epstein note and sent a copy of the photograph to Mr. Barket, and Mr. Barket had an examination and investigation conducted into the Epstein note to attempt to determine its authenticity.   That examination and investigation had at that point proved inconclusive.[6]

Two days after the Epstein note was removed from the MCC, Mr. Barket and Aida Leisenring, Esq., advised his court-appointed co-counsel, Anthony L. Ricco, Esq., of the existence of the Epstein note and consulted with Mr. Ricco about what should be done with the

---

[6]Recently, Mr. Barket has uncovered evidence demonstrating the authenticity of the Epstein note.

Law Offices Of
Michael S. Ross

Honorable Kenneth M. Karas
January 16, 2020
Page 5

Epstein note.  Subsequently, on August 9, 2019, in response to an inquiry made by Mr. Barket, Mr. Barket was notified by email by Adam Johnson, Esq., general counsel for the MCC, that Mr. Tartaglione would not be charged with any violation in connection with Mr. Epstein's attempted suicide on July 23, 2019.  The following day, August 10, 2019, Mr. Epstein committed suicide. Mr. Wieder has advised Mr. Barket that, to date, the Epstein note remains safe and intact.

Separately, Mr. Barket had previously spoken to Mr. Tartaglione about whether he (Mr. Barket) might use any information he possessed in connection with Mr. Tartaglione's case to advance Mr. Tartaglione's interests, and Mr. Tartaglione advised Mr. Barket that he trusted him completely and that Mr. Barket could use any such information he had in any manner he deemed appropriate.  Following Mr. Epstein's death on August 10th, Mr. Barket understood that:  1) the Government was investigating the circumstances of the death of Mr. Epstein; and 2) Mr. Tartaglione's cooperation with the Government in the exceptionally high-profile Epstein matter might result in a benefit to Mr. Tartaglione.

Therefore, Mr. Barket reasonably believed that he had express authority under Rule 1.6(a) to advise the press about the fact that Mr. Tartaglione might be of help to the Government in its investigation of the death of Mr. Epstein.  Mr. Tartaglione would have been able to advise the Government about the abysmal conditions in the MCC which contributed to Mr. Epstein taking his own life and about the attitude and conduct of the MCC's prison staff which would have fostered and permitted Mr. Epstein's suicide.  Of course, the fact that Mr. Tartaglione was a witness to what happened to Mr. Epstein in connection with his July 23, 2019 suicide attempt was widely known as a result of the leak from the MCC to Channel 4 News on July 24th and the resulting press coverage.  The Government, even without the press coverage, knew that Mr. Tartaglione was Mr. Epstein's cellmate during the July 23rd suicide attempt, had witnessed the guards' treatment of inmates including Mr. Epstein, had long complained about the conditions of the jail and had been on the same tier as Mr. Epstein on the night Mr. Epstein died.

C.    MR. BARKET HAD BOTH EXPRESS AND IMPLIED AUTHORITY TO MAKE HIS STATEMENTS TO THE PRESS AND THOSE STATEMENTS WILL NOT PRECIPITATE A WAIVER OF THE ATTORNEY-CLIENT PRIVILEGE.

At various junctures in the Report,[7] questions are raised concerning whether Mr. Barket had the right to disclose information concerning Mr. Tartaglione's ability to assist in the Government's investigation of the death of Mr. Epstein.  I respectfully submit that such concerns are misguided.

---

[7]See e.g., Report, pp. 5-6.

LAW OFFICES OF
MICHAEL S. ROSS

Honorable Kenneth M. Karas
January 16, 2020
Page 6

There can be little question that Mr. Barket had, pursuant to Rule 1.6(a)(2), both express and implied authority to disclose to the press that Mr. Tartaglione possessed a great deal of information about the death of Mr. Epstein. *First*, as discussed above, Mr. Tartaglione had previously advised Mr. Barket that he could use any information he possessed in connection with Mr. Tartaglione's case in any manner he (Mr. Barket) deemed appropriate to advance Mr. Tartaglione's interests. *Second*, Mr. Barket knew of the power of the press and he knew that lawyers may lawfully and ethically make public statements to the press to impact a client's criminal case.[8] The decision of what public statements should be made to the press in connection with Mr. Tartaglione's case was a strategic decision which Mr. Barket had the power to make under Rule 1.2(a).

Accordingly, Mr. Barket's contact with the press, which was a strategic decision he made, is not a basis to conclude that he acted improperly. As then District Court (and now Second Circuit) Judge Richard J. Sullivan recently explained, "[w]hen evaluating counsel's conduct, a court must do so on the basis of the facts of the particular case, viewed as of the time of counsel's conduct, and may not use hindsight to second-guess his strategy choices." United States v. Goffer, 2017 U.S. Dist. LEXIS 6410, at *29 (S.D.N.Y. Jan. 17, 2017) (internal citations and quotations omitted).

The Report suggests that Mr. Barket's revelation of certain facts concerning the Epstein note would somehow operate as a wholesale waiver of the attorney-client privilege between Mr. Barket and Mr. Tartaglione. I strongly disagree. Under New York law, a waiver of the attorney-client privilege occurs only in very limited circumstances and only where a party seeks to assert the attorney-client privilege in a manner that is unfair to its adversary. See, e.g., In re von Bulow, 828 F.2d 94 (2d Cir. 1987). The von Bulow case illustrates that courts apply the doctrine of waiver of the attorney-client privilege so that that litigants cannot use the attorney-client privilege as both a "sword" and a "shield." Courts, therefore, do not allow litigants to disclose privileged confidential communications favorable to their cause and then use the

---

[8]Mr. Barket knew, as every seasoned criminal defense lawyer knows, of the passage in Gentile v. State Bar of Nevada, 501 U.S. 1030, 1043 (1991), which addresses the importance of a criminal defense attorney dealing with the press:

> "An attorney's duties do not begin inside the courtroom door. He or she cannot ignore the practical implications of a legal proceeding for the client. Just as an attorney may recommend a plea bargain or civil settlement to avoid the adverse consequences of a possible loss after trial, so too an attorney may take reasonable steps to defend a client's reputation and reduce the adverse consequences of indictment, especially in the face of a prosecution deemed unjust or commenced with improper motives."

Law Offices Of
Michael S. Ross

Honorable Kenneth M. Karas
January 16, 2020
Page 7

attorney-client privilege to protect damaging confidential communications. As one court recently explained in Pearstein v. Blackberry, Ltd., 2019 U.S. Dist. LEXIS 45098 at *20-21 (S.D.N.Y. March 19, 2019) (Mag. Judge Parker):

> "When a waiver of attorney-client privilege or work product protection has occurred, the court then must address the scope of the waiver. The scope of waiver of attorney-client privilege is determined based on the 'fairness doctrine' as described by the Second Circuit in In re von Bulow.... The doctrine is designed 'to prevent prejudice to a party and distortion of the judicial process that may be caused by the privilege-holder's elective disclosure during litigation of otherwise privileged information.' *Id.; see* United States v. Bilzerian, 926 F.2d 1285, 1292 (2d Cir. 1991) ('[T]he attorney-client privilege cannot at once be used as a shield and a sword. A defendant may not use the privilege to prejudice his opponent's case or to disclose some selected communications for self-serving purposes.') (citations omitted). When there has been a selective disclosure of attorney-client communications in the litigation, courts typically find the party has waived privilege as to all documents pertaining to the subject disclosed. In re Symbol Techs., Inc. Sec. Litig., 2017 U.S. Dist. LEXIS 50530, 2017 WL 1233842, at *16-18 (ordering disclosure of nine memoranda on confidential witnesses' statements because five other memoranda were disclosed for withholding party's strategic benefit) (citations omitted); Tribune Co. v. Purcigliotti, No. 93-cv-7222 (LAP) (THK), 1997 U.S. Dist. LEXIS 228, 1997 WL 10924, at *5 (S.D.N.Y. Jan. 10, 1997), modified, 1998 U.S. Dist. LEXIS 5155, 1998 WL 175933 (S.D.N.Y. Apr. 14, 1998) ('[W]here there is partial disclosure in the context of the litigation for the benefit of the privilege holder, there may be a complete subject matter waiver as to all communications on the subject.')."

Thus, when a litigant has partially disclosed a privileged communication in the litigation – and here the disclosure was not made in litigation, but only to the press – courts have found fairness requires the litigant to disclose either the entire communication or enough to prevent the litigant from misleading an adversary or the court. See, e.g., In re Grand Jury Proceedings, 219 F.3d 175, 182 (2d Cir. 2000), in which the court explained:

> "We have stated in In re von Bulow, 828 F.2d at 103, and in Bilzerian, 926 F.2d at 1292, that fairness considerations arise when the party attempts to use the privilege both as 'a shield and a

Law Offices Of
Michael S. Ross

Honorable Kenneth M. Karas
January 16, 2020
Page 8

sword.'    *In other words, a party cannot partially disclose privileged communications or affirmatively rely on privileged communications to support its claim or defense and then shield the underlying* communications from scrutiny by the opposing party." (Emphasis added.)

Here, Mr. Barket did not engage in unfair selective disclosure of privileged information to support a claim or defense and, therefore, his pre-trial disclosure of information to the press would not create unfairness to the Government at trial and, therefore, he did not trigger any wholesale waiver of the attorney client privilege.

Finally, the Report of Curcio Counsel speculates that statements made by Mr. Barket to the press "could be used as adoptive admissions adverse to Mr. Tartaglione's interests if relied upon by the Government during the penalty phase." (Report, p. 3) I respectfully submit that that statement, like various other statements in the Report which question tactical decisions made by Mr. Barket, strays far beyond the role of a Court-appointed Curcio Counsel. Mr. Barket is a highly experienced criminal trial lawyer and has made, and will continue to make, tactical decisions that may or may not carry tactical risks. Moreover, Mr. Barket makes those decisions in consultation with Mr. Tartaglione pursuant to his duty under Rule 1.4(a)(2)[9] to communicate with his client. The role of Curcio Counsel is to advise defendants on whether or not to waive an actual or potential conflict and not to make subjective judgements about tactical decisions by counsel. See, e.g., United States v. Arrington, 941 F.3d 24, 33 (2d Cir. 2019) ("The District Court then apprised Arrington of his right to a conflict-free lawyer, assigned independent Curcio counsel to advise Arrington, instructed Arrington that he could discuss whether or not to waive the conflict with both Curcio counsel [and his defense counsel], and gave Arrington ample time to decide. Arrington and his Curcio counsel then left the courtroom to discuss the issues in another room."). Here, there are multiple statements in the Report by Curcio Counsel that seem to question tactical decisions made by Mr. Barket and, I respectfully submit, this strays far beyond the appropriate charter of a Curcio Counsel.

In sum, Mr. Barket had both express and implied authority to make his statements to the press.

_____

[9]Rule 1.4(a)(2) requires attorneys to "reasonably consult with the client about the means by which the client's objectives are to be accomplished."

LAW OFFICES OF
MICHAEL S. ROSS

Honorable Kenneth M. Karas
January 16, 2020
Page 9

### D.   MR. BARKET DID NOT ENGAGE IN IMPROPER CONDUCT IN CONNECTION WITH THE REMOVAL OF THE EPSTEIN NOTE FROM THE MCC.

#### 1.   INTRODUCTION.

As I demonstrate below, Mr. Barket's conduct in connection with the removal of the Epstein note was not improper. Based upon the extensive research that my firm performed, Mr. Barket did not violate any prison rule by facilitating the removal of the Epstein note from the MCC. This is because, as discussed below, the Epstein note was not "contraband"; and there is no MCC rule which prohibits lawyers, such as Mr. Barket, from taking a non-contraband note from an inmate-client, such as Mr. Tartaglione, and removing it from the MCC (or facilitating another lawyer to do so).

#### 2.   THE EPSTEIN NOTE WAS NOT "CONTRABAND."

I begin by addressing the issue of whether the Epstein note was contraband. The Federal Regulations governing the Bureau of Prisons ("BOP") are contained in Chapter V of Title 28 of the Code of Federal Regulations; and 28 CFR Section 500.1(h) defines contraband as "material prohibited by law, regulation, or policy that can reasonably be expected to cause physical injury or adversely affect the safety, security, or good order of the facility or protection of the public."[10]

---

[10]The BOP has interpreted 28 CFR Section 500.1(h) to include broadly two types of contraband: hard contraband and nuisance contraband. Hard contraband includes weapons, intoxicants, currency (where prohibited), escape tools such as rope, ammunition or explosives, combustible or flammable liquid, hazardous or poisonous chemicals and gases and narcotics or other controlled substances not dispensed or approved by the institution. The BOP defines nuisance contraband as: "any item other than hard contraband, which has never been authorized, or which may be, or which previously has been authorized for possession by an inmate, but whose possession is prohibited when it presents a threat to security or its condition or excessive quantities of it present a health, fire, or housekeeping hazard. Examples of nuisance contraband include: personal property no longer permitted for admission to the institution or permitted for sale in the commissary; altered personal property; excessive accumulation of commissary, newspapers, letters, or magazines which cannot be stored neatly and safely in the designated area; food items which are spoiled or retained beyond the point of safe consumption; government-issued items which have been altered, or other items made from government property without staff authorization." United States Department of Justice, Federal Bureau of Prisons, "Inmate Personal Property," pp. 8-9, Aug. 22, 2011, *available at* https://www.bop.gov/policy/progstat/ 5580_008.pdf (last accessed: Jan. 15, 2020).

LAW OFFICES OF
MICHAEL S. ROSS

Honorable Kenneth M. Karas
January 16, 2020
Page 10

In addition, a review of 18 U.S.C. Section 1791(d)(1)[11] and 28 CFR Section 511.12,[12] which define "prohibited objects" that inmates cannot possess, reveals that such "prohibited objects" do not ordinarily include a paper note.[13]

The Epstein note obviously could not reasonably be expected to cause physical injury, pursuant to 28 CFR 500.1(h), or threaten "the life, health, or safety of an individual," pursuant to 18 U.S.C. Section 1791(d)(1)(G), as the Epstein note itself was not instrumental in Mr. Epstein's death. Nor did the Epstein note jeopardize the BOP's ability to ensure the safety, security and orderly operation of BOP facilities, or its ability to protect the public, either before or after Mr. Epstein's death. Therefore, the Epstein note was neither contraband nor a "prohibited object" pursuant to 28 CFR Sections 511.11 and 511.12.

Mr. Barket was of the common sense view that the only way that the Epstein note could have impacted the MCC would be that it would have supported what Mr. Tartaglione had already told the MCC's staff when he was interviewed by them – i.e., that Mr. Epstein had tried to hang himself. Thus, the Epstein note was not contraband, but, at most, was duplicative of the information the MCC's staff already had.

Mr. Barket's view that the Epstein note was not contraband is consistent with the view of at least one noted ethics scholar, Professor Stephen Gillers, as expressed in his well-known article, "Guns, Fruits, Drugs, and Documents: A Criminal Defense Lawyer's Responsibility for Real Evidence," 63 Stan. L. Rev. 813 (2011). Professor Gillers notes that:

---

[11] 18 U.S.C. Section 1791 makes it a crime for an inmate to, among other things, possess a "prohibited object" and makes it a crime for another individual to provide or attempt to provide an inmate with a "prohibited object" in violation of a statute or a rule or order issued under a statute.

[12] 28 CFR Section 511.12 incorporates 18 U.S.C. Section 1791(d)(1)'s definition of "prohibited objects" into the Federal Regulations which govern the BOP.

[13] 18 U.S.C. Section 1791(d)(1) defines "prohibited object" to mean firearms, weapons, destructive devices, illegal drugs, currency, phones and similar devices or any other object that threatens the order, discipline, or security of a prison, or the life, health, or safety of an individual. 28 CFR Sections 511.12(a) and (b) collectively define "prohibited objects" to include any objects that could "jeopardize the Bureau's ability to ensure the safety, security, and orderly operation of Bureau facilities, and protect the public," such as, for example, "[w]eapons; explosives; drugs; intoxicants; currency; cameras of any type; recording equipment; telephones; radios; pagers; electronic devices...."

LAW OFFICES OF
MICHAEL S. ROSS

Honorable Kenneth M. Karas
January 16, 2020
Page 11

"Contraband is defined as 'an item possession of which is in and of itself a crime such as narcotics.' This would seem also to include weapons illegal to possess and stolen property, but not most documents[14]." Id. at 847 (internal citations to footnotes omitted).

In discussing the definition of "contraband," Professor Gillers cites Standard 4-4.6(d) of the American Bar Association ("ABA") Standards for Criminal Justice Prosecution Function and Defense Function (3rd Ed. 1993). Standard 4-4.6 states that contraband is "an item possession of which is in and of itself a crime such as narcotics...." Professor Gillers expresses the view that, in addition to illegal drugs, other examples of items that are illegal in themselves to possess are counterfeit money, certain weapons, burglar tools and child pornography. 63 Stan. L. Rev. at 835. Obviously, the Epstein note does not meet Professor Gillers' view of what is contraband – which, I respectfully submit, is the view of most reasonably-minded attorneys in the United States.

Lastly, with respect to the issue of the Epstein note, I must respectfully urge the Court to reject the assertion by Curcio Counsel, on page 8 of the Report, that "[a]ccording to **BOP Guidelines**, the Epstein Note qualifies at [sic] contraband" (emphasis added) because it was not "authorized or issued by the institution, received through approved channels, or purchased through the commissary." To support her position, Curcio Counsel erroneously cites to the definition of "contraband" from an obviously outdated, undated and subsequently revised "Inmate Information Handbook"[15] published by the United States Medical Center For Federal Prisoners facility located in Springfield, Missouri. That Inmate Information Handbook was published by the *Springfield facility* and does not constitute "BOP Guidelines" published by the BOP as a guide to *all* BOP facilities throughout the country. In fact, most BOP facilities, including the New York City Metropolitan Correctional Center, publish their own handbooks for inmates housed in those facilities. See Metropolitan Correctional Center, "Admission and Orientation: A Manual for Pre-Trial Inmates," *available at* https://www.bop.gov/locations/institutions/nym/NYM_aohandbook.pdf (last accessed: Jan. 16, 2020).

