1

191120tartaglioneC        Conference

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------x

UNITED STATES OF AMERICA,

       v.                          16 Cr. 832 KMK

NICHOLAS TARTAGLIONE,

         Defendant.

-------------------------------x

                          United States Courthouse
                          White Plains, N.Y.
                          November 20, 2019
                          12:40 p.m.

Before:

              THE HONORABLE KENNETH M. KARAS,

                              District Judge

APPEARANCES

GEOFFREY S. BERMAN
    United States Attorney for the
    Southern District of New York
MAURENE COMEY and JASON SWERGOLD
    Assistant United States Attorneys

BRUCE BARKET and AIDA LEISENRING
    -and-
ANTHONY RICCO, Learned Counsel
    -and-
JOHN DIAZ
    -and-
MICHAEL BACHRACH
    -and-
BRUCE KOFFSKY,
   Attorneys for Defendant Nicholas Tartaglione

ALSO PRESENT:   BOBBI C. STERNHEIM, Curcio Counsel
                 DAVID RUNKHE, Resource Counsel

       SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
                (914)390-4053

2

191120tartaglioneC          Conference

(In open court)

THE COURT:  In the matter of the United States of America v. Tartaglione, Docket 16 Cr. 832.

Counsel, please state your appearances for the record.

MS. COMEY:  Good afternoon, your Honor.  Maurene Comey and Jason Swergold for the government.

THE COURT:  Good afternoon to you both.

MR. BARKET:  Good afternoon, your Honor.  Bruce Barket and Aida Leisenring for Mr. Tartaglione.

THE COURT:  Good afternoon.

MR. RICCO:  Good afternoon, your Honor.  Anthony Ricco for Mr. Nicholas Tartaglione.

MR. DIAZ:  Good afternoon, your Honor.  John Diaz, appearing for Nicholas Tartaglione.

MR. BACHRACH:  Good afternoon, your Honor.  Michael Bachrach for Nicholas Tartaglione.

MR. KOFFSKY:  And good afternoon, your Honor, Bruce Koffsky for Mr. Tartaglione.

MR. RICCO:  I'd like the record to reflect again that we are in the presence of our Resource Counsel David Runkhe who is at the back table.

THE COURT:  Good afternoon, Mr. Runkhe.

MR. RICCO:  And also *Curcio* counsel decided to join us this afternoon, Bobbi Sternheim.

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

191120tartaglioneC        Conference

THE COURT:  And always welcome, and good afternoon.

MS. STERNHEIM:  Good afternoon.

THE COURT:  Welcome, Ms. Sternheim.

Any updates, Ms. Comey, from the government's perspective?

MS. COMEY:  Your Honor, the government is still ready for trial.  As we set forth repeatedly, we are asking the Court to set a trial date.

I know your Honor has read our letter setting forth the various reasons that we believe a trial should be set as quickly as possible.

I won't repeat them all, but I would like to emphasize the interests of the family members of the victims in this case, many of whom are in the courtroom here today, and several of whom have come to nearly every single conference in this case from its inception.  They have been following this case very closely and they have a real interest in seeing this case brought to trial as quickly as possible.

THE COURT:  As do I, but there are some complicated representation issues that have to be resolved through the *Curcio* process.  So, in my view, until we resolve those issues, we just can't set a trial date.  And I say that very reluctantly because I am sympathetic to all the points in your letter and the ones that you have emphasized here today, but it would be imprudent to adopt a schedule until these

SABRINA A. D'EMIDIO – OFFICIAL COURT REPORTER
(914)390-4053

4

191120tartaglioneC        Conference

representation issues are resolved.

MS. COMEY:  Understood, your Honor.

In light of your Honor's ruling on that matter, we do have four issues that we would like to bring up for your Honor. The first is whether it would be possible to set a schedule for Capital motions, even if it is not possible to set a schedule for a trial.

THE COURT:  No, because it's the same -- the representation issues are -- I don't even know the full scope of the issues that have to be resolved at the *Curcio* hearing because I'm waiting for *Curcio* counsel to submit a report, but they are pervasive in terms of the representation of Mr. Tartaglione.  And so setting a schedule, again, would just be imprudent.  Really, it would be giving the people you have identified sort of a false representation as to how realistic that schedule is going to be, and I don't think there's any purpose in doing that.

*Curcio* counsel is working very hard because, obviously, she understands the importance of getting this resolved in terms of the rest of the case getting back on track.  And so, given that, I just don't think that there's anything we can do about setting even a Capital motion schedule, because that's obviously a very important part of the case.  So, we need to get the representation issues figured out.

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

5

191120tartaglioneC        Conference

MS. COMEY:  Thank you, your Honor.

Our second question is whether your Honor can provide us any guidance about the anticipated timing of resolving the *Curcio* issue.

THE COURT:  As soon as practicable.  I can't give you a schedule because it all starts with *Curcio* counsel completing the report, and then, obviously, I intend to move forward quickly, but thoroughly and carefully, with the *Curcio* process.

MS. COMEY:  Thank you, your Honor.

Our third question is whether the government should be aware of, or involved in, the resolution of the *Curcio* issue at this point.

THE COURT:  So, that is an issue that is actually foremost on my mind, and I'm doing research on that.

And to counsel for Mr. Tartaglione, if I think that there needs to be more notice provided to the government, I will of course alert you to that, and I'll hear you if you have any objections, but I think in some way, shape or form, the government does have to be informed as much as possible without, of course, jeopardizing the defense strategy, internal defense workings, about the issue.

Some of that will be informed when I get the report honestly, Ms. Comey.  I don't want to get ahead of myself here, but I do think -- I'm very sensitive to that concern.

MS. COMEY:  Thank you, your Honor.

191120tartaglioneC        Conference

Our final request is we want to make sure that there is a clear record that the defendant understands what is happening with the delay and agrees with his defense team's continued requests for delay.  So we would ask that the Court allocute the defendant to confirm that he understands what is going on and agrees with the continued requests for adjournments.

THE COURT:  Mr. Barket, do you have a reaction to that?

MR. BARKET:  I do, Judge.  Because of the proposed -- relative proposed timing of the trial dates and I think -- I know we exchanged them, so the parties certainly know what they are and conversations we've had internally with Mr. Tartaglione, this process has, I don't want to say it's taken long because it needs to take as long as it's taken, it's not going to in any way interfere with these proposed dates which are off in the future.

So the decision by the Court not to try the set dates now is not something that Mr. Tartaglione objects to because it really doesn't affect what's going on now.  We are still working on our investigation of -- Capital Counsel, Learned Counsel are doing work on the mitigation front.  We have investigators.  We're actively pursuing the things we're supposed to be pursuing now.

So to say to Mr. Tartaglione, Do you mind not setting

191120tartaglioneC        Conference

a trial date today, is I think what they're asking, which we can set one or not, it's not going to affect the work that's going on, so there's nothing he needs to waive at this point. No matter what happened with the *Curcio* issue, we would not be seeking a trial date in the time that the *Curcio* matter is likely to be resolved and certain to be resolved.

THE COURT:  So let me say this for the record, and then I'll hear from Mr. Ricco, as well.  The one thing that I think is very important that the record reflect, because it's 100 percent true, is that notwithstanding the *Curcio* issues that are percolating, counsel for Mr. Tartaglione have been working diligently on the assumption that this case should, of course, proceed as quickly as it can, obviously consistent with their obligation to do fulsome investigation and legal research and everything that they need to do to effectively represent Mr. Tartaglione.

