X20201mtartc2x          S E A L E D

UNITED STATES DISTRICT COURT
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------x
**UNITED STATES OF AMERICA**


                 v.                           **16 Cr.  832(KMK)**

                                              **CONFERENCE**

NICHOLAS TARTAGLIONE,

                 **Defendant.**
------------------------------------x


                                              **United States Courthouse**
                                              **White Plains, N.Y.**
                                              **January 22, 2020**




**Before:   THE HONORABLE KENNETH M. KARAS, District Judge**



                         **APPEARANCES**

BARKET, EPSTEIN & KEARON, LLP
     Attorneys for Defendant
BRUCE BARKET
AIDA LEISENRING


ANTHONY RICCO
BRUCE KOFFSKY
MICHAEL BACHRACH
JOHN DIAZ
KENNETH MONTGOMERY
     Learned Counsel


Also present:  BOBBI STERNHEIM, Curcio counsel
               DAVID RUNKE, Resource counsel


              CHRISTINA M. ARENDS-DIECK, RPR, RMR, CRR
                        (914)390-4103

X20201mtartc2x        S E A L E D

THE COURT:  All right, Mr. Barket.

MR. RICCO:  Your Honor, before we do the traditional application, one issue I did want to bring up, your Honor.  And it's no criticism of Jerry or the office or anything.  Jerry has been terrific.  He's been all of the things that you would hope for in a case like this.  But we do have an issue with the investigators.  The payment for them is like really, really behind.  And in this business, you know, you get a call from a person and you hear something in their voice and, you know, they're letting you know that, you know, something has to be done.  So I spoke to Jerry about the situation, he's aware of it, but if your Honor could just call.

THE COURT:  Okay.

MR. RICCO:  In particular is Mr. Dowd's vouchers in terms of the investigation.  He's got several men working and he's taking care of them.  It's become difficult for him.

THE COURT:  All right.  I'll reach out to Mr. Tritz.

MR. RICCO:  Thank you.

THE COURT:  And we'll see if we can get things moving.

MR. RICCO:  And I can see a smile on Mr. Dowd's face now.

THE COURT:  What did Mr. Tritz indicate to you?  Is it just bureaucratic holdup?

MR. RICCO:  Jerry -- I'm sorry.  Mr. Tritz said that

X20201mtartc2x       S E A L E D

they were really backed up.

THE COURT:  Okay.

MR. RICCO:  And he said he had no problem bringing Mr. Dowd's vouchers to the front of the line.

And as you know, Mr. Tritz has been out.  He had surgery.

THE COURT:  Yes, yes.

MR. RICCO:  So he said they were a little behind. But he said he would do everything he could.  But a friendly phone call from the Court would help.

THE COURT:  No problem.

MR. RICCO:  Thank you.

THE COURT:  Mr. Barket.

MR. BARKET:  So let me start off with the issue we raise regularly.  I want to continue to make a record.

Mr. Tartaglione has asked that learned counsel be removed.  And I would add to that --

THE COURT:  All learned counsel?

MR. BARKET:  Yes.

THE COURT:  Okay.  I didn't know that.

MR. BARKET:  No.  This is new.

THE COURT:  Okay.

MR. BARKET:  We're going to withdraw a request under the statute for learned counsel.  How this Curcio issue resolves, assuming that I'm still here, we're going to withdraw

X20201mtartc2x        S E A L E D

a request for these gentlemen.  All of them.

And certainly, as to what Mr. Tartaglione has been articulating all along, he wanted Mr. Ricco relieved, and the Court continued to kind of kick -- I don't want to say kick the can down the road, but to hold that in abeyance, essentially saying what's the harm.

THE COURT:  Well, no, but the record is what it is. But fine.

MR. BARKET:  Right.  I don't mean to make light of it or give it short shrift or describe it inaccurately, but has not ruled on it and for the reasons that the Court's articulated.

And I raised this several appearances ago.  An individual has a right, qualified right, to counsel of his choice.  So you can't pick anybody you want if you're retaining somebody.  Qualified, can't have conflicts and so forth.  But in terms of being forced to be represented by somebody that you do not want to be represented by when that is not a situation where you have, like you don't get to pick your CJA lawyer, is a different issue.  A different issue entirely.  And it's akin to, although not exactly, somebody who's saying I want to represent myself and the Court saying, well, no harm, continue on with this person, he's going to continue to be your lawyer, with the client saying I don't want a lawyer, I want to do it myself.  This instance is a little bit different.  It's

X20201mtartc2x        S E A L E D

Mr. Ricco saying I don't want those lawyers, I want the lawyer that I hired, that I chose --

THE COURT:  Mr. Tartaglione.

