# ANTHONY L. RICCO

*Attorney At Law*
20 VESEY STREET, SUITE 400
NEW YORK, NEW YORK 10007

TEL. (212) 791-3919  FAX. (212) 964-2926
EMAIL: tonyricco@aol.com

STEVEN Z. LEGON
OF COUNSEL

January 28, 2020

**TO BE FILED *EX PARTE* AND UNDER SEAL**

**BY EMAIL**

Hon. Kenneth M. Karas
United States District Court Judge
Southern District of New York
The Hon. Charles L. Brieant Jr.
Federal Building and Courthouse
300 Quarropas Street
White Plains, New York 10601-4150

Re: ***United States v.  Nicholas Tartaglione***, Docket No. 16 Cr.  832 (KMK)

Dear Judge Karas:

This letter is a follow up to the correspondence sent to the court on January 23, 2020.  Since that date, we have (1) served a so ordered judicial subpoena on the Bureau of Prisons (BOP) for the visiting logs, mail and telephone logs of Nicholas Tartaglione from January 16, 2020 to January 23, 2020; (2) have had the occasion to review the BOP protocols related to the policy for monitoring the outgoing mail of detainees.

**BOP Regulations on Correspondence**

In order to protect the integrity of the BOP institutions and to ensure the safety of staff, inmates and the general public, the BOP has adopted specific regulations and policies to monitor the incoming and outgoing correspondences of inmates.  See, BOP Policy Statement on Inmate Correspondence, 5265.14 and 28 CFR §540.10, *et seq.*

The BOP Policy Statement on Inmate Correspondence requires all inmate correspondence mailed out of the facility to contain the inmate's Register number.  See, BOP Policy Statement

5265.14 (4)(d) at page 6 (which adopts 28 CFR 540.12(d)) and BOP Policy Statement 5265.14 (8) at page 13 (which adopts 28 CFR 540.16).    In addition, outgoing mail is read to ensure, *inter alia*, compliance; that the inmate is abiding by institutional rules and protocols.   See, BOP Policy Statement 5265.14 (4) at page 9 (which adopts 28 CFR 540.14).

Outgoing Mail Addressed To An Attorney or Legal Assistant

Outgoing mail addressed to an attorney or legal assistant stamped "legal mail" is permitted to be sealed by the inmate and is not opened and read by BOP staff.   See, BOP Policy Statement 5265.14 (10) at page 14 (which adopts 28 CFR 540.18(c)(I) and See, BOP Policy Statement 5265.14 (11) at page 16 (which adopts 28 CFR 540.19).    These rules also apply to a person whom the attorney of record has designated and attested to as a legal assistant, who may visit and correspond with the detainee under the attorney's supervision.   See, BOP Policy Statement 5265.14 (11)(d) at page 16 (which adopts 28 CFR 540.19).

As indicated in our correspondence to the court dated January 23, 2020, the envelope which contained the Tartaglione letter was not properly addressed to Learned Counsel.  First, neither the envelope nor the letter itself contains Nicholas Tartaglione's Register Number.   The lack of a registration number is significant.  Based upon the BOP regulations discussed above, an outgoing envelope without a Register number is rejected by BOP staff and not mailed.

As stated above, all outgoing correspondences, except those addressed to an attorney or an attorney's designated legal assistant, are read by BOP staff to ensure that the letter inside is being mailed to the addressee on the envelope, *inter alia.* See, BOP Policy Statement 5265.14 (4) at page 9 (which adopts 28 CFR 540.14).  This means that without a Registration number, the Tartaglione letter and envelope, as presently written, would not have passed inspection.  If an attempt to mail had been made without a Registration number, the correspondence would have been rejected and not permitted to be mailed out of the detention center.   When this occurs, the detainee is advised of

2

the rejection of the outgoing correspondence, and is permitted an opportunity to appeal the adverse decision.  28 CFR 540.14(2)(d).

