LAW OFFICE OF

# MICHAEL K. BACHRACH

276 FIFTH AVENUE, SUITE 501
NEW YORK, N.Y. 10001
--------------
TEL. (212) 929-0592 · FAX. (866) 328-1630

MICHAEL K. BACHRACH *                                                        http://www.mbachlaw.com
* admitted in N.Y., MN and D.C.                                              michael@mbachlaw.com

February 13, 2020

**By Email – Filed Ex Parte and Under Seal**

The Honorable Kenneth M. Karas
United States District Court Judge
Southern District of New York
300 Quarropas Street
White Plains, NY 10601-4150

> *Re: United States v. Nicholas Tartaglione,*
> *16 Cr. 832 (S-4) (KMK)*

Dear Judge Karas:

As Learned Counsel duly appointed under the Criminal Justice Act, 18 U.S.C. § 3005, we write to address the three related questions posed by this Court during the ex parte proceedings on January 22, 2020, during which retained counsel made an application to withdraw Defendant Nicholas Tartaglione's prior request for the appointment of Learned Counsel and to immediately discharge all appointed counsel. Specifically, we write to address: (1) Whether a capital defendant may make decisions that may not be in that defendant's interest, such as discharging all Learned Counsel (which might make it more likely that he is convicted and sentenced to death), so long as that decision is knowingly and voluntarily made? See January 22, 2020, Sealed Transcript at 27 (hereinafter cited as, "Sealed Tr."). (2) Does the question whether Mr. Tartaglione's request to discharge all Learned Counsel and concomitant request to permit retained counsel to control the public budget need to be decided now (rather than after the Curcio process is complete)? See Sealed Tr. 26. And (3), if this Court's decision on #2 must be decided now, then what should the decision be? See Sealed Tr. 26.

For the reasons that follow, we respectfully submit that Mr. Tartaglione may not withdraw *in toto* his prior request for Learned Counsel under 18 U.S.C. § 3005 but may terminate specific counsel under certain situations. Even if complete withdrawal of the request were permitted, such withdrawal – which is a waiver of a unique and essential right bestowed only upon defendants facing the death penalty – should only be permitted if knowing and voluntary and after consultation with a disinterested, conflict-free, counsel.

Moreover, because no decision can be made knowingly and voluntarily if done so without an understanding of any substantial consequences that could result, we believe it necessary for this Court to first ascertain what public funding could be provided to retained counsel pursuant to Chapters 3 and 6 of the Guide to Judiciary Policy, Vol. 7, Part A (Guidelines for Administering

**Filed Ex Parte and Under Seal**

The Honorable Kenneth M. Karas
February 13, 2020
Page 2 of 11

the CJA and Related Statues) (hereinafter cited as, the "CJA Guidelines"), before ruling on the knowing and voluntariness of the withdrawal of the request for Learned Counsel.  We likewise believe the knowing and voluntariness of Mr. Tartaglione's decision should not be reached until after the Curcio issues have been ruled upon, as Mr. Tartaglione might view his decision differently if retained counsel is disqualified.  This being a death-*authorized* capital case, this Court should be particularly vigilant to ensure that there is no lapse in Mr. Tartaglione's representation.

## I.        Death is Different

The bedrock principle of capital jurisprudence is that "death is different."  This view of capital cases informs and guides the entire body of capital jurisprudence and capital-case litigation. Simply stated, death-penalty cases are not the same as other cases and cannot be treated the same as other cases. See Harris v. Alabama, 513 U.S. 504, 516 n.1 (1995) (Stevens, J., dissenting) (citing seven separate decisions, noting, "Our opinions have repeatedly emphasized that death is a fundamentally different kind of penalty from any other that society may impose").

Commencing with the 1976 quintet of cases that mark the beginning of post-Furman death-penalty jurisprudence, the Supreme Court has taken numerous opportunities to emphasize its recognition of the difference between death as a punishment and all others.  In Woodson, for example, striking down North Carolina's initial post-Furman death-penalty scheme, the Court observed:

> The penalty of death is qualitatively different from a sentence of imprisonment, however long. Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two.

