UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
UNITED STATES,

    v.

NICHOLAS TARTAGLIONE,

      Defendant.
-------------------------------------------------------X

**Filed Ex Parte & Under Seal**

16 Cr. 832 (KMK)


## PRE-HEARING MEMORANDUM OF LAW BY APPOINTED COUNSEL IN SUPPORT OF DEFENDANT NICHOLAS TARTAGLIONE'S SIXTH AMENDMENT RIGHT TO CONFLICT-FREE COUNSEL

### EXHIBITS


ANTHONY L. RICCO, ESQ.
20 Vesey Street, Suite 400
New York, NY 10007
(212) 791-3919

JOHN A. DIAZ, ESQ.
Diaz & Moskowitz PLLC
225 Broadway, Suite 715
New York, NY 10007

KENNETH J. MONTGOMERY, ESQ.
198 Rodgers Avenue
Brooklyn NY 11225

MICHAEL K. BACHRACH, ESQ.
224 West 30th Street, Suite 302
New York, NY 10001
(212) 929-0592

BRUCE D. KOFFSKY, ESQ
Koffsky & Felsen, LLC
1150 Bedford Street
Stamford, CT 06905


*Counsel for Defendant Nicholas Tartaglione*
*under the Criminal Justice Act, 18 U.S.C. §§ 3005, 3006A*

**Table of Contents**

**Basecamp Posts**

Basecamp post, dated, March 7, 2017, at 4:50 p.m. ....................................................DX 1

Basecamp post, dated, July 3, 2019 ...........................................................................DX 2

*Including:*

Basecamp post, dated, July 3, 2019, at 12:38 p.m.

Basecamp post, dated, July 3, 2019, at 3:38 p.m.

Basecamp post, dated, July 3, 2019, at 3:50 p.m.

Basecamp post, dated, July 3, 2019, at 4:00 p.m.

Basecamp post, dated, July 3, 2019, at 4:01 p.m.

Basecamp post, dated, July 3, 2019, at 4:03 p.m.

Basecamp post, dated, July 3, 2019, at 4:10 p.m.

Basecamp post, dated, July 3, 2019, at 4:16 p.m.

Basecamp post, dated, July 3, 2019, at 6:07 p.m.

Basecamp post, dated, July 3, 2019, at 6:10 p.m.

Basecamp post, dated, July 3, 2019, at 7:11 p.m.

Basecamp post, dated, July 5, 2019, at 12:39 p.m. ....................................................DX 3

Basecamp post, dated, July 9, 2019, at 7:38 p.m. ......................................................DX 4

*Including:*

Basecamp post, dated, July 9, 2019, at 7:57 p.m.

Basecamp post, dated, July 9, 2019, at 7:59 p.m.

Basecamp post, dated, July 9, 2019, at 8:07 p.m.

Basecamp post, dated, July 10, 2019, at 3:00 p.m.

Basecamp post, dated, July 9, 2019, at 10:14 p.m. ......................................................DX 5

Basecamp post, dated, July 24, 2019, at 1:49 p.m. ......................................................DX 6

*Including:*

Basecamp post, dated, August 2, 2019, at 3:04 p.m.

Basecamp post, dated, November 23, 2019, at 10:15 a.m.

Basecamp post, dated, November 23, 2019, at 11:18 a.m.

Basecamp Post, dated, July 24, 2019, at 11:00 p.m. ....................................................DX 7

Basecamp Post, dated, July 25, 2019, at 7:52 a.m., et seq. ..........................................DX 8

Basecamp post, dated, July 27, 2019, at 2:52 a.m. ......................................................DX 9

*Including:*

Basecamp post, dated, July 27, 2019, at 5:55 a.m.

Basecamp post, dated, July 27, 2019, at 6:35 a.m.

Basecamp Post, dated, July 31, 2019, at 9:54 p.m., et seq. ..........................................DX 10

Basecamp post, dated, August 1, 2019, at 6:30 p.m., et seq. .......................................DX 11

Basecamp Post, dated, August 9, 2019, at 2:46 p.m., et seq. .......................................DX 12

Basecamp Post, dated, August 10, 2019, 9:14 a.m. ....................................................DX 13

Basecamp Post, dated, August 10, 2019, 9:16 a.m. ....................................................DX 14

Basecamp post, dated, August 10, 2019, at 10:24 a.m. ...............................................DX 15

Basecamp Post, dated, August 13, 2019 .....................................................................DX 16

Basecamp post, dated, August 15, 2019, at 5:42 a.m., et seq. .....................................DX 17

Basecamp, post, dated, August 15, 2019, at 11:23 p.m. ..............................................DX 18

Basecamp post, dated, August 16, 2019, 5:41 p.m., et seq. .........................................DX 19

Basecamp post, dated, August 16, 2019, at 11:48 p.m. ...............................................DX 20

Basecamp post, dated, August 17, 2019, at 9:32 a.m. ...............................................DX 21

*Including:*

Basecamp post, dated, August 17, 2019, at 3:05 p.m.

Basecamp, post, dated, August 17, 2019, at 3:40 p.m.

Basecamp Post, dated, August 21, 2019 ...................................................................DX 22

Basecamp Post, dated, August 24, 2019 ...................................................................DX 23

Basecamp Post, dated, August 25, 2019 ...................................................................DX 24

Basecamp Post, dated, September 6, 2019 ................................................................DX 25

Basecamp Post, dated, September 14, 2019 ..............................................................DX 26

Basecamp post, dated, September 16, 2019, at 11:57 a.m. ........................................DX 27

Basecamp post, dated, October 23, 2019, at 5:45 a.m. .............................................DX 28

*Including:*

Basecamp post, dated, October 23, 2019, at 4:29 p.m.

Basecamp post, dated, October 23, 2019, at 4:39 p.m.

Basecamp post, dated, October 23, 2019, at 4:56 p.m.

Basecamp post, dated, October 23, 2019, at 5:56 p.m.

Basecamp post, dated, October 23, 2019, at 6:03 p.m.

Basecamp post, dated November 1, 2019 ..................................................................DX 29

Basecamp posts dated, November 2, 2019, at 8:18 a.m. ...........................................DX 30

Basecamp posts dated, November 2, 2019, at 10:43 a.m. .........................................DX 31

Basecamp posts dated, November 13, 2019, at 8:24 a.m. .........................................DX 32

Basecamp post, dated, November 16, 2019 ..............................................................DX 33

Basecamp posts dated, November 26, 2019, at 3:10 a.m. .........................................DX 34

iii

Basecamp posts dated, November 26, 2019, at 8:03 a.m. .........................................DX 35

Basecamp post, dated, December 2, 2019 ...................................................................DX 36

Basecamp posts dated, February 11, 2020, at 1:01 p.m..............................................DX 37

**Emails**

Leisenring email, dated, July 3, 2019, at 4:24 p.m. ...................................................DX 38

Bachrach, email, dated, July 3, 2019, at 5:00 p.m. ....................................................DX 39

Ricco email, dated, August 17, 2019, at 8:46 a.m. ....................................................DX 40

Ricco email, dated, August 17, 2019, at 10:14 p.m. ..................................................DX 41

*Including:*

Barket email, dated, August 17, 2019, at 8:58 p.m.

Ricco email, dated, August 17, 2019, at 8:35 p.m.

Barket email, dated, August 17, 2019, at 7:01 p.m.

Ricco email, dated, August 17, 2019, at 5:19 p.m.

Barket email, dated, August 17, 2019, at 6:41 p.m.....................................................DX 42

Barket email, dated, August 17, 2019, at 3:37 p.m.....................................................DX 43

*Including:*

Ricco email, dated, August 17, 2019, at 2:21 p.m.

Barket email, dated, August 17, 2019, at 1:59 p.m.

Ricco email, dated, August 17, 2019, at 1:43 p.m.

Barket email, dated, August 17, 2019, at 11:39 a.m.

Ricco email, dated, August 17, 2019, at 9:13 a.m.

Barket email, dated, August 17, 2019, at 9:09 a.m.

Ricco email, dated, August 17, 2019, at 9:03 a.m.

Ricco email, dated, August 17, 2019, at 1:43 p.m. ....................................................DX 44

Barket email, dated, August 17, 2019, at 9:02 a.m. ....................................................DX 45

*Including:*

Ricco email, dated, August 17, 2019, at 8:46 a.m.

Barket email, dated, August 17, 2019, at 6:58 a.m.

Koffsky email, dated, August 17, 2019, at 6:39 a.m.

Ricco email, dated, August 18, 2019, 7:33 a.m. ........................................................DX 46

*Including:*

Barket email, dated, August 18, 2019, at 6:53 a.m.

Ricco email, dated, August 18, 2019, at 7:47 a.m. ....................................................DX 47

*Including:*

Barket email, dated, August 18, 2019, at 7:18 a.m.

Leisenring email, dated, August 18, 2019, at 11:38 a.m. ...........................................DX 48

Ricco email, dated, August 22, 2019, at 6:57 a.m. ....................................................DX 49

Barket email, dated, August 22, 2019, at 9:09 a.m. ...................................................DX 50

*Including:*

Montgomery email, dated, August 22, 2019, at 8:34 a.m.

Bachrach email, dated, August 22, 2019, at 8:15 a.m.

Barket email, dated, August 22, 2019, at 8:07 a.m.

Ricco email, dated, August 22, 2019, at 6:57 a.m.

Barket email, dated, August 22, 2019, at 11:38 a.m. .................................................DX 51

*Including:*

Montgomery email, dated, August 22, 2019, at 11:36 a.m.

Barket email, dated, August 22, 2019, at 11:33 a.m.

Bachrach email, dated, August 22, 2019, at 11:01 a.m.

Bachrach email, dated, August 22, 2019, at 10:05 a.m.

Barket email, dated, August 21, 2019, at 7:41 p.m.

Sternheim email, dated, August 21, 2019, at 9:01 p.m.

Ricco email, dated, August 22, 2019, at 12:02 p.m. ..................................................DX 52

Barket email, dated, August 22, 2019, at 12:23 p.m...................................................DX 53

Barket email, dated, August 22, 2019, at 12:34 p.m...................................................DX 54

*Including:*

Bachrach email, dated, August 22, 2019, at 12:30 p.m.

Barket email, dated, August 22, 2019, at 12:29 p.m.

Bachrach email, dated, August 22, 2019, at 12:06 p.m.

Barket email, dated, August 22, 2019, at 11:38 a.m.

Barket email, dated, August 22, 2019, at 12:53 p.m...................................................DX 55

Barket email, dated, August 25, 2019, at 10:19 a.m. .................................................DX 56

Sternheim email, dated, August 26, 2019, at 9:08 p.m. ..............................................DX 57

Barket email, dated, September 10, 2019, at 4:39 a.m. ............................................DX 58

Sternheim email, dated, September 16, 2019, at 5:40 p.m. ........................................DX 59

Barket email, dated, September 20, 2019, at 9:08 a.m. ..............................................DX 60

Barket email, dated, September 20, 2019, at 7:50 a.m. ..........................................DX 60A

Koffsky email, dated, September 20, 2019, at 10:17 a.m. ...........................................DX 61

Sternheim email, dated, September 20, 2019, at 12:24 p.m. ......................................DX 62

Ricco email, dated, September 20, 2019, at 3:00 p.m. ..............................................DX 63

Bachrach email to Gov't, dated, October 30, 2019, at 3:57 p.m. ...............................DX 64

Swergold email, datted, October 31, 2019, at 10:04 a.m.............................................DX 65

Barket email, dated, October 31, 2019, at 10:31 a.m.................................................DX 66

Comey email, dated, October 31, 2019, at 10:40 a.m.................................................DX 67

Barket email, dated, October 31, 2019, at 10:43 a.m.................................................DX 68

Bachrach email, dated, October 31, 2019, at 10:44 a.m. ...........................................DX 69

Swergold email, dated, October 31, 2019, at 11:27 a.m.............................................DX 70

Bachrach email, dated, November 11, 2019, at 11:47 p.m..........................................DX 71

Comey email, dated, January 8, 2020, at 10:06 a.m. .................................................DX 72

    *Including:*

    Barket email to Gov't, dated, January 8, 2020, at 9:41 a.m.

Ricco email to Gov't, dated, January 8, 2020, at 11:45 a.m.......................................DX 73

Barket email to Gov't, dated, January 8, at 12:43 p.m. ..............................................DX 74

Bachrach email to Gov't, dated, January 8, 2020, at 1:28 p.m....................................DX 75

Ricco email to Gov't, dated, January 8, 2020, at 2:51 p.m.........................................DX 76

Ricco email to Gov't, dated, January 8, 2020, at 4:07 p.m.........................................DX 77

    *Including:*

    Barket email to Gov't, dated, January 8, 2020, at 3:31 p.m.

Comey email, dated, January 8, 2020, at 10:53 a.m. .................................................DX 78

Barket email, dated, January 9, 2020, at 12:15 a.m. .................................................DX 79

Ricco email, dated, January 9, 2020, at 12:22 a.m. ..................................................DX 80

Swergold email, dated, January 9, 2020, at 11:28 a.m. .............................................DX 81

Swergold email, dated, January 9, 2020, at 2:23 p.m. ...............................................DX 82

*Including:*

Barket email, dated, January 9, 2020, at 12:36 p.m.

Swergold email, dated, January 9, 2020, at 11:28 a.m.

Barket email, dated, January 13, 2020, at 7:58 a.m. ...................................................DX 83

Wright email, dated, January 28, 2020, at 7:02 p.m. ..................................................DX 84

## Text Messages

Text messages between Barket and Ricco, dated, July 29, 2019................................DX 85

Text messages between Barket and Ricco, dated, August 2, 2019.............................DX 86

Text messages between Barket and Ricco, dated, August 17, 2019............................DX 87

Text messages between the defendant and his wife (Screen shot, undated, time 1:28, Photos – file1-1.png)....................................................................................................DX 88

Text messages between the defendant and his wife (Screen shot, undated, time 8:45, Photos – file2.png).........................................................................................................DX 89

Text messages between the defendant and his wife (Screen shot, undated, time 1:15, Photos – file2-1.png)....................................................................................................DX 90

Text messages between the defendant and his wife (Screen shot, undated, time 5:10, Photos – file3-1.png)....................................................................................................DX 91

Text messages between the defendant and his wife (Screen shot, undated, time 1:28, Photos – file4.png).........................................................................................................DX 92

## Letters from Defendant

Tartaglione letter, dated, March 28, 2018...................................................................DX 93

Tartaglione letter, dated, August 15, 2019.................................................................DX 94

Tartaglione letter, dated, August 22, 2019.................................................................DX 95

Tartaglione letter, dated, September 6, 2019 .............................................................DX 96

Tartaglione letter, dated, September 12, 2019 ...........................................................DX 97

Tartaglione letter, dated September 16, 2019 ............................................................DX 98

Tartaglione letter, dated, on or about October 14, 2019 ............................................DX 99

**BOP Memos and Reports**

BOP memo, dated, July 5, 2019, written by "SIS LT. DOCTOR" and written to "THE SIS FILE" ...............................................................................................DX 100

BOP report, dated, August 14, 2019 (re cellphone)...................................................DX 101

BOP report, dated, August 14, 2019 (re SIM card) ...................................................DX 102

**BOP Program Statements**

BOP Program Statement No. 5265.14 ......................................................................DX 103

BOP Program Statement No. 5324.08 ......................................................................DX 104

BOP Program Statement No. 5580.08 ......................................................................DX 105

Tartaglione (SD NY) Team Jail Visit

**Tartaglione (SD NY) Team Lang & Kaboski, LLP**

# Jail Visit

From: Bruce Barket
Date: Tue, 7 Mar 2017 at 4:50pm

Nick's commercial lawyer is going to see him tomorrow at 8:00. He knows not to discuss the criminal case but has some lease documents he needs to review with Nick. He should be gone by 10:00 FYI, he was a high school friend of Nick so he may be someone we want to have that conversation with in the not to distant future.



**Tony Ricco Tue, 7 Mar 2017 at 5:18pm**

okay. Stay on it.



**Melissa Lang Tue, 7 Mar 2017 at 5:34pm**

Thanks Bruce. I'm going tomorrow morning. I'll see another client before Nick and can hopefully do a hand off with the attorney. I'll also take the opportunity to introduce myself and get his digits.

**DX 1-1**

# Jail Visit

From: Bruce Barket
Date: Tue, 7 Mar 2017 at 4:50pm

Nick's commercial lawyer is going to see him tomorrow at 8:00.  He knows not to discuss the criminal case but has some lease documents he needs to review with Nick.  He should be gone by 10:00  FYI, he was a high school friend of Nick so he may be someone we want to have that conversation with in the not to distant future.

 **Tony Ricco Tue, 7 Mar 2017 at 5:18pm**

okay.  Stay on it.

 **Melissa Lang Tue, 7 Mar 2017 at 5:34pm**

Thanks Bruce. I'm going tomorrow morning. I'll see another client before Nick and can hopefully do a hand off with the attorney. I'll also take the opportunity to introduce myself and get his digits.

**DX 1-1**

**Tartaglione (SD NY) Team Lang & Kaboski, LLP**

# Nick Visit Today

From: Melissa Lang
Date: Wed, 3 Jul 2019 at 12:38pm
Category: 03 Client Contact & Concerns

---

I saw Nick this morning, he is in SHU, they confiscated the cell phone in his cell. He is distraught, as you can imagine. Please call me for any additional details, I'm free until 2:30 p.m. today or later this evening. (917) 432-8819
I spoke with Tony and Bruce B and filled them in, and Tony recommended that I remind everyone just in an abundance of caution, to not text or respond to any messages from Nick.

Bruce B will be seeing him this evening.
Anyone who is planning to see him in the next few days or week, please alert the rest of us or put it on the basecamp calendar.

Thanks everyone.

 **Bruce Barket Wed, 3 Jul 2019 at 3:38pm**

If anyone has been texting with Nick, please think about whether or not we will want to assert a privilege before the government goes through his phone.  It may be awkward to assert, but that needs to be weighed against disclosing whatever was on the text if anyone was texting.

 **Beth Cahill Wed, 3 Jul 2019 at 3:50pm via email**

I have never texted with him and told him (and his father) that I could not
accept any calls from him.

 **Aida Leisenring Wed, 3 Jul 2019 at 4:00pm**

Nick has disclosed to me private information (sentiments about V and their situation). Even if I never responded is there an argument that the information is privileged? I have picked up his calls in the past not recognizing the number while I was driving.

 **Tony Ricco Wed, 3 Jul 2019 at 4:01pm**

We need to know who has been texting with Nicholas. Please advise, if you have.

 **Michael K. Bachrach Wed, 3 Jul 2019 at 4:03pm**

I have never texted with Nick nor spoken to him on the phone.

 **Aida Leisenring Wed, 3 Jul 2019 at 4:10pm**

His texts with V are very concerning. I have some screen shots that V sent me in the past FYI

 **Michael K. Bachrach Wed, 3 Jul 2019 at 4:12pm**

Could you please emails those to the rest of us? It would be very helpful to see them.

**DX 2-1**



**David Ruhnke Wed, 3 Jul 2019 at 4:15pm via email**

Michael, as RC I would suggest strongly any circulation of these messages be limited to counsel only. US is likely However, I do recognize that US will likely have these since they have the cellphone.

Any motion/notice appropriate to require a SW for any search?

David

_____



**Melissa Lang Wed, 3 Jul 2019 at 4:15pm**

I received one strange text from a number I didn't recognize about a month ago that said "Tommy". Nick told me it was from a friend of his but i assumes it was from Nick. I'm not sure and I never responded.



**Bruce Barket Wed, 3 Jul 2019 at 4:16pm**

I didn't me to start an detailed discussion. Here, just to raise the general question. Let's stop this chain here



**bkoffsky@snet.net Wed, 3 Jul 2019 at 4:16pm**

I have never texted with Nick nor received any telephone calls from him nor have tried to reach out to him.



**Tony Ricco Wed, 3 Jul 2019 at 4:17pm**

Aida,can you please forward those screen shots and text meesgaes to Michael. A motion to preclude will be in the works, i am sure.



**Aida Leisenring Wed, 3 Jul 2019 at 4:25pm**

I just did.



**Michael K. Bachrach Wed, 3 Jul 2019 at 6:07pm**

I've started drafting a motion.

Quick question: Besides texts messages, do we have a good faith basis to believe that there might also be emails and/or photographs on the phone that might also be privileged?

Please let me know so I can adjust my draft accordingly. Thanks.



**Aida Leisenring Wed, 3 Jul 2019 at 6:10pm**

Give me a call 917-474-4694



**Bruce Barket Wed, 3 Jul 2019 at 7:11pm**

I saw Nick. As good/bad as one would expect. Fully engaged on facts, reviewed the video a bit.

Nothing on phone unless they can retrieve the texts. All deleted. Other inmates used the phone.

**DX 2-2**

I am going to try to get him to Nassau.



**Melissa Lang Fri, 5 Jul 2019 at 9:10am**

Does anyone know if SHU visits this week are at noon or 5? I can't get through to MCC and haven't heard back from Stephanie. Mr T is debating visiting Nick. Thanks!



**Michael K. Bachrach Fri, 5 Jul 2019 at 9:15am**

On Wednesday they told me that the MCC would be operating on a normal weekday schedule today.

**DX 2-3**

# Met with V

From: Bruce Barket
Date: Fri, 5 Jul 2019 at 12:39pm

I met with V and her lawyer for about 2 hours. Informative and productive. Call for details.

 **Melissa Lang Sun, 7 Jul 2019 at 8:59am**

Bruce, Beth and I will give you a call Monday. Thanks.

 **Aida Leisenring Sun, 7 Jul 2019 at 3:19pm**

Saw Nick for 45 minutes today. He's surprisingly strong given what he is going through but visits seem critical at this time. I'll generate a memo later today but in the meantime if anyone visits Nick who he has not met before (I mentioned some members from the team may see him), use the code word "wink" says Nick. It's his dog's name.

 **Beth Cahill Sun, 7 Jul 2019 at 3:26pm via email**

Wink used to ride with him everywhere, even to the gym while he worked out. Nick would keep the car running – heat in the winter/ac in the summer – and check on him every 45minutes or so. According to Nick, Wink was with him at the Liquid Lounge the day of the offense. The dog was in the car waiting for him. He reportedly never went anywhere without him. Just thought that was an interesting tidbit and worth sharing.

 **Bruce Barket Sun, 7 Jul 2019 at 3:37pm**

See, my mind goes to the defense. He would not have brought his dog to a murder. How would the dog have reacted to a dead body in the back of the Explorer? Will Biggs/Marcos recall the dog being there?

 **Michael K. Bachrach Sun, 7 Jul 2019 at 3:48pm**

Aida, Thanks for the password. I'm out of town on a brief family vacation until Wednesday night, but I plan to visit Nick, and now use the password, on Friday.

**DX 3-1**

**Tartaglione (SD NY) Team Lang & Kaboski, LLP**

# Nick today

From: Melissa Lang
Date: Tue, 9 Jul 2019 at 2:37pm
Category: 03 Client Contact & Concerns

I saw Nick today. After waiting for about two and a half hours for a SHU room and to have him brought down. I will draft a memo later this evening, but he remains extremely fragile and described moments of considering suicide, meaning actually thinking through making a plan - beyond saying he can't do this anymore. He "promised" or agreed, that he would take it one day at a time as far as at least giving us the chance to try to move him to a different facility. Feel free to call me for any details, but again I'll try to get the memo out today. I also notified Dr. Dudley, who is seeing him tomorrow.

Melissa



**Beth Cahill Tue, 9 Jul 2019 at 2:52pm via email**

Thanks, Melissa. I'll see him Thursday and touch base with Dudley before I do.

Beth Cahill

Mitigation Specialist/Sentencing Advocate

Lang & Kaboski, LLP

Phone: 908.896.3945

Fax: 347.402.8917

Email: bethkcahill@gmail.com

This transmission is intended only for the individual or entity to which addressed, and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If the reader of this communication is not the intended recipient, or its employee or agent responsible for delivering the communication to the intended recipient, you are notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify the sender immediately via return e-mail or by telephone and return the original communication to us.



**Melissa Lang Tue, 9 Jul 2019 at 3:07pm**

Also FYI - Epstein is in SHU and part of the very long wait today was his attorney spending most of the day with him and taking up one of the rooms. He left for lunch and came back. Keep it in mind when you go it may take extra time.



**Bruce Barket Tue, 9 Jul 2019 at 3:27pm**

I have a call with Comey and Johnson on this issue at 3:30. This is helpful.  Thanks

**DX 4-1**



**Melissa Lang Tue, 9 Jul 2019 at 7:33pm**

Bruce,
How was the call? Any word of possibility of moving him?



**Aida Leisenring Tue, 9 Jul 2019 at 7:38pm**

The government indicated they would request the Marshalls move him to Nassau but that it would depend on whether they had the capability there to transport him back and forth to Westchester for court appearances. If not they would try and suggest other locations.

According to the government, The confiscated phone does not have the capability to text but they will be subpoenaing subscriber info on all calls made to that phone, and if/when they obtain a search warrant for the phone, if texts are present they will use a taint team to review them.



**Tony Ricco Tue, 9 Jul 2019 at 7:57pm**

Doesn't our own client know whether he used the phone confiscated for texting?



**Danielle Muscatello Tue, 9 Jul 2019 at 7:59pm via email**

I do recall Nick stating that he texted with the phone when Bruce and I met with him last Wednesday. He said the texts were deleted, and that multiple individuals had used the phone.

Danielle Muscatello
Barket Epstein Kearon Aldea & LoTurco LLP
666 Old Country Road
Suite 700
Garden City, NY 11530
(516) 745-1500



**Aida Leisenring Tue, 9 Jul 2019 at 8:07pm**

Yes. Of course it was used for texting as discussed in our conference call. I was just divulging what the government claimed. My understanding is all texts (including texts by other inmates as it was a communal phone) were deleted.



**Melissa Lang Wed, 10 Jul 2019 at 11:00am**

Here is a memo from yesterday's visit.

[Client Visit Conf Privileged Work Product 2019-07-09.docx](#)
19.8 KB



**Bruce Barket Wed, 10 Jul 2019 at 11:16am**

So frustrating. How we treat prisoners is so awful.



**Kenneth Montgomery Wed, 10 Jul 2019 at 2:41pm via email**

Yes, America and the rule of law is very efficient at it.

Sent from kjmontgomerylaw.com

**DX 4-2**

>



**Bruce Barket Wed, 10 Jul 2019 at 3:00pm**

I know how difficult of a position we are in with Nick being caught with a cell phone after the judge intervened, but I am not going to walk by this. That facility is despicable.  The shu conditions are inhumane and unconstitutional.  They get away with it because their policy is so different than the practice and because the complaints either aren't made or are not believed.

I know this is not a defense, but Nick used a cell phone for the same reason dozens of other inmates do: to stay sane in an insane place. An hour a week with family with monitored phone calls and reviewed emails is insufficient humane contact over the course of 30 plus months.  Anyone of us would have used a cell phone if available.

This process puts people in situations that make it nearly impossible to survive and then punish the person when they can't do the impossible.  It is as if the process is designed to break the will of a person like Nick who wants to go to trial on the facts and results in a not so subtle coerced guilty plea



**Melissa Lang Thu, 11 Jul 2019 at 9:37am**

Quick note - I spoke with Dr. Dudley last night after he saw Nick. Slight improvement. More importantly - Nick has a new cell mate. I'll give you all three guesses.

Yes, Jeffrey Epstein.

**DX 4-3**

**Tartaglione (SD NY) Team Lang & Kaboski, LLP**

# No Further Text Messages

From: Tony Ricco
Date: Tue, 9 Jul 2019 at 10:14pm

All Team members must refrain from communicating messages via text (and email) between Nicholas Tartaglione and any third party person.

**The Trust Fund Limited Inmate Computer System (TRULINCS) is the inmate computer network that provides inmates access to multiple services, including limited text messaging. However, TRULINCS enables electronic messages to be exchanged between inmates and the general public in a secured manner.  For example, inmates are only permitted to text message with individuals who are on their approved list and/or individuals who have consented to receipt of such electronic messages from the inmate.  Third party communications are strictly prohibited.**
Third party texting (phone calls, emails, correspondences) is a violation of BOP Rules and Regulations.  Should the government get hold of such messages, you can be sure that the government will argue in the penalty phase that Nicholas Tartaglione manipulates the system and uses his lawyers (and/or legal team) to communicate with people on the outside IN VIOLATION OF INSTITUTIONAL REGULATIONS; that such improper communications jeopardize institutional security and, in some cases, has even resulted in the death of BOP staff, etc.

So, from this point forward, team members must not communicate
messages for Nicholas Tartaglione to third parties via texting or email.  To do so, risks providing the government with evidence which will be used to secure a jury verdict for the death sentence.   If any person has any further question about this, call me.

**DX 5-1**

4/13/2020                    Tartaglione (SD NY) Team > Confidential Memo: Latest Event/ Nick Visit/ Future Dangerousness/ Jail Conditions/

Case 7:16-cr-00832-KMK    Document 641-1    Filed 07/02/26    Page 21 of 404

**Tartaglione (SD NY) Team Lang & Kaboski, LLP**

# Confidential Memo: Latest Event/ Nick Visit/ Future Dangerousness/ Jail Conditions/

From: Aida Leisenring
Date: Wed, 24 Jul 2019 at 1:49pm

**Epstein Incident:**
As you may have heard, there are allegations that Epstein attempted to commit suicide. He was found unconscious on the floor. Nick supposedly yelled for help and gave Lieutenant Anderson a statement, in sum and substance: "I felt something hit my feet. He was unresponsive. I called the guards. I don't know if there was something around his neck. It was dark." (Nick reports that he asked for a lawyer before making the statement but was denied a call). According to Nick, the sheet Epstein used while Nick was sleeping ended up ripping, but only after Epstein had lost full consciousness to the degree where his eyes were open and not dilated and he was doing "the death snore." Epstein is currently on suicide watch and no longer in Nick's cell.

I bumped into an attorney visiting Epstein who stated she was told by BOP that there was an altercation between Nick and Epstein, but that she did not believe it because Epstein was happy with Nick and stated Nick had been good to him, and because she later learned Epstein was on suicide watch. To the extent I could see Epstein from a distance and through a window, I saw no bruising or swelling on his face (I could not see his neck). Nick was photographed by Anderson. I observed no visible injuries or recent scratches on Nick.

I asked Adam Johnson who was on the third floor what the allegations were and he said they are still investigating.
Because Nick cannot afford to be accused of trying to kill 'America's Most Famous Defendant' (in a manner moderately consistent with the murder of Martin Luna), we should consider subpoenaing hallway footage and all records associated with this incident. There are 2 guys in the cell next to Nick's, who may have overheard Nick yelling for help. We would want photos of Nick's body, face, and arms that were taken by BOP.

Epstein's suicide attempt is not public knowledge, FYI. Only we and Epstein's team know about it (and BOP).

**Countering Future Danger: CO's that are favorable to Nick/ Allegations of Bullying of Child Abusers**
I have been compiling a list of possible witnesses that could testify that Nick is not a threat to others in jail. These are some names I've come across. I have no personal knowledge if they would in fact say favorable things, but here is the running list with some possible quotes by them (some names may be misspelled):
Sodhi "you don't belong in the SHU"
"E" (Eliasant?): "Nick doesn't need a belly shank" (I witnessed him treat Nick very well).
Clarke
Richards
Morando
Fletcher
Amaro (but last time Nick saw him Nick mouthed off to him).

***When Bruce approached Comey about moving Nick to another facility, Comey said he was high risk and could not return to MDC because at MDC Nick was setting up child molesters to be killed. I believe she walked that comment back and then gave other generic reasons. That said, Nick had a good relationship ("I played chess with him all the time") with a man accused of sexual abuse of a minor at MDC named "Elliot Haverstraw." Apparently, Nick protected him. I have no idea if he is still there, but we should keep his name handy and explore that.

**DX 6-1**

Case 7:16-cr-00832-KMK   Document 641-1   Filed 07/02/26   Page 22 of 404

**Nick's Mental State and Conditions:**
Nick was anxious. He demonstrated some paranoia that guards were going to kill him. "Something is coming. I can feel it." He has lost a tremendous amount of weight. 20 lbs? I actually think I could beat him in a fight. He looks extremely pale. He says they leave him naked with no towel in the showers freezing for 1.5 hours each day. He received 5 old books he already read, 1 packet of batteries, his old discovery disks but he is missing 3 disks. He is not receiving mail. (Epstein's lawyer confirmed similar conditions and the standing water issue). Rice gave him half his time line (the one I prepared). Not sure where the rest of the pages are.

**Good news:** The discovery disk Comey recently provided was made available to Nick. He was able to go through it while I was there, and Johnson told me they would allow him to stay and continue reviewing it after I left. Nick was completely engrossed in discovery as I was leaving.

Feel free to call me for any more information: 917 474-4694.

Aida

---



**Melissa Lang Fri, 2 Aug 2019 at 3:04pm**

Aida, thanks for sharing this.

I'm searching the BOP inmate locator and not finding Elliott Haverstraw. I wonder if there could be a different spelling of the name? I can ask him about it. I'm planning to see him Monday.

---



**Bruce Barket Sat, 23 Nov 2019 at 10:15am**

This is an excellent note with great suggestions for investigation, subpoenas and witnesses. Thanks, Tony for reminding us.

We would have done well to follow up on these items in July rather than getting lost in a debate about media comments.

But, at least we have begun to tend to these tasks now. I want to highlight one thing, a roster of the inmates near Nick and Epstein on the night of the 22nd-23rd. They indeed might have heard things.

---



**Kenneth Montgomery Sat, 23 Nov 2019 at 11:18am via email**

It wasn't a debate it was advice from very experienced resource and learned counsel and other members of the team as to why media comments were not helpful.

Sent from kjmontgomerylaw.com

> 

**DX 6-2**

Tartaglione (SD NY) Team - Epstein Suicide Attempt In the News

**Tartaglione (SD NY) Team Lang & Kaboski, LLP**

**DX 7-1**

# Epstein Suicide Attempt In the News

From: Aida Leisenring
Date: Wed, 24 Jul 2019 at 11:00pm

https://www.google.com/amp/s/www.nbcnewyork.com/news/local/Jeffrey-Epstein-Found-Injured-in-NYC-Jail...

**DX 7-1**

**Tartaglione (SD NY) Team Lang & Kaboski, LLP**

---

# Statements To The Press Concerning a Detainee named Jeff Epstein

From: Tony Ricco
Date: Thu, 25 Jul 2019 at 7:52am

---

Have statements been made to the press concerning an alleged incident involving the detainee Jeff Epstein?   If so, what are they?

---



**Bruce Barket Thu, 25 Jul 2019 at 7:55am**

Below is what I wrote to several outlets. In my conversations with others I have refused to talk about Epstein but emphatically denied any involvement by Nick and then tried to redirect the conversation to the conditions at the mcc.

"Any suggestion that Mr. Tartaglione assault anyone is a complete fabrication. This story is being leaked to retaliate against Mr. Tartaglione for complaining to the court about the deplorable conditions at the MCC. We made those complaints on Monday in open court. Get the transcript. We warned the judge that officials at the jail would retaliate against Nick because we have been exposing the inhumane conditions at the facility."

---



**bkoffsky@snet.net Thu, 25 Jul 2019 at 8:12am**

https://www.nbcnewyork.com/news/local/Jeffrey-Epstein-Found-Injured-in-NYC-Jail-Cell-After-Possible-…

---



**Michael K. Bachrach Thu, 25 Jul 2019 at 8:31am**

This article also mentions Nick and references Bruce B.'s comments without quoting them.

https://www.dailymail.co.uk/news/article-7283825/Jeffrey-Epstein-injured-jail-cell-following-possible-suicide-assault.html

---



**Tony Ricco Thu, 25 Jul 2019 at 8:37am**

Unfortunately, the above statements may have a significant negative impact on our ability the develop Mr. Tartaglione's mitigation case.   Statements to the press in a death authorized case should always be discussed with the Team, particularly with Learned Counsel, and optionally Resource Counsel, who have experience in how these statements will impact the ability to effectively present mitigation.   Going forward, can all Team members *please* refrain from making statements to the press in this death authorized case before *at least* consulting with Learned Counsel and/or Resource Counsel.

---



**john diaz Thu, 25 Jul 2019 at 9:03am via email**

There is an article in the Daily Beast that quotes Bruce B extensively and details his complaints against the jail and retaliation Nick has experienced.

Sent from my iPhone

>

**DX 8-1**

Case 7:16-cr-00832-KMK Document 641-1 Filed 07/02/26 Page 25 of 404



**Michael K. Bachrach Thu, 25 Jul 2019 at 10:17am**

Here's the Daily Beast article that John mentioned.

https://www.thedailybeast.com/jeffrey-epstein-found-injured-in-manhattan-jail-cell

I assume everyone gets this already but as Tony mentioned this incident will significantly hamper our ability to establish that Nick is not a future danger. We still have ways to make the argument, but now we will have to do so without opening the door to this incident, and will need to move in limine to preclude reference to it, regardless whether the allegations of Nick's involvement turn out to be unfounded. The last thing we want now is a trial within a trial regarding whether it's safe to be Nick's cellmate. There's simply no way to win that argument now, even if Nick had absolutely nothing to do with what occurred.

We should also discuss with resource counsel whether this incident, or the press related to it, will need to be addressed in some way during jury selection.

We had been gift wrapped a mitigating factor, but now that's gone. Feel free to call me or Tony if you'd like to discuss this some more.



**Bruce Barket Thu, 25 Jul 2019 at 10:18am**

I am always happy to to talk with anyone about any aspect of the case. Tony, I will give you a call now.



**Bruce Barket Thu, 25 Jul 2019 at 10:23am**

Mike,
Read Aida's post from yesterday. Nick saved this guy's life! He called for help. Epstein was put in Nick's cell because the jail knows Nick wouldn't hurt him. They are friends, just like virtually every other cell mate Nick has had.

This incident, despite the initial bad press (against which, I am pushing back hard), should be helpful. I didn't go to the press. The press was reporting on this regardless.



**Michael K. Bachrach Thu, 25 Jul 2019 at 10:59am**

I saw Aida's post. If Nick tried to save Epstein's life that's great, as is the fact that they were placed in a cell together for Epstein's protection. That's the gift wrapped mitigation that I was referring to. The problem is that if the BOP digs in its heels in the belief that Nick was involved (either by assaulting Epstein or helping Epstein stage the incident) then all of that great positive mitigation will be lost to us. Worse still, unless we win a crafty motion in limine, even if Nick is cleared we will be unable to introduce this Skipper evidence without opening the door to the Gov't's rebutal argument that Nick may have in fact been involved. There are no cameras that will show what occured inside the cell, so no way of indisputably exculpating him.

With respect to incidents negatively impacting upon a juror's view of a defendant's future danger, there is no good press. Let's just hope none of our jurors read any of these articles.



**Aida Leisenring Thu, 25 Jul 2019 at 11:04am**

I understand the cameras won't show what occurred in the cell, but if they show Nick standing in the hallway looking concerned, or them dragging Epstein out who appears unconscious as opposed to semi-unconscious, and if it shows COs taking out a ripped sheet that was used as a noose, it will at least help corroborate the suicide attempt - and

**DX 8-2**

if it shows COs running in, that will corroborate that someone (Nick) yelled out for help, as opposed to them just discovering this during a routine flashlight check. Also, it may show the light being turned on in the cell, which would corroborate Nick discovering him, turning a light switch to check, and then COs running in shortly thereafter.



**Bruce Barket Thu, 25 Jul 2019 at 11:10am**

Just got off the phone with Tony. I think it is important for us to talk about this stuff BEFORE anyone of us act. Last night's calls to my house at 10:55 just before the story was going to air, did not allow for that. I had to make a decision about whether and how to respond. I know that my view on responding to bad press is a minority view in the profession, but a view I am comfortable with. Mike if you want to talk more about this, call my office 516 745 1500. I would like to hear your thoughts in more detail.

I can say this, that in the future, if I can, I will and want to get input from everyone on the team before I do or say something. I might still do it or say it, but at least I will have the benefit of our considerable collective wisdom.



**Kenneth Montgomery Thu, 25 Jul 2019 at 12:09pm via email**

I think its too early to tell at this point but I agree that press in general is not helpful. The Doj's announcement of 5 executions today and more in the future brings home the seriousness of where we are at.

Sent from kjmontgomerylaw.com

>



**Michael K. Bachrach Thu, 25 Jul 2019 at 1:41pm**

The press related to this incident keeps getting worse. The story has evolved from one about Epstein, to one about Epstein that references Nick, to now one about Nick that references Epstein.

This article was posted on the NY Post website around 12:40 p.m.: https://nypost.com/2019/07/25/jailed-ex-cop-questioned-about-jeffrey-epsteins-injuries/

The headline: "Jailed 'killer cop' questioned about Jeffrey Epstein's injuries." The article is about how Nick is being investigated in relation to the incident, and, unfortunately, the way it is written gives off the impression that the incident occured while the two were cellmates in 10-South. In relation to that, here's what the article says:

"Earlier this month, The Post exclusively revealed that Epstein was being housed in the '10 South' unit, a block of six cells known as the 'terror wing' because it's where the city's most dangerous federal inmates, including alleged terrorists, are held. Tartaglione's lawyer, Bruce Barket, said the beefy ex-cop, 51, and Epstein were housed 'in the same unit and doing well,' according to NBC News 4, which first reported the questioning of Tartaglione."

I just this discussed article with Tony. He asked that everyone please refrain from any further comments to the press.



**Bruce Barket Thu, 25 Jul 2019 at 1:42pm**

Ironically, the post is one publication I have not spoken to.

**Michael K. Bachrach Fri, 26 Jul 2019 at 5:04pm**

**DX 8-3**



Attached is a copy of the NY Post article as published in the print edition. The paper updated the language prior to going to press, and it's even worse than what was available when I first posted the link.

Regardless of the actual language, it's worth looking at the print edition to see the visual that our potential jurors are likely to be seeing.

 [7-26-19 NYPost Ex Cop cellmate now eyed in jail choking - Epstein Twist.pdf](#)
697 KB

---



**Kenneth Montgomery Fri, 26 Jul 2019 at 5:20pm via email**

I honestly don't see how this aids the client in any way. My understanding of the case law and the ethical rules leads me to believe that these statements can be devastating from a mitigation standpoint and likely will come back to possibly haunt and hinder us at some point. They have the potential to take away very valid future danger arguments and from my understanding of this week's appearance some of the statements can be construed to be in direct contradiction of the record made in court this week. I also feel that the government at some point are going to compare what's been said in the press and what was made on the record to possibly argue that Bruce may be a witness to certain events. We probably all have about 200 years of legal experience amongst us and we know prison conditions is a real thing, however the crusade against the Bop conditions in this manner and in this case where so much is on the line is potentiaally deadly (no pun intended). The Bop issue is intertwined in the case in such a way that every word to the press has the potential of hurting future arguments. I just don't think its a good thing particularly when Epstein is such a toxic figure and fighting the BOP in this manner is a losing battle and could prove to be a deadly distraction. Again this is just my opinion, watching the news and reading the articles concerning the Client felt very uncomfortable knowing what's at stake and I think there is very little value in our client's favor to be gathered from such a public display considering what he's charged with.

---



**Bruce Barket Fri, 26 Jul 2019 at 5:55pm**

I appreciate everyone's input and thoughts. Happy to discuss further over the phone or in person if we can. My cell is 516 287 7230, my office is 516 7456 1500.

---



**David Ruhnke Fri, 26 Jul 2019 at 6:12pm via email**

I think the best course here is to hold off any further comment until we have a clearer understanding of what the facts are and whether Nick is going to be tagged with what amounts to a serious assault/attempted murder of a cellmate, supporting a future danger claim, or whether he acted in a way that helped save a suicidal cellmate's life. Concerned about the FREvid 801 implications of anything said by his attorneys. Plus circumstance rules of evidence do not even apply at penalty.

"Ladies and gentlemen, not only did Nick Tartaglione commit this attempted murder of his high-profile cellmate, he got his lawyers to lie to the public about what really happened."

David R.

**DX 8-4**

Case 7:16-cr-00832-KMK   Document 641-1   Filed 07/02/26   Page 28 of 404



**Bruce Barket Fri, 26 Jul 2019 at 6:19pm**

If Nick gets charged with a serious assault or attempted murder on Epstein, his lawyer's assertions to the contrary are the least of his problems.  You will note that I have not been quoted describing what happened.



**Kenneth Montgomery Fri, 26 Jul 2019 at 7:26pm via email**

Yes I saw the reporters ask the question on Fox and I think you responded that its privileged.

**DX 8-5**

Case 7:16-cr-00832-KMK   Document 641-1   Filed 07/02/26   Page 29 of 404

**Tartaglione (SD NY) Team Lang & Kaboski, LLP**

---

## The Continuation of Public Statements Detrimental to the Development and Presentment of Evidence at the Penalty Phase

From: Tony Ricco
Date: Sat, 27 Jul 2019 at 2:52am

---

It is very disturbing that these interviews have continued notwithstanding the recommendation made and agreed upon on Thursday, July 25, 2019.

On July 25, 2019, it was requested that team members please refrain from making statements to the press, a dangerous practice frowned upon in death authorized cases.  Notwithstanding that request, further interviews were conducted later in the day on July 25, 2019, and worst of all, on public television Fox 5 on Friday, morning July 26, 2019.  http://www.fox5ny.com/news/epstein-held-in-deplorable-jail

As I watched the Fox News broadcast, there were several statements by counsel that put Mr. Tartaglione in serious jeopardy for the presentation of aggravating evidence at the penalty phase based upon statements made by his own counsel as adoptive admission, authorized admission or admissions by an agent. See, *United States v. McKeon*, 733 F.2d 26 (2d Cir. 1984); Federal Rule of Evidence, Rule 801(2)(d)(B), Rule 801(2)(d)(c) and Rule 801(2)(d)(D); See also, *United States v. Reyes*, 10-10323 (9th Cir. 2011)(district court did not error in admitting public statements - in the form of two press releases that the defendant did not engage in the charged criminal conduct)

There were also several statements, which in addition to providing a basis for the introduction of adoptive admissions, authorized admissions and/or admissions by agent, which when combined with statements made by counsel in open court on July 22, 2019, (an observation by Ken Montgomery) have the potential to serve to disqualify counsel and other members of this team - as potential witnesses. See, *United States v. Locascio*, 6 F.3d 924, 933 (2d Cir. 1993)

Mr. Tartaglione is blessed to have several experienced capital counsel on his case, along with equally experienced mitigation specialists and others who have proceeded to capital verdict.  In addition, David Ruhnke, our Resource Counsel, has tried 19 capital murder cases to penalty verdict.  It was requested that team members *at least* consult with either Learned Counsel or Resource Counsel before making any further statements to the press - a concern shared by all team members with capital experience.  That advice, however, was ignored.   Unfortunately,  there have been additional further interviews with more statements that have further placed Mr. Tartaglione in jeopardy having to address aggravating evidence at the penalty phase provided by his own counsel.

It is absolutely critical for counsel in a death authorized case to be aware of how public statements (particularly around facts related to mitigation and/or aggravating evidence under investigation) can be used against the interest of the defendant at the penalty phase of a capital case.  In addition, it is critical for counsel to be aware of how, in this case, statements (on matters under investigation, including the possession of contraband in prison) have the potential to disqualify counsel - on the grounds that he or she may become a potential witness. See, *United States v. Locascio*, 6 F.3d 924, 933 (2d Cir. 1993). It for this reason, that it was requested that team members refrain from any further statements to the press in this case.

**An Example** (In addition to example David Ruhnke provided)

At the pre-trial conference on July 22, 2019, there was a spirited argument concerning the possession of contraband by Mr. Tartaglione - a cellular phone, and the use of the cellular phone to text to individuals outside of the prison, including to counsel. The possession of the cellular phone

**DX 9-1**

4/13/2020 Tartaglione (SD-NY) Team - The Continuation of Public Statements Detrimental to the Development and Presentment of Evidence ...

Case 7:16-cr-00832-KMK Document 641-1 Filed 07/02/26 Page 30 of 404

*itself* is an aggravator, and we can expect to be confronted with this evidence at the penalty phase of this authorized death penalty case.

However, a detainee's actual use of the cellular phone to text messages is an exacerbating or additional aggravator. Keep in mind that at the July 22, 2019 pre-trial conference, the government stated on the record that the cellular phone seized from Mr. Tartaglione was incapable of texting. Counsel, however, indicated that the cellular phone was, in fact, capable of texting and used by Mr. Tartaglione for that purpose. Counsel stated that he was aware of the texting capability because the defendant had used the contraband telephone to text counsel (and others), and that there were, in fact, text messages read by counsel.

Although counsel stated that there was no response, counsel made himself and possibly other counsel and members of the team, a potential witness to be called by the government to establish a serious aggravating factor - the use (not just the mere possession) of the contraband cellular phone. This potential testimony is exacerbated by statements made by counsel to the press during the Fox 5 interview that Mr. Tartaglione is (1) a "*model prisoner in many ways*," who (2) "liked, and respected and *gets along zwell" with people he is incarcerated with;"* and who (3) "*now gets along with the guards and inmates*."

The above are some of the problematic statements made by counsel during the Fox 5 interview which undermine the ability to present mitigation evidence on behalf of Mr. Tartaglione. However, there is more. The proliferation of the newspaper articles on this sad episode involving Jeff Epstein, and statements by counsel of the "cordial," "friendly" relationship between Mr. Tartaglione and Jeff Epstein, will require extensive *voir dire* on Jeff Epstein - an ugly proposition that has been exacerbated by statements by counsel.

Moreover, the BOP investigation is in its early stages. Regardless of the outcome, we are certainly aware that the facts will either be presented in mitigation or aggravation at the penalty phase. As such, it is improper for counsel to make public statements concerning that pending investigation. The New York Rules of Professional Conduct, Rule 3.6(a).

Pursuing this toxic, divisive issue in this manner has undermined our collective efforts to protect Mr. Tartaglione at the penalty phase of this authorized death penalty case. Going forward, all counsel must refrain from making statements to the press, and again, I am requesting that any counsel who believes that making a public statement is somehow going to help us defend this death authorized case, and who believes that he or she is within the ethical rules, to at least discuss the proposed statement with experienced capital counsel before hand. To proceed without consulting with the counsel with considerable capital experience in this case, just does not make any sense. And, thus far proceeding in this manner has placed Mr. Tartaglione life at jeopardy at the penalty phase, and may also very well result in the discharge of counsel from this case. Please refrain from further public statements on this Epstein matter, the BOP ongoing investigation, and "statements of fact" related to Mr. Tartaglione's conduct in detention, including his possession and use of an unauthorized cellular phone.

Next week this time, our defense team will be in Santa Clara, which will provide an outstanding opportunity to develop our mitigation case, and to address penalty phase aggravating evidence with some of the best capital defense lawyers in the country. Team members should be focusing on the preparation for our participation at Santa Clara which will focus on mitigation development.

 [US v McKeon.pdf](#)
354 KB

 [US v Locascio.pdf](#)
560 KB

---

 **Bruce Barket Sat, 27 Jul 2019 at 5:55am**

I am looking forward to Santa Clara, although attending a 5 day seminar will be very difficult given the work on our plate for Nick and other clients. I appreciate Tony getting me and Aida admitted into the program at the last minute. Like Boulder, I will attend, prepare, work hard and learn everything I can.

**DX 9-2**

I am also very appreciative of the input on the Epstein/jail condition issue from everyone on the team.  Tony, in particular took an hour on the 25th to speak with me. I agree it is important to continue to speak about this and every issue that comes up.  Of course consultation and discussion won't always lead to agreement.  Responding to press inquires about our client on a matter that will receive substantial attention and which cast our client in a negative light, I think it is appropriate, helpful and ethical to respond.  I understand others feel differently and that my view may be a minority view.  Please reach out to me personally or continue to write here. I am open to changing my mind.

As to the issue regarding the phone, we jointly agreed to write a letter to the court asserting a privilege. In fact, I don't think the letter was my idea, but I agreed with Tony and Michael that we should write it.  The privilege is only applicable here if texts were sent and we know they were.  We discussed early on a strategy of not writing the letter in the hope that the government would not discover the texting capabilities of the phone. I agreed that the letter, which Michael was kind enough to draft, was appropriate because I know the government intends to obtain the phone records which will indicate data in addition to phone calls.  The Government's ignorance, whether feigned or real, about the texting capabilities was not going to last long.  If we wanted to rest on the hope that the texting capabilities of the phone would remain undiscovered then I would not have been in favor of writing the letter.

I saw Nick Thursday evening and he was in good spirits, happy to have received books, batteries for his radio AND discovery. In reviewing that with him it was obvious that he received material we have not been given, including important leads that we must follow up on.  (Jim I will reach out.  We have some information we have been searching for).

But his parents saw him last night and reported that he was distraught so I am going to see him again at 8:00 this morning. I have some family obligations this afternoon but have time for a call on the drive in between 7:00 and 8:00 or between 9:30 and noon. My cell is 516 287 7230 for anyone who wants to speak with me about the new facts, Nick's condition, the press or any other matter.



**Tony Ricco Sat, 27 Jul 2019 at 6:35am**

Please, no more interviews on the subject before checking with team members. Its the statements not the letter that has created the above problems. However, I am confident that we can work through these problems created by the statmemts made during these interviews as a team. If we communicate before hand, we will be fine. Good luck with the visit.



**Bruce Barket Sat, 27 Jul 2019 at 6:46am**

I am confident that we will work together and that that we will solve the problems this case presents.  The interviews are done for now.  If I get more calls, I will reach out to you before I respond.

**DX 9-3**

**Tartaglione (SD NY) Team Lang & Kaboski, LLP**

# daily news on the choice to authorize

From: Bruce Barket
Date: Wed, 31 Jul 2019 at 9:54pm

The Daily News is going to write a piece about the politics of the death penalty and why the Government chose to authorize the case against Nick. I view this as an opportunity to express my view about the death penalty, about why even if it should exist, it is inappropriate here and about the facade of fairness surrounding the decision to seek it in any case and in particular this case.

Please offer any thoughts. But keep in mind that the publicity around this indictment has been one sided and almost exclusively the government's theory, with the statements of the USA and various law enforcement personal. We didn't start the pubic fight. I think it is mistake to let pass an unsolicited opportunity to add our thoughts to the public domain to counter, or at least offer a view different, than the government.

I gather my thoughts on this are not shared by the group as a whole. I told the reporter, Steven Brown, that I wanted to think about my comments and whether I should add anything at all to the story. The story will run over the weekend with or without my comments.



**Melissa Lang Wed, 31 Jul 2019 at 10:27pm**

Bruce, thank you for asking for everyone's thoughts on this. I have been traveling so haven't been a part of all the discussions but have read through everything. My impression, from what I've read, was that our highly experienced resource counsel and learned counsel both recommended strongly against engaging with the press in any way.

Given that, I just wanted to ask some follow up questions - are you seeing this as the appropriate forum to engage in a debate about the fairness of the death penalty? And this is the Daily News, correct? And your position is it might be helpful, in our collective effort to defend Nick, and save Nick's life, to discuss the fairness of the death penalty and the criminal justice system related to a white defendant who is charged with killing four minority men? I just want to make sure I'm not missing anything.

Thanks again for reaching out to the group.

Melissa



**Michael K. Bachrach Wed, 31 Jul 2019 at 10:32pm**

Bruce, Please don't comment for this article. Every time you comment in the press you create a slurry of new articles that draw negative attention to Nick. I know you mean well, but the harder you push; the more negative articles follow.

I've said this before but there is no good press in a death penalty case.

Here, most articles about Nick -- and now Epstein -- mention that Nick is being investigated for either assaulting Epstein or staging a false suicide attempt. Worse still, EVERY article on Nick -- and now Epstein too! -- mentions the fact that Nick is charged with four murders. This article will be a hatchet job and we shouldn't be contributing to it in any way.

Any potential juror that reads any of these articles will be stricken for cause during jury selection, which inevitably hurts the defense more than the prosecution since there are

**DX 10-1**

fewer defense orientated jurors in the jury pool to begin with, and it's also those defense orientated jurors who tend to be more honest with their beliefs during voir dire.

We need to win our battles in the courtroom, not in the press. I can think of no comment that could be made to the press that will help win Nick's case.



**Kenneth Montgomery Wed, 31 Jul 2019 at 11:27pm via email**

I agree with Mike. Ultimately in this day and age of media/information system and how humans think the last imprint on the mind is "what is he accused of?!!!" "oh he killed four people!!!" "He was into the drug trade?!!!" all of those thoughts diminish the mitigation that helps the client. This isn't the type of case where it is split in public opinion. The client is accused of killing four people and participating in the drug trade where if we all know the federal government there will be multiple cooperators testifying against our client. We have not seen the 3500 material. What if its devastating? The Government will use all of these Defense statements.



**Tony Ricco Thu, 1 Aug 2019 at 5:30am**

As a general rule, lawyers refrain from the urge to respond to the press in death penalty cases. Newspapers articles on criminal law issues are generally one sided affairs. It is no secrete that articles published to generate revenue from selling advertising space. The more salacious the article, the more papers sell. As an attorney representing a defendant actually facing the death sentence, we are not trying to influence the public on its views towards the death penalty or the process. Such questions are generally directed to Judy Clarke, the Executive Director of the Federal Death Penalty Resource Project or our Resource Counsel. The Project goes through a process of vetting what, if any response, is made on the overall process. The impact of joining the debate, *on the platform* of *an actual pending authorized case,* will have devastating consequences down the road.
What appears to be an opportunity to be heard, is actually a pathway to future harm to Nicholas Tartaglione. Michael Bachrach accurately points out that during capital jury selection, you will find that we will have a very small pool of favorable jurors to begin with, and attempting to influence that process through the press, you will find, is not only practically unsound, it is also a violation the New York Rules of Professional Conduct, Rule 3.6(a).
Based on statements made to date that have commented on the particular facts of this case, and other accusations, we can expect that a "gag order" is looming. If one is issued, well more negative press will be generated which will impact on the functioning of all counsel for Mr. Tartaglione.
For further insight on this subject, I recommend giving Resource Counsel at call, both Tanya and David have considerable experience on dealing with the press on death penalty matters on a local and national level. You will all be pleasantly surprised with the level of thought and review that goes into the responses to the press in death authorized cases. Keep in mind "*death is different,*" and the difference between life and death is in subtle and sometimes not so subtle consequences of our actions.
As counsel for a defendant who is facing the death sentence, we simply cannot inject ourselves in the general public debate on the death penalty *in the name of the person represented.* We have a far more imminent and compelling responsibility. On the issue of the death penalty, the Tartaglione case will have its victories in the courtroom not in the media. Give Resource Counsel a call.



**Bruce Barket Thu, 1 Aug 2019 at 6:07am**

Thank you for your thoughtful responses. I take the unanimity opposing press statements to heart. I will reach out to David and/or Tanya.

**DX 10-2**

Of course, I am familiar with the ethical rules, as every lawyer should be.  I didn't, nor did Nick, initiate the press about Epstein.  I responded and as a result the reports were less harmful than they otherwise would have been. In fact, some were helpful. See the WSJ piece and the Daily News piece.  I take rule 3.6(C) as more of a mandate, than simply permission to defend a client in the forum where he/she is attacked. I have responded to press attacks my entire career.  I know its a minority view, not just on this team but in the profession generally.  It has mostly proven successful for my clients.  I don't share the cynicism about the media. There are good reporters who want to get the story correct. Many are sympathetic to our positions about everything from the conditions of confinement to opposition to the death penalty to the government making mistakes about who they choose prosecute and who they choose to offer a deal.  When representing a client whose case is being reported in the media and where the Government or Government agents are leaking false and negative stories about a client, I generally believe it is a lawyers obligation to defend the client in the public forum.

Yes, I do believe that one should use opportunities available to educate the public about the death penalty. I despise this system. Its not fair. It's arbitrary. It's cruel. It is morally wrong.  It has to be abolished. No, I don't want to harm Nick for a soundbite, but nor do I want to pretend that he is being treated fairly any more than I am willing to pretend that the conditions at the MCC are humane.

That said, I want to talk to David and Tanya before I speak to the reporter again. Nothing is more important than doing what is best for Nick.  I am just not convinced that silence is best.

One more thing, while I consider everyone's thoughts on this topic, please reflect on my views.  I haven't come to them without reflection and experience.  They may be unorthodox in a death penalty case, but they may also be appropriate in this death penalty case.

---



**Kenneth Montgomery Thu, 1 Aug 2019 at 6:15am via email**

Sincere question. How is success measured or calibrated through in the media in relationship to clients?

---



**Bruce Barket Thu, 1 Aug 2019 at 6:27am**

Results in court, acquittals. Convincing a jury your client is wrongly accused is much more difficult, sometimes impossible, after the client has been pummeled in the press for the months or years leading up to trial. That's why sub C in rule 3.6 exists. It is an under appreciated and woefully under used provision

---



**Tony Ricco Thu, 1 Aug 2019 at 6:43am**

Wrongly accused is just one of many strategies employed that leads to an acquittal, the goal and ethical duty of every defense attorney.  If wrongly accused is the theory selected by counsel, there are different views as to whether you win such a defense in the press and on the internet (a interesting conversation for another day).

However, this is a death penalty case, and "death is different."  Factored into any analysis of facts, issues legal theories and the selected defense to present is the impact that such a decision with have not only on the liability phase but the powerful penalty phase (where death awaits those who have ignored or not properly prepared for that tragic possibility).

As to this press issue on the death penalty process in response to the daily news request - call Resource Counsel.  You will find these issues have been regularly and successfully address by attorneys representing capital defendants.

**DX 10-3**

Malcolm X often observed:  "*if you know its going to rain, take your rain coat*," in other words be prepared.  Santa Clara provides an opportunity to prepare on the high level of care that is required of capital counsel.  A great program, and a great opportunity.  Look forward to seeing everyone there.

---



**Kenneth Montgomery Thu, 1 Aug 2019 at 7:07am via email**

I have only been working on these capital cases for the last 4 or 5 years. I don't think wrongly accused is the theory in this death matter where the government will carry their narrative through multiple cooperators backed by corroborating evidence. However, I'm looking forward to Santa Clara and developing the important and necessary mitigation that MUST be developed.

Sent from kjmontgomerylaw.com

>

---



**Bruce Barket Thu, 1 Aug 2019 at 7:19am**

I am in 100% agreement,Tony, and I will speak with resource counsel.

Ken, phrase it anyway you want, our client has asserted his innocence (wrongly accused) to each of you and directed all of us to do everything possible to gain an acquittal. We will honor the choice he has a right to make while also doing everything possible to be certain he is not sentenced to death.

Combining these two goals so they compliment one another is our job as I see it. We will be successful.



**Kenneth Montgomery Thu, 1 Aug 2019 at 7:31am via email**

You preaching and grand standing for the choir Bruce I've been a lawyer for a minute and know how to get acquittals. I just disagree with your process and that's ok. Looking forward to the next week and staying focused at the tremendous task at hand. Everyone safe travels to Santa Clara.

Sent from kjmontgomerylaw.com

>

---



**Bruce Barket Thu, 1 Aug 2019 at 7:50am**

I am actually looking to "preach and grandstand" to the public.



**bkoffsky@snet.net Thu, 1 Aug 2019 at 7:56am**

Bruce-

I also strongly urge you not to talk to the press and for a whole host of reasons that I won't belabor now because I believe that even if the entire team told you not to speak to the press, you would ignore us.  But we are scheduled to travel to Santa Clara on Friday to spend the better part of a week devising a strategy on how to save Nick's life should the jury return a guilty verdict on death eligible counts.  For you to ignore that, to in any way jeopardize the work that the rest of us are trying to do so that you can make some

**DX 10-4**

point about the government's prosecution in this case or the death penalty writ-large, would be unconscionable.



**Bruce Barket Thu, 1 Aug 2019 at 8:46am**

Bruce,

You're just wrong and I am not sure why you suggest I would cavalierly disregard the collective wisdom Nick is lucky to have at his disposal. I respect and appreciate the experience and talent of every member of the team.

I have followed the advice on a range of topics from the script I read to the committee in DC to largely refrained from speaking to the media over the life of the case to seeking input here before speaking to the daily news.

I may or may not follow the advice on every issue but as I said above I take the unanimity opposing comment to heart. I have already reached our to DAVID and Tanya.

Feel free to call me to discuss your reasons why I should not comment. 516 287 7239



**bkoffsky@snet.net Thu, 1 Aug 2019 at 8:55am**

I am a judge on the Connecticut statewide grievance panel and have a full day of hearings but will try to reach out to you towards the end of the day.



**Michael K. Bachrach Thu, 1 Aug 2019 at 8:56am**

Bruce B.,

In a non-capital case I agree that there are many times when a comment in the press can be useful, so long as it's the right comment at the right time. But I'm sure when you comment in non-capital cases you're always careful not to telegraph or undermine important aspects of your defense, and I'm sure you're also careful to avoid adoptive admissions or agency admissions. But death is different, and one reason it's different is because every act we take, no matter how subtle, can have a negative impact on the penalty phase.

While the penalty phase might not matter to Nick, we have an ethical obligation created by the ABA Death Penalty Guidelines to not take any actions that undermine Nick's penalty phase case. Continued comments in the press are consistently undermining the strength of our penalty phase case.

At the very least, please stand down until after Santa Clara. We will be spending 5 days brainstorming the mitigating and aggravating factors related to this case with experts from all over the country. Once done, I suspect you'll have a better appreciation for how fragile the case for life can be.

I've been on faculty there three times, and this will be my third time as a student. I've also been involved in capital defense for most of my career, which, to my great consternation is getting close to 20 years. And everry time I go to Santa Clara I learn something new. Trust me, give it a chance and your view on this debate might just change. At the very least, you'll be better informed and hopefully in a better position to appreciate which comments really should not be said to the press no matter how you personally feel.



**john diaz Thu, 1 Aug 2019 at 9:06am via email**

I am flying out today, looking forward to seeing you all at Santa Clara.

**DX 10-5**

Sent from my iPhone

>



**Michael K. Bachrach Thu, 1 Aug 2019 at 9:13am**

Have a great flight John! See you in Cali!



**David Ruhnke Thu, 1 Aug 2019 at 3:43pm via email**

I have been out of the loop most of the day. WE need to stay out of the press on this issue. Period. David R.

_____



**Bruce Barket Thu, 1 Aug 2019 at 4:37pm**

So, I asked the reporter to email the questions he wants to ask me and asked him what the article was going to be about.

Here are then questions:

Why is the Tartaglione case not an appropriate death penalty case?

Why does your client face the death penalty while his co-defendant, who appears to be cooperating, does not face the death penalty? Is that fair?

I think not responding is a mistake.

**David Ruhnke Thu, 1 Aug 2019 at 5:57pm via email**

Disagree. Big mistake to go press/public on this. Especially if when we get to voir dire and jurors have been exposed to publicity and judge notes that we are the source of a good deal of it.

David R.

_____



**Michael K. Bachrach Thu, 1 Aug 2019 at 6:05pm**

Bruce, respectfully, you are wrong.

Responding to those questions would be a huge mistake. There is no way for you to answer those questions without revealing the arguments that we intend to make during the penalty phase.

Would you ever tell the Gov't that their forensic experts made a mistake, or who your client's alibi witness is, even one moment before the law required you to? Of course not, and this is no different. Worse still, our client's life is on the line, not just the possibility of a conviction.

If you reveal to the press any more of our mitigating evidence all you are doing is showing our cards to the Gov't so that they can prepare their response. How does that possibly help Nick?

**DX 10-6**

If you really think a response is necessary, then, as Tony said, direct the reporter to Judy Clarke and Kevin McNally of the Capital Resource Counsel Project. Let them defend the cause, if they believe it appropriate. They can do so without putting Nick's life in further jeopardy. You cannot.

As David said, none of us should be speaking to the press. Not only will it undermine our penalty phase case but it will undermine our ability to select a jury that is as fair as possible even under the strictures of the death qualification process.

For Nick's sake, stop.

---



**Bruce Barket Thu, 1 Aug 2019 at 6:47pm**

Thanks for the notes. I remain willing to speak to anyone who wants to call me 516 287 7230.

I have not revealed any part of our penalty phase case, nor did I plan to do so here.

I fundamentally disagree with a self imposed gag order in the face of press that we didn't initiate and is harmful. Ignoring the press because responding is complicated abandons a front in the battle for client. I won't do that.

That said, this one article is not that important one way or the other. I will take a pass here though I think doing so is a mistake.

---



**Tony Ricco Fri, 2 Aug 2019 at 5:11am**

By definition answering the proposed questions by the daily news is providing an unnecessary and ill advised preview of our mitigation case about facts and issues that we may or may not ultimately present. However, statements that counsel make about mitigation could serve handicap the presentation of mitigation that we ultimately present, *inter alia*, such as jury selection. Adoptive admission, Agency admissions, and lack of the knowledge of the non-statutory aggravating evidence that the court will permit the government to present are the reasons for measured restraint to press requests in a death authorized case. These requests over call for the disclosure of serious issues and statements that require a great deal of work and development. The exercising the wisdom gained from years of individual capital experience, and the collective experiences of members of the Resource Project is not "ignoring the press" or creating a self imposed "gag order." That conclusion is just not an accurate assessment of the advice given about not responding to the press in general, and the specific requests that have been made in this case. Capital work is difficult, and very counterintuitive to what course of conduct counsel may or may not employ in a non-capital case. It is the reason that a defendant has learned counsel, it is the reason that the Defender Services Program provides so much training, and why we have a Federal Death Penalty Resource Counsel Project. There are many, many terrific lawyers in our country who have vast experience with the issue of the press in context of counsels' responsibilities *in capital cases.* Mr. Tartaglione is blessed to not only have an outstanding team of lawyers (both appointed and retained) but also two the best and most experienced Resource Counsel in the country assigned to our case. In both David and Tanya, we have the "go to" Resource Counsel who handle the avalanche of press interest in capital cases on both a local and national level. Over the years, I have found both David and Tanya to be outstanding, and the serious, measured, and thoughtful manner in which they help teams deal with the press issues exemplary. Far for ignoring, the decisions related to are always given in depth thought and analysis. Self imposed gag order? No. But a thoughtful and methodical way of addressing the press - which places protecting the process of protecting the life of the defendant and helping counsel make informed decisions which do not result in a motion to discharge them from the case - is first and foremost in the advise given.

**DX 10-7**

When at Santa Clara, if any team member is interested in requesting private time with any faculty member or our Resource Counsel (David Ruhnke will be present and is on the faculty), approach a lesson leader and make the request.   I am certain that private time will be arranged for such a session on this subject.   I believe that any team member who choses to seek a private session, will find learning more about issues of the press and the impact (risks, benefits and consequences) on capital litigation information insightful and informative, and help provide an more informed understanding of the complexity of making statements in the press and impact of the development and presentment of evidence at the penalty phase.  I am confident that each and everyone of us is of the view that working together as a team will serve to save Mr. Tartaglione's life.  The process or the journey is also part of the challenge.   It is great that we have a team, where everyone is dedicated to that process.  Along the way, we all expect differences of opinions and views.  That's okay.  It's part of the journey or as Bob Marley once observed "completing the book." (Redemption Song).  See everyone later today at Santa Clara.  Looking forward to everyone having an outstanding experience.



**Bruce Barket Fri, 2 Aug 2019 at 5:49am**

As usual Tony, I don't disagree with much of what you wrote. Consider this a request for private time with David (sent a note yesterday seeking a call) and you. I am eager to tap into your collective experience and share my perspective.



**David Ruhnke Fri, 2 Aug 2019 at 8:07am via email**

Getting set to travel. Maybe find time to talk through this issue in Santa Clara. David

_____

**DX 10-8**

**Tartaglione (SD NY) Team Lang & Kaboski, LLP**

# DHO ruling

From: Bruce Barket
Date: Thu, 1 Aug 2019 at 6:30pm

Nick saw the DHO today. 46 days loss of good time, 45 days more in SHU and ONE YEAR no visits.

It would seem to impact mitigation and trial prep or case resolution.



**David Ruhnke Thu, 1 Aug 2019 at 6:41pm via email**

Just to be clear, this was on the cellphone issue? Thanks. David R.

---



**Bruce Barket Thu, 1 Aug 2019 at 6:49pm**

Yes. No official word on the Epstein incident



**Melissa Lang Fri, 2 Aug 2019 at 3:12pm**

I have another client who also lost visits for a year over a cell phone. It seems pretty outrageous to me.
With this other client, we're going through the painstaking process of appealing the decision. We have to go through the internal appeal process (which we know well from when Nick was at MDC).

What do people think about me bringing up filing an appeal on the DHO decision with Nick on Monday? I won't write it out with him, but just start the conversation with him, about the first steps in trying to get the loss of visits reduced?

thanks and hope everyone is traveling safely.

---



**Bruce Barket Fri, 2 Aug 2019 at 3:20pm**

Counsel for the facility is going to bring him a form. I told nick to fill it out as quickly as he could. I am going to the judge with this and the conditions. We can't represent him properly if he can't speak privately to his family.



**Michael K. Bachrach Fri, 2 Aug 2019 at 3:20pm**

I defer to group on whether Nick should file an internal appeal. I can see arguments both ways.

As for the length of the punishment, however, keep in mind how serious of a security threat the BOP considers cell phones. As David can tell you, Kenny McGriff (aka Supreme) was sent directly to ADX after being sentenced in his case, and the direct and immediate designation was a direct result of the cell phone.

That's how serious of a violation the BOP views cell phones.

**DX 11-1**

# Epstein/Event

From: Bruce Barket
Date: Fri, 9 Aug 2019 at 2:46pm

I wrote Adam Johnson today asking about the status of the investigation into the even event with Epstein.  He replied as follows

"It is my understanding that the investigation has concluded and that no charges, disciplinary or otherwise, are being filed against your client.  I hope this helps."

One less problem.



**Kenneth Montgomery Fri, 9 Aug 2019 at 3:09pm via email**

Great.



**David Ruhnke Fri, 9 Aug 2019 at 3:22pm via email**

And we at least explore the potential for mitigation if Nick acted in a way that may have saved Epstein's life. Have to admit it does not sound that way since Epstein was not in any way fatally injured, but it also seems the case that Nick at least acted responsibly.

Will Epstein's lawyers allows us to interview their client limited to this issue?

David R.

_____



**Melissa Lang Fri, 9 Aug 2019 at 3:28pm**

That is good news. Especially given that I spoke with one of the guards on 3 today, just before they brought Nick down and he indicated that it Epstein was saying Nick had been involved. I have no idea where he got that from, or if that was just an old rumor, which it very well could have been.

We still need to formally request, via court order, any and all documentation related to the incident and something in writing verifying what he said. If there are internal documents about the incident, we should be requesting a copy of them. Michael, I don't know if this can be combined with what you're preparing or have already prepared or if we want to do a follow up request?

thanks for letting us know Bruce.

_Confidential Privileged Work Product_
I met with Nick today, he continues to seem depressed. The scratches have all healed and you can't see the ones on his head at all. He's hoping for visits whenever people are available.

**DX 12-1**

He made a legal call this week, which he was happy to have finally had a chance to make, to the paralegal, Kim, but he also tried to call V. Apparently, V answered, said hello and he said Hi V, and then she hung up on him before he could say anything else. He seemed to be pretty upset that this happened. I didn't attempt to broach with him that he shouldn't have made the call, especially doing so under the guise of making a legal call, because he seemed upset about it, and just focused on talking to him about how he was feeling about it and feeling about losing V. But the team should be aware that he reached out to her, and I suspect he might want to talk about it some more.

He wanted to me to be sure to let everyone know, he still has no books. The paralegal said she had sent a bunch of books, and he has received nothing. He still has no batteries, and it's been three weeks with no commissary despite ordering. He ordered again on Wednesday and hasn't received anything. The vending machines on the third floor were both not working and were empty, so it didn't really matter.

He very much  wants a trial date at the next court date, and he wants to be moved out of MCC.

We had an interesting talk about his sister Ellen, some things came out he hasn't shared before that I can share during our meeting.

He was given to BP230 forms - Regional Administrative Remedy Appeals Form, and he hasn't filled them out yet, he wants help from the attorneys on what exactly he should include. He has not yet received his DHO decision packet, which I think he is supposed to get before he can put in an appeal, but I could be wrong. Either way, it seems late that he has not yet been given that.

Finally, Dr. Dudley is confirmed to see him again, next week Wednesday August 14th in the morning, so others should avoid going that day.

thanks,

Melissa



**Aida Leisenring Fri, 9 Aug 2019 at 3:28pm**

We can certainly ask. My gut is that Epstein (or his attorneys) do not want America to know he tried to kill himself --since they would not give us any indication one way or another. So they would not want any public statements with respect to this issue. Perhaps we could create a limited purpose interview--promising pursuant to a contract disclosure in court only if it went to penalty phase? Something to think about and research before we ask his attorneys. One of his lawyers is a woman who used to share a suite with John Diaz.



**David Ruhnke Fri, 9 Aug 2019 at 3:33pm via email**

Wondering if the circumstance of a suicide attempt is something they actually might want to include in a bail reconsideration motion. Conditions so bad client tried to end his life.

But Aida's suggestions are good and let's explore.

David R.

_____



**Bruce Barket Fri, 9 Aug 2019 at 3:34pm**

We have spoken to Epstein's lawyers a few times and have a decent relationship with them.  But, for obvious reasons, they have been very reluctant  to discuss the issue.

**DX 12-2**

They have told us that Epstein "recalls getting up for water and then recalls being revived by the guards." I can't imagine they would allow an interview, but it can't hurt to ask.

BTW, Nick's account is that it was a real suicide attempt. He provides details that strongly corroborate his overall description of the event.



**john diaz Fri, 9 Aug 2019 at 3:37pm via email**

Who is the attorney?

Sent from my iPhone

>



**Aida Leisenring Fri, 9 Aug 2019 at 3:40pm**

I don't remember her name, but she is from Uzbekistan, no accent, pale, long black hair, lives in Coney Island.



**Bruce Barket Fri, 9 Aug 2019 at 4:09pm**

Thanks, Melissa.

I will see Nick on Sunday morning. I will go over the appeal with him. I will also extinguish the idea that we are going to set a trial date at the next appearance.

It is important that we continue to document the timing of the legal visits,a s well as the complained of conditions. I understand that some people have had to wait for hours despite the protocol set up to make appointments. Can those persons please email the details separately?

On a related note, Aida and I met with Kim Tinsley today. She has known Nick since at least 2014 and knows his family quite well. She works as a paralegal for a lawyer I knew 25 years ago who has an office near our Garden City office. She is also an animal rescue person. Calling Kim as a "legal call" has the same issues as calling V under that guise. As much as she would like to be, she is not part of the team,

I am not sure who is requesting the documents from MCC. Mike, if that is you, let me know if we can help. If it is not Mike, then we will do it.



**Michael K. Bachrach Fri, 9 Aug 2019 at 4:16pm**

Bruce,

Yes, I'll be requesting the documents, but I'm consulting with some experts first to make sure we request ALL of the specific documents that we need. Over the years, Tony and I have noticed that a request for a client's complete BOP file still results in intentional omissions unless you know exactly what specific docs to request. I'll make sure no stone is left uncovered and will loop everyone in at the appropriate point along the way.
—Michael



**Bruce Barket Fri, 9 Aug 2019 at 4:18pm**

Mike,

Thanks. Most interesting will be the Epstein material AND the events/allegations that got him in trouble at MDC and that prevent him from going back there

**DX 12-3**



**Aida Leisenring Fri, 9 Aug 2019 at 4:21pm**

Confidential Information:
Kim Tinsley provided a lot of mitigation about Nick. It appears she dated him for one year and has been in touch with him ever since. Unfortunately, that year coincided with the time he was with V. That said, she speaks regularly with Gerry (Nick's mother) and visits her and provided a lot of favorable character evidence about Nick and insight into family dynamics, some of which comes from Nick, the other from her own observations. She has a BA from Hofstra University, and had hoped to go to law school. She has been a paralegal for years. She has a very nice demeanor. She communicated with Nick using the illegal phone. She sends him books and tries to calm Gerry down daily on the phone. She owns 2 horses. She is 44, not married, no kids. She states she loves Nick. Feel free to call me for more details. We should definitely explore all of the insight she can provide.

**DX 12-4**

**Tartaglione (SD NY) Team Lang & Kaboski, LLP**

**DX 13-1**

# Epstein commit suicide this morning

From: Michael K. Bachrach
Date: Sat, 10 Aug 2019 at 9:14am

According to the NY Post, Jeffrey Epstein commit suicide this morning. I'm sure other newspapers will be running this information soon.

https://nypost.com/2019/08/10/convicted-pedophile-jeffrey-epstein-dead/

**DX 13-1**

**Tartaglione (SD NY) Team Lang & Kaboski, LLP**

**DX 14-1**

# Epstein Suicide

From: Aida Leisenring
Date: Sat, 10 Aug 2019 at 9:16am

Epstein killed himself last night.

 **Melissa Lang Sat, 10 Aug 2019 at 9:27am**

It's in the Times too.

 **Kenneth Montgomery Sat, 10 Aug 2019 at 9:53am via email**

Yup.

Sent from kjmontgomerylaw.com

>

 **Tony Ricco Sat, 10 Aug 2019 at 10:05am**

I got a call early this am.

**Tartaglione (SD NY) Team Lang & Kaboski, LLP**

# Epstein's Suicide and The Press

From: Tony Ricco
Date: Sat, 10 Aug 2019 at 10:24am

Team members should refrain from what appears to be an opportunity to appear in the media around this event and tout Nicholas Tartaglione's actions earlier this month.   One, the Epstein death will open a full investigation into the actions taken by the BOP in relation to Epstein's detention.  If statements are made about his property, his conduct, etc., any individual with such information will be a witness and ultimately discharged from this case. I am very concerned about the actions of the civil attorney who has been visiting Nicholas Tartaglione, his communications with Nicholas Targalione via cell phone, and any materials that may or may not have been removed from the MCC (unlawfully) that had the potential of impacting the BOP investigation.   Everyone should be certain that the BOP will investigate, and will look for scape-goats, any scape-goats that they can later claim impeded, influenced their ability to properly investigate (that is protect Epstein).  Individuals who had any involvement whatsoever, need to proceed with extreme caution.

Nicholas Tartaglione should be instructed not to make any further statements in relation to the matter at all (to nobody), in the absence of the presence of counsel (period).

In addition, we do not want to be viewed as exploiting Epstein's death for any gain or benefit whatsoever.   A person once said:  "Facts are a stubborn thing."   But Facts, are facts, and let's have them speak for themselves without anything further.

Keep in mind that there have been prior accusations that the BOP staff acted inappropriately in relation Nicholas Tartaglione, and in relation to the Epstein situation.

Statements to the Press in this matter should be avoided.   And, should anyone feel absolutely compelled, it is requested that any statement be floated by Resource Counsel (Tanya and David) and that they float it by the Project before release.

THIS IS A VERY SERIOUS MATTER that has devastating consequences for some, and has the potential to adversely impact our preparation for the penalty phase.   Caution must be exercised by all.



**Bruce Barket Sat, 10 Aug 2019 at 10:48am**

I appreciate your thoughts and take them to heart, but I want to think this through a bit.

This validates so much of what we have said about the mcc, about what happened with Nick and Epstein and about Nick's character and his truthfulness.

I want to exploit it, we should exploit it, our client deserves to have it exploited.

The only question I have is how best to exploit it, for Nick and to further shine the light on the horror of that hell-hole.



**David Ruhnke Sat, 10 Aug 2019 at 11:10am via email**

Nick should not be associated with this story. No comment to press. 100% sure on that. We do not "exploit " a suicide. And if Nick ever goes to a penalty phase jury, conditions of confinement will become relevant. Not now. David R.

RUHNKE & BARRETT
ATTORNEYS AT LAW

**DX 15-1**

Montclair, NJ Office New York City Office
Ruhnke & Barrett Ruhnke & Barrett
47 Park Street 29 Broadway, Suite 1412
Montclair, NJ 07042 New York, NY 10006
Tel: 973-744-1000 Tel: 212-608-7949
Fax: 973-746-1490 Fax: 973-746-1490

David Ruhnke's cellphone: 201-321-8718
David Ruhnke's email: dr@ruhnkeandbarrett.com

Please note that this communication is from a law firm and should be considered privileged and confidential. If you received this in error, kindly delete and do not distribute further. We would also appreciate an email back noting our message went astray. Thank you.

---



**Tony Ricco Sat, 10 Aug 2019 at 11:18am**

That is a terrible idea.   We do not want Nicholas Tartaglione connected to this story at all - in the Press.   Exploit?  No.  And going to the press should not be done in the name of a person facing the death sentence.

Conditions of confinement are all over the record in this case.  It has been well documented.  Making more statements to the press frenzy does not advance a single cause for Nicholas Tartaglione on either guilt or penalty.

What is the remedy that is being sought?  If the goal is get Nicholas Tartaglione transferred then make the application to Judge Karas, not to the Press?

No authority (in particular Judge Karas) needs "*validation*" about the conditions at MCC, they are a known fact, and actions have been taken.  What Nicholas Tartaglione, a capital authorized defendant, "*deserves*" is for the team to stay focused, and act on matters that impact his guilt or penalty, and to refrain from public statements concerning an alleged pedofile, who has committed suicide.

Again, if you are making statements to the Press, float that written statement by Resource Counsel and Project.

**I have reached out the Project this morning, and all experienced capital attorneys are in complete agreement with this position**.



**Bruce Barket Sat, 10 Aug 2019 at 11:19am**

Nick is inextricably associated with this story.  We have a client charged with capital murder and I will exploit anything to help him.  I had a friend ask if Nick was still his cellmate.  The press is going to write about this and about Nick's role.  I think about that stupid piece in the Yonkers paper alleging that nothing Nick says can be believed.  Well, had the BOP believed Nick, Epstein would still be alive.

I am sorry, I respect your experience and your opinion but I we just don't agree here. I am going to say something



**Tony Ricco Sat, 10 Aug 2019 at 11:38am**

You are absolutely wrong professionally, ethically and morally to do this.  There is no reason to make such a "I told you so" statement to the press.   That kind of statement does not advance a single fact or legal issue that we have the professional obligation develop in this death authorized case.

**DX 15-2**

There is a reason why counsel with capital experience is required for representation of defendant's facing the death penalty; and this situation is just one of the many circumstances that our law says that Nicholas Tartaglione must have capital experienced counsel.  You should not be making statement or doing things that to not serve the interest of capital defendant.  And everyone is telling you that but you want to do it anyway.

 You may be "*sorry*" now, but it is Nicholas Tartaglione who will suffer from your decision not to follow the soundness and wealth of advice that has been provided.

**Do not proceed in the matter that you are contemplating**.



**Bruce Barket Sat, 10 Aug 2019 at 11:58am**

I am not morally, ethically or professionally wrong.  I am not obligated to so what learned counsel say. I am obligated to listen and think about your opinion, which I have and will continue to do so.  Here we disagree.



**Tony Ricco Sat, 10 Aug 2019 at 12:09pm**

On our development of the presentment of penalty phase on conditions of confinement and our prison adjustment (Nicholas Tartaglione's post arrest prison conduct), we need to have all the benefit of all the BOP investigative reports and documents taken in relation to Mr. Epstein's death.  It seems that the BOP did not follow protocols, but we do not know that.

Also, everyone should know and be advised that the FBI has opened an official investigation into the death of Mr. Epstein, so we also want to have the benefit of the FBI investigative reports to develop and then decide what, if anything, we ultimately present as evidence at the penalty phase of about this tragic incident.  The investigation of Mr. Epstein's death is now out of the hands of the BOP.



**Tony Ricco Sat, 10 Aug 2019 at 12:16pm**

I am advising all team members to refrain from making any statements to the press concerning the Epstein death.  This matter is under investigation by both the BOP and the FBI.   Our obligation under the ABA guidelines and for the lawyers (ABA and NYCRR Professional Rules) is to protect the confidentiality of the our client, and to not engage in conduct to adversely influence potential jury panels.  There is nothing more to say about this, as I am confident that everyone understands the gravity of this matter and will act accordingly.

Can team members respond to their availability to meet on the dates proposed for follow up (post Santa Clara) meetings in either NYC next week (penalty phase), and the following week in Garden City (guilt phase)?   Thank you.



**Bruce Barket Sat, 10 Aug 2019 at 12:19pm**

I am stepping out for the day and will have limited access to my phone. I issued this statement.

For the record.  " I was sorry to learn of Mr. Epstein's suicide, while in custody at the Metropolitan Correctional Center.  I hope there is a thorough investigation into how this occurred despite the Bureau of Prisons being on notice that Mr. Epstein had already attempted suicide at least once.  That investigation should be broad enough to examine the deplorable conditions inmates are forced to endure at the MCC "

**Tony Ricco Sat, 10 Aug 2019 at 12:33pm**

Deep.

**DX 15-3**



**Kenneth Montgomery Sat, 10 Aug 2019 at 12:44pm via email**

Absolutely nothing to gain in the press. This investigation is sure to have generated documents and statements and there will be now an investigation of an investigation by the FBI. The conditions of MCC are of public knowledge we would be beating a dead horse that does nothing to help the client at this juncture. In fact it is a dangerous risk since ultimately we don't know what is in the contents of any of these reports. We also don't want the client associated in any way with such a vilified figure in any way whatsoever. Epstein is hated even in suicide. There is nothing to exploit but negativity. Let the dusk clear. Stay focused on both phases and the continued development of our defense and mitigation.

Sent from kjmontgomerylaw.com

>



**Tony Ricco Sat, 10 Aug 2019 at 1:22pm**

The long game is serious, deadly serious. You can be sure that the government prosecutors, in this capital prosecution and will have the FBI thoroughly investigate with a view towards flipping the incident into an aggravator. This is dangerous and those with capital experience see the clear danger. The strength of this team is based upon its talent and collective wisdom. We will be saving Nicholas Tartaglione's life in spite of everything, even ourselves at times.



**Aida Leisenring Sat, 10 Aug 2019 at 1:46pm**

In addition to the FBI investigation William Barr has called for an investigation by the Inspector General. FYI.



**Tony Ricco Sat, 10 Aug 2019 at 1:56pm**

Thanks, missed that. Ugh. BTW Aida, Nicholas Tartaglione knows not to make any statements to anyone (BOP, FBI, detainees, etc.) about this?



**Aida Leisenring Sat, 10 Aug 2019 at 2:09pm**

He has been well advised to never ever make any statement when in these situations. By me. By Bruce. And I'm sure by others.

I will see him tomorrow but I fear he was likely questioned before any of us learned about this.



**Bruce Barket Sat, 10 Aug 2019 at 3:02pm**

I will see Nick tomorrow but I am sure he has already been interviewed



**Tony Ricco Sat, 10 Aug 2019 at 3:14pm**

A letter should be emailed to legal saying no interviews without counsel being present.



**Melissa Lang Sat, 10 Aug 2019 at 3:32pm**

Immediate press not good for Nick, blames him for first incident.

https://www.gq.com/story/jeffrey-epstein-found-dead

**DX 15-4**

And this suggesting it could have been an arranged murder and not a suicide:
https://t2conline.com/jeffrey-epstein-is-dead-who-killed-him/



**Bruce Barket Sat, 10 Aug 2019 at 4:50pm**

This doesn't matter much but it demonstrate why we can't ignore the media. The stories are obviously false and posted by two outlets we never spoke to and hopefully no one reads.



**Tony Ricco Sat, 10 Aug 2019 at 8:38pm**

Wrong again. Nobody is ignoring anything. The advice given is not based upon selfserving negative cliches but rather an understanding of how the government uses information, statements made by counsel to the press in the penalty phase. The advice has been given and you made your decision, a decision that does not have any relevant purpose to our liability or penalty phase. If anything, this entire episode demonsrates why capital eligible defendants must represented by qualified capitally trained lawyers. The danger to Nicholas Tartaglione is clear to capital counsel, Resource Counsel, the Project and other counsel on this case who have been involved in penalty phase litigation. You are in dangerous water on this issue, and you are putting Nicholas Tartaglione at risk. Come up with a remedy for whatever your concerns are related to the death of Mr. Epstein and make an application to the court - underseal. Stay out of the media on this issue.



**Bruce Barket Sat, 10 Aug 2019 at 8:42pm**

Tony, you can say it 1000X. We disagree. Nick chose me to represent him and I am not going to hand over my decision making to anyone



**Bruce Barket Sat, 10 Aug 2019 at 8:43pm**

I will seek and consider all advice and opinions and value the experience and views of others, but I am not going to follow orders because they were issued.



**Kenneth Montgomery Sat, 10 Aug 2019 at 9:06pm via email**

That just sounds cliche. How is it tied to a client centered approach if people who have dealt with these issues are giving sound intelligent legal advice? I don't think any of the advice has come from I said it so there it is, it has come with reason and intellect backed by experience and case law. How about this? Nick does not have a law degree and has never litigated a death penalty case. Deciding to play tit for tat with the media is a journey into nonsense and clearly becomes cultural entertainment. It does not help the client. We need to move on and prepare.



**Bruce Barket Sat, 10 Aug 2019 at 9:27pm**

Couldn't agree more with we need to move and continue to prepare. For those, apparently everyone, who disagree with my decision to comment, time to move on.



**Kenneth Montgomery Sat, 10 Aug 2019 at 9:29pm via email**

You right Bruce, you are retained counsel and you have the client's best interest and you have the last word. We have moved on.

**DX 15-5**

# Abandonment of Professional Ethics and Confidentiality

From: Tony Ricco
Date: Tue, 13 Aug 2019 at 7:45am

The purpose of this post is to advise all team members of the consequences of the public disclosure of statements made by Nicholas Tartaglione during interviews.

Yesterday, the media quoted an attorney in this case, who decided to disclosure information possessed by Nicholas Tartaglione in relation to Jeffrey Epstein suicide. During the media interview with the attorney, the attorney is quoted as to having stated that he interviewed Nicholas Tartalione since the appaent suicide. The attorney then proceeded to disclose to the media what Nicholas Tartaglione heard or did not hear on the morning of the apparent suicide, *inter alia*. In so doing, the attorney has violated the attorney client privilege thereby exposing Nicholas Tartaglione (and the attorney) to a compelled disclosure of the entirety of the conversation. Apparently, the attorney was fully aware of the rules related to such disclosure and its consequences, before making such a statement. However, for the remainder of the team. I want to everyone else to understand the basic principles of law related to any information provided by Nicholas Tartaglione during an interview. Understanding of those laws are of critical importance to the effective representation of Nicholas Tartaglione in this authorized death penalty case.

At common law, communications made in confidence between attorney and client were held confidential as a matter of the attorney's code of honor (see, Richardson, Evidence § 410 [Prince 10th ed]). New York's attorney-client privilege as codified at CPLR §4503(a) protects against disclosure of a "*confidential communication made between the attorney or his or her employee and the client in the course of professional employment*" and "*confidential*." See*, People v. Harris*, 57 N.Y.2d 335, 342 (1982).

The attorney-client privilege protects confidential communications between attorneys and clients concerning legal advice. An attorney may *rely* on this privilege to prevent the discovery of materials and communications that would otherwise be available to an adversary. The attorney-client privilege has been expressed both statutorily, CPLR 4503, and under the Federal Rules of Evidence; Rule 501, Rule 502(a)(1).

However, the purposeful disclosure of information discussed during the confidential conversation, unquestionably waives the privilege. When there is a disclosure of a confidential communications a waiver of the privilege is affected as to *all related communications regarding the same subject matter*. (*See*, *In re Grand Jury Proceedings*, 219 F.3d 175 [2d Cir. 2000]; *In re Sealed Case*, 877 F.2d 976 [D.C. Cir. 1989]).

The concept is also embodied in the Code of Professional Responsibility binding attorneys *to keep private* the confidential communications and secrets of their clients on pain of professional discipline, including loss of their license to practice law (see, DR 4-101 [22 NYCRR 1200.19]; 22 NYCRR 1200.6 Rule 1.6. (Confidentiality of Information);see also, EC 4-4.

Notwithstanding the sound advice of experienced capital counsel, our Resource Counsel and from the Project itself for counsel to refrain from public interviews/statements or alternatively to float comments on the Jeffrey Epstein suicide by Resource Counsel before hand, an attorney decided to join the media frenzy to "exploit" the Jeffrey Epstein suicide. In so doing, the attorney has made statements which violate several governing statutes, established court rules and the New York Rules governing professional conduct. The result? Counsel has potentially subjected Nicholas Tartaglione (and himself) to a compelled disclosure to *all related communications regarding the same subject matter*.

**DX 16-1**

As a result of this disclosure of confidentiality, if have two requests (1) Michael can you please step up your effort to obtain all public statements made by counsel to the media and the court by counsel and prepare a team memo on the subject; and (2) for all attorneys and team members to refrain from public statements related to the Jeffrey Epstein suicide. To the extent that such a statement is desired, to float the statement by Learned Counsel or our Resource Counsel.

Those with capital experience understand how much we protect the defendant from any type of compelled interview in course of developing a capital defense (i.e., Rule 12.2). Counsel has made several statements to the media in relation to the Jeffrey Epstein suicide which has put Nicholas Tartaglione at risk in the penalty phase. In the absence of an understanding how evidence is presented at the penalty phase, statements have been made and will apparently continue.

Therefore, if there is some remedy that is being sought to benefit Nicholas Tartaglione, **it is requested that the remedy is reduced to a written application and filed with the court** (under seal if necessary) **- *not litigated in the public media*.**



**Bruce Barket Tue, 13 Aug 2019 at 8:53am**

As always Tony, your posts are thoughtful.  A few points

1. Although I am not accustom to Basecamp and it proper use, it seems unfortunate for it to be used to attack co counsel.  I don't know of any violation of any rule of professional conduct by any member of the team.  If I thought there was a violation, I would first address the matter privately with the lawyer to be sure I knew all the facts and had learned that lawyers perspective and thoughts before accusing the lawyer on a platform with nearly 20 members. But, I don't fault any lawyer for proceeding in a manner they think best.

2.  Gathering the media quotes by counsel is of course a good idea and my office regularly collects all media on every case we handle.  Here, I think it is particularly important to collect the media containing the leaks of false allegations about our client in relation to the Epstein attempted suicide and his death. Given the quantity of media it is a good idea to have someone else gather the stories as well so as not to miss anything. Mike, feel free to call me if you need help with this.

3.  Please recall that this "frenzy" began with a false leak that our client assaulted Epstein a few weeks ago.  The outlet quoted unnamed law enforcement sources and personal a the mcc.  All of our public comments were in response to that leak or addressed the conditions generally at the MCC, which I hope now receive scrutiny by the pubic and by investigators.  Sealed filings won't change the culture of that place nor improve the conditions for the people detained there.

4.  I am eager to get help on how best to address the media frenzy to achieve goals for Nick. While I have read all the comments indicating that we should not say anything, I disagree.  I would, however, be interested in input from others on what to say and how to say it.

5.  Of course I am acting in order to achieve goals for Nick, but I don't think I should lay out those goals nor the strategy here.  We haven't in the past gone into that level of detail and I have been chastised at times for writing too much.  I would be happy to discuss all of this or anything else with anyone who wants to talk to me.  I am available for a call and can drive into NYC later today for a meeting if people want to spend a few minutes constructively working towards our common goals.

Happy to hear from anyone.



**Kenneth Montgomery Tue, 13 Aug 2019 at 1:39pm via email**

That MSNBC article I just read is incredibly harmful on many fronts. No doubt about it.

**DX 16-2**



**Bruce Barket Tue, 13 Aug 2019 at 1:43pm**

Share the link and please make sure Mike gets it.



**Kenneth Montgomery Tue, 13 Aug 2019 at 1:44pm via email**

Sometimes the you don't say can be more important than the things you say.
I also have never seen an attorney offer to proffer their death authorized
client via the media. Particulrly on an active investigation.



**Kenneth Montgomery Tue, 13 Aug 2019 at 1:52pm via email**

I also think the story can have an adverse affect on the client's safety
from other prisoners.



**Bruce Barket Tue, 13 Aug 2019 at 3:35pm**

Kenny,

I did not speak with MSNBC.  Happy to read the article if you post the link. I don't have
time to search for it today.



**Kenneth Montgomery Tue, 13 Aug 2019 at 3:41pm via email**

Sorry, NBC.

https://www.nbcnews.com/news/us-news/nearby-inmate-heard-nothing-when-jeffrey-epstein-died-lawyer-sa...

Sent from kjmontgomerylaw.com

>



**Bruce Barket Tue, 13 Aug 2019 at 4:41pm**

I had not seen this.  Thanks.  I wonder if this is the same article Tony referred to.  I think
Nick will be fine with other inmates, as he was when the guards called him out following
my complaints in Court.  And I agree that the strategy of speaking to press is as much
about what to withhold as it is about what to say.  There is a lot about this case and
about representing Nick that I have never seen before. It's one of the benefits of having
so many talented lawyers.  Hopefully, nearly everything will be something at least one
person on the team has seen before.

**DX 16-3**

**Tartaglione (SD NY) Team Lang & Kaboski, LLP**

# Stop Speaking To The Press About The Jeffrey Esptein Matter

From: Tony Ricco
Date: Thu, 15 Aug 2019 at 5:42am

Again, we wake up to yet another day of newspaper articles where attorney Barket is again is quoted and is litigating issues related to potential penalty phase evidence in the media.  These interviews are continuing notwithstanding the fact that during these interviews, the lawyer has (1) in one article violated New York state statutory and ethical rules governing attorney/client privilege; (2) in yet another article opened the door to non-aggravating statutory rebuttal evidence in the penalty phase; and (3) has been advised by every single person with a wealth of capital experience that such a practice is detrimental to the development and presentment of mitigation evidence, and (4) that we should stay clear of the media and/or government investigation of the Jeffrey Epstein suicide.

Yesterday, more than 5 hours was spent on the telephone with team members, the Executive Director of the Federal Death Penalty Project and others discussing the ugly ramifications of the disclosures (which are in fact a violation of attorney/client privilege) that appeared in the NBC and NY Post articles.   After many hours of painstaking analysis, we all came to the conclusion, that as a result of the attorneys comments, a very important potential mitigating fact has been, effectively, wiped out of the case.

And, to demonstrate the point, now this:

https://nypost.com/2019/08/14/epstein-told-lawyers-that-cellmate-nicholas-tartaglione-roughed-him-up/

This article represents exactly what happens, when an attorney decides to litigate death penalty phase issues and/or facts in the media.  I repeat:  "*This article represents exactly what happens, when an attorney decides to litigate death penalty phase issues and facts in the newspaper.*"

When an attorney, as a result of inexperience or indifference, previews or telegraphs penalty phase arguments in the media, the government will be on notice, will dissect that  mitigatory, flip it and turn the very same facts into an aggravator.  Counsel was previously advised of that this would result, but decided to move ahead anyway with media interviews.   The result?  Predictable, and expected by those with capital experience (the about article link makes the point).  The result?  Cluelessness, to those with no capital experience.

Yesterday, a lengthy inter-team memorandum of written (yet to be circulated) reminding all members of the dangers of litigating a death penalty case in the media, and to the actual prejudices and risks that these interviews (in particular the NBC/NY Post interviews) have, *in fact*, caused to Nicholas Tartaglione, and the potential ethical delimma that the disclosure of the client's remarks protected by privilege have caused to *all*, *all* other counsel on the case who have refrained from falling into this circular trap - a trap with deadly consequences for Nicholas Tartaglione.

You can be certain that the government is monitoring these statements, building its case in aggravation in rebuttal, and waiting for the disclosure of even more statements, before it gives notice and seeks sanctions against counsel.   The result?  Leaving Nicholas Tartaglione's penalty phase case in jeopardy.

**Simple Advice** (Repeated):   **Stop with these press interviews**.  Stop with this "*tit* for *tat, he said, she said, they said, my client said*" course of behavior in the media.  The information disclosed by counsel to date is adverse to the interest of Nicholas Tartaglione, violates his right to confidentiality and to develop a penalty phase defense in an effective manner.   **Just Stop**.  **Enough damage has been done.**   Before we can respond to the NBC (NY Post) quotes, we now have this to deal with.

**DX 17-1**

These disclosure have no known legal or factual benefit for the development and presentment of mitigation evidence in this case.

Finally, and again, all counsel should understand the simple wisdom that we **must** exercise patience, restraint and wisdom until such time that the BOP, the Inspector General and the FBI completes its investigation, and we have an opportunity to review those documents, before making "*in fact*" judicial or extra-judicial proclamations (if any) in relation to either the so-called attempted suicide, the apparent suicide, and the actions of the BOP in relation to both matters.

If there is a remedy that any counsel believes should be sought, the proper course of conduct is to file an application to the court *ex parte* and under seal, if necessary.

Finally, all team members be advised that the investigation of the Jeffrey Epstein attempted suicide, suicide is **not limited** to what you are reading in the papers, watching on TV and in social media. The investigation is far more expansive involving many matters related BOP policy, staff, equipment, including detainees and several civilians - including lawyers who have been visiting Jeffrey Epstein and others during this relevant time period. Subpoenas have been served with more expected.

---



**Bruce Barket Thu, 15 Aug 2019 at 6:54am**

I remain perfectly willing to participate in any call or attend any meeting concerning any aspect our representation of our client--or as is the case here, read about the calls and meetings after they have taken place without me or my input.

I am not willing, as should be obvious by now, to abandon my responsibility to do what I believe is in my client's best interest because of instructions issued by any person or persons, despite their experience, expertise and my respect for them personally and professionally.

If people want to engage in a dialogue, I am open to discussions and frankly to changing my views, my positions and altering the course of my conduct, if I think it is in Nick's best interest.

My email address is [bbarket@barketepstein.com](mailto:bbarket@barketepstein.com) and my cell phone is 516 287 2730. Both are working if anyone wants to address these issue with me directly.

---



**Tony Ricco Thu, 15 Aug 2019 at 7:57am**

There is is no duty or obligation to engage in violating and attorenys duty to obligation to protect the attorney/client privilege. You have it backwards. What you are being asked to do is stop violating his protected rights. To abandon operating adverse interest of Nicholas Tartalione's interest. Every single law who has read these remarks, see that Nicholas Tartalione's rights are being compromised except the attoreny who persists in engaging in the conduct. One remedy is not do it, if you dont see or understand the laws and rules you are violated. Over a week ago, an alternative remedy was suggested: float the statements before hand to Lesrned Counsel or Resource counsel. This sound advice was ignored, with really damaging statements coming AFTER this remedy was suggested. Then there is also the ethical delimma that you are causing for everyone of your professional colleagues who also causing. Are you aware of what those ethical reaponsibilities are? I will call call you directly to discuss what you claim what you are interested in doing but what your persist conduct reflects either you simply do not understand or is simply disregarding for other reasons.

---



**Michael K. Bachrach Thu, 15 Aug 2019 at 7:57am**

**DX 17-2**

Bruce, I called you yesterday to discuss these issues as well as the emails from the prior day. Let's try to talk today, if you're available.

On a related note for all, take a look at the layout of the print edition of the NY Post this morning (see photo attached). This is how most potential jurors are likely seeing these articles and as always it looks even worse in print.



---

 **Michael K. Bachrach Thu, 15 Aug 2019 at 7:58am**

See attached floor better viewing.



---

 **Bruce Barket Thu, 15 Aug 2019 at 8:06am**

What should also be obvious by now is that I won't engage in a debate on this platform.

 **Bruce Barket Thu, 15 Aug 2019 at 8:08am**

I got your message but was not working yesterday. I will calm today between 11:00 and noon. I have time then

**DX 17-3**

**Tartaglione (SD NY) Team Lang & Kaboski, LLP**

---

# Meeting With Nicholas Tartaglione

From: Tony Ricco
Date: Thu, 15 Aug 2019 at 11:23pm

---

I had a three hour meeting with Nicholas Tartaglione today at the MCC. We were joined in the meeting with Leonard Rollock, a paralegal who had previously met Nicholas Tartaglione and who had served nearly 30 years in federal prison. The meeting was outstanding, as we discussed many aspects of the case, along with a considerable amount of time devoted to the impact of the Jeffrey Epstein suicide on the development of his prison adjustment mitigator, and what, if any, the suicide and surrounding circumstances could have on the liability phase of the case.

- During the meeting, we discussed the impact that statements made by counsel in the recent media interviews (Jeffrey Epstein suicide) have on the attorney/client privilege, and the consequences to the development of the prison adjustment mitigatory, among other things.

- During the meeting, we also discussed the expanding investigation of the July 23, 2019 incident involving Jeffrey Epstein. https://nypost.com/2019/08/14/epstein-told-lawyers-that-cellmate-nicholas-tartaglione-roughed-him-up/

- During the meeting, we discussed the curable ethical delimma that all counsel in the case are presently confronted with, and the steps that are needed to resolve that delimma, so that the case could proceed without any disturbance of its present direction.

- Finally, we discussed the liability phase investigation and the development of the defense: Jason Sullivan, Benderoff, Biggs, Marcos and forensic evidence, along with alternate theories for the presentation of a defense at trial. We also discussed the selection and role of our liability phase investigators and experts. Nicholas Tartaglione was advised of the dollar amount of the proposed Stage 2 budget, which included a consensus on the experts and investigators included therein.

Everything considered, Nicholas Tartaglione was in fine spirits, and we had an engaging and productive meeting. Nicholas Tartaglione provided me with necessary information concerning the statements made by counsel in the press that are attributed to him, along with the actions taken by attorney John Wieder. That information made it clear to me that, although there is a violation of the attorney/client privilege, Nicholas Tartaglione understands his rights, that he is okay and is prepared to address the issue, so that we can move forward and into the important work which must be done in preparation for his trial.

I would like to have a brief **attorneys only** conference call tomorrow to discuss the next steps that the Second Circuit case law says must be taken, so that we satisfy counsels' present ethical obligation and to protect Nicholas Tartaglione's rights. What is a good time for everyone? It would help if everyone is aware of the ethical rules and the case law. In addition to the previous authorities cited, take a look at the responsibility of counsel as stated in *United States v. Malpiedi*, 62 F.3d 465, 469-70 (2d Cir. 1995).

 **Kenneth Montgomery Fri, 16 Aug 2019 at 12:05am via email**

I'm available anytime after 12 noon.

**DX 18-1**

Sent from kjmontgomerylaw.com

>

---



**john diaz Fri, 16 Aug 2019 at 12:25am via email**

I can do after 12 pm also

Sent from my iPhone

>

---



**bkoffsky@snet.net Fri, 16 Aug 2019 at 5:21am**

I am available all afternoon as well.

B

---



**Kenneth Montgomery Fri, 16 Aug 2019 at 6:55am via email**

I'm available.

Sent from kjmontgomerylaw.com

>

---



**Michael K. Bachrach Fri, 16 Aug 2019 at 7:04am**

I am available anytime today until 4pm.

Are we looking at 12pm? If so, that works for me. If not 12pm, then just let me know when.

---



**Kenneth Montgomery Fri, 16 Aug 2019 at 7:08am via email**

My flight to miami is delayed I will be in the air from 9:32-1:15. Available anytime after 1:15 pm.

Sent from kjmontgomerylaw.com

>

---



**Bruce Barket Fri, 16 Aug 2019 at 7:11am**

Let me know when the call will take place and what number to dial. I have court this morning but I am free after 12:00 p.m. or so

---



**David Ruhnke Fri, 16 Aug 2019 at 7:13am via email**

Will be free for call almost anytime today except 10-11am. Sooner we settle on a time the better. David R

RUHNKE & BARRETT
ATTORNEYS AT LAW

**DX 18-2**

Montclair, NJ Office New York City Office
Ruhnke & Barrett Ruhnke & Barrett
47 Park Street 29 Broadway, Suite 1412
Montclair, NJ 07042 New York, NY 10006
Tel: 973-744-1000 Tel: 212-608-7949
Fax: 973-746-1490 Fax: 973-746-1490

David Ruhnke's cellphone: 201-321-8718
David Ruhnke's email: dr@ruhnkeandbarrett.com

Please note that this communication is from a law firm and should be considered privileged and confidential. If you received this in error, kindly delete and do not distribute further. We would also appreciate an email back noting our message went astray. Thank you.

———————————————————



**Kenneth Montgomery Fri, 16 Aug 2019 at 8:04am via email**

I'm actually available anytime after 11:30 am today flight was updated.



**David Ruhnke Fri, 16 Aug 2019 at 8:14am via email**

Want to try for 12noon? David R.

———————————————————



**Kenneth Montgomery Fri, 16 Aug 2019 at 8:15am via email**

Works for me.



**David Ruhnke Fri, 16 Aug 2019 at 8:17am via email**

Whenever it happens, we can use my call-in line. David R.

Call: 866-414-2828; entry code 540092#

———————————————————



**john diaz Fri, 16 Aug 2019 at 8:52am via email**

12pm is good for me

Sent from my iPhone

>



**Bruce Barket Fri, 16 Aug 2019 at 10:16am**

Do we have a time? Tony?



**Tony Ricco Fri, 16 Aug 2019 at 10:24am**

Yes, I was waiting to here from Ken, in relation to his delay flight. The telephone conference is for 2 pm, that is the time Kenneth Montgomery will have landed in the

**DX 18-3**

Florida.

The telephone conference is for the benefit of counsel on the case: Michael Bachrach, Bruce Barket, John Diaz, Bruce Koffsky, Aida Leisenring, (or anyone else from the Barket firm), Kenneth Montgomery and Anthony Ricco.

The call-in number is 866-414-2828; entry code 540092#.

We will contact other necessary team members, and Resource Counsel after the telephone conference.

Is this okay with all counsel? If not, we can change.



**Tony Ricco Fri, 16 Aug 2019 at 10:26am**

There will be a different conference number set up in a moment.



**Bruce Barket Fri, 16 Aug 2019 at 10:30am**

2:00 works for Aida and I.



**Tony Ricco Fri, 16 Aug 2019 at 10:49am**

Great. Call in number: 1 (510) 338-9438;
    Meeting Number: 626 849 393
    Meeting Password: 81619



**David Ruhnke Fri, 16 Aug 2019 at 10:57am via email**

OK. Understood it's attorneys only and, as RC, will not join. David R.

_____



**Bruce Barket Fri, 16 Aug 2019 at 11:44am**

I don't have a preference either way, but RC has been part of every bit of this (thanks to the Basecamp posts and the complete lack of any other communication) so I have no objection to RC joining the call or not.

**DX 18-4**

**Tartaglione (SD NY) Team Lang & Kaboski, LLP**

# court on the 21st

From: Bruce Barket
Date: Fri, 16 Aug 2019 at 5:41pm

We spoke to Maureen and Jason:

1. They won't consent to moving Nick, but may not object
2. They will consent as will the jail to "social visits" as necessary to prepare the defense.
3. They say that the phone is still with BOP and there is some trouble in locating it.
4. They will read the letter submitted today and will consider consenting to partially sealing the motion to suppress
5. They are going to again address issues related to the conditions of Nick's confinement and asked for details about wait times.



**Tony Ricco Fri, 16 Aug 2019 at 8:35pm**

FYI, I was at the MCC on July 14, 2019.   I arrived at around 9:55 am, and waited to 10:40 or so, before going upstairs.  There was a lawyer, Sara Kuntsler who was visiting in the only SHU available.    When we went upstairs, Nicholas Tartaglione was brought down promptly (with 5 mins).   We met until around 1:15 pm.   Nicholas was kept in the visiting area, because we were told he had another visitor downstairs.

During our visit, Adam Johnson stopped by with Stephanie Scannell.   We had a brief exchange.   Adam Johnson had 5 books in his hand, along with 4 or 5 newspapers (redacted).   Adam and Nicholas Tartaglione had cordial small talk about the books.  Adam asked me how was my wait?  I told him "it was not too bad, and that I was fine." I thanked him for asking.   There was, in fact, a lot going on:  The US Attorney and Suicide Investigation Team was touring the 9 South and the visiting area.   I am sure they came to the visit area with the books, as a show for me - but it happened.  And, you should know, so that they do not hit you with my experiences on August 14, 2019 in rebuttal.



**Bruce Barket Fri, 16 Aug 2019 at 8:50pm**

Stephanie and Adam are great! I praise them regularly. Btw, you mean 8-15, right?



**Beth Cahill Fri, 16 Aug 2019 at 8:58pm via email**

Just adding to this FWIW...

I arranged and confirmed a visit (with Stephanie; Joy was out) for 10AM on Tuesday 8/6. I arrived at 9:40AM and didn't get up to see Nick until 2PM. Both SHU rooms were occupied before I arrived and another lawyer visiting a SHU client was allowed up before me. On his way out he told me that it took over an hour for his client to be brought down.

Re: reading materials – Nick told me that he had to choose between books or daily periodicals. It was BOP policy that they wouldn't allow both? But, perhaps based on Tony's last visit, this issue has since been resolved.

I left the visit early (around 3:30PM) when John Wieder arrived. I opted to give them their time together instead of a joint visit. I was able to leave

**DX 19-1**

before count.

Nick and I spent the bulk of our time reviewing discovery of the Clay Tiffany recordings (provided in the last production). These recordings between Clay, an agent, and a Westchester AUSA from the late 90s/early 2000s makes me believe the Govt has more the of the Civil Rights case file than they have turned over. Michael – we can discuss this in more detail on Monday.

Beth



**Michael K. Bachrach Fri, 16 Aug 2019 at 9:07pm**

My last visit with Nick was before Santa Clara. John and I arrived at 8:30 a.m., we went upstairs immediately, and Nick was already in the room waiting for us with his discovery (though it was old discovery, he got newer discovery later that day).

I had given Adam 24 hours notice and everything went smoothly. That was 7/16/19, I believe.



**Bruce Barket Fri, 16 Aug 2019 at 9:51pm**

Thanks. Beth and Michael



**Aida Leisenring Fri, 16 Aug 2019 at 9:58pm**

Today August 16, I waited two hours to see Nick but it was not an arranged visit. Other people waiting for SHU inmate had the same wait time.



**Tony Ricco Fri, 16 Aug 2019 at 11:50pm**

August 15, 2019.



**Melissa Lang Sat, 17 Aug 2019 at 9:27am**

I had multiple visits with Nick in July and August, for each visit I waited at least two hours to see Nick, all a result of having to wait for an available SHU room, despite having given notice.

Like Beth said, he also mentioned to me that he was told he couldn't have newspapers and books at the same time.
He still was not receiving commissary items he had ordered.
For a long period of time he was not given batteries for his mp-3, and then when he was given batteries, they gave him the wrong ones.
He had difficulty getting basic things like toilet paper.

When I have been with him, and he has asked to review his discovery, they've given it to him quickly, and allowed him to stay in the room to review it until the room was needed for a legal visit. If no one was waiting for a legal visit, my impression was they let him stay as long as he wanted to review discovery.



**Bruce Barket Sat, 17 Aug 2019 at 11:42am**

Thank you Mellissa. This is good to know and will help with the application to get Nick out of mcc, as steep of a hill as that will be to climb.

**David Ruhnke Mon, 19 Aug 2019 at 9:12am via email**

**DX 19-2**



All, I went on the docket today to determine the actual time of the status conference Weds. And saw no reference to it at all. Here's the docket entry from our June 17 conference, and I believe we were also there July 22, but no docket entry from that date.

Minute Entry for proceedings held before Judge Kenneth M. Karas: Pretrial Conference as to Nicholas Tartaglione held on 6/17/2019. Defendant Tartaglione present with attorneys Bruce Barket, Aida Leisenring, Bruce Koffsky, Anthony Ricco and Michael Bachrach. AUSA Maurene Comey and AUSA Jason Swergold. Time is excluded from today thru July 22, 2019 in the interest of justice. The next conference will be held on July 22, 2019 at 2:00 p.m. Defendant remanded. (Pretrial Conference set for 7/22/2019 at 02:00 PM before Judge Kenneth M. Karas) (Court Reporter Sue Ghoreyab) (ap) (Entered: 08/01/2019)

Anyone got an answer? And the time is . . . .? David R.

This comment was sent to Aida Leisenring, Anna Jeno, Beth Cahill, Bruce Barket, Christian New, Danielle Muscatello, David Ruhnke, Don Taylor, Jim Dowd, Kenneth Montgomery, Matt Rubenstein, Melissa Lang, Michael K. Bachrach, Tanya Greene, Tony Ricco, bkoffsky@snet.net, and john diaz.

Stop receiving emails<https://rubensteinlaw.basecamphq.com/posts/108886131/subscription/unsubscribe> when comments are posted to this message. Prefer plain text emails? <https://rubensteinlaw.basecamphq.com/people/12332816/prefers_text_emails?v=1>

Delivered by Basecamp<http://basecamphq.com/?source=notice> [https://beanstalk.37signals.com/beanstalk/beacon.gif? return_receipt=RR/BC/3e12369709ae6ad3ed641c864e...]

---



**Aida Leisenring Mon, 19 Aug 2019 at 9:49am**

I have it down as 12 pm. Do others have the same?

---



**Tony Ricco Mon, 19 Aug 2019 at 9:54am**

I wrote down 12 noon.

---



**Bruce Barket Mon, 19 Aug 2019 at 10:14am**

Don confirmed it is for Noon.

---



**Jim Dowd Mon, 19 Aug 2019 at 11:55am via email**

Bruce, is this for attorneys only or for the whole team ??

---



**Jim Dowd Mon, 19 Aug 2019 at 11:58am via email**

Is this conference just for attorneys Tony ??

**DX 19-3**

**Tartaglione (SD NY) Team Lang & Kaboski, LLP**

# Team Telephone Conference - Saturday, August 16, 2019

From: Tony Ricco
Date: Fri, 16 Aug 2019 at 11:48pm

**Team Telephone Conference** - Saturday, August 16, 2019

We had an informative meeting today on the number of outstanding ethical issues *now* confronted by the attorneys on the case, related to the public disclosure of statements made by Nicholas Targatlione during counsel interview(s) at the MCC in connection with the Jeffrey Epstein suicide and the events of July 23, 2019.

We are working on a solution to the various ethical issues; a solution that will allow Nicholas Tartaglione to maintain and continue with his counsel of choice, and also to limit the exposure and scope of the issues upon which counsel is a potential witness.

A draft letter will be circulated in a few minutes. Attorneys should feel free to amend, edit or modify the circulated draft. The amended draft will then be shared with Resource Counsel (and/or the Project) and the Executive Director of the Federal Defenders before being forwarded to Judge Karas *ex parte* and under seal.

**For Those Team Members New To Capital Litigation**:

The reason that the letter is being sent to the Executive Director of the Federal Defenders is because we are seeking the appointment of counsel to consult a defendant in death authorized case. And, since under 18 U.S.C. §3005 the court is obligated to consider the recommendation of the Federal Defender for the appointment of counsel in cases involving capital crimes, we are of the view that such a recommendation for counsel with capital experience is needed to properly advise Nicholas Tartaglione. Inexperienced attorneys with capital training or experience generally lack the knowledge to recognize and understand the subtle and not-so-subtle dynamics of attorney conflicts in the context of the unique, *heightened level of reliability,* significance and complexity of death penalty litigation.

**DX 20-1**

**Tartaglione (SD NY) Team Lang & Kaboski, LLP**

---

# Follow Up Informational To Telephone Conference

From: Tony Ricco
Date: Sat, 17 Aug 2019 at 9:32am

---

Although we had a great conversation yesterday, there is one thing that seemed clear - there are various levels of counsels' understanding of the laws of ethics, rules governing professional conduct, confidentiality, attorney client privilege, conflicts and counsels' lawfully imposed obligations in connection with those concepts via disciplinary rules and long established judicial authorities. A fact to be expected on any case where you have varying levels of experience in general and with the law of conflicts in particular.

Another point to reiterate. Based upon the information provided I am cautioning all counsel, and team members against any discussions with attorney John Wieder in connection with any information, conversations, and documents it is claimed that he is possession of, related to the Jeffrey Esptein suicide/attempted suicide and/or the various investigation(s).

Each attorney needs to consult with an ethics attorney on this subject, if you have not already done so. For starters, take a look at New York Rules of Professional Conduct, Rule 3.3, and ABA standard 4-4.6 and applicable Bar opinions on this explosive subject. However, *at this juncture*, I am advising all attorneys to consult with an ethics attorney, and for team members who are not attorneys to refrain from any conversation with attorney John Wieder on this subject, unless requested to by counsel.

And, can all team members who are not lawyers indicate that you have reviewed and understand this request. If there has already been any contact with John Wieder on this subject, give me, Bruce B, or Bruce K a call.

---



**Beth Cahill Sat, 17 Aug 2019 at 9:56am via email**

I have reviewed and understand this request. I have not had any conversations with John Weider related to Epstein or the investigation of his death.

---



**Melissa Lang Sat, 17 Aug 2019 at 11:59am**

Thank you Tony. I have reviewed and understand the request and will follow it. I have not ever spoken with John Weider.

---



**Anna Jeno [(503) 715-7389 mobile] Sat, 17 Aug 2019 at 2:43pm via email**

Thank you, Tony. As the team's Basecamp administrator, I confirm that I have reviewed, understand the request, and will follow it, of course (being outside of the state, I do not know John Weider, have no reason to ever speak to him, and will not).

**Anna Louise Jeno**
**Litigation Technology Specialist**
**Capital Resource Counsel Project**
**Hosted by the Federal Public Defender for the District of Oregon**
101 SW Main Street, Suite 1700

**DX 21-1**

Portland, Oregon 97204-3225
**503.715.7389 mobile**
anna.jeno@crcproject.org

This e-mail is meant for only the intended recipient, and may be a communication privileged by law. If you received this e-mail in error, any review, use, dissemination, distribution, or copying of this e-mail is strictly prohibited – please notify us immediately of the error and please delete this message from your system. Thank you.

---



**David Ruhnke Sat, 17 Aug 2019 at 3:05pm via email**

Who is he? Sorry if I missed that. David R.

RUHNKE & BARRETT
ATTORNEYS AT LAW

Montclair, NJ Office New York City Office
Ruhnke & Barrett Ruhnke & Barrett
47 Park Street 29 Broadway, Suite 1412
Montclair, NJ 07042 New York, NY 10006
Tel: 973-744-1000 Tel: 212-608-7949
Fax: 973-746-1490 Fax: 973-746-1490

David Ruhnke's cellphone: 201-321-8718
David Ruhnke's email: dr@ruhnkeandbarrett.com

Please note that this communication is from a law firm and should be considered privileged and confidential. If you received this in error, kindly delete and do not distribute further. We would also appreciate an email back noting our message went astray. Thank you.

---

---



**Bruce Barket Sat, 17 Aug 2019 at 3:40pm**

David,

John Weider is a good friend of Nick who is a lawyer. They have known each other since high school. He has done transnational work for Nick over the years, including during the period of his incarceration. He visits Nick regularly.



**David Ruhnke Sat, 17 Aug 2019 at 4:01pm via email**

Thanks. Knew there was someone like that in the mix; did not have the name.

---

---



**Emma Greenwood Sat, 17 Aug 2019 at 4:53pm via email**

Thank you, Tony. On behalf of my team providing litigation support in this matter, I have reviewed and understand this request. We've had no contact with Mr. Weider. My team (comprised of one lawyer besides myself, and two non lawyers) is advised to alert me if he contacts our office so that I may let you know immediately.

**DX 21-2**

Case 7:16-cr-00832-KMK   Document 641-1   Filed 07/02/26   Page 68 of 404

DX 21-3

# The Court Has Appointed Curcio Counsel

From: Tony Ricco
Date: Wed, 21 Aug 2019 at 6:58am

As expected, and in compliance with the longstanding law in the Second Circuit, late yesterday afternoon, Judge Karas appointed *Curcio* Counsel in this case.

Judge Karas has appointed **Bobbi Sternheim**, an attorney with four decades of criminal practice under her belt, a recognized leader in the local and national criminal defense Bar who has considerable federal death penalty experience.

**The protocol taking place later this morning is as follows**:

1.    Bobbi Sternheim is expected to arrive around 10:45 am to 11:00 am.   Bobbi Sternheim will then be debriefed by the defense attorneys - either individually or as a group or both.  I have been advised that this option is available because two separate letters were filed on this basic issue (extremely rare).   Since Bobbi Sternheim is appointed as *Curcio* Counsel, all statements are protected by confidentiality.  Bobbi Sternheim will be provided with the Index and copy of the relevant newspaper articles.  After debriefing by defense counsel on the facts which provide the basis of a *possible* conflict, Bobbi Sternheim will then proceed to interview Nicolas Tartaglione but outside the presence of all other counsel.

2.    Bobbi Sternheim will interview Nicholas Tartaglione.  After the interview, Bobbi Sternheim will then make her own recommendation of whether the possible conflict can be waived.   If so, Bobbi Sternheim will
likely get a determination of whether Nicholas Tartaglione is willing waive.   Bobbi Sternheim will make her recommendation to the court.

3.    The decision, however, of whether there is a potential conflict or an actual non-waivable conflict, is a decision ultimately made by the court.

**Additional Concerns**:   Until my conversation on Sunday, most of us were operating under the impression that the remarks to the press that disclosed information gained from interviews with Nicholas Tartaglione were simply "*inadvertent.*"  However, we were instructed on Sunday by counsel that the comments were **not** "*inadvertent*."   This concerns me, particularly given the email circulated to the Team yesterday about approaching DOJ.   The combination of the two concepts is extremely problematic for all the fairly obvious reasons.  And, will naturally impact Bobbi Sternheim's decision and recommendation to the court.

I plan to arrive in court around 10:45 am, and will await the arrival of others before debriefing Bobbi Sternheim.  If you are not attending this morning, please notify, so that we are not left waiting.

**DX 22-1**

Case 7:16-cr-00832-KMK Document 641-1 Filed 07/02/26 Page 70 of 404

**Tartaglione (SD NY) Team Lang & Kaboski, LLP**

# Government Letter To Court on Future Place of Confinement

From: Tony Ricco
Date: Sat, 24 Aug 2019 at 9:34am

---

**Future Confinement**:  An opinion (and only an opinion)

If there is a penalty phase in this case, it is to Nicholas Tartaglione's advantage to present evidence and argue that he can make a positive prison adjustment without being a future danger to prison staff and/or inmates.    When the defense raises these issues, the government always pushes back.  The government focuses upon the detainees history of following institutional rules; history of infractions an any negative interaction with BOP staff, civil employees or other detainees.   Therefore, the government's letter should, at least (not only) be analyzed (dissected) from that standpoint.   How can his next housing assignment provide the basis for advancing positive arguments for the penalty phase?  What are the risks and benefits?

The Government's Letter:

So, let's look at what is being said about those issues (prison adjustment and/or future danger) in the government's letter?   Is there a BOP assessment that he can be housed "safely" somewhere?   If so, if Nicholas Tartaglione is in that "safe" environment and
makes a relatively positive transition, does that fact help us advance an argument that a positive adjustment can be made (even after he has some minor disciplinary infractions)?

Naturally, there are risks going both ways.

Conclusion:

The purpose of expressing this opinion is not to corner the subject, to limit anyone else's thinking, or any other negative.  It is simply to ask folks to think about this moment in time from the perspective of how we can use the information and statements of fact contained in the government's proposal, along with Nicholas Tartaglione next place to confinement to advance positive arguments during the penalty phase development.

Keep in mind, however, the that whether Nicholas Tartaglione stays at the MCC or is transferred to the MDC we will be using our skillset and experiences to develop prison adjustment mitigation - one way or the other.

**Miscellaneous Factors:**

There are way too many other factors to get into for discussion (access by family, counsel, etc.)  However, the one factor that I will share is simple and paramount  -  the best interest of preserving the positive mindset of Nicholas Tartaglione.

Other than detainees who intentionally seek to be in SHU for safety/protective purposes, in the my entire career I have witnessed the deteriorating impact on the mindset of detainees from prolonged housing in the SHU.   Every single detainee has suffered and wanted out of the restrictive conditions of confinement in the SHU.

Therefore, on this issue it makes sense to find out where Nicholas Tartaglione says he prefers to go.    I am not voicing an opinion one way or the other.   However, whichever decision is made - as stated above, we will work hard to develop a mitigator around his ability to make a positive adjustment to prison, to follow and obey institutional rules, and not be a danger to BOP staff and other detainees.

**DX 23-1**

That's it for me on this issue of future confinement.

 **Bruce Barket Sun, 25 Aug 2019 at 12:12pm**

The letter by the Gov. essentially presents Nick with a Hobson's choice: stay where the conditions are horrible with a hope that they will improve; or move to MDC and live in SHU through trial. Neither option in acceptable. I will be drafting a response later today/tonight. BTW, the ridiculous proposition that Nick won't be safe at MDC in general population because he "may cooperate" against MCC guards but can stay at MCC in general population reveals as clearly as anything the insincerity of the offer.

**DX 23-2**

# Dynamic Prison Adjustment/Future Danger Presentation

From: Tony Ricco
Date: Sun, 25 Aug 2019 at 11:12am

---

To date, we have been discussing in general terms ideas about issues for the presentation of prison adjustment/future danger.  Recent events and revelations have adversely impacted our efforts, and has made the presentation of such evidence in this case particularly challenging.  However, in like all capital cases, we will move forward with the development of several ideas (works in progress) to present a compelling case that Nicholas Tartaglione can make a positive adjustment of prison, if convicted, and that he can follow institutional rules, and not pose a threat of danger other inmates and BOP staff.

Thus far, Ken Montgomery and John Diaz have expressed an interest in developing this aspect of the mitigation presentation in our case.   Ken Montgomery is Jamaica vacationing with his family.   He expected to return, God willing, next weekend.   During the first week of September, Bruce K and I are planning to help them coordinate their thoughts and ideas - which thus far are very dynamic.

**Note**:  (Not To Be Overlooked)

Participation in development of these concepts to be presented at the penalty phase of this case is attorney and/or team members who has an interest.  For any members of the team with no prior penalty phase experience on the above issues take a look at the following authorities:
*Jurek v. Texas*, 428 U.S. 262 (1976); *Skipper v. South Carolina*, 476 U.S. 1 (1976); *Johnson v. Texas*, 509 U.S. 350 (1993); *Barefoot v. Estelle*, 463 U.S. 880 (1976).
In addition, to effectively and knowledgeably argue that Nicholas Tartaglione can make a positive adjustment of prison and follow the BOP rules and regulations, for those who have not done so, take a look those regulations.
As stated above, this conference call will be scheduled for the first week in September,upon Ken Montgomery's return.   This looks like it will be a very interesting and challenging project.



**Bruce Barket Sun, 25 Aug 2019 at 12:07pm**

Count me in on this.  Just let me know when.



**Tanya Greene Mon, 26 Aug 2019 at 11:03am**

I'd like to join this call.

**DX 24-1**

Case 7:16-cr-00832-KMK Document 641-1 Filed 07/02/26 Page 73 of 404

**Tartaglione (SD NY) Team Lang & Kaboski, LLP**

---

# Prison Classification, Adjustment, Future Dangerousness

From: Tony Ricco
Date: Fri, 6 Sep 2019 at 6:58am

---

Prison Classification, Prison Adjustment and Future Dangerousness remain critical factors to develop for any capital defendant with Nicholas Tartaglione's history and background.

Recent events related to the conduct of counsel has severely challenged not only the ability to present this important information to a penalty phase jury but also which members of the defense team would the court permit to conduct such an examination and present arguments on these issues.

With a careful and methodical approach, there is the possibility that we can salvage these important mitigators and effectively present information on Prison Classification, Prison Adjustment and Future Dangerousness at the penalty at the penalty phase.   However, before we can move forward with those emerging and evolving ideas, we will have to await the court's decision on the pending *Curcio* issue.

In the interim, however, all counsel who have expressed an interest in participating in the development of Prison Classification, Prison Adjustment and Future Dangerousness, should familiarize themselves, if they have not already done so, with the Department of Justice's publication entitled: "Legal Resource Guide to the Federal Bureau of Prisons (2019)"; and also, Title, 28 Code of Federal Regulations (CFR), Chapter V - Bureau of Prisons, Department of Justice.   These documents set forth the basic rules and regulations that provide the foundation for the presentment of evidence concerning the conditions of confinement and prison adjustment.  Experts and other witnesses provide dynamic testimony, but familiarity with these documents will help provide you with the baseline knowledge upon which to pose questions and make persuasive arguments before the jury in the penalty phase.

 legal Research Guide To The BOP.pdf
525 KB

**DX 25-1**

# Daily News Article

From: Tony Ricco
Date: Sat, 14 Sep 2019 at 10:20am

I have had an opportunity to review the recent Daily News article, and have a opinion, for the benefit of our entire Team, about (1) the impact of the published letter has on the *Curcio* inquiry presently before the court, and (2) the impact of that letter on the preparation for the penalty phase in this case.

## Nicholas Tartaglione's Assertion Attorney/Client Privilege

The *Curcio* inquiry in this case is complicated and appears to become more vexing, more troubling with each passing week.  A part of the problem here is that some of the issues related to the need for the appointment of *Curcio* counsel is grounded statements ordinarily protected by attorney client privilege.  Any *Curcio* counsel would have difficulty presenting the conflicts issues, because most if not all matters are either directly or indirectly the subject of the attorney client privilege, and the concomitant obligation to resolve such issues without doing unnecessary violence to Nicholas Tartaglione's right to confidentiality.

However, Nicholas Tartaglione's decision to make public his relationship with Jeffrey Epstein, (which mirrors the proliferation of similar public statements made by his counsel as reported in the media on July 24 and 25, 2019 (Daily Mall); July 24, 2019 (News 4 television counsel in person interview and NBC News article on line); July 25, 2019 (New York Post); July 26, 2019 (Daily News); July 26, 2019 (Fox5 News televised interview via telephone); July 26, 2019 (NY Post);August 5, 2019 (Yonkers Times); August 13, 2019 (NBC News on-line); August 14, 2019 (NY Post); August 19, 2019 (Daily Beast)), shall foreclose any assertion that his discussion (and actions taken) with counsel on matters related to his relationship and interaction with Jeffrey Epstein and the investigation of the suicide and suicide attempt are protected by privilege.

The timing of Nicholas Tartaglione's letter as published in the Daily News, along with the timing of many of the post *Curcio* appointment letters, disclosures and/or revelations, will undoubtedly be the subject of the court's inquiry about (1) the request for the discharge of Learned Counsel and (2) the *Curcio* inquiry and court's ultimate findings.

As a result, on the issue of Nicholas Tartaglione relationship with
Jeffrey Epstein and the similar statements made by counsel in the press, the Team should be prepared for a finding that the attorney/client privilege has been waived by Nicholas
Tartaglione's public disclosure of the letter to the Daily News.  And, therefore, to the extent that there is any conflict issue on with the attorney statements concerning his relationship with Jeffrey Epstein, the good news is that they perhaps can be waved.

In relation to counsel's statements made concerning Nicholas Tartaglione's reporting of events of his knowledge about the events of the attempted suicide, the suicide and the offering him as witness, along with the recent revelations of the role of counsel on evidence and information subject to that Epstein investigation, even if waivable (and I doubt that they are), are far more problematic and penetrating, and shall impact, *inter alia*, our preparation for penalty phase evidence on prison adjustment and future dangerousness.

Back on July 26, 2019, David Ruhnke on a basecamp post an example of the type of argument that the prosecution presents to implicate counsel on issues of prison adjustment and future dangerous. David Ruhnke's admonition and sound advice, simply was not followed.  And, now we are confronted with two serious problems with counsel in developing and ultimately presenting this important mitigator.

## Penalty Phase Development

It is clear that the press disclosures, an actions taken by counsel and Nicholas Tartaglione will have a challenging impact the presentment of Prison Adjustment and Future Dangerous evidence at the

**DX 26-1**

penalty phase (as either affirmative proof by the defense, and/or as rebuttal by the government).   Notwithstanding these difficulties, the team has and

shall continue prepare for the presentment of prison adjustment evidence at the penalty phase and/or to defend in rebuttal.  I remain confident that we will get in done.

In anticipation of these issues, our September 13, 2019 request for a Bill of Particulars and/or Informational Outline included a request for a narrative and/or BOP documentation of Nicholas Tartaglione's institutional disciplinary records, *inter alia*.  Depending upon the response by the government, these issues will be subject of future motion practice (motion to compel and/or motion *in limnine*).

In addition to preparation for litigation, there have been ongoing discussions of the development of the prison adjustment/future dangerousness mitigators by the attorneys who have *thus far* agreed to develop these issues for presentation at the penalty phase.

FYI, for the recent team members, back on January 16, 2017, a memorandum was circulated to the entire Team on how *future dangerousness* is litigated in the context of pre-trial conditions of confinement.   This long ago, and apparently forgotten memoranda will help all team members assess the issues and provide the frame work for future discussions.  (See, attached Team Memorandum)

In this case the presentation will be challenging because of counsel's direct involvement (alleged text messages on a contraband phone, and the recent revelations about removal of the so-called Esptein note from the MCC) with Nicholas Tartaglione's adherence to follow institutional rules, the specific manner in which we ultimately present prison adjustment evidence, in this case, will be influenced by the outcome of litigation around the text messages with counsel, and also how the court ultimately resolves the pending *Curcio* inquiry on issues related to the Epstein attempted suicide and investigation.  In the meantime, however, designated counsel and our experts on prison adjustment and future dangerousness (Tom Reidy, Jon Sorensen, Mark Bezy) are moving forward with alternative theories for the development and presentment of evidence of these critical issues at the penalty phase.

Finally, this recent Daily News article and similar articles demonstrates the danger that counsel and Resource Counsel long ago warned against.  The enormity of what has occurred here, is exactly what happens when capital defenses are played out in the press.  Why?  Experience has shown that as counsel, we have no editorial control of the end product, as demonstrated by the article recently published in the Daily News, nor how such statements will impact future unanticipated events.

As been said repeatedly, everyone should just stay away from the press and encourage Nicholas Tartaglione against engaging in such activity, which will only be used against him - perhaps in both the guilt and penalty phase.

  [Future Dangerousness In House Memo.pdf](Future Dangerousness In House Memo.pdf)
82.8 KB

---

**Bruce Barket Sat, 14 Sep 2019 at 3:24pm**

First, Nick's letter did not discuss at all any conversations he had with counsel.  The privilege is not waived by Nick writing about a topic that he separately discussed with his lawyer.  He is permitted to talk to others about a topic and still maintain his right to have privileged discussions with his lawyer on the same topic.   He has NOT waived the privilege as to conversations he has had with counsel related to the Epstein matter because he wrote about that topic in a letter to the press. As his lawyers, we should be prepared to fight any attempt to pierce the privilege on such spurious grounds.

Second, there was nothing improper about the "Epstein Note" being given to counsel to be authenticated and preserved.  If someone has a cite or a rule to the contrary, please share it. Otherwise, let's stop assuming as fact that this is "clearly" improper, and move on.

Third, there is no actual or even potential conflict that has been articulated here, except as based on factual and legal assumptions that are inaccurate and unsupported; thus there is no conflict, and certainly no non-waivable conflict.

Fourth, while I don't agree with Nick's recent letter writing campaign, I do understand it.  He is frustrated and angry with what he has seen.   My advice to him has been devalued as talk of my disqualification has increased.  So I, for one, am not shocked that he is

**DX 26-2**

now acting on his own.  This, unfortunately, is a by-product of this counterproductive atmosphere of co-counsel accusing other co-counsel of unethical – or even illegal – conduct and expending significant time and resources to try to vindicate their own strategic positions, rather than working together on the substantive issues in Nick's defense, which have received far less attention as a result of this distraction.

Fifth, it is unfortunate that some have such a negative attitude about the press coverage of Nick's role in saving Epstein's life, and of my attempting to highlight the awful conditions at MCC in furtherance of the goals of gaining for our client humane conditions, regular contact with his family, and access to his legal team.  These goals, while subsidiary to the penalty phase, are of paramount importance to Nick and his day-to-day existence.  And, I would note, they are not at all incompatible or harmful to our mitigation goals.  At bottom, MCC put Epstein in the same cell with Nick because they knew that Epstein would be safe there -- and he was. Nick saved the man's life.  Once Epstein was in another cell, he killed himself.  The action of placing Epstein with Nick speaks much louder than any talk of how he is a problem inmate. That Nick saved his life once is also a very good thing.

That Nick, through his lawyer, has helped shine a light on the conditions at MCC is also positive.  He is trying to make things better for himself and for other inmates.  We have been complaining loudly about the conditions of the facility and the conduct of the staff for years.  We were right, and recent events, as tragic as they are, have vindicated our position.  Finally the DOJ is looking at these issues, albeit because a man died, and finally MCC is taking steps to address the conditions we have been complaining about.  Things there may improve somewhat for everyone thanks in part to Nick's refusal to accept deplorable as acceptable.

Lastly, no one has "offered" Nick as a witness.  Everyone knows he is a witness because he was there.  If they want to kill Nick more than they want a complete investigation then there is nothing for us to do.  But there is a chance they will want the information he has.  We would not be doing our job if we ignored that possibility

I have spoken to almost every cellmate Nick has had.  They all speak very highly of Nick. His record inside is not perfect, but there is plenty to use to his advantage.  We have a great deal to work with on the factor of Nick's positive prison adjustment.  The doom-and-gloom sentiment is just not something I share.

**DX 26-3**

**Tartaglione (SD NY) Team Lang & Kaboski, LLP**

# Status conference tomorrow (9/17)

From: David Ruhnke
Date: Mon, 16 Sep 2019 at 11:54am

I have it on for 11am tomorrow. That correct? David R.



**Bruce Barket Mon, 16 Sep 2019 at 11:57am**

yes, but the judge has asked to be there at 10:30, presumably to discuss the status of the the Curcio inquiry and Nick's letters to the court regarding Tony's role. (BTW, he tells me he wrote a 3rd letter on the same subject)



**David Ruhnke Mon, 16 Sep 2019 at 11:59am via email**

OK. Will be there no later than 10:30. Thanks.

_____



**Michael K. Bachrach Mon, 16 Sep 2019 at 1:00pm**

Bruce, Did Nick show you his latest letter or describe to you it's contents? Is there anything in it that is different from what he wrote in his two prior letters?



**Bruce Barket Mon, 16 Sep 2019 at 1:25pm**

He sent it last week. Again, as I have been saying about all of his recent writings, Nick did not show it to me before he sent it, tell me he was going to send it before he sent it nor ask for my input as to what he should write. He wrote, sent it and told me about it today.

**DX 27-1**

**Tartaglione (SD NY) Team Lang & Kaboski, LLP**

# The Wisdom of Saving a Life - The Penalty Phase Development

From: Tony Ricco
Date: Wed, 23 Oct 2019 at 5:45am

The inspiring aspect of capital work is found in the great effort of applying your skill set to save a life.   Developing a capital defense case is the ultimate challenge because the stakes are so high. Often times, we find ourselves deeply involved in helping a distraught and sometimes bitter defendant understand and appreciate the value to saving his or her life.  The obligation to develop and present mitigation is embodied in the ABA Standards which require the investigation and develop of mitigation, even where the defendant has expressed his or her opposition to such action being taken.  ABA Guideline 10.7(b).

Our goal is too never give in to fear and indifference but to always to conduct ourselves with the high professional standards of ethics and professionalism that the Supreme Court has held is the hallmark of effective capital representation.   Notwithstanding many distractions, there are several mitigation factors that have been identified by our team to be developed, and hopefully presented of behalf of Nicholas Tartaglione in the event that his case advances to a penalty phase - on the conviction on one or more of the death authorized counts.

The mitigation factors previously identified by the team for development but which have been placed in jeopardy or are problematic as a result of the decision(s) and/or conduct of one or more counsel in this case are (1) positive prison adjustment and (2) other culpable participants not facing the death penalty.

**Positive Prison Adjustment**
Under *Skipper v. South Carolina,* 476 U.S. 1 (1986), a capital defendant is entitled to put before the jury evidence of his positive adjustment to prison and his lack of future danger.   Based upon his background, history and strong family ties, Nicholas Tartaglione is capable of making a positive adjustment in prison.   There have been several events that have placed in jeopardy our ability to develop and effectively present evidence of a positive prison adjustment.  Those events have been (1) the attempt to pay money to influence the testimony of Marcos (which resulted in the discharge of attorney Mark De Marco as a result of a conflict of interest); (2) the possession of a contraband cell phone, and communicating with lawyers via text messages on a contraband cell phone; and (3) the removal of the so-called Epstein note from the M.C.C. with the participation of  one or more counsel. Notwithstanding these unfortunate events, and contrary to the remarks made by at least one attorney before court on September 17, 2019, the team has never given up or abandoned our intention to develop and present this important mitigating factor.   See, *Basecamp* posts of August 9, 10, 15 and 25; September 6 and 14, 2019.   To the contrary, we are (1) actively investigating a new and creative approach to presenting prison adjustment evidence and are (2) awaiting the conclusion of various government investigations into the attempted suicide and suicide of Jeffrey Epstein to further assist in the development of the prison adjustment mitigator.

Overall we are actively developing a narrative for the presentment of prison adjustment evidence, notwithstanding the conduct of counsel and the defendant in episodes that have placed such a presentation in jeopardy.  John Diaz and Kenneth Montgomery and other members of the team are conducting an investigation to present prison adjustment in an innovative *conflict free* manner.

In addition, as discussed among conflict free counsel, the effective presentation of this mitigator will be substantially influenced by the result of the *Curcio* counsel.   Either way, it will take hard work but we will get it done, and in a timely manner.

To this end, can John and Ken give me a call to discuss an update.

**Participants In the Commission of the Offense Not Facing Capital Punishment**
This mitigation factor is derived from the statutory mitigator of equally culpable defendants not facing the death penalty (18 USC 3592(a)(4), but is conceptually different.  The ground work for the presentation of such evidence at the penalty phase often takes place *via* a well developed and comprehensive defense advanced during the liability phase.   However, based upon the choice by

**DX 28-1**

counsel for the presentment of the defense during the liability phase, the development of the "*other participants not facing the death penalty*" mitigator for the presentment at the penalty phase is problematic and its development in its infancy stage. The ability to present evidence of this mitigator will be informed and directed by the ultimate defense and manner in which counsel decides to present Nicholas Tartaglione's defense at the liability phase. Therefore, this mitigatory, if presented, is extremely problematic and will take a special approach that is continent upon many factors; such as, the outcome of our motion to limit aggravating evidence, a review of 3500 materials, the completion of the liability phase defense investigation and the skill set of the counsel during the liability phase, *inter alia*. It is also clear that the resolution of the *Curcio* inquiry will influence the develop for presentment of this mitigator.

**Other Factors in the Defendant's Background, Record, or Character that Mitigate Against Imposition of the Death Penalty**

Since the earliest stages of this case, the development of mitigation evidence in this case has been problematic, challenging. Notwithstanding many distractions, and the reluctance of Nicholas Tartaglione and family to participate, our mitigation specialists have done an outstanding job in identifying several mitigation factors for presentment at the penalty phase. Over the past two weeks, I have had the occasion to have extensive discussions with both our mitigation specialists. The purpose of these discussions was also to maintain a "*real time*" assessment of our needs as we progress towards trial. It is clear, however, that a great deal of work is required and that both mitigation specialist need to *reset* the approach to obtain fundamental mitigation evidence related to the background and character of Nicholas Tartaglione. In addition, the discussions with our mitigation specialists have included an assessment of the influence of the *Curcio* inquiry on the ability to obtain and develop fundamental background and character mitigation evidence.

Overall it is great to see that the team is moving forward towards its goals and has not permitted the *Curcio* inquiry or the comments of counsel subject to the *Curcio* inquiry deter the commitment and professionalism that is required for the effective representation of a death authorized defendant. In remaining focused and determined we will continue to provide the high level of professionalism required for representation of Nicholas Tartaglione, a man who is at risk of the imposition of the death sentence.



**David Ruhnke Wed, 23 Oct 2019 at 8:54am via email**

One exercise that other teams (and me in my cases) have found useful is to create a working and evolving draft of a penalty-phase verdict sheet stating the mitigating factors presented as they would be on a real verdict sheet. Would be glad to draft that and circulate if team believes it would be of value.

David R., Resource Counsel

_____



**Bruce Barket Wed, 23 Oct 2019 at 4:29pm**

I think it may be worth rereading McCoy. Nick, not anyone of us, sets the objectives for his defense. He has made his objective quite clear. We are not free to ignore that objective and claim effectiveness by trying to achieve a different goal.

That said, he is not opposed to developing a mitigation case so long as it does not detract from his objective to be acquitted. I am not sure why the false narrative that he is opposed to developing mitigation is repeated. If the team wants anything or needs any assistance from Nick or his family or friends and finds a roadblock or resistance, please reach out to me or Aida. We will make sure whatever work needs to be done is done.

As for the prison adjustment and the other participant mitigation , I would suggest that the statements above are a product of the cloud of the Curcio inquiry rather than clear and creative thinking to develop a defense. The cell phone and the Epstein episode help, don't hurt, our mitigation case.

**DX 28-2**

Case 7:16-cr-00832-KMK   Document 641-1   Filed 07/02/26   Page 80 of 404

Lastly, we can use help on the liability defense. Look at the basecamp posts requesting help and let us know who is willing to work towards Nick's objective.



**Michael K. Bachrach Wed, 23 Oct 2019 at 4:39pm**

Re-read McCoy, it has it's limits.  And if you think "the cell phone and the Epstein epidode help, don't hurt, our mitigation case," then I am greatly concerned about your understanding of the mitigation case and your definition of what mitigation is in general. That said, I am confident we will be able to turn those aggravating facts into mitigation if given the opportunity.



**Tanya Greene Wed, 23 Oct 2019 at 4:44pm via email**

For those who haven't seen this re the McCoy decision—attached

_____Tanya Greene, Capital Resource Counsel Project

Capital Resource Counsel and Director of Training

(718) 407-7426 office(718) 855-0760 fax(917) 635-0941

mobileTanya_Greene@fd.orgmailing address:Federal Defenders of New York

One Pierrepont Plaza, 16th floor

Brooklyn, NY   11201

On Wednesday, October 23, 2019, 04:29:35 PM EDT, Bruce Barket <notifications@rubensteinlaw.basecamphq.com> wrote:

|

 Maher McCoy op-ed 2018.pdf
78.8 KB



**Aida Leisenring Wed, 23 Oct 2019 at 4:56pm**

Insofar as Nick was using the cell phone to call his mother, father, wife, brother, friends and maintain intimate bonds with the people he loves and not for illegal objectives such as coordinating drug deals and intimidating witnesses, the illegality of the use of the phone can be spun to demonstrate the importance of relationships with loved ones to Nick and that Nick's family and friends value him. To the extent that Epstein was placed in a cell with Nick because guards knew he would not pose a physical threat to him, that fact (if provable) can also help to demonstrate that Nick is not known to be an aggressor, physically, within the facility. In fact, he has been a target and physically victimized in the past. I assume that the attack on Nick by the government for having a cell phone is what Michael is referring to, and I assume the counter-narrative is what Bruce is referring to....and what Michael is "confident" about spinning...In other words, there is no such thing as a bad fact for mitigation (a learned man once said) ;)



**Bruce Barket Wed, 23 Oct 2019 at 5:56pm**

Brilliant, Tanya. Thanks for weighing in. Exactly right on all counts.



**Bruce Barket Wed, 23 Oct 2019 at 6:03pm**

Sorry. Thought Aida's post was Tanya's. Still good thoughts.



**Melissa Lang Wed, 23 Oct 2019 at 10:31pm**

Just to go back to David Ruhnke's earlier post, which is a good suggestion, everyone probably recalls that we have sent some drafts of mitigating factors/verdict sheets around. Beth and I put together a chart of the mitigating factors and what records or people can support or prove each factor this summer in preparation for Santa Clara. I

**DX 28-3**

just realized those things are not on box, I apologize. If you get box alerts you'll notice I just uploaded those documents to box in a folder called Mitigating Factors (Drafts) which is in the Master Document folder, and a link is here: https://app.box.com/s/l0p1imn1m8j13npe2ycwpci0xl2x9djf ;

Also in the Master Document folder I uploaded two other working documents that we had sent to the group prior to Santa Clara, a rough outline of life history events and a social history chronology. These are both working drafts. As is the mitigating factors chart, obviously.
Here is a link to the master documents
folder: https://app.box.com/s/o5l9d5uci0ok46l7hxqbi4bff0e3u6z5 ;

---



**Bruce Barket Thu, 24 Oct 2019 at 5:40am**

Thanks, Melissa but neither link worked



**Beth Cahill Thu, 24 Oct 2019 at 6:28am via email**

Bruce,

At the beginning of this case, you received an invite to join our Box.com account where Melissa and I have been storing all mitigation files. I double checked the folder membership (see attached) and it doesn't look like you have joined the folder? I'll resend the invite and once you join, the links will work. If it doesn't, just let me know and I can walk you through it.

Thanks,
Beth

**DX 28-4**

Case 7:16-cr-00832-KMK   Document 641-1   Filed 07/02/26   Page 82 of 404

**Tartaglione (SD NY) Team Lang & Kaboski, LLP**

# Development of Defense In Relation To The Seized Contraband Cellular Phone

From: Tony Ricco
Date: Fri, 1 Nov 2019 at 7:47am

---

Everyone is aware that a contraband cellular phone was seized from Nicholas Tartaglione at the MCC. During our July 22, 2019 court conference, several statements were made on the record in relation to both the possession and usage of the contraband cellular. (The Transcript is available in Dropbox) Based upon the statements made on record, there are several problematic issues related to our development of *Skipper* evidence.

There are several telephones that have had contact with the contraband cellular phone seized from Nicholas Tartaglione at the M.C.C. We are in the process of developing a narrative for the prison adjustment mitigator at the penalty phase. The narrative includes the possession and use of the contraband cellular phone. As part of that process, we need to get a truthful account of the contacts between the contraband phone and the telephone numbers which appear on the phone log.
Based upon comments made on the record before Judge Karas on July 22, 2019 by counsel concerning the contraband celluar phone, there may (may) be counsel conflicts or other problems in relation to the Nicholas Tartaglione's possession and usage of telephone.
We need to approach this subject cautiously. I would like to first discuss this matter with Jim Dowd, whose telephone number has had contact with the Contraband cellular phone. So, Jim can you give me a call at some point today. Also, if there was an exchange of text messages, we need to get screen shots of those texts. Talk with you later.

 **Michael K. Bachrach Fri, 1 Nov 2019 at 12:14pm**

On this issue, yesterday the Government provided us with a BOP memo listing telephone numbers that were found by SIS in the history log of the seized contraband cellphone. That list, as written in the BOP memo, is as follows:



914-969-6747
Chris ▮▮▮▮▮▮
Kym ▮▮▮▮▮▮
Weider ▮▮▮▮▮▮
Tracy ▮▮▮▮▮
M. Grry ▮▮▮▮▮▮
914-685-5894
Rich ▮▮▮▮▮
914-806-5681
Marina ▮▮▮▮▮▮
Barb ▮▮▮▮
Jim ▮▮▮▮
Ken ▮▮▮▮
Patty ▮▮▮
Pauly ▮▮▮
Ron ▮▮▮
Tim ▮▮▮

A couple of these names and/or numbers I recognize. For example, I assume "Weider" is John Wieder, and I know the number listed for "Jim" belongs to Jim Dowd.

If anyone knows who the other numbers belong to, please let me know. I'm going to try to identity each of these numbers, but if someone already knows please speak up as that would save me time and be greatly appreciated.

**DX 29-1**

Obviously, we may want to interview some or all of these people in conjunction with our mitigation investigation, but before doing so we need to discuss who everyone is and evaluate their connection and usefulness to Nick's penalty phase defense.

Thanks.

--Michael



**Melissa Lang Fri, 1 Nov 2019 at 12:59pm**

Tim Webb, it is a childhood friend from the neighborhood, who also knew Tommy Potonovic.



**Tony Ricco Fri, 1 Nov 2019 at 1:48pm**

Jim Dowd, give me a call please on this contraband cellular phone issue.



**Jim Dowd Sat, 2 Nov 2019 at 6:49am via email**

Are you up yet??

Sent from my iPhone

>



**Jim Dowd Sat, 2 Nov 2019 at 7:46am via email**

Call me when you get up. Or call me after 8:30 I'm going for a run

Sent from my iPhone

>



**Tony Ricco Sat, 2 Nov 2019 at 8:22am**

Will do.



**Jim Dowd Sat, 2 Nov 2019 at 2:05pm**

The only number I recognize other than mine is Pat Brosnan. Pat is a retired Detective that has known Nick for many years and used to see him at the gym quite often. Pat was also a good friend of Gerard Benderoth, and someone I intend to meet at some point to get as much info about Benderoth as I can.
The text's that Nick sent to me were understood to be his authorized BOP text's, not from a contraband phone. There was no phone calls from Nick and obviously no phone calls from me. Screenshots to be sent to Michael.



**Michael K. Bachrach Sat, 2 Nov 2019 at 2:37pm**

Jim,

Thanks. That's helpful.

Just to make sure we're on the same page, which number do you recognize to be Pat Brosnan's?
—Michael

**DX 29-2**

Case 7:16-cr-00832-KMK   Document 641-1   Filed 07/02/26   Page 84 of 404



**Jim Dowd Sat, 2 Nov 2019 at 4:52pm**

Patty - 914-255-5331



**Bruce Barket Sun, 3 Nov 2019 at 10:18am**

I saw Nick yesterday. All the numbers are family or close friends. He was staying in touch with people he loves and who love him.



**Michael K. Bachrach Sun, 3 Nov 2019 at 10:57am**

Thanks. I assumed as much. Could you let me know which friend or family member goes with each number?

**DX 29-3**

Case 7:16-cr-00832-KMK Document 641-1 Filed 07/02/26 Page 85 of 404

**Tartaglione (SD NY) Team Lang & Kaboski, LLP**

# Important Information Requested in Connection with Contraband Cellular Phone

From: Tony Ricco
Date: Sat, 2 Nov 2019 at 8:18am

Pursuant to our responsibility as capital counsel, we are identifying evidence relevant to the penalty phase - to be presented as part of a defense mitigation narrative (*Skipper*) or in rebuttal to government proofs.   Part of the development of our *Skipper* evidence has been to address: (1) the possession, and (2) the usage of the contraband cellular phone which was seized by BOP officials from Nicholas Tartaglione which was discussed with Judge Karas during the court conference on July 22, 2019.   See also, Basecamp post of July 3, 2019, September 14, 2019 and October 23, 2019.   As previously stated, this is a problematic issue, that can be addressed with careful planning and preparation.

In order to properly develop this evidence, we have requested from team members any information that they possess in relation to the numbers posted in the Basecamp post of November 1, 2019.   The response thus far has been lacking and has not helped that effort along.   During the court proceeding before Judge Karas on July 22, 2019, there was a substantial colloquy between the court and attorney Barket.  During that colloquy, attorney Barket stated to the court, (at page 15, line 14 to 19) that, upon information and belief, there were text messages between the seized contraband cellular phone and members of the defense team.
Therefore we need to know, three (3) things from those team members referred to during the July 22, 2019 court conference:

1.   If any of the telephone numbers posted on November 1, 2019 are recognizable to any team member who has not responded yet?
2.   If you (any team member) had any contact (text or actual conversation or incoming dial answered) with the contraband cellular phone, go back, check your call history, retrieve and post the number that contacted your phone?

3.   If you (any team member) have had any actual text message(s) with the contraband cellular phone, take a "screen shot" of all text and forward to Michael Bachrach by email?     Under no circumstances should those text message(s) be deleted, and if previously deleted, please advise.

**DX 30-1**

Case 7:16-cr-00832-KMK Document 641-1 Filed 07/02/26 Page 86 of 404

**Tartaglione (SD NY) Team Lang & Kaboski, LLP**

# Additional Information on The Contraband Cellular Phone Seized From Nicholas Tartaglione

From: Tony Ricco
Date: Sat, 2 Nov 2019 at 10:43am

Our investigation has revealed that a telephone number of the contraband cellular phone that Nicholas Tartaglione used for texting members of the team is (516) 708-5275.   I have the following questions:

1.    For those team members that texted with Nicholas Tartaglione, and/or who had conversations with him via a contraband cellular phone while he was detained in the MCC, can you examine your phone (in coming) to determine whether you had, in fact, texted or communicated via the (516) 708-5275 line?

2.    Did you receive text and/or communicated with Nicholas Tartaglione via a contraband telephone with a different number?  If so, what is that number?

3.    In addition, have any team member received a telephone call and/or a text message via the (516) 708-5275 number from anyone else other than Nicholas Tartaglione (for example, a family member, family friend or other third person))?  In other words, did another person seem to have access to the (516) 708-5275 line?

Your attention to this evolving issue is most appreciated.



**Beth Cahill Sat, 2 Nov 2019 at 10:58am via email**

1. I've never received or sent text messages with Nicholas Tartaglione.

2. No.

3. No.



**Melissa Lang Sat, 2 Nov 2019 at 1:28pm**

I did not correspond with Nick at the above number, and did not receive any texts from him.
I received one text from a friend of his, but I did not respond, and do not have the text any longer, but I'm almost positive it was NOT that same number.
I never received a call from Nick on that number or any other number, or from any friend of Nick's.

**DX 31-1**

**Tartaglione (SD NY) Team Lang & Kaboski, LLP**

# Further Request For Important Information For Prison Adjustment Mitigator

From: Tony Ricco
Date: Wed, 13 Nov 2019 at 8:24am

---

From November 1, 2019 through November 3, 2019, three Basecamp post were addressed to the need for the team to obtain important information related to the contraband cellular phone that was seized from Nicholas Tartaglione, and the subject of an application before the court on July 22, 2019.    Those Basecamp posts request certain critical information and most, but not all, team members promptly replied within hours of the requests and provided the information.   11 days later, we still have not heard from others.

I repeat, as part of our investigation to present Skipper evidence at the penalty phase we need the following information from team members who had text message contact or oral communications with Nicholas Tartaglione via the contraband cellular phone.

Therefore we need to know, three (3) things from those team members referred to during the July 22, 2019 court conference:

1.   If any of the telephone numbers posted on November 1, 2019 are recognizable to any team member who has not responded yet?
2.   If you (any team member) had any contact (text or actual conversation or incoming dial answered) with the contraband cellular phone, go back, check your call history, retrieve and post the number that contacted your phone?

3.   If you (any team member) have had any actual text message(s) with the contraband cellular phone, take a "screen shot" of all text and forward to Michael Bachrach by email?     Under no circumstances should those text message(s) be deleted, and if previously deleted, please advise.

**DX 32-1**

**Tartaglione (SD NY) Team Lang & Kaboski, LLP**

---

# The 2019 Federal Death Penalty Strategy Session - San Diego

From: Tony Ricco
Date: Sat, 16 Nov 2019 at 1:49pm

---

This was another outstanding conference where the high values and principles for successful capital representation were reaffirmed through outstanding presentations.   With each session, we were reminded of our role, and sacrifices required and skill set needed, to prevent the government from executing a capital defendant.

Over the next few weeks we are going to step up our already aggressive focus on preparing for the penalty phase in this case.  A substantial amount of public funds (over a million dollars) have been devoted towards us having the tools to accomplish the goals of this capital team.   The court endorses such an order, when the court is confident that expenditure of those public funds are in the hands of those qualified and competent to dispense those funds.   So, as we proceed towards the commencement of trial, all team members are going to step back and reflect, think about the life narrative of Nicholas Tartaglione and continue on our task of developing all the areas of his penalty phase defense.

Penalty Phase Factors and Issues Related To The Commissions of The Offense

The notion that appointed counsel are not interested or has not devoted themselves to trial phase issues is, as we all know, completely inaccurate.   First, there are several factors that are relevant and material to the government's aggravating proof in the penalty phase (embedded in the liability phase proof) which are related to several factors that we have identified as mitigation to be explored and presented; to wit:

1.   One or more of the individuals who played significant roles in the events leading to the death of the victims will not face the death penalty.

2.    Joseph Biggs intentionally murdered one of the victims by shooting him through the back of the head, but will not face the death penalty.

3.   Joseph Biggs has entered into a plea bargain with the government that allows he and his attorneys to request a sentence of less than lifetime imprisonment.

4.   If Joseph Biggs complies with the government's conditions of cooperation, the government will not oppose his request for a less than life sentence.

5.   Gerard Benderoth orchestrated and participated in the murders of the victims but later killed himself, and will therefore not face the death penalty.

6.    Marcos Cruz, a participant in the drug conspiracy, will not face the death penalty despite the role he played in the death of the four victims.

7.   Jason Sullivan, a participant in the drug conspiracy, will not face the death penalty despite the role he played in the death of the four victims.

8.   The proof regarding Nicholas Tartaglione's role in the four deaths does not rise to a level to justify singling him out for authorization for a sentence of death.

9.   One or more of the victims voluntarily chose to engage in dangerous and illegal activity, a circumstance contributing to their deaths.

Second group of factors that we have identified as being relevant and material to penalty phase are related to the background, and life narrative of Nicholas Tartaglione, including is post arrest conduct (the so-called good, bad and the ugly) while detained in the BOP and his interaction or lack thereof with us (team members), his family (including his wife), friends (including John Weider and others). Those areas have thus far been identified as follows:

**DX 33-1**

1.  If spared a sentence of death, Mr. Tartaglione will be incarcerated for the remainder his life, with no possibility of release, in a secure federal prison.

2.  Nicholas Tartaglione served and protected his community as a police officer.

3.  Because he is a former law enforcement officer, Nicolas Tartaglione will always be at risk of harm from prison inmates.

4.  Nicholas Tartaglione is loved and respected by his family, and his execution would cause others to suffer grief and loss.

5.  Nicholas Tartaglione's life has value and one or more members of the jury may wish to extend mercy to Mr. Tartaglione and/or his family and loved ones.

6.  Executing Nicholas Tartaglione will not ease the suffering of the victims' families.

7.  Nicholas Tartaglione is capable redemption and positive prison adjustment (*Skipper* Evidence)

The above is a tall order of evidence that we must direct our attention to, and will be doing so, over the next few weeks.   Now that Judge Karas has issued his most recent order, I am requesting that all counsel direct there attention towards the development of the foregoing factors, and that we leave all the distractions of the upcoming *Curcio* inquiry to others so impacted and to *Curcio* counsel.  We have far too much work to accomplish, especially if we expect to make even the February 2021 trial date.

John Diaz and Ken Montgomery, can you please prepare a memorandum on an analysis of above factors related to the circumstances of the offense (an evidentiary analysis of the those 9 factors - the good, bad and ugly of what is there and what we need to develop), along with the assistance of Jim Dowd?  Two-three weeks?

Bruce Koffsky and I (along with Melissa and Beth) will prepare a memorandum on an analysis of the above factors related to his background, history and life narrative.   I want everyone to understand that in my view, Nicholas Tartaglione's present behavior, his inability to have an appreciation for the high level of representation he has been afforded *for free*, his negative focus upon individual members of the team, myself included, is part of his mitigation narrative.   That is, Nicholas Tartaglione's need to create these negative false issues is part of his life narrative, they help us to understand who he is, and why a jury s*hould not vote to  execute him*.  We will be developing a comprehensive memorandum which shall include a "conflict free" analysis of his conditions of confinement, as it relates to the development of *Skipper* evidence to be presented at the penalty phase of the case.   Whether such evidence is ever presented is a separate and distinct issue from our professional responsibility as capital counsel to give a good faith, comprehensive analysis of this information for presentation at the penalty phase.

So, team members, let me know whether you can work on the above assignments over the next few weeks.   As usual, these assignments are not exclusive, any team member can get involved and help develop the above issues - *if you can and/or are interested*.

Team members, let me know, where you are on this.  Okay.   Thanks.

 **john diaz Sat, 16 Nov 2019 at 2:05pm via email**

I ll reach out to Kenny and begin working on this next week

Sent from my iPhone

>

**Beth Cahill Sat, 16 Nov 2019 at 2:13pm via email**

**DX 33-2**



We're on it. Thanks, Tony.



**Kenneth Montgomery Sat, 16 Nov 2019 at 2:43pm via email**

Excellent break down.

Sent from kjmontgomerylaw.com

>



**Melissa Lang Sat, 16 Nov 2019 at 3:05pm**

Thank you Tony. We will start thinking this through and working on it right away.



**Bruce Barket Sat, 16 Nov 2019 at 6:49pm**

Can I make a few points here?
1. That other people participated in the offense who won't face the death penalty is not as strong as it may appear. It certainly fell flat with the committee in D.C.

a. Marcos had no role that I am aware of in the murder of anyone. Yes, he (was forced to?) help bury the bodies, but he did not kill them, nor did he know they were going to be killed.

b. Benderoth only avoided the death penalty by doing it himself.

c. Jason did not set them up to be killed. He set up Martin to allow Nick to collect.

d. Biggs did kill, at least one--likely more than one, but from what I recall from Boulder, jurors in very few cases (less than 15% if i recall correctly) give any weight to this factor. Not to say we shouldn't develop it, but it;s not likely going to carry the day if what we were taught is accurate.

2. Clearly, at least two victims participated in the offense that led to their death and likely engaged in a host of other crimes as well. We are developing more evidence of Martin's criminal history and working on whether or not he was at the time of the murder or had been previously a cooperator.

3. We need to connect the crime to Nick's life. If he is convicted, the jury should know why he did it, what he needed the money for and why having money stolen from him (that is what Nick believed, but it may be that Martin was actually robbed and we have a line on at least one of the thieves) affected Nick so deeply. Connecting the motive to the mitigation found in Nick's life history is critical to being able to tell one story from liability to penalty, if there is a conviction.

4. As we all know, Nick's objective is to win an acquittal. Jim is swamped with witnesses and potential witnesses in 4 states and 3 countries. I want to be sure he doesn't lose any time on the liability front to help develop a statistically weak mitigation argument. Jim can manage his own time, but his plate seems full helping to build a liability defense. That can't get interrupted.



**Tony Ricco Sat, 16 Nov 2019 at 7:11pm**

Interesting observations but the standard applied at the DOJ is not the standard employed by a jury at a penalty phase. In addition, one single vote on any mitigation factor can result in a life verdict. Also, if I may, mitigation is not presented in the chronology style addressed in your analysis – not a criticism. Mitigation is developed to be presented as a comprehensive

**DX 33-3**

4/17/2020 Tartaglione SD NY Document 641-1 Federal Death Penalty Strategy Session San Diego Filed 07/02/26 Page 91 of 404

Case 7:16-cr-00832-KMK

narravtive, where a finder if fact gets to exercise a moral judgement. You have some insight, however, we prepare for mitigation to be presented where the jury would have convicted Nicholas Tartaglione on one or more intentional murder(s). The presentation of mitigation is dynamic, you investigate, you gather information and then decide if and/or how it will be presented. It is way too early to dismiss any information that helps define the narrative that is ultimately presented

This effort takes incredible amounts of time, and excritiatingly thorough analysis. Finally, Jim may very be swamped, but his contribution to the effort John and Ken will be working on will take all of 20 mins of his time, and I am confident that he can provide the insight needed for the initial stages of the tasks assigned. And, on a general note: Jim if you are overworked and need to add more investigators let me know, and we will go to the Judge to add investigators. Not a problem. In this way, we can make that February 2021 trial date. Now, these comments are only provided to help provide a perspective on the views expressed and are not a criticism or a disagreement. It's just a perspective on how mitigation is identified and developed for presentment.



**Tony Ricco Sat, 16 Nov 2019 at 7:16pm**

Jim, if you do not have 20 or 30 mins to assist John and Ken with this initial assignment, ket me know. I do not want to pull you away from any assignment(s) that any other lawyer has you working on. Let me know. I am in San Diego but available by phone. Thanks.



**Tony Ricco Sun, 17 Nov 2019 at 6:58am**

Also the comments are welcomed. It is through the exhenge of ideas that the information (or perspective 9n the information) evolves. What is ultimately actually presented is more than often a vague resemblance to where you start. Thats why it is so important to maintain an atmosphere for the full exchange of ideas. This is great danger in Nicholas Tartaglione's view about me and other lawyers. He fails to understand that these matters, called mitigation, must be investigated and they lead to other information that would not have ever been discovered but for the effort. In his case, that investigation naturally involves the facts that comprise the liability phase of his case. Why? How? just look at the aggravating factors in his case. Undercutting them, which s9me call establishing reasonable doubt in the liability phase, is what others call presenting mitigation in the penalty phase. See it? I fully explained this to Nicholas Tartalione when I met with him on August 15, 2019, and he fully understood and appreciated it. But something happened to influence his thinking. But getting back to the main point here. Your comments, like everyone's, is welcomed thats where strength comes from. This work, like others, involves hardwork, humility, an ability to get along with others, and above all faith. This is who I am, and that is what I am about. And, I have found, after 25 years of in the trenches capital work, that when that process happens, lives are saved. And, when it does not, the sentence of death is always, always imposed. So, everyone keep the ideas coming, they will serve to make a stronger, more effective defense at both the liability and penalty phase.

Jim Dowd, can you give me a call.



**Kenneth Montgomery Sun, 17 Nov 2019 at 8:39am via email**

I think paragraph 3 is a very dangerous argument that doesn't easily fit into mitigation at all.

Sent from kjmontgomerylaw.com

**DX 33-4**

4/17/2020     Case 7:16-cr-00832-KMK Tartaglione SD NY Document 641-1 Team Federal Death Penalty Strategy Session San Diego Filed 07/02/26 Page 92 of 404



**Bruce Barket Sun, 17 Nov 2019 at 8:55am**

Tony, I agree with your sentiment, but can I suggest you look inward and not out for what went wrong with you and Nick?

Ken, I am assuming you mean paragraph 3 in my post. It Nick is convicted, the jury will want to know why he killed or participated in the killing of 4 men. If that answer is found in part in his life's story (bitterness at his father having stolen from him, a struggle to support a huge animal rescue operation and desperation to support his pregnant wife) that will allow us to develop those factors during the penalty phase if there is one. I certainly like that explanation of his conduct better than the easier answer that he wasn't going to be ripped off by "those Mexicans"



**Tony Ricco Sun, 17 Nov 2019 at 10:10am**

Nothing went wrong. There is no wrong here (period). Nicholas Tartaglione is a capital defendant who has issues, issues that are part of his true life narrative. Nicholas Tartaglione is not the first capital defendant to condct himself in the way in which he is attempting to go. Nicholas Tartaglione's predicament is part of his life journey. I, along with other skilled members if the team, am a professional who can help him save his life. Nicholas Tartalione has repeated expressed to me, and all others, including the court, a total lack of interest and or appreciation for the need to develop a mitigation case.

You have expressed to others a sentiment of understanding of that fateful person – a very dangerous proposition. There is an interesting line in United States v Wheat that is right on point here. Capital defendants rarely have an appreciation for the enormous effort that is required of capaital counsel, mutigatiin specialists and others to develeooment a capital defense. In the absence of knowledge, and faith we have a defendant who is lost in his own negative thoughts about something that he does not understand. In addition, many of Nicholas Tartaglione's supporters also have no clue of the mangitude of the threat of the risk for him to losehis life in this case. I represent men on capital death row, and understand how they go there, many of those negative signs are here. The difference? There are focused experienced counsel that will not permit it, no matter what distractions emergence. As for Nicholas Tartaglione, he needs to have faith and trust in others, who have and will continue to work to save his life – if he can.



**Tony Ricco Sun, 17 Nov 2019 at 10:14am**

All team members keep in mind that mitigation is never an excuse or justification for the commission of the crime, (that is precisely what prosecutors attempt to argue). Mitigation is a reason to vote for life, and the judge will give the jury such an instruction.



**Bruce Barket Sun, 17 Nov 2019 at 10:30am**

The sentiment that I understand is Nick's decision to set as the objective of his defense, an acquittal and not a guilty plea. I have never joined his dismissive attitude toward mitigation. To the contrary, I have told him explicitly and repeatedly that we MUST prepare a penalty phase defense. I do not want him sentenced to death and recognize the risks he faces.

I agree we can't proffer "excuses" for his conduct if he is convicted, but I don't see putting into context the crimes as proffering an excuse. I see it as expanding the breadth

**DX 33-5**

Case 7:16-cr-00832-KMK   Document 641-1   Filed 07/02/26   Page 93 of 404

of the case the jury will consider. But it's merely a suggestion. The caution not to make an excuse for the crime and state the case for life positively is spot on.



**Tony Ricco Sun, 17 Nov 2019 at 10:58am**

That's called front loading and it is done in every successful capital defense. The idea goal is to do it in this case but as a result of a thorough and complete investiagtion.



**Kenneth Montgomery Sun, 17 Nov 2019 at 2:58pm via email**

Upon a conviction I think the jury will have more than agreed with the Government's narrative as to why he killed or participated in the killing of 4 men.

**DX 33-6**

Case 7:16-cr-00832-KMK Document 641-1 Filed 07/02/26 Page 94 of 404

**Tartaglione (SD NY) Team Lang & Kaboski, LLP**

# Penalty Phase Development - Contraband Cellular Phone

From: Tony Ricco
Date: Tue, 26 Nov 2019 at 3:10am

We have a responsibility to investigate information and evidence in preparation of the penalty phase.   This includes the investigation of mitigation evidence and aggravating evidence that the prosecution may probably use during the penalty phase.  See, Rompilla v Beard, 545 US 374, 377-380.   The possession and usage of the contraband cellular as described in open court, in front of the government, on July 22, 2019 is such evidence.

In connection with our penalty phase investigation, on November 2, 2019, we requested that team members check their individuals cellular phones and provide the following information:

1.   If you (any team member) have had any contact (text messages and/or actual conversation) with the contraband cellular phone, check your call history, retrieve and post the number that contacted your phone?

2.  If you (any team member) have had any actual text message(s) with the contraband cellular phone, take a "screen shot" of all text and forward to Michael Bachrach by email?

Within 10 minutes of the initial request, team members responded with the requested information.  Others who have stated that they had contact, however, did not respond at all.   This information is so important, a second request was made on November 14, 2019.   The second request was also met with no response.    So, this is the third request for this important information.  If you have not already done so, respond.

Finally, as stated before, under no circumstances should the previously described text messages be deleted.   If they have been deleted, please advise.   So, that we can take appropriate steps to otherwise secure this important information.

**DX 34-1**

**Tartaglione (SD NY) Team Lang & Kaboski, LLP**

---

# Penalty Phase Development - Official Role of John Weider in July and August 2019

From: Tony Ricco
Date: Tue, 26 Nov 2019 at 8:03am

---

As previously stated, the contraband cellular phone seized from Nicholas Tartaglione is, understandably, part of our mitigation/aggravation investigation for the penalty phase.   There were representations also in court, in front of the government, that there were text messages between the legal team and seized cellular phone.  Transcript of proceedings of July 22, 2019, page 12-14.

On September 6, 2019, the team was informed, during a team meeting, that John Weider, along with at least one other attorney, had changed text communications with Nicholas Tartaglione.   However, there is uncertainty in my mind about the official role of John Weider, which impacts an important decision that must be made in preparation of the penalty phase defense.

In past Basecamp posts, when we were discussing the participation of John Weider in connection with the Epstein episode, in response to a direct question posed by Resource Counsel, attorney Barket described John Weider as follows: "John Weider is a good friend of Nick who is a lawyer. They have known each other since high school. He has done transnational work for Nick over the years, including during the period of his incarceration. He visits Nick regularly."   See, Basecamp post of August 17, 2019.

However, in subsequent discussions with team members individually (an August 22, 2019 exchange with Michael Bachrach), and together with *Curcio* counsel on August 23, 2019, John Weider was described as retained and/or associated with the Barket firm to assist with the preparation of Nicholas Tartaglione's defense.

We must make important decisions in relation to the method to be employed to gather information in relation to the use of the contraband cellular phonse, as a possible aggravator at the penalty phase in the government's direct case or in rebuttal to the defense mitigation presentation.   John Weider's official status in relation to Nicholas Tartaglione's defense is crucial to the method employed to obtain important information from his cellular phone (whose number that is actually listed on the seized contraband telephone.)   See, Basecamp post of November 1, 2019.

Therefore, can a person with personal knowledge of attorney Weider provide a clear explanation of whether John Weider's was a member of the defense team employed, retained or associated with Barket firm during July 2019 through the end of August 2019?

Thank you.  A response would be helpful from someone from the Barket firm with personal knowledge, as decisions must be made in preparation of the presentation and/or confrontation of evidence at the penalty phase.

**DX 35-1**

# Official Statement on The Status of John Weider

From: Tony Ricco
Date: Mon, 2 Dec 2019 at 8:18am

Can someone with personal knowledge please provide a definitive statement of the present status of John Weider in connection to the defense of Nicholas Tartaglione? In addition, what was John Weider's official status in relation to the defense of Nicholas Tartaglione in June, July, August and September 2019?

**DX 36-1**

Case 7:16-cr-00832-KMK   Document 641-1   Filed 07/02/26   Page 97 of 404

**Tartaglione (SD NY) Team Lang & Kaboski, LLP**

# Important Request From Government Firewall Counsel: Contraband Cellular Phone

From: Tony Ricco
Date: Tue, 11 Feb 2020 at 1:01pm

This morning the government's firewall counsel on the usage of the Contraband Cellular Phone made a very important request from the defense that has implications for Nicholas Tartaglione beyond the *Curcio* inquiry.

There have been several statements by attorneys made on the court record (in both open court and during ex parte sealed proceedings).   Those statements, at a minimum, have not been corroborated by the information extracted from the seized contraband cellular phone by the BOP and disclosed to the defense.   Problematic.

In addition, in a December 4, 2020 email retained counsel describes certain text messages in his possession.  Those text messages have not been disclosed to either *Curcio* counsel or any other attorney not subjected to the *Curcio* inquiry.   While these statements and the failure to provide the information when *previously* requested by appointed counsel in the course of investigating the aggravating evidence at the penalty phase, and *Curcio* counsel during the course of the investigation are facts relevant to the *Curcio* inquiry in this case, since the requested information (and thereby the basis for the assertion of the privilege on behalf of Nicholas Tartaglione is in the possession of the attorney subject of *Curcio* counsel, the request is problematic, and the assertion of an answer has a variety of adverse diverging consequences for both the defendant and the attorney (s) asserting a privilege on his behalf.   As such, an answer to the government's firewall counsel is extremely problematic.

For any attorneys on the case, who do not understand how the question posed exposes a profound divergence of interest in this case, give Michael, Bruce Koffsky, me or any of the Resource Counsel at call.

All counsel must remember, and keep in the forefront of their minds as decisions on which course of action to pursue, that the interest of a death authorized defendant is the priority and his rights must and shall be protected.

**DX 37-1**

## Confidential Screen Shots

From:   Aida Leisenring (aleisenring@barketepstein.com)

To:     mbach2000@yahoo.com

Date:   Wednesday, July 3, 2019, 04:24 PM EDT

Attached.

Get Outlook for iOS

 file3-1.png
722.4kB

 file2-1.png
918.9kB

 file4.png
1.1MB

 file-2.png
681.3kB

 file1-1.png
1.1MB

**DX 38-1**

## Fw: Confidential Screen Shots

| | |
|---|---|
| From: | Michael Bachrach (mbach2000@yahoo.com) |
| To: | tonyricco@aol.com; bkoffsky@snet.net |
| Date: | Wednesday, July 3, 2019, 05:00 PM EDT |

Tony and Bruce K.,

See attached screen shots that I received from Aida. These are texts Nick sent to V.

Take a look at all but particularly: File.2-1

Call me when you can if you'd like to discuss.

--Michael


Sent from Yahoo Mail on Android


> ----- Forwarded Message -----
> **From:** "Aida Leisenring" <aleisenring@barketepstein.com>
> **To:** "mbach2000@yahoo.com" <mbach2000@yahoo.com>

**Sent:** Wed, Jul 3, 2019 at 4:24 PM
**Subject:** Confidential Screen Shots

Attached.

Get Outlook for iOS

 file3-1.png
722.4kB

 file2-1.png
918.9kB

 file4.png
1.1MB

 file-2.png
681.3kB

 file1-1.png
1.1MB

**DX 39-1**

1/1

Yahoo Mail - Re: Epstein's Last Days - NYT NOT QUITE!!!!

## Re: Epstein's Last Days - NYT NOT QUITE!!!!

From:  tonyricco@aol.com

To:  bbarket@barketepstein.com

Cc:  aleisenring@barketmarion.com; bbarket@barketmarion.com; bkoffsky@snet.net; johnadiazlaw@gmail.com; ken@kjmontgomerylaw.com; mbach2000@yahoo.com; tonyricco@aol.com

Date:  Saturday, August 17, 2019, 08:46 AM EDT

Bruce B;

Unfortunately, your conclusion is only partially correct.  It is not in dispute that being in jail is horrible, especially for a privileged middle aged white man whose life was so free of reality, so delusional that he openly proclaimed that he thought it was okay for older men to prey upon underaged teenaged girls.  Nor is it in dispute that he was so destitute, having been stripped of his privileges in life (all of them), and being incarcerated in damp, dark, overcrowded jail, with lousy food and dangerous people all around, etc.  Nor is it disputed, based upon information from the investigation, that Jeffrey Epstein purposefully planned to, and ultimately took his life.  Jeffrey Epstein's reaction to being stripped of his privileges (that he criminally exploited to the maximum), are not in dispute nor the subject of anything in the guilt or penalty phases of our case - except for one - the investigation of Nicholas Tartaglione's prison adjustment.   We are investigating the possibility of placing before a capital jury a mitigatory entitled : positive prison adjustment, and including his actions on July 23, 2019 as part of that narrative.

On this issue, our client has interacted with Mr. Epstein and many other detainees.   There is an investigation going on, not by the NY Times but by the FBI, the IG and now the SDNY U.S. Attorney's Office.   Subpoenas have gone out, and everyone (BOP Officers, Civilian Staff, Detainees) have been subpoenaed and interviewed.   These staff members, civilian employees, and detainees are represented by reputable criminal defense attorneys who have a breath of experience in federal criminal practice.

The ongoing criminal investigation(s), contrary to what is being written about in the newspapers, has as part of its focus the relationship between Jeffrey Epstein and Nicholas Tartaglione .  The answers to the questions posed by the investigators on this subject, should cause all involved in the representation of Nicholas Tartaglione to rethink and refrain from any further public statements that there was "good relationship" as was reported in the media and as was stated on Fox News.   Not only are those statements, along with others such as the only reason the evidence against Nicholas Tartaglione being "leaked" is because he complained of prison conditions or negative comments were made by Epstein's attorneys as a ploy to get him off of suicide watch, placing you in jeopardy of being a potential witness, they are unleashing a powerful inquiry that is resulting in an alarming level of aggravating evidence against Nicholas Tartaglione to the contrary.

The NY Times article may thoroughly discuss Jeffrey Epstein's experiences and ultimate fate in jail, but the same cannot be said of the issue that is our concern - Jeffery Epstein's relationship with our client.

As feared, the government is, *in fact*, investigating and gathering an avalanche of evidence - from a variety of *disparate* sources - that is turning the publically proclaimed mitigator into a devastating aggravator.

Frankly, I have seen, and heard enough to clearly understand the importance of the necessary action that must be taken, and for us to put this one single mitigator on hold - not to abandon  - but to intelligently and responsibly put on hold, until these various investigations are completed and we can, at that time, revisit whether we wish to go forward with the July 23, 2019 episode as part of our mitigation case.

Until that time, however, I repeat my prior my recommendation that we all refrain from any further public statements on Jeffrey Epstein, his suicide, its plans, attempts and/or his relationship with Nicholas Tartaglione.  Also, we need to try hard not to reach conclusion about the scope and depth of several investigations based upon what appears in the media.   These articles simply do not provide a basis upon which to arrive at conclusions, and certainly not worthy of a public response.

**DX 40-1**

Finally, we really have so much more work to deal with, a mountain of theories to develop on the guilt and penalty phase. The fate of this one (the value to be placed upon the act of intervention on July 23, 2019) seems pretty obvious to all - *at this juncture*.

BTW, the letter we discussed is going to circulated in a few minutes. I would like to get it back by this afternoon, so that I can send a draft to Resource Counsel and David Patton. If anyone, wants more time to review or consult an ethics attorney, please advise.

Tonyricco


-----Original Message-----
From: Bruce Barket <bbarket@barketepstein.com>
To: BRUCE KOFFSKY <bkoffsky@snet.net>
Cc: Aida Leisenring <aleisenring@barketepstein.com>; Tony Ricco <tonyricco@aol.com>; Michael Bachrach <michael@mbachlaw.com>; Kenneth Montgomery <ken@kjmontgomerylaw.com>; John Diaz <johnadiazlaw@gmail.com>
Sent: Sat, Aug 17, 2019 6:58 am
Subject: Re: Epstein's Last Days - NYT

Thorough and accurate.

Bruce Barket
Barket, Epstein, Kearon, Aldea & LoTurco
666 Old Country road
Garden City, NY 11530
(516) 745 1500 - O
(516) 287 7230 - M
Barket Epstein.com

On Aug 17, 2019, at 6:39 AM, BRUCE KOFFSKY <bkoffsky@snet.net> wrote:


https://www.nytimes.com/2019/08/17/nyregion/epstein-suicide-death.html?action=click&module=Top%20Stories&pgtype=Homepage



Regards.

Bruce


Bruce D. Koffsky, Esq.
Koffsky & Felsen, LLC
1150 Bedford Street
Stamford, CT. 06905
203-327-1500

Sent by my IPhone

**DX 40-2**

## Re: Letter To Be Filed Requesting the Appointment of Curcio Counsel

From: tonyricco@aol.com

To: bbarket@barketepstein.com

Cc: aleisenring@barketmarion.com; bbarket@barketmarion.com; bkoffsky@snet.net; johnadiazlaw@gmail.com; ken@kjmontgomerylaw.com; mbach2000@yahoo.com; tonyricco@aol.com

Date: Saturday, August 17, 2019, 10:14 PM EDT

Bruce B:

The question that is more appropriate, after hours and hours of discussing this issue, is what is the reason to wait?

The application is only to alert the court of the need to appoint a Curcio counsel (period). I have been in involved in dozens of these application over the past 25 plus years. All counsel are aware, that the substance of whether there is a conflict to be waved awaits the conclusion reached between Nicholas Tartaglione and *Curcio* Counsel.

Based upon my interview with Nicholas Tartaglione, and years of experience addressing this issue, he will waive the potential conflict. As a result of Nicholas Tartaglione, all counsel, Resource Counsel, the Project and the Federal Defenders have worked hard to present an application (bare bones) to get his waiver without having to disclose any more confidential information (period). You either do not or unwilling to accept that others act in good faith to secure the wishes of the client.

If you can tell me one single reason why this bare bone application should be further delayed, I will accommodate you and delay the filing. In absence of such a reason, Nicholas Tartaglione's rights will be protected by the attorneys who are free of any conflicts - potential or actual.

Again, this is an application to obtain a waiver (that we all expect the defendant to execute) which (1) preserves the attorney/client privilege and (2) prevents you from becoming a potential (the word is potential) witness. Quite frankly, I do not understand your resistance to such a fundamental and rather routine application that is made when there is an inadvertent breach of a defendant's right to confidentiality.

If there is something that we are missing (that is Learned Counsel, Resource Counsel, the Executive Director of the Federal Death Penalty Resource Project and the Executive Director of the Federal Defenders of New York and all the attorneys on this case who have tried a capital case to verdict, please advise). In the absence of such information, Nicholas Tartaglione will be protected and we must move on to other critical issues.

Attached is the final revision, which included the issues raised in your latest email on this subject.

Let me know what you want to do.

Tonyricco

-----Original Message-----
From: Bruce Barket <bbarket@barketepstein.com>
To: tonyricco <tonyricco@aol.com>
Cc: Michael Bachrach <michael@mbachlaw.com>; "Kenneth Montgomery" <ken@kjmontgomerylaw.com>
Sent: Sat, Aug 17, 2019 8:58 pm
Subject: Re: Letter To Be Filed Requesting the Appointment of Curcio Counsel

Once again, we can agree to disagree, but you should do what you—in good faith— believe is right.

**DX 41-1**

Btw, what's the need to file this on a Saturday night?

Bruce Barket
Barket, Epstein, Kearon, Aldea & LoTurco
666 Old Country road
Garden City, NY 11530
(516) 745 1500 - O
(516) 287 7230 - M
Barket Epstein.com

On Aug 17, 2019, at 8:35 PM, tonyricco <tonyricco@aol.com> wrote:

> The articles can be attached.  The letter will be filed this evening.  The informationbset forth is to respect and protect Nicholas Tartalione's right and nothing more.  Under the procedures established by the Second Circuit, the next step or additional level of disclosure shall be based upon the waiver by Nicholas  Tartaglione, and the inquiry of the court.
>
> The only issue before the court, at the moment, is whether a waiver is required.  I do not think there is any dispute that a waiver is necessary here.
>
>
> Tonyricco
> Sent from my Verizon, Samsung Galaxy smartphone
>
> -------- Original message --------
> From: Bruce Barket <bbarket@barketepstein.com>
> Date: 8/17/19 7:01 PM (GMT-05:00)
> To: tonyricco@aol.com
> Cc: Aida Leisenring <aleisenring@barketepstein.com>, bkoffsky@snet.net, johnadiazlaw@gmail.com, ken@kjmontgomerylaw.com, mbach2000@yahoo.com
> Subject: Re: Letter To Be Filed Requesting the Appointment of Curcio Counsel
>
> At A quick glance it lacks details. If you're going to say I disclosed confidences, you should list them. They were In the paper so it's not like your publishing them to an audience who hasn't seen them.  Maybe attach the articles. More tomorrow
>
> Bruce Barket
> Barket, Epstein, Kearon, Aldea & LoTurco
> 666 Old Country road
> Garden City, NY 11530
> (516) 745 1500 - O
> (516) 287 7230 - M
> Barket Epstein.com
>
> On Aug 17, 2019, at 5:19 PM, "tonyricco@aol.com" <tonyricco@aol.com> wrote:
>
>> Team members:
>>
>> Attached please find a letter that will be filed with the court this evening.   Your comments are welcomed.   The letter has been vetted by David Patton and Resource Counsel.
>>
>> We look forward to your comments.
>>
>> Tonyricco
>>
>> <Curcio Letter Final Draft1A.pdf>

 Curcio Letter Final Draft1AFINAL.pdf

**DX 41-2**

Yahoo Mail - Re: Letter To Be Fixed. Requesting the Appointment of Curious Counsel

    160.2kB

**DX 41-3**

## Re: Letter To Be Filed Requesting the Appointment of Curcio Counsel

From:   Bruce Barket (bbarket@barketepstein.com)

To:      tonyricco@aol.com

Cc:      aleisenring@barketepstein.com; bkoffsky@snet.net; johnadiazlaw@gmail.com; ken@kjmontgomerylaw.com; mbach2000@yahoo.com

Date:   Saturday, August 17, 2019, 06:41 PM EDT

I won't be able to review this before tomorrow.  If you want my feedback, can you hold it until tomorrow or Monday?  Thanks.

Bruce Barket
Barket, Epstein, Kearon, Aldea & LoTurco
666 Old Country road
Garden City, NY 11530
(516) 745 1500 - O
(516) 287 7230 - M
Barket Epstein.com

> On Aug 17, 2019, at 5:19 PM, "tonyricco@aol.com" <tonyricco@aol.com> wrote:
>
> Team members:
>
> Attached please find a letter that will be filed with the court this evening.   Your comments are welcomed.   The letter has been vetted by David Patton and Resource Counsel.
>
> We look forward to your comments.
>
> Tonyricco
>
>     <Curcio Letter Final Draft1A.pdf>

**DX 42-1**

## RE: The Letter To The Court

| | |
|---|---|
| From: | Bruce Barket (bbarket@barketepstein.com) |
| To: | tonyricco@aol.com |
| Cc: | aleisenring@barketepstein.com; bkoffsky@snet.net; johnadiazlaw@gmail.com; ken@kjmontgomerylaw.com; mbach2000@yahoo.com |
| Date: | Saturday, August 17, 2019, 03:37 PM EDT |

Thank you.  I really do appreciate the effort here, the work and the desire to get this behind all of us.  Nick is lucky to have such dedicated lawyers, even if we don't always agree.


Bruce A. Barket, Esq.

Barket Epstein Kearon Aldea & LoTurco, LLP

666 Old Country Road , Ste. 700

Garden City, NY 11530

(516) 745 1500 [P]  (516) 745 1245 [F]

www.barketepstein.com



This transmittal may be a confidential attorney client communication or may otherwise be privileged or confidential. If it is not clear that you are the intended recipient, you are hereby notified that you have received this transmittal in error; any review, dissemination, distribution or copying of this transmittal is strictly prohibited. If you suspect that you have received this communication in error, please notify us immediately by telephone or email and immediately delete this message and all its attachments


**From:** tonyricco@aol.com [mailto:tonyricco@aol.com]
**Sent:** Saturday, August 17, 2019 2:21 PM
**To:** Bruce Barket
**Cc:** Aida Leisenring; bkoffsky@snet.net; johnadiazlaw@gmail.com; ken@kjmontgomerylaw.com; mbach2000@yahoo.com
**Subject:** Re: The Letter To The Court


I know he will provide the waiver, because he told me that he would.  It made perfect since to him to get, since their was prior authority.  Nicholas Tartaglione is totally on aboard, and understands this is necessary to protect his confidentiality and to prevent you from becoming potential witness - as least as it relates to the comments attributed to him.

**DX 43-1**

Finally, since you are not concerned that Judge Karas reviews the possibility of a potential waiver, we will be a little more forthcoming in the letter.   I will send it to you, after return from David Patton, and before sending out.


Thanks.   Time to move on.


Tonyricco



-----Original Message-----
From: Bruce Barket <bbarket@barketepstein.com>
To: 'tonyricco@aol.com' <tonyricco@aol.com>
Cc: Aida Leisenring <aleisenring@barketepstein.com>; bkoffsky@snet.net <bkoffsky@snet.net>; johnadiazlaw@gmail.com <johnadiazlaw@gmail.com>; ken@kjmontgomerylaw.com <ken@kjmontgomerylaw.com>; mbach2000@yahoo.com <mbach2000@yahoo.com>
Sent: Sat, Aug 17, 2019 1:59 pm
Subject: RE: The Letter To The Court

Thanks.


I wasn't suggestion you talk to John. I was asking that you talk to me about John to follow up on the conversations we had several weeks ago.


I will decline to address your view of me as it relates to doing what is in Nick's best interest, as you are entitled to your view.


Thank you for sharing the information.  It is indeed helpful.


Happy to discuss contact with the authorities investigating the jail and Epstein's death.  I won't do anything without first speaking to everyone.  And of course I would never allow Nick to provide information while the government is seeking to execute him.


If the judge requires a waiver of the possibility of a potential conflict, then I am sure Nick will provide it.


Does it make sense to share our respective letters, make any changes we think appropriate and submit both letter together?

**DX 43-2**

Bruce A. Barket, Esq.

Barket Epstein Kearon Aldea & LoTurco, LLP

666 Old Country Road , Ste. 700

Garden City, NY 11530

(516) 745 1500 [P]  (516) 745 1245 [F]

www.barketepstein.com

This transmittal may be a confidential attorney client communication or may otherwise be privileged or confidential. If it is not clear that you are the intended recipient, you are hereby notified that you have received this transmittal in error; any review, dissemination, distribution or copying of this transmittal is strictly prohibited. If you suspect that you have received this communication in error, please notify us immediately by telephone or email and immediately delete this message and all its attachments

**From:** tonyricco@aol.com [mailto:tonyricco@aol.com]
**Sent:** Saturday, August 17, 2019 1:43 PM
**To:** Bruce Barket
**Cc:** Aida Leisenring; Bruce Barket; bkoffsky@snet.net; johnadiazlaw@gmail.com; ken@kjmontgomerylaw.com; mbach2000@yahoo.com; tonyricco@aol.com
**Subject:** Re: The Letter To The Court

No problem, I will ask that the court consider the entire matter.   That language was only there to help ensure that you can remain on the case.   The language is out, since you do not want it.

My concern is that in your comments that you make to the press, that you will further disclose information related to the press, and further place Mr. Tartaglione at jeopardy.

However, I am confident to share with you what I have already told you, and the entire team:

1.      The investigation is far more expansive than what is described in the media.

2.      That subpoenas have gone out, and interviews have been conducted with BOP staff, civilian employees, and many detainees.

**DX 43-3**

3.      That in those interviews individuals have been questioned on whether Jeffrey Epstein ever discussed his relationship with Nicholas Tartaglione.


4.      To describe their impressions of Jeffrey Epstein's mood and appearances.


5.       Whether Jeffrey Epstein provided them with any money (commissary, etc)


There is information that has been provided that Nicholas Tartaglione and Jeffrey Epstein had a strained relationship, and reports that he as uncomfortable with Nicholas Tartaglione, that Nicholas Tartaglione was putting pressure on him, and that their relationship could not be considered "good" as you described to the press.


Finally, your public explanation (or speculation) for the reasons why the Esptein lawyers said that Esptein was allegedly rough up by Nicholas Tartaglione (just to get off of suicide watch) does not find support, by comments allegedly made by Jeffrey Esptein to others after he was released from suicide watch, where he made similar comments to others.


This is the information that have been advised of in response to your question.


Based upon the above information, there is a sufficient "good faith" reason to exercise cautious restraint from any further public comments (if at all), until such time that the entire team has an opportunity to review the final reports and documents of the various investigation(s).  And not to box ourselves into statements which may very well serve to be irrevocably detrimental to Nicholas Tartaglione - whose interest is the focus of all concerned.


And, as I have actually said, all lawyers should do what they think is right, *but to do so only in compliance with the ethical, law rules that the guide professional conduct,* including those established by the BOP.   Based upon those rules, I again caution you against public statements.   Where you violate confidentiality and/or attorney client privilege, your public statements can lead to you becoming a potential witness - which shall risk your discharge from this case.


Nicholas Tartaglione wants you to remain, we are all doing everything we can to help that happen but you are resistant, and seem to want to be in the media.  Based upon your consistent comments, I am certain nothing is going to stop you from doing so, even at the expense of jeopardizing Nicholas Targalione's life.


The entire team is prepared to move on from this issue of the possibility of potential conflicts, and place it in the court's hands where it belongs.  Finally, you still fail to grasp that the issue is the *possibility* of conflict, not actual conflict, and that counsel we are all duty bound by Second Circuit authority to inform the court when there is a *possibility* - your actions are clearly within that standard.   I am absolutely confident that the court will agree that a waiver is required.  It is my hope, for Nicholas Tartaglione's sake, the court does not make finding of fact.  This is what the law requires to protect Nicholas Tartaglione. Everyone on the Team fully understands that.

**DX 43-4**

**Meeting With Epstein Investigators**

I do not recall there being a conversation with team members or Resource Counsel your intention to approach the Epstein investigators.  I hope it is not for the purpose of offering up Nicholas Tartaglione as a witness - with a capital trial pending. Not a good idea.

**John Wieder**

Also, in response to the question of whether I have time for a telephone with John Wieder:  Based upon what I have been previously told by you concerning the conduct of John Wieder and based upon my understanding of the law, the rules and regulations governing the conduct of attorneys inside BOP facilities, and to ensure that I do not unwittingly become a potential witness to any of his conduct to which I have no present direct knowledge, I have no interest in speaking to him in relation to his contact with Nicholas Tartaglione, until such time as there is waiver on the record concerning the possibility of potential conflict issues that have already arisen.   At this juncture, prior to a waiver, there is no benefit to Nicholas Tartaglione for me or any other lawyer associated with this case to telephone John Wieder, until there is waiver.  John Wieder enjoys no privilege from any statements that he makes to me or any other attorney on our team, about his alleged conduct and interaction with Nicholas Tartaglione.  And, I am interested in becoming a potential witness to any of the conduct that I have heard about thus far.

Tonyricco

-----Original Message-----
From: Bruce Barket <bbarket@barketepstein.com>
To: tonyricco@aol.com <tonyricco@aol.com>
Cc: Aida Leisenring <aleisenring@barketepstein.com>; Bruce Koffsky <bkoffsky@snet.net>; Michael Bachrach <michael@mbachlaw.com>; john diaz <johnadiazlaw@gmail.com>; ken@kjmontgomerylaw.com <ken@kjmontgomerylaw.com>
Sent: Sat, Aug 17, 2019 11:39 am
Subject: Re: The Letter To The Court

No need.

Once you file, I will articulate my view in a Separate letter.

I can state that I want Karas to hear the entire matter. I am not worried about my credibility and nothing said will negatively impact Nick. My credibility should be based on my word and my conduct, not what the judge doesn't know about my conduct.

**DX 43-5**

I am confident that no violation of the rules of professional conduct occurred and that there not a conflict real or Potential. Thus, there is no need for any inquiry by independent counsel or the court. But, as you have often counseled me, every lawyer should do what they think is right.

I respect everyone's view and would never fault anyone acting in good faith for doing what they believe they are required to do under the rules.

You mentioned information you gained from various sources which you view as important on the issues you placed before us. Please share it.

I continue to get calls from the media and I am planning on contacting the prosecutors in charge of the investigation into Epstein's death.

Withholding information may result in me doing something I otherwise would not have done or not doing something I should have.

Bruce Barket
Barket, Epstein, Kearon, Aldea & LoTurco
666 Old Country road
Garden City, NY 11530
(516) 745 1500 - O
(516) 287 7230 - M
Barket Epstein.com

On Aug 17, 2019, at 9:13 AM, "tonyricco@aol.com" <tonyricco@aol.com> wrote:

That's fine, I will put in that you object to the application. Let me know - I am okay either way.

Tonyricco


-----Original Message-----
From: Bruce Barket <bbarket@barketepstein.com>
To: tonyricco@aol.com <tonyricco@aol.com>
Cc: Aida Leisenring <aleisenring@barketepstein.com>; bkoffsky@snet.net <bkoffsky@snet.net>; johnadiazlaw@gmail.com <johnadiazlaw@gmail.com>; ken@kjmontgomerylaw.com <ken@kjmontgomerylaw.com>; mbach2000@yahoo.com <mbach2000@yahoo.com>
Sent: Sat, Aug 17, 2019 9:09 am
Subject: Re: The Letter To The Court

Damn, you caught me just before I left.

I don't think we are going to join you on this application. But I will reflect more on it as I ride.

Perhaps you can share the information you received.

Bruce Barket
Barket, Epstein, Kearon, Aldea & LoTurco
666 Old Country road
Garden City, NY 11530
(516) 745 1500 - O
(516) 287 7230 - M
Barket Epstein.com

On Aug 17, 2019, at 9:03 AM, "tonyricco@aol.com" <tonyricco@aol.com> wrote:

**DX 43-6**

Based upon my conversation with counsel for two witnesses interviewed by federal investigators after our conference meeting yesterday, coupled with the information that I have been become aware of, we need to get ahead of this, and in a hurry - before we are on the receiving side of a government application.

Let's set the narrative and demonstrate our ethics, if we can.

Tonyricco


<Curcio letter (DRAFT)A.docx>

**DX 43-7**

## Re: The Letter To The Court

From:  tonyricco@aol.com

To:     bbarket@barketepstein.com

Cc:     aleisenring@barketmarion.com; bbarket@barketmarion.com; bkoffsky@snet.net; johnadiazlaw@gmail.com; ken@kjmontgomerylaw.com; mbach2000@yahoo.com; tonyricco@aol.com

Date:   Saturday, August 17, 2019, 01:43 PM EDT

No problem, I will ask that the court consider the entire matter.   That language was only there to help ensure that you can remain on the case.   The language is out, since you do not want it.

My concern is that in your comments that you make to the press, that you will further disclose information related to the press, and further place Mr. Tartaglione at jeopardy.

However, I am confident to share with you what I have already told you, and the entire team:

1.      The investigation is far more expansive than what is described in the media.

2.      That subpoenas have gone out, and interviews have been conducted with BOP staff, civilian employees, and many detainees.

3.      That in those interviews individuals have been questioned on whether Jeffrey Epstein ever discussed his relationship with Nicholas Tartaglione.

4.      To describe their impressions of Jeffrey Epstein's mood and appearances.

5.       Whether Jeffrey Epstein provided them with any money (commissary, etc)

There is information that has been provided that Nicholas Tartaglione and Jeffrey Epstein had a strained relationship, and reports that he as uncomfortable with Nicholas Tartaglione, that Nicholas Tartaglione was putting pressure on him, and that their relationship could not be considered "good" as you described to the press.

Finally, your public explanation (or speculation) for the reasons why the Esptein lawyers said that Esptein was allegedly rough up by Nicholas Tartaglione (just to get off of suicide watch) does not find support, by comments allegedly made by Jeffrey Esptein to others after he was released from suicide watch, where he made similar comments to others.

This is the information that have been advised of in response to your question.

Based upon the above information, there is a sufficient "good faith" reason to exercise cautious restraint from any further public comments (if at all), until such time that the entire team has an opportunity to review the final reports and documents of the various investigation(s).  And not to box ourselves into statements which may very well serve to be irrevocably detrimental to Nicholas Tartaglione - whose interest is the focus of all concerned.

And, as I have actually said, all lawyers should do what they think is right, *but to do so only in compliance with the ethical, law rules that the guide professional conduct,* including those established by the BOP.   Based upon those rules, I again caution you against public statements.   Where you violate confidentiality and/or attorney client privilege, your public statements can lead to you becoming a potential witness - which shall risk your discharge from this case.

Nicholas Tartaglione wants you to remain, we are all doing everything we can to help that happen but you are resistant, and seem to want to be in the media.  Based upon your consistent comments, I am certain nothing is going to stop you from doing so, even at the expense of jeopardizing Nicholas Targalione's life.

**DX 44-1**

The entire team is prepared to move on from this issue of the possibility of potential conflicts, and place it in the court's hands where it belongs.  Finally, you still fail to grasp that the issue is the *possibility* of conflict, not actual conflict, and that counsel we are all duty bound by Second Circuit authority to inform the court when there is a *possibility* - your actions are clearly within that standard.   I am absolutely confident that the court will agree that a waiver is required.  It is my hope, for Nicholas Tartaglione's sake, the court does not make finding of fact.  This is what the law requires to protect Nicholas Tartaglione.  Everyone on the Team fully understands that.

**Meeting With Epstein Investigators**

I do not recall there being a conversation with team members or Resource Counsel your intention to approach the Epstein investigators.  I hope it is not for the purpose of offering up Nicholas Tartaglione as a witness - with a capital trial pending.  Not a good idea.

**John Wieder**

Also, in response to the question of whether I have time for a telephone with John Wieder:  Based upon what I have been previously told by you concerning the conduct of John Wieder and based upon my understanding of the law, the rules and regulations governing the conduct of attorneys inside BOP facilities, and to ensure that I do not unwittingly become a potential witness to any of his conduct to which I have no present direct knowledge, I have no interest in speaking to him in relation to his contact with Nicholas Tartaglione, until such time as there is waiver on the record concerning the possibility of potential conflict issues that have already arisen.   At this juncture, prior to a waiver, there is no benefit to Nicholas Tartaglione for me or any other lawyer associated with this case to telephone John Wieder, until there is waiver.  John Wieder enjoys no privilege from any statements that he makes to me or any other attorney on our team, about his alleged conduct and interaction with Nicholas Tartaglione.  And, I am interested in becoming a potential witness to any of the conduct that I have heard about thus far.


Tonyricco


-----Original Message-----
From: Bruce Barket <bbarket@barketepstein.com>
To: tonyricco@aol.com <tonyricco@aol.com>
Cc: Aida Leisenring <aleisenring@barketepstein.com>; Bruce Koffsky <bkoffsky@snet.net>; Michael Bachrach <michael@mbachlaw.com>; john diaz <johnadiazlaw@gmail.com>; ken@kjmontgomerylaw.com <ken@kjmontgomerylaw.com>
Sent: Sat, Aug 17, 2019 11:39 am
Subject: Re: The Letter To The Court

No need.

Once you file, I will articulate my view in a Separate letter.

I can state that I want Karas to hear the entire matter. I am not worried about my credibility and nothing said will negatively impact Nick. My credibility should be based on my word and my conduct, not what the judge doesn't know about my conduct.

I am confident that no violation of the rules of professional conduct occurred and that there not a conflict real or Potential.  Thus, there is no need for any inquiry by independent counsel or the court.  But, as you have often counseled me, every lawyer should do what they think is right.

I respect everyone's view and would never fault anyone acting in good faith for doing what they believe they are required to do under the rules.

You mentioned information you gained from various sources which you view as important on the issues you placed before us. Please share it.

**DX 44-2**

I continue to get calls from the media and I am planning on contacting the prosecutors in charge of the investigation into Epstein's death.

Withholding information may result in me doing something I otherwise would not have done or not doing something I should have.

Bruce Barket
Barket, Epstein, Kearon, Aldea & LoTurco
666 Old Country road
Garden City, NY 11530
(516) 745 1500 - O
(516) 287 7230 - M
Barket Epstein.com

On Aug 17, 2019, at 9:13 AM, "tonyricco@aol.com" <tonyricco@aol.com> wrote:

That's fine, I will put in that you object to the application.  Let me know - I am okay either way.

Tonyricco


-----Original Message-----
From: Bruce Barket <bbarket@barketepstein.com>
To: tonyricco@aol.com <tonyricco@aol.com>
Cc: Aida Leisenring <aleisenring@barketepstein.com>; bkoffsky@snet.net <bkoffsky@snet.net>; johnadiazlaw@gmail.com <johnadiazlaw@gmail.com>; ken@kjmontgomerylaw.com <ken@kjmontgomerylaw.com>; mbach2000@yahoo.com <mbach2000@yahoo.com>
Sent: Sat, Aug 17, 2019 9:09 am
Subject: Re: The Letter To The Court

Damn, you caught me just before I left.

I don't think we are going to join you on this application.  But I will reflect more on it as I ride.

Perhaps you can share the information you received.

Bruce Barket
Barket, Epstein, Kearon, Aldea & LoTurco
666 Old Country road
Garden City, NY 11530
(516) 745 1500 - O
(516) 287 7230 - M
Barket Epstein.com

On Aug 17, 2019, at 9:03 AM, "tonyricco@aol.com" <tonyricco@aol.com> wrote:

Based upon my conversation with counsel for two witnesses interviewed by federal investigators after our conference meeting yesterday, coupled with the information that I have been become aware of, we need to get ahead of this, and in a hurry - before we are on the receiving side of a government application.

Let's set the narrative and demonstrate our ethics, if we can.

Tonyricco

<Curcio letter (DRAFT)A.docx>

**DX 44-3**

## Re: Epstein's Last Days - NYT NOT QUITE!!!!

From:    Bruce Barket (bbarket@barketepstein.com)

To:      tonyricco@aol.com

Cc:      aleisenring@barketepstein.com; bkoffsky@snet.net; johnadiazlaw@gmail.com; ken@kjmontgomerylaw.com; mbach2000@yahoo.com

Date:    Saturday, August 17, 2019, 09:02 AM EDT

Interesting take. The facts will dictate what use of any either side can make of Nick and Epstein being in the same cell for a few weeks. I don't pretend to know where it will end up and I can see the mines ahead, at least some of them.

Hopping on my bike for a few hours.

I will review the letter when I get back

Bruce Barket
Barket, Epstein, Kearon, Aldea & LoTurco
666 Old Country road
Garden City, NY 11530
(516) 745 1500 - O
(516) 287 7230 - M
Barket Epstein.com

On Aug 17, 2019, at 8:46 AM, "tonyricco@aol.com" <tonyricco@aol.com> wrote:

Bruce B;

Unfortunately, your conclusion is only partially correct. It is not in dispute that being in jail is horrible, especially for a privileged middle aged white man whose life was so free of reality, so delusional that he openly proclaimed that he thought it was okay for older men to prey upon underaged teenaged girls. Nor is it in dispute that he was so destitute, having been stripped of his privileges in life (all of them), and being incarcerated in damp, dark, overcrowded jail, with lousy food and dangerous people all around, etc. Nor is it disputed, based upon information from the investigation, that Jeffrey Epstein purposefully planned to, and ultimately took his life. Jeffrey Epstein's reaction to being stripped of his privileges (that he criminally exploited to the maximum), are not in dispute nor the subject of anything in the guilt or penalty phases of our case - except for one - the investigation of Nicholas Tartaglione's prison adjustment. We are investigating the possibility of placing before a capital jury a mitigatory entitled : positive prison adjustment, and including his actions on July 23, 2019 as part of that narrative.

On this issue, our client has interacted with Mr. Epstein and many other detainees. There is an investigation going on, not by the NY Times but by the FBI, the IG and now the SDNY U.S. Attorney's Office. Subpoenas have gone out, and everyone (BOP Officers, Civilian Staff, Detainees) have been subpoenaed and interviewed. These staff members, civilian employees, and detainees are represented by reputable criminal defense attorneys who have a breath of experience in federal criminal practice.

The ongoing criminal investigation(s), contrary to what is being written about in the newspapers, has as part of its focus the relationship between Jeffrey Epstein and Nicholas Tartaglione . The answers to the questions posed by the investigators on this subject, should cause all involved in the representation of Nicholas Tartaglione to rethink and refrain from any further public statements that there was "good relationship" as was reported in the media and as was stated on Fox News. Not only are those statements, along with others such as the only reason the evidence against Nicholas Tartaglione being "leaked" is because he complained of prison conditions or negative comments were made by Epstein's attorneys as a ploy to get him off of suicide

**DX 45-1**

Yahoo Mail - Re: Epstein's Last Days - NYT - QUITE!!!

watch, placing you in jeopardy of being a potential witness, they are unleashing a powerful inquiry that is resulting in an alarming level of aggravating evidence against Nicholas Tartaglione to the contrary.

The NY Times article may thoroughly discuss Jeffrey Epstein's experiences and ultimate fate in jail, but the same cannot be said of the issue that is our concern - Jeffery Epstein's relationship with our client.

As feared, the government is, *in fact*, investigating and gathering an avalanche of evidence - from a variety of *disparate* sources - that is turning the publically proclaimed mitigator into a devastating aggravator.

Frankly, I have seen, and heard enough to clearly understand the importance of the necessary action that must be taken, and for us to put this one single mitigator on hold - not to abandon  - but to intelligently and responsibly put on hold, until these various investigations are completed and we can, at that time, revisit whether we wish to go forward with the July 23, 2019 episode as part of our mitigation case.

Until that time, however, I repeat my prior my recommendation that we all refrain from any further public statements on Jeffrey Epstein, his suicide, its plans, attempts and/or his relationship with Nicholas Tartaglione. Also, we need to try hard not to reach conclusion about the scope and depth of several investigations based upon what appears in the media.   These articles simply do not provide a basis upon which to arrive at conclusions, and certainly not worthy of a public response.

Finally, we really have so much more work to deal with, a mountain of theories to develop on the guilt and penalty phase.   The fate of this one (the value to be placed upon the act of intervention on July 23, 2019) seems pretty obvious to all - *at this juncture*.

BTW, the letter we discussed is going to circulated in a few minutes.   I would like to get it back by this afternoon, so that I can send a draft to Resource Counsel and David Patton.   If anyone, wants more time to review or consult an ethics attorney, please advise.

Tonyricco


-----Original Message-----
From: Bruce Barket <bbarket@barketepstein.com>
To: BRUCE KOFFSKY <bkoffsky@snet.net>
Cc: Aida Leisenring <aleisenring@barketepstein.com>; Tony Ricco <tonyricco@aol.com>; Michael Bachrach <michael@mbachlaw.com>; Kenneth Montgomery <ken@kjmontgomerylaw.com>; John Diaz <johnadiazlaw@gmail.com>
Sent: Sat, Aug 17, 2019 6:58 am
Subject: Re: Epstein's Last Days - NYT

Thorough and accurate.

Bruce Barket
Barket, Epstein, Kearon, Aldea & LoTurco
666 Old Country road
Garden City, NY 11530
(516) 745 1500 - O
(516) 287 7230 - M
Barket Epstein.com

On Aug 17, 2019, at 6:39 AM, BRUCE KOFFSKY <bkoffsky@snet.net> wrote:


https://www.nytimes.com/2019/08/17/nyregion/epstein-suicide-death.html?action=click&module=Top%20Stories&pgtype=Homepage


Regards.

Bruce

**DX 45-2**

Yahoo Mail - Re: Epstein's Last Days. IT'S NOT POLITE!!!

Bruce D. Koffsky, Esq.
Koffsky & Felsen, LLC
1150 Bedford Street
Stamford, CT. 06905
203-327-1500

Sent by my IPhone

**DX 45-3**

3/3

## Re: Letter To Be Filed Requesting the Appointment of Curcio Counsel

From:  tonyricco@aol.com

To:    bbarket@barketepstein.com

Cc:    aleisenring@barketepstein.com; bkoffsky@snet.net; johnadiazlaw@gmail.com; ken@kjmontgomerylaw.com; mbach2000@yahoo.com

Date:  Sunday, August 18, 2019, 07:33 AM EDT

Let's be clear, our *Curcio* letter is in compliance with the second circuit case law.   It seemed to our team that your comments were inadvertent, and that opinion remains.

If you want to write to the court and in form the court that you acted purposefully, at the comments you made were purposeful, then only you know that.   If your actions were purposeful or inadvertent, there is a need for *Curcio* Counsel.   The only difference is the remedy.   And, that is precisely why the Second Circuit has said that is a decision for the court, after *Curcio* Counsel obtains a waiver.

If you, indeed acted purposefully, then you understand the remedies.   However, if true, then the court should and will make a further inquiry - even if there is a remedy.   However, that inquiry, should await the waiver by the client, and the recommendation of *Curcio* Counsel.

The Team decided that so much effort and energy was devoted to such a fundamental concept that they would go along with your request, and your request prevailed.    The conflict free letter as written will be filed at noon today. That gives you more than enough time to read the case authorities, and the governing professional ethics.

The Team is guided by the best interest of securing that Nicholas Tartaglione maintains his counsel of choice, which happens to be you.   Your lack of knowledge and experience, and perhaps other reasons unknown and undisclosed to the rest of us, has you resistant to nothing other than a spectacular effort to help Nicholas Tartaglione, and to protect his ability to have you serve as his counsel.

This preliminary issue has run its course, at this time.   The letter authored by the team members without any possible conflicts, potential or actual, will be filed for the reasons stated above at noon today.

Enough.   I am on my way to MDC to help a young detainee to make a life or death decision.   As difficult as that task is, it is a welcomed relief and I am on may way.

Bruce Koffsky, please file our letter at noon today.   Thank you Team members for your extraordinary level of patience and commitment to protect Nicholas Tartaglione.

Tonyricco


-----Original Message-----
From: Bruce Barket <bbarket@barketepstein.com>
To: tonyricco@aol.com <tonyricco@aol.com>
Cc: Aida Leisenring <aleisenring@barketepstein.com>; bkoffsky@snet.net <bkoffsky@snet.net>;
johnadiazlaw@gmail.com <johnadiazlaw@gmail.com>; ken@kjmontgomerylaw.com
<ken@kjmontgomerylaw.com>; mbach2000@yahoo.com <mbach2000@yahoo.com>
Sent: Sun, Aug 18, 2019 6:53 am
Subject: Re: Letter To Be Filed Requesting the Appointment of Curcio Counsel

As I wrote last night, "if you want me feedback" I won't be able to review it until Sunday.  If my input isn't needed, then there is not a need to wait

At its core, it alleges that I did something wrong.  I assume it was carefully drafted and I want to carefully review it.

**DX 46-1**

Please be clear, there was not an "inadvertent [or any other type of] breach" of Nick's right to confidentiality.

I am not questioning  the good faith of any member of the team.

Bruce Barket
Barket, Epstein, Kearon, Aldea & LoTurco
666 Old Country road
Garden City, NY 11530
(516) 745 1500 - O
(516) 287 7230 - M
Barket Epstein.com

On Aug 17, 2019, at 10:14 PM, "tonyricco@aol.com" <tonyricco@aol.com> wrote:

> Bruce B:
>
> The question that is more appropriate, after hours and hours of discussing this issue, is what is the reason to wait?
>
> The application is only to alert the court of the need to appoint a Curcio counsel (period).  I have been in involved in dozens of these application over the past 25 plus years.   All counsel are aware, that the substance of whether there is a conflict to be waved awaits the conclusion reached between Nicholas Tartaglione and *Curcio* Counsel.
>
> Based upon my interview with Nicholas Tartaglione, and years of experience addressing this issue, he will waive the potential conflict.   As a result of Nicholas Tartaglione, all counsel, Resource Counsel, the Project and the Federal Defenders have worked hard to present an application (bare bones) to get his waiver without having to disclose any more confidential information (period).   You either do not or unwilling to accept that others act in good faith to secure the wishes of the client.
>
> If you can tell me one single reason why this bare bone application should be further delayed, I will accommodate you and delay the filing.   In absence of such a reason, Nicholas Tartaglione's rights will be protected by the attorneys who are free of any conflicts - potential or actual.
>
> Again, this is an application to obtain a waiver (that we all expect the defendant to execute) which (1) preserves the attorney/client privilege and (2) prevents you from becoming a potential (the word is potential) witness. Quite frankly, I do not understand your resistance to such a fundamental and rather routine application that is made when there is an inadvertent breach of a defendant's right to confidentiality.
>
> If there is something that we are missing (that is Learned Counsel, Resource Counsel, the Executive Director of the Federal Death Penalty Resource Project and the Executive Director of the Federal Defenders of New York and all the attorneys on this case who have tried a capital case to verdict, please advise).   In the absence of such information, Nicholas Tartaglione will be protected and we must move on to other critical issues.
>
> Attached is the final revision, which included the issues raised in your latest email on this subject.
>
> Let me know what you want to do.
>
> Tonyricco
>
>
>
> -----Original Message-----
> From: Bruce Barket <bbarket@barketepstein.com>
> To: tonyricco <tonyricco@aol.com>
> Cc: Michael Bachrach <michael@mbachlaw.com>; "Kenneth Montgomery" <ken@kjmontgomerylaw.com>
> Sent: Sat, Aug 17, 2019 8:58 pm
> Subject: Re: Letter To Be Filed Requesting the Appointment of Curcio Counsel

**DX 46-2**

Once again, we can agree to disagree, but you should do what you—in good faith— believe is right.

Btw, what's the need to file this on a Saturday night?

Bruce Barket
Barket, Epstein, Kearon, Aldea & LoTurco
666 Old Country road
Garden City, NY 11530
(516) 745 1500 - O
(516) 287 7230 - M
Barket Epstein.com

On Aug 17, 2019, at 8:35 PM, tonyricco <tonyricco@aol.com> wrote:

> The articles can be attached.  The letter will be filed this evening.  The informationbset forth is to respect and protect Nicholas Tartalione's right and nothing more.  Under the procedures established by the Second Circuit, the next step or additional level of disclosure shall be based upon the waiver by Nicholas Tartaglione, and the inquiry of the court.
>
> The only issue before the court, at the moment, is whether a waiver is required.  I do not think there is any dispute that a waiver is necessary here.
>
>
> Tonyricco
> Sent from my Verizon, Samsung Galaxy smartphone
>
> -------- Original message --------
> From: Bruce Barket <bbarket@barketepstein.com>
> Date: 8/17/19 7:01 PM (GMT-05:00)
> To: tonyricco@aol.com
> Cc: Aida Leisenring <aleisenring@barketepstein.com>, bkoffsky@snet.net, johnadiazlaw@gmail.com, ken@kjmontgomerylaw.com, mbach2000@yahoo.com
> Subject: Re: Letter To Be Filed Requesting the Appointment of Curcio Counsel
>
> At A quick glance it lacks details. If you're going to say I disclosed confidences, you should list them. They were In the paper so it's not like your publishing them to an audience who hasn't seen them.  Maybe attach the articles. More tomorrow
>
> Bruce Barket
> Barket, Epstein, Kearon, Aldea & LoTurco
> 666 Old Country road
> Garden City, NY 11530
> (516) 745 1500 - O
> (516) 287 7230 - M
> Barket Epstein.com
>
> On Aug 17, 2019, at 5:19 PM, "tonyricco@aol.com" <tonyricco@aol.com> wrote:
>
>> Team members:
>>
>> Attached please find a letter that will be filed with the court this evening.   Your comments are welcomed.   The letter has been vetted by David Patton and Resource Counsel.
>>
>> We look forward to your comments.
>>
>> Tonyricco
>>
>> <Curcio Letter Final Draft1A.pdf>

**DX 46-3**

<Curcio Letter Final Draft1AFINAL.pdf>

**DX 46-4**

## Re: Index of statements

From:   tonyricco@aol.com

To:     bbarket@barketepstein.com

Cc:     aleisenring@barketepstein.com; bkoffsky@snet.net; johnadiazlaw@gmail.com; ken@kjmontgomerylaw.com; mbach2000@yahoo.com

Date:   Sunday, August 18, 2019, 07:47 AM EDT

My advise is to Google your name, and get the newspapers accounts and your on line interviews.   Surely, you are not claiming your statements to the media are inadvertent and you have not even read or reviewed them.

You said you were familiar with a Curcio hearing.  That's what you said.  If so, then you understand that it is the Curcio Counsel that you provide all the information to, not the court.   And, it is the Curcio Counsel (acting on behalf of the Court) who makes the inquiry to the defendant.   The Court does not preview the issue.   Read the cases.

Gather up all our comments, it will take 10 mins.   The letter will be filed at noon, and the articles will be given to Curcio Counsel.    This procedure is set this way, to allow for a full discussion with a counsel in confidence, not the court which would damage further confidences.  That's why this procedure has been set by the Second Circuit.

Enough.  Contact and ethics lawyer, or a person at your firm who handles ethic matters.  There is a reason that Learned Counsel is required on death penalty cases, and this episode dramatically demonstrates that point.

Tonyricco


-----Original Message-----
From: Bruce Barket <bbarket@barketepstein.com>
To: tonyricco@aol.com <tonyricco@aol.com>
Cc: Aida Leisenring <aleisenring@barketepstein.com>; bkoffsky@snet.net <bkoffsky@snet.net>; johnadiazlaw@gmail.com <johnadiazlaw@gmail.com>; ken@kjmontgomerylaw.com <ken@kjmontgomerylaw.com>; mbach2000@yahoo.com <mbach2000@yahoo.com>
Sent: Sun, Aug 18, 2019 7:18 am
Subject: Re: Index of statements

Please forward the statements you refer to in the first footnote.

I asked during our call what statements you were referring to and you cited only two newspaper accounts.

It is impossible for me to fully understand the factual basis of the issues unless you point to the statements you are citing to and offering to the court

Thanks.

Bruce Barket
Barket, Epstein, Kearon, Aldea & LoTurco
666 Old Country road
Garden City, NY 11530
(516) 745 1500 - O
(516) 287 7230 - M
Barket Epstein.com

On Aug 17, 2019, at 10:14 PM, "tonyricco@aol.com" <tonyricco@aol.com> wrote:

**DX 47-1**

1/3

Bruce B:

The question that is more appropriate, after hours and hours of discussing this issue, is what is the reason to wait?

The application is only to alert the court of the need to appoint a Curcio counsel (period). I have been in involved in dozens of these application over the past 25 plus years. All counsel are aware, that the substance of whether there is a conflict to be waved awaits the conclusion reached between Nicholas Tartaglione and *Curcio* Counsel.

Based upon my interview with Nicholas Tartaglione, and years of experience addressing this issue, he will waive the potential conflict. As a result of Nicholas Tartaglione, all counsel, Resource Counsel, the Project and the Federal Defenders have worked hard to present an application (bare bones) to get his waiver without having to disclose any more confidential information (period). You either do not or unwilling to accept that others act in good faith to secure the wishes of the client.

If you can tell me one single reason why this bare bone application should be further delayed, I will accommodate you and delay the filing. In absence of such a reason, Nicholas Tartaglione's rights will be protected by the attorneys who are free of any conflicts - potential or actual.

Again, this is an application to obtain a waiver (that we all expect the defendant to execute) which (1) preserves the attorney/client privilege and (2) prevents you from becoming a potential (the word is potential) witness. Quite frankly, I do not understand your resistance to such a fundamental and rather routine application that is made when there is an inadvertent breach of a defendant's right to confidentiality.

If there is something that we are missing (that is Learned Counsel, Resource Counsel, the Executive Director of the Federal Death Penalty Resource Project and the Executive Director of the Federal Defenders of New York and all the attorneys on this case who have tried a capital case to verdict, please advise). In the absence of such information, Nicholas Tartaglione will be protected and we must move on to other critical issues.

Attached is the final revision, which included the issues raised in your latest email on this subject.

Let me know what you want to do.

Tonyricco


-----Original Message-----
From: Bruce Barket <bbarket@barketepstein.com>
To: tonyricco <tonyricco@aol.com>
Cc: Michael Bachrach <michael@mbachlaw.com>; "Kenneth Montgomery" <ken@kjmontgomerylaw.com>
Sent: Sat, Aug 17, 2019 8:58 pm
Subject: Re: Letter To Be Filed Requesting the Appointment of Curcio Counsel

Once again, we can agree to disagree, but you should do what you—in good faith— believe is right.

Btw, what's the need to file this on a Saturday night?

Bruce Barket
Barket, Epstein, Kearon, Aldea & LoTurco
666 Old Country road
Garden City, NY 11530
(516) 745 1500 - O
(516) 287 7230 - M
Barket Epstein.com

On Aug 17, 2019, at 8:35 PM, tonyricco <tonyricco@aol.com> wrote:

**DX 47-2**

The articles can be attached.  The letter will be filed this evening.  The informationbset forth is to respect and protect Nicholas Tartalione's right and nothing more.  Under the procedures established by the Second Circuit, the next step or additional level of disclosure shall be based upon the waiver by Nicholas Tartaglione, and the inquiry of the court.

The only issue before the court, at the moment, is whether a waiver is required.  I do not think there is any dispute that a waiver is necessary here.


Tonyricco
Sent from my Verizon, Samsung Galaxy smartphone

-------- Original message --------
From: Bruce Barket <bbarket@barketepstein.com>
Date: 8/17/19 7:01 PM (GMT-05:00)
To: tonyricco@aol.com
Cc: Aida Leisenring <aleisenring@barketepstein.com>, bkoffsky@snet.net, johnadiazlaw@gmail.com, ken@kjmontgomerylaw.com, mbach2000@yahoo.com
Subject: Re: Letter To Be Filed Requesting the Appointment of Curcio Counsel

At A quick glance it lacks details. If you're going to say I disclosed confidences, you should list them. They were In the paper so it's not like your publishing them to an audience who hasn't seen them.  Maybe attach the articles. More tomorrow

Bruce Barket
Barket, Epstein, Kearon, Aldea & LoTurco
666 Old Country road
Garden City, NY 11530
(516) 745 1500 - O
(516) 287 7230 - M
Barket Epstein.com

On Aug 17, 2019, at 5:19 PM, "tonyricco@aol.com" <tonyricco@aol.com> wrote:

Team members:

Attached please find a letter that will be filed with the court this evening.   Your comments are welcomed.   The letter has been vetted by David Patton and Resource Counsel.

We look forward to your comments.

Tonyricco

<Curcio Letter Final Draft1A.pdf>


<Curcio Letter Final Draft1AFINAL.pdf>

**DX 47-3**

## Re: Letter To Be Filed Requesting the Appointment of Curcio Counsel

From:　Aida Leisenring (aleisenring@barketepstein.com)

To:　　tonyricco@aol.com; bbarket@barketepstein.com

Cc:　　bkoffsky@snet.net; johnadiazlaw@gmail.com; ken@kjmontgomerylaw.com; mbach2000@yahoo.com

Date:　Sunday, August 18, 2019, 11:38 AM EDT

If the Court is not going to be reviewing it sooner than tomorrow morning, can Bruce B please wait until later this afternoon assuming he is able to?

I appreciate the time every one has put into this already but we need a little more, especially if the letter expresses our position.

Get Outlook for iOS

On Sun, Aug 18, 2019 at 7:33 AM -0400, "tonyricco@aol.com" <tonyricco@aol.com> wrote:

Let's be clear, our *Curcio* letter is in compliance with the second circuit case law.　It seemed to our team that your comments were inadvertent, and that opinion remains.

If you want to write to the court and in form the court that you acted purposefully, at the comments you made were purposeful, then only you know that.　If your actions were purposeful or inadvertent, there is a need for *Curcio* Counsel.　The only difference is the remedy.　And, that is precisely why the Second Circuit has said that is a decision for the court, after *Curcio* Counsel obtains a waiver.

If you, indeed acted purposefully, then you understand the remedies.　However, if true, then the court should and will make a further inquiry - even if there is a remedy.　However, that inquiry, should await the waiver by the client, and the recommendation of *Curcio* Counsel.

The Team decided that so much effort and energy was devoted to such a fundamental concept that they would go along with your request, and your request prevailed.　The conflict free letter as written will be filed at noon today.　That gives you more than enough time to read the case authorities, and the governing professional ethics.

The Team is guided by the best interest of securing that Nicholas Tartaglione maintains his counsel of choice, which happens to be you.　Your lack of knowledge and experience, and perhaps other reasons unknown and undisclosed to the rest of us, has you resistant to nothing other than a spectacular effort to help Nicholas Tartaglione, and to protect his ability to have you serve as his counsel.

This preliminary issue has run its course, at this time.　The letter authored by the team members without any possible conflicts, potential or actual, will be filed for the reasons stated above at noon today.

Enough.　I am on my way to MDC to help a young detainee to make a life or death decision.　As difficult as that task is, it is a welcomed relief and I am on may way.

Bruce Koffsky, please file our letter at noon today.　Thank you Team members for your extraordinary level of patience and commitment to protect Nicholas Tartaglione.

Tonyricco

**DX 48-1**

-----Original Message-----
From: Bruce Barket <bbarket@barketepstein.com>
To: tonyricco@aol.com <tonyricco@aol.com>
Cc: Aida Leisenring <aleisenring@barketepstein.com>; bkoffsky@snet.net <bkoffsky@snet.net>;
johnadiazlaw@gmail.com <johnadiazlaw@gmail.com>; ken@kjmontgomerylaw.com
<ken@kjmontgomerylaw.com>; mbach2000@yahoo.com <mbach2000@yahoo.com>
Sent: Sun, Aug 18, 2019 6:53 am
Subject: Re: Letter To Be Filed Requesting the Appointment of Curcio Counsel

As I wrote last night, "if you want me feedback" I won't be able to review it until Sunday.  If my input isn't
needed, then there is not a need to wait

At its core, it alleges that I did something wrong.  I assume it was carefully drafted and I want to carefully
review it.

Please be clear, there was not an "inadvertent [or any other type of] breach" of Nick's right to confidentiality.

I am not questioning  the good faith of any member of the team.

Bruce Barket
Barket, Epstein, Kearon, Aldea & LoTurco
666 Old Country road
Garden City, NY 11530
(516) 745 1500 - O
(516) 287 7230 - M
Barket Epstein.com

On Aug 17, 2019, at 10:14 PM, "tonyricco@aol.com" <tonyricco@aol.com> wrote:

Bruce B:

The question that is more appropriate, after hours and hours of discussing this issue, is what is the reason
to wait?

The application is only to alert the court of the need to appoint a Curcio counsel (period).  I have been in
involved in dozens of these application over the past 25 plus years.   All counsel are aware, that the
substance of whether there is a conflict to be waved awaits the conclusion reached between Nicholas
Tartaglione and *Curcio* Counsel.

Based upon my interview with Nicholas Tartaglione, and years of experience addressing this issue, he will
waive the potential conflict.   As a result of Nicholas Tartaglione, all counsel, Resource Counsel, the Project
and the Federal Defenders have worked hard to present an application (bare bones) to get his waiver
without having to disclose any more confidential information (period).   You either do not or unwilling to
accept that others act in good faith to secure the wishes of the client.

If you can tell me one single reason why this bare bone application should be further delayed, I will
accommodate you and delay the filing.   In absence of such a reason, Nicholas Tartaglione's rights will be
protected by the attorneys who are free of any conflicts - potential or actual.

Again, this is an application to obtain a waiver (that we all expect the defendant to execute) which (1)
preserves the attorney/client privilege and (2) prevents you from becoming a potential (the word is potential)
witness.  Quite frankly, I do not understand your resistance to such a fundamental and rather routine
application that is made when there is an inadvertent breach of a defendant's right to confidentiality.

If there is something that we are missing (that is Learned Counsel, Resource Counsel, the
Executive Director of the Federal Death Penalty Resource Project and the Executive Director of the Federal
Defenders of New York and all the attorneys on this case who have tried a capital case to verdict, please
advise).   In the absence of such information, Nicholas Tartaglione will be protected and we must move on to
other critical issues.

**DX 48-2**

Attached is the final revision, which included the issues raised in your latest email on this subject.

Let me know what you want to do.

Tonyricco


-----Original Message-----
From: Bruce Barket <bbarket@barketepstein.com>
To: tonyricco <tonyricco@aol.com>
Cc: Michael Bachrach <michael@mbachlaw.com>; "Kenneth Montgomery" <ken@kjmontgomerylaw.com>
Sent: Sat, Aug 17, 2019 8:58 pm
Subject: Re: Letter To Be Filed Requesting the Appointment of Curcio Counsel

Once again, we can agree to disagree, but you should do what you—in good faith— believe is right.

Btw, what's the need to file this on a Saturday night?

Bruce Barket
Barket, Epstein, Kearon, Aldea & LoTurco
666 Old Country road
Garden City, NY 11530
(516) 745 1500 - O
(516) 287 7230 - M
Barket Epstein.com


On Aug 17, 2019, at 8:35 PM, tonyricco <tonyricco@aol.com> wrote:


The articles can be attached.  The letter will be filed this evening.  The informationbset forth is to respect and protect Nicholas Tartalione's right and nothing more.  Under the procedures established by the Second Circuit, the next step or additional level of disclosure shall be based upon the waiver by Nicholas Tartaglione, and the inquiry of the court.

The only issue before the court, at the moment, is whether a waiver is required.  I do not think there is any dispute that a waiver is necessary here.


Tonyricco
Sent from my Verizon, Samsung Galaxy smartphone

-------- Original message --------
From: Bruce Barket <bbarket@barketepstein.com>
Date: 8/17/19 7:01 PM (GMT-05:00)
To: tonyricco@aol.com
Cc: Aida Leisenring <aleisenring@barketepstein.com>, bkoffsky@snet.net, johnadiazlaw@gmail.com, ken@kjmontgomerylaw.com, mbach2000@yahoo.com
Subject: Re: Letter To Be Filed Requesting the Appointment of Curcio Counsel

At A quick glance it lacks details. If you're going to say I disclosed confidences, you should list them. They were In the paper so it's not like your publishing them to an audience who hasn't seen them.  Maybe attach the articles. More tomorrow

Bruce Barket
Barket, Epstein, Kearon, Aldea & LoTurco
666 Old Country road
Garden City, NY 11530
(516) 745 1500 - O
(516) 287 7230 - M
Barket Epstein.com

**DX 48-3**

On Aug 17, 2019, at 5:19 PM, "tonyricco@aol.com" <tonyricco@aol.com> wrote:

Team members:

Attached please find a letter that will be filed with the court this evening.   Your comments are welcomed.   The letter has been vetted by David Patton and Resource Counsel.

We look forward to your comments.

Tonyricco

<Curcio Letter Final Draft1A.pdf>


<Curcio Letter Final Draft1AFINAL.pdf>

**DX 48-4**

## The Scope of Inquiry of Curcio Counsel

From:  tonyricco@aol.com

To:  aleisenring@barketmarion.com; bbarket@barketmarion.com; bkoffsky@snet.net; johnadiazlaw@gmail.com; ken@kjmontgomerylaw.com; mbach2000@yahoo.com; tonyricco@aol.com

Date:  Thursday, August 22, 2019, 06:57 AM EDT

To all Counsel:

This email is to make clear my position on the issue of whether the so-called note allegedly discovered in a book by Nicholas Tartaglione must be disclosed to Curcio Counsel.  The reasons set forth below, the answer is yes.  Disclosure of the so-called note is necessary to properly protect Nicholas Tartaglione's right to conflict free counsel for the following reasons:

1.    Based upon the public disclosure by Bruce Barket of information revealed by the client in confidence, most counsel on this case was of the opinion that the appointment of Curcio Counsel was required to protect the interest of our client Nicholas Tartaglione.  The Court agreed and, in compliance with the Second Circuit case authority, appointed Bobbi Sternheim as *Curcio* Counsel.

2.    There are members of the team, who have a different view of whether the conduct engaged in by counsel has the potential of adversely impacting the right of Nicholas Tartaglione to have conflict free counsel.   Based upon the information that we have been provided with in relation to the so-called note, the public disclosure of information in relation to discussions with Nicholas Tartaglione in relation to the Epstein matter *thus far* constitutes a waivable conflict of interest.  I am aware that there are two attorneys on the team who have a different view.

3.    In order to obtain a lawful waiver, *Curcio* Counsel is required to have an open, candid and honest discussion with NIcholas Tartaglione about the advice given to him in relation to his observations and conduct in relation to the Epstein attempted suicide and the suicide.   Public statements have been made to the press about those observations, in my view, in violation of the Rules of Professional Conduct and also serve as the gateway to a potential for a conflict for counsel.  Two members of the team have a view that there has been no disclosure of confidential information, and therefore no possibility of a conflict.   This point of view was reiterated and stated directly to the court during our *ex parte* communication with court on August 21, 2019.   The court correctly restated the law and  appointed *Curcio* Counsel.   The ultimate decision of whether this case involves a waivable or non-waivable conflict awaited *Curcio* Counsel's investigation and recommendation.   The court also reminded all that given the "high stakes in this case," an attorney of high standards, stature and knowledge was required to conduct a proper inquiry.

4.    *Curcio* Counsel will, as part of her responsibility to the court and, most importantly to Nicholas Tartaglione conduct an interview of Nicholas Tartaglione in relation to the public statements disclosed by counsel in relation to the Epstein attempted suicide and suicide.

5.    Since the case also involves obtaining a waiver, *Curcio* Counsel will make an inquiry of the legal advice counsel has given, if any, to Nicholas Tartaglione in relation to the Epstein attempted suicide and suicide, and whether such advice has impacted the decision to waive.

6.    Also Nicholas Tartaglione's attorneys are also required to inform and advise *Curcio* Counsel of the discussions with Nicholas Tartaglione and the advice given in relation to the public disclosure of information in relation to the Epstein attempted suicide and suicide, and how those statements and/or advise raise the possibility of a conflict.

7.    Attorney Barket has reasonably asked for a discussion among counsel of whether as counsel we should disclose to *Curcio* Counsel (1) our conversations with Nicholas Targatlione (and among each other) of the existence of and information concerning the so-called note claimed to be found inside a book by Nicholas Tartaglione; (2) and how the existence of and information concerning the so-called note is a factor related to the issue of whether there is a possibility of a conflict in this case.   Attorney Barket's question raising the issue is a fair matter for all counsel to consider.   However, it is clear that the complete knowledge and information surrounding the discovery of the note,

**DX 49-1**

the circumstances under which the note was allegedly removed from the MCC, the present whereabouts of the so-called note and other matters are not factors to which most counsel lack any personal or direct knowledge.

8.    Having given this matter considerable thought, I am of the view that as counsel I' am obligated, in my role to protect the interest of Nicholas Tartaglione to engage in open and honest discussions with *Curcio* Counsel.  I have an ethical responsibility to ensure that *Curcio* Counsel has complete truthful information upon which to conduct her inquiry with Nicholas Tartaglione, and upon which to make her ultimate recommendation to the court.  My decision is based upon our professional ethics, along with the expectations of the court that our representation reflect the heighten standards required for a defendant facing the highest stakes in our criminal justice system - the death penalty.

9.    Therefore, consistent with counsel's responsibilities under Rule 3.3 (Conduct Before Tribunal) and Rule 1.4 (Communications) of New York Rules of Professional Conduct and pursuant to ABA Capital Guidelines 10.2, 10.5, 10.7(A) & (B)(2), 10.8, 10.10.1 and 10.11, I am of the view that *Curcio* Counsel **must be** advised of the so-called note in this case.   And, that a discussion of the so-note must be part of *Curcio* Counsel's discussion with Nicholas Tartaglione's decision to waive any possible conflict that arises from the so-call note related to the information he possesses in connection to the public  disclosures of the Epstein attempted suicide and suicide by attorney Bruce Barket to the press.

In have made the above views known via this email, because I will be traveling to Cleveland later today on business related to the national Federal Defender Services program, and will be in Cleveland until Saturday.   Since *Curcio* Counsel must timely meet with Nicholas Tartaglione, I did not want my absence to delay the timely discussion requested by Bruce Barket.   That discussion should take place as soon as possible, so that *Curcio* Counsel has the benefit of our insights to move forward with her responsibilities to Nicholas Tartaglione and the Court.

Finally, I have discussed the foregoing with my own ethics counsel, and I strongly suggest for those attorneys who have any doubt about the foregoing conclusion that they do the same.

Tonyricco

**DX 49-2**

2/2

## Re: The Scope of Inquiry of Curcio Counsel

From:   Bruce Barket (bbarket@barketepstein.com)

To:     kennethjmontgomery@gmail.com

Cc:     michael@mbachlaw.com; tonyricco@aol.com; aleisenring@barketepstein.com; bkoffsky@snet.net; johnadiazlaw@gmail.com; ken@kjmontgomerylaw.com

Date:   Thursday, August 22, 2019, 09:09 AM EDT

Tony,

I think consulting an ethics expert is a good idea here, for each of us if we choose, AND for all of us, at least to give us advice and answer questions.   The rules permit disclose of confidences to consult with ethics counsel.

Can we use your expert?  If not, I would be happy to retain someone to advise all of us and answer questions.

It's one thing to say "I have consulted ethics counsel" and another to have an expert at a meeting to advise us and guide a discussion.


Bruce Barket
Barket, Epstein, Kearon, Aldea & LoTurco
666 Old Country road
Garden City, NY 11530
(516) 745 1500 - O
(516) 287 7230 - M
Barket Epstein.com

> On Aug 22, 2019, at 8:34 AM, Kenneth J. Montgomery Esq <kennethjmontgomery@gmail.com> wrote:
>
> I can phone in.
>
> Sent from kjmontgomerylaw.com
>
>
> On Aug 22, 2019, at 8:15 AM, Michael Bachrach <mbach2000@yahoo.com> wrote:
>
>> Since Bobbi wants to visit Nick on Monday, let's meet tomorrow if we can.  I can host at my office in midtown if that's convenient for everyone, though I'm fine to go elsewhere too.
>>
>> How's 11:00 a.m. tomorrow at my place?
>>
>> --Michael
>>
>> Sent from Yahoo Mail on Android
>>
>>> On Thu, Aug 22, 2019 at 8:07 AM, Bruce Barket <bbarket@barketepstein.com> wrote:
>>>
>>>> So, when do we meet and where?
>>>>
>>>> Bruce Barket

**DX 50-1**

Barket, Epstein, Kearon, Aldea & LoTurco
666 Old Country road
Garden City, NY 11530
(516) 745 1500 - O
(516) 287 7230 - M
Barket Epstein.com

On Aug 22, 2019, at 6:57 AM, "tonyricco@aol.com" <tonyricco@aol.com> wrote:

To all Counsel:

This email is to make clear my position on the issue of whether the so-called note allegedly discovered in a book by Nicholas Tartaglione must be disclosed to Curcio Counsel. The reasons set forth below, the answer is yes. Disclosure of the so-called note is necessary to properly protect Nicholas Tartaglione's right to conflict free counsel for the following reasons:

1.    Based upon the public disclosure by Bruce Barket of information revealed by the client in confidence, most counsel on this case was of the opinion that the appointment of Curcio Counsel was required to protect the interest of our client Nicholas Tartaglione. The Court agreed and, in compliance with the Second Circuit case authority, appointed Bobbi Sternheim as *Curcio* Counsel.

2.    There are members of the team, who have a different view of whether the conduct engaged in by counsel has the potential of adversely impacting the right of Nicholas Tartaglione to have conflict free counsel. Based upon the information that we have been provided with in relation to the so-called note, the public disclosure of information in relation to discussions with Nicholas Tartaglione in relation to the Epstein matter *thus far* constitutes a waivable conflict of interest. I am aware that there are two attorneys on the team who have a different view.

3.    In order to obtain a lawful waiver, *Curcio* Counsel is required to have an open, candid and honest discussion with NIcholas Tartaglione about the advice given to him in relation to his observations and conduct in relation to the Epstein attempted suicide and the suicide. Public statements have been made to the press about those observations, in my view, in violation of the Rules of Professional Conduct and also serve as the gateway to a potential for a conflict for counsel. Two members of the team have a view that there has been no disclosure of confidential information, and therefore no possibility of a conflict. This point of view was reiterated and stated directly to the court during our *ex parte* communication with court on August 21, 2019. The court correctly restated the law and appointed *Curcio* Counsel. The ultimate decision of whether this case involves a waivable or non-waivable conflict awaited *Curcio* Counsel's investigation and recommendation. The court also reminded all that given the "high stakes in this case," an attorney of high standards, stature and knowledge was required to conduct a proper inquiry.

4.    *Curcio* Counsel will, as part of her responsibility to the court and, most importantly to Nicholas Tartaglione conduct an interview of Nicholas Tartaglione in relation to the public statements disclosed by counsel in relation to the Epstein attempted suicide and suicide.

5.    Since the case also involves obtaining a waiver, *Curcio* Counsel will make an inquiry of the legal advice counsel has given, if any, to Nicholas Tartaglione in relation to the Epstein attempted suicide and suicide, and whether such advice has impacted the decision to waive.

6.    Also Nicholas Tartaglione's attorneys are also required to inform and advise *Curcio* Counsel of the discussions with Nicholas Tartaglione and the advice given in relation to the public disclosure of information in relation to the Epstein attempted suicide and suicide, and how those statements and/or advise raise the possibility of a conflict.

7.    Attorney Barket has reasonably asked for a discussion among counsel of whether as counsel we should disclose to *Curcio* Counsel (1) our conversations with Nicholas Targatlione (and among each other) of the existence of and information concerning the so-called note claimed to be found inside a book by Nicholas Tartaglione; (2) and how the existence of and information concerning the so-called note is a factor related to the issue of whether there is a possibility of a conflict in this case. Attorney Barket's question raising the issue is a fair matter for all counsel to consider.

**DX 50-2**

However, it is clear that the complete knowledge and information surrounding the discovery of the note, the circumstances under which the note was allegedly removed from the MCC, the present whereabouts of the so-called note and other matters are not factors to which most counsel lack any personal or direct knowledge.

8.      Having given this matter considerable thought, I am of the view that as counsel I' am obligated, in my role to protect the interest of Nicholas Tartaglione to engage in open and honest discussions with *Curcio* Counsel.  I have an ethical responsibility to ensure that *Curcio* Counsel has complete truthful information upon which to conduct her inquiry with Nicholas Tartaglione, and upon which to make her ultimate recommendation to the court.  My decision is based upon our professional ethics, along with the expectations of the court that our representation reflect the heighten standards required for a defendant facing the highest stakes in our criminal justice system - the death penalty.

9.      Therefore, consistent with counsel's responsibilities under Rule 3.3 (Conduct Before Tribunal) and Rule 1.4 (Communications) of New York Rules of Professional Conduct and pursuant to ABA Capital Guidelines 10.2, 10.5, 10.7(A) & (B)(2), 10.8, 10.10.1 and 10.11, I am of the view that *Curcio* Counsel **must be** advised of the so-called note in this case.   And, that a discussion of the so-note must be part of *Curcio* Counsel's discussion with Nicholas Tartaglione's decision to waive any possible conflict that arises from the so-call note related to the information he possesses in connection to the public  disclosures of the Epstein attempted suicide and suicide by attorney Bruce Barket to the press.

In have made the above views known via this email, because I will be traveling to Cleveland later today on business related to the national Federal Defender Services program, and will be in Cleveland until Saturday.   Since *Curcio* Counsel must timely meet with Nicholas Tartaglione, I did not want my absence to delay the timely discussion requested by Bruce Barket.   That discussion should take place as soon as possible, so that *Curcio* Counsel has the benefit of our insights to move forward with her responsibilities to Nicholas Tartaglione and the Court.

Finally, I have discussed the foregoing with my own ethics counsel, and I strongly suggest for those attorneys who have any doubt about the foregoing conclusion that they do the same.

Tonyricco

**DX 50-3**

## RE: Nicholas Tartaglione - COUNSEL ONLY

From:  Bruce Barket (bbarket@barketepstein.com)

To:    kennethjmontgomery@gmail.com

Cc:    michael@mbachlaw.com; aleisenring@barketepstein.com; bkoffsky@snet.net; tonyricco@aol.com;
       johnadiazlaw@gmail.com

Date:  Thursday, August 22, 2019, 11:38 AM EDT

Absolutely, individual lawyers can and perhaps should consult their own lawyer. I am suggesting that we have someone in the room to advise us all and answer questions

Bruce A. Barket, Esq.

Barket Epstein Kearon Aldea & LoTurco, LLP

666 Old Country Road , Ste. 700

Garden City, NY 11530

(516) 745 1500 [P]  (516) 745 1245 [F]

www.barketepstein.com

This transmittal may be a confidential attorney client communication or may otherwise be privileged or confidential. If it is not clear that you are the intended recipient, you are hereby notified that you have received this transmittal in error; any review, dissemination, distribution or copying of this transmittal is strictly prohibited. If you suspect that you have received this communication in error, please notify us immediately by telephone or email and immediately delete this message and all its attachments

**From:** Kenneth J. Montgomery Esq [mailto:kennethjmontgomery@gmail.com]
**Sent:** Thursday, August 22, 2019 11:36 AM
**To:** Bruce Barket
**Cc:** Michael Bachrach; Aida Leisenring; BRUCE KOFFSKY; "Anthony L. Ricco" ; johnadiazlaw@gmail.com
**Subject:** Re: Nicholas Tartaglione - COUNSEL ONLY

Wouldn't it make sense for counsel to be sought individually since each attorney does not have the same relationship to the ethical issue and its associated facts?

Sent from kjmontgomerylaw.com

On Aug 22, 2019, at 11:33 AM, Bruce Barket <bbarket@barketepstein.com> wrote:

**DX 51-1**

Mike,

Thanks.  I will take a look at this.  What are thoughts about retaining an ethics expert to participate in a meeting?


Bruce A. Barket, Esq.

Barket Epstein Kearon Aldea & LoTurco, LLP

666 Old Country Road , Ste. 700

Garden City, NY 11530

(516) 745 1500 [P]  (516) 745 1245 [F]

www.barketepstein.com


This transmittal may be a confidential attorney client communication or may otherwise be privileged or confidential. If it is not clear that you are the intended recipient, you are hereby notified that you have received this transmittal in error; any review, dissemination, distribution or copying of this transmittal is strictly prohibited. If you suspect that you have received this communication in error, please notify us immediately by telephone or email and immediately delete this message and all its attachments

---

**From:** Michael Bachrach [mailto:mbach2000@yahoo.com]
**Sent:** Thursday, August 22, 2019 11:01 AM
**To:** Aida Leisenring; BRUCE KOFFSKY; "Anthony L. Ricco"; johnadiazlaw@gmail.com; Bruce Barket; Kenneth J. Montgomery Esq
**Subject:** Re: Nicholas Tartaglione - COUNSEL ONLY


Hi all,


Attached for your review are the Basecamp threads that I view as responsive and/or relevant to Bobbi's inquiry.  I've redacted portions of the conversations that do not relate to the Curcio inquiry (e.g., discussions related to Kim Tinsely, expert witnesses, and the time Nick had all of those cuts on his head).


In putting this together just now, I did not review any Basecamp threads prior to the July 23, 2019 incident.  If there's something prior to that incident that someone thinks is relevant, please let me know so I can include it.

**DX 51-2**

Let me know your thoughts.  Thanks.


--Michael


P.S. If this case ever reaches the 2255 land, Basecamp will be a huge asset.  It was so easy to put these files together.  I haven't attemped to look through non-Basecamp emails, and I shudder to think how difficult a task that will be if 2255 counsel ever asks us to do so 5 or 10 years from now, or whatever year that might finally come.


=========================

Michael K. Bachrach, Esq.

276 Fifth Ave., Suite 501

New York, NY 10001

tel: (212) 929-0592

fax: (866) 328-1630

cell: (917) 304-5044

michael@mbachlaw.com


On Thursday, August 22, 2019, 10:05:58 AM EDT, Michael Bachrach <mbach2000@yahoo.com> wrote:


Hey Bruce,


Putting aside the elephant in the room, Bobbi's email appears to be asking for any written communications between counsel and/or with the client that might be relevant to the Curcio inquiry.  I'm going to look through Basecamp and pick out the messages that I believe relevant.  I'll then forward them to you, Tony, etc. (but not Bobbi), to confirm if everyone agrees with me regarding their relevance.


To be honest, there's been a lot of discussion on Basecamp about the media, but I don't remember how much actually related to privilege or conflicts as opposed to mere strategy disagreements.  I am of the view that disagreements over whether to speak to the press, period in any capital context, is beyond the Curcio inquiry.  But discussion of what statements in the press did or did not create privilege or conflict issues is likely within the scope of the inquiry.

**DX 51-3**

Again, whatever I find on Basecamp that I think is relevant I will share with everyone on this email chain *before* sending to Bobbi.  If anyone disagrees with what I view of as within or outside the scope, we can discuss it at that point.


Obviously, I took Bobbi off this email.


--Michael


===========================

Michael K. Bachrach, Esq.

276 Fifth Ave., Suite 501

New York, NY 10001

tel: (212) 929-0592

fax: (866) 328-1630

cell: (917) 304-5044

michael@mbachlaw.com


On Wednesday, August 21, 2019, 09:07:41 PM EDT, Bruce Barket <bbarket@barketepstein.com> wrote:


Other than the articles and the news videos, what else will you need?

Bruce A. Barket, Esq.

Barket Epstein Kearon Aldea & LoTurco, LLP

666 Old Country Road , Ste. 700

Garden City, NY 11530

(516) 745 1500 [P]  (516) 745 1245 [F]

www.barketepstein.com

**DX 51-4**

Yahoo Mail - RE: Nicholas Tartaglione - COUNSEL ONLY

This transmittal may be a confidential attorney client communication or may otherwise be privileged or confidential. If it is not clear that you are the intended recipient, you are hereby notified that you have received this transmittal in error; any review, dissemination, distribution or copying of this transmittal is strictly prohibited. If you suspect that you have received this communication in error, please notify us immediately by telephone or email and immediately delete this message and all its attachments

---

**From:** BOBBI C STERNHEIM [mailto:bcsternheim@mac.com]
**Sent:** Wednesday, August 21, 2019 9:01 PM
**To:** Bruce Barket; Aida Leisenring; BRUCE KOFFSKY; ""Anthony L. Ricco""; Michael Bachrach; johnadiazlaw@gmail.com
**Subject:** Nicholas Tartaglione

Good evening-

I plan to meet with Nick on Monday @ 9 am

and have sent my request to MCC Legal.

In preparation for my assignment, I will need to

review relevant documents/correspondence.

I hope to email my request to you by Friday.

Best-

Bobbi

**BOBBI C. STERNHEIM, ESQ.**

**Law Offices of Bobbi C. Sternheim**

**33 West 19th Street - 4th Floor**

**New York, NY 10011**

**Main:**   **212-243-1100**

**Cell:**    **917-912-9698**

**Fax:**     **888-587-4737**

**bcsternheim@mac.com**

*This message and any attached documents contain information from the Law Offices of Bobbi C. Sternheim*

*that may be confidential and/or privileged.*

*If you are not the intended recipient, you may not read, copy, distribute, or use this information.*

**DX 51-5**

Yahoo Mail - RE: Nicholas Tartaglione COUNSEL ONLY

*If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete this message. Thank you.*

**DX 51-6**

## RE: Nicholas Tartaglione - COUNSEL ONLY

From:  tonyricco (tonyricco@aol.com)

To:  bbarket@barketepstein.com; kennethjmontgomery@gmail.com

Cc:  michael@mbachlaw.com; aleisenring@barketepstein.com; bkoffsky@snet.net; johnadiazlaw@gmail.com

Date:  Thursday, August 22, 2019, 12:02 PM EDT

There is no reason for the appointment of an ethics lawyer to advise us on the issues that the attorneys who have knowledge about the note want to share with the other counsel in the case.  I have individually consulted my own counsel, and a have aa very thorough understanding of these issues after 38 years of practice.  Based upon the advise and knowledge of the law, no group ethics attorney is needed for the decision of whether we an attorney is obligated to be truthful, hones and through in an inquiry conducted by Curcio Counsel.

If there is any attorney who believes that such a contrary authority or ethical rule exists, please let advise.

Everyonne has been saying to date that they understand the ethical rules, etc.  If any attorney is having second thoughts then perhaps that attorney should, as i have repeadly suggested, contact their own, individual counsel to advise that attorney on his individual conduct and responsibility under the ethical rules, for starters.

We are this position because counsel engaged in conduct that others believed should not have been undertaken.  The reasons said action was undertaken should be in compliance with the ethical standards required of an attorney representing a defendant facing the death penalty.  Those same rules say that Curcio consul must be advised of all information relevant to conflicts and statementns disclosed in the press.

tonyricco


Sent from my Verizon, Samsung Galaxy smartphone

-------- Original message --------
From: Bruce Barket <bbarket@barketepstein.com>
Date: 8/22/19 11:38 AM (GMT-05:00)
To: "'Kenneth J. Montgomery Esq'" <kennethjmontgomery@gmail.com>
Cc: Michael Bachrach <michael@mbachlaw.com>, Aida Leisenring <aleisenring@barketepstein.com>, BRUCE KOFFSKY <bkoffsky@snet.net>, "'"Anthony L. Ricco"'" <tonyricco@aol.com>, johnadiazlaw@gmail.com
Subject: RE: Nicholas Tartaglione - COUNSEL ONLY


Absolutely, individual lawyers can and perhaps should consult their own lawyer. I am suggesting that we have someone in the room to advise us all and answer questions


Bruce A. Barket, Esq.

Barket Epstein Kearon Aldea & LoTurco, LLP

666 Old Country Road , Ste. 700

Garden City, NY 11530

(516) 745 1500 [P]  (516) 745 1245 [F]

www.barketepstein.com

**DX 52-1**

This transmittal may be a confidential attorney client communication or may otherwise be privileged or confidential. If it is not clear that you are the intended recipient, you are hereby notified that you have received this transmittal in error; any review, dissemination, distribution or copying of this transmittal is strictly prohibited. If you suspect that you have received this communication in error, please notify us immediately by telephone or email and immediately delete this message and all its attachments

---

**From:** Kenneth J. Montgomery Esq [mailto:kennethjmontgomery@gmail.com]
**Sent:** Thursday, August 22, 2019 11:36 AM
**To:** Bruce Barket
**Cc:** Michael Bachrach; Aida Leisenring; BRUCE KOFFSKY; "Anthony L. Ricco" ; johnadiazlaw@gmail.com
**Subject:** Re: Nicholas Tartaglione - COUNSEL ONLY

Wouldn't it make sense for counsel to be sought individually since each attorney does not have the same relationship to the ethical issue and its associated facts?

Sent from kjmontgomerylaw.com

On Aug 22, 2019, at 11:33 AM, Bruce Barket <bbarket@barketepstein.com> wrote:

Mike,

Thanks.  I will take a look at this.  What are thoughts about retaining an ethics expert to participate in a meeting?

Bruce A. Barket, Esq.

Barket Epstein Kearon Aldea & LoTurco, LLP

666 Old Country Road , Ste. 700

Garden City, NY 11530

(516) 745 1500 [P]  (516) 745 1245 [F]

www.barketepstein.com

This transmittal may be a confidential attorney client communication or may otherwise be privileged or confidential. If it is not clear that you are the intended recipient, you are hereby notified that you have received this transmittal in error; any review, dissemination, distribution or copying of this transmittal is strictly prohibited. If you suspect that you have received this communication in error, please notify us immediately by telephone or email and immediately delete this message and all its attachments

**DX 52-2**

**From:** Michael Bachrach [mailto:mbach2000@yahoo.com]
**Sent:** Thursday, August 22, 2019 11:01 AM
**To:** Aida Leisenring; BRUCE KOFFSKY; "Anthony L. Ricco"; johnadiazlaw@gmail.com; Bruce Barket; Kenneth J. Montgomery Esq
**Subject:** Re: Nicholas Tartaglione - COUNSEL ONLY

Hi all,

Attached for your review are the Basecamp threads that I view as responsive and/or relevant to Bobbi's inquiry.  I've redacted portions of the conversations that do not relate to the Curcio inquiry (e.g., discussions related to Kim Tinsely, expert witnesses, and the time Nick had all of those cuts on his head).

In putting this together just now, I did not review any Basecamp threads prior to the July 23, 2019 incident.  If there's something prior to that incident that someone thinks is relevant, please let me know so I can include it.

Let me know your thoughts.  Thanks.

--Michael

P.S. If this case ever reaches the 2255 land, Basecamp will be a huge asset.  It was so easy to put these files together.  I haven't attemped to look through non-Basecamp emails, and I shudder to think how difficult a task that will be if 2255 counsel ever asks us to do so 5 or 10 years from now, or whatever year that might finally come.

========================

Michael K. Bachrach, Esq.

276 Fifth Ave., Suite 501

New York, NY 10001

tel: (212) 929-0592

fax: (866) 328-1630

cell: (917) 304-5044

michael@mbachlaw.com

On Thursday, August 22, 2019, 10:05:58 AM EDT, Michael Bachrach < mbach2000@yahoo.com> wrote:

**DX 52-3**

Yahoo Mail - RE: Nicholas Tartaglione - COUNSEL ONLY

Hey Bruce,

Putting aside the elephant in the room, Bobbi's email appears to be asking for any written communications between counsel and/or with the client that might be relevant to the Curcio inquiry.  I'm going to look through Basecamp and pick out the messages that I believe relevant.  I'll then forward them to you, Tony, etc. (but not Bobbi), to confirm if everyone agrees with me regarding their relevance.

To be honest, there's been a lot of discussion on Basecamp about the media, but I don't remember how much actually related to privilege or conflicts as opposed to mere strategy disagreements.  I am of the view that disagreements over whether to speak to the press, period in any capital context, is beyond the Curcio inquiry.  But discussion of what statements in the press did or did not create privilege or conflict issues is likely within the scope of the inquiry.

Again, whatever I find on Basecamp that I think is relevant I will share with everyone on this email chain *before* sending to Bobbi.  If anyone disagrees with what I view of as within or outside the scope, we can discuss it at that point.

Obviously, I took Bobbi off this email.

--Michael

=========================

Michael K. Bachrach, Esq.

276 Fifth Ave., Suite 501

New York, NY 10001

tel: (212) 929-0592

fax: (866) 328-1630

cell: (917) 304-5044

michael@mbachlaw.com

On Wednesday, August 21, 2019, 09:07:41 PM EDT, Bruce Barket <bbarket@barketepstein.com> wrote:

Other than the articles and the news videos, what else will you need?

**DX 52-4**

Bruce A. Barket, Esq.

Barket Epstein Kearon Aldea & LoTurco, LLP

666 Old Country Road , Ste. 700

Garden City, NY 11530

(516) 745 1500 [P]  (516) 745 1245 [F]

www.barketepstein.com

This transmittal may be a confidential attorney client communication or may otherwise be privileged or confidential. If it is not clear that you are the intended recipient, you are hereby notified that you have received this transmittal in error; any review, dissemination, distribution or copying of this transmittal is strictly prohibited. If you suspect that you have received this communication in error, please notify us immediately by telephone or email and immediately delete this message and all its attachments

---

**From:** BOBBI C STERNHEIM [mailto:bcsternheim@mac.com]
**Sent:** Wednesday, August 21, 2019 9:01 PM
**To:** Bruce Barket; Aida Leisenring; BRUCE KOFFSKY; ""Anthony L. Ricco""; Michael Bachrach; johnadiazlaw@gmail.com
**Subject:** Nicholas Tartaglione

Good evening-

I plan to meet with Nick on Monday @ 9 am

and have sent my request to MCC Legal.

In preparation for my assignment, I will need to

review relevant documents/correspondence.

I hope to email my request to you by Friday.

Best-

Bobbi

**BOBBI C. STERNHEIM, ESQ.**

**Law Offices of Bobbi C. Sternheim**

**33 West 19th Street - 4th Floor**

**New York, NY 10011**

**Main:   212-243-1100**

**DX 52-5**

Yahoo Mail - RE: Nicholas Tartaglione - COUNSEL ONLY

**Cell:    917-912-9698**

**Fax:    888-587-4737**

**bcsternheim@mac.com**

*This message and any attached documents contain information from the Law Offices of Bobbi C. Sternheim*

*that may be confidential and/or privileged.*

*If you are not the intended recipient, you may not read, copy, distribute, or use this information.*

*If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete this message. Thank you.*

**DX 52-6**

## RE: Nicholas Tartaglione - COUNSEL ONLY

From:   Bruce Barket (bbarket@barketepstein.com)

To:     tonyricco@aol.com; kennethjmontgomery@gmail.com

Cc:     michael@mbachlaw.com; aleisenring@barketepstein.com; bkoffsky@snet.net; johnadiazlaw@gmail.com

Date:   Thursday, August 22, 2019, 12:23 PM EDT

After giving this some thought, I agree that we should tell Bobbi about the note.  Unlike the baseless allegation that there was an improper disclosure of confidential information, I think there is a basis for Curcio counsel to be appointed and review this matter.

I don't agree with some of Tony's comments about the proceeding yesterday, but the transcript will speak for itself.

Perhaps the meeting tomorrow can include Bobbi to give fil her in on the letter

Bruce A. Barket, Esq.

Barket Epstein Kearon Aldea & LoTurco, LLP

666 Old Country Road , Ste. 700

Garden City, NY 11530

(516) 745 1500 [P]  (516) 745 1245 [F]

www.barketepstein.com

This transmittal may be a confidential attorney client communication or may otherwise be privileged or confidential. If it is not clear that you are the intended recipient, you are hereby notified that you have received this transmittal in error; any review, dissemination, distribution or copying of this transmittal is strictly prohibited. If you suspect that you have received this communication in error, please notify us immediately by telephone or email and immediately delete this message and all its attachments

**From:** tonyricco [mailto:tonyricco@aol.com]
**Sent:** Thursday, August 22, 2019 12:02 PM
**To:** Bruce Barket; 'Kenneth J. Montgomery Esq'
**Cc:** Michael Bachrach; Aida Leisenring; BRUCE KOFFSKY; johnadiazlaw@gmail.com
**Subject:** RE: Nicholas Tartaglione - COUNSEL ONLY

**DX 53-1**

There is no reason for the appointment of an ethics lawyer to advise us on the issues that the attorneys who have knowledge about the note want to share with the other counsel in the case.  I have individually consulted my own counsel, and a have aa very thorough understanding of these issues after 38 years of practice.  Based upon the advise and knowledge of the law, no group ethics attorney is needed for the decision of whether we an attorney is obligated to be truthful, hones and through in an inquiry conducted by Curcio Counsel.

If there is any attorney who believes that such a contrary authority or ethical rule exists, please let advise.

Everyonne has been saying to date that they understand the ethical rules, etc.  If any attorney is having second thoughts then perhaps that attorney should, as i have repeadly suggested, contact their own, individual counsel to advise that attorney on his individual conduct and responsibility under the ethical rules, for starters.

We are this position because counsel engaged in conduct that others believed should not have been undertaken.  The reasons said action was undertaken should be in compliance with the ethical standards required of an attorney representing a defendant facing the death penalty.  Those same rules say that Curcio consul must be advised of all information relevant to conflicts and statementns disclosed in the press.

tonyricco

Sent from my Verizon, Samsung Galaxy smartphone

-------- Original message --------

From: Bruce Barket <bbarket@barketepstein.com>

Date: 8/22/19 11:38 AM (GMT-05:00)

To: "'Kenneth J. Montgomery Esq'" <kennethjmontgomery@gmail.com>

Cc: Michael Bachrach <michael@mbachlaw.com>, Aida Leisenring <aleisenring@barketepstein.com>, BRUCE KOFFSKY <bkoffsky@snet.net>, "'Anthony L. Ricco'" <tonyricco@aol.com>, johnadiazlaw@gmail.com

Subject: RE: Nicholas Tartaglione - COUNSEL ONLY

Absolutely, individual lawyers can and perhaps should consult their own lawyer. I am suggesting that we have someone in the room to advise us all and answer questions

Bruce A. Barket, Esq.

Barket Epstein Kearon Aldea & LoTurco, LLP

666 Old Country Road , Ste. 700

Garden City, NY 11530

**DX 53-2**

(516) 745 1500 [P]  (516) 745 1245 [F]

www.barketepstein.com

This transmittal may be a confidential attorney client communication or may otherwise be privileged or confidential. If it is not clear that you are the intended recipient, you are hereby notified that you have received this transmittal in error; any review, dissemination, distribution or copying of this transmittal is strictly prohibited. If you suspect that you have received this communication in error, please notify us immediately by telephone or email and immediately delete this message and all its attachments

---

**From:** Kenneth J. Montgomery Esq [mailto:kennethjmontgomery@gmail.com]
**Sent:** Thursday, August 22, 2019 11:36 AM
**To:** Bruce Barket
**Cc:** Michael Bachrach; Aida Leisenring; BRUCE KOFFSKY; "Anthony L. Ricco" ; johnadiazlaw@gmail.com
**Subject:** Re: Nicholas Tartaglione - COUNSEL ONLY

Wouldn't it make sense for counsel to be sought individually since each attorney does not have the same relationship to the ethical issue and its associated facts?

Sent from kjmontgomerylaw.com

On Aug 22, 2019, at 11:33 AM, Bruce Barket <bbarket@barketepstein.com> wrote:

> Mike,
>
> Thanks.  I will take a look at this.  What are thoughts about retaining an ethics expert to participate in a meeting?
>
> Bruce A. Barket, Esq.
>
> Barket Epstein Kearon Aldea & LoTurco, LLP
>
> 666 Old Country Road , Ste. 700
>
> Garden City, NY 11530
>
> (516) 745 1500 [P]  (516) 745 1245 [F]
>
> www.barketepstein.com
>
> This transmittal may be a confidential attorney client communication or may otherwise be privileged or confidential. If it is not clear that you are the intended recipient, you are hereby notified that you have received this transmittal in error; any review, dissemination, distribution or copying of this transmittal is

**DX 53-3**

strictly prohibited. If you suspect that you have received this communication in error, please notify us immediately by telephone or email and immediately delete this message and all its attachments

---

**From:** Michael Bachrach [mailto:mbach2000@yahoo.com]
**Sent:** Thursday, August 22, 2019 11:01 AM
**To:** Aida Leisenring; BRUCE KOFFSKY; "Anthony L. Ricco"; johnadiazlaw@gmail.com; Bruce Barket; Kenneth J. Montgomery Esq
**Subject:** Re: Nicholas Tartaglione - COUNSEL ONLY

Hi all,

Attached for your review are the Basecamp threads that I view as responsive and/or relevant to Bobbi's inquiry.  I've redacted portions of the conversations that do not relate to the Curcio inquiry (e.g., discussions related to Kim Tinsely, expert witnesses, and the time Nick had all of those cuts on his head).

In putting this together just now, I did not review any Basecamp threads prior to the July 23, 2019 incident.  If there's something prior to that incident that someone thinks is relevant, please let me know so I can include it.

Let me know your thoughts.  Thanks.

--Michael

P.S. If this case ever reaches the 2255 land, Basecamp will be a huge asset.  It was so easy to put these files together.  I haven't attemped to look through non-Basecamp emails, and I shudder to think how difficult a task that will be if 2255 counsel ever asks us to do so 5 or 10 years from now, or whatever year that might finally come.

=========================

Michael K. Bachrach, Esq.

276 Fifth Ave., Suite 501

New York, NY 10001

tel: (212) 929-0592

fax: (866) 328-1630

cell: (917) 304-5044

michael@mbachlaw.com

**DX 53-4**

On Thursday, August 22, 2019, 10:05:58 AM EDT, Michael Bachrach < mbach2000@yahoo.com> wrote:

Hey Bruce,

Putting aside the elephant in the room, Bobbi's email appears to be asking for any written communications between counsel and/or with the client that might be relevant to the Curcio inquiry. I'm going to look through Basecamp and pick out the messages that I believe relevant. I'll then forward them to you, Tony, etc. (but not Bobbi), to confirm if everyone agrees with me regarding their relevance.

To be honest, there's been a lot of discussion on Basecamp about the media, but I don't remember how much actually related to privilege or conflicts as opposed to mere strategy disagreements. I am of the view that disagreements over whether to speak to the press, period in any capital context, is beyond the Curcio inquiry. But discussion of what statements in the press did or did not create privilege or conflict issues is likely within the scope of the inquiry.

Again, whatever I find on Basecamp that I think is relevant I will share with everyone on this email chain *before* sending to Bobbi. If anyone disagrees with what I view of as within or outside the scope, we can discuss it at that point.

Obviously, I took Bobbi off this email.

--Michael

========================

Michael K. Bachrach, Esq.

276 Fifth Ave., Suite 501

New York, NY 10001

tel: (212) 929-0592

fax: (866) 328-1630

cell: (917) 304-5044

michael@mbachlaw.com

On Wednesday, August 21, 2019, 09:07:41 PM EDT, Bruce Barket <bbarket@barketepstein.com> wrote:

**DX 53-5**

Other than the articles and the news videos, what else will you need?


Bruce A. Barket, Esq.

Barket Epstein Kearon Aldea & LoTurco, LLP

666 Old Country Road , Ste. 700

Garden City, NY 11530

(516) 745 1500 [P]  (516) 745 1245 [F]

www.barketepstein.com


This transmittal may be a confidential attorney client communication or may otherwise be privileged or confidential. If it is not clear that you are the intended recipient, you are hereby notified that you have received this transmittal in error; any review, dissemination, distribution or copying of this transmittal is strictly prohibited. If you suspect that you have received this communication in error, please notify us immediately by telephone or email and immediately delete this message and all its attachments

---

**From:** BOBBI C STERNHEIM [mailto:bcsternheim@mac.com]
**Sent:** Wednesday, August 21, 2019 9:01 PM
**To:** Bruce Barket; Aida Leisenring; BRUCE KOFFSKY; ""Anthony L. Ricco""; Michael Bachrach; johnadiazlaw@gmail.com
**Subject:** Nicholas Tartaglione


Good evening-

I plan to meet with Nick on Monday @ 9 am

and have sent my request to MCC Legal.

In preparation for my assignment, I will need to

review relevant documents/correspondence.

I hope to email my request to you by Friday.

Best-

Bobbi

**DX 53-6**

6/7

**BOBBI C. STERNHEIM, ESQ.**

**Law Offices of Bobbi C. Sternheim**

**33 West 19th Street - 4th Floor**

**New York, NY 10011**


**Main: 212-243-1100**

**Cell: 917-912-9698**

**Fax: 888-587-4737**

**bcsternheim@mac.com**


*This message and any attached documents contain information from the Law Offices of Bobbi C. Sternheim*

*that may be confidential and/or privileged.*

*If you are not the intended recipient, you may not read, copy, distribute, or use this information.*

*If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete this message. Thank you.*

**DX 53-7**

7/7

## RE: Nicholas Tartaglione - COUNSEL ONLY

From:  Bruce Barket (bbarket@barketepstein.com)

To:  michael@mbachlaw.com

Date:  Thursday, August 22, 2019, 12:34 PM EDT

Great, I am in the office

Bruce A. Barket, Esq.

Barket Epstein Kearon Aldea & LoTurco, LLP

666 Old Country Road , Ste. 700

Garden City, NY 11530

(516) 745 1500 [P]  (516) 745 1245 [F]

www.barketepstein.com

This transmittal may be a confidential attorney client communication or may otherwise be privileged or confidential. If it is not clear that you are the intended recipient, you are hereby notified that you have received this transmittal in error; any review, dissemination, distribution or copying of this transmittal is strictly prohibited. If you suspect that you have received this communication in error, please notify us immediately by telephone or email and immediately delete this message and all its attachments

**From:** Michael Bachrach [mailto:mbach2000@yahoo.com]
**Sent:** Thursday, August 22, 2019 12:30 PM
**To:** Bruce Barket
**Subject:** Re: Nicholas Tartaglione - COUNSEL ONLY

Yes.  Give me about 15 minutes and then I'll call you, ok?

=========================

Michael K. Bachrach, Esq.

276 Fifth Ave., Suite 501

New York, NY 10001

tel: (212) 929-0592

fax: (866) 328-1630

**DX 54-1**

cell: (917) 304-5044

michael@mbachlaw.com

On Thursday, August 22, 2019, 12:29:32 PM EDT, Bruce Barket <bbarket@barketepstein.com> wrote:

Do you have minute or two for a call?

Bruce A. Barket, Esq.

Barket Epstein Kearon Aldea & LoTurco, LLP

666 Old Country Road , Ste. 700

Garden City, NY 11530

(516) 745 1500 [P]  (516) 745 1245 [F]

www.barketepstein.com

This transmittal may be a confidential attorney client communication or may otherwise be privileged or confidential. If it is not clear that you are the intended recipient, you are hereby notified that you have received this transmittal in error; any review, dissemination, distribution or copying of this transmittal is strictly prohibited. If you suspect that you have received this communication in error, please notify us immediately by telephone or email and immediately delete this message and all its attachments

**From:** Michael Bachrach [mailto:mbach2000@yahoo.com]
**Sent:** Thursday, August 22, 2019 12:06 PM
**To:** 'Kenneth J. Montgomery Esq'; Bruce Barket
**Cc:** Aida Leisenring; BRUCE KOFFSKY; "Anthony L. Ricco"; johnadiazlaw@gmail.com
**Subject:** Re: Nicholas Tartaglione - COUNSEL ONLY

Bruce,

No, I don't think an ethics attorney is necessary to advise *the group* as a whole since the decision to go to the press was an individual one.  As far as I can tell, the only way an ethical issue arises for anyone else is if relevant information is knowingly withheld from Curcio counsel, which I for one am not about to do.  Remember, Curcio

**DX 54-2**

counsel is within the umbrella of Nick Tartaglione's attorney/client privilege, so we can speak freely to her on this issue.

I'm still happy to host an in-person discussion at my office tomorrow at 12pm for anyone that is available.  We could always conference in anyone that cannot attend in person.

--Michael

On Thursday, August 22, 2019, 11:38:48 AM EDT, Bruce Barket < bbarket@barketepstein.com> wrote:

Absolutely, individual lawyers can and perhaps should consult their own lawyer. I am suggesting that we have someone in the room to advise us all and answer questions

Bruce A. Barket, Esq.

Barket Epstein Kearon Aldea & LoTurco, LLP

666 Old Country Road , Ste. 700

Garden City, NY 11530

(516) 745 1500 [P]  (516) 745 1245 [F]

www.barketepstein.com

This transmittal may be a confidential attorney client communication or may otherwise be privileged or confidential. If it is not clear that you are the intended recipient, you are hereby notified that you have received this transmittal in error; any review, dissemination, distribution or copying of this transmittal is strictly prohibited. If you suspect that you have received this communication in error, please notify us immediately by telephone or email and immediately delete this message and all its attachments

**From:** Kenneth J. Montgomery Esq [mailto:kennethjmontgomery@gmail.com]
**Sent:** Thursday, August 22, 2019 11:36 AM
**To:** Bruce Barket
**Cc:** Michael Bachrach; Aida Leisenring; BRUCE KOFFSKY; "Anthony L. Ricco" ; johnadiazlaw@gmail.com
**Subject:** Re: Nicholas Tartaglione - COUNSEL ONLY

**DX 54-3**

Wouldn't it make sense for counsel to be sought individually since each attorney does not have the same relationship to the ethical issue and its associated facts?

Sent from kjmontgomerylaw.com

On Aug 22, 2019, at 11:33 AM, Bruce Barket <bbarket@barketepstein.com> wrote:

Mike,

Thanks.  I will take a look at this.  What are thoughts about retaining an ethics expert to participate in a meeting?

Bruce A. Barket, Esq.

Barket Epstein Kearon Aldea & LoTurco, LLP

666 Old Country Road , Ste. 700

Garden City, NY 11530

(516) 745 1500 [P]  (516) 745 1245 [F]

www.barketepstein.com

This transmittal may be a confidential attorney client communication or may otherwise be privileged or confidential. If it is not clear that you are the intended recipient, you are hereby notified that you have received this transmittal in error; any review, dissemination, distribution or copying of this transmittal is strictly prohibited. If you suspect that you have received this communication in error, please notify us immediately by telephone or email and immediately delete this message and all its attachments

**From:** Michael Bachrach [mailto:mbach2000@yahoo.com]
**Sent:** Thursday, August 22, 2019 11:01 AM
**To:** Aida Leisenring; BRUCE KOFFSKY; "Anthony L. Ricco"; johnadiazlaw@gmail.com; Bruce Barket; Kenneth J. Montgomery Esq
**Subject:** Re: Nicholas Tartaglione - COUNSEL ONLY

Hi all,

Attached for your review are the Basecamp threads that I view as responsive and/or relevant to Bobbi's inquiry.  I've redacted portions of the conversations that do not relate to the Curcio inquiry

**DX 54-4**

4/8

(e.g., discussions related to Kim Tinsely, expert witnesses, and the time Nick had all of those cuts on his head).

In putting this together just now, I did not review any Basecamp threads prior to the July 23, 2019 incident.  If there's something prior to that incident that someone thinks is relevant, please let me know so I can include it.

Let me know your thoughts.  Thanks.

--Michael

P.S. If this case ever reaches the 2255 land, Basecamp will be a huge asset.  It was so easy to put these files together.  I haven't attemped to look through non-Basecamp emails, and I shudder to think how difficult a task that will be if 2255 counsel ever asks us to do so 5 or 10 years from now, or whatever year that might finally come.

=========================

Michael K. Bachrach, Esq.

276 Fifth Ave., Suite 501

New York, NY 10001

tel: (212) 929-0592

fax: (866) 328-1630

cell: (917) 304-5044

michael@mbachlaw.com

On Thursday, August 22, 2019, 10:05:58 AM EDT, Michael Bachrach <mbach2000@yahoo.com> wrote:

Hey Bruce,

Putting aside the elephant in the room, Bobbi's email appears to be asking for any written communications between counsel and/or with the client that might be relevant to the Curcio inquiry. I'm going to look through Basecamp and pick out the messages that I believe relevant.  I'll then

**DX 54-5**

Yahoo Mail - RE: Nicholas Tartaglione - COUNSEL ONLY

forward them to you, Tony, etc. (but not Bobbi), to confirm if everyone agrees with me regarding their relevance.

To be honest, there's been a lot of discussion on Basecamp about the media, but I don't remember how much actually related to privilege or conflicts as opposed to mere strategy disagreements. I am of the view that disagreements over whether to speak to the press, period in any capital context, is beyond the Curcio inquiry. But discussion of what statements in the press did or did not create privilege or conflict issues is likely within the scope of the inquiry.

Again, whatever I find on Basecamp that I think is relevant I will share with everyone on this email chain *before* sending to Bobbi. If anyone disagrees with what I view of as within or outside the scope, we can discuss it at that point.

Obviously, I took Bobbi off this email.

--Michael

=========================

Michael K. Bachrach, Esq.

276 Fifth Ave., Suite 501

New York, NY 10001

tel: (212) 929-0592

fax: (866) 328-1630

cell: (917) 304-5044

michael@mbachlaw.com

On Wednesday, August 21, 2019, 09:07:41 PM EDT, Bruce Barket <bbarket@barketepstein.com> wrote:

Other than the articles and the news videos, what else will you need?

Bruce A. Barket, Esq.

**DX 54-6**

Yahoo Mail - RE: Nicholas Tartaglione - COUNSEL ONLY

Barket Epstein Kearon Aldea & LoTurco, LLP

666 Old Country Road , Ste. 700

Garden City, NY 11530

(516) 745 1500 [P]  (516) 745 1245 [F]

www.barketepstein.com

This transmittal may be a confidential attorney client communication or may otherwise be privileged or confidential. If it is not clear that you are the intended recipient, you are hereby notified that you have received this transmittal in error; any review, dissemination, distribution or copying of this transmittal is strictly prohibited. If you suspect that you have received this communication in error, please notify us immediately by telephone or email and immediately delete this message and all its attachments

---

**From:** BOBBI C STERNHEIM [mailto:bcsternheim@mac.com]
**Sent:** Wednesday, August 21, 2019 9:01 PM
**To:** Bruce Barket; Aida Leisenring; BRUCE KOFFSKY; ""Anthony L. Ricco""; Michael Bachrach; johnadiazlaw@gmail.com
**Subject:** Nicholas Tartaglione

Good evening-

I plan to meet with Nick on Monday @ 9 am

and have sent my request to MCC Legal.

In preparation for my assignment, I will need to

review relevant documents/correspondence.

I hope to email my request to you by Friday.

Best-

Bobbi

**BOBBI C. STERNHEIM, ESQ.**

**Law Offices of Bobbi C. Sternheim**

**33 West 19th Street - 4th Floor**

**New York, NY 10011**

**Main:   212-243-1100**

**DX 54-7**

**Cell:** 917-912-9698

**Fax:** 888-587-4737

[bcsternheim@mac.com](mailto:bcsternheim@mac.com)

*This message and any attached documents contain information from the Law Offices of Bobbi C. Sternheim*

*that may be confidential and/or privileged.*

*If you are not the intended recipient, you may not read, copy, distribute, or use this information.*

*If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete this message. Thank you.*

**DX 54-8**

8/8

## RE: Nicholas Tartaglione - COUNSEL ONLY

| | |
|---|---|
| From: | Bruce Barket (bbarket@barketepstein.com) |
| To: | tonyricco@aol.com; kennethjmontgomery@gmail.com |
| Cc: | michael@mbachlaw.com; aleisenring@barketepstein.com; bkoffsky@snet.net; johnadiazlaw@gmail.com |
| Date: | Thursday, August 22, 2019, 12:51 PM EDT |

I think the law of unintended consequences applies here. The letter has been bothering me for a while. The brief discussion we had after court (thanks to those who stayed and shared their thoughts) coupled with some internal discussions in our firm convinced me that Curcio counsel should review with this Nick. We need to give some thought to the possible conflicts and discuss that.

Bruce A. Barket, Esq.

Barket Epstein Kearon Aldea & LoTurco, LLP

666 Old Country Road , Ste. 700

Garden City, NY 11530

(516) 745 1500 [P]   (516) 745 1245 [F]

www.barketepstein.com

This transmittal may be a confidential attorney client communication or may otherwise be privileged or confidential. If it is not clear that you are the intended recipient, you are hereby notified that you have received this transmittal in error; any review, dissemination, distribution or copying of this transmittal is strictly prohibited. If you suspect that you have received this communication in error, please notify us immediately by telephone or email and immediately delete this message and all its attachments

**From:** tonyricco [mailto:tonyricco@aol.com]
**Sent:** Thursday, August 22, 2019 12:02 PM
**To:** Bruce Barket; 'Kenneth J. Montgomery Esq'
**Cc:** Michael Bachrach; Aida Leisenring; BRUCE KOFFSKY; johnadiazlaw@gmail.com
**Subject:** RE: Nicholas Tartaglione - COUNSEL ONLY

There is no reason for the appointment of an ethics lawyer to advise us on the issues that the attorneys who have knowledge about the note want to share with the other counsel in the case. I have individually consulted my own counsel, and a have aa very thorough understanding of these issues after 38 years of practice. Based upon the advise and knowledge of the law, no group ethics attorney is needed for the decision of whether we an attorney is obligated to be truthful, hones and through in an inquiry conducted by Curcio Counsel.

**DX 55-1**

If there is any attorney who believes that such a contrary authority or ethical rule exists, please let advise.

Everyonne has been saying to date that they understand the ethical rules, etc.  If any attorney is having second thoughts then perhaps that attorney should, as i have repeadly suggested, contact their own, individual counsel to advise that attorney on his individual conduct and responsibility under the ethical rules, for starters.

We are this position because counsel engaged in conduct that others believed should not have been undertaken.  The reasons said action was undertaken should be in compliance with the ethical standards required of an attorney representing a defendant facing the death penalty.  Those same rules say that Curcio consul must be advised of all information relevant to conflicts and statementns disclosed in the press.

tonyricco

Sent from my Verizon, Samsung Galaxy smartphone

-------- Original message --------

From: Bruce Barket <bbarket@barketepstein.com>

Date: 8/22/19 11:38 AM (GMT-05:00)

To: "'Kenneth J. Montgomery Esq'" <kennethjmontgomery@gmail.com>

Cc: Michael Bachrach <michael@mbachlaw.com>, Aida Leisenring <aleisenring@barketepstein.com>, BRUCE KOFFSKY <bkoffsky@snet.net>, "'Anthony L. Ricco'" <tonyricco@aol.com>, johnadiazlaw@gmail.com

Subject: RE: Nicholas Tartaglione - COUNSEL ONLY

Absolutely, individual lawyers can and perhaps should consult their own lawyer. I am suggesting that we have someone in the room to advise us all and answer questions

Bruce A. Barket, Esq.

Barket Epstein Kearon Aldea & LoTurco, LLP

666 Old Country Road , Ste. 700

Garden City, NY 11530

(516) 745 1500 [P]  (516) 745 1245 [F]

www.barketepstein.com

**DX 55-2**

This transmittal may be a confidential attorney client communication or may otherwise be privileged or confidential. If it is not clear that you are the intended recipient, you are hereby notified that you have received this transmittal in error; any review, dissemination, distribution or copying of this transmittal is strictly prohibited. If you suspect that you have received this communication in error, please notify us immediately by telephone or email and immediately delete this message and all its attachments

---

**From:** Kenneth J. Montgomery Esq [mailto:kennethjmontgomery@gmail.com]
**Sent:** Thursday, August 22, 2019 11:36 AM
**To:** Bruce Barket
**Cc:** Michael Bachrach; Aida Leisenring; BRUCE KOFFSKY; "Anthony L. Ricco" ; johnadiazlaw@gmail.com
**Subject:** Re: Nicholas Tartaglione - COUNSEL ONLY

Wouldn't it make sense for counsel to be sought individually since each attorney does not have the same relationship to the ethical issue and its associated facts?

Sent from kjmontgomerylaw.com

On Aug 22, 2019, at 11:33 AM, Bruce Barket <bbarket@barketepstein.com> wrote:

> Mike,
>
> Thanks.  I will take a look at this.  What are thoughts about retaining an ethics expert to participate in a meeting?
>
> Bruce A. Barket, Esq.
>
> Barket Epstein Kearon Aldea & LoTurco, LLP
>
> 666 Old Country Road , Ste. 700
>
> Garden City, NY 11530
>
> (516) 745 1500 [P]  (516) 745 1245 [F]
>
> www.barketepstein.com
>
> This transmittal may be a confidential attorney client communication or may otherwise be privileged or confidential. If it is not clear that you are the intended recipient, you are hereby notified that you have received this transmittal in error; any review, dissemination, distribution or copying of this transmittal is strictly prohibited. If you suspect that you have received this communication in error, please notify us immediately by telephone or email and immediately delete this message and all its attachments

**DX 55-3**

**From:** Michael Bachrach [mailto:mbach2000@yahoo.com]
**Sent:** Thursday, August 22, 2019 11:01 AM
**To:** Aida Leisenring; BRUCE KOFFSKY; "Anthony L. Ricco"; johnadiazlaw@gmail.com; Bruce Barket; Kenneth J. Montgomery Esq
**Subject:** Re: Nicholas Tartaglione - COUNSEL ONLY

Hi all,

Attached for your review are the Basecamp threads that I view as responsive and/or relevant to Bobbi's inquiry. I've redacted portions of the conversations that do not relate to the Curcio inquiry (e.g., discussions related to Kim Tinsely, expert witnesses, and the time Nick had all of those cuts on his head).

In putting this together just now, I did not review any Basecamp threads prior to the July 23, 2019 incident. If there's something prior to that incident that someone thinks is relevant, please let me know so I can include it.

Let me know your thoughts. Thanks.

--Michael

P.S. If this case ever reaches the 2255 land, Basecamp will be a huge asset. It was so easy to put these files together. I haven't attemped to look through non-Basecamp emails, and I shudder to think how difficult a task that will be if 2255 counsel ever asks us to do so 5 or 10 years from now, or whatever year that might finally come.

=========================

Michael K. Bachrach, Esq.

276 Fifth Ave., Suite 501

New York, NY 10001

tel: (212) 929-0592

fax: (866) 328-1630

cell: (917) 304-5044

michael@mbachlaw.com

On Thursday, August 22, 2019, 10:05:58 AM EDT, Michael Bachrach <mbach2000@yahoo.com> wrote:

**DX 55-4**

Hey Bruce,

Putting aside the elephant in the room, Bobbi's email appears to be asking for any written communications between counsel and/or with the client that might be relevant to the Curcio inquiry.  I'm going to look through Basecamp and pick out the messages that I believe relevant.  I'll then forward them to you, Tony, etc. (but not Bobbi), to confirm if everyone agrees with me regarding their relevance.

To be honest, there's been a lot of discussion on Basecamp about the media, but I don't remember how much actually related to privilege or conflicts as opposed to mere strategy disagreements.  I am of the view that disagreements over whether to speak to the press, period in any capital context, is beyond the Curcio inquiry.  But discussion of what statements in the press did or did not create privilege or conflict issues is likely within the scope of the inquiry.

Again, whatever I find on Basecamp that I think is relevant I will share with everyone on this email chain *before* sending to Bobbi.  If anyone disagrees with what I view of as within or outside the scope, we can discuss it at that point.

Obviously, I took Bobbi off this email.

--Michael

=========================

Michael K. Bachrach, Esq.

276 Fifth Ave., Suite 501

New York, NY 10001

tel: (212) 929-0592

fax: (866) 328-1630

cell: (917) 304-5044

michael@mbachlaw.com

On Wednesday, August 21, 2019, 09:07:41 PM EDT, Bruce Barket <bbarket@barketepstein.com> wrote:

Other than the articles and the news videos, what else will you need?

**DX 55-5**

Bruce A. Barket, Esq.

Barket Epstein Kearon Aldea & LoTurco, LLP

666 Old Country Road , Ste. 700

Garden City, NY 11530

(516) 745 1500 [P]  (516) 745 1245 [F]

www.barketepstein.com

This transmittal may be a confidential attorney client communication or may otherwise be privileged or confidential. If it is not clear that you are the intended recipient, you are hereby notified that you have received this transmittal in error; any review, dissemination, distribution or copying of this transmittal is strictly prohibited. If you suspect that you have received this communication in error, please notify us immediately by telephone or email and immediately delete this message and all its attachments

---

**From:** BOBBI C STERNHEIM [mailto:bcsternheim@mac.com]
**Sent:** Wednesday, August 21, 2019 9:01 PM
**To:** Bruce Barket; Aida Leisenring; BRUCE KOFFSKY; ""Anthony L. Ricco""; Michael Bachrach; johnadiazlaw@gmail.com
**Subject:** Nicholas Tartaglione

Good evening-

I plan to meet with Nick on Monday @ 9 am

and have sent my request to MCC Legal.

In preparation for my assignment, I will need to

review relevant documents/correspondence.

I hope to email my request to you by Friday.

Best-

Bobbi

**BOBBI C. STERNHEIM, ESQ.**

**Law Offices of Bobbi C. Sternheim**

**DX 55-6**

**33 West 19th Street - 4th Floor**

**New York, NY 10011**

**Main:   212-243-1100**

**Cell:    917-912-9698**

**Fax:     888-587-4737**

**bcsternheim@mac.com**

*This message and any attached documents contain information from the Law Offices of Bobbi C. Sternheim*

*that may be confidential and/or privileged.*

*If you are not the intended recipient, you may not read, copy, distribute, or use this information.*

*If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete this message. Thank you.*

**DX 55-7**

## Re: Nicholas Tartaglione - COUNSEL ONLY

From:   Bruce Barket (bbarket@barketepstein.com)

To:     bkoffsky@snet.net

Cc:     kennethjmontgomery@gmail.com; michael@mbachlaw.com; aleisenring@barketepstein.com; tonyricco@aol.com; johnadiazlaw@gmail.com

Date:   Sunday, August 25, 2019, 10:19 AM EDT

I saw Nick this morning to discuss the letter form the government and to also address the note from his cell.

After our discussion on Friday, I had renewed doubts about the authenticity of the note.  Nick insists it was written by Epstein.  He seems sincere but his account of how he found it is problematic and the note itself raises serious questions about its authenticity.

Nick also now claims that he told a guard about the note and that he was going to give the note to his lawyer.  Regardless of the credibility one may assign to this assertion, I thought it was worth noting before

If anyone wants more details, feel free to call me.  My cell number is below.

Bruce Barket
Barket, Epstein, Kearon, Aldea & LoTurco
666 Old Country road
Garden City, NY 11530
(516) 745 1500 - O
(516) 287 7230 - M
Barket Epstein.com

> On Aug 23, 2019, at 8:31 PM, BRUCE KOFFSKY <bkoffsky@snet.net> wrote:

> Barr Seized on Epstein Case as Doubts Mounted About Justice Dept.



**Barr Seized on Epstein Case as Doubts Mounted About Justice Dept.**

The attorney general has been unusually personally involved in the investigations into the jailhouse suicide of …

**DX 56-1**

Bruce Koffsky
Koffsky & Felsen, LLC
1150 Bedford Street
Stamford, CT  06905
203-327-1500
bkoffsky@snet.net


On Thursday, August 22, 2019, 12:05:59 PM EDT, Michael Bachrach <mbach2000@yahoo.com> wrote:


Bruce,

No, I don't think an ethics attorney is necessary to advise *the group* as a whole since the decision to go to the press was an individual one.  As far as I can tell, the only way an ethical issue arises for anyone else is if relevant information is knowingly withheld from Curcio counsel, which I for one am not about to do.  Remember, Curcio counsel is within the umbrella of Nick Tartaglione's attorney/client privilege, so we can speak freely to her on this issue.

I'm still happy to host an in-person discussion at my office tomorrow at 12pm for anyone that is available.  We could always conference in anyone that cannot attend in person.

--Michael



On Thursday, August 22, 2019, 11:38:48 AM EDT, Bruce Barket < bbarket@barketepstein.com> wrote:


Absolutely, individual lawyers can and perhaps should consult their own lawyer. I am suggesting that we have someone in the room to advise us all and answer questions


Bruce A. Barket, Esq.

Barket Epstein Kearon Aldea & LoTurco, LLP

666 Old Country Road , Ste. 700

Garden City, NY 11530

(516) 745 1500 [P]  (516) 745 1245 [F]

www.barketepstein.com



This transmittal may be a confidential attorney client communication or may otherwise be privileged or confidential. If it is not clear that you are the intended recipient, you are hereby notified that you have received this transmittal in error; any review, dissemination, distribution or copying of this transmittal is strictly prohibited.


**DX 56-2**

If you suspect that you have received this communication in error, please notify us immediately by telephone or email and immediately delete this message and all its attachments

**From:** Kenneth J. Montgomery Esq [mailto:kennethjmontgomery@gmail.com]
**Sent:** Thursday, August 22, 2019 11:36 AM
**To:** Bruce Barket
**Cc:** Michael Bachrach; Aida Leisenring; BRUCE KOFFSKY; "Anthony L. Ricco" ; johnadiazlaw@gmail.com
**Subject:** Re: Nicholas Tartaglione - COUNSEL ONLY

Wouldn't it make sense for counsel to be sought individually since each attorney does not have the same relationship to the ethical issue and its associated facts?

Sent from kjmontgomerylaw.com

On Aug 22, 2019, at 11:33 AM, Bruce Barket <bbarket@barketepstein.com> wrote:

Mike,

Thanks.  I will take a look at this.  What are thoughts about retaining an ethics expert to participate in a meeting?

Bruce A. Barket, Esq.

Barket Epstein Kearon Aldea & LoTurco, LLP

666 Old Country Road , Ste. 700

Garden City, NY 11530

(516) 745 1500 [P]  (516) 745 1245 [F]

www.barketepstein.com

This transmittal may be a confidential attorney client communication or may otherwise be privileged or confidential. If it is not clear that you are the intended recipient, you are hereby notified that you have received this transmittal in error; any review, dissemination, distribution or copying of this transmittal is strictly prohibited. If you suspect that you have received this communication in error, please notify us immediately by telephone or email and immediately delete this message and all its attachments

**From:** Michael Bachrach [mailto:mbach2000@yahoo.com]
**Sent:** Thursday, August 22, 2019 11:01 AM
**To:** Aida Leisenring; BRUCE KOFFSKY; "Anthony L. Ricco"; johnadiazlaw@gmail.com; Bruce Barket;

**DX 56-3**

Kenneth J. Montgomery Esq
**Subject:** Re: Nicholas Tartaglione - COUNSEL ONLY

Hi all,

Attached for your review are the Basecamp threads that I view as responsive and/or relevant to Bobbi's inquiry. I've redacted portions of the conversations that do not relate to the Curcio inquiry (e.g., discussions related to Kim Tinsely, expert witnesses, and the time Nick had all of those cuts on his head).

In putting this together just now, I did not review any Basecamp threads prior to the July 23, 2019 incident. If there's something prior to that incident that someone thinks is relevant, please let me know so I can include it.

Let me know your thoughts. Thanks.

--Michael

P.S. If this case ever reaches the 2255 land, Basecamp will be a huge asset. It was so easy to put these files together. I haven't attemped to look through non-Basecamp emails, and I shudder to think how difficult a task that will be if 2255 counsel ever asks us to do so 5 or 10 years from now, or whatever year that might finally come.

=========================

Michael K. Bachrach, Esq.

276 Fifth Ave., Suite 501

New York, NY 10001

tel: (212) 929-0592

fax: (866) 328-1630

cell: (917) 304-5044

michael@mbachlaw.com

On Thursday, August 22, 2019, 10:05:58 AM EDT, Michael Bachrach <mbach2000@yahoo.com> wrote:

Hey Bruce,

**DX 56-4**

4/7

Putting aside the elephant in the room, Bobbi's email appears to be asking for any written communications between counsel and/or with the client that might be relevant to the Curcio inquiry.  I'm going to look through Basecamp and pick out the messages that I believe relevant.  I'll then forward them to you, Tony, etc. (but not Bobbi), to confirm if everyone agrees with me regarding their relevance.

To be honest, there's been a lot of discussion on Basecamp about the media, but I don't remember how much actually related to privilege or conflicts as opposed to mere strategy disagreements.  I am of the view that disagreements over whether to speak to the press, period in any capital context, is beyond the Curcio inquiry.  But discussion of what statements in the press did or did not create privilege or conflict issues is likely within the scope of the inquiry.

Again, whatever I find on Basecamp that I think is relevant I will share with everyone on this email chain **before** sending to Bobbi.  If anyone disagrees with what I view of as within or outside the scope, we can discuss it at that point.

Obviously, I took Bobbi off this email.

--Michael

=========================

Michael K. Bachrach, Esq.

276 Fifth Ave., Suite 501

New York, NY 10001

tel: (212) 929-0592

fax: (866) 328-1630

cell: (917) 304-5044

michael@mbachlaw.com

On Wednesday, August 21, 2019, 09:07:41 PM EDT, Bruce Barket <bbarket@barketepstein.com> wrote:

Other than the articles and the news videos, what else will you need?

Bruce A. Barket, Esq.

Barket Epstein Kearon Aldea & LoTurco, LLP

666 Old Country Road , Ste. 700

**DX 56-5**

Garden City, NY 11530

(516) 745 1500 [P]  (516) 745 1245 [F]

www.barketepstein.com

This transmittal may be a confidential attorney client communication or may otherwise be privileged or confidential. If it is not clear that you are the intended recipient, you are hereby notified that you have received this transmittal in error; any review, dissemination, distribution or copying of this transmittal is strictly prohibited. If you suspect that you have received this communication in error, please notify us immediately by telephone or email and immediately delete this message and all its attachments

**From:** BOBBI C STERNHEIM [mailto:bcsternheim@mac.com]
**Sent:** Wednesday, August 21, 2019 9:01 PM
**To:** Bruce Barket; Aida Leisenring; BRUCE KOFFSKY; ""Anthony L. Ricco""; Michael Bachrach; johnadiazlaw@gmail.com
**Subject:** Nicholas Tartaglione

Good evening-

I plan to meet with Nick on Monday @ 9 am

and have sent my request to MCC Legal.

In preparation for my assignment, I will need to

review relevant documents/correspondence.

I hope to email my request to you by Friday.

Best-

Bobbi

**BOBBI C. STERNHEIM, ESQ.**

**Law Offices of Bobbi C. Sternheim**

**33 West 19th Street - 4th Floor**

**New York, NY 10011**

**Main:  212-243-1100**

**Cell:    917-912-9698**

**Fax:     888-587-4737**

**bcsternheim@mac.com**

**DX 56-6**

Yahoo Mail Re: Nicholas Tartaglione - COUNSEL ONLY

*This message and any attached documents contain information from the Law Offices of Bobbi C. Sternheim*

*that may be confidential and/or privileged.*

*If you are not the intended recipient, you may not read, copy, distribute, or use this information.*

*If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete this message. Thank you.*

**DX 56-7**

## NT-Privileged/Confidential/Attorney Work Product

From:   BOBBI C STERNHEIM (bcsternheim@mac.com)

To:      bbarket@barketepstein.com; aleisenring@barketepstein.com; tonyricco@aol.com; bkoffsky@snet.net; michael@mbachlaw.com; kennethjmontgomery@gmail.com; johnadiazlaw@gmail.com

Date:   Monday, August 26, 2019, 09:08 PM EDT

Good evening-
This evening I had my initial meeting with Nick.
This email is limited to information bearing on possible conflict.
Nick told me he would not discuss the note except in the presence of Bruce B.
I stated it was my understanding that only members of the defense team knew
of the existence of the note. Nick stated that was not correct.
Nick stated that he told a corrections officer (CO) about the existence of the note.
The CO asked for the note. Nick declined to give the note to the CO, informing the CO that
he (Nick) believed the MCC/BOP would make the note disappear.
The CO nodded in agreement.
Nick said he did not know the name of the CO but described him as short.
In response to my question whether Nick had told anyone about the CO's knowledge of the existence
of the note, Nick said he told Bruce B.
I am heading out of town til 9/9 and will meet again with Nick after I return.
I am available by email or phone (917-912-9698) while away.
Please forward any materials (correspondence, emails, transcripts, etc.).
Thank you-
Bobbi
**BOBBI C. STERNHEIM, ESQ.**
**Law Offices of Bobbi C. Sternheim**
**33 West 19th Street - 4th Floor**
**New York, NY 10011**

**Main:   212-243-1100**
**Cell:    917-912-9698**
**Fax:     888-587-4737**
bcsternheim@mac.com

*This message and any attached documents contain information from the Law Offices of Bobbi C. Sternheim*
*that may be confidential and/or privileged.*
*If you are not the intended recipient, you may not read, copy, distribute, or use this information.*
*If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete this message. Thank you.*

**DX 57-1**

## FW: Activity in Case 7:16-cr-00832-KMK USA v. Tartaglione Endorsed Letter

From:   Bruce Barket (bbarket@barketepstein.com)

To:     bkoffsky@snet.net; michael@mbachlaw.com; tonyricco@aol.com; aleisenring@barketepstein.com

Date:   Tuesday, September 10, 2019, 04:39 AM EDT

We received this last Friday which I am sure you saw.  I plan on submitting a letter taking no position. Let me know if anyone thinks we should do anything different

Bruce A. Barket, Esq.

Barket Epstein Kearon Aldea & LoTurco, LLP

666 Old Country Road , Ste. 700

Garden City, NY 11530

(516) 745 1500 [P]  (516) 745 1245 [F]

www.barketepstein.com

This transmittal may be a confidential attorney client communication or may otherwise be privileged or confidential. If it is not clear that you are the intended recipient, you are hereby notified that you have received this transmittal in error; any review, dissemination, distribution or copying of this transmittal is strictly prohibited. If you suspect that you have received this communication in error, please notify us immediately by telephone or email and immediately delete this message and all its attachments

**From:** NYSD_ECF_Pool@nysd.uscourts.gov [mailto:NYSD_ECF_Pool@nysd.uscourts.gov]
**Sent:** Friday, September 06, 2019 11:39 AM
**To:** CourtMail@nysd.uscourts.gov
**Subject:** Activity in Case 7:16-cr-00832-KMK USA v. Tartaglione Endorsed Letter

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**
**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

**U.S. District Court**

**DX 58-1**

## Southern District of New York

**Notice of Electronic Filing**

The following transaction was entered on 9/6/2019 at 11:39 AM EDT and filed on 9/6/2019

**Case Name:**      USA v. Tartaglione
**Case Number:**      7:16-cr-00832-KMK
**Filer:**
**Document Number:** 155

**Docket Text:**
**ENDORSED LETTER as to Nicholas Tartaglione addressed to Judge Kenneth M. Karas from Stephen Rex Brown, New York Daily New and Emily M. N. Saul, New York Post dated 9/5/19 re: Request to unseal paperwork...ENDORSEMENT: The parties are directed to file responses to this letter by Wednesday, September 11, 2019. SO ORDERED. (Signed by Judge Kenneth M. Karas on 9/6/19)(jbo)**

**7:16-cr-00832-KMK-1 Notice has been electronically mailed to:**

Mark Steven DeMarco (Terminated)      msdlaw@aol.com, mdema10208@aol.com

David M Stern      dstern@rssslaw.com, mulerio@rssslaw.com, office@rssslaw.com

Bruce A. Barket      bbarket@barketepstein.com, aklein@barketepstein.com, dtaylor@barketepstein.com, lrodriguez@barketepstein.com, sodonoghue@barketepstein.com

Bobbi C Sternheim      bc@sternheimlaw.com, bcsternheim@mac.com, ecf@sternheimlaw.com

George Robert Goltzer      grgoltzer@gmail.com

Michael Keith Bachrach      mbach2000@yahoo.com

Anthony L. Ricco      tonyricco@aol.com

Bruce D. Koffsky      bkoffsky@snet.net

Ying Stafford      ying@staffordesq.com

Michael Gerber      michael.gerber@usdoj.gov, USANYS.ECF@USDOJ.GOV

Lauren Brooke Schorr      lauren.schorr@usdoj.gov, CaseView.ECF@usdoj.gov, USANYS.ECF@USDOJ.GOV

Jason Michael Swergold      jason.swergold@usdoj.gov, CaseView.ECF@usdoj.gov, USANYS.ECF@USDOJ.GOV

Aida Ferrer Leisenring      aleisenring@barketepstein.com, dtaylor@barketepstein.com, lrodriguez@barketepstein.com

Donna Aldea      daldea@barketepstein.com, aklein@barketepstein.com, dtaylor@barketepstein.com, lrodriguez@barketepstein.com

Alexander Robert Klein      aklein@barketepstein.com, dtaylor@barketepstein.com, lrodriguez@barketepstein.com

Maurene Ryan Comey      maurene.comey@usdoj.gov, CaseView.ECF@usdoj.gov, USANYS.ECF@USDOJ.GOV

**7:16-cr-00832-KMK-1 Notice has been delivered by other means to:**

The following document(s) are associated with this transaction:

**DX 58-2**

**Document description:** Main Document
**Original filename:** n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1008691343 [Date=9/6/2019] [FileNumber=22738482-0
] [245e76f56d32e6f8f593c0da0036fe65e433ae681e0e6ef9c4b9ef9e89ff03ee5d1
a1d032840f1a54f7537a0e3e8a3a3d862d3cc47b7f3d6703bd64307e9a78b]]

**DX 58-3**

## Re: NT-Privileged/Confidential

From:   BOBBI C STERNHEIM (bcsternheim@mac.com)

To:   aleisenring@barketepstein.com; bbarket@barketepstein.com; bkoffsky@snet.net; tonyricco@aol.com; michael@mbachlaw.com; johnadiazlaw@gmail.com; kennethjmontgomery@gmail.com

Date:   Monday, September 16, 2019, 05:40 PM EDT

Scanned ltr attached-

On Sep 16, 2019, at 5:18 PM, BOBBI C STERNHEIM <bcsternheim@mac.com> wrote:

I met with Nick. He asked me to send you the attached letter (to be scanned and emailed later this evening). Reviewed issues of potential and actual conflict and discussed Curcio hearing to be conducted by Judge Karas.
I will be at Courthouse tomorrow by 9:30.

<IMG_0201.JPG>

**BOBBI C. STERNHEIM, ESQ.**
**Law Offices of Bobbi C. Sternheim**
**33 West 19th Street - 4th Floor**
**New York, NY 10011**

**Main:   212-243-1100**
**Cell:   917-912-9698**
**Fax:    888-587-4737**

**bcsternheim@mac.com**

*This message and any attached documents contain information from the Law Offices of Bobbi C. Sternheim*

*that may be confidential and/or privileged.*
*If you are not the intended recipient, you may not read, copy, distribute, or use this information.*
*If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete this message. Thank you.*

**BOBBI C. STERNHEIM, ESQ.**
**Law Offices of Bobbi C. Sternheim**
**33 West 19th Street - 4th Floor**
**New York, NY 10011**

**Main:   212-243-1100**
**Cell:   917-912-9698**
**Fax:    888-587-4737**
**bcsternheim@mac.com**

*This message and any attached documents contain information from the Law Offices of Bobbi C. Sternheim*
*that may be confidential and/or privileged.*
*If you are not the intended recipient, you may not read, copy, distribute, or use this information.*
*If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete this message. Thank you.*

**DX 59-1**

1/2



NT Ltr 9-16-19.pdf
312kB

## Disclosure to the court

From:  Bruce Barket (bbarket@barketepstein.com)

To:    bcsternheim@mac.com; tonyricco@aol.com; bkoffsky@snet.net; michael@mbachlaw.com; johnadiazlaw@gmail.com; kennethjmontgomery@gmail.com

Cc:    aleisenring@barketepstein.com; daldea@barketepstein.com; michaelross@rosslaw.org

Date:  Friday, September 20, 2019, 09:08 AM EDT

After listening to everyone on Tuesday at our conference among counsel before we went into the courtroom, conferring with Mike Ross (who is copied here) and giving the matter some further thought (particularly in light of all of the other issues that swirling around in the case), I believe that we should place the matter of the note before Judge Karas at the soonest possible time. I also think that I should, in the first instance, outline what took place because I have firsthand knowledge of most of the events. At the same time, I remain concerned about the disclosures, which would necessarily involve revealing to the court client confidences, which could prejudice Nick. I am interested in any ideas you have concerning the process to accomplish the disclosure in a manner that is protective of Nick's interests.

Bruce A. Barket, Esq.

Barket Epstein Kearon Aldea & LoTurco, LLP

666 Old Country Road , Ste. 700

Garden City, NY 11530

(516) 745 1500 [P]  (516) 745 1245 [F]

www.barketepstein.com

This transmittal may be a confidential attorney client communication or may otherwise be privileged or confidential. If it is not clear that you are the intended recipient, you are hereby notified that you have received this transmittal in error; any review, dissemination, distribution or copying of this transmittal is strictly prohibited. If you suspect that you have received this communication in error, please notify us immediately by telephone or email and immediately delete this message and all its attachments

**DX 60-1**

## Re: Disclosure to the court

From:  BRUCE KOFFSKY (bkoffsky@snet.net)

To:  bbarket@barketepstein.com; bcsternheim@mac.com; tonyricco@aol.com; michael@mbachlaw.com; johnadiazlaw@gmail.com; kennethjmontgomery@gmail.com

Cc:  aleisenring@barketepstein.com; daldea@barketepstein.com; michaelross@rosslaw.org

Date:  Friday, September 20, 2019, 10:17 AM EDT

Timing in this matter is completely up to Curcio counsel and what she needs in terms of facts, either individual statements in some joint filing, should be left completely up to her.

BK

Regards.

Bruce

Bruce D. Koffsky, Esq.
Koffsky & Felsen, LLC
1150 Bedford Street
Stamford, CT. 06905
203-327-1500

Sent by my IPhone

> On Friday, September 20, 2019, 9:08 AM, Bruce Barket <bbarket@barketepstein.com> wrote:
>
> After listening to everyone on Tuesday at our conference among counsel before we went into the courtroom, conferring with Mike Ross (who is copied here) and giving the matter some further thought (particularly in light of all of the other issues that swirling around in the case), I believe that we should place the matter of the note before Judge Karas at the soonest possible time. I also think that I should, in the first instance, outline what took place because I have firsthand knowledge of most of the events. At the same time, I remain concerned about the disclosures, which would necessarily involve revealing to the court client confidences, which could prejudice Nick. I am interested in any ideas you have concerning the process to accomplish the disclosure in a manner that is protective of Nick's interests.
>
> Bruce A. Barket, Esq.
> Barket Epstein Kearon Aldea & LoTurco, LLP
> 666 Old Country Road , Ste. 700
> Garden City, NY 11530
> (516) 745 1500 [P]  (516) 745 1245 [F]
> www.barketepstein.com
>
> This transmittal may be a confidential attorney client communication or may otherwise be privileged or confidential. If it is not clear that you are the intended recipient, you are hereby notified that you have received this transmittal in error; any review, dissemination, distribution or copying of this transmittal is strictly prohibited.

**DX 61-1**

If you suspect that you have received this communication in error, please notify us immediately by telephone or email and immediately delete this message and all its attachments

**DX 61-2**

## Re: Disclosure to the court

From: BOBBI C STERNHEIM (bcsternheim@mac.com)

To: bbarket@barketepstein.com

Cc: tonyricco@aol.com; bkoffsky@snet.net; michael@mbachlaw.com; johnadiazlaw@gmail.com; kennethjmontgomery@gmail.com; aleisenring@barketepstein.com; daldea@barketepstein.com; michaelross@rosslaw.org; davidruhnke@ruhnkeandbarrett.com

Date: Friday, September 20, 2019, 12:24 PM EDT

I appreciate your desire to move this along. I am out of the country from
9/30 -10/16 with deadlines, court proceedings, and conferences jammed into the few days before I leave. I plan to see Nick next week.
Bobbi

**BOBBI C. STERNHEIM, ESQ.**
**Law Offices of Bobbi C. Sternheim**
**33 West 19th Street - 4th Floor**
**New York, NY 10011**

**Main:   212-243-1100**
**Cell:    917-912-9698**
**Fax:     888-587-4737**

**bcsternheim@mac.com**

*This message and any attached documents contain information from the Law Offices of Bobbi C. Sternheim*

*that may be confidential and/or privileged.*
*If you are not the intended recipient, you may not read, copy, distribute, or use this information.*
*If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete this message. Thank you.*

> On Sep 20, 2019, at 9:08 AM, Bruce Barket <bbarket@barketepstein.com> wrote:
>
> After listening to everyone on Tuesday at our conference among counsel before we went into the courtroom, conferring with Mike Ross (who is copied here) and giving the matter some further thought (particularly in light of all of the other issues that swirling around in the case), I believe that we should place the matter of the note before Judge Karas at the soonest possible time.  I also think that I should, in the first instance, outline what took place because I have firsthand knowledge of most of the events.  At the same time, I remain concerned about the disclosures, which would necessarily involve revealing to the court client confidences, which could prejudice Nick.  I am interested in any ideas you have concerning the process to accomplish the disclosure in a manner that is protective of Nick's interests.
>
> Bruce A. Barket, Esq.
>
> Barket Epstein Kearon Aldea & LoTurco, LLP

**DX 62-1**

666 Old Country Road , Ste. 700

Garden City, NY 11530

(516) 745 1500 [P]  (516) 745 1245 [F]

[www.barketepstein.com](http://www.barketepstein.com)

This transmittal may be a confidential attorney client communication or may otherwise be privileged or confidential. If it is not clear that you are the intended recipient, you are hereby notified that you have received this transmittal in error; any review, dissemination, distribution or copying of this transmittal is strictly prohibited. If you suspect that you have received this communication in error, please notify us immediately by telephone or email and immediately delete this message and all its attachments

**DX 62-2**

## Re: Disclosure to the court

From:  tonyricco@aol.com

To:    bbarket@barketepstein.com; bcsternheim@mac.com; bkoffsky@snet.net; michael@mbachlaw.com; johnadiazlaw@gmail.com; kennethjmontgomery@gmail.com

Cc:    aleisenring@barketepstein.com; DAldea@barketepstein.com

Date:  Friday, September 20, 2019, 03:00 PM EDT

I totally disagree on two levels.   First, this matter involves an allegation of conflict - either waivable or not. The Second Circuit has set up a procedure for the district court to follow, whenever, the issue is raised. The procedure is set up to protect the rights of the defendant to prevent the ineffective assistance of counsel.  The *Curcio* protocols allows for a process to take place which is designed to ensures that the rights of defendant to the effective assistance of counsel are protected while honoring the attorney client privilege.   The procedure you are suggesting circumvents that orderly process and also violates the very rights that the process is designed to protect. As your observations and explanation of your own conduct and behavior, as counsel subject to the *Curcio* inquiry, places you in a position that is possibly adversarial to the best interest of Nicholas Tartaglione.  See, *Lopez v. Scully*, 58 F.3d 38 (2d Cir. 1995).

As counsel subject to the *Curcio* counsel inquiry, you are not even the attorney who should be framing the the above facts and issues on conflicts for the court.  To the contrary, such an assignment belongs to the professional obligation of *Curcio* counsel.   After *Curcio* counsel provides her report to the court, it will be Judge Karas who will decide the best procedure upon which to move forward.   Judge Karas will then decide whether the court will conduct a full evidentiary hearing placing the affected individuals under oath, except written submissions.   Judge Karas will also decide if or when the government must be apprised of the issues subject to the *Curcio* inquiry before deciding how to proceed.

Secondly, this is a death authorized case, where the defendant is facing the risk of execution upon the conviction. There is a serious issue before the court related to the possible conflicts, and the proper representation of a death authorized defendant (a defendant who has expressed, on the court record, no interest or concern with the consequences of an adverse jury determination at the penalty phase).   This case presents important constitutional issues that could have and easily have been avoided.  However, we are now dealing with the consequences to Nicholas Tartaglione right to effective representation, representation in a death authorized case.

As has been said on many occasion in this case, in order to properly represent a defendant in a death authorized case (here Nicholas Tartaglione), it is imperative that all counsel understand and comport to the ABA Capital Guidelines, the Supreme Court and Second Circuit case authorities, and the orders issued by the district court.   The court has ordered the appointment of *Curcio* counsel to initiate the resolution of the above issues, let's understand and respect that process.

Tonyricco

Also please do not include your private counsel (Michael Ross) on team email communications, as he is not a member of the team nor counsel for Nicholas Tartaglione nor *Curcio* counsel appointed by the court.  If you want to send your private counsel team correspondences, that's your choice.   However, no attorney who is neither counsel of record nor appointed by the court should be on team emails discussing team issues - particularly those involving attorney client privilege and conflicts.

-----Original Message-----
From: Bruce Barket <bbarket@barketepstein.com>

**DX 63-1**

To: 'BOBBI C STERNHEIM' <bcsternheim@mac.com>; tonyricco (tonyricco@aol.com) <tonyricco@aol.com>; bkoffsky@snet.net <bkoffsky@snet.net>; Michael Bachrach (michael@mbachlaw.com) <michael@mbachlaw.com>; john diaz (johnadiazlaw@gmail.com) <johnadiazlaw@gmail.com>; Kenneth J. Montgomery Esq (kennethjmontgomery@gmail.com) <kennethjmontgomery@gmail.com>
Cc: Aida Leisenring <aleisenring@barketepstein.com>; Donna Aldea <DAldea@barketepstein.com>; 'Michael Ross' <michaelross@rosslaw.org>
Sent: Fri, Sep 20, 2019 9:08 am
Subject: Disclosure to the court

After listening to everyone on Tuesday at our conference among counsel before we went into the courtroom, conferring with Mike Ross (who is copied here) and giving the matter some further thought (particularly in light of all of the other issues that swirling around in the case), I believe that we should place the matter of the note before Judge Karas at the soonest possible time.  I also think that I should, in the first instance, outline what took place because I have firsthand knowledge of most of the events. At the same time, I remain concerned about the disclosures, which would necessarily involve revealing to the court client confidences, which could prejudice Nick.  I am interested in any ideas you have concerning the process to accomplish the disclosure in a manner that is protective of Nick's interests.

Bruce A. Barket, Esq.
Barket Epstein Kearon Aldea & LoTurco, LLP
666 Old Country Road , Ste. 700
Garden City, NY 11530
(516) 745 1500 [P]  (516) 745 1245 [F]
www.barketepstein.com


This transmittal may be a confidential attorney client communication or may otherwise be privileged or confidential. If it is not clear that you are the intended recipient, you are hereby notified that you have received this transmittal in error; any review, dissemination, distribution or copying of this transmittal is strictly prohibited. If you suspect that you have received this communication in error, please notify us immediately by telephone or email and immediately delete this message and all its attachments

**DX 63-2**

# Nicholas Tartaglione

From:  Michael Bachrach (mbach2000@yahoo.com)

To:      maurene.comey@usdoj.gov; jason.swergold@usdoj.gov

Cc:      tonyricco@aol.com; bkoffsky@snet.net; bbarket@barketepstein.com; aleisenring@barketepstein.com; kennethjmontgomery@gmail.com; johnadiazlaw@gmail.com

Date:    Wednesday, October 30, 2019, 03:57 PM EDT

Hi Maurene,

You or Jason mentioned at one point that you would be subpoenaing the call history and subscriber info, etc., related to the contraband cellphone seized from Tartaglione.  At your earliest convenience, could you please send us whatever material you received in association with the subpoenas related to that cellphone as well as any information that you were able to extract from the phone without the need for a warrant?

We view that information as, among other things, Rule 16 material in relation to the penalty phase.

Call me if you have any questions.

Thanks for your help.

--Michael

==========================
Michael K. Bachrach, Esq.
276 Fifth Ave., Suite 501
New York, NY 10001
tel: (212) 929-0592
fax: (866) 328-1630
cell: (917) 304-5044
michael@mbachlaw.com

**DX 64-1**

## RE: Nicholas Tartaglione

From:   Swergold, Jason (USANYS) (jason.swergold@usdoj.gov)

To:     michael@mbachlaw.com; maurene.comey@usdoj.gov

Cc:     tonyricco@aol.com; bkoffsky@snet.net; bbarket@barketepstein.com; aleisenring@barketepstein.com; kennethjmontgomery@gmail.com; johnadiazlaw@gmail.com

Date:   Thursday, October 31, 2019, 10:04 AM EDT

Michael,

We have not received the records yet from the FBI, but we requested a full set and will produce them as soon as we receive them.

Jason M. Swergold

Assistant United States Attorney

212-637-1023

**From:** Michael Bachrach <mbach2000@yahoo.com>
**Sent:** Wednesday, October 30, 2019 3:58 PM
**To:** Comey, Maurene (USANYS) <MComey@usa.doj.gov>; Swergold, Jason (USANYS) <JSwergold@usa.doj.gov>
**Cc:** Tony Ricco <tonyricco@aol.com>; BRUCE KOFFSKY <bkoffsky@snet.net>; Bruce Barket <bbarket@barketepstein.com>; Aida Leisenring <aleisenring@barketepstein.com>; Kenneth J. Montgomery Esq <kennethjmontgomery@gmail.com>; John Diaz <johnadiazlaw@gmail.com>
**Subject:** Nicholas Tartaglione

Hi Maurene,

You or Jason mentioned at one point that you would be subpoenaing the call history and subscriber info, etc., related to the contraband cellphone seized from Tartaglione.  At your earliest convenience, could you please send us whatever material you received in association with the subpoenas related to that cellphone as well as any information that you were able to extract from the phone without the need for a warrant?

We view that information as, among other things, Rule 16 material in relation to the penalty phase.

Call me if you have any questions.

**DX 65-1**

Thanks for your help.


--Michael


=========================

Michael K. Bachrach, Esq.

276 Fifth Ave., Suite 501

New York, NY 10001

tel: (212) 929-0592

fax: (866) 328-1630

cell: (917) 304-5044

michael@mbachlaw.com

**DX 65-2**

## Re: Nicholas Tartaglione

From:   Bruce Barket (bbarket@barketepstein.com)

To:     jason.swergold@usdoj.gov

Cc:     michael@mbachlaw.com; maurene.comey@usdoj.gov; tonyricco@aol.com; bkoffsky@snet.net;
        aleisenring@barketepstein.com; kennethjmontgomery@gmail.com; johnadiazlaw@gmail.com

Date:   Thursday, October 31, 2019, 10:31 AM EDT

I am sorry.  I don't understand.  What "records" were Obtained by the fbi?  I thought there was not a search done of the phone

Bruce Barket
Barket, Epstein, Kearon, Aldea & LoTurco
666 Old Country road
Garden City, NY 11530
(516) 745 1500 - O
(516) 287 7230 - M
Barket Epstein.com

> On Oct 31, 2019, at 10:06 AM, Swergold, Jason (USANYS) <Jason.Swergold@usdoj.gov> wrote:

Michael,

We have not received the records yet from the FBI, but we requested a full set and will produce them as soon as we receive them.

Jason M. Swergold

Assistant United States Attorney

212-637-1023

**From:** Michael Bachrach <mbach2000@yahoo.com>
**Sent:** Wednesday, October 30, 2019 3:58 PM
**To:** Comey, Maurene (USANYS) <MComey@usa.doj.gov>; Swergold, Jason (USANYS) <JSwergold@usa.doj.gov>
**Cc:** Tony Ricco <tonyricco@aol.com>; BRUCE KOFFSKY <bkoffsky@snet.net>; Bruce Barket <bbarket@barketepstein.com>; Aida Leisenring <aleisenring@barketepstein.com>; Kenneth J. Montgomery Esq <kennethjmontgomery@gmail.com>; John Diaz <johnadiazlaw@gmail.com>
**Subject:** Nicholas Tartaglione

**DX 66-1**

Hi Maurene,

You or Jason mentioned at one point that you would be subpoenaing the call history and subscriber info, etc., related to the contraband cellphone seized from Tartaglione. At your earliest convenience, could you please send us whatever material you received in association with the subpoenas related to that cellphone as well as any information that you were able to extract from the phone without the need for a warrant?

We view that information as, among other things, Rule 16 material in relation to the penalty phase.

Call me if you have any questions.

Thanks for your help.

--Michael

=========================

Michael K. Bachrach, Esq.

276 Fifth Ave., Suite 501

New York, NY 10001

tel: (212) 929-0592

fax: (866) 328-1630

cell: (917) 304-5044

michael@mbachlaw.com

**DX 66-2**

## RE: Nicholas Tartaglione

From:    Comey, Maurene (USANYS) (maurene.comey@usdoj.gov)

To:      bbarket@barketepstein.com; jason.swergold@usdoj.gov

Cc:      michael@mbachlaw.com; tonyricco@aol.com; bkoffsky@snet.net; aleisenring@barketepstein.com;
         kennethjmontgomery@gmail.com; johnadiazlaw@gmail.com

Date:    Thursday, October 31, 2019, 10:40 AM EDT

Bruce,

When BOP officials first took custody of the phone, they followed their ordinary practice of reviewing the phone numbers in the contacts and call log.  The BOP provided us with a list of those phone numbers, and the FBI sought records for those phone numbers via administrative subpoena.

Maurene

Maurene Comey

Assistant United States Attorney

Southern District of New York

1 St. Andrew's Plaza

New York, NY 10007

212-637-2324

Maurene.Comey@usdoj.gov

---

**From:** Bruce Barket <bbarket@barketepstein.com>
**Sent:** Thursday, October 31, 2019 10:31 AM
**To:** Swergold, Jason (USANYS) <JSwergold@usa.doj.gov>
**Cc:** Michael Bachrach <michael@mbachlaw.com>; Comey, Maurene (USANYS) <MComey@usa.doj.gov>; Tony Ricco <tonyricco@aol.com>; BRUCE KOFFSKY <bkoffsky@snet.net>; Aida Leisenring <aleisenring@barketepstein.com>; Kenneth J. Montgomery Esq

**DX 67-1**

1/3

<kennethjmontgomery@gmail.com>; John Diaz <johnadiazlaw@gmail.com>
**Subject:** Re: Nicholas Tartaglione

I am sorry.  I don't understand.  What "records" were Obtained by the fbi?  I thought there was not a search done of the phone

Bruce Barket

Barket, Epstein, Kearon, Aldea & LoTurco

666 Old Country road

Garden City, NY 11530

(516) 745 1500 - O

(516) 287 7230 - M

Barket Epstein.com

On Oct 31, 2019, at 10:06 AM, Swergold, Jason (USANYS) <Jason.Swergold@usdoj.gov> wrote:

Michael,

We have not received the records yet from the FBI, but we requested a full set and will produce them as soon as we receive them.

Jason M. Swergold

Assistant United States Attorney

212-637-1023

---

**From:** Michael Bachrach <mbach2000@yahoo.com>
**Sent:** Wednesday, October 30, 2019 3:58 PM
**To:** Comey, Maurene (USANYS) <MComey@usa.doj.gov>; Swergold, Jason (USANYS) <JSwergold@usa.doj.gov>
**Cc:** Tony Ricco <tonyricco@aol.com>; BRUCE KOFFSKY <bkoffsky@snet.net>; Bruce Barket <bbarket@barketepstein.com>; Aida Leisenring <aleisenring@barketepstein.com>; Kenneth J. Montgomery Esq <kennethjmontgomery@gmail.com>; John Diaz <johnadiazlaw@gmail.com>
**Subject:** Nicholas Tartaglione

**DX 67-2**

Hi Maurene,

You or Jason mentioned at one point that you would be subpoenaing the call history and subscriber info, etc., related to the contraband cellphone seized from Tartaglione.  At your earliest convenience, could you please send us whatever material you received in association with the subpoenas related to that cellphone as well as any information that you were able to extract from the phone without the need for a warrant?

We view that information as, among other things, Rule 16 material in relation to the penalty phase.

Call me if you have any questions.

Thanks for your help.

--Michael

========================

Michael K. Bachrach, Esq.

276 Fifth Ave., Suite 501

New York, NY 10001

tel: (212) 929-0592

fax: (866) 328-1630

cell: (917) 304-5044

michael@mbachlaw.com

**DX 67-3**

## Re: Nicholas Tartaglione

From:    Bruce Barket (bbarket@barketepstein.com)

To:       maurene.comey@usdoj.gov

Cc:      jason.swergold@usdoj.gov; michael@mbachlaw.com; tonyricco@aol.com; bkoffsky@snet.net; aleisenring@barketepstein.com; kennethjmontgomery@gmail.com; johnadiazlaw@gmail.com

Date:    Thursday, October 31, 2019, 10:43 AM EDT

Thanks. Can we have a copy of the the numbers in the contacts now while we await the records from the fbi?

The fbi issued an "administrative" subpoena for which records? Those of the phone numbers In the contacts? Or the calls/texts made to and from the phone?

Bruce Barket
Barket, Epstein, Kearon, Aldea & LoTurco
666 Old Country road
Garden City, NY 11530
(516) 745 1500 - O
(516) 287 7230 - M
Barket Epstein.com

> On Oct 31, 2019, at 10:40 AM, Comey, Maurene (USANYS) <Maurene.Comey@usdoj.gov> wrote:
>
>
>
> Bruce,
>
>
> When BOP officials first took custody of the phone, they followed their ordinary practice of reviewing the phone numbers in the contacts and call log. The BOP provided us with a list of those phone numbers, and the FBI sought records for those phone numbers via administrative subpoena.
>
>
> Maurene
>
>
>
> Maurene Comey
>
> Assistant United States Attorney
>
> Southern District of New York
>
> 1 St. Andrew's Plaza
>
> New York, NY 10007

**DX 68-1**

212-637-2324

Maurene.Comey@usdoj.gov

---

**From:** Bruce Barket <bbarket@barketepstein.com>
**Sent:** Thursday, October 31, 2019 10:31 AM
**To:** Swergold, Jason (USANYS) <JSwergold@usa.doj.gov>
**Cc:** Michael Bachrach <michael@mbachlaw.com>; Comey, Maurene (USANYS) <MComey@usa.doj.gov>; Tony Ricco <tonyricco@aol.com>; BRUCE KOFFSKY <bkoffsky@snet.net>; Aida Leisenring <aleisenring@barketepstein.com>; Kenneth J. Montgomery Esq <kennethjmontgomery@gmail.com>; John Diaz <johnadiazlaw@gmail.com>
**Subject:** Re: Nicholas Tartaglione

I am sorry. I don't understand. What "records" were Obtained by the fbi? I thought there was not a search done of the phone

Bruce Barket

Barket, Epstein, Kearon, Aldea & LoTurco

666 Old Country road

Garden City, NY 11530

(516) 745 1500 - O

(516) 287 7230 - M

Barket Epstein.com

On Oct 31, 2019, at 10:06 AM, Swergold, Jason (USANYS) <Jason.Swergold@usdoj.gov> wrote:

Michael,

We have not received the records yet from the FBI, but we requested a full set and will produce them as soon as we receive them.

Jason M. Swergold

Assistant United States Attorney

**DX 68-2**

212-637-1023

DX 68-3

**From:** Michael Bachrach <mbach2000@yahoo.com>
**Sent:** Wednesday, October 30, 2019 3:58 PM
**To:** Comey, Maurene (USANYS) <MComey@usa.doj.gov>; Swergold, Jason (USANYS) <JSwergold@usa.doj.gov>
**Cc:** Tony Ricco <tonyricco@aol.com>; BRUCE KOFFSKY <bkoffsky@snet.net>; Bruce Barket <bbarket@barketepstein.com>; Aida Leisenring <aleisenring@barketepstein.com>; Kenneth J. Montgomery Esq <kennethjmontgomery@gmail.com>; John Diaz <johnadiazlaw@gmail.com>
**Subject:** Nicholas Tartaglione

Hi Maurene,

You or Jason mentioned at one point that you would be subpoenaing the call history and subscriber info, etc., related to the contraband cellphone seized from Tartaglione. At your earliest convenience, could you please send us whatever material you received in association with the subpoenas related to that cellphone as well as any information that you were able to extract from the phone without the need for a warrant?

We view that information as, among other things, Rule 16 material in relation to the penalty phase.

Call me if you have any questions.

Thanks for your help.

--Michael

========================

Michael K. Bachrach, Esq.

276 Fifth Ave., Suite 501

New York, NY 10001

tel: (212) 929-0592

fax: (866) 328-1630

cell: (917) 304-5044

michael@mbachlaw.com

## Re: Nicholas Tartaglione

From:   Michael Bachrach (mbach2000@yahoo.com)

To:      bbarket@barketepstein.com; jason.swergold@usdoj.gov; maurene.comey@usdoj.gov

Cc:      tonyricco@aol.com; bkoffsky@snet.net; aleisenring@barketepstein.com; kennethjmontgomery@gmail.com; johnadiazlaw@gmail.com

Date:    Thursday, October 31, 2019, 10:44 AM EDT

Hi Maurene,

Yes, please, could send us the list of those phone numbers now?

Thanks.

--Michael

==========================
Michael K. Bachrach, Esq.
276 Fifth Ave., Suite 501
New York, NY 10001
tel: (212) 929-0592
fax: (866) 328-1630
cell: (917) 304-5044
michael@mbachlaw.com

On Thursday, October 31, 2019, 10:40:57 AM EDT, Comey, Maurene (USANYS) <maurene.comey@usdoj.gov> wrote:

Bruce,

When BOP officials first took custody of the phone, they followed their ordinary practice of reviewing the phone numbers in the contacts and call log.  The BOP provided us with a list of those phone numbers, and the FBI sought records for those phone numbers via administrative subpoena.

Maurene

Maurene Comey

**DX 69-1**

Assistant United States Attorney

Southern District of New York

1 St. Andrew's Plaza

New York, NY 10007

212-637-2324

Maurene.Comey@usdoj.gov

---

**From:** Bruce Barket <bbarket@barketepstein.com>
**Sent:** Thursday, October 31, 2019 10:31 AM
**To:** Swergold, Jason (USANYS) <JSwergold@usa.doj.gov>
**Cc:** Michael Bachrach <michael@mbachlaw.com>; Comey, Maurene (USANYS)
<MComey@usa.doj.gov>; Tony Ricco <tonyricco@aol.com>; BRUCE KOFFSKY <bkoffsky@snet.net>;
Aida Leisenring <aleisenring@barketepstein.com>; Kenneth J. Montgomery Esq
<kennethjmontgomery@gmail.com>; John Diaz <johnadiazlaw@gmail.com>
**Subject:** Re: Nicholas Tartaglione

I am sorry.  I don't understand.  What "records" were Obtained by the fbi?  I thought there was not a search done of the phone

Bruce Barket

Barket, Epstein, Kearon, Aldea & LoTurco

666 Old Country road

Garden City, NY 11530

(516) 745 1500 - O

(516) 287 7230 - M

Barket Epstein.com

On Oct 31, 2019, at 10:06 AM, Swergold, Jason (USANYS) <Jason.Swergold@usdoj.gov> wrote:

Michael,

**DX 69-2**

2/4

We have not received the records yet from the FBI, but we requested a full set and will produce them as soon as we receive them.

Jason M. Swergold

Assistant United States Attorney

212-637-1023

---

**From:** Michael Bachrach <mbach2000@yahoo.com>
**Sent:** Wednesday, October 30, 2019 3:58 PM
**To:** Comey, Maurene (USANYS) <MComey@usa.doj.gov>; Swergold, Jason (USANYS) <JSwergold@usa.doj.gov>
**Cc:** Tony Ricco <tonyricco@aol.com>; BRUCE KOFFSKY <bkoffsky@snet.net>; Bruce Barket <bbarket@barketepstein.com>; Aida Leisenring <aleisenring@barketepstein.com>; Kenneth J. Montgomery Esq <kennethjmontgomery@gmail.com>; John Diaz <johnadiazlaw@gmail.com>
**Subject:** Nicholas Tartaglione

Hi Maurene,

You or Jason mentioned at one point that you would be subpoenaing the call history and subscriber info, etc., related to the contraband cellphone seized from Tartaglione. At your earliest convenience, could you please send us whatever material you received in association with the subpoenas related to that cellphone as well as any information that you were able to extract from the phone without the need for a warrant?

We view that information as, among other things, Rule 16 material in relation to the penalty phase.

Call me if you have any questions.

Thanks for your help.

--Michael

========================

Michael K. Bachrach, Esq.

276 Fifth Ave., Suite 501

New York, NY 10001

tel: (212) 929-0592

fax: (866) 328-1630

**DX 69-3**

cell: (917) 304-5044

michael@mbachlaw.com

**DX 69-4**

## RE: Nicholas Tartaglione

From:   Swergold, Jason (USANYS) (jason.swergold@usdoj.gov)

To:     bbarket@barketepstein.com; maurene.comey@usdoj.gov

Cc:     michael@mbachlaw.com; tonyricco@aol.com; bkoffsky@snet.net; aleisenring@barketepstein.com;
        kennethjmontgomery@gmail.com; johnadiazlaw@gmail.com

Date:   Thursday, October 31, 2019, 11:27 AM EDT

Attached is the memo that we received from BOP regarding the phone numbers.


Jason M. Swergold

Assistant United States Attorney

212-637-1023


**From:** Bruce Barket <bbarket@barketepstein.com>
**Sent:** Thursday, October 31, 2019 10:44 AM
**To:** Comey, Maurene (USANYS) <MComey@usa.doj.gov>
**Cc:** Swergold, Jason (USANYS) <JSwergold@usa.doj.gov>; Michael Bachrach
<michael@mbachlaw.com>; Tony Ricco <tonyricco@aol.com>; BRUCE KOFFSKY
<bkoffsky@snet.net>; Aida Leisenring <aleisenring@barketepstein.com>; Kenneth J. Montgomery Esq
<kennethjmontgomery@gmail.com>; John Diaz <johnadiazlaw@gmail.com>
**Subject:** Re: Nicholas Tartaglione


Thanks.  Can we have a copy of the the numbers in the contacts now while we await the records from the fbi?


The fbi issued an "administrative" subpoena for which records? Those of the phone numbers In the contacts? Or the calls/texts made to and from the phone?

Bruce Barket

Barket, Epstein, Kearon, Aldea & LoTurco

666 Old Country road

Garden City, NY 11530

(516) 745 1500 - O

(516) 287 7230 - M

Barket Epstein.com

**DX 70-1**

On Oct 31, 2019, at 10:40 AM, Comey, Maurene (USANYS) <Maurene.Comey@usdoj.gov> wrote:

Bruce,

When BOP officials first took custody of the phone, they followed their ordinary practice of reviewing the phone numbers in the contacts and call log.  The BOP provided us with a list of those phone numbers, and the FBI sought records for those phone numbers via administrative subpoena.

Maurene

Maurene Comey

Assistant United States Attorney

Southern District of New York

1 St. Andrew's Plaza

New York, NY 10007

212-637-2324

Maurene.Comey@usdoj.gov

---

**From:** Bruce Barket <bbarket@barketepstein.com>
**Sent:** Thursday, October 31, 2019 10:31 AM
**To:** Swergold, Jason (USANYS) <JSwergold@usa.doj.gov>
**Cc:** Michael Bachrach <michael@mbachlaw.com>; Comey, Maurene (USANYS) <MComey@usa.doj.gov>; Tony Ricco <tonyricco@aol.com>; BRUCE KOFFSKY <bkoffsky@snet.net>; Aida Leisenring <aleisenring@barketepstein.com>; Kenneth J. Montgomery Esq <kennethjmontgomery@gmail.com>; John Diaz <johnadiazlaw@gmail.com>
**Subject:** Re: Nicholas Tartaglione

I am sorry.  I don't understand.  What "records" were Obtained by the fbi?  I thought there was not a search done of the phone

**DX 70-2**

Bruce Barket

Barket, Epstein, Kearon, Aldea & LoTurco

666 Old Country road

Garden City, NY 11530

(516) 745 1500 - O

(516) 287 7230 - M

Barket Epstein.com

On Oct 31, 2019, at 10:06 AM, Swergold, Jason (USANYS) <Jason.Swergold@usdoj.gov> wrote:

Michael,

We have not received the records yet from the FBI, but we requested a full set and will produce them as soon as we receive them.

Jason M. Swergold

Assistant United States Attorney

212-637-1023

---

**From:** Michael Bachrach <mbach2000@yahoo.com>
**Sent:** Wednesday, October 30, 2019 3:58 PM
**To:** Comey, Maurene (USANYS) <MComey@usa.doj.gov>; Swergold, Jason (USANYS) <JSwergold@usa.doj.gov>
**Cc:** Tony Ricco <tonyricco@aol.com>; BRUCE KOFFSKY <bkoffsky@snet.net>; Bruce Barket <bbarket@barketepstein.com>; Aida Leisenring <aleisenring@barketepstein.com>; Kenneth J. Montgomery Esq <kennethjmontgomery@gmail.com>; John Diaz <johnadiazlaw@gmail.com>
**Subject:** Nicholas Tartaglione

Hi Maurene,

You or Jason mentioned at one point that you would be subpoenaing the call history and subscriber info, etc., related to the contraband cellphone seized from Tartaglione. At your earliest convenience, could you please

**DX 70-3**

send us whatever material you received in association with the subpoenas related to that cellphone as well as any information that you were able to extract from the phone without the need for a warrant?

We view that information as, among other things, Rule 16 material in relation to the penalty phase.

Call me if you have any questions.

Thanks for your help.

--Michael

========================

Michael K. Bachrach, Esq.

276 Fifth Ave., Suite 501

New York, NY 10001

tel: (212) 929-0592

fax: (866) 328-1630

cell: (917) 304-5044

michael@mbachlaw.com



BOP Memo re Tartaglione Phone.doc.pdf
117.2kB

**DX 70-4**

## Re: Nicholas Tartaglione

From:   Michael Bachrach (mbach2000@yahoo.com)

To:     babarket@aol.com

Date:   Monday, November 11, 2019, 11:47 PM EST

Bruce, I don't know what you're referring to.  I'm trying to find out the scope of information the Gov't has that is relevant to the penalty phase of the proceedings.  That information is relevant to our client's mitigating factors as well as the Gov't's potential case in aggravation.  Asking the Gov't to tell us what evidence they have against our client is exactly how you defend someone, particularly when facing the death penalty.

On a related note, could you please send me screen shots of any texts sent to/from Nick since he's been in custody?  I'm referring to texts to/from you, Aida, Weider, V, or any others that you can provide me.  The texts may or may not be relevant to the Curcio proceedings, but regardless I need to review them so that I can evaluate the impact of those texts on the penalty phase case.  Please send them to me.

> On Monday, November 11, 2019, 09:54:09 PM EST, BRUCE BARKET <babarket@aol.com> wrote:
>
> This is no way to defend anyone, let alone someone facing the death penalty.
>
> Bruce Barket
> Mobile (516) 287 7230
>
>> On Nov 11, 2019, at 7:08 PM, Michael Bachrach <mbach2000@yahoo.com> wrote:
>>
>> Sorry about that. I don't know why you're private email address keeps coming up. I didn't even realize I had it.
>>
>> As I said before, I'm trying to confirm that we have the same information as the Gov't. Did they ever respond to you? If so, please advise. They never responded to me.
>>
>> Sent from Yahoo Mail on Android
>>
>>> On Mon, Nov 11, 2019 at 7:01 PM, BRUCE BARKET <babarket@aol.com> wrote:
>>>
>>> Can you please, please use my office address? Please. I won't ask for 4th time why your asking for a number we have.
>>>
>>> Bruce Barket
>>> Mobile (516) 287 7230
>>>
>>>> On Nov 11, 2019, at 5:45 PM, Michael Bachrach <mbach2000@yahoo.com> wrote:

**DX 71-1**

Hi Jason,

Just following up on our prior exchange as well as Tony's conversation with Maurene. Could you send us the contraband telephone's number now?

Thanks.

--Michael

Sent from Yahoo Mail on Android

On Mon, Nov 4, 2019 at 12:02 PM, Swergold, Jason (USANYS) <Jason.Swergold@usdoj.gov> wrote:

Michael,

We don't think the MCC actually gave us the number, but we will double check.

Jason M. Swergold

Assistant United States Attorney

212-637-1023

**From:** Michael Bachrach <mbach2000@yahoo.com>
**Sent:** Saturday, November 2, 2019 1:38 PM
**To:** Swergold, Jason (USANYS) <JSwergold@usa.doj.gov>; Comey, Maurene (USANYS) <MComey@usa.doj.gov>
**Cc:** Michael Bachrach <michael@mbachlaw.com>; Tony Ricco <tonyricco@aol.com>; BRUCE KOFFSKY <bkoffsky@snet.net>; Aida Leisenring <aleisenring@barketepstein.com>; Kenneth J. Montgomery Esq <kennethjmontgomery@gmail.com>; John Diaz <johnadiazlaw@gmail.com>; Bruce Barket <babarket@aol.com>
**Subject:** RE: Nicholas Tartaglione

Hi Jason,

Could you send us the telephone number of the seized phone too?

Thanks.

--Michael

**DX 71-2**

Sent from Yahoo Mail on Android

3/6

On Thu, Oct 31, 2019 at 11:27 AM, Swergold, Jason (USANYS)

<Jason.Swergold@usdoj.gov> wrote:

> Attached is the memo that we received from BOP regarding the phone numbers.
>
>
> Jason M. Swergold
>
> Assistant United States Attorney
>
> 212-637-1023
>
>
> _____
>
> **From:** Bruce Barket <bbarket@barketepstein.com>
> **Sent:** Thursday, October 31, 2019 10:44 AM
> **To:** Comey, Maurene (USANYS) <MComey@usa.doj.gov>
> **Cc:** Swergold, Jason (USANYS) <JSwergold@usa.doj.gov>; Michael Bachrach <michael@mbachlaw.com>; Tony Ricco <tonyricco@aol.com>; BRUCE KOFFSKY <bkoffsky@snet.net>; Aida Leisenring <aleisenring@barketepstein.com>; Kenneth J. Montgomery Esq <kennethjmontgomery@gmail.com>; John Diaz <johnadiazlaw@gmail.com>
> **Subject:** Re: Nicholas Tartaglione
>
>
> Thanks.  Can we have a copy of the the numbers in the contacts now while we await the records from the fbi?
>
>
> The fbi issued an "administrative" subpoena for which records? Those of the phone numbers In the contacts? Or the calls/texts made to and from the phone?
>
> Bruce Barket
>
> Barket, Epstein, Kearon, Aldea & LoTurco
>
> 666 Old Country road
>
> Garden City, NY 11530
>
> (516) 745 1500 - O
>
> (516) 287 7230 - M
>
> Barket Epstein.com
>
>
>> On Oct 31, 2019, at 10:40 AM, Comey, Maurene (USANYS)
>> <Maurene.Comey@usdoj.gov> wrote:

**DX 71-3**

Yahoo Mail - Re: Nicholas Tartaglione

Bruce,

When BOP officials first took custody of the phone, they followed their ordinary practice of reviewing the phone numbers in the contacts and call log.  The BOP provided us with a list of those phone numbers, and the FBI sought records for those phone numbers via administrative subpoena.

Maurene

Maurene Comey

Assistant United States Attorney

Southern District of New York

1 St. Andrew's Plaza

New York, NY 10007

212-637-2324

Maurene.Comey@usdoj.gov

---

**From:** Bruce Barket <bbarket@barketepstein.com>
**Sent:** Thursday, October 31, 2019 10:31 AM
**To:** Swergold, Jason (USANYS) <JSwergold@usa.doj.gov>
**Cc:** Michael Bachrach <michael@mbachlaw.com>; Comey, Maurene (USANYS) <MComey@usa.doj.gov>; Tony Ricco <tonyricco@aol.com>; BRUCE KOFFSKY <bkoffsky@snet.net>; Aida Leisenring <aleisenring@barketepstein.com>; Kenneth J. Montgomery Esq <kennethjmontgomery@gmail.com>; John Diaz <johnadiazlaw@gmail.com>
**Subject:** Re: Nicholas Tartaglione

I am sorry.  I don't understand.  What "records" were Obtained by the fbi?  I thought there was not a search done of the phone

Bruce Barket

**DX 71-4**

Barket, Epstein, Kearon, Aldea & LoTurco

666 Old Country road

Garden City, NY 11530

(516) 745 1500 - O

(516) 287 7230 - M

Barket Epstein.com

On Oct 31, 2019, at 10:06 AM, Swergold, Jason (USANYS) <Jason.Swergold@usdoj.gov> wrote:

Michael,

We have not received the records yet from the FBI, but we requested a full set and will produce them as soon as we receive them.

Jason M. Swergold

Assistant United States Attorney

212-637-1023

---

**From:** Michael Bachrach <mbach2000@yahoo.com>
**Sent:** Wednesday, October 30, 2019 3:58 PM
**To:** Comey, Maurene (USANYS) <MComey@usa.doj.gov>; Swergold, Jason (USANYS) <JSwergold@usa.doj.gov>
**Cc:** Tony Ricco <tonyricco@aol.com>; BRUCE KOFFSKY <bkoffsky@snet.net>; Bruce Barket <bbarket@barketepstein.com>; Aida Leisenring <aleisenring@barketepstein.com>; Kenneth J. Montgomery Esq <kennethjmontgomery@gmail.com>; John Diaz <johnadiazlaw@gmail.com>
**Subject:** Nicholas Tartaglione

Hi Maurene,

You or Jason mentioned at one point that you would be subpoenaing the call history and subscriber info, etc., related to the contraband cellphone seized from Tartaglione. At your earliest convenience, could you please send us whatever material you received in association with the subpoenas related to that cellphone as well as any

**DX 71-5**

information that you were able to extract from the phone without the need for a warrant?

We view that information as, among other things, Rule 16 material in relation to the penalty phase.

Call me if you have any questions.

Thanks for your help.

--Michael


=========================

Michael K. Bachrach, Esq.

276 Fifth Ave., Suite 501

New York, NY 10001

tel: (212) 929-0592

fax: (866) 328-1630

cell: (917) 304-5044

michael@mbachlaw.com

**DX 71-6**

## RE: reversing the Authorization decision

From:    Comey, Maurene (USANYS) (maurene.comey@usdoj.gov)

To:      bbarket@barketepstein.com; jason.swergold@usdoj.gov

Cc:      aleisenring@barketepstein.com; tonyricco@aol.com; michael@mbachlaw.com; bkoffsky@snet.net; kennethjmontgomery@gmail.com; johnadiazlaw@gmail.com; michael.gerber@usdoj.gov

Date:    Wednesday, January 8, 2020, 10:06 AM EST

Good morning,

We will discuss internally and get back to you.

Best,

Maurene

Maurene Comey

Assistant United States Attorney

Southern District of New York

1 St. Andrew's Plaza

New York, NY 10007

212-637-2324

Maurene.Comey@usdoj.gov

**From:** Bruce Barket <bbarket@barketepstein.com>
**Sent:** Wednesday, January 8, 2020 9:41 AM
**To:** Swergold, Jason (USANYS) <JSwergold@usa.doj.gov>; Comey, Maurene (USANYS) <MComey@usa.doj.gov>
**Cc:** Aida Leisenring <aleisenring@barketepstein.com>
**Subject:** reversing the Authorization decision

Good morning,

**DX 72-1**

We would like to make further arguments to the committee and ask that it reverse its decision.  Can you please let me know the process to do that?  Do we first write to you? To the committee? To the AG?

The new arguments we would like to make will not include an offer to plead guilty.

Bruce A. Barket, Esq.

Barket Epstein Kearon Aldea & LoTurco, LLP

666 Old Country Road , Ste. 700

Garden City, NY 11530

(516) 745 1500 [P]  (516) 745 1245 [F]

www.barketepstein.com

This transmittal may be a confidential attorney client communication or may otherwise be privileged or confidential. If it is not clear that you are the intended recipient, you are hereby notified that you have received this transmittal in error; any review, dissemination, distribution or copying of this transmittal is strictly prohibited. If you suspect that you have received this communication in error, please notify us immediately by telephone or email and immediately delete this message and all its attachments

**DX 72-2**

## Re: reversing the Authorization decision

From:   tonyricco@aol.com

To:     maurene.comey@usdoj.gov; bbarket@barketepstein.com; jason.swergold@usdoj.gov

Cc:     aleisenring@barketepstein.com; michael@mbachlaw.com; bkoffsky@snet.net; kennethjmontgomery@gmail.com; johnadiazlaw@gmail.com; michael.gerber@usdoj.gov; bcsternheim@mac.com

Date:   Wednesday, January 8, 2020, 11:45 AM EST

AUSA Comey:

Thank you for making sure that all counsel were noticed on your response to this extremely important request.   This request was presented to the government without any knowledge or participation of Learned Counsel and/or our David Ruhnke or Tanya Greene, the teams Resource Counsel.

As you are aware, there is a **serious** *Curcio* inquiry presently pending before the court.   As you are also aware, on December 31, 2019, *Curcio* counsel has filed her report with Judge Karas.   As a result, it is requested that government refrain from scheduling any presentation before the Capital Case Review Committee in relation to the withdrawal of the notice of intention to seek the death penalty in this case until Judge Karas decides whether (any) counsel in this case is operating under a waivable or non-waivable conflict of interest.

According to attorney Barket, the application to withdraw death authorization does not include an offer to plead guilty. Therefore, the timing of a submission seeking withdrawal, if any, is clearly a decision to be made by counsel - *a non-conflicted counsel*.   Such an application, filed without any input or consultation of experienced Learned Counsel, and/or highly experienced Resource Counsel, in the present status of this case is not in the best interest of Nicholas Tartaglione, a capital authorized defendant.   In fact, Judge Karas has held all motion practice with the court in abeyance until the Curcio issues are litigated, and on behalf of the defendant, it is requested that the Department of Justice similarly not entertain an application of such magnitude.

Further you can rest assured, that all counsel in this case have, in fact, been previously fully instructed by Learned Counsel on the procedure to be followed for application of United States Attorney Manual section 9-10.160 (B) on an application to seek withdrawal of the notice of intention to seek the death penalty.

Therefore, for reasons stated above it is requested that any application for withdrawal of the notice of intention to seek the death penalty in this case is not presented to the Capital Case Review until the conclusion of facts and issues of law on the conflicts issue in this case have been decided upon by Judge Karas.

Respectfully,

# Anthony L. Ricco

Anthony L. Ricco, Esq.
Learned Counsel of Record for Nicholas Tartaglione

cc:   *Curcio* Counsel

-----Original Message-----
From: Comey, Maurene (USANYS) <Maurene.Comey@usdoj.gov>
To: Bruce Barket <bbarket@barketepstein.com>; Swergold, Jason (USANYS) <Jason.Swergold@usdoj.gov>
Cc: Aida Leisenring <aleisenring@barketepstein.com>; Tony Ricco <tonyricco@aol.com>; Michael K. Bachrach <michael@mbachlaw.com>; BRUCE KOFFSKY <bkoffsky@snet.net>; Kenneth J. Montgomery Esq <kennethjmontgomery@gmail.com>; John Diaz <johnadiazlaw@gmail.com>; Gerber, Michael (USANYS) <Michael.Gerber@usdoj.gov>

**DX 73-1**

Sent: Wed, Jan 8, 2020 9:58 am
Subject: RE: reversing the Authorization decision

Good morning,

We will discuss internally and get back to you.

Best,
Maurene


Maurene Comey
Assistant United States Attorney
Southern District of New York
1 St. Andrew's Plaza
New York, NY 10007
212-637-2324
Maurene.Comey@usdoj.gov


---

**From:** Bruce Barket <bbarket@barketepstein.com>
**Sent:** Wednesday, January 8, 2020 9:41 AM
**To:** Swergold, Jason (USANYS) <JSwergold@usa.doj.gov>; Comey, Maurene (USANYS) <MComey@usa.doj.gov>
**Cc:** Aida Leisenring <aleisenring@barketepstein.com>
**Subject:** reversing the Authorization decision

Good morning,

We would like to make further arguments to the committee and ask that it reverse its decision.  Can you please let me know the process to do that?  Do we first write to you? To the committee? To the AG?

The new arguments we would like to make will not include an offer to plead guilty.

Bruce A. Barket, Esq.
Barket Epstein Kearon Aldea & LoTurco, LLP
666 Old Country Road , Ste. 700
Garden City, NY 11530
(516) 745 1500 [P]  (516) 745 1245 [F]
www.barketepstein.com


This transmittal may be a confidential attorney client communication or may otherwise be privileged or confidential. If it is not clear that you are the intended recipient, you are hereby notified that you have received this transmittal in error; any review, dissemination, distribution or copying of this transmittal is strictly prohibited. If you suspect that you have received this communication in error, please notify us immediately by telephone or email and immediately delete this message and all its attachments

**DX 73-2**

## RE: reversing the Authorization decision

From:    Bruce Barket (bbarket@barketepstein.com)

To:      tonyricco@aol.com; maurene.comey@usdoj.gov; jason.swergold@usdoj.gov

Cc:      aleisenring@barketepstein.com; michael@mbachlaw.com; bkoffsky@snet.net; kennethjmontgomery@gmail.com; johnadiazlaw@gmail.com; michael.gerber@usdoj.gov; bcsternheim@mac.com

Date:    Wednesday, January 8, 2020, 12:43 PM EST

---

Respectfully, Mr. Ricco does speak for Mr. Tartaglione nor the for the defense and he lacks the authority to contradict a request made by Mr. Tartaglione's lawyer. Our request stands. We will move forward.


Bruce A. Barket, Esq.

Barket Epstein Kearon Aldea & LoTurco, LLP

666 Old Country Road , Ste. 700

Garden City, NY 11530

(516) 745 1500 [P]  (516) 745 1245 [F]

www.barketepstein.com


This transmittal may be a confidential attorney client communication or may otherwise be privileged or confidential. If it is not clear that you are the intended recipient, you are hereby notified that you have received this transmittal in error; any review, dissemination, distribution or copying of this transmittal is strictly prohibited. If you suspect that you have received this communication in error, please notify us immediately by telephone or email and immediately delete this message and all its attachments

**From:** tonyricco@aol.com [mailto:tonyricco@aol.com]
**Sent:** Wednesday, January 08, 2020 11:45 AM
**To:** Maurene.Comey@usdoj.gov; Bruce Barket; Jason.Swergold@usdoj.gov
**Cc:** Aida Leisenring; michael@mbachlaw.com; bkoffsky@snet.net; kennethjmontgomery@gmail.com; johnadiazlaw@gmail.com; Michael.Gerber@usdoj.gov; bcsternheim@mac.com
**Subject:** Re: reversing the Authorization decision


AUSA Comey:

**DX 74-1**

Thank you for making sure that all counsel were noticed on your response to this extremely important request.   This request was presented to the government without any knowledge or participation of Learned Counsel and/or our David Ruhnke or Tanya Greene, the teams Resource Counsel.

As you are aware, there is a **serious** *Curcio* inquiry presently pending before the court.   As you are also aware, on December 31, 2019, *Curcio* counsel has filed her report with Judge Karas.   As a result, it is requested that government refrain from scheduling any presentation before the Capital Case Review Committee in relation to the withdrawal of the notice of intention to seek the death penalty in this case until Judge Karas decides whether (any) counsel in this case is operating under a waivable or non-waivable conflict of interest.

According to attorney Barket, the application to withdraw death authorization does not include an offer to plead guilty. Therefore, the timing of a submission seeking withdrawal, if any, is clearly a decision to be made by counsel - *a non-conflicted counsel*.   Such an application, filed without any input or consultation of experienced Learned Counsel, and/or highly experienced Resource Counsel, in the present status of this case is not in the best interest of Nicholas Tartaglione, a capital authorized defendant.   In fact, Judge Karas has held all motion practice with the court in abeyance until the Curcio issues are litigated, and on behalf of the defendant, it is requested that the Department of Justice similarly not entertain an application of such magnitude.

Further you can rest assured, that all counsel in this case have, in fact, been previously fully instructed by Learned Counsel on the procedure to be followed for application of United States Attorney Manual section 9-10.160 (B) on an application to seek withdrawal of the notice of intention to seek the death penalty.

Therefore, for reasons stated above it is requested that any application for withdrawal of the notice of intention to seek the death penalty in this case is not presented to the Capital Case Review until the conclusion of facts and issues of law on the conflicts issue in this case have been decided upon by Judge Karas.

Respectfully,

# Anthony L. Ricco

Anthony L. Ricco, Esq.

Learned Counsel of Record for Nicholas Tartaglione

cc:   *Curcio* Counsel

**DX 74-2**

-----Original Message-----
From: Comey, Maurene (USANYS) <Maurene.Comey@usdoj.gov>
To: Bruce Barket <bbarket@barketepstein.com>; Swergold, Jason (USANYS) <Jason.Swergold@usdoj.gov>
Cc: Aida Leisenring <aleisenring@barketepstein.com>; Tony Ricco <tonyricco@aol.com>; Michael K. Bachrach
<michael@mbachlaw.com>; BRUCE KOFFSKY <bkoffsky@snet.net>; Kenneth J. Montgomery Esq
<kennethjmontgomery@gmail.com>; John Diaz <johnadiazlaw@gmail.com>; Gerber, Michael (USANYS)
<Michael.Gerber@usdoj.gov>
Sent: Wed, Jan 8, 2020 9:58 am
Subject: RE: reversing the Authorization decision

Good morning,

We will discuss internally and get back to you.

Best,
Maurene


Maurene Comey
Assistant United States Attorney
Southern District of New York
1 St. Andrew's Plaza
New York, NY 10007
212-637-2324
Maurene.Comey@usdoj.gov


---

**From:** Bruce Barket <bbarket@barketepstein.com>
**Sent:** Wednesday, January 8, 2020 9:41 AM
**To:** Swergold, Jason (USANYS) <JSwergold@usa.doj.gov>; Comey, Maurene (USANYS) <MComey@usa.doj.gov>
**Cc:** Aida Leisenring <aleisenring@barketepstein.com>
**Subject:** reversing the Authorization decision

Good morning,

We would like to make further arguments to the committee and ask that it reverse its decision. Can you please let me know the process to do that? Do we first write to you? To the committee? To the AG?

The new arguments we would like to make will not include an offer to plead guilty.

Bruce A. Barket, Esq.
Barket Epstein Kearon Aldea & LoTurco, LLP
666 Old Country Road , Ste. 700
Garden City, NY 11530
(516) 745 1500 [P]  (516) 745 1245 [F]
www.barketepstein.com


This transmittal may be a confidential attorney client communication or may otherwise be privileged or confidential. If it is not clear that you are the intended recipient, you are hereby notified that you have received this transmittal in error; any review, dissemination, distribution or copying of this transmittal is strictly prohibited. If you suspect that you have received this communication in error, please notify us immediately by telephone or email and immediately delete this message and all its attachments

**DX 74-3**

## Re: reversing the Authorization decision

From:  Michael Bachrach (mbach2000@yahoo.com)

To:    tonyricco@aol.com; maurene.comey@usdoj.gov; jason.swergold@usdoj.gov; bbarket@barketepstein.com

Cc:    aleisenring@barketepstein.com; bkoffsky@snet.net; kennethjmontgomery@gmail.com; johnadiazlaw@gmail.com; michael.gerber@usdoj.gov; bcsternheim@mac.com

Date:  Wednesday, January 8, 2020, 01:28 PM EST

Respectfully, Mr. Tartaglione has chosen to be represented by learned counsel pursuant to 18 U.S.C. 3005.  Mr. Ricco is one of three learned counsel appointed to represent Mr. Tartaglione in that regard.  As such, so long as he remains learned counsel he does in fact speak for the defense and is likewise Mr. Tartaglione's lawyer.  I note that Mr. Ricco's views are shared by all three learned counsel as well as all other counsel appointed pursuant to 18 U.S.C. 3006A(e)(1).  I also note that as learned counsel it is specifically our role to address this issue.

Pursuant to Local Criminal Rule 1.2 and Local Civil Rule 1.4, all counsel serve as counsel for the defendant until otherwise terminated by the Court.  Mr. Barket does not have the authority to amend or alter the Local Rules.

Kindly hold in abeyance Mr. Barket's application, which effects the rights of this capital defendant, until the Curcio issue is decided.

Thank you.


==========================
Michael K. Bachrach, Esq.
224 West 30th Street, Suite 302
New York, NY 10001
tel: (212) 929-0592
fax: (866) 328-1630
cell: (917) 304-5044
michael@mbachlaw.com


> On Wednesday, January 8, 2020, 12:43:21 PM EST, Bruce Barket <bbarket@barketepstein.com> wrote:
>
>
> Respectfully, Mr. Ricco does speak for Mr. Tartaglione nor the for the defense and he lacks the  authority to contradict a request made by Mr. Tartaglione's lawyer.  Our request stands.   We will move forward.
>
>
> Bruce A. Barket, Esq.
>
> Barket Epstein Kearon Aldea & LoTurco, LLP
>
> 666 Old Country Road , Ste. 700

**DX 75-1**

Garden City, NY 11530

(516) 745 1500 [P]  (516) 745 1245 [F]

www.barketepstein.com

This transmittal may be a confidential attorney client communication or may otherwise be privileged or confidential. If it is not clear that you are the intended recipient, you are hereby notified that you have received this transmittal in error; any review, dissemination, distribution or copying of this transmittal is strictly prohibited. If you suspect that you have received this communication in error, please notify us immediately by telephone or email and immediately delete this message and all its attachments

**From:** tonyricco@aol.com [mailto:tonyricco@aol.com]
**Sent:** Wednesday, January 08, 2020 11:45 AM
**To:** Maurene.Comey@usdoj.gov; Bruce Barket; Jason.Swergold@usdoj.gov
**Cc:** Aida Leisenring; michael@mbachlaw.com; bkoffsky@snet.net; kennethjmontgomery@gmail.com; johnadiazlaw@gmail.com; Michael.Gerber@usdoj.gov; bcsternheim@mac.com
**Subject:** Re: reversing the Authorization decision

AUSA Comey:

Thank you for making sure that all counsel were noticed on your response to this extremely important request. This request was presented to the government without any knowledge or participation of Learned Counsel and/or our David Ruhnke or Tanya Greene, the teams Resource Counsel.

As you are aware, there is a **serious** *Curcio* inquiry presently pending before the court.   As you are also aware, on December 31, 2019, *Curcio* counsel has filed her report with Judge Karas.   As a result, it is requested that government refrain from scheduling any presentation before the Capital Case Review Committee in relation to the withdrawal of the notice of intention to seek the death penalty in this case until Judge Karas decides whether (any) counsel in this case is operating under a waivable or non-waivable conflict of interest.

According to attorney Barket, the application to withdraw death authorization does not include an offer to plead guilty.  Therefore, the timing of a submission seeking withdrawal, if any, is clearly a decision to be made by counsel - *a non-conflicted counsel*.   Such an application, filed without any input or consultation of experienced Learned Counsel, and/or highly experienced Resource Counsel, in the present status of this case is not in the best interest of Nicholas Tartaglione, a capital authorized defendant.   In fact, Judge Karas has held all motion practice with the court in abeyance until the Curcio issues are litigated, and on behalf of the defendant, it is requested that the Department of Justice similarly not entertain an application of such magnitude.

Further you can rest assured, that all counsel in this case have, in fact, been previously fully instructed by Learned Counsel on the procedure to be followed for application of United States Attorney Manual section 9-10.160 (B) on an application to seek withdrawal of the notice of intention to seek the death penalty.

Therefore, for reasons stated above it is requested that any application for withdrawal of the notice of intention to seek the death penalty in this case is not presented to the Capital Case Review until the conclusion of facts and

**DX 75-2**

issues of law on the conflicts issue in this case have been decided upon by Judge Karas.

Respectfully,

# Anthony L. Ricco

Anthony L. Ricco, Esq.

Learned Counsel of Record for Nicholas Tartaglione

cc:   *Curcio* Counsel

-----Original Message-----
From: Comey, Maurene (USANYS) <Maurene.Comey@usdoj.gov>
To: Bruce Barket <bbarket@barketepstein.com>; Swergold, Jason (USANYS) <Jason.Swergold@usdoj.gov>
Cc: Aida Leisenring <aleisenring@barketepstein.com>; Tony Ricco <tonyricco@aol.com>; Michael K. Bachrach <michael@mbachlaw.com>; BRUCE KOFFSKY <bkoffsky@snet.net>; Kenneth J. Montgomery Esq <kennethjmontgomery@gmail.com>; John Diaz <johnadiazlaw@gmail.com>; Gerber, Michael (USANYS) <Michael.Gerber@usdoj.gov>
Sent: Wed, Jan 8, 2020 9:58 am
Subject: RE: reversing the Authorization decision

Good morning,

We will discuss internally and get back to you.

Best,

Maurene

Maurene Comey

Assistant United States Attorney

Southern District of New York

1 St. Andrew's Plaza

New York, NY 10007

212-637-2324

**DX 75-3**

Gmail - Re: reversing the Authorization decision

Maurene.Comey@usdoj.gov

---

**From:** Bruce Barket <bbarket@barketepstein.com>
**Sent:** Wednesday, January 8, 2020 9:41 AM
**To:** Swergold, Jason (USANYS) <JSwergold@usa.doj.gov>; Comey, Maurene (USANYS) <MComey@usa.doj.gov>
**Cc:** Aida Leisenring <aleisenring@barketepstein.com>
**Subject:** reversing the Authorization decision

Good morning,

We would like to make further arguments to the committee and ask that it reverse its decision.  Can you please let me know the process to do that?  Do we first write to you? To the committee? To the AG?

The new arguments we would like to make will not include an offer to plead guilty.

Bruce A. Barket, Esq.

Barket Epstein Kearon Aldea & LoTurco, LLP

666 Old Country Road , Ste. 700

Garden City, NY 11530

(516) 745 1500 [P]  (516) 745 1245 [F]

www.barketepstein.com

This transmittal may be a confidential attorney client communication or may otherwise be privileged or confidential. If it is not clear that you are the intended recipient, you are hereby notified that you have received this transmittal in error; any review, dissemination, distribution or copying of this transmittal is strictly prohibited. If you suspect that you have received this communication in error, please notify us immediately by telephone or email and immediately delete this message and all its attachments

**DX 75-4**

## Re: reversing the Authorization decision

From: tonyricco@aol.com

To: michael@mbachlaw.com; maurene.comey@usdoj.gov; jason.swergold@usdoj.gov; bbarket@barketepstein.com

Cc: aleisenring@barketepstein.com; bkoffsky@snet.net; kennethjmontgomery@gmail.com; johnadiazlaw@gmail.com; michael.gerber@usdoj.gov; bcsternheim@mac.com; tonyricco@aol.com

Date: Wednesday, January 8, 2020, 02:51 PM EST

AUSA Maurene Comey:

Mr. Barket is fully aware of the subject and subject matter of the *Curcio* inquiry.   Mr. Barket is also fully aware that each of his prior applications to have appointed Learned Counsel discharged from this case have been denied by the court.  Judge Karas has ruled, on two recent occasions, that any such application shall be held in abeyance until the court decides the *Curcio* inquiry.

Mr. Barket's application is problematic.

First, Mr. Barket seeks to pursue a serious remedy in a capital case (the withdrawal of a notice of intention to seek the death penalty), claiming that he is unaware of the rules to proceed and the protocols for such an application as set forth in the US Attorney's Manual (9-160.10).  And, instead of seeking guidance from one of three appointed Learned Counsel and/or one of our two highly experienced Resource Counsel, he claims to be seeking advice and direction by the government.

Second, and most important, Mr. Barket's self-serving declaration of authority discharging Learned Counsel that has been duly appointed by an order of the court [in a death authorized case], and declaring that Learned Counsel serves without any authority not only demonstrates his complete unfamiliarity with or indifference to the Local Criminal Rules of the Southern District of New York (Local Criminal Rule 1.1(b) - which adopts Local Civil Rule 1.4 governing the displacement of counsel of record), but it also shows a total disrespect towards the past rulings by Judge Karas - who has directly addressed this very issue.

I repeat, there is a serious *Curcio* inquiry pending before the court.   In short time, I am of belief that the government will be advised of the subject attorney(s) and subject matter of the *Curio* inquiry.  A *Curcio* inquiry addresses whether a defendant has been afforded effective representation and advice via a conflict free counsel.

Therefore, on behalf of Nicholas Tartaglione, whose right to the effective assistance of counsel is what a *Curcio* inquiry is designed to protect, it is requested that the government not present a matter as serious as an application to withdraw the notice to seek the death penalty to the Capital Case Review Committee, until such time that Judge Karas has reasonable opportunity to rule upon the facts and issues set forth in the report that has been filed by *Curcio* counsel.

Finally, I certainly do not believe that the government needs to be advised that Mr. Barket has no judicial authority to discharge any counsel from a criminal case that has been appointed by an order of the court.  In light of the pending *Curcio* inquiry, and Judge Karas' specific rulings on this very subject, Mr. Barket's position and his adherence to such a position is both troubling, alarming and revealing.   As I have stated this serious *Curcio* inquiry is, after an extensive investigation, finally in the hands of Judge Karas.

All Learned Counsel, duly appointed by order of Judge Karas, are requesting that the government not present Mr. Barket's application to the Capital Case Review Committee until such time that the court rules upon the *Curcio* inquiry in this case.

Given Mr. Barket's remarks, I am copying *Curcio* counsel on this email.

Tonyricco

  cc: *Curcio* Counsel

**DX 76-1**

1/4

-----Original Message-----
From: Michael Bachrach <mbach2000@yahoo.com>
To: 'tonyricco@aol.com' <tonyricco@aol.com>; Maurene.Comey@usdoj.gov <maurene.comey@usdoj.gov>; Jason.Swergold@usdoj.gov <jason.swergold@usdoj.gov>; Bruce Barket <bbarket@barketepstein.com>
Cc: Aida Leisenring <aleisenring@barketepstein.com>; bkoffsky@snet.net <bkoffsky@snet.net>; kennethjmontgomery@gmail.com <kennethjmontgomery@gmail.com>; johnadiazlaw@gmail.com <johnadiazlaw@gmail.com>; Michael.Gerber@usdoj.gov <michael.gerber@usdoj.gov>; bcsternheim@mac.com <bcsternheim@mac.com>
Sent: Wed, Jan 8, 2020 1:30 pm
Subject: Re: reversing the Authorization decision

Respectfully, Mr. Tartaglione has chosen to be represented by learned counsel pursuant to 18 U.S.C. 3005. Mr. Ricco is one of three learned counsel appointed to represent Mr. Tartaglione in that regard. As such, so long as he remains learned counsel he does in fact speak for the defense and is likewise Mr. Tartaglione's lawyer. I note that Mr. Ricco's views are shared by all three learned counsel as well as all other counsel appointed pursuant to 18 U.S.C. 3006A(e)(1). I also note that as learned counsel it is specifically our role to address this issue.

Pursuant to Local Criminal Rule 1.2 and Local Civil Rule 1.4, all counsel serve as counsel for the defendant until otherwise terminated by the Court. Mr. Barket does not have the authority to amend or alter the Local Rules.

Kindly hold in abeyance Mr. Barket's application, which effects the rights of this capital defendant, until the Curcio issue is decided.

Thank you.


==========================
Michael K. Bachrach, Esq.
224 West 30th Street, Suite 302
New York, NY 10001
tel: (212) 929-0592
fax: (866) 328-1630
cell: (917) 304-5044
michael@mbachlaw.com


On Wednesday, January 8, 2020, 12:43:21 PM EST, Bruce Barket <bbarket@barketepstein.com> wrote:


Respectfully, Mr. Ricco does speak for Mr. Tartaglione nor the for the defense and he lacks the authority to contradict a request made by Mr. Tartaglione's lawyer. Our request stands. We will move forward.

Bruce A. Barket, Esq.
Barket Epstein Kearon Aldea & LoTurco, LLP
666 Old Country Road , Ste. 700
Garden City, NY 11530
(516) 745 1500 [P]  (516) 745 1245 [F]
www.barketepstein.com

**DX 76-2**

This transmittal may be a confidential attorney client communication or may otherwise be privileged or confidential. If it is not clear that you are the intended recipient, you are hereby notified that you have received this transmittal in error; any review, dissemination, distribution or copying of this transmittal is strictly prohibited. If you suspect that you have received this communication in error, please notify us immediately by telephone or email and immediately delete this message and all its attachments

**From:** tonyricco@aol.com [mailto:tonyricco@aol.com]
**Sent:** Wednesday, January 08, 2020 11:45 AM
**To:** Maurene.Comey@usdoj.gov; Bruce Barket; Jason.Swergold@usdoj.gov
**Cc:** Aida Leisenring; michael@mbachlaw.com; bkoffsky@snet.net; kennethjmontgomery@gmail.com; johnadiazlaw@gmail.com; Michael.Gerber@usdoj.gov; bcsternheim@mac.com
**Subject:** Re: reversing the Authorization decision

AUSA Comey:

Thank you for making sure that all counsel were noticed on your response to this extremely important request. This request was presented to the government without any knowledge or participation of Learned Counsel and/or our David Ruhnke or Tanya Greene, the teams Resource Counsel.

As you are aware, there is a **serious** *Curcio* inquiry presently pending before the court.   As you are also aware, on December 31, 2019, *Curcio* counsel has filed her report with Judge Karas.   As a result, it is requested that government refrain from scheduling any presentation before the Capital Case Review Committee in relation to the withdrawal of the notice of intention to seek the death penalty in this case until Judge Karas decides whether (any) counsel in this case is operating under a waivable or non-waivable conflict of interest.

According to attorney Barket, the application to withdraw death authorization does not include an offer to plead guilty.  Therefore, the timing of a submission seeking withdrawal, if any, is clearly a decision to be made by counsel - *a non-conflicted counsel*.   Such an application, filed without any input or consultation of experienced Learned Counsel, and/or highly experienced Resource Counsel, in the present status of this case is not in the best interest of Nicholas Tartaglione, a capital authorized defendant.   In fact, Judge Karas has held all motion practice with the court in abeyance until the Curcio issues are litigated, and on behalf of the defendant, it is requested that the Department of Justice similarly not entertain an application of such magnitude.

Further you can rest assured, that all counsel in this case have, in fact, been previously fully instructed by Learned Counsel on the procedure to be followed for application of United States Attorney Manual section 9-10.160 (B) on an application to seek withdrawal of the notice of intention to seek the death penalty.

Therefore, for reasons stated above it is requested that any application for withdrawal of the notice of intention to seek the death penalty in this case is not presented to the Capital Case Review until the conclusion of facts and issues of law on the conflicts issue in this case have been decided upon by Judge Karas.

Respectfully,

# Anthony L. Ricco

Anthony L. Ricco, Esq.
Learned Counsel of Record for Nicholas Tartaglione

cc:  *Curcio* Counsel


-----Original Message-----
From: Comey, Maurene (USANYS) <Maurene.Comey@usdoj.gov>
To: Bruce Barket <bbarket@barketepstein.com>; Swergold, Jason (USANYS) <Jason.Swergold@usdoj.gov>
Cc: Aida Leisenring <aleisenring@barketepstein.com>; Tony Ricco <tonyricco@aol.com>; Michael K. Bachrach <michael@mbachlaw.com>; BRUCE KOFFSKY <bkoffsky@snet.net>; Kenneth J. Montgomery Esq <kennethjmontgomery@gmail.com>; John Diaz <johnadiazlaw@gmail.com>; Gerber, Michael (USANYS) <Michael.Gerber@usdoj.gov>
Sent: Wed, Jan 8, 2020 9:58 am
Subject: RE: reversing the Authorization decision

**DX 76-3**

3/4

Good morning,

We will discuss internally and get back to you.

Best,
Maurene


Maurene Comey
Assistant United States Attorney
Southern District of New York
1 St. Andrew's Plaza
New York, NY 10007
212-637-2324
Maurene.Comey@usdoj.gov

---

**From:** Bruce Barket <bbarket@barketepstein.com>
**Sent:** Wednesday, January 8, 2020 9:41 AM
**To:** Swergold, Jason (USANYS) <JSwergold@usa.doj.gov>; Comey, Maurene (USANYS) <MComey@usa.doj.gov>
**Cc:** Aida Leisenring <aleisenring@barketepstein.com>
**Subject:** reversing the Authorization decision

Good morning,

We would like to make further arguments to the committee and ask that it reverse its decision.  Can you please let me know the process to do that?  Do we first write to you? To the committee? To the AG?

The new arguments we would like to make will not include an offer to plead guilty.

Bruce A. Barket, Esq.
Barket Epstein Kearon Aldea & LoTurco, LLP
666 Old Country Road , Ste. 700
Garden City, NY 11530
(516) 745 1500 [P]  (516) 745 1245 [F]
www.barketepstein.com


This transmittal may be a confidential attorney client communication or may otherwise be privileged or confidential. If it is not clear that you are the intended recipient, you are hereby notified that you have received this transmittal in error; any review, dissemination, distribution or copying of this transmittal is strictly prohibited. If you suspect that you have received this communication in error, please notify us immediately by telephone or email and immediately delete this message and all its attachments

**DX 76-4**

## RE: reversing the Authorization decision

From:    tonyricco (tonyricco@aol.com)

To:      bbarket@barketepstein.com; michael@mbachlaw.com; maurene.comey@usdoj.gov; jason.swergold@usdoj.gov

Cc:      aleisenring@barketepstein.com; bkoffsky@snet.net; kennethjmontgomery@gmail.com; johnadiazlaw@gmail.com; michael.gerber@usdoj.gov; bcsternheim@mac.com

Date:    Wednesday, January 8, 2020, 04:07 PM EST

Mr. Barket needs to make his selfserving declaration before Judge Karas.  Mr. Barket's disclosures are problematic and reveals his distain for the rulings of Judge Karas and his disregard of established Local court rules.

I repeat Mr. Barrket has no authority to declare that any Learned Counsel duly appointed by an of a United States District Court Judge has no authority to advocate on behalf of the capital defendant.

If there is a death verdict in this case, the action of counsel shall impact the integrity of any verdict and or sentence in this case.  Before the court is an issue of whether one or more counsel is qualified to serve as counsel due to serious conflicts of interest.

That combination was the precise grounds that Judge Karas cited when he differed  other issues of counsel, the filing of penalty pleadings and the settting of a trial date in abeyance until he had a full opportunity to decide the Curcio issues in this case.  Those very same reasons serve as the basis as to why no attorney should be moving forward with application as serious as a submission to withdraw the death notice in this case.  While those reasons are apparently not good enough or sufficient for Mr. Barket, (an attorney who is not even aware of the protocols), it certainly was a good and sufficient reason for Judge Karas - who oberved over Mr. Barket's vehement obection, that Mr. Tartaglione suffers no prejudice in this death authorized case from holding such matters in abeyance.

Similarly, for the very same reasons, I am requesting that no submission is made to the Capital Case Review Committee until the issue of ineffective assistance (conflicts of counsel) is decided by Judge Karas.

All Learned Counsel are in agreement, and shall later testify if necessitated by an adverse verdict, that no such apppication should be presented at this juncture of these proceedings, until such time that Judge Karas rules on the Curcio.  All Learned Cousel are in agreement that to move forward on this issue at this juncture is not in Mr. Tartaglione's interest, interests which Judge Karas is endeavoring to protect.

Tonyricco

Sent from my Verizon, Samsung Galaxy smartphone

-------- Original message --------
From: Bruce Barket <bbarket@barketepstein.com>
Date: 1/8/20 3:31 PM (GMT-05:00)
To: "'tonyricco@aol.com'" <tonyricco@aol.com>, michael@mbachlaw.com, maurene.comey@usdoj.gov, jason.swergold@usdoj.gov
Cc: Aida Leisenring <aleisenring@barketepstein.com>, bkoffsky@snet.net, kennethjmontgomery@gmail.com, johnadiazlaw@gmail.com, michael.gerber@usdoj.gov, bcsternheim@mac.com
Subject: RE: reversing the Authorization decision

I am Mr. Tartaglione's lawyer.  I am going to ask the Government to revisit it's decision to seek the death penalty.  I wrote to the assigned assistants as a courtesy to see how they would suggest I move forward.  Mr. Ricco has not consulted with Mr. Tartaglione in nearly 5 months and never on this issue.  He lacks the authority to thwart the decisions and work of Mr. Tartaglione's chosen counsel.   His attempt to do that

**DX 77-1**

1/7

here, where we are beginning the process to seek to reverse the decision to seek the death penalty is problematic, to say the least.  There is no reason to hold up this process.


Bruce A. Barket, Esq.

Barket Epstein Kearon Aldea & LoTurco, LLP

666 Old Country Road , Ste. 700

Garden City, NY 11530

(516) 745 1500 [P]  (516) 745 1245 [F]

www.barketepstein.com


This transmittal may be a confidential attorney client communication or may otherwise be privileged or confidential. If it is not clear that you are the intended recipient, you are hereby notified that you have received this transmittal in error; any review, dissemination, distribution or copying of this transmittal is strictly prohibited. If you suspect that you have received this communication in error, please notify us immediately by telephone or email and immediately delete this message and all its attachments


**From:** tonyricco@aol.com [mailto:tonyricco@aol.com]
**Sent:** Wednesday, January 08, 2020 2:52 PM
**To:** michael@mbachlaw.com; maurene.comey@usdoj.gov; jason.swergold@usdoj.gov; Bruce Barket
**Cc:** Aida Leisenring; bkoffsky@snet.net; kennethjmontgomery@gmail.com; johnadiazlaw@gmail.com; michael.gerber@usdoj.gov; bcsternheim@mac.com; tonyricco@aol.com
**Subject:** Re: reversing the Authorization decision


AUSA Maurene Comey:


Mr. Barket is fully aware of the subject and subject matter of the *Curcio* inquiry.   Mr. Barket is also fully aware that each of his prior applications to have appointed Learned Counsel discharged from this case have been denied by the court.  Judge Karas has ruled, on two recent occasions, that any such application shall be held in abeyance until the court decides the *Curcio* inquiry.


Mr. Barket's application is problematic.


First, Mr. Barket seeks to pursue a serious remedy in a capital case (the withdrawal of a notice of intention to seek the death penalty), claiming that he is unaware of the rules to proceed and the protocols for such an application as set forth in the US Attorney's Manual (9-160.10).  And, instead of seeking guidance from one of three appointed Learned Counsel and/or one of our two highly experienced Resource Counsel, he claims to be seeking advice and direction by the government.


Second, and most important, Mr. Barket's self-serving declaration of authority discharging Learned Counsel that has been duly appointed by an order of the court [in a death authorized case], and declaring that Learned Counsel serves

**DX 77-2**

without any authority not only demonstrates his complete unfamiliarity with or indifference to the Local Criminal Rules of the Southern District of New York (Local Criminal Rule 1.1(b) - which adopts Local Civil Rule 1.4 governing the displacement of counsel of record), but it also shows a total disrespect towards the past rulings by Judge Karas - who has directly addressed this very issue.

I repeat, there is a serious *Curcio* inquiry pending before the court.   In short time, I am of belief that the government will be advised of the subject attorney(s) and subject matter of the *Curio* inquiry.  A *Curcio* inquiry addresses whether a defendant has been afforded effective representation and advice via a conflict free counsel.

Therefore, on behalf of Nicholas Tartaglione, whose right to the effective assistance of counsel is what a *Curcio* inquiry is designed to protect, it is requested that the government not present a matter as serious as an application to withdraw the notice to seek the death penalty to the Capital Case Review Committee, until such time that Judge Karas has reasonable opportunity to rule upon the facts and issues set forth in the report that has been filed by *Curcio* counsel.

Finally, I certainly do not believe that the government needs to be advised that Mr. Barket has no judicial authority to discharge any counsel from a criminal case that has been appointed by an order of the court.  In light of the pending *Curcio* inquiry, and Judge Karas' specific rulings on this very subject, Mr. Barket's position and his adherence to such a position is both troubling, alarming and revealing.   As I have stated this serious *Curcio* inquiry is, after an extensive investigation, finally in the hands of Judge Karas.

All Learned Counsel, duly appointed by order of Judge Karas, are requesting that the government not present Mr. Barket's application to the Capital Case Review Committee until such time that the court rules upon the *Curcio* inquiry in this case.

Given Mr. Barket's remarks, I am copying *Curcio* counsel on this email.

Tonyricco

 cc:   *Curcio* Counsel

-----Original Message-----
From: Michael Bachrach <mbach2000@yahoo.com>
To: 'tonyricco@aol.com' <tonyricco@aol.com>; Maurene.Comey@usdoj.gov <maurene.comey@usdoj.gov>; Jason.Swergold@usdoj.gov <jason.swergold@usdoj.gov>; Bruce Barket <bbarket@barketepstein.com>
Cc: Aida Leisenring <aleisenring@barketepstein.com>; bkoffsky@snet.net <bkoffsky@snet.net>; kennethjmontgomery@gmail.com <kennethjmontgomery@gmail.com>; johnadiazlaw@gmail.com <johnadiazlaw@gmail.com>; Michael.Gerber@usdoj.gov <michael.gerber@usdoj.gov>; bcsternheim@mac.com <bcsternheim@mac.com>
Sent: Wed, Jan 8, 2020 1:30 pm
Subject: Re: reversing the Authorization decision

Respectfully, Mr. Tartaglione has chosen to be represented by learned counsel pursuant to 18 U.S.C. 3005.  Mr. Ricco is one of three learned counsel appointed to represent Mr. Tartaglione in that regard.  As such, so long as he remains learned counsel he does in fact speak for the defense and is likewise Mr. Tartaglione's lawyer.  I note that Mr. Ricco's views are shared by all three learned counsel as well as all other counsel appointed pursuant to 18 U.S.C. 3006A(e)(1).  I also note that as learned counsel it is specifically our role to address this issue.

**DX 77-3**

Pursuant to Local Criminal Rule 1.2 and Local Civil Rule 1.4, all counsel serve as counsel for the defendant until otherwise terminated by the Court.  Mr. Barket does not have the authority to amend or alter the Local Rules.

Kindly hold in abeyance Mr. Barket's application, which effects the rights of this capital defendant, until the Curcio issue is decided.

Thank you.

========================

Michael K. Bachrach, Esq.

224 West 30th Street, Suite 302

New York, NY 10001

tel: (212) 929-0592

fax: (866) 328-1630

cell: (917) 304-5044

michael@mbachlaw.com

On Wednesday, January 8, 2020, 12:43:21 PM EST, Bruce Barket <bbarket@barketepstein.com> wrote:

Respectfully, Mr. Ricco does speak for Mr. Tartaglione nor the for the defense and he lacks the  authority to contradict a request made by Mr. Tartaglione's lawyer.  Our request stands.   We will move forward.

Bruce A. Barket, Esq.

Barket Epstein Kearon Aldea & LoTurco, LLP

666 Old Country Road , Ste. 700

Garden City, NY 11530

(516) 745 1500 [P]  (516) 745 1245 [F]

www.barketepstein.com

**DX 77-4**

This transmittal may be a confidential attorney client communication or may otherwise be privileged or confidential. If it is not clear that you are the intended recipient, you are hereby notified that you have received this transmittal in error; any review, dissemination, distribution or copying of this transmittal is strictly prohibited. If you suspect that you have received this communication in error, please notify us immediately by telephone or email and immediately delete this message and all its attachments

**From:** tonyricco@aol.com [mailto:tonyricco@aol.com]
**Sent:** Wednesday, January 08, 2020 11:45 AM
**To:** Maurene.Comey@usdoj.gov; Bruce Barket; Jason.Swergold@usdoj.gov
**Cc:** Aida Leisenring; michael@mbachlaw.com; bkoffsky@snet.net; kennethjmontgomery@gmail.com; johnadiazlaw@gmail.com; Michael.Gerber@usdoj.gov; bcsternheim@mac.com
**Subject:** Re: reversing the Authorization decision

AUSA Comey:

Thank you for making sure that all counsel were noticed on your response to this extremely important request.   This request was presented to the government without any knowledge or participation of Learned Counsel and/or our David Ruhnke or Tanya Greene, the teams Resource Counsel.

As you are aware, there is a **serious** *Curcio* inquiry presently pending before the court.   As you are also aware, on December 31, 2019, *Curcio* counsel has filed her report with Judge Karas.   As a result, it is requested that government refrain from scheduling any presentation before the Capital Case Review Committee in relation to the withdrawal of the notice of intention to seek the death penalty in this case until Judge Karas decides whether (any) counsel in this case is operating under a waivable or non-waivable conflict of interest.

According to attorney Barket, the application to withdraw death authorization does not include an offer to plead guilty. Therefore, the timing of a submission seeking withdrawal, if any, is clearly a decision to be made by counsel - *a non-conflicted counsel*.   Such an application, filed without any input or consultation of experienced Learned Counsel, and/or highly experienced Resource Counsel, in the present status of this case is not in the best interest of Nicholas Tartaglione, a capital authorized defendant.   In fact, Judge Karas has held all motion practice with the court in abeyance until the Curcio issues are litigated, and on behalf of the defendant, it is requested that the Department of Justice similarly not entertain an application of such magnitude.

Further you can rest assured, that all counsel in this case have, in fact, been previously fully instructed by Learned Counsel on the procedure to be followed for application of United States Attorney Manual section 9-10.160 (B) on an application to seek withdrawal of the notice of intention to seek the death penalty.

Therefore, for reasons stated above it is requested that any application for withdrawal of the notice of intention to seek the death penalty in this case is not presented to the Capital Case Review until the conclusion of facts and issues of law on the conflicts issue in this case have been decided upon by Judge Karas.

Respectfully,

Anthony L. Ricco

**DX 77-5**

Anthony L. Ricco, Esq.

Learned Counsel of Record for Nicholas Tartaglione


cc:　*Curcio* Counsel



-----Original Message-----
From: Comey, Maurene (USANYS) <Maurene.Comey@usdoj.gov>
To: Bruce Barket <bbarket@barketepstein.com>; Swergold, Jason (USANYS) <Jason.Swergold@usdoj.gov>
Cc: Aida Leisenring <aleisenring@barketepstein.com>; Tony Ricco <tonyricco@aol.com>; Michael K. Bachrach <michael@mbachlaw.com>; BRUCE KOFFSKY <bkoffsky@snet.net>; Kenneth J. Montgomery Esq <kennethjmontgomery@gmail.com>; John Diaz <johnadiazlaw@gmail.com>; Gerber, Michael (USANYS) <Michael.Gerber@usdoj.gov>
Sent: Wed, Jan 8, 2020 9:58 am
Subject: RE: reversing the Authorization decision

Good morning,


We will discuss internally and get back to you.


Best,

Maurene



Maurene Comey

Assistant United States Attorney

Southern District of New York

1 St. Andrew's Plaza

New York, NY 10007

212-637-2324

Maurene.Comey@usdoj.gov


**DX 77-6**

6/7

**From:** Bruce Barket <bbarket@barketepstein.com>
**Sent:** Wednesday, January 8, 2020 9:41 AM
**To:** Swergold, Jason (USANYS) <JSwergold@usa.doj.gov>; Comey, Maurene (USANYS) <MComey@usa.doj.gov>
**Cc:** Aida Leisenring <aleisenring@barketepstein.com>
**Subject:** reversing the Authorization decision


Good morning,


We would like to make further arguments to the committee and ask that it reverse its decision.  Can you please let me know the process to do that?  Do we first write to you? To the committee? To the AG?


The new arguments we would like to make will not include an offer to plead guilty.


Bruce A. Barket, Esq.

Barket Epstein Kearon Aldea & LoTurco, LLP

666 Old Country Road , Ste. 700

Garden City, NY 11530

(516) 745 1500 [P]  (516) 745 1245 [F]

www.barketepstein.com



This transmittal may be a confidential attorney client communication or may otherwise be privileged or confidential. If it is not clear that you are the intended recipient, you are hereby notified that you have received this transmittal in error; any review, dissemination, distribution or copying of this transmittal is strictly prohibited. If you suspect that you have received this communication in error, please notify us immediately by telephone or email and immediately delete this message and all its attachments


**DX 77-7**

RE: reversing the Authorization decision

From: Comey, Maurene (USANYS) (maurene.comey@usdoj.gov)

To:    tonyricco@aol.com; bbarket@barketepstein.com; michael@mbachlaw.com; jason.swergold@usdoj.gov

Cc:    aleisenring@barketepstein.com; bkoffsky@snet.net; kennethjmontgomery@gmail.com; johnadiazlaw@gmail.com; michael.gerber@usdoj.gov; bcsternheim@mac.com; perry.carbone@usdoj.gov; kathryn.martin@usdoj.gov

Date:   Wednesday, January 8, 2020, 10:53 PM EST

Counsel,

Consistent with USAM 9-10.160(B), any request by the defense for withdrawal of a notice of intent to seek the death penalty should be submitted in writing to the AUSAs handling the case. Such written submission should explain the changed circumstances supporting the defense request. Upon receipt of such a written submission, the USAO-SDNY will review the defense request. Upon completion of that review, the USAO-SDNY will transmit both the defense submission and the recommendation of the USAO-SDNY to the Capital Case Section of DOJ for consideration by the Capital Review Committee. Following this review, if two or more members of the Capital Review Committee agree with the defense submission, then the defense request will be forwarded to the Attorney General for consideration and final decision. If fewer than two members of the Capital Review Committee agree with the defense submission, then the request will be denied without further consideration within DOJ. There is no provision in the USAM for any additional meetings involving defense counsel at any point in this process.

In light of the inconsistent requests we have received from retained counsel and learned counsel, which include inconsistent positions regarding how the Government should communicate with attorneys for Mr. Tartaglione, we intend to submit a letter to Judge Karas requesting a conference so that we may seek the Court's guidance.

Thank you,

Maurene

Maurene Comey

Assistant United States Attorney

Southern District of New York

1 St. Andrew's Plaza

New York, NY 10007

212-637-2324

Maurene.Comey@usdoj.gov

**DX 78-1**

---

**From:** tonyricco <tonyricco@aol.com>
**Sent:** Wednesday, January 8, 2020 4:08 PM
**To:** Bruce Barket <bbarket@barketepstein.com>; michael@mbachlaw.com; Comey, Maurene (USANYS) <MComey@usa.doj.gov>; Swergold, Jason (USANYS) <JSwergold@usa.doj.gov>
**Cc:** Aida Leisenring <aleisenring@barketepstein.com>; bkoffsky@snet.net; kennethjmontgomery@gmail.com; johnadiazlaw@gmail.com; Gerber, Michael (USANYS) <MGerber@usa.doj.gov>; bcsternheim@mac.com
**Subject:** RE: reversing the Authorization decision

Mr. Barket needs to make his selfserving declaration before Judge Karas. Mr. Barket's disclosures are problematic and reveals his distain for the rulings of Judge Karas and his disregard of established Local court rules.

I repeat Mr. Barrket has no authority to declare that any Learned Counsel duly appointed by an of a United States District Court Judge has no authority to advocate on behalf of the capital defendant.

If there is a death verdict in this case, the action of counsel shall impact the integrity of any verdict and or sentence in this case. Before the court is an issue of whether one or more counsel is qualified to serve as counsel due to serious conflicts of interest.

That combination was the precise grounds that Judge Karas cited when he differed other issues of counsel, the filing of penalty pleadings and the settting of a trial date in abeyance until he had a full opportunity to decide the Curcio issues in this case. Those very same reasons serve as the basis as to why no attorney should be moving forward with application as serious as a submission to withdraw the death notice in this case. While those reasons are apparently not good enough or sufficient for Mr. Barket, (an attorney who is not even aware of the protocols), it certainly was a good and sufficient reason for Judge Karas - who oberved over Mr. Barket's vehement obection, that Mr. Tartaglione suffers no prejudice in this death authorized case from holding such matters in abeyance.

Similarly, for the very same reasons, I am requesting that no submission is made to the Capital Case Review Committee until the issue of ineffective assistance (conflicts of counsel) is decided by Judge Karas.

All Learned Counsel are in agreement, and shall later testify if necessitated by an adverse verdict, that no such apppication should be presented at this juncture of these proceedings, until such time that Judge Karas rules on the Curcio. All Learned Cousel are in agreement that to move forward on this issue at this juncture is not in Mr. Tartaglione's interest, interests which Judge Karas is endeavoring to protect.

Tonyricco

**DX 78-2**

Sent from my Verizon, Samsung Galaxy smartphone

-------- Original message --------

From: Bruce Barket <bbarket@barketepstein.com>

Date: 1/8/20 3:31 PM (GMT-05:00)

To: "'tonyricco@aol.com'" <tonyricco@aol.com>, michael@mbachlaw.com, maurene.comey@usdoj.gov, jason.swergold@usdoj.gov

Cc: Aida Leisenring <aleisenring@barketepstein.com>, bkoffsky@snet.net, kennethjmontgomery@gmail.com, johnadiazlaw@gmail.com, michael.gerber@usdoj.gov, bcsternheim@mac.com

Subject: RE: reversing the Authorization decision

I am Mr. Tartaglione's lawyer. I am going to ask the Government to revisit it's decision to seek the death penalty. I wrote to the assigned assistants as a courtesy to see how they would suggest I move forward. Mr. Ricco has not consulted with Mr. Tartaglione in nearly 5 months and never on this issue. He lacks the authority to thwart the decisions and work of Mr. Tartaglione's chosen counsel. His attempt to do that here, where we are beginning the process to seek to reverse the decision to seek the death penalty is problematic, to say the least. There is no reason to hold up this process.

Bruce A. Barket, Esq.

Barket Epstein Kearon Aldea & LoTurco, LLP

666 Old Country Road , Ste. 700

Garden City, NY 11530

(516) 745 1500 [P]  (516) 745 1245 [F]

www.barketepstein.com

This transmittal may be a confidential attorney client communication or may otherwise be privileged or confidential. If it is not clear that you are the intended recipient, you are hereby notified that you have received this transmittal in error; any review, dissemination, distribution or copying of this transmittal is strictly prohibited. If you suspect that you have received this communication in error, please notify us immediately by telephone or email and immediately delete this message and all its attachments

**From:** tonyricco@aol.com [mailto:tonyricco@aol.com]
**Sent:** Wednesday, January 08, 2020 2:52 PM
**To:** michael@mbachlaw.com; maurene.comey@usdoj.gov; jason.swergold@usdoj.gov; Bruce Barket
**Cc:** Aida Leisenring; bkoffsky@snet.net; kennethjmontgomery@gmail.com; johnadiazlaw@gmail.com; michael.gerber@usdoj.gov; bcsternheim@mac.com; tonyricco@aol.com
**Subject:** Re: reversing the Authorization decision

**DX 78-3**

AUSA Maurene Comey:

Mr. Barket is fully aware of the subject and subject matter of the *Curcio* inquiry.   Mr. Barket is also fully aware that each of his prior applications to have appointed Learned Counsel discharged from this case have been denied by the court.  Judge Karas has ruled, on two recent occasions, that any such application shall be held in abeyance until the court decides the *Curcio* inquiry.

Mr. Barket's application is problematic.

First, Mr. Barket seeks to pursue a serious remedy in a capital case (the withdrawal of a notice of intention to seek the death penalty), claiming that he is unaware of the rules to proceed and the protocols for such an application as set forth in the US Attorney's Manual (9-160.10).  And, instead of seeking guidance from one of three appointed Learned Counsel and/or one of our two highly experienced Resource Counsel, he claims to be seeking advice and direction by the government.

Second, and most important, Mr. Barket's self-serving declaration of authority discharging Learned Counsel that has been duly appointed by an order of the court [in a death authorized case], and declaring that Learned Counsel serves without any authority not only demonstrates his complete unfamiliarity with or indifference to the Local Criminal Rules of the Southern District of New York (Local Criminal Rule 1.1(b) - which adopts Local Civil Rule 1.4 governing the displacement of counsel of record), but it also shows a total disrespect towards the past rulings by Judge Karas - who has directly addressed this very issue.

I repeat, there is a serious *Curcio* inquiry pending before the court.   In short time, I am of belief that the government will be advised of the subject attorney(s) and subject matter of the *Curio* inquiry.  A *Curcio* inquiry addresses whether a defendant has been afforded effective representation and advice via a conflict free counsel.

Therefore, on behalf of Nicholas Tartaglione, whose right to the effective assistance of counsel is what a *Curcio* inquiry is designed to protect, it is requested that the government not present a matter as serious as an application to withdraw the notice to seek the death penalty to the Capital Case Review Committee, until such time that Judge Karas has reasonable opportunity to rule upon the facts and issues set forth in the report that has been filed by *Curcio* counsel.

Finally, I certainly do not believe that the government needs to be advised that Mr. Barket has no judicial authority to discharge any counsel from a criminal case that has been appointed by an order of the court.  In light of the pending *Curcio* inquiry, and Judge Karas' specific rulings on this very subject, Mr. Barket's position and his adherence to such a position is both troubling, alarming and revealing.   As I have stated this serious *Curcio* inquiry is, after an extensive investigation, finally in the hands of Judge Karas.

All Learned Counsel, duly appointed by order of Judge Karas, are requesting that the government not present Mr. Barket's application to the Capital Case Review Committee until such time that the court rules upon the *Curcio* inquiry in this case.

Given Mr. Barket's remarks, I am copying *Curcio* counsel on this email.

**DX 78-4**

Tonyricco

   cc:   *Curcio* Counsel


-----Original Message-----
From: Michael Bachrach <mbach2000@yahoo.com>
To: 'tonyricco@aol.com' <tonyricco@aol.com>; Maurene.Comey@usdoj.gov <maurene.comey@usdoj.gov>;
Jason.Swergold@usdoj.gov <jason.swergold@usdoj.gov>; Bruce Barket <bbarket@barketepstein.com>
Cc: Aida Leisenring <aleisenring@barketepstein.com>; bkoffsky@snet.net <bkoffsky@snet.net>;
kennethjmontgomery@gmail.com <kennethjmontgomery@gmail.com>; johnadiazlaw@gmail.com
<johnadiazlaw@gmail.com>; Michael.Gerber@usdoj.gov <michael.gerber@usdoj.gov>; bcsternheim@mac.com
<bcsternheim@mac.com>
Sent: Wed, Jan 8, 2020 1:30 pm
Subject: Re: reversing the Authorization decision

Respectfully, Mr. Tartaglione has chosen to be represented by learned counsel pursuant to 18
U.S.C. 3005.  Mr. Ricco is one of three learned counsel appointed to represent Mr. Tartaglione in
that regard.  As such, so long as he remains learned counsel he does in fact speak for the
defense and is likewise Mr. Tartaglione's lawyer.  I note that Mr. Ricco's views are shared by all
three learned counsel as well as all other counsel appointed pursuant to 18 U.S.C. 3006A(e)(1).  I
also note that as learned counsel it is specifically our role to address this issue.

Pursuant to Local Criminal Rule 1.2 and Local Civil Rule 1.4, all counsel serve as counsel for the
defendant until otherwise terminated by the Court.  Mr. Barket does not have the authority to
amend or alter the Local Rules.

Kindly hold in abeyance Mr. Barket's application, which effects the rights of this capital defendant,
until the Curcio issue is decided.

Thank you.


=========================
Michael K. Bachrach, Esq.
224 West 30th Street, Suite 302
New York, NY 10001
tel: (212) 929-0592
fax: (866) 328-1630
cell: (917) 304-5044
michael@mbachlaw.com


On Wednesday, January 8, 2020, 12:43:21 PM EST, Bruce Barket <bbarket@barketepstein.com> wrote:


Respectfully, Mr. Ricco does speak for Mr. Tartaglione nor the for the defense and he lacks the  authority to
contradict a request made by Mr. Tartaglione's lawyer.  Our request stands.   We will move forward.

Bruce A. Barket, Esq.
Barket Epstein Kearon Aldea & LoTurco, LLP
666 Old Country Road , Ste. 700

**DX 78-5**

Garden City, NY 11530
(516) 745 1500 [P]  (516) 745 1245 [F]
www.barketepstein.com

This transmittal may be a confidential attorney client communication or may otherwise be privileged or confidential. If it is not clear that you are the intended recipient, you are hereby notified that you have received this transmittal in error; any review, dissemination, distribution or copying of this transmittal is strictly prohibited. If you suspect that you have received this communication in error, please notify us immediately by telephone or email and immediately delete this message and all its attachments

**From:** tonyricco@aol.com [mailto:tonyricco@aol.com]
**Sent:** Wednesday, January 08, 2020 11:45 AM
**To:** Maurene.Comey@usdoj.gov; Bruce Barket; Jason.Swergold@usdoj.gov
**Cc:** Aida Leisenring; michael@mbachlaw.com; bkoffsky@snet.net; kennethjmontgomery@gmail.com; johnadiazlaw@gmail.com; Michael.Gerber@usdoj.gov; bcsternheim@mac.com
**Subject:** Re: reversing the Authorization decision

AUSA Comey:

Thank you for making sure that all counsel were noticed on your response to this extremely important request.   This request was presented to the government without any knowledge or participation of Learned Counsel and/or our David Ruhnke or Tanya Greene, the teams Resource Counsel.

As you are aware, there is a **serious** *Curcio* inquiry presently pending before the court.   As you are also aware, on December 31, 2019, *Curcio* counsel has filed her report with Judge Karas.   As a result, it is requested that government refrain from scheduling any presentation before the Capital Case Review Committee in relation to the withdrawal of the notice of intention to seek the death penalty in this case until Judge Karas decides whether (any) counsel in this case is operating under a waivable or non-waivable conflict of interest.

According to attorney Barket, the application to withdraw death authorization does not include an offer to plead guilty. Therefore, the timing of a submission seeking withdrawal, if any, is clearly a decision to be made by counsel - *a non-conflicted counsel*.   Such an application, filed without any input or consultation of experienced Learned Counsel, and/or highly experienced Resource Counsel, in the present status of this case is not in the best interest of Nicholas Tartaglione, a capital authorized defendant.   In fact, Judge Karas has held all motion practice with the court in abeyance until the Curcio issues are litigated, and on behalf of the defendant, it is requested that the Department of Justice similarly not entertain an application of such magnitude.

Further you can rest assured, that all counsel in this case have, in fact, been previously fully instructed by Learned Counsel on the procedure to be followed for application of United States Attorney Manual section 9-10.160 (B) on an application to seek withdrawal of the notice of intention to seek the death penalty.

Therefore, for reasons stated above it is requested that any application for withdrawal of the notice of intention to seek the death penalty in this case is not presented to the Capital Case Review until the conclusion of facts and issues of law on the conflicts issue in this case have been decided upon by Judge Karas.

Respectfully,

# Anthony L. Ricco

Anthony L. Ricco, Esq.
Learned Counsel of Record for Nicholas Tartaglione

cc:   *Curcio* Counsel


-----Original Message-----
From: Comey, Maurene (USANYS) <Maurene.Comey@usdoj.gov>
To: Bruce Barket <bbarket@barketepstein.com>; Swergold, Jason (USANYS) <Jason.Swergold@usdoj.gov>

**DX 78-6**

Cc: Aida Leisenring <aleisenring@barketepstein.com>; Tony Ricco <tonyricco@aol.com>; Michael K. Bachrach <michael@mbachlaw.com>; BRUCE KOFFSKY <bkoffsky@snet.net>; Kenneth J. Montgomery Esq <kennethjmontgomery@gmail.com>; John Diaz <johnadiazlaw@gmail.com>; Gerber, Michael (USANYS) <Michael.Gerber@usdoj.gov>
Sent: Wed, Jan 8, 2020 9:58 am
Subject: RE: reversing the Authorization decision

Good morning,

We will discuss internally and get back to you.

Best,
Maurene

Maurene Comey
Assistant United States Attorney
Southern District of New York
1 St. Andrew's Plaza
New York, NY 10007
212-637-2324
Maurene.Comey@usdoj.gov

---

**From:** Bruce Barket <bbarket@barketepstein.com>
**Sent:** Wednesday, January 8, 2020 9:41 AM
**To:** Swergold, Jason (USANYS) <JSwergold@usa.doj.gov>; Comey, Maurene (USANYS) <MComey@usa.doj.gov>
**Cc:** Aida Leisenring <aleisenring@barketepstein.com>
**Subject:** reversing the Authorization decision

Good morning,

We would like to make further arguments to the committee and ask that it reverse its decision.  Can you please let me know the process to do that?  Do we first write to you? To the committee? To the AG?

The new arguments we would like to make will not include an offer to plead guilty.

Bruce A. Barket, Esq.
Barket Epstein Kearon Aldea & LoTurco, LLP
666 Old Country Road , Ste. 700
Garden City, NY 11530
(516) 745 1500 [P]  (516) 745 1245 [F]
www.barketepstein.com

This transmittal may be a confidential attorney client communication or may otherwise be privileged or confidential. If it is not clear that you are the intended recipient, you are hereby notified that you have received this transmittal in error; any review, dissemination, distribution or copying of this transmittal is strictly prohibited. If you suspect that you have received this communication in error, please notify us immediately by telephone or email and immediately delete this message and all its attachments

**DX 78-7**

# Re: reversing the Authorization decision

From:   Bruce Barket (bbarket@barketepstein.com)

To:     maurene.comey@usdoj.gov

Cc:     tonyricco@aol.com; michael@mbachlaw.com; jason.swergold@usdoj.gov; aleisenring@barketepstein.com; bkoffsky@snet.net; kennethjmontgomery@gmail.com; johnadiazlaw@gmail.com; michael.gerber@usdoj.gov; bcsternheim@mac.com; perry.carbone@usdoj.gov; kathryn.martin@usdoj.gov

Date:   Thursday, January 9, 2020, 12:15 AM EST

Thank you.  We will follow up accordingly.

Bruce Barket
Barket, Epstein, Kearon, Aldea & LoTurco
666 Old Country road
Garden City, NY 11530
(516) 745 1500 - O
(516) 287 7230 - M
Barket Epstein.com

> On Jan 8, 2020, at 10:36 PM, Comey, Maurene (USANYS) <Maurene.Comey@usdoj.gov> wrote:
>
>
> Counsel,
>
> Consistent with USAM 9-10.160(B), any request by the defense for withdrawal of a notice of intent to seek the death penalty should be submitted in writing to the AUSAs handling the case.  Such written submission should explain the changed circumstances supporting the defense request.  Upon receipt of such a written submission, the USAO-SDNY will review the defense request.  Upon completion of that review, the USAO-SDNY will transmit both the defense submission and the recommendation of the USAO-SDNY to the Capital Case Section of DOJ for consideration by the Capital Review Committee.  Following this review, if two or more members of the Capital Review Committee agree with the defense submission, then the defense request will be forwarded to the Attorney General for consideration and final decision.  If fewer than two members of the Capital Review Committee agree with the defense submission, then the request will be denied without further consideration within DOJ.  There is no provision in the USAM for any additional meetings involving defense counsel at any point in this process.
>
> In light of the inconsistent requests we have received from retained counsel and learned counsel, which include inconsistent positions regarding how the Government should communicate with attorneys for Mr. Tartaglione, we intend to submit a letter to Judge Karas requesting a conference so that we may seek the Court's guidance.
>
> Thank you,
>
> Maurene

**DX 79-1**

Maurene Comey

Assistant United States Attorney

Southern District of New York

1 St. Andrew's Plaza

New York, NY 10007

212-637-2324

Maurene.Comey@usdoj.gov

---

**From:** tonyricco <tonyricco@aol.com>
**Sent:** Wednesday, January 8, 2020 4:08 PM
**To:** Bruce Barket <bbarket@barketepstein.com>; michael@mbachlaw.com; Comey, Maurene (USANYS) <MComey@usa.doj.gov>; Swergold, Jason (USANYS) <JSwergold@usa.doj.gov>
**Cc:** Aida Leisenring <aleisenring@barketepstein.com>; bkoffsky@snet.net; kennethjmontgomery@gmail.com; johnadiazlaw@gmail.com; Gerber, Michael (USANYS) <MGerber@usa.doj.gov>; bcsternheim@mac.com
**Subject:** RE: reversing the Authorization decision

Mr. Barket needs to make his selfserving declaration before Judge Karas.  Mr. Barket's disclosures are problematic and reveals his distain for the rulings of Judge Karas and his disregard of established Local court rules.

I repeat Mr. Barrket has no authority to declare that any Learned Counsel duly appointed by an of a United States District Court Judge has no authority to advocate on behalf of the capital defendant.

If there is a death verdict in this case, the action of counsel shall impact the integrity of any verdict and or sentence in this case.  Before the court is an issue of whether one or more counsel is qualified to serve as counsel due to serious conflicts of interest.

That combination was the precise grounds that Judge Karas cited when he differed  other issues of counsel, the filing of penalty pleadings and the settting of a trial date in abeyance until he had a full opportunity to decide the Curcio issues in this case.  Those very same reasons serve as the basis as to why no attorney should be moving forward with application as serious as a submission to withdraw the death notice in this case.  While those reasons are apparently not good enough or sufficient for Mr. Barket, (an attorney who is not even aware of the protocols), it certainly was a good and sufficient reason for Judge Karas - who oberved over Mr. Barket's vehement obection, that Mr. Tartaglione suffers no prejudice in this death authorized case from holding such matters in abeyance.

**DX 79-2**

Similarly, for the very same reasons, I am requesting that no submission is made to the Capital Case Review Committee until the issue of ineffective assistance (conflicts of counsel) is decided by Judge Karas.

All Learned Counsel are in agreement, and shall later testify if necessitated by an adverse verdict, that no such apppication should be presented at this juncture of these proceedings, until such time that Judge Karas rules on the Curcio. All Learned Cousel are in agreement that to move forward on this issue at this juncture is not in Mr. Tartaglione's interest, interests which Judge Karas is endeavoring to protect.

Tonyricco

Sent from my Verizon, Samsung Galaxy smartphone

-------- Original message --------

From: Bruce Barket <bbarket@barketepstein.com>

Date: 1/8/20 3:31 PM (GMT-05:00)

To: "'tonyricco@aol.com'" <tonyricco@aol.com>, michael@mbachlaw.com, maurene.comey@usdoj.gov, jason.swergold@usdoj.gov

Cc: Aida Leisenring <aleisenring@barketepstein.com>, bkoffsky@snet.net, kennethjmontgomery@gmail.com, johnadiazlaw@gmail.com, michael.gerber@usdoj.gov, bcsternheim@mac.com

Subject: RE: reversing the Authorization decision

I am Mr. Tartaglione's lawyer. I am going to ask the Government to revisit it's decision to seek the death penalty. I wrote to the assigned assistants as a courtesy to see how they would suggest I move forward. Mr. Ricco has not consulted with Mr. Tartaglione in nearly 5 months and never on this issue. He lacks the authority to thwart the decisions and work of Mr. Tartaglione's chosen counsel. His attempt to do that here, where we are beginning the process to seek to reverse the decision to seek the death penalty is problematic, to say the least. There is no reason to hold up this process.

Bruce A. Barket, Esq.

Barket Epstein Kearon Aldea & LoTurco, LLP

666 Old Country Road , Ste. 700

Garden City, NY 11530

(516) 745 1500 [P]  (516) 745 1245 [F]

www.barketepstein.com

**DX 79-3**

This transmittal may be a confidential attorney client communication or may otherwise be privileged or confidential. If it is not clear that you are the intended recipient, you are hereby notified that you have received this transmittal in error; any review, dissemination, distribution or copying of this transmittal is strictly prohibited. If you suspect that you have received this communication in error, please notify us immediately by telephone or email and immediately delete this message and all its attachments

**From:** tonyricco@aol.com [mailto:tonyricco@aol.com]
**Sent:** Wednesday, January 08, 2020 2:52 PM
**To:** michael@mbachlaw.com; maurene.comey@usdoj.gov; jason.swergold@usdoj.gov; Bruce Barket
**Cc:** Aida Leisenring; bkoffsky@snet.net; kennethjmontgomery@gmail.com; johnadiazlaw@gmail.com; michael.gerber@usdoj.gov; bcsternheim@mac.com; tonyricco@aol.com
**Subject:** Re: reversing the Authorization decision

AUSA Maurene Comey:

Mr. Barket is fully aware of the subject and subject matter of the *Curcio* inquiry.   Mr. Barket is also fully aware that each of his prior applications to have appointed Learned Counsel discharged from this case have been denied by the court.  Judge Karas has ruled, on two recent occasions, that any such application shall be held in abeyance until the court decides the *Curcio* inquiry.

Mr. Barket's application is problematic.

First, Mr. Barket seeks to pursue a serious remedy in a capital case (the withdrawal of a notice of intention to seek the death penalty), claiming that he is unaware of the rules to proceed and the protocols for such an application as set forth in the US Attorney's Manual (9-160.10).  And, instead of seeking guidance from one of three appointed Learned Counsel and/or one of our two highly experienced Resource Counsel, he claims to be seeking advice and direction by the government.

Second, and most important, Mr. Barket's self-serving declaration of authority discharging Learned Counsel that has been duly appointed by an order of the court [in a death authorized case], and declaring that Learned Counsel serves without any authority not only demonstrates his complete unfamiliarity with or indifference to the Local Criminal Rules of the Southern District of New York (Local Criminal Rule 1.1(b) - which adopts Local Civil Rule 1.4 governing the displacement of counsel of record), but it also shows a total disrespect towards the past rulings by Judge Karas - who has directly addressed this very issue.

I repeat, there is a serious *Curcio* inquiry pending before the court.   In short time, I am of belief that the government will be advised of the subject attorney(s) and subject matter of the *Curio* inquiry.  A *Curcio* inquiry addresses whether a defendant has been afforded effective representation and advice via a conflict free counsel.

Therefore, on behalf of Nicholas Tartaglione, whose right to the effective assistance of counsel is what a *Curcio* inquiry is designed to protect, it is requested that the government not present a matter as serious as an application to withdraw the notice to seek the death penalty to the Capital Case Review Committee, until such time that Judge

**DX 79-4**

Karas has reasonable opportunity to rule upon the facts and issues set forth in the report that has been filed by *Curcio* counsel.

Finally, I certainly do not believe that the government needs to be advised that Mr. Barket has no judicial authority to discharge any counsel from a criminal case that has been appointed by an order of the court.  In light of the pending *Curcio* inquiry, and Judge Karas' specific rulings on this very subject, Mr. Barket's position and his adherence to such a position is both troubling, alarming and revealing.   As I have stated this serious *Curcio* inquiry is, after an extensive investigation, finally in the hands of Judge Karas.

All Learned Counsel, duly appointed by order of Judge Karas, are requesting that the government not present Mr. Barket's application to the Capital Case Review Committee until such time that the court rules upon the *Curcio* inquiry in this case.

Given Mr. Barket's remarks, I am copying *Curcio* counsel on this email.

Tonyricco

  cc:   *Curcio* Counsel

-----Original Message-----
From: Michael Bachrach <mbach2000@yahoo.com>
To: 'tonyricco@aol.com' <tonyricco@aol.com>; Maurene.Comey@usdoj.gov <maurene.comey@usdoj.gov>; Jason.Swergold@usdoj.gov <jason.swergold@usdoj.gov>; Bruce Barket <bbarket@barketepstein.com>
Cc: Aida Leisenring <aleisenring@barketepstein.com>; bkoffsky@snet.net <bkoffsky@snet.net>; kennethjmontgomery@gmail.com <kennethjmontgomery@gmail.com>; johnadiazlaw@gmail.com <johnadiazlaw@gmail.com>; Michael.Gerber@usdoj.gov <michael.gerber@usdoj.gov>; bcsternheim@mac.com <bcsternheim@mac.com>
Sent: Wed, Jan 8, 2020 1:30 pm
Subject: Re: reversing the Authorization decision

Respectfully, Mr. Tartaglione has chosen to be represented by learned counsel pursuant to 18 U.S.C. 3005.  Mr. Ricco is one of three learned counsel appointed to represent Mr. Tartaglione in that regard.  As such, so long as he remains learned counsel he does in fact speak for the defense and is likewise Mr. Tartaglione's lawyer.  I note that Mr. Ricco's views are shared by all three learned counsel as well as all other counsel appointed pursuant to 18 U.S.C. 3006A(e)(1).  I also note that as learned counsel it is specifically our role to address this issue.

Pursuant to Local Criminal Rule 1.2 and Local Civil Rule 1.4, all counsel serve as counsel for the defendant until otherwise terminated by the Court.  Mr. Barket does not have the authority to amend or alter the Local Rules.

Kindly hold in abeyance Mr. Barket's application, which effects the rights of this capital defendant, until the Curcio issue is decided.

Thank you.

**DX 79-5**

Gmail - Re: reversing the Authorization decision

========================

Michael K. Bachrach, Esq.

224 West 30th Street, Suite 302

New York, NY 10001

tel: (212) 929-0592

fax: (866) 328-1630

cell: (917) 304-5044

michael@mbachlaw.com


On Wednesday, January 8, 2020, 12:43:21 PM EST, Bruce Barket <bbarket@barketepstein.com> wrote:


Respectfully, Mr. Ricco does speak for Mr. Tartaglione nor the for the defense and he lacks the  authority to contradict a request made by Mr. Tartaglione's lawyer.  Our request stands.   We will move forward.


Bruce A. Barket, Esq.

Barket Epstein Kearon Aldea & LoTurco, LLP

666 Old Country Road , Ste. 700

Garden City, NY 11530

(516) 745 1500 [P]  (516) 745 1245 [F]

www.barketepstein.com


This transmittal may be a confidential attorney client communication or may otherwise be privileged or confidential. If it is not clear that you are the intended recipient, you are hereby notified that you have received this transmittal in error; any review, dissemination, distribution or copying of this transmittal is strictly prohibited. If you suspect that you have received this communication in error, please notify us immediately by telephone or email and immediately delete this message and all its attachments


**From:** tonyricco@aol.com [mailto:tonyricco@aol.com]
**Sent:** Wednesday, January 08, 2020 11:45 AM
**To:** Maurene.Comey@usdoj.gov; Bruce Barket; Jason.Swergold@usdoj.gov
**Cc:** Aida Leisenring;  michael@mbachlaw.com;  bkoffsky@snet.net;  kennethjmontgomery@gmail.com; johnadiazlaw@gmail.com;  Michael.Gerber@usdoj.gov;  bcsternheim@mac.com
**Subject:** Re: reversing the Authorization decision

**DX 79-6**

AUSA Comey:


Thank you for making sure that all counsel were noticed on your response to this extremely important request. This request was presented to the government without any knowledge or participation of Learned Counsel and/or our David Ruhnke or Tanya Greene, the teams Resource Counsel.


As you are aware, there is a **serious** *Curcio* inquiry presently pending before the court.   As you are also aware, on December 31, 2019, *Curcio* counsel has filed her report with Judge Karas.   As a result, it is requested that government refrain from scheduling any presentation before the Capital Case Review Committee in relation to the withdrawal of the notice of intention to seek the death penalty in this case until Judge Karas decides whether (any) counsel in this case is operating under a waivable or non-waivable conflict of interest.


According to attorney Barket, the application to withdraw death authorization does not include an offer to plead guilty.  Therefore, the timing of a submission seeking withdrawal, if any, is clearly a decision to be made by counsel - *a non-conflicted counsel*.   Such an application, filed without any input or consultation of experienced Learned Counsel, and/or highly experienced Resource Counsel, in the present status of this case is not in the best interest of Nicholas Tartaglione, a capital authorized defendant.   In fact, Judge Karas has held all motion practice with the court in abeyance until the Curcio issues are litigated, and on behalf of the defendant, it is requested that the Department of Justice similarly not entertain an application of such magnitude.


Further you can rest assured, that all counsel in this case have, in fact, been previously fully instructed by Learned Counsel on the procedure to be followed for application of United States Attorney Manual section 9-10.160 (B) on an application to seek withdrawal of the notice of intention to seek the death penalty.


Therefore, for reasons stated above it is requested that any application for withdrawal of the notice of intention to seek the death penalty in this case is not presented to the Capital Case Review until the conclusion of facts and issues of law on the conflicts issue in this case have been decided upon by Judge Karas.


Respectfully,


# Anthony L. Ricco

Anthony L. Ricco, Esq.

Learned Counsel of Record for Nicholas Tartaglione


cc:   *Curcio* Counsel

AOL Mail - Re: reversing the Authorization decision

-----Original Message-----
From: Comey, Maurene (USANYS) <Maurene.Comey@usdoj.gov>
To: Bruce Barket <bbarket@barketepstein.com>; Swergold, Jason (USANYS) <Jason.Swergold@usdoj.gov>
Cc: Aida Leisenring <aleisenring@barketepstein.com>; Tony Ricco <tonyricco@aol.com>; Michael K. Bachrach
<michael@mbachlaw.com>; BRUCE KOFFSKY <bkoffsky@snet.net>; Kenneth J. Montgomery Esq
<kennethjmontgomery@gmail.com>; John Diaz <johnadiazlaw@gmail.com>; Gerber, Michael (USANYS)
<Michael.Gerber@usdoj.gov>
Sent: Wed, Jan 8, 2020 9:58 am
Subject: RE: reversing the Authorization decision

Good morning,


We will discuss internally and get back to you.


Best,

Maurene




Maurene Comey

Assistant United States Attorney

Southern District of New York

1 St. Andrew's Plaza

New York, NY 10007

212-637-2324

Maurene.Comey@usdoj.gov

---

**From:** Bruce Barket <bbarket@barketepstein.com>
**Sent:** Wednesday, January 8, 2020 9:41 AM
**To:** Swergold, Jason (USANYS) <JSwergold@usa.doj.gov>; Comey, Maurene (USANYS)
<MComey@usa.doj.gov>
**Cc:** Aida Leisenring <aleisenring@barketepstein.com>
**Subject:** reversing the Authorization decision


Good morning,


We would like to make further arguments to the committee and ask that it reverse its decision. Can you please let
me know the process to do that? Do we first write to you? To the committee? To the AG?

**DX 79-8**

The new arguments we would like to make will not include an offer to plead guilty.

Bruce A. Barket, Esq.

Barket Epstein Kearon Aldea & LoTurco, LLP

666 Old Country Road , Ste. 700

Garden City, NY 11530

(516) 745 1500 [P]  (516) 745 1245 [F]

www.barketepstein.com

This transmittal may be a confidential attorney client communication or may otherwise be privileged or confidential. If it is not clear that you are the intended recipient, you are hereby notified that you have received this transmittal in error; any review, dissemination, distribution or copying of this transmittal is strictly prohibited. If you suspect that you have received this communication in error, please notify us immediately by telephone or email and immediately delete this message and all its attachments

**DX 79-9**

# RE: reversing the Authorization decision

From:  tonyricco (tonyricco@aol.com)

To:  maurene.comey@usdoj.gov; bbarket@barketepstein.com; michael@mbachlaw.com; jason.swergold@usdoj.gov

Cc:  aleisenring@barketepstein.com; bkoffsky@snet.net; kennethjmontgomery@gmail.com; johnadiazlaw@gmail.com; michael.gerber@usdoj.gov; bcsternheim@mac.com; perry.carbone@usdoj.gov; kathryn.martin@usdoj.gov

Date:  Thursday, January 9, 2020, 12:22 AM EST

Thank you.   The application and positions advanced by Mr. Barket are unprecedented and matters that should have been filed with the court - which is has had direct rulings with the issues that Mr. Barket attempted to advance.

The application, along with the nformation disclosed and declarations by Mr. Barket in support of his position  are matters for resolution by the district court not the government.

Additionally, in view of Judge Karas' prior rulings and the issues raised in the Curcio report, (of which the government is without any knowledge), Mr. Barket's views and declarations should be raised directly with the court.

Again, thank you.

Tonyricco


Sent from my Verizon, Samsung Galaxy smartphone


-------- Original message --------
From: "Comey, Maurene (USANYS)" <Maurene.Comey@usdoj.gov>
Date: 1/8/20 10:36 PM (GMT-05:00)
To: tonyricco <tonyricco@aol.com>, Bruce Barket <bbarket@barketepstein.com>, michael@mbachlaw.com, "Swergold, Jason (USANYS)" <Jason.Swergold@usdoj.gov>
Cc: Aida Leisenring <aleisenring@barketepstein.com>, bkoffsky@snet.net, kennethjmontgomery@gmail.com, johnadiazlaw@gmail.com, "Gerber, Michael (USANYS)" <Michael.Gerber@usdoj.gov>, bcsternheim@mac.com, "Carbone, Perry (USANYS)" <Perry.Carbone@usdoj.gov>, "Martin, Kathryn (USANYS)" <Kathryn.Martin@usdoj.gov>
Subject: RE: reversing the Authorization decision


Counsel,


Consistent with USAM 9-10.160(B), any request by the defense for withdrawal of a notice of intent to seek the death penalty should be submitted in writing to the AUSAs handling the case.  Such written submission should explain the changed circumstances supporting the defense request.  Upon receipt of such a written submission, the USAO-SDNY will review the defense request.  Upon completion of that review, the USAO-SDNY will transmit both the defense submission and the recommendation of the USAO-SDNY to the Capital Case Section of DOJ for consideration by the Capital Review Committee.  Following this review, if two or more members of the Capital Review Committee agree with the defense submission, then the defense request will be forwarded to the Attorney General for consideration and final decision.  If fewer than two members of the Capital Review Committee agree with the defense submission, then the request will be denied without further consideration within DOJ.  There is no provision in the USAM for any additional meetings involving defense counsel at any point in this process.

**DX 80-1**

In light of the inconsistent requests we have received from retained counsel and learned counsel, which include inconsistent positions regarding how the Government should communicate with attorneys for Mr. Tartaglione, we intend to submit a letter to Judge Karas requesting a conference so that we may seek the Court's guidance.

Thank you,

Maurene

Maurene Comey

Assistant United States Attorney

Southern District of New York

1 St. Andrew's Plaza

New York, NY 10007

212-637-2324

Maurene.Comey@usdoj.gov

---

**From:** tonyricco <tonyricco@aol.com>
**Sent:** Wednesday, January 8, 2020 4:08 PM
**To:** Bruce Barket <bbarket@barketepstein.com>; michael@mbachlaw.com; Comey, Maurene (USANYS) <MComey@usa.doj.gov>; Swergold, Jason (USANYS) <JSwergold@usa.doj.gov>
**Cc:** Aida Leisenring <aleisenring@barketepstein.com>; bkoffsky@snet.net; kennethjmontgomery@gmail.com; johnadiazlaw@gmail.com; Gerber, Michael (USANYS) <MGerber@usa.doj.gov>; bcsternheim@mac.com
**Subject:** RE: reversing the Authorization decision

Mr. Barket needs to make his selfserving declaration before Judge Karas. Mr. Barket's disclosures are problematic and reveals his distain for the rulings of Judge Karas and his disregard of established Local court rules.

I repeat Mr. Barrket has no authority to declare that any Learned Counsel duly appointed by an of a United States District Court Judge has no authority to advocate on behalf of the capital defendant.

If there is a death verdict in this case, the action of counsel shall impact the integrity of any verdict and or sentence in this case. Before the court is an issue of whether one or more counsel is qualified to serve as counsel due to serious conflicts of interest.

**DX 80-2**

That combination was the precise grounds that Judge Karas cited when he differed  other issues of counsel, the filing of penalty pleadings and the settting of a trial date in abeyance until he had a full opportunity to decide the Curcio issues in this case.  Those very same reasons serve as the basis as to why no attorney should be moving forward with application as serious as a submission to withdraw the death notice in this case.  While those reasons are apparently not good enough or sufficient for Mr. Barket, (an attorney who is not even aware of the protocols), it certainly was a good and sufficient reason for Judge Karas - who oberved over Mr. Barket's vehement obection, that Mr. Tartaglione suffers no prejudice in this death authorized case from holding such matters in abeyance.

Similarly, for the very same reasons, I am requesting that no submission is made to the Capital Case Review Committee until the issue of ineffective assistance (conflicts of counsel) is decided by Judge Karas.

All Learned Counsel are in agreement, and shall later testify if necessitated by an adverse verdict, that no such apppication should be presented at this juncture of these proceedings, until such time that Judge Karas rules on the Curcio.  All Learned Cousel are in agreement that to move forward on this issue at this juncture is not in Mr. Tartaglione's interest, interests which Judge Karas is endeavoring to protect.

Tonyricco

*Sent from my Verizon, Samsung Galaxy smartphone*

-------- Original message --------

From: Bruce Barket <bbarket@barketepstein.com>

Date: 1/8/20 3:31 PM (GMT-05:00)

To: "'tonyricco@aol.com'" <tonyricco@aol.com>, michael@mbachlaw.com, maurene.comey@usdoj.gov, jason.swergold@usdoj.gov

Cc: Aida Leisenring <aleisenring@barketepstein.com>, bkoffsky@snet.net, kennethjmontgomery@gmail.com, johnadiazlaw@gmail.com, michael.gerber@usdoj.gov, bcsternheim@mac.com

Subject: RE: reversing the Authorization decision

I am Mr. Tartaglione's lawyer.  I am going to ask the Government to revisit it's decision to seek the death penalty.  I wrote to the assigned assistants as a courtesy to see how they would suggest I move forward.  Mr. Ricco has not consulted with Mr. Tartaglione in nearly 5 months and never on this issue.  He lacks the authority to thwart the decisions and work of Mr. Tartaglione's chosen counsel.   His attempt to do that here, where we are beginning the process to seek to reverse the decision to seek the death penalty is problematic, to say the least.  There is no reason to hold up this process.

**DX 80-3**

Bruce A. Barket, Esq.

Barket Epstein Kearon Aldea & LoTurco, LLP

666 Old Country Road , Ste. 700

Garden City, NY 11530

(516) 745 1500 [P]  (516) 745 1245 [F]

www.barketepstein.com

This transmittal may be a confidential attorney client communication or may otherwise be privileged or confidential. If it is not clear that you are the intended recipient, you are hereby notified that you have received this transmittal in error; any review, dissemination, distribution or copying of this transmittal is strictly prohibited. If you suspect that you have received this communication in error, please notify us immediately by telephone or email and immediately delete this message and all its attachments

**From:** tonyricco@aol.com [mailto:tonyricco@aol.com]
**Sent:** Wednesday, January 08, 2020 2:52 PM
**To:** michael@mbachlaw.com; maurene.comey@usdoj.gov; jason.swergold@usdoj.gov; Bruce Barket
**Cc:** Aida Leisenring; bkoffsky@snet.net; kennethjmontgomery@gmail.com; johnadiazlaw@gmail.com; michael.gerber@usdoj.gov; bcsternheim@mac.com; tonyricco@aol.com
**Subject:** Re: reversing the Authorization decision

AUSA Maurene Comey:

Mr. Barket is fully aware of the subject and subject matter of the *Curcio* inquiry.   Mr. Barket is also fully aware that each of his prior applications to have appointed Learned Counsel discharged from this case have been denied by the court.  Judge Karas has ruled, on two recent occasions, that any such application shall be held in abeyance until the court decides the *Curcio* inquiry.

Mr. Barket's application is problematic.

First, Mr. Barket seeks to pursue a serious remedy in a capital case (the withdrawal of a notice of intention to seek the death penalty), claiming that he is unaware of the rules to proceed and the protocols for such an application as set forth in the US Attorney's Manual (9-160.10).  And, instead of seeking guidance from one of three appointed Learned Counsel and/or one of our two highly experienced Resource Counsel, he claims to be seeking advice and direction by the government.

Second, and most important, Mr. Barket's self-serving declaration of authority discharging Learned Counsel that has been duly appointed by an order of the court [in a death authorized case], and declaring that Learned Counsel serves without any authority not only demonstrates his complete unfamiliarity with or indifference to the Local Criminal Rules of the Southern District of New York (Local Criminal Rule 1.1(b) - which adopts Local Civil Rule 1.4 governing the displacement of counsel of record), but it also shows a total disrespect towards the past rulings by Judge Karas - who has directly addressed this very issue.

**DX 80-4**

I repeat, there is a serious *Curcio* inquiry pending before the court.   In short time, I am of belief that the government will be advised of the subject attorney(s) and subject matter of the *Curio* inquiry.  A *Curcio* inquiry addresses whether a defendant has been afforded effective representation and advice via a conflict free counsel.

Therefore, on behalf of Nicholas Tartaglione, whose right to the effective assistance of counsel is what a *Curcio* inquiry is designed to protect, it is requested that the government not present a matter as serious as an application to withdraw the notice to seek the death penalty to the Capital Case Review Committee, until such time that Judge Karas has reasonable opportunity to rule upon the facts and issues set forth in the report that has been filed by *Curcio* counsel.

Finally, I certainly do not believe that the government needs to be advised that Mr. Barket has no judicial authority to discharge any counsel from a criminal case that has been appointed by an order of the court.  In light of the pending *Curcio* inquiry, and Judge Karas' specific rulings on this very subject, Mr. Barket's position and his adherence to such a position is both troubling, alarming and revealing.   As I have stated this serious *Curcio* inquiry is, after an extensive investigation, finally in the hands of Judge Karas.

All Learned Counsel, duly appointed by order of Judge Karas, are requesting that the government not present Mr. Barket's application to the Capital Case Review Committee until such time that the court rules upon the *Curcio* inquiry in this case.

Given Mr. Barket's remarks, I am copying *Curcio* counsel on this email.

Tonyricco

  cc:   *Curcio* Counsel

-----Original Message-----
From: Michael Bachrach <mbach2000@yahoo.com>
To: 'tonyricco@aol.com' <tonyricco@aol.com>; Maurene.Comey@usdoj.gov <maurene.comey@usdoj.gov>; Jason.Swergold@usdoj.gov <jason.swergold@usdoj.gov>; Bruce Barket <bbarket@barketepstein.com>
Cc: Aida Leisenring <aleisenring@barketepstein.com>; bkoffsky@snet.net <bkoffsky@snet.net>; kennethjmontgomery@gmail.com <kennethjmontgomery@gmail.com>; johnadiazlaw@gmail.com <johnadiazlaw@gmail.com>; Michael.Gerber@usdoj.gov <michael.gerber@usdoj.gov>; bcsternheim@mac.com <bcsternheim@mac.com>
Sent: Wed, Jan 8, 2020 1:30 pm
Subject: Re: reversing the Authorization decision

Respectfully, Mr. Tartaglione has chosen to be represented by learned counsel pursuant to 18 U.S.C. 3005.  Mr. Ricco is one of three learned counsel appointed to represent Mr. Tartaglione in that regard.  As such, so long as he remains learned counsel he does in fact speak for the defense and is likewise Mr. Tartaglione's lawyer.  I note that Mr. Ricco's views are shared by all three learned counsel as well as all other counsel appointed pursuant to 18 U.S.C. 3006A(e)(1). I also note that as learned counsel it is specifically our role to address this issue.

Pursuant to Local Criminal Rule 1.2 and Local Civil Rule 1.4, all counsel serve as counsel for the defendant until otherwise terminated by the Court.  Mr. Barket does not have the authority to amend or alter the Local Rules.

**DX 80-5**

Kindly hold in abeyance Mr. Barket's application, which effects the rights of this capital defendant, until the Curcio issue is decided.


Thank you.



========================

Michael K. Bachrach, Esq.

224 West 30th Street, Suite 302

New York, NY 10001

tel: (212) 929-0592

fax: (866) 328-1630

cell: (917) 304-5044

michael@mbachlaw.com



On Wednesday, January 8, 2020, 12:43:21 PM EST, Bruce Barket <bbarket@barketepstein.com> wrote:



Respectfully, Mr. Ricco does speak for Mr. Tartaglione nor the for the defense and he lacks the  authority to contradict a request made by Mr. Tartaglione's lawyer.  Our request stands.   We will move forward.


Bruce A. Barket, Esq.

Barket Epstein Kearon Aldea & LoTurco, LLP

666 Old Country Road , Ste. 700

Garden City, NY 11530

(516) 745 1500 [P]  (516) 745 1245 [F]

www.barketepstein.com



This transmittal may be a confidential attorney client communication or may otherwise be privileged or confidential. If it is not clear that you are the intended recipient, you are hereby notified that you have received this transmittal in error; any review, dissemination, distribution or copying of this transmittal is strictly prohibited. If you suspect that you

**DX 80-6**

have received this communication in error, please notify us immediately by telephone or email and immediately delete this message and all its attachments

**From:** tonyricco@aol.com [mailto:tonyricco@aol.com]
**Sent:** Wednesday, January 08, 2020 11:45 AM
**To:** Maurene.Comey@usdoj.gov; Bruce Barket; Jason.Swergold@usdoj.gov
**Cc:** Aida Leisenring; michael@mbachlaw.com; bkoffsky@snet.net; kennethjmontgomery@gmail.com; johnadiazlaw@gmail.com; Michael.Gerber@usdoj.gov; bcsternheim@mac.com
**Subject:** Re: reversing the Authorization decision

AUSA Comey:

Thank you for making sure that all counsel were noticed on your response to this extremely important request.   This request was presented to the government without any knowledge or participation of Learned Counsel and/or our David Ruhnke or Tanya Greene, the teams Resource Counsel.

As you are aware, there is a **serious** *Curcio* inquiry presently pending before the court.   As you are also aware, on December 31, 2019, *Curcio* counsel has filed her report with Judge Karas.   As a result, it is requested that government refrain from scheduling any presentation before the Capital Case Review Committee in relation to the withdrawal of the notice of intention to seek the death penalty in this case until Judge Karas decides whether (any) counsel in this case is operating under a waivable or non-waivable conflict of interest.

According to attorney Barket, the application to withdraw death authorization does not include an offer to plead guilty. Therefore, the timing of a submission seeking withdrawal, if any, is clearly a decision to be made by counsel - *a non-conflicted counsel*.   Such an application, filed without any input or consultation of experienced Learned Counsel, and/or highly experienced Resource Counsel, in the present status of this case is not in the best interest of Nicholas Tartaglione, a capital authorized defendant.   In fact, Judge Karas has held all motion practice with the court in abeyance until the Curcio issues are litigated, and on behalf of the defendant, it is requested that the Department of Justice similarly not entertain an application of such magnitude.

Further you can rest assured, that all counsel in this case have, in fact, been previously fully instructed by Learned Counsel on the procedure to be followed for application of United States Attorney Manual section 9-10.160 (B) on an application to seek withdrawal of the notice of intention to seek the death penalty.

Therefore, for reasons stated above it is requested that any application for withdrawal of the notice of intention to seek the death penalty in this case is not presented to the Capital Case Review until the conclusion of facts and issues of law on the conflicts issue in this case have been decided upon by Judge Karas.

Respectfully,

# Anthony L. Ricco

Anthony L. Ricco, Esq.

**DX 80-7**

Learned Counsel of Record for Nicholas Tartaglione


cc: *Curcio* Counsel




-----Original Message-----
From: Comey, Maurene (USANYS) <Maurene.Comey@usdoj.gov>
To: Bruce Barket <bbarket@barketepstein.com>; Swergold, Jason (USANYS) <Jason.Swergold@usdoj.gov>
Cc: Aida Leisenring <aleisenring@barketepstein.com>; Tony Ricco <tonyricco@aol.com>; Michael K. Bachrach <michael@mbachlaw.com>; BRUCE KOFFSKY <bkoffsky@snet.net>; Kenneth J. Montgomery Esq <kennethjmontgomery@gmail.com>; John Diaz <johnadiazlaw@gmail.com>; Gerber, Michael (USANYS) <Michael.Gerber@usdoj.gov>
Sent: Wed, Jan 8, 2020 9:58 am
Subject: RE: reversing the Authorization decision

Good morning,


We will discuss internally and get back to you.


Best,

Maurene




Maurene Comey

Assistant United States Attorney

Southern District of New York

1 St. Andrew's Plaza

New York, NY 10007

212-637-2324

Maurene.Comey@usdoj.gov




From: Bruce Barket <bbarket@barketepstein.com>
Sent: Wednesday, January 8, 2020 9:41 AM
To: Swergold, Jason (USANYS) <JSwergold@usa.doj.gov>; Comey, Maurene (USANYS) <MComey@usa.doj.gov>

**DX 80-8**

Yahoo Mail - RE: reversing the Authorization decision

**Cc:** Aida Leisenring <aleisenring@barketepstein.com>
**Subject:** reversing the Authorization decision

Good morning,

We would like to make further arguments to the committee and ask that it reverse its decision.  Can you please let me know the process to do that?  Do we first write to you? To the committee? To the AG?

The new arguments we would like to make will not include an offer to plead guilty.

Bruce A. Barket, Esq.

Barket Epstein Kearon Aldea & LoTurco, LLP

666 Old Country Road , Ste. 700

Garden City, NY 11530

(516) 745 1500 [P]  (516) 745 1245 [F]

www.barketepstein.com

This transmittal may be a confidential attorney client communication or may otherwise be privileged or confidential. If it is not clear that you are the intended recipient, you are hereby notified that you have received this transmittal in error; any review, dissemination, distribution or copying of this transmittal is strictly prohibited. If you suspect that you have received this communication in error, please notify us immediately by telephone or email and immediately delete this message and all its attachments

**DX 80-9**

## Tartaglione - Additional Information re Discovery Requests

From:   Swergold, Jason (USANYS) (jason.swergold@usdoj.gov)

To:       bbarket@barketepstein.com; aleisenring@barketepstein.com; tonyricco@aol.com; bkoffsky@snet.net; kenneth@kjmontgomerylaw.com; michael@mbachlaw.com; johnadiazlaw@gmail.com

Cc:      maurene.comey@usdoj.gov

Date:   Thursday, January 9, 2020, 11:28 AM EST

All –

1 – We have been informed by MCC that if you would like to inspect the makeshift rope from the July 23, 2019 incident (a picture of which was contained in the report you reviewed at our office), you can arrange to do so by contacting Nicole McFarland, the new legal counsel at MCC. You will not be allowed to take photographs of the rope.

2 – We have been informed that in the course of its investigation into Mr. Tartaglione's contraband cellphone, BOP created forensic reports of the phone and SIM card. We have not obtained or requested copies of these reports. If you would like to review the reports, please let us know. In that case, in light of earlier claims of privilege raised by Mr. Barket, we will ask BOP to provide the reports to a walled off team of AUSAs to review for privileged materials. That walled off team of AUSAs will coordinate producing the reports to you and will work with you to determine what, if any, portions of the report can be provided to the case AUSAs

3 – We have been informed by BOP that apart from the photographs contained in the materials you reviewed at our office regarding the July 23 incident, no other pictures or videos were taken from inside the Tartaglione/Epstein cell.

4 – We have received additional information from BOP regarding the video outside of the Tartaglione/Epstein cell, and we will be filing a letter with the Court shortly. As stated in the letter, the video that we have is available for review at our office at your convenience.

Jason M. Swergold

Co-Chief, Narcotics Unit

United States Attorney's Office

Southern District of New York

One Saint Andrew's Plaza

New York, New York 10007

Tel: (212) 637-1023

jason.swergold@usdoj.gov

**DX 81-1**

Case 7:16-cr-00832-KMK    Document 641-1    Filed 07/02/26    Page 262 of 404

## RE: Tartaglione - Additional Information re Discovery Requests

From:   Swergold, Jason (USANYS) (jason.swergold@usdoj.gov)

To:       bbarket@barketepstein.com; aleisenring@barketepstein.com; tonyricco@aol.com; bkoffsky@snet.net; kenneth@kjmontgomerylaw.com; michael@mbachlaw.com; johnadiazlaw@gmail.com

Cc:      maurene.comey@usdoj.gov

Date:   Thursday, January 9, 2020, 02:23 PM EST

Bruce,

1 – Are you in fact requesting a copy of the cellphone reports? If so, we will have a privilege team assigned and will ask them to reach out to you.

2 – We looked into whether any hand held videos were used to film inside the cell, and were told no on this specific issue.

3 – We do not believe a hearing is warranted regarding the video and expect to oppose your request to the Court.

Jason M. Swergold

Co-Chief, Narcotics Unit

212-637-1023

---

**From:** Bruce Barket <bbarket@barketepstein.com>
**Sent:** Thursday, January 9, 2020 12:36 PM
**To:** Swergold, Jason (USANYS) <JSwergold@usa.doj.gov>; Aida Leisenring <aleisenring@barketepstein.com>; Tony Ricco <tonyricco@aol.com>; BRUCE KOFFSKY <bkoffsky@snet.net>; kenneth@kjmontgomerylaw.com; michael@mbachlaw.com; John Diaz <johnadiazlaw@gmail.com>
**Cc:** Comey, Maurene (USANYS) <MComey@usa.doj.gov>
**Subject:** RE: Tartaglione - Additional Information re Discovery Requests

Thanks for the update. We will follow up with Nicole McFarland.

As for the cell phone, we had discussed agreeing or attempting to agree on the process for such a review. Can you have the taint team reach out to us before they begin their review?

It is our understanding that there were hand held videos used to film the inside or the cell on the night of the 23rd of July. I understand your email, but in light of the inconsistent accounts of the surveillance video can you please make

**DX 82-1**

further inquiries on this specific point?

Lastly, we are going to request a hearing on what happened to the surveillance video.  Please let us know what your position on that request.

Bruce A. Barket, Esq.

Barket Epstein Kearon Aldea & LoTurco, LLP

666 Old Country Road , Ste. 700

Garden City, NY 11530

(516) 745 1500 [P]  (516) 745 1245 [F]

www.barketepstein.com

This transmittal may be a confidential attorney client communication or may otherwise be privileged or confidential. If it is not clear that you are the intended recipient, you are hereby notified that you have received this transmittal in error; any review, dissemination, distribution or copying of this transmittal is strictly prohibited. If you suspect that you have received this communication in error, please notify us immediately by telephone or email and immediately delete this message and all its attachments

**From:** Swergold, Jason (USANYS) [mailto:Jason.Swergold@usdoj.gov]
**Sent:** Thursday, January 09, 2020 11:12 AM
**To:** Bruce Barket; Aida Leisenring; Tony Ricco; BRUCE KOFFSKY; kenneth@kjmontgomerylaw.com; michael@mbachlaw.com; John Diaz
**Cc:** Comey, Maurene (USANYS)
**Subject:** Tartaglione - Additional Information re Discovery Requests

All –

1 – We have been informed by MCC that if you would like to inspect the makeshift rope from the July 23, 2019 incident (a picture of which was contained in the report you reviewed at our office), you can arrange to do so by contacting Nicole McFarland, the new legal counsel at MCC.  You will not be allowed to take photographs of the rope.

2 – We have been informed that in the course of its investigation into Mr. Tartaglione's contraband cellphone, BOP created forensic reports of the phone and SIM card.  We have not obtained or requested copies of these reports.  If you would like to review the reports, please let us know.  In that case, in light of earlier claims of privilege raised by Mr. Barket, we will ask BOP to provide the reports to a walled off team of AUSAs to review for privileged materials. That walled off team of AUSAs will coordinate producing the reports to you and will work with you to determine what, if any, portions of the report can be provided to the case AUSAs

**DX 82-2**

3 – We have been informed by BOP that apart from the photographs contained in the materials you reviewed at our office regarding the July 23 incident, no other pictures or videos were taken from inside the Tartaglione/Epstein cell.

4 – We have received additional information from BOP regarding the video outside of the Tartaglione/Epstein cell, and we will be filing a letter with the Court shortly.  As stated in the letter, the video that we have is available for review at our office at your convenience.

Jason M. Swergold

Co-Chief, Narcotics Unit

United States Attorney's Office

Southern District of New York

One Saint Andrew's Plaza

New York, New York  10007

Tel:  (212) 637-1023

jason.swergold@usdoj.gov

**DX 82-3**

3/3

## RE: Tartaglione - Additional Information re Discovery Requests

From:  Bruce Barket (bbarket@barketepstein.com)

To:  jason.swergold@usdoj.gov; aleisenring@barketepstein.com; tonyricco@aol.com; bkoffsky@snet.net; kenneth@kjmontgomerylaw.com; michael@mbachlaw.com; johnadiazlaw@gmail.com

Cc:  maurene.comey@usdoj.gov

Date:  Monday, January 13, 2020, 07:58 AM EST

Jason,

I am sorry for the delayed response.  If there are reports that currently exist, yes I would like to review them and obtain copies.  On the other hand, if the Government wants to either review the reports or do a further forensic examination of the phone or sim card, we ask that the team assigned contact us to discuss protocols.

Thanks

Bruce A. Barket, Esq.

Barket Epstein Kearon Aldea & LoTurco, LLP

666 Old Country Road , Ste. 700

Garden City, NY 11530

(516) 745 1500 [P]  (516) 745 1245 [F]

www.barketepstein.com

This transmittal may be a confidential attorney client communication or may otherwise be privileged or confidential. If it is not clear that you are the intended recipient, you are hereby notified that you have received this transmittal in error; any review, dissemination, distribution or copying of this transmittal is strictly prohibited. If you suspect that you have received this communication in error, please notify us immediately by telephone or email and immediately delete this message and all its attachments

**From:** Swergold, Jason (USANYS) [mailto:Jason.Swergold@usdoj.gov]
**Sent:** Thursday, January 09, 2020 1:53 PM
**To:** Bruce Barket; Aida Leisenring; Tony Ricco; BRUCE KOFFSKY; kenneth@kjmontgomerylaw.com; michael@mbachlaw.com; John Diaz
**Cc:** Comey, Maurene (USANYS)
**Subject:** RE: Tartaglione - Additional Information re Discovery Requests

**DX 83-1**

Bruce,

1 – Are you in fact requesting a copy of the cellphone reports? If so, we will have a privilege team assigned and will ask them to reach out to you.

2 – We looked into whether any hand held videos were used to film inside the cell, and were told no on this specific issue.

3 – We do not believe a hearing is warranted regarding the video and expect to oppose your request to the Court.

Jason M. Swergold

Co-Chief, Narcotics Unit

212-637-1023

---

**From:** Bruce Barket <bbarket@barketepstein.com>
**Sent:** Thursday, January 9, 2020 12:36 PM
**To:** Swergold, Jason (USANYS) <JSwergold@usa.doj.gov>; Aida Leisenring <aleisenring@barketepstein.com>; Tony Ricco <tonyricco@aol.com>; BRUCE KOFFSKY <bkoffsky@snet.net>; kenneth@kjmontgomerylaw.com; michael@mbachlaw.com; John Diaz <johnadiazlaw@gmail.com>
**Cc:** Comey, Maurene (USANYS) <MComey@usa.doj.gov>
**Subject:** RE: Tartaglione - Additional Information re Discovery Requests

Thanks  for the update. We will follow up with Nicole McFarland.

As for the cell phone, we had discussed agreeing or attempting to agree on the process for such a review.  Can you have the taint team reach out to us before they begin their review?

It is our understanding that there were hand held videos used to film the inside or the cell on the night of the 23rd of July.  I understand your email, but in light of the inconsistent accounts of the surveillance video can you please make further inquiries on this specific point?

Lastly, we are going to request a hearing on what happened to the surveillance video.  Please let us know what your position on that request.

Bruce A. Barket, Esq.

**DX 83-2**

Barket Epstein Kearon Aldea & LoTurco, LLP

666 Old Country Road , Ste. 700

Garden City, NY 11530

(516) 745 1500 [P]  (516) 745 1245 [F]

www.barketepstein.com

This transmittal may be a confidential attorney client communication or may otherwise be privileged or confidential. If it is not clear that you are the intended recipient, you are hereby notified that you have received this transmittal in error; any review, dissemination, distribution or copying of this transmittal is strictly prohibited. If you suspect that you have received this communication in error, please notify us immediately by telephone or email and immediately delete this message and all its attachments

---

**From:** Swergold, Jason (USANYS) [mailto:Jason.Swergold@usdoj.gov]
**Sent:** Thursday, January 09, 2020 11:12 AM
**To:** Bruce Barket; Aida Leisenring; Tony Ricco; BRUCE KOFFSKY; kenneth@kjmontgomerylaw.com; michael@mbachlaw.com; John Diaz
**Cc:** Comey, Maurene (USANYS)
**Subject:** Tartaglione - Additional Information re Discovery Requests

All –

1 – We have been informed by MCC that if you would like to inspect the makeshift rope from the July 23, 2019 incident (a picture of which was contained in the report you reviewed at our office), you can arrange to do so by contacting Nicole McFarland, the new legal counsel at MCC.  You will not be allowed to take photographs of the rope.

2 – We have been informed that in the course of its investigation into Mr. Tartaglione's contraband cellphone, BOP created forensic reports of the phone and SIM card.  We have not obtained or requested copies of these reports.  If you would like to review the reports, please let us know.  In that case, in light of earlier claims of privilege raised by Mr. Barket, we will ask BOP to provide the reports to a walled off team of AUSAs to review for privileged materials. That walled off team of AUSAs will coordinate producing the reports to you and will work with you to determine what, if any, portions of the report can be provided to the case AUSAs

3 – We have been informed by BOP that apart from the photographs contained in the materials you reviewed at our office regarding the July 23 incident, no other pictures or videos were taken from inside the Tartaglione/Epstein cell.

4 – We have received additional information from BOP regarding the video outside of the Tartaglione/Epstein cell, and we will be filing a letter with the Court shortly.  As stated in the letter, the video that we have is available for review at our office at your convenience.

Jason M. Swergold

**DX 83-3**

Co-Chief, Narcotics Unit

United States Attorney's Office

Southern District of New York

One Saint Andrew's Plaza

New York, New York  10007

Tel:  (212) 637-1023

jason.swergold@usdoj.gov

**DX 83-4**

## US v. Nicholas Tartaglione, 16 CR 832 (KMK) -- Privilege Review of BOP Reports

From: Wright, Thomas (USANYS) (thomas.wright2@usdoj.gov)

To: bbarket@barketepstein.com; aleisenring@barketepstein.com; tonyricco@aol.com; bkoffsky@snet.net; michael@mbachlaw.com; johnadiazlaw@gmail.com; kenneth@kjmontgomerylaw.com

Date: Tuesday, January 28, 2020, 07:02 PM EST

Counsel,

I attach two .pdf files, which reflect forensic reports that the Bureau of Prisons prepared and that detail the data extracted from a cellphone and a SIM card seized from your client last year. Having now reviewed both reports for the purpose of identifying any communications over which your client could choose to assert a privilege, I have not identified any such communications. If, after your own review of both reports, one or more of you have a different view, then please reply all to this email, stating the claim to privilege that you perceive. If, instead, you agree that there is no claim to privilege, then, after coming to agreement among yourselves, please reply all to this email. Finally, setting aside any claim to privilege, if one or more of you perceive any other basis on which the reports should not be made available in their entirety to those of my colleagues assigned to prosecute the above-captioned case, then please reply all to this email, stating the basis.

Given the number of counsel here and the mandate from the Court to communicate with you as a group, I prefer that we come to agreement or disagreement in writing through email that all of you simultaneously receive. If for some reason that becomes unworkable, then I am glad to arrange a time to meet.

Good Evening,

AUSA Wright

Thomas John Wright

Assistant United States Attorney

United States Attorney's Office

 for the Southern District of New York

One Saint Andrew's Plaza

New York, New York 10007

T: 212.637.2295

C: 917.696.4147

E: thomas.wright2@usdoj.gov

 US v. Nicholas Tartaglione, 16 CR 832 (KMK) -- 2019.08.14 BOP Report (SIM Card) (C).pdf
307.4kB

**DX 84-1**

 US v. Nicholas Tartaglione, 16 CR 832 (KMK) -- 2019.08.14 BOP Report (Cellphone) (C).pdf
263.1kB

**DX 84-2**

**10:28**

< **Aida2, Bruce BAR...** (2)    🔍  ⋮
2 recipients

Monday, July 29, 2019

**B** Bruce BARKETT

Tony, something has come up. Do you have time to chat later today, say after 6:00

MMS
1:21 PM

MMS
2:22 PM    I do.  Call me.

**B** Bruce BARKETT

Ok.  I am busy until at least 6 so we will call you after that

MMS
2:32 PM

MMS
2:33 PM    that okay.  talk to you then.

       

|||    ◯    ‹    **DX 85-1**

**Bruce BARKETT**
(516) 287-7230

Friday, August 2, 2019

**B** Nick says they put him back in the same cell after the incident and left all of Epstein's belongings in there, including medication and glasses and books
7:52 AM

8:12 AM  interesting.

**B** Epstein is off suicide watch.  Nick insists it was a real attempt. For what it's worth, he gives a lot of

DX 86-1

**Bruce BARKETT**
(516) 287-7230

Saturday, August 17, 2019

**B** Do you have time for a call about John W?

12:21 PM

**B** It's unclear to me who on the team you told about John W. You asked me not to tell anyone and I haven't but Mike knew and you're posting about it. Just need clarification

I don't want people thinking I am hiding things from them

1:18 PM

1:44 PM    on the wieder question see my email.

**DX 87-1**

1:28

(516) 708-5275 >

i need this ... last name is mine. no men at my farm. im not talking about hay guy or family. annie is not in ur circle socially. let her run page but thats it. whem im out she is gone. u need to send me pics way more. when i call answer most of the time. call n txt me more. act like my wife. yes or no v? can u do these? if not we will say goodbye because i will walk out of here w nothing left for us.

is this a game? where r u

i cant compromise on that stuff. if i do when i go free i will just leave. im willing to give u my heart, $ and life. but i want to be put b4 rescue, fb annie and even the animals. i want to celebrate w you not someone else. im 51 , i want kids n family. i dont need man hating wierdos in my life. i dont need

Text Message

**DX 88-1**



not be a coward. lets do divorce today

do u love him v? me?

if u want tosave this marriage?

Today 8:29 AM

is this nics wife

this nics girl

u got to call jail

DX 89-1

1:15

GT

Gerry >

I am coming up

Today 12:22 AM

U piece of crap ni dont give a dam if u call. Bruce we have someone watching why is your dogtrainer car there n u do t answer iwant the truck back ni will charge u with fraud niw

Iam going to shut u down u better acknowledge i will be up

I have pic of his plate that says he is atrainer

Is ur phone still dead n ur charger onveniently not around or r u still with trsiner i will fi d out to.orrow where he is i will see him ni am going to consult lawyer

I stuck up 4 u all this while come to find out everybody else was right

Text Message

DX 90-1

5:10

 

(516) 708-5275 >

nope is all I have right now. I hope your ok in this storm.

Today 4:19 PM

i need u to txt me. its important

not about our stuff!!

V!! FUCKING CONTACT ME!!

v?!!!

v if u love me at all and my animals please contact me

   Text Message

      

Q W E R T Y U I O P

A S D F G H J K L

 Z X C V B N M

123          space          return

                     

**DX 91-1**

1:28 ✔   LTE

(516) 708-5275 >

can u do these? if not we will say goodbye because i will walk out of here w nothing left for us.

is this a game? where r u

i cant compromise on that stuff. if i do when i go free i will just leave. im willing to give u my heart, $ and life. but i want to be put b4 rescue, fb annie and even the animals. i want to celebrate w you not someone else. im 51 , i want kids n family. i dont need man hating wierdos in my life. i dont need to hear about men at my farm or txting my wife while im in prison. be my wife. i want u to be a part of my day. i want to know now b4 anything else about any men. i want no contact w nate or any single man again. u know what i mean. im so serious about this v. please dont test me. i dont want loseu

Text Message

**DX 92-1**

Dear Judge KARAS,                                    3/28/18

   Im writing to Ask that Mr Ricco And Mr DeMarco be Immediately Removed As lawyers on my CASE.
   As you Know Im A retired Police officer And Im very familiar with the Criminal Justice System. Also, I was previously Accused of A Crime I did Not commit, went to trial and was aquitted. Ive been incarcerated for Almost 17 Months Regarding this Case. To the extent that Ive been permitted, Ive Read the discovery on this Case And I have had Countless Meeting with the lawyers I have Selected to represent Me, Bruce Barket And Aida Leisenring. I have full Confidence in them And their firm.
   Im giving your Honor this background So that you Can be assured that My decision to dismiss Mr Ricco, And Mr DeMarco is based on A complete understanding of My Rights And of the Criminal Justice System.
   If Necessary I can articulate exactly why I want them Removed but doing so would Compromise My defence And May Make it more difficult to argue with the government why they should Not Seek the death Penalty. I hope that you simply agree with My Request. This is something I have wanted to do for over A year but held off on the advise of Mr. Barket.
   I would like that you Appoint Another Attorney as learned Counsel, One who will meet with Me Regularly And Assist with My Chosen defense lawyers. However even if you decide Not to appoint New learned Counsel, I Still want to Remove Mr Ricco, And Mr DeMarco.

                    THAK You,
                       Nicholas Tartaglione

DX 93-1

To All the Members of My Legal Team,                    8-15-19

First let me thank all of you for the hard work And dedication everyone has shown for the past 2 years and 8 months on this case. I am grateful for All the talented people who I have with me on this monumental hurdle in my life. I understand completly the gravity of this being a capitol case, And I am fully aware of the possible death penalty that awaits me should I be found guilty At trial. That being said it is still My choice to focus our efforts towards the trial. I am not guilty of these charges and will not compromise our efforts for an aquittal just to be spared a death verdict should I be convicted. That being said I wish to remind my team that my chosen lead counsel is And Always has been Bruce Barket. He has my complete trust and confidence. Over the past 32 months he has met with me countless times to discuss and or explain to me the events and strategies of this complicated case. It is my hope that everyone on my team will support him And follow his lead but if anyone finds conflict with this request please let Bruce know so we can find a replacement in time to prepare for trial.    THANK You
                    Nick Tartaglione

**DX 94-1**

Honorable Kenneth M. Karas          8-22-19

Your Honor,

My name is Nicholas Tartaglione
And as I'm sure The Court is aware, I am
currently fighting some very serious charges
in Your Court. first, let me just say I'm writing
this letter in a cell without the help of a
dictionary or Spell check or Any of the other
aids I came to rely upon as a Police Officer
when writing reports so I apologize for any
and all errors that may appear in this letter,
they Are not A reflection of my respect towards
the Court.

That being said, the purpose of this letter
is to Ask that The Court please remove Anthony
Ricco from my mitigation team As Soon as possible.
I understand Mr. Riccos has a great deal
of experience and talent, however I still
must Ask that he be removed or replaced
as Soon As possible. As Your Honor may recall,
we visited this same problem about two years
ago but decided to leave things As they
Are At that time. I'm sorry to Say
that Can no longer be the Case.
My reasons to remove Mr. Ricco are quite
valid and at this time I Respectfully Ask
The Court to let me Keep those reasons

DX 95-1

to Myself.
In Closing I would like to thank
Your Honor for His help in not just
this matter, but for All the help The Court
has been in regards to the Conditions
here At M.C.C. Im truly grateful.

Respectfully
Nicholas Tartaglione

DX 95-2

Honorable Judge Karas                    9-6-19

Your Honor,

I would first like to thank The Court for again taking the time out to read this letter As well As the previous letter I sent to The Court regarding Mr. Anthony Ricco. Earlier today I met with my attorney, Bruce Barket and he informed me that Your Honor received my first letter.

The reason for this letter Your Honor is to stress to The Court that I do not want to meet with Mr. Ricco Again nor do I want Any members of my legal team to meet with him. I'm very grateful to The Court for the Concern that has been shown regarding this matter in the past, however I must respectfully request that Mr. Ricco be removed from my team As soon As The Court can possibly do so.

In closing, I again would like to express my sincere gratitude in Your Honors Concern for my well being at M.C.C.. Conditions here Are still deplorable but its Not for lack of trying.

Respectfully
Nicholas Tartaglione

DX 96-1

Hon. Kenneth M. Karas                                    9-12-19

      Your Honor,

    I'm writing this letter to respectfully INFORM the Court that I AM standing firm in my decision to fire MR. Anthony Ricco. As the Court is AWARE I have been INCARCERATED for almost three years Now. During that entire time Mr. Ricco has met with me only three times. We have never discussed the details or the facts of my case. At the last visit which took place in August of 2019, Mr Ricco misrepresented the reason for that visit. He later lied to other members of my legal team as to what took place at that meeting. As a result my trust in Mr. Ricco has diminished to the point that No Significant progress relating to my defense can be Acomplished. It is my belief that Mr. Ricco remaining on my team will be highly distracting And very likely damaging in my prepereation for trial.

                   Respectfully
                   Nicholas Tartaglione
                   Nicholas Tartaglione

CC: Bruce Barket

DX 97-1

To My Legal Team,

I was informed today that members of my legal team are scheduling a trial date for Feb. 2021. This date is entirely unacceptable. I want everyone on my team to know that if a trial date for Mid 2020 is not set by the end of this year (2019), I will proclaim my right to a speedy trial. If anyone feels that they can't be ready after 3½ years already then please remove yourself as counsel on this case. Tomorrow on 9/17/19 I have a status hearing in front of Judge KARAS. I will follow up the 3 letters I have sent him asking that Anthony Ricco be removed from my team by putting it on the record. If anyone wishes to follow him now would be an excellent time to do so. I am innocent of the charges against me and would rather be executed proclaiming my innocence then submit to a plea just to spare my life. I am furious that some lawyers on this team have met with me just to give me "lip service" then disregard what I've said and go forward with their own agenda. Bruce Barket is my chosen lead attorney and if he is removed as my attorney by the court I will replace him with someone else from outside my current team. I am not a lawyer but this is my life and my decision. We are going to trial by Mid 2020

Nick Tartaglione

DX 98-1

To my Team

As I write this the scabs on my knuckles are still healing. My right hand has trouble holding the pen and it will get more painful the longer I write. My hands have been fractured many times over since Ive been arrested. I have a scar on my right ass cheek. And another scar on my right thigh. These are from being stabbed on 2 different occassions. I have another scar on my back from a sharpened screwdriver. Most of my teeth are cracked. My right foot is mishapen because it was broken and then healed without medical supervision. Medical staff can't be notified because even if you are the victim you will be put in the box. The vision in my left eye is reduced to a blur and Ive been told will be nil in another 10 years. My face is numb on the same left side due to a metal graph that supports my cheekbone and eye socket. This was all due to a gang member earning "points" by trying to kill "the cop". I was lucky I didnt go black when he hit me with a plumbers wrench and I was able to fight back long enough for the guards to come. This is what Im told. I have no memory of it. Most of these injuries have come in the past 2 years in general population. These injuries are trivial compared to the mental and emotional trauma I now live with.

What Im asking is out of necessity and not out of being impatient. Any member of this team that cant be ready for trial by summer of 2020 please leave the team. Any member that wants to put the penalty phase above or before the

**DX 99-1**

trial, Please leave the team. I have ignored the lip service And the fact that my wishes have been ignored up until now but no longer. Ive went on Record And Said I did not want Anyone on my team to discuss my case with Tony Ricco. He is fired. Ive written Another letter to the judge to make Sure this point is gotten across.

Ive been lucky to have made it this far in here. That luck is going to Run out. I expect the prosecution to drag this out And hope Im killed in here. I dont expect it from my own Attorneys. Im innocent And Saving me from the death penalty so I can be killed in here eventually is not doing me Any Service. Its A cop out on your end And its not want I want. I can not last in here Another year. If you need to work harder or get more help then do it. If you need to get the death penalty taken off do it. Even I see theres MANY issues that can be brought up.

I have to fight every day in here so I dont think Im asking too much to ask that my team, All of my team, work harder and more often. If you cant then let me replace you with Someone who can. I have been here for 3 years. Why wasnt the majority of the work done in that time? No matter i guess. It needs to be done in A time frame that gets me to trial while there is still enough left of me to go to trial. Please. Step up And get the work done or quit.

Nick Tartaglione



**UNITED STATES GOVERNMENT MEMORANDUM**
**FEDERAL BUREAU OF PRISONS**
**MCC NEW YORK**
**150 PARK ROW**
**NEW YORK, NY 10007**


**DATE:    JULY 5, 2019**

**TO:       THE SIS FILE**

**FROM :   SIS LT. DOCTOR**

**SUBJECT: TARTAGLIONE, NICHOLAS; REG. NO. 78514-054**


On July 2, 2019, inmate Tartaglione, Nicholas; Reg. No. 78514-054 was found in possession of a cell phone. The following telephone numbers were found in the history of the telephone:

914-969-6747
Chris 914-308-9625
Kym 516-972-3214
Weider 914-490-0316
Tracy 914-562-0844
M. Grry 914-346-1319
914-685-5894
Rich 914-619-6903
914-806-5681
Marina 914-355-8236
Barb 914-522-2207
Jim 845-494-3025
Ken +15515741623
Patty 914-255-5331
Pauly 845-234-8455
Ron 845-234-8455
Tim 646-627-6712

**DX 100-1**



US DEPARTMENT OF JUSTICE
FEDERAL BUREAU OF PRISONS
BOPINTEL - FORENSICS LABORATORY

## Exhibit Data
Data entered by the program user, not extracted from device

| | |
|---|---|
| Case Reference | 1448-19-NYM |
| Exh bit Id | NYM-19-0130 |
| Case Operator | JACQUELINE DOMINGUEZ-MAYS |
| Notes | Phone received in lab locked with pin passcode with T-Mobile SIM card. |

Case Reference: 1448-19-NYM

Date Created: 8/14/2019 2:35:15 PM

Printed: 14-Aug-2019 14:44
Page 1 of 22
1448-19-NYM--NYM-19-0130--L8Star BM70 BT Headset Phone (Verified).xry

**DX 101-1**



## Summary
Summary and history of this report



**US DEPARTMENT OF JUSTICE**

FEDERAL BUREAU OF PRISONS

BOPINTEL - FORENSICS LABORATORY

| | |
|---|---|
| Date Created | 8/14/2019 2:35:15 PM |
| Locked | No |
| XRY Version | 8.0 |
| Lowest Module Version | 7.2 |
| File GUID | {93FFE21D-63CF-4A0C-BB38-AEF960B9D14D} |
| XryCore Version | 1.0.107 |
| Is File Subset | No |
| Is Encrypted | No |
| SHA-1 | 168d3d1f2684d1b42116221d35fe16cb291f99dd |
| Actual dump size | 4 MB |

| Category name | Number of Items | Deleted Items |
|---|---|---|
| Contacts / Contacts | 5 | |
| Calls | 49 | |
| Files / Unrecognized | 51 | |

**DX 101-2**



US DEPARTMENT OF JUSTICE

FEDERAL BUREAU OF PRISONS

BOPINTEL - FORENSICS LABORATORY

## Device/General Information
General information about the device

Data



| Attr bute | Device Name |
|---|---|
| Data | L8Star BM70 BT Headset Phone (Verified) |

| Attr bute | Device Family |
|---|---|
| Data | Phone |

| Attr bute | Mobile Id (IMEI) |
|---|---|
| Data | 358507101545400 |
| Storage | SIM 1 |

| Attr bute | Unlock Code |
|---|---|
| Data | 1234 |

| Attr bute | SIM Identification (ICCID) |
|---|---|
| Data | 8901260153736505119 |

| Attr bute | Issuer Id (from ICCID) |
|---|---|
| Data | Unknown Card Issuer, Anguilla (89012601); Unknown Card Issuer, Antigua and Barbuda (89012601); Unknown Card Issuer, Bahamas (89012601); Unknown Card Issuer, Barbados (89012601); Unknown Card Issuer, Bermuda (89012601); Unknown Card Issuer, British Virgin Islands (89012601); Unknown Card Issuer, Canada (89012601); Unknown Card Issuer, Cayman Islands (89012601); Unknown Card Issuer, Dominica (89012601); Unknown Card Issuer, Dominican Rep. (89012601); Unknown Card Issuer, Grenada (89012601); Unknown Card Issuer, Guam (89012601); Unknown Card Issuer, Jamaica (89012601); Unknown Card Issuer, Montserrat (89012601); Unknown Card Issuer, Northern Marianas (89012601); Unknown Card Issuer, Puerto Rico (89012601); Unknown Card Issuer, Saint Kitts and Nevis (89012601); Unknown Card Issuer, Saint Lucia (89012601); Unknown Card Issuer, Saint Vincent and the Grenadines (89012601); Unknown Card Issuer, Trinidad and Tobago (89012601); Unknown Card Issuer, Turks and Caicos Islands (89012601); Unknown Card Issuer, United States (89012601); Unknown Card Issuer, United States Virgin Islands (89012601) |

| Attr bute | Subscr ber Id (IMSI) |
|---|---|
| Data | 310260153650511 |

| Attr bute | Network Code (from IMSI) |
|---|---|
| Data | United States (310), T-Mobile USA (260) |

Case Reference: 1448-19-NYM

Date Created: 8/14/2019 2:35:15 PM

Printed: 14-Aug-2019 14:44

Page 3 of 22

1448-19-NYM--NYM-19-0130--L8Star BM70 BT Headset Phone (Verified).xry

**DX 101-3**



US DEPARTMENT OF JUSTICE

FEDERAL BUREAU OF PRISONS

BOPINTEL - FORENSICS LABORATORY

## Files/Unrecognized

Files with unrecognized format stored on the device or on removable media (51 items)

| | |
|---|---|
| File Name | MP0B_001 |
| File Size | 12 Bytes |
| Path | /NVRAM/NVD_IMEI/ |
| Created | 1/1/2018 12:00:02 AM |
| Modified | 1/1/2018 1:10:00 AM |
| Attr butes | Archive |
| Hash (SHA1) | a3efbad333f60db1dc50d8a44c1eda3fbfc78f91 |

| | |
|---|---|
| File Name | ST33A004 |
| File Size | 190 Bytes |
| Path | /NVRAM/NVD_IMEI/ |
| Created | 1/1/2018 12:00:02 AM |
| Modified | 1/1/2018 12:00:02 AM |
| Attr butes | Archive |
| Hash (SHA1) | 405096816514a9a5e0e0c95faddbcc6ea1c8b638 |

| | |
|---|---|
| File Name | ST33B004 |
| File Size | 190 Bytes |
| Path | /NVRAM/NVD_IMEI/ |
| Created | 1/1/2018 12:00:02 AM |
| Modified | 1/1/2018 12:00:02 AM |
| Attr butes | Archive |
| Hash (SHA1) | 405096816514a9a5e0e0c95faddbcc6ea1c8b638 |

| | |
|---|---|
| File Name | MT1F_000 |
| File Size | 130 Bytes |
| Path | /NVRAM/CALIBRAT/ |
| Created | 1/1/2018 12:00:02 AM |
| Modified | 1/1/2018 12:00:02 AM |
| Attr butes | Archive |
| Hash (SHA1) | e2f191b9235f70420d8f9d63cbc09ca209b11a83 |

| | |
|---|---|
| File Name | MT05_002 |
| File Size | 262 Bytes |
| Path | /NVRAM/CALIBRAT/ |
| Created | 1/1/2018 12:00:02 AM |
| Modified | 1/1/2018 12:00:02 AM |
| Attr butes | Archive |
| Hash (SHA1) | bd0729ef7a71a36830b9659a2b54dc8e3e6bef1b |

Case Reference: 1448-19-NYM

Date Created: 8/14/2019 2:35:15 PM

Printed: 14-Aug-2019 14:44

Page 4 of 22

1448-19-NYM--NYM-19-0130--L8Star BM70 BT Headset Phone (Verified).xry

**DX 101-4**



US DEPARTMENT OF JUSTICE

FEDERAL BUREAU OF PRISONS

BOPINTEL - FORENSICS LABORATORY

| | |
|---|---|
| File Name | MT06_002 |
| File Size | 666 Bytes |
| Path | /NVRAM/CALIBRAT/ |
| Created | 1/1/2018 12:00:02 AM |
| Modified | 1/1/2018 12:00:02 AM |
| Attr butes | Archive |
| Hash (SHA1) | 9cf9f4324cb48c9df6bf0f9c797ac62c7ff9b413 |

| | |
|---|---|
| File Name | MT07_002 |
| File Size | 666 Bytes |
| Path | /NVRAM/CALIBRAT/ |
| Created | 1/1/2018 12:00:02 AM |
| Modified | 1/1/2018 12:00:02 AM |
| Attr butes | Archive |
| Hash (SHA1) | 4c1ae580846fefea69aa7f198523bd3b09efcc22 |

| | |
|---|---|
| File Name | MT08_002 |
| File Size | 666 Bytes |
| Path | /NVRAM/CALIBRAT/ |
| Created | 1/1/2018 12:00:02 AM |
| Modified | 1/1/2018 12:00:02 AM |
| Attr butes | Archive |
| Hash (SHA1) | d881dc7b8b914184bedd5cdcdef493af5403348c |

| | |
|---|---|
| File Name | MT09_002 |
| File Size | 666 Bytes |
| Path | /NVRAM/CALIBRAT/ |
| Created | 1/1/2018 12:00:02 AM |
| Modified | 1/1/2018 12:00:02 AM |
| Attr butes | Archive |
| Hash (SHA1) | 3d206b6a190e7a8ec127922cdd5359e0b1924162 |

| | |
|---|---|
| File Name | MT0I_002 |
| File Size | 10 Bytes |
| Path | /NVRAM/CALIBRAT/ |
| Created | 1/1/2018 12:00:02 AM |
| Modified | 1/1/2018 12:00:02 AM |
| Attr butes | Archive |
| Hash (SHA1) | b7fbee8b53df33a8559720e872da65bc9a38cb17 |

| | |
|---|---|
| File Name | MT0J_004 |
| File Size | 46 Bytes |

Case Reference: 1448-19-NYM

Date Created: 8/14/2019 2:35:15 PM

Printed: 14-Aug-2019 14:44

Page 5 of 22

1448-19-NYM--NYM-19-0130--L8Star BM70 BT Headset Phone (Verified).xry

**DX 101-5**



US DEPARTMENT OF JUSTICE
FEDERAL BUREAU OF PRISONS
BOPINTEL - FORENSICS LABORATORY

| | |
|---|---|
| Path | /NVRAM/CALIBRAT/ |
| Created | 1/1/2018 12:00:02 AM |
| Modified | 1/1/2018 12:00:02 AM |
| Attr butes | Archive |
| Hash (SHA1) | 250a21dae507056b21e5a8467d989a23bd3d75d6 |

| | |
|---|---|
| File Name | MT0K_005 |
| File Size | 210 Bytes |
| Path | /NVRAM/CALIBRAT/ |
| Created | 1/1/2018 12:00:02 AM |
| Modified | 1/1/2018 12:00:02 AM |
| Attr butes | Archive |
| Hash (SHA1) | 30fa3f6b4719345952f1eacaf58317ae0f9f6208 |

| | |
|---|---|
| File Name | MT0L_002 |
| File Size | 18 Bytes |
| Path | /NVRAM/CALIBRAT/ |
| Created | 1/1/2018 12:00:02 AM |
| Modified | 1/1/2018 12:00:02 AM |
| Attr butes | Archive |
| Hash (SHA1) | adafc202650869aec61966b9a1292187db064645 |

| | |
|---|---|
| File Name | MT0M_002 |
| File Size | 18 Bytes |
| Path | /NVRAM/CALIBRAT/ |
| Created | 1/1/2018 12:00:02 AM |
| Modified | 1/1/2018 12:00:02 AM |
| Attr butes | Archive |
| Hash (SHA1) | adafc202650869aec61966b9a1292187db064645 |

| | |
|---|---|
| File Name | MT0N_002 |
| File Size | 18 Bytes |
| Path | /NVRAM/CALIBRAT/ |
| Created | 1/1/2018 12:00:02 AM |
| Modified | 1/1/2018 12:00:02 AM |
| Attr butes | Archive |
| Hash (SHA1) | 90fd5d1bb4185ca2e26f1d58bfa346ea6d985bdf |

| | |
|---|---|
| File Name | MT0O_002 |
| File Size | 18 Bytes |
| Path | /NVRAM/CALIBRAT/ |
| Created | 1/1/2018 12:00:02 AM |
| Modified | 1/1/2018 12:00:02 AM |

**DX 101-6**



US DEPARTMENT OF JUSTICE
FEDERAL BUREAU OF PRISONS
BOPINTEL - FORENSICS LABORATORY

| | |
|---|---|
| Attr butes | Archive |
| Hash (SHA1) | 90fd5d1bb4185ca2e26f1d58bfa346ea6d985bdf |

| | |
|---|---|
| File Name | MT0P_003 |
| File Size | 34 Bytes |
| Path | /NVRAM/CALIBRAT/ |
| Created | 1/1/2018 12:00:02 AM |
| Modified | 1/1/2018 12:00:02 AM |
| Attr butes | Archive |
| Hash (SHA1) | 3cbf0157dea82c60dd61b9f075fd6810481e8e5d |

| | |
|---|---|
| File Name | MT0Q_002 |
| File Size | 6 Bytes |
| Path | /NVRAM/CALIBRAT/ |
| Created | 1/1/2018 12:00:02 AM |
| Modified | 1/1/2018 12:00:02 AM |
| Attr butes | Archive |
| Hash (SHA1) | 6fd76e4ed9278e69f5a3f364f79b4d1113c89ee1 |

| | |
|---|---|
| File Name | MT0R_000 |
| File Size | 22 Bytes |
| Path | /NVRAM/CALIBRAT/ |
| Created | 1/1/2018 12:00:02 AM |
| Modified | 1/1/2018 12:00:02 AM |
| Attr butes | Archive |
| Hash (SHA1) | ef66f8df5542f12967a561a8448da362bd963ec7 |

| | |
|---|---|
| File Name | MT1V_000 |
| File Size | 6 Bytes |
| Path | /NVRAM/CALIBRAT/ |
| Created | 1/1/2018 12:00:02 AM |
| Modified | 1/1/2018 12:00:02 AM |
| Attr butes | Archive |
| Hash (SHA1) | a6aab31092bb6816be9cbf3094eafdace295bc23 |

| | |
|---|---|
| File Name | MP09_001 |
| File Size | 66 Bytes |
| Path | /NVRAM/CALIBRAT/ |
| Created | 1/1/2018 12:00:02 AM |
| Modified | 1/1/2018 12:00:02 AM |
| Attr butes | Archive |
| Hash (SHA1) | 0c2ec09bd6458f04828a5b7932deff32fe18ebbe |

Case Reference: 1448-19-NYM

Date Created: 8/14/2019 2:35:15 PM

Printed: 14-Aug-2019 14:44
Page 7 of 22
1448-19-NYM--NYM-19-0130--L8Star BM70 BT Headset Phone (Verified).xry

**DX 101-7**



US DEPARTMENT OF JUSTICE
FEDERAL BUREAU OF PRISONS
BOPINTEL - FORENSICS LABORATORY

| | |
|---|---|
| File Name | MPA2_000 |
| File Size | 314 Bytes |
| Path | /NVRAM/CALIBRAT/ |
| Created | 1/1/2018 12:00:02 AM |
| Modified | 1/1/2018 12:00:02 AM |
| Attr butes | Archive |
| Hash (SHA1) | c0c46ca7a7d73ffb54a1b1e67718e2c1b0c837d6 |

| | |
|---|---|
| File Name | MPA8_000 |
| File Size | 1.32 KB |
| Path | /NVRAM/CALIBRAT/ |
| Created | 1/1/2018 12:00:02 AM |
| Modified | 1/1/2018 12:00:02 AM |
| Attr butes | Archive |
| Hash (SHA1) | 987012b14991dea19c1da81ac664b8ae61221d39 |

| | |
|---|---|
| File Name | MT6Y_000 |
| File Size | 49 Bytes |
| Path | /NVRAM/CALIBRAT/ |
| Created | 1/1/2018 12:00:02 AM |
| Modified | 5/10/2019 11:26:48 AM |
| Attr butes | Archive |
| Hash (SHA1) | dedfb67e8d79c98ba2ada0ba36267b6abe593b50 |

| | |
|---|---|
| File Name | MT00A000 |
| File Size | 108 Bytes |
| Path | /NVRAM/NVD_CORE/ |
| Created | 1/1/2018 12:00:02 AM |
| Modified | 1/1/2018 12:00:02 AM |
| Attr butes | Archive |
| Hash (SHA1) | a9e1101b6717c9998425aa6960ec874b004b8940 |

| | |
|---|---|
| File Name | MT00B000 |
| File Size | 108 Bytes |
| Path | /NVRAM/NVD_CORE/ |
| Created | 1/1/2018 12:00:02 AM |
| Modified | 1/1/2018 12:00:02 AM |
| Attr butes | Archive |
| Hash (SHA1) | a9e1101b6717c9998425aa6960ec874b004b8940 |

| | |
|---|---|
| File Name | CA00_000 |
| File Size | 6 Bytes |
| Path | /NVRAM/NVD_CORE/ |

Case Reference: 1448-19-NYM

Date Created: 8/14/2019 2:35:15 PM

Printed: 14-Aug-2019 14:44
Page 8 of 22
1448-19-NYM--NYM-19-0130--L8Star BM70 BT Headset Phone (Verified).xry

**DX 101-8**



| | |
|---|---|
| Created | 1/1/2018 12:00:02 AM |
| Modified | 1/1/2018 12:00:02 AM |
| Attr butes | Archive |
| Hash (SHA1) | a3fb7f5bea94cd8c4e39c0c093cc80b54479dea5 |

| | |
|---|---|
| File Name | PACKALID |
| File Size | 9.70 KB |
| Path | /NVRAM/NVD_DATA/ |
| Created | 1/1/2018 12:00:02 AM |
| Modified | 7/3/2019 8:18:56 AM |
| Attr butes | Archive |
| Hash (SHA1) | f07086f82e2e2a4e49b887403887f5de61183100 |

| | |
|---|---|
| File Name | INFOALID |
| File Size | 1.32 KB |
| Path | /NVRAM/NVD_DATA/ |
| Created | 1/1/2018 12:00:02 AM |
| Modified | 1/1/2018 12:00:02 AM |
| Attr butes | Archive |
| Hash (SHA1) | 9296176b68f3bde864b9a8eed05a76155a410919 |

| | |
|---|---|
| File Name | MT6B_010 |
| File Size | 1.81 KB |
| Path | /NVRAM/NVD_DATA/ |
| Created | 1/1/2018 12:00:02 AM |
| Modified | 1/1/2018 12:00:02 AM |
| Attr butes | Archive |
| Hash (SHA1) | fb611d29d09e8e86ef4691f250957ecef4066e1e |

| | |
|---|---|
| File Name | MT6C_120 |
| File Size | 1.72 KB |
| Path | /NVRAM/NVD_DATA/ |
| Created | 1/1/2018 12:00:02 AM |
| Modified | 1/1/2018 12:00:02 AM |
| Attr butes | Archive |
| Hash (SHA1) | aeb6a991320bf0bab766122ddac71caf9b4bea37 |

| | |
|---|---|
| File Name | MP1K_001 |
| File Size | 1.53 KB |
| Path | /NVRAM/NVD_DATA/ |
| Created | 1/1/2018 12:00:02 AM |
| Modified | 1/1/2018 12:00:02 AM |
| Attr butes | Archive |

Case Reference: 1448-19-NYM

Date Created: 8/14/2019 2:35:15 PM

Printed: 14-Aug-2019 14:44
Page 9 of 22
1448-19-NYM--NYM-19-0130--L8Star BM70 BT Headset Phone (Verified).xry

**DX 101-9**



| | |
|---|---|
| Hash (SHA1) | 60ef3aa3648ce10296afdbe2e5b3f04cdef1de3b |

| | |
|---|---|
| File Name | MT03_000 |
| File Size | 2.51 KB |
| Path | /NVRAM/NVD_DATA/ |
| Created | 1/1/2018 12:00:02 AM |
| Modified | 7/1/2019 4:43:42 PM |
| Attr butes | Archive |
| Hash (SHA1) | 10d917313a620bcdb269d10e6cd1c0348535bed7 |

| | |
|---|---|
| File Name | MT0Y_002 |
| File Size | 1.35 KB |
| Path | /NVRAM/NVD_DATA/ |
| Created | 1/1/2018 12:00:02 AM |
| Modified | 1/1/2018 12:00:02 AM |
| Attr butes | Archive |
| Hash (SHA1) | ce591fcf32d807c78270e5decfb22916ded0db35 |

| | |
|---|---|
| File Name | MT1A_007 |
| File Size | 1.96 KB |
| Path | /NVRAM/NVD_DATA/ |
| Created | 1/1/2018 12:00:02 AM |
| Modified | 7/3/2019 8:18:54 AM |
| Attr butes | Archive |
| Hash (SHA1) | 910bf468f7aa3d73ec9e4000d6aba4af9a9ac483 |

| | |
|---|---|
| File Name | MP0C_003 |
| File Size | 21.48 KB |
| Path | /NVRAM/NVD_DATA/ |
| Created | 1/1/2018 12:00:02 AM |
| Modified | 6/28/2019 4:10:20 PM |
| Attr butes | Archive |
| Hash (SHA1) | 2d02556332f242444e14238698eaeb3c7dbaa070 |

| | |
|---|---|
| File Name | MM03_000 |
| File Size | 1.98 KB |
| Path | /NVRAM/NVD_DATA/ |
| Created | 1/1/2018 12:00:02 AM |
| Modified | 1/1/2018 12:00:02 AM |
| Attr butes | Archive |
| Hash (SHA1) | 6a1cce44019bdf8629229ef9f4afda685dc4d44c |

| | |
|---|---|
| File Name | MM04_000 |

Case Reference: 1448-19-NYM

Date Created: 8/14/2019 2:35:15 PM

Printed: 14-Aug-2019 14:44
Page 10 of 22
1448-19-NYM--NYM-19-0130--L8Star BM70 BT Headset Phone (Verified).xry

**DX 101-10**



US DEPARTMENT OF JUSTICE
FEDERAL BUREAU OF PRISONS
BOPINTEL - FORENSICS LABORATORY

| | |
|---|---|
| File Size | 1012 Bytes |
| Path | /NVRAM/NVD_DATA/ |
| Created | 1/1/2018 12:00:02 AM |
| Modified | 1/1/2018 12:00:02 AM |
| Attr butes | Archive |
| Hash (SHA1) | 6e2bf25c38620039468c24ba71a4b6ea3bd261cd |

| | |
|---|---|
| File Name | MP0H_006 |
| File Size | 23.44 KB |
| Path | /NVRAM/NVD_DATA/ |
| Created | 1/1/2018 12:00:02 AM |
| Modified | 6/28/2019 4:10:20 PM |
| Attr butes | Archive |
| Hash (SHA1) | 43b0ebed11c70017659a638694a410321c8a0dd3 |

| | |
|---|---|
| File Name | MP0I_002 |
| File Size | 1.96 KB |
| Path | /NVRAM/NVD_DATA/ |
| Created | 1/1/2018 12:00:02 AM |
| Modified | 6/28/2019 4:10:20 PM |
| Attr butes | Archive |
| Hash (SHA1) | 5f5f53c1a50cf52ce013d9a4d8d6e6c6c19cd048 |

| | |
|---|---|
| File Name | MP0Q_002 |
| File Size | 3.91 KB |
| Path | /NVRAM/NVD_DATA/ |
| Created | 1/1/2018 12:00:02 AM |
| Modified | 6/22/2019 9:46:16 PM |
| Attr butes | Archive |
| Hash (SHA1) | df8051ca23b9684c5b24c79da38d0b9dd6800330 |

| | |
|---|---|
| File Name | MP26_001 |
| File Size | 1.35 KB |
| Path | /NVRAM/NVD_DATA/ |
| Created | 1/1/2018 12:00:02 AM |
| Modified | 1/1/2018 12:00:02 AM |
| Attr butes | Archive |
| Hash (SHA1) | 0c5ea157a954a065ca9ac71b60be0a312d1947e0 |

| | |
|---|---|
| File Name | MP6S_001 |
| File Size | 1.64 KB |
| Path | /NVRAM/NVD_DATA/ |
| Created | 1/1/2018 12:00:02 AM |

Case Reference: 1448-19-NYM

Date Created: 8/14/2019 2:35:15 PM

Printed: 14-Aug-2019 14:44
Page 11 of 22
1448-19-NYM--NYM-19-0130--L8Star BM70 BT Headset Phone (Verified).xry

**DX 101-11**



US DEPARTMENT OF JUSTICE
FEDERAL BUREAU OF PRISONS
BOPINTEL - FORENSICS LABORATORY

| | |
|---|---|
| Modified | 1/1/2018 12:00:02 AM |
| Attr butes | Archive |
| Hash (SHA1) | 449c5920960881b99125254544abc0ccdab1f81d |

| | |
|---|---|
| File Name | MPA3_001 |
| File Size | 8.89 KB |
| Path | /NVRAM/NVD_DATA/ |
| Created | 1/1/2018 12:00:02 AM |
| Modified | 7/2/2019 12:26:20 PM |
| Attr butes | Archive |
| Hash (SHA1) | e7a761c0036eae64b85a00cceb5f42064d7c85b0 |

| | |
|---|---|
| File Name | MPD1_002 |
| File Size | 1.78 KB |
| Path | /NVRAM/NVD_DATA/ |
| Created | 1/1/2018 12:00:02 AM |
| Modified | 7/3/2019 8:17:48 AM |
| Attr butes | Archive |
| Hash (SHA1) | 212564e1fca0b17de03a4ef64fec1a8298c349d6 |

| | |
|---|---|
| File Name | atomic_op.dat |
| File Size | 5 Bytes |
| Path | /@Dtcnt/ |
| Created | 1/1/2018 12:00:10 AM |
| Modified | 1/1/2018 12:00:10 AM |
| Attr butes | Archive |
| Hash (SHA1) | a10909c2cdcaf5adb7e6b092a4faba558b62bd96 |

| | |
|---|---|
| File Name | sim_reset_fact.dat |
| File Size | 0 Bytes |
| Path | /@Dtcnt/DB/SIM/ |
| Created | 1/1/2018 12:00:10 AM |
| Modified | 1/1/2018 12:00:10 AM |
| Hash (SHA1) | da39a3ee5e6b4b0d3255bfef95601890afd80709 |

| | |
|---|---|
| File Name | store_info.dat |
| File Size | 680 Bytes |
| Path | /@Dtcnt/DB/ |
| Created | 1/1/2018 12:00:10 AM |
| Modified | 1/1/2018 12:00:06 AM |
| Attr butes | Archive |
| Hash (SHA1) | 54536b643f3d043bbaafbc473cbea66b33f80486 |

Case Reference: 1448-19-NYM

Date Created: 8/14/2019 2:35:15 PM

Printed: 14-Aug-2019 14:44
Page 12 of 22
1448-19-NYM--NYM-19-0130--L8Star BM70 BT Headset Phone (Verified).xry

**DX 101-12**



US DEPARTMENT OF JUSTICE
FEDERAL BUREAU OF PRISONS
BOPINTEL - FORENSICS LABORATORY

| | |
|---|---|
| File Name | CONFIG.DAT |
| File Size | 12 Bytes |
| Path | /@Dtcnt/ |
| Created | 1/1/2018 12:00:10 AM |
| Modified | 1/1/2018 12:00:10 AM |
| Attr butes | Archive |
| Hash (SHA1) | 2c513f149e737ec4063fc1d37aee9beabc4b4bbf |

| | |
|---|---|
| File Name | DEVDB |
| File Size | 1.02 KB |
| Path | /@BT/ |
| Created | 5/10/2019 11:26:50 AM |
| Modified | 5/10/2019 11:26:50 AM |
| Attr butes | Archive |
| Hash (SHA1) | 9e2a624befef0e648252ba1dc0701ecec34d7171 |

| | |
|---|---|
| File Name | COD |
| File Size | 484 Bytes |
| Path | /@BT/ |
| Created | 5/10/2019 11:26:50 AM |
| Modified | 5/10/2019 11:26:50 AM |
| Attr butes | Archive |
| Hash (SHA1) | 1b83d5c3cbfcc6fe290473f632d1f5d5ecdcbe16 |

Case Reference: 1448-19-NYM

Date Created: 8/14/2019 2:35:15 PM

Printed: 14-Aug-2019 14:44
Page 13 of 22
1448-19-NYM--NYM-19-0130--L8Star BM70 BT Headset Phone (Verified).xry

**DX 101-13**



US DEPARTMENT OF JUSTICE

FEDERAL BUREAU OF PRISONS

BOPINTEL - FORENSICS LABORATORY

## Contacts/Contacts

Contacts stored in the device, on the SIM card or on removable media (5 items)

| Name | ron |
| --- | --- |
| Tel | 8452348455 |

| Name | marina |
| --- | --- |
| Tel | +19143558236 |

| Name | ken |
| --- | --- |
| Tel | +15515741623 |

| Name | chris |
| --- | --- |
| Tel | 9143089625 |

| Name | tracy |
| --- | --- |
| Tel | +19145620844 |

Case Reference: 1448-19-NYM

Date Created: 8/14/2019 2:35:15 PM

Printed: 14-Aug-2019 14:44

Page 14 of 22

1448-19-NYM--NYM-19-0130--L8Star BM70 BT Headset Phone (Verified).xry

**DX 101-14**



US DEPARTMENT OF JUSTICE
FEDERAL BUREAU OF PRISONS
BOPINTEL - FORENSICS LABORATORY

# Calls

Calls made, received, missed or attempted from or to the device (49 items)

| Call Type | Dialed |
|---|---|
| Time | 6/29/2019 3:28:51 PM UTC (Device) |
| **To** | |
| Name (Matched) | tracy |
| Tel | +19145620844 |

| Call Type | Dialed |
|---|---|
| Time | 6/29/2019 3:28:46 PM UTC (Device) |
| **To** | |
| Name (Matched) | tracy |
| Tel | +19145620844 |

| Call Type | Dialed |
|---|---|
| Time | 6/29/2019 3:00:26 PM UTC (Device) |
| **To** | |
| Name (Matched) | tracy |
| Tel | +19145620844 |

| Call Type | Dialed |
|---|---|
| Time | 6/28/2019 4:55:21 PM UTC (Device) |
| Duration | 00:00:10 |
| **To** | |
| Name (Matched) | tracy |
| Tel | +19145620844 |

| Call Type | Dialed |
|---|---|
| Time | 7/1/2019 4:45:25 PM UTC (Device) |
| Duration | 00:00:36 |
| **To** | |
| Name (Matched) | tracy |
| Tel | +19145620844 |

| Call Type | Dialed |
|---|---|
| Time | 6/28/2019 2:04:15 PM UTC (Device) |
| Duration | 00:00:52 |
| **To** | |
| Tel | 9148065681 |

| Call Type | Dialed |
|---|---|

Case Reference: 1448-19-NYM

Date Created: 8/14/2019 2:35:15 PM

Printed: 14-Aug-2019 14:44
Page 15 of 22
1448-19-NYM--NYM-19-0130--L8Star BM70 BT Headset Phone (Verified).xry

**DX 101-15**



US DEPARTMENT OF JUSTICE

FEDERAL BUREAU OF PRISONS

BOPINTEL - FORENSICS LABORATORY

| | |
|---|---|
| Time | 6/28/2019 4:46:56 PM UTC (Device) |
| **To** | |
| Tel | 9148065681 |

| | |
|---|---|
| Call Type | Dialed |
| Time | 7/1/2019 4:48:33 PM UTC (Device) |
| Duration | 00:09:53 |
| **To** | |
| Tel | 9149696747 |

| | |
|---|---|
| Call Type | Dialed |
| Time | 7/1/2019 3:09:30 PM UTC (Device) |
| Duration | 00:04:38 |
| **To** | |
| Tel | 9149696747 |

| | |
|---|---|
| Call Type | Dialed |
| Time | 6/30/2019 4:01:50 PM UTC (Device) |
| Duration | 00:00:03 |
| **To** | |
| Tel | 9149696747 |

| | |
|---|---|
| Call Type | Dialed |
| Time | 6/30/2019 3:57:38 PM UTC (Device) |
| Duration | 00:00:02 |
| **To** | |
| Tel | 9149696747 |

| | |
|---|---|
| Call Type | Dialed |
| Time | 7/2/2019 11:32:56 AM UTC (Device) |
| **To** | |
| Tel | 9149696747 |

| | |
|---|---|
| Call Type | Dialed |
| Time | 6/30/2019 4:00:31 PM UTC (Device) |
| **To** | |
| Tel | +19143461319 |

| | |
|---|---|
| Call Type | Dialed |
| Time | 6/30/2019 3:57:12 PM UTC (Device) |
| **To** | |
| Tel | +19143461319 |

Case Reference: 1448-19-NYM

Date Created: 8/14/2019 2:35:15 PM

Printed: 14-Aug-2019 14:44

Page 16 of 22

1448-19-NYM--NYM-19-0130--L8Star BM70 BT Headset Phone (Verified).xry

**DX 101-16**



US DEPARTMENT OF JUSTICE
FEDERAL BUREAU OF PRISONS
BOPINTEL - FORENSICS LABORATORY

| | |
|---|---|
| Call Type | Dialed |
| Time | 6/30/2019 3:55:56 PM UTC (Device) |
| Duration | 00:00:01 |
| **To** | |
| Tel | +19143461319 |

| | |
|---|---|
| Call Type | Dialed |
| Time | 6/29/2019 4:42:15 PM UTC (Device) |
| **To** | |
| Tel | +19143461319 |

| | |
|---|---|
| Call Type | Dialed |
| Time | 7/1/2019 3:09:05 PM UTC (Device) |
| Duration | 00:00:08 |
| **To** | |
| Tel | +19143461319 |

| | |
|---|---|
| Call Type | Received |
| Direction | Incoming |
| Time | 6/29/2019 4:29:36 PM UTC (Device) |
| Duration | 00:00:11 |
| **From** | |
| Tel | +15169723214 |

| | |
|---|---|
| Call Type | Received |
| Direction | Incoming |
| Time | 6/29/2019 3:26:47 PM UTC (Device) |
| Duration | 00:00:14 |
| **From** | |
| Tel | +15169723214 |

| | |
|---|---|
| Call Type | Received |
| Direction | Incoming |
| Time | 6/29/2019 3:06:37 PM UTC (Device) |
| Duration | 00:00:09 |
| **From** | |
| Tel | +15169723214 |

| | |
|---|---|
| Call Type | Received |
| Direction | Incoming |
| Time | 6/27/2019 1:50:04 PM UTC (Device) |
| Duration | 00:00:08 |
| **From** | |

**DX 101-17**



US DEPARTMENT OF JUSTICE

FEDERAL BUREAU OF PRISONS

BOPINTEL - FORENSICS LABORATORY

**From**

Tel                    +15169723214

Call Type              Received

Direction              Incoming

Time                   6/29/2019 5:13:55 PM UTC (Device)

Duration               00:00:05

**From**

Tel                    +15169723214

Call Type              Dialed

Time                   6/29/2019 3:27:56 PM UTC (Device)

**To**

Tel                    9146855894

Call Type              Missed

Direction              Incoming

Time                   7/2/2019 12:48:37 PM UTC (Device)

Duration               00:00:33

**From**

Tel                    +15167081453

Call Type              Dialed

Time                   6/27/2019 6:14:14 PM UTC (Device)

Duration               00:08:35

**To**

Tel                    +19146196903

Call Type              Dialed

Time                   6/27/2019 6:13:33 PM UTC (Device)

**To**

Tel                    +19146196903

Call Type              Dialed

Time                   6/27/2019 6:12:25 PM UTC (Device)

Duration               00:00:03

**To**

Tel                    +19146196903

Call Type              Dialed

Time                   6/27/2019 6:12:15 PM UTC (Device)

Duration               00:00:02

**To**

To                     +19146196903

Case Reference: 1448-19-NYM

Date Created: 8/14/2019 2:35:15 PM

Printed: 14-Aug-2019 14:44

Page 18 of 22

1448-19-NYM--NYM-19-0130--L8Star BM70 BT Headset Phone (Verified).xry

**DX 101-18**



US DEPARTMENT OF JUSTICE

FEDERAL BUREAU OF PRISONS

BOPINTEL - FORENSICS LABORATORY

| | |
|---|---|
| Call Type | Dialed |
| Time | 6/29/2019 3:06:00 PM UTC (Device) |
| Duration | 00:00:12 |
| **To** | |
| Tel | +19146196903 |

| | |
|---|---|
| Call Type | Received |
| Direction | Incoming |
| Time | 6/22/2019 4:35:01 PM UTC (Device) |
| Duration | 00:00:09 |
| **From** | |
| Name (Matched) | marina |
| Tel | +19143558236 |

| | |
|---|---|
| Call Type | Dialed |
| Time | 7/1/2019 6:19:56 PM UTC (Device) |
| **To** | |
| Name (Matched) | chris |
| Tel | 9143089625 |

| | |
|---|---|
| Call Type | Dialed |
| Time | 7/1/2019 5:43:26 PM UTC (Device) |
| Duration | 00:00:04 |
| **To** | |
| Name (Matched) | chris |
| Tel | 9143089625 |

| | |
|---|---|
| Call Type | Dialed |
| Time | 7/1/2019 5:42:45 PM UTC (Device) |
| Duration | 00:00:04 |
| **To** | |
| Name (Matched) | chris |
| Tel | 9143089625 |

| | |
|---|---|
| Call Type | Dialed |
| Time | 7/1/2019 4:47:07 PM UTC (Device) |
| Duration | 00:00:33 |
| **To** | |
| Name (Matched) | chris |
| Tel | 9143089625 |

| | |
|---|---|
| Call Type | Dialed |

**DX 101-19**



US DEPARTMENT OF JUSTICE

FEDERAL BUREAU OF PRISONS

BOPINTEL - FORENSICS LABORATORY

| | |
|---|---|
| Time | 7/2/2019 11:16:31 AM UTC (Device) |
| Duration | 00:00:06 |
| **To** | |
| Name (Matched) | chris |
| Tel | 9143089625 |

| | |
|---|---|
| Call Type | Dialed |
| Time | 7/1/2019 6:20:06 PM UTC (Device) |
| **To** | |
| Tel | +19144900310 |

| | |
|---|---|
| Call Type | Dialed |
| Time | 6/30/2019 3:02:55 PM UTC (Device) |
| **To** | |
| Tel | +19144900310 |

| | |
|---|---|
| Call Type | Dialed |
| Time | 6/29/2019 4:20:53 PM UTC (Device) |
| Duration | 00:00:40 |
| **To** | |
| Tel | +19144900310 |

| | |
|---|---|
| Call Type | Dialed |
| Time | 6/29/2019 4:19:47 PM UTC (Device) |
| **To** | |
| Tel | +19144900310 |

| | |
|---|---|
| Call Type | Dialed |
| Time | 7/3/2019 4:17:49 AM UTC (Device) |
| **To** | |
| Tel | +19144900310 |

| | |
|---|---|
| Call Type | Received |
| Direction | Incoming |
| Time | 6/25/2019 11:53:39 AM UTC (Device) |
| Duration | 00:00:08 |
| **From** | |
| Name (Matched) | chris |
| Tel | +19143089625 |

| | |
|---|---|
| Call Type | Dialed |
| Time | 7/2/2019 11:00:58 AM UTC (Device) |
| **To** | |

Case Reference: 1448-19-NYM

Date Created: 8/14/2019 2:35:15 PM

Printed: 14-Aug-2019 14:44

Page 20 of 22

1448-19-NYM--NYM-19-0130--L8Star BM70 BT Headset Phone (Verified).xry

**DX 101-20**



US DEPARTMENT OF JUSTICE
FEDERAL BUREAU OF PRISONS
BOPINTEL - FORENSICS LABORATORY

**To**

Tel                          +15169723214


Call Type              Dialed
Time                    7/2/2019 11:00:38 AM UTC (Device)
**To**
Tel                          +15169723214


Call Type              Dialed
Time                    7/2/2019 11:00:21 AM UTC (Device)
**To**
Tel                          +15169723214


Call Type              Dialed
Time                    7/2/2019 10:17:45 AM UTC (Device)
Duration              00:38:38
**To**
Tel                          +15169723214


Call Type              Dialed
Time                    7/2/2019 11:01:57 AM UTC (Device)
Duration              00:01:28
**To**
Tel                          +15169723214


Call Type              Missed
Direction            Incoming
Time                    7/2/2019 9:57:51 AM UTC (Device)
Duration              00:00:31
**From**
Tel                          +15169723214


Call Type              Received
Direction            Incoming
Time                    6/28/2019 12:14:17 PM UTC (Device)
Duration              00:00:07
**From**
Name (Matched)    tracy
Tel                          +19145620844


Call Type              Missed
Direction            Incoming
Time                    7/2/2019 1:46:46 PM UTC (Device)

---

Case Reference: 1448-19-NYM

Date Created: 8/14/2019 2:35:15 PM

Printed: 14-Aug-2019 14:44
Page 21 of 22
1448-19-NYM--NYM-19-0130--L8Star BM70 BT Headset Phone (Verified).xry

**DX 101-21**



US DEPARTMENT OF JUSTICE
FEDERAL BUREAU OF PRISONS
BOPINTEL - FORENSICS LABORATORY

| Duration | 00:00:19 |
| --- | --- |
| **From** | |
| Tel | +19144900310 |

Case Reference: 1448-19-NYM

Date Created: 8/14/2019 2:35:15 PM

Printed: 14-Aug-2019 14:44
Page 22 of 22
1448-19-NYM--NYM-19-0130--L8Star BM70 BT Headset Phone (Verified).xry

**DX 101-22**



US DEPARTMENT OF JUSTICE
FEDERAL BUREAU OF PRISONS
BOPINTEL - FORENSICS LABORATORY

## Exhibit Data
Data entered by the program user, not extracted from device

| | |
|---|---|
| Case Reference | 1448-19-NYM |
| Exh bit Id | NYM-19-0130 |
| Case Operator | JACQUELINE DOMINGUEZ-MAYS |
| Notes | Phone received in lab locked with pin passcode with T-Mobile SIM card. |

Case Reference: 1448-19-NYM

Date Created: 8/14/2019 2:33:47 PM

Printed: 14-Aug-2019 14:45
Page 1 of 21
1448-19-NYM--NYM-19-0130--SIM Card (Verified).xry

**DX 102-1**



US DEPARTMENT OF JUSTICE
FEDERAL BUREAU OF PRISONS
BOPINTEL - FORENSICS LABORATORY

# Summary
Summary and history of this report



**US DEPARTMENT OF JUSTICE**

FEDERAL BUREAU OF PRISONS

BOPINTEL - FORENSICS LABORATORY

| | |
|---|---|
| Date Created | 8/14/2019 2:33:47 PM |
| Locked | No |
| Extraction Media | SIM |
| XRY Version | 8.0 |
| Lowest Module Version | 8.0 |
| File GUID | {1CF8C08A-EE60-46D4-B63E-4DB3A9AF1F4D} |
| XryCore Version | 1.0.107 |
| Is File Subset | No |
| Is Encrypted | No |

| Category name | Number of Items | Deleted Items |
|---|---|---|
| Device / Network Information | 15 | |
| Contacts / Contacts | 9 | |
| Messages / SMS | 9 | |
| Files / Unrecognized | 61 | |

Case Reference: 1448-19-NYM

Date Created: 8/14/2019 2:33:47 PM

Printed: 14-Aug-2019 14:45
Page 2 of 21
1448-19-NYM--NYM-19-0130--SIM Card (Verified).xry

**DX 102-2**



US DEPARTMENT OF JUSTICE

FEDERAL BUREAU OF PRISONS

BOPINTEL - FORENSICS LABORATORY

## Device/General Information
General information about the device

| | |
|---|---|
| Data |  |

| | |
|---|---|
| Attr bute | Device Family |
| Data | SIM |

| | |
|---|---|
| Attr bute | Device Name |
| Data | SIM Card (Verified) |

| | |
|---|---|
| Attr bute | Sub Model |
| Data | USIM |

| | |
|---|---|
| Attr bute | SIM Identification (ICCID) |
| Data | 8901260153736505119 |
| Storage | USIM |

| | |
|---|---|
| Attr bute | Issuer Id (from ICCID) |
| Data | Unknown Card Issuer, Anguilla (89012601); Unknown Card Issuer, Antigua and Barbuda (89012601); Unknown Card Issuer, Bahamas (89012601); Unknown Card Issuer, Barbados (89012601); Unknown Card Issuer, Bermuda (89012601); Unknown Card Issuer, British Virgin Islands (89012601); Unknown Card Issuer, Canada (89012601); Unknown Card Issuer, Cayman Islands (89012601); Unknown Card Issuer, Dominica (89012601); Unknown Card Issuer, Dominican Rep. (89012601); Unknown Card Issuer, Grenada (89012601); Unknown Card Issuer, Guam (89012601); Unknown Card Issuer, Jamaica (89012601); Unknown Card Issuer, Montserrat (89012601); Unknown Card Issuer, Northern Marianas (89012601); Unknown Card Issuer, Puerto Rico (89012601); Unknown Card Issuer, Saint Kitts and Nevis (89012601); Unknown Card Issuer, Saint Lucia (89012601); Unknown Card Issuer, Saint Vincent and the Grenadines (89012601); Unknown Card Issuer, Trinidad and Tobago (89012601); Unknown Card Issuer, Turks and Caicos Islands (89012601); Unknown Card Issuer, United States (89012601); Unknown Card Issuer, United States Virgin Islands (89012601) |
| Storage | USIM |

| | |
|---|---|
| Attr bute | Language Preference |
| Data | English |
| Storage | USIM |

| | |
|---|---|
| Attr bute | Subscr ber Id (IMSI) |
| Data | 310260153650511 |
| Storage | USIM |

| | |
|---|---|
| Attr bute | Network Code (from IMSI) |
| Data | United States (310), T-Mobile USA (260) |

Case Reference: 1448-19-NYM

Date Created: 8/14/2019 2:33:47 PM

Printed: 14-Aug-2019 14:45

Page 3 of 21

1448-19-NYM--NYM-19-0130--SIM Card (Verified).xry

**DX 102-3**



US DEPARTMENT OF JUSTICE
FEDERAL BUREAU OF PRISONS
BOPINTEL - FORENSICS LABORATORY

| Storage | USIM |
|---|---|

| Attr bute | Number |
|---|---|
| Data | 15167085275 |
| Storage | USIM |

Case Reference: 1448-19-NYM

Date Created: 8/14/2019 2:33:47 PM

Printed: 14-Aug-2019 14:45
Page 4 of 21
1448-19-NYM--NYM-19-0130--SIM Card (Verified).xry

**DX 102-4**



## Files/Unrecognized
Files with unrecognized format stored on the device or on removable media (61 items)

| | |
|---|---|
| File Name | ICC |
| File Size | 10 Bytes |
| Path | /MF/ |
| Storage | USIM |
| Hash (SHA1) | bc2afd30b6e22e831ba54750e856dfde2ec9984b |
| Index | 2fe2 |

| | |
|---|---|
| File Name | LP (Language Preference) |
| File Size | 10 Bytes |
| Path | /MF/ |
| Storage | USIM |
| Hash (SHA1) | 2b18e6c5c28902ed982305000bfb820825bf6ae2 |
| Index | 6f05 |

| | |
|---|---|
| File Name | DIR |
| File Size | 152 Bytes |
| Path | /MF/ |
| Storage | USIM |
| Hash (SHA1) | 7692572f8ed3cad085648902544b8f4729ddbc93 |
| Index | 2f00 |

| | |
|---|---|
| File Name | PL |
| File Size | 10 Bytes |
| Path | /MF/ |
| Storage | USIM |
| Hash (SHA1) | 2b18e6c5c28902ed982305000bfb820825bf6ae2 |
| Index | 2f05 |

| | |
|---|---|
| File Name | ICCID |
| File Size | 10 Bytes |
| Path | /MF/ |
| Storage | USIM |
| Hash (SHA1) | bc2afd30b6e22e831ba54750e856dfde2ec9984b |
| Index | 2fe2 |

| | |
|---|---|
| File Name | IMSI |
| File Size | 9 Bytes |
| Path | /GSM/ |
| Storage | USIM |

Case Reference: 1448-19-NYM

Date Created: 8/14/2019 2:33:47 PM

Printed: 14-Aug-2019 14:45
Page 5 of 21
1448-19-NYM--NYM-19-0130--SIM Card (Verified).xry

**DX 102-5**



US DEPARTMENT OF JUSTICE

FEDERAL BUREAU OF PRISONS

BOPINTEL - FORENSICS LABORATORY

| | |
|---|---|
| Hash (SHA1) | 8e4f590e66d227c8e67c7fad6da52ef7b0c2b840 |
| Index | 6f07 |

| | |
|---|---|
| File Name | LOCI |
| File Size | 11 Bytes |
| Path | /GSM/ |
| Storage | USIM |
| Hash (SHA1) | 516a4c3e86b8e4ec8b370ad03eab25455c1ea0d3 |
| Index | 6f7e |

| | |
|---|---|
| File Name | PSLOCI |
| File Size | 14 Bytes |
| Path | /GSM/ |
| Storage | USIM |
| Hash (SHA1) | 11098788809e32f833efb450e61d8b178df99fa2 |
| Index | 6f73 |

| | |
|---|---|
| File Name | GID1 |
| File Size | 2 Bytes |
| Path | /GSM/ |
| Storage | USIM |
| Hash (SHA1) | 70d0ea2bc55293b4dbebd9c283545828c0607b05 |
| Index | 6f3e |

| | |
|---|---|
| File Name | PLMN |
| File Size | 500 Bytes |
| Path | /GSM/ |
| Storage | USIM |
| Hash (SHA1) | 5776039332ee6e1c1f1e0864e3c7e0db952cfb9d |
| Index | 6f61 |

| | |
|---|---|
| File Name | HPLMN |
| File Size | 50 Bytes |
| Path | /GSM/ |
| Storage | USIM |
| Hash (SHA1) | 4d0335a8a6ca620b7209d6d41708a8d58dd4328a |
| Index | 6f62 |

| | |
|---|---|
| File Name | SMS |
| File Size | 5.16 KB |
| Path | /Telecom/ |
| Storage | USIM |
| Hash (SHA1) | 96a6437492470c369637016dbedb8d192af3f3f1 |

Case Reference: 1448-19-NYM

Date Created: 8/14/2019 2:33:47 PM

Printed: 14-Aug-2019 14:45

Page 6 of 21

1448-19-NYM--NYM-19-0130--SIM Card (Verified).xry

**DX 102-6**



US DEPARTMENT OF JUSTICE
FEDERAL BUREAU OF PRISONS
BOPINTEL - FORENSICS LABORATORY

| | |
|---|---|
| Index | 6f3c |
| File Name | MSISDN |
| File Size | 64 Bytes |
| Path | /AD/ |
| Storage | USIM |
| Hash (SHA1) | 80192a91df2225bfbf2480e98eeab6249d8d8a01 |
| Index | 6f40 |
| File Name | EXT5 |
| File Size | 39 Bytes |
| Path | /AD/ |
| Storage | USIM |
| Hash (SHA1) | 8501ced2aec2afddd318e2d10b171ee250e769c8 |
| Index | 6f4e |
| File Name | SMSP |
| File Size | 44 Bytes |
| Path | /Telecom/ |
| Storage | USIM |
| Hash (SHA1) | 978da7126fa575f5b5555270c3df43fb21c5a5b6 |
| Index | 6f42 |
| File Name | ICI |
| File Size | 870 Bytes |
| Path | /AD/ |
| Storage | USIM |
| Hash (SHA1) | 16f506d53a41fbe4e5270972f7d32db7e53e11ff |
| Index | 6f80 |
| File Name | EXT5 |
| File Size | 39 Bytes |
| Path | /AD/ |
| Storage | USIM |
| Hash (SHA1) | 8501ced2aec2afddd318e2d10b171ee250e769c8 |
| Index | 6f4e |
| File Name | ICT |
| File Size | 3 Bytes |
| Path | /AD/ |
| Storage | USIM |
| Hash (SHA1) | 29e2dcfbb16f63bb0254df7585a15bb6fb5e927d |
| Index | 6f82 |

Case Reference: 1448-19-NYM

Date Created: 8/14/2019 2:33:47 PM

Printed: 14-Aug-2019 14:45
Page 7 of 21
1448-19-NYM--NYM-19-0130--SIM Card (Verified).xry

**DX 102-7**



US DEPARTMENT OF JUSTICE

FEDERAL BUREAU OF PRISONS

BOPINTEL - FORENSICS LABORATORY

| File Name | OCI |
|---|---|
| File Size | 855 Bytes |
| Path | /AD/ |
| Storage | USIM |
| Hash (SHA1) | 26f286ca6b948cf62be053a9d205c6ac4993b245 |
| Index | 6f81 |

| File Name | EXT5 |
|---|---|
| File Size | 39 Bytes |
| Path | /AD/ |
| Storage | USIM |
| Hash (SHA1) | 8501ced2aec2afddd318e2d10b171ee250e769c8 |
| Index | 6f4e |

| File Name | OCT |
|---|---|
| File Size | 3 Bytes |
| Path | /AD/ |
| Storage | USIM |
| Hash (SHA1) | 29e2dcfbb16f63bb0254df7585a15bb6fb5e927d |
| Index | 6f83 |

| File Name | CCP2 |
|---|---|
| File Size | 45 Bytes |
| Path | /AD/ |
| Storage | USIM |
| Hash (SHA1) | 5f9c04b01c7a8cfae3af0834274bb4413dc57e79 |
| Index | 6f4f |

| File Name | LI |
|---|---|
| File Size | 10 Bytes |
| Path | /ADF/ |
| Storage | USIM |
| Hash (SHA1) | 2b18e6c5c28902ed982305000bfb820825bf6ae2 |
| Index | 6f05 |

| File Name | IMSI |
|---|---|
| File Size | 9 Bytes |
| Path | /ADF/ |
| Storage | USIM |
| Hash (SHA1) | 8e4f590e66d227c8e67c7fad6da52ef7b0c2b840 |
| Index | 6f07 |

Case Reference: 1448-19-NYM

Date Created: 8/14/2019 2:33:47 PM

Printed: 14-Aug-2019 14:45

Page 8 of 21

1448-19-NYM--NYM-19-0130--SIM Card (Verified).xry

**DX 102-8**



US DEPARTMENT OF JUSTICE
FEDERAL BUREAU OF PRISONS
BOPINTEL - FORENSICS LABORATORY

| File Name | KEYS |
| --- | --- |
| File Size | 33 Bytes |
| Path | /ADF/ |
| Storage | USIM |
| Hash (SHA1) | 0d40876f7a892b84300dd403cb607b30fe0d4c90 |
| Index | 6f08 |

| File Name | KEYSPS |
| --- | --- |
| File Size | 33 Bytes |
| Path | /ADF/ |
| Storage | USIM |
| Hash (SHA1) | f108a82170828981cefa14b8129720a881f91edc |
| Index | 6f09 |

| File Name | HPPLMN |
| --- | --- |
| File Size | 1 Bytes |
| Path | /ADF/ |
| Storage | USIM |
| Hash (SHA1) | bf8b4530d8d246dd74ac53a13471bba17941dff7 |
| Index | 6f31 |

| File Name | UST |
| --- | --- |
| File Size | 13 Bytes |
| Path | /ADF/ |
| Storage | USIM |
| Hash (SHA1) | 7d76b0cc4283d9df4019ba511196d58f92358824 |
| Index | 6f38 |

| File Name | CBMI |
| --- | --- |
| File Size | 10 Bytes |
| Path | /ADF/ |
| Storage | USIM |
| Hash (SHA1) | 4fb996e6acbd05e934c78313a5564c66dcfdf06a |
| Index | 6f45 |

| File Name | ACC |
| --- | --- |
| File Size | 2 Bytes |
| Path | /ADF/ |
| Storage | USIM |
| Hash (SHA1) | 9ac521e32f8e19473bc914e1af8ae423a6d8c122 |
| Index | 6f78 |

| File Name | FPLMN |
| --- | --- |

Case Reference: 1448-19-NYM

Date Created: 8/14/2019 2:33:47 PM

Printed: 14-Aug-2019 14:45
Page 9 of 21
1448-19-NYM--NYM-19-0130--SIM Card (Verified).xry

**DX 102-9**



US DEPARTMENT OF JUSTICE
FEDERAL BUREAU OF PRISONS
BOPINTEL - FORENSICS LABORATORY

| | |
|---|---|
| File Size | 12 Bytes |
| Path | /ADF/ |
| Storage | USIM |
| Hash (SHA1) | a4a22152faab8db4a63de422ae0d5852fd35b04a |
| Index | 6f7b |

| | |
|---|---|
| File Name | AD |
| File Size | 4 Bytes |
| Path | /ADF/ |
| Storage | USIM |
| Hash (SHA1) | a40dc8ca42102b7db12aeeae5f5d91a964a588a0 |
| Index | 6fad |

| | |
|---|---|
| File Name | ECC |
| File Size | 20 Bytes |
| Path | /ADF/ |
| Storage | USIM |
| Hash (SHA1) | 9e9f36a719629b413392996d1318c03023c176a7 |
| Index | 6fb7 |

| | |
|---|---|
| File Name | CBMIR |
| File Size | 40 Bytes |
| Path | /ADF/ |
| Storage | USIM |
| Hash (SHA1) | f443319695979917a03b717049235423874d2716 |
| Index | 6f50 |

| | |
|---|---|
| File Name | SMSR |
| File Size | 150 Bytes |
| Path | /ADF/ |
| Storage | USIM |
| Hash (SHA1) | 83cd042aebd0e99ed6cbd45ef2375b4dcc2dff59 |
| Index | 6f47 |

| | |
|---|---|
| File Name | CCP2 |
| File Size | 45 Bytes |
| Path | /ADF/ |
| Storage | USIM |
| Hash (SHA1) | 5f9c04b01c7a8cfae3af0834274bb4413dc57e79 |
| Index | 6f4f |

| | |
|---|---|
| File Name | HIDDENKEY |
| File Size | 4 Bytes |

Case Reference: 1448-19-NYM

Date Created: 8/14/2019 2:33:47 PM

Printed: 14-Aug-2019 14:45
Page 10 of 21
1448-19-NYM--NYM-19-0130--SIM Card (Verified).xry

**DX 102-10**



| | |
|---|---|
| Path | /ADF/ |
| Storage | USIM |
| Hash (SHA1) | d9be6524a5f5047db5866813acf3277892a7a30a |
| Index | 6fc3 |

| | |
|---|---|
| File Name | EST |
| File Size | 2 Bytes |
| Path | /ADF/ |
| Storage | USIM |
| Hash (SHA1) | 1489f923c4dca729178b3e3233458550d8dddf29 |
| Index | 6f56 |

| | |
|---|---|
| File Name | ACL |
| File Size | 500 Bytes |
| Path | /ADF/ |
| Storage | USIM |
| Hash (SHA1) | ad31d07a0843b6c7d82af8ba7304859c2140d6ea |
| Index | 6f57 |

| | |
|---|---|
| File Name | START_HFN |
| File Size | 6 Bytes |
| Path | /ADF/ |
| Storage | USIM |
| Hash (SHA1) | 66fa3883a1b35151fb13a737dc0cc11216194a0a |
| Index | 6f5b |

| | |
|---|---|
| File Name | TRESHOLD |
| File Size | 3 Bytes |
| Path | /ADF/ |
| Storage | USIM |
| Hash (SHA1) | 78670e88a9c2c711124471d2f24a8dbc8ce5dba9 |
| Index | 6f5c |

| | |
|---|---|
| File Name | OPLMNwACT |
| File Size | 500 Bytes |
| Path | /ADF/ |
| Storage | USIM |
| Hash (SHA1) | 5776039332ee6e1c1f1e0864e3c7e0db952cfb9d |
| Index | 6f61 |

| | |
|---|---|
| File Name | HPLMNwACT |
| File Size | 50 Bytes |
| Path | /ADF/ |

**DX 102-11**



US DEPARTMENT OF JUSTICE
FEDERAL BUREAU OF PRISONS
BOPINTEL - FORENSICS LABORATORY

| | |
|---|---|
| Storage | USIM |
| Hash (SHA1) | 4d0335a8a6ca620b7209d6d41708a8d58dd4328a |
| Index | 6f62 |

| | |
|---|---|
| File Name | ARR |
| File Size | 910 Bytes |
| Path | /ADF/ |
| Storage | USIM |
| Hash (SHA1) | e177974c474c247d68108aa6c9f637352438671f |
| Index | 6f06 |

| | |
|---|---|
| File Name | NETPAR |
| File Size | 218 Bytes |
| Path | /ADF/ |
| Storage | USIM |
| Hash (SHA1) | eeaeb5a3f0545c5c9e78353db671c5e6cb52d4ee |
| Index | 6fc4 |

| | |
|---|---|
| File Name | PNN |
| File Size | 300 Bytes |
| Path | /ADF/ |
| Storage | USIM |
| Hash (SHA1) | 998e94ffa89571fb3bd0ad25b011dd8bba787303 |
| Index | 6fc5 |

| | |
|---|---|
| File Name | OPL |
| File Size | 80 Bytes |
| Path | /ADF/ |
| Storage | USIM |
| Hash (SHA1) | 283187b0b4a019e303ddb3c5ab9ba9032cbb917e |
| Index | 6fc6 |

| | |
|---|---|
| File Name | MBI |
| File Size | 4 Bytes |
| Path | /ADF/ |
| Storage | USIM |
| Hash (SHA1) | a93755f8273b0e8dc4b0ecc158e5853119a24bf0 |
| Index | 6fc9 |

| | |
|---|---|
| File Name | MWIS |
| File Size | 5 Bytes |
| Path | /ADF/ |
| Storage | USIM |

Case Reference: 1448-19-NYM

Date Created: 8/14/2019 2:33:47 PM

Printed: 14-Aug-2019 14:45
Page 12 of 21
1448-19-NYM--NYM-19-0130--SIM Card (Verified).xry

**DX 102-12**



| | |
|---|---|
| Hash (SHA1) | a10909c2cdcaf5adb7e6b092a4faba558b62bd96 |
| Index | 6fca |

| | |
|---|---|
| File Name | CFIS |
| File Size | 32 Bytes |
| Path | /ADF/ |
| Storage | USIM |
| Hash (SHA1) | e09463fbe48ca36b4b82203cae3f7ee0e380920a |
| Index | 6fcb |

| | |
|---|---|
| File Name | MMSN |
| File Size | 200 Bytes |
| Path | /ADF/ |
| Storage | USIM |
| Hash (SHA1) | 56e4cd02d0cd865bcb2448b0d29cf957ad97c8da |
| Index | 6fce |

| | |
|---|---|
| File Name | KC |
| File Size | 9 Bytes |
| Path | /GSM/ |
| Storage | USIM |
| Hash (SHA1) | 753eeee319d59bc60363eb30839c17b43e1c2b1b |
| Index | 4f20 |

| | |
|---|---|
| File Name | KCGPRS |
| File Size | 9 Bytes |
| Path | /GSM/ |
| Storage | USIM |
| Hash (SHA1) | f97efeb688663bd7a52dd246766f53032fcd3247 |
| Index | 4f52 |

| | |
|---|---|
| File Name | CPBCCH |
| File Size | 8 Bytes |
| Path | /GSM/ |
| Storage | USIM |
| Hash (SHA1) | be673e8a56eaa9d8c1d35064866701c11ef8e089 |
| Index | 4f63 |

| | |
|---|---|
| File Name | INVSCAN |
| File Size | 1 Bytes |
| Path | /GSM/ |
| Storage | USIM |
| Hash (SHA1) | 5ba93c9db0cff93f52b521d7420e43f6eda2784f |

Case Reference: 1448-19-NYM

Date Created: 8/14/2019 2:33:47 PM

Printed: 14-Aug-2019 14:45
Page 13 of 21
1448-19-NYM--NYM-19-0130--SIM Card (Verified).xry

**DX 102-13**



US DEPARTMENT OF JUSTICE
FEDERAL BUREAU OF PRISONS
BOPINTEL - FORENSICS LABORATORY

| | |
|---|---|
| Index | 4f64 |

| | |
|---|---|
| File Name | OPLMNWLAN |
| File Size | 192 Bytes |
| Path | /WLAN/ |
| Storage | USIM |
| Hash (SHA1) | adfdb805c0b9ce6638ea3f12b4324817bc8fda8f |
| Index | 4f43 |

| | |
|---|---|
| File Name | UWSIDL |
| File Size | 250 Bytes |
| Path | /WLAN/ |
| Storage | USIM |
| Hash (SHA1) | 51e8796ef5c859d9ba8dd3e34d17ceefe4e89799 |
| Index | 4f44 |

| | |
|---|---|
| File Name | OWSIDL |
| File Size | 250 Bytes |
| Path | /WLAN/ |
| Storage | USIM |
| Hash (SHA1) | 51e8796ef5c859d9ba8dd3e34d17ceefe4e89799 |
| Index | 4f45 |

| | |
|---|---|
| File Name | WRI |
| File Size | 52 Bytes |
| Path | /WLAN/ |
| Storage | USIM |
| Hash (SHA1) | 2f086ceb5b9e7c9da819ac249eee8d5084ca9ee7 |
| Index | 4f46 |

| | |
|---|---|
| File Name | ADN |
| File Size | 4.30 KB |
| Path | /Phonebook/ |
| Storage | USIM |
| Hash (SHA1) | 9d2631a3da0bb2a1a6c08d34dbc39509f6412a17 |
| Index | 4f3a |

| | |
|---|---|
| File Name | PBR |
| File Size | 75 Bytes |
| Path | /Phonebook/ |
| Storage | USIM |
| Hash (SHA1) | 517c398b31985294fc995d0fab5fbb9f95dfe682 |
| Index | 4f30 |

Case Reference: 1448-19-NYM

Date Created: 8/14/2019 2:33:47 PM

Printed: 14-Aug-2019 14:45
Page 14 of 21
1448-19-NYM--NYM-19-0130--SIM Card (Verified).xry

**DX 102-14**

US DEPARTMENT OF JUSTICE
FEDERAL BUREAU OF PRISONS
BOPINTEL - FORENSICS LABORATORY

## Device/Network Information
Information related to the network (15 items)

| | |
|---|---|
| Attribute | Temporary Identity (TMSI) |
| Data | 47797480 |
| Storage | USIM |

| | |
|---|---|
| Attribute | Last Network (LAI-MCC/MNC) |
| Data | United States (310), T-Mobile USA (260) |
| Storage | USIM |

| | |
|---|---|
| Attr bute | Last Area Code (LAI-LOC) |
| Data | 7DB6 |
| Storage | USIM |

| | |
|---|---|
| Attr bute | Location Update Status |
| Data | Updated |
| Storage | USIM |

| | |
|---|---|
| Attr bute | Packet Temporary Identity (P-TMSI) |
| Data | FFFFFFFF |
| Storage | USIM |

| | |
|---|---|
| Attribute | P-TMSI Signature Value |
| Data | FFFFFF |
| Storage | USIM |

| | |
|---|---|
| Attribute | Routing Area Network (RAI-MCC/MNC) |
| Data | United States (310), T-Mobile USA (260) |
| Storage | USIM |

| | |
|---|---|
| Attr bute | Routing Area Location (RAI-LAC) |
| Data | 0000 |
| Storage | USIM |

| | |
|---|---|
| Attr bute | Routing Area Code (RAI-RAC) |
| Data | 255 |
| Storage | USIM |

| | |
|---|---|
| Attr bute | Routing Area Update Status |
| Data | Not Updated |
| Storage | USIM |

Case Reference: 1448-19-NYM

Date Created: 8/14/2019 2:33:47 PM

Printed: 14-Aug-2019 14:45
Page 15 of 21
1448-19-NYM--NYM-19-0130--SIM Card (Verified).xry

**DX 102-15**



US DEPARTMENT OF JUSTICE
FEDERAL BUREAU OF PRISONS
BOPINTEL - FORENSICS LABORATORY

| Attr bute | Group Identifier Level 1 |
|---|---|
| Data | 544D |
| Storage | USIM |

| Attr bute | PLMN Selector |
|---|---|
| Data | United States (310), Unknown Network (370); United States (310), Union Telephone Company (20); United States (311), Unknown Network (330); United States (310), Unknown Network (320); United States (310), North East Cellular Inc. (450); United States (310), West Central Wireless (180); Mexico (334), Telcel (2); Canada (302), Telus Mobility (220); Canada (302), Unknown Network (610); United Kingdom (234), T-Mobile UK (30); Japan (440), NTT DoCoMo Hokuriku Inc. (20); Dominican Rep. (370), Orange Dominicana, S.A. (1); Spain (214), Vodafone (1); China (460), China Mobile (0); Germany (262), T-Mobile Deutschland GmbH (1); France (208), Orange France (1); Italy (222), Telecom Italia Mobile (TIM) (1); Colombia (732), Telfónica Móviles Colombia S.A. (123); Philippines (515), Smart Communications (3); United Arab Emirates (424), Etisalat (2); Thailand (520), Unknown Network (-467995); Taiwan (466), Taiwan Mobile Co. Ltd (97); Peru (716), Unknown Network (60); Netherlands (204), BEN Nederland B.V. (16); Greece (202), Cosmote (1); Guatemala (704), Telefónica Centroamérica Guatemala S.A. (3); Afghanistan (412), Roshan (20); Israel (425), Cellcom Israel Ltd. (2); Egypt (602), Vodafone Egypt (2); Kuwait (419), Mobile Telecommunications Company (2); El Salvador (706), Unknown Network (-635396); Russian Federation (250), Mobile Telesystems (1) |
| Storage | USIM |

| Attr bute | Operator PLMN Selector |
|---|---|
| Data | United States (310), Unknown Network (370); United States (310), Union Telephone Company (20); United States (311), Unknown Network (330); United States (310), Unknown Network (320); United States (310), North East Cellular Inc. (450); United States (310), West Central Wireless (180); Mexico (334), Telcel (2); Canada (302), Telus Mobility (220); Canada (302), Unknown Network (610); United Kingdom (234), T-Mobile UK (30); Japan (440), NTT DoCoMo Hokuriku Inc. (20); Dominican Rep. (370), Orange Dominicana, S.A. (1); Spain (214), Vodafone (1); China (460), China Mobile (0); Germany (262), T-Mobile Deutschland GmbH (1); France (208), Orange France (1); Italy (222), Telecom Italia Mobile (TIM) (1); Colombia (732), Telfónica Móviles Colombia S.A. (123); Philippines (515), Smart Communications (3); United Arab Emirates (424), Etisalat (2); Thailand (520), Unknown Network (-467995); Taiwan (466), Taiwan Mobile Co. Ltd (97); Peru (716), Unknown Network (60); Netherlands (204), BEN Nederland B.V. (16); Greece (202), Cosmote (1); Guatemala (704), Telefónica Centroamérica Guatemala S.A. (3); Afghanistan (412), Roshan (20); Israel (425), Cellcom Israel Ltd. (2); Egypt (602), Vodafone Egypt (2); Kuwait (419), Mobile Telecommunications Company (2); El Salvador (706), Unknown Network (-635396); Russian Federation (250), Mobile Telesystems (1) |
| Storage | USIM |

| Attr bute | HPLMN Selector |
|---|---|
| Data | United States (310), T-Mobile USA (260) (4000); United States (310), T-Mobile USA (260) (UTRAN); United States (310), T-Mobile USA (260) (GSM) |
| Storage | USIM |

| Attr bute | SMS Parameters |
|---|---|
| Data | T-Mobile SCA:+12063130004 PID:00 DCS:00 VP:FF |
| Storage | USIM |

Case Reference: 1448-19-NYM

Date Created: 8/14/2019 2:33:47 PM

Printed: 14-Aug-2019 14:45
Page 16 of 21
1448-19-NYM--NYM-19-0130--SIM Card (Verified).xry

**DX 102-16**



US DEPARTMENT OF JUSTICE
FEDERAL BUREAU OF PRISONS
BOPINTEL - FORENSICS LABORATORY

## Messages/SMS

SMS messages sent or received from the device (9 items)

| | |
|---|---|
| Text | Hey unlocked? |
| Status | Unread |
| Time | 7/2/2019 5:52:01 PM UTC-04:00 (Network) |
| Storage | USIM |
| Index | 1 |
| Direction | Incoming |
| Type | Deliver |
| Service Center | +14054720057 |
| **From** | |
| Name (Matched) | Kym |
| Tel | +15169723214 |

| | |
|---|---|
| Text | U ok? |
| Status | Unread |
| Time | 7/2/2019 7:20:28 PM UTC-04:00 (Network) |
| Storage | USIM |
| Index | 2 |
| Direction | Incoming |
| Type | Deliver |
| Service Center | +14054720057 |
| **From** | |
| Name (Matched) | Kym |
| Tel | +15169723214 |

| | |
|---|---|
| Text | you're going to win your case be famous make lots of money And do whatever you want wherever you want when you get out |
| Status | Unsent |
| Storage | USIM |
| Index | 3 |
| Direction | Outgoing |
| Type | Submit |

| | |
|---|---|
| Text | Nicole Dedcovich 213 Willow Drive Great Neck http://ddzfuvehjb.co/G7LMI |
| Status | Unread |
| Time | 7/2/2019 8:44:35 PM UTC-04:00 (Network) |
| Storage | USIM |
| Index | 4 |
| Direction | Incoming |
| Type | Deliver |

Case Reference: 1448-19-NYM

Date Created: 8/14/2019 2:33:47 PM

Printed: 14-Aug-2019 14:45
Page 17 of 21
1448-19-NYM--NYM-19-0130--SIM Card (Verified).xry

**DX 102-17**



US DEPARTMENT OF JUSTICE
FEDERAL BUREAU OF PRISONS
BOPINTEL - FORENSICS LABORATORY

| | |
|---|---|
| Service Center | +14054720057 |
| **From** | |
| Tel | +17753620768 |

| | |
|---|---|
| Text | piece of shit |
| Status | Sent |
| Storage | USIM |
| Index | 6 |
| Direction | Outgoing |
| Type | Submit |
| **To** | |
| Tel | +19145620844 |

| | |
|---|---|
| Text | jeep |
| Status | Sent |
| Storage | USIM |
| Index | 7 |
| Direction | Outgoing |
| Type | Submit |
| **To** | |
| Name (Matched) | Kym |
| Tel | +15169723214 |

| | |
|---|---|
| Text | no worries babe |
| Status | Sent |
| Storage | USIM |
| Index | 10 |
| Direction | Outgoing |
| Type | Submit |
| **To** | |
| Name (Matched) | Kym |
| Tel | +15169723214 |

| | |
|---|---|
| Text | he answered me 15 min ago |
| Status | Sent |
| Storage | USIM |
| Index | 14 |
| Direction | Outgoing |
| Type | Submit |
| **To** | |
| Name (Matched) | m grry |
| Tel | +19143461319 |

Case Reference: 1448-19-NYM

Date Created: 8/14/2019 2:33:47 PM

Printed: 14-Aug-2019 14:45
Page 18 of 21
1448-19-NYM--NYM-19-0130--SIM Card (Verified).xry

**DX 102-18**



US DEPARTMENT OF JUSTICE
FEDERAL BUREAU OF PRISONS
BOPINTEL - FORENSICS LABORATORY

| | |
|---|---|
| Text | the guards here are so ghetto. woman guards wear wigs, fake eyelashes and 3 inch nails |
| Status | Sent |
| Storage | USIM |
| Index | 15 |
| Direction | Outgoing |
| Type | Submit |
| **To** | |
| Tel | +19145620844 |

Case Reference: 1448-19-NYM

Date Created: 8/14/2019 2:33:47 PM

Printed: 14-Aug-2019 14:45
Page 19 of 21
1448-19-NYM--NYM-19-0130--SIM Card (Verified).xry

**DX 102-19**



US DEPARTMENT OF JUSTICE

FEDERAL BUREAU OF PRISONS

BOPINTEL - FORENSICS LABORATORY

## Contacts/Contacts

Contacts stored in the device, on the SIM card or on removable media (9 items)

| Name | Kym |
| --- | --- |
| Tel | 5169723214 |
| Storage | USIM |
| Index | 1 |

| Name | m grry |
| --- | --- |
| Tel | 9143461319 |
| Storage | USIM |
| Index | 3 |

| Name | jim |
| --- | --- |
| Tel | +18454943025 |
| Storage | USIM |
| Index | 4 |

| Name | barb |
| --- | --- |
| Tel | +19145222207 |
| Storage | USIM |
| Index | 6 |

| Name | pauly |
| --- | --- |
| Tel | 9733901822 |
| Storage | USIM |
| Index | 7 |

| Name | weider |
| --- | --- |
| Tel | +19144900310 |
| Storage | USIM |
| Index | 8 |

| Name | patty |
| --- | --- |
| Tel | +19142555331 |
| Storage | USIM |
| Index | 11 |

| Name | tim |
| --- | --- |
| Tel | +16466276712 |
| Storage | USIM |
| Index | 12 |

Case Reference: 1448-19-NYM

Date Created: 8/14/2019 2:33:47 PM

Printed: 14-Aug-2019 14:45

Page 20 of 21

1448-19-NYM--NYM-19-0130--SIM Card (Verified).xry

**DX 102-20**



US DEPARTMENT OF JUSTICE
FEDERAL BUREAU OF PRISONS
BOPINTEL - FORENSICS LABORATORY

| Name | rich |
| --- | --- |
| Tel | +19146196903 |
| Storage | USIM |
| Index | 14 |

Case Reference: 1448-19-NYM

Date Created: 8/14/2019 2:33:47 PM

Printed: 14-Aug-2019 14:45
Page 21 of 21
1448-19-NYM--NYM-19-0130--SIM Card (Verified).xry

**DX 102-21**

 **U.S. Department of Justice**
Federal Bureau of Prisons

P R O G R A M   S T A T E M E N T
OPI:  CPD/CPB
NUMBER:  5265.14
DATE:  April 5, 2011

# Correspondence

/s/
*Approved*: Harley G. Lappin
Director, Federal Bureau of Prisons

## 1. PURPOSE AND SCOPE

### § 540.10 Purpose and scope.

**The Bureau of Prisons encourages correspondence that is directed to socially useful goals.  The Warden shall establish correspondence procedures for inmates in each institution, as authorized and suggested in this rule.**

Institution guidelines concerning correspondence will be made widely available to staff and inmates through posting on bulletin boards, placement in the institution library, or other appropriate means.

### a. Summary of Changes

*Policy Rescinded*
P5265.11    Correspondence (7/9/99)

This edition of the Program Statement incorporates changes that have occurred since its last publication and initiatives resulting from the Reduction and Elimination of Duties Management Assessment Project (REDMAP):

- Now requires that funds intended for an inmate's commissary account will be mailed by the sender directly to the centralized commissary account center.
- Eliminates outgoing special/legal mail drop-boxes.

**Federal Regulations from 28 CFR are shown in this type.**
Implementing instructions are shown in this type.

DX 103-1

- Institutions with a TRULINCS-generated mailing label system will ensure inmates use the mailing labels on all outgoing correspondence.
- Eliminates requirement to obtain subsequent authorization for inmates" with prior approval to correspond with immediate family members or co-defendants housed in a federal or non-federal facility.

b. **Program Objectives.**  Expected results of this program are:

- Inmates will be able to send and receive correspondence per established procedures.
- Incoming and outgoing general correspondence will be subject to monitoring, reading, and inspection.
- Restrictions on general correspondence will be enforced for an inmate because of misconduct or for classification purposes.
- Incoming correspondence deemed inappropriate will be rejected.
- An inmate without funds will be provided a limited amount of postage stamps and mailing materials.
- An inmate will be permitted to possess a limited quantity of postage stamps.
- An inmate will be permitted to receive funds through the mail.

c. **Pretrial, Holdover, and Detainee Inmates**.  Specific sections of this Program Statement pertain to either designated inmates or inmates in pretrial, detainee, or holdover status.

2.  **DEFINITIONS**

**§ 540.2 Definitions.**

**(a)  *General correspondence* means incoming or outgoing correspondence other than *special mail*.  *General correspondence* includes packages sent through the mail.**

General correspondence refers to traditional mail sent or received via the U.S. Postal Service.  For the purpose of this policy, general correspondence refers to inmate mail only.

The Warden or designee must give prior approval for an inmate to receive or send a package (see the Program Statement **Mail Management Manual**).  Procedures for incoming publications are discussed in the Program Statement **Incoming Publications**. Procedures for inmate electronic messaging are addressed in the Program Statement **Trust Fund Limited Inmate Computer System (TRULINCS) — Electronic Messaging**.

**(1)  *Open general correspondence* means general correspondence which is not limited to a list of authorized correspondents, except as provided in § 540.17.**

28 CFR § 540.17 refers to Section 9 of this Program Statement.

**(2)  *Restricted general correspondence* means general correspondence which is limited to a list of authorized correspondents.**

**(b)  *Representatives of the news media* means persons whose principal employment is to gather or report news for:**

**(1)  A newspaper which qualifies as a general circulation newspaper in the community in which it is published.  A newspaper is one of "general circulation" if it circulates among the general public and if it publishes news of a general character of general interest to the public such as news of political, religious, commercial, or social affairs.  A key test to determine whether a newspaper qualifies as a "general circulation" newspaper is to determine whether the paper qualifies for the purpose of publishing legal notices in the community in which it is located or the area to which it distributes;**

**(2)  A news magazine which has a national circulation and is sold by newsstands and by mail subscription to the general public;**

**(3)  A national or international news service; or**

**(4)  A radio or television news program, whose primary purpose is to report the news, of a station holding a Federal Communications Commission license.**

**(c)  *Special mail* means correspondence *sent to* the following:  President and Vice President of the United States, the U.S. Department of Justice (including the Bureau of Prisons), U.S. Attorneys Offices, Surgeon General, U.S. Public Health Service, Secretary of the Army, Navy, or Air Force, U.S. Courts (including U.S. Probation Officers), Members of the U.S. Congress, Embassies and Consulates, Governors, State Attorneys General, Prosecuting Attorneys, Directors of State Departments of Corrections, State Parole Commissioners, State Legislators, State Courts, State Probation Officers, other Federal and State law enforcement offices, attorneys, and representatives of the news media.**

The Centers for Disease Control (CDC) is part of the U.S. Public Health Service; correspondence sent to the CDC is considered special mail.

An inmate is expected to use the special mail privilege responsibly.  Refer questions concerning alleged abuses to the Office of General Counsel.

P5265.14    4/5/2011    **Federal Regulations are shown in this type**.    Implementing instructions: this type.    3

**DX 103-3**

**Special mail also includes correspondence received from the following: President and Vice President of the United States, attorneys, Members of the U.S. Congress, Embassies and Consulates, the U.S. Department of Justice (excluding the Bureau of Prisons but including U.S. Attorneys), other Federal law enforcement officers, State Attorneys General, Prosecuting Attorneys, Governors, U.S. Courts (including U.S. Probation Officers), and State Courts.  For incoming correspondence to be processed under the special mail procedures (see §§ 540.18--540.19), the sender must be adequately identified on the envelope, and the front of the envelope must be marked "Special Mail — Open only in the presence of the inmate".**

28 CFR §§ 540.18-19 refers to Sections 10 and 11, respectively, of this Program Statement.

d.  *Warden* is defined in 28 CFR 500.1, separately published, as "... the chief executive officer of a U.S. Penitentiary, Federal Correctional Institution, Medical Center for Federal Prisoners, Federal Prison Camp, Federal Detention Center, Metropolitan Correctional Center, or any federal penal or correctional institution or facility. „Warden‟ also includes any staff member with authority explicitly delegated by any chief executive officer."

3.  **MAIL DEPOSITORIES**

**§ 540.11 Mail depositories.**

**The Warden shall establish at least one mail depository within the institution for an inmate to place outgoing correspondence.  The Warden may establish a separate mail depository for outgoing special mail.  Each item placed in a mail depository must contain a return address. (see § 540.12(d)).**

28 CFR § 540.12(d) refers to Section 4.d. of this Program Statement.

The Warden of Federal Detention Centers, Metropolitan Correctional Centers, and Metropolitan Detention Centers will establish a mail depository to allow an attorney to "hand-deliver" legal mail to the institution (see the **Mail Management Manual**).  Other facilities housing pretrial inmates may also establish a mail depository for attorneys to "hand-deliver" special mail.

4.  **CONTROLS AND PROCEDURES**

**§ 540.12 Controls and procedures.**

**(a)  The Warden shall establish and exercise controls to protect individuals, and the security, discipline, and good order of the institution.  The size, complexity, and security level of the institution, the degree of sophistication of the inmates confined, and other variables require flexibility in correspondence procedures. All Wardens shall establish open general correspondence procedures.**

**DX 103-4**

Open general correspondence privileges may be given to inmates who are able to exercise them responsibly. Care should be taken during orientation and thereafter to help inmates understand their responsibility for open correspondence privileges.

**(b) Staff shall inform each inmate in writing promptly after arrival at an institution of that institution's rules for handling of inmate mail. This notice includes the following statement:**

**The staff of each institution of the Bureau of Prisons has the authority to open all mail addressed to you before it is delivered to you. "Special Mail" (mail from the President and Vice President of the U.S., attorneys, Members of the U.S. Congress, Embassies and Consulates, the U.S. Department of Justice (excluding the Bureau of Prisons but including U.S. Attorneys), other Federal law enforcement officers, State Attorneys General, Prosecuting Attorneys, Governors, U.S. Courts (including U.S. Probation Officers), and State Courts) may be opened only in your presence to be checked for contraband. This procedure occurs only if the sender is adequately identified on the envelope and the front of the envelope is marked "Special Mail — Open only in the presence of the inmate." Other mail may be opened and read by the staff.**

**If you do not want your *general* correspondence opened and read, the Bureau will return it to the Postal Service. This means that you will not receive such mail. You may choose whether you want your general correspondence delivered to you subject to the above conditions, or returned to the Postal Service. Whatever your choice, special mail will be delivered to you, after it is opened in your presence and checked for contraband. You can make your choice by signing Part I or Part II.**

If the inmate elects not to have his/her general correspondence opened and read or refuses to sign the notice, a copy of the refusal is forwarded to the mail room (notice follows this section).

**Part I — General Correspondence to be Returned to the Postal Service**

**I have read or had read to me the foregoing notice regarding mail. I do not want my general correspondence opened and read. I REQUEST THAT THE BUREAU OF PRISONS RETURN MY GENERAL CORRESPONDENCE TO THE POSTAL SERVICE. I understand that special mail will be delivered to me, after it is opened in my presence and checked for contraband.**

_____       _____       _____
**(Name)                        (Reg. No.)              (Date)**

**DX 103-5**

**Part II — General Correspondence to be Opened, Read, and Delivered**

**I have read or had read to me the foregoing notice regarding mail, I WISH TO RECEIVE MY GENERAL CORRESPONDENCE.  I understand that the Bureau of Prisons may open and read my general correspondence if I choose to receive same.  I also understand that special mail will be delivered to me, after it is opened in my presence and checked for contraband.**

_____        _____        _____
**(Name)                        (Reg. No.)            (Date)**

_____

**Inmate _____   _____, refused to sign this form.  He (she) was**
            **(NAME)        (REG. NO.)**
**advised by me that the Bureau of Prisons retains the authority to open and read all general correspondence.  The inmate was also advised that his (her) refusal to sign this form will be interpreted as an indication that he (she) wishes to receive general correspondence subject to the conditions in Part II above.**

_____          _____
**Staff Member's Signature              Date**

The above notice is included as part of the Acknowledgment of Inmate (BP-A0407**)**.

**(c)  Staff shall inform an inmate that letters placed in the U.S. Mail are placed there at the request of the inmate and the inmate must assume responsibility for the contents of each letter.  Correspondence containing threats, extortion, etc., may result in prosecution for violation of federal laws.  When such material is discovered, the inmate may be subject to disciplinary action, the written material may be copied, and all material may be referred to the appropriate law enforcement agency for prosecution.**

**(d)  The inmate is responsible for filling out the return address completely on envelopes provided for the inmate's use by the institution.  If the inmate uses an envelope not provided by the institution, the inmate is responsible for ensuring that the envelope used contains all return address information listed on the envelope provided by the institution.**

All envelopes, whether preprinted envelopes ordered through UNICOR or written by the inmate, must have a return address with the:

- Inmate's name.
- Register number.
- Name of the institution.

P5265.14   4/5/2011   **Federal Regulations are shown in this type**.   Implementing instructions: this type.      6

**DX 103-6**

- P.O. Box (or street address if there is no P.O. Box).
- City, state, and ZIP code.

In addition, all outgoing mail, for institutions with a TRULINCS-generated mailing label system, must utilize these mailing labels on all outgoing correspondence, in accordance with the Program Statement **Trust Fund Limited Inmate Computer System (TRULINCS) — Electronic Messaging**.  Consistent with this TRULINCS Program Statement, if an inmate fails to place the TRULINCS-generated label on outgoing postal mail, the mail is returned to the inmate for proper preparation.

## 5.  NOTIFICATION OF REJECTIONS

**§ 540.13 Notification of rejections.**

**When correspondence is rejected, the Warden shall notify the sender in writing of the rejection and the reasons for the rejection.  The Warden shall also give notice that the sender may appeal the rejection.  The Warden shall also notify an inmate of the rejection of any letter addressed to that inmate, along with the reasons for the rejection and shall notify the inmate of the right to appeal the rejection.  The Warden shall refer an appeal to an official other than the one who originally disapproved the correspondence.  The Warden shall return rejected correspondence to the sender unless the correspondence includes plans for or discussion of commission of a crime or evidence of a crime, in which case there is no need to return the correspondence or give notice of the rejection, and the correspondence should be referred to appropriate law enforcement authorities.  Also, contraband need not be returned to the sender.**

The Warden may not delegate the authority to reject correspondence or sign notification letters below the level of Associate Warden.

Section 6.d outlines the basis for determining whether correspondence should be rejected.  Returned Correspondence (BP-A0327) is used to notify the involved parties of the rejection. "Nuisance" contraband is returned to the sender using Stamps, Negotiable Instrument & Other Returned to Sender (BP-A0328).

The Warden acknowledges receipt of an appeal from the sender of a rejected letter and designates the appropriate staff to respond.  When the Warden makes the initial rejection, a subsequent appeal by a non-inmate sender is referred to the Regional Office.

If the Warden is doubtful about the propriety of an incoming or outgoing letter or has questions concerning the interpretation of regulations, he/she may refer the problem to the Regional Correctional Programs Administrator or the Regional Counsel.  In case of rejection, the offending content is reproduced and retained for a reasonable period (at least 3 months), to have it available if the rejection is appealed.

**DX 103-7**

## 6.  GENERAL CORRESPONDENCE

**§ 540.14 General correspondence.**

**(a)  Institution staff shall open and inspect all incoming general correspondence. Incoming general correspondence may be read as frequently as deemed necessary to maintain security or monitor a particular problem confronting an inmate.**

**(b)  Except for "special mail," outgoing mail from a pretrial inmate may not be sealed by the inmate and may be read and inspected by staff.**

**(c) (1)  Outgoing mail from a sentenced inmate in a minimum or low security level institution may be sealed by the inmate and, except as provided for in paragraphs (c)(1)(i) through (iv) of this section, is sent out unopened and uninspected.  Staff may open a sentenced inmate's outgoing general correspondence:**

**(i)  If there is reason to believe it would interfere with the orderly running of the institution, that it would be threatening to the recipient, or that it would facilitate criminal activity;**

**(ii)  If the inmate is on a restricted correspondence list;**

**(iii)  If the correspondence is between inmates (see § 540.17); or**

28 CFR § 540.17 refers to Section 9 of this Program Statement.

**(iv)  If the envelope has an incomplete return address.**

**(2)  Except for "special mail," outgoing mail from a sentenced inmate in a medium or high security level institution, or an administrative institution may not be sealed by the inmate and may be read and inspected by staff.**

See the Program Statement **Inmate Security Designation and Custody Classification** for identification of security levels.

(3)  **Mail Monitoring**.  Each institution establishes procedures for monitoring incoming and outgoing mail.  Institutions may wish to give closer scrutiny to incoming and outgoing mail of inmates, for example, who:

- ■  Participated in criminal activity of a sophisticated nature.
- ■  Committed crimes that involved mail or fraudulent schemes.
- ■  Are considered escape risks.

**DX 103-8**

■ Present management problems (i.e., interference /disruption of the orderly running of the institution).

The staff member designated to supervise correspondence may keep a list of such inmates. Monitoring procedures may not interfere with mail handling.

(4) **Reading and Inspection**. As stated in this section, all incoming general correspondence and outgoing mail in medium, high, and administrative institutions (except "special mail") is subject to random reading by correctional staff. The objectives of reading mail differ from the objectives of inspection. For *inspection* (to which all incoming general correspondence is subjected), the objective is primarily to detect contraband. The random *reading* of mail is intended to reveal, for example, escape plots, plans to commit illegal acts, plans to violate institution rules, or other security concerns.

(5) **Disclosure**. When reading correspondence, a staff member may incidentally learn information about the private lives of inmates or their correspondents. Bureau staff must be sensitive to the fact that most information in correspondence is private, and must be handled discreetly. Unless there is a legitimate correctional concern relating to security, safety, orderly running of the institution, criminal activity, or inmate rehabilitation, the contents of reviewed correspondence should not be revealed to any other person.

**(d)  The Warden may reject correspondence sent by or to an inmate if it is determined detrimental to the security, good order, or discipline of the institution, to the protection of the public, or if it might facilitate criminal activity. Correspondence which may be rejected by a Warden includes, but is not limited to, correspondence which contains any of the following:**

**(1)  Matter which is nonmailable under law or postal regulations;**

**(2)  Matter which depicts, describes, or encourages activities which may lead to the use of physical violence or group disruption;**

This includes any printed material individually identified as placing that inmate, another inmate, or staff at risk of assault or other safety concerns.

**(3)  Information of escape plots, of plans to commit illegal activities, or to violate Bureau rules or institution guidelines;**

**(4)  Direction of an inmate's business (See § 541.13, Prohibited Act No. 408).  An inmate, unless a pre-trial detainee, may not direct a business while confined.**

**This does not, however, prohibit correspondence necessary to enable an inmate to protect property and funds that were legitimately the inmate's at the time of commitment.  Thus, for example, an inmate may correspond about refinancing an**

P5265.14   4/5/2011   **Federal Regulations are shown in this type**.   Implementing instructions: this type.     9

**DX 103-9**

**existing mortgage or sign insurance papers, but may not operate a mortgage or insurance business while in the institution.**

§ 541.13, Prohibited Act No. 408, refers to Chapter 4 of the Program Statement **Inmate Discipline and Special Housing Units**.

**(5)  Threats, extortion, obscenity, or gratuitous profanity;**

**(6)  A code;**

**(7)  Sexually explicit material (for example, personal photographs) which by its nature or content poses a threat to an individual's personal safety or security, or to institution good order; or**

Nude or sexually suggestive photos (individual prints or copies as opposed to those from publications) present a special concern for personal safety, security, and good order.  This is particularly true when the subject is an inmate's relative, friend, or acquaintance.  For these reasons, ordinarily an inmate is not permitted to receive through the mail a personal photograph in which the subject is nude, displays genitalia or female breasts, or when the photo depicts sexual suggestive acts such as intercourse, fellatio, or sodomy.

The exclusion of this or similar materials is determined by whether it would be detrimental to an individual's safety or security, or to institution good order, if it were in the inmate's possession.  For purposes of this section, clippings from publications are considered correspondence.  For the rule on publications, see the Program Statement **Incoming Publications**.

**(8)  Contraband.  (See § 500.1 of this chapter.  A package received without prior authorization by the Warden is considered to be contraband.)**

28 CFR 500.1 is contained in Section 2.d. of this Program Statement.

Multiple copies of printed materials intended for inmate distribution and third-party mailing are also considered contraband.

7.  **RESTRICTED GENERAL CORRESPONDENCE**

**§ 540.15 Restricted general correspondence.**

**(a)  The Warden may place an inmate on restricted general correspondence based on misconduct or as a matter of classification.**

For this restriction, the term "classification" is used to identify categories of behavior.

**Determining factors include the inmate's:**

P5265.14   4/5/2011    **Federal Regulations are shown in this type**.   Implementing instructions: this type.      10

**DX 103-10**

**(1)  Involvement in any of the activities listed in § 540.14(d);**

28 CFR § 540.14(d) is contained in Section 6.d. of this Program Statement.

**(2)  Attempting to solicit funds or items (e.g., samples), or subscribing to a publication without paying for the subscription;**

**(3)  Being a security risk;**

**(4)  Threatening a government official; or**

**(5)  Having committed an offense involving the mail.**

**(b)  The Warden may limit to a reasonable number persons on the approved restricted general correspondence list of an inmate.**

A recommendation to place an inmate on restricted correspondence is made by the unit team during the inmate˙s program review or by the Unit Disciplinary Committee (UDC) or Disciplinary Hearing Officer (DHO), when restricted correspondence is required by an infraction of an institution rule.

Action taken by the UDC or DHO as a disciplinary sanction is ordinarily based on a finding of violation of correspondence regulations.

**(c)  The Warden shall use one of the following procedures before placing an inmate on restricted general correspondence.**

**(1)  Where the restriction will be based upon an incident report, procedures must be followed in accordance with inmate disciplinary regulations (part 541, subpart B of this chapter).**

Part 541, subpart B, refers to the Program Statement **Inmate Discipline and Special Housing Units**.

**(2)  Where there is no incident report, the Warden:**

**(i)  Shall advise the inmate in writing of the reasons the inmate is to be placed on restricted general correspondence;**

**(ii)  Shall give the inmate the opportunity to respond to the classification or change in classification; the inmate has the option to respond orally or to submit written information or both; and**

**DX 103-11**

**(iii)  Shall notify the inmate of the decision and the reasons, and shall advise the inmate that the inmate may appeal the decision under the Administrative Remedy Procedure.**

**(d)  When an inmate is placed on restricted general correspondence, the inmate may, except as provided in §§ 540.16 and 540.17:**

28 §§ CFR 540.16 and 540.17 refer to Sections 8 and 9, respectively, of this Program Statement.

**(1)  Correspond with the inmate's spouse, mother, father, children, and siblings, unless the correspondent is involved in an violation of correspondence regulations, or would be a threat to the security or good order of the institution;**

The word "spouse" includes a common-law relationship which has previously been established in a state which recognizes this status.  In states that do not, a common-law relationship is not considered "immediate family."  For determination of applicable state laws, consult the Regional Counsel.

**(2)  Request other persons also to be placed on the approved correspondence list, subject to investigation, evaluation, and approval by the Warden; with prior approval, the inmate may write to a proposed correspondence to obtain a release authorizing an investigation; and**

**(3)  Correspond with former business associates, unless it appears to the Warden that the proposed correspondent would be a threat to the security or good order of the institution, or that the resulting correspondence could reasonably be expected to result in criminal activity.  Correspondence with former business associates is limited to social matters.**

**Verification Procedures**.  Each year it becomes more difficult to obtain information from law enforcement agencies on proposed correspondents.  For this reason, staff attempt to secure information from other sources, including the inmate, the proposed correspondent, and the U.S. Probation Officer.  Each institution develops its own verification procedures, depending on the sophistication of its inmates and resources for verification.

A release from the individual in question may be necessary (for example, under the Privacy Act) to complete the investigation.  If a release is needed, the inmate is responsible for obtaining it, and is permitted to write to the correspondent for this purpose.

**(e)  The Warden may allow an inmate additional correspondence with persons other than those on the inmate's approved mailing list when the correspondence is shown to be necessary and does not require an addition to the mailing list because it is not of an ongoing nature.**

P5265.14   4/5/2011   **Federal Regulations are shown in this type**.   Implementing instructions: this type.      12

**DX 103-12**

8.  **INMATE CORRESPONDENCE WHILE IN SEGREGATION AND HOLDOVER STATUS**

**§ 540.16 Inmate correspondence while in segregation and holdover status.**

**(a)  The Warden shall permit an inmate in holdover status (i.e., enroute to a designated institution) to have correspondence privileges similar to those of other inmates insofar as practical.**

**(b)  The Warden shall permit an inmate in segregation to have full correspondence privileges unless placed on restricted general correspondence under § 540.15.**

28 CFR § 540.15 refers to Section 7 of this Program Statement.

9.  **CORRESPONDENCE BETWEEN CONFINED INMATES**

**§ 540.17 Correspondence between confined inmates.**

**An inmate may be permitted to correspond with an inmate confined in any other penal or correctional institution if the other inmate is either a member of the immediate family, or is a party or witness in a legal action in which both inmates are involved.  Such correspondence may be approved in other exceptional circumstances, with particular regard to the security level of the institution, the nature of the relationship between the two inmates, and whether the inmate has other regular correspondence.  The following additional limitations apply:**

Inmates must provide current documentation (dated within the past six months) to support both inmates are parties to or a witness in a current legal action.  At subsequent inmate team reviews, inmates will provide supporting documentation to continue correspondence privileges.

**(a)  Such correspondence at institutions of all security levels may always be inspected and read by staff at the sending and receiving institutions (it may not be sealed by the inmate); and**

If inspection of the correspondence reveals communication other than a legal matter, the unit manager will be advised and a determination will be made whether to disapprove further correspondence.  If privileges are rescinded, the unit manager or designee will ensure mail room and trust fund staff are notified.

**(b)  (1)  The appropriate unit manager at each institution must approve of the correspondence if both inmates are housed in Federal institutions and both inmates are members of the same immediate family or are a party or witness in a legal action in which both inmates are involved.**

**DX 103-13**

The Warden is appraised of unusual circumstances pertaining to a request (e.g., inmates who have Central Inmate Monitoring assignments and/or disruptive group members) to correspond, for members of the same immediate family or for inmates who are a party or witness in the same legal action, for inmates housed in federal facilities.

Normally, the approval of mail correspondence privileges will apply to electronic messages generated via TRULINCS.  The approval of correspondence privileges for both inmates will remain in effect even if either is transferred within the Bureau.  The unit team will forward a copy of the approved mail correspondence to the mail room and trust fund staff for processing.

Unit team staff will review the status of previously approved correspondence during the inmate's classification/program review.  When denying an inmate's request to correspond with immediate family, the unit manager will document the reason(s) for the denial.

**(2)  The Wardens of both institutions must approve of the correspondence if one of the inmates is housed at a non-Federal institution or if approval is being granted on the basis of exceptional circumstances.**

The Warden documents a denial or the rationale for approving the request for an inmate to correspond with an inmate, who is an immediate family member or a party or witness in the same legal action, housed in a non-federal facility/contract facility.

The approval of correspondence privileges for the inmate will remain in effect even when the inmate transfers within the Bureau.  Unit team will review previously approved correspondence for either of the above circumstances.  Unit team will forward a copy of the approval for mail correspondence to mail room staff.

10.  **SPECIAL MAIL**

**§ 540.18 Special mail.**

**(a)  The Warden shall open incoming special mail only in the presence of the inmate for inspection for physical contraband and the qualification of any enclosures as special mail.  The correspondence may not be read or copied if the sender is adequately identified on the envelope, and the front of the envelope is marked "Special Mail — Open only in the presence of the inmate".**

Incoming mail meeting these requirements must be treated per this rule.  The Warden may, however, treat incoming mail that does not meet all requirements for special mail handling in the same fashion as special mail, including opening it in the inmate's presence and inspecting it only for contraband.  For example, mail from the chambers of a Federal judge or from a Member of Congress should be given special handling even if it does not have a special mail marking on the envelope.

P5265.14   4/5/2011   **Federal Regulations are shown in this type**.   Implementing instructions: this type.   14

**DX 103-14**

Similarly, mail from an adequately identified sender that contains markings similar to the phrase "Special Mail — Open only in the presence of the inmate" may be given special handling. Examples of similar markings include "Attorney-Client — Open only in the presence of the inmate" and "Legal Mail — Open only in the presence of the inmate."

**(b)  In the absence of either adequate identification or the "special mail" marking indicated in paragraph (a) of this section appearing on the envelope, staff may treat the mail as general correspondence and may open, inspect, and read the mail.**

**(c)  (1) Except as provided for in paragraph (c)(2) of this section, outgoing special mail may be sealed by the inmate and is not subject to inspection.**

**(2)  Special mail shall be screened in accordance with the provisions of paragraph (c)(2)(iii) of this section when the special mail is being sent by an inmate who has been placed on restricted special mail status.**

**(i)  An inmate may be placed on restricted special mail status if the Warden, with the concurrence of the Regional Counsel, documents in writing that the special mail either has posed a threat or may pose a threat of physical harm to the recipient (e.g., the inmate has previously used special mail to threaten physical harm to a recipient).**

**(ii)  The Warden shall notify the inmate in writing of the reason the inmate is being placed on restricted special mail status.**

**(iii)  An inmate on restricted special mail status must present all materials and packaging intended to be sent as special mail to staff for inspection.  Staff shall inspect the special mail material and packaging, in the presence of the inmate, for contraband.  If the intended recipient of the special mail has so requested, staff may read the special mail for the purpose of verifying that the special mail does not contain a threat of physical harm.  Upon completion of the inspection, staff shall return the special mail material to the inmate if the material does not contain contraband, or contain a threat of physical harm to the intended recipient. The inmate must then seal the special mail material in the presence of staff and immediately give the sealed special mail material to the observing staff for delivery.  Special mail determined to pose a threat to the intended recipient shall be forwarded to the appropriate law enforcement entity.  Staff shall send a copy of the material, minus the contraband, to the intended recipient along with notification that the original of the material was forwarded to the appropriate law enforcement entity.**

**(iv)  The Warden shall review an inmate's restricted special mail status at least once every 180 days.  The inmate is to be notified of the results of this review.  An**

P5265.14    4/5/2011    **Federal Regulations are shown in this type**.    Implementing instructions: this type.    15

**DX 103-15**

**inmate may be removed from restricted special mail status if the Warden determines, with the concurrence of the Regional Counsel, that the special mail does not threaten or pose a threat of physical harm to the intended recipient.**

**(v)  An inmate on restricted mail status may seek review of the restriction through the Administrative Remedy Program.**

**(d)  Except for special mail processed in accordance with paragraph (c)(2) of this section, staff shall stamp the following statement directly on the back side of the inmate's outgoing special mail:**

**"The enclosed letter was processed through special mailing procedures for forwarding to you.  The letter has neither been opened nor inspected.  If the writer raises a question or problem over which this facility has jurisdiction, you may wish to return the material for further information or clarification.  If the writer encloses correspondence for forwarding to another addressee, please return the enclosure to the above address."**

The stamp includes the above statement, the name and address of the institution and space for the date.

11.  **LEGAL CORRESPONDENCE**

**§ 540.19 Legal correspondence.**

**(a)  Staff shall mark each envelope of incoming legal mail (mail from courts or attorneys) to show the date and time of receipt, the date and time the letter is delivered to an inmate and opened in the inmate's presence, and the name of the staff member who delivered the letter.  The inmate may be asked to sign as receiving the incoming legal mail.  This paragraph applies only if the sender has marked the envelope as specified in § 540.18.**

28 CFR § 540.18 refers to Section 10 of this Program Statement.

Staff are expected to develop a master log containing the above information.  The inmate may be requested (but not required) to sign the log, indicating receipt of the legal mail.  If the inmate refuses, staff note this in the log.

**(b)  The inmate is responsible for advising any attorney that correspondence will be handled as special mail only if the envelope is marked with the attorney's name and an indication that the person is an attorney, and the front of the envelope is marked "Special Mail — Open only in the presence of the inmate".**

**DX 103-16**

**Legal mail shall be opened in accordance with special mail procedures (see § 540.18).**

28 CFR § 540.18 refers to Section 10 of this Program Statement.

**(c) Grounds for the limitation or denial of an attorney's correspondence rights or privileges are stated in part 543, subpart B. If such action is taken, the Warden shall give written notice to the attorney and the inmate affected.**

Part 543, subpart B, refers to the Program Statement **Inmate Legal Activities**.

Any violation of the attorney/client correspondence privilege is referred to Regional Counsel, who, in conjunction with the Office of General Counsel, may restrict the inmate or attorney from further correspondence privileges.

**(d) In order to send mail to an attorney's assistant or to a legal aid student or assistant, an inmate shall address the mail to the attorney or legal aid supervisor, or the legal organization or firm, to the attention of the student or assistant.**

See the Program Statement **Inmate Legal Activities** for information concerning Bureau recognition of an attorney's assistant or legal aid student assistant.

**(e) Mail to an inmate from an attorney's assistant or legal aid student or assistant, in order to be identified and treated by staff as special mail, must be properly identified on the envelope as required in paragraph (b) of this section, and must be marked on the front of the envelope as being mail from the attorney or from the legal aid supervisor.**

12. **INMATE CORRESPONDENCE WITH REPRESENTATIVES OF THE NEWS MEDIA**

**§ 540.20 Inmate correspondence with representatives of the news media.**

**(a) An inmate may write through "special mail" to representatives of the news media specified by name or title (see § 540.2(b)).**

28 CFR § 540.2(b) refers to Section 2.b. of this Program Statement.

Properly identified and labeled correspondence from an inmate who is not on restricted mail status to qualifying news media representatives is sealed and forwarded without inspection, directly and promptly. Properly identified and labeled correspondence from an inmate on restricted special mail status is also sealed and forwarded promptly, but may be subject to inspection per procedures in Section 10. If there is doubt whether a representative qualifies, contact the Public Information Officer in the Central Office.

**DX 103-17**

**(b)  The inmate may not receive compensation or anything of value for correspondence with the news media.  The inmate may not act as reporter.**

**(c)  Representatives of the news media may initiate correspondence with an inmate.  Staff shall open incoming correspondence from representatives of the media and inspect for contraband, for its qualification as media correspondence, and for content which is likely to promote either illegal activity or conduct contrary to Bureau regulations.**

See the Program Statement **News Media Contacts** on other aspects of contact with news media.

13.   **PAYMENT OF POSTAGE**

**§ 540.21 Payment of postage.**

**(a)  Except as provided in paragraphs (d), (e), (f), and (i) of this section, postage charges are the responsibility of the inmate.  The Warden shall ensure that the inmate commissary has postage stamps available for purchase by inmates.**

Mail room staff should obtain postage rate charts from the local servicing post office and place them where inmates ordinarily have access — the mail room or housing units.

(1)  **Postage Sold by Commissary**.  The inmate commissary must have available sufficient stamp denominations to allow mailing letters in excess of 1 ounce, but not requiring an additional first-class stamp.

(2)  **Purchase Limitation**.  The Warden issues local guidelines, which ordinarily limit an inmate's commissary purchase per visit to 20 postage stamps (denomination for first-class, domestic, 1-ounce mailing), or the equivalent; if such visits are limited to once per week or less, the Warden may authorize an additional purchase of stamps.

(3)  **Inmate Possession of Postage Stamps**.  The Warden issues local guidelines, limiting an inmate's possession of stamps at one time to no more than 60 (denomination for first-class, domestic, 1-ounce mailing), or the equivalent.  The Warden may authorize possession of stamps to a specified amount in excess of this limit.  The stamps are to be maintained by the inmate in the same manner the stamps are sold or in the manner provided by the unit manager.

(4)  **Approval for Additional Purchases**.  An inmate may be authorized to purchase (per commissary visit) more than 20 postage stamps (denomination for first-class, domestic, 1-ounce mailing), or the equivalent, only upon approval of the associate warden.  This authority may not be delegated below unit manager.

**DX 103-18**

**(b)  Writing paper and envelopes are provided at no cost to the inmate.  Inmates who use their own envelopes must place a return address on the envelope (see § 540.12(d)).**

28 CFR § 540.12(d) refers to Section 4(d) of this Program Statement.

**(c)  Inmate organizations will purchase their own postage.**

**(d)  An inmate who has neither funds nor sufficient postage and who wishes to mail legal mail (includes courts and attorneys) or Administrative Remedy forms will be provided the postage stamps for such mailing.  To prevent abuses of this provision, the Warden may impose restrictions on the free legal and administrative remedy mailings.**

(1)  To prevent abuses of Bureau directives regarding purchase of postage, Wardens will:

- Provide an inmate who has neither funds nor postage up to five postage stamps (denomination for first-class, domestic, 1-ounce mailing) or the equivalent each week, for legal mail or Administrative Remedy filing
- Require an inmate who has, for at least two separate months, depleted his/her commissary account, obtained Government-paid postage stamps, and then restored money to the account to complete the form for reimbursement Request for Withdrawal of Inmate˝s Personal Funds (BP-199) for the amount of postage given for legal mail or Administrative Remedy filings. Commissary staff hold the BP-199 and charge it against the inmate˝s account as soon as he/she has funds (see the Program Statement **Trust Fund Management Manual**).
- Allow an inmate to purchase sufficient postage for legal mail or Administrative Remedy mailings.  The amount may not exceed the limit for postage purchases.

(2)  The associate warden makes a final determination whether the inmate is to receive postage under the conditions of this subsection.  An "inmate without funds" means an inmate without sufficient commissary balance to purchase a postage stamp sufficient for first-class, 1-ounce domestic mailing.  This authority may not be delegated below unit manager.

**(e)  When requested by an inmate who has neither funds nor sufficient postage, and upon verification of this status by staff, the Warden shall provide the postage stamps for mailing a reasonable number of letters at government expense to enable the inmate to maintain community ties.  To prevent abuses of this provision, the Warden may impose restrictions on the free mailings.**

Five letters per month are suggested as reasonable in most circumstances.  To prevent abuses, the Warden may require reimbursement as provided in Section 13(d)(1).  The associate warden (not to be delegated below unit manager) makes a final determination on whether the inmate is to receive postage under this subsection.

**DX 103-19**

In making this determination, an "inmate without funds" means an inmate without sufficient commissary balance to purchase a postage stamp sufficient for first-class, 1-ounce domestic mailing, or postage for half-ounce international air mail for an inmate whose community ties require foreign correspondence.

**(f)  Mailing at government expense is also allowed for necessary correspondence in verified emergency situations for inmates with neither funds nor sufficient postage.**

The associate warden makes a final determination whether the inmate is to receive postage stamps under this subsection.  This authority may not be delegated below unit manager.

**(g)  Inmates must sign for all stamps issued to them by institution staff.**

A separate log is kept for this purpose.

**(h)  Mail received with postage due is not ordinarily accepted by the Bureau of Prisons.**

The mail room staff refuses postage-due mail.  However, if such mail is tendered to mail room staff without collection of postage due, it is processed without further collection action (see the **Mail Management Manual**).

**(i)  Holdovers and pre-trial commitments will be provided a reasonable number of stamps for the mailing of letters at government expense.**

Three letters per week is suggested as reasonable in most circumstances.  Commissary purchase of postage is also available to pretrial inmates.  For holdovers, additional Government-furnished postage stamps may be allowed for special needs demonstrated by the inmate.

**(j)  Inmates may not be permitted to receive stamps or stamped items (e.g., envelopes embossed with stamps, postal cards with postage affixed) other than by issuance from the institution or by purchase from commissary.**

Stamps and stamped items sent into the institution are returned to the sender.  Indicate the reason for return on Form BP-A0328, Stamps, Negotiable Instrument & Other Returned to Sender.  A copy of the form is placed with the correspondence for delivery to the inmate.  See the **Mail Management Manual** for further information.

k.  The institution's business manager is responsible for the purchase and security of stamps purchased by the Bureau for issue to inmates per Section 13.d.  The business manager also conducts quarterly audits.

P5265.14   4/5/2011   **Federal Regulations are shown in this type**.   Implementing instructions: this type.   20

**DX 103-20**

14. **SPECIAL POSTAL SERVICES**

**§ 540.22  Special postal services.**

The information in this section was extracted from the **Mail Management Manual**.  See that policy for more detailed information.

**(a)  An inmate, at no cost to the government, may send correspondence by registered, certified, or insured mail, and may request a return receipt.**

**(b)  An inmate may insure outgoing personal correspondence (e.g., a package containing the inmate's hobbycrafts) by completing the appropriate form and applying sufficient postage.**

The Request Authorization to Mail Inmate Package (BP-329) form is used.

**(1)  In the event of loss or damage, any claim relative to this matter is made to the U.S. Postal Service, either by the inmate or the recipient.  The U.S. Postal Service will only indemnify a piece of insured mail for the actual value of an item, regardless of declared value.**

When an inmate decides that a claim is necessary for an incoming piece of insured mail, he/she is advised that the mailer is the most appropriate person to file the claim with the U.S. Postal Service.

**(2)  Inmate packages forwarded as a result of institution administration are considered official mail, except as otherwise specified (for example, hobbycraft articles mailed out of the institution).  Official mail is not insured.  If such an item is subsequently lost or damaged in the mail process the inmate may file a tort claim with the Bureau of Prisons (see part 543, subpart C of this chapter).**

Such packages are forwarded as official mail at Government expense.  If documentation indicates that the package left Bureau control and was lost or damaged by the U.S. Postal Service (or mailed via a contract mail provider), the inmate is instructed to file a tort claim with the U.S. Postal Service (or directly with the contract mail provider) (see the Program Statement **Federal Tort Claims Act**).  Hobbycraft articles are discussed in the Program Statement **Inmate Recreation Programs**.

**(c)  Certified mail is sent first class at the inmate's expense.**

The inmate must pay basic postage, costs of certification, and costs of a return receipt (if requested).

**DX 103-21**

**(d)  An inmate may not be provided such services as express mail, COD, private carriers, or stamp collecting while confined.**

15.   **INMATE FUNDS RECEIVED THROUGH THE MAILS**

**§ 540.23 Inmate funds received through the mails.**

**Except as provided for in part 506 of this chapter, funds enclosed in inmate correspondence are to be rejected.  Deposits intended for the inmate's commissary account must be mailed directly to the centralized commissary account (see 28 CFR part 506).**

Section 2 of the Acknowledgment of Inmate, Part 1 & 2 (BP-A0407) contains an authorization for disposition of funds.  The inmate ordinarily completes this form upon initial entry into Bureau custody.  Negotiable instruments must include the inmate's full name and register number.

Negotiable instruments received through the mail enclosed in inmate correspondence are rejected using the Stamps, Negotiable Instrument and Other Returned to Sender form (BP-A0328).

Inmates are not permitted to receive unsolicited funds through the mail, nor are inmates permitted to solicit funds or initiate requests for funds other than from family and friends.

b. Staff should be alert to unusual activity concerning funds received for posting to an inmate's account or being mailed out of the institution.  For example, accounting technicians, unit staff and others should notify the unit manager when an inmate receives a large amount of money either in a lump sum or over a short period of time or has unusual activity in his/her account.  The unit manager determines whether an appropriate reason exists for such activity or if a referral to the captain is necessary.

16.   **RETURNED MAIL**

**§ 540.24 Returned mail.**

**Staff shall open and inspect for contraband all undelivered mail returned to an institution by the Post Office before returning it to the inmate.  The purpose of this inspection is to determine if the content originated with the inmate sender identified on the letter or package; to prevent the transmission of material, substances, and property which an inmate is not permitted to possess in the institution; and to determine that the mail was not opened or tampered with before its return to the institution.  Any remailing is at the inmate's expense.  Any returned mail qualifying as "special mail" is opened and inspected for contraband in the inmate's presence.**

P5265.14   4/5/2011   **Federal Regulations are shown in this type**.   Implementing instructions: this type.      22

**DX 103-22**

17.  **CHANGE OF ADDRESS AND FORWARDING OF MAIL FOR INMATES**

**§ 540.25 Change of address and forwarding of mail for inmates.**

**(a)  Staff shall make available to an inmate who is being released or transferred appropriate Bureau of Prisons and U.S. Postal Service forms for change of address.**

A U.S. Postal Service "Change of Address" kit is made available to each inmate being transferred to notify correspondents.  (**Note**:  The "kit" is a notice to publishers, businesses, correspondents, etc.; it is **not** a notification to the U.S. Postal Service.)  Staff obtain supplies of these kits from the servicing U.S. postal facility.  Kits are kept in Receiving and Discharge and the mail room for inmates leaving the institution.

**(b)  Inmates are responsible for informing their correspondents of a change of address.**

**(c)  Postage for mailing change of address cards is paid by the inmate**.

**(d)  Except as provided in paragraphs (e) through (g) of this section, all mail received for a released or transferred inmate will be returned to the U.S. Postal Service for disposition in accordance with U.S. Postal Service regulations.**

**(e)  Staff shall use all means practicable to forward special mail.**

The Program Statement **Mail Management Manual** provides more detailed instructions on forwarding inmate special mail.

**(f)  Staff shall forward inmate general correspondence to the new address for a period of 30 days.**

Inmate general mail (as opposed to special mail) is forwarded to the new address for 30 days. General mail is forwarded to the address in the SENTRY database.  After 30 days, general mail is returned to the sender with the notation "Not at this address — return to sender."

**(g)  Staff shall permit an inmate released temporarily on writ to elect either to have general correspondence held at the institution for a period not to exceed 30 days, or returned to the U.S. Postal Service for disposition.**

Use the form Disposition of General Correspondence While Inmate is Released Temporarily on Writ (BP-A0398).

**(1)  If the inmate refuses to make this election, staff at the institution shall document this refusal, and any reasons, in the inmate's central file.  Staff shall**

P5265.14   4/5/2011   **Federal Regulations are shown in this type**.   Implementing instructions: this type.   23

**DX 103-23**

**return to the U.S. Postal Service all general correspondence received for such as inmate after the inmate's departure.**

Document the refusal on the Disposition of General Correspondence While Inmate is Released Temporarily on Writ (BP-A0398).

**(2)  If the inmate does not return from writ within the time indicated, staff shall return to the U.S. Postal Service all general correspondence being held for that inmate for disposition in accordance with postal regulations.**

## 18.   INSTITUTION SUPPLEMENT

Each institution must update its Institution Supplement (IS) and forward a copy to the Regional Correctional Programs Administrator.  The IS includes:

- Designation of a staff member to supervise inmate correspondence.
- Procedures for monitoring incoming and outgoing mail, including inspection and reading mail, especially to and from particular inmates.
- Use of a master log to note receipt and inmate acknowledgment of incoming legal mail.
- Limitations on the amount of postage stamps an inmate may possess and single purchases of stamps.
- Restrictions on free legal and administrative remedy mailings.

## REFERENCES

*Program Statements*
P1315.07     Legal Activities, Inmate (11/5/99)
P1320.06     Federal Tort Claims Act (8/1/03)
P1330.16     Administrative Remedy Program (12/31/07)
P1480.05     News Media Contacts (9/21/00)
P4500.07     Trust Fund/Deposit Fund Manual (4/19/10)
P5100.08     Inmate Security Designation and Custody Classification (9/12/06)
P5265.13     Trust Fund Limited Inmate Computer System (TRULINCS)
                  — Electronic Messaging (2/19/09)
P5266.10     Incoming Publications (1/10/03)
P5270.08     Inmate Discipline and Special Housing Units (12/4/09)
P5370.11     Recreation Programs, Inmate (6/28/08)
P5800.16     Mail Management Manual (4/5/11)
P5800.15     Correctional Systems Manual (1/01/09)
P7331.04     Pretrial Inmates (1/31/03)

P5265.14   4/5/2011   **Federal Regulations are shown in this type**.   Implementing instructions: this type.       24

**DX 103-24**

*Federal Regulations*

Federal Regulations cited in this Program Statement are contained in 28 CFR part 540.

*ACA Standards*

- 2nd Edition Standards for Administration of Correctional Agencies:  2-CO-5D-01
- 4th Edition Standards for Adult Correctional Institutions:  4-4266, 4-4275, 4-4279, 4-4487, 4-4488, 4-4489, 4-4491, 4-4492 and 4-4496
- 4th Edition Standards for Adult Local Detention Facilities:  4-ALDF-2A-60, 4-ALDF-6A-02, 4-ALDF-6A-04, 4-ALDF-5B-05, 4-ALDF-5B-06, 4-ALDF-5B-08 and 4-ALDF-5B-09

*Records Retention Requirements*

Requirements and retention guidance for records and information applicable to this program are available in the Records and Information Disposition Schedule (RIDS) on Sallyport.

**DX 103-25**



**U.S. Department of Justice**
Federal Bureau of Prisons

# Program Statement

**OPI:** CPD/PSB
**NUMBER:** P5324.08
**DATE:** 4/5/2007
**SUBJECT:** Suicide Prevention Program

**RULES EFFECTIVE:** 3/15/2007

1.  **PURPOSE AND SCOPE.**  The Bureau of Prisons (Bureau) operates a suicide prevention program to assist staff in identifying and managing potentially suicidal inmates.  Each Warden will ensure that a suicide prevention program is implemented consistent with this policy.  In addition, Wardens will facilitate a discussion regarding the issue of suicide at department head meetings, staff recalls, lieutenants' meetings, etc., to heighten staff awareness about the need to detect and report any changes in inmate behavior that might suggest suicidal intent.

2.  **SUMMARY OF CHANGES.**  This re-issuance adds the following new procedures for preventing inmate suicides:

   a.  Suicide prevention training will include three mock suicide emergencies per year, one on each shift.  One of these exercises must be conducted in the Special Housing Unit (SHU) during the morning or evening watch.

   b.  Specific minimum criteria that must be included in a Suicide Risk Assessment and a Post-Watch Report are delineated.

   c.  Designation of a room for suicide watch outside of the Health Services area requires written approval of the Regional Director.

   d.  Specific criteria that exclude an inmate from consideration for an inmate companion position are delineated.

   e.  Correctional Services will notify Psychology Services when an inmate requests protective custody (PC).  Psychology Services will no longer be required to monitor SENTRY for entry of a PC code.

3.  **PROGRAM OBJECTIVES.**  The expected results of this program are:

   a.  All institution staff will be trained to recognize signs and information that may indicate a potential suicide.

**DX 104-1**

P5324.08
4/5/2007
Page 2

b.   Staff will act to prevent suicides with appropriate
sensitivity, supervision, and referrals.

c.   Any inmate clinically found to be suicidal will receive
appropriate preventive supervision, counseling, and other
treatment.

4.   **DIRECTIVES AFFECTED**

a.   **Directive Rescinded**

P5324.05   Suicide Prevention Program (3/1/04)

b.   **Directives Referenced**

P5270.07   Inmate Discipline and Special Housing Units
           (12/29/87)
P5290.14   Admission and Orientation Program (4/3/03)
P5310.12   Psychology Services Manual (8/13/93)
P5566.06   Use of Force and Application of Restraints
           (11/30/05)
P6031.01   Patient Care (1/15/05)
P6340.04   Psychiatric Services (1/15/05)

c.   Rules cited in this Program Statement are contained in
28 CFR 552.40 through 552.41.

5.   **STANDARDS REFERENCED**

a.   American Correctional Association Standards for Adult
Correctional Institutions, 4th Edition: 4-4084,4-4084-1,4-
4370M,4-4371M,and 4-4373M.

b.   American Correctional Association Performance Based
Standards for Adult Local Detention Facilities, 4th Edition: 4-
ALDF-7B-08,4-ALDF-7B-10,4-ALDF-7B-10-1,4-ALDF-4C-29M,4-ALDF-4C-
30M,and 4-ALDF-4C-32M.

6.   **INSTITUTION SUPPLEMENT.**   See Section 7a.

7.   **POLICY**.   Each Bureau institution, other than Medical Referral
Centers (MRCs), will implement a suicide prevention program that
conforms to the procedures outlined in this policy.   Each Bureau
medical center is to develop specific written procedures
consistent with the specialized nature of the institution and the
intent of this policy.

a.   **Medical Referral Centers.**   MRCs serve a unique
evaluation/treatment function addressing the needs of a wide
range of inmates, while meeting community standards of care.
Psychology Services is responsible for developing an Institution
Supplement that describes local procedures for managing the

**DX 104-2**

P5324.08
4/5/2007
Page 3

Suicide Prevention Program's components.

MRC psychologists are to document significant treatment information in the Psychological Data System (PDS) so that the information is readily available for post-discharge treatment.

   b.   **Residential Reentry Center Contract Facilities.**   When contracts for outside facilities (including Residential Reentry Centers (RRCs)) are used, the Statement of Work will include a suicide prevention plan or program that meets accepted Bureau standards.

Community Corrections Managers (CCMs) will monitor contract facilities regularly to determine their capability to manage at-risk populations effectively.  The CCM will consult the Regional Psychology Services Administrator if questions arise about the adequacy of a contract facility's Suicide Prevention Program or about the need to transfer a suicidal inmate to a different facility.  The CCM will contact Central Office Psychology Services when there is system-wide or interagency issues.

In the event of a suicide, all possible evidence and documentation will be preserved to provide data and support for subsequent investigators doing a psychological reconstruction. Ordinarily, the Regional Director will authorize an after-action review of a suicide at a RRC, to be conducted by the Regional Psychology Administrator.  The findings will be documented as a Psychological Reconstruction Report as outlined in Attachment A.

   c.   **Privately-Managed Contract Prisons.**   Private security contract facilities maintain a suicide prevention and intervention program in compliance with American Correctional Association (ACA) standards.  Ordinarily, the Assistant Director, Correctional Programs Division, will authorize an after-action review of a suicide at a contract private prison, to be conducted under the direction of the Central Office Psychology Services Administrator.  The findings will be documented as a Psychological Reconstruction Report as outlined in Attachment A.

8.   **PROGRAM ADMINISTRATION**.

   a.   **Program Coordinator**.   Each institution must have a Program Coordinator for the institution's suicide prevention program. The Program Coordinator shall be responsible for managing the treatment of suicidal inmates and for ensuring that the institution's suicide prevention program conforms to the guidelines for training, identification, referral, assessment, and intervention outlined in this policy.

Ordinarily, the Chief Psychologist will be the Program Coordinator.  The Program Coordinator's responsibilities will not be delegated to staff other than a doctoral-level psychologist.

**DX 104-3**

P5324.08
4/5/2007
Page 4

The Program Coordinator, in conjunction with institution executive staff, must ensure that adequate coverage is available when he or she is absent from the institution for training, annual leave, etc.

   b.  **Training**.  While the initial period of incarceration is often a critical time for detecting potential suicides, serious suicidal crises may arise at any time.  Line staff are often the first to identify signs of potential suicidal behavior based on their frequent interactions with inmates.

The Program Coordinator is responsible for ensuring that appropriate training is available to staff.  The Program Coordinator will ensure that all staff will be trained (ordinarily by psychology services personnel) to recognize signs indicative of a potential suicide, the appropriate referral process, and suicide prevention techniques.

Wardens will include discussions of suicide prevention at department head meetings, staff recalls, etc., to remind staff of the need to observe inmates constantly for signs of suicidal behavior.

   1)  **Training for All Staff.**  Suicide prevention training will be included in the Introduction to Correctional Techniques curriculum.  Training in local suicide prevention procedures will be provided during Institution Familiarization Training and Annual Training (AT) at all institutions.

   Training for staff will focus on:

   ◆    identifying suicide risk factors;

   ◆    typical inmate profiles of completed suicides;

   ◆    recognition of potentially suicidal behavior;

   ◆    appropriate information associated with identifying and referring suicidal inmates;

   ◆    responding to a suicide emergency (e.g., a suicide in progress), including location and proper use of suicide cut-down tool; and

   ◆    name of Program Coordinator, location of suicide watch room, etc.

   2)  **Supplemental Speciality Training.**  The Program Coordinator will offer supplemental training to staff having frequent inmate contacts. Ordinarily, supplemental specialty training for health services staff (i.e., Physician's Assistants, Nurse Practitioners, Emergency Medical Technicians, Registered

**DX 104-4**

P5324.08
4/5/2007
Page 5

Nurses), lieutenants, and correctional counselors is offered approximately six months after the conclusion of institution AT. It is encouraged that this training be provided during regularly scheduled meetings when possible.

3) **Supplemental Training for Special Housing Unit (SHU) Staff.** Information about recognizing potentially suicidal inmates and procedures to follow will be included in the SHU post orders. Attachment B is an example of post orders for suicide prevention in a SHU.

4) **Emergency Response Training.** At a minimum, the Captain and Chief Psychologist will jointly conduct three mock suicide emergencies yearly, one on each shift, approximately four months apart. Complexes will complete the exercises separately at each institution within the complex.

- Within the calendar year, at least one of these exercises will be conducted in the SHU during the evening or morning watch. (Institutions that do not have a SHU [e.g., Camps] are exempted from this requirement, but are still required to conduct three mock suicide emergencies yearly).

- Confirmation of mock suicide emergency training will occur in writing to the Associate Warden over Psychology Services with a copy to the Suicide Prevention Program Coordinator for placement in a training documentation file. See sample memorandum format in Attachment C.

- This training is in addition to the supplemental speciality training for lieutenants, health services staff, and correctional counselors.

9. **IDENTIFICATION OF AT-RISK INMATES.**

a. **Medical Staff Screening**. Medical staff are to screen a newly admitted inmate for signs that the inmate is at risk for suicide. Ordinarily, this screening is to take place within twenty-four hours of the inmate's admission to the institution.

- The Physician's Assistant/Nurse Practitioner (PA/NP) will refer suicidal or emotionally disturbed inmates on an emergency basis to the Program Coordinator or designee.

b. **Psychological Intake**.

1) **Pre-Trial Detainees, Pre-Sentence Detainees, and Holdovers in MCCs, MDCs, FDCs, FTCs, or Jails**. Because of the high rate of admissions and short length of stay in MCCs, MDCs,

**DX 104-5**

P5324.08
4/5/2007
Page 6

FDCs, FTCs and Detention units, the comprehensive psychological intake conducted by Psychology Services ordinarily will be performed only on inmates who are suspected of being suicidal or appear psychologically unstable (e.g., mental illness or significant substance abuse withdrawal), or who request services via the Psychology Services Inmate Questionnaire.

2) **Newly Assigned or Writ-Return Inmates**.  For newly assigned designated inmates or writ-return inmates, a psychologist will conduct a comprehensive psychological intake within 14 days of the inmate's admission to the institution.

3) **Transferred Inmates**.  For transferred inmates, a psychologist will conduct a comprehensive psychological intake within 30 days of the inmate's admission to the institution if the psychologist determines it is clinically warranted based upon the PSIQ and other available inmate records.

c. **Inmates in SHUs.**  Inmates in Administrative Detention or Disciplinary Segregation status often may be at higher risk for suicidal behavior.  Inmates being transferred into the SHU will be monitored for signs of potential suicide risk (e.g., crying, emotionally distraught, threats of self-harm, or engaging in misconduct to purposefully effect removal from the general population).  Inmates exhibiting such behavior will be referred to the Shift Lieutenant.

1) **Protective Custody (PC) Inmates.**  Inmates requesting protective custody or demanding to be housed alone may actually be contemplating suicide.  When an inmate requests protective custody or demands to be celled alone, Correctional Services staff will immediately:

- ◆ notify the Program Coordinator or designee in Psychology Services during normal business hours, or

- ◆ during non-routine working hours notify the on-call psychologist.

The PC inmate should be screened for suicidal ideation **within 72 hours** of being placed into SHU.  When clinically indicated by this screening, a formal Suicide Risk Assessment will be conducted.

The Program Coordinator will work closely with custody staff to monitor each PC inmate's mental status for behavior (e.g., hopelessness, anxiety, increasing agitation, depression, psychoses) that suggests a need for an increased level of services.

2) **Inmates Requiring Special Precautions.**  The Program Coordinator will provide SHU staff with a list ("hot list") of

**DX 104-6**

P5324.08
4/5/2007
Page 7

inmates with mental health conditions who may become dangerous, self-destructive, or suicidal when placed into the SHU.

- ◆ This list will be updated as needed and distributed to Correctional Services, Health Services, and Unit Team staff.  This list will be made available to all staff.

- ◆ When an inmate on this "hot list" is placed into the SHU, a Correctional Services Supervisor will notify Psychology Services immediately.

   3) **SHU Custodial Issues**.

    A) **Program Coordinator Involvement.**  At a minimum, the Program Coordinator or designee will make weekly rounds of SHUs and consult with staff in those areas concerning any inmates needing special attention.

    B) **Review of Lieutenant's Log.**  The Program Coordinator will review the Lieutenant's log each working day to determine if an inmate with mental health problems has been placed in the SHU.  A psychologist will see the inmate as soon as possible to assess the inmate's mental status and alert SHU staff.

    C) **Health Services.** Health Services policy contains procedures to ensure inmates placed in SHU continue to received needed medications.

- ◆ Psychology Services will be notified whenever an inmate refuses or misses his/her medication.  If the inmate has the potential to become violent, self-destructive, or suicidal without the medication, psychologists will notify SHU staff of this.

    D) **Suicide Rescue Tool.**  Every SHU will be equipped with a suicide rescue tool(s) that is sharp, stored in a secure location, and readily available.  All SHU staff will be trained to use the tool and in the procedures for responding to a suicide emergency.

    E) **Inmate Removal from the SHU.**  The Program Coordinator will arrange to have an inmate exhibiting significant potential for suicide removed from the SHU and placed on suicide watch. Ordinarily, once the crisis is over, the inmate will be returned to the SHU to satisfy any sanction that was imposed.

  d.  **Staff Referral**.  **Any staff** may identify an inmate as potentially suicidal **at any time** based upon the inmate's observed behavior.

**DX 104-7**

P5324.08
4/5/2007
Page 8

DX 104-8

P5324.08
4/5/2007
Page 9

**STAFF MUST NEVER TAKE LIGHTLY ANY INMATE SUICIDE
THREATS OR ATTEMPTS OR ANY INFORMATION OR HINTS FROM
OTHER INMATES ABOUT AN INMATE BEING POTENTIALLY
SUICIDAL.**

Any staff member who has reason to believe an inmate may be
suicidal should:

♦ ordinarily maintain the inmate under direct, continuous
observation,

♦ contact the Shift Lieutenant for assistance, and

♦ during regular working hours, contact the Program
Coordinator or designee (i.e., any other available
psychologist).

♦ During non-routine working hours, the Shift Lieutenant
will contact the on-call psychologist and continue
direct, continuous observation, or immediately place
the inmate on suicide watch.

In emergency situations, the Shift Lieutenant will immediately
place the inmate on suicide watch.  It should be noted that in
emergency situations **any staff** member may place an inmate on
suicide watch.  Special procedures may apply to MRCs where the
initiation of suicide watch may be limited to specific clinical
staff.

   e.  **Inmate Referral**.  In addition to staff, inmates can play a
vital role in helping to prevent inmate suicides.  To facilitate
this process each institution will encourage inmate referrals by:

♦ including a statement in the institution inmate
handbook/orientation materials encouraging inmates to
notify staff of any behavior or situation that may
suggest an inmate is upset and potentially suicidal,

♦ incorporating the topic of inmate referrals into the
Admissions and Orientation lesson plan for Psychology
Services,

♦ placing posters in each housing unit addressing the
topic, and

♦ ensuring that the information is made available to
inmates in multiple languages as appropriate,
particularly Spanish.

**DX 104-9**

P5324.08
4/5/2007
Page 10

10.  **SUICIDE RISK ASSESSMENT OF IDENTIFIED INMATES**.  During regular working hours inmates referred for assessment of suicide potential will be seen on a priority basis.  During non-regular hours, the Program Coordinator or designee should consult with institution staff and may choose to see the inmate immediately or have the inmate placed on suicide watch.  In either case, the inmate will receive an individual assessment within 24 hours of referral.

A Suicide Risk Assessment will be completed when:

◆    staff refer an inmate to Psychology Services because the inmate may be at risk for suicide (e.g., the inmate refuses his or her property, talks about ending his or her life),

◆    an inmate's written or verbal behavior is suggestive of suicide,

◆    an inmate exhibits behavior suggestive of self-harm, or

◆    any other condition is present that would lead the clinician to believe an assessment is warranted.

Ordinarily, the Suicide Risk Assessment will be completed in PDS within 24 hours of the incidents outlined above.  At a minimum, the Suicide Risk Assessment will include:

◆    reason for / source of referral,

◆    risk factors assessed,

◆    risk assessment findings,

◆    diagnosis, and

◆    follow-up recommendations.

When a staff member has made a referral based on observed behavior, the psychologist who interviews the inmate will also make every effort to interview the staff member who observed the behavior.  The staff member's comments will be included in the report/clinical notes.

11.  **INTERVENTION.**  Upon completion of the suicide risk assessment, the Program Coordinator or designee will determine the appropriate intervention that best meets the needs of the inmate.  Because deliberate self-injurious behavior does not necessarily reflect suicidal intent, a variety of interventions other than placing an inmate on suicide watch may be deemed appropriate by the Program Coordinator, such as heightened staff or inmate interaction, a room/cell change, greater observation,

**DX 104-10**

P5324.08
4/5/2007
Page 11

placement in restraints, or referral for psychotropic medication. In any case, the Program Coordinator or designee will assume responsibility for the recommended intervention and clearly document the rationale.

a. **Non-suicidal Inmates**.  If the Program Coordinator determines that the inmate does not appear imminently suicidal, he/she shall document in writing the basis for this conclusion and any treatment recommendations made.  This documentation will be placed in the inmate's medical, psychology, and central file.

b. **Suicidal Inmates**.  If the Program Coordinator determines the individual to have an imminent potential for suicide, the inmate will be placed on suicide watch in the institution's designated suicide prevention room.  The actions and findings of the Program Coordinator will be documented, with copies going to the central file, medical record, psychology file, and the Warden.

**12.  SUICIDE WATCH.**

a. **Housing.**  Each institution must have one or more rooms designated specifically for housing an inmate on suicide watch. The designated room must allow staff to maintain adequate control of the inmate without compromising the ability to observe and protect the inmate.

◆ The primary concern in designating a room for suicide watch must be the ability to observe, protect, and maintain adequate control of the inmate.

◆ The room must permit easy access, privacy, and unobstructed vision of the inmate at all times.

◆ The suicide prevention room may not have fixtures or architectural features that would easily allow self-injury.

Inmates on watch will be placed in the institution's designated suicide prevention room, a non-administrative detention/segregation cell ordinarily located in the health services area.  Despite the cell's location, the inmate will not be admitted as an in-patient unless there are medical indications that would necessitate immediate hospitalization.

Placement of a suicide watch room in a different area may be warranted given the unique features of some institutions.

◆ However, designating a room for suicide watch outside of the Health Services area requires written approval of the Regional Director.  Such rooms must meet all of the requirements identified above.

**DX 104-11**

P5324.08
4/5/2007
Page 12

◆ Administrative detention and disciplinary segregation cells will not be designated or approved as suicide watch cells.

◆ Under emergency conditions a suicidal inmate may be placed temporarily on suicide watch in a cell other than the institution's designated watch room.  The inmate must be moved to a designated suicide watch room as soon as one becomes available.

b.  **Conditions of Confinement**.  While on suicide watch, the inmate's conditions of confinement will be the least restrictive available to ensure control and safety.
The inmate on watch will ordinarily be seen by the Program Coordinator on at least a daily basis.  Unit staff will have frequent contact with the inmate while he/she is on watch. Ordinarily, the Program Coordinator or designee will interview or monitor each inmate on suicide watch at least daily and record clinical notes following each visit.

The Program Coordinator or designee will specify the type of personal property, bedding, clothing, magazines, that may be allowed.

◆ If approved by the Warden, restraints may be applied if necessary to obtain greater control, but their use must be clearly documented and supported.

◆ Any deviations from prescribed suicide watch conditions may be made only with the Program Coordinator's concurrence.

◆ The Program Coordinator will develop local procedures to ensure timely notification to the inmate's Unit Manager when a suicide watch is initiated and terminated. Correctional Services staff, in consultation with the Program Coordinator or designee, will be responsible for the inmate's daily custodial care, cell, and routine activities.

◆ Unit Management staff in consultation with the Program Coordinator will continue to be responsive to routine needs while the inmate is on suicide watch.

c.  **Observation.**  For **all** suicide watches:

◆ Any visual observation techniques used to monitor the suicide companion program will focus on the inmate companion and/or the inmate on suicide watch only.

◆ The observer and the suicidal inmate will not be in the same room/cell and will have a locked door between them.

◆ The person performing the suicide watch must have a means to summon help immediately (e.g., phone, radio)

**DX 104-12**

P5324.08
4/5/2007
Page 13

if the inmate displays any suicidal or unusual behavior.

◆ The Program Coordinator will establish procedures for documenting observations of the inmate's behavior in a Suicide Watch log book, which will be maintained as a secure document. Staff and inmate observers will document in separate log books. Post Orders will provide direction to staff on requirements for documentation.

1) **Staff Observers**. The suicide watch may be conducted using staff observers. Staff assigned to a suicide watch must have received training (Introduction to Correctional Techniques or in AT) and must review and sign the Post Orders before starting the watch. The Program Coordinator will review the Post Orders annually to ensure their accuracy.

2) **Inmate Observers**. Only the Warden may authorize the use of inmate observers (inmate companion program). The authorization for the use of inmate companions is to be made by the Warden on a case-by-case basis. If the Warden authorizes a companion program, the Program Coordinator will be responsible for the selection, training, assignment, and removal of individual companions. Inmates selected as companions are considered to be on an institution work assignment when they are on their scheduled shift and shall receive performance pay for time spent monitoring a potentially suicidal inmate.

d. **Watch Termination and Post-Watch Report**. Based upon clinical findings, the Program Coordinator or designee will:

1) Remove the inmate from suicide watch when the inmate is no longer at imminent risk for suicide, or

2) Arrange for the inmate's transfer to a medical referral center or contract health care facility.

Once an inmate has been placed on watch, the watch may not be terminated, **under any circumstance**, without the Program Coordinator or designee performing a face-to-face evaluation. Only the Program Coordinator will have the authority to remove an inmate from suicide watch. Generally, the post-watch report should be completed in PDS prior to terminating the watch, or as soon as possible following watch termination, to ensure appropriate continuity of care. Copies of the report will be forwarded to the central file, medical record, psychology file, and the Warden. There should be a clear description of the resolution of the crisis and guidelines for follow-up care.

**DX 104-13**

P5324.08
4/5/2007
Page 14

At a minimum, the post-watch report will include:

◆    risk factors assessed,
◆    changes in risk factors since the onset of watch,
◆    reasons for removal from watch, and
◆    follow-up recommendations.

13.    **INMATE OBSERVERS - INMATE COMPANION PROGRAM**.

a.    **Selection of Inmate Observers.**  Because of the very sensitive nature of such assignments, the selection of inmate observers requires considerable care.  To provide round-the-clock observation of potentially suicidal inmates, a sufficient number of observers should be trained, and alternate candidates should be available.
Observers will be selected based upon their ability to perform the specific task but also for their reputation within the institution.  In the Program Coordinator's judgement, they must be mature, reliable individuals who have credibility with both staff and inmates.  They must be able, in the Program Coordinator's judgement, to protect the suicidal inmate's privacy from other inmates, while being accepted in the role by staff. Finally, in the Program Coordinator's judgement, they must be able to perform their duties with minimal need for direct supervision.

In addition, any inmate who is selected as a companion **must not**:

♦    Be in pre-trial status or a contractual boarder;

♦    Have been found to have committed a 100-level prohibited act within the last three years; or

♦    Be in FRP, GED, or Drug Ed Refuse status.

b. **Inmate Observer Shifts.**  Observers ordinarily will work a four-hour shift.  Except under unusual circumstances, observers will not work longer than one five-hour shift in any 24-hour period.  Inmate observers will receive performance pay for time on watch.

c.    **Training Inmate Observers.**  Each observer will receive at least four hours of initial training before being assigned to a suicide watch observer shift.  Each observer will also receive at least four hours of training semiannually.  Each training session will review policy requirements and instruct the inmates on their duties and responsibilities during a suicide watch, including:

◆    the location of suicide watch areas;

◆    summoning staff during all shifts;

**DX 104-14**

P5324.08
4/5/2007
Page 15

◆ recognizing behavioral signs of stress or agitation; and

◆ recording observations in the suicide watch log.

d. **Meetings with Program Coordinator.** Observers will meet at least quarterly with the Program Coordinator or designee to review procedures, discuss issues, and supplement training. After inmates have served as observers, the Program Coordinator or designee will debrief them, individually or in groups, to discuss their experiences and make program changes, if necessary.

e. **Records.** The Program Coordinator will maintain a file containing:

◆ An agreement of understanding and expectations signed by each inmate observer;

◆ Documentation of attendance and topics discussed at training meetings;

◆ Lists of inmates available to serve as observers, which will be available to Correctional Services personnel during non-regular working hours; and

◆ Verification of pay for those who have performed watches.

f. **Supervision of Inmate Observer During a Suicide Watch.** Although observers will be selected on the basis of their emotional stability, maturity, and responsibility, they still require some level of staff supervision while performing a suicide watch.

◆ This supervision will be provided by staff who are in the immediate area of the suicide watch room or who have continuous video observation of the inmate observer.

◆ In all cases, when an inmate observer alerts staff to an emergency situation, staff must immediately respond to the suicide watch room and take necessary action to prevent the inmate on watch from incurring debilitating injury or death. In no case will an inmate observer be assigned to a watch without adequate provisions for staff supervision or without the ability to obtain immediate staff assistance.

**THE DECISION TO USE INMATE OBSERVERS MUST BE PREDICATED ON THE FACT THAT IT TAKES ONLY THREE TO FOUR MINUTES FOR MANY SUICIDE DEATHS TO OCCUR.**

**DX 104-15**

P5324.08
4/5/2007
Page 16

♦ Supervision must consist of at least 60-minute checks conducted in-person.  Staff will initial the chronological log upon conducting checks.

g.  **Removal.**  The Program Coordinator or designee may remove any observer from the program at his/her discretion.  Removal of an inmate observer should be documented in the records kept by the Program Coordinator.

14.  **TRANSFER OF INMATES TO OTHER INSTITUTIONS.**  The Program Coordinator will be responsible for making emergency referrals of suicidal inmates to the appropriate medical center.  No inmate who is determined to be imminently suicidal will be transferred to another institution, except to a medical center on an emergency basis.

a.  **Medical Center Referral.**  Inmates who do not respond to treatment interventions and remain imminently suicidal require emergency hospitalization.  Although a psychiatric referral may be indicated at any time, ordinarily the inmate shall be referred to a MRC after he or she has been on continuous watch for 72 hours.  If the watch exceeds 72 continuous hours, the Program Coordinator must:

♦ Contact the Regional Psychology Administrator to discuss the case and determine if an emergency transfer is appropriate.

♦ If the decision is not to transfer the inmate to a MRC, the rationale for **not** initiating a request for emergency transfer must be documented in the PDS.

b.  **Psychology Services at MRCs.**  Psychology Services at each MRC will provide an appropriate intervention program for inmates who have been admitted for suicidal behavior.  The program will include:

♦ assessment,
♦ therapeutic interventions, and
♦ discharge planning.

The discharge planning may include a request to designate an institution for the inmate that can provide the custody and level of psychological service needed to prevent re-hospitalization.

c.  **Consultations.**  As part of the referral consideration process, it may be beneficial to consult with other mental health resources, MRC staff, or the Regional Psychology Services Administrator.

♦ To ensure maximum communication and tracking of suicidal inmates, the Program Coordinator will notify

**DX 104-16**

P5324.08
4/5/2007
Page 17

his or her Regional Psychology Administrator when a suicide watch is begun or terminated and when a suicide watch exceeds 72 hours.

◆ The Program Coordinator or designee will document the referral considerations and all actions taken in the inmate's PDS record.

d. **SENTRY "Psych Alert" Assignments.** It is critically important that other institutions are notified when they are to receive inmates with recent suicidal indications and are at risk for self-harm.

◆ The Program Coordinator must ensure that a suicidal inmate being transferred to a MRC is given the SENTRY "Psych Alert" assignment to signal all staff that serious psychological management problems and "continuity of care" issues are present.

15. **ANALYSIS OF SUICIDES**. If an inmate suicide does occur, the Program Coordinator will immediately notify the Regional Administrator, Psychology Services.

The suicide scene will be treated in a manner consistent with an inmate death investigation. All measures necessary to preserve and document the evidence needed to support subsequent investigations will be maintained or otherwise recorded adequately.

◆ In the event of a suicide, institution staff, particularly Correctional Services staff, and other law enforcement personnel, will handle the site with the same level of protection as any crime scene in which a death has occurred.

◆ All possible evidence and documentation will be preserved to provide data and support for subsequent investigators doing a psychological reconstruction.

Ordinarily, the Regional Director will authorize an after-action review of the suicide to be completed by a psychologist from another institution or administrative office. Psychologists who have previously been involved in treatment of the inmate or in peer consultation in the case shall not participate in the suicide reconstruction. The report will address all the areas listed in the "Guide for the Psychological Reconstruction of an Inmate Suicide" (Attachment A).

The Regional Psychology Administrator will also review the Mortality Review Report prepared by Health Services for additional information and to explain any discrepancies with the Psychological Reconstruction Report.

DX 104-17

a. **Central Office Review.**  The Regional Director will forward copies of the Psychological Reconstruction Report to:

- ◆    the Assistant Director, Correctional Programs Division;
- ◆    the Assistant Director, Health Services Division; and
- ◆    the Senior Deputy Assistant Director, Program Review Division.

b. **Special Review Committee.**  The PRD Senior Deputy Assistant Director will submit the report to the Special Review Committee. The Special Review Committee will review the report and assess whether recommendations for corrective action will be addressed at the national or local institution level.

- ◆    The PRD Senior Deputy Assistant Director will be responsible for tracking corrective actions and verifying the corrective action is accomplished.

16.  **CODE OF FEDERAL REGULATIONS**. Federal Regulations appear in bracketed bold text, as reproduced from volume 28 of the Code of Federal Regulations, Chapter 5.  The federal regulations that bind Bureau staff to specific program practices are primarily intended to describe Bureau programs and inmate rights, privileges, or responsibilities to inmates and members of the public.

**[§ 552.40 Purpose and scope.**

**The Bureau of Prisons (Bureau) operates a suicide prevention program to assist staff in identifying and managing potentially suicidal inmates.  When staff identify an inmate as being at risk for suicide, staff will place the inmate on suicide watch.  Based upon clinical findings, staff will either terminate the suicide watch when the inmate is no longer at imminent risk for suicide or arrange for the inmate's transfer to a medical referral center or contract health care facility.**

**§ 552.41 Program procedures.**

**(a) Program Coordinator.  Each institution must have a Program Coordinator for the institution's suicide prevention program.**

**(b) Training.  The Program Coordinator is responsible for ensuring that appropriate training is available to staff and to inmates selected as inmate observers.**

**(c) Identification of at risk inmates.**

**(1) Medical staff are to screen a newly admitted inmate for signs that the inmate is at risk for suicide.  Ordinarily, this screening is to take place within twenty-four hours of the inmate's admission to the institution.**

**DX 104-18**

P5324.08
4/5/2007
Page 19

(2) Staff (whether medical or non-medical) may make an identification at any time based upon the inmate's observed behavior.

(d) <u>Referral</u>.  Staff who identify an inmate to be at risk for suicide will have the inmate placed on suicide watch.

(e) <u>Assessment</u>.  A psychologist will clinically assess each inmate placed on suicide watch.

(f) <u>Intervention</u>.  Upon completion of the clinical assessment, the Program Coordinator or designee will determine the appropriate intervention that best meets the needs of the inmate.

§ 552.42 Suicide watch conditions.

(a) <u>Housing</u>.  Each institution must have one or more rooms designated specifically for housing an inmate on suicide watch. The designated room must allow staff to maintain adequate control of the inmate without compromising the ability to observe and protect the inmate.

(b) <u>Observation</u>.

(1) Staff or trained inmate observers operating in scheduled shifts are responsible for keeping the inmate under constant observation.

(2) Only the Warden may authorize the use of inmate observers.

(3) Inmate observers are considered to be on an institution work assignment when they are on their scheduled shift.

(c) <u>Suicide watch log</u>.  Observers are to document significant observed behavior in a log book.

(d) <u>Termination</u>.  Based upon clinical findings, the Program Coordinator or designee will:

(1) Remove the inmate from suicide watch when the inmate is no longer at imminent risk for suicide, or

(2) Arrange for the inmate's transfer to a medical referral center or contract health care facility.]

/s/
Harley G. Lappin
Director

**DX 104-19**

P5324.08
4/5/2007
Attachment A, Page 1

**GUIDE FOR THE PSYCHOLOGICAL
RECONSTRUCTION OF AN INMATE SUICIDE**

Name:_____          Prepared by:_____

Reg. No:_____          Date:_____

Date of Birth:_____    Date of Death:_____

I.   **Background Information**

          Education
          Marital/Family Status
          Religious Preference/Involvement
          Race/Ethnic Background
          Offense
          Sentence/Time Served
          Occupational/Military History
          Release Plans

II.  **Health Care and Personality Description**

          Physical Status-Functioning
             Previous/Current
          Social Status-Functioning
             Previous/Current
          Psychological Status-Functioning
             Previous/Current
          Suicidal History
          Medication History
          Mental Health History
             Diagnosis/Treatment
          Abuse History
             Drug/Alcohol
          Assaultive History
          Institutional Infractions

III. **Antecedent Circumstances**

          Identifiable Stressors
          Staff Opinions
          Inmate Opinions
          Last Person to Have Contact
          Last Staff Contact

**DX 104-20**

P5324.08
4/5/2007
Attachment A, Page 2

IV.  **Full Description of Suicide Act and Scene (to include
diagrams were appropriate)**

      Date/Time of incident
      Location
      Method
      Predictors of Suicidal Actions
      Suicide Note
      Other Relevant Information

V.   **Conclusions/Recommendations**

VI.  **List of Documents Examined**

VII. **List of Staff and Inmates Interviewed**

**DX 104-21**

P5324.08
4/5/2007
Attachment B, Page 1

**"SAMPLE"**
**SUICIDE PREVENTION INFORMATION**
**SPECIAL HOUSING UNIT ADDENDUM TO POST ORDERS**

**BOP HIGH RISK GROUPS**

♦    **New Inmates** - The first few hours and days after admission can be critical.  Newly incarcerated inmates may experience feelings such as shame, guilt, fear, sadness, anger, agitation, depression, relationship problems, legal concerns, hopelessness, and helplessness, which can contribute to increased suicide risk.

♦    **Protective Custody** - Inmates who volunteer to enter protective custody are at high risk for suicide, especially during the first 72 hours in SHU.  These inmates should be referred to psychology services immediately.

♦    **Long-term Protective Custody Inmates** - These inmates are particularly vulnerable to depression that can lead to a suicide attempt, and should be monitored closely while they are in SHU.

♦    **Inmates Taking Medication for Mental Health Reasons** -  These inmates are vulnerable to developing suicidal thoughts and attempting suicide by overdosing on their medication. Inmates on medication should be monitored to make sure they are not hoarding medication.  Any signs of distress, deterioration in hygiene, or sudden changes in behavior should be reported to psychology.

**FACTORS THAT CAN INCREASE THE PROBABILITY THAT AN INMATE MAY BECOME SUICIDAL:**

♦    **Mental Health Factors**
History of mental illness
1.    Is the inmate depressed, actively psychotic?
2.    Has the inmate been compliant with psychotropic medication?
3.    Have there been changes in eating, sleeping, hygiene, weight, recreation, activity level?

Prior suicide attempt
1.    How lethal was the attempt?
2.    How many attempts have been made?

**DX 104-22**

P5324.08
4/5/2007
Attachment B, Page 2

Inmate's current mood, affect, and behavior
1.  Is the inmate emotionally upset, angry, easily agitated?
2.  Are the inmate's thoughts clear and goal directed (vs. delusional or psychotic in nature)?
3.  Is the inmate depressed, has there been a recent loss?
4.  Has hopelessness persisted even after the depression has lifted?
5.  Has the inmate given away property, revised a will, requested a phone call to say his goodbyes?

♦  **Medical Condition(s)/Chronic Pain**
1.  Does the inmate have a chronic life threatening medical illness?
2.  Has the inmate's overall health diminished recently?
3.  Is the inmate experiencing pain or other negative symptoms?

♦  **Relationship Difficulties**
1.  Has the inmate received a Dear John letter?
2.  Have communications and or visits decreased?
3.  Has there been a change in the relationship?

♦  **Situational Factors**
1.  Legal issues - pending indictment; loss of appeal to reduce sentence.
2.  Difficulties with staff or other inmates.
3.  Gambling debts, drugs.
4.  Ending of a close relationship with another inmate.
5.  Possible victim of a sexual assault.

**REPORTING AND DOCUMENTING INMATE BEHAVIOR**

♦  **Report Your Concerns** - Any inmate behavior(s) that is questionable and may reflect a change in mental health status should be reported to the Shift Lieutenant immediately.

♦  **During non-working hours** - Inform the Shift Lieutenant of any questionable inmate behavior.  He/she will determine if the on-call psychologist needs to be contacted.

♦  **Segregation Log Book** - Any changes in inmate behaviors should be noted in the log book.  A detailed note regarding the observed behavior is advisable.  Documenting in the log book serves two purposes.  First, the entry serves as a means of communication for other staff members.  Second, it provides an accurate account of activity during your shift.  Documentation should be neat, legible, and professional.

**DX 104-23**

P5324.08
4/5/2007
Attachment B, Page 3

**RESPONDING TO A SUICIDE EMERGENCY**

♦  A Segregation Officer observing an inmate in the act of committing suicide, causing other self-injurious behavior, or who appears to have committed suicide will call for back-up before entering the cell.  The officer will notify the Control Center and the Lieutenant's Office by radio of the situation and request immediate back-up.  BACK-UP MUST BE PRESENT IN ORDER TO ENTER A CELL.

♦  The "cut-down" tool is located in the storage closet on a shadow board.  It is the #1 officer's responsibility to locate this item at the start of the shift.  This tool is only authorized to be used in emergency situations.  Miscellaneous use of this tool is not permitted and will result in dulling the blade of the tool.

♦  In the event an inmate commits suicide, the scene of the suicide will be treated in a manner consistent with the investigation of an inmate death.  All measures necessary to preserve and document the evidence needed to support subsequent investigations will be maintained or otherwise adequately recorded.

**DX 104-24**

P5324.08
4/5/2007
Attachment C, Page 1

**"SAMPLE"**
**MEMORANDUM DOCUMENTING MOCK SUICIDE EMERGENCY TRAINING**

**DATE:**      **4/5/2007**

**TO:**        **Name, Associate Warden**

**FROM:**      **Name, Operations Lieutenant**

**Subject:  Mock Suicide Emergency Training**

This memorandum documents a mock suicide emergency training
exercise.  This training exercise occurred in the Special Housing
Unit on Morning Watch on today's date at 5:30 a.m.

Staff present were:
        Name, Psychologist
        Name, Operations Lieutenant
        Name, Correctional Officer
        Name, Correctional Officer
        Name, Correctional Officer

The mock suicide emergency involved a hanging in a SHU cell.
Staff responded quickly in notifying the Operations Lieutenant
and Control.  The Cut Down tool, AED, appropriate keys to allow
access to the cell, and sufficient staff to open the cell door
were assembled quickly (within XX minutes).

Staff discussed the exercise and response for training purposes.

**(IN CASES WHERE RECOMMENDATIONS ARE MADE, TEXT CAN BE ADDED TO
DESCRIBE THE RECOMMENDATION AND CORRECTIVE ACTION TAKEN, e.g.)**
Staff suggested the key to the security cage housing the Cut Down
tool be placed on the Operations Lieutenant's and Compound
Officer's key rings.  A security work order has been initiated to
do this.

cc:  Psychology Services, Suicide Prevention Training File

**DX 104-25**



**U.S. Department of Justice**
Federal Bureau of Prisons

P R O G R A M   S T A T E M E N T
OPI:          CPD/CSB
NUMBER:   5580.08
DATE:        August 22, 2011

# Inmate Personal Property

/s/
*Approved*: Thomas R. Kane
Acting Director, Federal Bureau of Prisons

## 1.  PURPOSE AND SCOPE

**§ 553.10  Purpose and scope.**

**It is the policy of the Bureau of Prisons that an inmate may possess ordinarily only that property which the inmate is authorized to retain upon admission to the institution, which is issued while the inmate is in custody, which the inmate purchases in the institution commissary, or which is approved by staff to be mailed to, or otherwise received by an inmate.  These rules contribute to the management of inmate personal property in the institution, and contribute to a safe environment for staff and inmates by reducing fire hazards, security risks, and sanitation problems which relate to inmate personal property.  Consistent with the mission of the institution, each Warden shall identify in writing that personal property which may be retained by an inmate in addition to that personal property which has been approved by the Director for retention at all institutions.**

a.  **Summary of Changes.**  This revision includes the following:

*Policy Rescinded*
P5580.07        Inmate Personal Property (12/28/05)

**Federal Regulations from 28 CFR are in this type**.
Implementing instructions are in regular type.

DX 105-1

- Updates lists of inmate property.
- Removes requirement for radios to be engraved.
- Clarifies the process of confiscation and disposition of cash and negotiable instruments as contraband.
- Removes Attachment B – Approved Athletic/Specialty Shoe.  Attachment A and B are incorporated into one attachment.

b.  **Program Objectives.**  The expected results of this program are:

- Inmates will be permitted to retain and store authorized personal property.

- Contraband items found in the possession of inmates or in inmate living or work areas will be properly identified, processed, and discarded.

c.  **Pretrial/Holdover Procedures.**  Procedures required in this Program Statement apply to pretrial and holdover inmates.

2.  **LIMITATIONS ON INMATE PERSONAL PROPERTY**

**§ 553.11  Limitations on inmate personal property.**

**(a)  *Numerical limitations*.  Authorized personal property may be subject to numerical limitations.  The institution's Admission and Orientation program shall include notification to the inmate of any numerical limitations in effect at the institution and a current list of any numerical limitations shall be posted on inmate unit bulletin boards.**

**(b)  *Storage space*.  Staff shall set aside space within each housing area for use by an inmate.  The designated area shall include a locker or other securable area in which the inmate is to store authorized personal property.  The inmate shall be allowed to purchase an approved locking device for personal property storage in regular living units.  Staff may not allow an inmate to accumulate materials to the point where the materials become a fire, sanitation, security, or housekeeping hazard.**

The amount of space provided depends upon the number of inmates assigned to that housing area.

Allowing an inmate to retain excess personal property increases the likelihood that property will be damaged or lost, and thereby increases the risk to the Bureau of liability claims.

By providing secured space, and adhering to guidelines on retention of property, the individual inmate has responsibility for securing personal property.

P5580.08    8/22/2011    **Federal Regulations from 28 CFR: this type**. Implementing instructions: this type.    2

**DX 105-2**

**(c)** *Clothing.*  **Civilian clothing (i.e., clothing not issued to the inmate by the Bureau or purchased by the inmate from the commissary) ordinarily is not authorized for retention by the inmate.  Civilian clothing which previously had been approved for retention may not be retained after August 6, 1999.  Prerelease civilian clothing for an inmate may be retained by staff in the Receiving and Discharge area during the last 30 days of the inmate's confinement.**

- **Blue/Black/Red/Camouflage Clothing.**  No inmates may be issued, permitted to purchase, or have in their possession **any** clothing items, or pieces of cloth, in the aforementioned colors.
- **Civilian Clothing.**  All inmates are prohibited from wearing any clothing not government-issued or purchased in the commissary.

**(1)  Commissary Clothing Inventory.**  Wardens will restrict clothing to the following colors:

- Only gray and/or white clothing may be sold in institutions for males and only pastel green, gray, and/or white may be sold in institutions for females.
- The only exception is for religious headgear.

**(2)  Shoes.**  The following may be stocked or sold through the SPO process:

- Athletic, specialty shoes (i.e., a court, turf, basketball, or running shoe) ($100 maximum selling price with no pumps, no pockets) in black or white, or a combination of black or white, or with gray markings (no other colors allowed). (2 pr)
- Casual (such as hushpuppies). (1 pr)
- Shower. (1 pr)
- Slippers. (1 pr)
- Work (ASTM Standard F2412-05 and F2413-05). (1 pr)

Commissaries will be the sole source for inmates to purchase athletic shoes and only supply shoes that sell for $100 or less.

**(d)** *Legal materials.*  **Staff may allow an inmate to possess legal materials in accordance with the provisions on inmate legal activities (see § 543.11 of this chapter).**

**(e)** *Hobbycraft materials.*  **Staff shall limit an inmate's hobby shop projects within the cell or living area to those projects which the inmate may store in designated personal property containers.  Staff may make an exception for an item (for example, a painting) where size would prohibit placing the item in a locker.  This exception is made with the understanding that the placement of the item is at the inmate's own risk.  Staff shall require that hobby shop items be removed from the living area when completed, and be disposed of in accordance with the**

**DX 105-3**

**provisions of part 544, subpart D of this chapter.**
Part 544, Subpart D refers to the Program Statement **Inmate Recreation Programs**, which sets limits on the amount of materials which can be purchased quarterly.

**(f)  *Radios and Watches*.  An inmate may possess only one approved radio and one approved watch at a time.  The inmate must be able to demonstrate proof of ownership.  An inmate who purchases a radio or watch through a Bureau of Prisons commissary is ordinarily permitted the use of that radio or watch at any Bureau institution if the inmate is later transferred.  If the inmate is not allowed to use the radio or watch at the new institution, the inmate shall be permitted to mail, at the receiving institution's expense, the radio or watch to a destination of the inmate's choice.  Where the inmate refuses to provide a mailing address, the radio and/or watch may be disposed of through approved methods, including destruction of the property.**

Inmates may not retain other audio equipment, such as tape players/recorders, or radios with tape players/recorders, except as provided for the Program Statement **Legal Activities, Inmate** or as sold through the Commissary.

Where appropriate, certain department heads (e.g., Supervisor of Education, Supervisory Chaplain, and/or Unit Manager) may provide this type of equipment for use by inmates participating in self-study courses or other programs.

Such equipment will only be used in the program area and will not be permitted in inmate living quarters, except in medical centers where inmates are medically confined to the unit.

Wardens will take steps to reasonably accommodate inmates with disabilities in conformance with the Rehabilitation Act of 1973, which prohibits discrimination on the basis of disability in Federally-assisted programs.

In such cases, appropriate security procedures must be developed, and both tape players and tapes be limited to those available through state and Federal agencies providing these services to the disabled.

A Warden may determine that it is more appropriate to accommodate an inmate in another manner (for example, by providing volunteer readers).

Watches must have a selling price of no more than $100, no stones, and be electronically unsophisticated (i.e., unable to send or receive signals).

Language translators are permitted to inmates who have displayed a need.

**(g)  *Education Program Materials*.  Education program materials or current correspondence courses may be retained even if not stored as provided in**

**DX 105-4**

**paragraph (b) of this section.**
Only education, religious study materials, and correspondence materials pertaining to current course work may be retained.

Once an educational course is completed, associated books and materials must be removed from the living area or be included as part of an inmate's correspondence and reading materials.

**(h)  *Personal Photos*.  An inmate may possess photographs, subject to the limitations of paragraph (b) of this section, so long as they are not detrimental to personal safety or security, or to the good order of the institution.**

Ordinarily, photographs, particularly those of family and friends, are approved, since they represent meaningful ties to the community.

A personal photograph is defined as a photograph intended for individual viewing, as opposed to a photograph published for commercial use.  Personal photographs may be stored or displayed in the housing units according to local sanitation and housekeeping guidelines.

Inmates may not retain Polaroid photos.

Nude or sexually suggestive photos (individual prints or copies as opposed to those from publications) present special concerns about personal safety, security, and good order, particularly when the subject is an inmate's relative, friend, or acquaintance or could reasonably be perceived as such.  For these reasons, an inmate may not be permitted to retain, receive, or possess a personal photograph in which the subject is partially nude or nude, or when the photograph depicts sexual acts such as intercourse, fellatio, or sodomy.  These materials will be returned to the sender upon receipt at the institution.

An inmate may possess 25 loose photos.  In addition to these photos, an inmate may possess a photo album containing photos, provided they are properly stored in the photo album.

i.  **Religious Items.**  Each inmate, upon commitment, will be permitted to retain religious items approved by the Warden.

Ordinarily, inmates will be permitted to retain one religious medallion and chain with no stones, non-metallic.  The item will not be valued more than $100.

The Warden will authorize retention of religious items unless they pose a threat to the security and orderly running of the institution.

Inmates may not receive these items from home.

P5580.08    8/22/2011    **Federal Regulations from 28 CFR: this type**. Implementing instructions: this type.    5

**DX 105-5**

Items of religious wearing apparel include, but are not limited to:

- Prayer shawls and robes.
- Kurda or ribbon shirts.
- Medals and pendants (as noted above).
- Medicine pouches.
- Various types of approved headwear.

Personal religious property may be purchased only from commissary stock or from a Chaplain-approved catalogue using the Special Purchase Order process.

The inmate must have prior approval from the Chaplain. The Religious Beliefs and Practices Institution Supplement must include proper acquisition procedures for those items not available through a catalogue.

Religious headwear is permitted in all areas of the institution, subject to normal considerations of security and good order, including inspection by staff.

Guidance for approved religious headwear and attire is found in the Program Statement **Religious Beliefs and Practices**.

Religious headwear and/or attire which has been altered without staff approval is contraband.

j. **Consumable Awards.** Bureau entities such as Education, UNICOR, and Recreation Departments may provide consumables as awards to recognize inmate achievements. Consumables such as soda, cookies, hygiene items, small monetary awards, paper certificates, etc., are to replace property awards.

Property awards such as trophies, hats, tee shirts, mugs, pens, etc., are not authorized at any institution.

k. **Packages From Home.** The only packages an inmate may receive from home are those containing release clothing and authorized medical devices.

Release clothing packages may only be received within the last 30 days of confinement. This clothing will be stored in R&D and not released to the general population.

Medical devices such as hearing aids, eyeglasses, dentures, wheelchairs, braces, orthopedic/ prescription shoes, and artificial limbs are authorized if medically required and approved by the Health Services Administrator.

**DX 105-6**

3. **PERSONAL PROPERTY LIST AND RECORDS**

The Inmate Personal Property List (Attachment A), includes all personal property that an inmate can retain at every institution, including non-government property approved for use at all Bureau institutions and permitted for transfer between institutions.
This includes any medical device which is either issued or approved by the Health Services Unit (HSU) prior to it being added to the inmate's personal property list.

Should an inmate transfer to another institution, this property may be sent along with the inmate or his or her property at the discretion of the sending and receiving institutions' Wardens.

While the institution may set a limit on the number of specific items that the inmate may retain, this limit may not exceed the capacity of the local specified area or container designated for inmate clothing.

a.  **Additional Property Items.** The Warden must approve any item of inmate property not found in Attachment A and then only for local and short-term retention.

Items that are added to an inmate's property list may vary by institution due to climatic, cultural, or other reasons.  All such property will be clearly identified when sold at Commissary as "for local use only."

Property approved for local use will be mailed home at the inmate's expense upon transfer or release.  If abandoned by the inmate, the property will be disposed of in accordance with the Program Statement **Property Management Manual**, Chapter 11, sec. 2.

Examples of items identified for possession at the Warden's discretion are listed in Attachment A.

b.  **Personal Property Record.**  A copy of the Inmate Personal Property Record (BP-A0383) will be given to the inmate during the initial property inventory or any subsequent inventory. This form and/or a commissary receipt constitutes proof of ownership, not proof of value.

c.  **Inmate Property Inventory Records.**  The BP-A0383 will be used to inventory all inmate property except when:

■   The Authorization to Receive Package or Property (BP-A0331) will be used to inventory release clothing received from an outside source.
■   The Warden elects to use a local form instead; for instance, when an inmate moves from Administrative Detention to Disciplinary Segregation or from Disciplinary Segregation to Administrative Detention.

**DX 105-7**

Regardless of the form used, a written record of that inventory will be retained in the Special Housing Unit (SHU) for at least two years.  A copy of the Inmate Personal Property Record form will also be kept in the Inmate Central File.

The Request-Authorization to Mail Inmate Package (BP-329), must be used to inventory property which is authorized for retention, but not authorized for shipment at Bureau expense (the inmate incurs the cost of mailing).

4.  **CONTRABAND**

**§ 553.12  Contraband.**

**(a)  Contraband is defined in §500.1 (h) of this chapter.  Items possessed by an inmate ordinarily are not considered to be contraband if the inmate was authorized to retain the item upon admission to the institution, the item was issued by authorized staff, purchased by the inmate from the commissary, or purchased or received through approved channels (to include approved for receipt by an authorized staff member or authorized by institution guidelines).**

Contraband includes material prohibited by law, or by regulation, or material which can reasonably be expected to cause physical injury or adversely affect the security, safety, or good order of the institution.

For example, a manual describing the operation of the Bureau's data processing equipment would be considered contraband if possessed by an inmate because of the threat it would pose to the security, safety, and good order of the institution.

**(b)  For the purposes of this subpart, there are two types of contraband.**

**(1)  Staff shall consider as hard contraband any item which poses a serious threat to the security of an institution and which ordinarily is not approved for possession by an inmate or for admission into the institution.  Examples of hard contraband include weapons, intoxicants, and currency (where prohibited).**

Other examples of hard contraband include:

- Tools which may be used to aid in an escape (e.g., rope).
- Ammunition or explosives.
- Combustible or flammable liquids.
- Knives or tools not provided in accordance with the Program Statement **Correctional Services Manual**.
- Hazardous or poisonous chemicals and gases.

**DX 105-8**

Narcotics or other controlled substances not dispensed or approved by the institution HSU are also hard contraband.

Medicine the HSU dispensed or approved is hard contraband if not possessed by the inmate for whom it was prescribed or if not consumed or used in the manner prescribed.

Staff must consult the institution pharmacist or other health services staff member in any case involving questions whether a prescribed medication represents contraband.

Medicines the inmate carries into the institution at the time of commitment (e.g., voluntary commitment) will be forwarded to the institution medical staff for disposition.  If appropriate, this medicine will be returned to the inmate.

**(2)  Staff shall consider as nuisance contraband any item other than hard contraband, which has never been authorized, or which may be, or which previously has been authorized for possession by an inmate, but whose possession is prohibited when it presents a threat to security or its condition or excessive quantities of it present a health, fire, or housekeeping hazard. Examples of nuisance contraband include: personal property no longer permitted for admission to the institution or permitted for sale in the commissary; altered personal property; excessive accumulation of commissary, newspapers, letters, or magazines which cannot be stored neatly and safely in the designated area; food items which are spoiled or retained beyond the point of safe consumption; government-issued items which have been altered, or other items made from government property without staff authorization.**

The Warden may set limits locally, based on available storage space, on the amount of commissary items, newspapers, magazines, etc., each inmate may retain.

5.  **PROCEDURES FOR HANDLING CONTRABAND**

**§ 553.13  Procedures for handling contraband.**

**(a)  Staff shall seize any item in the institution which has been identified as contraband whether the item is found in the physical possession of an inmate, in an inmate's living quarters, or in common areas of the institution.**

**(b)  Staff shall dispose of items seized as contraband in accordance with the following procedures.**

Exceptions to these procedures may occur only upon written authorization of the Warden or designee.

**DX 105-9**

The procedures described in this section apply to and include property found in the inmate's physical possession, in an inmate's living quarters, or in common areas of the institution.

These procedures also encompass the property of inmates processed through Receiving and Discharge (R&D), such as new commitments and inmates received through transfer.

When religious items are confiscated the chaplain must be consulted as to the validity of the items.

**(1)  Staff shall return to the institution's issuing authority any item of government property seized as contraband, except where the item is needed as evidence for disciplinary action or criminal prosecution.  In such cases, staff may retain the seized property as evidence.**

Seized government property, if not altered, may be placed in normal stock for reissue.

Altered government property, including items an inmate made from government property without staff authorization, will be destroyed at the Warden's discretion.

The Warden may delegate the authority to determine if altered government property is to be destroyed.

The chaplain must be consulted regarding the disposition of religious items confiscated.

**(2)  Items of personal property confiscated by staff as contraband are to be inventoried and stored pending identification of the true owner (if in question) and possible disciplinary action.  Following an inventory of the confiscated items, staff shall employ the following procedures.**

**(i)  Staff shall provide the inmate with a copy of the inventory as soon as practicable.  A copy of this inventory shall also be placed in the inmate's central file.**

Placing a copy of the inventory in the Inmate Central File will assist staff in the investigation of possible tort claims.

**(ii)  The inmate shall have seven days following receipt of the inventory to provide staff with evidence of ownership of the listed items.  A claim of ownership may not be accepted for an item made from the unauthorized use of government property. Items obtained from another inmate (for example, through purchase, or as a gift) without staff authorization may be considered nuisance contraband for which a claim of ownership is ordinarily not accepted.**

**DX 105-10**

**(iii)  If the inmate establishes ownership, but the item is identified as contraband, staff shall mail such items (other than hard contraband), at the inmate's expense, to a destination of the inmate's choice.  The Warden or designee may authorize the institution to pay the cost of such mailings when the item had not been altered and originally had been permitted for admission to the institution or had been purchased from the commissary, or where the inmate has insufficient funds and no likelihood of new funds being received.  Where the inmate has established ownership of a contraband item, but is unwilling, although financially able to pay postage as required, or refuses to provide a mailing address for return of the property, the property is to be disposed of through approved methods, including destruction of the property.**

The Confiscation and Disposition of Contraband form (BP-A0402) will be completed.

Ordinarily, the Correctional Systems Manager (CSM) is responsible for authorizing the institution to pay mailing costs.

**(iv)  If the inmate is unable to establish ownership, staff shall make reasonable efforts to identify the owner of the property before any decision to destroy the property is made.**

**(v)  Staff shall prepare and retain written documentation describing any items destroyed and the reasons for such action.**

Destroying contraband will be accomplished as follows:

- Ordinarily, the CSM (for R&D only) or Captain or designee receives the inmate's proof of ownership and determines if an item is contraband.
- When it is determined that the item is to be destroyed, the CSM (for R&D only) or Captain or designee will prepare the written documentation describing the item(s) destroyed and the reasons for this action.
- Ordinarily, property is held for 120 days before it is destroyed.  This delay allows an inmate the opportunity to obtain proof of ownership and/or appeal the decision through the Administrative Remedy Procedure.
- The employee who actually destroys the property, and at least one staff witness to the disposal, will state in writing that they have witnessed the destruction.
- Records of disposal of property will remain on file for at least two years to ensure the availability of information necessary to an investigation of a subsequent tort claim.

**(vi)  Where disciplinary action is appropriate, staff shall delay disposition of property until completion of such action (including appeals).**

**DX 105-11**

**(c)  Staff shall retain items of hard contraband for disciplinary action or prosecution or both.  The contraband items may be delivered to law enforcement personnel for official use.  When it is determined that the item is not needed for criminal prosecution, the hard contraband shall be destroyed as provided in paragraph (b)(2)(v) of this section.  Written documentation of the destruction shall be maintained for at least two years.**

**(d)  Staff may not allow an inmate to possess funds in excess of established institutional limits.  Staff shall deliver to the cashier any cash or negotiable instruments found in an inmate's possession which exceed the institution's allowable limits.  Funds determined to be contraband shall be confiscated for crediting to the U.S. Treasury.**

All cash and negotiable instruments in the possession of inmates is unauthorized.

Cash and negotiable instruments that were inadvertently delivered to the inmate via the mail and are immediately turned over to staff shall be returned to the mail room to be processed in accordance with the Program Statement **Correspondence**.

All other cash and negotiable instruments found in the inmate's possession shall be processed as contraband.  The cash and negotiable instruments shall be turned over to the cashier.

**(1)  Where disciplinary action against the inmate is appropriate, staff shall delay final disposition of the funds until such action (including appeals) is completed.**

**(2)  Prior to a decision on the disposition of funds, staff shall allow the inmate a reasonable amount of time to prove ownership.**

6.  **INMATE TRANSFER BETWEEN INSTITUTIONS AND INMATE RELEASE**

**§ 553.14  Inmate transfer between institutions and inmate release.**

**(a)  Except as provided for in paragraphs(a)(1) through (3) of this section, authorized personal property shall be shipped by staff to the receiving institution.**

**(1)  The Warden ordinarily shall allow an inmate transferring to another institution to transport personal items determined necessary or appropriate by staff and, if applicable, legal materials for active court cases.**

**(2)  The Warden may require or allow an inmate who is transferring to another institution under furlough conditions to transport all the inmate's authorized personal property with him or her.**

**DX 105-12**

**(3)  An inmate who is being released or who is transferring to a Community Corrections Center may arrange to ship personal property at the inmate's expense.  The inmate is responsible for transporting any personal property not so shipped.**

**(b)  If the inmate's personal property is not authorized for retention by the receiving institution, staff at the receiving institution shall arrange for the inmate's excess personal property to be mailed to a non-Bureau destination of the inmate's choice.  The inmate shall bear the expense for this mailing.**

**(c)  Whenever the inmate refuses to provide a mailing address for return of the property or, when required, refuses to bear the expense of mailing the property, the property is to be disposed of through approved methods, including destruction of the property.**

This property determination is to be made in the receiving institution's R&D unit when the inmate's property is processed (i.e., inventoried) in the inmate's presence.  Bureau institutions will accept for each inmate the property approved in this Program Statement as authorized for retention and transfer between Bureau institutions.  Staff will adhere to the procedures that follow with respect to an inmate's property while he or she is in transfer between institutions.

d.  Sending institution staff will ship authorized property of inmates transferring via bus, van, or airlift directly to receiving institutions.  Ordinarily, no more than two boxes of property, size 14" x 14" x 19", will be shipped at government expense for each inmate.  The inmate may elect to pay for expenses related to the shipment of authorized personal property beyond the two boxes.

Institutional clothing and shoes for an inmate with special needs (large sizes, small sizes, orthopedic designs, orthopedic shoes, appliances, clothing, insulin testing kits, etc.), may be shipped at government expense in addition to the two-box maximum when the inmate transfers to another Bureau institution.  All other Bureau-issued clothing will not be transferred.

Property of inmates transferring on furlough will also be handled in this same manner.

Legal property will be exempt from this two-box limit.

e.  Bureau buses and vans will accept two standard size (14" x 14" x 19") boxes for transport with the inmate when the same bus or van delivers the inmate to the final destination.  This shipment will be in lieu of the two boxes which would normally be mailed at government expense.

f.  Essential Daily Prayer items, as authorized by the Warden, must be delivered to transporting officials upon the inmate's removal.  The inmate is responsible for production of the items, in the

**DX 105-13**

authorized container (authorization affixed by Chaplain), to the R&D Officer.  The items will be re-issued to the inmate for daily use at all holdover points.

The Chaplaincy Services Branch, Central Office, will provide sample authorization forms and a sample container to each location for use in the issuance of essential daily prayer items.

g.  R&D staff will use a Transfer Receipt (BP-A0821), for receipting all packages delivered to transporting officials in accordance with the above changes.

A separate entry will be made for the package containing essential Daily Prayer items.

h.  An inmate who is to be assigned as a holdover while en route to a new institution will be limited in the amount of personal property that may accompany him or her.  Such property is limited to the necessary personal items and legal materials for active court cases.

i.  All property which accompanies the inmate must be listed on the Inmate Personal Property Record (BP-A0383).

Property inadvertently omitted from the form may not be given to the transporting officer or to any other staff for the purpose of having the item(s) taken to the new institution (either holdover or designated).

This property must be listed on a new Inmate Personal Property Record and shipped to the receiving institution.

j.  Inmates being released or transferring to a Community Corrections Center will be encouraged to ship their property home at their expense prior to release.  If they choose not to, they will take their personal property with them.

k.  Property which is authorized for retention at Bureau institutions, but not authorized for shipment at Bureau expense, may be shipped by each inmate incurring the cost.

These packages will be inventoried using a Request-Authorization to Mail Inmate Package form (BP-329).  Inmates will affix the correct postage.

7. **VOLUNTARY SURRENDERS**

When an inmate voluntarily surrenders to Bureau custody he or she will be permitted to retain only the following items:

- Plain wedding band (no stones or intricate markings).
- Earrings for females only (no stones) with a declared value of less than $100.
- Medical or orthopedic devices.

P5580.08    8/22/2011    **Federal Regulations from 28 CFR: this type**. Implementing instructions: this type.    14

**DX 105-14**

- Legal documents.
- Social Security card and other forms of identification (driver's license, passport, etc.) to be retained in the Inmate Central File until the inmate's release.
- Religious items approved by the Warden as long as they do not present a threat to the security of the institution (religious medallions and chains must have a declared value of less than $100, male or female).
- Prescription glasses.

The institution will only pay for the shipping costs of clothing the inmate wears upon initial commitment – pants, shirt, underwear, shoes, coat, etc.

All other property will be rejected and shipped to the inmate's home at the inmate's expense.

## 8.  LIMITATIONS ON PERSONAL PROPERTY – MEDICAL TRANSFERS

**§ 553.15  Limitations on personal property – medical transfers.**

**The Warden shall set a limit on the amount of personal property that may accompany an inmate transferring to a medical facility.  For purpose of this rule, a medical facility is one which provides observation and/or treatment of a medical, surgical, or psychiatric nature, or any combination of these.  Such medical transfers are ordinarily of a short-term duration (30--120 days).**

Patients transferring to a medical facility for medical, surgical, or psychiatric treatment are ordinarily limited to the amount of personal property which can be placed in a box approximately 14" x 14" x 19."

The amount of clothing and other personal effects (for example, watches, rings, orthopedic devices, personal letters, religious articles) are limited to the items which can be appropriately placed within this container.

**(a)  The Wardens of the sending and receiving institutions shall allow the inmate to retain those legal materials specifically needed in respect to on-going litigation.  Questions as to the need for such material may be referred to Regional Counsel.**

If an inmate claims the need to take what can be considered an excessive amount of legal materials on a transfer, staff at the sending institution, ordinarily the CSM, will contact Regional Counsel to determine if the inmate has any pending court litigation or a hearing set to occur during the inmate's expected absence from the institution that would justify taking these legal materials.

**(b)  The Warden of the sending institution shall designate a secure location for storage of all inmate personal property not accompanying the inmate.**

**DX 105-15**

Minimum guidelines for storage will include accurate record keeping indicating:

- The number of boxes.
- The inmate's name.
- Registration number.
- The institution to which the inmate is being transferred for treatment.

**(c)  Personal property permitted in the sending institution, but not in the receiving institution, shall either be retained at the sending institution or be mailed to a destination of the inmate's choice.**

**(1)  If the inmate is expected to return to the sending institution within 120 days of transfer, staff shall advise the inmate that property not allowed in the medical facility may be held at the sending institution or sent to a destination of the inmate's choice (other than the medical facility), at the inmate's expense.  Where lack of space prevents retention of the inmate's property at the sending institution, that institution shall pay postage costs connected with mailing the inmate's property to a destination of the inmate's choice.  Where lack of space prevents the retention of the inmate's property at the sending institution, and the inmate refuses to provide a mailing address for return of the property, the property is to be disposed of through approved methods, including destruction of the property.**

**(2)  The inmate's property may be sent with the inmate to the medical facility when the inmate is not expected to return to the sending institution, will be at the medical facility over 120 days, or for any other justified reason.  The Warden at the sending institution shall prepare and place in the inmate's central file written documentation for forwarding the inmate's personal property.**

**(d)  The Warden of the medical facility shall return an inmate's personal property ordinarily in the same or equivalent size container as originally used by the sending institution.  Property accumulated over that amount, at the option of the inmate, will either be sent to a destination selected by the inmate, at the inmate's expense, donated, or destroyed.  If the inmate is financially able but refuses to pay for the mailing, or if the inmate refuses to provide a mailing address for forwarding of the property, the property is to be disposed of through approved methods, including destruction of the property.**

On occasion, staff may allow an inmate to retain more property than he or she brought to the institution.  Situations when this might be permitted include when the inmate has been at the institution over three months or when a transfer is unexpectedly effected immediately after the inmate has made significant commissary purchases.

**DX 105-16**

If the inmate is re-designated after completing medical treatment to an institution other than the sending institution, the medical facility is to notify the sending institution of this fact via GroupWise.

The medical institution will send this message when treatment has been completed and the inmate is ready for transfer.

Upon receiving the GroupWise message, the institution retaining the inmate's property will arrange for the property to be forwarded to the institution to which the inmate was transferred.

Ordinarily, once every 30 days, staff will inspect the stored property to guard against tampering or pilferage.

9.  **U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT (ICE) DETAINEES**

ICE has placed limitations on the amount of personal property for detainees who will be deported.  Consequently, detainees who transfer to other facilities should have their property limited to the following items:

- Wedding Band (plain, no stones).
- Prescribed Medication.
- Legal Materials (ongoing case).
- Photographs (10, no Polaroids).
- Shoes (1 pair).
- Funds (transfer to non-BOP Facilities only).
- Religious Medal and/or Medallion.
- Watch (value less than $100.00).
- Prescription Eyeglasses.
- Personal Letters (5).
- Soft-back Bible.

Any items not authorized for transport by ICE must be mailed at the inmate's expense.  If abandoned by the inmate, the property will be disposed of in accordance with Program Statement **Property Management Manual**, Chapter 11, sec. 2.

10.  **INSTITUTION SUPPLEMENT**

All institutions will develop an Institution Supplement describing that institution's procedures regarding inmate personal property.

A copy of the Institution Supplement will be forwarded for approval to the appropriate Regional Director prior to initial issuance or any change.

**DX 105-17**

Each Institution Supplement must cover at least the following areas:

■ Identification of personal property which the inmate may retain.  Inmates will be advised as part of the admission and orientation program what personal property they may keep.

■ Identification of areas within the institution for property storage.  Such storage areas are to be secured, with limited staff access and no access by inmates.

Property storage may not be in offices of the unit team or the correctional supervisor except in temporary emergency situations.

When an inmate leaves on writ or furlough or is placed in SHU status, staff will place the inmate's property in a secured storage area without frequent access by staff or inmates.

■ Establishment of a procedure to ensure a property inventory whenever an inmate's status requires such action (for example, admission, placement in special housing, transfer, release).  At a minimum, this will include completion of the Inmate Personal Property Record (BP-A0383) for identifying property and documenting valuables, particularly property valued over $100.

Specificity is necessary when completing inventory forms.  For example, instead of identifying a package of books as "1 lot books" the items should be identified as "three hardback legal books and two paperback books."

An exception is allowed for new inmates received in the R&D area and placed in a SHU.  Then, R&D staff must inventory the property and forward the property to the SHU officer, who will inspect the property for contraband and not re-inventory it.

■ Establishment of a procedure to retain the Inmate Personal Property Record for two years in the R&D unit, and, when applicable, in the SHU.

It is suggested that Inmate Personal Property Record forms be kept chronologically, thereby allowing easy identification of those forms over two years old.

■ Establishment of a procedure to ensure documentation in the Inmate Central File of all major items received through the mail.

**REFERENCES**

*Program Statements*
P1315.07    Legal Activities, Inmate (11/5/99)
P1330.16    Administrative Remedy Program (12/31/07)
P2000.02    Accounting Management Manual (5/22/87)
P4400.05    Property Management Manual (5/26/04)
P4500.07    Trust Fund/Deposit Fund Manual (4/19/10)
P5580.08    8/22/2011    **Federal Regulations from 28 CFR: this type**. Implementing instructions: this type.    18

**DX 105-18**

P5266.10    Incoming Publications (1/10/03)
P5270.08    Inmate Discipline and Special Housing Units (12/4/09)
P5360.09    Religious Beliefs and Practices (12/31/04)
P5370.11    Recreation Programs, Inmate (6/28/08)
P5500.11    Correctional Services Manual (10/10/03)
P5540.06    Prisoner Transportation Manual (4/20/00)

*Federal Regulations*

Federal Regulations cited in this Program Statement are contained in 28 CFR 553.10-15.

*ACA Standards*

- 4th Edition Standards for Adult Correctional Institutions: 4-4164, 4-4285, 4-4292, 4-4293, 4-4294, and 4-4446.
- 4th Edition Standards for Adult Local Detention Facilities: 4-ALDF-2A-24, 4-ALDF-2A-23, 4-ALDF-5B-18.

*BOP Forms*

BP-329     Request-Authorization to Mail Inmate Package
BP-A0331   Authorization to Receive Package or Property
BP-A0383   Inmate Personal Property Record
BP-A0402   Confiscation and Disposition of Contraband
BP-A0821   Transfer Receipt

*Records Retention*

Requirements and retention guidance for records and information applicable to this program are available in the Records and Information Disposition Schedule (RIDS) on Sallyport.

DX 105-19

**Attachment A**

**Inmate Personal Property List – National Limit Authorized For Transfer Between Institutions**

B = Black
W = White
BW = Black/White Combination
GRY = Gray
GRN = Green (pastel)
C = Commissary Only
I = BOP Issue

**Items Apply to All Inmates Unless Otherwise Noted**

**CLOTHING**

Bathrobe
    Males - W GRY (no hoods) c (1)
    **Females - W GRN (no hoods) c (1)**
Cap, Baseball
    Males - W GRY (no logos) c (1)
    **Females - W GRN (no logos) c (1)**
Handkerchief, W c (5)
Shoes, Athletic/Specialty, B W BW ($100 value maximum/no pumps/no pockets) court, turf, running shoe, c (2 pr)
Shoes, Casual, c (1 pr)
Shoes, Shower, c (1 pr)
Shoes, Slippers, c (1 pr)
Shoes, Work, c, (1 pr), (I)
Shorts, Gym
    Males – W GRY c (2)
    **Females – W GRN GRY c (2)**
Socks, Tube, W c (5)
Stockings/Pantyhose, **Females – skintone, c (5)**
Sweatshirt
    Males – GRY (cotton/pullover/no hoods/no logos) c (2)
    **Females – W GRN GRY (cotton/pullover/no hoods/no logos) c (2)**
Sweatpants
    Males – GRY (cotton/no logos) c (2)
    **Females – W GRN GRY (cotton/no logos) c (2)**

**DX 105-20**

T-Shirts/Sleeveless Undershirts
    Males – W GRY (no pockets/no logos) c (5)
    **Females – W GRY (no pockets/no logos) c (5)**
Underwear
    Males – W GRY (boxers or briefs) c (7)
    **Females – W (bras/panties) c (7)**

## PERSONALLY OWNED ITEMS

Address Book, c (1)
Alarm Clock (non-electric), c (1)
Bag, Athletic Tote (no logo), c (1)
Barrettes/Clips/Bows, **Females – c (5)**
Batteries (not including batteries stored in electronic items), c (4)
Blush Kit, **Females - c (1)**
Books (hard/soft), (5)
Book/Reading Light, c (1)
Bowl (plastic/24 oz. or less), c (1)
Calculator, small (electronically unsophisticated, inexpensive, non-print feature/battery or solar operated) c (1)
Calendar, small, c (1)
Comb/Pick (plastic), c (2)
Combination Lock, c (1)
Cosmetic Bag, **Females – c (1)**
Cup (plastic), c (1)
Dentures (1 set)
Earplugs, c (1 set)
Earrings, **Females – 1 pr**
Envelopes, c (1 box)
Eyeglasses (no stones), (2 pr)
Eyeglass Case (2)
Eyeliner/Pencil, **Females – c (2)**
Eye Shadow, **Females – c (2)**
Hairbrush, c (1)
Hangers (plastic), c (5)
Headphones, c (1)
Jug (plastic/up to 1 gal), c (1)
Language Translator, (small, electronically unsophisticated, inexpensive, non-print feature/ battery, or solar operated), c (1)
Laundry Bag (mesh), c (1)
Letters (25)
Lipstick, **Females – c (3)**
Makeup/Foundation/Base, **Females – c (2)**
Mirror (small/plastic), c (1)

P5580.08    8/22/2011    **Federal Regulations from 28 CFR: this type**. Implementing instructions: this type.    21

**DX 105-21**

Pen, Ballpoint, c (2)
Pencils, c (2)
Photo Album/Scrapbook with photos, c (1)
Photos (single-faced) (25)
Playing Cards, c (2 decks)
Radio with Earplugs (walkman-type), c (1)
Shaving Bag, Males – c (1)
Stamps (total value equivalent to 40, 1st Class), c
Sunglasses (non-reflective), c (1)
Towel (white/large), c (1)
Watch ($100 maximum value, no stones, electronically unsophisticated; i.e., inability to send signals), c (1)
Watchband, c (1)
Wedding Band (plain - no stones/white/yellow metal) (1)
Writing Tablet, c (2)

**HYGIENE ITEMS**

Brushless Shave
Conditioner/Hair
Dental Floss and/or Pick (unwaxed), c (1 container)
Denture Adhesive, c (1)
Denture Brush, c (1)
Denture Cleaner/Powder, c (1)
Denture Cup, c (1)
Deodorant, c (2)
Face Cream, **Females**
Hair Oil/Gel (non-flammable, non-alcoholic), c (1)
Laundry Detergent
Lens Cloth, c (1)
Lotion, Skin (moisturizing), c (1)
Mouthwash
Nail Clippers (no file), c (2)
Powder/Body/Foot
Razor, c (1)
Scissors, Mustache, Males – (blunt tip), c (1)
Sewing Kit, c (1)
Shampoo
Shaving Cream/Lotion, Males
Soap, Bar, c (3)
Soap Dish, c (1)
Toothbrush, c (1)
Toothbrush Holder, c (1)

**DX 105-22**

Toothpaste, c (2 tubes)
Tweezers (blunt tip), c (1)

## RECREATIONAL ITEMS

Athletic Supporter, Males – c (2)
Bra, Jogging, **Females – c (2)**
Eye Protection, c (1)
Gloves (fingerless/athletic), c (1)
Gloves (handball), c (2)
Harmonica, c (1)
Headbands/Sweatbands, W c (2)
Knee Wraps, c (2)
Knitting/Crochet Needles, c (1)
Mouth Piece, c (1)
Racquetballs (2 cans of 2), c (4)
Softball Glove, c (1)
Tennis Balls (can of 3), c (1)
Tools for Bead Work, c (1)
Weightlifting Belt, c (1)
Weightlifting Gloves, c (1)
Weightlifting Wraps, c (2)
Yarn, Embroidery, Hoops/Needles, c (1 set)

## APPROVED RELIGIOUS ITEMS

Items authorized in "Manual on Inmate Beliefs and Practices" and "Transferrable Religious Property," posted on Chaplaincy Services Branch Sallyport page.

## APPROVED MEDICAL DEVICES

Non-perishable commissary items sealed in unopened, original containers may also be transported or shipped.

**DX 105-23**