# EXHIBIT 1

## Bruce Barket

| | |
|---|---|
| **From:** | Bruce Barket |
| **Sent:** | Friday, July 19, 2019 6:39 AM |
| **To:** | 'Adam Johnson'; Jason Swergold |
| **Cc:** | tonyricco (tonyricco@aol.com); Aida Leisenring; Stephanie Scannell; bkoffsky@snet.net; Maurene Comey; Talia Kraemer |
| **Subject:** | RE: Tartaglione Sunday's attempt |

Good morning,

I was able to see Nick last night. Thank you for arranging a room for him.  He reports that he has not had his hearing yet and the conditions in his cell remain the same. He was told by a guard that he is going to be denied visits, phone calls and commissary for a year, in addition to being held in SHU for 90 days.  Water is constantly leaking into the cell, which he now shares with another inmate. He still has not received the updated discovery hard drive. He has only been given three short books which he read several times, despite having new books sent to him (we have the receipts indicating that MCC has received them).  He does not have the paper discovery he had prior to being placed in SHU.  Recently, he found a dead rodent in his bed.  Apparently he accidently smothered it while sleeping.  The lights in the cell are frequently off during the day and on at night.  Nick has asked to be given medication to treat his increased depression and anxiety.  His mental health is diminishing rapidly.

I understand that the cell phone justifies some sanction, but the troubling conditions in the cell should be rectified.  Lastly, I hope the guard who told Nick about his punishment is mistaken.

Bruce A. Barket, Esq.
Barket Epstein Kearon Aldea & LoTurco, LLP
666 Old Country Road , Ste. 700
Garden City, NY 11530
(516) 745 1500 [P]  (516) 745 1245 [F]
www.barketepstein.com

This transmittal may be a confidential attorney client communication or may otherwise be privileged or confidential. If it is not clear that you are the intended recipient, you are hereby notified that you have received this transmittal in error; any review, dissemination, distribution or copying of this transmittal is strictly prohibited. If you suspect that you have received this communication in error, please notify us immediately by telephone or email and immediately delete this message and all its attachments

**From:** Adam Johnson [mailto:a10johnson@bop.gov]
**Sent:** Monday, July 15, 2019 3:48 PM
**To:** Bruce Barket; Jason Swergold
**Cc:** tonyricco (tonyricco@aol.com); Aida Leisenring; Stephanie Scannell; bkoffsky@snet.net; Maurene Comey; Talia Kraemer
**Subject:** Re: Tartaglione Sunday's attempt

Bruce,

My apologies for the delay yesterday.  The institution was short-staffed, and they were actively  finding personnel to process you in the lobby and to oversee the attorney conference room area. If you experience any delays on the weekends, please ask to speak to the Duty Officer and/or the Operations Lieutenant as they were aware of the visit and could have expedited your admission to the facility.  They also could have called me at home to resolve any

# EXHIBIT 2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------x

UNITED STATES OF AMERICA

               v.                    16 CR. 832 (KMK)

NICHOLAS TARTAGLIONE,

                        Defendant.

------------------------------------x

                        U.S. Courthouse
                        White Plains, N.Y.
                        July 22, 2019
                        2:15 p.m.

Before:   HON. KENNETH M. KARAS,
           United States District Judge

APPEARANCES

GEOFFREY S. BERMAN
UNITED STATES ATTORNEY
SOUTHERN DISTRICT OF NEW YORK
300 Quarropas Street
White Plains, N.Y.  10601
BY:  MAURENE COMEY
    JASON SWERGOLD
Assistant United States Attorneys

BRUCE BARKET, Esq.
BRUCE KOFFSKY, Esq.
ANTHONY L. RICCO, Esq.
AIDA LEISENRING, Esq.
MICHAEL BACHRACH, Esq.
DAVID RUHNKE, Esq.
Attorneys for Defendant

Sue Ghorayeb, R.P.R., C.S.R.
Official Court Reporter

THE CLERK: United States of America v. Nicholas Tartaglione, 16 CR 832. Counsel, please state your appearances.

MR. SWERGOLD: Good afternoon, Your Honor. Jason Swergold and Maurene Comey for the Government.

THE COURT: Good afternoon to you both.

MS. COMEY: Good afternoon, Your Honor.

MR. BARKET: Good afternoon, Judge. I'll just give my name, because —

THE COURT: Okay.

MR. BARKET: — I'll mess up the other. So, Bruce Barket for Nick Tartaglione.

MS. LEISENRING: Aida Leisenring.

MR. RICCO: Good afternoon, Your Honor. Anthony Ricco for Mr. Tartaglione. And, Your Honor, we are joined this afternoon by Michael Bachrach —

MR. BACHRACH: Hello, Judge.

MR. RICCO: John Diaz —

MR. DIAZ: Good afternoon, Judge.

THE COURT: Good afternoon. Welcome.

MR. RICCO: — plus Bruce Koffsky, who is learned counsel.

MR. KOFFSKY: Good afternoon, Your Honor.

THE COURT: Good afternoon. Please be —

MR. RICCO: Your Honor, I do want the record to

Sue Ghorayeb, Official Court Reporter

reflect the presence of resource counsel, David Ruhnke --

THE COURT:  Yep.

MR. RICCO:    -- who is present for the conference today.

MR. RUHNKE:  Good afternoon, Judge.

THE COURT:  Good afternoon.

Okay.  Please be seated.

All right.  Should we start with the issue that was the subject of the recent series of letters or I guess two letters.  Mr. Barket.

MR. BARKET:  Well, you're, you're the Judge, so anywhere you want to start --

THE COURT:  Well, I know, but if there's something else that people want to talk about first --

MR. BARKET:  No.  I think that's, that's certainly poignant.

THE COURT:  Okay.

MR. BARKET:  Our -- I think our letter motion speaks for itself.  There's some confusion as to where the phone has been and where it is now.  The Government's letter, as I understand it, indicated -- and I only read it briefly kind of in transit, but I understood it to say that the FBI was waiting to receive the phone from the Bureau of Prisons.

The Bureau of Prisons indicated to me that Nick's hearing -- internal hearing as to what sanction should be

imposed, if any, was being delayed because the FBI took the phone the day it was seized or the day after and it had it up until a few days ago. So, it's not clear to me -- and I have confirmed that again with Mr. Johnson before I came to court. So, it's not clear to me whether the phone has been with the FBI for a month and they did whatever they did with it or it's been at the Bureau of Prisons for a month and the FBI is still waiting for it.

THE COURT: So, before we get to the question of who has the phone, should we answer the question: Whose phone is it?

MR. BARKET: Well, the phone was recovered, as was reported, in Mr. Tartaglione's cell.

THE COURT: Right. But, according to the Government, your client said it wasn't his.

MR. BARKET: I'm not sure that's a statement -- that was a statement I first heard from them.

THE COURT: Yeah.

MR. BARKET: So, I understand their objection about standing. Our privilege assertion remains. We have a good faith basis to believe that the phone could contain privileged information.

THE COURT: But if it's not your client's phone --

MR. BARKET: Well, when you say it's not his --

THE COURT: -- then what will be -- yeah.

Sue Ghorayeb, Official Court Reporter

MR. BARKET: It's not his in the sense of he didn't go to AT&T and buy it.

THE COURT: Right.

MR. BARKET: But, as I understand it, generally, in this facility --

THE COURT: Yeah.

MR. BARKET: -- these phones are passed around from inmate to inmate to inmate through a user.

THE COURT: Okay.

MR. BARKET: So, the phone is a --

THE COURT: But whatever the general practice may be, we have to establish that the phone that's at issue here is something your client is claiming an interest in. And if he's claim that there is privileged material on it, and at the same time you're saying that the phone gets passed from person to person to person, then what is to be made of the privilege?

MR. BARKET: I believe that the -- Your Honor, I think that that will be borne out as the analysis of the phone is conducted, the phone is conducted.

THE COURT: Well, whatever may be said about privileged material being on there, if it's -- if Mr. Tartaglione isn't saying it's his phone and it's some community phone that got passed from person to person to person, then what is to be said of the privilege existing at all?

Sue Ghorayeb, Official Court Reporter

MR. BARKET: Well, assuming -- just assume for a second --

THE COURT: Yes.

MR. BARKET: And I didn't say that that's what happened with this phone.

THE COURT: Okay.

MR. BARKET: I said, to be clear, that that's what my understanding is what happens --

THE COURT: Yeah. Okay.

MR. BARKET: -- with these phones in this facility.

Assume for the time being that a phone has message -- text messages on it --

THE COURT: Yeah.

MR. BARKET: -- and those messages are sent, are received --

THE COURT: Sure.

MR. BARKET: -- and they're privileged.

THE COURT: Well, except if the phone is shared by people.

MR. BARKET: No, no. If the text messages are shared.

THE COURT: Or if -- or if the phone is accessible to anybody in the community.

MR. BARKET: If the text messages are.

THE COURT: Mr. Barket, if the phone, for example,

Sue Ghorayeb, Official Court Reporter

isn't password protected, okay, so anybody who gets the phone can read the text messages, then I'm not sure what's to be made of any privilege claim.

MR. BARKET:  That second part I think is where we —

THE COURT:  Well, but my — I'm asking the questions.  So, what I'm trying to understand is:  Is your client claiming that it's his phone or not?

MR. BARKET:  He is not claiming that it's his phone. We're claiming that there are — we have a basis to believe there could be privileged information on it.

THE COURT:  But then we have to know more about the phone.  If the phone is something that is — where the messages — each person has their own password to access the messages, is that what the issue is?

MR. BARKET:  I don't know how I can explain that further than I have.  I think that we've laid the foundation.

THE COURT:  Well, I don't think you've explained it at all.  I'm trying to understand.

So, if your client had the phone and it was seized from him, is the claim that there is privileged material on there that only he could access even though others might have had access to the phone?

MR. BARKET:  The text messages, if any, that will be recoverable on the phone —

THE COURT:  Yeah.

Sue Ghorayeb,  Official Court Reporter

8

MR. BARKET:  -- would not be accessible to other individuals.

THE COURT:  And how do you know that?

MR. BARKET:  That's my understanding, Judge.

THE COURT:  But -- I claim not to be an expert on cellphones, but I'm unaware of any cellphone that has multiple passwords for each person who wants to send and receive text messages.

MR. BARKET:  I could, I could -- for example --

THE COURT:  Yeah.

MR. BARKET:  -- my phone --

THE COURT:  Yeah.

MR. BARKET:  -- one password.  If you get to it, you can access --

THE COURT:  Right.

MR. BARKET:  -- all the applications on the phone.

THE COURT:  Right.

MR. BARKET:  Is application the right word or is it apps?

THE COURT:  How about all uses on the phone.

MR. BARKET:  All uses on the phone.

THE COURT:  Including texts, right?

MR. BARKET:  Well, however, some of the uses or apps on the phone --

THE COURT:  Yeah.

Sue Ghorayeb,  Official Court Reporter

MR. BARKET:  -- have their own password.

THE COURT:  Right, but not --

MR. BARKET:  So --

THE COURT:  -- but not texts.

MR. BARKET:  Yes, including texts.

THE COURT:  Well, my phone doesn't have that.  So, if we're going to use our -- if we're going to compare anecdotes, it doesn't help us answer the question --

MR. BARKET:  But, but --

THE COURT:  -- hang on -- about this phone.

MR. BARKET:  So, it is -- actually, on my phone, you can access the --

THE COURT:  Your phone is not the one that's at issue.

MR. BARKET:  It's not.

THE COURT:  Okay.

MR. BARKET:  But I'm just saying, hypothetically, that a phone indeed can have a layered password protection.

THE COURT:  I understand that.

MR. BARKET:  In addition --

THE COURT:  But what we need to know about is this phone.

MR. BARKET:  In addition, if I were to delete the text messages on this phone --

THE COURT:  Yeah.

Sue Ghorayeb,  Official Court Reporter

MR. BARKET: -- and pass it to a colleague, who then opened it and looked at it, they wouldn't be able to see the text messages, but a computer forensic expert might be able to access those text messages that were already deleted.

THE COURT: Okay. So, am I to understand then, when you say that these text messages -- and we don't know whether or not those particular text messages were password protected on this phone, we don't know that right now.

MR. BARKET: I don't know that, no.

THE COURT: Is this -- when you say it's privileged material, is this privileged material because it involves communication with counsel?

MR. BARKET: I think there's multiple privileges that could --

THE COURT: Is that one of them?

MR. BARKET: That would be one of them, yes.

THE COURT: Okay. So that you were texting -- other lawyers or other people part of the legal team were texting with Mr. Tartaglione?

MR. BARKET: Excuse me, I'm sorry. That's okay.

The privilege would work if we exchanged texts --

THE COURT: Okay.

MR. BARKET: -- going back and forth.

THE COURT: Sure.

MR. BARKET: Privilege would also apply if one would

receive text messages and not respond to them.

THE COURT:  Right, but it will be somebody from his legal team.

MR. BARKET:  It would be somebody from his legal team, and keep in mind that we, as lawyers, receive text messages on our cellphones regularly —

THE COURT:  Yeah.

MR. BARKET:  — from people that we don't recognize, so —

THE COURT:  I know.  But you might receive text messages from people you don't recognize.  I wouldn't assume any text messages from Mr. Tartaglione would be one of those people whose text messages you wouldn't recognize.

MR. BARKET:  Depends on the content of it, Judge, to be perfectly frank with you.

THE COURT:  Okay.  So, so is the idea — is the scenario that Mr. Tartaglione sends a text and there's something about the text that wouldn't tell you it's from him?

MR. BARKET:  That's entirely possible —

THE COURT:  Is that what you're saying happened here?

MR. BARKET:  I'm not saying anything happened here specifically.  I don't think I have to to assert the privilege.

THE COURT:  Well —

Sue Ghorayeb,  Official Court Reporter

MR. BARKET:  I'm not going to get into --

THE COURT:  -- that remains to be seen.

MR. BARKET:  -- the details of -- clearly, there were communications over that phone with certainly his wife, that would be privileged, and I don't -- I don't know.  I don't think there were any -- there may have been -- we received calls from him as well.

THE COURT:  Yeah.

MR. BARKET:  So, I don't know if the calls that I received from him on my cellphone came over the jail's phones or over the cellphone.

THE COURT:  Okay.  But the calls aren't on the phone, right?

MR. BARKET:  I wouldn't think so.

THE COURT:  So, any calls he made on the cellphone are not what we're talking about here, right?

MR. BARKET:  Well, I think the Government's first step that they're going to give us -- they want us to receive all of the numbers.

THE COURT:  But the numbers aren't privileged.

MR. BARKET:  Numbers are not privileged.

THE COURT:  Okay.  So -- but the texts, the texts and voicemail, by the way, wouldn't be on the phone, that will be through the provider presumably, right?

MR. BARKET:  Yes.

Sue Ghorayeb,  Official Court Reporter

THE COURT: Right?

MR. SWERGOLD: I think it would depend, Your Honor --

THE COURT: Yeah. Right.

MR. SWERGOLD: -- if it's a voicemail going back and forth.

THE COURT: But in any event -- so, so the Government -- one of the things the Government mentions in its letter is that it's not clear what privilege is being asserted -- being asserted. You're talking about attorney-client privilege?

MR. BARKET: We have asserted that as well as marital privilege.

THE COURT: Okay. Marital privilege I understand. The attorney-client privilege, I'm still at a loss to understand. So, if there were conversations that took place over the phone, those are not -- getting the phone and searching the phone, obviously, wouldn't reveal those privileged communications.

MR. BARKET: Right.

THE COURT: Are there texts between Mr. Tartaglione and his legal team?

MR. BARKET: All right. You can help now.

(Counsel conferring)

MR. BARKET: Okay. The question again was?

Sue Ghorayeb, Official Court Reporter

THE COURT: Are there texts between Mr. Tartaglione and his legal team on that phone?

MR. BARKET: That's not a question I think I can answer in open court. I would answer it, at least, preliminarily, in camera with this Court.

THE COURT: Why? I mean, if there are texts, that fact itself is not privileged. The substance of the texts might be, but why is that privileged?

MR. BARKET: I mean, I could give the explanation, but then it would defeat the purpose of --

THE COURT: Well, it's a yes or no.

MR. BARKET: So, what's, what's the question?

THE COURT: Are there texts between Mr. Tartaglione and his legal team on that phone?

I don't want to know anything about the substance of the texts. It's yes or no.

MR. BARKET: I do think there are -- there were text messages to members of the defense team.

THE COURT: Okay. All right. I assume it's -- and maybe I'm wrong on this. Is it common knowledge that people in the MCC are not supposed to have cellphones, inmates?

MR. SWERGOLD: Yes, Your Honor, it is.

THE COURT: Do you know that, that your client is not supposed to have a cellphone in the prison?

MR. BARKET: Yes.

Sue Ghorayeb,  Official Court Reporter

THE COURT:  So, there are texts involving this contraband cellphone with the legal team?

MR. BARKET:  Again, Judge, I think the implication is that there is conversations going on.

THE COURT:  Yeah.

MR. BARKET:  To my understanding or to the best of my knowledge or recollection -- I shouldn't say recollection.

To the best of my understanding, the answer is: No, there weren't conversations.

THE COURT:  Not conversations.  Were there texts?

MR. BARKET:  Well, they're different.  Well, I mean, I mean exchanges.

THE COURT:  Okay.

MR. BARKET:  I think, I think, based upon information and belief, there were text messages sent from the phone --

THE COURT:  Okay.

MR. BARKET:  -- to members of the defense team.

THE COURT:  Okay.

MR. BARKET:  Okay.  So, people, people received those messages and I don't know what an attorney is supposed to do in that instance, assuming that there'll be a --

THE COURT:  Well, I mean, I assume that the first text will be:  "You're not supposed to have this cellphone, so why don't you just wait until I see you before whatever it is

Sue Ghorayeb,  Official Court Reporter

that's in the text," is one answer.

MR. BARKET: Well, I think that we've communicated that -- one of the difficulties in representing people that are incarcerated is communication. So, I've communicated quite clearly to all my clients there are three methods with which you can reach out to me.

THE COURT: Yes.

MR. BARKET: You can call me.

THE COURT: Yes.

MR. BARKET: You can send me an e-mail, if you are in a facility that has e-mails.

THE COURT: Yes.

MR. BARKET: Or I can see you --

THE COURT: Right.

MR. BARKET:  -- which I do fairly regularly.

THE COURT: Right.

MR. BARKET: And if you want to have conversations that are sensitive, wait until you see me again --

THE COURT: Right.

MR. BARKET:  -- and I will -- if you need to see me in a hurry, shoot me a note or call me and tell me to come tomorrow and I will.

THE COURT: Right. Sure.

MR. BARKET: So that message that Your Honor suggested we should have --

Sue Ghorayeb, Official Court Reporter

THE COURT:  Yeah.

MR. BARKET:  -- that's something that is fairly --

THE COURT:  Right.  But I guess I'm trying to understand why there would be more than one text.

The first text it seems to me should be responded to:  You shouldn't be texting me on a cellphone.

MR. BARKET:  Well, if you can respond at all.

THE COURT:  Yeah, but the one way to make sure that a contraband phone isn't used again is to say, "don't text me by the cellphone," right?  So --

MR. BARKET:  In a perfect world, you'd say --

THE COURT:  Well, no.  I think in any world.  I think in any world.

MR. BARKET:  How about in this world:  Don't use cellphones in the jail because it will cause a headache at some point in time.

THE COURT:  Well, and it's also not allowed.

MR. BARKET:  Right.

THE COURT:  Right.  Okay.  I don't know who wants to respond for the Government.

MR. SWERGOLD:  Your Honor, I think that this sort of back and forth highlights why there are these open questions that the Government put in our letter.

THE COURT:  Yes.

MR. SWERGOLD:  First, to just answer one though

Sue Ghorayeb,  Official Court Reporter

that's, that's not in the letter but that Mr. Barket raised, which is: Where is the cellphone and where has it gone?

THE COURT: Yes. Yes, please.

MR. SWERGOLD: So, it actually has never left BOP custody. It went from -- after it was seized in the facility, it went to a more centralized location in Washington, D.C. where it was going to be analyzed internally by BOP. However, after Mr. Barket reached out to the Government to say, "a cellphone was seized and we're asserting a privilege over it" --

THE COURT: Yeah.

MR. SWERGOLD: -- and that was back in early July, we instructed BOP not to search the cellphone.

THE COURT: Okay. Did they notify you when they seized it?

MR. SWERGOLD: No --

THE COURT: BOP.

MR. SWERGOLD: -- they did not. We heard about it first from -- and I think Mr. Barket learned about it the same day. I think he -- I think he told us he was on his way to go see the Defendant.

THE COURT: Okay. So, he learned it -- okay. So, in other words, it wasn't as if days passed between its seizure and when you learned about it.

MR. SWERGOLD: No. I think we learned the same day

Sue Ghorayeb, Official Court Reporter

from the Defendant.

THE COURT:  You actually learned from Mr. Barket —

MR. SWERGOLD:  Yes, that's right.

THE COURT:  — not from BOP?

MR. SWERGOLD:  That's right.  And our understanding from speaking with BOP was that they had sent it out to be processed, but we told them to wait; —

THE COURT:  Okay.

MR. SWERGOLD:  — that if there was going to be a search, we would want to get a search warrant and do it that way.

THE COURT:  Okay.  So —

MR. SWERGOLD:  And we said we want that phone to come back into FBI custody here.

I think the disconnect is that — what Mr. Barket was talking about is that:  Whenever there is any kind of potential crime inside one of these facilities, it gets referred to the FBI to see if they want to open a case and have it be a criminal prosecution versus an internal disciplinary matter, and here what they were waiting on was the FBI's decision whether or not to have this referred criminally for prosecution.

THE COURT:  I see.  Okay.

MR. SWERGOLD:  That decision now appears to have been made in the negative, so that it will proceed to a

Sue Ghorayeb,  Official Court Reporter

hearing and disciplinary proceedings within the facility. Separate from that is whether -- is getting the phone into FBI custody --

THE COURT:  For this case.

MR. SWERGOLD:  -- for purposes of this case.  That's right.

THE COURT:  Okay.  I understand.

MR. SWERGOLD:  So that describes where the phone is.

MR. BARKET:  Just on that point, I mean --

THE COURT:  Yeah.

MR. BARKET:  I, I -- Nick has been waiting for this hearing for a while, for almost a month now, and it's supposed to take place within a few days of the incident.

THE COURT:  Okay.

MR. BARKET:  And I asked Mr. Johnson about that several weeks ago and he said, "the phone is with the FBI and until we get it back, there's nothing we can do."

When I got the letter today from the Government, I wrote to Mr. Johnson again, who says -- and I'm just -- this is not information I have.  I'm just reporting what --

THE COURT:  Yeah, I understand.

MR. BARKET:  He says, "Hi, Bruce.  The FBI released the matter back to BOP Friday to handle it internally.  He should receive his incident report and his initial hearing in the following week."  So, I understood that to be the FBI has

had the phone all along.

I don't — I'm not saying that either person is obviously misrepresenting things, but —

THE COURT: Okay. I'm not sure it matters if no one is searching.

MR. BARKET: It matters for the purposes of the hearing that he's supposed to get, which affects where he's being housed right now, which affects the conditions that are —

THE COURT: Well, that's a separate issue.

In terms of the integrity of the phone, it sounds like — whether it's in FBI hands or BOP hands — no one has searched it. That's the important issue, right?

MR. BARKET: Yes.

THE COURT: We want to make sure it doesn't get searched.

MR. BARKET: Well, but it caused me some concern when the Government represented that they've never had it and Mr. Johnson is saying they've had it all along.

MR. SWERGOLD: But that's not what Mr. Johnson said in the e-mail that Mr. Barket just read. What Mr. Barket just read is consistent with what I just said. It's two tracks: It's where is the phone for purposes of searching it and it's how is this infraction going to be dealt with.

THE COURT: Yes.

Sue Ghorayeb, Official Court Reporter

MR. SWERGOLD: And one of the issues is, because even though the phone was in Mr. Tartaglione's hand when the guards seized it from him, he claimed the phone was not his, and, so, part of the issue — and I think Mr. Johnson explained this to him on a call that we all had. Part of the issue is: You can't go forward with the disciplinary hearing until they've done their full investigation to determine is it his phone and are we going to punish him for having this phone. So —

THE COURT: Separate from whether or not there's going to be —

MR. SWERGOLD: A search.

THE COURT: — an independent criminal investigation unrelated to this case.

MR. SWERGOLD: That's right.

THE COURT: That sometimes there's contraband —

MR. SWERGOLD: Right.

THE COURT: — that can be prosecuted criminally separate from the administrative proceeding that BOP might engage in.

MR. SWERGOLD: That's right. And this type of contraband can be prosecuted criminally —

THE COURT: Yes.

MR. SWERGOLD: — but the FBI chose not to make that referral —

THE COURT: Got it.

MR. SWERGOLD: — and instead it's being handled internally —

THE COURT: Okay.

MR. SWERGOLD: — at BOP.

THE COURT: All right.

MR. SWERGOLD: So, with respect — so, I think that answers that part of the question. Then, just with respect to the issue of taint teams and searching the phone —

THE COURT: Yeah.

MR. SWERGOLD: — again, there are — Mr. Tartaglione had the phone in his hand. Clearly, he has the information that will allow the Court to make a determination about whether there's a reasonable expectation of privacy, which I think we would dispute —

THE COURT: Yeah.

MR. SWERGOLD: — whether there are — is the potential for any kind of privileged communications on it, and, so, we just need that information and the Court needs that information before we can really make a decision about whether or not a taint team is even required.

THE COURT: So, the assertion is both marital and legal privilege.

MR. SWERGOLD: Right. So, we — and one of the reasons also why we asked for clarification on what kind of

Sue Ghorayeb,   Official Court Reporter

privilege it is is because we can probably work out some arrangement with defense counsel to make sure certain things are not -- are not viewed.

The other overarching issue though is that our understanding from BOP and from the guards who seized it initially is that this phone does not have text messaging capabilities.  It's one of these -- it's described as a mini-phone.

THE COURT:  Uh-huh.

MR. SWERGOLD:  And, so, when they -- when the guard -- when the phone was originally seized and as part of the immediate investigation, before we communicated to them not to look at the phone, and they were able to look at the phone, which is one of the first things they do, all they could find was like a caller -- a frequent call list, like the most recent call history, and their representation was that it does not even have text messaging capabilities, which may be the case, which is another reason why that's one of the open items that the Government is asking about before we figure out whether we need this.

THE COURT:  Well, the assertion of the privileges is on the premise that there is texting capability on the phone.

MR. SWERGOLD:  Right, and that's inconsistent with what the people who have actually seen the phone in the facility have said.  So, that's why, that's why we put this in

Sue Ghorayeb,   Official Court Reporter

the letter, Your Honor.

THE COURT:  Yeah.  No, I understand.

MR. SWERGOLD:   — because there's just too much confusion on our --

THE COURT:  Right.

MR. SWERGOLD:  — on our part.

THE COURT:  No, I understand.  But, I mean, I think in terms of that dispute, to the extent that your office has indicated its intention to get a search warrant, it may be that the search warrant -- and if you get it and you execute the search, it may be that there are no texts on there, which presumably will resolve the issue of the taint team, where —

MR. SWERGOLD:  Yes.

THE COURT:  — the taint team will end up being fired immediately —

MR. SWERGOLD:  That's right, Your Honor.

THE COURT:  — for lack of necessity.

MR. SWERGOLD:  That's right.

THE COURT:  But that's really neither here nor there, right?

I mean, I think that your point about you should get together with Mr. Tartaglione's defense team and work out a protocol for the ethical wall makes perfect sense, if you're going to go ahead and do the search.

MR. SWERGOLD:  That's right, Your Honor.

THE COURT: Because if you, if you really didn't think there was any texting on there, then you wouldn't get a search warrant, because there will be nothing to retrieve in theory.

MR. BARKET: Well, call history.

THE COURT: Right, but there, there I think you're going to have a harder argument on privilege.

MR. BARKET: A little bit — the talk of search warrants and standing is a little bit cart before the horse.

If they end up getting a search warrant, which I'm not so — it's not so clear that there is a basis to believe that the phone was — that there's evidence of a crime on the phone.

THE COURT: Yeah.

MR. BARKET: Right? I mean, if he's texting his wife and friends and saying, "how are you doing? What happened with the Yankees" —

THE COURT: I —

MR. BARKET: — whatever. So, so — but assuming that they get a search warrant and there is probable cause to get a search warrant, and they receive information off that warrant, which they then disclose to us, that we want to move to suppress, then standing becomes an issue.

THE COURT: Mm-hmm.

MR. BARKET: It's really not an issue at this point.

Sue Ghorayeb, Official Court Reporter

Regardless of his standing to move to suppress information in the phone, if there's privileged information on it that they can retrieve, that becomes an issue regardless of standing. He could have borrowed somebody else's cellphone in ten minutes and texted his wife and we'll be able to assert a privilege, even though he wouldn't be able to assert standing necessarily.

THE COURT: Well, it's not clear you would get to assert privilege, because it's not clear to me that, that the privilege wouldn't have been waived by using somebody else's phone. So, whatever, right?

MR. BARKET: Well, it depends on, on --

THE COURT: There's lots of carts before horses here.

MR. BARKET: Right.

THE COURT: Right? And I think the idea is -- I think your suggestion is a good one in your letter, is to try to think prophylactically about this -- is to make sure that in case there is privileged material, that there be a mechanism in place to, to respect that possibility, right?

I mean, I don't have -- I don't think that -- you're right, we don't need to address standing issues with respect to that. So, it sounds like the Government doesn't disagree with --

MR. SWERGOLD: No. Your Honor, if we, if we obtain

Sue Ghorayeb,   Official Court Reporter

a search warrant for the phone —

THE COURT:  Yeah.

MR. SWERGOLD:  — then we will speak with defense counsel about implementing a procedure for a taint team, and then we would just note that somewhere down the line, if we get to the horse, I guess, or the cart, we would, we would probably dispute the reasonable expectation of privacy with the phone and possibly the privilege also, but that's not for now.

THE COURT:  Right, exactly, we don't need to resolve that now.

MR. SWERGOLD:  Yes.

THE COURT:  Right.  So, I think in terms of where we go from here, the Government is going to decide what it wants to do with the phone, and if the Government does want to seek a search warrant, then it sounds like the Government has committed, Mr. Barket, to talking to you and your colleagues about trying to agree to a protocol that will be put in place if the phone is searched.

MR. BARKET:  That makes sense and that was the point of the letter.

THE COURT:  Yeah.

MR. BARKET:  One, one question, and I didn't ask it: Is there just one phone?

In other words, was a duplicate or a forensic copy

made of it?

MR. SWERGOLD: As far as we know, it has not been searched in that way yet that would create a forensic copy. Our understanding was that the investigators on-site at the time just looked through and into the phone.

THE COURT: Okay. All right. Do you have any other, any other questions, Mr. Barket?

MR. BARKET: No, Judge. Thank you.

THE COURT: Okay. Do you have any idea when you're going to decide if you're going to try to get a search warrant for the phone?

MR. SWERGOLD: Your Honor, we don't know when we're actually going to get the phone, but pretty soon thereafter we would get a search warrant.

THE COURT: Does it have to await the hearing?

MR. SWERGOLD: No, we don't think so.

THE COURT: Okay. So --

MR. SWERGOLD: We're not aware of any reason why it would have to wait.

THE COURT: Is there any reason why if you did call up BOP and said, "we'd like the phone," you wouldn't get the phone?

MR. SWERGOLD: No. We think we will get the phone. We just don't know how long it will take for them to deliver it to us.

Sue Ghorayeb, Official Court Reporter

THE COURT: Is it in Washington still?

MR. SWERGOLD: It may very well be, because we requested it I think over — it might have been about two weeks ago, when we were having these conversations with BOP, and we have not received it yet, so.

THE COURT: Okay. Well —

MR. SWERGOLD: But we will continue to press them for the fact that we would like to have the phone into our possession —

THE COURT: Okay.

MR. SWERGOLD: -- as soon as possible.

THE COURT: Okay. All right. So, the Government is going to make a decision, Mr. Barket, and be in touch with you. If they don't want to search it, then there's no need for protocol; if they do, then you all will agree to some taint team, and if there's disagreement, you know where to reach me. Okay?

MR. BARKET: Very good.

THE COURT: Fair enough?

MR. BARKET: Yes.

THE COURT: Okay. Other issues?

MR. SWERGOLD: Your Honor, if I can give you a brief update --

THE COURT: Sure.

MR. SWERGOLD: -- since our last conference. So,

Sue Ghorayeb, Official Court Reporter

the Government has not produced any new discovery.  We did provide a full set of all of the discovery to Emma Greenwood, the discovery coordinator, so that defense counsel can have -- make full copies.

THE COURT:  Okay.

MR. SWERGOLD:  We also, on July 16th, sent a hard drive that had all of the discovery except for some sensitive phone materials to the MCC so that Mr. Tartaglione has one drive with all of the discovery on it.

With respect to the sensitive phone issue -- materials, if he wants to review them, his lawyers can review them with him, but we can't send them into the MCC given their nature.

We also had a few calls and e-mail exchanges with defense counsel where we answered any direct questions they had about particular pieces of discovery and provided them more information where appropriate.

On July 13th, we made a disclosure to defense counsel.  In an unrelated case in our office, we learned that somebody who was proffering had said something at the end of a proffer that potentially related to this case, so we then interviewed that individual, as well as four other people who were mentioned in the statement.  We produced that in an abundance of caution, because the information was inconsistent with the Government's theory about who was

present at 419 Old Mountain Road at the time that the victims' bodies were buried.

We don't credit the information, but we investigated it. We interviewed everybody. We provided a disclosure letter that summarized what we had learned, but also the actual reports of the interviews and the notes to defense counsel along with it.

With respect to three of the individuals interviewed, they're represented by counsel. We provided counsels' name and number. With respect to the two people in the disclosure who the information was actually about, they are not represented by counsel. We just provided their name and the reports have their addresses. So, if defense counsel wants to speak with them, they can do that.

So, that's sort of the update on any kind of discovery between the last conference and now, and as we — as was the case at the last conference, the Government is ready to proceed to trial. We would ask Your Honor to set a trial date.

THE COURT: Okay.

MR. BARKET: Our motion schedule that we set out is going along well. We're done with a fairly good draft of both motions, so we certainly would file on time, potentially, even a week early.

We're not in a position yet to tell the Court we

think we'll be ready for trial on this date or that date, that's still — I think that, that forecast or that — getting to that point is still a bit off. The —

THE COURT: Yes. I mean, we have a lot of motions to resolve —

MR. BARKET: We do.

THE COURT: — as to these motions that you're about to file. And, then, depending on what happens to those motions, potentially motions relating to the capital phase of the case.

MR. BARKET: Yes.

THE COURT: Right.

MR. BARKET: So, I mean, some of them — one of — there are really two motions that are attacking the warrants, and the warrants include data from cell towers that were subject to the Carpenter decision and the Government proceeded under the old statute not getting a warrant. So, you'll get to write some —

THE COURT: Understood.

MR. BARKET: — interesting law on good faith exceptions and whatnot. And the other part of it is going to be on the statements that Mr. Tartaglione made. Those we believe to be quite meritorious and there probably will be hearings.

THE COURT: Yes.

Sue Ghorayeb, Official Court Reporter

MR. BARKET:  I'm not going to forecast it --

THE COURT:  Sure.

MR. BARKET:  -- but there probably will be hearings. I'm not going to, you know, predict what Your Honor is going to do, but I suspect --

THE COURT:  But that's what you're asking for?

MR. BARKET:  We certainly are.

THE COURT:  Right.  Okay.  All right.

MR. BARKET:  So -- and those motions should be done, as I said, within the two weeks that they're supposed to be, probably earlier.

The cellphone incident is unfortunate for a number of obvious reasons.  And, look, there's a lot that we can complain about with respect to the Bureau of Prisons.  The Bureau of Prisons appropriately sanctioning someone who possesses a cellphone is not one of the things that we have -- we're going to complain about because it just wouldn't be appropriate.  You can't have cellphones in facilities like that.  There's a whole host of problems that can result from it.  Pretty clear that it's against the rules and some appropriate, proportional sanction is in order.  So, I don't want to skip over that part.

THE COURT:  Okay.

MR. BARKET:  But as Your Honor is aware, the difficulties of Mr. Tartaglione's incarceration at this

Sue Ghorayeb,  Official Court Reporter

particular facility are long-standing, years, in fact. I think we've been complaining about various things.

Since he was placed in SHU, which is the Special Housing Unit, where he is in a windowless room, basically, 24-hours-seven, 24 hours a day, seven days a week, the conditions are just unbelievably poor and despite Mr. Johnson's urging I think of -- to change some of that. So, just a quick example:

He has no books. He's had the same three books, that are about 40 pages each, since he's been there. He has read them a number of times. We have receipts of books that were sent to him. The prison officials -- the guards just won't give them to him.

He has none of his discovery. There was a privilege document, a very sensitive privilege document that he was working on out on his bed. It was prepared by counsel. He had notes on it. It was taken and never returned. So, somebody in the Bureau of Prisons has this document. We don't know what happened to it. It's of great concern to us, because it's the kind of thing that really could cause difficulty in defending the case if it were disclosed. It really was work product that we put together for him. He was making notes on it.

THE COURT: And when -- and when did this happen?

MR. BARKET: That happened I believe July 3rd.

Sue Ghorayeb,  Official Court Reporter

THE COURT:  Okay.

MR. BARKET:  I think is the date that he was caught with the phone.  And we brought —

THE COURT:  So — I'm sorry.  The same day he was caught with the phone was the day that the privileged document disappears?

MR. BARKET:  Yes, the privileged document was out —

THE COURT:  Okay.

MR. BARKET:  — it was something he was working on, and they came in, searched the area and found the phone.

THE COURT:  Okay.

MR. BARKET:  And all of his discovery has been taken.  All of his personal property has been taken.  None of it has been given back to him.

THE COURT:  All as a result of this phone thing --

MR. BARKET:  Well --

THE COURT:  -- or since then.

MR. BARKET:  Since then, because it's been taken, it's been taken.  It was taken.

He's moved to SHU as part of the protocol there. We don't have any complaint with — we don't like it, but I don't mean — you know, there's no legal grounds to object to their moving him to Special Housing under the circumstances, but he's supposed to have, still have his discovery, he's still supposed to get five books — up to five books there

Sue Ghorayeb,  Official Court Reporter

and he can swap them out.

THE COURT: Yeah.

MR. BARKET: He hasn't. Batteries for his radio, he had 19 packages of batteries for his radio. None of them were given to him. So, he has a radio and no batteries for it.

There was standing water in the first cell they put him in. They moved him to a second cell, that had standing water in it. About a week ago, he woke up, got up, looked down at his cot and apparently he smothered, unbeknownst to him, a rodent that was dead on his cot.

He has not had visits from his parents or family for the last several weeks. On Friday, they spent four hours -- and they're here and you can -- they're elderly.

THE COURT: Good afternoon.

MR. BARKET: It's difficult for them to travel down to that particular area in New York City and park. They spent hours doing it, spending over an hour in the facility, and visits were abruptly canceled for reasons that weren't entirely clear.

The hard drive that we delivered to the Government, I think on July 2nd or July 3rd -- we sent it on the 2nd, I think they received it on the 3rd -- has never been given to him. The hard drives that he has access to are the old hard drives without the entire -- all of the discovery on it.

None of the paper discovery he has been given. We

Sue Ghorayeb,  Official Court Reporter

complained about the work product.

And Lieutenant Rice -- I hesitate to use the name because I fear what will happen to my client as a result, but I think it's the right thing to do -- said to him -- because all of these factors, right, we've been seeing him regularly and I ask how -- "have you gotten your books? Have you gotten the discovery? What's going on?" And he tells me what's happening in the facility. I write a letter to the Government or an e-mail and to Mr. Johnson or a call or both.

Lieutenant Rice said to him, "Stop complaining or it's gonna get worse." So -- and this is on the heels of when he was in general population and we had that conversation in court several appearances ago where Your Honor was quite emphatic that the conditions had to improve.

THE COURT: Yeah.

MR. BARKET: After that, what the facility did is, they brought officers down, searched every cell in his tier except for his, searched every inmate on the tier except for Mr. Tartaglione, and then marched Mr. Tartaglione, Tartaglione around asking him to point out the conditions that we had complained of in court, and I right away wrote an email saying, "this is what we feared, which is, instead of a remedy, there will be retribution," which is exactly what happened. Thankfully, the inmates on the tier understood what was going on, didn't take it out on him, and Mr. Johnson, to

his credit, right away got ahold of people and said, "cut it out. Stop it."

But the complaints continue not because I like doing this or I want to spend time doing it, but because I can't sit by while a client is sitting in a cell with nothing to read and nothing to listen to 24 hours a day, seven days a week, with water on the floor, rodents running around, inability to contact really anybody, waiting for some kind of legal visit. And the problems of visiting him at — with SHU in that facility are significant, somewhat alleviated by Mr. Johnson's willingness to reserve rooms for us, for our team, so if I want to go see him, I can.

THE COURT: Right.

MR. BARKET: Right. And that's a protocol that mostly works, but it doesn't always. So, even under those circumstance, we've had people waiting for hours to see him despite, despite the appointments.

Now, I get the courtesy that we're being extended, so waiting for hours to see somebody in the SHU is kind of par for the course, but even with the courtesy, it still happens from time to time, less frequently as I've been pointing it out. And I don't like to be in this position of him being caught with a cellphone and then complaining about the consequences of it, and that's not what I want to see the Court — I don't want it to be seen that way.

Sue Ghorayeb, Official Court Reporter

THE COURT: No, I understand.

MR. BARKET: He's got to pay a price for that. The price ought not include rodents, water, no books, no radio, troubles with legal visits, no discovery, not getting his hard drive, and being threatened that "if you tell your lawyer about what's happening here, we're gonna make it worse for you."

THE COURT: So, it sounds like most of what is — that you've just mentioned is since our last conference, because as I recall at the last conference — let me just -- just for the record.

MR. BARKET: Sure.

THE COURT: Because I've asked at every conference, and I think the last couple of conferences you said something to the effect of, "look, prison is never good, but -- and there are still some things we would like to see improved." But you know that whenever you wanted to bring these issues to my attention, I have solicited that, and I told you that we're going to fix the things that should be fixed. So — but the last conference or two, I don't think these issues were raised. It sounds like a lot of these things hadn't happened.

MR. BARKET: Well, some of these things had been going on well before. Since our conferences and Your Honor's assistance, they largely were addressed, I mean.

THE COURT: Right. But now they have picked up

again.

MR. BARKET:  They didn't pick up again for no reason.  The tier where he was, they had done insecticides, fixed some of the plumbing, done some of the things to alleviate any problems, brought him his property, he was getting the mail every —

THE COURT:  So this is since he got sent to SHU?

MR. BARKET:  Since he got sent to SHU, these conditions in SHU are — have always been at SHU.  When he was there, when he first got arrested, it was a big deal to get him out of there.  When he got moved from Brooklyn back to MCC —

THE COURT:  Yeah.

MR. BARKET:  — the problems — he got — if you remember, he was assaulted at one point.

THE COURT:  Yeah, yeah.

MR. BARKET:  So, the problems up there — I hate to use other — if you read just kind of the paper and then end up talking to some of the lawyers that represent some very high-profile people in this very facility, in SHU, the complaints are strikingly similar and I think true, that there is a fundamental problem with how this facility administers to the inmates overall and in SHU the problem is acute.

They have, I think, 99 people in SHU, two rooms for visiting, two.  One of them is an individual who has the

Sue Ghorayeb,  Official Court Reporter

resources to have a legal team in the attorney visiting room virtually all day, which is a big advantage, a big benefit to the person, because at least then you have somebody to talk to, you have papers you can read.  There's vending machines.  You can actually eat something.  But then that leaves one room for 98 people.

The facility has been good or tries to be good about us seeing Mr. Tartaglione on a fairly regular basis.  Obviously, there's a great deal of information that we need from him and work that we have to do with him, the motions and litigation and so forth.

And, so, it's just a fundamental problem there and I don't know why in the world they can't give him books and discovery and a cell without rodents and water.  It just — I don't understand that.  And, look, if he deserves to be sanctioned —

THE COURT:  That's a separate issue.

MR. BARKET:  Separate issue.

THE COURT:  Right.

MR. BARKET:  These problems existed before the cellphone was found, they existed in SHU every time he was in there, and they existed to a lesser degree in the general population until Your Honor interceded.

THE COURT:  So, just so I'm clear, so Mr. Tartaglione went back to SHU after the cellphone was seized?

Sue Ghorayeb,  Official Court Reporter

MR. BARKET:  Yes, that's why he's there now.

THE COURT:  Right.

MR. BARKET:  And he may very well be there —

THE COURT:  Depending on how this hearing comes out.

MR. BARKET:  Right.  I mean, I'm sure there will be some additional sanction, and it's odd because SHU is kind of — forgive the use of this phrase — capital punishment in a facility.  There's nothing else they can do to you.

THE COURT:  Yeah.

MR. BARKET:  Right?  It's not like we're going to take away your commissary for 30 days, or we're going to restrict your visits to once every other week, or you can't use the telephone or some other, you know, keeplock in your cell.  There's other intermediate steps, but it seems to go from zero to a hundred, and what else are they going to do?  There's nothing else they can do to him in that facility.

THE COURT:  Yeah.  Okay.

MR. SWERGOLD:  Your Honor, so — just so I think we all have the same record about the timeline.

THE COURT:  Yeah.

MR. SWERGOLD:  So, Your Honor is correct, because I do recall at the last conference that — I think defense counsel, Mr. Johnson, Miss Skano, who works for Mr. Johnson, and the Government were taking this and are taking this incredibly seriously, and I think we had reached sort of an

equilibrium on the issue in the unit that he was in. Now he has been moved to the SHU by virtue of being caught with the cellphone. And from where — from where the Government is sitting — and we've been on the phone with Mr. Johnson a number of times. We've had joint calls with Mr. Barket. We've seen the e-mails. Every time Mr. Barket has raised an issue — and I think, I think he'll agree to this — Mr. Johnson is incredibly responsive that we can see.

There is, obviously, different protocols in the SHU as there are in his old unit. So, yes, he had 19 packs of batteries in the old unit. He's not — Mr. Johnson explained he's not allowed to have that many in his current unit.

THE COURT: Well, but it doesn't sound like he has any.

MR. SWERGOLD: Right. And our understanding was that they were going to make sure he did get however many he was allowed to get. All of his property from his original cell had to be cleared out and brought up to SHU property, which is where, our understanding is, for example, all of his books are.

THE COURT: Right.

MR. SWERGOLD: Mr. Johnson —

THE COURT: But that happened — Mr. Tartaglione got designated to the SHU July what?

MR. SWERGOLD: Third.

Sue Ghorayeb, Official Court Reporter

THE COURT: Third. So, here we are on July 22nd. It's 19 days ago.

MR. SWERGOLD: Right. And our understanding is that the batteries and the books and all of that stuff were provided. We heard the battery complaint -- the battery issue early on in the time in the SHU. We had not heard it until today, since then. So that was raised with Mr. Johnson and we were on that call. So, we assumed that that had been provided. We've had followup calls with Mr. Johnson. We've seen the way he has responded to Mr. Barket's --

THE COURT: What about the books? Like why --

MR. SWERGOLD: So, so our understanding is that all of his property -- again, all of his books -- and he has more books than he is allowed to have.

THE COURT: So, he's allowed five though, right?

MR. SWERGOLD: Right. So, he had books. The rest were put in property.

THE COURT: Yeah.

MR. SWERGOLD: Mr. Barket sent an e-mail saying that he's had the same books, he wants to swap them out. Mr. Johnson responded immediately. "I'm gonna talk to the SHU property lieutenant, make sure that he sits down with him and those books can be changed."

THE COURT: And when was that?

MR. SWERGOLD: That e-mail was on July 19th.

THE COURT: Okay. So, we just don't know if the book swap has happened yet?

MR. SWERGOLD: That's right. Well, presumably, they may know if the books --

THE COURT: And the answer is no.

MR. BARKET: Obviously, the complaint, if you will, or my -- the reason I -- I'm not complaining about the Government --

THE COURT: Well, I know, but you've raised the issue.

MR. BARKET: -- about Mr. Johnson or the Government.

THE COURT: No, I understand.

MR. BARKET: There is a significant disconnect between Mr. Johnson saying, "of course I'll deal with it," and having it dealt with.

THE COURT: Yeah.

MR. BARKET: Because he is not the one who provides the books.

THE COURT: Right.

MR. BARKET: It's like the appointment, if you will, to visit. We write the e-mail. He says, "no problem." We get there at -- I remember Ms. Leisenring and I arrived at 8:00 o'clock -- before 8:00 o'clock actually in the morning about a week and a half, two weeks ago, and said, "look, we need to see Nick today and we need to get some work done, but

we both have appointments." I had a hearing on a wrongful conviction case that I ended up being late for, because it was an hour and a half before we got to see him.

Part of the reason is the staff doesn't show up on time. You get there at 8:00 and they say there is visiting hours, and you stand outside for however long. So, it's not, it's not Mr. Johnson's lack of response. It's not the Government's lack of sensitivity to this.

THE COURT: Right.

MR. BARKET: There is -- he has never gotten the books. He doesn't have the discovery. If the hard drive has been at that facility for two weeks or since the 16th, he still doesn't have it.

THE COURT: Okay. All right. I understand.

MR. SWERGOLD: Your Honor, with respect to the hard drive, so -- and we explained this to defense counsel. We had asked that the hard drive be sent to our office here in White Plains and addressed to our paralegal up here. It was sent up here but it was addressed to Ms. Comey. So, when the security guards saw the package, they sent it Downtown where Ms. Comey's office is now.

THE COURT: Okay.

MR. SWERGOLD: Once we received it down there, we inter-officed it back up here. It got to our paralegal, it was all burned and it was sent out on July 16th.

Sue Ghorayeb, Official Court Reporter

Our understanding from other cases too is that whenever you provide a hard drive to a facility, it takes a few days for it to go through the administrative process to be made available to where it needs to be, whether it's to a defendant or to the law library.

THE COURT:  Yes.

MR. SWERGOLD:  We will follow up again with Mr. Johnson and make sure that that drive gets to Mr. Tartaglione, because it was sent six days ago now.  And I think, I think the overall point is that, just as it was pre-SHU, and we take this incredibly seriously, we can tell Mr. Johnson and the BOP do, we fixed it before as best as we could and it seemed to be working, and we're committed to fix it again now and to make sure that the conditions while Mr. Tartaglione is in the SHU are ones where he is able to --

THE COURT:  I'll be more blunt.  I don't see why the books, the batteries, the discovery can't be provided to Mr. Tartaglione in the next 48 hours, all of it.  None of that stuff is a threat to anything.

MR. SWERGOLD:  That's correct.

THE COURT:  And it's not -- and no one is asking BOP to redo the SHU restrictions.

So, I get that Mr. Tartaglione can't have 19 batteries, but he ought to have enough to operate his radio, and -- and this is not directed to you all or to Mr. Johnson

Sue Ghorayeb,  Official Court Reporter

but to this fellow Rice and anybody else there who, by the way, we'll get back to Rice in a minute — when the battery dies, it gets replaced immediately, no administrative excuse-making.  Because that's why he wants 19 batteries, so that when they die, he's got another one at the ready.  So, whatever the max is, he gets the max, and then the first battery that dies, it gets replaced immediately, so he keeps at the max that he's allowed in the SHU.

But nobody is stupid here, right?  You know, there are all kinds of little things that can be done that delay things and the delay is problematic for Mr. Tartaglione and it's not going to be allowed here.  So, again, I'm not asking BOP to redo its SHU Guidelines, but I'm asking them to respect what the Guidelines say immediately.

MR. SWERGOLD:  Yes, and we will convey that message today to Mr. Johnson.

THE COURT:  Because I'm going to start having hearings and I'm going to make people very uncomfortable.

Again, I got no beef with you or Ms. Comey or Mr. Johnson.  I know you all have been taking this seriously, a hundred percent you've been taking it seriously, but talk is cheap.  We gotta get this done.

MR. SWERGOLD:  We agree, Your Honor, and we will convey that message.

THE COURT:  Okay.

MR. SWERGOLD: One other point that I just wanted to make was on the issue of — Mr. Barket described it as a sensitive privileged document.

THE COURT: Yes.

MR. SWERGOLD: So, our understanding from BOP and from Mr. Barket was, yes, there was materials that Mr. Tartaglione had out at the time that he was taken to the SHU. Mr. Barket raised that. And, so, the property is gathered up, right, and it's transferred. And Mr. Barket raised that issue with BOP, we were on a call and I think there might have been an e-mail, and BOP confirmed, one of the attorneys from BOP actually went down to the cell to look, to make sure. There was I think a lot of loose papers that they were able to flip through without looking at substance but just see, okay, court heading for an inmate, for the cell mate or court heading for Mr. Tartaglione, to make sure that there was property — that any of his property that was there that was discovery, including this document, could be accounted for.

THE COURT: Yeah.

MR. SWERGOLD: That document was not in the cell. We obviously take incredibly seriously any allegation that it was stolen by a member of the BOP. It could have been taken by his cell mate, we just don't know, but BOP immediately went down there. And we will follow up with them again to see, to see if that document has been located, but they went to the

Sue Ghorayeb,  Official Court Reporter

cell right away to check and it was not there.

THE COURT: So the stuff that was there, what happened to it?

MR. SWERGOLD: It's taken to the SHU property and to his new cell in the SHU.

THE COURT: But, apparently, he hasn't gotten it.

MR. SWERGOLD: Right. So, there is a -- there's a SHU property room I guess --

THE COURT: Yeah.

MR. SWERGOLD: -- is what it is, and there is a lieutenant who oversees it, and he can go and see that property while he is there in the SHU. That's sort of the way it gets done when he --

THE COURT: So, he doesn't get to bring it into the cell with him in the SHU?

MR. SWERGOLD: That's correct.

THE COURT: Okay.

MR. SWERGOLD: That's our understanding.

THE COURT: So, no discovery he gets to review in his cell at SHU?

MR. SWERGOLD: Just one moment, Your Honor.

THE COURT: Yeah.

MR. SWERGOLD: Your Honor, I don't know the exact regulations about how much he can have it. It may be that he can take some but not all, consistent with sort of like the

books.

THE COURT:  He apparently has none.

MR. SWERGOLD:  Right, and we -- and that is an issue that -- at least when -- at least when it was conveyed at the outset to Mr. Johnson, and we will follow up today when we speak with Mr. Johnson to convey Your Honor's order.

THE COURT:  Yeah.

MR. SWERGOLD:  Our understanding was that that property was being provided up to the SHU so that he could have access to it, along with the books and the batteries and everything else.  If it is not there now, obviously, that's something that needs to be fixed.  We're going to talk to them right away about it with respect to any of the paper discovery and the old hard drives.  And then this current hard drive, we're going to tell Mr. Johnson it was sent to the facility, let's make sure it gets to the facility and to Mr. Tartaglione right away.

THE COURT:  The clock is ticking.

MR. SWERGOLD:  Yes.

THE COURT:  Forty-seven hours and 50 minutes.

Standing water, rodents.

MR. SWERGOLD:  Yes.  The same thing, Your Honor. When -- so, when the first complaint of standing water was sent to Mr. Johnson, they moved Mr. Tartaglione into a different cell.  He was -- they -- when Mr. Barket alerted Mr.

Sue Ghorayeb,  Official Court Reporter

Johnson to new standing water, I think Mr. Johnson responded right away that he was going to have -- yeah, I understand facilities are looking into the plumbing and should have them corrected very soon.

With respect to the rodent, I think it's the same thing, and in fact, actually, Mr. Johnson went sort of -- I think using his sort of specialized knowledge at the MCC, his first response -- in addition to making sure this stuff is taking care of -- is: Does Mr. Tartaglione have any concerns that it was put there by a cell mate, perhaps as some kind of message. Mr. Barket assured that it seems they're getting along fine, so that that's not the issue.

So, Mr. Johnson is very tuned in to any issues that are going on with Mr. Tartaglione, and, again, from what we can see from our conversations with him and from the e-mails, he is incredibly responsive and we're going to continue --

THE COURT: Right, but nothing needs to get lost in translation. So, he may say the right thing and direct things to be fixed, but he needs others to carry out his directives.

MR. SWERGOLD: Right. And I think this will be what we saw before the last conference, Your Honor, which is, BOP legal is very responsive.

THE COURT: Yeah.

MR. SWERGOLD: We can let them know non-legal people are going to need to be here for a hearing if something is not

Sue Ghorayeb,  Official Court Reporter

done in the next 24 or 48 hours —

THE COURT:  Yeah.

MR. SWERGOLD:  — and things get fixed.  And, so, hopefully, as they were done before, they will again get fixed.

THE COURT:  And here is the other message you need to convey.  Any guard who thinks that they can get away with any retaliation, they got another thing coming.  I'm going to have a hearing and I'm going to have a guard who is accused of doing anything of the sort on that stand answering my questions, and God help him if I make findings that I think are appropriate under the circumstances that they are doing anything to retaliate against Mr. Tartaglione or lying to me about it.  They need to understand that it's in their interests to not retaliate at all, even think that they can get away with it, and I'm sure the U.S. Attorney's Office shares my concern in that regard.

MR. SWERGOLD:  We do, Your Honor, absolutely.

THE COURT:  All right.  So, let's, let's see if this works, Mr. Barket.  If it doesn't, then we will consider alternatives.

And do we know when this hearing is supposed to take place regarding the cellphone, if that's publicly knowable information?

MR. SWERGOLD:  I think I have an e-mail, Your Honor.

Sue Ghorayeb,  Official Court Reporter

MR. BARKET:  There's -- they used the same e-mail that was referred to when I was asking why haven't they done it.  He said it will take place shortly, so sometime this week.

THE COURT:  Okay.

MR. BARKET:  The preliminary hearing and hopefully the final adjudication and we'll see where that leaves us.

THE COURT:  Okay.  I mean, do we know if it's going to be contested?  Is there going to be, you know --

MR. BARKET:  No.  No.

THE COURT:  This is just going to be mostly decided on what the appropriate sanction is?

MR. BARKET:  What the appropriate sanction is, Your Honor.

THE COURT:  Okay.

MR. BARKET:  And I've had conversations with Mr. Johnson about the range of possibilities.  And, look, for good or for bad, without commenting at all, this is not unique or even unusual.

THE COURT:  Right.  There may be an informal -- I hate to use the phrase guidelines, but there may be some history.

MR. BARKET:  Quite a bit of history as to that.

THE COURT:  Yes, as to what the range is of punishing people, like first offenders, that kind of thing.

Sue Ghorayeb,  Official Court Reporter

And, so, if there is a sentence that's way outside of what the recent range has been, I'm sure, Mr. Barket, you will let me know.

MR. BARKET:  I will.

THE COURT:  I don't want to micromanage BOP's administrative sanctions process, but I don't want it to be used as a guise to retaliate against Mr. Tartaglione for making sure that he and his rights are protected.

MR. BARKET:  Or against Mr. Tartaglione because his lawyer is --

THE COURT:  Yeah, exactly, right.  I don't want it to be used for retaliation in any way, shape or form.

If he is found to have improperly been in possession of a cellphone, then that's their call as long as the sanction is within the bounds of what they've been sanctioning other people in similar circumstances.

And, again, I don't want to micromanage the BOP, but if it turns out, hypothetically, the sanction he gets is ten times what another person has got under similar circumstances, then somebody up here is going to have to explain that to me, and I don't mean ten times to suggest the floor either.

MR. BARKET:  I certainly understood --

THE COURT:  Right.

MR. BARKET:  -- what Your Honor was saying.

THE COURT: You all relay that.

The Government is shaking its head yes.

MR. BARKET: Listen -- I mean, look, I hope that we can fix this. He's not the only client we have there and we -- I've actually had the opportunity to speak to a number of different inmates in the facility. This place is a problem. MDC got a lot of publicity with the blackout for good reason. It's not close to as bad as MCC in terms of the conditions and what goes on inside there. As a lawyer who visits there now, you know, a couple of times a week --

THE COURT: Yeah.

MR. BARKET: -- it's a problem.

THE COURT: Well, I'm assuming our two A.U.S.A.s here will convey those concerns to their higher-ups and they can think more broadly about institutional fixes to some of these problems, because doing it as an individual approach isn't in anybody's interests. It's certainly not in the interests of you two, spending time dealing with this kind of stuff, which is super-important but not what you thought you were going to be doing when you took this job.

MR. SWERGOLD: We take it incredibly seriously, Your Honor. It gets discussed at the highest levels of our office --

THE COURT: Okay.

MR. SWERGOLD: -- and we continue to work with BOP.

Sue Ghorayeb,  Official Court Reporter

58

THE COURT: All right. Okay. So, Mr. Barket, you know, we will schedule another conference, but in the meantime don't be shy to write me a letter if it turns out things are not improving or have gotten worse, God forbid, on these issues.

Okay. Other issues to raise?

MR. RICCO: Good afternoon.

THE COURT: Mr. Ricco, good afternoon.

MR. RICCO: Not an issue to be raised and actually not a point to be made. Just so that the Court has the assurances that the other aspects of this very important case is taking place in earnest and it is, you know, quite an undertaking, and all of those things are happening as the Court can see reflected here in the proceedings today. And Ms. Comey and I have had some informal discussions about what the capital motion schedule would look like and we've been going back and forth on that. You know, we'll finish these motions and then start that. We're working towards those goals and I will continue to keep in touch with Ms. Comey.

THE COURT: I don't have the slightest doubt that the lawyers -- all of the lawyers on this case are performing at the highest levels of the profession, not the slightest doubt. So, I appreciate you saying that, but like I said, I don't have any doubts. But the record should be clear, so I thank you for making that clear for the record.

Sue Ghorayeb, Official Court Reporter

All right.  Any -- anything else?

So, we should schedule our next conference while -- what do you want to do, Mr. Barket, in that regard?

MR. BARKET:  Well, I don't know what the Court's availability is in August, but --

THE COURT:  I'm most available the week of the 19th.

MR. BARKET:  Then that would be --

THE COURT:  You want to do it that week?

MR. BARKET:  That would make some sense, yes.

THE COURT:  Okay.  That's roughly 30 days.  It's been keeping to our schedule.  How about the 22nd?

MR. BARKET:  Could we do it a little earlier in the week just to have everybody here, at least, the county players here?

THE COURT:  How about Tuesday the 20th, at 3:30?

The morning is booked solid.

MR. SWERGOLD:  Your Honor, both of the prosecutors here are not available on the 20th.  We can send somebody else if that's the date that works for everybody.  Otherwise, we would just prefer another date.

THE COURT:  Well, can you do the 21st?

MR. SWERGOLD:  Yes, we can.

THE COURT:  Okay.  Can you do the 21st, Mr. Ricco?

MR. RICCO:  Yes, Your Honor.

THE COURT:  All right.  Then, let's see if we can do

this on the 21st.  How about noon on the 21st?

MR. RICCO:  That will be fine.

THE COURT:  Is that okay?  Does that work for the Government?

MR. SWERGOLD:  Yes.  Thank you, Your Honor.

THE COURT:  All right.  Noon on the 21st then.  But, again, if there are issues —

MR. BARKET:  You know I will.

THE COURT:  Okay.  Okay.  So, both with respect to the conditions in the prison, and then I'm going to assume you're going to work out the protocol issues with any possible search.  If there's a dispute on that, obviously, let me know, okay.

Any objection to excluding time from now until August 21 of 2019?

MR. BARKET:  No.

THE COURT:  Okay.  Then, I'll prospectively exclude time from today until August 21 of 2019, finding it's in the interests of justice to do so.  There are a number of reasons for this.  Counsel are working diligently on the motions. They obviously need time to do that.  They need time to prepare their next set of motions.  There are the issues with respect to the cellphone that have come up and the general preparation of the case.  All of those are reasons why the interests of justice outweigh the public's and Mr.

Sue Ghorayeb,  Official Court Reporter

Tartaglione's interest in a speedy trial.  The finding is made pursuant to 18 U.S.C. Section 3161(h)(7)(A).

Anything else?

MR. RICCO:  No, Your Honor.

MR. BARKET:  No.

MR. RICCO:  Thank you very much.

THE COURT:  Okay.  Anything else?

MR. SWERGOLD:  No.  Thank you, Your Honor.

THE COURT:  Then we're adjourned.

Thank you, marshals.

(Case adjourned)

Sue Ghorayeb,  Official Court Reporter

# EXHIBIT 3

Jeffrey Epstein on suicide watch after injury in jail

POLITICS

# Jeffrey Epstein on suicide watch after accused sex trafficker is found injured in New York jail

PUBLISHED WED, JUL 24 2019·10:56 PM EDT    UPDATED THU, JUL 25 2019·5:45 PM EDT



**Dan Mangan**
@_DANMANGAN

**Kevin Breuninger**
@KEVINWILLIAMB

SHARE  f  🐦  in  ✉

## KEY POINTS

Accused sex trafficker Jeffrey Epstein is on a suicide watch after the wealthy financier was found mysteriously injured in his cell in a federal jail in New York City, WNBC-TV reported Wednesday night.

According to sources, officials do not know whether Epstein tried to hang himself, if he staged a suicide attempt, or if he was assaulted.

The former friend of presidents Donald Trump and Bill Clinton is accused of sexually abusing dozens of young girls at his New York and Florida residences in the early 2000s.



    



Accused sex trafficker Jeffrey Epstein is on a suicide watch after the wealthy financier was found mysteriously injured in his cell in a federal jail in New York City, WNBC-TV reported Wednesday night.

Epstein, who was arrested in early July on federal charges, was on the floor of his cell in a fetal position when he was discovered, sources told NBC. He was semi-conscious and had marks on his neck when he was found.

Epstein may have tried to hang himself in the lower Manhattan lockup, according to sources who spoke with WNBC-TV.

But another source said Epstein's injuries were not serious, and raised the possibility that he may have used the incident to try obtain a transfer from the jail.

A fourth source who spoke with NBC said that officials have not ruled out the chance that Epstein was assaulted in the Metropolitan Correctional Center, where he was being held in the jail's Special Housing Unit to protect him against possible violence from inmates in general population.

Another inmate in that jail, where Epstein is being held without bail, has been questioned about the incident.

NBC reported that the inmate was Nicholas Tartaglione, a former Orange County, New York, police officer who was arrested in December 2016 and accused of killing four men in an alleged cocaine distribution conspiracy.





Two sources told NBC on Thursday that Tartaglione was cellmates with Epstein.

A spokesman for the U.S. Bureau of Prison said on Thursday that Epstein remains in the MCC, despite some reports that he is in a local hospital.

"As with all inmates, for privacy and security reasons, we do not share information on an inmate's medical status or their conditions of confinement," the BOP spokesman said.



**VIDEO** 11:25

**NYT reporter explains Jeffrey Epstein's Wall Street connections**

Sources told WNBC that Tartaglione claimed that he did not see anything happen to Epstein, and said he did not touch him.

Tartaglione's lawyer Bruce Barket told CNBC on Thursday that Epstein and his client were in the Special Housing Unit, but would not confirm that they shared a cell.

"They interacted extensively," Barket said of Epstein and his client. "They've gotten along pretty well."

Tartaglione has pleaded not guilty in his case. Prosecutors announced in March they would seek the death penalty for the ex-cop.



f      y      in      ✉

The U.S Attorney's Office for the Southern District of New York, which is prosecuting Epstein, declined to comment.

Bruce Barket said in an email to CNBC on Wednesday night: "Any suggestion that Mr. Tartaglione assault[ed] anyone is a complete fabrication."

"This story is being leaked to retaliate against Mr. Tartaglione for complaining to the court about the deplorable conditions at the MCC," Barket said.

"We made those complaints on Monday in open court ... We warned the judge that officials at the jail would retaliate against Nick because we have been exposing the inhumane conditions at the facility."

Lisa Bloom, a lawyer who says she represents several accusers of Epstein, tweeted in response to the news about his injury.

Epstein, 66, was indicted this month on charges of sex trafficking and conspiracy to commit sex trafficking in U.S. District Court in Manhattan. He faces up to 45 years in prison if convicted.

A judge last week denied him bail of upwards of $100 million because he represented a danger to women if released, and his risk of flight due to his vast wealth.

Judge Richard Berman also noted the fact that Epstein had in recent months made large payments to potential witnesses against him, and the discovery by FBI agents of a trove of lewd photographs of young women at his Manhattan townhouse.

"This newly discovered evidence also suggests that Mr. Epstein poses 'ongoing and forward-looking danger,'" the judge wrote. "Mr. Epstein's dangerousness is considerable and includes sex crimes with minor girls and tampering with potential witnesses."

Epstein's lawyers on Monday notified Berman that they plan to appeal his bail denial.





**VIDEO**   00:58

## NBC archive footage shows Trump partying with Jeffrey Epstein in 1992

Epstein, a former friend of presidents Donald Trump and Bill Clinton, has pleaded not guilty in the case.

Prosecutors say he sexually abused dozens of underage girls from 2002 through 2005 at his New York City townhouse and Palm Beach, Florida, who visited him under the guise of giving him massages. Some of the girls were as young as 14 years old.

Epstein pleaded guilty in 2008 to state prostitution charges in Florida related to an underage girl.

He served 13 months in custody in that case, but spent much of that time on work release.

He was not prosecuted on federal charges at the time due to a non-prosecution agreement he reached with the U.S. Attorney's Office in Miami, which was headed at the time by Alex Acosta. Acosta resigned this month as U.S. Labor secretary after controversy over that deal.



f        in   

## TRENDING NOW

 **The coronavirus has mutated and appears to be more contagious now, new study finds**

 **Norwegian Cruise Line sees 'substantial doubt' about its future, warns of possible bankruptcy**

 **Amazon engineer says he 'snapped' when company fired workers calling for coronavirus protections**

 **Elon Musk's lavish LA mansions appear to be listed for sale days after he pledged to 'own no house'**

 **When will we start traveling again? Here's what experts are saying**

Sponsored Links by Taboola

FROM THE WEB

　　　　　　　　　　　　　　　　

## The New 2020 Volvo SUVs Outshine The Best in Their Class!

Volvo Lineup | Search Ads

## The Five Guys Ordering Secret You Need To Know

Wikibuy



| | |
|---|---|
| Subscribe to CNBC PRO | Licensing & Reprints |
| CNBC Councils | Supply Chain Values |
| Advertise With Us | Join the CNBC Panel |
| Digital Products | News Releases |
| Closed Captioning | Corrections |
| About CNBC | Internships |
| Site Map | Podcasts |
| AdChoices | Careers |
| Help | Contact |

     

## News Tips

Got a confidential news tip? We want to hear from you.

GET IN TOUCH

 **CNBC Newsletters**

Sign up for free newsletters and get more CNBC delivered to your inbox

   

SIGN UP NOW

Get this delivered to your inbox, and more info about our products and services.

Privacy Policy

Do Not Sell My Personal Information

Terms of Service

© 2020 CNBC LLC. All Rights Reserved. A Division of NBCUniversal

Data is a real-time snapshot *Data is delayed at least 15 minutes. Global Business and Financial News. Stock Quotes, and Market Data and Analysis.

Market Data Terms of Use and Disclaimers

Data also provided by



   

# EXHIBIT 4

# Statements To The Press Concerning a Detainee named Jeff Epstein

From: Tony Ricco

Date: Thu, 25 Jul 2019 at 7:52am

Have statements been made to the press concerning an alleged incident involving the detainee Jeff Epstein? If so, what are they?



## Bruce Barket Thu, 25 Jul 2019 at 7:55am

Below is what I wrote to several outlets. In my conversations with others I have refused to talk about Epstein but emphatically denied any involvement by Nick and then tried to redirect the conversation to the conditions at the mcc.

"Any suggestion that Mr. Tartaglione assault anyone is a complete fabrication. This story is being leaked to retaliate against Mr. Tartaglione for complaining to the court about the deplorable conditions at the MCC. We made those complaints on Monday in open court. Get the transcript. We warned the judge that officials at the jail would retaliate against Nick because we have been exposing the inhumane conditions at the facility."



## bkoffsky@snet.net Thu, 25 Jul 2019 at 8:12am

https://www.nbcnewyork.com/news/local/Jeffrey-Epstein-Found-Injured-in-NYC-Jail-Cell-After-Possible-...



## Michael K. Bachrach Thu, 25 Jul 2019 at 8:31am

This article also mentions Nick and references Bruce B.'s comments without quoting them.

https://www.dailymail.co.uk/news/article-7283825/Jeffrey-Epstein-injured-jail-cell-following-possible-suicide-assault.html



## Tony Ricco Thu, 25 Jul 2019 at 8:37am

Unfortunately, the above statements may have a significant negative impact on our ability the develop Mr. Tartaglione's mitigation case.  Statements to the press in a death authorized case should always be discussed with the Team, particularly with Learned Counsel, and optionally Resource Counsel, who have experience in how these statements will impact the ability to effectively present mitigation.  Going forward, can all Team members *please* refrain from making statements to the press in this death authorized case before *at least* consulting with Learned Counsel and/or Resource Counsel.



## john diaz Thu, 25 Jul 2019 at 9:03am via email

There is an article in the Daily Beast that quotes Bruce B extensively and details his complaints against the jail and retaliation Nick has experienced.

Sent from my iPhone

>



## Michael K. Bachrach Thu, 25 Jul 2019 at 10:17am

Here's the Daily Beast article that John mentioned.

https://www.thedailybeast.com/jeffrey-epstein-found-injured-in-manhattan-jail-cell

I assume everyone gets this already but as Tony mentioned this incident will significantly hamper our ability to establish that Nick is not a future danger. We still have ways to make the argument, but now we will have to do so without opening the door to this incident, and will need to move in limine to preclude reference to it, regardless whether the allegations of Nick's involvement turn out to be unfounded. The last thing we want now is a trial within a trial regarding whether it's safe to be Nick's cellmate. There's simply no way to win that argument now, even if Nick had absolutely nothing to do with what occurred.

We should also discuss with resource counsel whether this incident, or the press related to it, will need to be addressed in some way during jury selection.

We had been gift wrapped a mitigating factor, but now that's gone. Feel free to call me or Tony if you'd like to discuss this some more.



### Bruce Barket Thu, 25 Jul 2019 at 10:18am

I am always happy to to talk with anyone about any aspect of the case. Tony, I will give you a call now.



### Bruce Barket Thu, 25 Jul 2019 at 10:23am

Mike,

Read Aida's post from yesterday. Nick saved this guy's life! He called for help. Epstein was put in Nick's cell because the jail knows Nick wouldn't hurt him. They are friends, just like virtually every other cell mate Nick has had.

This incident, despite the initial bad press (against which, I am pushing back hard), should be helpful. I didn't go to the press. The press was reporting on this regardless.



### Michael K. Bachrach Thu, 25 Jul 2019 at 10:59am

I saw Aida's post. If Nick tried to save Epstein's life that's great, as is the fact that they were placed in a cell together for Epstein's protection. That's the gift wrapped mitigation that I was referring to. The problem is that if the BOP digs in its heels in the belief that Nick was involved (either by assaulting Epstein or helping Epstein stage the incident) then all of that great positive mitigation will be lost to us. Worse still, unless we win a crafty motion in limine, even if Nick is cleared we will be unable to introduce this Skipper evidence without opening the door to the Gov't's rebutal argument that Nick may have in fact been involved. There are no cameras that will show what occured inside the cell, so no way of indisputably exculpating him.

661

With respect to incidents negatively impacting upon a juror's view of a defendant's future danger, there is no good press. Let's just hope none of our jurors read any of these articles.



## Aida Leisenring Thu, 25 Jul 2019 at 11:04am

I understand the cameras won't show what occurred in the cell, but if they show Nick standing in the hallway looking concerned, or them dragging Epstein out who appears unconscious as opposed to semi-unconscious, and if it shows COs taking out a ripped sheet that was used as a noose, it will at least help corroborate the suicide attempt - and if it shows COs running in, that will corroborate that someone (Nick) yelled out for help, as opposed to them just discovering this during a routine flashlight check. Also, it may show the light being turned on in the cell, which would corroborate Nick discovering him, turning a light switch to check, and then COs running in shortly thereafter.



## Bruce Barket Thu, 25 Jul 2019 at 11:10am

Just got off the phone with Tony. I think it is important for us to talk about this stuff BEFORE anyone of us act. Last night's calls to my house at 10:55 just before the story was going to air, did not allow for that. I had to make a decision about whether and how to respond. I know that my view on responding to bad press is a minority view in the profession, but a view I am comfortable with. Mike if you want to talk more about this, call my office 516 745 1500. I would like to hear your thoughts in more detail.

I can say this, that in the future, if I can, I will and want to get input from everyone on the team before I do or say something. I might still do it or say it, but at least I will have the benefit of our considerable collective wisdom.



## Kenneth Montgomery Thu, 25 Jul 2019 at 12:09pm via email

I think its too early to tell at this point but I agree that press in general is not helpful. The Doj's announcement of 5 executions today and more in the future brings home the seriousness of where we are at.

Sent from kjmontgomerylaw.com

>



## Michael K. Bachrach Thu, 25 Jul 2019 at 1:41pm

The press related to this incident keeps getting worse. The story has evolved from one about Epstein, to one about Epstein that references Nick, to now one about Nick that references Epstein.

This article was posted on the NY Post website around 12:40 p.m.: https://nypost.com/2019/07/25/jailed-ex-cop-questioned-about-jeffrey-epsteins-injuries/

The headline: "Jailed 'killer cop' questioned about Jeffrey Epstein's injuries." The article is about how Nick is being investigated in relation to the incident, and, unfortunately, the way it is written gives off the impression that the incident occured while the two were cellmates in 10-South. In relation to that, here's what the article says:

"Earlier this month, The Post exclusively revealed that Epstein was being housed in the '10 South' unit, a block of six cells known as the 'terror wing' because it's where the city's most dangerous federal inmates, including alleged terrorists, are held. Tartaglione's lawyer, Bruce Barket, said the beefy ex-cop, 51, and Epstein were housed 'in the same unit and doing well,' according to NBC News 4, which first reported the questioning of Tartaglione."

I just this discussed article with Tony. He asked that everyone please refrain from any further comments to the press.



## Bruce Barket Thu, 25 Jul 2019 at 1:42pm

Ironically, the post is one publication I have not spoken to.



## Michael K. Bachrach Fri, 26 Jul 2019 at 5:04pm

Attached is a copy of the NY Post article as published in the print edition. The paper updated the language prior to going to press, and it's even worse than what was available when I first posted the link.

Regardless of the actual language, it's worth looking at the print edition to see the visual that our potential jurors are likely to be seeing.



## 7-26-19 NYPost Ex Cop cellmate now eyed in jail choking - Epstein Twist.pdf

697 KB



### Kenneth Montgomery Fri, 26 Jul 2019 at 5:20pm via email

I honestly don't see how this aids the client in any way. My understanding of the case law and the ethical rules leads me to believe that these statements can be devastating from a mitigation standpoint and likely will come back to possibly haunt and hinder us at some point. They have the potential to take away very valid future danger arguments and from my understanding of this week's appearance some of the statements can be construed to be in direct contradiction of the record made in court this week. I also feel that the government at some point are going to compare what's been said in the press and what was made on the record to possibly argue that Bruce may be a witness to certain events. We probably all have about 200 years of legal experience amongst us and we know prison conditions is a real thing, however the crusade against the Bop conditions in this manner and in this case where so much is on the line is potentiaally deadly (no pun intended). The Bop issue is intertwined in the case in such a way that every word to the press has the potential of hurting future arguments. I just don't think its a good thing particularly when Epstein is such a toxic figure and fighting the BOP in this manner is a losing battle and could prove to be a deadly distraction. Again this is just my opinion, watching the news and reading the articles concerning the Client felt very uncomfortable knowing what's at stake and I think there is very little value in our client's favor to be gathered from such a public display considering what he's charged with.



### Bruce Barket Fri, 26 Jul 2019 at 5:55pm

I appreciate everyone's input and thoughts. Happy to discuss further over the phone or in person if we can. My cell is 516 287 7230, my office is 516 7456 1500.



### David Ruhnke Fri, 26 Jul 2019 at 6:12pm via email

I think the best course here is to hold off any further comment until we have a clearer understanding of what the facts are and whether Nick is going to be tagged with what amounts to a serious assault/attempted murder of a cellmate, supporting a future danger claim, or whether he acted in a way that helped save a suicidal cellmate's life. Concerned about the FREvid 801 implications of anything said by his attorneys. Plus circumstance rules of evidence do not even apply at penalty.

"Ladies and gentlemen, not only did Nick Tartaglione commit this attempted murder of his high-profile cellmate, he got his lawyers to lie to the public about what really happened."

David R.



### Bruce Barket Fri, 26 Jul 2019 at 6:19pm

If Nick gets charged with a serious assault or attempted murder on Epstein, his lawyer's assertions to the contrary are the least of his problems. You will note that I have not been quoted describing what happened.



### Kenneth Montgomery Fri, 26 Jul 2019 at 7:26pm via email

Yes I saw the reporters ask the question on Fox and I think you responded that its privileged.

## Justice Department plans to restart capital punishment after long hiatus

From: Michael K. Bachrach

Date: Thu, 25 Jul 2019 at 11:05am

https://www.washingtonpost.com/national-security/justice-department-plans-to-restart-capital-punishment-after-long-hiatus/2019/07/25/f2cc6402-aee5-11e9-bc5c-e73b603e7f38_story.html?utm_term=.cf87bc648b04

# EXHIBIT 5

## The Continuation of Public Statements Detrimental to the Development and Presentment of Evidence at the Penalty Phase

From: Tony Ricco
Date: Sat, 27 Jul 2019 at 2:52am

It is very disturbing that these interviews have continued notwithstanding the recommendation made and agreed upon on Thursday, July 25, 2019.

On July 25, 2019, it was requested that team members please refrain from making statements to the press, a dangerous practice frowned upon in death authorized cases. Notwithstanding that request, further interviews were conducted later in the day on July 25, 2019, and worst of all, on public television Fox 5 on Friday, morning July 26, 2019. http://www.fox5ny.com/news/epstein-held-in-deplorable-jail

As I watched the Fox News broadcast, there were several statements by counsel that put Mr. Tartaglione in serious jeopardy for the presentation of aggravating evidence at the penalty phase based upon statements made by his own counsel as adoptive admission, authorized admission or admissions by an agent. See, *United States v. McKeon*, 733 F.2d 26 (2d Cir. 1984); Federal Rule of Evidence, Rule 801(2)(d)(B), Rule 801(2)(d)(c) and Rule 801(2)(d)(D); See also, *United States v. Reyes*, 10-10323 (9th Cir. 2011)(district court did not error in admitting public statements - in the form of two press releases that the defendant did not engage in the charged criminal conduct)

There were also several statements, which in addition to providing a basis for the introduction of adoptive admissions, authorized admissions and/or admissions by agent, which when combined with statements made by counsel in open court on July 22, 2019, (an observation by Ken Montgomery) have the potential to serve to disqualify counsel and other members of this team - as potential witnesses. See, *United States v. Locascio*, 6 F.3d 924, 933 (2d Cir. 1993)

Mr. Tartaglione is blessed to have several experienced capital counsel on his case, along with equally experienced mitigation specialists and others who have proceeded to capital verdict. In addition, David Ruhnke, our Resource Counsel, has tried 19 capital murder cases to penalty verdict. It was requested that team members *at least* consult with either Learned Counsel or Resource Counsel before making any further statements to the press - a concern shared by all team members with capital experience. That advice, however, was ignored. Unfortunately, there have been additional further interviews with more statements that have further placed Mr. Tartaglione in jeopardy having to address aggravating evidence at the penalty phase provided by his own counsel.

It is absolutely critical for counsel in a death authorized case to be aware of how public statements (particularly around facts related to mitigation and/or aggravating evidence under investigation) can be used against the interest of the defendant at the penalty phase of a capital case. In addition, it is critical for counsel to be aware of how, in this case, statements (on matters under investigation, including the possession of contraband in prison) have the potential to disqualify counsel - on the grounds that he or she may become a

668

potential witness. See, *United States v. Locascio*, 6 F.3d 924, 933 (2d Cir. 1993). It for this reason, that it was requested that team members refrain from any further statements to the press in this case.

**An Example** (In addition to example David Ruhnke provided)

At the pre-trial conference on July 22, 2019, there was a spirited argument concerning the possession of contraband by Mr. Tartaglione - a cellular phone, and the use of the cellular phone to text to individuals outside of the prison, including to counsel. The possession of the cellular phone *itself* is an aggravator, and we can expect to be confronted with this evidence at the penalty phase of this authorized death penalty case.

However, a detainee's actual use of the cellular phone to text messages is an exacerbating or additional aggravator. Keep in mind that at the July 22, 2019 pre-trial conference, the government stated on the record that the cellular phone seized from Mr. Tartaglione was incapable of texting. Counsel, however, indicated that the cellular phone was, in fact, capable of texting and used by Mr. Tartaglione for that purpose. Counsel stated that he was aware of the texting capability because the defendant had used the contraband telephone to text counsel (and others), and that there were, in fact, text messages read by counsel.

Although counsel stated that there was no response, counsel made himself and possibly other counsel and members of the team, a potential witness to be called by the government to establish a serious aggravating factor - the use (not just the mere possession) of the contraband cellular phone. This potential testimony is exacerbated by statements made by counsel to the press during the Fox 5 interview that Mr. Tartaglione is (1) a *"model prisoner in many ways,"* who (2) *"liked, and respected and gets along zwell" with people he is incarcerated with;"* and who (3) *"now gets along with the guards and inmates."*

The above are some of the problematic statements made by counsel during the Fox 5 interview which undermine the ability to present mitigation evidence on behalf of Mr. Tartaglione. However, there is more. The proliferation of the newspaper articles on this sad episode involving Jeff Epstein, and statements by counsel of the "cordial," "friendly" relationship between Mr. Tartaglione and Jeff Epstein, will require extensive *voir dire* on Jeff Epstein - an ugly proposition that has been exacerbated by statements by counsel.

Moreover, the BOP investigation is in its early stages. Regardless of the outcome, we are certainly aware that the facts will either be presented in mitigation or aggravation at the penalty phase. As such, it is improper for counsel to make public statements concerning that pending investigation. The New York Rules of Professional Conduct, Rule 3.6(a).

Pursuing this toxic, divisive issue in this manner has undermined our collective efforts to protect Mr. Tartaglione at the penalty phase of this authorized death penalty case. Going forward, all counsel must refrain from making statements to the press, and again, I am requesting that any counsel who believes that making a public statement is somehow going to help us defend this death authorized case, and who believes that he or she is within the ethical rules, to at least discuss the proposed statement with experienced capital counsel before hand. To proceed without consulting with the counsel with considerable capital experience in

this case, just does not make any sense. And, thus far proceeding in this manner has placed Mr. Tartaglione life at jeopardy at the penalty phase, and may also very well result in the discharge of counsel from this case. Please refrain from further public statements on this Epstein matter, the BOP ongoing investigation, and "statements of fact" related to Mr. Tartaglione's conduct in detention, including his possession and use of an unauthorized cellular phone.

Next week this time, our defense team will be in Santa Clara, which will provide an outstanding opportunity to develop our mitigation case, and to address penalty phase aggravating evidence with some of the best capital defense lawyers in the country. Team members should be focusing on the preparation for our participation at Santa Clara which will focus on mitigation development.



US v McKeon.pdf
354 KB



US v Locascio.pdf
560 KB



**Bruce Barket** Sat, 27 Jul 2019 at 5:55am

I am looking forward to Santa Clara, although attending a 5 day seminar will be very difficult given the work on our plate for Nick and other clients. I appreciate Tony getting me and Aida admitted into the program at the last minute. Like Boulder, I will attend, prepare, work hard and learn everything I can.

I am also very appreciative of the input on the Epstein/jail condition issue from everyone on the team. Tony, in particular took an hour on the 25th to speak with me. I agree it is important to continue to speak about this and every issue that comes up. Of course consultation and discussion won't always lead to agreement. Responding to press inquires about our client on a matter that will receive substantial attention and which cast our client in a negative light, I think it is appropriate, helpful and ethical to respond. I understand others feel differently and that my view may be a minority view. Please reach out to me personally or continue to write here. I am open to changing my mind.

As to the issue regarding the phone, we jointly agreed to write a letter to the court asserting a privilege. In fact, I don't think the letter was my idea, but I agreed with Tony and Michael that we should write it. The privilege is only applicable here if texts were sent and we know they were. We discussed early on a strategy of not writing the letter in the hope that the government would not discover the texting capabilities of the phone. I agreed that the letter, which Michael was kind enough to draft, was appropriate because I know the government intends to obtain the phone records which will indicate data in addition to phone calls. The Government's ignorance, whether feigned or real, about the texting capabilities was not going to last long. If

670

we wanted to rest on the hope that the texting capabilities of the phone would remain undiscovered then I would not have been in favor of writing the letter.

I saw Nick Thursday evening and he was in good spirits, happy to have received books, batteries for his radio AND discovery. In reviewing that with him it was obvious that he received material we have not been given, including important leads that we must follow up on. (Jim I will reach out. We have some information we have been searching for).

But his parents saw him last night and reported that he was distraught so I am going to see him again at 8:00 this morning. I have some family obligations this afternoon but have time for a call on the drive in between 7:00 and 8:00 or between 9:30 and noon. My cell is 516 287 7230 for anyone who wants to speak with me about the new facts, Nick's condition, the press or any other matter.



**Tony Ricco** Sat, 27 Jul 2019 at 6:35am

Please, no more interviews on the subject before checking with team members. Its the statements not the letter that has created the above problems. However, I am confident that we can work through these problems created by the statmemts made during these interviews as a team. If we communicate before hand, we will be fine. Good luck with the visit.



**Bruce Barket** Sat, 27 Jul 2019 at 6:46am

I am confident that we will work together and that that we will solve the problems this case presents. The interviews are done for now. If I get more calls, I will reach out to you before I respond.

671

# EXHIBIT 6

# daily news on the choice to authorize

From: Bruce Barket

Date: Wed, 31 Jul 2019 at 9:54pm

The Daily News is going to write a piece about the politics of the death penalty and why the Government chose to authorize the case against Nick. I view this as an opportunity to express my view about the death penalty, about why even if it should exist, it is inappropriate here and about the facade of fairness surrounding the decision to seek it in any case and in particular this case.

Please offer any thoughts. But keep in mind that the publicity around this indictment has been one sided and almost exclusively the government's theory, with the statements of the USA and various law enforcement personal. We didn't start the pubic fight. I think it is mistake to let pass an unsolicited opportunity to add our thoughts to the public domain to counter, or at least offer a view different, than the government.

I gather my thoughts on this are not shared by the group as a whole. I told the reporter, Steven Brown, that I wanted to think about my comments and whether I should add anything at all to the story. The story will run over the weekend with or without my comments.



## Melissa Lang Wed, 31 Jul 2019 at 10:27pm

Bruce, thank you for asking for everyone's thoughts on this. I have been traveling so haven't been a part of all the discussions but have read through everything. My impression, from what I've read, was that our highly experienced resource counsel and learned counsel both recommended strongly against engaging with the press in any way.

Given that, I just wanted to ask some follow up questions - are you seeing this as the appropriate forum to engage in a debate about the fairness of the death penalty? And this is the Daily News, correct? And your position is it might be helpful, in our collective effort to defend Nick, and save Nick's life, to discuss the fairness of the death penalty and the criminal justice system related to a white defendant who is charged with killing four minority men? I just want to make sure I'm not missing anything.

Thanks again for reaching out to the group.

Melissa



### Michael K. Bachrach Wed, 31 Jul 2019 at 10:32pm

Bruce, Please don't comment for this article. Every time you comment in the press you create a slurry of new articles that draw negative attention to Nick. I know you mean well, but the harder you push; the more negative articles follow.

I've said this before but there is no good press in a death penalty case.

Here, most articles about Nick -- and now Epstein -- mention that Nick is being investigated for either assaulting Epstein or staging a false suicide attempt. Worse still, EVERY article on Nick -- and now Epstein too! -- mentions the fact that Nick is charged with four murders. This article will be a hatchet job and we shouldn't be contributing to it in any way.

Any potential juror that reads any of these articles will be stricken for cause during jury selection, which inevitably hurts the defense more than the prosecution since there are fewer defense orientated jurors in the jury pool to begin with, and it's also those defense orientated jurors who tend to be more honest with their beliefs during voir dire.

We need to win our battles in the courtroom, not in the press. I can think of no comment that could be made to the press that will help win Nick's case.



### Kenneth Montgomery Wed, 31 Jul 2019 at 11:27pm via email

I agree with Mike. Ultimately in this day and age of media/information system and how humans think the last imprint on the mind is "what is he accused of?!!!" "oh he killed four people!!!" "He was into the drug trade?!!!" all of those thoughts diminish the mitigation that helps the client. This isn't the type of case where it is split in public opinion. The client is accused of killing four people and participating in the drug trade where if we all know the federal government there will be multiple

673

cooperators testifying against our client. We have not seen the 3500 material. What if its devastating? The Government will use all of these Defense statements.



## Tony Ricco Thu, 1 Aug 2019 at 5:30am

As a general rule, lawyers refrain from the urge to respond to the press in death penalty cases. Newspapers articles on criminal law issues are generally one sided affairs. It is no secrete that articles published to generate revenue from selling advertising space. The more salacious the article, the more papers sell. As an attorney representing a defendant actually facing the death sentence, we are not trying to influence the public on its views towards the death penalty or the process. Such questions are generally directed to Judy Clarke, the Executive Director of the Federal Death Penalty Resource Project or our Resource Counsel. The Project goes through a process of vetting what, if any response, is made on the overall process. The impact of joining the debate, *on the platform of an actual pending authorized case,* will have devastating consequences down the road.

What appears to be an opportunity to be heard, is actually a pathway to future harm to Nicholas Tartaglione. Michael Bachrach accurately points out that during capital jury selection, you will find that we will have a very small pool of favorable jurors to begin with, and attempting to influence that process through the press, you will find, is not only practically unsound, it is also a violation the New York Rules of Professional Conduct, Rule 3.6(a).

Based on statements made to date that have commented on the particular facts of this case, and other accusations, we can expect that a "gag order" is looming. If one is issued, well more negative press will be generated which will impact on the functioning of all counsel for Mr. Tartaglione.

For further insight on this subject, I recommend giving Resource Counsel at call, both Tanya and David have considerable experience on dealing with the press on death penalty matters on a local and national level. You will all be pleasantly surprised with the level of thought and review that goes into the responses to the press in death authorized cases. Keep in mind *"death is different,"* and the difference between life and death is in subtle and sometimes not so subtle consequences of our actions.

As counsel for a defendant who is facing the death sentence, we simply cannot inject ourselves in the general public debate on the death penalty *in the name of the person represented.* We have a far more imminent and compelling responsibility. On the issue of the death penalty, the Tartaglione case will have its victories in the courtroom not in the media. Give Resource Counsel a call.



## Bruce Barket Thu, 1 Aug 2019 at 6:07am

Thank you for your thoughtful responses. I take the unanimity opposing press statements to heart. I will reach out to David and/or Tanya.

Of course, I am familiar with the ethical rules, as every lawyer should be. I didn't, nor did Nick, initiate the press about Epstein. I responded and as a result the reports were less harmful than they otherwise would have been. In fact, some were helpful. See the WSJ piece and the Daily News piece. I take rule 3.6(C) as more of a mandate, than simply permission to defend a client in the forum where he/she is attacked. I have responded to press attacks my entire career. I know its a minority view, not just on this team but in the profession generally. It has mostly proven successful for my clients. I don't share the cynicism about the media. There are good reporters who want to get the story correct. Many are sympathetic to our positions about everything from the conditions of confinement to opposition to the death penalty to the government making mistakes about who they choose prosecute and who they choose to offer a deal. When representing a client whose case is being reported in the media and where the Government or Government agents are leaking false and negative stories about a client, I generally believe it is a lawyers obligation to defend the client in the public forum.

Yes, I do believe that one should use opportunities available to educate the public about the death penalty. I despise this system. Its not fair. It's arbitrary. It's cruel. It is morally wrong. It has to be abolished. No, I don't want to harm Nick for a soundbite, but nor do I want to pretend that he is being treated fairly any more than I am willing to pretend that the conditions at the MCC are humane.

That said, I want to talk to David and Tanya before I speak to the reporter again. Nothing is more important than doing what is best for Nick. I am just not convinced that silence is best.

One more thing, while I consider everyone's thoughts on this topic, please reflect on my views. I haven't come to them without reflection and experience. They may be unorthodox in a death penalty case, but they may also be appropriate in this death penalty case.



## Kenneth Montgomery Thu, 1 Aug 2019 at 6:15am via email

Sincere question. How is success measured or calibrated through in the media in relationship to clients?



## Bruce Barket Thu, 1 Aug 2019 at 6:27am

Results in court, acquittals. Convincing a jury your client is wrongly accused is much more difficult, sometimes impossible, after the client has been pummeled in the press for the months or years leading up to trial. That's why sub C in rule 3.6 exists. It is an under appreciated and woefully under used provision



## Tony Ricco Thu, 1 Aug 2019 at 6:43am

Wrongly accused is just one of many strategies employed that leads to an acquittal, the goal and ethical duty of every defense attorney.  If wrongly accused is the theory selected by counsel, there are different views as to whether you win such a defense in the press and on the internet (a interesting conversation for another day).

However, this is a death penalty case, and "death is different."  Factored into any analysis of facts, issues legal theories and the selected defense to present is the impact that such a decision with have not only on the liability phase but the powerful penalty phase (where death awaits those who have ignored or not properly prepared for that tragic possibility).

As to this press issue on the death penalty process in response to the daily news request - call Resource Counsel.  You will find these issues have been regularly and successfully address by attorneys representing capital defendants.

Malcolm X often observed:  "*if you know its going to rain, take your rain coat,*" in other words be prepared.  Santa Clara provides an opportunity to prepare on the high level of care that is required of capital counsel.  A great program, and a great opportunity.  Look forward to seeing everyone there.



## Kenneth Montgomery Thu, 1 Aug 2019 at 7:07am via email

I have only been working on these capital cases for the last 4 or 5 years. I don't think wrongly accused is the theory in this death matter where the government will carry their narrative through multiple cooperators backed by corroborating evidence. However, I'm looking forward to Santa Clara and developing the important and necessary mitigation that MUST be developed.

Sent from kjmontgomerylaw.com

>



### Bruce Barket Thu, 1 Aug 2019 at 7:19am

I am in 100% agreement,Tony, and I will speak with resource counsel.

Ken, phrase it anyway you want, our client has asserted his innocence (wrongly accused) to each of you and directed all of us to do everything possible to gain an acquittal. We will honor the choice he has a right to make while also doing everything possible to be certain he is not sentenced to death.

Combining these two goals so they compliment one another is our job as I see it. We will be successful.



### Kenneth Montgomery Thu, 1 Aug 2019 at 7:31am via email

You preaching and grand standing for the choir Bruce I've been a lawyer for a minute and know how to get acquittals. I just disagree with your process and that's ok. Looking forward to the next week and staying focused at the tremendous task at hand. Everyone safe travels to Santa Clara.

Sent from kjmontgomerylaw.com

>



### Bruce Barket Thu, 1 Aug 2019 at 7:50am

I am actually looking to "preach and grandstand" to the public.



### bkoffsky@snet.net Thu, 1 Aug 2019 at 7:56am

677

Bruce-

I also strongly urge you not to talk to the press and for a whole host of reasons that I won't belabor now because I believe that even if the entire team told you not to speak to the press, you would ignore us. But we are scheduled to travel to Santa Clara on Friday to spend the better part of a week devising a strategy on how to save Nick's life should the jury return a guilty verdict on death eligible counts. For you to ignore that, to in any way jeopardize the work that the rest of us are trying to do so that you can make some point about the government's prosecution in this case or the death penalty writ-large, would be unconscionable.



## Bruce Barket Thu, 1 Aug 2019 at 8:46am

Bruce,

You're just wrong and I am not sure why you suggest I would cavalierly disregard the collective wisdom Nick is lucky to have at his disposal. I respect and appreciate the experience and talent of every member of the team.

I have followed the advice on a range of topics from the script I read to the committee in DC to largely refrained from speaking to the media over the life of the case to seeking input here before speaking to the daily news.

I may or may not follow the advice on every issue but as I said above I take the unanimity opposing comment to heart. I have already reached our to DAVID and Tanya.

Feel free to call me to discuss your reasons why I should not comment. 516 287 7239



## bkoffsky@snet.net Thu, 1 Aug 2019 at 8:55am

I am a judge on the Connecticut statewide grievance panel and have a full day of hearings but will try to reach out to you towards the end of the day.



## Michael K. Bachrach Thu, 1 Aug 2019 at 8:56am

Bruce B.,

In a non-capital case I agree that there are many times when a comment in the press can be useful, so long as it's the right comment at the right time. But I'm sure when you comment in non-capital cases you're always careful not to telegraph or undermine important aspects of your defense, and I'm sure you're also careful to avoid adoptive admissions or agency admissions. But death is different, and one reason it's different is because every act we take, no matter how subtle, can have a negative impact on the penalty phase.

While the penalty phase might not matter to Nick, we have an ethical obligation created by the ABA Death Penalty Guidelines to not take any actions that undermine Nick's penalty phase case. Continued comments in the press are consistently undermining the strength of our penalty phase case.

At the very least, please stand down until after Santa Clara. We will be spending 5 days brainstorming the mitigating and aggravating factors related to this case with experts from all over the country. Once done, I suspect you'll have a better appreciation for how fragile the case for life can be.

I've been on faculty there three times, and this will be my third time as a student. I've also been involved in capital defense for most of my career, which, to my great consternation is getting close to 20 years. And everry time I go to Santa Clara I learn something new. Trust me, give it a chance and your view on this debate might just change. At the very least, you'll be better informed and hopefully in a better position to appreciate which comments really should not be said to the press no matter how you personally feel.



## john diaz Thu, 1 Aug 2019 at 9:06am via email

I am flying out today, looking forward to seeing you all at Santa Clara.

Sent from my iPhone

>



**Michael K. Bachrach Thu, 1 Aug 2019 at 9:13am**

Have a great flight John! See you in Cali!



**David Ruhnke Thu, 1 Aug 2019 at 3:43pm via email**

I have been out of the loop most of the day. WE need to stay out of the press on this issue. Period. David R.

---



**Bruce Barket Thu, 1 Aug 2019 at 4:37pm**

So, I asked the reporter to email the questions he wants to ask me and asked him what the article was going to be about.

Here are then questions:

Why is the Tartaglione case not an appropriate death penalty case?

Why does your client face the death penalty while his co-defendant, who appears to be cooperating, does not face the death penalty? Is that fair?

I think not responding is a mistake.



**David Ruhnke Thu, 1 Aug 2019 at 5:57pm via email**

Disagree. Big mistake to go press/public on this. Especially if when we get to voir dire and jurors have been exposed to publicity and judge notes that we are the source of a good deal of it.

680

David R.



## Michael K. Bachrach Thu, 1 Aug 2019 at 6:05pm

Bruce, respectfully, you are wrong.

Responding to those questions would be a huge mistake. There is no way for you to answer those questions without revealing the arguments that we intend to make during the penalty phase.

Would you ever tell the Gov't that their forensic experts made a mistake, or who your client's alibi witness is, even one moment before the law required you to? Of course not, and this is no different. Worse still, our client's life is on the line, not just the possibility of a conviction.

If you reveal to the press any more of our mitigating evidence all you are doing is showing our cards to the Gov't so that they can prepare their response. How does that possibly help Nick?

If you really think a response is necessary, then, as Tony said, direct the reporter to Judy Clarke and Kevin McNally of the Capital Resource Counsel Project. Let them defend the cause, if they believe it appropriate. They can do so without putting Nick's life in further jeopardy. You cannot.

As David said, none of us should be speaking to the press. Not only will it undermine our penalty phase case but it will undermine our ability to select a jury that is as fair as possible even under the strictures of the death qualification process.

For Nick's sake, stop.



## Bruce Barket Thu, 1 Aug 2019 at 6:47pm

Thanks for the notes. I remain willing to speak to anyone who wants to call me 516 287 7230.

I have not revealed any part of our penalty phase case, nor did I plan to do so here.

I fundamentally disagree with a self imposed gag order in the face of press that we didn't initiate and is harmful. Ignoring the press because responding is complicated abandons a front in the battle for client. I won't do that.

That said, this one article is not that important one way or the other. I will take a pass here though I think doing so is a mistake.



### Tony Ricco Fri, 2 Aug 2019 at 5:11am

By definition answering the proposed questions by the daily news is providing an unnecessary and ill advised preview of our mitigation case about facts and issues that we may or may not ultimately present. However, statements that counsel make about mitigation could serve handicap the presentation of mitigation that we ultimately present, *inter alia*, such as jury selection. Adoptive admission, Agency admissions, and lack of the knowledge of the non-statutory aggravating evidence that the court will permit the government to present are the reasons for measured restraint to press requests in a death authorized case. These requests over call for the disclosure of serious issues and statements that require a great deal of work and development. The exercising the wisdom gained from years of individual capital experience, and the collective experiences of members of the Resource Project is not "ignoring the press" or creating a self imposed "gag order." That conclusion is just not an accurate assessment of the advice given about not responding to the press in general, and the specific requests that have been made in this case. Capital work is difficult, and very counterintuitive to what course of conduct counsel may or may not employ in a non-capital case. It is the reason that a defendant has learned counsel, it is the reason that the Defender Services Program provides so much training, and why we have a Federal Death Penalty Resource Counsel Project. There are many, many terrific lawyers in our country who have vast experience with the issue of the press in context of counsels' responsibilities *in capital cases*. Mr. Tartaglione is blessed to not only have an outstanding team of lawyers (both appointed and retained) but also two the best and most experienced Resource Counsel in the country assigned to our case. In both David and Tanya, we have the "go to" Resource Counsel who handle the avalanche of press interest in capital cases on both a local and national level. Over the years, I have found both David and Tanya to be outstanding, and the serious, measured, and thoughtful manner in which they help teams deal with the press issues exemplary. Far for ignoring, the decisions related to are always given in depth thought and analysis. Self imposed gag order? No. But a thoughtful and methodical way of addressing the press - which places protecting the process of protecting the life of the defendant and helping counsel make informed decisions which do not result in a motion to discharge them from the case - is first and foremost in the advise given.

When at Santa Clara, if any team member is interested in requesting private time with any faculty member or our Resource Counsel (David Ruhnke will be present and is on the faculty), approach a lesson leader and make the request. I am certain that private time will be arranged for such a session on this

subject. I believe that any team member who choses to seek a private session, will find learning more about issues of the press and the impact (risks, benefits and consequences) on capital litigation information insightful and informative, and help provide an more informed understanding of the complexity of making statements in the press and impact of the development and presentment of evidence at the penalty phase. I am confident that each and everyone of us is of the view that working together as a team will serve to save Mr. Tartaglione's life. The process or the journey is also part of the challenge. It is great that we have a team, where everyone is dedicated to that process. Along the way, we all expect differences of opinions and views. That's okay. It's part of the journey or as Bob Marley once observed "completing the book." (Redemption Song). See everyone later today at Santa Clara. Looking forward to everyone having an outstanding experience.



## Bruce Barket Fri, 2 Aug 2019 at 5:49am

As usual Tony, I don't disagree with much of what you wrote. Consider this a request for private time with David (sent a note yesterday seeking a call) and you. I am eager to tap into your collective experience and share my perspective.



## David Ruhnke Fri, 2 Aug 2019 at 8:07am via email

Getting set to travel. Maybe find time to talk through this issue in Santa Clara. David

# EXHIBIT 7

# Epstein's Suicide and The Press

From: Tony Ricco

Date: Sat, 10 Aug 2019 at 10:24am

Team members should refrain from what appears to be an opportunity to appear in the media around this event and tout Nicholas Tartaglione's actions earlier this month.  One, the Epstein death will open a full investigation into the actions taken by the BOP in relation to Epstein's detention.  If statements are made about his property, his conduct, etc., any individual with such information will be a witness and ultimately discharged from this case. I am very concerned about the actions of the civil attorney who has been visiting Nicholas Tartaglione, his communications with Nicholas Targalione via cell phone, and any materials that may or may not have been removed from the MCC (unlawfully) that had the potential of impacting the BOP investigation.   Everyone should be certain that the BOP will investigate, and will look for scape-goats, any scape-goats that they can later claim impeded, influenced their ability to properly investigate (that is protect Epstein).  Individuals who had any involvement whatsoever, need to proceed with extreme caution.

Nicholas Tartaglione should be instructed not to make any further statements in relation to the matter at all (to nobody), in the absence of the presence of counsel (period).

In addition, we do not want to be viewed as exploiting Epstein's death for any gain or benefit whatsoever.  A person once said: "Facts are a stubborn thing."   But Facts, are facts, and let's have them speak for themselves without anything further.

Keep in mind that there have been prior accusations that the BOP staff acted inappropriately in relation Nicholas Tartaglione, and in relation to the Epstein situation.

Statements to the Press in this matter should be avoided.   And, should anyone feel absolutely compelled, it is requested that any statement be floated by Resource Counsel (Tanya and David) and that they float it by the Project before release.

THIS IS A VERY SERIOUS MATTER that has devastating consequences for some, and has the potential to adversely impact our preparation for the penalty phase.   Caution must be exercised by all.



## Bruce Barket Sat, 10 Aug 2019 at 10:48am

I appreciate your thoughts and take them to heart, but I want to think this through a bit.

This validates so much of what we have said about the mcc, about what happened with Nick and Epstein and about Nick's character and his truthfulness.

I want to exploit it, we should exploit it, our client deserves to have it exploited.

The only question I have is how best to exploit it, for Nick and to further shine the light on the horror of that hell-hole.



## David Ruhnke Sat, 10 Aug 2019 at 11:10am via email

Nick should not be associated with this story. No comment to press. 100% sure on that. We do not "exploit " a suicide. And if Nick ever goes to a penalty phase jury, conditions of confinement will become relevant. Not now. David R.

RUHNKE & BARRETT
ATTORNEYS AT LAW

Montclair, NJ Office New York City Office
Ruhnke & Barrett Ruhnke & Barrett
47 Park Street 29 Broadway, Suite 1412
Montclair, NJ 07042 New York, NY 10006
Tel: 973-744-1000 Tel: 212-608-7949
Fax: 973-746-1490 Fax: 973-746-1490

David Ruhnke's cellphone: 201-321-8718
David Ruhnke's email: dr@ruhnkeandbarrett.com

Please note that this communication is from a law firm and should be considered privileged and confidential. If you received this in error, kindly delete and do not distribute further. We would also appreciate an email back noting our message went astray. Thank you.



## Tony Ricco Sat, 10 Aug 2019 at 11:18am

That is a terrible idea.  We do not want Nicholas Tartaglione connected to this story at all - in the Press.  Exploit? No.  And going to the press should not be done in the name of a person facing the death sentence.

Conditions of confinement are all over the record in this case.  It has been well documented.  Making more statements to the press frenzy does not advance a single cause for Nicholas Tartaglione on either guilt or penalty.

What is the remedy that is being sought? If the goal is get Nicholas Tartaglione transferred then make the application to Judge Karas, not to the Press?

No authority (in particular Judge Karas) needs "*validation*" about the conditions at MCC, they are a known fact, and actions have been taken. What Nicholas Tartaglione, a capital authorized defendant, "*deserves*" is for the team to stay focused, and act on matters that impact his guilt or penalty, and to refrain from public statements concerning an alleged pedofile, who has committed suicide.

Again, if you are making statements to the Press, float that written statement by Resource Counsel and Project.

**I have reached out the Project this morning, and all experienced capital attorneys are in complete agreement with this position.**



### Bruce Barket Sat, 10 Aug 2019 at 11:19am

Nick is inextricably associated with this story. We have a client charged with capital murder and I will exploit anything to help him. I had a friend ask if Nick was still his cellmate. The press is going to write about this and about Nick's role. I think about that stupid piece in the Yonkers paper alleging that nothing Nick says can be believed. Well, had the BOP believed Nick, Epstein would still be alive.

I am sorry, I respect your experience and your opinion but I we just don't agree here. I am going to say something



### Tony Ricco Sat, 10 Aug 2019 at 11:38am

You are absolutely wrong professionally, ethically and morally to do this. There is no reason to make such a "I told you so" statement to the press. That kind of statement does not advance a single fact or legal issue that we have the professional obligation develop in this death authorized case.

There is a reason why counsel with capital experience is required for representation of defendant's facing the death penalty; and this situation is just one of the many circumstances that our law says that Nicholas Tartaglione must have capital experienced counsel. You should not be making statement or doing things that to not serve the interest of capital defendant. And everyone is telling you that but you want to do it anyway.

You may be "*sorry*" now, but it is Nicholas Tartaglione who will suffer from your decision not to follow the soundness and wealth of advice that has been provided.

**Do not proceed in the matter that you are contemplating.**



### Bruce Barket Sat, 10 Aug 2019 at 11:58am

I am not morally, ethically or professionally wrong. I am not obligated to so what learned counsel say. I am obligated to listen and think about your opinion, which I have and will continue to do so. Here we disagree.



### Tony Ricco Sat, 10 Aug 2019 at 12:09pm

On our development of the presentment of penalty phase on conditions of confinement and our prison adjustment (Nicholas Tartaglione's post arrest prison conduct), we need to have all the benefit of all the BOP investigative reports and documents taken in relation to Mr. Epstein's death. It seems that the BOP did not follow protocols, but we do not know that.

Also, everyone should know and be advised that the FBI has opened an official investigation into the death of Mr. Epstein, so we also want to have the benefit of the FBI investigative reports to develop and then decide what, if anything, we ultimately present as evidence at the penalty phase of about this tragic incident. The investigation of Mr. Epstein's death is now out of the hands of the BOP.



### Tony Ricco Sat, 10 Aug 2019 at 12:16pm

I am advising all team members to refrain from making any statements to the press concerning the Epstein death. This matter is under investigation by both the BOP and the FBI. Our obligation under the ABA guidelines and for the lawyers (ABA and NYCRR Professional Rules) is to protect the confidentiality of the our client, and to not engage in conduct to adversely influence potential jury panels. There is nothing more to say about this, as I am confident that everyone understands the gravity of this matter and will act accordingly.

Can team members respond to their availability to meet on the dates proposed for follow up (post Santa Clara) meetings in either NYC next week (penalty phase), and the following week in Garden City (guilt phase)? Thank you.



### Bruce Barket Sat, 10 Aug 2019 at 12:19pm

I am stepping out for the day and will have limited access to my phone. I issued this statement.

For the record. " I was sorry to learn of Mr. Epstein's suicide, while in custody at the Metropolitan Correctional Center. I hope there is a thorough investigation into how this occurred despite the Bureau of Prisons being on notice that Mr. Epstein had already attempted suicide at least once. That investigation should be broad enough to examine the deplorable conditions inmates are forced to endure at the MCC "



### Tony Ricco Sat, 10 Aug 2019 at 12:33pm

Deep.



### Kenneth Montgomery Sat, 10 Aug 2019 at 12:44pm via email

Absolutely nothing to gain in the press. This investigation is sure to have generated documents and statements and there will be now an investigation of an investigation by the FBI. The conditions of MCC are of public knowledge we would be beating a dead horse that does nothing to help the client at this juncture. In fact it is a dangerous risk since ultimately we don't know what is in the contents of any of these reports. We also don't want the client associated in any way with such a vilified figure in any way whatsoever. Epstein is hated even in suicide. There is nothing to exploit but negativity. Let the dusk clear. Stay focused on both phases and the continued development of our defense and mitigation.

Sent from kjmontgomerylaw.com

>



### Tony Ricco Sat, 10 Aug 2019 at 1:22pm

The long game is serious, deadly serious.  You can be sure that the government prosecutors, in this capital prosecution and will have the FBI thoroughly investigate with a view towards flipping the incident into an aggravator.  This is dangerous and those with capital experience see the clear danger.  The strength of this team is based upon its talent and collective

wisdom.  We will be saving Nicholas Tartaglione's life in spite of everything, even ourselves at times.



### Aida Leisenring Sat, 10 Aug 2019 at 1:46pm

In addition to the FBI investigation William Barr has called for an investigation by the Inspector General. FYI.



### Tony Ricco Sat, 10 Aug 2019 at 1:56pm

Thanks, missed that. Ugh.  BTW Aida, Nicholas Tartaglione knows not to make any statements to anyone (BOP, FBI, detainees, etc.) about this?



### Aida Leisenring Sat, 10 Aug 2019 at 2:09pm

He has been well advised to never ever make any statement when in these situations. By me. By Bruce. And I'm sure by others.

I will see him tomorrow but I fear he was likely questioned before any of us learned about this.



### Bruce Barket Sat, 10 Aug 2019 at 3:02pm

I will see Nick tomorrow but I am sure he has already been interviewed



### Tony Ricco Sat, 10 Aug 2019 at 3:14pm

A letter should be emailed to legal saying no interviews without counsel being present.



### Melissa Lang Sat, 10 Aug 2019 at 3:32pm

Immediate press not good for Nick, blames him for first incident.

https://www.gq.com/story/jeffrey-epstein-found-dead

And this suggesting it could have been an arranged murder and not a suicide:
https://t2conline.com/jeffrey-epstein-is-dead-who-killed-him/



### Bruce Barket Sat, 10 Aug 2019 at 4:50pm

This doesn't matter much but it demonstrate why we can't ignore the media. The stories are obviously false and posted by two outlets we never spoke to and hopefully no one reads.



### Tony Ricco Sat, 10 Aug 2019 at 8:38pm

Wrong again. Nobody is ignoring anything. The advice given is not based upon selfserving negative cliches but rather an understanding of how the government uses information, statements made by counsel to the press in the penalty phase. The advice has been given and you made your decision, a decision that does not have any relevant purpose to our liability or penalty phase. If anything, this entire episode demonsrates why capital eligible defendants must represented by qualified capitally trained lawyers. The danger to Nicholas Tartaglione is clear to capital counsel, Resource Counsel, the Project and other counsel on this case who have been involved in penalty phase litigation. You are in dangerous water on this issue, and you are putting Nicholas Tartaglione at risk. Come up with a remedy for whatever your concerns are related to the death of Mr. Epstein and make an application to the court - underseal. Stay out of the media on this issue.



### Bruce Barket Sat, 10 Aug 2019 at 8:42pm

Tony, you can say it 1000X. We disagree. Nick chose me to represent him and I am not going to hand over my decision making to anyone



### Bruce Barket Sat, 10 Aug 2019 at 8:43pm

I will seek and consider all advice and opinions and value the experience and views of others, but I am not going to follow orders because they were issued.



### Kenneth Montgomery Sat, 10 Aug 2019 at 9:06pm via email

That just sounds cliche. How is it tied to a client centered approach if people who have dealt with these issues are giving sound intelligent legal advice? I don't think any of the advice has come from I said it so there it is, it has come with reason and intellect backed by experience and case law. How about this? Nick does not have a law degree and has never litigated a death penalty case. Deciding to play tit for tat with the media is a journey into nonsense and clearly becomes cultural entertainment. It does not help the client. We need to move on and prepare.



### Bruce Barket Sat, 10 Aug 2019 at 9:27pm

Couldn't agree more with we need to move and continue to prepare. For those, apparently everyone, who disagree with my decision to comment, time to move on.



### Kenneth Montgomery Sat, 10 Aug 2019 at 9:29pm via email

You right Bruce, you are retained counsel and you have the client's best interest and you have the last word. We have moved on.

# EXHIBIT 8

# Nearby inmate heard nothing when Jeffrey Epstein died, lawyer says

Attorney Bruce Barket said his client heard nothing out of the ordinary on the morning the accused sex trafficker apparently took his own life.



The Metropolitan Correctional Center in New York where Jeffrey Epstein was found unresponsive Aug. 10, 2019.Jeenah Moon / Reuters

Aug. 12, 2019, 8:15 PM EDT

**By Rich Schapiro**

An inmate locked up a few cells away from Jeffrey Epstein heard nothing out of the ordinary the morning of his death, according to the man's lawyer.

"Nobody heard anything," said Bruce Barket, who represents Nicholas Tartaglione, a former upstate New York police officer awaiting trial on murder charges.

"It was a silent act."

Epstein, 66, was found unresponsive in his cell at the Metropolitan Correctional Facility in New York City about 6:30 a.m. Aug. 10.

The wealthy financier and accused sex trafficker appeared to have hanged himself, according to multiple law enforcement officials. The chief medical examiner has yet to release a determination on a cause of death but point to suicide, people briefed on the case have told NBC News.

Privacy - Terms

Nearby inmate heard nothing when Jeffrey Epstein died, lawyer says



### [New questions surface following Epstein's apparent suicide](#)

AUG. 12, 2019 12:32

The incident came roughly three weeks after Epstein was found unconscious in his cell, with marks around his neck, in what authorities were investigating as a suicide attempt.

Tartaglione was inside the cell with Epstein at the time of the first incident, his lawyer said, and not far away in the facility's special housing unit when Epstein apparently succeeded in taking his life.

Let our news meet your inbox. The news and stories that matters, delivered weekday mornings.

Your Email Address

**SIGN UP**

THIS SITE IS PROTECTED BY RECAPTCHA PRIVACY POLICY | TERMS OF SERVICE

"Nick knows a heck of a lot about what went on," Barket said. "He was there during the first attempt and he was there when he actually killed himself – he just wasn't in the same cell."

The FBI and the Justice Department Inspector General have launched investigations into Epstein's death. But Tartaglione has not yet been contacted by investigators, Barket said.

A former police officer in Briarcliff Manor, New York, Tartaglione, 51, is facing the death penalty if convicted of charges of killing four men and burying them in his yard in 2016. Prosecutors allege that the former officer was involved in a cocaine distribution conspiracy.

Privacy - Terms

"Whether or not he'll be in a position to cooperate remains unclear," his lawyer said. "But he certainly has information that would be very valuable to the investigation if they want access to it."

Epstein's death has prompted mounting criticism of the federal jail system and the Justice Department, which is responsible for overseeing it.

Epstein was placed under suicide watch after the incident last month, a protocol that called for him to be moved to a cell stripped of bedsheets, placed in special clothing and monitored more closely, according to multiple officials.

But he was pulled off suicide watch a week or so later, and returned to a cell in the special housing unit, officials say. He was supposed to be checked every 30 minutes but a period of hours passed with no checks on the morning of Aug. 10, officials told NBC News.

Barket, who has been to the facility dozens of times in recent months, said it's a grueling and dehumanizing place for inmates, plagued by poor ventilation, faulty plumbing and rodent and insect infestations.

The conditions at the Metropolitan Correctional Center, also known as the MCC, have drawn numerous complaints from inmates over the years. Just last month, the notorious drug lord Joaquin "El Chapo" Guzman described his stint in a more restrictive unit than Epstein's as "physical, emotional and mental torture."

"None of us are surprised this happened," Barket said. "This is a result of the whole nature of the way this place is run – a bad combination of cruel and lazy."

In an interview with NBC News, one of Epstein's lawyers, Marc Fernich, described the MCC as a "barbaric place" to keep people who have yet to be found guilty of a crime.

"Almost anybody would prefer to be in their permanent designation facility than locked up there under really inhumane conditions that can break a person's soul and crush their spirit," Fernich said.

Fernich declined to go into specifics about Epstein's mental state or the conditions he was living in, but he lamented what he described as an absence of educational programs, as well as poor food and limited if any recreational time.

"Prosecutors and judges and other stakeholders in the justice system know with a wink and a nod that if you're subjected to those onerous conditions, the likelihood of a plea or worse, as happened here, is exponentially increased," Fernich said.

"When something like this happens, nobody feels sorry for these people and I'm not asking them to," Fernich said. "But this is a dark stain on the justice system in our country."

Rich Schapiro

Rich Schapiro is a reporter for the NBC News Investigative Unit.



ABOUT                             DO NOT SELL MY PERSONAL INFOR

CONTACT                          TERMS OF SERVICE     Privacy · Terms

CAREERS

COUPONS

PRIVACY POLICY

NBCNEWS.COM SITE MAP

ADVERTISE

ADCHOICES

© 2020 NBC UNIVERSAL

NEWS　　　　　　　　MSNBC　　　　　　　　TODAY

CAREERS

NBCNEWS.COM SITE MAP

ADVERTISE

Privacy - Terms

# EXHIBIT 9

## Abandonment of Professional Ethics and Confidentiality

From: Tony Ricco

Date: Tue, 13 Aug 2019 at 7:45am

The purpose of this post is to advise all team members of the consequences of the public disclosure of statements made by Nicholas Tartaglione during interviews.

Yesterday, the media quoted an attorney in this case, who decided to disclosure information possessed by Nicholas Tartaglione in relation to Jeffrey Epstein suicide. During the media interview with the attorney, the attorney is quoted as to having stated that he interviewed Nicholas Tartalione since the appaent suicide. The attorney then proceeded to disclose to the media what Nicholas Tartaglione heard or did not hear on the morning of the apparent suicide, *inter alia*. In so doing, the attorney has violated the attorney client privilege thereby exposing Nicholas Tartaglione (and the attorney) to a compelled disclosure of the entirety of the conversation. Apparently, the attorney was fully aware of the rules related to such disclosure and its consequences, before making such a statement. However, for the remainder of the team. I want to everyone else to understand the basic principles of law related to any information provided by Nicholas Tartaglione during an interview. Understanding of those laws are of critical importance to the effective representation of Nicholas Tartaglione in this authorized death penalty case.

At common law, communications made in confidence between attorney and client were held confidential as a matter of the attorney's code of honor (see, Richardson, Evidence § 410 [Prince 10th ed]). New York's attorney-client privilege as codified at CPLR §4503(a) protects against disclosure of a "*confidential communication made between the attorney or his or her employee and the client in the course of professional employment*" and "*confidential*." See, *People v. Harris*, 57 N.Y.2d 335, 342 (1982).

The attorney-client privilege protects confidential communications between attorneys and clients concerning legal advice. An attorney may *rely* on this privilege to prevent the discovery of materials and communications that would otherwise be available to an adversary. The attorney-client privilege has been expressed both statutorily, CPLR 4503, and under the Federal Rules of Evidence; Rule 501, Rule 502(a)(1).

However, the purposeful disclosure of information discussed during the confidential conversation, unquestionably waives the privilege. When there is a disclosure of a confidential communications a waiver of the privilege is affected as to *all related communications regarding the same subject matter*. (*See, In re Grand Jury Proceedings*, 219 F.3d 175 [2d Cir. 2000]; *In re Sealed Case*, 877 F.2d 976 [D.C. Cir. 1989]).

The concept is also embodied in the Code of Professional Responsibility binding attorneys *to keep private* the confidential communications and secrets of their clients on pain of professional discipline, including loss of their license to practice law (see, DR 4-101 [22 NYCRR 1200.19]; 22 NYCRR 1200.6 Rule 1.6. (Confidentiality of Information);see also, EC 4-4.

Notwithstanding the sound advice of experienced capital counsel, our Resource Counsel and from the Project itself for counsel to refrain from public interviews/statements or alternatively to float comments on the

721

Jeffrey Epstein suicide by Resource Counsel before hand, an attorney decided to join the media frenzy to "exploit" the Jeffrey Epstein suicide. In so doing, the attorney has made statements which violate several governing statutes, established court rules and the New York Rules governing professional conduct. The result? Counsel has potentially subjected Nicholas Tartaglione (and himself) to a compelled disclosure to *all related communications regarding the same subject matter*.

As a result of this disclosure of confidentiality, if have two requests (1) Michael can you please step up your effort to obtain all public statements made by counsel to the media and the court by counsel and prepare a team memo on the subject; and (2) for all attorneys and team members to refrain from public statements related to the Jeffrey Epstein suicide. To the extent that such a statement is desired, to float the statement by Learned Counsel or our Resource Counsel.

Those with capital experience understand how much we protect the defendant from any type of compelled interview in course of developing a capital defense (i.e., Rule 12.2). Counsel has made several statements to the media in relation to the Jeffrey Epstein suicide which has put Nicholas Tartaglione at risk in the penalty phase. In the absence of an understanding how evidence is presented at the penalty phase, statements have been made and will apparently continue.

Therefore, if there is some remedy that is being sought to benefit Nicholas Tartaglione, **it is requested that the remedy is reduced to a written application and filed with the court** (under seal if necessary) - *not litigated in the public media*.



**Bruce Barket** Tue, 13 Aug 2019 at 8:53am

As always Tony, your posts are thoughtful. A few points

1. Although I am not accustom to Basecamp and it proper use, it seems unfortunate for it to be used to attack co counsel. I don't know of any violation of any rule of professional conduct by any member of the team. If I thought there was a violation, I would first address the matter privately with the lawyer to be sure I knew all the facts and had learned that lawyers perspective and thoughts before accusing the lawyer on a platform with nearly 20 members. But, I don't fault any lawyer for proceeding in a manner they think best.

2. Gathering the media quotes by counsel is of course a good idea and my office regularly collects all media on every case we handle. Here, I think it is particularly important to collect the media containing the leaks of false allegations about our client in relation to the Epstein attempted suicide and his death. Given the quantity of media it is a good idea to have someone else gather the stories as well so as not to miss anything. Mike, feel free to call me if you need help with this.

3. Please recall that this "frenzy" began with a false leak that our client assaulted Epstein a few weeks ago. The outlet quoted unnamed law enforcement sources and personal a the mcc. All of our public

722

comments were in response to that leak or addressed the conditions generally at the MCC, which I hope now receive scrutiny by the pubic and by investigators. Sealed filings won't change the culture of that place nor improve the conditions for the people detained there.

4. I am eager to get help on how best to address the media frenzy to achieve goals for Nick. While I have read all the comments indicating that we should not say anything, I disagree. I would, however, be interested in input from others on what to say and how to say it.

5. Of course I am acting in order to achieve goals for Nick, but I don't think I should lay out those goals nor the strategy here. We haven't in the past gone into that level of detail and I have been chastised at times for writing too much. I would be happy to discuss all of this or anything else with anyone who wants to talk to me. I am available for a call and can drive into NYC later today for a meeting if people want to spend a few minutes constructively working towards our common goals.

Happy to hear from anyone.



**Kenneth Montgomery** Tue, 13 Aug 2019 at 1:39pm via email

That MSNBC article I just read is incredibly harmful on many fronts. No doubt about it.



**Bruce Barket** Tue, 13 Aug 2019 at 1:43pm

Share the link and please make sure Mike gets it.



**Kenneth Montgomery** Tue, 13 Aug 2019 at 1:44pm via email

Sometimes the you don't say can be more important than the things you say. I also have never seen an attorney offer to proffer their death authorized client via the media. Particulrly on an active investigation.



**Kenneth Montgomery** Tue, 13 Aug 2019 at 1:52pm via email

I also think the story can have an adverse affect on the client's safety from other prisoners.

723



**Bruce Barket** Tue, 13 Aug 2019 at 3:35pm

Kenny,

I did not speak with MSNBC. Happy to read the article if you post the link. I don't have time to search for it today.



**Kenneth Montgomery** Tue, 13 Aug 2019 at 3:41pm via email

Sorry, NBC.

https://www.nbcnews.com/news/us-news/nearby-inmate-heard-nothing-when-jeffrey-epstein-died-lawyer-sa...

Sent from kjmontgomerylaw.com

>



**Bruce Barket** Tue, 13 Aug 2019 at 4:41pm

I had not seen this. Thanks. I wonder if this is the same article Tony referred to. I think Nick will be fine with other inmates, as he was when the guards called him out following my complaints in Court. And I agree that the strategy of speaking to press is as much about what to withhold as it is about what to say. There is a lot about this case and about representing Nick that I have never seen before. It's one of the benefits of having so many talented lawyers. Hopefully, nearly everything will be something at least one person on the team has seen before.

# EXHIBIT 10

## Stop Speaking To The Press About The Jeffrey Esptein Matter

From: Tony Ricco
Date: Thu, 15 Aug 2019 at 5:42am

Again, we wake up to yet another day of newspaper articles where attorney Barket is again is quoted and is litigating issues related to potential penalty phase evidence in the media. These interviews are continuing notwithstanding the fact that during these interviews, the lawyer has (1) in one article violated New York state statutory and ethical rules governing attorney/client privilege; (2) in yet another article opened the door to non-aggravating statutory rebuttal evidence in the penalty phase; and (3) has been advised by every single person with a wealth of capital experience that such a practice is detrimental to the development and presentment of mitigation evidence, and (4) that we should stay clear of the media and/or government investigation of the Jeffrey Epstein suicide.

Yesterday, more than 5 hours was spent on the telephone with team members, the Executive Director of the Federal Death Penalty Project and others discussing the ugly ramifications of the disclosures (which are in fact a violation of attorney/client privilege) that appeared in the NBC and NY Post articles. After many hours of painstaking analysis, we all came to the conclusion, that as a result of the attorneys comments, a very important potential mitigating fact has been, effectively, wiped out of the case.

And, to demonstrate the point, now this:

https://nypost.com/2019/08/14/epstein-told-lawyers-that-cellmate-nicholas-tartaglione-roughed-him-up/

This article represents exactly what happens, when an attorney decides to litigate death penalty phase issues and/or facts in the media. I repeat: *"This article represents exactly what happens, when an attorney decides to litigate death penalty phase issues and facts in the newspaper."*

When an attorney, as a result of inexperience or indifference, previews or telegraphs penalty phase arguments in the media, the government will be on notice, will dissect that mitigatory, flip it and turn the very same facts into an aggravator. Counsel was previously advised of that this would result, but decided to move ahead anyway with media interviews. The result? Predictable, and expected by those with capital experience (the about article link makes the point). The result? Cluelessness, to those with no capital experience.

Yesterday, a lengthy inter-team memorandum of written (yet to be circulated) reminding all members of the dangers of litigating a death penalty case in the media, and to the actual prejudices and risks that these interviews (in particular the NBC/NY Post interviews) have, *in fact*, caused to Nicholas Tartaglione, and the potential ethical delimma that the disclosure of the client's remarks protected by privilege have caused to *all*, *all* other counsel on the case who have refrained from falling into this circular trap - a trap with deadly consequences for Nicholas Tartaglione.

725

You can be certain that the government is monitoring these statements, building its case in aggravation in rebuttal, and waiting for the disclosure of even more statements, before it gives notice and seeks sanctions against counsel.  The result?  Leaving Nicholas Tartaglione's penalty phase case in jeopardy.

**Simple Advice** (Repeated):  **Stop with these press interviews.** Stop with this "*tit* for *tat, he said, she said, they said, my client said*" course of behavior in the media.  The information disclosed by counsel to date is adverse to the interest of Nicholas Tartaglione, violates his right to confidentiality and to develop a penalty phase defense in an effective manner.  **Just Stop. Enough damage has been done.**  Before we can respond to the NBC (NY Post) quotes, we now have this to deal with.  These disclosure have no known legal or factual benefit for the development and presentment of mitigation evidence in this case.

Finally, and again, all counsel should understand the simple wisdom that we **must**

exercise patience, restraint and wisdom until such time that the BOP, the Inspector General and the FBI completes its investigation, and we have an opportunity to review those documents, before making "*in fact*" judicial or extra-judicial proclamations (if any) in relation to either the so-called attempted suicide, the apparent suicide, and the actions of the BOP in relation to both matters.

If there is a remedy that any counsel believes should be sought, the proper course of conduct is to file an application to the court *ex parte* and under seal, if necessary.

Finally, all team members be advised that the investigation of the Jeffrey Epstein attempted suicide, suicide is **not limited** to what you are reading in the papers, watching on TV and in social media.  The investigation is far more expansive involving many matters related BOP policy, staff, equipment, including detainees and several civilians - including lawyers who have been visiting Jeffrey Epstein and others during this relevant time period.  Subpoenas have been served with more expected.



**Bruce Barket** Thu, 15 Aug 2019 at 6:54am

I remain perfectly willing to participate in any call or attend any meeting concerning any aspect our representation of our client--or as is the case here, read about the calls and meetings after they have taken place without me or my input.

I am not willing, as should be obvious by now, to abandon my responsibility to do what I believe is in my client's best interest because of instructions issued by any person or persons, despite their experience, expertise and my respect for them personally and professionally.

If people want to engage in a dialogue, I am open to discussions and frankly to changing my views, my positions and altering the course of my conduct, if I think it is in Nick's best interest.

726

My email address is bbarket@barketepstein.com and my cell phone is 516 287 2730. Both are working if anyone wants to address these issue with me directly.



**Tony Ricco** Thu, 15 Aug 2019 at 7:57am

There is is no duty or obligation to engage in violating and attorenys duty to obligation to protect the attorney/client privilege. You have it backwards. What you are being asked to do is stop violating his protected rights. To abandon operating adverse interest of Nicholas Tartalione's interest. Every single law who has read these remarks, see that Nicholas Tartalione's rights are being compromised except the attoreny who persists in engaging in the conduct. One remedy is not do it, if you dont see or understand the laws and rules you are violated. Over a week ago, an alternative remedy was suggested: float the statements before hand to Lesrned Counsel or Resource counsel. This sound advice was ignored, with really damaging statements coming AFTER this remedy was suggested. Then there is also the ethical delimma that you are causing for everyone of your professional colleagues who also causing. Are you aware of what those ethical reaponsibilities are? I will call call you directly to discuss what you claim what you are interested in doing but what your persist conduct reflects either you simply do not understand or is simply disregarding for other reasons.



**Michael K. Bachrach** Thu, 15 Aug 2019 at 7:57am

Bruce, I called you yesterday to discuss these issues as well as the emails from the prior day. Let's try to talk today, if you're available.

On a related note for all, take a look at the layout of the print edition of the NY Post this morning (see photo attached). This is how most potential jurors are likely seeing these articles and as always it looks even worse in print.

727



**Michael K. Bachrach** Thu, 15 Aug 2019 at 7:58am

See attached floor better viewing.



**Bruce Barket** Thu, 15 Aug 2019 at 8:06am

What should also be obvious by now is that I won't engage in a debate on this platform.



**Bruce Barket** Thu, 15 Aug 2019 at 8:08am

I got your message but was not working yesterday. I will calm today between 11:00 and noon. I have time then

# EXHIBIT 11

To All the Members of My Legal Team,                    8-15-19

First let me thank all of you For the hard work And dedication everyone has shown for the past 2 years and 8 months on this Case. I am grateful for All the talented people who I have with me on this Monumental hurdle in my life. I understand completly the gravity of this being a Capitol Case, And I am fully aware of the possible death penalty that awaits me should I be found guilty At trial. That being said it is still My Choice to focus Our efforts towards the trial. I am not guilty of these charges and will not Compromise our efforts for an aquittal just to be spared a death verdict should I be Convicted. That being said I wish to remind my team that my Chosen lead Counsel is And Always has been Bruce Barket. He has My Complete trust and Confidence. Over the past 32 Months he has Met with me countless times to discuss and or explain to me the events And Strategies of this Complicated case. It is my hope that everyone on my team will support him And follow his lead but if anyone finds Conflict with this request please let Bruce Know so we Can find a replacement in time to prepare for trial.        THANK You
                                                Nick Tartaglione

# EXHIBIT 12

# Meeting With Nicholas Tartaglione

From: Tony Ricco

Date: Thu, 15 Aug 2019 at 11:23pm

I had a three hour meeting with Nicholas Tartaglione today at the MCC. We were joined in the meeting with Leonard Rollock, a paralegal who had previously met Nicholas Tartaglione and who had served nearly 30 years in federal prison. The meeting was outstanding, as we discussed many aspects of the case, along with a considerable amount of time devoted to the impact of the Jeffrey Epstein suicide on the development of his prison adjustment mitigator, and what, if any, the suicide and surrounding circumstances could have on the liability phase of the case.

- During the meeting, we discussed the impact that statements made by counsel in the recent media interviews (Jeffrey Epstein suicide) have on the attorney/client privilege, and the consequences to the development of the prison adjustment mitigatory, among other things.

- During the meeting, we also discussed the expanding investigation of the July 23, 2019 incident involving Jeffrey Epstein. https://nypost.com/2019/08/14/epstein-told-lawyers-that-cellmate-nicholas-tartaglione-roughed-him-up/

- During the meeting, we discussed the curable ethical delimma that all counsel in the case are presently confronted with, and the steps that are needed to resolve that delimma, so that the case could proceed without any disturbance of its present direction.

- Finally, we discussed the liability phase investigation and the development of the defense: Jason Sullivan, Benderoff, Biggs, Marcos and forensic evidence, along with alternate theories for the presentation of a defense at trial. We also discussed the selection and role of our liability phase investigators and experts. Nicholas Tartaglione was advised of the dollar amount of the proposed Stage 2 budget, which included a consensus on the experts and investigators included therein.

Everything considered, Nicholas Tartaglione was in fine spirits, and we had an engaging and productive meeting. Nicholas Tartaglione provided me with necessary information concerning the statements made by counsel in the press that are attributed to him, along with the actions taken by attorney John Wieder. That information made it clear to me that, although there is a violation of the attorney/client privilege, Nicholas Tartaglione understands his rights, that he is okay and is prepared to address the

729

issue, so that we can move forward and into the important work which must be done in preparation for his trial.

I would like to have a brief **attorneys only** conference call tomorrow to discuss the next steps that the Second Circuit case law says must be taken, so that we satisfy counsels' present ethical obligation and to protect Nicholas Tartaglione's rights. What is a good time for everyone? It would help if everyone is aware of the ethical rules and the case law. In addition to the previous authorities cited, take a look at the responsibility of counsel as stated in *United States v. Malpiedi*, 62 F.3d 465, 469-70 (2d Cir. 1995).



## Kenneth Montgomery Fri, 16 Aug 2019 at 12:05am via email

I'm available anytime after 12 noon.

Sent from kjmontgomerylaw.com

>



## john diaz Fri, 16 Aug 2019 at 12:25am via email

I can do after 12 pm also

Sent from my iPhone

>



## bkoffsky@snet.net Fri, 16 Aug 2019 at 5:21am

I am available all afternoon as well.

B

# EXHIBIT 13

**ANTHONY L. RICCO**

*Attorney At Law*

20 VESEY STREET, SUITE 400

NEW YORK, NEW YORK 10007

TEL. (212) 791-3919  FAX. (212) 791-3940

August 17, 2019

**BY FACSIMILE**: TO BE FILED EX PARTE AND UNDER SEAL

Hon. Kenneth M. Karas
United States District Court Judge
Southern District of New York
The Hon. Charles L. Brieant Jr.
Federal Building and Courthouse
300 Quarropas Street
White Plains, New York 10601-4150

Re: *United States v. Nicholas Tartaglione*, Docket No. 16 Cr. 832 (KMK)

Dear Judge Karas:

The next status conference in this case is scheduled for Wednesday, August 21, 2019, at 12:00 p.m.  In advance of that conference, and in compliance with the admonition of the Second Circuit in *United States v. Mapliedi*, 62 F.3d 465, 470 (2d Cir. 1995), we write to alert the Court that there exists a potential conflict and to request that the Court appoint *"Curcio* Counsel" to (a) advise the defendant Nicholas Tartaglione regarding a potential conflict, and (b) to discuss with the defendant his right to waive the potential conflict..[1] *See United States v. Curcio*, 680 F.2d 881 (2d Cir. 1982); *see also United States v. Williams*, 372 F.3d 96, 102 (2d Cir. 2004) ("a

---

[1]    Attorneys Bruce Barket and Aida Leisenring do not join this application, and plan to submit a separate letter. We have declined to include the various newspaper articles which support this application, as counsel is of the view that these articles should, in the first instance, be presented to *Curcio* counsel.  As a result of the importance of this issue in a death authorized case, each step taken by counsel in this matter has been thoroughly vetted with the Executive Director of the Federal Defenders of New York, Resource Counsel assigned to this case, and the Executive Director of the Federal Death Penalty Resource Counsel Project.  However, the newspaper articles, and on line links to the dates of the television interviews have been indexed should the court direct counsel to file that information.

client's representation suffers from a *potential* conflict of interest if 'the interests of the defendant may place the attorney under inconsistent duties at some time in the future.' "), quoting, *United States v. Kliti*, 156 F.3d 150, 153 n.3 (2d Cir. 1998); *United States v. Lussier*, 71 F.3d 456, 470 (2d Cir. 1995) (the court must make an inquiry even where there is only a *possibility* of a conflict).

Counsel has determined that there is a potential conflict relating to the defendant's Sixth Amendment right to counsel of choice, and the defendant's Fifth Amendment rights regarding statements attributed to him, which statements were disclosed by counsel during media interviews. Undersigned counsel are particularly sensitive to this issue because the potential conflict arises in the context of the defendant's preparation for the presentment of evidence in the sentencing phase of this authorized death penalty case. The Supreme Court has recognized that authorized death penalty cases require unique and heightened constitutional protections, *Ford v. Wainwright*, 477 U.S. 399, 414 (1986); therefore, we request that the Court consult with the Executive Director of the Federal Defenders of New York, and appoint an attorney with significant capital experience. We request the appointment of an attorney such as John Kaley, Richard Ware Levitt, Bobbi Sternheim or Kelley Sharkey, all of whom are well versed in both the law related to conflicts as well as the impact such conflicts could have on the penalty phase of an authorized capital case.

Undersigned counsel are constrained in providing more detail regarding the potential conflict and the substance of the many statements made in the media because of the need to preserve confidentiality. However, we expect this matter can be resolved by Mr. Tartaglione's

2

consultation with *"Curcio"* Counsel. If *"Curcio"* Counsel determines that further inquiry or action is necessary, such counsel will inform Court.

Finally, we respectfully request that this application and the related proceedings that follow be held *ex parte* and under seal to avoid revealing information that could adversely impact the defendant and prejudice his penalty phase investigation and presentation.

Respectfully submitted,

*Anthony L Ricco*

Anthony L. Ricco, Esq.

*Bruce D. Koffsky*

Bruce D. Koffsky, Esq.


Michael Bachrach, Esq.
Kenneth J. Montgomery, Esq.
John Diaz, Esq.

ALR/jh

cc:  All defense counsel (including Barket and Leisenring)

3

# EXHIBIT 14

-----Original Message-----
From: Bruce Barket <bbarket@barketepstein.com>
To: tonyricco (tonyricco@aol.com) <tonyricco@aol.com>; bkoffsky@snet.net <bkoffsky@snet.net>; Michael Bachrach (michael@mbachlaw.com) <michael@mbachlaw.com>; ken@kjmontgomerylaw.com <ken@kjmontgomerylaw.com>; john diaz (johnadiazlaw@gmail.com) <johnadiazlaw@gmail.com>
Cc: Aida Leisenring <aleisenring@barketepstein.com>; Danielle Muscatello <DMuscatello@barketepstein.com>; Donna Aldea <DAldea@barketepstein.com>
Sent: Tue, Aug 20, 2019 3:57 pm
Subject: next step

I am planning on writing the Justice Department in an attempt to get them to trade authorization for Nick's full cooperation into Epstein's death and the overall manner in which MCC is run and the conditions of the facility. Others can offer evidence about the facility, but only Nick knows what happened on the 23rd of July and before. He has a good deal of information about Epstein and his past and state of mind.

I know this is a long shot, but we have nothing to lose. All they can say is "no" but in so doing they will fail to have interviewed the key witness in Epstein's first attempt.

Hopefully, people can weigh in here and help. I won't have time today to circulate a draft but I plan on writing to Barr.

Bruce A. Barket, Esq.
Barket Epstein Kearon Aldea & LoTurco, LLP
666 Old Country Road , Ste. 700
Garden City, NY 11530
(516) 745 1500 [P]  (516) 745 1245 [F]
www.barketepstein.com

This transmittal may be a confidential attorney client communication or may otherwise be privileged or confidential. If it is not clear that you are the intended recipient, you are hereby notified that you have received this transmittal in error; any review, dissemination, distribution or copying of this transmittal is strictly prohibited. If you suspect that you have received this communication in error, please notify us immediately by telephone or email and immediately delete this message and all its attachments

# EXHIBIT 15



**BARKET EPSTEIN & KEARON, LLP**

666 OLD COUNTRY ROAD, SUITE 700
GARDEN CITY, NEW YORK 11530
516.745.1500 • (F) 516.745.1245
WWW.BARKETEPSTEIN.COM

350 FIFTH AVENUE, SUITE 6400
NEW YORK, NEW YORK 10118
212.972.1710
ALL MAIL TO GARDEN CITY ADDRESS

*Ex Parte and Under Seal*

August 20, 2019

Hon. Kenneth M. Karas
United States District Court
Southern District of New York
300 Quarropas Street
White Plains, NY 10601

Re:    ***United States v. Nicholas Tartaglione***
**16 Cr. 832 (KMK)**

Dear Honorable Karas:

I write to supplement the letter written by co-counsel requesting a *Curcio* hearing. Contrary to learned counsel's representations, there is no actual, potential, or possible conflict caused by any of my communications with the press that would warrant assignment of *Curcio* counsel or a *Curcio* hearing.

To the contrary, the bond between Mr. Tartaglione and my firm has never been stronger and nothing has occurred, or is reasonably likely to occur, which will in any way interfere with our ability and willingness to zealously represent Mr. Tartaglione on every front where he is being attacked. From the guilt/innocence phase, to the penalty phase, to the conditions of his confinement, to the baseless allegations in the media, we have done, and will continue to do, everything within our power to protect him, in accordance with our ethical obligations.

Indeed, it is not clear from co-counsel's letter what potential conflicts exist, what specific statements or conduct has caused them, and what exactly Mr. Tartaglione would be asked to waive. While I appreciate the need to be circumspect when dealing with these issues, I do not believe that the Court should direct a *Curcio* inquiry and appoint *Curcio* counsel unless and until it has identified both a factual and legal basis establishing the existence of any possible or potential conflicts. If there are none, then no further inquiry should take place.

As learned counsel well knows, my firm and I are Mr. Tartaglione's counsel of choice, and in the context of learned counsel's letter to the Court, Mr. Tartaglione fully supports the statements I have made to the media, which I had full authority to make pursuant to Rules 1.6,

1.7, 1.8, and 3.6 of the New York Rules of Professional Conduct, as applicable to me pursuant to Rule 1.5(b)(5) of the Local Rules of the Southern and Eastern District Courts of New York.

Therefore, before appointing *Curcio* counsel, if one should be appointed at all, we are asking that any potential conflicts be specifically identified and that the factual and legal basis for them be specified so as to permit intelligent discussion and review of this issue.

We are asking that this letter be filed *ex parte* and under seal.

Thank you for your consideration.

Respectfully submitted,

Bruce A. Barket
Aida F. Leisenring

cc via email: co-counsel

08/20/2019 TUE 10:33    FAX                                                              ☑001

```
                        *********************
                        *** FAX TX REPORT ***
                        *********************

                           TRANSMISSION OK

              JOB NO.                 4087
              DEPT. ID                9906
              DESTINATION ADDRESS     19143904152
              SUBADDRESS
              DESTINATION ID
              ST. TIME                08/20 10:32
              TX/RX TIME              00' 40
              PGS.                    3
              RESULT                  OK
```

# TO BE FILED EX PARTE AND UNDER SEALED

## BARKET EPSTEIN KEARON ALDEA & LOTURCO, LLP
*Attorneys at Law*
666 Old Country Road
Garden City, New York 11530
(516)745-1500
Fax (516) 745-1245

## FAX TRANSMITTAL SHEET

**Facsimile No.:**     (914) 390-4152

**Date:**              August 20, 2019

**To:**                Honorable Kenneth M. Karas
                       District Court Judge of the Southern District of New York

**From:**              Bruce A. Barket, Esq

**Re:**                United States v. Nicholas Tartaglione
                       (16-CR-832)

**NOTE:**              **ALSO MAILED VIA FEDERAL EXPRESS**

**Pages: 3**
**(Including Cover)**

**MESSAGE:**    CC via Email to All Counsel of Record for Mr. Tartaglione.

**NOTICE:**  Pursuant to CPLR Rule 2103(b) (5) the telecopier number of this office has not yet been
designated as a proper number for the service of documents or papers in this action or proceeding

# EXHIBIT 16

## The Court Has Appointed Curcio Counsel

From: Tony Ricco

Date: Wed, 21 Aug 2019 at 6:58am

As expected, and in compliance with the longstanding law in the Second Circuit, late yesterday afternoon, Judge Karas appointed *Curcio* Counsel in this case.

Judge Karas has appointed **Bobbi Sternheim**, an attorney with four decades of criminal practice under her belt, a recognized leader in the local and national criminal defense Bar who has considerable federal death penalty experience.

**The protocol taking place later this morning is as follows:**

1. Bobbi Sternheim is expected to arrive around 10:45 am to 11:00 am. Bobbi Sternheim will then be debriefed by the defense attorneys - either individually or as a group or both. I have been advised that this option is available because two separate letters were filed on this basic issue (extremely rare). Since Bobbi Sternheim is appointed as *Curcio* Counsel, all statements are protected by confidentiality. Bobbi Sternheim will be provided with the Index and copy of the relevant newspaper articles. After debriefing by defense counsel on the facts which provide the basis of a *possible* conflict, Bobbi Sternheim will then proceed to interview Nicolas Tartaglione but outside the presence of all other counsel.

2. Bobbi Sternheim will interview Nicholas Tartaglione. After the interview, Bobbi Sternheim will then make her own recommendation of whether the possible conflict can be waived. If so, Bobbi Sternheim will likely get a determination of whether Nicholas Tartaglione is willing waive. Bobbi Sternheim will make her recommendation to the court.

3. The decision, however, of whether there is a potential conflict or an actual non-waivable conflict, is a decision ultimately made by the court.

**Additional Concerns:** Until my conversation on Sunday, most of us were operating under the impression that the remarks to the press that disclosed information gained from interviews with Nicholas Tartaglione were simply "*inadvertent.*" However, we were instructed on Sunday by counsel that the comments were **not** "*inadvertent.*" This concerns me, particularly given the email circulated to the Team yesterday about approaching DOJ. The combination of the two concepts is extremely problematic for all the fairly obvious reasons. And, will naturally impact Bobbi Sternheim's decision and recommendation to the court.

I plan to arrive in court around 10:45 am, and will await the arrival of others before debriefing Bobbi Sternheim. If you are not attending this morning, please notify, so that we are not left waiting.

755

# EXHIBIT 17

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------x

UNITED STATES OF AMERICA,

Case No. 16-cr-832

-vs-

NICHOLAS TARTAGLIONE,

Defendant.

------------------------------------x

United States Courthouse
White Plains, New York

August 21, 2019
12:21 p.m.

** PARTIALLY SEALED **

B e f o r e:

HONORABLE KENNETH M. KARAS

District Judge

A P P E A R A N C E S:

GEOFFREY S. BERMAN
    United States Attorney for the
    Southern District of New York
MAURENE COMEY
JASON SWERGOLD
    Assistant United States Attorneys

MICHAEL K. BACHRACH
    Attorney for Defendant

BARKET, MARION, EPSTEIN & KEARON, LLP
BRUCE A. BARKET
AIDA F. LEISENRING
    Attorneys for Defendant

JOHN DIAZ
    Attorney for Defendant

2

A P P E A R A N C E S:   (CONT.)

KOFFSKY & FELSEN, LLC
BRUCE D. KOFFSKY
      Attorney for Defendant


LAW OFFICE OF ANTHONY L. RICCO,
ANTHONY L. RICCO
      Attorney for Defendant

LAW OFFICES OF BOBBI C. STERNHEIM,
BOBBI C. STERNHEIM
      Attorney for Defendant


DAVID A. RUHNKE
      Attorney for Defendant

THE DEPUTY CLERK:  The Honorable Kenneth M. Karas presiding.  United States of America versus Nicholas Tartaglione, 16-cr-83.

Counsel, please state their appearances.

MR. SWERGOLD:  Good afternoon, Your Honor.  Jason Swergold and Maurene Comey for the government.

THE COURT:  Good afternoon to you both.

MS. COMEY:  Good afternoon, Your Honor.

MR. BARKET:  I'll just announce myself.  Bruce Barket for Nicholas Tartaglione.

MS. LEISENRING:  Aida Leisenring.  Good morning, Your Honor.  Or Good afternoon.

THE COURT:  Good afternoon.

MR. DIAZ:  Good afternoon, Your Honor.  John Diaz for Nicholas Tartaglione.

MR. BACHRACH:  Good afternoon, Your Honor.  Michael Bachrach for Mr. Tartaglione.

MR. KOFFSKY:  Good afternoon, Your Honor.  Bruce Koffsky.

MR. RICCO:  Good afternoon, Your Honor.  Anthony Ricco from Mr. Tartaglione.

THE COURT:  Good afternoon, everybody.  Please be seated.

MR. RICCO:  Just for the record, we do have the presence of David Ruhnke, who is resource counsel.  He is here.

THE COURT:  Good afternoon, Mr. Ruhnke.

MR. RUHNKE:  Good afternoon, Judge.

THE COURT:  All right.  So we've got a couple of things to discuss.  I think we have a couple of things to discuss.  I think what I would like to do is if I could start off by asking counsel for Mr. Tartaglione to meet me at the sidebar for a brief conversation.

(The following pages are under seal)

(Sealed proceedings at the side bar; defense counsel only)

THE COURT:  So I think it makes sense to start off with the correspondence, Mr. Ricco, that you submitted, and Mr. Barket, you respond.  Procedurally, how do you want to move forward?

MR. BARKET:  That was -- I agree, but that's without anybody else.

THE COURT:  Oh, okay.  So if you want, we can go into the conference room.

MR. BARKET:  We need Nick.

THE COURT:  You have to talk to the marshals about that because I think there is a preliminary question about whether or not this really does need to be ex parte, and I don't think we need your client for that.  If it is ex parte, then we probably just have to just clear the courtroom.

MR. BARKET:  Yeah, that's what I was thinking.

THE COURT:  Because I don't think the marshals are going to let him in chambers, and it's not personal.

MR. BARKET:  No, I know.

THE COURT:  Seriously.

MR. BARKET:  I would.  He's a good guy, I tell you.

THE COURT:  I mean, again, the marshals have their protocol.  So -- so if we want, we can at least start with just the lawyers in the back, and then we can have that conversation,

SEALED PROCEEDINGS

6

and then if we go from there, we can move --

MR. BARKET: Sure. Let me just tell him what's happening. The first part is, should it be ex parte or not?

THE COURT: Right.

MR. BARKET: That's fine.

MR. RICCO: And, Judge, I would request that the first part is ex parte.

THE COURT: I respect that that's your view. I just don't want you to go in there, and -- but let's do it in the back, and I don't believe you need Mr. Tartaglione for that piece, but of course let him know.

(Side bar concluded)

(In conference room, defense counsel only)

THE COURT: All right. So for the record, we are in a conference room that adjoins the courtroom, and the reason I wanted to have this conference with counsel for Mr. Tartaglione only is to address in the first instance the extent to which the letters that were filed. Mr. Ricco, your letter was filed August 17th; Mr. Barket, your response August 20th, whether the conversation about these letters should remain ex parte.

So for now, we are going to have the transcript of this proceeding be made available only to counsel for Mr. Tartaglione until otherwise because I can understand the arguments I can anticipate are going to be made. So whoever wants to address the issue?

MR. BARKET: Well, I think the short answer is the substance of what the letters entail certainly touch upon the attorney-client privilege, and it may involve discussions beyond -- discussions of conversations with Mr. Tartaglione beyond what's been reported in the paper. So to have that aired publicly in the presence of counsel for the government would be problematic.

And, secondarily, there's been no hint by the government so far that I know that any counsel for Mr. Tartaglione would become a witness. I wouldn't want our free-flowing discussion of some of the topics here to give them any ideas.

THE COURT: So the attorney-client privilege piece is the one that's obviously the most potentially problematic. I mean, to begin whether it's ex parte or not, Mr. Tartaglione's attorney-client privilege is his, and it only gets waived if he wants to waive it or there is some other legal basis to think that it's waived beyond his own personal consent. I am at a little bit of a loss in terms of the basis for all this.

So I don't know more about the -- I guess it would be useful to know more about what the potential conflict is, so I can figure out how much of this might touch upon the privilege because the flip side of it is, you know, Curcio hearings normally are done in the presence of the government because they don't typically involve attorney-client privilege, and the

SEALED PROCEEDINGS

8

government has a stake in making sure that the client's situation is either conflict free or the client knows about the potential conflict, and it's waivable, and the client waives it, right?  And oftentimes there is consultation with counsel and so on and so forth.  So I take it you don't disagree with what Mr. Barket says, Mr. Ricco?

MR. RICCO:  I do not disagree with that.

THE COURT:  So if you can maybe enlighten me a little bit as to what the potential conflict is so I understand the dots that are being connected here.

MR. RICCO:  Judge, in my -- I think what's problematic here is is that to fully lay out the circumstances we would be intruding way into revealing confidentialities that were discussed with counsel, and so we are trying to alert the Court to the -- not only the doorway issue, but --

THE COURT:  Yes.

MR. RICCO:  -- getting in the weeds on this.

THE COURT:  Yes.  Okay.

MR. RICCO:  And I believe by flushing it out, we would then be violating his confidentiality -- his confidence.

MR. BARKET:  Can I take a stab at it this way?

THE COURT:  Yeah.

MR. BARKET:  I think the fundamental question is, at least in part, whether or not counsel had authorization to make the statements that were reported in the press if they involved

disclosure of client confidences; and if so, then the client should say so, and if not, then the client should say not, and then we take it from there.

So that's kind of I think -- I think that's fair. I think that's kind of articulating Mr. Ricco's underlying motivation for writing this. Obviously, we wrote our letter and our view is our view.

THE COURT: Yes.

MR. BARKET: But I think that's the core issue, and then necessary in that discussion, whether he has it in open court with independent counsel, he's obviously had it with us, the answers to those questions are going to involve, by their definition, other discussions that counsel has had with Mr. Tartaglione.

THE COURT: Which he has to waive, right?

MR. BARKET: Right. So to the fundamental question I think is: Here is a set of statements, and there is an index that we all have which is of various articles that reported various comments that were attributed to me, frankly. And so Nick, did you authorize this? And do you adopt it? Is this okay with you? Or not.

THE COURT: But he also has to be advised that he doesn't have to answer the question. It's his privilege.

MR. BARKET: Well, I think what Mr. Ricco's idea was, and is that if you have an independent counsel go ask it, that

person's covered under the privilege, so he can talk to independent counsel.

THE COURT: Sure. Right.

MR. BARKET: And it would be -- it would be privileged.

THE COURT: Right. But when we get to the hearing aspect of this, there is no hearing unless he waives because how do you resolve --

MR. BARKET: Well, I think -- I think what we all anticipate -- I think what we all anticipate he is going to say -- I don't want to speak for him, but I think we all --

MR. RICCO: We can.

MR. BARKET: We can. He is going to say, I wish he had said more.

MR. RICCO: Well, certainly, he is going to waive.

MR. KOFFSKY: Your Honor, if I may?

THE COURT: Yes.

MR. KOFFSKY: I think the Court has to ask itself: Under these circumstances, can the Court appoint Curcio counsel simply based upon the representation of defense counsel that there is a potential conflict? And simply by making that statement, does the Court have authority to appoint counsel, Curcio counsel, who the Court believes is knowledgeable in the area of Fifth Amendment and conflict, to report back to the Court as to whether the issue of conflict and Fifth Amendment

rights has been explained to the defendant, and whether there is a knowing and valid waiver and whether the client -- whether the Court, without pulling back the curtain, can accept that and accept the waiver.

Because what I think what we are trying to tell the Court is that we don't -- in the first instance, since this is the Court that's sitting on the case, is going to be hearing evidence, is going to be addressing other issues, that maybe this Court isn't -- excuse me. Maybe in this instance, the Court isn't the correct forum to address the underlying facts of the conflict, but if the Court can feel comfortable in appointing learned counsel --

THE COURT: But I am almost -- what I am doing is I am almost appointing a special master to evaluate the issue, and that's pretty tricky.

MR. RICCO: Judge --

THE COURT: I understand the point, but that's what I am a little worried about is --

MR. RICCO: Judge, one of the interesting things about this is that different lawyers have different views on this based upon where they are.

Judge, my concern is that this is a death-authorized case, and I would like to see us err on the side of caution and protection.

THE COURT: Of course.

SEALED PROCEEDINGS                           12

MR. RICCO:  And I think that I want to be able to say that we all agree that the best way to protect Mr. Tartaglione's interests here is to have Curcio counsel, have a full discussion with him about the matters that are of concern of counsel and to find out whether or not he is prepared to waive on this.  We believe that he will.  And --

THE COURT:  Are you done?

MR. RICCO:  No, I am not.

THE COURT:  Sorry.  Finish.

MR. RICCO:  And we believe that he will.

What we are hesitant to do is to have an open conversation more about in addition to what has been discussed in the paper because -- because we then have a greater exposure of confidence, and I did run across a case that troubled me because what happened was that the lawyers just went right in to discussing with the Court the conflict, and at the time everyone was comfortable about that, but it ended up in that conviction being reversed.

And so my sense is at the first instance we -- I think we are in agreement that this is limited to these statements in the paper and the context under which he is willing to adopt.

MR. BARKET:  Look, I am not -- I don't want to -- and Tony is looking at me, and Mr. Ricco is looking at me.

MR. RICCO:  For a reason.

MR. BARKET:  Right.  So I am assuming it's to say

something.

MR. RICCO:  No, it's not to say something.  It's to say nothing.

MR. BARKET:  My view I think I articulated in the letter that was sent to the Court.  If the Court is inclined to have somebody separate from all of us speak to Mr. Tartaglione to confirm what I wrote, that's fine with me.

THE COURT:  I certainly don't see the downside in that, and, you know, I think that that's just a conceptual matter.  I think picking the right person is important.  I think somebody that -- I think there can be consensus would be well-versed, I mean, in Fifth Amendment and conflicts, but also just well-regarded, good judgment, experienced, you know.

MR. BARKET:  I am assuming you have done that, right?

THE COURT:  Well, I have certainly tried.  So we are not going to pick rookie of the year to do this.  And so maybe what we do is, we can go ahead and appoint Curcio counsel.  The benefit to doing that is then, then we are done with this for now.  Give Curcio counsel time to talk to Mr. Tartaglione, and then we can schedule a conference that can just be ex parte, and then we won't have a packed courtroom to deal with.

MR. BARKET:  I think, speaking for everybody, we are hoping because we think this is so straightforward, and I think clean, that this can all happen today so we all can move beyond it.

SEALED PROCEEDINGS                                    14

THE COURT:  I appreciate that may be your view.  I don't want speed to be the guiding principle here.

MR. BARKET:  Well, neither do I.

THE COURT:  Right.

MR. BARKET:  Of course, but I think the one thing that -- maybe more than one thing -- but certainly this thing that we agreed upon --

THE COURT:  Yes.

MR. BARKET:  -- I think that we thought we would be able to have somebody appointed today.

THE COURT:  Yes.

MR. BARKET:  And have that person conduct a rather limited inquiry into the problems that exist or potentially exist or possibly exist; get some feedback from the client, and maybe she can report back and say, Judge, I need more time or you know what, Judge, this is not an issue.

THE COURT:  Fair enough.  But put yourselves in the shoes of the Curcio counsel.  You don't know anything about the case.  Maybe you've read some stuff, but basically you don't know about the case.  You don't know much about what the potential conflict is.  What you do know is that you have got a lot of lawyers on the case.  It's a capital case.  The stakes could not be higher.  You would not be inclined to say, sure, Judge.  Just I will be back to you in a half hour.

I think that that -- I would be -- I would be very

concerned just about the weightiness of the magnitude of what we are dealing with here and say, while the lawyers may want to get this resolved lickety-split, my obligation as Curcio counsel is to make sure that this is thoroughly reviewed, and as an officer of the court, I would want to take that obligation seriously and not rush -- not dawdle either for sure, but --

MR. BARKET: If she said that, I would respect it. I just don't know -- we have already had -- you have appointed her.

THE COURT: I have not. I have asked her to be here today because I didn't want to jump the gun. I asked Bobbi Sternheim to be here today.

MR. BARKET: We had understood that you had appointed her, and we had a lengthy confidential conversation with her --

THE COURT: She is appointed, but no, I had not.

MR. BARKET: -- nunc pro tunc to half an hour ago.

THE COURT: I asked her to be here because, I mean, I took seriously what all the letters said. I took seriously your concerns about the Curcio counsel. So I did not appoint her. I asked her to be here today in case I wanted to appoint her.

MR. BARKET: Oh, I thought that ship had sailed or I would have addressed it.

THE COURT: No. No ships have sailed.

MR. BARKET: Then -- well, then my position remains the same. I mean, there are -- you can look at the statements

that are attached in the index.   And --

THE COURT:   Which I haven't seen.

MR. BARKET:   Right.   But -- and I have no doubt that Mr. Tartaglione authorized them, will authorize them, adopted them, is happy with them, and --

MR. RICCO:   And that's not the issue.   The issue is whether or not you have a waiver, and that needs to happen on the record.   And so I have no objection.   Ms. Sternheim is here. She was under the impression that the Court had appointed her and this is -- it's fine.   That's not a problem here.

And she could start today by interviewing him.   He is here in the building.   She is here.   I am sure she is going to want to get started.   I think that's a good way to proceed.

THE COURT:   Yeah, 1 think the prudent thing to do is appoint Ms. Sternheim, and I will put on the record 1 have a world of respect for Ms. Sternheim.   She has -- I have dealt with her as an adversary, and I have dealt with her in this job, and I think she is exactly the kind of lawyer that we can all trust to handle this with great professionalism and integrity, and so that's why I asked her to be here today.

I do think that if it's true, Mr. Barket, that this is a no-brainer, then this will be a no-brainer, but at least we have, I think, respected Mr. Tartaglione's right to make sure that this issue is thoroughly covered.   Again, given the magnitude of what he is facing, I just think it's the

SEALED PROCEEDINGS                                    17

appropriate thing to do.

MR. BARKET:  Sure.

THE COURT:  I don't think there is any downside in terms of the attorney-client relationship or certainly anything to having to do with his strategy going forward.  So --

MS. LEISENRING:  If I may?

THE COURT:  Sure.

MS. LEISENRING:  The only downside is any kind of statement that the quote-unquote potential or actual conflict has been waived is an assertion that an attorney violated the Rules of Professional Conduct.  So to the extent that that's not an assertion of that, then we are fine.

THE COURT:  It's not at all.  Getting back to the ship has sailed, the ship is in the port.  I have made no such finding, and by appointing Ms. Sternheim, it's not even a preliminary finding of anything of the sort.

MR. RICCO:  And, Judge, that's right.  We have made that clear.

THE COURT:  To be prudent here.

MS. LEISENRING:  I want that on the record.

MR. RICCO:  We made that clear to all counsel and also Mr. Tartaglione.  They understand that this is a protocol.  This is the protocol that the circuit has said these matters are to be resolved, and everyone understands that the ultimate decisions are made by the Court, not by us as counsel.  We don't

get to say what conflicts are and aren't.

THE COURT:  That's true.

MR. RICCO:  We have to discuss those with Curcio counsel, and the Court decides whether or not there is a waiver or nonwaiver of conflict here.

MR. BARKET:  I am sure the Court understands that it's from our perspective, and when I say "ours," my firm, out of the tremendous respect we have for Mr. Ricco and the other attorneys here, we moderated our response.  If the government had made this application, our response would have been much different.  But, you know, they are experienced at this.  They understand this.  He is fantastic resource, so --

THE COURT:  Yes.

MR. BARKET:  You know.  So we tried to tread lightly here.  Even if I --

THE COURT:  You are lucky this is going to be ex parte right now, taking a shot at the government.

MR. BARKET:  Even if I think -- well, I am just saying.

THE COURT:  The gloves would be off.

MR. BARKET:  All that will come in a few minutes, but the -- you know.

THE COURT:  Okay.  I appreciate that.  Look, again, I think it should be clear from the letters that there is nothing but professionalism here.  I mean, all the way around, and

everybody's concern is, as it should be, what's in Mr. Tartaglione's interests and how do we protect his rights and interests here --

MR. BARKET:  Of course.

THE COURT:  -- consistent with the law.  So I think that that goes without saying, and I think the fair point -- and that's why there is no findings here other than I think it's prudent to under the circumstances to have Ms. Sternheim be appointed Curcio counsel, and then she can -- either you all can talk to her about wanting to get this resolved as quickly as possible, but then I think we let her do her thing and do what she thinks she needs to do to perform the role of Curcio counsel, and then if we have to come back another day and have an ex parte conference, then so be it.

MR. BARKET:  Okay.

MR. RICCO:  Makes sense, Judge.

THE COURT:  So again, the transcript of this proceeding is going to be sealed for now because I am satisfied based on the representation of counsel that the Curcio issue about which there have been no findings made, could involve sensitive issues about attorney-client confidences, and so therefore, there is no reason at this point to have the government, let alone the public, learn about this.  Whatever First Amendment and common law right of access there is, and of course there is such rights to grant access to transcripts of

criminal proceedings, they are outweighed by the compelling interests of Mr. Tartaglione's attorney-client privileged communications with his attorneys, which, based on the representations of counsel, are potentially at issue here.

So counsel for Mr. Tartaglione can get a copy of this transcript, but at this point nobody else can.

MR. BARKET: Please. Thank you.

THE COURT: Okay. Anything else?

MR. BARKET: No.

MR. RICCO: No, Judge.

THE COURT: So, again for the record, I am appointing Ms. Sternheim to be Curcio counsel if you want to be the messengers to let her know that, and then I can talk to her afterwards, but I think in terms of how we transition back to the courtroom, I think that might be the smoothest thing to do. She already thinks she is the Curcio counsel.

MR. BARKET: I just want it clear that it goes back and encompasses the conversations we have had before --

THE COURT: Fair. Nunc pro tunc.

MR. BARKET: Right.

MR. RICCO: Yes. And those conversations only included what's in the newspapers anyway. So but I think that we are okay. It's always good to be overly cautious in a capital case on everything.

THE COURT: Hear, hear. Okay.

(In open court)

THE COURT:  All right.  Have a seat.  Does it make sense to address the issue about conditions at the prison next?

Mr. Barket?

MR. BARKET:  I am --

THE COURT:  Sorry.

MR. BARKET:  Sure.  I am happy to.

THE COURT:  Okay.

MR. BARKET:  I shouldn't say I am happy to.  I am actually dismayed with having to come back to this over and over and over again to the point where I am asking the Court to order that Mr. Tartaglione be detained in some other facility.

The only concerns I have about the other facilities is that it be local enough where he has access to the people that he needs to have access to, his attorneys.

So Valhalla really isn't maybe further in miles from MCC than our office, but certainly not further in time on most business days; and then you can kind of draw a circumference around New York City and imagine all of the facilities that exist, many of which house inmates who are charged federally and inmates who have been -- are facing a death penalty as well.

So and my reasons for that, and I think I state in the letter, as much as we tried to get things right at MCC, I think it should be apparent to everybody now that MCC has ingrained, longstanding issues that go well beyond being able to provide

reasonable conditions for Mr. Tartaglione and ordinary access to his attorneys, which has been a problem even when we have engaged in this process, which is highly unusual, but much appreciated where we can, in essence, call the jail or write to the jail a few days ahead of time and have an appointment for one of the two rooms available to see Mr. Tartaglione.

Even when we have done that, it's worked about -- I haven't taken a statistic on it -- but about 30 or 40 percent of the time. Even with that in place, people wait -- and I say "people," we are talking about lawyers, some of whom are being paid by the government, hours, and investigators and mitigation people before they are allowed to see him.

And also my concern more recently is, given the events at MCC and Mr. Tartaglione's proximity to them, he is in a particularly vulnerable position. One of the things that occurred that I just found out about this morning that I did not put in the letter to the Court is that Mr. Tartaglione received a correspondence, a note from a friend, three, and my understanding is that those letters were cut up with razor blades, which I have never heard of before happening. He had to piece them together to read them, and he's never received a letter like that. I haven't heard from any other clients having that ever happen. I took a straw poll among counsel. We haven't as well.

And I understand there are people's jobs on the line,

perhaps more than that, and they recognize pretty clearly that we have been complaining about the conditions and their treatment of my client for I think it's been more than a year before Your Honor; and then, obviously, more poignantly over the last month or so, and certainly over the last couple of weeks, it has been something that we have complained about quite vociferously, and they are telling him in the comments that I wrote in the letter, you know, tell your lawyer to shut up, which he takes as a specific threat to him, stop complaining. Stop talking.

At this point, it just doesn't seem appropriate that he be housed and guarded by the very people that are under investigation given his proximity to the events that are being investigated, regardless of whether or not he is ever called as a witness, talked to by those investigators, and whether or not it's to specific people or the colleagues or friends or co-workers, the same principle applies.

There are multiple jails in the metropolitan area that hold inmates charged with homicides. They are all secure and safe. I would ask the Court to please put him in another one, and we should not have to deal with these issues in a capital case; should not have trouble reaching a client. I shouldn't have a client who is fearful for extraneous reasons of the people that are guarding him. We shouldn't have to deal with the conditions that exist, and the conditions is -- the books is

a silly thing, sort of, except if you are locked in a cell 24 hours a day and then being able to read a book is the difference between insanity and sanity; and the way he's gotten books is the lawyers for the facility, who have been above and beyond courteous, professional, accommodating, to us and to the concerns, literally are bringing him the books themselves. So you have the attorney for MCC being the very person to deliver books to make sure that Mr. Tartaglione has the books that other people are buying for him and sending to the facility.

Sooner or later, I don't want to have a hearing about MCC, necessarily. I don't want to have this ongoing conversation with the Court. It is an unbelievable distraction to the preparation of his case. It takes time when I meet with him. It takes time to write the letters. It takes time to make the appointments even to go see him.

At this point, I am simply asking the Court direct that he be housed someplace else, and I mean, obviously, Nassau would be simple for me because it's 15 minutes from our local office and no further from his family, but I am happy to drive to Valhalla or wherever.

THE COURT: Okay. Who wants to respond from the government?

MR. SWERGOLD: Thank you, Your Honor. So with respect to the overall position regarding moving him out of the MCC, the government's view is that we defer to the U.S. marshals on this.

They are the ones who have the expertise in determining where defendants should be housed, what are the appropriate facilities. I know in prior conversations with the marshals, and Stuart Smith is here as well, that given the nature of the charges --

THE COURT: For the record, Stuart Smith is the --

MR. SWERGOLD: From the marshals.

THE COURT: -- from the marshals and is the person who runs the White Plains marshals office.

MR. SWERGOLD: Yes. Thank you. Your Honor.

THE COURT: Okay.

MR. SWERGOLD: Given the nature of the charges here, quadruple homicide, Mr. Tartaglione's former profession in law enforcement, certain actions that occurred at the MDC, the position is that he is not a suitable candidate for a local or contract facility; that it is only a BOP facility, and the fact that he is facing the death penalty, that it is only a BOP facility that is appropriate.

THE COURT: Do you know if there are local facilities that are even an option? Because they are not federal facilities. So Valhalla is run by the County of Westchester. Right? I assume Nassau is run by -- if I could finish the question. Is Nassau County the one you are referring to? Is that run by the federal government?

MR. BARKET: No. The Nassau County Jail, Valhalla is

a Westchester County jail, but those are I guess contract facilities, so there are federal inmates in both facilities.

THE COURT:   Right.

MR. BARKET:   Some of whom are facing the death penalty.

THE COURT:   Right.  But as I understand it -- and maybe I am wrong about this -- that there is a contract, but the contract doesn't require these facilities to take whatever inmate the marshals say go there because I just know this from other cases; that we have had other cases where for a variety of reasons, maybe sometimes there's been a particular inmate has been at a county facility, and then there was a misbehavior problem, and they said, that's it.  We want them out, and the marshals have to take them out, and they don't get to say, no, no, you must take them per paragraph whatever of the contract.

MR. BARKET:   I don't know.  You know better than I about what the contract is.  If we get to the point where they go to Valhalla, and Valhalla says, we can't have him here because of X, Y and Z --

THE COURT:   Yeah.

MR. BARKET:   -- that's different than in the first instance the government or the marshal service saying, MCC is the only place we are putting him.  I don't care if ten other facilities --

THE COURT:   That's not what I am hearing.

MR. SWERGOLD:  Your Honor, so --

MR. BARKET:  That's what -- I think that's what the position is, that MCC --

THE COURT:  Okay.  Well, let's find out.

Yes.  Go ahead.

MR. SWERGOLD:  So a couple of things, Your Honor. First of all, you are correct that with respect to these local facilities, the marshals in the Southern District of New York have a contract with some of the facilities.  They -- the S.D.N.Y. marshals do not have a contract, my understanding is, with Nassau.  Those are local facilities.  They determine who they are going to take.  Your Honor's experienced the same as the experience we have had in other cases where when we seek to put in a defendant in a particular local facility, they may either just be rejected out of hand, or they may get there and do something that requires them to be kicked out, and the marshals have to accept that and put them into another facility. They don't get a final say on it.

My understanding is that the determination was made, based on all of the factors that I discussed, that a contract facility is not an appropriate place to house this defendant; and one other thing I would just point out, Your Honor, is Mr. Barket has mentioned a number of times that these other facilities are housing defendants facing the death penalty.  I am not aware of any.  I know that there are two cases in this

district, including this one, where the government is seeking the death penalty. Both of those defendants are detained at the MCC. I am not aware if there is any from the Eastern District, and that would be in a contract facility that they have, and I don't know -- I don't think that would apply to any state inmates because there is no death penalty in New York right now.

So the position of the government, again, is that we would defer to the marshals on what their determination is as to the best place to house --

THE COURT: So when you say the marshals have said that the local facilities are not appropriate, is there a particular reason? In other words, is this a situation where the marshals are making that decision or the local facilities are saying, we are not going to entertain housing this particular individual? I just want to be clear on that.

MR. SWERGOLD: Your Honor, in my conversations with the marshals, and in particular with Mr. Smith, we have talked about some of the reasons -- the marshals have talked about some of the reasons why a BOP facility is the only appropriate facility. I would defer to him as to whether there have been conversations with local facilities; what the marshals' experience has been with local facilities with similarly situated defendants to be able to provide the Court with that kind of context.

THE COURT: Okay. So let's put that issue to the

side.

So with respect to MDC, because that's the other BOP facility that's in the New York metropolitan area.

MR. SWERGOLD: Sorry, Your Honor.

THE COURT: That's okay. With respect to MDC, which is the only other BOP facility in the New York metropolitan area, the issue there as I understand was that Mr. Tartaglione was housed there before MCC, but there was some kind of a disciplinary issue, and that that led MDC to say that they didn't want to house Mr. Tartaglione. Is that correct?

MR. SWERGOLD: That's correct, Your Honor.

THE COURT: And has anybody gone back to MDC and asked if it would revisit the issue?

MR. SWERGOLD: We would have to defer to the marshals on that, Your Honor.

THE COURT: Okay.

MR. SWERGOLD: As to whether or not MDC is willing to take him back.

THE COURT: Okay. Okay. Anything else you want to add?

MR. SWERGOLD: I mean, I am happy to, and I think the government should respond to some of the -- to the conditions arguments raised in the letter.

THE COURT: Sure.

MR. SWERGOLD: So the record is clear on them.

THE COURT:   Yes.

MR. SWERGOLD:   I think one of the overall issues here, Your Honor, is that, as Your Honor knows from prior conferences, the government and MCC legal have been working very diligently taking this very seriously to address any of these concerns that are raised by Mr. Barket in his letters.

One issue that we see in the most recent letter is that things are being sort of held close to the vest and then only told to us on the eve of a conference when we are trying to keep an open communication because most of the things that he raises, we reach out to MCC right away, and then they get fixed.

A lot of the things that are in this letter have already been addressed or have never been raised before or members of the staff went and spoke to Mr. Tartaglione, and he did not raise any of these issues, and so that becomes a little bit difficult for the government to be able to stay on top of these things because if Your Honor recalls, back maybe three conferences ago before the defendant was moved to the SHU because of the cell phone, we stood up in court and everybody sort of agreed that the conditions had reached a point where there were no complaints. Everybody was working to make sure we keep them that way.

So we would ask again that defense counsel sort of keep us in the loop on this stuff and let us know in a timely fashion if things are happening that they would like us to look

into; and that's I think also particularly important with respect to the allegations in this letter on the second page that there are -- that there is some retaliation going on --

THE COURT: Yes.

MR. SWERGOLD: -- or some comments that Mr. Tartaglione is interpreting as threats.

THE COURT: Yes.

MR. SWERGOLD: So, again, as we have told Mr. Barket, it is helpful for him to let us know with as much specificity as possible, and in a timely fashion, when something like this happens.

So, for example, on Friday of last week, we had a call with Mr. Barket in which he said that -- he said that guards were retaliating against Mr. Tartaglione because of what occurred with respect to one of his former cellmates. We said, okay, please give us specifics. Tell us the names of the guards. Tell us when this happened, what they said, and do it soon because the sooner you can do it and the more specific, we can follow up with MCC legal. We can investigate. We can try to corroborate the investigations. We can look into them. We have not been provided with those specifics. The letter itself also is incredibly vague, and so it just makes it very difficult. We have told the MCC legal. They have told their staff repeatedly there is to be no retaliation whatsoever for the fact that Mr. Barket and Mr. Tartaglione are raising issues

in court with respect to conditions. They are fully aware of that fact. And we -- these types of allegations are difficult for us to look into. We want to be able to look into them to the extent they are happening because it's incredibly serious, and we understand that none of this should be taking place to the extent that it is.

And I think, understandably, there might be some frustration from the staff, though I am not saying it justifies making any kind of comments if those are being made, but they interact with Mr. Tartaglione on a daily basis. He is not telling them about any particular problems, then it gets raised in court, and the first they are hearing about it is MCC legal or the U.S. Attorney's Office saying something to them.

So, again, this is what we talked about at a prior conference. If there are particular issues, if -- if a newspaper didn't arrive. If he wants access to another book, just ask the staff. Ask, and if he is not getting the responses that he wants, tell his attorney. Have him tell us right away, and we immediately follow up. I think in almost every circumstance that we have received a call or an email or a letter from Mr. Barket, we immediately get on the phone with MCC legal, and they immediately start looking into it.

There is a number of things that MCC legal has been doing, for example, with respect to the newspapers where they now get daily updates in the legal department about what is

coming into the mailroom to see if there are any newspapers. They then follow up that night with the SHU staff to ensure that whatever came in that day from the post office is being delivered to him. So while there are some days, for example, where nothing comes in from the post office, then there are days where they find out, okay, there are three newspapers. I think today actually three arrived. We saw the emails confirming that. They then follow up with SHU staff to make sure that it's getting to Mr. Tartaglione. So as long as there is open communication, we can continue to address any of these issues that exist.

The one thing I would also just say with respect to the legal visits. So Mr. Barket alluded to the fact --

THE COURT: Yes.

MR. SWERGOLD: -- that MCC legal has created a system for this defense team where if they notify them in advance, even morning of, that they are coming, they are moving Mr. Tartaglione in advance of the time that his lawyers are getting there to one of the attorney visiting rooms to ensure that one of them is available for him because I think Your Honor may remember that at a prior conference there was a concern that some inmates were spending all their time in it with a legal team 12 hours a day, and it was cutting down access to the rooms.

So they made that accommodation. He is then given his

discovery so that he can -- while he is in that room, he can make use of the time and look at the discovery while he is waiting for his attorneys.

They have also told defense counsel, Mr. Barket repeatedly, if you are waiting downstairs and you don't feel like you are being brought up quick enough, tell the guards to call Adam Johnson or Stephanie Scannell at MCC legal or if you have your cell phone on you, do it yourself, or if you don't and you want to grab it and step out, just call us. Let us know so that we can follow up on it as it's happening.

And our understanding from MCC legal is that in almost all of the circumstances where there is -- we later learn of a delay that Mr. Barket has raised as an issue, they did not avail themselves of that procedure. So MCC has put a procedure in place, and there's only been actually two instances our understanding from MCC legal where they were notified by Mr. Barket of delays. In the first one, one of the members of the legal staff ran into Mr. Barket and another member of the defense team, as they were leaving, Mr. Barket mentioned that he had to wait a while and said I think in substance, that he didn't have anywhere to be that day, so it was okay. That's why he didn't call. They reminded him, ask the guards to call us or call us yourself while you are there so that we can come down and get you up faster.

In the second instance, there was a special count that

was taking place in light of the ongoing investigation at MCC right now, and MCC legal staff emailed Mr. Barket ahead of time to let him know this special count was going to be happening; it might delay the time that the inmates are brought down for attorney visits.  My understanding is that that count cleared by about 5:30 p.m., and although MCC legal doesn't know exactly what time Mr. Tartaglione was able to start meeting with Mr. Barket, MCC legal staff went up to the SHU at around 6:30, so just about one hour after the count cleared, and Mr. Tartaglione was not in his cell.  He was already in an attorney conference room.  So yes, there was a slight delay there.  It was caused by the fact that a special count was being done, and they were given advance notice of it.

So I think with respect to all of the conditions that are raised in this letter, Your Honor, as long as we know about it in time, we are working very diligently with the MCC legal staff, and they are working very diligently and coming up with accommodations and new procedures to help the team have more access to their client, to make sure that they can get in there, and to make sure that any little issue that Mr. Tartaglione raises with respect to his cell, his mail, anything at all, is addressed in a timely manner.

THE COURT:  Okay.  Hang on, Mr. Barket.

So with respect to alternatives, I think everybody agrees that the only other BOP facility in the New York

metropolitan area is MDC, and I guess if we can get an answer to the question, if there is somebody here who knows, that MDC has been asked and they have already said we are not taking Mr. Tartaglione back or can they be asked?

MR. SWERGOLD:  Can we have one moment, Your Honor?

THE COURT:  Sure.  Of course.

(Pause)

MR. SWERGOLD:  All right.  Thank you, Your Honor.

THE COURT:  Sure.

MR. SWERGOLD:  So a couple of things:  With respect to MDC, it's our understanding that the decision to move him out of MDC in the first place was one that was made by MDC, not by the marshals.  Within the last year, however, the marshals did ask MDC if they would take him back, and the answer was no.  But the marshals will follow up again and ask them.

THE COURT:  That was my memory because we had, I think, explored this alternative before.

MR. SWERGOLD:  Right.

THE COURT:  So I appreciate the marshals inquiring again.

MR. SWERGOLD:  They will inquire again, and then with respect to the contract facilities that the Southern District has, the answer has actually come from the contract facilities, no.  They will not accept him.  And then with respect to Nassau, that's, again, not a contract facility that the marshals here

have a contract with.  We admit the Southern District marshals have never housed inmates there, and so they don't have any basis to ask them to do it.

THE COURT:  Yes, as far as I understand it, there is a contract with Valhalla, and then in the past there's been some -- there have been a few federal inmates at Orange County, and I think those are the only two --

MR. SMITH:  Putnam as well, Your Honor.

THE COURT:  Putnam.

MR. SWERGOLD:  All three have said no.

THE COURT:  Have said no.

MR. SMITH:  Yes, Your Honor.

THE COURT:  Okay.  Mr. Barket?

MR. BARKET:  I know that Nassau houses federal inmates because I see them.

THE COURT:  But they may not do it -- right, but that's the thing.  It may not be -- there is no contract with the Southern District marshals.

MR. BARKET:  Okay.

THE COURT:  So --

MR. BARKET:  That's what it is, that's what it is.  I just -- they house inmates there regularly.

THE COURT:  It may be, but it sounds like they are Eastern District cases.

MR. BARKET:  Right.

THE COURT:  So --

MR. BARKET:  I'm not privy to the contracts, so I don't know how --

THE COURT:  Neither am I, but it stands to reason that the Eastern District marshals office would be the one that has a contract with facilities in the Eastern District.

MR. BACHRACH:  Sorry, Your Honor.  May I?

THE COURT:  Yes, of course.  Try to be near a microphone if possible.

MR. BACHRACH:  Sure.

THE COURT:  Thank you.

MR. BACHRACH:  Thank you, Your Honor.  Just so the record is clear, there have been exceptions where, even though the facility is not contracted with a specific district, the inmate was able to -- the marshals were able to make arrangements so the inmate could be housed there.  For example, Your Honor, in *United States versus Farad Roland*, which was an authorized death penalty case in the District of New Jersey, there was an issue as to needing to find a new facility for him, and he was placed at the MDC, which was not contracted with the New Jersey marshals.

THE COURT:  But the MDC is a Bureau of Prisons facility.  It's a federal facility.  I mean, what we are talking about here is having a federal judge try to fiat a county facility to take a federal inmate, even though that facility

doesn't have a contract with the marshals service that is responsible for housing the defendant. So the New Jersey case is different. That's why, if there were -- if there were a third federal facility in the New York metropolitan area, this would be a lot easier, right? And I imagine we don't want to call up Philadelphia and say, do you have room, right? So -- so that's the issue is that how we manage with respect to the fact that there is only two federal facilities. One of which, you know, said to Mr. Tartaglione, we don't want to house you here anymore because there was some discipline issue, and the other which is being complained about. So that's the problem we have.

MR. BACHRACH: Understood, Your Honor.

THE COURT: Okay. Mr. Barket?

MR. BARKET: Just to -- some of the problems have been addressed. The books sort of. But just as an example of what goes on at that facility.

THE COURT: Yes.

MR. BARKET: Mr. Ricco, I believe, was in to see Mr. Tartaglione on the 15th of this month, and got in pretty quickly, and he got in pretty quickly because maybe the point is one of, in my view, 30 or 40 percent of the time the system worked.

THE COURT: Right.

MR. BARKET: And Johnson came down with a fistful of -- armful of books, and I got books for you, Nick, and I will

bring them upstairs. And sure enough, he did. And they sat there for a day and a half until the guards felt like giving them to him. This kind of thing goes on over and over again.

For the government to say that Nick should ask the staff for a shower? He does, constantly. He asks for books, constantly. He asks for legal calls, constantly. And he is routinely ignored. He was supposed to have a shower on Monday. Yesterday he asked the guard, can I have a shower?

THE COURT: For the record, today is Wednesday. Go ahead.

MR. BARKET: Sorry. Asked the guard, can I have a shower? And he says, I didn't get one yesterday. I was supposed to get one. And the guard said, you didn't get one yesterday, and you are not getting one today.

This morning when he woke up, the guard said, give this guy a shower. I don't want to read my name in the paper, and so he got a shower this morning.

The access to the -- by the lawyers every time I go there, or virtually every time I go there, I write a note, and as does all the people in the team because we are aware of the system and try to make an appointment. What I am saying is that about 40 percent of the time it works. The other 60 percent of the time people wait hours, and it's not waiting downstairs. It's you go upstairs to the room, and you sit in the room for hours at times. Sometimes an hour. Sometimes two. Sometimes

three.  And it's not a function of the legal staff not doing what they are supposed to because I know they do.  I have dealt with them for years.

THE COURT:  I understand.

MR. BARKET:  They are fantastic.  And the government has been accommodating.  It's that the -- a disconnect between what's supposed to happen and what happens; and this should not be a surprise given how this facility is run, how the hands-on, what actually goes on.

The silly example I repeat over and over again, there were, you know, 12 clocks in 12 different visiting rooms, including the SHU.  For years none of them worked because nobody put a 10 cent AA battery, and they just shrug.

THE COURT:  Forgive my facetiousness having been in the government for many years.  Do you think that's an MCC-only problem or do you think if we were to send audit teams around to BOP facilities around the country, we wouldn't find a substantial number of clocks also battery-less?

MR. BARKET:  They pulled that facility up as the preeminent place to house the worst of the worst; is it supposed to run this way?  It is the worst facility I have ever experienced.  Inmate after inmate who have been there and at Rikers Island who have said, send me to Rikers.

THE COURT:  I read articles that are very critical of MDC as well.  They -- MDC was also --

MR. BARKET:  MDC --

THE COURT:  Hang on.  Please let me finish.

MR. BARKET:  I'm sorry.

THE COURT:  I let you finish.  MDC has certainly earned its headline stories as well, and I suppose if we were to do, you know, searches, we might find similar things about BOP facilities in other parts of the country.

I'm not -- and I don't mean to sound facetious, but I do think, you know, it may be that moving Mr. Tartaglione to get away from some of these things of course is the right answer, but it may be that at the other BOP facility that he will have some of the similar issues.

MR. BARKET:  It may be, and some of the conditions at MDC -- MDC got a lot of publicity because the power went out, and rightfully so, right?  So there's an incident that took place there.

One of the big differences between MCC and MDC is that there are a limited number of attorney conference rooms at MDC like there are at MCC.

THE COURT:  Yes.

MR. BARKET:  But MDC permits the lawyers to visit with the clients in the general population area.  So clearly, you can't get every bit of work done, right, if you have a real intense or important -- but you can get some work done.

THE COURT:  Sure.

MR. BARKET: So if you go there, you are not stuck waiting for hours for a room to open up. They will put you in the room.

THE COURT: Do they do that regardless of the -- what the inmate is charged with?

MR. BARKET: Yes. I have seen Mr. Tartaglione when he was at MDC.

THE COURT: Okay.

MR. BARKET: If you recall, he was actually MCC first.

THE COURT: And then MDC and then --

MR. BARKET: Then MDC. And the disciplinary problem that they talk about didn't result in any discipline at all to him. It was -- we all know what it was because I think we talked about it. They just said, get him out of here, but there was no formal charges brought against him. So it's difficult for us to respond to it to say, what's the problem? You know, they just said we don't want him anymore, and this is the vague allegation of what the problem was.

So MDC has that ability to go over and you sit, and they have a separate area where the attorneys meet in the -- in a much bigger room --

THE COURT: Okay.

MR. BARKET: -- probably a little bigger than the courtroom perhaps, and so that's one big difference between the two places. But whatever other problems I am sure exist at

jails and prisons around the country, we are not saying put him up at the Four Seasons.

THE COURT:  I understand.

MR. BARKET:  This particular place is acutely a problem and has been a problem over and over and over again really with the same issues.

THE COURT:  Okay.

MR. BARKET:  As much as we address them, we come back, it's the same thing.

THE COURT:  All right.  So I -- sort of my reaction to this is that to the extent we want to explore transferring Mr. Tartaglione, our options are fairly limited because I don't think, you know, if a county facility says no, we are not going to let him in, I don't know what the authority would be for a federal judge to say, no, you have to take this person, including Nassau, which isn't even in our district; doesn't have a contract with Southern District marshals.  So it seems to me our options are:  We try to improve the situation at MCC or we see if MDC can be accommodating.  If not, whether their unwillingness to be accommodating can be somehow basically overruled.

So if you could do this, government, if you could have the marshals, and maybe you should be involved in this conversation as well, because I don't want to put this all on the marshals.  They are dealing with BOP just like you are

dealing with BOP. At the end of the day, you know, the issues here that are being raised are problematic, right? They go to Mr. Tartaglione's ability to live, but also his ability to defend himself and his lawyers' ability to help defend him.

So either you are going to have to come up with some solution that is better than what we have now, and have to consider the probability of doing that, or we are going to have to get MDC to take Mr. Tartaglione back. If it's really the view that the local facilities won't take him, then those are our options, and the status quo really isn't acceptable.

You know, these -- the fact that counsel are waiting too long; the fact that there are these other issues that affect Mr. Tartaglione's, as I said, ability to prepare his defense. That can't be. So, you know, I am not asking for an immediate answer, but if you could work with the marshals and talk to MDC officials because if the answer really is no, and by the way, judge, you don't have the authority to order that he be transferred to MDC, which I would be curious to read that authority, then we are going to have to make life very uncomfortable for MCC officials, and I will start having hearings, and I will start throwing around contempt, and so on and so forth because I have no beef with MCC legal. They have been responsive in other cases where we have people housed. They are very good. I agree with you, Mr. Barket, but there has to be a full translation between what MCC legal wants done and

what actually gets done.

So if you could, expeditiously review those options, and then if you could send a letter by close of business on Friday, and if you can't do it for some reason, let me know why you can't and when you will be able to get some answers. Because I think part of the problem is sort of a, well, you know, I accept that Mr. Barket doesn't quarrel with the notion that your office has been on top of this issue, and from where I sit, that's true. From where I sit, it seems like MCC legal is on top of the issue; but factually, there is a disconnect, and to the extent you think some of it's communication related, maybe that's true, but some of it seems to me is not communication related; and there just seems to be a problem in terms of implementing what we agreed to here, what MCC legal says they are going to do, and what actually happens. So that's what has to be addressed.

And MDC may be the way to go, but again, I don't want to speak for the marshals. I don't want to speak for the BOP at this point, and then I will entertain whatever options we have at that point. Okay?

MR. SWERGOLD: And, Your Honor, just on this issue, before we, I guess, maybe move on to something else, there is just one other thing in the letter I wanted to address just so the record is clear.

THE COURT: Please.

MR. SWERGOLD:  We haven't put in an opposition letter.

There is an allegation here that Mr. Tartaglione is only able to -- permitted to review his discovery prior to and after legal visits in the attorney visiting room.  So we have never heard that complaint before.  This is the first time raised here.  The time he is talking about is actually the time that they set up so that he could get that room and make sure that his lawyers get into a room.

THE COURT:  Right.

MR. SWERGOLD:  And MCC legal confirmed that the drives are in the SHU library.  They spoke with staff at the SHU.  He is not -- there's not been an instance where he has requested it and not been given it.  He hasn't been requesting it.  We sent another drive into the facility.  We are happy to send as many drives as he wants with full copies of the discovery so that they are in every place where he could possibly be, but I wanted to make sure the record was clear on that point since this is the first time that it's being raised.

MR. BARKET:  Just to put a final button on that.  The computers in the SHU are broken, and so the only place he can --

THE COURT:  Right.  But do you know how long they have been broken?

THE DEFENDANT:  Since I have been there.

THE COURT:  Okay.  But have you been told that?

MR. SWERGOLD:  No.  That's the first time we have

heard about it.

THE COURT:  So I also think it's very important that there be full disclosure of all the grievances on behalf of Mr. Tartaglione.  I don't want this to become a game of "gotcha," and to the extent that there are issues like broken computers, that seems to me to be an issue that's easily reported; doesn't involve any retaliation by any MCC officials.

MCC legal should want to know that, not just for this case, but for all the others.  And again, given the history of the U.S. Attorney's Office being extraordinarily responsive to the points that have been raised, that's one that can be raised and addressed.  So I do -- I am going to put on you, Mr. Barket, to the extent that these types of issues, the government should not be learning about these the first time that there is a letter that gets filed.  Okay?  You need to let them know. Those are the kinds of --

MR. BARKET:  I just assumed that BOP knew that the computers were broken since they have staff there to do it.

THE COURT:  Well, whether BOP knows, the U.S. Attorney's Office needs to know.

MR. BARKET:  I take your point.

THE COURT:  All right.  Anything else?

MR. SWERGOLD:  No.  Not on that letter.  Thank you, Your Honor.

THE COURT:  Okay.  All right.  The other issue with

respect to the motions --

MR. BARKET:  One thing before we get to that, should be quick.

THE COURT:  Please.

MR. BARKET:  The cell phone, we were supposed to report back to the Court on that issue.

THE COURT:  Yes.

MR. BARKET:  I don't want to speak for the government, but perhaps they can address it.  We talked about it on Friday. I just --

THE COURT:  Okay.

MR. SWERGOLD:  Your Honor, we -- so BOP still has custody of the cell phone, and we are still deciding internally whether to have a search warrant, to apply for a search warrant so no review has been done.  And we understand Your Honor's directive from last time and Mr. Barket's concern, and if we make the decision to apply, then we will speak with Mr. Barket and the defense team about setting up the proper taint protocol.

THE COURT:  Okay.  Do you have a sense, rough sense of when you might make a decision on that?

MR. SWERGOLD:  We also -- we also need to get the phone because we don't know whether it even has the capability to have something on it that searching it would be worthwhile.

THE COURT:  And I assume you know where the phone is or is that the wrong assumption?

MR. SWERGOLD:  It's in BOP custody, but we don't know physically whether it's still down in the central location or back in the MCC, and we will add that --

THE COURT:  So that's a no.

MR. SWERGOLD:  -- to follow up.  That's right, Your Honor.

THE COURT:  Okay.  So when do you think you are going to try to get an answer to that question so you can get an answer to the question of the search?

MR. SWERGOLD:  We will try to find out from MCC counsel today where it is.  I will say that that -- we are doing some additional investigating coupled with that --

THE COURT:  Sure.

MR. SWERGOLD:  -- so what the phone has, plus some more, but we should have a decision soon.

THE COURT:  Okay.  All right.  All right.  So with respect to the motions, the one of the two suppression motions has been filed.  One is not yet; is that correct?

MR. BARKET:  I don't know.  When you say "filed," we have -- the government has copies of all the motions unredacted.

THE COURT:  Right.

MR. BARKET:  The Court --

THE COURT:  So there is one that's not been filed; it's been produced or shared?

MR. BARKET:  Right.

THE COURT:  But we have the issue with the redactions.

MR. BARKET:  Correct.  So I don't think it's actually been --

THE COURT:  Got it.  So the answer is yes.

MR. BARKET:  -- on the docket yet, but Ms. Leisenring is going to address the issue of sealing.

THE COURT:  Right.  Because that's why it hasn't been filed because we have to resolve the issue about what should remain under seal.

MS. LEISENRING:  That's correct.  I am asking Your Honor not to redact the entirety of the motion, but merely what would otherwise fall under Rule 16 discovery statement that's contributed to our client.

In other motions that have been filed we have agreed to certain redactions that have been requested by the people in this case.

THE COURT:  Well, it's covered by a protective order, right?

MS. LEISENRING:  Correct, but we agreed as part of our discovery agreement that we would sign the -- we would agree to the protective order.  We wouldn't object to it.

THE COURT:  Yes.

MS. LEISENRING:  And then, Your Honor, understanding that agreement, signed the protective order.  In this case, I am arguing that filing the statement without redactions and having

that publicly accessible before Your Honor has made a ruling on a motion to suppress that we believe is meritorious --

THE COURT:  Yes.

MS. LEISENRING:  -- will have a prejudicial effect in a death-authorized case, especially if Your Honor were to ultimately suppress the statement.

THE COURT:  Okay.  I mean, I guess do you have any legal authority that says that that interest outweighs the First Amendment or common law right of access to court filings?

MS. LEISENRING:  I would -- I have reviewed Your Honor's opinion on *United States versus Malcolm Smith*, and I would argue, yes, in this case, what's at issue, what's important in terms of a judicial administration of justice is issues that pertain to law enforcement conduct, whether or not our client was under custody, whether or not our client was interrogated, whether or not our client was advised his Miranda warnings.

THE COURT:  Right.  So I guess -- but I guess so *Smith* is not authority that supports the application.  It really kind of cuts the other way.

MS. LEISENRING:  Well, in terms of the appreciation that matters that are already under the headlights of the media, having a disclosure of the defendant's statements that in general are deemed presumptively prejudicial insofar as the ethical guidelines don't permit us to make extrajudicial

statements about them as well as the government.

THE COURT:  Right.

MS. LEISENRING:  In this particular case, given the fact that every time we file a document, it's immediately broadcast by the media what the underlying documents are to the public in a death-authorized case where the statements are very, very lengthy and could be taken piecemeal out of context; it would ultimately prejudice Mr. Tartaglione.

THE COURT:  But just so I understand, the motion to suppress is premised on the notion that the government did some things that were inappropriate or should have done certain things and they didn't, and so therefore, evidence should be suppressed, right?

MS. LEISENRING:  Correct.

THE COURT:  So there is a full area of grievances and things that the government does wrong.  That gets -- to use your phrase -- immediately broadcast by the media, which, by the way, is kind of how the First Amendment works, right?  So that's kind of how our system of justice operates.  We are all under the headlights of public scrutiny, whether it's through the media or otherwise.  That's what the First Amendment is all about.

You want to say, it's okay for you to be critical of the government and its investigative techniques, but you don't want the statements that the government got as a result of the its investigative techniques because that might be prejudicial

to you, but it's okay to bash the government?

MS. LEISENRING:  I actually would have no objection to the entire contents.

THE COURT:  So then all criminal cases would be litigated under seal?  And where is your authority for that?  That is so contrary to how we operate and all the case law that applies to the First Amendment.  You have to identify very specific compelling interests that can't be protected other ways.

So the government says, for example, that's what voir dire is for.  Right?  If there is somebody who is somehow prejudiced by something they may have read or listened to or watched, then we can inquire of them at voir dire, and if that person turns out to have some predisposition that makes it so they can't be fair and impartial, then they are out, and they go sit in a bankruptcy trial instead of this case.

MS. LEISENRING:  Well, first -- first of all, Your Honor, I am not asking that you indefinitely redact part of our motion.  I am asking that it is put on hold until Your Honor has issued on our motion -- issued a -- rendered a decision on our motion.

Second of all --

THE COURT:  Well, hang on.  Just so I understand because -- so if the motion is denied, then the motion would be publicly filed, but what about your point that, oh, well, people

might -- the statements are long, and they might be taken out of context, and so even though the full statement is available, there might be people who misread it, and I mean, all of those -- if that's true, that would argue for sealing everything.

MS. LEISENRING: Well, that is my position, Your Honor; that we have a very lengthy statement.

THE COURT: Yes.

MS. LEISENRING: Statements generally are presumptively prejudicial.

THE COURT: Yes.

MS. LEISENRING: Here, where we know the contents of the statement would be revealed to the public, and we know that it is so lengthy that they would not be revealed in their entirety.

THE COURT: What if the statements were part inculpatory and part exculpatory? What if the statement was exculpatory? Would the government be allowed to seal the exculpatory portions of the statement that might be prejudicial to us?

MS. LEISENRING: I believe that the government has, at least in many trials, argued that self-serving statements should not come in.

THE COURT: Shouldn't come in as evidence, but they don't seek to keep them from public knowledge.

PROCEEDINGS                                    56

MS. LEISENRING:  Well, I am not personally aware of it.

THE COURT:  Yes.

MS. LEISENRING:  I can't state that they never have.

THE COURT:  I just think if this were as straightforward of a legal proposition as you are proposing, there would be some case law that says that that interest that you have identified somehow outweighs the First Amendment or common law right of access, and I just don't see any case law that says that.

MS. LEISENRING:  Well, Your Honor, I think what the case law says, if doing so can result in a substantial risk of prejudice to the defendant, and if we can narrowly tailor the Court's decision to redact only a limited portion, then -- then it absolutely can be done.

THE COURT:  Why doesn't voir dire fix any potential prejudice?

MS. LEISENRING:  Well, we know that in good faith a juror -- first of all, a jury pool here is going to be automatically narrowed and more difficult to obtain because we have to find jurors that believe in administering the death penalty, right?  And in this case, a juror may have read a portion of Mr. Tartaglione's statement that didn't mean anything in a vacuum and claims in good faith that they can absolutely be fair and impartial, but then when the rest of the evidence is

presented before that juror, they recall that statement, and it changes how they feel even though the Court may have deemed that statement inadmissible.

THE COURT: So is there any case that says voir dire is not sufficient to address this kind of prejudice?

MS. LEISENRING: I am not aware of any case. I have not done an exhaustive search, but not --

THE COURT: Okay. Fair enough.

All right. Anything else you want to add on this point?

MS. LEISENRING: No. Not at this time.

THE COURT: Who wants to address this for the government?

MR. SWERGOLD: I will, Your Honor. And unless -- if the Court has specific questions, I am obviously happy to address them. I think we have set forth our basis in the letter that we filed on August 19th.

Again, basically, just in three parts: That there is no -- the statements are not covered by the protective order; there is no other rule that requires them to be redacted in court filings. We agree that certainly with respect to the Rules of Professional Conduct governing defense counsel and prosecutors, as well as the DOJ regulations that are cited, those apply to extrajudicial statements. They don't apply to court filings, and I think that the rule -- the argument here

that because this case has generated media attention, it somehow should go into a separate category. I mean, that sort of swallows the limitation on extrajudicial statements, and Your Honor has already pointed out the fact that we note that there is the possibility to address this issue through voir dire.

THE COURT: Yes. All right. So, as I said, there is a First Amendment common law right of access to court filings even in criminal cases, and that those interests and those rights can be outweighed by certain compelling interests, and, of course, any sealing of information would have to be narrowly tailored, but the types of information that the defense wants to keep from the public is not something that involves an interest that outweighs the First Amendment right of access.

The fact that the case may generate a lot of public attention is really the point. You know, we don't sort of calibrate First Amendment and you only protect the First Amendment rights of people in cases that don't generate a lot of attention. There is no sliding scale. And to the extent that there is some potential for prejudice to Mr. Tartaglione, and that certainly can be addressed during voir dire, which will be, I have no doubt, quite rigorous in this case.

So the application to seal the statements or keep them under seal is denied. All right.

MR. SWERGOLD: And, Your Honor, on that point --

THE COURT: Please.

MR. SWERGOLD:  -- and I am sure defense counsel would do this, but we would ask just as what took place with the first motion that's been filed, we ask that defense counsel just send us a copy with the proposed redactions because we have agreed that the material covered by the protective order in this second motion needs to be redacted, and we will review it and make sure that it looks fine before it's filed on the public docket.

THE COURT:  So avoid any further inadvertent disclosures.

MR. SWERGOLD:  Exactly.  Which is what Your Honor saw with the first one.

THE COURT:  Inadvertence can happen once.  So let's not have it happen again.

MS. LEISENRING:  Your Honor, to that end, I will provide a copy with our agreed-upon final redactions to the government for their approval, and once I have received their approval, we will e-file it to Your Honor tomorrow.

THE COURT:  Fair enough.  Okay.  All right.  Other issues to take up?

MR. SWERGOLD:  Your Honor, the government is happy to provide a general update on the case --

THE COURT:  Sure.

MR. SWERGOLD:  -- as we do at each conference.

No new discovery has been produced since the last conference in this case.  We do continue to make duplicate

drives, as requested by defense counsel. As Your Honor knows, there is a discovery coordinator, so we have sent drives to MCC. Any time a request comes in to make another set for defense counsel, we are more than happy to do it, but there has been nothing new since the last conference; and so from the government's position, again, we are ready for trial. We would ask that the Court set a schedule for the remaining non-capital motions, and for a trial date so that the parties can start working together on a more robust scheduling order that addresses all of the disclosure deadlines that need to take place for both the guilt and penalty phase that are typically seen in a death penalty case.

THE COURT: Okay. Thank you very much.

MS. LEISENRING: And actually, just to rewind a moment, I think we have to have a new motion schedule for the people's response to our motions since -- okay.

THE COURT: Right. So.

MS. LEISENRING: Okay. Withdrawn.

THE COURT: So it may not have been publicly filed. They have had access. The schedule is still on.

MR. BARKET: Still on.

MR. SWERGOLD: We have the schedule.

THE COURT: Okay.

MR. BARKET: We are not in a position to offer the trial date.

THE COURT:  I mean, and everybody's positions remain the same as do -- as does mine.

MR. BARKET:  We are working.

THE COURT:  Yes.  I said this.  I have no doubt about the diligence of all of the lawyers in this case, and I think that the interests that have been expressed by counsel for Mr. Tartaglione in the current schedule, as is, in my view, are the ones that are most compelling, and so we are going to continue on the current path, and then we will obviously continue to have these conferences where we can address other issues.

So on that point, when would you like to get together again to have another one of our regular --

MR. BARKET:  Well, we have an interim event, don't we?

THE COURT:  Yes.  But do you want to have another status conference on the calendar?

MR. BARKET:  Sure.

THE COURT:  Okay.  When would you like it?

MR. BARKET:  We have been doing about 30 days or so.  So --

THE COURT:  Okay.

MR. BARKET:  Sometime in mid September?

THE COURT:  Okay.

(Pause)

THE COURT:  How about September 17th?

MR. SWERGOLD:  That works for the government.

THE COURT:  At 11:00?

MR. BARKET:  I'm sorry?

THE COURT:  Sure.

MR. BARKET:  I am having difficulty with the phone with the calendar, the phone rings.

THE COURT:  It's difficult if you are popular, and you clearly are, Mr. Barket.

MR. BARKET:  September, Tuesday at what time?

THE COURT:  At 11:00.  Is that okay?

MR. BARKET:  That's fine.

THE COURT:  Any objection to excluding time until then?  The motions are pending anyway, but --

MR. SWERGOLD:  Right.

MS. LEISENRING:  No.

THE COURT:  Okay.  Then I will prospectively exclude time from today until September 17, 2019, finding it's in the interests of justice to do so.  That finding is based on the fact that motions are being prepared, being responded to.  There is review of discovery, and I therefore find that the interests of justice in this exclusion outweigh Mr. Tartaglione's and the public's interest in a speedy trial.  The finding is made pursuant to 18 U.S.C. Section 3161(h)(7)(A).

If I could see counsel for Mr. Tartaglione at the side bar real quickly, please?

SEALED PROCEEDINGS                                    63

(At the side bar; defense counsel only)

THE COURT:  All right.  Circling back on the issue with respect to appointing Ms. Sternheim as Curcio counsel, there is two issues:  One is, I am assuming that we know that she does not have a conflict in this case as she isn't representing anybody who is connected to this case; do you know that?  I didn't ask her that when I talked to her.

MR. RICCO:  I believe that she does not, and nor has the government raised any.  Maybe we can take that extra step to ask the government affirmatively, but they haven't raised it.

THE COURT:  Which is my second point, which is I am not sure I am comfortable with the government not knowing -- with the government not knowing what the potential conflict is at this point because of the attorney-client issues, but I am not sure I am comfortable with the government not knowing Ms. Sternheim is going to be appointed as Curcio counsel without getting into the issues as to why.

MR. RICCO:  Judge, I think that it's entirely consistent for the government to know that Curcio counsel has been appointed.

THE COURT:  Okay.

MR. RICCO:  Yes.

THE COURT:  So I would -- and I would ask you to make sure there is no conflict, but also I just want to let them

SEALED PROCEEDINGS

64

know.

MR. RICCO:  Yes.

THE COURT:  I am not going to get into why at this point for reasons I have already -- I made that finding on the record, and that they are going to have to live with that.  So that's how I want to end this conference.  Okay?

MR. RICCO:  Yes, that would be fine.  Thank you, Your Honor.

(In open court)

THE COURT:  All right.  The last bit of business is that for reasons I have explained on the record in the portion of the transcript that for now is sealed, I am appointing Ms. Sternheim to be Curcio counsel.  So I thank you, Ms. Sternheim, for being here today and for being willing to accept the appointment.  That appointment is on the condition that Ms. Sternheim has no conflicts in this cause.  So if there is a conflict, government can speak now or whatever.

MR. SWERGOLD:  No.  There is no conflict.

THE COURT:  Again, the particular issues that are being addressed for right now are going to remain under seal, but I want the government to be aware of that appointment.  Okay?

So is there anything else?

MR. SWERGOLD:  Not from the government.

MR. BARKET:  Not from the defense, Judge.  Thank you.

THE COURT:  Okay.  Again, I thank you, Mr. Ruhnke, for being here.

Ms. Sternheim, thank you for accepting the appointment.

Marshals, thank you, not only for today, but for helping out on the issues.  We are adjourned.

(Time noted:  1:51 p.m.)

# EXHIBIT 18

## Daily News Article

From: Tony Ricco

Date: Sat, 14 Sep 2019 at 10:20am

I have had an opportunity to review the recent Daily News article, and have a opinion, for the benefit of our entire Team, about (1) the impact of the published letter has on the *Curcio* inquiry presently before the court, and (2) the impact of that letter on the preparation for the penalty phase in this case.

### Nicholas Tartaglione's Assertion Attorney/Client Privilege

The *Curcio* inquiry in this case is complicated and appears to become more vexing, more troubling with each passing week. A part of the problem here is that some of the issues related to the need for the appointment of *Curcio* counsel is grounded statements ordinarily protected by attorney client privilege. Any *Curcio* counsel would have difficulty presenting the conflicts issues, because most if not all matters are either directly or indirectly the subject of the attorney client privilege, and the concomitant obligation to resolve such issues without doing unnecessary violence to Nicholas Tartaglione's right to confidentiality.

However, Nicholas Tartaglione's decision to make public his relationship with Jeffrey Epstein, (which mirrors the proliferation of similar public statements made by his counsel as reported in the media on July 24 and 25, 2019 (Daily Mall); July 24, 2019 (News 4 television counsel in person interview and NBC News article on line); July 25, 2019 (New York Post); July 26, 2019 (Daily News); July 26, 2019 (Fox5 News televised interview via telephone); July 26, 2019 (NY Post);August 5, 2019 (Yonkers Times); August 13, 2019 (NBC News on-line); August 14, 2019 (NY Post); August 19, 2019 (Daily Beast)), shall foreclose any assertion that his discussion (and actions taken) with counsel on matters related to his relationship and interaction with Jeffrey Epstein and the investigation of the suicide and suicide attempt are protected by privilege.

The timing of Nicholas Tartaglione's letter as published in the Daily News, along with the timing of many of the post *Curcio* appointment letters, disclosures and/or revelations, will undoubtedly be the subject of the court's inquiry about (1) the request for the discharge of Learned Counsel and (2) the *Curcio* inquiry and court's ultimate findings.

As a result, on the issue of Nicholas Tartaglione relationship with

Jeffrey Epstein and the similar statements made by counsel in the press, the Team should be prepared for a finding that the attorney/client privilege has been waived by Nicholas Tartaglione's public disclosure of the letter to the Daily News. And, therefore, to the extent that there is any conflict issue on with the attorney statements concerning his relationship with Jeffrey Epstein, the good news is that they perhaps can be waved.

826

In relation to counsel's statements made concerning Nicholas Tartaglione's reporting of events of his knowledge about the events of the attempted suicide, the suicide and the offering him as witness, along with the recent revelations of the role of counsel on evidence and information subject to that Epstein investigation, even if waivable (and I doubt that they are), are far more problematic and penetrating, and shall impact, *inter alia*, our preparation for penalty phase evidence on prison adjustment and future dangerousness.

Back on July 26, 2019, David Ruhnke on a basecamp post an example of the type of argument that the prosecution presents to implicate counsel on issues of prison adjustment and future dangerous. David Ruhnke's admonition and sound advice, simply was not followed. And, now we are confronted with two serious problems with counsel in developing and ultimately presenting this important mitigator.

**Penalty Phase Development**

It is clear that the press disclosures, an actions taken by counsel and Nicholas Tartaglione will have a challenging impact the presentment of Prison Adjustment and Future Dangerous evidence at the penalty phase (as either affirmative proof by the defense, and/or as rebuttal by the government). Notwithstanding these difficulties, the team has and

shall continue prepare for the presentment of prison adjustment evidence at the penalty phase and/or to defend in rebuttal. I remain confident that we will get in done.

In anticipation of these issues, our September 13, 2019 request for a Bill of Particulars and/or Informational Outline included a request for a narrative and/or BOP documentation of Nicholas Tartaglione's institutional disciplinary records, *inter alia*. Depending upon the response by the government, these issues will be subject of future motion practice (motion to compel and/or motion *in limnine*).

In addition to preparation for litigation, there have been ongoing discussions of the development of the prison adjustment/future dangerousness mitigators by the attorneys who have *thus far* agreed to develop these issues for presentation at the penalty phase.

FYI, for the recent team members, back on January 16, 2017, a memorandum was circulated to the entire Team on how *future dangerousness* is litigated in the context of pre-trial conditions of confinement. This long ago, and apparently forgotten memoranda will help all team members assess the issues and provide the frame work for future discussions. (See, attached Team Memorandum)

In this case the presentation will be challenging because of counsel's direct involvement (alleged text messages on a contraband phone, and the recent revelations about removal of the so-called Esptein note from the MCC) with Nicholas Tartaglione's adherence to follow institutional rules, the specific manner in which we ultimately present prison adjustment evidence, in this case, will be influenced by the outcome of litigation

827

around the text messages with counsel, and also how the court ultimately resolves the pending *Curcio* inquiry on issues related to the Epstein attempted suicide and investigation. In the meantime, however, designated counsel and our experts on prison adjustment and future dangerousness (Tom Reidy, Jon Sorensen, Mark Bezy) are moving forward with alternative theories for the development and presentment of evidence of these critical issues at the penalty phase.

Finally, this recent Daily News article and similar articles demonstrates the danger that counsel and Resource Counsel long ago warned against. The enormity of what has occurred here, is exactly what happens when capital defenses are played out in the press. Why? Experience has shown that as counsel, we have no editorial control of the end product, as demonstrated by the article recently published in the Daily News, nor how such statements will impact future unanticipated events.

As been said repeatedly, everyone should just stay away from the press and encourage Nicholas Tartaglione against engaging in such activity, which will only be used against him - perhaps in both the guilt and penalty phase.



[Future Dangerousness In House Memo.pdf](#)
82.8 KB



**Bruce Barket** Sat, 14 Sep 2019 at 3:24pm

First, Nick's letter did not discuss at all any conversations he had with counsel. The privilege is not waived by Nick writing about a topic that he separately discussed with his lawyer. He is permitted to talk to others about a topic and still maintain his right to have privileged discussions with his lawyer on the same topic. He has NOT waived the privilege as to conversations he has had with counsel related to the Epstein matter because he wrote about that topic in a letter to the press. As his lawyers, we should be prepared to fight any attempt to pierce the privilege on such spurious grounds.

Second, there was nothing improper about the "Epstein Note" being given to counsel to be authenticated and preserved. If someone has a cite or a rule to the contrary, please share it. Otherwise, let's stop assuming as fact that this is "clearly" improper, and move on.

Third, there is no actual or even potential conflict that has been articulated here, except as based on factual and legal assumptions that are inaccurate and unsupported; thus there is no conflict, and certainly no non-waivable conflict.

Fourth, while I don't agree with Nick's recent letter writing campaign, I do understand it. He is frustrated and angry with what he has seen. My advice to him has been devalued as talk of my disqualification has increased. So I, for one, am not shocked that he is now acting on his own. This, unfortunately, is a by-product

of this counterproductive atmosphere of co-counsel accusing other co-counsel of unethical – or even illegal – conduct and expending significant time and resources to try to vindicate their own strategic positions, rather than working together on the substantive issues in Nick's defense, which have received far less attention as a result of this distraction.

Fifth, it is unfortunate that some have such a negative attitude about the press coverage of Nick's role in saving Epstein's life, and of my attempting to highlight the awful conditions at MCC in furtherance of the goals of gaining for our client humane conditions, regular contact with his family, and access to his legal team. These goals, while subsidiary to the penalty phase, are of paramount importance to Nick and his day-to-day existence. And, I would note, they are not at all incompatible or harmful to our mitigation goals. At bottom, MCC put Epstein in the same cell with Nick because they knew that Epstein would be safe there -- and he was. Nick saved the man's life. Once Epstein was in another cell, he killed himself. The action of placing Epstein with Nick speaks much louder than any talk of how he is a problem inmate. That Nick saved his life once is also a very good thing.

That Nick, through his lawyer, has helped shine a light on the conditions at MCC is also positive. He is trying to make things better for himself and for other inmates. We have been complaining loudly about the conditions of the facility and the conduct of the staff for years. We were right, and recent events, as tragic as they are, have vindicated our position. Finally the DOJ is looking at these issues, albeit because a man died, and finally MCC is taking steps to address the conditions we have been complaining about. Things there may improve somewhat for everyone thanks in part to Nick's refusal to accept deplorable as acceptable.

Lastly, no one has "offered" Nick as a witness. Everyone knows he is a witness because he was there. If they want to kill Nick more than they want a complete investigation then there is nothing for us to do. But there is a chance they will want the information he has. We would not be doing our job if we ignored that possibility

I have spoken to almost every cellmate Nick has had. They all speak very highly of Nick. His record inside is not perfect, but there is plenty to use to his advantage. We have a great deal to work with on the factor of Nick's positive prison adjustment. The doom-and-gloom sentiment is just not something I share.

# EXHIBIT 19

« All Messages



## Representing A Defendant Facing The Death Penalty

From: Tony Ricco
Date: Sat, 28 Sep 2019 at 7:52am

### Some Early Morning Thoughts to a Very Talented Team of Lawyers

Over the past 25 years, I have had the privilege of representing mostly, but not exclusively, young Black and Brown men facing capital punishment. Throughout that time period, I have been inspired by some of the most dedicated, talented and committed attorneys in our country. Those attorneys and mitigation specialists have included many that are well known to you, such as our Resource Counsel David Ruhnke, Project Members Jean Barrett, Judy Clarke, Kevin McNally, David Bruck, Ed Wilford but also many not known to you such as George Chaney, Omodare Jupiter, Juan Mateo, Tony Chambers and many others. The journey has taken me to courthouses, and county jails and detention facilities all over the country. I have felt pride and a deep sense of purpose and responsibility in representing those that the government seeks to execute. The work has always been extremely difficult but always spiritually rewarding. I have never felt anything more important, more divinely responsible than standing before a jury pleading to save a man's life. What an honor it is, what a responsibility is demanded.

Capital work, brings out the best in most, but the worst in others. Its not for everyone, even those very talented with non-capital work. Capital work is counterintuitive. It does not come naturally, it requires training, along with hours upon hours of hard work. Capital representation demands a high level of integrity, the ability to own up to mistakes, to look your colleagues, sometimes your client in the face and to make changes. In the end of this litigation a human beings' life is at stake, not any attorneys' personal politics, mind set, personal prejudices, likes or dislikes or career goals but a human beings' life. The saving of a life is always the foremost motivating factor of any successful capital defense team.

Assembled in this case, is an extraordinary group of talented attorneys, mitigation specialists and investigators; each deeply experienced, each bringing a powerful level commitment, and for most, a high level of personal integrity. The defendant, Nicholas Tartaglione (and his family) is truly blessed to have such a group working on his behalf in this case. That fact remains whether Nicholas Tartaglione (and or his family) wants to, or **is even capable of understanding or appreciating that fact**. On that score, attorneys and the mitigation specialists who have capital experience are not strangers to indifferent or absent parents, parents (if even involved or interested) who are poor historians,

parents who are incapable of spiritually embracing that their child faces execution by the government. Some suffer from parental guilt.

Even more rare, is a defendant who accepts, recognizes, feels good about or even has the capacity of understanding something that eludes even the most experienced non-capital defense lawyers; that is the enormous complexity, the subtle nuances, the deep humility

and grace required of capital representation. Nicholas Tartaglione a man who lived a left of privilege prior to his incarceration, a former police officer, is no different. Nicholas Tartaglioine is confused, frustrated, disoriented and losing hope. Every single meeting that I have had with him, has been positive, thorough and informative. The meetings, though reported differently, have all provided Nicholas Tartaglione with a sense of hope. There is not question, that Nicholas Tartagione's day of reckoning is approaching and that he is afraid, scared to (and of) death. Nicholas Tartaglione is afraid, like any other human being who find themselves in such a difficult situation.

Our first job, our primary responsibility our foremost moral duty is to protect and save the preciousness of his life, to see beyond the limitations of his fears and to be prepared for the day of reckoning. Often times, the capital defense lawyer has to step up to that responsibility in an atmosphere of public tension, scorn, hatred, racism or vindictiveness. Often times, the capital defense lawyer has to step up, and step up big time in a situation where the defendant him or herself is confused, angry bitter and even (momentarily) suicidal. This is a tremendous responsibility, and it is not for everyone. Capital work is never about money or personal prestige, it's moral obligation and responsibility.

Capital work challenges the skill set, the humility, the prejudices, and talents and skills or lack thereof of the attorneys and the team. All great capital team members are works in progress, a progress needed to save a life. A capital defense attorney should never be an enabler; that is to refrain from joining the at risk defendant and/or his or her family in the endorsement of their fears, or what Wilbert Rideau, a former death row inmate, calls "*magical thinking*" - that is a straight line to death row.

To the contrary, the capital defense lawyer (and all team members) have a moral duty,

responsibility to help the capital defendant (and family, if you can) to see through his or her fears and do everything within their skills to make sure that it happens, and never to join and endorse those fears. Capital work is the epitome of team work, lives are saved when team members have the humility and grace to learn and grow. That is the ability to learn and grow from everyone, especially those that we may have difficulty learning from outside of this environment. Tired, worn out cliches' and lack of effort, self serving remarks will not help, only hard work and humility and an willingness to grow, learn and to work with others - who sometimes know more than you about a particular subject.

Nicholas Tartaglione is presently the beneficiary of a team of talented individuals with skills. The telephone conference calls (penalty phase scheduling, those around the jury questionnaire with Project Members and those with Emma's team) over the past few days were just further examples of that fact.

907

# EXHIBIT 20

## Reflections On The Temperment and Skills Needed To Be a Capital Defense Lawyer

From: Tony Ricco

Date: Sat, 26 Oct 2019 at 7:04am

Yesterday, I had an opportunity to give a presentation to a group of attorneys in Buffalo in a program hosted by the NYSACDL. It was an outstanding event, with criminal defense attorneys giving presentations from Tennessee, Baltimore, Rochester, Buffalo and New York City. The comradery and spirit in the criminal defense bar is the hallmark of the greatness of our profession. During the day, I had an opportunity to reflect upon the Tartaglione case, and the tremendous assembly of attorneys and dedicated professionals assigned to this case, and the troubling concerns that the attorney and other professionals many have expressed from the very beginning, concerns that have remained right up to and including the present *Curcio* inquiry.

Capital defense work is not for everyone. It is one of the most challenging aspects of our profession. Capital defense work requires a high skill level, but more importantly capital defense work involves an even heightened level of commitment to team work, and an uncompromising commitment of to saving the life of a fellow human being. The best of the capital defense lawyers have, as a compliment to their extraordinary skills, a great level of patience, humility and grace. A capital defense attorney or team member should never, ever become an enabler, a participant that facilitates the worst fears of the capital defendant and/or their families.

The spector of the death penalty puts enormous, frightening pressure on a capital defendant and their families, and capital counsel should never, ever feed into those fears by joining the defendant in unfounded misrepresentations that only serves to lead to further pain and anguish.

This work is not for everyone. There is no place for personal or professional animosity, jealously, envy or spite - those are negatives which left unchecked lead to death sentences. As stated above, the hallmark of effective capital representation is teamwork, humility and grace and excellence in all aspects of preparation. At the center of the Tartaglione case, is a man's life. The notion that any appointed attorney has somehow not performed on an extraordinary level, in all aspects of the development of the defense will not receive any serious consideration from anyone who understands the great commitment required in these cases, along with the truth about the extraordinary efforts that have taken place thus far, and shall continue to be applied. Such a view only finds support in those unfamiliar with the facts of what has actually happened and is happening in this case. To call the great commitment by any lawyer in this case "lip service," is an embarrassment, a false statement that is result of purposeful misinformation and/or worst.

Demands, via letters, authored by Nicholas Tartaglione expressing his frustrations by attacking any dedicated attorney or demanding that attorneys pledge allegiance of any particular attorney exposes the professionalism of those who have maintained exclusive access to him and his family. There is no reason for existence of the atmosphere that only serves the interest of an agenda other than that of those individuals who are committed to a high level of capital representation for Nicholas Tartaglione. A capital defense

964

attorney would use every opportunity to educate the defendant and his family and to reaffirm the true effort and character of a dedicated team. A capital defense attorney should never join and certainly not become an advocate for misinformation and frustration. Not a good look at all.

So, as this team continues to move forward, there is no question in my mind that it shall do so, with the best that our profession has to offer, and nothing less. A man's life is at stake, and those of us who understand the nuances of capital representation, who are very much aware of how ignorance, indifference and the lack of team work leads to death sentences, simply will not allow that to happen (period). Nicholas Tartaglione as a capital defendant is entitled to no less than what any similarly situated defendant facing capital charges deserves - the best that our Defender Services program has to offer - no more, and certainly no less. We have a job to do here, get it done but do so in compliance with our professional, ethical and moral responsibility to these most difficult cases.



**Bruce Barket** Sat, 26 Oct 2019 at 7:44am

3-5 times a week this platform is used to insult, demean me and/or our firm, always authored by learned counsel. Today is no different. But today I laughed. The author doesn't see any irony in claiming among his skills "teamwork," "humility," "grace" and "patience."

# EXHIBIT 21

## Sudden Death of An Outstanding Capital Defense Lawyer - A Reminder

From: Tony Ricco

Date: Mon, 28 Oct 2019 at 6:19am

Over the past weekend, the capital defense community learned that a well known Akron capital defense attorney Brian Pierce died of a brain aneurysm at age 51. Although I did not know Brian personally, he had an outstanding reputation for his humility, commitment to capital representation and was well respected by many in our community. Although his life was cut way to short, Brian's grace as a human being and an outstanding lawyer, like the great Edward Wilford, Bruce McIntyre, Reggie Haley and many others was an example of the integrity, intelligence, and commitment that is needed for capital defense.

One thing is clear, capital defense work is not for everyone. To be effective, one has to be able to learn and grow. There is a level of integrity and honesty and commitment to team work that is essential. On September 17, 2019, Judge Karas made one of many significant statements in his observation of this case and some of the representations that he been made: "*You cannot change your history.*"

Brian, like so many others, reminded us that capital cases are about a commitment to saving the life of a human being. That fact will remain a constant of capital representation in this, and any other capital case. Each team member has an important part to play in that process. This is a fact known to everyone connected to this case including the court and even Nicholas Tartaglione. Everyone responds to pressure differently. For some, it brings out the best that they have, for others . . . well . . . not so good. Pressure exposes, and in capital work pressure is always present.

On this journey, we have a single most important goal: that is to combine our collective efforts to save Nicholas Tartaglione's life, to help him past where he does not see a further for himself. Our job is not to join him in despair, anger, frustration and the ignorance of the promise of tomorrow. The effort thus far, and for the most part, has been outstanding, and the contributions by most have been in the tradition that is expected by the court for counsel, investigators and team members in a case of this magnitude. Most have done their best, all the time.

There is an important *Curcio* inquiry that will take place in this case. To my knowledge and the collective knowledge of many, no attorney has ever participated in a case where a *Curcio* inquiry was not welcomed. Why? Because a *Curcio* hearing is designed for the benefit of ensuring that as defendant, in this case, a capital defendant, is represented properly, effectively. Such an inquiry is welcomed, because no person benefits from conflict representation, especially not the capitally charged defendant. A *Curcio* inquiry is not for the benefit of the attorney, the focus is on the proper representation of the defendant. As the day of judgment nears on the *Curcio* inquiry, each of us has a responsibility to continue the high level of representation that is required for the proper representation of Nicholas Tartaglione. My job, and that of others, is to see it that he is properly represented, and most in our profession understand those precious responsibilities, which includes providing necessary perspective. Then there are others, who lose their way, reject good advice and guidance, and ultimately engage in conduct that placing the defendant is jeopardy of harm.

966

Sometimes the truth hurts, and that realization often escapes many. Anger, bitterness is a skillset for other pursuits in life, not capital defense work. I am confident that those trained, committed and experienced "*get it*," and understand exactly what has happened here and remain committed to excellence, and their commitment to learn and grow and to save a precious life.

Our team has several goals that must be accomplished this week in connection with developing Nicholas Tartaglione's defense. I look forward to working on those matters with those team members who can. Lawyers like Brian, Ed, Bruce and Reggie would want us to do our best. I am confident of those who can, will.

# EXHIBIT 22

# ANTHONY L. RICCO

*Attorney At Law*
20 VESEY STREET, SUITE 400
NEW YORK, NEW YORK 10007

TEL. (212) 791-3919 FAX. (212) 791-3940

November 5, 2019

**BY FACSIMILE: TO BE FILED EX PARTE AND UNDER SEAL**

Hon. Kenneth M. Karas
United States District Court Judge
Southern District of New York
The Hon. Charles L. Brieant Jr.
Federal Building and Courthouse
300 Quarropas Street
White Plains, New York 10601-4150

Re: ***United States v. Nicholas Tartaglione***, Docket No. 16 Cr. 832 (KMK)

Dear Judge Karas:

As Learned Counsel appointed to represent the interest of Nicholas Tartaglione in this death authorized case, we submit this letter to request an order authorizing *Curcio* Counsel to expand the scope of the *Curcio* inquiry to include communications made to and from the contraband cellular phone as described by attorney Bruce Barket in open court on July 22, 2019.

## I. Reasons for The Scope of The Curcio Inquiry

At the July 22, 2019, status conference the parties discussed whether the defendant had standing to object to a potential search warrant that the Government was considering seeking in relation to a contraband cellular telephone that had been recovered from the defendant's cell at the MCC. Mr. Barket, in open court and in the presence of the government, conceded a number of issues related to the cellphone including that the defendant had used and possessed the phone. *See, e.g.*, Transcript, page 14, lines 13-18. Mr. Barket asserted both the

1

attorney/client privilege and the marital privilege, in turn disclosing, *inter alia*, that the defendant used the contraband cellular telephone to communicate with "members of the defense team" as well as the defendant's wife. *See, e.g.*, id. at pages 13-15. Mr. Barket likewise acknowledged to the court his awareness that possession and communications via the contraband cellular phone was prohibited. Id. at page 14, lines 17-25.

The public disclosure of the defendant's communications, along with the public disclosure of certain counsels' statements and conduct (or misconduct) in relation to the contraband cellular telephone has impacted the defendant's ability to effectively present an important mitigator during the penalty phase - positive prison adjustment pursuant to *Skipper v. South Carolina*, 476 U.S. 1 (1986).

## II. The Defense Investigation of *Skipper* Evidence

Notwithstanding the present *Curcio* inquiry, Learned Counsel and other counsel have continued to fulfill our obligation and prepare for trial in this case, including the preparation for the presentment of penalty phase evidence. *See* American Bar Association Capital Guideline 10.7(A)(2) (Duty To Investigate); Guideline 10.8(A)(2)(The Duty to Assert Legal Claims); and Guideline 10.11 (A)(The Defense Case Concerning Penalty); *see also Wiggins v. Smith*, 539 U.S. 510, 524 (2003); *Rompilla v. Beard*, 545 U.S. 374, 387 (2005).

In accordance with that obligation, Learned Counsel have also conducted an investigation and full review of the statements made by Mr. Barket on the record at the conference held before this court on July 22, 2019 in relation to the possession and use of the contraband cellular phone. Based upon those statements, and evidence gathered thus far, including discovery provided by the government, Learned Counsel have discovered additional information which creates either a potential or actual conflict of interest that necessitates a further *Curcio* inquiry by the court.

2

To clarify, during the course of *Curcio* counsel's investigation, Learned Counsel became aware of the possibility of additional conflicts that were not known to Learned Counsel at the time of the request initially seeking *Curcio* counsel's appointment. These additional grounds relate, on multiple levels, to the contraband cellular telephone that was seized from the defendant's prison cell. As the court is aware, to date Learned Counsel has refrained from advising the court, or otherwise disclosing to the court the specific grounds related to the request for *Curcio* counsel, other than to inform the Court that the conflict relates to Mr. Barket, and could negatively impact the defendant's penalty phase case if disclosed to the Government. The same caution is once again sought here, though we believe it appropriate to alert the court that the new grounds warranting a *Curcio* inquiry extend to both Mr. Barket as well as additional individuals associated with Mr. Barket's law firm.

We note, however, that all appointed counsel have provided *Curcio* counsel with all information known to us to be relevant to the original *Curcio* inquiry as well as the additional bases that we have now discovered. To that end we have provided *Curcio* counsel with complete access to all team documents requested by *Curcio* counsel in relation thereto, including, *inter alia*, Basecamp posts, emails, and text messages. Although *Curcio* counsel's investigation is not complete, *Curcio* counsel has informed all counsel of her preliminary findings of the existence of multiple conflicts of a serious nature that shall, at a minimum, necessitate and trigger a serious *Curcio* inquiry by the court.

In relation to the new issues that Learned Counsel have now discovered, *Curcio* counsel has indicated a belief that these new issues do in fact raise additional grounds for a *Curcio* inquiry; grounds that she believes appropriate to include in her report to the court even though these new issues were not raised at the time of her appointment. *Curcio* counsel believes, however, and

3

Learned Counsel agree, that it is appropriate to first seek this court's authorization for *Curcio* counsel to expand her report to include these additional areas of conflict. As a result, *Curcio* counsel has requested that Learned Counsel seek this Court's authorization for her to expand her inquiry into these new matters.

### III. The Applicable Law and Obligation of Counsel

This letter is written in full compliance with the admonition to counsel, as expressed by the Second Circuit in *United States v. Maplledi*, 62 F.3d 465, 470 (2d Cir. 1995), to inform and alert the court to the possibility of conflicts, so that the court can make an appropriate inquiry to (a) advise the defendant Nicholas Tartaglione regarding any conflicts, and (b) discuss with the defendant his right to waive the potential conflict.[1] *See United States v. Curcio*, 680 F.2d 881 (2d Cir. 1982); *see also United States v. Williams*, 372 F.3d 96, 102 (2d Cir. 2004) ("a client's representation suffers from a *potential* conflict of interest if 'the interests of the defendant may place the attorney under inconsistent duties at some time in the future.' "), *quoting, United States v. Kliti*, 156 F.3d 150, 153 n.3 (2d Cir. 1998); *United States v. Lussier*, 71 F.3d 456, 470 (2d Cir. 1995) (the court must make an inquiry even where there is only a *possibility* of a conflict).

Again, Learned Counsel are constrained to provide more detail regarding the conflicts related to the contraband cellular telephone, due to the limitations of our ethical obligations at this juncture. However, Learned counsel is of the view that (1) based upon the statements made by Mr. Barket on the public record on July 22, 2019; (2) the information subsequently provided by the government (*i.e.*, a listing of telephone numbers recovered from the call history of the seized

---

[1] As a result of the importance of this issue in a death authorized case, each step taken by Learned counsel in this matter, including the submission of this application to expand the scope of *Curcio* counsel, has been thoroughly vetted with the Executive Director of the Federal Defenders of New York and the Executive Director of the Federal Death Penalty Resource Counsel Project.

4

cellular phone); (3) other information obtained as a result of Learned Counsels' penalty phase investigation; and in lieu of (4) the proposed penalty phase arguments advanced by conflicted counsel on this subject, the *Curcio* inquiry should be expanded to include counsel's statements and conduct in relation to the contraband cellular telephone.

As with the initial inquiry, Learned Counsel is of the view that the interest of some counsel in this case diverge with the interest of the defendant, Nicholas Tartaglione, and that the court should therefore be notified by *Curcio* counsel of the grounds for the divergence.

Finally, we respectfully request that this application, and the related proceedings that follow, be held *ex parte* and under seal to avoid revealing information that could adversely impact the defendant and prejudice his penalty phase investigation and presentation.

Respectfully submitted,

*Anthony L. Ricco*

Anthony L. Ricco, Esq.

*Bruce D. Koffsky*

Bruce D. Koffsky, Esq.

**Michael K. Bachrach**

Michael K. Bachrach, Esq.

Kenneth J. Montgomery, Esq.

John Diaz, Esq.

ALR/jh

cc:    Bruce A. Barket, Esq.
       Aida F. Leisenring, Esq.

# EXHIBIT 23

# ANTHONY L. RICCO

*Attorney At Law*
20 VESEY STREET, SUITE 400
NEW YORK, NEW YORK 10007

TEL. (212) 791-3919   FAX. (212) 791-3940

November 7, 2019

**BY FACSIMILE**: TO BE FILED EX PARTE AND UNDER SEAL

Hon. Kenneth M. Karas
United States District Court Judge
Southern District of New York
The Hon. Charles L. Brieant Jr.
Federal Building and Courthouse
300 Quarropas Street
White Plains, New York 10601-4150

Re: *United States v. Nicholas Tartaglione*, Docket No. 16 Cr. 832 (KMK)

Dear Judge Karas:

I write to the court in reply to the letter filed by retained counsel Bruce Barket which is in response to Learned Counsels' request to expand the *Curcio* inquiry to include additional conduct of retained counsel.

First and foremost, contrary to attorney Barket's misleading and inaccurate premise, neither Learned Counsel nor *Curcio* counsel is attempting to set the parameters of the *Curcio* inquiry in this case. The law is clear that the Second Circuit requires counsel to alert the court when counsel is of the belief that there may exist a potential conflict in a case. See, *United States v. Mapliedi*, 62 F.3d 465, 470 (2d Cir. 1995).

It is not up to counsel to debate and determine whether a conflict is potential or actual or whether any conflict exist at all. To the contrary, when there is a reasoned belief that a conflict may exist, it is counsel's duty to alert the court, *at the earliest possible moment. Id at* 470. Such a notification allows the court (and not counsel) to determine the next steps to be taken. This process is required

even where just "*the specter of conflicts of interest arises.*" *United States v. Lussier,* 71 F.3d 456, 461 (2d Cir. 1995)(the court must make an inquiry even where there is only a *possibility* of a conflict). This process allows the court to either "secure a waiver under *Curcio* or disqualify defense counsel under *Levy.*" *Id at* 470. See also, *United States v. Lussier,* 71 F.3d 456, 461 (2d Cir. 1995)

Attorney Barket's letter to the court appears to invite a *Curcio* inquiry. It is a diversion, and an attempt to take the focus away from the full discovery of the actual divergence of interest resulting from the attorney(s) participation with the possession and use of a contraband cellular phone at the M.C.C. Attorney Barket is attempting to gather information so that he can improperly influence the outcome of the *Curcio* investigation, just as he previously attempted to do in relation to Learned Counsel's initial August 19, 2019 application for the appointment of *Curcio* counsel.

The Court appointed *Curcio* counsel over attorney Barket's objection via a letter dated August 20, 2019. In that letter, attorney Barket asserted that neither he nor his firm did anything wrong, and the all interaction with Nicholas Tartaglione was in compliance with ethical rules. This court will soon discover that as a result of the *Curcio* inquiry, *Curcio* counsel has found out that attorney Barket was directly involved in the removal of contraband (a document) material to the investigation of Jeffrey Epstein's attempted suicide/suicide. This finding is contrary to contrary to the assertions made by attorney Barket to the court in his August 20, 2019 letter. It is expected that *Curcio* counsel will detail in her final report to the court the existence of a serious conflict (in relation to attorney Barket's direct involvement in the removal of contraband which necessitates the court to either "secure a waiver under *Curcio* or to disqualify defense counsel under *Levy.*" It is certain, however, that had, this court been persuaded by attorney Barket's assurances in his August 20, 2019 letter, and failed to appoint *Curcio* counsel and had also not permitted *Curcio* counsel the time to conduct a thorough investigation, this information of attorney Barket's direct involvement

2

would have remained unknown and therefore not subject to the court's ultimate inquiry. The court, however, taking recognition of the heightened standards applicable to capital cases, not only granted the appointment over attorney Barket's objection, but also resisted his persistence that *Curcio* inquiry take place on that day. See, Transcript of August 21, 2019, page 13, line 23-25. Attorney Barket was persistent that all that was needed was for *Curcio* counsel to just go down and pose a few questions to the defendant and return. *Id.* Attorney Barket even proffered to the court Nicholas Tartaglione's expected responses. See, Transcript of August 21, 2019, page 15, line 24 to page 16, line 5. Learned counsel interjected that what attorney Barket was attempting to frame was "not the issue." See, Transcript of August 21, 2019, page 16, line 5. The court observed that if what attorney Barket was proposing was the issue resolution would be *"no brainer,"* but even if so, the issue required a thorough investigation. Transcript of August 12, 2019, page 16, line 14 to page 17, line 1. Even attorney Leisenring contributed her part to have the matter resolved that day, by attempting to fabricate a downside in the absence of immediate action and to narrow the issue to simply whether an attorney violated the Rules of Professional Conduct.[1] Transcript of August 21, 2019, page 17, line 8 to 12. The court disagreed and directed a thorough investigation. Transcript of August 21, 2019, page 18 line 23 to page 19, line 14. For the most part all appointed counsel remained silent exercising restraint *at that juncture* due to the Second Circuits holding in the *Lopez v. Scully,* 58 F.3d 38 (2d Cir. 1995)

Attorney Barket's present letter is yet another attempt to thwart the legitimate process required to ensure that a defendant is properly represented by an attorney free of conflicts. Just as

---

[1] At the time these representation were made by attorney Barket and his associate, all other counsel were unaware that attorney Barket had directly participated in the removal of the contraband item nor that he had previously instructed Nicholas Tartaglione not to discuss the item with anyone, unless he was present in the room. Good lawyer's instincts, and adherence to the protocols of the Second Circuit, and just sound wisdom prevailed and the truth concerning the depth and the actual participants with the removal was revealed as a result of the thorough inquiry by *Curcio* counsel.

attorney Barket did previously, he again wants others to set forth their thoughts on the specifics of his conduct, and/or the conduct of the members of his firm, now in relation to the possession and usage of a contraband cellular phone at the M.C.C.

Out of grave concern, we have asked the court to expand the inquiry into the statements made by attorney Barket on the record on July 22, 2019 in connection with the possession and use of a contraband cellular phone by Nicholas Tartaglione at the M.C.C.   With this request, we are not, as attorney Barket claims "setting parameters."   No at all.  We are concerned because the communications between counsel associated with the Barket firm, as reported on the record by attorney Barket, and Nicholas Tartaglione via a prohibited contraband cellular phone has jeopardized Learned Counsel's ability to effectively investigate "a course of action" to be taken in preparation for presentation during the penalty phase on mitigation evidence on the issue of the defendant's prison adjustment.

This is significant, attorney Barket has made representations concerning the possession and use of the contraband cellular, and has posed a potential mitigation presentation on prison adjustment.  However, the theory posed "diverges from the interest of Nicholas Tartaglione," and is also not supported by evidence which impeaches and contradicts the foundation of premise proffered by conflicted counsel.   To date, Learned Counsel has had the opportunity to examine a screen shot of a text message sent from a contraband phone reportedly possessed by Nicholas Tartaglione, an also examined the telephone logs provided by the government and has identified multiple conflicts that impair the effective representation of the defendant by attorney Barket and members of his firm.

Finally, Learned Counsel is of the view that *Curcio* counsel could have simply moved forward and expanded the inquiry on her own, based upon the information that is presently in her

4

possession on the subject of the contraband cellular phone. However, since this is an authorized capital case, everyone is of the belief that it would be prudent, and without any prejudice to the defendant or the government, to strictly comply with the established protocols of the Second Circuit and alert the court to the possibility of conflicts (here in connection with the statements related to Nicholas Tartgalione's possession and use of the contradict cellular as claimed by attorney Barket on the record on August 21, 2019), so that the court can make an appropriate inquiry to direct existing *Curcio* counsel to (a) advise the defendant Nicholas Tartaglione regarding any conflicts, and (b) to discuss with the defendant his right to waive the potential conflict or to discharge counsel after a full hearing.[2] *See United States v. Curcio*, 680 F.2d 881 (2d Cir. 1982); *see also United States v. Williams*, 372 F.3d 96, 102 (2d Cir. 2004)

There is no question, that a *Curcio* inquiry is required in relation to the statements made by attorney Barket in relation to the Nicholas Tartaglione's possession and use of a contraband cellular phone (which includes in the participation of attorney(s) from the Barket firm), and that given the finding already discovered by *Curcio* counsel in relation to contraband in connection with the Jeffrey Epstein attempted suicide/suicide, the failure to conduct such an inquiry would deprive this court of it's responsibility to ensure, over attorney Barket's assurances to the contrary, that Nicholas Tartaglione is represented by conflict free counsel who has conducted themselves within the code of ethics and the law.

Learned Counsel have exercised great restraint not to set forth the specific facts supporting the initial request for the appointment of *Curcio* counsel, and again we are reluctant to do so here.

---

[2]     As previously stated , a result of the importance of this issue in a death authorized case, each step taken by Learned counsel in this matter, including the information to be included in the submission of this application to request an expansion of the scope of *Curcio* counsel, has been discussed with the Executive Director of the Federal Defenders of New York and the Executive Director of the Federal Death Penalty Resource Counsel Project.

There is a time and place for the full factual inquiry. Our investigation, which includes a review of documents, and a review of the statements made on the record by attorney Barket necessitate the appointment of *Curcio* counsel and the expansion of *Curcio* counsel's report to include conflicts related to the contraband cellular.

As counsel for a defendant facing criminal charges, we have an ethical obligation to protect the confidences information obtained during the course of the representation of Nicholas Tartaglione under New York Rules of Professional Conduct, Rule 1.6. Besides, just as before in relation to the removal of contraband material to the Epstein attempted suicide/suicide, we are also unaware of the full extent of the attorney(s) conduct who actually engaged in the conduct subject to the *Curcio* inquiry. However, there is certainly enough information in our possession that has been reviewed to demonstrate more than a "specter of conflict of interests has arisen," in relation to the contraband cellular phone to necessitate a *Curcio* inquiry.

Attorney Barket's desire to have specifics revealed to him about his conduct or the conduct of attorneys in his firm does not make any sense, unless he wants a preview of information to influence those that he believes will be interviewed. As stated above, this court will soon discover that attorney Barket has previously engaged in conduct to influence those to be interviewed by *Curcio* counsel. *Curcio* counsel is aware of those circumstances, and we expect that they will be included in her final report to the court.

All non-conflicted counsel share the above views, and the need for a complete and thorough inquiry in relation to attorney Barket and his firm in relation to contraband at the M.C.C. An independent, objective inquiry is required, one free of the influences of those subject to the conflict. We therefore, request that this court authorize *Curcio* counsel to explore any matters deemed relevant to the determination of whether this case involves any conflicts - including issues related to

6

the admitted communications via a contraband cellular phone that was seized by the BOP, as described by attorney Barket on the record on July 22, 2019.

Finally, we respectfully request that this application and the related proceedings that follow be held *ex parte* and under seal to avoid revealing information that could adversely impact the defendant and prejudice his penalty phase investigation and presentation.

Respectfully submitted,

*Anthony L Ricco*

Anthony L. Ricco, Esq.

*Bruce D. Koffsky*

Bruce D. Koffsky, Esq.

*Michael Bachrach*

Michael Bachrach, Esq.

Kenneth J. Montgomery, Esq.
John Diaz, Esq.

ALR/jh

cc:  All defense counsel (including Barket and Leisenring)

7

# EXHIBIT 24

# Possible Leak of Sealed Information To The Press

From: Tony Ricco

Date: Wed, 13 Nov 2019 at 8:06am

All Team Members:

I received the following email from the press yesterday:

*"Hi Tony, I just got additional information about this curcio issue on the Tartaglione case.*

*I'm told he won't be attending next week's hearing in protest of your continuing representation of him.*

*Have some time to talk about this?*

*Thx,*

*Stephen Brown*

*Manhattan Federal Court reporter*

*NY DAILY NEWS*

917-589-9831"

The above email from the Daily News is a little troubling since it contains information that has been filed with the court and is the subject of confidential sealed proceedings. Can team members (attorneys, experts, investigators) indicate whether they have any contact with the press concerning information that is set forth in the email?

Also, I would like the views/opinions of all counsel on whether this email should be brought to the attention of the court. I have no intention of speaking to the press about this email at all. I shall follow a practice that I have had since I first was assigned to this case over 32 months ago: no comments to the press.

If I do not hear from anyone, I will make a decision that I believe is appropriate. Every attorney must keep in the forefront of their thoughts and actions that we represent a man in an authorized capital case who is risk of being executed in this quadruple murder/drug case. These comments in the press are devastating and will not help Nicholas Tartaglione. The court has set forth an orderly judicial process for the resolution of all issues of counsel. Every person, including Nicholas Tartaglione should

1004

respect that process, and all counsel have an obligation to see to it that both the letter and spirit of the court's directions are followed.

So, let me know how counsel want this matter handled?   Thank you.



## Beth Cahill Wed, 13 Nov 2019 at 8:14am via email

I have not had contact with the press concerning information that is set forth in the email.



## Michael K. Bachrach Wed, 13 Nov 2019 at 8:15am

This is not the first time that the press has received privileged or sealed information. It is very concerning.

To answer your first question, no, I have not had any contact with the press regarding this issue.

With respect to the second question, if the sealed information gets published, then yes, the article should be immediately brought to the court's attention. That is something that Judge Karas would want to know.

I also think it's time for us to consider whether a gag order is warranted prohibiting all parties from contact with the press. Such an order would protect the defendant from being prejudiced by additional press coverage, particularly coverage of this nature which could impact jury selection as well as the penalty phase of the case.



## Jim Dowd Wed, 13 Nov 2019 at 8:20am via email

I have not, and would never speak with the press !!!



## Melissa Lang Wed, 13 Nov 2019 at 8:28am

I have had no communication with the press.



## Kenneth Montgomery Wed, 13 Nov 2019 at 8:31am via email

No contact with press at all concerning the case. Based on the Courts prior instructions regarding the press as well as to maintain the integrity of the proceedings we should absolutely make the court aware of this most recent incident concerning the press. Its disturbing on several levels and at least on its face appears to be consistent with affirmations made in the letter provided to us by Curcio counsel from the Client.

Sent from kjmontgomerylaw.com

>



## Bruce Barket Wed, 13 Nov 2019 at 8:57am

I think we delete the word "possible" from the subject line.

The good news is that there isn't any news this morning.

Leaking the details of the Curcio inquiry is not in anyone's interest.

To be clear, despite the implication by at least one lawyer, I did not provided any information to any reporter about the Curcio inquiry or Nick's instance on removing Tony from his defense team. Further, I did not know about this leak, nor did I approve the leak. I had no hand in this. Period.

If one considers the matter for a moment, it should be clear that this leak is not be something that can help Nick, me or in anyway advance any interests we have.

The reporter did, however, call me yesterday. I flatly told him I would not discuss the matter with him and that he should not take my position as either a confirmation or denial of any information he claimed to have.

My view is that the Curcio inquiry concerns the highly sensitive client confidences and as I have said repeatedly, they should not be shared.

It is deeply troubling that someone (the people who know about this are limited, but apparently—as I learned yesterday—include Nick's parents and at least one "friend," Kim) provided information to the press.

We have to consider that Nick (who has been frustrated by the Curcio process, by the Court's refusal to remove Tony and by the proposed trial date, among other things) is taking matters into his own hands. This is the reporter to whom Nick wrote a few months ago and who published portions of the letter.

If it was Nick, reporting this to the court may not be a good idea.



### bkoffsky@snet.net Wed, 13 Nov 2019 at 9:43am

I have had no contact with the Press. I also don't see any downside in notifying the court about the reporter's contacting you.



### Tony Ricco Wed, 13 Nov 2019 at 9:43am

I am not in New York, so I am leaving it up to team members to monitor the News media to see if any of this appears in the press. I have not heard from other team members, and would not like to take any action without at least attempting to have a consensus. I am concerned about (1) the integrity of these capital proceedings; and (2) that we do not have a person ending up on death row. Frustrated, angry, bitter, disillusioned, afraid, along with frustrated and misinformed families, are all characteristics and circumstances that capital defense lawyers confront in just about every capital authorized case. However, everything is subject to a court process, a process that ensures that the frustrated, angry, bitter, disillusioned and afraid is properly represented by qualified, experienced counsel. Capital work is always challenging, with each case bringing its own unique set of nuances. Hopefully, we will hear the views and/or opinions of other team members. This is a serious matter, and should be of great concern for all involved. I can see how press on the issue of counsel in this could be devastating for the defense, well beyond the ability to present *Skipper* evidence at the penalty phase.

1007



## Bruce Barket Fri, 15 Nov 2019 at 8:19am

I have already given some thought to this and I can see a benefit of either appearing or pushing the matter back two weeks. I am going to see Nick over the weekend and speak to him about it. I don't see a need to make a final decision until Monday.



## bkoffsky@snet.net Fri, 15 Nov 2019 at 8:30am

I begin trial before Judge Schofield on 12/9 in a matter scheduled to last 2 weeks. Since I was not able to appear at the last status conference, if the request is made to continue next week's conference, please request a day either before or after my trial.



## Tony Ricco Fri, 15 Nov 2019 at 8:30am

I totally agree with attorney Barket that no decision needs to be made today. Folks who can, should talk to Nicholas Tartaglione (and show him the basecamp post, if it will help). Even if we did not have the issue with the statement of protest in Nicholas Tartalaglione's most recent letter, I would still be leaning towards a continuance. Why? Pre-trial conference are designed to accomplish goals - seeking a remedy from the court or apprising the court of the status of the case. At this juncture, with people working hard on the case towards preparing the defense for trial, along with the initial penalty phase pleadings near completion to be served, and the *Curcio* issue pending and no real input needed from the court, this would be a good juncture for everyone to take a moment for reflection. So, let's see what happens.



## Michael K. Bachrach Fri, 15 Nov 2019 at 8:37am

If Nick is going to refuse to come to court on 11/20 then I see no benefit for Nick in keeping the date and only downside. A force order, or any actions that might result in a public discussion of even the possibility of a force order, would be an absolute disaster for Nick on a multitude of levels, the most critical of which would be the impact on the penalty phase and the manner in which the MCC would be authorized to treat him if he refused in the future.

Relatedly, in case anyone missed it, Judge Karas issued an order yesterday granting the motion to continue the motion and trial scheduling, stating in the docket entry, "There is no value in forcing counsel to commit to a trial date while the Curcio issue remains unresolved." In the order Judge Karas also designated the case as a complex case under 18 U.S.C. § 3161(g)(7)(B)(ii).

Based upon all of that, as well as what was mentioned in the other posts, a continuance to the first week of December makes sense to me, assuming there's nothing urgent that needs to be addressed sooner.

By the way, do we have a date for the suppression hearing? If yes, when is it? We might want to push that back too.



### Bruce Barket Fri, 15 Nov 2019 at 8:41am

The court agreed that scheduling a date for hearing at this juncture didn't make sense in light of the fact that there is an effort underway to disqualify counsel who wrote the motion and presumably would take the lead at the hearing.



### Michael K. Bachrach Fri, 15 Nov 2019 at 8:42am

Ok. That makes sense. I couldn't remember and am not in my office at the moment.



### john diaz Fri, 15 Nov 2019 at 10:13am via email

I also agree with adjourning the conference

Sent from my iPhone

>



### john diaz Fri, 15 Nov 2019 at 11:30am via email

Do we have a consensus among the attorneys that the conference should be adjourned at least two weeks subject to Nick's approval?

Sent from my iPhone

\>



### Kenneth Montgomery Fri, 15 Nov 2019 at 1:23pm via email

yes



### Bruce Barket Fri, 15 Nov 2019 at 1:27pm

I thought we had agreed to revisit this Monday?  I have mixed thoughts.



### Michael K. Bachrach Fri, 15 Nov 2019 at 1:30pm

We can certainly revisit on Monday, but it could be useful to discuss this a bit more now too, particularly if you are going to see Nick before Monday.

What are you mixed about?



### Bruce Barket Fri, 15 Nov 2019 at 1:33pm

It is rare that Tony and I agree and we both think this can wait until Monday.  Let's revisit on Monday.



### Tony Ricco Fri, 15 Nov 2019 at 2:16pm

1022

Stop, please, stop. It is not rare that we agree (even here), we disagree about the impact that how the conduct subject to the *Curcio* inquiry damages Nicholas Tartaglione (period). And, the *Curcio* inquiry is only one aspect of a very serious at risk death penalty case.

Think about it. I have long ago agreed to support the efforts to put on a strong liability defense; I have fully agreed to every expert and investigator the defense to retain for to pursue that cause - and put my name out there on over 1 million dollar budget. Attorney Barket certainly does not take the position that counsel should not investigate every aspect of the defendants background, history, experiences and the circumstances of the offense when representing a capital defendant. Attorney Barket and others certainly have agreed to get training to increase their skillsets to participate in the case. Those efforts have received my full support and endorsement and everything was done to get counsel into Denver (Colorado jury selection) and Santa Clara(overall training) and several ACTs.

I have issues with clichés, especially when they are just not accurate. As Judge Karas has observed in this case: "You cannot change your history." And, in this case, there is strong agreement, to go along with a strong commitment to the effective representation of a man facing execution. On these critical issues, there is very little that is in disagreement here.

And, at the end of the day, my opinion and other counsel about the *Curcio* issues do not even matter, because these are issues for the Judge to decide. We do not even disagree that the case law says that responsible counsel has an obligation to bring these matters to the court's attention for resolution. That single issue - whether there exists counsel conflict(s) in this case (albiet quite serious in this case - some may disagree with that statement) - has zero impact on my and other counsel's and team members ability to stay focused and to fulfill our professional obligation to an at risk capital defendant.

Let's just stay focused. Nicholas Tartaglione is about to take action that will hurt him in the future and in ways that he is completely unable to comprehend or appreciate - that's why he has capital trained counsel. What is at stake here? We run the risk of creating a public record that will have a devastating negative impact on the defendant and the overall case. So, let's just get a simple task done - decide to have or not have a conference. I we have it, I will be there doing my best to protect Nicholas Tartaglione, even from himself, if necessary. If not, I, and all the rest of us, will continue protecting Nicholas Tartaglione until discharged from our professional responsibilities by the court.

The bottom line is that there is no identified issue to address with the court, and therefore no reason to be there - when we are concerned about a tremendous downside. If attorney Barket wants to discuss a continuance with Nicholas Tartaglione before taking action, I have zero objection to that. So, let's just get there.



**Bruce Barket Fri, 15 Nov 2019 at 3:05pm**

"Lighten up Francis."

# EXHIBIT 25

## Epstein Investigation - Arrests Later Today - No Statements To The Press

From: Tony Ricco

Date: Tue, 19 Nov 2019 at 3:25am

The arrest of at least two of the BOP officers subject to the investigation into the attempted suicide/suicide of Jeffrey Epstein will take place later this morning, and they will be appearing in SDNY for arraignment. Based upon past experiences, we can expect that members of the media will be contacting individuals associated with Tartaglione team for comment. For reasons previously stated since July 23, 2019 and for he reasons below, all team members should *at this juncture* decline making any comment.

I am requesting that no members of the team comment to the media on any matters related to this *on going investigation*. Or, in event that any person feels so inclined that they at least share the remarks with LC or RC before hand. Why? Upon information and belief, the Jeffrey Epstein attempted suicide/suicide investigation is not limited to the BOP officers and those scheduled for arrest today, but also includes in inquiry into the actions and conduct of Nicholas Tartaglione and others. Therefore, we want to ensure that there are no public statements made that have the potential of being used adversely against Nicholas Tartaglione and/or could result in additional charges in this case. At this juncture of this death authorized case, the last thing we need is more statements to the press concerning Nicholas Tartaglione's actions, observations and/or what he said to his counsel or others in relation to the attempted suicide/suicide by Jeffrey Epstein. Just because Nicholas Tartaglione has previously made clear that he has granted his counsel the full authority to make statements and/or has and is willing to endorse (waive) public statements to the press by his counsel in relation to the foregoing, there was, and remains, sound reasoning for not making such statements in the first place. In addition, prior statements are already part of the subject of the pending *Curcio* inquiry, that all agree should be resolved without unnecessary delay. Adding more comments about Jeffrey Epstein based upon information gained in confidence from the representation of Nicholas Tartaglione will only serve to further complicate and delay resolution of the pending *Curcio* inquiry. Therefore, extreme caution and restraint should be exercised in relation to the arrest later today, and to making any public statements in relation to the overall investigation itself of the attempted suicide/suicide by Jeffrey Epstein.



**Bruce Barket** Wed, 20 Nov 2019 at 8:44am

You haven't already read the Indictment charging the guards at mcc, everyone should. It goes along way to vindicate Nick and corroborate some of what we have said about how the mcc was run. Ironically, the comments from the union and the defense lawyers reflect the culture of active indifference that we complained about.

This is playing out much as expected. The move to exploit events in an attempt to disqualify Nick's counsel of choice has hampered our effort to use these events to Nick's advantage. He saved a man's life, a man who the

jail put in his cell because, despite the allegation of 4 murders, the jail knew Epstein was safe with Nick. Had they returned Epstein to Nick's cell, Epstein would be still be alive.

In addition to trying to obtain whatever statements Nick was forced to make the night of the attempted suicide, we are going to move to obtain all the reports of that event including the video, which if the indictment is correct, will corroborate our client's account of the incident.

Further, allowing the false narrative of Nick being a muscle bound monster who attacked Epstein to fester was an error. An error that we won't make again given other opportunities.



**Michael K. Bachrach** Wed, 20 Nov 2019 at 9:23am

There was no "move to exploit events in an attempt to disqualify Nick's counsel of choice," that's absolutely ridiculous. You have multiple potential and actual conflicts. They may or may not be waivable. The law is clear that any time there is even a possibility of a conflict the court must be advised so that the court can ensure that the defendant understands the impact of these possible conflicts on his defense. This is required so that the defendant can then make a knowing and voluntary decision on how to proceed based upon the advice of an independent, conflict-free counsel. This is basic Federal practice 101.

As for the need to obtain Nick's statements and the evidence related to the investigation of Epstein's suicide, those are things we were always going to seek and this indictment does not change that at all. We're entitled to this information under Rule 16 as to the penalty phase, as well as, potentially, as Brady/Kyles as to the penalty phase as well.

The requests for everyone to avoid the press during the pendency of the Epstein investigation was/is to ensure that no member of Nick's defense team could be accused of attempting to interfere with an ongoing investigation. Again, this is basic stuff, even more so when defending an individual facing the death penalty.



**Kenneth Montgomery** Wed, 20 Nov 2019 at 9:34am via email

Spot on Mike. Really intelligent analysis considering all the tentacles of the Epstein investigation which includes the client and counsel acting on his behalf.

Sent from kjmontgomerylaw.com

>



1031

**john diaz** Wed, 20 Nov 2019 at 9:45am via email

It think it is unwise to box yourself into a narrative in the press while an active investigation that could still yield additional unknown details is occurring.

Sent from my iPhone

>



**Tony Ricco** Wed, 20 Nov 2019 at 10:33am

When representing a capital defendant, an attorneys' statutory, moral and legal duty is clear. (The relevant case authorities, CJA and ABA Guidelines have repeated been the subject of many posts) No attorney moved to disqualify anyone, that's on you. An application was made for the appointment of Curcio counsel. It is our clear duty to well established Supreme Court and Second Circuit case authorities to ensure that a defendant (in this case a capital defendant) is not represented by an attorney with conflicts (potential or actual). Many of us practice and represent defendants at the highest levels, but do so in compliance with the law, especially the law that is designed to protect the defendant from harm, and that is precisely what the conflict laws are designed to do - protect the defendant from conflicted counsel. My opinion, and it is only my opinion, is that Judge Karas is going to find several conflicts in this case. This means that not only was counsel for a capital defendant following the law but that there was a bona fide "good faith" basis for doing so.

On another subject, I would caution all team members from doing a victory lap from reading the indictment against BOP officers Tova Noel and Michael Thomas which charges a conspiracy to file false documents and substantive counts of filing false documents. John Diaz is absolutely correct that it is completely unwise to reach any conclusions at all from the Noel and Thomas indictments. The indictment contains allegations which are not knew.

I have previously suggested against reaching any conclusion from the ongoing investigations and continue to stand by that position. As capital defense lawyers will continue to conduct ourselves in high standards required and prepare for the upcoming capital and will not be influenced by anyone's distractions. (Period)

# EXHIBIT 26

## Aida Leisenring

| | |
|---|---|
| **From:** | Aida Leisenring |
| **Sent:** | Thursday, December 12, 2019 7:36 PM |
| **To:** | 'bcsternheim@mac.com' |
| **Cc:** | Bruce Barket |
| **Subject:** | FW: Confidential Screen Shots |
| **Attachments:** | file3-1.png; file2-1.png; file4.png; file-2.png; file1-1.png |

Bobbi,

I searched my sent emails and found this – which, I had forgotten about. I had forwarded screen shots (of text messages between the contraband phone to Nick's wife) to Michael Bachrach at Michael's request and Tony's instruction the day we learned Nick's contraband cell phone had been seized.

At the time, I believed all of them to be from the contraband phone, not realizing that the one we discussed was from Gerry (Nick's mother) to V (Nick's wife). So that one was included in the attachments to Michael as well.

Since I previously disclosed them to Michael Bachrach, I do not see a problem in sharing them with you. And I assume he has them as well.

Aida Ferrer Leisenring, Esq.
Barket, Epstein, Kearon, Aldea & LoTurco LLP
666 Old Country Road, Ste 700
Garden City, NY 11530
T (516) 745-1500
F (516 745-1245

Please note that my emailed has changed to:

aleisenring@barketepstein.com

----------------------------------------------------------

This transmittal may be a confidential attorney client communication or may otherwise be privileged or confidential. If it is not clear that you are the intended recipient, you are hereby notified that you have received this transmittal in error; any review, dissemination, distribution or copying of this transmittal is strictly prohibited. If you suspect that you have received this communication in error, please notify us immediately by telephone or email and immediately delete this message and all its attachments.

----------------------------------------------------------

------------ Forwarded message -----------
From: "Aida Leisenring" <aleisenring@barketepstein.com>
Date: Wed, Jul 3, 2019 at 1:24 PM -0700
Subject: Confidential Screen Shots
To: "mbach2000@yahoo.com" <mbach2000@yahoo.com>

Attached.

Get Outlook for iOS

# EXHIBIT 27

# LAW OFFICES OF BOBBI C. STERNHEIM

212-243-1100 • Main
917-306-6666 • Cell
888-587-4737 • Fax

33 West 19th Street - 4th Floor
New York, New York 10011
bc@sternheimlaw.com

December 30, 2019

**Ex Parte Submission Under Seal**
**For In Camera Review**

Honorable Kenneth M. Karas
United States District Judge
United States Courthouse
300 Quarropas Street
White Plains, NY 10601

Re: *United States v. Nicholas Tartaglione*
S4 16 Cr. 832 (KMK)

Dear Judge Karas:

This Report, prepared in connection with my appointment as *Curcio* counsel for Nicholas Tartaglione, is submitted *ex parte*, under seal, for *in camera* review by the Court. This capital case presents unique *Curcio* issues. This Report contains highly sensitive and privileged information, the inclusion of which is deemed necessary to provide the Court with relevant background and sufficient facts to make critical decisions that will impact the rights of a capital defendant. Statements contained herein do not constitute admissions on behalf of Mr. Tartaglione and are not admissible against him under Rule F.R.Cr.P. 11(e)(6) and F.R.E. Rule 410. Additionally, this Report is not a waiver of any of his rights as to self-incrimination.

The Court will provide defense counsel the opportunity to review this Report. The Court has yet to decide whether the contents of this Report will be provided to the Government and whether a *Curcio* hearing will be conducted *ex parte*. *Curcio* counsel requests the opportunity to confer with the Court prior to disclosing this Report to counsel in the first instance and to the Government, should the Court determine that disclosure to the Government is required.

Information contained herein is derived from various sources, including but not limited to consultations with defense counsel and Mr. Tartaglione, attorney work product, court records (public and sealed), miscellaneous documents, Internet sites,

1

LAW OFFICES OF BOBBI C. STERNHEIM

case law and rules. Unless otherwise stated, assertions are based on information and belief. As discussed during my October 21st *ex parte* conversation with the Court, my investigation has revealed conflict-related categories beyond statements made to the media by Bruce Barket, Esq. Additional areas of inquiry include: removal of a document from the MCC, communications via contraband cellphone(s), and attempts to deter efforts to safeguard legal interests of Mr. Tartaglione in this this death-authorized case.

The Report focuses on areas that give rise to conflict without concluding that any issue is a potential, actual, *per se*, or waivable conflict. Because the Court will give defense counsel the opportunity to respond to this Report, I leave it to them to amplify, clarify, or otherwise respond to statements that follow.

I have had several meetings with Mr. Tartaglione. We discussed the areas detailed in this Report. I have responded to his questions and addressed his concerns. It is my belief that Mr. Tartaglione comprehends the issues. It is my understanding that he will knowingly and voluntarily waive any type of conflict in order to have Attorney Barket continue as his counsel of choice.

## Defense Counsel

Attorney Barket and his firm, including Aida Leisenring, Esq., were chosen by Mr. Tartaglione and privately retained to represent him in this capital case. John Wieder, Esq. also provides private legal counsel to Mr. Tartaglione. As a defendant charged with death-eligible offenses, Mr. Tartaglione qualifies for a second counsel "learned in the law applicable to capital cases," as specified in 18 U.S.C. § 3005. The Court appointed "Learned Counsel" pursuant to the Criminal Justice Act. Learned Counsel for Mr. Tartaglione comprise a team of attorneys that includes Bruce Koffsky, Esq., Anthony Ricco, Esq., Michael Bachrach, Esq., Kenneth Montgomery, Esq., and John Diaz, Esq.

## Statements to Media

Throughout the course of this capital case, Attorney Barket has made numerous statements to the media which have been widely reported in print and broadcast via television and Internet sites. The subject of his statements include but are not limited to: conditions at the Metropolitan Correctional Center ("MCC"), threats made by MCC personal against Mr. Tartaglione, denial of allegations that Mr. Tartaglione assaulted Jeffrey Epstein, mention of the amicable relationship

between Mr. Tartaglione and Epstein while cellmates, and assertion that Mr. Tartaglione has information pertinent to ongoing investigations concerning Epstein's attempted suicide on July 23, 2019 and death on August 10th.

Various print and Internet articles contain statements by Attorney Barket which allude to information provided to him by Mr. Tartaglione. Other articles and interviews contain statements by Attorney Barket that could be used as adoptive admissions adverse to Mr. Tartaglione's interests if relied upon by the Government during the penalty phase. Such extra-judicial statements create the potential for Attorney Barket to be questioned in relation to Epstein's suicide attempt and death.

**Request for *Curcio* Counsel**

On August 21, 2019, in response to concerns that Attorney Barket's public statements may conflict with the interests of Mr. Tartaglione in this death-authorized case, the Court appointed the undersigned to serve as *Curcio* counsel.

By *ex parte* letter, dated August 17, 2019, Learned Counsel expressed concerns about conflicts arising from statements made to the media by Attorney Barket. Learned Counsel believed that certain statements contained information derived from Mr. Tartaglione that may constitute a breach of attorney-client privilege and statements regarding the MCC and prison staff that would negatively impact presentation of evidence during the penalty phase in support of positive prison adjustment. The request included the following qualification:

> *Undersigned counsel are constrained in providing more detail regarding the potential conflict and the substance of the many statements made in the media because of the need to preserve confidentiality.*

Ricco letter, 8/17/19.

In a separate *ex parte* letter, dated August 20th, Attorney Barket stated:

> *Contrary to learned counsel's representation, there is no actual, potential, or possible conflict caused by any of my communications with the press that would warrant assignment of Curcio counsel or a Curcio hearing. . .*

> *While I appreciated the need to be circumspect when dealing with these issues, I do not believe that the Court should direct a Curcio inquiry and*

3

*appoint Curcio counsel unless and until it has identified both a factual and legal basis establishing the existence of any possible or potential conflicts. If there are none, then no further inquiry should take place. . .*

*Mr. Tartaglione fully supports the statements I have made to the media, which I had full authority to make pursuant to Rules 1.6, 1.7, 1.8, and 3.6 of the New York Rules of Professional Conduct, as applicable to me pursuant to Rule 1.5(b)(5) of the Local Rules of the Southern and Eastern District Courts of New York.*

Barket letter, 8/20/19.

During an *ex parte* conference on August 21st, Attorney Barket stated:

*If the Court is inclined to have somebody separate from all of us speak to Mr. Tartaglione to confirm what I wrote, that's fine with me. . .I think, speaking for everybody, we are hoping because we think this is so straightforward, and I think clean, that this can all happen today so we all can move beyond it.*

8/2/19 Transcript, at 13.

Attorney Barket then agreed with the Court that speed should not be the guiding principle. *Id.* at 14.

Attorney Barket's statements to the Court seem to touch upon Learned Counsel's concern regarding conflict area beyond mere statements to the media and attorney-client privilege:

*MR. BARKET: Well, I think the short answer is the substance of what the letters entail certainly touch upon the attorney-client privilege, and it may involve discussions beyond discussions of conversations with Mr. Tartaglione beyond what's been reported in the paper. So to have that aired publicly in the presence of counsel for the government would be problematic.*

*And, secondarily, there's been no hint by the government so far that I know that any counsel for Mr. Tartaglione would become a witness. I wouldn't want our free-flowing discussion of some of the topics here to give them any ideas.*

*Id.* at 7 (underline added).

4

LAW OFFICES OF BOBBI C. STERNHEIM

The Court astutely sensed a larger concern:

*So the attorney-client privilege piece is the one that's obviously the most potentially problematic ... <u>I guess it would be useful to know more about what the potential conflict is, so I can figure out how much of this might touch upon the privilege.</u>*

*Id.* at 7 (underline added).

<u>*So if you can maybe enlighten me a little bit as to what the potential conflict is so I understand the dots that are being connected here.*</u>

*Id.* at 7 (underline added).

*MR. RICCO: Judge, in my -- I think what's problematic here is that to fully lay out the circumstances we would be intruding way into revealing confidentialities that were discussed with counsel, and so we are trying to alert the Court to the -- not only the doorway issue, but -- . . . -- getting in the weeds on this... And I believe by flushing it out, we would then be violating his confidentiality -- his confidence.*

*Id.* at 8.

*And we believe that he will [waive privilege]. What we are hesitant to do is to have an open conversation more about <u>in addition to what has been discussed in the paper</u> because we then have a greater exposure of confidence . . .*

*Id.* at 12 (underline added).

Defense counsel are in general agreement that Mr. Tartaglione will likely waive the privilege issue and, as previously stated, Mr. Tartaglione intends to do so before the Court. However, Attorney Barket's statements to the media do not merely pose a conflict issue involving privilege. While the majority take issue with deplorable conditions in the MCC, a few target Mr. Tartaglione's knowledge of circumstances pertaining to Jeffrey Epstein. The following two statements in particular give rise to concerns that survive waiver of privilege:

5

'*Nick knows a heck of a lot about what went on*,' Barket said. '*He was there during the first attempt and he was there when he actually killed himself — he just wasn't in the same cell.*' (underline added).

https://www.nbcnews.com/news/us-news/nearby-inmate-heard-nothing-when-jeffrey-epstein-died-lawyer-says-n1041646.

'*Whether or not the investigators into the suicide chose to interview Mr. Tartaglione about the attempted suicide to which he was witness or about how the facility is run and the conditions under which the inmates are forced to live, the correction officers know he has information potentially very damaging to the very people now charged with guarding him or their coworkers*' (underline added).

https://www.lohud.com/story/news/crime/2019/08/20/tartaglione-epstein-death/2066257001/.

Any alleged breach of attorney-client privilege may be resolved by Mr. Tartaglione's waiver of privilege or a declaration that he authorized Attorney Barket to make such statements. However, the above-cited statements give rise to the specter of conflict between client and counsel.

Imbedded in these statements is information concerning a document removed from the MCC that is material to investigations focused on the attempted suicide and subsequent death of Epstein. As such, these statements spark a greater concern for conflict.

At the time of his August 20th letter and August 21st statements to the Court, Attorney Barket had knowledge of a handwritten document allegedly written by Jeffrey Epstein ("Epstein Note"; "Note") that had been removed from the MCC prior to Epstein's death on August 10th. Mr. Tartaglione and Mr. Epstein shared a cell at the time of Epstein's alleged suicide attempt on July 23d. Epstein was removed from the cell but some of his property remained. The Bureau of Prisons ("BOP") commenced an investigation and questioned Mr. Tartaglione.

During the period after Epstein's attempted suicide but prior to his death, Mr. Tartaglione found the Note in his cell. During a legal visit, he gave it to John Wieder, Esq. Attorney Wieder removed the Note from the MCC. Attorney Barket informed Learned Counsel of the existence of the Note, stating the Note had been removed

6

from the MCC by Attorney Wieder. Attorney Barket instructed Mr. Tartaglione not to discuss the Note with anyone unless Attorney Barket was present. Attorney Barket requested that Learned Counsel not disclose information concerning the Note to *Curcio* counsel. Only after appointment of *Curcio* counsel did Attorney Barket disclose his personal involvement in removal of the Note.

At a defense meeting attended by *Curcio* counsel on August 23d, Attorney Barket provided the following details concerning discovery and removal of the Note, including his personal involvement in removal of the Note from the MCC:

During a legal conference at the MCC, Mr. Tartaglione told Attorney Barket that he had found a handwritten note in a book belonging to Epstein in the cell they shared prior to Epstein's alleged suicide attempt. The Note was discovered after Epstein's alleged suicide attempt. Attorney Barket asked to see the Note but Mr. Tartaglione had left it in his cell. Following this legal conference, Attorney Barket contacted Attorney Wieder. Attorney Wieder went to the MCC, met with Mr. Tartaglione in the Attorney Visiting Room, obtained the Note from Mr. Tartaglione, and removed the Note from the MCC. Attorney Wieder showed the Note to Attorney Barket. Attorney Barket told Attorney Ricco about the Note.

*Curcio* counsel later learned that prior to telling Attorney Barket about the Note, Mr. Tartaglione had told an MCC officer about the Note but expressed concerns to the officer that if given to MCC officials, the Note would not be properly safeguarded. The officer tacitly agreed.

During the August 23d defense meeting, Attorney Barket showed *Curcio* counsel a screenshot of the Note and offered a copy provided it was not further disclosed. *Curcio* counsel declined the offer. Recently, *Curcio* counsel requested a copy of the Note for inclusion in this Report. Attorney Barket declined the request on the ground that Mr. Tartaglione does not want it shared and on advice of ethics counsel, Michael Ross, Esq.[1]

---

[1] During an *ex parte* proceeding on November 21st, Attorney Barket took issue with a statement made by *Curcio* counsel during an *ex parte* conference with the Court on October 21st. While being circumspect about issues under examination in this unusual matter, *Curcio* counsel made reference to the fact that "even counsel is represented by counsel'. The context for that statement follows:

*Curcio* counsel arranged to meet with defense counsel in the jury room before commencement of the status conference on September 17th. To the surprise of all except members of the Barket Firm, Michael Ross, Esq., a prominent ethics lawyer, was present. At that meeting, Attorney

The content of the Note is reprinted from *Curcio* counsel's personal notes. *Curcio* counsel believes the underlined portion, in particular, is relevant to the ongoing investigations regarding Epstein:

> *They investigated me for months – Found nothing!!!*
> *So 15 year old charges resulted.*
> <u>*It is a treat to be able to choose ones time to say goodbye.*</u>
> *Watcha want me to do –*
> *Bust out crying!!!*
> *No fun – Not worth it.*

Epstein Note (underline added).

According to BOP Guidelines, the Epstein Note qualifies at contraband:

> *Contraband is defined as any item or thing not authorized or issued by the institution, received through approved channels, or purchased through the commissary. . . Any item in an inmate's personal possession must be authorized and a record of the receipt of the item should be kept in the inmate's possession.*

https://www.bop.gov/locations/institutions/spg/SPG_aohandbook.pdf      (revised November 2012), at 15.

The Epstein Note did not belong to Mr. Tartaglione. More importantly, its content is relevant, and material, to the investigations being conducted into Epstein's suicide attempt and death. Its removal from a scene under investigation, its retention by counsel, and its non-disclosure to investigators casts Mr. Tartaglione, Attorney Barket and Attorney Wieder as potential witnesses in ongoing investigations and prosecutions. Disclosure to the Government of the Note and circumstances of its recovery and removal invites a serious potential for conflict between client and

---

Barket stated that he had retained Attorney Ross "a couple of months before." Attorney Ross had attended each status conference since September 17th.

Mr. Barket has not revealed the reason for retaining ethics counsel. With the exception of declining *Curcio* counsel's request for a copy of the Epstein Note, it is unknown whether Attorney Barket retained ethics counsel as a result of decisions and actions discussed in this Report or whether such decisions and actions were made on advice of counsel.

counsel.

In addition to any internal investigation being conducted by BOP Special Investigative Services, the Office of the Inspector General and local United States Attorney's Office ("SDNY") are conducting investigations into the circumstances which led to Epstein's return from suicide watch and his subsequent death. In connection with those investigations, several BOP officers and BOP staff have criminal exposure and risk termination from employment by the BOP. A number have already been indicted by SDNY. The Epstein Note is relevant and material to these investigations.

As a result of his involvement in the removal of the Note, his decision to conceal it, and the untimely death of Epstein, Attorney Barket is a witness to events related to the Epstein suicide and may become embroiled in these ongoing investigations. BOP medical staff and supervisory officers who previously relied upon statements by Epstein's lawyers in the decision to remove Epstein from suicide watch will likely claim that had they been in possession of the Note, it would have been relevant to their assessment of Epstein and may have prevented his death.

BOP Protocols specifically require a Suicide Risk Assessment when "an inmate's *written* or verbal *behavior is suggestive of suicide*" to "determine the appropriate intervention that best meets the needs of the inmate" and bear directly on decisions whether to return a detainee from suicide watch or place him alone in a cell. *See* BOP Suicide Prevention Program Statement, Number 5324.08, at 10 (emphasis added). https://www.bop.gov/PublicInfo/execute/policysearch?todo=query&series=5000#.

Whether or not in violation of BOP institutional rules, removal and concealment of the Note poses serious concerns for both defendant and defense counsel. Failure to timely disclose the Note may impact the penalty phase. Should the Court feel obliged to disclose the Note to the Government, this could expose Attorney Barket to investigation by the very office prosecuting Mr. Tartaglione, in addition to professional disciplinary proceedings. As a result of his personal involvement in removal and retention of the Note, Attorney Barket becomes an unsworn witness to events material to evidence to be presented at the penalty phase (by either the defense or the prosecution) concerning prison adjustment.

Attorney Barket's personal involvement exposes him to professional disciplinary proceedings, administrative and criminal investigations, and wrongful

9

death claims, predicaments that raise conflict concerns. Disclosure of the Note combined with public statements suggesting that Mr. Tartaglione has information concerning the alleged suicide attempt and subsequent death of Epstein could further implicate Mr. Tartgalione in ongoing investigations.

The Epstein Note is the crux of concern regarding conflict.

**Contraband Cellphone**

By letter dated, July 19th, Attorney Barket informed the Court that on or about July 3d, MCC corrections officers confiscated a cellphone found in Mr. Tartaglione's cell, a violation of MCC institutional rules. (The cellphone is contraband as defined in the BOP Inmate Information Handbook.) Attorney Barket asserted "a good faith basis to believe that privileged material exists within the communications stored on that telephone."

By letter dated July 22d, the Government informed the Court and counsel that "[a]ccording to MCC legal staff, the cellphone is a mini-cellphone that is only capable of making voice calls and *does not have the ability to send or receive text or other written messages*" (emphasis added).

During the July 22d status conference, Attorney Barket clarified that Mr. Tartaglione was asserting both a legal and marital privilege to communications stored in the contraband cellphone. *See* 7/22/19 Transcript, at 5 - 11. In response to questioning by the Court, Attorney Barket confirmed that "on information and belief there were text messages sent from the phone to members of the defense team." *Id.* at 14-15. The Government reiterated that the seized phone does not have text messaging capabilities. *Id.* at 24.

On October 31st, the Government provided a log of the call history extracted from the seized cellphone. Names corresponding to call numbers include Attorney Wieder and other members of the Barket Firm team. Neither Attorney Barket's nor Attorney Leisenring's phone numbers appear on the phone log.

In compliance with obligations to investigate and prepare for the penalty phase by developing mitigation evidence in support of adjustment to incarceration (*see Skipper v. South Carolina*, 476 U.S. 1 (1989)) and to defend against the Government's presentation of aggravating evidence (*see Rampilla v. Beard*, 545 U.S. 374 (2005)), Learned Counsel asked all defense team members to disclose

10

critical information from their cellular phones: incoming telephone number and screen shots of text messages from contraband cellphones. Not all defense team members have responded.

*Curcio* counsel requested copies of any text messages received or sent via contraband cellphones. Attorney Leisenring confirmed that she received text communications from a cellphone but does not believe she responded to them, and she provided copies of screenshots. Attorney Barket believed he had not received any text communications via the contraband cellphone but confirmed that other defense team members, including Attorney Wieder, had texted with Mr. Tartaglione via a contraband cellphone. No information has been provided from Attorney Wieder's phone.

**John Wieder, Esq.**

Attorney Wieder regularly visits with Mr. Tartaglione in the MCC's Attorney Visiting Room. Descriptions of Attorney Wieder's role in relation to this case have varied: a commercial lawyer and long-term friend who visits Mr. Tartaglione to discuss transactional issues but knows not to discuss criminal issues; an attorney retained by the Barket Firm to assist with the criminal defense of Mr. Tartaglione.

It appears that Attorney Wieder's relationship to the Barket Firm was formalized after his removal of the Epstein Note from the MCC. Following appointment of *Curcio* counsel, Attorney Barket informed Attorney Bachrach that the Barket Firm had retained Attorney Wieder to assist in the criminal defense of Mr. Tartaglione. At the August 23d defense meeting, Attorney Barket announced that his firm had entered into an agreement with Attorney Wieder concerning his role in this case. Learned Counsel's request for a statement confirming the nature of Attorney Wieder's relationship with the Barket Firm remains pending.

Attorney Wieder's conduct regarding the Epstein Note and his text communications via the contraband cellphone, each violations of BOP policy, make him a potential witness during the penalty phase and in connection with ongoing BOP and DOJ investigations, and a potential subject of disciplinary proceedings Attorney Wieder's participation in removal of the Epstein Note heightens the need for review of his text communications with Mr. Tartaglione to assess their bearing on the penalty phase: whether texts contain information related to Epstein, mitigating evidence supporting positive prison adjustment and/or classification, or

11

aggravating evidence subject to disclosure to and use by the Government during its penalty phase rebuttal.

## Penalty Phase Obligations

Capital proceedings are governed by reciprocal discovery obligations. Any text messages between Mr. Tartaglione and others via contraband cellphones are potentially subject to disclosure by the defense to the Government. *See* Commentary to ABA Guidelines 10.7; 2008 ABA Supplementary Guideline 4.1(D). In addition, defense experts must have complete information in order to provide reliable testimony as credible witnesses during the penalty phase. The requested text messages must be disclosed and provided to Learned Counsel and defense experts, even if Mr. Tartaglione objects. Failure to provide information and evidence pertinent to the defense is a dereliction of professional standards required of capital counsel in preparation of a capital trial. *See* ABA Guidelines 10.7, 10.8, 10.10.1 and 10:11. To date, the requested information has not been provided to Learned Counsel.

## Obstacles to Effective Representation

Defense of Mr. Tartaglione is compromised when Attorney Barket justifies decisions by asserting that he is following the wishes of Mr. Tartaglione in compliance with ethical rules. Attorney Barket has made this assertion regarding issues that impact Learned Counsel's obligations to prepare for the penalty phase. In addition, the following decisions and actions conflict with interests of a defendant facing the death penalty:

- making statements to the press
- resisting appointment of *Curcio* counsel
- withholding information pertaining to the Epstein Note
- directing Mr. Tartaglione to withhold information
- attempting to persuade Learned Counsel to conceal the Epstein Note from *Curcio* counsel
- declining to provide a copy of the Note to *Curcio* counsel.

Regardless of underlying reasons or motivations, such actions diverge from and can compromise legitimate interests of a death-authorized defendant.

Attorney Barket's claim of compliance with ethical rules should not shield

12

him from disclosure of information requested by Learned Counsel nor should it support an attorney-client privilege for the Barket Firm separate and distinct from Learned Counsel in the joint representation of a single capital defendant. Rule 1.6 of the New York Rules of Professional Conduct does not apply to attorneys on the same defense team. Counsel joined in the representation of one defendant share a single privilege which serves to protect the confidences of their mutual client. Mr. Tartaglione's communications which form the basis of developing a capital defense are subject to one single attorney-client privilege that should not exclude Learned Counsel.

Attorney Barket has asserted objections by Mr. Tartaglione to justify decisions to withhold information needed to develop penalty phase evidence. Capital counsel have an obligation, recognized by Supreme Court authority, to investigate all existing and potential aggravating evidence which may be introduced by the Government on its direct and rebuttal cases during the penalty phase. *See Rompilla.* Capital counsel are obligated to conduct such an investigation even if the defendant vehemently opposes (ABA Guidelines §§10.7, 10.8, 10.10.1 and 10.11) and even where the defendant is of the view that there is no basis or reason to conduct such an investigation. *See Rompilla.*

**Legal Considerations**

The right to effective assistance of counsel has been interpreted to guarantee that counsel is conflict-free. *See United States v. Curcio,* 680 F.2d 881 (2d Cir. 1982); *Wood v. Georgia,* 450 U.S. 261, 271 (1981). It has long been recognized that while the right to select counsel of one's own choice is entitled to deference, that right is not unlimited, unfettered, or absolute. *See, e.g., United States v. Schmidt,* 105 F.3d 82, 89 (2d Cir. 1997); *United States v. Brumer,* 528 F.3d 157, 160 (2d Cir. 2008) (*per curiam*).

While conflicts of interest most often occur when one attorney is representing two or more defendants who themselves have conflicting interests, conflicts may occur between counsel and an individual client in various factual settings and may not be readily apparent. Such is the situation presented in this case.

Certain ethical rules require client consent, and with it, a defendant's waiver should be entitled to significant weight. "Where the right to counsel of one's choice conflicts with the right to an attorney of undivided loyalty, the determination of which right is to take precedence must generally be left to the defendant, who may

13

make a knowing and intelligent waiver of his right to a conflict-free lawyer if he desires to continue the representation." *United States v. Cain*, 671 F.3d 271, 293 (2d Cir. 2012), citing *United States v. Perez*, 325 F.3d 115, 124-25 (2d Cir. 2003). "The courts do, of course, retain discretion to reject a defendant's knowing and intelligent waiver when his attorney's conflict jeopardizes the integrity of judicial proceedings. But absent such institutional concerns, courts will not 'assume too paternalistic an attitude in protecting the defendant from himself,' and although the defendant's choice of counsel 'may sometimes seem woefully foolish' to the court, the choice remains his." *Perez at* 125 (citations omitted).

If the Court determines that counsel is laboring under a conflict, it "has a 'disqualification/waiver' obligation... If the conflict is so severe that no rational defendant would waive it, the court must disqualify the attorney..." *United States v. Kliti*, 156 F.3d 150, 153 (2d Cir 1998).

A defendant may not receive the full effort of his attorney if counsel's decisions are influenced by obligations owed to person's other than the defendant, including counsel's self-interest. The Court needs to ascertain whether Attorney Barket's decisions and actions have placed him in a position inherently conducive to divided loyalties divergent to the interests of Mr. Tartaglione in this capital case. Where a defense attorney is prevented from considering a particular tactical option by obligation to another or to self-interest, there is a conflict even if another tactical route remains viable. *See, e.g., United States v. Mazzariello*, 2014 U.S. Dist. LEXIS 620, at *17 (W.D.N.Y. Jan 3, 2014).

Conflicts may also arise when defense counsel prevents or hinders protective measures for his client or becomes an actual or "unsworn" witness. A conflict may arise in a situation where a defendant's interests in zealous and effective representation may come into conflict with counsel's own interests. When an attorney faces the possibility of criminal or disciplinary proceedings, the threat or power of charges and sanctions can create an actual conflict by influencing an attorney's conduct and compromising the attorney's ability to comply with his legal and ethical obligations to represent his client with undivided loyalty.

The Court has an obligation to preserve public trust in the scrupulous administration of justice and the integrity of the bar, a responsibility ever more heightened in a capital case. The Court has an "independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them." *Wheat v. United States*, 486

14

U.S. 153, 160 (1988). Further, the Court has an institutional interest in assuring that its judgment remains intact on appeal.

The Supreme Court has defined actual conflict to mean, in the Sixth Amendment context, as one that adversely affects counsel's performance. *Mickens v. Taylor*, 535 U.S. 162, 172 n.5 (2002). For Sixth Amendment purposes, an actual conflict of interest should not be confused with the mere existence of a conflict as defined by a particular jurisdiction's ethical rules. The Second Circuit has drawn a distinction between actual conflicts and *"per se"* conflicts. "[A]n actual conflict of interest exists when, 'during the course of the representation, the attorney's and defendant's interests diverge with respect to material factual or legal issues or to a course of action." *Maxwell v. Racette*, 2018 U.S. Dist. LEXIS 148552, at *25-26 (S.D.N.Y. Aug. 29, 2018) (citations omitted). A *per se* conflict of interest exists where certain facts about a defense attorney's status prompts a disabling conflict that raises the possibility that the attorney will be unwilling or unable to effectively represent the defendant. *See, e.g., Cardoza v. Rock*, 731 F.3d 169, 183 (2d Cir. 2013). "We have observed that the *per se* rule applies 'when an attorney is implicated in the crimes of his or her client' because 'the attorney cannot be free from fear that a vigorous defense should lead the prosecutor or the trial judge to discover evidence of the attorney's own wrongdoing.'" *Id.*, quoting *United States v. Fulton*, 5 F.3d 605, 611 (2d Cir. 1993).

A criminal defense attorney is typically in the best position to make the initial decision as to whether a conflict of interest exists or is likely to develop in the course of trial. Once a potential conflict has been identified, the defendant must be informed of the relevant facts surrounding the conflict and advised of the likely consequences of the perceived conflict. In addition, the defense attorney (and/or prosecutor) is expected to promptly advise the court of the existence and nature of any conflict which has the potential to impede defense counsel's ability to properly defend his client.

Informed by Learned Counsel of the specter or existence of an actual or potential conflict of interest, the Court appointed independent *Curcio* counsel who conducted an inquiry summarized in this Report. The Court now must determine whether any actual conflicts or potential for conflict have arisen and whether continued representation by conflicted counsel are likely to impede the fairness and integrity of this capital case.

15

Should the Court conclude that defense counsel's representation is affected by an actual conflict or a serious potential for one, the Court must conduct a *Curcio* hearing and inquire into whether the conflict is one that may be waived. The Court must inquire whether Mr. Tartaglione has been informed of the conflict, whether he has a full understanding of the nature of the conflict, and whether he is aware of his constitutional right to conflict-free counsel. The Court must question Mr. Tartaglione to determine whether he will proffer a waiver of that conflict and then determine whether such waiver is made knowingly, intelligently, and voluntarily. Finally, the Court must then decide whether to accept Mr. Tartaglione's proffered waiver or disqualify and remove conflicted counsel. *See, e.g., United States v. Rivera*, 571 Fed. Appx. 55, 60 (2d Cir. 2014), *cert denied*, 190 L. Ed. 2d. 352 (2014); *United States v. Zarrab*, 15 Cr. 867, 2017 U.S. Dist. LEXIS 51762, at *14 (S.D.N.Y. Mar. 28, 2017); *United States v. Lussier*, 71 F.3d 456, 461 (2d Cir. 1995).

## Conclusion

*Curcio* counsel has met with Mr. Tartaglione numerous times. *Curcio* counsel has discussed the conflict areas with Mr. Tartaglione, advised him of the implications and potential risks in being represented by conflicted counsel, informed him of his right to proceed with other counsel and his right to waive such conflicts. *Curcio* counsel had explained what is likely to occur during a *Curcio* hearing in this case and the nature of questions the Court may ask him.

The Court has given Mr. Tartaglione ample time to meet with *Curcio* counsel and to digest the risks of proceeding with conflicted counsel. Mr. Tartaglione is prepared to elicit a narrative statement reflecting his understanding of the conflict areas and his right to effective representation by conflict-free counsel and to respond to questioning by the Court.

Mr. Tartaglione has informed *Curcio* counsel that he intends to waive any conflict and wishes to proceed with representation by Attorney Barket, his retained counsel of choice.

Please contact me with any questions or requests for further information.

Respectfully submitted:

BOBBI C. STERNHEIM

16

# EXHIBIT 28

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------

UNITED STATES OF AMERICA,      :    **AFFIDAVIT OF JAY SALPETER**

          -against-        :

                       :    16-CR-832 (KMK)

NICHOLAS TARTAGLIONE,     :

          Defendant.    :

---------------------------------

STATE OF NEW YORK    )
                   : SS.:
COUNTY OF NASSAU    )

1. My name is Jay Salpeter and I am a licensed Private Investigator (11000041048) in the state of New York.

2. I have worked with Bruce Barket on several matters over the course of the last 25 years.

3. On July 29, 2019, Bruce contacted me to request my assistance in obtaining hand writing exemplars for Jeffrey Epstein.

4. I made several attempts to locate an exemplar and was met with negative results.

5. Within several hours of his initial request, I contacted Bruce to let him know that I was unable to obtain the exemplars.

_JAY SALPETER_

_Sworn to me this_ 15 _day of January, 2020
in the County of Nassau, State of New York_

Notary Public

LENSKA RODRIGUEZ
NOTARY PUBLIC, State of New York
No. 01RO6147462
Qualified in Suffolk County
Commission Expires June 5, _2022_

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

UNITED STATES OF AMERICA,      :    **AFFIDAVIT OF**
                                      :    **WILLIAM FLANAGAN**

   -against-                  :

                                        :    16-CR-832 (KMK)

NICHOLAS TARTAGLIONE,        :

           Defendant.    :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

STATE OF FLORIDA        )
                           : ss.:
COUNTY OF PALM BEACH  )

1. My name is William Flanagan and I am a licensed Private Investigator in the state of New York.

2. I have worked with Bruce Barket on several matters over the course of the last 5 years.

3. On July 28, 2019, Bruce contacted me to request my assistance in obtaining hand writing exemplars for Jeffrey Epstein.

4. I made several attempts to locate some exemplars but unfortunately, after several attempts, my efforts were unsuccessful.

5. After several hours I contacted Bruce to let him know that I was unable to obtain the exemplars.

_____
**WILLIAM FLANAGAN**

*Sworn to me this* 15 *day of January, 2020*
*in the County of Palm Beach, State of Florida*

_____
Notary Public

EVELYN RENTA
MY COMMISSION # GG 079609
EXPIRES: March 6, 2021
Bonded Thru Notary Public Underwriters

# EXHIBIT 29



BARKET EPSTEIN KEARON ALDEA & LoTurco, LLP

666 OLD COUNTRY ROAD, SUITE 700
GARDEN CITY, NEW YORK 11530
516.745.1500 • [F] 516.745.1245
WWW.BARKETEPSTEIN.COM

ADDITIONAL OFFICES:
EMPIRE STATE BUILDING, NY, NEW YORK
HUNTINGTON, NEW YORK
ALL MAIL TO GARDEN CITY ADDRESS

January 16, 2020

**BY HAND**

**TO BE FILED EX PARTE AND UNDER SEAL**

The Honorable Kenneth M. Karas
United States District Court Judge
United States District Court for
the Southern District of New York
The Hon. Charles L. Brieant Jr.
Federal Building and United States Courthouse
300 Quarropas Street
White Plains, New York 10601

> Re:  *United States v. Tartaglione*;
>       No. 7:16-cr-00832 (KMK).

Your Honor,

I write in response to the Court's directive to articulate our position about what portions of *Curcio* Counsel's report may be provided to the Government.[1]  On behalf of my client, Nicholas Tartaglione, whom I have consulted on this matter, I cannot join appointed counsel in their position that the report, in its present form and in its entirety, should be disclosed to the Government. I oppose disclosing the report in its present form – and particularly the sections of the report pertaining to the Epstein note – for three broad reasons, which are further detailed below: (1) the report contains significant factual errors, which form the basis for, and taint, the report's conclusions; (2) the report contains, and its conclusions are based upon, incorrect statements of law and clearly inapplicable rules or regulations; and (3) the disclosure of the portions of the report pertaining to the Epstein note would prejudice Mr. Tartaglione.

---

[1] To be clear, we write now to answer the Court's specific question, and will write to address the report and its conclusions in greater detail once the Court rules on this preliminary question and once a full record of the alleged potential or actual conflicts is developed.

1

While I agree that the Government has an interest in protecting the validity of any conviction it obtains in this case, there is no justification for furnishing the Government with a report premised on clear factual and legal errors, which form the foundational underpinnings for its conclusions of the existence of "areas of conflict."[2] Indeed, prior to this Court's determination that there is an actual or potential conflict in this case – which should not be made on the basis of the report in its present form, and prior to full briefing by counsel -- disclosure of the report to the Government simply cannot be justified, as it would result in the disclosure of confidential and privileged information, against Mr. Tartaglione's express direction and, potentially, to his detriment, while serving no countervailing interest.[3]

## I.    THE *CURCIO* REPORT CONTAINS SIGNIFICANT FACTUAL ERRORS THAT UNDERMINE THE VALIDITY OF ITS CONCLUSIONS AND MILITATE AGAINST ITS DISCLOSURE TO THE GOVERNMENT IN THIS FORM.

*Curcio* counsel's report contains several significant misstatements of fact, specifically discussed and detailed below. Because the report's conclusions are, then, premised on these inaccurate facts, they too are incorrect. Prior to any disclosure to the Government, these factual errors – and the conclusions based upon them – must be corrected.

### A.    THE REPORT CONTAINS SIGNIFICANT MISSTATEMENTS OF FACT ABOUT THE CIRCUMSTANCES UNDERLYING THE DISCOVERY, REMOVAL, AND NON-DISCLOSURE OF THE EPSTEIN NOTE

In her report, *Curcio* counsel states, as fact, that: (1) "during a legal conference at the MCC, Mr. Tartaglione told Attorney Barket that he had found a handwritten note *in a book belonging to Epstein* in the cell they shared prior to Epstein's alleged suicide attempt" (*Curcio* Report at 7, emphasis added); (2) that the Epstein note was removed "from a scene under investigation" (*Curcio* Report at 8); and (3) that I thereafter took measures to "conceal" the note. These "facts" are then used by *Curcio* counsel, in a series of escalating inferences, to draw conclusions that I engaged in improper conduct, that I had improper motives, and that this exposes me to possible ethical, civil, or criminal consequences that create potential or actual conflicts between me and my client.

Specifically, based on her statement that Mr. Tartaglione told me that he had found the Epstein note in "a book belonging to Epstein" (*Curcio* Report at 7), *Curcio* counsel concludes that (a) the note "did not belong to Mr. Tartaglione" (*id.*), (b) the note was, therefore, contraband, as it was not "received

---

[2] The attached report of Michael Ross (attached as Exhibit A) underscores this point. Addressing the same issues as *Curcio* counsel, but based upon verifiably correct facts, the current MCC rules and regulations, and well-settled interpretations of the relevant Rules of Professional Conduct, Mr. Ross reaches opposite conclusions. This is not just a common disagreement between experts. Where the correct facts and law are unassailable, all counsel must base their conclusions and arguments upon them.

[3] While the Government is generally involved in *Curcio* issues from their inception, as they are usually the party that brings the issue to the Court's attention and requests a hearing, the posture of this case – where the allegation of conflict is levied by co-counsel – appears to be unprecedented.

2

through approved channels" (*id.* at 8), (c) since Mr. Tartaglione "told" me that he found the note in Epstein's book, I knew or should have known, that removal of the note from MCC was improper,[4] and (c) my involvement in the note's improper removal creates a conflict, as it makes me "an unsworn witness to events material to evidence to be presented at the penalty phase concerning prison adjustment" and, "exposes [me to professional disciplinary proceedings, administrative and criminal investigations, and wrongful death claims" (*id.* at 9-10).

Similarly, *Curcio* counsel's factual claim that the note was removed "from a scene under investigation" (*Curcio* Report at 8), further buttresses her assertion that its removal was improper, and, more significantly underlies her assumptions that, (a) but for its removal, the note would have been found by BOP staff, (b) that it constituted "written ... behavior suggestive of suicide" that "bear[s] directly on decisions whether to return [Epstein] from suicide watch or place him alone in a cell" (*id.* at 9, citing BOP Suicide Prevention Program Statement, Number 5324.08, at 10), and (c) that BOP medical staff and supervisory officers "will likely claim that had they been in possession of the Note, it would have been relevant to their assessment of Epstein and may have prevented his death" (*Curcio* Report at 9).

Finally, *Curcio* counsel's repeated factual recitation of my supposed attempts to "conceal" the note – first from BOP staff, then from *Curcio* counsel (*Curcio* report at 9, 12) – not only buttresses her conclusion of wrongful conduct by suggesting the existence of an improper motive, but also directly forms the basis for her conclusion that my "decisions and actions conflict with interests of a defendant facing the death penalty" and "diverge from and can compromise legitimate interests of a death-authorized defendant" (*Curcio* Report at 9).

But because all three of the key factual assertions underlying *Curcio* counsel's discussion of the Epstein note are flatly incorrect, the series of escalating conclusions she premises upon these factual errors are fatally compromised, and collapse like a house of cards. The relevant, and correct, facts underlying the discovery, removal, and non-disclosure of the Epstein note are as follows:

Jeffrey Epstein was arrested on July 6, 2019, and, within a few days, was placed in Mr. Tartaglione's cell. On July 23, at approximately 1:30 a.m., Epstein tried to hang himself, but the noose fashioned from bedsheets apparently broke and he fell. Mr. Tartaglione, who had been sleeping, woke up, and found Epstein unresponsive but with a noose around his neck.  Mr. Tartaglione immediately alerted BOP personnel, who removed Epstein and Mr. Tartaglione from the cell. Mr. Tartaglione was interviewed immediately thereafter, and told BOP personnel some of what he had observed.  BOP personnel then searched the cell and, I believe, took photographs of it.[5]  During this search and investigation, Mr. Tartaglione was kept out of the cell for several hours.  At some point later that day,

---

[4] *Curcio* counsel does not directly state this proposition, but it is suggested by her analysis.

[5] The guards were observed entering the cell with hand held cameras, something I believe would have been depicted had the surveillance video been preserved.  The MCC, however, has denied that any hand held cameras were used.

3

Mr. Tartaglione was allowed to return to the cell. He stayed there alone for a few days, and then was given a new cellmate. Mr. Tartaglione discovered the note *long after the guards had completed their search of the cell*, days after he had been returned to it, and after the BOP had already placed Epstein on suicide watch. Notably, BOP personnel *never* returned to search the cell at any time thereafter – either before or after Epstein's suicide.

On July 24th at about 10:45 p.m., I received several messages from NBC news channel 4 saying that they were going to run a story based on information from "law enforcement sources" that Mr. Tartaglione had attacked Epstein. I told them that the story was false, but declined to provide any details about what took place. By the morning of July 25, this story was headline news, and was being widely reported on TV and in print. I had already discussed the matter with Mr. Tartaglione, and I believed the story to be false and very damaging to my client. I decided to refute the account without revealing the details I learned from Mr. Tartaglione, and to use the opportunity to bring public attention to the ongoing terrible conditions at MCC. Learned Counsel strongly disagreed with my decision, but I concluded that it was in Mr. Tartaglione's best interest to respond to the stories in the press which were going to run with or without my comments.

On July 27, 2019, at 8:00 a.m., during a visit at MCC, Mr. Tartaglione told me, "Epstein left me a note." When I inquired further, he described it as "not really a suicide note" but a note that "talks about suicide," and said he found it in "one of *my* books." But Mr. Tartaglione forgot to bring it down from his cell to the legal visiting area. Mr. Tartaglione expressed to me that he believed Epstein had written the note before he attempted suicide on July 23, and left it for Mr. Tartaglione. I believed that this assumption would have been reasonable under the circumstances Mr. Tartaglione described to me, because Epstein placed the note *inside Mr. Tartaglione's book* – a place he would have expected Mr. Tartaglione, rather than BOP personnel, to find it – and, presumably, Epstein did not expect to survive the attempt. However, under the circumstances – and given the timing of the note's discovery in the midst of widely-reported allegations that Mr. Tartaglione had assaulted Epstein – I also had serious concerns about the note's authenticity. Thus, while I believed that the note might provide evidence to counter these serious allegations against Mr. Tartaglione, and might therefore be beneficial to him, I was also afraid that the note was a forgery. Under these circumstances, I determined that I needed to see the note to authenticate it.

Accordingly, during our meeting on July 27, Mr. Tartaglione and I asked the guards to allow Mr. Tartaglione to go upstairs and get it, but they denied the request. So I told Mr. Tartaglione to give it to the next lawyer who visited him. Once I left the jail, I texted John Weider and asked him to call me. I knew that Weider was planning to visit Mr. Tartaglione later that day, and so I told Weider to expect Mr. Tartaglione to give him a document; I don't recall if I told him what it was, but I probably did. Whether the note was genuine or not, I believed that it was important to safeguard it[6] and not yet disclose it to

---

[6] Indeed, I was concerned that if the note remained at MCC among Nick's legal paperwork, it might be lost or discarded by staff at the jail. Just a few days earlier, I had alerted the Court that important legal work (a timeline based on the discovery) had been lost when Nick was moved to the SHU. Further, at that same Court appearance,

4

authorities – if genuine, it would be powerful evidence that could be used to clear Mr. Tartaglione of widely-spread allegations that Epstein's injuries were a product of Mr. Tartaglione's assault rather than a suicide attempt; and if a forgery, its disclosure to authorities investigating Epstein's injuries would not only subject him to additional criminal charges, but would be damning evidence at the penalty phase of his capital trial.

Later that day, Weider sent me a photograph of the note, and I forwarded a copy to co-counsel, Aida Leisenring. We immediately began trying to authenticate it, conducting research and, over the next two days, enlisting the assistance of investigators to attempt to locate documents containing Epstein's handwriting. In that regard on July 28th I contacted William Flanagan and on July 29th I contacted Jay Salpeter, both retired police offices and private investigators, with whom I had worked on a number of matters over the years. I asked each of them to try to locate a sample of Epstein's handwriting. Neither was able to do so (attached as Exhibit "B" and "C" respectively are their affidavits).[7]

On July 29, at approximately 6 p.m., Ms. Leisenring and I called Tony Ricco and advised him of the note, and discussed what to do with it. Later that evening, Ms. Leisenring spoke to Mr. Ricco again, and read him the note over the phone. On July 30, Mr. Ricco called me and we spoke for over thirty minutes during two calls. We again discussed the note and the circumstances of how it was found in detail. Mr. Ricco never advised me to disclose the note and, among other comments and instructions, raised his own concerns about its authenticity.

From August 2 to August 6, Ms. Leisenring and I were in California with the team at a death-penalty conference. The note was not discussed. On August 9, we learned that Mr. Tartaglione had been cleared in the investigation into Epstein's injuries (*See* Exhibit D, email from Adam Johnson in reply to an inquiry I made about the status of the investigation). On the morning of August 10th, Epstein – who had been on suicide watch from July 23 until July 29 – was found dead in his cell. At that time, an investigation into Epstein's suicide began.

Thus, the three key "facts" underlying all of *Curcio* counsel's conclusions relating to the Epstein note are simply wrong. First, Mr. Tartaglione found the note, and told me he found the note, in *his own book* – not in Epstein's – under circumstances where he reasonably believed it had been left for him by Epstein. Second, the note was not removed "from a scene under investigation" (*Curcio* Report at 8); rather, at the time the note was found by Mr. Tartaglione and removed from MCC, the investigation of the "scene" had been over for four days. In fact, that cell was never searched again. Third, I never

---

I told the Court that Nick was threatened by a guard and told, in sum and substance, that things will get worse if his lawyer keeps complaining about the jail conditions. Then, on July 24th I was told that "law enforcement" sources, presumably officials from the MCC, had leaked the false accusation that Nick assaulted Epstein.

[7] Since that time, but well after Epstein's death, I became confident that the note is authentic and that it was written by Jeffery Epstein. Ms. Leisenring has reached the same conclusion, but came to that belief only in the last two weeks.

attempted to "conceal" the note from BOP personnel, or from *Curcio* counsel.  When I advised Mr. Tartaglione to give the note to the next attorney that visited him, I had not yet seen it, but believed, based on Mr. Tartaglione's description of its contents, that it would need to be safeguarded and investigated.  At no point thereafter did I "conceal" the note from anyone – I simply did not take the affirmative step of *disclosing* it, under circumstances where I had no legal obligation whatsoever to do so (*see* Ross Report at fn. 21), and where I believed it was in the best interests of my client not to disclose it.[8]  Indeed, the suggestion that I "concealed" the note from other counsel is perplexing under the circumstances.  While there is no doubt that I was cautious about its dissemination because it was a highly confidential item, I nevertheless did disclose and discuss the note with Mr. Ricco less than two days after I learned of it, and I similarly disclosed and discussed the note with *Curcio* counsel upon her appointment and the expansion of the inquiry.[9]

While I also have other strong objections to the disclosure of the Epstein note to the Government on ethical and legal grounds (*see infra, Points II and III*), the existence of these serious factual errors in the report, and their tremendous impact on the validity of *Curcio* counsel's conclusions, is, even standing alone, sufficient reason not to disclose this portion of the report, in its present form, to the Government.

## B.    THE REPORT CONTAINS SIGNIFICANT MISSTATEMENTS OF FACT ABOUT THE CIRCUMSTANCES RELATING TO THE CONTRABAND TELEPHONE

*Curcio* counsel identifies, as an "area of conflict" what she perceives to be an incomplete disclosure by me, Ms. Leisenring, and/or Mr. Weider of "critical information from [our] cellular phones" relating to communications with any contraband cell phone(s) possessed by Mr. Tartaglione (*Curcio* Report at 10-11).  In this regard, *Curcio* counsel suggests that I revealed confidential information during the July 22, 2019 court appearance by disclosing the fact the Mr. Tartaglione used the contraband cell phone to text members of the defense team, despite the fact that Government believed at that time that the phone was not capable of texting.   She also seems to imply that the existence of text messages from Mr. Tartaglione to me, Ms. Leisenring, and Mr. Weider supports the conclusion that Mr. Tartaglione may have possessed a *second* contraband phone – other than the one recovered from him by BOP on July 3, 2019 – because the Government represented in July that the recovered phone was a "mini-cellphone that ... *does not have the ability to send or receive text or other written messages*" and because neither my phone number nor Ms. Leisenring's appear on the log of the call history extracted

---

[8] Underlying the concealment argument is *Curcio* counsel's suggestion that if the note had remained at the jail, it would have been found by jail personnel.  But this is refuted by the simple fact that no one at the jail searched the cell between the time Nick gave the note to Mr. Weider and the date of Epstein's suicide weeks later.  Had Nick kept the note exactly where Epstein left it, it still would have remained "concealed" from jail officials.

[9] Notably, the suggestion that the "conceal[ment]" of the note from BOP personnel potentially subjects me to ethical, civil, or criminal liability, and thereby creates a conflict of interest – because had BOP known about the note, they might not have taken Epstein off suicide watch and might, thereby, have averted his death – is an argument that applies equally to Tony Ricco and any other member of the defense team who learned of the note prior to Epstein's suicide, and did not alert BOP.  If this is a conflict, then we are all conflicted counsel.

6

from the seized phone (*Curcio* Report at 10, emphasis in original). While *Curcio* counsel does not elaborate on the specific nature of any potential conflict that might be implicated, she concludes that disclosure of all information regarding the contraband phone(s) to learned counsel is essential to permit him to prepare for the penalty phase by defending against the Government's presentation of aggravating evidence (*Curcio* Report at 10).

She also states that Mr. Weider's text communications via the contraband cellphone "make him a potential witness during the penalty phase and in connection with ongoing BOP and DOJ Investigations, and a potential subject of disciplinary proceedings" and that his "participation in removal of the Epstein Note heightens the need for review of his text communications with Mr. Tartaglione to assess their bearing on the penalty phase" for various reasons, including that these texts might "contain information related to Epstein" (*Curcio* Report at 11).

*Curcio* counsel's analysis of this issue is premised on several serious factual errors. First, *Curcio* counsel's belief that the confiscated phone was either incapable of texting, or that but for my disclosures and assertion that the texts were privileged, the Government would not have learned of its texting capabilities, is simply incorrect. The Government had the phone and the ability to obtain the phone's records, which would have revealed data transmissions as well as phone calls. It was my judgment that risk of the Government obtaining the privileged communications greatly outweighed the hope that they would never discover that the phone was capable of texting. Whatever information the Government had received in July about the texting-capacity of the contraband phone recovered from Mr. Tartaglione, the objectively verifiable facts disclosed to *Curcio* counsel by myself and Ms. Leisenring – and, presumably, by *Curcio* counsel's conversations with Mr. Tartaglione – was that the phone could be used, and was used, to text. In this regard, all of the text messages sent by Mr. Tartaglione to both myself and Ms. Leisenring came from the phone number of the confiscated contraband phone recovered from Mr. Tartaglione, and were sent during the time he possessed that phone. So there is no conflict engendered by my on-the-record "disclosures" in court that Mr. Tartaglione had sent texts.[10] It was a strategic decision and in my view the right one.

Second, *Curcio* counsel's statement about what information she had, and had not, received in response to her request for information on the texts is wholly inaccurate. In this regard, while *Curcio* counsel states that I told her that I believed that I "had not received any text communications via the contraband cellphone" this is untrue; in response to *Curcio* counsel's inquiry, Ms. Leisenring and I sent her an email outlining the communications, and explaining that I had received a single text from Mr. Tartaglione and that I had briefly responded (*see* Exhibit F). Conversely, while *Curcio* counsel reports being provided with copies of screen shots of texts from Mr. Tartaglione to Ms. Leisenring, this is also untrue. We declined to provide those for the reasons stated in the same email. *Curcio* counsel's conclusions about the existence of possible conflicts due to incomplete disclosure are seriously undermined when her report reveals her lack of knowledge of the materials in her possession.

---

[10] Recently, the Government has indicated that the BOP has forensic reports from the phone and its SIM card (*see* an email attached as exhibit "E" from Jason Swergold).

7

Third, *Curcio* counsel's conclusion that the text messages between Mr. Weider and Mr. Tartaglione via the contraband cell phone may contain references to Mr. Epstein, and thus create heightened concern for conflict, is based on a fundamental factual impossibility: these texts could not possibly contain any reference to Mr. Epstein because the contraband phone was seized, and Mr. Tartaglione was placed in SHU, *before* Mr. Epstein was even arrested.

Thus, while I do not object conceptually to the disclosure to the Government of the portions of a report by *Curcio* counsel pertaining to the contraband cellphone, as, indeed, the Government already has all the substantive information concerning the phone, I do object to the disclosure of *this report*, which is premised on significant and verifiable misstatements of fact.

## II. THE *CURCIO* REPORT CONTAINS SIGNIFICANT ERRORS OF LAW THAT UNDERMINE THE VALIDITY OF ITS CONCLUSIONS AND MILITATE AGAINST ITS DISCLOSURE TO THE GOVERNMENT IN THIS FORM.

In addition to its factual errors, the *Curcio* report is also tainted by significant misstatements of governing law, which further undermine the validity and reliability of its conclusions, and further militate against its disclosure to the Government in this form.

## A. IN CONCLUDING THAT THE EPSTEIN NOTE WAS "CONTRABAND" THE REPORT RELIES ON AN OUTDATED AND INAPPLICABLE REGULATION FOR THE SPRINGFIELD MISSOURI MEDICAL FACILITY, RATHER THAN THE CURRENT REGULATIONS OF THE MCC.

Key to *Curcio* counsel's conclusions that the Epstein note "invites a serious potential for conflict between client and counsel" and is the "crux of concern regarding conflict" (*Curcio* Report at 8-9, 10) is her assertion that "according to BOP Guidelines, that the Epstein Note qualifies as contraband" (*Curcio* Report at 8). Problematically, however, the definition of "contraband" provided in the report cites to a segment of a regulation from an outdated handbook for the medical facility in Springfield, Missouri (*id.*, citing https://www.bop.gov/locations/institutions/spg/SPG_aohandbook.pdf, 2012 edition). The current edition is at https://www.bop.gov/locations/institutions/spg/spg_ao_handbook050917.pdf, and became effective in 2017. Notably, the current edition *removed* the definition of contraband cited by *Curcio* counsel. Neither version, however, applies to the MCC in 2019.

As carefully detailed in the annexed Report of Michael Ross, and directly contrary to *Curcio* counsel's assertion, the outdated Missouri handbook cited by *Curcio* counsel does not constitute or contain any "BOP Guidelines" – to the contrary, it specifically states in its introduction that the handbook "is *not* a specific guide to the detailed policies of the Bureau" (*See* Ross Report at 12, citing Handbook at p.1, emphasis added). Nor is the Missouri handbook applicable to the MCC, which publishes its own handbook of rules for inmates housed at its facility (*See* Ross Report at 11, citing MCC

8

Manual, at https://www.bop.gov/locations/institutions/nym_aohandbook.pdf).[11] Notably, neither the applicable BOP Regulations nor the MCC handbook contain the definition of "contraband" cited by *Curcio* counsel in her report, and, indeed, as explained in the annexed report of Michael Ross, pursuant to the applicable rules and regulations, the Epstein Note was not contraband (Ross Report at 9-11).

With this glaring misstatement of law forming the foundation of its conclusions regarding the potential conflicts engendered by the Epstein note, the Report, in its present form, should not be disclosed to the Government.

**B.    IN CONCLUDING THAT AN AREA OF CONFLICT IS CREATED BY RETAINED COUNSEL'S ABIDING BY MR. TARTAGLIONE'S INSTRUCTIONS TO NOT DISCLOSE CERTAIN INFORMATION TO CO-COUNSEL, THE *CURCIO* REPORT RELIES ON A MISSTATEMENT OF RULE 1.6**

*Curcio* counsel asserts that the "[d]efense of Mr. Tartaglione is compromised when Attorney Barket justifies decisions by asserting that he is following the wishes of Mr. Tartaglione in compliance with ethical rules" (*Curcio* Report at 12). According to the *Curcio* report, my "claim of compliance with ethical rules should not shield [me] from disclosure of information requested by Learned Counsel nor should it support an attorney-client privilege for the Barket Firm separate and distinct from Learned Counsel in the joint representation of a single capital defendant" (*id*. at 12-13). *Curcio* counsel's conclusion in this regard is premised on her assertion – unsupported by any authority or case law – that "Rule 1.6 of the New York Rules of Professional Conduct does not apply to attorneys on the same defense team" (*Curcio* Report at 13). The *Curcio* report's understanding of Rule 1.6 is, simply, wrong.

Contrary to the *Curcio* report's statement of the law, Rule 1.6 contains no limitation or exception for "attorneys on the same defense team" and explicitly prohibits a lawyer from knowingly revealing "information that the client has requested be kept confidential" unless disclosure is required by the Rules, some other law, or court order (*see* Rule 1.6). Here, given Mr. Tartaglione's explicit directive that certain confidential information not be disclosed to Learned Counsel, I am ethically bound to follow his wishes.

*Curcio* counsel's reasoning suggests that she believes that Learned Counsel is necessarily exempted from the rule pursuant to Rule 1.6(a)(2), which authorizes disclosure where it is "impliedly authorized to advance the best interests of the client *and* is either reasonable under the circumstances or customary in the professional community" (emphasis added). According to the *Curcio* Report's reasoning, this exception would be satisfied here because sharing information with Learned Counsel is in the best interest of Mr. Tartaglione –indeed, a failure to do so "diverge[s] from and can compromise legitimate interests of a death-authorized defendant" (*Curcio* Report at 12) – and such cooperation of

---

[11] Indeed, it is curious that *Curcio* counsel did not find the MCC manual, as it is located on the same main bop.gov website, under the list of "locations" and then by selecting "New York MCC" rather than "Springfield MCFP" from the list provided.

9

co-counsel, particularly in a capital case, is both reasonable and customary in the community (*id.* at 13, explaining obligations and responsibilities of capital counsel).

However, this reasoning is premised on a fundamental oversight by *Curcio* counsel: disclosure cannot be "impliedly authorized" where it has been *explicitly forbidden* as a result of the client's specific request that it be kept confidential. This common sense principle is not just evident from the plain language of the Rule, but also from other authorities and comments interpreting it and analogous provisions (*see* Ross Report at 16-20, collecting and discussing authorities). Indeed, Comment 5 to Rule 1.6 clearly articulates that even in circumstances where lawyers can share client information with each other as a matter of practice —such as when they are part of one firm, equally bound by privilege and confidentiality — they may not do so if the "client has instructed that particular information be confined to specified lawyers." This proposition is equally applicable here, and directly contradicts the *Curcio* Report's assertion that the sharing of a "single attorney-client privilege" by two attorneys — which occurs when lawyers are on the same defense team, just as it does when they are in the same law firm — would obviate the applicability of the Rule.

Thus, because this portion of the report is premised on a significant error of law, it should not be disclosed to the Government in its present form.[12]

## C.  AT ITS CORE, THE REPORT IS PREMISED ON A FUNDAMENTAL MISUNDERSTANDING OF THE ROLE AND RIGHT OF MR. TARTAGLIONE'S RETAINED COUNSEL TO MAKE STRATEGIC DECISIONS ON HIS BEHALF, AND IMPROPERLY FINDS "CONFLICT" IN EVERY STRATEGY WITH WHICH APPOINTED COUNSEL DISAGREES.

The Report at its foundation misunderstands the role of Mr. Tartaglione's counsel of choice and thereby converts sound strategic decisions (which should not be shared with anyone, particularly the Government) into "conflicts" simply because the strategy is not shared by appointed counsel. Much of the report criticizes me, Mr. Tartaglione's retained counsel, for making strategic choices, and because they are different from the choices Learned Counsel advised, structures these decisions as conflicts.

For example, the report describes certain statements I made to the media, and in conclusory fashion asserts that the statements conflict with Mr. Tartaglione's interests (*Curcio* Report at 12, 6-7). However, it is beyond cavil that pursuant to Rule 1.6(a)(2), I had both express and implied authority to

---

[12] Additionally, it should be noted that the report contains numerous statements attributed to Nick concerning the Epstein note which were initially made to me, then shared with Learned Counsel (who in turn apparently shared them with all appointed counsel, resource counsel, and others), and, ultimately with *Curcio* Counsel, under the *explicit understanding* that those statements were protected by Rule 1.6. Nonetheless, *Curcio* Counsel shared them with the Court, and now appointed counsel is advocating that they be distributed to the Government. Nick strongly objects to this. If some version of the report is ultimately shared with the Government, we would urge the construction of a "hypothetical" that provides the Government with the facts necessary to participate meaningfully in any hearing, but still protects the privileged statements.

disclose to the press that Mr. Tartaglione possessed a great deal of information about the death of Mr. Epstein, and to use the press to advance Mr. Tartaglione's interests (see full discussion in Ross Report at 5-8). In this regard, the *Curcio* report's suggestion that my statements to the press somehow create a conflict between me and Mr. Tartaglione because "imbedded in these statements is information concerning [the Epstein note]" is simply puzzling. My statement that "Mr. Tartaglione knows a heck of a lot about what went on" – highlighted by *Curcio* counsel as implicating the Epstein note – does no such thing. Indeed, the very next quoted line explains that this knowledge is derived from the fact that Mr. Tartaglione "was there during the first attempt and he was there when he actually killed himself – he just wasn't in the same cell" (see *Curcio* Report at 6, citing article). So too, my statement that "the correction officers know [Mr. Tartaglione] has information potentially very damaging to the very people now charged with guarding him or their coworkers" (see *id.*, citing article) makes no hint or allusion to the existence, or content, of the Epstein note. Indeed, it too is informed by the context of the line above it, stating that Mr. Tartaglione's basis of knowledge is "the attempted suicide to which he was witness," and his direct knowledge "about how the facility is run and the conditions under which the inmates are forced to live." (*id.*).

Instead of being buttressed upon any reasoned analysis of Rules 1.6, 3.6, or the advocate-witness rule, the report's conclusions about the existence of a possible conflict as a result of my communications with the media are, as with other identified areas of conflict, actually premised on the *Curcio* counsel's concern that my strategic decisions conflicted with the opinion and advice of appointed counsel.

The report lays bare the true source of its concern on page 12, where it lists the various "obstacles" to effective representation, and thereby reveals the inherent misunderstanding that *Curcio*, like other appointed counsel, has with respect to retained counsel's role. Contrary to their understanding, and in direct response to *Curcio* counsel's list:

1. I have the right to either speak to the press, or not, in an attempt to forward my client's interests. Here, I thought it imprudent to allow the false allegation that Mr. Tartaglione assaulted Mr. Epstein to go unrebutted. Appointed counsel vehemently disagreed and voiced their views. I evaluated their opinions and rejected them.

2. I have the obligation to articulate a good faith position regarding the appointment of *Curcio* counsel, which I have done. Suggesting that the only reasonable, conflict-free, position is that of the appointed counsel (something that is at the heart of virtually all the issues dividing counsel) ignores the obligations I have as Mr. Tartaglione's lawyer.[13]

---

[13] Indeed, the assignment of *Curcio* counsel, and the resulting inquiry – which is far from over, according to Learned Counsel, who expects it to continue even into an interlocutory appeal – has not only resulted in the disclosure of confidential information against Mr. Tartaglione's express instruction and contrary to his interests, but has also consumed hundreds of hours of all counsels' time that, Mr. Tartaglione believes, would have been better spent working on his defense, and threatens to delay Mr. Tartaglione's trial, which upsets him greatly.

11

3. It is simply inaccurate to say I "withheld" information about the Epstein note. *All* of the information about the note was disclosed by *me*, first to Learned Counsel, then to *Curcio* Counsel.

4. Following my client's directive and my own best judgment to withhold confidential information (the Epstein note) from individuals who refused to promise to keep it confidential, or unless ordered to disclose it by the court, is not a conflict or potential conflict. Further, *Curcio* counsel has not articulated any purpose in obtaining a copy of the note nor any shortcoming in her report because she was only shown the note and permitted to precisely copy its contents, but was not given a physical copy to take with her and then to disseminate as she saw fit.

Indeed, the depth of the report's fundamental misunderstanding of my role as retained counsel is crystalized on page 13, when *Curcio* counsel criticizes me for "withholding information [presumably text messages, the Epstein note and other information] needed to develop penalty phase evidence" and states that "capital counsels are obligated to conduct an investigation..." into penalty phase evidence. Contrary to *Curcio* and appointed counsels' understanding, this is a nonsensical statement; for *I* am Mr. Tartaglione's lawyer and I am "obligated to conduct," and am actively conducting, the investigation into penalty phase evidence while we prepare to vigorously contest his guilty in the liability phase. I cannot "withhold" information needed, because I have the information. That I have decided to share or not to share any part of the confidential information with any of the lawyers in my office, or with appointed counsel—either because I am obligated to do so or not to do so at Mr. Tartaglione's direction, or simply because I think it is appropriate under the circumstances—is part of the responsibility I carry as Mr. Tartaglione's lawyer. I am not the lawyer for a part of the case, as the *Curcio* report suggests; I am the lawyer for all of the case.

## III.    DISCLOSURE OF THE PORTIONS OF THE REPORT RELATING TO THE EPSTEIN NOTE WOULD PREJUDICE MR. TARTAGLIONE

While the factual and legal errors permeating the report militate against its disclosure in its present form, the disclosure of the Epstein note to the Government suffers an additional problem – it would irreparably prejudice Mr. Tartaglione.

Lost in the avalanche of words about "protecting Mr. Tartaglione's interests" which underlie this report and accompany the last five months of this inquiry, is the need to actually *act* to advance Mr. Tartaglione's objectives.

The Epstein note has a value to the Government that increases with each new conspiracy theory about how Jeffrey Epstein died. Demonstrating that Epstein had suicidal thoughts before his suicide attempt on July 23, coupled with other information Mr. Tartaglione possesses, it is the type of

12

information in this political atmosphere that can be used to try to negotiate a benefit for our client.[14] The proposition that we should just hand it over to the Government – contrary to Mr. Tartaglione's express wishes, with no legal or ethical obligation to do so, and without thereby obtaining any conceivable benefit to Mr. Tartaglione – because of the flawed view that it may represent "an area of potential conflict" is, in my view, unwise.

## CONCLUSION

I recognize that this preliminary letter does not address many of the questions that the Court may have, and I specifically did not address a number of factual errors and legal errors which may be the subject of dispute between retained counsel and appointed counsel. I simply tried to present enough facts to give an accurate context of the events. The Court should not assume that we adopt or agree with the facts or conclusion reached by *Curcio* counsel beyond those we discussed.

In sum, the report in its present form should not be provided to the Government.

Respectfully submitted,

_____/s/_____

Bruce Barket
BARKET EPSTEIN KEARON ALDEA & LOTURCO, LLP
Attorneys for Nicholas Tartaglione

---

[14] In fact, I have begun, although thus far not successfully, to try and persuade the prosecutors investigating Epstein's suicide to speak to Mr. Tartaglione (of course with the appropriate protections). Even if ultimately unsuccessful, it would be a dereliction of my duty not to try.

13

# EXHIBIT A

# EXHIBIT A

LAW OFFICES OF
MICHAEL S. ROSS
ONE GRAND CENTRAL PLACE
60 EAST 42ND STREET
FORTY-SEVENTH FLOOR
NEW YORK, NY 10165

TELEPHONE
(212) 505-4060
FACSIMILF
(212) 505-4054
E-MAIL
michaelross@rosslaw.org

January 16, 2020

BY HAND

TO BE FILED EX PARTE AND UNDER SEAL

The Honorable Kenneth M. Karas
United States District Court Judge
United States District Court for
the Southern District of New York
The Hon. Charles L. Brieant Jr.
Federal Building and United States Courthouse
300 Quarropas Street
White Plains, New York 10601

Re:     *United States v. Tartaglione*;
        No. 7:16-cr-00832 (KMK).

Dear Judge Karas:

A.    INTRODUCTION.

I am submitting this letter in connection with the December 30, 2019 Report of Bobbi C. Sternheim, Esq. (the "Report"), who was appointed by this Court to serve as Curcio Counsel to Mr. Tartaglione. As Your Honor is aware from statements made by various counsel, my firm's practice has focused on issues relating to attorney ethics and professional responsibility for many years,[1] and I was retained as special professional responsibility counsel to represent Bruce Barket, Esq., and his firm, Barket Epstein Kearon Aldea & LoTurco, LLP (collectively the "Barket Firm") to assist them in addressing issues which arose and have continued to arise in connection with their representation of Mr. Tartaglione. The Report focuses on certain issues as to which I have views which support the notion that Mr. Barket acted ethically.

---

[1]My background and experience in the field of attorney ethics and professional responsibility are set forth in my *curriculum vitae*, a copy of which is attached hereto as "Exhibit A."

LAW OFFICES OF
MICHAEL S. ROSS

Honorable Kenneth M. Karas
January 16, 2020
Page 2

      I advised Mr. Barket early on that he was limited in providing information to the Court to address many of the statements and concerns raised by his co-counsel in this case.[2]  No formal accusation of misconduct had been made against Mr. Barket and it was clear that he would eventually be expected to address a Report to be issued by Curcio Counsel.  It was only then that Mr. Barket would be permitted, pursuant to Rule 1.6(b)(5)(i) of the New York Rules of Professional Conduct (the "Rules"),[3] to reveal confidential information.  See, e.g., ABA Formal Opinion 10-456 (July 14, 2010) (ABA expressed the view that a criminal defense attorney whose ex-client brings an ineffective assistance claim may not *unilaterally* provide information about the client's case to the prosecution); Azzara v. United States, 2011 U.S. Dist. LEXIS 10971, at *5-6 (S.D.N.Y. 2011) (adopting the position of the ABA Opinion); Virginia State Bar Standing Committee on Legal Ethics Opinion 1859 (Jun. 6, 2012) (adopting the ABA Opinion's position).

      This letter is not intended to serve as a comprehensive response to the Report; rather its purpose is to provide the Court with an overview of key issues, which, in my view, provide a broad and supportive view of Mr. Barket's ethical conduct in this matter.

      In particular, I will be addressing certain issues that have been raised by the Report and Mr. Barket's co-counsel concerning Mr. Barket's conduct with respect to:

- Mr. Barket's statements to the press, including statements acknowledging that Mr. Tartaglione possessed a great deal of information about the death of Jeffrey Epstein, his cellmate at the New York City Metropolitan Correction Center ("MCC"); and

---

[2]Curcio Counsel's Report at pp. 7-8, n.1, notes that Mr. Barket did not "reveal" why I had been retained as ethics counsel.  I have been advising Mr. Barket on aspects of this case which have *not*, and are *not*, focused on issues of whether he has personal exposure in any respect.  Rather he consulted me on issues relating to matters which are privileged as between him and Mr. Tartaglione and, derivatively, with me.  However, when the issue surrounding Mr. Barket's statements to the media arose in the context of the Epstein note and related issues, I began my work to examine the issues raised by co-counsel.

[3]The New York Rules of Professional Conduct apply to the conduct of attorneys appearing before the United States District Court for the Southern District of New York.  See Rule 1.5(b)(5)(i) of the Local Rules of the Southern and Eastern District Courts of New York.  Rule 1.6(b)(5)(i) provides that:  "A lawyer may reveal or use confidential information to the extent that the lawyer reasonably believes necessary … to defend the lawyer or the lawyer's employees and associates against an accusation of wrongful conduct."

LAW OFFICES OF
MICHAEL S. ROSS

Honorable Kenneth M. Karas
January 16, 2020
Page 3

- Mr. Barket's involvement in having Mr. Tartaglione provide to his civil counsel who visited him at the MCC a note that was given to Mr. Tartaglione by Mr. Epstein (the "Epstein note"), and then having John Weider, Esq., remove the Epstein note from the MCC.

It appears that the Report suggests that Mr. Barket was not ethically permitted pursuant to Rule 1.6 of the New York Rules of Professional Conduct (the "Rules")[4] to make statements to the press, including information that Mr. Tartaglione possessed regarding Mr. Epstein; and Mr. Barket's conduct was improper and contrary to prison rules and regulations.

As I demonstrate below:

- Mr. Barket had both express and implied authority pursuant to Rule 1.6(a) to speak to the press about information which Mr. Tartaglione possessed in connection with Mr. Epstein's attempted suicide and his ultimate suicide; and

- Mr. Barket was bound by Rule 1.6 to follow Mr. Tartaglione's directive not to share with his co-counsel all of the information he learned in the case.

### B. THE FACTS RELEVANT TO MY VIEWS EXPRESSED IN THIS LETTER.

The facts most relevant to my views as set forth in this letter can be described briefly[5] as follows:

---

[4] For purposes relevant here, Rule 1.6(a) provides that: "A lawyer shall not knowingly reveal confidential information, as defined in this Rule, or use such information to the disadvantage of a client or for the advantage of the lawyer or a third person, unless: (1) the client gives informed consent, as defined in Rule 1.0(j); (2) the disclosure is impliedly authorized to advance the best interests of the client and is either reasonable under the circumstances or customary in the professional community...."

[5] I am disclosing in this letter *only* the information necessary to address the suggestion that Mr. Barket acted improperly, pursuant to Rule 1.6(b)(5)(i), which permits lawyers to reveal confidential information of a client only to the extent necessary to defend the lawyer against accusations of misconduct. As one court explained, "the right to part the curtain of confidentiality [in the context of Rule 1.6's self-defense provision] must be sparingly applied. It extends only to the bare minimum 'necessary to accomplish [its] purpose.'" Helie v. McDermott, Will & Emery, 18 Misc. 3d 673, 682 (Sup. Ct. N.Y. Co. 2007) (citations omitted).

LAW OFFICES OF
MICHAEL S. ROSS

Honorable Kenneth M. Karas
January 16, 2020
Page 4

On July 27, 2019, following Mr. Epstein's suicide attempt on July 23, 2019, and before his death on August 10, 2019, Mr. Tartaglione advised Mr. Barket that Mr. Epstein had given him a note personally written by Mr. Epstein (by placing the note in one of Mr. Tartaglione's books), and the contents of that note indicated that Mr. Epstein was despondent and expressing thoughts about suicide.    This information seemed to Mr. Barket to be relevant to his representation of Mr. Tartaglione because Mr. Barket understood at the time that:  1) the MCC was conducting an internal investigation into the circumstances of how Mr. Epstein became injured on July 23rd and that the media coverage of the incident stated or implied that Mr. Tartaglione had assaulted Mr. Epstein; 2) Mr. Barket had been advised by at least one news outlet that the story regarding Mr. Tartaglione had come from a source within the MCC; and 3) Mr. Tartaglione had advised Mr. Barket that, in fact, he (Mr. Tartaglione) had found Mr. Epstein unconscious and nonresponsive on July 23rd and had alerted the guards, saving Mr. Epstein's life.

Mr. Barket wanted to ensure that the Epstein note – which, as discussed below, was not contraband and was not otherwise prohibited from being removed from the MCC by Mr. Tartaglione's counsel:  1) was authentic; and 2) would be protected from loss or destruction, especially in light of the fact that Mr. Barket had been advised that MCC had previously lost important documents belonging to Mr. Tartaglione, including portions of a time-line prepared by Mr. Barket's office.  Furthermore, Mr. Barket had been advised that a source within the MCC had previously leaked a false story about to the press concerning Mr. Tartaglione.

Mr. Barket understood that the Epstein note could be highly relevant in countering any allegations that Mr. Tartaglione had attacked Mr. Epstein, as the Epstein note would – if authentic – support the conclusions that Mr. Epstein's relationship with Mr. Tartaglione was not hostile, and that Mr. Epstein's injures were sustained in a suicide attempt, and not an assault. Therefore, he asked Mr. Tartaglione's civil counsel, John Wieder, Esq. (who was already planning to visit Mr. Tartaglione that day), to view the Epstein note and take the note from Mr. Tartaglione during his upcoming visit.  Mr. Wieder then photographed the Epstein note and sent a copy of the photograph to Mr. Barket, and Mr. Barket had an examination and investigation conducted into the Epstein note to attempt to determine its authenticity.  That examination and investigation had at that point proved inconclusive.[6]

Two days after the Epstein note was removed from the MCC, Mr. Barket and Aida Leisenring, Esq., advised his court-appointed co-counsel, Anthony L. Ricco, Esq., of the existence of the Epstein note and consulted with Mr. Ricco about what should be done with the

---

[6]Recently, Mr. Barket has uncovered evidence demonstrating the authenticity of the Epstein note.

LAW OFFICES OF
MICHAEL S. ROSS

Honorable Kenneth M. Karas
January 16, 2020
Page 5

Epstein note. Subsequently, on August 9, 2019, in response to an inquiry made by Mr. Barket, Mr. Barket was notified by email by Adam Johnson, Esq., general counsel for the MCC, that Mr. Tartaglione would not be charged with any violation in connection with Mr. Epstein's attempted suicide on July 23, 2019. The following day, August 10, 2019, Mr. Epstein committed suicide. Mr. Wieder has advised Mr. Barket that, to date, the Epstein note remains safe and intact.

Separately, Mr. Barket had previously spoken to Mr. Tartaglione about whether he (Mr. Barket) might use any information he possessed in connection with Mr. Tartaglione's case to advance Mr. Tartaglione's interests, and Mr. Tartaglione advised Mr. Barket that he trusted him completely and that Mr. Barket could use any such information he had in any manner he deemed appropriate. Following Mr. Epstein's death on August 10th, Mr. Barket understood that: 1) the Government was investigating the circumstances of the death of Mr. Epstein; and 2) Mr. Tartaglione's cooperation with the Government in the exceptionally high-profile Epstein matter might result in a benefit to Mr. Tartaglione.

Therefore, Mr. Barket reasonably believed that he had express authority under Rule 1.6(a) to advise the press about the fact that Mr. Tartaglione might be of help to the Government in its investigation of the death of Mr. Epstein. Mr. Tartaglione would have been able to advise the Government about the abysmal conditions in the MCC which contributed to Mr. Epstein taking his own life and about the attitude and conduct of the MCC's prison staff which would have fostered and permitted Mr. Epstein's suicide. Of course, the fact that Mr. Tartaglione was a witness to what happened to Mr. Epstein in connection with his July 23, 2019 suicide attempt was widely known as a result of the leak from the MCC to Channel 4 News on July 24th and the resulting press coverage. The Government, even without the press coverage, knew that Mr. Tartaglione was Mr. Epstein's cellmate during the July 23rd suicide attempt, had witnessed the guards' treatment of inmates including Mr. Epstein, had long complained about the conditions of the jail and had been on the same tier as Mr. Epstein on the night Mr. Epstein died.

C.    MR. BARKET HAD BOTH EXPRESS AND IMPLIED AUTHORITY TO MAKE HIS STATEMENTS TO THE PRESS AND THOSE STATEMENTS WILL NOT PRECIPITATE A WAIVER OF THE ATTORNEY-CLIENT PRIVILEGE.

At various junctures in the Report,[7] questions are raised concerning whether Mr. Barket had the right to disclose information concerning Mr. Tartaglione's ability to assist in the Government's investigation of the death of Mr. Epstein. I respectfully submit that such concerns are misguided.

---

[7] See e.g., Report, pp. 5-6.

LAW OFFICES OF
MICHAEL S. ROSS

Honorable Kenneth M. Karas
January 16, 2020
Page 6

There can be little question that Mr. Barket had, pursuant to Rule 1.6(a)(2), both express and implied authority to disclose to the press that Mr. Tartaglione possessed a great deal of information about the death of Mr. Epstein. *First*, as discussed above, Mr. Tartaglione had previously advised Mr. Barket that he could use any information he possessed in connection with Mr. Tartaglione's case in any manner he (Mr. Barket) deemed appropriate to advance Mr. Tartaglione's interests. *Second*, Mr. Barket knew of the power of the press and he knew that lawyers may lawfully and ethically make public statements to the press to impact a client's criminal case.[8] The decision of what public statements should be made to the press in connection with Mr. Tartaglione's case was a strategic decision which Mr. Barket had the power to make under Rule 1.2(a).

Accordingly, Mr. Barket's contact with the press, which was a strategic decision he made, is not a basis to conclude that he acted improperly. As then District Court (and now Second Circuit) Judge Richard J. Sullivan recently explained, "[w]hen evaluating counsel's conduct, a court must do so on the basis of the facts of the particular case, viewed as of the time of counsel's conduct, and may not use hindsight to second-guess his strategy choices." United States v. Goffer, 2017 U.S. Dist. LEXIS 6410, at *29 (S.D.N.Y. Jan. 17, 2017) (internal citations and quotations omitted).

The Report suggests that Mr. Barket's revelation of certain facts concerning the Epstein note would somehow operate as a wholesale waiver of the attorney-client privilege between Mr. Barket and Mr. Tartaglione. I strongly disagree. Under New York law, a waiver of the attorney-client privilege occurs only in very limited circumstances and only where a party seeks to assert the attorney-client privilege in a manner that is unfair to its adversary. See, e.g., In re von Bulow, 828 F.2d 94 (2d Cir. 1987). The von Bulow case illustrates that courts apply the doctrine of waiver of the attorney-client privilege so that that litigants cannot use the attorney-client privilege as both a "sword" and a "shield." Courts, therefore, do not allow litigants to disclose privileged confidential communications favorable to their cause and then use the

---

[8]Mr. Barket knew, as every seasoned criminal defense lawyer knows, of the passage in Gentile v. State Bar of Nevada, 501 U.S. 1030, 1043 (1991), which addresses the importance of a criminal defense attorney dealing with the press:

> "An attorney's duties do not begin inside the courtroom door. He or she cannot ignore the practical implications of a legal proceeding for the client. Just as an attorney may recommend a plea bargain or civil settlement to avoid the adverse consequences of a possible loss after trial, so too an attorney may take reasonable steps to defend a client's reputation and reduce the adverse consequences of indictment, especially in the face of a prosecution deemed unjust or commenced with improper motives."

LAW OFFICES OF
MICHAEL S. ROSS

Honorable Kenneth M. Karas
January 16, 2020
Page 7

attorney-client privilege to protect damaging confidential communications. As one court recently explained in Pearstein v. Blackberry, Ltd., 2019 U.S. Dist. LEXIS 45098 at *20-21 (S.D.N.Y. March 19, 2019) (Mag. Judge Parker):

> "When a waiver of attorney-client privilege or work product protection has occurred, the court then must address the scope of the waiver. The scope of waiver of attorney-client privilege is determined based on the 'fairness doctrine' as described by the Second Circuit in In re von Bulow.... The doctrine is designed 'to prevent prejudice to a party and distortion of the judicial process that may be caused by the privilege-holder's elective disclosure during litigation of otherwise privileged information.' Id.; see United States v. Bilzerian, 926 F.2d 1285, 1292 (2d Cir. 1991) ('[T]he attorney-client privilege cannot at once be used as a shield and a sword. A defendant may not use the privilege to prejudice his opponent's case or to disclose some selected communications for self-serving purposes.') (citations omitted). When there has been a selective disclosure of attorney-client communications in the litigation, courts typically find the party has waived privilege as to all documents pertaining to the subject disclosed. In re Symbol Techs., Inc. Sec. Litig., 2017 U.S. Dist. LEXIS 50530, 2017 WL 1233842, at *16-18 (ordering disclosure of nine memoranda on confidential witnesses' statements because five other memoranda were disclosed for withholding party's strategic benefit) (citations omitted); Tribune Co. v. Purcigliotti, No. 93-cv-7222 (LAP) (THK), 1997 U.S. Dist. LEXIS 228, 1997 WL 10924, at *5 (S.D.N.Y. Jan. 10, 1997), modified, 1998 U.S. Dist. LEXIS 5155, 1998 WL 175933 (S.D.N.Y. Apr. 14, 1998) ('[W]here there is partial disclosure in the context of the litigation for the benefit of the privilege holder, there may be a complete subject matter waiver as to all communications on the subject.')."

Thus, when a litigant has partially disclosed a privileged communication in the litigation – and here the disclosure was not made in litigation, but only to the press – courts have found fairness requires the litigant to disclose either the entire communication or enough to prevent the litigant from misleading an adversary or the court. See, e.g., In re Grand Jury Proceedings, 219 F.3d 175, 182 (2d Cir. 2000), in which the court explained:

> "We have stated in In re von Bulow, 828 F.2d at 103, and in Bilzerian, 926 F.2d at 1292, that fairness considerations arise when the party attempts to use the privilege both as 'a shield and a