Additionally, that Inmate Information Handbook is inapplicable to the present case because: 1) the United States Medical Center For Federal Prisoners has replaced it with a new

[14]Professor Gillers' observation leaves open the question as to what documents might constitute contraband. The obvious answer is that there are documents inherently tied to the commission of a crime, such as a bank robber's note to a teller or a kidnapper's ransom note that would fall into the category of contraband-type documents.

[15]United States Medical Center For Federal Prisoners, "Inmate Information Handbook" revised November 2012, *available at* https://www.bop.gov/locations/institutions/spg/SPG_aohandbook.pdf (last accessed: Jan. 16, 2020).

LAW OFFICES OF
MICHAEL S. ROSS

Honorable Kenneth M. Karas
January 16, 2020
Page 12

Inmate Admission and Orientation Handbook, and therefore it is not even applicable to the Springfield facility; 2) the United States Medical Center For Federal Prisoners has removed the definition of "contraband" from the new Inmate Admission and Orientation Handbook, and therefore the definition is not even applicable to the Springfield facility; and 3) neither guide is applicable to the New York City Metropolitan Correctional Center because both the outdated Inmate Information Handbook and the new Inmate Admission and Orientation Handbook state that they are not a comprehensive guide to the procedures of each Bureau location.

*First*, the former and now-outdated Inmate Information Handbook, which was last revised in November 2012, has since been replaced with a new Inmate Admission and Orientation Handbook and is no longer applicable to the very facility that published it.[16] *Second*, the United States Medical Center For Federal Prisoners removed the definition of "Contraband"[17] that was published in the outdated and superseded Inmate Information Handbook (which was cited by Curcio Counsel) and did not include that definition in the new Inmate Admission and Orientation Handbook. Thus, the former definition of "Contraband" is not even applicable to the United States Medical Center For Federal Prisoners – the very facility that published the outdated Inmate Information Handbook cited by Curcio Counsel. *Third*, neither the outdated Inmate Information Handbook (revised in 2012), nor the current Inmate Admission and Orientation Handbook (revised in 2017) are applicable to the Metropolitan Correctional Center, New York. The identical Introduction on the first pages of each Handbook states that the Handbook is not a guide to the procedures at other Bureau locations, which would include the Metropolitan Correctional Center, New York:

> "The purpose of this handbook is to provide newly committed inmates and others interested in the Federal Bureau of Prisons with general information regarding the Bureau, its programs, institutions, and the rules and regulations they will encounter during confinement. *It is not a specific guide to the detailed policies of the Bureau or all procedures in effect at each Bureau location.*" (Inmate Admission And Orientation Handbook, p. 1; Inmate Information Handbook, p. 1; emphasis added.)

---

[16]United States Medical Center For Federal Prisoners, "Inmate Admission And Orientation Handbook" revised February 2017, *available at* https://www.bop.gov/locations/institutions/spg/spg_ao_hand book050917.pdf (last accessed: Jan. 16, 2020).

[17]Inmate Information Handbook, p. 15.

LAW OFFICES OF
MICHAEL S. ROSS

Honorable Kenneth M. Karas
January 16, 2020
Page 13

3.    **BECAUSE THE EPSTEIN NOTE WAS NOT CONTRABAND, IT WAS NOT IMPROPER FOR MR. BARKET TO FACILITATE ITS REMOVAL FROM THE MCC.**

The MCC rules do not prohibit the transfer from a client-inmate of a non-contraband note to their lawyer for the purpose of having the document removed from the MCC. Indeed, if the MCC intended to prohibit attorneys from removing non-contraband documents provided to them by inmate-clients during attorney visits, it would have included that prohibition in the "Attorney's Guide to the Metropolitan Correctional Center, New York, New York" (the "MCC Guide").[18] For instance, in the MCC Guide, the MCC has explicitly prohibited lawyers from conducting certain activities:

- Attorneys are expressly not permitted to carry into the Visiting Room handbags, newspapers, portable telephones, and non-legal materials. (MCC Guide, p. 5)

- "Attorneys are ordinarily not permitted to bring material witnesses into the Visiting Room." (MCC Guide, p. 7)

- "An attorney may not call an inmate." (MCC Guide, p. 11)

- "[A]ttorneys may not fax documents to inmates or to MCC New York staff for delivery to inmates." (MCC Guide, p. 11)[19]

---

[18]United States Department of Justice, Federal Bureau of Prisons, "Attorney's Guide to the Metropolitan Correctional Center, New York, New York," April 2008, *available at* https://www.bop.gov/locations/institutions/nym/mcc_ny_attny_guide_april_2008.pdf (last accessed: Jan. 15, 2020). Indeed, I am advised that Curcio Counsel has herself accepted a document from Mr. Tartaglione and removed it from the MCC as part of her representation of him.

[19]I should also note that, just as the MCC's rules do not prohibit removal by an attorney of non-contraband documents provided to an attorney by his or her client, the various Federal Regulations and statutes that apply to BOP institutions, including the MCC, do not prohibit the transfer from a client-inmate of a non-contraband note to his or her lawyer. 28 CFR Sections 511.11(a) and (b) collectively define activities that are prohibited for non-inmates within BOP institutions to include "any activities that could jeopardize the Bureau's ability to ensure the safety, security, and orderly operation of Bureau facilities, and protect the public, whether or not such activities are criminal in nature," such as, for example, "[i]ntroducing, or attempting to introduce, prohibited objects into a Bureau facility or upon Bureau grounds; assisting an escape; and any other conduct that violates criminal laws or is prohibited by federal regulations or

(continued...)

LAW OFFICES OF
MICHAEL S. ROSS

Honorable Kenneth M. Karas
January 16, 2020
Page 14

In contrast to the rules of the MCC, which do not prohibit an attorney from removing from the institution a non-contraband document provided by an inmate-client, the Federal Correctional Institution in Florence, Colorado, has enacted a rule that prohibits inmate-clients from providing, for the purpose of removal, legal papers to their attorneys during client visits:

> "Necessary legal papers brought in by attorneys will be permitted during attorney visits. Inmates may bring legal materials into the visiting room during attorney visits only with approval, and hand-carried by their unit team. *Inmates may not give legal papers to the attorney or receive papers from the attorney to retain after the visit*, absent compelling circumstances and prior authorization by unit team or Duty Officer. Legal papers should be mailed to the institution in every other case."[20] (Emphasis added.)

In the case of Mr. Barket, because the MCC does not specifically prohibit attorneys from accepting for removal non-contraband documents from inmate-clients during attorney visits, Mr. Tartaglione's civil counsel did not violate an MCC rule by accepting the Epstein note from Mr. Tartaglione and removing it from the MCC. And, therefore, any involvement by Mr. Barket in facilitating that removal also could not have violated an MCC rule.

In sum, Mr. Barket did not engage in improper conduct in connection with the removal of the Epstein note from the MCC.[21]

---

(...continued)
Bureau policies." Section 511.11 does not prohibit an attorney from accepting a non-contraband document from his or her inmate-client during an attorney visit and removing it from a BOP facility. Accordingly, by accepting the Epstein note from Mr. Tartaglione and removing it from the MCC, Mr. Tartaglione's civil counsel did not violate 28 CFR Section 511.11.

[20]Federal Correctional Institution, "Visiting Regulations," p. 12, Jun. 26, 2018, *available at* https://www.bop.gov/locations/institutions/flf/flf_visiting062618.pdf (last accessed: Jan. 15, 2020).

[21]Before I conclude my discussion relating to the Epstein note, I want to address an additional issue. Surprisingly, Curcio Counsel takes the position that Mr. Barket "conceal[ed]" the removal of the Epstein note. (Report, p. 9) I respectfully submit that this statement is wholly unfair to Mr. Barket.

It is important to remember that the knowledge that Mr. Barket possessed concerning the Epstein note is and remains "confidential information," as defined under Rule 1.6(a), and *there was no requirement under the Rules or other statute that he disclose information concerning the Epstein note to the Government then or now.* A lawyer's decision to advance a client's interest

(continued...)

LAW OFFICES OF
MICHAEL S. ROSS

Honorable Kenneth M. Karas
January 16, 2020
Page 15


### E.    MR.    BARKET    PROPERLY    DID    NOT    SHARE    CERTAIN    INFORMATION WITH HIS CO-COUNSEL.

Curcio Counsel has taken the position that Mr. Barket was obligated to reveal to co-counsel all of the information he has obtained during the course of the representation. Report, pp. 12-13. The misplaced premise of Curcio Counsel is that because the case involves a joint representation, "Rule 1.6 of the New York Rules of Professional Conduct does not apply to attorneys on the same defense team." Report, p. 13. With all due respect to Curcio Counsel, that statement is wrong. My analysis is set forth below.

My firm's research has not uncovered any New York court decisions or other definitive authority which compels a lead counsel such as Mr. Barket in a criminal case to share all information with his co-counsel. Nor has my firm uncovered any controlling authority on this issue in the context of a case where Learned Counsel is appointed in a death case. And yet central to the position of Curcio Counsel is the issue of whether, under Rule 1.6, which governs the lawyer's ability to disclose confidential information, Mr. Barket was required to disregard Mr. Tartaglione's directive that he not share certain information with his co-counsel. Suffice it to say that this Court has already heard Mr. Tartaglione explain in articulate language his

---

(...continued)

by not disclosing something to the Government which is confidential is not an act of concealment. Rather, it is ethical act in furtherance of the client's interests. The responsibility of Mr. Barket, as Mr. Tartaglione's attorney, is not to aid the Government in its endeavors, but, as reflected in Preamble [2] of the ABA Model Rules of Professional Conduct, to "zealously assert[] his client's position under the rules of the adversary system." See also ABA Criminal Justice Standards for the Defense Function (4th Ed. 2017), Standard 4-1.4 (Defense Counsel's Tempered Duty of Candor) ("Defense counsel must act zealously within the bounds of the law and applicable rules to protect the client's confidences and the unique liberty interests that are at stake in criminal prosecution."); "Commentary" to former Standard 4-1.2 of the Third Edition of the ABA Criminal Justice Standards for the Defense Function ("Advocacy is not for the timid, the meek, or the retiring. Our system of justice is inherently contentious, albeit bounded by the rules of professional ethics and decorum, and it demands that the lawyer be inclined towards vigorous advocacy."); State v. Clay, 824 N.W.2d 488, 495 (Sup. Ct. Iowa 2012) (citing this former ABA commentary). Here, while the information concerning the Epstein note, and the Epstein note itself, would be of interest to the Government, Mr. Barket properly determined that he was and is not required to disclose its existence to the Government. And, Mr. Barket's decision not to reveal the Epstein note to the Government was a strategic decision that was he entitled to make as lead counsel in the case and pursuant to his authority under Rule 1.2(a).

LAW OFFICES OF
MICHAEL S. ROSS

Honorable Kenneth M. Karas
January 16, 2020
Page 16

unhappiness with Mr. Barket's co-counsel in this case. Mr. Tartaglione has advised Mr. Barket repeatedly not to share all of the information in his possession with his co-counsel.

Indeed, while Curcio Counsel is correct (see Report at p. 13) that there exists an attorney-client privilege among co-counsel in a criminal case,[22] I am unaware, nor has Curcio Counsel cited, any authority *requiring* a *lead counsel* such as Mr. Barket to share all information with his co-counsel. Indeed, some of the information which Mr. Barket has not shared with his co-counsel was not shared at the specific and emphatic direction of Mr. Tartaglione.[23] In that regard, Rule 1.6 provides that a lawyer may not reveal information that a client has requested be kept confidential unless disclosure is required by the Rules, some other law or court order. Specifically, Rule 1.6 provides, in relevant part, as follows:

> "(a) A lawyer shall not knowingly reveal confidential information, as defined in this Rule, or use such information to the disadvantage of a client or for the advantage of the lawyer or a third person, unless:
>
>> (1) the client gives informed consent, as defined in Rule 1.0(j);
>>
>> (2) the disclosure is *impliedly authorized to advance the best interests of the client and* is either *reasonable under the circumstances* or customary in the professional community; or
>>
>> (3) the disclosure is permitted by paragraph (b).
>
> 'Confidential information' consists of information gained during or relating to the representation of a client, whatever its source, that is (a) protected by the attorney-client privilege, (b) likely to be embarrassing or detrimental to the client if disclosed, or (c) *information that the client has requested be kept confidential.*

---

[22]"It would seem self-evident that when two or more lawyers represent one client anything that the client says in their presence or that they say to each other about the client's affairs must necessarily be as privileged as if it were said to a single lawyer." Edna S. Epstein, The Attorney-Client Privilege and the Work-Product Doctrine, Vol. 1, p 354 (6th Ed. 2017 American Bar Assn. Publ.).

[23]The nature of this information will not be delineated upon the insistence of Mr. Tartaglione.

Law Offices Of
Michael S. Ross

Honorable Kenneth M. Karas
January 16, 2020
Page 17

> 'Confidential information' does not ordinarily include (i) a lawyer's legal knowledge or legal research or (ii) information that is generally known in the local community or in the trade, field or profession to which the information relates." (Emphasis added.)

Where, as here, a client expressly instructs his or her lawyer *not* to disclose specific confidential information, the lawyer no longer possesses implied authority within the meaning of Rule 1.6(a)(2) to reveal such information, even for the purpose of advancing the client's interests. This principle is reflected in the <u>Restatement (Third) of the Law Governing Lawyers</u> (2000) ("<u>Restatement</u>"), Section 60 (and its related Commentary), which is similar in substance to Rule 1.6. Section 60(1)(a) provides that:

> "(1) Except as provided in §§ 61-67, during and after representation of a client:
>
>> (a) the lawyer may not use or disclose confidential client information as defined in § 59 if there is a reasonable prospect that doing so will adversely affect a material interest of the client *or if the client has instructed the lawyer not to use or disclose such information*[.]" (Emphasis added.)

At first blush, one might think that the duty of confidentiality is driven only by the consideration of "adverse effect" on the client. That is not, however, true. Comment c(ii) to Section 60 makes that point clearly:

> "Even in the absence of a reasonable prospect of risk of harm to a client, use or disclosure is [] prohibited if the affected client instructs the lawyer (<u>see</u> § 21[2])[24] not to use or disclose information. Such a direction is the client's definition of the

---

[24]<u>Restatement</u>, Section 21, provides: "As between client and lawyer: (1) A client and lawyer may agree which of them will make specified decisions.... The agreement may be superseded by another valid agreement. (2) A client may instruct a lawyer during the representation, subject to the requirements stated in §§ 22, 23, and other provisions of this Restatement. (3) Subject to Subsections (1) and (2) a lawyer may take any lawful measure within the scope of representation that is reasonably calculated to advance a client's objectives as defined by the client, consulting with the client as required by § 20. (4) A client may ratify an act of a lawyer that was not previously authorized."

Law Offices Of
Michael S. Ross

Honorable Kenneth M. Karas
January 16, 2020
Page 18

> client's interests (see § 16[1])[25], which controls (see § 21[2]). *Such an instruction may also limit a lawyer's implied authority to use or disclose confidential client information to advance a client's interests.* ... However, client limitations on a lawyer's authority do not alter a lawyer's obligations under § 63[26] (using or disclosing confidential client information when required by law or court order) (see § 23).[27]"

Moreover, the unofficial Comments to Rule 1.6 address an attorney's duty to "confine" confidential information upon a client's request, and further support the view that attorneys may not disclose information to co-counsel when explicitly instructed by the client to not disclose such information. Specifically:

- Comment [2] to Rule 1.6 explains that, "*in the absence of the client's informed consent,* or except as permitted or required by these Rules, the lawyer must not knowingly reveal information gained during and related to the representation, whatever its source." (Emphasis added.)

- Comment [5] to Rule 1.6 provides that, "*[e]xcept to the extent that the client's instructions or special circumstances limit that authority,* a lawyer may make disclosures of confidential information that are impliedly authorized by a client...." (Emphasis added.)

---

[25]Restatement, Section 16(1) provides: "To the extent consistent with the lawyer's other legal duties and subject to the other provisions of this Restatement, a lawyer must, in matters within the scope of the representation: (1) proceed in a manner reasonably calculated to advance a client's lawful objectives, as defined by the client after consultation."

[26]Restatement, Section 63, provides: "A lawyer may use or disclose confidential client information when required by law, after the lawyer takes reasonably appropriate steps to assert that the information is privileged or otherwise protected against disclosure."

[27]Restatement, Section 23, provides: "As between client and lawyer, a lawyer retains authority that may not be overridden by a contract with or an instruction from the client: (1) to refuse to perform, counsel, or assist future or ongoing acts in the representation that the lawyer reasonably believes to be unlawful; (2) to make decisions or take actions in the representation that the lawyer reasonably believes to be required by law or an order of a tribunal."

LAW OFFICES OF
MICHAEL S. ROSS

Honorable Kenneth M. Karas
January 16, 2020
Page 19

- Comment [5] to Rule 1.6 further provides that "lawyers in a firm may, in the course of the firm's practice, disclose to each other information relating to a client of the firm, *unless the client has instructed that particular information be confined to specified lawyers*." (Emphasis added.)

Comment [5] to Rule 1.6 (quoted, in part, above) is particularly instructive because it provides that a lawyer must honor a client's request that "particular information be confined to specified lawyers" within a single law firm – seemingly regardless of whether other attorneys at that law firm are working on the client's matter and whether or not there is co-counsel involved in that matter. In my view, Comment [5] further supports the view that a client may direct counsel to withhold certain information from co-counsel. My view of the language in Comment [5] is consistent with a recent law review article discussing situations where a single client is represented by two lawyers. See Professor Stephen C. Sieberson,[28] *Two Lawyers, One Client, and the Duty to Communicate: A Gap in Rules 1.2 and 1.4*, 11 U.N.H. L. REV. 27, 35 (2013). Professor Sieberson, in discussing "Scenario 1" in which Lawyer 1 and Lawyer 2 are co-counsel in a matter because of the matter's size or complexity, posits that the client controls what confidential information Lawyer 1 can share with Lawyer 2. In particular, Professor Sieberson pointedly observed that the limiting language of Comment [5] to Rule 1.6 of the American Bar Association Model Rules of Professional Conduct[29] seemingly applies to co-counsel in different firms:

> "Once [Lawyer 2] has been associated as co-counsel for the client, *unless the client specifically instructs [Lawyer 1] to withhold certain information from [Lawyer 2]*, the sharing of information with [Lawyer 2] will not violate Rule 1.6."