There has been no TV time-out called by counsel for Mr. Tartaglione while this is getting resolved.  So while the *Curcio* issues I think need to be resolved before we can be specific about schedules, they have not caused any let-up on work that's being done on Mr. Tartaglione's behalf.

And assuming that the *Curcio* issues don't resolve in any disruption of the roster of attorneys representing Mr. Tartaglione, then I think Mr. Barket is 100 percent right, that the work that he and the other lawyers are doing will

191120tartaglioneC        Conference

allow for the setting of a trial date consistent with whatever the range is that you all have been discussing.

THE COURT: Mr. Ricco, did you want to add anything?

MR. RICCO: I completely agree with the Court's analysis. I would just add something to what Mr. Barket said, and that is Capital Counsel are diligently working on all aspects of the defense in this case, both liability and penalty phase.

MR. BARKET: And we are, too.

THE COURT: So, I mean, Mr. Barket, I guess the only question is whether or not there's a downside to allocuting Mr. Tartaglione on the question that he understands that until -- and he may not agree with my analysis, but at least he -- I want him -- is there a downside to him -- my making clear to him that the hold-up is only with respect to setting the trial date, not when the trial is actually going to take place; to your point, that the *Curcio* issue may, in my view, prevent us from scheduling the trial date, but ultimately, the resolution of that issue doesn't necessarily affect the trial date.

MR. BARKET: Correct.

THE COURT: So, is there any downside to my allocuting Mr. Tartaglione about that?

MR. BARKET: I just want to make sure we're clear, because I think I understand what you're saying, and I hope you

191120tartaglioneC        Conference

understand what I'm saying.

THE COURT:  Yes.

MR. BARKET:  Nothing -- setting -- the *Curcio* inquiry or matter, how ever you want to phrase it, assuming, as the Court said, that the roster doesn't change dramatically, then the range of trial dates that are some point off in the future are not going to be affected one way or the other.  We'll either agree or the Court will order something and that will go forward, so there's nothing to allocute to now.  It's not as if he's being asked to waive something he otherwise wouldn't be asked to waive.

Let's say we had set a -- I don't even want to suggest a date --

THE COURT:  A date, whatever.

MR. BARKET:  -- a date in the future for the trial, we would not here be today saying, Mr. Tartaglione, is it okay that we adjourn the case another month, because another month won't include that trial date.  The trial date is certainly going to be well beyond the *Curcio* issue.  So there's nothing for him to waive now that he wouldn't waive if there was no *Curcio* issue.

If there's no *Curcio* issue, we'd argue about the trial dates, perhaps, or agree upon it, and everybody would agree I think at this point that we're not going to trial this month, next month or any time in the next couple of months; and

10

191120tartaglioneC        Conference

that we'd adjourn the case for further action on some of the matters that are going to come up.

We have a pretrial suppression hearing to do. Presumably, they've consented.  I assume the Court will order that.

THE COURT:  Yes.

MR. BARKET:  We'll wait for that order.  We have other motions that have to be done, so there's really nothing for him to allocute to.  I think that I understand what your Honor is saying and I think Mr. Tartaglione does.

So, I don't object, but I don't think there's anything to ask that would be --

THE COURT:  I think also the record should be clear Mr. Tartaglione has not been shy.  When he has concerns, he has raised them, and I say that because that's in fact the record.

So if Mr. Tartaglione wanted to voice his opinion, he obviously -- I would prefer he do it through you, and he's here, and he is aware of the *Curcio* issue that's out there to be resolved.

So I understand your concern, Ms. Comey.  I do.  I do think that Mr. Barket is right and Mr. Ricco is right that counsel are proceeding on the assumption that there's going to be the setting of a trial date, and then, obviously, interim dates somewhere in the range of what's been discussed between you all and that the *Curcio* issue for now is not going to

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

11

191120tartaglioneC        Conference

disrupt that conversation.

MS. COMEY:  Yes, your Honor.

One point I would add, though, is that there is the possibility that the *Curcio* issue could disrupt the make-up of the defense team and could therefore lead to additional delay.

THE COURT:  Correct.

MS. COMEY:  That is the part of what we are worried about.

THE COURT:  And I think Mr. Tartaglione understands that.  And I think there may come a point where there needs to be more specific conversation, but I'm afraid at this point, it's kind of moot court.  We don't know.  And I don't know what the value is in going down a set of hypotheticals with Mr. Tartaglione.

He is aware that his lawyers are working around the clock to get this case to trial as soon as it can be done. What that date is going to be obviously has been the subject of a lot of discussion, I'm gathering, internally among the defense team and with the government.  And he also understands that there is a lot of motion practice to be done and everything else, and all that work is being done by his attorneys.

And the *Curcio* issues may have zero effect on the scheduling of everything.  And if it looks like they are going to have an effect, then I think at that point, it would be

191120tartaglioneC        Conference

appropriate to have a more specific conversation with Mr. Tartaglione.

MS. COMEY:  Understood, your Honor.  Thank you.

THE COURT:  Okay.  Anything else, Ms. Comey, from your perspective?

MS. COMEY:  No.  Thank you, your Honor.

THE COURT:  Mr. Barket.

MR. BARKET:  Actually, relatively briefly, Judge. Although it's important, right around the time of the last court date, Mr. Tartaglione had a hard drive in his possession at the correctional center, and he has been working --

THE COURT:  This is to review the discovery?

MR. BARKET:  It was given to him by the government. It's not -- given some of the other issues, perfectly legitimate hard drive provided by the government.  And he had been working in the way that I wish young lawyers in my office would work on cases: consistently, thoroughly, extraordinarily helpful in identifying -- he's been very helpful to the defense, very helpful --

THE COURT:  And he got this right around the time of the last conference --

MR. BARKET:  He had it, he had it -- I don't remember exactly when the hard drive was delivered, at some point over the late summer, I think.

THE COURT:  Okay.

191120tartaglioneC        Conference

MR. BARKET:  Whenever it was, there's certainly a record of it, but he received it, and it's the full breadth of the discovery.  And the discovery here is voluminous, as you might expect, but it is very -- it includes dumps of phones, reports, photographs of multiple scenes, multiple areas, aerial photographs.  So, having it on a single hard drive, it's important to review it because it allows you to go from item to item with some continuity.

If you broke that down into disks -- and there's a reason for me mentioning this.  If you broke it down into disks, it would bevy very, very difficult to review the discovery with the same efficiency, because as you're looking at a report, it refers to a video --

THE COURT:  You have to pop out the disk.

MR. BARKET:  Right.  And it's even more complicated than that when you're dealing with phone dumps because there's -- massive amounts of information exists on smart phones these days.  That hard drive was given to him.  He used it on the unit without incident for I think months, weeks, at least, but I think longer than a month, perhaps two or three months.

For whatever reason, right around the date of the last court date, it was taken from him.  And the rule was, you can't have a hard drive on -- in your possession on the tier. If you want to see the hard drive, you have to go to Education,

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

191120tartaglioneC        Conference

and it's a spot, I guess, like a library or something, and at that point, you can review the discovery.