MR. BARKET:  Mr. Tartaglione.  Sorry.

THE COURT:  Yes.

MR. BARKET:  -- that I hired and I want those lawyers, the people that I hired.

And so the prejudice in one instance, I would submit, is in the act itself, the compelled representation, kind of the forced you will continue to be represented by this person who you don't want representing you and who you've objected to. That in and of itself I think is a problem, without any showing of prejudice, in a similar way that if someone articulated that they wanted to go pro se, represent themselves.

THE COURT:  Yes, but the Faretta right is also qualified.

MR. BARKET:  It is qualified.

THE COURT:  Sure.

MR. BARKET:  But that's what I'm saying.  It's not a perfect analogy.

THE COURT:  No, it is perfect in the sense that they're both qualified rights.

MR. BARKET:  Well, they're both qualified.

THE COURT:  Yes.

MR. BARKET:  But the inquiry under representing

X20201mtartc2x        S E A L E D

yourself is a knowing, intelligent, voluntary what are you doing, do you know what you're doing, do you understand where you're going, advisements and so forth. So, to that extent, this is I think even more problematic because there is no suggestion -- or there's not even an inquiry yet if Mr. Tartaglione understands knowingly, intelligently, voluntarily waiving. And it's not his right to counsel. It's a statutory right that he's opted for, or he opted for. And, actually, he opted for this before he retained an attorney.

Just historically what happened was -- I believe I'm correct about this -- was that Mr. DeMarco was assigned. He asked Mr. Ricco to be learned counsel. Mr. Ricco was appointed. Mr. Tartaglione retained our firm. Then a magistrate issued an order relieving Mr. DeMarco, and Mr. Ricco wrote a letter to the Court asking that Mr. DeMarco stay on. And we had a discussion about it, and I said, sure, more hands on deck, we could certainly use the help.

Unfortunately, and I think for some of the reasons that the Court has already seen, this is not working to Mr. Tartaglione's advantage. His objectives in this case and his use of resources and his direction of where he wants the case to go and how he wants the case defended have to be respected. And recent Supreme Court decisions have made that abundantly clear. He gets to seek a full acquittal at all costs. And that's not to say that his attorneys don't have the

X20201mtartc2x        S E A L E D

obligation to continue to defend and work on the penalty phase, and we've been doing that. And I say we. I think all counsel have been doing that.

But we're now at a point where his desires and his choice -- and the strategic decisions made by his chosen lawyer are being explicitly counter-manned by the attorneys he doesn't want and, in that way, there's actual real prejudice happening.

The Curcio issue is going to have to get worked out. I understand that. But, at the end of the day, I don't want to say I don't have any doubt, but I fully expect to still be standing here, and the last six months that this process has gone on, with what's taken place and the efforts to represent Mr. Tartaglione both on the liability phase and the penalty phase, have been obstructed by the presence of the attorney that he has said I don't want.

So we have now real prejudice of use of resources, use of investigators, strategic decisions on --

THE COURT: By the way, use of resources at public expense.

MR. BARKET: At public expense.

THE COURT: Okay.

MR. BARKET: Which he has a right to without learned counsel. They're separate questions. He doesn't have to take learned counsel in order to access investigators that he otherwise can't afford. If he was simply here as a defendant

X20201mtartc2x          S E A L E D

with retained counsel --

THE COURT:  No, but my point is to the extent money is being spent, it's not his money.

MR. BARKET:  Correct, it's not his money.

THE COURT:  Right.

MR. BARKET:  But it's his lawyer's decision on how to use the resources; not waste the resources, but does the investigator interview this person for the liability phase or do they spend their time interviewing that person for the penalty phase.  Which comes first?  What's more important?  The details of how the defense gets built and how we attack the government's case and how we defend him on the liability phase and the penalty phase involve a host of decisions, small and great, little things and huge things, along the way.  And those decisions by the attorney that he's picked are not being effectuated, sometimes in ways that don't matter and sometimes in ways that do.

The incident with the government that we alluded to -- was mentioned before is one of those.  And it's not for the Court to sit and decide this strategy is better than that one.

THE COURT:  When you say the incident with the government, are you talking about the videotape?

MR. BARKET:  No, not the videotape.  The e-mail that I sent to the government --

X20201mtartc2x        S E A L E D

THE COURT:  Okay, okay.

MR. BARKET:  -- asking for something and saying what we were going to do and then have learned counsel say don't do that, don't give him what he asks for, don't do that --

THE COURT:  Okay.

MR. BARKET:  -- on a very important point.

And, look, so I think there's real prejudice with the continued joint representation with learned counsel and his retained attorney.