Further, there is substantial evidence that the Tartaglione correspondence was not actually mailed from the Metropolitan Correctional Center.  The envelope does not contain a postmark from a Manhattan post office, where the Metropolitan Correctional Center is located.[1]  To the contrary, the envelope is postmarked January 21, 2020 at 6:00 pm, from the MID ISLAND, NEW YORK, POST OFFICE, which is located in Suffolk County, New York.  In view of the foregoing, it stands to reason that the Tartaglione correspondence was either physically removed from the Metropolitan Correctional Center or concealed in a correspondence mailed to another individual on Nicholas Tartaglione's mailing list.  In either event, the goal of informing the media of the issues related to Learned Counsel, which are the subject of *ex parte* and sealed judicial proceedings, was the result of a concerted effort involving at least one or more individuals.[2]

Removal of Documents Through Visits at the Metropolitan Correctional Center

The judicial subpoena requests the disclosure of the visiting, mail and telephone logs from Nicholas Tartaglione on the dates of January 16, 2020 through January 23, 2020.  The Tartaglione letter is dated January 18, 2020.  Our past court conference was held on January 22, 2020.  The Tartaglione correspondence dated January 18, 2020, is postmarked from a Post Office located in

---

[1]    As stated in our correspondence dated January 23, 2020, there is no outgoing mail service from BOP facilities on weekends and on federal holidays.  See, BOP Policy Statement 5800.16, (3.16).  Therefore rendering it impossible that the Tartaglione letter, dated January 18, 2020, was mailed from the Metropolitan Correctional Center until sometime on Tuesday, January 21, 2020; delivered that very same day; then addressed and mailed to my office; and delivered on the morning of January 23, 2020.  It seems likely this letter was, therefore, smuggled out of the Metropolitan Correctional Center on or after January 18, 2020, and later addressed and deposited into a U.S. postal facility in Suffolk County on January 21, 2020.  As a result, the undersigned have requested the visiting logs for that relevant time period.

[2]    The envelope clearly appears to have been addressed by one or more writers, as the handwriting which sets forth the return address, sans a BOP Register number, is clearly distinct from the handwriting of the individual who wrote the name and address of the addressee.

3

Suffolk County at 6:00 pm on January 21, 2020.    Therefore, the Tartaglione letter was, more than likely, physically removed from the Metropolitan Correctional Center during a visit and deposited into the U.S. mail system on Long Island, prior to the court conference on January 22, 2020.

Social Visits at the Metropolitan Correctional Center

All visitation at the Metropolitan Correctional Center is governed by strictly enforced BOP policy.  See,  BOP Visiting Policy, Statement No., 5267.09.  These regulations are in place to protect the staff and detainees from harm, to prevent the introduction of contraband (cellular phones, drugs, weapons, etc.), which ensures "the safety, security, or good order the facility or protection of the public" from ham.   See, 28 CFR 510.1(h) and 28 CFR 553.12.  These BOP rules are also in place to prevent improper unauthorized communications, and to ensure that detainees, and their counsel, comply with judicial protective orders, and other directives of the court, *inter alia*.

The Rules of Conduct For Social Visits

To prevent the exchange of documents, detainees are not permitted to bring with them for social visits any items - including papers and documents.  The only item a detainee is permitted to possess during a social visit is his/her BOP issued identification card.  To enforce this policy, detainees are double searched before they are permitted to enter the social visiting area.  In addition, social visitors are also not permitted to bring into the Metropolitan Correctional Center any documents or papers and are also searched.  Additionally, the social visiting areas are heavily monitored.  Inmates and visitors are visually monitored by the staff present in the social visiting area, as well as by staff observing the social visiting area via surveillance camera.  The BOP policy is clear.  Detainees are specifically prohibited from exchanging documents during social visits.  BOP Visiting Policy Statement No., 5267.09 (21)(d) page 11.

In addition to the foregoing, and most significant. is the fact that Nicholas Tartaglione's social visits were suspended for an entire year, as a result of his possession and usage of a

contraband cellular phone (actual contact with his attorneys of record and, according to attorney Barket, at least one other lawyer whom he once claimed was retained to assist the Barket firm with the development of the defense.)  Based upon the information known to the undersigned counsel, there were no scheduled social visits for Nicholas Tartaglione from Saturday, January 18, 2020 (the date the letter was authored) through Wednesday, January 21, 2020 (the date that the letter was postmarked by a Long Island post office).    Therefore, in view of the stringent regulations in place in relation to social visits, and the fact that Nicholas Tartaglione's social visits have been suspended for one year, it is unlikely that the Tartaglione note was removed as a result of a social visit at the Metropolitan Correctional Center on any date from January 18, 2020 through January 21, 2020.

<u>Legal Visitations</u>

Legal visits on the other hand are entirely different than social visits, and are government by Policy Statement No. 5267.09.  See also, 28 CFR §§543.10 thru 543.16; 28 CFR §540.46.  Detainees are permitted to bring paperwork and documents into the room for legal visits.  Attorneys are also permitted to bring into the visiting area legal documents and papers.  Legal visits are not monitored and take place outside of the visual surveillance of BOP staff.