Woodson v. North Carolina, 428 U.S. 280, 305 (1976).  The following year, in Gardner v. Florida, 430 U.S. 339 (1977), the proposition was reiterated:

> [D]eath is a different kind of punishment from any other which may be imposed in this country.  From the point of view of the defendant, it is different in both its severity and its finality.  From the point of view of society, the action of the sovereign in taking the life of one of its citizens differs dramatically from any other legitimate state action.  It is of vital importance to the defendant and to the community that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion.

Gardner, 430 U.S. at 357-58.

The notion that "death is different" is not simply the dramatic recitation of an obvious truth. Rather, the principle triggers sharply increased levels of judicial attention to every step of the

**Filed Ex Parte and Under Seal**

The Honorable Kenneth M. Karas
February 13, 2020
Page 3 of 11

process through which the irrevocable sanction of death is sought and carried out.  The post-Furman Court has described capital jurisprudence as mandating a "heightened standard of reliability" for the entire process through which a government marshals the legal and moral authority to terminate a life.  As stated in Caldwell v. Mississippi, 472 U.S. 320, 329 (1985), "[T]he qualitative difference of death from all other punishments requires a correspondingly greater degree of scrutiny of the capital sentencing determination."  See also Monge v. California, 524 U.S. 721, 731 (1998) (reiterating the "acute need for reliability in capital sentencing proceedings").  Moreover, "Evolving standards of decency must embrace and express respect for the dignity of the person, and the punishment of criminals must conform to that rule."  Kennedy v. Louisiana, 128 S.Ct. 2641, 2649 (2008).  Otherwise, "When the law punishes by death, it risks its own sudden descent into brutality, transgressing the constitutional commitment to decency and restraint."  Kennedy, 128 S.Ct. at 2650.

## II.        The Right to Learned Counsel under 18 U.S.C. § 3005

Because "death is different," Ford v. Wainwright, 477 U.S. 399, 411 (1986), Congress enacted additional safeguards "to reduce the chance that an innocent defendant would be put to death because of inadvertence or errors in judgment of his counsel, and to attempt to prevent mistakes that would be irrevocable because of the finality of the punishment."  United States v. Shepherd, 576 F.2d 719, 729 (7th Cir. 1978).  One such safeguard is the provision in 18 U.S.C. § 3005, which grants a capital defendant the right to the appointment of Learned Counsel.

18 U.S.C. § 3005, states in relevant part:

> Whoever is indicted for treason or other capital crime shall be allowed to make his full defense by counsel; and the court before which the defendant is to be tried, or a judge thereof, shall promptly, *upon the defendant's request, assign 2 such counsel, of whom at least 1 shall be learned in the law applicable to capital cases*, and who shall have free access to the accused at all reasonable hours.  In assigning counsel under this section, the court shall consider the recommendation of the Federal Public Defender organization, or, if no such organization exists in the district, of the Administrative Office of the United States Courts.

(Emphasis added.)

In Shepherd, the Seventh Circuit recognized that "no provision has been made for more than one appointed counsel in any but those involving a 'capital crime.' "  Shepherd, 576 F.2d at 729.  This is because of the unique nature of capital defense, which requires entirely different skill sets than even the most complex non-capital trial.  See Guidelines 4.1(A), 5.1(B), 8.1(B), 10.7, 10.10.1, ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, 31 Hofstra L. Rev. 913 (Revised Edition, February 2003) (hereinafter cited as,

**Filed Ex Parte and Under Seal**

The Honorable Kenneth M. Karas
February 13, 2020
Page 4 of 11

"ABA Guidelines") (also available at <https://www.americanbar.org/content/dam/aba/administrative/death_penalty_representation/2003guidelines.authcheckdam.pdf>); see also Rompilla v. Beard, 545 U.S. 374, 387 & 387 n.7 (2005) (explaining that the Supreme Court has long held that the ABA Guidelines set the standard for determining the reasonableness of capital defense representation), citing, Wiggins v. Smith, 539 U.S. 510, 524 (2003), Strickland v. Washington, 466 U.S. 668, 688 (1984).