Sieberson, *Two Lawyers, One Client*, 11 U.N.H. L. REV. at 35 (footnote omitted; emphasis added).

This quote is followed by a footnote that reads:

---

[28]Professor Sieberson is a Professor of Law at Creighton University School of Law, where he focuses his teachings on Professional Responsibility, International and Comparative Law, and Corporate Law. He has taught widely on matters relating to ethics and professional responsibility. See https://law.creighton.edu/faculty-directory-profile/702/stephen-sieberson (last accessed: Jan. 15, 2020).

[29]Comment [5] to Model Rule 1.6 is substantially similar to Comment [5] to New York's Rule 1.6.

LAW OFFICES OF
MICHAEL S. ROSS

Honorable Kenneth M. Karas
January 16, 2020
Page 20

> "MRPC R. 1.6 cmt. 5 (1983) generally permits lawyers within a firm to share client information with each other, although such sharing can be limited if 'the client has instructed that particular information be confined to specific lawyers.' *This concept would seem to apply as well to co-counsel in different firms*."

Sieberson, *Two Lawyers, One Client*, 11 U.N.H. L. REV. at 35 n.21 (emphasis added).

Thus, Professor Sieberson is expressing the same view I have set forth above. Given Mr. Tartaglione's clear instruction to Mr. Barket not to disclose certain information to co-counsel, Mr. Barket was not permitted to make the disclosures to his co-counsel. Such disclosure would violate Rule 1.6. Although there is no case law directly on point, in the past, lawyers have been disciplined for disclosing confidential information, purportedly for the benefit of the client, in violation of a client's instructions and/or without client consent. See In re Pressly, 628 A.2d 927, 929 (Vt. 1993) (attorney for wife in divorce case reprimanded for disclosing to husband's lawyer, in violation of wife's express instructions, her suspicion that the husband was abusing their child, as part of wife's attorney's effort to convince husband's attorney to cooperate with continuing supervised visitation); In re Mandelman, 514 N.W.2d 11, 12 (Wis. 1994) (lawyer violated Rule 1.6 when he asked other lawyers for help on several client matters and transferred client files without seeking clients' consent); see also Texas Committee on Professional Ethics, Opinion 673 (Aug. 2018) (opining that, in the context of seeking advice about a client's case on an Internet forum, an attorney "may not reveal confidential information protected by the lawyer-client privilege without the client's express, informed consent," and, furthermore, "may not reveal unprivileged confidential information for the benefit of the client if the client has expressly instructed the lawyer not to do so."). In sum, it is clear that attorneys may not unilaterally choose to reveal confidential information, even for the benefit of the client, against the client's *express* directive.

In sum, Curcio Counsel is incorrect in her assertion that Mr. Barket was obligated to reveal to co-counsel all of the information he has obtained during the course of the representation.

## F.   CONCLUSION.

As demonstrated above:

- Mr. Barket had both express and implied authority pursuant to Rule 1.6(a) to speak to the press about information which Mr. Tartaglione possessed in connection with Mr. Epstein's attempted suicide and his ultimate suicide, and was fully authorized to make those statements to the press; and

LAW OFFICES OF
MICHAEL S. ROSS

Honorable Kenneth M. Karas
January 16, 2020
Page 21

> •    Mr. Barket was bound by Rule 1.6 to follow Mr. Tartaglione's directive not to share with his co-counsel all of the information he learned in the case.

Again, as I said earlier, this letter is not intended to serve as a comprehensive response to the Report; rather, its purpose is to provide the Court with an overview of key issues, which in my view, provide a broad and supportive view of Mr. Barket's ethical conduct in this matter.

Respectfully submitted,

Michael S. Ross

Att.

As of January 16, 2020

RESUME

MICHAEL S. ROSS

J.D., New York University School of Law, 1974

B.A., Rutgers University, 1971

Principal in:

Law Offices Of Michael S. Ross
One Grand Central Place
60 East 42nd Street
Forty-Seventh Floor
New York, New York 10165
Telephone (212) 505-4060
Facsimile (212) 505-4054
Email "michaelross@RossLaw.org"

Formerly a principal partner in the law firms of LaRossa & Ross, from 1998 through November of 2001; LaRossa, Mitchell & Ross, from 1986 through 1998; and LaRossa, Cooper, Axenfeld, Mitchell & Bergman from 1984 through 1986.

Practice concentrated in the areas of the representation of attorneys in ethics and professional responsibility matters, as well as criminal law.

Assistant United States Attorney, Southern District of New York, Criminal Division; May, 1978 through November, 1981.

Assistant District Attorney, Kings County; August, 1974 through May, 1978.

Adjunct Professor, Benjamin Cardozo Law School; having taught courses over the years in Trial Practice, Appellate Advocacy, Judicial Administration and Professional Responsibility courses (1979 through the present) and having served as Faculty Advisor of the Cardozo Law School Moot Court Program from 1978 through 2004. Currently teaching Litigation Ethics (Fall and Spring Semesters). Co-founder in 1983 and Executive Director/Team Leader (1984 through 2012) of the Law School's annual two week Intensive Trial Advocacy Program ("ITAP"). Currently an instructor at the program and evidence lecturer for the program's students.

Adjunct Associate Professor, Brooklyn Law School; teaching Professional Responsibility (2005 - to the present [Fall, Spring and Summer Courses]).

Listed in Martindale-Hubbell's "Bar Register Of Preeminent Lawyers" (status as "AV Preeminent Rated Lawyer" with primary practice

Resume of Michael S. Ross

areas listed as "Attorney Discipline"; "Professional Liability"; and "Criminal Practice").

Listed in "Super Lawyers" – New York Edition – in the field of Civil Litigation Defense.

Listed in "Best Lawyers in America" – in the practice area of Ethics and Professional Responsibility Law.

Listed in Who's Who In American Law.

Recipient, "Ethics Practitioner of the Year Award," Institute of Jewish Humanities (2007).

Recipient, "Educator of the Year Award," Institute of Jewish Humanities (2017).

Recipient, "Service to the Society Award" from the Legal Aid Society of the City of New York, 2010 Pro Bono Awards Presentation.

Member, Continuing Legal Education Advisory Board, New York County Lawyers Association (2003 to present).

Member, New York State Bar Association Committee on Technology and the Legal Profession. (2017 to present).

Member, Ethics Institute Advisory Board, New York County Lawyers' Association (2008 to present).

Member, Committee on Professional Discipline of the New York State Bar Association (1991 through 1994; 1998 to 2004; 2005 to present).

Member, Committee on Professional Discipline of the Association of the Bar of the City of New York (various terms).

Member, Committee on Professional Discipline (more recently named Committee on Professionalism and Professional Discipline), New York County Lawyers Association (1992 to present).

Member, Special Committee on the Unlawful Practice of Law, New York State Bar Association (2005).

Member, Committee on Mass Disaster Response (which addresses, in part, the manner in which lawyers attempt to solicit clients after mass disasters), New York State Bar Association (2000 to present).

Member, Task Force On Lawyer Advertising, New York State Bar Association (2005 to 2007).

Page 2 of 45

Resume of Michael S. Ross

Member, New York State Continuing Legal Education Board (Chair, Subcommittee on Pro Bono Credits; Chair, Subcommittee on Internet Issues). Among other things, the Board addresses the accreditation of continuing legal education providers in the State (appointment by the Presiding Justice of the Appellate Division, First Department - 2000 to 2005 [having served two consecutive terms]).

Member, Special Committee on Procedures for Judicial Discipline of the New York State Bar Association (2001).

Section Liaison of the American Bar Association Criminal Justice Section to the American Bar Association Standing Committee on Ethics and Professional Responsibility (1994-1997).

Member, American Bar Association "Criminal Justice Council" – the twenty member policy making body of the ABA's Criminal Justice Section (1990 through 1993).

Member, New York Council of Defense Lawyers (1987 through present); former member of the Board of Directors (1989 through 1992).

Former Chairperson, Association of the Bar of the City of New York, Committee on Criminal Advocacy (1988-1990).

Former Chairperson, American Bar Association "Grand Jury Committee" (1988 through 1990); Vice-Chairperson (1987-1988).

Member, American Bar Association Special "Criminal Justice In Crisis Committee" (1988 through 1990).

Member, American Bar Association Special Nine Member "Committee On Criminal Justice In a Free Society" (1987 through 1988).

Member, New York State Association of Criminal Defense Lawyers; former member of Board of Directors (1987-1989).

Member, New York City Bar Association Subcommittee on "U.S. Sentencing Commission Guidelines" (1986 and 1987).

Member, National Order of the Barristers (elected in 1981).

CourtTV Live Guest On-Air Commentator, on forty-two occasions between 1999 and 2006.

Bloomberg 1130 Radio Live Guest, "The Money Show," discussing how the public can deal with lawyer misconduct, May 15, 2002.

Page 3 of  45

Lecturer, "The Disciplinary Process In The First Judicial Department," presented as part of the mandatory continuing legal education for newly admitted attorneys in the Appellate Division, First Judicial Department, October 18, 2017. (The video of this presentation is now part of the required viewing for all newly admitted attorneys in the First Judicial Department.)

Lecturer at monthly swearing-ins of all new attorneys in the Appellate Division, First Judicial Department, speaking on the topic of "The Ethical Issues Facing Newly Admitted Attorneys," (1999 through 2010; and May 4, 2016).

Instructor at National Institute of Trial Advocacy ("NITA"), National Program in Boulder, Colorado (July 2000).

Instructor, National Institute of Trial Advocacy ("NITA") Building Trial Skills Program, Boston, Ma. (December 8, 9 and 10, 2019).

Lecturer, "Ethical Issues In Aggressive Litigation," National Institute of Trial Advocacy ("NITA"), Building Trial Skills Program, Boston, Ma. (December 9, 2019).

Instructor at NITA, Northeast Region held at Hofstra Law School in: 1980; 1981; 1982; 1983; 1984; 1985; 1986; 1987; 1988; 1989; 1990; 1991; 1992; 1993; 1994; 1995; 1996; 1997; 1998; 1999; 2000; 2001; 2002; 2003; 2004; 2005; 2006; 2007; 2008; 2009; 2010; 2011; 2012; 2013; 2014; 2015; 2016; 2017; 2018; and 2019.

Lecturer, "Ethical Issues In Aggressive Litigation," National Institute of Trial Advocacy ("NITA") Northeast Regional Program at Hofstra Law School, August 6, 2019 (and at each of the previous annual programs since 1998).

Panelist, "When the Lawyer is Obliged to Turn Against His Client," New York State Bar Association General Practice Section & Committee On Professional Discipline, Continuing Legal Education Ethics Program, Annual Meeting of the New York State Bar Association, New York City, January 28, 2020.

Lecturer, "Ethics: 2018-2019 Update," Continuing Legal Education Program sponsored by the New York State Academy of Trial Lawyers (New York City [September 27,2019]); (Long Island, New York [September 29,2019]); (Brooklyn, New York [November 15, 2019]);(Westchester, New York [November 8, 2019]).

Panelist, "The Attorney Client Privilege in the Age of Corruption Investigations," Continuing Legal Education Program sponsored by the Criminal Advocacy Committee of the Association of the Bar of the City of New York, June 30, 2019.

Resume of Michael S. Ross

Panelist, "25 Trial Issues That Keep You Up In The Middle Of The Night," Continuing Legal Education Program sponsored by the New York State Trial Lawyers Institute, June 17, 2019.

Lecturer, "Conflicts Of Interest For Appellate Court Attorneys," Continuing Legal Education sponsored by the Appellate Division, First Judicial Department, June 7, 2019.

Lecturer, "Hot Topics In Ethics 2019," Continuing Legal Education Program sponsored by the New York State Academy of Trial Lawyers; Albany, New York (April 3, 2019); Syracuse, New York (April 3, 2019); Rochester, New York (April 4, 2019); Buffalo, New York (April 4, 2019); Brooklyn, New York (May 22, 2019); and Westchester, New York (May 23, 2019).

Panelist, "Professional Discipline: A Year In Review," Continuing Legal Education Program sponsored by the Professional Discipline of the Association of the Bar of the City of New York, March 28, 2019.

Lecturer, "Legal Malpractice 2019: Attorney Discipline and Risk Management for Lawyers," Continuing Legal Education Program sponsored by the Law Practice Management Committee and the Committee for Continuing Education of the New York State Bar Association, New York City, March 25, 2019.

Panelist, "Annual Ethics Update 2019," Continuing Legal Education Program sponsored by the Queens County Bar Association, February 27, 2019.

Panelist, "The Ethical Obligations of a Lawyer to Learn the *True* Facts," New York State Bar Association General Practice Section & Committee On Professional Discipline, Continuing Legal Education Ethics Program, Annual Meeting of the New York State Bar Association, New York City, January 15, 2019.

Instructor, National Institute of Trial Advocacy ("NITA") Building Trial Skills Program, Boston, Ma. (December 9, 10 and 11, 2018).

Lecturer, "Ethical Issues In Aggressive Litigation," National Institute of Trial Advocacy ("NITA"), Building Trial Skills Program, Boston, Ma. (December 11, 2018).

Lecturer, "A 2018 Ethics Update: An Analysis Of Key Decisions And Opinions," Continuing Legal Education Program sponsored by the Appellate Division, Third Judicial Department, Albany, New York, October 25, 2018.

Panel Moderator, "Ethics for Corporate Counsel 2018," Continuing Legal Education Program sponsored by the New York State Bar

Association Corporate Counsel Section and the Continuing Legal Education Committee, November 30, 2018.

Lecturer, "Ethics: 2017-2018 Update," Continuing Legal Education Program sponsored by the New York State Academy of Trial Lawyers (New York City [September 21,2018]); (Long Island, New York [September 28,2018]); (Brooklyn, New York [November 2, 2018]);(Westchester, New York [November 16, 2018]).

Lecturer, "Raising The Bar: Creating An Ethical And Inclusive Workplace," Continuing Legal Education Program sponsored by the New York State Academy of Trial Lawyers (Plainview, New York [June 28, 2018]; Brooklyn, New York [September 12, 2018]).

Lecturer, "Ethical Concerns for Cross-Examination," Cross to Kill 2018 Continuing Legal Education Program sponsored by the New York State Association of Criminal Defense Lawyers, New York, New York(May 4, 2018).

Lecturer, "2018 Ethics Update For Criminal Law Practitioners," Continuing Legal Education Program sponsored by the Kings County Criminal Bar Association, February 15, 2018.

Moderator and Panelist, "Law Firm Cyber Protection: Everything You Wanted To Know," New York State Bar Association Commercial & Federal Litigation Section Continuing Legal Education Ethics Program, Annual Meeting of the New York State Bar Association, New York City, January 24, 2018.

Panelist, "Whistleblowers, Reporting Up, and the Professional Rules of Conduct," New York State Bar Association Business Law Section & Corporate Counsel Section Continuing Legal Education Ethics Program, Annual Meeting of the New York State Bar Association, New York City, January 24, 2018.

Moderator and Panelist, "Loose Lips and Emailing Lawyers: The Ethics of Protecting Client Confidences," Continuing Legal Education Program sponsored by the New York State Bar Association General Practice Section and the Committee on Professional Discipline, Annual Meeting of the New York State Bar Association, New York City, January 23, 2018.

Instructor, National Institute of Trial Advocacy ("NITA") Building Trial Skills Program, Boston, Ma. (December 11, 12 and 13, 2017).

Lecturer, "Ethical Issues In Aggressive Litigation," National Institute of Trial Advocacy ("NITA"), Building Trial Skills Program, Boston, Ma. (December 13, 2017).

Lecturer, "Ethics: 2016-2017 Update," Continuing Legal Education Program sponsored by the New York State Academy of Trial Lawyers (New York City [October 13, 2017]); (Long Island, New York [October 27, 2017]); (Brooklyn, New York [November 3, 2017]);(Westchester, New York [November 17, 2017]).

Instructor, National Institute of Trial Advocacy ("NITA") LEAP (New York City metropolitan area consortium of public interest organizations) Teacher Training Program, New York City, October 2, 2017.

Lecturer, "Ethics Update For Criminal Law Practitioners," Continuing Legal Education Program sponsored by the Queens Law Associates (Criminal Defender Group), July 10, 2017.

Panelist, "Injustice and Ethics," Continuing Legal Education Program for Appellate Court Attorneys, sponsored by the Appellate Division of the Supreme Court, Second Judicial Department, June 28, 2017.

Panelist, "Injustice and Ethics," Continuing Legal Education Program sponsored by Stroock & Stroock & Lavan, LLP, June 12, 2017.

Panelist, "A 2016-2017 Ethics Update: A Review Of Key Cases And Ethics Opinions," Continuing Legal Education Program sponsored by the Queens County Bar Association, May 10, 2017.

Panelist, "Legal Malpractice 2017:  Attorney Discipline and Risk Management for Lawyers," Continuing Legal Education Program sponsored by the New York State Bar Association Continuing Legal Education And Practice Management Committee, New York City(March 24, 2017) and Melville, New York (March 31, 2017).

Lecturer, "Hot Topics In Ethics 2017," Continuing Legal Education Program sponsored by the New York State Academy of Trial Lawyers Syracuse, New York (March 8, 2017); Rochester, New York (March 9, 2017); Buffalo, New York (March 9, 2017);New York City (April 5, 2017); Long Island, New York (April 6, 2017); and Brooklyn, New York (April 20, 2017).

Panelist, "Current Ethics Issues In Commercial Litigation," Continuing Legal Education Program sponsored by the Commercial and Litigation Section of the New York State Bar Association, New York State Bar Association Annual Meeting, New York City, January 25, 2017.

Lecturer, "Ethical Issues In Aggressive Litigation," National Institute of Trial Advocacy ("NITA"), Building Trial Skills Program, Boston, Ma. (December 8, 2016).