He's asked -- he keeps track, I think it's 60 times -- 65 -- he's gone, I think, a handful, four or five, probably can count on one hand.  And even when he's been brought down, to get the hard drive to him and get it uploaded, there's a delay and it limits his ability to do this.

So I have obviously been in communication with -- initially with the MCC -- excuse me, just getting over a little cold -- and with the government, and what I've been told, what I was told last week, I've been told a couple times it's been fixed, and no bad faith implied from Mr. Johnson who has been great, or the government, but it wasn't fixed.

THE COURT:  When you say "fixed," what were they saying was fixed?

MR. BARKET:  No problem.  There will be people in Education, he can go down whenever he wants, they'll let him go in the attorney rooms, and it just wasn't happening because of either lack of staff or the attorney rooms were filled, whatever the issue was.

The latest communication Wednesday -- late last week, Thursday or Friday, was that, okay, it's fixed now, he'll be able to go to Education, which isn't open, by the way, or hadn't been open on the weekends and it had limited hours during the week, and he'll be fine.  So, he went Saturday and

191120tartaglioneC        Conference

Sunday, but only had viewed the discovery or had the opportunity to review the discovery for an hour or two because of some of the issues that I alluded to.

I also was told that they're going to institute some kind of new rule that's going to allow the hard drive back on the tier, but those regulations haven't been promulgated.  It hasn't been done yet.

THE COURT:  These are Washington-based regulations or MCC?

MR. BARKET:  I honestly don't know because he had the hard drive there.  And I hate to bring up rumors, but there's this -- there are -- there is this -- it actually came, I think, from an attorney who I won't name, but somebody had a laptop who had a complicated, serious case, had a laptop on a tier in order to review discovery.  It was obviously provided by the government and screened or some sort.  So I don't know what's going on because I don't know.

But the first reason I was given for the hard drive being prohibited is you never know; people have all kinds of things on the hard drive.  And yes, I suppose that's true except it came from the government, so we know what's on it.

THE COURT:  Yes.

MR. BARKET:  So, it's been a problem now for a month that I've been communicating with Mr. Johnson and included the government in the last few e-mails.  It's one of those

191120tartaglioneC        Conference

frustrating things.

THE COURT:  Okay.

MS. COMEY:  Your Honor, first, I'd like to clarify that the defendant has had a drive with his discovery since it was initially produced in 2017.  Since then, there has been additional discovery production.  The defense team asked this past summer that we put all of the discovery together on a single drive for the defendant and send it to the MCC.  So he has had discovery material since the very early time of this case with him in his facility.

THE COURT:  And how much has been produced since the summer?  I assume percentage-wise, a very small --

MS. COMEY:  Since the summer, I don't believe there have been any discovery production.

THE COURT:  Whatever it is, it's a very small percentage of the total discovery?

MS. COMEY:  Yes, your Honor, so he has everything.

THE COURT:  Okay.

MS. COMEY:  In terms of the access to the drive at the MCC, it is institution-specific what the security protocols are for whether an inmate can have disks or drives on the tier.

My understanding is that the MCC is working to get lockers where inmates can keep their drives on the tier when they're not using them on computers, and they need to get more computers onto the tier to allow access to the drives.  They

191120tartaglioneC        Conference

are working on that.  I do not have a timeline of when that will be complete.

THE COURT:  How did Mr. Tartaglione get the drive to begin with if it's supposedly prohibited on the tier?

MS. COMEY:  It was apparently an oversight when he was taken out of SHU and put onto the tier.

THE COURT:  Okay.

MS. COMEY:  My understanding is that he can have as many disks of material as he wants on the tier.  So anything that he wants to review on the tier, my office, Ms. Greenwood, defense team can put onto disks and send to him to have in his cell and review on the tier any time he wants.

In the meantime, Mr. Johnson has worked with the Education staff to give Mr. Tartaglione as many opportunities as possible to go down to Education.  The e-mail that I was copied on said that he now has more access to his discovery in the law library than any other inmate at the MCC.  Apparently, they are making it available to him Monday through Thursday, as well as on Friday evenings, Saturdays and Sundays.

He has apparently declined to go to the law library on a couple of occasions.  So, from our perspective and Mr. Johnson's perspective, Mr. Tartaglione has had ample time to review his discovery.  That said, to the extent there are ongoing issues, we are happy to work with the MCC to try to figure out other ways to allow the defendant to review

18

191120tartaglioneC        Conference

discovery while we wait for the MCC to set up the policy that lets him have the drive on the tier.

THE COURT:  Do you know what the security concern is with having the hard drives on the tier?

MS. COMEY:  I don't, your Honor.

THE COURT:  Okay.  Okay.

MR. BARKET:  What I don't mean to say -- I mean, the idea that he refused is --

THE COURT:  I don't think that's where -- right --

MR. BARKET:  Well, --

THE COURT:  I think it sounds to me like Mr. Tartaglione has had ample opportunity to review the discovery, and I understand why the hard drive is preferable over reviewing the discovery via disks, but what I am being told is that Mr. Tartaglione is going to be given access to the drive Monday through Thursday, Friday nights and Saturdays and Sundays, and he gets -- if he wants, he can use disks to review the discovery.  So I don't think this is a situation where he's not getting an opportunity to review discovery.  I think it's a question of convenience.

And in the meantime, the MCC, it sounds like, they're working toward a change in the protocols where they can get these lockers and the hard drive can be available to Mr. Tartaglione and others on the tier.

So I don't at this point see that there's any

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

191120tartaglioneC        Conference

intervention that's appropriate or necessary from my perspective. I would encourage you all to keep talking to MCC and see if there are ways to make it more convenient to Mr. Tartaglione, but this is not a case where, unlike other situations, where a person just can't get access to his discovery at all; that's not what's going on here.

So I'm not insensitive to the convenience factor, but to me, it's not enough for a judge to tell the MCC how to run itself.

MR. BARKET:  Just the -- again, my point at the beginning of this was, they said it was fixed, was a reference to he has access Monday through Thursday, Friday night, Saturdays and Sundays. With all due respect, I gather that's what they want to have happen --

THE COURT:  Yes.

MR. BARKET:  There's, once again, a large area between the objective and the practical --

THE COURT:  And that's what I'm asking you all to keep working on, to see if it can be a little bit more seamless, but --

MS. COMEY:  Yes, your Honor.

THE COURT:  But I'm not going to tell the MCC, you know, you have to move the hard drive to the tier. They have a plan. The plan makes sense in terms of the lockers. The disks can be made available. And then there are some other

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914) 390-4053

20

191120tartaglioneC          Conference

intermittent access to the hard drive, which hopefully will be more accessible, but given that situation and given how much time Mr. Tartaglione has had to review the discovery up until the last month, and even since our last conference, as I said, this is not a situation where he's not being given access to the discovery, but if it becomes worse, obviously let me know, okay?

MR. BARKET:  We will.

THE COURT:  Any other issues?

MR. BARKET:  No.  I think we have to -- I'd like to have a conference with the Court on some of the other issues *ex parte*, if that's okay.

THE COURT:  Okay.  We should schedule another status conference with everybody here?

MR. BARKET:  Yes.  Please.

THE COURT:  Do you want to do a month from now or a little bit more than a month from now?  How do you want to handle the holidays?