And you don't know what you don't know, so assuming I were to get disqualified, where would that leave Mr. Tartaglione?  I can't imagine that he would then say, oh, I want these gentlemen here to continue to represent me.  He would end up hiring somebody else who would have the same responsibilities I have, making the same decisions that I'm forced to make and with the same obligation to seek Mr. Tartaglione's objectives; not mine, not the capital defense community, not how we handle every death penalty case, not how death penalty works, but how Mr. Tartaglione set out his objectives.  And so, in that sense, the continued representation is causing him real harm.  And him being forced to be represented by somebody he doesn't want to be represented by is in itself harm.

So that's one part of what I wanted to say ex-parte. The other part is simply -- I don't know that I need to say it,

X20201mtartc2x        S E A L E D

but I'm going to -- the allegations made in that letter, which were unsupported --

THE COURT:  When you say that letter --

MR. BARKET:  -- the letter Mr. Ricco filed yesterday --

THE COURT:  Okay.

MR. BARKET:  -- in response to my letter concerning the report -- were stunning.

I've been practicing law for 35 years as a prosecutor and a defense attorney.  I am aggressive and abrasive at times. I've rubbed a lot of people the wrong way over the course of my career.  Not only have I never had those allegations made against me that way.  I don't know that I've ever seen those allegations made about anybody, defense attorneys against prosecutors, in quite a broad and sweeping manner, without any support whatsoever.

So, look, those allegations are false.  I have not misrepresented anything to the Court.  I was careful in the letter that I submitted that we only pointed out issues of fact that were supported and I think are irrefutable.  And I just -- I could not believe it when I read it.  I read it once and I read it again last night.  It is clearly a matter that the Grievance Committee at some point is going to have to take up. If I did the things that he said I did, they should take my license.  Contrary, if I didn't, if I was honest and straight

X20201mtartc2x        S E A L E D

and factual with the letter that I submitted, well, then those baseless allegations are also subject to the same disciplinary proceeding.

So this is just extremely, extremely disturbing to me on a personal level. And I don't want to make it about me but I cannot allow those kinds of allegations made to a Court without any support whatsoever, any support, go and who cares, as if I just kind of walked past them. I didn't want to write another letter. I didn't want to go back and forth with that. I just want to put it on the record.

THE COURT: Okay.

MR. BARKET: So that's my position with respect to that.

THE COURT: Okay.

MR. BARKET: And I am going to ask that the Court relieve these attorneys. They can continue to practice or participate in the Curcio process. Their services under that statute, we're withdrawing our request. We don't want them representing him any longer. He can be represented by us. If we get disqualified, he can hire somebody else and that attorney can move forward. If it's still us, we're going to move forward.

THE COURT: Mr. Ricco.

MR. RICCO: Yes, Judge, I would ask, first of all, that the Court deny that request because Mr. Barket is the

X20201mtartc2x          S E A L E D

subject of the Curcio hearing.  It's a fact-finding process.

And I would say to the Court you can use words stunning and whatever.  You have lawyers in this room, not just me, all of us, resource counsel, all of us, who have witnessed the events that have been taking place for months.  Bobbi Sternheim's report was attacked by Mr. Barket in the same kind of vitriolic words.  He seems to think that if he uses those words, it carries weight.

Every factual point made in Ms. Sternheim's report is backed up by some of Mr. Barket's own text messages and his own e-mails, his own words.  And so when he stands before you and says, oh, they filed a letter and it's baseless and it has no support, no, Judge.  We provided Curcio counsel in this case with dozens of base camp quotes directed to each factual circumstance asserted.

The lawyers in this case stood by and allowed conduct to go.  It was uncomfortable for the lawyers.  And it reached the point where we decided that we had to bring these matters to the attention of the Court.

We met as a team.  He was present.  He withheld information from us about his true involvement in things.  That's his right.  He's a former prosecutor, like he says.  He knows -- he kept information from us.

When we decided to notify the Court, we felt that we were obligated first and foremost as Mr. Tartaglione's lawyers,

X20201mtartc2x        S E A L E D

whether he recognizes it or appreciates it or not.  His position today may not be the same come the verdict in this case.  And so we decided to inform the Court and quietly wait until a Curcio inquiry can take place and a fact-finding process should start.  We are relieved that that has started and, we are relieved that it has started in our stead to protect him from conflict counsel.

So, Judge, with respect to his request that we all be relieved now, that's his goal.  And I understand why he wants to get us out of the way.  I do.

THE COURT:  When you say his, who are you referring to?

MR. RICCO:  Mr. Barket's.

THE COURT:  Okay.

MR. RICCO:  That's what I'm talking about.