The BOP has prescribed regulations which set forth documents which an attorneys are permitted to exchange with a detainee, and the procedures for when, if ever, the attorney is permitted to remove documents from the Metropolitan Correctional Center.    Under BOP regulations, attorneys are permitted to review documents brought to the meeting by the detainee; however, the BOP maintains a strict policy on the removal of legal documents from the Metropolitan Correctional Center.    See, BOP Visiting Policy Statement No., 5267.09 (21)(d) page 11.[3]  Achieving the goals and success of the above BOP policy regulations is based upon the good

---

[3]    Detainees are prohibited from giving legal papers to the attorney or receive papers from the attorney to retain after the visit, absent compelling circumstances and prior authorization by unit team or Duty Officer. BOP Visiting Policy Statement No., 5267.09 (21)(d) page 11.

faith and integrity of the attorneys who request legal visits.    However, there are attorneys who engage in prohibited conduct and violate the BOP rules which have been designed to ensure the integrity of BOP facilities and to protect the public from harm.

In addition to the foregoing, attorneys are not permitted to take out letters and documents to be delivered or mailed to third parties.    See, BOP Visiting Policy Statement No., 5265.14 (6)(5)(d)(8) page 10 (prohibiting third party mailings).    Attorneys should only have in their possession "legal documents" related to the detainee's case, or other documents which were lawfully in the detainee's possession in compliance with BOP rules and regulations - memoranda or other documents which have lawfully entered the detention center, documents which have been deposited in the law library for review or documents written by the detainee in relation to his or her case.[4]

In response to the order of the court requiring a response to Learned Counsel's letter to the court dated January 23, 2020,  attorney Barket has responded and assured the court that neither he nor his associates visited Nicholas Tartaglione subsequent to court conference on January 22, 2020. The response, however, begs a question, since the relevant time period, here, is from January 18, 2020, the date of the Tartaglione letter, up until January 21, 2020 at 6:00 p.m., which is when the Tartaglione letter was postmarked by a post office located in Suffolk County, New York.

To obtain objective reliable information about the relevant time period, a judicial subpoena has been served upon the BOP, so that the court can have information about who was, in fact, visiting Nicholas Tartaglione - - not subsequent to our conference - - but from the time period of January 18, 2020 up to and including January 21, 2020, the date of the Tartaglione letter's postmark.

It stands to reason that if the purpose of the Tartaglione letter was merely to express his

---

[4]    For example, the so-called *Epstein* note removed from the MDC by counsel is contraband, because based upon the statements made by attorney Barket to his co-counsel during several meetings, and as represented in his own email exchanges and Basecamp posts, the *Epstein* note is not a "legal document," nor did the document come into Nicholas Tartaglione's possession in compliance with established BOP rules and regulations.

legitimate displeasure with his representation by Learned Counsel, he would have simply placed the letter in a sealed envelope, marked it "Legal Mail," and, in compliance with BOP regulations, simply mailed it directly to Learned Counsel, and sent a copy to his retained counsel or to the court, but that is not what happened here.   The conduct must be viewed in context of the proceedings which proceeded the date of the Tartaglione letter.

On several prior occasions, the court has carefully explained to Nicholas Tartaglione and his retained counsel, that all of his concerns about issues with Learned Counsel would be addressed at the end of the *Curcio* inquiry.   In fact, on ever since the application was filed for the appointment of *Curcio* counsel, retained counsel has repeated made an application, on behalf of the defendant, to have Learned Counsel Anthony Ricco removed from the case.[5]   See, *Transcript*, October 28, 2019 (Sealed), page 28, line 6, pages 48-52.

The court directly addressed Nicholas Tartaglione and has taken time to explain to him, *inter alia*, that the purpose of these proceedings are to protect his rights and ensure proper representation. See, *Transcript*, September 17, 2019, pages 45 to 62.   Notwithstanding these thoughtful expressions by this court, the Tartaglione letter dated January 18, 2020 was written in such a manner, and copied to the media, in a concerted effort, with the assistance of others, to put his views in the press, and to impose his will upon this court and the integrity of this process.   This type of behavior is a pattern which has been adopted by retained counsel - - by his own words (in court on January 22, 2020) - - to engage the media and get Nicholas Tartaglione's views into the public forum.   See, *Transcript*, January 21, 2020 (sealed), page 30, line 6 to 14).