Pursuant to ABA Guideline 4.1(A), in order to provide effective representation in a death penalty case "[t]he defense team should consist of no fewer than two attorneys qualified in accordance with Guideline 5.1, an investigator, and a mitigation specialist…. The defense team should [also] contain at least one member qualified by training and experience to screen individuals for the presence of mental or psychological disorders or impairments." See also ABA Guideline 1.1, Definitional Notes, 31 Hofstra L. Rev. at 919 (explaining that "[t]hroughout these Guidelines … 'should' is used as a mandatory term").

Pursuant to ABA Guideline 5.1(B)(1)(b) to satisfy the qualifications required of counsel in a capital case "every attorney representing a capital defendant" must have, inter alia, "demonstrated a commitment to providing zealous advocacy and high quality legal representation in the defense of capital cases…." The 1989 edition of the ABA Guidelines only required, in this context, "quality legal representation." In the 2003 edition, "[t]he language has been amended to call for 'high quality legal representation' to emphasize that, because of the extraordinary complexity and demands of capital cases, a significantly greater degree of skill and experience on the part of defense counsel is required than in a noncapital case." ABA Guideline 1.1, History of Guideline, 31 Hofstra L. Rev. at 921; see also id. at 930 ("In mandating the provision of high quality legal representation at the trial level of a capital case, this Guideline recognizes the simple truth that any other course has weighty costs—to be paid in money and delay if cases are reversed at later stages or in injustice if they are not.").

ABA Guideline 5.1(B)(2)(a) goes on to explain that "the qualification standards" require "attorneys who have demonstrated," inter alia, "substantial knowledge and understanding of the relevant state, federal and international law, both procedural and substantive, governing capital cases." Notably, the Commentary to ABA Guideline 5.1 explains that this Guideline has been reorganized from the 1989 edition to deemphasize the importance of "years of litigation experience and number of jury trials" and focus instead on "counsel's ability to provide high quality legal representation" "as the basis for qualifying counsel to undertake representation in death penalty cases." ABA Guideline 5.1, History of Guideline. Stated another way, it's an attorney's knowledge of the law and procedure governing capital cases that is most important, not an attorney's skill or experience in non-capital cases.[1]  See also CJA Guidelines, Ch. 6, Appx. 6A

---

[1]    Indeed, To be "learned in the law applicable to capital cases," 18 U.S.C. § 3005, counsel must have significantly more experience than the three years of felony trial experience and five years of practice in the court of prosecution required generally for "lead counsel" capital assignments under 18 U.S.C. § 3599 (also referred to by some practitioners and judges as "trial counsel", "liability phase counsel", or "co-counsel" given the misnomer of the term, "lead counsel" in this context).  Learned Counsel should have "distinguished prior experience in the trial, appeal,

**Filed Ex Parte and Under Seal**

The Honorable Kenneth M. Karas
February 13, 2020
Page 5 of 11

(Recommendations & Commentary Concerning the Cost and Quality of Defense Representation [Updated Spencer Report, September 2010]) (hereinafter cited as, "Spencer Report"), at 91 ("Counsel in a federal death penalty case must not only be skilled in defending the charged offense, e.g., a homicide, but also must be thoroughly knowledgeable about a complex body of constitutional law and special procedures that do not apply in other criminal cases.").[2]

Here, this Court has appointed not one, nor two, but three attorneys learned in the law of capital defense, all of which with experience representing defendants in numerous Federal capital cases and all of which have tried to verdict one or more Federal or State authorized death penalty trials. This Court has also appointed two additional counsel who have served on a number of death-eligible capital trials, and two mitigation specialists and one investigator who have each worked on multiple death-authorized trials that were tried to verdict. There can be no question – and there has been none – that this Court has provided Mr. Tartaglione with substantial "high quality legal representation" and resources ably qualified to protect his interests in this death-authorized case.