Lecturer, "Recurring Ethical Issues For Criminal Defense Attorneys: Superstar Trial Seminar 2016," Continuing Legal Education Program sponsored by the New York State Association of Criminal Defense Lawyers, Rochester, New York(December 2, 2016).

Instructor, National Institute of Trial Advocacy ("NITA") Building Trial Skills Program, Boston, Ma. (December 7 and 8, 2016).

Lecturer, "Ethics: 2015-2016 Update," Continuing Legal Education Program sponsored by the New York State Academy of Trial Lawyers (New York City [September 3, 2016]); (Long Island, New York [September 30, 2016]); (Brooklyn, New York [November 4, 2016]);(Westchester, New York [November 18, 2016]).

Panelist, "Common Disciplinary Problems and How to Prevent Them: Use of Client Funds and Escrow Accounts," Continuing Legal Education Program for the Manhattan District Attorney's Office, sponsored by the Policy Committee of the Grievance Committee for the First Judicial Department, November 16, 2016.

Panelist, "Understanding Potential Liability With Respect To Quickly Developing And Changing Social Media Landscape: Best Practices For Making Sure That Attorneys Don't End Up With Clients They Never Intended To Represent And The Ethics Of Using Social Media In Jury Selection, Monitoring And Investigation," American Conference Institute Forum on Lawyers' Professional Liability/Legal Malpractice, New York City, October 24, 2016.

Panelist, "New York's New Statewide Disciplinary Rules," Continuing Legal Education Program sponsored by Brooklyn Law School's Center For Criminal Justice, October 29, 2016.

Panelist, "Ethical Issues Arising From The Panama Papers Incident," Continuing Legal Education Program sponsored by the Federal Bar Council, Federal Bar Council Fall Bench and Bar Retreat, Skytop Lodge, Skytop, Pa. October 21, 2016.

Panelist, "Defending the Indefensible: Navigating the Strategic and Ethical Landscape of Defending Clients Who Have Engaged in Indefensible Conduct;" Continuing Legal Education Program sponsored by the Tort, Trial and Insurance Practice Section of the American Bar Association ("ABA"); ABA Annual Meeting, San Francisco, Ca. (August 5, 2016).

Lecturer, "Nuts & Bolts Part I: The Ethics Of IOLA Accounts," Continuing Legal Education Program sponsored by the Asian American Bar Association of New York, June 22, 2016.

Panelist, "A 2015-2016 Ethics Update: A Review Of Key Cases And Ethics Opinions," Continuing Legal Education Program sponsored by the Queens County Bar Association, May 11, 2016.

Lecturer, "2016 Ethics Update For Criminal Law Practitioners And An Introduction To The New State-Wide Uniform Disciplinary Procedures," Continuing Legal Education Program sponsored by the Appellate Division, First Department, Assigned Counsel Plan, March 24, 2016.

Panelist, "The Disciplinary Process And Sanctions In The First Judicial Department," Continuing Legal Education Program sponsored by the Policy Committee of the Departmental Disciplinary Committee for the First Judicial Department, March 16, 2016.

Lecturer, "2016 Ethics Update For Criminal Law Practitioners," Continuing Legal Education Program sponsored by the Kings County Criminal Bar Association, March 10, 2016.

Moderator, "Implementation Of Uniform Rules and Sanctions As Proposed by the Commission On Statewide Attorney Discipline," Continuing Legal Education Program sponsored by the New York State Bar Association General Practice Section and the Committee on Professional Discipline, Annual Meeting of the New York State Bar Association, New York City, January 26, 2016.

Lecturer, "Ethical Considerations In Investigations Utilizing Deception," Continuing Legal Education Program sponsored by the National Attorney General Training And Research Institute, Miami, Fla., December 8, 2015.

Lecturer, "Ethical Issues In Aggressive Litigation," National Institute of Trial Advocacy ("NITA"), Building Trial Skills Program, Boston, Ma., December 7, 2015.

Instructor, National Institute of Trial Advocacy ("NITA") Building Trial Skills Program, Boston, Ma. (December 6 and 7, 2015).

Panelist, "A Continuing Legal Education Evening On American and Talmudic Law: Ethical Yet Effective Practice," Continuing Legal Education Program sponsored by the Jewish Legal Society, December 3, 2015, 2015 (Armonk, New York).

Lecturer, "Ethics: 2014-2015 Update," Continuing Legal Education Program sponsored by the New York State Academy of Trial Lawyers (New York City [September 25, 2015]); (New Hyde Park, New York [October 2, 2015]); (Brooklyn, New York [November 13, 2015]);(West Harrison, New York [November 20, 2015]).

Lecturer, "The Legal Aid Lawyer – A Review Of Conflict Of Interest and Related Principles," Continuing Legal Education Program sponsored by the Legal Aid Society of the City Of New York, September 16, 2015.

Lecturer, "The Ethical Use Of Deception And Interference In The Political Process," Continuing Legal Education Program sponsored by the National Attorney General Training And Research Institute, Philadelphia, Pa., June 10, 2015.

Instructor, National Institute of Trial Advocacy ("NITA") LEAP (New York City metropolitan area consortium of public interest organizations) Teacher Training Program, New York City, May 18, 2015.

Moderator and Panelist, "Exploring Attorney Client Privilege Among General Counsel," Continuing Legal Education Program sponsored by the Commercial and Federal Litigation Section, New York State Bar Association Spring Meeting (Sagamore, N.Y.), May 16, 2015.

Lecturer, "A Fresh Look At The Law Of Retainer And Fee Sharing Agreements," Continuing Legal Education Program sponsored by the New York State Academy of Trial Lawyers, April 22, April 23, May 13 and May 14, 2015 (Albany, New York; Syracuse, New York; Rochester, New York; Buffalo, New York).

Panelist, "A 2014 Ethics Update," Continuing Legal Education Program sponsored by the Queens County Bar Association, April 29, 2015.

Panelist, "The Lawyer's Duty to Check His/Her Facts," Continuing Legal Education Program sponsored by Stroock & Stroock & Lavan, LLP, March 11, 2015.

Panelist, "Sanctions in Criminal and Civil Proceedings and the Implications for Ethics and Professional Discipline," Continuing Legal Education Program sponsored by the General Practice Section & Committee on Professional Discipline, New York State Bar Association Annual Meeting, February 23, 2015.

Lecturer, "A 2014 Ethics Issue Review," Continuing Legal Education Program sponsored by the Appellate Division, Third Judicial Department, Albany, New York, January 23, 2015.

Lecturer, "New York's New Contingent Fee Retainer Rule," Continuing Legal Education Program sponsored by the New York State Academy of Trial Lawyers, January 21, 2015, Brooklyn Bar Association, Brooklyn, New York.

Lecturer, "Ethical Issues In Aggressive Litigation," National Institute of Trial Advocacy ("NITA"), Building Trial Skills Program, Boston, Ma., December 8, 2014.

Speaker, "Aiding and Abetting Claims Against Professionals," DRI Professional Liability Seminar, New York City, December 4, 2014.

Instructor, National Institute of Trial Advocacy ("NITA") Building Trial Skills Program, Boston, Ma. (December 7 and 8, 2014).

Panelist, "Disciplinary Actions:  What To Do When You Receive The Notice From Your State Bar," American Conference Institute Forum on Legal Malpractice Litigation/Legal Malpractice, New York City, November 19, 2014.

Lecturer, "Important Issues In Ethics And Criminal Law," Continuing Legal Education Program sponsored by the Suffolk County Criminal Bar Association, October 30, 2014.

Panelist, "Juror Misconduct," Continuing Legal Education Program sponsored by the Federal Bar Council, Fall Bar Council Fall Retreat Presentation, Inn at Pocono Manor, October 26, 2014.

Lecturer, "Important Ethical Issues for Federal Practice," Continuing Legal Education Program sponsored by the New York State Association of Criminal Defense Lawyers, October 24, 2014.

Panel Moderator, New York State Bar Association Corporate Counsel Section's Fall Continuing Legal Education Ethics Program, October 23, 2014.

Lecturer, "A Critical Update:  New York's New Contingent Fee Retainer Rule," Continuing Legal Education Program sponsored by the New York State Academy of Trial Lawyers, (October 1, 2014 [New York City] and May 15, 2014 [Plainview, New York]).

Lecturer, "Hot Topics In Ethics: 2013-2014", Continuing Legal Education Program sponsored by the New York State Academy of Trial Lawyers, (New York City, Brooklyn; Buffalo; Syracuse; Rochester, Albany; Plainview; April - June 2014).

Panelist, "A 2013-2014 Ethics Update," Continuing Legal Education Program sponsored by the Queens County Bar Association, May 8, 2014.

Panelist, "Interacting With The Media In High-Profile Cases," Continuing Legal Education Program sponsored by the Winston & Strawn law firm, April 29, 2014.

Lecturer, "2014 Ethics Update For Criminal Law Practitioners," Continuing Legal Education Program sponsored by the Kings County Criminal Bar Association, February 28, 2014.

Panelist, "Common Disciplinary Problems and How to Prevent Them," Continuing Legal Education Program sponsored by the Policy Committee of the Departmental Disciplinary Committee for the First Judicial Department, January 9, 2014.

Lecturer, "Emerging Ethical Issues For the Criminal Defense Practitioner," Federal Practice for the State Practitioner, Continuing Legal Education Program sponsored by the New York State Association of Criminal Defense Lawyers, October 4, 2013.

Lecturer, "The Ethics Of Reporting Attorney Misconduct; Correction Of fraud By Clients And Others; and Fee Sharing," Continuing Legal Education Program sponsored by the United States Department Of Homeland Security, Office Of The District Counsel, July 23, 2013.

Panelist, "Ethics and the Municipal Practitioner," Thirteenth Annual Municipal Law Institute, Practicing Law Institute, July 12, 2013.

Panelist, "Legal Malpractice," Continuing Legal Education Program for Principal Law Clerks in the First and Second Judicial Departments, sponsored by the Appellate Division, First Judicial Department, June 25, 2013.

Panelist, "Ten Important Keys For A Criminal Practitioner To Understand In Order To Avoid Ethical Difficulties," Continuing Legal Education Program sponsored by the New York Women's Bar Association, June 18, 2013.

Lecturer, "Ethical Conflicts," Webcast sponsored by the Federal Bar Council, June 12, 2013.

Panelist, "The Role of Empathy in Judicial Decision Making," sponsored by the New York County Lawyers' Association," May 2, 2013.

Lecturer, "Ethical Issues in Civil and Criminal Litigation," Continuing Legal Education Program for Court Attorneys, Principal Law Clerks and Law Secretaries, sponsored by the Appellate Division, Second Judicial Department, Brooklyn, New York, April 24, 2013.

Lecturer, "Ethics: 2012-2013 Update," Continuing Legal Education Program sponsored by the New York State Academy of Trial Lawyers (Brooklyn, New York [June 5, 2013]; New York City [June 6, 2013]; Buffalo [April 10, 2013]; Syracuse, New York

[April 9, 2013]; Rochester, New York [April 10, 2013]; Albany, New York [April 9, 2013]; Plainview, New York [June 13, 2013]).

Panelist, "A 2011-2012 Ethics Update," Continuing Legal Education Program sponsored by the Queens County Bar Association, February 20, 2013.

Lecturer, "Ethics and Lawyer Civility," Continuing Legal Education Program sponsored by the Torts, Insurance and Compensation Law Section and Trial Lawyers Section, New York State Bar Association Annual Meeting, New York City, January 24, 2013.

Lecturer, "The Seven Dangerous Ethical Challenges," Continuing Legal Education Program sponsored by the Appellate Division, Third Judicial Department, Albany, New York, December 5, 2012.

Lecturer, "Ethics/Mandatory Reporting Laws In A Multi-Disciplinary Practice," Continuing Legal Education Program sponsored by the Life Care Planning Law Firms Association, Cleveland, Ohio, October 12, 2012.

Panelist (and drafter of Program Hypotheticals), "America's Got Ethics," Continuing Legal Education Program sponsored by the Federal Bar Council, Fall Bar Council Fall Retreat Presentation, Skytop, Pa., September 23, 2012.

Lecturer, "A 2012 Ethics Update," Continuing Legal Education Program sponsored by the New York State Academy of Trial Lawyers," (New York City [September 21, 2012], Hauppage, New York [September 28, 2012]); Brooklyn, New York [November 16, 2012]); and Westchester, New York (November 30, 2012).

Panelist, "Balancing Duty To Clients With Duty Of Candor To Courts," United States Immigration Court, Southern District of New York Annual Judges Training Program, July 23, 2012.

Panelist, "The Business of Criminal Law:  Retainer Agreements," Continuing Legal Education Program, New York State Association of Criminal Defense Attorneys, July 11, 2012.

Lecturer, "2012 New York Ethics Update," Continuing Legal Education Program sponsored by the Kings County Law Secretaries Association, June 12, 2012.

Speaker, "Ethical Pitfalls Facing The Newly Admitted Lawyer," Orientation Program for Newly Admitted Attorneys, sponsored by the Appellate Division, Second Judicial Department, June 8, 2012.

Panelist, "The Interface Between Legal Malpractice Actions And Disciplinary Proceedings," 38th American Bar Association

National Conference On Professional Responsibility, Continuing Legal Education Program, Boston, Ma., May 31, 2012.

Lecturer, "The New Ethical Tererain: The Ethical Challenges Of Electronic Data," Continuing Legal Education Program sponsored by the Benjamin N. Cardozo School of Law, May 30, 2012.

Lecturer, "15 Ethical Scenarios Attorneys Must Know," Continuing Legal Education Program sponsored by LawLine, May 22, 2012.

Panelist, "Inequitable Conduct Before And After The AIA" and "Conflicts Arising In Patent Litigation," The New York Intellectual Property Law Association Annual Meeting Program, Continuing Legal Education Program, May 22, 2012.

Lecturer, "Ethical Pitfalls In Padilla C.P.L. Section 440 Proceedings," Continuing Legal Education Program conducted by New York County Defender Services, May 17, 2012.

Lecturer, "When The 'Rubber Hits The Road': How Ethical Principles Relating To Conflict And Candor Can Collide," Continuing Legal Education Program, National Academy of Elder Law Attorneys Annual Conference, Seattle, Washington, April 28, 2012.

Lecturer, "Bridge The Gap Program:  The Seven Dangerous Ethical Challenges," Continuing Legal Education Program sponsored by the Benjamin N. Cardozo School of Law, April 22, 2012.

Lecturer, "The Seven Dangerous Ethical Challenges," Continuing Legal Education Program sponsored by the New York State Academy of Trial Lawyers, (Syracuse, New York [April 17, 2012]; Brooklyn, New York [April 19, 2012]; Buffalo [April 25, 2012]; Albany, New York [April 17, 2012]; New York City [May 21, 2012]).

Panelist, "Addressing Bar Admission Issues After Law School Graduation," The New York Bar Admission Process," New York University School of Law, April 13, 2011.

Lecturer, "Ethics in Criminal Law:  A 2011-2012 Ethics Update," Continuing Legal Education Program sponsored by the Kings County Criminal Bar Association, March 29, 2012.

Panelist, "Ethics And Professional Misconduct: An Ethics Update 2010-2011," Continuing Legal Education Program sponsored by the Puerto Rican Bar Association, March 7, 2012.

Panelist, "The Ethics Of Aggressive Lawyering," Continuing Legal Education Program sponsored by The Jewish Lawyers Guild and Stroock & Stroock & Lavan, LLP, February 28, 2012.

Lecturer, "A 2010-2011 Ethics Update," Continuing Legal Education Program sponsored by the New York State Academy of Trial Lawyers," (New York City [September 23, 2011], Plainview, New York [September 24, 2011]) and Brooklyn, New York [November 18, 2011]).

Lecturer, "Cutting Edge Ethics Issues For 2011," Continuing Legal Education Program sponsored by LawLine, November 29, 2011.

Lecturer, "A 2010-2011 Ethics Update," Continuing Legal Education Program sponsored by the Queens County Bar Association, November 16, 2011.

Lecturer, "Ethical Issues in Connection With An Attorney's Handling Of Potentially False Documents," Continuing Legal Education Program sponsored by the National Academy of Elder Law Attorneys, National Aging and Law Institute, Boston, Ma. November 11, 2011.

Panelist, "Best Practices for Solo and Small Firm Practitioners," Convocation on Lawyer Independence Challenges and Best Practices Continuing Legal Education Program sponsored by the New York State Judicial Institute on Professionalism in the Law and Hofstra Law School, November 4, 2011.

Panelist, "Public Forum on Judicial Independence," sponsored by the New York County Lawyers' Association," November 2, 2011.

Lecturer, "What Every Attorney Must Know About Ethics," and Panelist, "The Deadly Dozen: Twelve of the Most Common Mistakes Lawyers Make When Dealing With Clients," Continuing Legal Education Program sponsored by the Practicing Law Institute, October 4, 2011.

Panel Moderator, "Ethics Panel – Annual Seminar – Criminal Law, Procedure and Evidence," Continuing Legal Education Program sponsored by Brooklyn Law School, September 17, 2011.

Lecturer, "What Every Attorney Must Know About Ethics," and Panelist, "The Deadly Dozen: Twelve of the Most Common Mistakes Lawyers Make When Dealing With Clients," Continuing Legal Education Program sponsored by the Practicing Law Institute, August 11, 2011.

Lecturer, "Ethical Issues Relating To Candor By Attorneys," Continuing Legal Education Program sponsored by the United States Department Of Homeland Security, Office Of The District Counsel, July 26, 2011.

Lecturer, "Top Ten Ethical Tips for Practicing Law in New York," Continuing Legal Education Program sponsored by the Appellate

Division, First Department, Assigned Counsel Plan, May 9, 2011.

Lecturer, "Bridge The Gap Program:  New York New Rules Of Professional Conduct – A Critical Key To Litigating Ethically And Avoiding Pitfalls," Continuing Legal Education Program sponsored by the Benjamin N. Cardozo School of Law, April 17, 2011.