MR. BARKET:  Celebrate them.

THE COURT:  Fair enough.

MR. BARKET:  I think before the end of the year.

THE COURT:  Okay.  Sure.  December -- how about December 18 at 2:00?

MR. BARKET:  I think that's -- what day of the week is that?

191120tartaglioneC        Conference

THE COURT:  It's a Wednesday.

MR. BARKET:  That's fine.

MS. COMEY:  That's fine for the government, your Honor.

THE COURT:  Okay.  So I've already found that this is a complex case, which is an understatement, but any objection independently to excluding time in the interest of justice from now until December 18?

MR. BARKET:  No.

THE COURT:  Okay.  Then I'll independently exclude time -- and also the motions are pending, so the clock is stopped for that reason, as well, but I'll independently exclude time from now until December 18, finding it's in the interest of justice to do so.  That finding is based on the fact that counsel continue to work diligently to prepare, on many levels, the defense on behalf of Mr. Tartaglione; and also, there are the *Curcio* issues that need to be resolved.

I therefore find that the interest of justice from this independent exclusion outweigh Mr. Tartaglione and the public's interest in a speedy trial.  The finding is made pursuant to 18 U.S.C. Section 3161(h)(7)(A).

Anything else while everybody is here?

MR. BARKET:  No.

MS. COMEY:  Not from the government, your Honor. Thank you.

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

191120tartaglioneC       Conference

THE COURT:  Okay.  All right.

MR. BARKET:  Judge, for reasons that I'll explain once we're in closed session, for lack of a better phrase, I'd like to have everyone excluded from the courtroom except the lawyers; that includes Mr. Tartaglione's family and friends. And I'll explain why once we do that.

THE COURT:  Okay.  We're going to keep just Mr. Tartaglione, the defense team, and the Marshals, and those who work for the court?

MR. BARKET:  Right.  If that's okay.

THE COURT:  That's fine.  You can make a record later on, and if it turns out I'm unpersuaded, we can invite people back in.

MR. BARKET:  Correct.

THE COURT:  Okay.  So with that, I'm going to ask that we clear the courtroom.

(Pages 23 through 52, sealed by order of the Court)

(Continued on next page)

191120tartaglioneC       S E A L E D

(Ex parte discussion; in open court)

THE COURT:  And you are...

MR. BARKET:  That's Michael Ross.  He is the attorney we hired to consult with us on ethical issues, part of --

THE COURT:  I figured he was part of the team.

MR. RICCO:  Judge, he's not part of the team.

MR. BARKET:  Oh, yes, he is, absolutely is.

MR. RICCO:  Judge, I'm speaking right now.

MR. BARKET:  I decide --

THE COURT:  Hang on, hang on, hang on.  I'll hear from both of you.

Go ahead, Mr. Ricco.

MR. RICCO:  To my knowledge, if Mr. Ross is, quote/unquote, part of the team, that decision was just made. He was previously introduced to us as Mr. Barket's ethical counselor, and we had conversations with him in this courthouse in the presence of Bobbi Sternheim, in the presence of resource counsel right there in the courtroom, and he was introduced and said on the record that he was Mr. Barket's ethics counsel.  He is now anointing him as ethics counsel for the, quote/unquote, team.  He is not ethics counsel for any of the lawyers in this room that I'm aware of, other than Mr. Barket and his firm.

MR. BARKET:  Factually, we're saying the same thing.

MR. RICCO:  We're not.

THE COURT:  Hang on.

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

24

191120tartaglioneC      S E A L E D

Now it's Mr. Barket's turn.

MR. BARKET:  He is the individual we hired, long ago actually, to consult with us on ethical issues.  What we're going to discuss now is going to touch upon those. Mr. Tartaglione approved his being retained, has given me explicit permission to discuss confidences with Mr. Ross, and he has been an active participant in -- before the *Curcio* issue was raised with the ethical issues that we addressed and obviously, has continued to consult with us.  So he's part of the defense team in that sense.  He's not going to be cross-examining witnesses, doing the investigations, but on the ethical issues that have arisen, and I think will continue to arise in this complex case, he's going to continue to consult with us.

MR. RICCO:  Judge, sometimes things are a lot easier resolved if people would just be candid.  I'm raising this issue because I'm trying to protect Mr. Tartaglione's rights, and I don't just repeat, Judge.  We were here in this court for a meeting and we all met that morning, and we were introduced to Mr. Ross for the first time.

If Mr. Barket is making a representation on this record that Mr. Ross has been involved in this case for months, well beyond this *Curcio* issue, and has been consulting with him about issues related to I don't know what they would be, it's news to us.

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

25

191120tartaglioneC        S E A L E D

And I only stand up because you can't do it this way. And we're entitled to candor about what people's relationships are, what is being said, how confidences are being transferred, and we have a responsibility to protect a capital defendant in this case.

And I have no objection to Mr. Tartaglione waiving issues. He has a right to do that, and that's been made absolutely clear to him, but when we proceed in this way, Judge, it's very problematic, particularly when Mr. Barket stands up and announces an individual that we have never had a conversation with about any ethical issues related to this case other than what was discussed here in court.

And when he was introduced to us as his counselor, and I even tried to ask him, how long have you been in this role, and the question was answered by Mr. Barket. I haven't had -- none of the lawyers present here have had any consultation with him, have not discussed any of Mr. Tartaglione's confidences with him at all. And in fact, it may be very well an issue related to the ultimate resolution of the *Curcio* issue in this case, and I don't want to speak out of turn because that's not in my hands, but certainly *Curcio* counsel would certainly support what I just said on the record as to how we were introduced to Mr. Ross and what his relationship was, and to announce today that he's the team's is just not accurate.

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

191120tartaglioneC     S E A L E D

THE COURT:  Well, if we were to exclude Mr. Ross, what would bar Mr. Barket from reporting to him what gets discussed during this conference?

MR. RICCO:  That's when I said there's an easier way to do things in life, because I think the bottom line is, is if Mr. Barket said he wanted to have his personal lawyer, the lawyer for his firm present for this conference, I don't think anybody would have an objection to that.  In fact, the first day we were here, I think I suggested for him to join us in the back and was told no.

So, the bottom line is, he's obviously discussing Mr. Tartaglione's confidence, and he has a right to that, but we can't help him when we're told different things, and then things are said on the record like it's a fact, and it isn't.

THE COURT:  Okay.  I think the record reflects the disagreement between you and Mr. Barket on Mr. Ross' role.  I think the immediate question that I want to try to resolve is whether there's an objection to him staying in the courtroom during this part of the proceeding.

MR. RICCO:  Could I consult with *Curcio* counsel on this issue?

THE COURT:  It's a free country.  You can consult with anybody you want to consult with.

MR. RICCO:  Thank you.

(Pause)

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

191120tartaglioneC     S E A L E D

MR. RICCO:  Judge, my responsibility is to protect the defendant, even when he doesn't understand it.  My bottom line is this:  We agree he can stay, he can stay because *Curcio* counsel says actually it's information that would be helpful to her in the resolution of her issues.  So when I intimated that it may be a part of it, it may very well be, but *Curcio* counsel is okay with it, resource counsel is okay with it, and my co-counsel are okay with it, because ultimately, we have to protect his rights, even when he doesn't understand.