And that's his decision to make.  And he has that right as a lawyer.  But we're appointed under the Criminal Justice Act to protect a person who's facing the death penalty.

And with respect to how we are proceeding in this, listen to this, Judge.  Every single investigator that Mr. Barket requested we submitted and advocated for, went back and forth with Jerry Tritz, and your Honor approved it.  Every single one of them.  Every single expert that Mr. Barket requested, every single forensic expert that he requested, if we even disagreed with how much he wanted to get paid and

X20201mtartc2x        S E A L E D

ultimately advocated on his behalf, your Honor has signed it. There is not one single expert or service that Mr. Barket stands before you and claims that somehow we've interfered with.  It's not true.

The budget is robust in this case.  It's important in this case.  We all recognize the need for dynamic representation here.  We long accepted that Mr. Tartaglione wants the liability phase done, and we've equipped a team accordingly.  That's why we have five investigators.  That's why we have all of these lawyers.  It's because we've embraced what he wants.  And so that has proceeded.

Now, here's the difficulty for Mr. Barket.  He says he wants to represent a capital defendant.  Judge, the incident that he refers to, this is the e-mail that he sends to the government.  He says:  "We would like to make further arguments to the Committee and ask that it reverse its decision.  Can you please let me know the process to do that.  Do we write to you, to the Committee or to to the Attorney General?"  We wouldn't have had known of this request but for the government sent it to us.

Judge, the Department of Justice protocols for how you withdraw the notice of intent to seek the death penalty and you how sign up an authorized defendant is a complicated procedure set forth in the Department manual as Section 9-10.160.  I know that because I discussed it with Mr. Barket

X20201mtartc2x        S E A L E D

via e-mails, via base camp posts, on August 21st, 2019.  And so to see him attempting to accomplish that without the benefit of the lawyers here who have done it, who have participated in it, without even bothering to contact resource counsel, was disturbing, because I could think of no good reason that a lawyer would do such a thing representing a death-authorized defendant.

Now, it's important, Judge.  This is just not some -- this is not like I want to go to the jail and see the cells.  What Mr. Barket did not know is that the manual, the Department of Justice manual, frowns on those applications.  It opposes successive requests.  So when you put in that application forward, you want to put that application forward when you got your best shot of getting it.

Now, Mr. Barket is doing things in support of a person who's facing the death penalty without even bothering to consult us.  We have no idea what his grounds are.  He has no idea of what to do.  He's representing.  He's moving forward.  The manual tells you exactly what to do.  The manual tells you who do you write to, who do you respond to, and the process that happens.  You don't ask the government how do we do that.

And then, you know, it's interesting.  If you could ever see our e-mails to the government, we didn't tell the government don't do that.  We wrote a very detailed e-mail to the government explaining, first of all, that we had a serious

X20201mtartc2x        S E A L E D

Curcio issue pending and that we thought that this should really wait until the resolution of the Curcio inquiry. Then we also discussed the manual with the government, Section 9-10.160(b). And we asked the government in our request to say that this is perhaps something that should not be acted upon until the Curcio issue has been decided by Judge Karas.

Mr. Barket's response: Respectfully, Mr. Ricco doesn't speak for Mr. Tartaglione, nor the defense, and he lacks the authority to contradict a request made by Mr. Tartaglione's lawyer. Our requests stand and we're going to move forward.

Michael Bachrach responds to that, saying: "No, sir. We are all Mr. Tartaglione's lawyers. We've been appointed by the Court. Local Rule 1."-- it should say 1.1 -- "and Civil Rule 1.4 say we are all counsel of record. None of us has been relieved. You shouldn't be telling the Court that we don't have the authority to speak on behalf of the defendant. It's just not true."

Mr. Barket's response. Stunning? Read the e-mail chain, Judge. I would invite the Court to read the e-mail chain. And what you will see is a person who comes into court and represents himself one way and, when he's out of here, he's a different person. It all sounds good. But the defendant is in jeopardy for an attorney to seek the withdrawal of the death lawyers without even bothering to consult with the individuals

X20201mtartc2x        S E A L E D

on the team, who have not only done it successfully.

Now, mind you, Judge, resource counsel has been involved with us throughout. They know it because resource counsel prepped the team before we went to Washington in the first place. And one of our resource counsel traveled with us to Washington and sat in during the proceedings when we gave our presentation to the Department of Justice. And so resource counsel has been intimately involved with every aspect of protecting Mr. Tartaglione's rights. So when Mr. Barket says, well, now the issue is he's being prejudiced, I would like to see someone make the argument that a defendant was being prejudiced because of a lawyer who doesn't know how to proceed, who wants to do something risky and not even consult with his fellow counsel or resource counsel. If that disqualifies lawyers, I'm not sure which way the wind blows.