As a result of this concerted activity, BOP protocols were again violated with the assistance

---

[5]    In fact, on January 21, 2020, after attorney Barket was unable to prevent the disclosure of the *Curcio* report to a government conflict or firewall team, he made an application, without any prior notice to anyone of his colleagues or the court nor the assertion of any articulated grounds, for the removal of all five appointed counsel.   The court noted that this was the first time such that the application for the removal of counsel was extended to include all five appointed counsel.

of others.  It is apparent that the original handwritten letter received at the office of Learned Counsel on the morning of Thursday, January 23, 2020, was the result of concerted activity.  The individuals who have been involved in the removal of documents from the Metropolitan Correctional Center (either the Epstein note and/or the Tartaglione letter) are engaged in conduct which is, at a minimum, a violation of BOP policy, and such facts are detrimental to the interests of a death authorized defendant in the preparation and/or presentation of evidence at the penalty phase.   The damage to Nicholas Tartaglione's ability to present *Skipper* evidence and to face additional powerful aggravating evidence at the penalty phases is enormous.   Simply put, aiding and abetting this type conduct increases the risk of the imposition of a sentence of death in this case.

This continued concerted activity, in face of the court's admonitions, has placed in jeopardy the ability to present mitigating *Skipper* evidence, and opens up Nicholas Tartaglione to additional aggravating evidence in the government's direct case at penalty phase or in rebuttal.  Sadly, we are involved in a *Curcio* inquiry, in the first place, because retained counsel rejected the sound cautionary advice of the undersigned counsel and Resource Counsel, and began litigating issues related to Nicholas Tartaglione in the media, *inter alia*.

This conduct has been so pervasive, that even during the pendency of the *Curcio* inquiry itself, retained counsel has continued raising issues related to development of Nicholas Tartaglione's penalty phase defense in media, including the nationally syndicated *60 Minutes* television news show.  Following this lead, we now have the defendant, himself, engaging in the same conduct, although he was directed by the court not to engage in such activity - and he agreed not to.  *Transcript* September 17, 2019 (Sealed), page 58, line 7 thru 10.   Aiding and abetting this type of conduct, including the removal of contraband and retained counsels' communications via contraband cellular phone communications with retained counsel and his associates, serves to facilitate the defendant's involvement which is contrary to the legitimate goals for the representation of a defendant in a death authorized case.

8

Clearly this self-destructive conduct could not have taken place without the aiding and abetting of others, who have demonstrated no regard for the integrity of the protocols set forth by the BOP to protect detainees, BOP staff and the public; but also no regard for the integrity of these very serious capital proceedings. To date, this concerted conduct has persisted with self-serving impunity.

As attorneys appointed to protect the rights of the defendant in these capital proceedings, we have an obligation to investigate and prepare for both mitigating and aggravating evidence at the penalty phase. See, ABA Guideline 10.7; and *Rompilla v. Beard*, 540 U.S. 345 (2005). When that important effort, recognized by the ABA Guidelines and Supreme Court case authorities, is impeded by the conduct of third parties, including those whose sworn duty is to protect the rights of the defendant, the ability to properly prepare and protect Nicholas Tartaglione from possible execution is put in severe jeopardy. In this case, it simply seems that there is nothing that can be said or done to stop the continuation of this self-destructive behavior.

In addition to preparing for trial and the penalty phase in this case, the undersigned counsel has had to seek judicial intervention to protect the rights of Nicholas Tartaglione from the influences and conduct of individuals who have a conflict of interest, and who have engaged in conduct both to undermine the integrity of these proceedings, and to undermine those who have attempted to provide Nicholas Tartaglione with the high level of representation and legal advice that must be afforded a death authorized defendant.

The undersigned counsel are presently awaiting the return of the information requested from the BOP by a "so ordered" judicial subpoena. Hopefully, the visitation logs, mail logs and telephone logs will help identify those individuals who are aiding and abetting the violation of important BOP regulations and prejudicing the rights and interest of Nicholas Tartaglione. Upon receipt and review of those materials, the undersigned counsel shall further notify the court.

Undersigned counsel is deeply concerned that it was necessary to seek judicial intervention; however, the conduct engaged in by individuals in this case is unprecedented and foreign to the effective representation of a death authorized defendant.  There is a need to ensure that an accurate, real time record of these events is memorialized for appellate review and post conviction capital litigation, if required.  Again, since this is a death authorized case, the undersigned is of the view that an accurate record needs to exist regarding all aspects of the issue of counsel, and the integrity of these capital proceedings.

Finally, I respectfully request that this letter be held *ex parte* and under seal to avoid revealing information that could adversely impact the defendant and prejudice his penalty phase investigation and presentation.

Respectfully submitted,

*Anthony L Ricco*

Anthony L. Ricco, Esq.

ALR/jh

cc:   All defense counsel (including Barket and Leisenring)