There can also be no question that notwithstanding retained counsel's ample non-capital experience, neither he nor a single member of his firm have ever tried, nor ever even previously worked on, a Federal death penalty case. This is not meant to denigrate their non-capital experience, only to state what is fact: this is their first Federal death penalty trial.[3] As such, upon information and belief, neither retained counsel nor any member of his firm meet the qualification standards required by the Spencer Report, the ABA Guidelines, and those Supreme Court cases that have affirmed that the ABA Guidelines set the standard for determining the reasonableness of capital defense representation. See Rompilla, 545 U.S. at 387 & 387 n.7, citing, Wiggins, 539 U.S. at 524, Strickland, 466 U.S. at 688.

Clearly, however, the right to Learned Counsel under 18 U.S.C. § 3005, is a discretionary right. The defendant is entitled to it, but he must request it. Stated another way, the right is one where discretion is placed on the defendant to decide whether to advance that right. Learned

---

or post-conviction review of federal death penalty cases, or distinguished prior experience in state death penalty trials, appeals, or post-conviction review that, in combination with co-counsel, will assure high quality representation." United States v. Miranda, 148 F.Supp.2d 292, 294 (SDNY 2001).

[2]     The Spencer Report is a report first generated by the Judicial Conference Committee on Defenders Services in 1998 and later updated in September 2010. The Spencer Report examines the cost, quality, and availability of defense representation in Federal death penalty cases and makes recommendations for the judiciary and defense counsel aimed at containing costs while ensuring high quality defense services in capital cases.

[3]     This Court has been previously told by Mr. Barket that one member of his firm has prior death penalty experience as a Queens County Assistant District Attorney representing the New York States District Attorney's Office on appeal in a New York State death penalty case. See Sealed Transcript, dated, March 29, 2018, at 11. New York State has not had the death penalty since it was struck down by the Court of Appeals in 2004. See People v. LaValle, 3 N.Y.3d 88 (NY 2004). With no disrespect intended, we respectfully submit that New York State prosecutorial experience is not analogous to the requirements of capital defense, particularly not capital defense in Federal court. The fact that the prior experience is over 16 years in the past further weakens the analogy.

**Filed Ex Parte and Under Seal**

The Honorable Kenneth M. Karas
February 13, 2020
Page 6 of 11

Counsel know of no case or precedent stating that the right, once asserted, cannot be withdrawn, even when it is against the defendant's interest to do so and might increase the chance that the defendant receives a sentence of death. At the same time, however, counsel knows of no prior case where a capital defendant has ever actually attempted to withdraw his request for Learned Counsel, with the exception of cases in which a defendant is choosing to go pro se. See, e.g., United States v. Dylan Roof, 225 F.Supp.3d 394 (D.SC 2016).

Because Mr. Tartaglione is not seeking to go pro se, and is instead, in essence, seeking to terminate the services of Learned Counsel so that he may proceed solely with the services of retained counsel who do not qualify for appointment as Learned Counsel under 18 U.S.C. § 3005, this Court is forced to wade in completely unchartered territory. Upon consideration and review of the ABA Guidelines, the Spencer Report, and the cases discussed herein, we respectfully submit that in light of this Court's overarching interest in ensuring the reliability of capital cases and the high quality of representation of capital defendants, the defendant should **not** be permitted to withdraw his request for appointment of Learned Counsel once the request for Learned Counsel has been asserted and provided for, as was the case here. Cf. Roof, 225 F.Supp.3d at 297 ("A defendant may choose to be represented by competent counsel, or he may choose to proceed pro se. There is no right to 'any intermediate accommodation'."), quoting, United States v. Singleton, 107 F.3d 1091, 1096 (4th Cir. 1997).