Presenter, "New York New Rules Of Professional Conduct – A Critical Key To Litigating Ethically And Avoiding Pitfalls," Continuing Legal Education Program sponsored by LawLine, April 12, 2011.

Panelist, "Crossing the Line:  When Sharp Practice Becomes Unethical," Continuing Legal Education Program sponsored by the Medical Malpractice Committee of the Association of the Bar of the City of New York, April 7, 2011.

Lecturer, "Hot Topics in Ethics: Litigation and Conflicts," Continuing Legal Education Program sponsored by the New York State Academy of Trial Lawyers, (Brooklyn, New York [March 3, 2011]; New York City [March 3, 2011]; Buffalo [March 9, 2011]; Syracuse, New York [March 10, 2011]; Rochester, New York [March 10, 2011]; Albany, New York [March 11, 2011]; Plainview, New York [March 17, 2011]).

Panelist, "Addressing Bar Admission Issues After Law School Graduation," The New York Bar Admission Process," New York University School of Law, February 7, 2011.

Lecturer, "What Every Attorney Must Know About Ethics," and Panelist, "The Deadly Dozen: Twelve of the Most Common Mistakes Lawyers Make When Dealing With Clients," Continuing Legal Education Program sponsored by the Practicing Law Institute, January 3, 2011.

Lecturer, "The Ethics Of Dealing With Possibly Fraudulent Documents," Continuing Legal Education Program sponsored by the New York State Bar Association Elder Law Section, 2010 Fall Section Meeting, White Plains, New York, October 30, 2010.

Lecturer, "What Every Attorney Must Know About Ethics," and Panelist, "The Deadly Dozen: Twelve of the Most Common Mistakes Lawyers Make When Dealing With Clients," Continuing Legal Education Program sponsored by the Practicing Law Institute, October 5, 2010.

Panelist, "Or Else:  Blackmail, Extortion, Threats and Damage Control In Negotiations," Continuing Legal Education Program sponsored by the Federal Bar Council, Fall Bar Council Fall Retreat Presentation, Lenox, Massachusetts, October 3, 2010.

Lecturer, "A 2009-2010 Ethics Update," Continuing Legal Education Program sponsored by the New York State Academy of Trial Lawyers," September 24 and September 25, 2010 (New York City and Plainview, New York).

Lecturer, "What Every Attorney Must Know About Ethics," and Panelist, "The Deadly Dozen: Twelve of the Most Common Mistakes Lawyers Make When Dealing With Clients," Continuing Legal Education Program sponsored by the Practicing Law Institute, August 12, 2010.

Lecturer, "New York's New Rules of Professional Responsibility: The First Year's Shake Out," Continuing Legal Education Program sponsored by the Benjamin N. Cardozo School of Law, May 23, 2010.

Panelist, "The Dissection and Treatment of Ponzi Schemes in the Post-Madoff Word," Continuing Legal Education Program sponsored by the Federal Bar Council, United States Courthouse, Eastern District Federal Courthouse, Central Islip, New York, May 13, 2010.

Lecturer, "Legal Fees and Disputes," Continuing Legal Education Program sponsored by the New York State Academy of Trial Lawyers," March 23, 2010 (Rochester, New York and Buffalo, New York).

Panelist, "Representing Clients in Federal and State Criminal Tax Investigations: Defense Strategies and Prosecution Initiatives Every Attorney Needs to Know," Continuing Legal Education Program sponsored by the Association of the Bar of the City of New York, March 11, 2010.

Lecturer, "Legal Fee Disputes: Old Issues, New Rules," Continuing Legal Education Program sponsored by the New York State Academy of Trial Lawyers and the Brooklyn Bar Association," March 10, 2010.

Panelist, "Addressing Bar Admission Issues After Law School Graduation," The New York Bar Admission Process," New York University School of Law, February 1, 2010.

Lecturer, "Legal Fees and Disputes," Continuing Legal Education Program sponsored by the New York State Academy of Trial Lawyers," January 27, 2010 (Syracuse, New York and Albany, New York).

Lecturer, "What Every Attorney Must Know About Ethics," and Panelist, "The Deadly Dozen: Twelve of the Most Common Mistakes Lawyers Make When Dealing With Clients," Continuing Legal Education Program sponsored by the Practicing Law Institute, January 19, 2010.

Lecturer, "Legal Fees and Disputes," Continuing Legal Education Program sponsored by the New York State Academy of Trial Lawyers," December 2, 2009 (Plainview, New York) and December 7, 2009 (New York City).

Panelist, "Decoding The New Rules Of Professional Conduct: The Changes That Matter," Continuing Legal Education Program sponsored by the Federal Bar Council, United States Courthouse, Southern District of New York, Central Islip, New York, December 3, 2009.

Lecturer, "New York's New Ethical Rules Effective April 1, 2009," Continuing Legal Education Program sponsored by the Queens County Bar Association, November 17, 2009.

Lecturer, "The 2009 Ethics Update," Continuing Legal Education Program sponsored jointly by the New York State Academy Of Trial Lawyers and the Brooklyn Bar Association, October 14, 2009.

Panelist, "The Attorney Disciplinary Process in Federal Court," Continuing Legal Education Program sponsored by the American Bar Association Section of Real Property, Trust and Estate Law (October 7, 2009).

Lecturer, "Ethics Update – 2008," Continuing Legal Education Program sponsored by the New York State Academy Of Trial Lawyers, October 2, 2009 (New York City) and October 3, 2009 (Smithtown, N.Y.).

Lecturer, "What Every Attorney Must Know About Ethics," and Panelist, "The Deadly Dozen: Twelve of the Most Common Mistakes Lawyers Make When Dealing With Clients," Continuing Legal Education Program sponsored by the Practicing Law Institute, September 21, 2009.

Panelist, "Defending Immigration Removal Proceedings 2009 – Ethical Issues in Removal Proceedings," Continuing Legal Education Program sponsored by the Practicing Law Institute, August 18, 2009.

Lecturer, "What Every Attorney Must Know About Ethics," Continuing Legal Education Program sponsored by the Practicing Law Institute, August 13, 2009.

Panelist, "What Every Attorney Must Know About Ethics," and "The Deadly Dozen: Twelve of the Most Common Mistakes Lawyers Make When Dealing With Clients," Continuing Legal Education Program sponsored by the Practicing Law Institute, August 13, 2009.

Lecturer, "New York's New Ethical Rules Effective April 1, 2009 As They Relate To Criminal Law Practitioners," Continuing Legal Education Program sponsored by the Appellate Division, First Department, Assigned Counsel Plan, May 18, 2009.

Panelist, "Decoding The New Rules Of Professional Conduct: The Changes That Matter," Continuing Legal Education Program sponsored by the Federal Bar Council, Central Islip, New York, May 14, 2009.

Lecturer, "New York's New Ethical Rules Effective April 1, 2009 As They Relate To Assigned Criminal Counsel," Continuing Legal Education Program sponsored by Brooklyn Defender Services, April 28, 2009.

Lecturer, "Ethics for Criminal Defense Attorneys," Criminal Advocacy Institute: Criminal Defense Practice, Continuing Legal Education Program sponsored by the New York County Lawyers Association, April 23, 2009.

Lecturer, "New York's New Ethical Rules Effective April 1, 2009 As They Relate To Assigned Criminal Counsel," Continuing Legal Education Program sponsored by District Council 37 (AFSCME) Municipal Employees Legal Services, New York University School of Law, April 7, 2009.

Lecturer, "Ethics Update: Need-to-know Information about New York's New Ethical Rules Effective April 1, 2009 As They Relate To Assigned Criminal Counsel," Continuing Legal Education Program sponsored by the New York State Defenders Association, New York University School of Law, February 28, 2009.

Lecturer, "Ethics In Litigation," Bridge The Gap Continuing Legal Education Program sponsored by the Association of the Bar of the City of New York, February 27, 2009.

Lecturer, "Ethics Update: New York's New Ethical Rules Effective April 1, 2009," Continuing Legal Education Program sponsored by the Kings County Chapter Of The American Inns of Court, Kings County Supreme Court, February 24, 2009.

Panelist, "Private Conduct: Should It Be Subject To Discipline?" Continuing Legal Education Program sponsored by the New York State Bar Association Committee on Professional Discipline for the State Bar's Annual Meeting, New York City, January 28, 2009.

Lecturer and Panelist, "What Every Attorney Must Know About Ethics," and "The Deadly Dozen: Twelve of the Most Common Mistakes Lawyers Make When Dealing With Clients," Continuing

Legal Education Program sponsored by the Practicing Law Institute, January 20, 2009.

Panelist, "Confronting Ethical Issues Arising in Criminal Law Practice – The Search for Truth, Zealous Advocacy v. Zealous Ethics in Criminal Law," Continuing Legal Education Program sponsored by the New York County Lawyers Association, November 19, 2008.

Panelist, "Managing Complex Litigation 2008: Ethical Issues Arising In Settlements," Continuing Legal Education Program sponsored by the Practicing Law Institute, November 11, 2008.

Lecturer, "What Every Attorney Must Know About Ethics," Continuing Legal Education Program sponsored by the Practicing Law Institute, October 7, 2008.

Lecturer, "Conflicts Of Interests: Thinking 'Inside The Box' On Issues Of Informed Consent And Multiple Representation," Continuing Legal Education Program sponsored by the Columbian Lawyers Association, October 7, 2008.

Lecturer, "Ethics Update – 2008," Continuing Legal Education Program sponsored by the New York State Academy Of Trial Lawyers, September 27, 2008 (New York City) and September 28, 2008 (Melville, N.Y.).

Lecturer, "Ethical Issues Relating To Judicial Recusal And Conflicts Of Interest In New York State," Continuing Legal Education Program sponsored by the Association Of Justices Of The Supreme Court Of The State Of New York, September 19, 2008 (West Point, New York).

Lecturer, "What Every Attorney Must Know About Ethics," Continuing Legal Education Program sponsored by the Practicing Law Institute, August 14, 2008.

Panelist and Moderator, "Ethics In Litigation:  A 2008 Update," Continuing Legal Education Program sponsored by the New York State Trial Lawyers' Association, July 30, 2008.

Lecturer,"Professional Responsibility Fundamentals: Common Ethical Issues In Litigation," Bridge The Gap Continuing Legal Education Program sponsored by the Association of the Bar of the City of New York, May 13, 2008.

Panelist, "Ethical Considerations In Litigation: A 2008 Update," Continuing Legal Education Program sponsored by the Queens County Bar Association, May 7, 2008.

Lecturer, "Ethical Issues Relating To The Attorney Client Privilege," Continuing Legal Education Program sponsored by

the United States Department Of Homeland Security, Office Of The District Counsel, March 13, 2008.

Panel Moderator and Lecturer, "Ethical Bounds Of Aggressive Litigation – a 2007 Update," Continuing Legal Education Program sponsored by the New York County Lawyers' Association, February 26, 2008.

Panelist, "Addressing Bar Admission Issues After Law School Graduation," The New York Bar Admission Process," New York University School of Law, February 11, 2008.

Lecturer, "The Ethics Of Negotiation," Continuing Legal Education Program sponsored by the New York State Bar Association Joint Trial Lawyer/Torts Insurance Law Sections (Annual Meeting Program), January 31, 2008.

Panelist, "The Ethics Of Witness Preparation," Continuing Legal Education Program sponsored by the New York State Bar Association Commercial and Federal Litigation Section (Annual Meeting Program), January 30, 2008.

Lecturer, "Conflicts Of Conflicts: 'Thinking Inside The Box' on Issues of Informed Consent and Multiple Representation," Continuing Legal Education Program sponsored by the Appellate Division, First Department, January 28, 2008.

Panelist, "Should Lawyers Be Constrained By The Truth?" Continuing Legal Education Program sponsored by LawLine, December 21, 2007.

Lecturer, "What Every Attorney Must Know About Ethics," Continuing Legal Education Program sponsored by the Practicing Law Institute, December 12, 2007.

Lecturer, "Ethics Update 2007 – The Changing Face of the Attorney-Client Privilege," Continuing Legal Education Program presented under the auspices of the New York State Office of the Attorney General for members of the New York State Legislature, December 7, 2007.

Panel Moderator, "Prosecution And Defense Ethics In Criminal Cases, A 2007 Update," Continuing Legal Education Program sponsored by Brooklyn Law School, December 1, 2007.

Lecturer, "Ethics for the Criminal Law Practitioner – A 2007 Update," Continuing Legal Education Program Sponsored by the Kings County Criminal Bar Association, November 27, 2007.

Lecturer, "How To Deal With An Ethics Or Grievance Complaint and Ethics Update – 2007," Continuing Legal Education Program

Sponsored by the New York City Small Claims Arbitrators' Association, October 23, 2007.

Lecturer, "What Is 'Effective Counsel' In A Criminal Case?" Continuing Legal Education Program sponsored by the Appellate Division, First Department, October 16, 2007.

Panel Moderator and Lecturer, "Critical Issues, Fresh Ideas, Best Practices: The Changing Face Of The Attorney-Client Privilege," Continuing Legal Education Program sponsored by the Corporate Counsel Section of the New York State Bar Association, October 12, 2007.

Lecturer, "Ethical Issues That Arise In Criminal Practice: What Is 'Effective Counsel'?" Continuing Legal Education Program sponsored by the Appellate Division, First Judicial Department and the New York County Lawyer's Association, October 11, 2007.

Lecturer, "Ethics Update – 2007," Continuing Legal Education Program sponsored by the Brooklyn Bar Association, October 10, 2007.

Lecturer, "Ethics Update – 2007," Continuing Legal Education Program sponsored by the New York State Academy Of Trial Lawyers, September 28, 2007 (New York City) and September 29, 2007 (Huntington, N.Y.).

Lecturer, "Ethics For The Younger Attorneys," Continuing Legal Education Program sponsored by the New York State Trial Lawyers' Association, September 25, 2007.

Lecturer, "Ethics Update – 2007," Continuing Legal Education Program sponsored jointly by the New York State Academy Of Trial Lawyers and the Brooklyn Bar Association, August 20, 2007.

Panelist, "Pressures from the Commission on Judicial Conduct," a Continuing Legal Education Program sponsored by the New York County Lawyers' Association Task Force on Judicial Independence, New York University School of Law, June 14, 2007.

Panelist, "Ethical Considerations In Litigation," Continuing Legal Education Program sponsored by the Queens County Bar Association, May 9, 2007.

Lecturer, "Current Ethics Events: New Attorney Advertising Rules- The Fallout From Hewlett Packard," Continuing Legal Education Program sponsored by the National Employment Lawyers Association, May 4, 2007.

Resume of Michael S. Ross

Lecturer, "Ethics Issues In The Zealous Representation Of Mentally Impaired Clients - a Program For Mental Hygiene Legal Services," Continuing Legal Education Program sponsored by the New York State Judicial Institute, April 25, 2007 and May 2, 2007.

Lecturer, "Understanding New York's New Advertising Rules For Attorneys," Continuing Legal Education Program sponsored jointly by the New York State Academy Of Trial Lawyers and the Brooklyn Bar Association, April 11, 2007.

Lecturer, "Ethical Issues Arising In Criminal Practice," Continuing Legal Education Program sponsored by the Appellate Division, First Department, March 28, 2007.

LawLine.Com televised program, entitled: "The Judicial Disciplinary Process," (appeared with Robert Tembeckjian, Chief Counsel of the New York State Commission on Judicial Conduct), March 28, 2007.

Lecturer, "Defense Ethics In Criminal Cases," Continuing Legal Education Program sponsored by Brooklyn Defender Services, March 27, 2007.

Panelist, "Understanding the Boundaries & Effectively Representing Your Client," Bridge The Gap Continuing Legal Education Program sponsored by the Association of the Bar of the City of New York, March 12, 2007.

Panelist, "As Much Dirt As Possible: The Corporate Mole, The Lawyer, And The Consequences," 2007 Mid-Year Meeting, Association of Professional Responsibility Lawyers, February 9, 2007, Miami, Florida.

Panelist, "Addressing Bar Admission Issues After Law School Graduation," New York University Law School, February 7, 2007.

Lecturer, New York Judicial State Institute, "Criminal Ethics Issues Update (2007)," Continuing Legal Education Program for court attorneys, January 8, 2007 and January 11, 2007.

Panelist, "Ethics For Criminal Defense Lawyers (2007)," Continuing Legal Education Program sponsored by the New York Criminal Bar Association and the Legal Aid Society, January 8, 2007.

Panel Chair and Lecturer, "Ethics for Litigators: Real Problems of Everyday Practice," Continuing Legal Education Program sponsored by the Practicing Law Institute, December 18, 2006.

Panelist, "Ethics And New York's No-Contact Rule," Continuing Legal Education Program sponsored by the Practicing Law Institute, December 18, 2006.

Lecturer, "Ethics In Litigation," Practicing Law Institute Continuing Legal Education Bridge The Gap Program, December 13, 2006.

Lecuturer, "Defense Ethics In Criminal Cases," Continuing Legal Education Program sponsored by Brooklyn Defender Services, December 12, 2006.

Panelist, "Ethics For Real Estate Lawyers," Continuing Legal Education Program sponsored by the New York State Bar Association, December 6, 2006.

Panel Moderator, "Prosecution And Defense Ethics In Criminal Cases," Developments In Criminal Law, Criminal Procedure And Evidence Continuing Legal Education Program sponsored by Brooklyn Law School, December 2, 2006.

Lecturer, New York Judicial State Institute, "Ethics Issues Relating To Judicial Recusal In New York State," Continuing Legal Education Program for court attorneys from civil, criminal and family courts throughout New York State; September 27, 2006 [Rochester, N.Y.].

Lecturer, "The Attorney-Client Privilege In The Litigation Process," Continuing Legal Education Program sponsored by Fordham University School of Law, November 28, 2006.

Panelist, "Everyday Ethical Challenges In The Practice Of Law," Continuing Legal Education Program sponsored by the Association of the Bar of the City of New York, November 21, 2006.

Panelist, "Ethics Issues Relating To Judicial Recusal In New York State," 19th Annual Appellate Term, First and Second Judicial Departments, Judicial Educational Seminar, Continuing Legal Education Program sponsored by the New York State Judicial Institute, November 20, 2006.