THE COURT:  Okay.  I'll just note for the record that everybody who is in the courtroom, should be in the courtroom; that the courtroom otherwise has been cleared of all individuals at Mr. Barket's request.

So, I think you should probably make the record you wanted to make.

MR. BARKET:  I do.  And I don't want to go too far into this, but we received a phone call I think a week ago today, I think it was last Wednesday.  There was a series of *ex parte* letters, --

THE COURT:  Yes, there were.

MR. BARKET:  -- one of which referenced a matter concerning Epstein, and to my knowledge, that was the first time that that particular topic had been broached with the Court.

THE COURT:  To be clear, you're talking about Jeffrey

191120tartaglioneC        S E A L E D

Epstein.

MR. BARKET:  Yes.  Right.  Not my partner, Steve Epstein.

THE COURT:  Or any other Epstein.

MR. BARKET:  Or any other Epstein; correct.

Following that letter being submitted to the Court, and I've guarded this particular event with a significant amount of care because of the nature of it, we received a call from a reporter from the "Daily News" who has been covering the Tartaglione/Epstein matters for some time.  So I know him, I've spoken to him before, talked to him on the record.  There's probably newspaper articles with quotes from me that he wrote. And he called me and asked me some very, very, very specific questions that clearly indicated to me that he had an accurate source of information concerning really I think everything that *Curcio* counsel is dealing with, all the confidences that I've been trying to protect for months, including the matter that was raised in the letter.

I absolutely flatly refused to discuss anything with him, confirm or deny, and I specifically said to him because he knows me, I said don't take my refusal to talk about this as confirmation of what you're telling me.  You shouldn't think it's confirming it or I'm denying it.  I'm just not talking to you about this.  And I left it at that.

Apparently -- well, not apparently -- he then sent or

191120tartaglioneC        S E A L E D

before or after, I didn't look at the timing of it, sent Mr. Ricco a letter or an e-mail asking for similar comments on similar topics.  So, I don't know where he got this information from, but I have to consider the possibility that family members or friends of Mr. Tartaglione.  And I don't mean to imply that they've done anything wrong or haven't, but that they somehow gained information from sitting through these conferences and have spoken to this particular reporter.

Fortunately, I think because no one on the defense team spoke to him at all, and refused to confirm or deny the information that he claimed he had, he wrote me and said he can't confirm it, so he's not going to write the story at this point, so we've avoided that.  So my request to have the courtroom closed to the point where it's only the lawyers, is to make sure that the conversations that we have concerning this, which are going to involve more and more I think information that's of a confidential nature, that the people that have access to that are literally the attorneys and Mr. Tartaglione.

THE COURT:  So, I understand.  I understand your concern about making sure that anything that's discussed about the so-called Epstein matter be as tightly held as possible.

What I'm wondering is how the family would know about anything regarding the Epstein matter as it relates to Mr. Tartaglione from anything that was done in court because my

30

191120tartaglioneC      S E A L E D

memory is far from perfect, but I don't recall any conversations regarding Mr. Epstein in any of our *ex parte* conferences.

MR. BARKET:  Never came up.

THE COURT:  Yeah.

MR. BARKET:  I apologize.  I don't want you to think we were concealing things.

THE COURT:  No, no, no.

MR. BARKET:  Specifically done, did not want to discuss it at that point.

THE COURT:  Right.  So I guess -- I'm not sure -- if, to the extent that what we're about to discuss is going to involve, not involve any conversations about Mr. Epstein, then I'm not sure why the family has to be excluded.  And I'm not sure that there's any record of them learning anything about the Epstein stuff from anything that was said in the courtroom.

MR. BARKET:  In addition to the Epstein material, there were also questions posed about Mr. Ricco's role that included material that did happen in court in the last two times:  Mr. Tartaglione's request to have Mr. Ricco removed.  So there was a breadth of material, some of which was discussed in court, and as your Honor points out, some of which wasn't.

THE COURT:  Right.  The issue of Mr. Ricco's representation is something that the family already knows about.  So, excluding the family from this conference for that

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

191120tartaglioneC        S E A L E D

reason I don't think satisfies any compelling need.

And with respect to the Epstein matter, again, I don't know, again, why excluding the family would be helpful in preventing a reporter from confirming a story when, as far as I know, we've never discussed it and wouldn't be planning on discussing it today.

MR. RICCO:  I wanted to say a couple of things for the record, because I had an opportunity to review comments made on the record, comments made to the Court, and I just want to be clear about something.  Mr. Barket is right about this. I did receive an e-mail from the press, and it didn't mention anything about Jeffrey Epstein.  The e-mail that I received --

THE COURT:  When did you get the e-mail?

MR. RICCO:  I got it from a guy who works for the "Daily News."

THE COURT:  But when did you get it?

MR. RICCO:  Oh, one day last week.  We all got it the same day and we addressed it as a team.

THE COURT:  All right.  So, you got an e-mail...

MR. RICCO:  Yes.  That e-mail had no discussion about -- no reference to Epstein.  That e-mail talked about something that was in one of Mr. Tartaglione's letters that he had just sent to the Court last week, and he wanted me to comment on that.

MR. BARKET:  Sorry.  He didn't send it to the Court.

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

32

191120tartaglioneC      S E A L E D

He sent it to --

THE COURT:  Mr. Ricco.

MR. BARKET:  No, no.  He sent it to us.

MR. RICCO:  Well, it was eventually filed with the Court.

MR. BARKET:  No, it was not.

MR. RICCO:  Oh.

MR. BARKET:  It was not.

THE COURT:  It's okay.  Something in a letter that Mr. Tartaglione wrote --

MR. RICCO:  I think Mr. Barket is right about that, because that letter should have been filed with the Court, but that's a different story.

MR. BARKET:  Should or should not?

MR. RICCO:  Should not have been.

MR. BARKET:  Right, right.

MR. RICCO:  It wasn't.  So, I got an e-mail from the press about that letter.  Judge, I didn't respond to that e-mail.  Very easy for me.  I haven't responded to a single e-mail from the press since I've been representing Mr. Tartaglione.  I haven't had a single telephone conversation with the press since I've been representing Mr. Tartaglione, and certainly was not going to respond to an e-mail where this person in the press was discussing something in a letter that Mr. Tartaglione wrote in confidence.  So, I get that part of

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

33

191120tartaglioneC      S E A L E D

it.  All of this is about I didn't say things because I was protecting this and protecting that, and mixing in the Epstein thing, and putting my name in it, Judge, I'm a little concerned about that.

I think ultimately all of these issues factually as to what happened here is going to be something that the Court is going to resolve.  I think the sooner it's resolved the better, but I don't want the record to reflect things as fact when they're not as fact.  So, I just wanted to say -- I wanted to say I did not receive anything about Mr. Epstein.

THE COURT:  Okay.  So, while we're all gathered here, is there anything else that anybody wants to raise?

MR. BARKET:  Yeah, there are a couple of things that I wanted to note, but you asked me to make a record as to why --

THE COURT:  Sure.  Absolutely.