With respect to the first issue, Judge, I will say this. I have been -- I have addressed this issue with Mr. Barket. And I've said to Mr. Barket -- he says you don't support that. It's all in e-mails, Judge.

Judge, we have about a $1.3 million budget here. We are not straw appointees.

In other words, we are not here so that you, Mr. Barket, can utilize public funds. We are here as real counsel with real responsibilities.

If your Honor would see, once the case was

X20201mtartc2x        S E A L E D

authorized, the first several meetings after authorization was solely dedicated to developing the liability phase. Completely devoted to it. We also have to develop a penalty-phase case. He's not paying for it. How is he prejudiced by it? No prejudice whatsoever.

The difficulty that I think that Mr. Barket has had is that it's very hard for him to be around people who have a good idea of what they're doing. And it's difficult. He wants to represent a capital defendant and, in my view, he doesn't have the skillset to do it or the knowledge to do it. And this e-mail in his own words demonstrates that. And that's just one of many.

His idea that he can write to the government in the same chain -- he's telling the government the following, Judge. Talk about stunning. He says to the government in the same e-mail chain that Mr. Ricco doesn't speak for Mr. Tartaglione. "he hasn't visited him in five months." This is what he says to the government in an e-mail. I don't know what the basis of him saying that to the government is. I don't know why a lawyer would say that. This has been a difficult situation. You go back five months. We've got letters. I don't want to see him. But to say that to the government is just -- it's his choice of proceeding.

I have explained to Mr. Barket the process by which, if he wants, he can make an application to the Court. There's

X20201mtartc2x        S E A L E D

an e-mail to that two months ago, when he was demanding to see the budget.  He wanted to see the budget during the middle of the Curcio proceedings and I said to him why.  No response.  I have no idea what his economic relationship is with the defendant.  I have none.  But I do know when I sense that something is not right when qualified, hard-working lawyers -- and these lawyers in the mitigation team in this case, the work has been extraordinary.  You want them out of the way.  Why?  Because they're working hard at what they're doing?  Because they're good at what they're doing?  And that's the application here.

The CJA guidelines sets forth the budget process for capital cases.  I gave him the chapters.  I told him to read it.  Make your applications to the Court.  But Chapter 6 guides Chapter 5.  And the courts just don't turn over a million-dollar budget to anybody.  A lawyer who is not qualified to do this work can't say, okay, I'll take these lawyers, I'll get the budget, then I'll fire them and continue with the budget.  And any person that's standing before this Court and saying I don't want the public funding, I don't want the five investigators, I don't want the two mitigation specialists, I don't want these lawyers, when you can see the legal work that they're doing, I don't want that, it really questions who's influencing that type of decision here and what's the true motivation for it, because no defendant is at

all prejudiced by the work that has happened here.

And so if the idea is that, as he says, the incident with the government demonstrates that, it does demonstrates it. What it demonstrates is he doesn't know what he's doing -- that is, Mr. Barket -- and that he's proceeding in a way injurious to the defendant, not to his benefit.  So I didn't ask the government not to meet with him.  If Mr. Barket had read the protocols, he could get up and tell you exactly what I asked the government to do.  And I did it.

The government has an option of weighing in and communicating to the Department of Justice.  What I asked the government to do is to not do that part, their part, until the Curcio issue was resolved.  Because if the Curcio issue is resolved in this case and it shows that there has been improper influences here, courses of action and decisions made by an attorney that diverge from the interests of the capital defendant, well, that's going to call in the question all of that activity that has taken place.

So we've tried to limit the type of conduct going forward because, one day, somebody's going to look at this record and they're going to see all of the statements.  We were told the Curcio application was baseless.  This was a letter of August 18.  He said it's baseless, it's a waste of time.  Your Honor can see from reading the report that that Curcio investigation is hardly baseless.  And at the time we made that

application, Judge, we didn't even know that he was directly involved with the note. And it's like -- it's -- you know, I don't want to use words like incredible and throw threats like with the Bar and this and that. You know, that's irrelevant, Judge.

We are doing our job. These lawyers are working hard. The mitigation experts are doing their job. Mr. Dowd is present here. He is doing his job. He's not told just investigate this, don't investigate that. He has a full team of people doing work on every aspect of this case.