The Supreme Court has long held that the right to counsel attaches to "critical stages of the proceedings," defined as, "any stage of the prosecution, formal or informal, in court or out, *where counsel's absence might derogate from the accused's right to a fair trial*." United States v. Wade, 388 U.S. 218, 224, 226-27 (1967) (emphasis added). Given the heightened and unique experience required to qualify as Learned Counsel in a Federal death penalty case, we respectfully submit that once the right to Learned Counsel under 18 U.S.C. § 3005 has been asserted, "critical stages" applies to the duration of the case unless or until the death penalty has been declined, withdrawn, stricken, or rejected. This is because absent counsel whose experience meets the requirements of Learned Counsel under 18 U.S.C. § 3005, the ABA Guidelines, the Spencer Report, and those Supreme Court cases examining effective representation in a death penalty case, Learned Counsel's absence **would** "derogate from the accused's right to a fair trial."[4]

This Court originally appointed Learned Counsel after finding that there was a need for Learned Counsel in this case. Even after Mr. Barket was retained, Learned Counsel were continued in our representation of Mr. Tartaglione because this Court found that the need for Learned Counsel remained. That need has not changed and there is nothing in the record to reflect that the need has diminished. To the contrary, given that Curcio counsel was appointed upon

---

[4]    We do not intend to imply that under no circumstance may a defendant terminate an individual attorney appointed as Learned Counsel under 18 U.S.C. § 3005, nor that under no circumstance may a defendant seek the replacement of all attorneys thus far appointed under 18 U.S.C. § 3005; only that once the right to Learned Counsel has been asserted and provided for, one or more attorneys "learned in the law applicable to capital cases" must represent the defendant in either a direct or standby capacity to ensure that high quality representation remains available to the defendant.

**Filed Ex Parte and Under Seal**

The Honorable Kenneth M. Karas
February 13, 2020
Page 7 of 11

Learned Counsel's application *and over the objection of retained counsel*, the record of the Curcio proceedings itself supports the continuing need for Learned Counsel in this case.

The above views are based upon Learned Counsel's understanding of the ABA Guidelines, Congress's intent when it passed 18 U.S.C. § 3005, and our obligation to ensure that a death-authorized capital defendant is properly represented. Should this Court disagree with our conclusion that the right to Learned Counsel, once asserted and provided for, cannot be withdrawn, then, at a minimum, this Court must take particularly close care to ensure that the right being withdrawn is being done so in a knowing and voluntary manner fully cognizant of all that is being given up. See Ford, 477 U.S. at 411 ("In capital proceedings generally, this Court has demanded that fact-finding procedures aspire to a heightened standard of reliability."). "This especial concern is a natural consequence of the knowledge that execution is the most irremediable and unfathomable of penalties; that death is different." Ford, 477 U.S. at 411, citing, Woodson, 428 U.S. at 305.

Given the fact that the application to withdraw the request for Learned Counsel occurred in the middle of a contested Curcio inquiry wherein retained counsel is the subject of that inquiry, we respectfully submit that the application to withdraw the request for Learned Counsel should not be ruled upon until the Curcio proceedings are complete. We submit that delay is necessary to ensure that the application is not being made simply as a gambit to undermine the outcome of the Curcio proceedings.[5]

This Court must likewise ensure that the defendant's withdrawal request is being made knowingly and voluntarily, with full knowledge and understanding of the consequences of his decision. See Brady v. United States, 397 U.S. 742, 748 (1970) (waivers "not only must be voluntary but must be knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences"). To that end, we respectfully submit that regardless of timing, the application should not be ruled upon absent the advice of a disinterested, non-conflicted attorney – be it Curcio counsel (Bobbi Sternheim), or some other attorney learned in the law of capital defense who is not otherwise associated with this case. We submit that the disinterested attorney must be learned in the law of capital defense because absent that there can be no assurance that the advice given to Mr. Tartaglione will come with a full and adequate understanding of the consequences of his decision.

### III.    Funding under the Criminal Justice Act

Pursuant to 18 U.S.C. § 3006A(h), the Judicial Conference of the United States is authorized to issue rules and regulations governing the operation of District plans created to furnish representational services (including counsel and investigative, expert, and other services necessary for adequate representation) to financially eligible persons. Volume 7, Part A of the Guide to the

---

[5]    Appointed counsel are all of the view that the application to withdraw Mr. Tartaglione's request for Learned Counsel under 18 U.S.C. § 3005, is purely retaliatory.