Lecturer, "Ethical Considerations In Matrimonial Litigation," Continuing Legal Education Program sponsored by the New York Family Law, American Inn of Court, Nassau County Bar Association, November 15, 2006.

Panelist, "Ethical Pitfalls in Medical Malpractice Litigation," Continuing Legal Education Program sponsored by the Medical Malpractice Committee of the Association of the Bar of the City of New York, September 20, 2006.

Panel Moderator and Lecturer, "Critical Issues, Fresh Ideas, Best Practices: Second Corporate Counsel Institute," Continuing Legal Education Program sponsored by the Corporate Counsel

Section of the New York State Bar Association, October 13, 2006.

Lecturer, "Blueprint For Building Your Own Practice 2006: Ethical Considerations For The Single Practitioner"; Continuing Legal Education Program sponsored by the New York County Lawyers' Association, October 13, 2006.

Panelist, "Ethics Update 2006: Recent Decisions," Continuing Legal Education Program sponsored by the Brooklyn Bar Association, October 11, 2006.

Panelist, "Ethical Pitfalls in Medical Malpractice Litigation," Continuing Legal Education Program sponsored by the Association of the Bar of the City of New York, September 20, 2006.

Lecturer, "Ethics And Professionalism: What Every Lawyer Must Know About Ethics," Continuing Legal Education Program sponsored by the Practicing Law Institute, August 21, 2006.

Lecturer, Summer College for District Attorneys, "Prosecution Ethics," Continuing Legal Education Program sponsored by the New York State Prosecutor's Training Institute, August 16, Syracuse, New York.

Lecturer, Annual Basic Course for Prosecutors, sponsored by the New York State Division of Criminal Justice Services; lectured on "Practical Aspects of Evidence at Trial"; Syracuse, New York; August 16, 2006 (previously delivered this same lecture each year from 1978 on).

Lecturer, "How to Avoid Ethical Problems in Your Day-to-Day Practice," Bridge the Gap 2: A Program for Newly Admitted Attorneys Second-Year Program for Newly Admitted Attorneys, Continuing Legal Education Program sponsored by the New York County Lawyers' Association, August 4, 2006.

Lecturer, "Ethical Challenges In Litigation," Continuing Legal Education Program sponsored by the New York Lawyers' Association American Law Academy, July 24, 2006.

Lecturer, New York State Judicial Institute, Summer Judicial Seminar, "Laying Proper Foundations In Civil Cases," July 19, 2006.

Lecturer, "Ethics Update 2006: Ethics In Advertising," Continuing Legal Education Program sponsored by the New York State Academy Of Trial Lawyers, July 12, 2006, Huntington, New York.

Panelist, "Functions and Procedures of the Grievance Committees," Continuing Legal Education Program sponsored by the Appellate

Resume of Michael S. Ross

Divisions First and Second Department for their court staff, June 20, 2006.

Program Coordinator, "Prosecutorial Misconduct and the Disciplinary System," National Conference on Professional Responsibility, a Continuing Legal Education Program sponsored by the American Bar Association, Vancouver, British Columbia, June 2, 2006.

Lecturer, "Ethics For New Trial Attorneys," Continuing Legal Education Program sponsored by the New York State Trial Lawyers' Association, May 10, 2006.

Panelist, "Ethics Update 2006: Proposed Changes To The Lawyer Advertising Rules," Continuing Legal Education Program sponsored by the Brooklyn Bar Association, May 3, 2006.

Lecturer, "Second-Year Program for Newly Admitted Attorneys," Continuing Legal Education Program sponsored by the New York County Lawyers' Association, April 28, 2006.

Lecturer, "Ethics for the Criminal Law Practitioner," Continuing Legal Education Program Sponsored by the Kings County Criminal Bar Association, April 25, 2006.

Panel Member, "Watch Out! Ethical Perils and Pitfalls Facing Small Firm Practitioners," Continuing Legal Education Program sponsored by the Association of the Bar of the City of New York, April 5, 2006.

Lecturer, "The Disciplinary Process from Respondent's Point of View," Continuing Legal Education Program sponsored by The Departmental Disciplinary Committee For The First Department, Committee Member Orientation Program, March 31, 2006.

Panel Moderator, "The Disciplinary Process: How It Works," Continuing Legal Education Program sponsored by the Association of the Bar of the City of New York, March 16, 2006.

Panel Moderator and Lecturer, "Ethical Bounds Of Aggressive Litigation," Continuing Legal Education Program sponsored by the New York County Lawyers' Association, March 15, 2006.

Lecturer, "Ethics In Litigation: A 2006 Update," Continuing Legal Education Program sponsored by Fordham University School of Law, March 15, 2006.

Panel Member, "Lawyers in the Dock: When Does Good Lawyering Become Criminal Conduct?" Continuing Legal Education Program sponsored by the Association of the Bar of the City of New York, February 16, 2006.

Lecturer, "Ethical Issues Arising In Criminal Practice," New York County Lawyer's Association Twenty-Eighth Annual Criminal Trial Advocacy Institute, Continuing Legal Education Program, First Department, January 26, 2006.

Panel Chair and Lecturer, "Ethics for Litigators: Real Problems of Everyday Practice," Continuing Legal Education Program sponsored by the Practicing Law Institute, December 21, 2005.

Lecturer, "The Attorney-Client Privilege In the Litigation Process," Continuing Legal Education Program sponsored by Fordham University School of Law, November 15, 2005.

Lecturer, New York State Institute, "Ethics Update," Continuing Legal Education Program for court attorneys from civil, criminal and family courts throughout New York State; September 28, 2005 [Rochester, N.Y.]; November 1, 2005 [Saratoga, N.Y.]; January 10, 2006 [White Plains, N.Y.]; March 7. 2006 [Uniondale, N.Y.]; and April 4, 2006 [Uniondale, N.Y.].

Lecturer, "Emerging Issues In Attorney Ethics: A Judicial Perspective," Legal Education Program sponsored by the Appellate Division, First Department, for Appellate Court Attorneys, November 15, 2005.

Lecturer, "The Attorney-Client Privilege In The Litigation Process," Continuing Legal Education Program sponsored by Fordham University School of Law, November 15, 2005.

Lecturer, "Professional Ethics – Recent Litigation Developments," Continuing Legal Education Program sponsored by the Columbian Lawyers' Association, November 9, 2005.

Lecturer, "Ethical Issues Arising In Criminal Practice," Continuing Legal Education Program sponsored by the Appellate Division, First Department, October 24, 2005.

Panel Moderator and Lecturer, "Critical Issues, Fresh Ideas, Best Practices: First Corporate Counsel Institute," Continuing Legal Education Program sponsored by the Corporate Counsel Section of the New York State Bar Association, September 23, 2005.

Panelist, "Ethics Roundtable 2005," Continuing Legal Education Program sponsored by the New York State Trial Lawyers Institute, September 16, 2005.

Panel Moderator and Lecturer, "Emerging Issues in Litigation Ethics," Continuing Legal Education Program sponsored by the New York County Lawyers' Association, September 14, 2005.

Resume of Michael S. Ross

Lecturer, "How to Avoid Pitfalls in Your Day-to-Day Practice," Continuing Legal Education Program sponsored by the New York County Lawyers' Association, August 12, 2005.

Panelist, "Ethics for Law Firm Practitioners: Managing Attorney Trust Accounts and Attorney Trust Accounts and Law Office Recordkeeping," Continuing Legal Education Program sponsored by the Practicing Law Institute, August 10, 2005.

Lecturer, "Ethical Challenges In Litigation," Continuing Legal Education Program sponsored by the New York Lawyers' Association American Law Academy, July 25, 2005.

Lecturer, "The Corporate Counsel Forum – Managing The Attorney-Client Relationship In The Corporate Counsel Setting," Continuing Legal Education Program sponsored by American Lawyer Media (May 12-15, 2005).

Lecturer, "What To Do When The Commission On Judicial Conduct Comes Calling," Continuing Legal Education Program sponsored by the Association of Judges of Hispanic Heritage, May 10, 2005.

Panel Moderator and Lecturer, "Emerging Ethical Issues For The Corporate Lawyer," Continuing Legal Education Program sponsored by the New York County Lawyers' Association, May 5, 2005.

Lecturer, "Ethical Pitfalls In Criminal Defense," Continuing Legal Education Program sponsored by the New York State Association of Criminal Defense Lawyers, April 22, 2005.

Lecturer, "Bridge the Gap 2: A Second Year Ethics Program for Newly Admitted Attorneys," Continuing Legal Education Program sponsored by the Practicing Law Institute, April 29, 2005.

Lecturer, "Ethics In Litigation: A 2005 Update," Continuing Legal Education Program sponsored by Fordham University School of Law, April 21, 2005.

Lecturer, "Ethics Update 2005," Continuing Legal Education Program Sponsored by the Brooklyn Bar Association, April 13, 2005.

Lecturer, "The Ethical Limits Of Zealous Representation – A View From Corporation Counsel's Office," In-House Continuing Legal Education Program conducted by the Corporation Counsel of the City New York, March 21, 2005.

Panelist, "Lynn Stewart: The Verdict And Its Implications," Brooklyn Law School, February 17, 2005.

Lecturer, "Ethical Dilemmas For the Civil and Criminal Litigator: A 2005 Practical Review," Continuing Legal Education Program

sponsored by the Appellate Division, First Department, February 7, 2005.

Panelist, "Current Issues In Professional Discipline – 'A Lawyer's Conundrum' – What To Do With Inadvertently Disclosed Information?" Continuing Legal Education Program sponsored by the Committee On Professional Discipline, 128th Annual Meeting of the New York State Bar Association, January 26, 2005.

Panelist, "General Ethics Pitfalls In Litigation," Continuing Legal Education Program sponsored by the Committee On Landlord Tenant Proceedings, 128th Annual Meeting of the New York State Bar Association, January 27, 2005.

Panel Moderator, "Prosecutorial Misconduct and the Disciplinary System," Continuing Legal Education Program sponsored by the Association of the Bar of the City of New York, January 19, 2005.

Lecturer and Panel Moderator, "Ethical Bounds of Aggressive Litigation – A Year 2004 Update," Continuing Legal Education Program sponsored by the New York County Lawyers' Association, January 12, 2005.

Lecturer, at In-House continuing legal education program for the Wilens & Baker lawfirm, and addressed the issue of "Litigation Ethics," November 23, 2004.

Lecturer, "The Role Of Defense Counsel," United States Department of Justice Training Program For Dutch Counsel, New York University Law School, November 17, 2004.

Lecturer, "Ethics In Litigation: A 2004 Update," Continuing Legal Education Program sponsored by Fordham University School of Law, November 16, 2004.

Lecturer and Panel Moderator, "Designing Ethics Programs: What Is Ethics And Professionalism? How Do You Weave It Seamlessly Into A Substantive Program?" Accredited Provider Conference, sponsored by the New York State Continuing Legal Education Board, New York State Judicial Institute, White Plains, New York, November 4, 2004.

Lecturer, "Litigation Ethics: A 2004 Practical Review," Continuing Legal Education Program sponsored by the New York State Academy of Trial Lawyers, October 30, 2004 (Long Island) and October 16, 2004 (New York City).

Panel Moderator and Lecturer, "Emerging Ethical Trends For Corporate Counsel – A Year 2004 Update," Continuing Legal Education Program sponsored by the Corporate Counsel Section of the New York State Bar Association, October 29, 2004.

Resume of Michael S. Ross

Lecturer, "Blueprint For Building Your Practice – Ethical Issues," Continuing Legal Education Program sponsored by the New York County Lawyers' Association, October 22, 2004.

Lecturer, "Professional Ethics: A 2004 Practical Review," Continuing Legal Education Program sponsored by the Appellate Division, First Department, October 19, 2004.

Lecturer, "Recent Developments In Litigation Ethics: A 2004 Update," Continuing Legal Education Program Sponsored by the New York City Small Claims Arbitrators' Association, October 7, 2004.

Panel Moderator and Lecturer, "Ethics For Corporate Counsel – A Year 2004 Update," Continuing Legal Education Program sponsored by the New York County Lawyers' Association, September 22, 2004.

Panelist, "Everyday Ethical Challenges in the Practice of Law," Continuing Legal Education Program sponsored by the Association of the Bar of the City of New York, September 20, 2004.

Panelist, "Ethics In Litigation," Continuing Legal Education in-house program at the U.S. Commodity Futures Trading Commission, New York City Office, July 29, 2004.

Lecturer and Panel Moderator, "Emerging Issues In Litigation Ethics," Continuing Legal Education Program sponsored by the New York County Lawyers' Association, July 22, 2004.

Panelist, "What is Fraud and Why Does It Matter?," 2004 National Conference on Professional Responsibility, Plenary Session, June 4, 2004, Naples, Florida.

Panelist, "Confidentiality and Current, Former, Prospective Clients: It's Not Just About Crowded Elevators Any More," 2004 National Conference on Professional Responsibility, June 4, 2004, Naples, Florida.

Lecturer, "What Every New Attorney Must Know About Ethics," Practicing Law Institute Continuing Legal Education Bridge The Gap Programs; May 26, 2004 (and previous dates, including August 23, 2000; January 2, 2001; May 29, 2001; July 25, 2001; July 25, 2001; August 22, 2001; October 8, 2001; November 30, 2001; January 2, 2002; April 10, 2002; August 29, 2002; November 25, 2002; May 27, 2003; and November 24, 2003).

Lecturer, "Protecting The Record: The Respondent's Point Of View," Continuing Legal Education Program sponsored by The Departmental Disciplinary Committee For The First Department (Refresher Course for Referees), April 29, 2004.

Page 30 of 45

Chair and Panel Moderator, "Bridge The Gap 2: How To Avoid Ethical Pitfalls In Your Day-to-Day Practice," Continuing Legal Education Program sponsored by the New York County Lawyers' Association, April 16, 2004.

Lecturer, "Confronting Possible Client Fraud: Is 'Don't Ask, Don't Tell' An Ethically Acceptable Approach," Continuing Legal Education Program Sponsored by the Brooklyn Bar Association, April 14, 2004.

Lecturer, "Recent Developments In Criminal Litigation Ethics And Fee Regulations," Continuing Legal Education Program Sponsored by the Kings County Criminal Bar Association, April 1, 2004.

Lecturer, "Addressing Client Fraud: The Permissible Bounds Of Advocacy," Continuing Legal Education Program sponsored by the United States Department Of Homeland Security, Office Of The District Counsel, (two part presentation) March 24 and April 27, 2004.

Lecturer, "Competency of Government Attorneys In The Face Of Excessive Caseloads: The Individual Attorney's Duties," Continuing Legal Education Program sponsored by the United States Department Of Homeland Security, Office Of The District Counsel, February 24, 2004.

Lecturer, 27th Annual Criminal Trial Advocacy Institute, sponsored by the Appellate Division, First Department and the New York County Lawyers' Association; "Practical Aspects of Evidence at Criminal Trials"; February 21, 2004 (previously delivered this same lecture on a yearly basis from 1982 on).

Lecturer, "Recent Developments In Litigation Ethics," Continuing Legal Education Program Sponsored by the New York City Small Claims Arbitrators' Association, February 18, 2004.

Lecturer and Panel Moderator, "Ethical Bounds of Aggressive Litigation -- A Year 2002 Update," Continuing Legal Education Program sponsored by the New York County Lawyers' Association, January 21, 2004.

Lecturer, "Recent Developments In Criminal Litigation Ethics And Fee Regulations," Continuing Legal Education Program sponsored by the Appellate Division, First Department, Office Of Special Projects, December 15, 2003.

Lecturer, Seventeenth Annual Appellate Terms' Education Seminar, speaking on "Ethics 2003 Primer: Ethical Highlights - The Year In Review and A Contemporary Overview of the Limits To Aggressive Litigation," St. John's University School of Law, December 1, 2003 (and previously delivered annual updates at

the Appellate Term's annual conferences on November 20, 2002, January 8, 2002 and November 29, 2000).

Lecturer, "Litigation Pitfalls for the New Practitioner," Continuing Legal Education Program sponsored by the New York University School of Continuing And Professional Studies, November 22, 2003.

Lecturer, "Ethics Update 2003: Significant Decisions And Impending Changes," Continuing Legal Education Program sponsored by the Brooklyn Bar Association, November 12, 2003.

Lecturer, "Professional Ethics -- Recent Litigation Developments," Continuing Legal Education Program sponsored by the Columbian Lawyers' Association, November 5, 2003.

Lecturer, "Ethics For Corporate Counsel – A Year 2003 Update," Continuing Legal Education Program sponsored by the Corporate Counsel Section of the New York State Bar Association, October 27, 2003.

Lecturer and Program Moderator, "Ethics For The Transactional Lawyer," Continuing Legal Education Program sponsored by the New York County Lawyer's Association, September 17, 2003.

Lecturer, "Bridge The Gap II" Ethics Program, Practicing Law Institute, August 18, 2003 (and multiple other dates).

Panel Moderator, "Ethics For The Entertainment Lawyer," Continuing Legal Education Program Sponsored by the Association of the Bar of the City of New York, June 11, 2003.

Lecturer, "Legal Ethics In Corporate Transactions," Bridge the Gap Continuing Legal Education Program sponsored by the Association of the Bar of the City of New York, May 28, 2003.

Lecturer, "Ethics For Corporate Counsel – A Year 2003 Update," Continuing Legal Education Program sponsored by the New York County Lawyers' Association, April 23, 2003.

Lecturer, "Conflicts Of Interests In The Immigration Context: Issues For Government Attorneys," Continuing Legal Education Program sponsored by the United States Department Of Homeland Security, Office Of The District Counsel, April 22, 2003.

Lecturer, "Emerging Issues In The Field Of Conflicts Of Interests For The Criminal Practitioner," Continuing Legal Education Program Sponsored by the Brooklyn Criminal Bar Association, February 27, 2003.

Panelist, "Ethics For The Busy Lawyer: Avoiding Ethical Dilemmas In Your Law Practice," Continuing Legal Education Program

sponsored by the New York County Lawyers' Association, February 26, 2003.