MR. BARKET:  I'm done with that.  If the Court wants --

THE COURT:  I still am a little perplexed.  I mean, if we just don't want the family to know anything about what's going to happen here, then the assumption, I guess, is that no one is going to tell the family about what happens here or after the conference, and can't everybody make that promise including your client, Mr. Barket?  And I'm not insisting on it.  Not at all.  He can talk to his family about whatever he

191120tartaglioneC       S E A L E D

wants to talk to his family about, of course, but if he's just going to talk to his family about what we talk about here, then I'm not sure what record is to be made that would justify excluding them from the courtroom.  They have a First Amendment common law right of access to be here.

MR. BARKET:  And that's the very reason that I've allowed -- I've not brought this up before, excluding the courtroom except for his family, but it's been loose.  It's been family and friends.  And, really, his family are, at this point, attending the court at least, are his parents, and today I think it's only his mom.

THE COURT:  Right.  What would be the basis, what record could there be made that would exclude her from the courtroom if Mr. Tartaglione is going to have a perfectly understandable conversation with his own mother about what happens in the courtroom?

MR. BARKET:  One second.

THE COURT:  Sure.

(Pause)

MR. BARKET:  At least for today, I think we're comfortable and, perhaps, going forward until this is either more out in the open or more resolved, that he won't have discussions about what goes on in here.

THE COURT:  Okay.  All right.  So I guess -- and the concern, of course, is if some of these matters in here are

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

191120tartaglioneC        S E A L E D

disclosed to the public, either through a journalist or otherwise, that that could be to the detriment of Mr. Tartaglione's constitutional right to a fair trial.

MR. BARKET:  Absolutely.

THE COURT:  Well, given that representation and given the representation that nothing is going to be shared by Mr. Tartaglione or any members of the team or counsel for members of the team with Mr. Tartaglione's family, then I think the request to exclude them from this conference is justified, even in light of their common law and First Amendment rights of access; that those rights can be outweighed by certain compelling interests, one of which can be the fair trial rights of an individual charged, let alone an individual charged in a capital case.

I think it's narrowly tailored to the extent that if we end up discussing things that, if were to be revealed to the family would not harm Mr. Tartaglione, then they can be allowed to attend these conferences.

I will seal the transcript of this proceeding, except that copies can be given to counsel for Mr. Tartaglione, as well as *Curcio* counsel and counsel who are representing counsel on the case.

Anything else before we then get to the substance of what you want to discuss?

MR. BARKET:  No.

SABRINA A. D'EMIDIO – OFFICIAL COURT REPORTER
(914)390-4053

36

191120tartaglioneC        S E A L E D

THE COURT:  Okay.  All right.

MR. BARKET:  Interesting that Mr. Ross was the first topic I wanted to bring up with the Court, just because I noticed a line in the sealed proceeding that took place at the last court conference where Ms. Sternheim had a conversation with the Court privately, and then the Court directed -- so we got that transcript and we read it.  And there was a comment made about, It's odd to have a lawyer have a lawyer.  And the Court -- I don't have the transcript in front of me, but the Court said, Yeah, I noticed that, or something along those lines.

THE COURT:  Do you know what the context was, because I don't remember.

MR. BARKET:  Yes.  It was the unusual nature of the *Curcio* application here.  I have a copy of it.  I can just read it.

THE COURT:  Sure.  Take a look at it.

MR. BARKET:  Reading from page 8, and I'll read the entire paragraph:

Ms. Sternheim:  I have not addressed this with them, and certainly all the meetings that I do have with them is an opportunity for everybody to weigh in on that.  So, going with the precedent of that, I think people are going to want to weigh in on this.  My concern with that is, you know, as courts love to say, it becomes a trial within a trial.  How

191120tartaglioneC        S E A L E D

appropriate all of that is, I'm not sure, but I view this as a rather unusual situation, and I will add, it's unusual that a lawyer brings a lawyer to court.

And your Honor indicated:  Oh, yes, correct, sure.

And it was something that had come up previously. And maybe I'm just a little nervous or overly cautious, but I didn't want the impression to be left that once the potential conflict was raised with the Court, that our firm went scurrying out to get ethics counsel as kind of a potential target of investigation scurries out for a criminal defense lawyer.

We have been, as Mr. Ricco indicated, have been consulting with Mr. Ross for some period of time about a number of issues.  And we did that specifically because, contrary to how I may appear to people, I'm not some rogue lawyer just wandering off into areas that I don't know anything about.  And when I do go into areas that I'm not familiar with, I try my best to get advice from people who know about them.

This is a complicated obviously death penalty case. While I've handled homicides and death penalty cases before, this is new ground for me.  You know it and I know it.  So, I'm not going to wander off without good advice.

I'm a lawyer, I can read the ethical rules, but there is a specific specialty, if you will, where people who handle professional ethic issues.  So, when I have an ethical question

SABRINA A. D'EMIDIO – OFFICIAL COURT REPORTER
(914)390-4053

38

191120tartaglioneC        S E A L E D

that comes to my mind on a death penalty case, it's not something that I feel comfortable resolving kicking around with colleagues in the office.

And in fact, Mr. Ricco repeatedly has advised us, at least since the time of these issues, that we should consult with ethics counsel. And I noted that but had already done it. So it wasn't -- I just wanted to put Mr. Ross' participation here in the context in which it is.

MR. RICCO: If I can add, and in a way, to try to be helpful, I think Ms. Sternheim's comment to the Court was the surprise that we all had when we arrived in court and we saw a lawyer that we know. We know Michael Ross. And he was in the room. And no one had any issue discussing issues in front of Michael Ross. Michael Ross is well respected. He's well known. His opinions are highly regarded by myself. I think Michael Bachrach used to work for him. We were all very surprised. And Mr. Barket -- it's not that "as Mr. Ricco indicated," that he has been retained for a long time. I'm not indicating that, Judge; I was told that, and I was told that that morning, and I was okay with it, actually, at that moment.

And some of the things that Mr. Barket is saying is correct. There were issues that arose in this case, Judge, that as soon as they arose, I told every lawyer in this room, consult with an ethics lawyer, and I did it repeatedly because there are issues that occurred here that, in my opinion,

191120tartaglioneC      S E A L E D

required consultation with ethics counsel, and several lawyers did, and apparently Mr. Barket did, also. We were not aware of that at the time, but that's his right. I don't have a problem with that.

Judge, I think that what we're doing is that we're trying to lay the groundwork -- I'm trying to figure out why are we here. And we're trying to lay the groundwork here for issues that the Court is going to have to deal with and the context of it, and I really think that what should happen here is what the Court has indicated. Let Ms. Sternheim finish the report, let the report get to your Honor, and then give whatever lawyers are affected by it the opportunity to respond to it.

My position in this is very simple. I have a very clear understanding of what my role and responsibility is, to prevent Mr. Tartaglione from being executed in this case. And we have, all of us, and I mean all of us, have worked very hard in this case, Judge. And of course, it's like everything in life. A man once told me, you never have to worried about being pulled in the water as long as you don't bend over to help somebody out. And there are some issues here that just have to be resolved. We all know it. We all feel it. None of us were even assuming that the reason Mr. Ross was here was because of this issue. Mr. Barket said that he had been retained for months. We accepted him for what he said. It's

40

191120tartaglioneC     S E A L E D

just news.  So, here we are.