And Mr. Barket is partially right when he talks about McCoy. He says Supreme Court decisions, but he's talking about McCoy. And McCoy says this. And we've discussed this as a team with him and the lawyers present. He has an absolute right to go and challenge the guilt phase. And we've accepted that, Judge, seven, eight months ago. We've set into play experts to get this done seven, eight months ago. As you move forward, you develop the work. So McCoy says he does have a right to do it, but there are competing Supreme Court decisions, Rompilla v. Beard that I've encouraged Mr. Barket to read and Wiggins v. Smith that I've encouraged Mr. Barket to read, that say the following: We still have to prepare. So if the defendant says, hey, I don't want a penalty phase -- and the Supreme Court addressed that in Rompilla -- he can say I don't want it, but it doesn't absolve counsel of its

X20201mtartc2x      S E A L E D

responsibility to prepare just in case he changes his mind. And so that's what we've been doing. And if following the Supreme Court authorities and following ABA Guidelines 10.7, 10.8, 10.10.1, 10.11, which all give us an obligation and responsibility to prepare, even when the defendant is opposed to it -- that is the language in ABA guidelines as adopted by the Supreme Court -- that's where we are. And if we're disqualified because we're doing the job to save his life, then we'll cross that bridge when we get to it.

If Mr. Barket can't fathom us remaining, I can't fathom what has been done to Mr. Tartaglione. I cannot fathom. I can't understand the true reasons for it. Something must be here that we don't know about, and given what has happened in this case thus far, that wouldn't surprise me.

With respect to his claims about people's allegations are baseless, let's be clear about something. All of the lawyers here and all of the mitigation experts on this case, every single one of them, are prepared to get on the witness stand under oath and swear to all of the statements made in the Curcio report and the statements made in our letter, swear to under oath, and, in addition to that, hand to the Court a base camp post, an e-mail or text message for each and every statement of fact.

The person who is subject to this Curcio inquiry is not Anthony Ricco, it's not Bruce Koffsky, it's not Michael

X20201mtartc2x        S E A L E D

Bachrach, it's not Johnny Diaz, and nor is it Ken Montgomery. We've been doing our job, Judge. The person who is subject to the Curcio inquiry is the guy who is standing up in Court saying get rid of them because they're pretty smart fellas. And you know what he's finding out also? They can't be bullied around.

You know, your Honor, you said something at one of these conferences. You can't change the history. And where I come from, people say just keep talking. And the more you listen and the more you hear, the more you reveal, you will see something that your Honor pointed out when Mr. Barket got before this Court and made one of these applications about 18 months ago is still present.

If Mr. Tartaglione does not want public funding, I have said to his lawyer, and I've written to him, he can do the following. He can say I don't want the public funding. He can't say, well, I want that budget, which is what he's asked for, and I want to get rid of them. Because Chapter 6 is the vehicle by which the Judicial Conference has said the funds are guided. So Chapter 6 that has the appointment of learned counsel, a part of that is the budget process. And the courts just don't turn over a budget of that magnitude unless the court is satisfied that the person is represented by learned counsel. And so, you know, you can't have it both ways. And if the defendant is saying, hey, I don't want qualified lawyers

and I don't want the public funding, that's really a knowing, voluntary waiver?  And if that's what he wants, so be it. That's his decision to make.

I would not recommend -- I would not stand before any court in this country on any case representing a capital-authorized defendant in the United States District Court and say I don't want the mitigation experts, I don't want the investigatory experts, I don't want any of them, and the reason why I don't want them is I don't trust Mr. Ricco and I don't trust this one.  And then when someone objectively looks at their work and says this work is fine, ultimately that's the decision for them to make.  And if he decides he doesn't want public funding for his case, that's on him.

My recommendation would be that he wait to make that decision until the end of this Curcio inquiry, and all the other, because he may very well sit down with another lawyer that he hires that says, you know, we need that public funding and we're going to need some lawyers.  And if the Court has to appoint another team of lawyers, he's going to get the same dedicated group of individuals that are vetted by this district for representing capital defendants in this case.  And we're preparing for that, also.

Personally, I think that the damage that has been done to the client has just been something outside of my experiences.  But it is what it is.  So Mr. Barket wanted a

record. He's got it.

And mind you, Judge, I am speaking on behalf of each one of these lawyers here, and I have made that decision, and they have consented to it, because if, in fact, the teams have to change, and that's obviously coming, we don't want so much of the public funds to have been wasted that if we can salvage some of this, it's to his benefit for it to be salvaged, not to be thrown away and started all over again behind what we've heard so far and what we've seen so far.

And I look forward to the Curcio hearing. I've never seen one like this. I'm glad I'm not the subject of it. But there will be an explanation. And I am speaking on behalf of each one of these lawyers.

THE COURT: All right. Well, that's a lot to digest there. I think a couple of things.