**Filed Ex Parte and Under Seal**

The Honorable Kenneth M. Karas
February 13, 2020
Page 8 of 11

Judiciary (i.e., the CJA Guidelines) is a compendium of Judicial Conference policy adopted pursuant to that authority, and it is those Guidelines that provide this Court with the authority to provide public funding under the Criminal Justice Act.

Under the CJA Guidelines, a defendant with retained counsel may request public funding to pay for necessary representative services, provided that the defendant "is financially unable to obtain the necessary services" on his own, "even if the person's resources are in excess of the amount needed to provide the person and the person's dependents with the necessities of life, provide defendant's release on bond, and pay a reasonable fee to the person's retained counsel," CJA Guidelines § 310.10.10(b). The defendant's resources must nonetheless be "insufficient to pay for the necessary services." Id.

In a non-capital case, funding for counsel and related services are provided under Chapter 3 of the CJA Guidelines. In such a situation, where a defendant has retained counsel but does not have the resources to fund additional services such as an investigator or an expert, retained counsel may apply for funding under Chapter 3 to cover the cost of those additional services. To be granted such an application, the following requirements must be met:

> (a) In responding to requests for services under 18 U.S.C. § 3006A(e) by a person represented by retained counsel, the court should inquire into the fee arrangement between the retained attorney and the client.

> (b) If the court finds the fee arrangement unreasonable in relation to fees customarily paid to qualified practitioners in the community for services in criminal matters of similar duration and complexity, or that it was made with a gross disregard of the defendant's trial expenses, the court may order the retained attorney to pay out of such fees all or such part of the costs and expenses as the court may direct.

> (c) The procedure outlined in Guide, Vol. 7A, § 210.40.40 applies to such persons who are financially able to pay some, but unable to pay all, the costs of necessary services.

CJA Guidelines § 310.10.20.

To meet these requirements, retained counsel is required to provide an accounting to the court of the fees that counsel has received thus far, what additional fees are expected (which most often is established through the disclosure of his or her retainer agreement), and the defendant must submit a detailed financial statement completed and sworn to under oath. Additionally, "All claims for services other than counsel, under 18 U.S.C. § 3006A(e)," are required to include the following:

**Filed Ex Parte and Under Seal**

The Honorable Kenneth M. Karas
February 13, 2020
Page 9 of 11

> (a) a statement as to the type of, dates of, and time expended for, the services provided;
>
> (b) an explanation of the fee arrangement (e.g., hourly rate, etc.);
>
> (c) an itemized statement of all expenses for which reimbursement is claimed; and
>
> (d) supporting documentation, where practicable, for all expenses of lodgings and subsistence, and for any expenses in excess of $50.

CJA Guidelines § 310.40.

In a capital case, funding for counsel and related services are provided under Chapter 6 of the CJA Guidelines and the court is obligated to monitor the budget and how public funds are being utilized. See CJA Guidelines § 660.20.20(c) ("Once payments for investigative, expert, and other services total $7,500, then additional payments must be approved by the chief judge of the circuit (or an active or senior circuit judge to whom the chief judge has delegated this authority). Accordingly, the court will monitor all payments for investigative, expert, and other services."). Likewise, it is Learned Counsel's obligation to the court to propose the budget and marshal the approved funds. See CJA Guidelines 640.10(b) ("Courts are encouraged to require appointed counsel to submit a proposed initial litigation budget for court approval that will be subject to modification in light of facts and developments that emerge as the case proceeds.").

Chapter 6 is premised on the expectation that a defendant in a death penalty case does not have the economic means to retain counsel or the additional services necessary for such representation. See CJA Guidelines § 660.10.10(a). Nonetheless, Chapter 6 still requires the establishment of economic need consistent with Chapter 3. See id.; see also CJA Guidelines § 660.10.40 ("Except as otherwise specified in § 660, the provisions of Guide, Vol. 7A, Ch. 3, including, § 310.20.30, are applicable to the authorization for payment for investigative, expert, and other services in capital cases."); see also CJA Guideline 640.20(f) ("Case budgets should be re-evaluated when justified by changed or unexpected circumstances, and should be modified by the court where good cause is shown.").