Lecturer, "The Duty of Zealous Advocacy And Its Limits: Basics For Newly Admitted Attorneys," Continuing Legal Education Program sponsored by Fordham University School of Law, February 25, 2003.

Lecturer, at In-House Continuing Legal Education program for Freshfields Bruckhaus Deringer, LLP, entitled: "Ethics For The Transactional Lawyer – A Year 2003 Update," January 23, 2003.

Lecturer, "Recent Developments In The Field Of Attorney Candor In Litigation," Continuing Legal Education Program sponsored by the United States Department Of Homeland Security, Office Of The District Counsel, January 28, 2003.

Lecturer, "The Attorney-Client Privilege: Is It Alive And Well?" Continuing Legal Education Program sponsored by the Appellate Division, First Department, Office Of Special Projects, December 9, 2002.

Panelist, "Clarence Darrow: Crimes, Causes and the Courtroom," Continuing Legal Education Program sponsored by the New York County Lawyers' Association, October 26, 2002.

Lecturer, "Ethics For Corporate Counsel – A Year 2002 Update," Continuing Legal Education Program sponsored by the Corporate Counsel Section of the New York State Bar Association, October 25, 2002.

Panelist, Ethics Panel following the dramatic presentation entitled "Impeach Justice Douglas!" Continuing Legal Education Program sponsored by the New York County Lawyers' Association, October 25, 2002.

Lecturer, "Ethical Considerations in Aggressive Trial Lawyering," Continuing Legal Education Program sponsored by Law Journal Seminars/American Lawyers Media, entitled Litigation Summit, The New York Hilton Hotel, October 15, 2002.

Lecturer, "Emerging Issues In The Field Of Conflicts," Continuing Legal Education Program Sponsored by the Brooklyn Bar Association, October 9, 2002.

Lecturer and Panel Moderator, "Ethical Bounds of Aggressive Litigation – A Year 2002 Update," Continuing Legal Education Program sponsored by the New York County Lawyers' Association, September 18, 2002.

Lecturer and Panel Moderator, "Emerging Challenges In Ethical Issues For The Corporate Lawyer," Continuing Legal Education Program sponsored by the New York County Lawyers' Association, June 26, 2002.

Speaker, "New York State Judicial Institute On Professionalism In The Law:  Summit on the Internet and the Practice of Law: Charting a Course for the Twenty-First Century," speaking on the issues of "On-Line Attorney Referral Service:  Partnering With Non-Attorneys and Fee-Splitting Among Attorneys," Fordham University School of Law, June 18, 2002.

Lecturer, "An Ethical Perspective for General Counsel," Continuing Legal Education Program sponsored by Law Journal Seminars/American Lawyers Media, entitled General Counsel Conference, The St. Regis Hotel, June 15, 2004 (previously spoke at the same program in June 2001 and June 2003).

Lecturer, "Recent Developments in Criminal Litigation Ethics," Continuing Legal Education Program sponsored by the Appellate Division, First Department and the Criminal Justice Coordinator's Office, April 22, 2002.

Lecturer, "Ethical Conduct In The Workplace," Practicing Law Institute Program entitled "The Law Library 2002," April 10, 2002.

Lecturer, "Civility and Professionalism," Continuing Legal Education Program sponsored by the Brooklyn Bar Association, April 10, 2002.

Panelist, "The Disciplinary Process:  How It Works," Continuing Legal Education Program sponsored by the Committee on Professional Discipline of the Association of the Bar of the City of New York, April 9, 2002.

Panelist, "Ethics – When Your Case Is On The Line," Continuing Legal Education Program sponsored by the New York County Lawyers' Association "American Inn of Court" Program, April 4, 2002.

Lecturer and Panel Moderator, "Ethical Bounds Of Aggressive Litigation -- An Update on Developments," Continuing Legal Education Program sponsored by the New York County Lawyers' Association, April 3, 2002.

Panelist, "An Ethics Roundtable For 2002," Continuing Legal Education Program sponsored by the New York State Trial Lawyers Institute, March 22, 2002 (previously served as panelist for this program in March 2001).

Resume of Michael S. Ross

Panelist, "Clarence Darrow:   Crimes, Causes and the Courtroom," Continuing Legal Education Program sponsored by the New York County Lawyers' Association, March 18, 2002.

Lecturer, "Ethics and the Criminal Law Practitioner – Avoiding Ethical Pitfalls," Continuing Legal Education Program sponsored by the New York State Defenders Association, March 16, 2002.

Lecturer, "Avoiding Ethical Pitfalls:   Basics for the New Practitioner," Continuing Legal Education Program sponsored by Fordham University School of Law, March 13, 2002.

Lecturer, at ten In-House continuing legal education programs for Kaye Scholer LLP, entitled: "Ethics In Aggressive Litigation"; "Ethics In Complex Litigation"; "Ethics In Transactional Lawyering"; "Ethical Issues In Aggressive Discovery"; and "Ethical Issues In Aggressive Lawyering" (November 2006; December 2006; March 2003; February 2003; December 2000; May 2001; January 2002).

Lecturer, "Ethics and the Criminal Practitioner," Continuing Legal Education Program sponsored by the Criminal Law Section and the Committee on Continuing Legal Education of the New York State Bar Association, November 16, 2001.

Lecturer, "Ethics For Corporate Counsel," Continuing Legal Education Program sponsored by the Corporate Counsel Section of the New York State Bar Association, October 25, 2001.

Lecturer and Panel Moderator, "Bridge The Gap Ethics:  What Every Practicing Lawyer Must Know," Continuing Legal Education Program sponsored by the Association of the Bar of the City of New York, October 22, 2001.

Lecturer, "Ethics For Lawyers In The 21st Century:  Ethics And The Internet," Continuing Legal Education Program sponsored by the New York University School of Continuing And Professional Studies, October 6, 2001.

Lecturer, "How [Not] To Commit Malpractice With Your Computer," Continuing Legal Education Program at "LegalTech," sponsored by Law Journal Seminars/American Lawyers Media, the ABA Law Practice Management Section and other entities; New York Hilton (September 25, 2001).

Lecturer, "Emerging Ethical Issues In Aggressive Litigation," Continuing Legal Education Program sponsored by the Suffolk County Bar Association, September 22, 2001.

Page 35 of 45

Lecturer and Program Moderator, "Ethics For The Transactional Lawyer," Continuing Legal Education Program sponsored by the New York County Lawyer's Association, November 7, 2001.

Lecturer, "Emerging Ethical Issues In Litigation," Continuing Legal Education Program sponsored by the New York City Law Department, September 5, 2001.

Lecturer, "Avoiding Ethical Pitfalls," New York County Lawyers' Association "Bridge The Gap Program: A Program For Newly Admitted Attorneys," August 10, 2001.

Lecturer, "Avoiding Ethical Pitfalls," Association of the Bar of the City of New York "Bridge The Gap Program," June 14, 2001.

Lecturer, "Aggressive Lawyering," Continuing Legal Education Program sponsored by the Brooklyn Bar Association, April 11, 2001.

LawLine.Com televised program, entitled: "The Disciplinary Committee," (appeared with Thomas Cahill, Chief Counsel of the Departmental Disciplinary Committee for the First Judicial Department), April 8, 2001.

Lecturer, "Ethics In Litigation: Aggressive Litigation Tactics," Continuing Legal Education Program sponsored by the Appellate Division, First Department and the Criminal Justice Coordinator's Office, April 2, 2001.

Lecturer, "Ethics and Professionalism," Continuing Legal Education Program sponsored by Law Journal Seminars/American Lawyers Media, entitled Civil Litigation – A View From The Bench And The Bar, The New York Hilton, March 23, 2001.

Lecturer, "Protecting The Record: The Respondent's Point Of View," Internal Training Course For Referees Of The Departmental Disciplinary Committee For The First Department, March 15, 2001.

Lecturer, "Limits to Aggressive Litigation," Continuing Legal Education Program sponsored by the General Practice, Solo and Small Firm Section, New York State Bar Association Annual Meeting, January 24, 2001.

Lecturer, "Avoiding Ethical Pitfalls," New York County Lawyers' Association "Bridge The Gap Program," December 1, 2000.

Panelist, Symposium entitled "The Cooperating Witness Conundrum: Is Justice Obtainable?" held at the Benjamin N. Cardozo School of Law, addressing the issue of "Proposal for Change – Internal and External Disciplinary Systems," November 30, 2000.

Lecturer, "Recurring Ethical Issues Facing Attorneys During Their Careers," Orientation Program For Candidates For Admission To The Bar, sponsored by the Office of the Committee on Character and Fitness, Appellate Division, First Department, October 24, 2000; November 14, 2000; December 5, 2000; January 9, 2001; and March 27, 2001.

Lecturer, "Ethics and the Internet," Continuing Legal Education Program sponsored by the Brooklyn Bar Association, November 8, 2000.

Panelist, "Ethics In Litigation," speaking on the topics of "Is Deceit Acceptable In The Litigation Process," and, "Offering Questionable Testimony And Documents," Continuing Legal Education Program sponsored by the Appellate Division, First Department, October 16, 2000.

Lecturer, "Ethics In Aggressive Litigation:  The Rules of Engagement," sponsored by Law Journal Seminars/American Lawyers Media, New York Hilton Hotel, October 5, 2000.

Panelist, "Ethical Considerations in Public Sector Law," American Bar Association Annual Convention For Year 2000, sponsored by the A.B.A.'s Government & Public Sector Lawyer Division, July 7, 2000, Warwick Hotel, New York City.

Panelist, "Ethical Problems Facing Prosecutors," American Bar Association Annual Convention For Year 2000, sponsored by the A.B.A.'s Criminal Justice Section, July 7, 2000, New York Hilton Hotel, New York City.

Panelist, "Ethical Issues On The Internet," Meeting Of The New York State Association Of Disciplinary Attorneys," May 18, 2000.

Lecturer, "The Internet Effect On Ethical Obligations Of The Law Firm To Its Clients:  Confidentiality And The Internet," sponsored by Law Journal Seminars/American Lawyers Media, New York Hilton & Towers, May 16, 2000.

Lecturer, "The Internet Effect On Ethical And Managerial Functions That Effect Law Firms Internally," sponsored by Law Journal Seminars/American Lawyers Media, New York Hilton & Towers, May 9, 2000.

Program Chair, "Civil Trial Practice:  Firefights In The New Millennium," Continuing Legal Education Program sponsored by Law Journal Seminars/American Lawyers Media; also lecturing at that program on the subject of Ethical Considerations in Trial Lawyering and on the issue of Effective Motions In Limine; The New York Hilton & Towers, May 1 and May 2, 2000.

Lecturer, "The Respondent's Perspective On The Disciplinary Process In The First Department," Internal Training Course For Referees And Panel Members Of The Departmental Disciplinary Committee For The First Department; April 11, 2000.

Panelist, "Basic Legal Ethics Program," speaking on the topic of "Avoiding Ethical Pitfalls In The Area Of Legal Fees," Continuing Legal Education Program sponsored by the Appellate Division, First Department; March 27, 2000.

Lecturer, "Ethics and Professionalism," Continuing Legal Education Program sponsored by Law Journal Seminars/American Lawyers Media, entitled Civil Litigation – A View From The Bench And The Bar, The New York Hilton & Towers; March 21, 2000.

Lecturer, "Understanding The Ethics Terrain," Practicing Law Institute Continuing Legal Education Bridge The Gap Program; February 21, 2000.

Lecturer, "How Not To Commit Malpractice With Your Computer," Continuing Legal Education Program at "LegalTech-ABA Small Firm Track series," sponsored by Law Journal Seminars/American Lawyers Media, New York Hilton & Towers; January 25, 2000.

Lecturer, "Avoiding Ethical Pitfalls," Marino Institute for Continuing Legal Education Program sponsored by the New York Criminal & Civil Courts Bar Association; December 7, 1999.

Lecturer and Demonstration, "Summations," Hofstra Law School Advanced Trial Seminar; December 2, 1999.

Lecturer, "Ethical Challenges For The Experienced Lawyer," Legal Education Program sponsored by St. John's University Law School; October 14, 1999.

Lecturer, "Avoiding Ethical Pitfalls Facing Experienced Practitioners," Continuing Legal Education Program sponsored by Law Journal Seminars/American Lawyers Media, New York Hilton, May 11, 1999 and October 4, 1999.

Lecturer, St. John's Law School, Continuing Legal Education Program on the "Client Fraud Exception To The Attorney-Client Privilege,"; April, 1999.

Panelist, 1998 New York State Bar Association Annual Meeting, Panel sponsored by the Committee on Professional Discipline, "New Rules Governing Lawyers,"; January 29, 1998.

Panelist, Association of Professional Responsibility Lawyers, American Bar Association 1996-1997 Houston, Texas Mid-Year Meeting, "Constitutional and Ethical Implications of Using Law

Firm Personnel as Confidential Informants in Disciplinary Investigations,"; January, 1997.

Panelist, Pace University School of Law, Center for Continuing Education, "Pitfalls In Client Billing In The 1990's," (March, 1997) (sponsored by the Westchester County Women's Bar Association).

Panelist, along with New York Court of Appeals Chief Judge Judith Kaye, at New York Press Club Foundation "Fourth Annual Conference on Journalism," Program on "The Impact of Television in the Courtroom," Columbia University; November 1996.

Lecturer, Brooklyn Bar Association Continuing Legal Education Program; "Pre-trial Hearings and Motions--The Wade Hearing"; 1995.

Instructor, Legal Aid Society Criminal Defense Division Trial Advocacy Program; 1986 through 1994.

Lecturer, Criminal Trial Advocacy In the Federal Courts Course, sponsored by the United States District Court, Eastern District of New York and the Brooklyn Bar Association; "Federal Sentencing Guidelines"; November, 1993.

Symposium moderator at Program entitled: "Should The Exclusionary Rule Be Scrapped?"; New York City Association; October, 1996.

Symposium moderator at Program entitled: "Are Prosecutors Really Subject To The Traditional Enforcement Of Ethical Rules?"; New York City Bar Association; June, 1994.

Lecturer at New York State Association of Criminal Defense Lawyers Program Entitled:  "Cross-Examination To Kill" – The Cross-Examination Of A Fingerprint Expert"; June, 1994.

Panelist, at U.S. Department of Justice First Annual Conference of Professional Responsibility Officers, Washington, D.C., "Private Bar Perspective"; October, 1994.

Symposium moderator at Program entitled:  "Confronting Client Fraud in 1990's:  Disasters in the Making"; New York County Lawyers' Association; June, 1993.

Instructor at U.S. Attorney General's Advocacy Institute, Advanced Advocacy Courses, on the topic of "The Ethics of Defending and Prosecuting Cases"; 1989-1990.

Panelist, Benjamin N. Cardozo School of Law Forum entitled:  "The Pregnancy Police: Prosecution of Maternal Substance Abuse"; April, 1992.

Resume of Michael S. Ross

Lecturer, Cornell Law School Seminar on "Abuses In The Government's Application Of The RICO Statute"; April, 1992.

Panelist, New York School Symposium entitled, "The United States Supreme Court In The 1990's"; February, 1992.

Panelist, WNYC Radio Program on the topic of "Grand Jury Abuse,"; January 13, 1992.

Lecturer, New York State Bar Association Continuing Legal Education Program on "Evidence and the Trial of a Criminal Case" (New York City, Albany, Tarrytown and Rochester, 1991).

Moderator, New York Council of Defense Lawyers Sentencing Program – "Advocacy With the Prosecutor"; October, 1991.

Lecturer, New York County Lawyers' Association Forum on "Forfeiture Laws: An Overview For the Federal and State Practitioner"; January, 1991.

Lecturer, Criminal Trial Advocacy in the Federal Courts Program, sponsored by the United States District Court for the Eastern District of New York and the Appellate Division, Second Department: "Plea Bargaining and Cooperation Under the New Sentencing Guidelines"; November, 1990.

Sponsored Association of the Bar of the City of New York Public Forum entitled: "When Criminal Advocates Talk To The Press: On And Off The Record After Gentile"; April, 1992.

Chaired Association of the Bar of the City of New York public forum entitled: "Are Federal Prosecutors Exempt From Professional Rules of Ethics?"; March, 1991.

Panelist, American Bar Association Program Entitled: "Blasting Into the 90's: Hot Issues In Criminal Law Practice -- The Grand Jury Witnesses of the 90's . . ." November, 1990 (Washington, D.C.).

Lecturer, American Law Institute's Seminar on "The Federal Sentencing Guidelines," Washington, D.C.; April, 1989.

Lecturer, Federal Bar Association (Philadelphia Chapter), Criminal Law Committee Seminar on "Federal Sentencing Guidelines," Philadelphia, Pa.; June, 1989.

Lecturer, Federal Courts Committee, Brooklyn Bar Association on "How To Practice Law and Not Lose Your Fees"; January, 1990.

Lecturer, Criminal Law and Procedure Course, sponsored by the Appellate Division, Second Department and the Brooklyn Bar Association; 1984; 1986; and 1988.

Resume of Michael S. Ross

Guest lecturer since 1981 at special programs and classes at various law schools, including Cornell Law School, Brooklyn Law School, St. John's Law School, New York Law School, Hofstra Law School and John Jay College of Criminal Justice, speaking on criminal law and ethics issues.

Appeared in half-hour interview on CSPAN, on the topic of Grand Juries — their operations and possible abuses (Washington, D.C.; February 26, 1998).

Participant in nationally syndicated program, "American Journal," in mock jury selection for O.J. Simpson trial; September, 1994.

Panelist in the nationally broadcast CBS program "Nightwatch," and discussed the government's attempts to compel attorneys to disclose information concerning their clients; February 1990.

Participant in the Legal Aid Society's Consulting Colleague Program (the "Mentor Program"); 1989-1990.

Testified before Congress' Federal Courts Study Committee on Long Range Planning For the Federal Judiciary; January, 1990.

Testified before the New York State Senate and Assembly Committee on Codes, Joint Legislative Hearings, in connection with "Forfeiture Under New York State Law: A Five Year Assessment"; August, 1989.

Testified before the New York State Law Enforcement Council in connection with proposed amendments to New York State's forfeiture laws; February, 1989.