Look, there's going to be ample opportunity for people to explain their conduct and tell the Court why things were quiet or not quiet.  It's going to be up for people to say.  But I kind of feel, Judge, right now we're kind of trying to set the table a little bit.  And I think ultimately, at the end of the day, it does a disservice to what ultimately has to happen here or perhaps not.  Perhaps, it's a reflection of issues that the Court will ultimately have to deal with.  But I believe, and when we made the request for the appointment of *Curcio* counsel, we followed the Second Circuit case authority. I believed then there was a good basis for it.  I believe at the time when I met with Mr. Tartaglione he said he was prepared to waive; that was communicated to the Court by myself.  No misrepresentation of that.  I believe that Mr. Tartaglione is still prepared to waive, and that will happen in the hearing.  And then we'll move on to the other issues as to whether I stay in the case or other lawyers stay in the case; however, if there's a point in time where none of these lawyers appear in this case, the Court will be rest assured of the following: that every single ounce of work that has to be done has been done.

Also, Judge, we don't have a schedule.  Many of the motions and documents and pleadings that have to be filed for the penalty phase were almost completed, and we're very happy

191120tartaglioneC     S E A L E D

about that.  Some days, it's a little difficult, but we get through the difficulty.  These issues that we're dealing with, Judge, are not that unusual to capital representation.  It happens.  We just have to get through it.

THE COURT:  Mr. Barket, to your point, I don't think there's anything more to say.  I don't think Ms. Sternheim's comment was anything other than this is where we're at, nothing whatsoever beyond that.  I don't think we should make a mountain out of a molehill.  I don't even think it's a molehill.

MR. BARKET:  No.  It was something that I noticed.  There was a comment about it being unusual that had been made earlier, so I just wanted to address it briefly.

THE COURT:  Okay.

MR. BARKET:  On the comment of substance, there had been, just generally, a number of things said back and forth, unfortunately.  My responses have been, to my best effort, limited, limited.  There's going to come a point in time, as Mr. Ricco has indicated, where I think all of this will come out and I'll be able to, consistent with my duties to Mr. Tartaglione and the ethical rules, lay out everything.  I actually kind of look forward to this day because being referred to, frankly, as, every time there's a disagreement, as the counsel subject to the *Curcio* inquiry, has been challenging for I think obvious reasons.  So, I'm looking forward to that,

SABRINA A. D'EMIDIO – OFFICIAL COURT REPORTER
(914)390-4053

191120tartaglioneC       S E A L E D

but I've been specifically guarded in my responses.  And I don't want the Court to think either I'm trying to hide something or that that's all I have to say.

THE COURT:  You know, when I read these letters, my reaction to the letters is I'm sad, honestly, and I'm in a holding pattern.  It's frustrating to the government, but my view is, you all need to keep doing your job, and you have been, and that's admirable.  In terms of my role in this, I'm awaiting Ms. Sternheim's report.  And until then, I assume nothing.  I conclude nothing.  I am as tabula rasa as it gets, so I understand your perspective.

MR. BARKET:  Thank you, Judge.

And obviously, nothing that I'm saying or doing in any way should be interpreted as trying to hurry, obstruct Ms. Sternheim's work.  We all look forward to the day when this is behind us, how ever that plays out.

THE COURT:  Sure.  I never assumed otherwise from anybody.

MR. BARKET:  Okay.  My client has asked me -- he asked several things; one is he said, I want you to write a letter detailing and arguing that Mr. Ricco be removed now.  I said I'll make another pitch knowing your Honor's position, and that I will do.

THE COURT:  Consistent with that I just said, where I'm doing nothing, assuming nothing, concluding nothing, on the

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

191120tartaglioneC        S E A L E D

representation issues, we are in a holding pattern.

MR. BARKET:  I would add just a little bit on the record of that, only because it's been a source of I think tension between, frankly, me and my client, which hasn't really come up before.  And I've started to do -- I shouldn't say started to do -- we've done some work on this issue.

Without commenting on the quality of the work or who is doing what or the division of labor -- Mr. Ricco said before we're working on the liability phase, I thought he said we're working on the mitigation, the work is being done I think as best that we can under the circumstances.

Mr. Tartaglione's point, and I think it's a fair one, is that, sure, the *Curcio* issues are a distraction, but it's a necessary one, and nobody has any problems with that going forward.  For Mr. Tartaglione, he's saying I don't want this person involved in my defense.  So, the Court earlier said what's the prejudice?  Work is getting done and it's moving along.  Mr. Tartaglione's own point is, I don't want him doing it.  I don't want him making strategic decisions for me.  I don't want him assigning tasks.  I don't want him allocating resources.  I don't want Mr. Ricco involved in my defense.  He's gone so far as to direct everybody not to discuss the confidences with Mr. Ricco.  He just did it again at the table a few minutes ago to all the lawyers.

And so that puts us all -- and he did that the first

44

191120tartaglioneC        S E A L E D

day that he made this application himself in an open court on the 17th of September, I think.  It reminded me of the prejudice, if you will, when somebody says they want to proceed *pro se*.  You can't defeat a reversal if that right's been denied by saying the lawyer did a really good job.  It's a personal right to the defendant.  So that while I think it's not inappropriate for the Court to say take some time and think about this, because of the way things have played out, it's now been -- I think he wrote the letter asking the Court for removal most recently on August 22nd.  I think that's the date the letter was written.

THE COURT:  I got a more recent letter.

MR. BARKET:  He's written several; I gather that.

THE COURT:  Yes.

MR. BARKET:  It's been about three months.  And your Honor knows, this is something that dates back to before the March application of 2018 when he wrote that letter, that we had the issue then.

So, at some level, at some point, his right not to have attorneys involved in the case is actually breached by deferring it because the attorney continues to do the work that they're otherwise obligated to do.  And to the extent that I kind of decline to write a letter on this issue, I did indicate that I would make these points for him which he's articulated to me repeatedly.  It's the same application.

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

191120tartaglioneC      S E A L E D

THE COURT:  So, the *Faretta* analogy has its limits. The right to choice of counsel, as we discussed, is a qualified right, so much so that, for example, a court can deny a request to have a lawyer replaced, a court-appointed lawyer, in the absence of some irreconcilable conflict between attorney and client.

And I think the other problem with the *Faretta* analogy is that Mr. Ricco is among many, many lawyers who are representing Mr. Tartaglione.  So, this is not a situation where it's, I've got my one lawyer here that I don't want, I want somebody else, and maybe that comes closer to the *Faretta* analogy; and plus, we can't ignore the context of everything else going on here, where there is, how shall I say it, a little bit of a bumpy relationship between the lawyers in this case representing Mr. Tartaglione.  So, there's a lot of things going on.

I am mindful of Mr. Tartaglione's wishes.  I am mindful of the reasons he has given.  And you have voiced his concern; I have listened to it.  I'm not going to make a decision.  It's consistent with what I said to you about everything else that's gone on.

MR. BARKET:  That's what I told him.

THE COURT:  I don't want to deny your chance to be heard.  You were standing up.

MR. RICCO:  I don't think it's necessary for me to

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

191120tartaglioneC        S E A L E D

add anything further.  I think that at times, Mr. Barket, lets a little bit of the attorney/client stuff out of the bag and then the rest of us have to sort of sit silently because we're concerned with attorney/client information and things that are said in confidence.  So, I don't want to add anything because I don't want to violate privilege.