First, you know, I said to Mr. Barket on the earlier occasions when he made this application that I thought it made sense to hold it in abeyance. I wasn't kicking the can down the road. I thought it made sense to hold it in abeyance to see what came of the Curcio process.

At the same time, I was cognizant of, Mr. Barket, what you said, that Mr. Tartaglione is understandably very interested in moving this case along so he can have his day in court and, from his perspective, get an acquittal and move on with his life.

X20201mtartc2x        S E A L E D

So we have a situation where you've got a defendant who potentially has representation that involves a conflict, a defendant who, at the same time, wants to keep things pressing ahead, but then also doesn't want all the lawyers who are responsible for pressing ahead to press ahead. Because what we could have done is we could have just called a time out on all work and behalf of Mr. Tartaglione until this got resolved. Right? Because that would have addressed the prejudice point, that there were things being done on his behalf that he doesn't want done. And I take the point. But there's a tension there because he can't have that and, at the same time, try to get ready for trial as quickly as possible.

And this is the first time that I've heard that he doesn't want all of learned counsel to represent him. Up until this point, I know it had only been Mr. Ricco. And part of the reason I thought it made sense to hold it in abeyance is that Mr. Ricco is only one of the learned counsel who has been appointed to represent Mr. Tartaglione and that the work could go on presumably without any prejudice to Mr. Tartaglione.

So, while I think we are coming closer to the day when we can finally get the Curcio issues tee'd up and hopefully resolved, I think we've come to a point where it may be that I'm going to need briefing on the extent to which Mr. Tartaglione's request needs to be decided now and, if so, then what the decision should be.

You know, Mr. Ricco mentioned a lot of different governing rules and cases, and so I think all that needs to be put into writing. And, Mr. Barket, you can do the same, of course. But I do think Mr. Tartaglione should consider that if what he wants is a trial as soon as possible and he doesn't want learned counsel to represent him, that, depending on how the Curcio hearing comes out, he may have to literally start over with his counsel, and that's going to delay things. And that may be what he wants. And that's fine.

And I do think, Mr. Ricco, in the briefing, I think it would be useful for you to address the scenario on which a capital defendant makes decisions that may not be in that person's interests, but if they're knowingly and voluntarily made, you know, even if it's more likely to get him convicted and even if it's more likely to have the death penalty imposed on him, if he wants to not have certain people represent him, then does he have that right?

MR. RICCO: I will submit to the Court, but my understanding is that he has that absolute right.

THE COURT: Yes. I don't disagree with you.

MR. RICCO: Right. But the right that he doesn't have is to say but I want to keep the budget.

THE COURT: No. And I think that needs to be addressed in this submission. But it also has to be a right that is knowingly and voluntarily exercised. And then to the

X20201mtartc2x          S E A L E D

extent that, when the dust settles and the results are in and he's displeased, the extent to which he has complicated any ineffective assistance claims when he says, oh, wait a minute, you know what?  My conviction is a result of a tainted process because my lawyering was not up to snuff.

And I also think it's important in the briefing that we focus on Mr. Tartaglione's rights, we focus on his interests.  I don't think it's fair to try to insinuate that there are broader agendas from the Capital Defense Bar.

Every experience I've ever had, and I have experience going back a quarter of a century in dealing with the Capital Bar both in this job and as a prosecutor and as a law clerk, and my reaction to the Capital Defense Bar is these are some of the most dedicated, hard-working, competent lawyers on the planet.  And thank goodness because the stakes couldn't be higher and we would not want lawyers with anything less to be representing people who are facing the ultimate punishment. And they're not about agendas.  They're about their client. Yeah, they may be vociferously opposed to the death penalty, but they don't put that interest above representing the client. And that is true for the lawyers that the Court has appointed to represent Mr. Tartaglione in this case.  And I, for one, am grateful that the Capital Bar is here every conference represented by one of its finest to support Mr. Tartaglione's defense.  And these are not individuals who have manifested any

X20201mtartc2x        S E A L E D

kind of agenda.  None of them has appeared on 60 Minutes. They've just been quietly doing their work.

So when we do this briefing, we're going to be focused on Mr. Tartaglione's rights and his interests, and anything else is background noise.

So I guess the question is when can we get the briefing.

MR. RICCO:  Judge, we'll get that brief to you within a week.  We've been working on it for a long time.

THE COURT:  Mr. Barket, is that okay?  Can you get your submission in within a week?

MR. BARKET:  We actually have a draft of it.  How about a week from Monday?

THE COURT:  Okay.