Thus, in the event that retained counsel envisions controlling the receipt of public funds if Learned Counsel are terminated from this case, retained counsel and the defendant must first apply for funding pursuant to the requirements of Chapters 3 and 6 of the CJA Guidelines. Should those requirements be met, then this Court is authorized to exercise its discretion to award the funding or not. See CJA Guidelines § 310.10.20. This Court should likewise ensure that experts, investigators, etc., sought by retained counsel in fact provide the services sought by retained counsel's requests for funding. See CJA Guidelines § 310.40; see also CJA Guideline 320.90(a) ("Investigative, expert, and other service providers must maintain contemporaneous time and

**Filed Ex Parte and Under Seal**

The Honorable Kenneth M. Karas
February 13, 2020
Page 10 of 11

attendance records for all work billed by them, as well as expense records."). Should any of these requirements not be met, then Mr. Tartaglione will simply not be entitled to public funding upon the withdrawal of his rights under 18 U.S.C. § 3005. See, generally, Chapters 3 & 6, CJA Guidelines.

In evaluating the defendant's application for CJA funding after withdrawing his request for Learned Counsel, this Court should be mindful of the dangerous precedent that would be set if any ruling is not carefully limited to the facts and circumstances of this case. This Court must be careful to avoid a broad-reaching precedent that could undermine the purpose of the CJA Plan by allowing defendants to seek Learned Counsel solely for the purposes of commandeering the budget and turning it over to retained counsel of choice once the public budget was in place. This would not be permitted in a non-capital context where the CJA budgets are relatively small. It certainly should not be permitted in a capital case where budgets are exponentially greater.

Thus, while a mechanism exists under the CJA Guidelines to permit retained counsel to gain access to CJA funds, that access is not automatic, is carefully circumscribed, and should be judiciously overseen.

## Conclusion

To sum up, it is the position of Learned Counsel that:

(1) the defendant does not have the right to withdraw his request for Learned Counsel under 18 U.S.C. § 3005 once that right has been asserted and Learned Counsel has been appointed;

(2) even if the defendant does possess the ability to withdraw *in toto* his request for Learned Counsel, withdrawal of the request may only be accepted if done so knowingly, voluntarily, and based upon the advice of a disinterested, non-conflicted, counsel learned in the laws of capital defense;

(3) should the defendant or retained counsel wish access to public funds after the termination of all Learned Counsel, they may receive such funding at this Court's discretion but only if they are able to satisfy the requirements of Chapters 3 and 6 of the CJA Guidelines;

(4) any application for public funding, which retained counsel reasonably expects or intends – at this time – to advance upon the termination of Learned Counsel, must be made and decided upon prior to the evaluation of the defendant's knowing and voluntary decision to withdraw his request for Learned Counsel since such a ruling may impact the defendant's decision-making with respect to such withdrawal; and

**Filed Ex Parte and Under Seal**

The Honorable Kenneth M. Karas
February 13, 2020
Page 11 of 11

(5) the Curcio inquiry should be permitted to reach its conclusion ***prior to*** a ruling on the defendant's application to withdraw his request for Learned Counsel, since such a ruling could likewise impact the defendant's decision-making vis-à-vis withdrawal.

Finally, because this letter relates to funding and the composition of the defense team under the Criminal Justice Act, we ask that it be filed ex parte and under seal. That said, because this letter also relates to issues overlapping with the Curcio inquiry, we ask that counsel be authorized to provide a copy of this letter to the Government's walled-off prosecutors, AUSA Margery Feinzig and AUSA Ilan Graff.

As always, we thank Your Honor for his time and consideration.

Respectfully submitted,

Michael K. Bachrach
Anthony L. Ricco
Bruce D. Koffsky
*Learned Counsel for Nicholas Tartaglione*

John Diaz, Esq.
Kenneth Montgomery, Esq.

cc:    All Defense Counsel of Record (by email under seal)