Testified as expert witness before the House of Representatives, Committee on the Judiciary, on behalf of National Association of Criminal Defense Attorneys in connection with amendments to Federal law governing grand jury practice; June, 1987.

Lecturer at New York Women's Bar Association, Litigation Skills Committee meeting on "Appellate Practice"; November, 1987.

Lecturer, National Network For the Right to Counsel's "Conference on Defending the Right to Counsel"; November, 1986.

Panelist, Citizen's Crime Commission of New York City, "The Proposed State RICO Statute"; May, 1986.

Lecturer, Criminal Law Institute, St. John's Law School; "Seeking Forfeiture of Attorney's Fees, A New Weapon For the Assault Upon Organized Crime"; March, 1986.

Page 41 of 45

Lecturer, Nassau Academy of Law White Collar Crime Program; "The Defense of Criminal RICO Cases"; January, 1986.

Lecturer at In-House Training programs since 1978 for various local prosecutors' offices including the Brooklyn District Attorney's Office, the Staten Island District Attorney's Office, etc.

Lecturer, New York County Criminal Bar Association Continuing Education Lecture Series; lectured on "Defense Perspectives on Court Ordered Electronic Surveillance"; February, 1982.

Instructor and lecturer at U.S. Attorney General's Advocacy Institutes on Public Corruption (San Diego, 1979; New Orleans, 1980); Grand Jury Practice (Denver, 1981; Chicago and Washington, D.C., 1982); and Economic Fraud (Atlanta, 1981; Chicago, 1982).

Lecturer, N.Y. State Division of Criminal Justice Services Seminar on Economic Crime; lectured on "Grand Jury Practice and the Search for Documentary Evidence"; March, 1981.

Instructor, N.Y. City Corporation Counsel "Trial Techniques Program"; February, 1981.

Instructor, N.Y. State Attorney General's Training Program; lectured on "The Acquisition of Evidence at the Grand Jury Stage"; January, 1980.

Lecturer, N.Y. State Division of Criminal Justice Services Seminar on Scientific Evidence and Expert Testimony; lectured on "The Utilization of Expert Testimony at Trial"; April, 1980.

Lecturer, N.Y. State Division of Criminal Justice Services Seminar on the Prosecution and Defense of Rape Cases; lectured on "The Acquisition and Use of Physical Evidence At a Rape Trial"; May, 1979.

Lecturer, N.Y. City Annual Criminal Justice Training Program for Law Students; lectured on "Lineups, Identification Procedures and Electronic Eavesdropping"; 1979 and 1980.

## PUBLICATIONS

Authored various articles and monographs to accompany the Continuing Legal Education Programs as described above.

Co-authored "Defending The Indefensible: Navigating The Strategic And Ethical Landscape Of Defending Clients Who Have Engaged In Indefensible Conduct," American Bar Association *Tort, Trial &*

*Insurance Practice Law Journal*, Volume 52, Issue 3 – Spring/Summer 2017.

Editorial Consultant, <u>The New York Rules Of Professional Conduct: Rules And Commentary</u>, (Winter 2012) Oxford University Press, Edited by the New York County Lawyers' Association Ethics Institute.

Co-authored chapter entitled "Client and Witness Perjury," in the American Bar Association, Section of Litigation, book entitled <u>Litigation Ethics: Course Materials For Continuing Legal Education</u>, (2000).

"How Not To Commit Malpractice With Your Computer," <u>Legal Tech Newsletter</u>, Vol. XVIII, Number 6 (September 2000) and Vol. XVIII, Number 7 (October 2000) (A Two-Part Series) (Published by American Lawyer Media).

"Strategic Moves To Defend White Collar Fees: Is A 'Good' Fee In A White Collar Case Always Really 'Good'," <u>A.B.A. Criminal Justice Magazine</u>, Summer 1999 (Cover Article), Vol. 14, No. 2, pp. 4,<u>et seq.</u>

Authored chapter entitled "Evidentiary Issues and Objections," in <u>New York Criminal Practice (2d ed. 1998)</u>, published by the New York State Bar Association.

"Cooperating with Federal Authorities: Operating on the Outer Limits," <u>A.B.A. Criminal Justice Magazine</u>, Summer 1997 (Cover article), Vol. 12, No. 2, pp. 4,<u>et seq.</u>

"Ethics Column: Alternative Forums for Ethics Disputes," <u>A.B.A. Criminal Justice Magazine</u>, Spring 1996, Vol. 11, No. 1, pp. 42,<u>et seq.</u>

"Ethics Column: Defense – A Decade of Litigating Dangerously: Time to Replace Rhetoric with Reason," <u>A.B.A. Criminal Justice Magazine</u>, Fall 1994, Vol. 9, No. 3, pp. 36,<u>et seq.</u> (co-authored with Sheldon Krantz).

Authored various "amicus" briefs on behalf of the American Bar Association's Criminal Justice Section, the Association of the Bar of the City of New York Criminal Advocacy Committee and the New York County Lawyer's Association Committee on Professional Discipline in connection with issues relating to attorney subpoenas, attorney fee forfeiture and attorney discipline issues.

Authored the original American Bar Association 1988 attorney subpoena resolution and supporting report; and in 1989, authored the original Model Rule of Professional Conduct (i.e., Rule 3.8[f]), adopted in 1990 (later repealed), which

required prior judicial approval of prosecutorial subpoenas to attorneys.

Monograph, Practical Evidentiary Problems at Trial; 1978 through 2002 editions of Manual for Basic Course for Prosecutors (published by the New York State Division of Criminal Justice Services).

Monograph, Practical Aspects of Evidence at Trial; 1995 through 2002 editions of New York County Lawyers' Association Continuing Legal Education Manual For Annual Program On Criminal Trial Advocacy.

Article, "The Forfeiture of Attorney Fees in Criminal Cases: A Call For Immediate Remedial Action," The Record of the Association of the Bar of the City of New York, Vol. 41, No. 4, pp. 469525 (May, 1986).

Monograph, Issuance of Subpoenas Upon Lawyers In Criminal Cases: A Defense Attorney's Perspective (March, 1985); published and distributed by the Association of the Bar of the City of New York.

Monograph, Special Considerations in the Utilization of Title III Electronic Surveillance in Official Corruption and Fraud Cases (April 1982); published and distributed nationally by U.S. Attorney General's Advocacy Institute.

Monograph, Constitutional and Statutory Privileges Before Federal Grand Juries (April, 1982); published and distributed nationally by U.S. Attorney General's Advocacy Institute.

Article, "Robbins v. California and the Standards For Searching and Seizing Packages," Search and Seizure Law Report, Vol. 8, No. 9 (September, 1981).

Monographs, New York State Grand Jury Practice and the Search For Documentary Evidence and Multiple Representation at the Grand Jury Stage (February, 1981); published and distributed throughout N.Y. State by N.Y. State Division of Criminal Justice Services.

Monograph, The Utilization of Expert Testimony At Trial (June, 1980); Reprinted in Manual for Basic Course for Prosecutors (N.Y. State Division of Criminal Justice Services).

Monograph, The Constitutional Acquisition Of Evidence From the Defendant and Its Use At Trial (April, 1979); Reprinted in Handbook on Scientific Evidence and Expert Testimony (N.Y. State Division of Criminal Justice Services).

Resume of Michael S. Ross

Monograph, <u>Evidentiary Aspects Of the Preparation and Trial Of a Rap Case</u> (April, 1979); Reprinted in <u>Sex Offense Manual</u> (N.Y. State Division of Criminal Justice Services).

Monograph, <u>Electronic Surveillance and the Grand Jury</u>, (April, 1978).


## SUPPLEMENTARY BACKGROUND INFORMATION


### ADDITIONAL LEGAL EDUCATION

National College of District Attorneys, Houston, Texas; Criminal Trial Advocacy Course (June, 1977).

Cornell Institute on Organized Crime (August, 1976).


### EDUCATIONAL HONORS

Law School:

Note and Comment Editor, <u>New York University Review of Law and Social Change</u>

International Moot Court Team; Runner-up, International Moot Court Regional Competition (Harvard, 1972)

Undergraduate:

Phi Beta Kappa
Omicron Delta Pi - National Honorary Economics Society
Tau Kappa Alpha - National Honorary Forensics Society
Henry Rutgers Scholar Program (Honors Program)

Graduated with "Honors"
Graduated with "Distinction" from the Department of Economics
Dean's List: 1968-71


Page 45 of 45

# EXHIBIT B

# EXHIBIT B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -

UNITED STATES OF AMERICA,         :    **AFFIDAVIT OF**
                                        :    **WILLIAM FLANAGAN**

       -against-                  :

                                        :    16-CR-832 (KMK)

NICHOLAS TARTAGLIONE,        :

            Defendant.       :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -

STATE OF FLORIDA        )
                            : ss.:
COUNTY OF PALM BEACH   )

1. My name is William Flanagan and I am a licensed Private Investigator in the state of New York.

2. I have worked with Bruce Barket on several matters over the course of the last 5 years.

3. On July 28, 2019, Bruce contacted me to request my assistance in obtaining hand writing exemplars for Jeffrey Epstein.

4. I made several attempts to locate some exemplars but unfortunately, after several attempts, my efforts were unsuccessful.

5. After several hours I contacted Bruce to let him know that I was unable to obtain the exemplars.

**WILLIAM FLANAGAN**

*Sworn to me this* 15 *day of January, 2020*
*in the County of Palm Beach, State of Florida*

Notary Public

EVELYN RENTA
MY COMMISSION # GG 079609
EXPIRES: March 6, 2021
Bonded Thru Notary Public Underwriters

# EXHIBIT C

# EXHIBIT C

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - -

UNITED STATES OF AMERICA,              :       **AFFIDAVIT OF JAY SALPETER**

                                       :

    -against-                          :

                                       :       16-CR-832 (KMK)

NICHOLAS TARTAGLIONE,                  :

                                       :

            Defendant.                 :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - -

STATE OF NEW YORK        )
                         : ss.:
COUNTY OF NASSAU         )

1.  My name is Jay Salpeter and I am a licensed Private Investigator (11000041048) in the state of New York.

2.  I have worked with Bruce Barket on several matters over the course of the last 25 years.

3.  On July 29, 2019, Bruce contacted me to request my assistance in obtaining hand writing exemplars for Jeffrey Epstein.

4.  I made several attempts to locate an exemplar and was met with negative results.

5.  Within several hours of his initial request, I contacted Bruce to let him know that I was unable to obtain the exemplars.

JAY SALPETER

*Sworn to me this* __15__ *day of January, 2020*
*in the County of Nassau, State of New York*

Notary Public

LENSKA RODRIGUEZ
NOTARY PUBLIC, State of New York
No. 01RO6147462
Qualified in Suffolk County
Commission Expires June 5, __2022__

LISVSKA RODRIGUEZ
NOTARY PUBLIC, State of New York
No. 01RO6144925
Qualified in Suffolk County
Commission Expires June 5,

# EXHIBIT D

# EXHIBIT D

## Bruce Barket

| | |
|---|---|
| **From:** | Adam Johnson <a10johnson@bop.gov> |
| **Sent:** | Friday, August 09, 2019 1:54 PM |
| **To:** | Bruce Barket; Stephanie Scannell |
| **Subject:** | Re: Epstein investigation |

Hi Bruce,

It is my understanding that the investigation has concluded and that no charges, disciplinary or otherwise, are being filed against your client. I hope this helps.

Also, I have notified the Duty Officer and Captain, and will notify the Lieutenants that you plan to visit first thing Sunday morning.

Thank you,
Adam

>>> Bruce Barket <bbarket@barketepstein.com> 8/9/2019 1:00 PM >>>
Adam,

Good afternoon. Any update on the investigation regarding Epstein's suicide attempt?

Bruce A. Barket, Esq.
Barket Epstein Kearon Aldea & LoTurco, LLP
666 Old Country Road , Ste. 700
Garden City, NY 11530
(516) 745 1500 [P]  (516) 745 1245 [F]
www.barketepstein.com


This transmittal may be a confidential attorney client communication or may otherwise be privileged or confidential. If it is not clear that you are the intended recipient, you are hereby notified that you have received this transmittal in error; any review, dissemination, distribution or copying of this transmittal is strictly prohibited. If you suspect that you have received this communication in error, please notify us immediately by telephone or email and immediately delete this message and all its attachments

1

# EXHIBIT E

# EXHIBIT E

## Bruce Barket

| | |
|---|---|
| **From:** | Swergold, Jason (USANYS) <Jason.Swergold@usdoj.gov> |
| **Sent:** | Thursday, January 09, 2020 11:12 AM |
| **To:** | Bruce Barket; Aida Leisenring; Tony Ricco; BRUCE KOFFSKY; kenneth@kjmontgomerylaw.com; michael@mbachlaw.com; John Diaz |
| **Cc:** | Comey, Maurene (USANYS) |
| **Subject:** | Tartaglione - Additional Information re Discovery Requests |

All –

1 – We have been informed by MCC that if you would like to inspect the makeshift rope from the July 23, 2019 incident (a picture of which was contained in the report you reviewed at our office), you can arrange to do so by contacting Nicole McFarland, the new legal counsel at MCC. You will not be allowed to take photographs of the rope.

2 – We have been informed that in the course of its investigation into Mr. Tartaglione's contraband cellphone, BOP created forensic reports of the phone and SIM card. We have not obtained or requested copies of these reports. If you would like to review the reports, please let us know. In that case, in light of earlier claims of privilege raised by Mr. Barket, we will ask BOP to provide the reports to a walled off team of AUSAs to review for privileged materials. That walled off team of AUSAs will coordinate producing the reports to you and will work with you to determine what, if any, portions of the report can be provided to the case AUSAs

3 – We have been informed by BOP that apart from the photographs contained in the materials you reviewed at our office regarding the July 23 incident, no other pictures or videos were taken from inside the Tartaglione/Epstein cell.

4 – We have received additional information from BOP regarding the video outside of the Tartaglione/Epstein cell, and we will be filing a letter with the Court shortly. As stated in the letter, the video that we have is available for review at our office at your convenience.

Jason M. Swergold
Co-Chief, Narcotics Unit
United States Attorney's Office
Southern District of New York
One Saint Andrew's Plaza
New York, New York 10007
Tel: (212) 637-1023
jason.swergold@usdoj.gov

1

# EXHIBIT F

# EXHIBIT F

# Bruce Barket

| | |
|---|---|
| **From:** | Bruce Barket |
| **Sent:** | Wednesday, December 04, 2019 3:00 PM |
| **To:** | 'BOBBI C STERNHEIM' |
| **Cc:** | Aida Leisenring |
| **Subject:** | RE: Tartaglione |

Bobbi,

I was able to meet with Nick yesterday. Nick has made it crystal clear to me that while I may disclose certain confidential information concerning his texting using the contraband phone – and I will disclose that information below – I am not authorized to disclose the contents of the messages. I should also say here that it is my current understanding that whatever information is provided to you will be shared with the entire defense team notwithstanding Nick's repeatedly stated desire that confidential information not be circulated in a manner that it will be available to Mr. Ricco. I understand that you view your role as *Curcio* counsel as requiring disclosure of such information to all counsel, including Mr. Ricco, but it is important that you understand that I believe that I must follow the directives of Nick in limiting disclosure of confidential information as dictated by the confidentiality mandate of Rule 1.6. I also understand that eventually, Judge Karas may have to resolve the disclosure issues.

With the above caveat as background, Nick has authorized me to make the following disclosures to you with the understanding that these *specific and limited* disclosures will be shared by you with the defense team and maybe in the report to the judge.

Nick used the contraband phone (516 708 5275) to contact me and Ms. Leisenring as follows.

1. Nick sent a total of 10 text messages to Ms. Leisenring from May 12, 2019 to May 17, 2019 and one other on June 22, 2019. Most of the messages were no more than a few words. Ms. Leisenring did not solicit or respond to the messages.     2

2. He sent me one text message on June 2, 2019 near midnight which I did not see until the next day and initially did not realize was from Nick. At 5 am, I responded that I did not recognize the number. Later on June 2nd, I realized it was Nick texting me and I sent a short response in 5 separate texts consisting of no more than a few words. Nick then sent a two word response and that ended the exchange. To the best of my knowledge, he did not text me before or after that.

3. He called Aida 3 times from the phone from May 16-May 18, 2019. Those calls were unsolicited by Ms. Leisenring.

4. I do not believe that Nick ever called me but I can't be sure, as I do not have detailed call records.

## REDACTED - PRIVILEGED

With respect to the Epstein note, I cannot provide this to you based upon Nick's specific instructions to me that I not share that note with you or anyone outside my firm other than my firm's Professional Responsibility Counsel, Michael Ross. I want to emphasize that yesterday Nick again stated to me in the strongest possible terms that he is opposed to me or you providing the note to anyone. For that reason, I would like to discuss with you how the *Curcio* process will address any potential conflict arising from the note while protecting Nick's right to keep his communications to his lawyers private and maintain his confidences. As I made clear in court, my firm's outside Professional Responsibility

1

Counsel, Michael Ross, is consulting with me on this issue and he has advised me that we should proceed lock-step and not make any disclosures against Nick's wishes without a Court directive. Mike is available to speak to you directly about his views on the matter.

Finally, I would like to speak to you about the open ended request you made for any other material relevant to the *Curcio* inquiry. As you know, there have been many assertions by Mr. Ricco concerning the scope and subject matter of your inquiry, and in order to properly provide you with relevant information, I need to get some specific guidance from you as to what you believe the specific *Curcio* issues are.

Bruce A. Barket, Esq.
Barket Epstein Kearon Aldea & LoTurco, LLP
666 Old Country Road , Ste. 700
Garden City, NY 11530
(516) 745 1500 [P]  (516) 745 1245 [F]
www.barketepstein.com

This transmittal may be a confidential attorney client communication or may otherwise be privileged or confidential. If it is not clear that you are the intended recipient, you are hereby notified that you have received this transmittal in error; any review, dissemination, distribution or copying of this transmittal is strictly prohibited. If you suspect that you have received this communication in error, please notify us immediately by telephone or email and immediately delete this message and all its attachments