But I will say that I feel very comfortable about the following: that the whole *Curcio* inquiry is to ensure that the defendant is represented by an attorney who is free of conflict, that the interests are not diverging, and that includes all aspects of that representation, not only his planning of the case, but the advice and information that is given to the defendant.  And I think that when your Honor has to deal with these issues in this case, your Honor will see many conflicts here, some of them are quite serious in my view. At the end of the day, the Court makes that decision and I believe that Mr. Tartaglione will waive those.  And I think --

THE COURT:  That's assuming they're waivable.

MR. RICCO:  If they're waivable.  And I think there's a real issue here.  And there's a serious budget at risk in this place.  And Mr. Koffsky and I stay on top of this budget in every respect, and we have a responsibility not only to the Court, but to Mr. Tartaglione to ensure that the requests that were made are allocated, spent and devoted to his defense and the way in which we make those representations to the Court.

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

47

191120tartaglioneC     S E A L E D

We will continue to do that, regardless of who writes what letters, who does want or doesn't want.  This is a very, very serious case where no one from the defense side should lose sight that there's a man's life at stake here, and we keep that in our forefront as we go through these issues.

And I feel very comfortable, Judge, in saying that the team has worked in an extraordinary way to be able to stand here in court and say Judge, we're not only where we are, I think we're actually ahead of where we would like to be on some issue, and that has been a testament to the commitment of the lawyers that you see in this courtroom.

THE COURT:  Anything else?

MR. BARKET:  No.

THE COURT:  So, one thing I would like you all to give some thought to, because as I mentioned to Ms. Comey, I've been giving it some thought, I have to decide at what point the government gets brought into this, and if so, how much, because the government will have to defend whatever happens if there's a conviction and if there is the ultimate sentence imposed.

And thus far, the government has no input, and as far as I know, knows very little - unless the "Daily News" is calling them, too - knows very little about what's going on here.  And to this point, I'm comfortable with that, because I'm very sensitive to attorney/client issues, defense strategy issues, but I'm not sure that the government needs to be

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

48

191120tartaglioneC        S E A L E D

excluded from the non-attorney/client, non-defense strategy issues that have been raised.

And one thing that's going to have to be addressed is the extent to which the government is allowed to be present when there is a *Curcio* proceeding.  I don't have an answer.  As I said, it's something that I've been giving a lot of thought to and doing some research about, and I think we can all agree that there is no case on point.

MR. RICCO:  No.

MR. BARKET:  If there is, none of us have found it.

MR. RICCO:  We have also researched that issue. We're sort of right where the Court is.  We're going to continue to research that issue because we believe that individuals, parties will be affected, Mr. Tartaglione's rights will be affected by that decision one way or another.  And I think that there's going to be an interest about having the Circuit perhaps resolve that and we've done research on that. And so we're in it, Judge.  We're on top of this.  We're trying to be on top of it.

THE COURT:  I wasn't suggesting anything to the contrary.  I was just --

MR. RICCO:  Thinking out loud?

THE COURT:  -- yes, thinking out loud, and letting you know that I'm thinking about this.  And at some point, I will invite your input.  Whether we see eye to eye, we'll see,

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

191120tartaglioneC        S E A L E D

but obviously everybody will be governed by what the governing law is. It's just not clear to me there is governing law, as I said, that's on point. There are principles we're going to have to maybe apply here.

MR. Barket, you said you're in unchartered waters. I think we all are.

MR. BARKET: One of the things I think the Court is aware of, normally, I say normally, but a *Curcio* issue, the Court would be, Here's the fact, here's the conflict, go do what you have to do.

THE COURT: Yes.

MR. BARKET: We've all not been explicit with the Court out of similar -- I won't speak for all because I don't want to speak for other people. I have been reticent to -- and I actually fronted this idea about two and-a-half months ago, I should just disclose everything to the Court --

MR. RICCO: Judge, please, please --

THE COURT: Hang on. Let him finish. Let him finish.

MR. BARKET: So, we're very, very concerned about that issue raised, and obviously, it's an issue that starts with how much can we tell the Court about this, consistent with Mr. Tartaglione's rights.

MR. RICCO: Judge, sometimes people just keep talking. There's a street term that says keep talking. It

50

191120tartaglioneC        S E A L E D

doesn't mean keep talking.  But there was just a representation that was made to you that I'm sure is going to be addressed in the *Curcio* report.  And there are people who are not the subject of the *Curcio* inquiry on the team.  So what's the relationship just to facts, not to the conduct, but to the facts?  And to try to preview the facts to say, hey, this is why I did this, it's clever, but it's improper.  And the Court keeps saying over and over, look, you'll have an opportunity, but it just keeps going.

And it puts -- I have a responsibility to Mr. Tartaglione.  And if this Court decides the *Curcio* issue one way or the other, I want to make sure that it's done on the facts that are true.  And it troubles us -- like in many of these conferences, we just sit here and we're listening to all kinds of representations, and then it just has come to a point, we can't do it anymore.

And I've said, look, there's going to come a time when people are going to be held accountable for their actions and statements, and I don't mean held accountable, but to have to explain.  And these are issues that we have given a lot of thought to and a lot of thought to what is our responsibility here, what's our role here.  Many of us, it's just factual, factual what happened.  And the Court is going to have to deal with that.  And we're sort of trying to get a posturing of how you should be starting to think about that, and I do think that

191120tartaglioneC        S E A L E D

that's improper.

I think what we should just be saying is, let's get the *Curcio* report in, as the Court has said.  And then at that point, you can explain why you were reticent or not reticent or what you did two months ago or what you said and who you said it to.  Let's do it that way, and not in this way.  It doesn't serve Mr. Tartaglione's interest to do that because, ultimately, the question is whether or not he was represented by an attorney who had a conflict.

MR. BARKET:  Just in the whole theme of laying the groundwork and fronting things, I am, and as the Court I think has a good way to put it, in unchartered waters on some of this, as we all are.  I'm not in unchartered waters as to the representations I've made to this Court --

MR. RICCO:  Good.

MR. BARKET:  -- ever.  Not one.

Every single representation I made to this Court, including today's, are accurate to the best of my ability, described perfectly to the best of my ability, and for today, there's written documentation of it.  The implication or the insinuation that I've misrepresented things to the Court in order to dissuade the Court of something or lay a groundwork, is offensive.

THE COURT:  So, I stand by what I said earlier, which is that I am completely tabula rasa on whatever *Curcio* issues

191120tartaglioneC        S E A L E D

have to be addressed.  I don't even know what they are.  I think -- as I read all the letters that come flying in, I think we broke a streak, there was, like, a six- or seven-day streak where we got letters from you all, it felt like the sun was shining.  Because my view is, the ball I'm trying to keep my eye on is, is making sure that there is fairness here to Mr. Tartaglione and to the government.  There needs to be fairness.  There needs to be a fair trial.  Everything has to be done fairly, and that's the oath I took.

And what I ask you all to do is keep your eyes on that ball.  And we'll let the *Curcio* issue play out through the proper course.  In the meantime, we're all going to do our jobs.

Anything else?

MR. RICCO:  No, your Honor.  Thank you very much.

MR. BARKET:  No.  Thank you.

THE COURT:  Marshals, thank you very much.

We are adjourned.

(Adjourned)

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053