MR. BARKET:  And just, your Honor, I get countless requests to appear on television on a number of different cases.  A long time ago, 25 years ago, an attorney much more experienced than me at that time said be careful of the press. It's a drug.  And sooner or later, you won't want to do any cases except press cases.  And I took that to heart.  And people who know me well know that, with each request for an interview, each request for on camera or off camera, I take some pain to say is this going to be good for my client or not. And I hope -- I'm not perfect, but I hope that when I make those decisions, that they are good for my client, because

X20201mtartc2x        S E A L E D

that's my purpose.

The reference to 60 Minutes.  I'm many things.  I'm not stupid to the point where I didn't recognize that doing a 60 Minutes interview in the course of being accused of having a conflict over press statements would rile things up.

At the same time, I knew that there is this theme out there that Mr. Tartaglione, the hulking defendant -- if you look at him here, he's smaller than me now -- assaulted and perhaps murdered Epstein in jail, and my strategic decision back in July, when this first came up, to today was that that can't go unrebutted.  It's the kind of thing that will taint a jury and it will never leave.  So I take your point about that, but my decision-making process and my motivation on this is for what's best for my client.

And the good thing about my career is that I don't need the press.  It wasn't the first time and it won't be the last time I suspect that somebody will cover a case of mine.  So kind of the thrill of being on TV that might exist for some lawyers has long since waned for me, a long time ago.

And I just will say a couple of things.

THE COURT:  Okay.  I really don't want to get into a back and forth.  I really don't.  You know what?  We've been out here now for two hours.  I've listened to a lot of stuff.  I've issued a schedule.  And I've got a lot of other cases to tend to this afternoon.  So this is an ex-parte proceeding.

X20201mtartc2x        S E A L E D

There's nobody else here except for those of us who work in the court or those who work on the defense team.  So there's nothing else that we are going to resolve today.  I've issued a briefing schedule.  We're going to do that.

MR. BARKET:  Okay.  Can I say just one thing, Judge, if I can?

THE COURT:  One thing.

MR. BARKET:  One thing.

THE COURT:  Quickly.

MR. BARKET:  Yes.

I am careful in paying attention to the Court's nonverbal and verbal cues.  I just ask the Court to withhold judgment until we get to the point where the proof comes out; the text messages, the e-mails, the testimony about what took place and what didn't.

THE COURT:  To suggest I would do anything other is ridiculous.  And there has been nothing about my nonverbal clues.  You know, I've had judges comment on my poker face, okay, Mr. Barket?  I have not reached any decisions about anything.  Okay?

Mr. Ricco, you want to say one last thing?

MR. RICCO:  I do.

Your Honor, the team wants to get working on a memo, and if your Honor can order that we get a copy of the transcripts today, that will help us down the road a day or

X20201mtartc2x        S E A L E D

two.  Or as soon as possible.  As soon as possible, Judge.

THE COURT:  And if there is a delay and you all need more time for your submission, just let me know.

MR. RICCO:  Judge, there's nothing else useful for me at this point.  I think everything's been covered.  And we have resolved --

MR. BARKET:  You know, I forgot.

MR. RICCO:  I'm in the --

MR. BARKET:  I'm out of state --

MR. RICCO:  -- middle of a sentence.

THE COURT:  Don't interrupt Mr. Ricco, please.

Go.

MR. RICCO:  We're on schedule.  And I know I've said this, and I will continue to say this.  Judge, there is substantial work being done every month of this case by every lawyer in this case.

THE COURT:  I sign the CJA vouchers.  I know exactly what everybody's doing in this case.

And the one thing Mr. Tartaglione I think has to admit, whether he doesn't like certain people in this case or he loves certain people in this case, he has to know that everybody who either he has retained or who has been appointed to represent him and who is working on his behalf are working hard on his behalf.  He may not agree with everything they're doing, but the one thing that can't be said is that anybody in

X20201mtartc2x        S E A L E D

this case is lazy.  That can't be said.

So a week from Monday does not work for you, Mr. Barket?

MR. BARKET:  No.  I forgot I'm out of state, and I really won't be able to work from --

THE COURT:  So when do you want?

MR. BARKET:  Two weeks from tomorrow.

THE COURT:  Okay.

MR. BARKET:  February 6th.

THE COURT:  So two weeks from tomorrow is February 6th, yes.

MR. BARKET:  We don't have to physically be here.

THE COURT:  No.  You're just going to submit something.  And I assume this is all going to be under seal for ex-parte review, right?

MR. BARKET:  Correct.

THE COURT:  Yes.  Okay.  So if you want until February 6, you've got it.

So the transcript of this proceeding, the ex-parte proceeding, is to be sealed because it involves, obviously, very sensitive matters in Mr. Tartaglione's representation, except copies can be made available to counsel of record for Mr. Tartaglione.

We're adjourned.

- - - -