LAW OFFICES OF
MICHAEL S. ROSS

Honorable Kenneth M. Karas
January 16, 2020
Page 8

> sword.' *In other words, a party cannot partially disclose privileged communications or affirmatively rely on privileged communications to support its claim or defense and then shield the underlying* communications from scrutiny by the opposing party."
> (Emphasis added.)

Here, Mr. Barket did not engage in unfair selective disclosure of privileged information to support a claim or defense and, therefore, his pre-trial disclosure of information to the press would not create unfairness to the Government at trial and, therefore, he did not trigger any wholesale waiver of the attorney client privilege.

Finally, the Report of Curcio Counsel speculates that statements made by Mr. Barket to the press "could be used as adoptive admissions adverse to Mr. Tartaglione's interests if relied upon by the Government during the penalty phase." (Report, p. 3) I respectfully submit that that statement, like various other statements in the Report which question tactical decisions made by Mr. Barket, strays far beyond the role of a Court-appointed Curcio Counsel. Mr. Barket is a highly experienced criminal trial lawyer and has made, and will continue to make, tactical decisions that may or may not carry tactical risks. Moreover, Mr. Barket makes those decisions in consultation with Mr. Tartaglione pursuant to his duty under Rule 1.4(a)(2)[9] to communicate with his client. The role of Curcio Counsel is to advise defendants on whether or not to waive an actual or potential conflict and not to make subjective judgements about tactical decisions by counsel. See, e.g., United States v. Arrington, 941 F.3d 24, 33 (2d Cir. 2019) ("The District Court then apprised Arrington of his right to a conflict-free lawyer, assigned independent Curcio counsel to advise Arrington, instructed Arrington that he could discuss whether or not to waive the conflict with both Curcio counsel [and his defense counsel], and gave Arrington ample time to decide. Arrington and his Curcio counsel then left the courtroom to discuss the issues in another room."). Here, there are multiple statements in the Report by Curcio Counsel that seem to question tactical decisions made by Mr. Barket and, I respectfully submit, this strays far beyond the appropriate charter of a Curcio Counsel.

In sum, Mr. Barket had both express and implied authority to make his statements to the press.

---

[9]Rule 1.4(a)(2) requires attorneys to "reasonably consult with the client about the means by which the client's objectives are to be accomplished."

Law Offices Of
Michael S. Ross

Honorable Kenneth M. Karas
January 16, 2020
Page 9

### D.   MR. BARKET DID NOT ENGAGE IN IMPROPER CONDUCT IN CONNECTION WITH THE REMOVAL OF THE EPSTEIN NOTE FROM THE MCC.

#### 1.   INTRODUCTION.

As I demonstrate below, Mr. Barket's conduct in connection with the removal of the Epstein note was not improper. Based upon the extensive research that my firm performed, Mr. Barket did not violate any prison rule by facilitating the removal of the Epstein note from the MCC. This is because, as discussed below, the Epstein note was not "contraband"; and there is no MCC rule which prohibits lawyers, such as Mr. Barket, from taking a non-contraband note from an inmate-client, such as Mr. Tartaglione, and removing it from the MCC (or facilitating another lawyer to do so).

#### 2.   THE EPSTEIN NOTE WAS NOT "CONTRABAND."

I begin by addressing the issue of whether the Epstein note was contraband. The Federal Regulations governing the Bureau of Prisons ("BOP") are contained in Chapter V of Title 28 of the Code of Federal Regulations; and 28 CFR Section 500.1(h) defines contraband as "material prohibited by law, regulation, or policy that can reasonably be expected to cause physical injury or adversely affect the safety, security, or good order of the facility or protection of the public."[10]

---

[10]The BOP has interpreted 28 CFR Section 500.1(h) to include broadly two types of contraband: hard contraband and nuisance contraband. Hard contraband includes weapons, intoxicants, currency (where prohibited), escape tools such as rope, ammunition or explosives, combustible or flammable liquid, hazardous or poisonous chemicals and gases and narcotics or other controlled substances not dispensed or approved by the institution. The BOP defines nuisance contraband as: "any item other than hard contraband, which has never been authorized, or which may be, or which previously has been authorized for possession by an inmate, but whose possession is prohibited when it presents a threat to security or its condition or excessive quantities of it present a health, fire, or housekeeping hazard. Examples of nuisance contraband include: personal property no longer permitted for admission to the institution or permitted for sale in the commissary; altered personal property; excessive accumulation of commissary, newspapers, letters, or magazines which cannot be stored neatly and safely in the designated area; food items which are spoiled or retained beyond the point of safe consumption; government-issued items which have been altered, or other items made from government property without staff authorization." United States Department of Justice, Federal Bureau of Prisons, "Inmate Personal Property," pp. 8-9, Aug. 22, 2011, *available at* https://www.bop.gov/policy/progstat/ 5580_008.pdf (last accessed: Jan. 15, 2020).

LAW OFFICES OF
MICHAEL S. ROSS

Honorable Kenneth M. Karas
January 16, 2020
Page 10

In addition, a review of 18 U.S.C. Section 1791(d)(1)[11] and 28 CFR Section 511.12,[12] which define "prohibited objects" that inmates cannot possess, reveals that such "prohibited objects" do not ordinarily include a paper note.[13]

The Epstein note obviously could not reasonably be expected to cause physical injury, pursuant to 28 CFR 500.1(h), or threaten "the life, health, or safety of an individual," pursuant to 18 U.S.C. Section 1791(d)(1)(G), as the Epstein note itself was not instrumental in Mr. Epstein's death. Nor did the Epstein note jeopardize the BOP's ability to ensure the safety, security and orderly operation of BOP facilities, or its ability to protect the public, either before or after Mr. Epstein's death. Therefore, the Epstein note was neither contraband nor a "prohibited object" pursuant to 28 CFR Sections 511.11 and 511.12.

Mr. Barket was of the common sense view that the only way that the Epstein note could have impacted the MCC would be that it would have supported what Mr. Tartaglione had already told the MCC's staff when he was interviewed by them – i.e., that Mr. Epstein had tried to hang himself. Thus, the Epstein note was not contraband, but, at most, was duplicative of the information the MCC's staff already had.

Mr. Barket's view that the Epstein note was not contraband is consistent with the view of at least one noted ethics scholar, Professor Stephen Gillers, as expressed in his well-known article, "Guns, Fruits, Drugs, and Documents: A Criminal Defense Lawyer's Responsibility for Real Evidence," 63 Stan. L. Rev. 813 (2011). Professor Gillers notes that:

---

[11] 18 U.S.C. Section 1791 makes it a crime for an inmate to, among other things, possess a "prohibited object" and makes it a crime for another individual to provide or attempt to provide an inmate with a "prohibited object" in violation of a statute or a rule or order issued under a statute.

[12] 28 CFR Section 511.12 incorporates 18 U.S.C. Section 1791(d)(1)'s definition of "prohibited objects" into the Federal Regulations which govern the BOP.

[13] 18 U.S.C. Section 1791(d)(1) defines "prohibited object" to mean firearms, weapons, destructive devices, illegal drugs, currency, phones and similar devices or any other object that threatens the order, discipline, or security of a prison, or the life, health, or safety of an individual. 28 CFR Sections 511.12(a) and (b) collectively define "prohibited objects" to include any objects that could "jeopardize the Bureau's ability to ensure the safety, security, and orderly operation of Bureau facilities, and protect the public," such as, for example, "[w]eapons; explosives; drugs; intoxicants; currency; cameras of any type; recording equipment; telephones; radios; pagers; electronic devices...."

LAW OFFICES OF
MICHAEL S. ROSS

Honorable Kenneth M. Karas
January 16, 2020
Page 11

"Contraband is defined as 'an item possession of which is in and of itself a crime such as narcotics.' This would seem also to include weapons illegal to possess and stolen property, but not most documents[14]." Id. at 847 (internal citations to footnotes omitted).

In discussing the definition of "contraband," Professor Gillers cites Standard 4-4.6(d) of the American Bar Association ("ABA") Standards for Criminal Justice Prosecution Function and Defense Function (3rd Ed. 1993). Standard 4-4.6 states that contraband is "an item possession of which is in and of itself a crime such as narcotics...." Professor Gillers expresses the view that, in addition to illegal drugs, other examples of items that are illegal in themselves to possess are counterfeit money, certain weapons, burglar tools and child pornography. 63 Stan. L. Rev. at 835. Obviously, the Epstein note does not meet Professor Gillers' view of what is contraband – which, I respectfully submit, is the view of most reasonably-minded attorneys in the United States.

Lastly, with respect to the issue of the Epstein note, I must respectfully urge the Court to reject the assertion by Curcio Counsel, on page 8 of the Report, that "[a]ccording to **BOP Guidelines**, the Epstein Note qualifies at [sic] contraband" (emphasis added) because it was not "authorized or issued by the institution, received through approved channels, or purchased through the commissary." To support her position, Curcio Counsel erroneously cites to the definition of "contraband" from an obviously outdated, undated and subsequently revised "Inmate Information Handbook"[15] published by the United States Medical Center For Federal Prisoners facility located in Springfield, Missouri. That Inmate Information Handbook was published by the *Springfield facility* and does not constitute "BOP Guidelines" published by the BOP as a guide to *all* BOP facilities throughout the country. In fact, most BOP facilities, including the New York City Metropolitan Correctional Center, publish their own handbooks for inmates housed in those facilities. See Metropolitan Correctional Center, "Admission and Orientation:    A    Manual    for    Pre-Trial    Inmates," *available    at* https://www.bop.gov/locations/institutions/nym/NYM_aohandbook.pdf (last accessed: Jan. 16, 2020).

Additionally, that Inmate Information Handbook is inapplicable to the present case because:  1) the United States Medical Center For Federal Prisoners has replaced it with a new

---

[14]Professor Gillers' observation leaves open the question as to what documents might constitute contraband. The obvious answer is that there are documents inherently tied to the commission of a crime, such as a bank robber's note to a teller or a kidnapper's ransom note that would fall into the category of contraband-type documents.

[15]United States Medical Center For Federal Prisoners, "Inmate Information Handbook" revised    November    2012,    *available    at*    https://www.bop.gov/locations/institutions/spg/SPG_aohandbook.pdf (last accessed: Jan. 16, 2020).

Law Offices Of
Michael S. Ross

Honorable Kenneth M. Karas
January 16, 2020
Page 12

Inmate Admission and Orientation Handbook, and therefore it is not even applicable to the Springfield facility; 2) the United States Medical Center For Federal Prisoners has removed the definition of "contraband" from the new Inmate Admission and Orientation Handbook, and therefore the definition is not even applicable to the Springfield facility; and 3) neither guide is applicable to the New York City Metropolitan Correctional Center because both the outdated Inmate Information Handbook and the new Inmate Admission and Orientation Handbook state that they are not a comprehensive guide to the procedures of each Bureau location.

*First*, the former and now-outdated Inmate Information Handbook, which was last revised in November 2012, has since been replaced with a new Inmate Admission and Orientation Handbook and is no longer applicable to the very facility that published it.[16] *Second*, the United States Medical Center For Federal Prisoners removed the definition of "Contraband"[17] that was published in the outdated and superseded Inmate Information Handbook (which was cited by Curcio Counsel) and did not include that definition in the new Inmate Admission and Orientation Handbook. Thus, the former definition of "Contraband" is not even applicable to the United States Medical Center For Federal Prisoners – the very facility that published the outdated Inmate Information Handbook cited by Curcio Counsel. *Third*, neither the outdated Inmate Information Handbook (revised in 2012), nor the current Inmate Admission and Orientation Handbook (revised in 2017) are applicable to the Metropolitan Correctional Center, New York. The identical Introduction on the first pages of each Handbook states that the Handbook is not a guide to the procedures at other Bureau locations, which would include the Metropolitan Correctional Center, New York:

> "The purpose of this handbook is to provide newly committed inmates and others interested in the Federal Bureau of Prisons with general information regarding the Bureau, its programs, institutions, and the rules and regulations they will encounter during confinement. ***It is not a specific guide to the detailed policies of the Bureau or all procedures in effect at each Bureau location.***" (Inmate Admission And Orientation Handbook, p. 1; Inmate Information Handbook, p. 1; emphasis added.)

---

[16]United States Medical Center For Federal Prisoners, "Inmate Admission And Orientation Handbook" revised February 2017, *available at* https://www.bop.gov/locations/institutions/spg/spg_ao_hand book050917.pdf (last accessed: Jan. 16, 2020).

[17]Inmate Information Handbook, p. 15.

Law Offices Of
Michael S. Ross

Honorable Kenneth M. Karas
January 16, 2020
Page 13

### 3. BECAUSE THE EPSTEIN NOTE WAS NOT CONTRABAND, IT WAS NOT IMPROPER FOR MR. BARKET TO FACILITATE ITS REMOVAL FROM THE MCC.

The MCC rules do not prohibit the transfer from a client-inmate of a non-contraband note to their lawyer for the purpose of having the document removed from the MCC. Indeed, if the MCC intended to prohibit attorneys from removing non-contraband documents provided to them by inmate-clients during attorney visits, it would have included that prohibition in the "Attorney's Guide to the Metropolitan Correctional Center, New York, New York" (the "MCC Guide").[18] For instance, in the MCC Guide, the MCC has explicitly prohibited lawyers from conducting certain activities:

- Attorneys are expressly not permitted to carry into the Visiting Room handbags, newspapers, portable telephones, and non-legal materials. (MCC Guide, p. 5)

- "Attorneys are ordinarily not permitted to bring material witnesses into the Visiting Room." (MCC Guide, p. 7)

- "An attorney may not call an inmate." (MCC Guide, p. 11)

- "[A]ttorneys may not fax documents to inmates or to MCC New York staff for delivery to inmates." (MCC Guide, p. 11)[19]

---

[18]United States Department of Justice, Federal Bureau of Prisons, "Attorney's Guide to the Metropolitan Correctional Center, New York, New York," April 2008, *available at* https://www.bop.gov/locations/institutions/nym/mcc_ny_attny_guide_april_2008.pdf    (last accessed: Jan. 15, 2020). Indeed, I am advised that Curcio Counsel has herself accepted a document from Mr. Tartaglione and removed it from the MCC as part of her representation of him.

[19]I should also note that, just as the MCC's rules do not prohibit removal by an attorney of non-contraband documents provided to an attorney by his or her client, the various Federal Regulations and statutes that apply to BOP institutions, including the MCC, do not prohibit the transfer from a client-inmate of a non-contraband note to his or her lawyer. 28 CFR Sections 511.11(a) and (b) collectively define activities that are prohibited for non-inmates within BOP institutions to include "any activities that could jeopardize the Bureau's ability to ensure the safety, security, and orderly operation of Bureau facilities, and protect the public, whether or not such activities are criminal in nature," such as, for example, "[i]ntroducing, or attempting to introduce, prohibited objects into a Bureau facility or upon Bureau grounds; assisting an escape; and any other conduct that violates criminal laws or is prohibited by federal regulations or

(continued...)

LAW OFFICES OF
MICHAEL S. ROSS

Honorable Kenneth M. Karas
January 16, 2020
Page 14

In contrast to the rules of the MCC, which do not prohibit an attorney from removing from the institution a non-contraband document provided by an inmate-client, the Federal Correctional Institution in Florence, Colorado, has enacted a rule that prohibits inmate-clients from providing, for the purpose of removal, legal papers to their attorneys during client visits:

> "Necessary legal papers brought in by attorneys will be permitted during attorney visits. Inmates may bring legal materials into the visiting room during attorney visits only with approval, and hand-carried by their unit team. *Inmates may not give legal papers to the attorney or receive papers from the attorney to retain after the visit*, absent compelling circumstances and prior authorization by unit team or Duty Officer. Legal papers should be mailed to the institution in every other case."[20] (Emphasis added.)

In the case of Mr. Barket, because the MCC does not specifically prohibit attorneys from accepting for removal non-contraband documents from inmate-clients during attorney visits, Mr. Tartaglione's civil counsel did not violate an MCC rule by accepting the Epstein note from Mr. Tartaglione and removing it from the MCC. And, therefore, any involvement by Mr. Barket in facilitating that removal also could not have violated an MCC rule.

In sum, Mr. Barket did not engage in improper conduct in connection with the removal of the Epstein note from the MCC.[21]

---

(...continued)
Bureau policies." Section 511.11 does not prohibit an attorney from accepting a non-contraband document from his or her inmate-client during an attorney visit and removing it from a BOP facility. Accordingly, by accepting the Epstein note from Mr. Tartaglione and removing it from the MCC, Mr. Tartaglione's civil counsel did not violate 28 CFR Section 511.11.

[20]Federal Correctional Institution, "Visiting Regulations," p. 12, Jun. 26, 2018, *available at* https://www.bop.gov/locations/institutions/flf/flf_visiting062618.pdf (last accessed: Jan. 15, 2020).

[21]Before I conclude my discussion relating to the Epstein note, I want to address an additional issue. Surprisingly, Curcio Counsel takes the position that Mr. Barket "conceal[ed]" the removal of the Epstein note. (Report, p. 9) I respectfully submit that this statement is wholly unfair to Mr. Barket.

It is important to remember that the knowledge that Mr. Barket possessed concerning the Epstein note is and remains "confidential information," as defined under Rule 1.6(a), and *there was no requirement under the Rules or other statute that he disclose information concerning the Epstein note to the Government then or now.* A lawyer's decision to advance a client's interest

(continued...)

LAW OFFICES OF
MICHAEL S. ROSS

Honorable Kenneth M. Karas
January 16, 2020
Page 15

### E.    MR. BARKET PROPERLY DID NOT SHARE CERTAIN INFORMATION WITH HIS CO-COUNSEL.

Curcio Counsel has taken the position that Mr. Barket was obligated to reveal to co-counsel all of the information he has obtained during the course of the representation. Report, pp. 12-13. The misplaced premise of Curcio Counsel is that because the case involves a joint representation, "Rule 1.6 of the New York Rules of Professional Conduct does not apply to attorneys on the same defense team." Report, p. 13. With all due respect to Curcio Counsel, that statement is wrong. My analysis is set forth below.

My firm's research has not uncovered any New York court decisions or other definitive authority which compels a lead counsel such as Mr. Barket in a criminal case to share all information with his co-counsel. Nor has my firm uncovered any controlling authority on this issue in the context of a case where Learned Counsel is appointed in a death case. And yet central to the position of Curcio Counsel is the issue of whether, under Rule 1.6, which governs the lawyer's ability to disclose confidential information, Mr. Barket was required to disregard Mr. Tartaglione's directive that he not share certain information with his co-counsel. Suffice it to say that this Court has already heard Mr. Tartaglione explain in articulate language his

---

(...continued)

by not disclosing something to the Government which is confidential is not an act of concealment. Rather, it is ethical act in furtherance of the client's interests. The responsibility of Mr. Barket, as Mr. Tartaglione's attorney, is not to aid the Government in its endeavors, but, as reflected in Preamble [2] of the ABA Model Rules of Professional Conduct, to "zealously assert[] his client's position under the rules of the adversary system." See also ABA Criminal Justice Standards for the Defense Function (4th Ed. 2017), Standard 4-1.4 (Defense Counsel's Tempered Duty of Candor) ("Defense counsel must act zealously within the bounds of the law and applicable rules to protect the client's confidences and the unique liberty interests that are at stake in criminal prosecution."); "Commentary" to former Standard 4-1.2 of the Third Edition of the ABA Criminal Justice Standards for the Defense Function ("Advocacy is not for the timid, the meek, or the retiring. Our system of justice is inherently contentious, albeit bounded by the rules of professional ethics and decorum, and it demands that the lawyer be inclined towards vigorous advocacy."); State v. Clay, 824 N.W.2d 488, 495 (Sup. Ct. Iowa 2012) (citing this former ABA commentary). Here, while the information concerning the Epstein note, and the Epstein note itself, would be of interest to the Government, Mr. Barket properly determined that he was and is not required to disclose its existence to the Government. And, Mr. Barket's decision not to reveal the Epstein note to the Government was a strategic decision that was he entitled to make as lead counsel in the case and pursuant to his authority under Rule 1.2(a).

Law Offices Of
Michael S. Ross

Honorable Kenneth M. Karas
January 16, 2020
Page 16

unhappiness with Mr. Barket's co-counsel in this case. Mr. Tartaglione has advised Mr. Barket repeatedly not to share all of the information in his possession with his co-counsel.

Indeed, while Curcio Counsel is correct (see Report at p. 13) that there exists an attorney-client privilege among co-counsel in a criminal case,[22] I am unaware, nor has Curcio Counsel cited, any authority *requiring* a *lead counsel* such as Mr. Barket to share all information with his co-counsel. Indeed, some of the information which Mr. Barket has not shared with his co-counsel was not shared at the specific and emphatic direction of Mr. Tartaglione.[23] In that regard, Rule 1.6 provides that a lawyer may not reveal information that a client has requested be kept confidential unless disclosure is required by the Rules, some other law or court order. Specifically, Rule 1.6 provides, in relevant part, as follows:

> "(a) A lawyer shall not knowingly reveal confidential information, as defined in this Rule, or use such information to the disadvantage of a client or for the advantage of the lawyer or a third person, unless:
>
>> (1) the client gives informed consent, as defined in Rule 1.0(j);
>>
>> (2) the disclosure is *impliedly authorized to advance the best interests of the client and* is either *reasonable under the circumstances* or customary in the professional community; or
>>
>> (3) the disclosure is permitted by paragraph (b).
>
> 'Confidential information' consists of information gained during or relating to the representation of a client, whatever its source, that is (a) protected by the attorney-client privilege, (b) likely to be embarrassing or detrimental to the client if disclosed, or (c) *information that the client has requested be kept confidential*.

---

[22]"It would seem self-evident that when two or more lawyers represent one client anything that the client says in their presence or that they say to each other about the client's affairs must necessarily be as privileged as if it were said to a single lawyer." Edna S. Epstein, The Attorney-Client Privilege and the Work-Product Doctrine, Vol. 1, p 354 (6th Ed. 2017 American Bar Assn. Publ.).

[23]The nature of this information will not be delineated upon the insistence of Mr. Tartaglione.

LAW OFFICES OF
MICHAEL S. ROSS

Honorable Kenneth M. Karas
January 16, 2020
Page 17

> 'Confidential information' does not ordinarily include (i) a lawyer's legal knowledge or legal research or (ii) information that is generally known in the local community or in the trade, field or profession to which the information relates." (Emphasis added.)

Where, as here, a client expressly instructs his or her lawyer *not* to disclose specific confidential information, the lawyer no longer possesses implied authority within the meaning of Rule 1.6(a)(2) to reveal such information, even for the purpose of advancing the client's interests. This principle is reflected in the Restatement (Third) of the Law Governing Lawyers (2000) ("Restatement"), Section 60 (and its related Commentary), which is similar in substance to Rule 1.6. Section 60(1)(a) provides that:

> "(1) Except as provided in §§ 61-67, during and after representation of a client:
>
> > (a) the lawyer may not use or disclose confidential client information as defined in § 59 if there is a reasonable prospect that doing so will adversely affect a material interest of the client *or if the client has instructed the lawyer not to use or disclose such information*[.]" (Emphasis added.)

At first blush, one might think that the duty of confidentiality is driven only by the consideration of "adverse effect" on the client. That is not, however, true. Comment c(ii) to Section 60 makes that point clearly:

> "Even in the absence of a reasonable prospect of risk of harm to a client, use or disclosure is [] prohibited if the affected client instructs the lawyer (see § 21[2])[24] not to use or disclose information. Such a direction is the client's definition of the

---

[24]Restatement, Section 21, provides: "As between client and lawyer: (1) A client and lawyer may agree which of them will make specified decisions.... The agreement may be superseded by another valid agreement. (2) A client may instruct a lawyer during the representation, subject to the requirements stated in §§ 22, 23, and other provisions of this Restatement. (3) Subject to Subsections (1) and (2) a lawyer may take any lawful measure within the scope of representation that is reasonably calculated to advance a client's objectives as defined by the client, consulting with the client as required by § 20. (4) A client may ratify an act of a lawyer that was not previously authorized."

LAW OFFICES OF
MICHAEL S. ROSS

Honorable Kenneth M. Karas
January 16, 2020
Page 18

client's interests (see § 16[1])[25], which controls (see § 21[2]). *Such an instruction may also limit a lawyer's implied authority to use or disclose confidential client information to advance a client's interests.* ... However, client limitations on a lawyer's authority do not alter a lawyer's obligations under § 63[26] (using or disclosing confidential client information when required by law or court order) (see § 23).[27]"

Moreover, the unofficial Comments to Rule 1.6 address an attorney's duty to "confine" confidential information upon a client's request, and further support the view that attorneys may not disclose information to co-counsel when explicitly instructed by the client to not disclose such information. Specifically:

- Comment [2] to Rule 1.6 explains that, "*in the absence of the client's informed consent*, or except as permitted or required by these Rules, the lawyer must not knowingly reveal information gained during and related to the representation, whatever its source." (Emphasis added.)

- Comment [5] to Rule 1.6 provides that, "*[e]xcept to the extent that the client's instructions or special circumstances limit that authority*, a lawyer may make disclosures of confidential information that are impliedly authorized by a client...." (Emphasis added.)

---

[25]Restatement, Section 16(1) provides: "To the extent consistent with the lawyer's other legal duties and subject to the other provisions of this Restatement, a lawyer must, in matters within the scope of the representation: (1) proceed in a manner reasonably calculated to advance a client's lawful objectives, as defined by the client after consultation."

[26]Restatement, Section 63, provides: "A lawyer may use or disclose confidential client information when required by law, after the lawyer takes reasonably appropriate steps to assert that the information is privileged or otherwise protected against disclosure."

[27]Restatement, Section 23, provides: "As between client and lawyer, a lawyer retains authority that may not be overridden by a contract with or an instruction from the client: (1) to refuse to perform, counsel, or assist future or ongoing acts in the representation that the lawyer reasonably believes to be unlawful; (2) to make decisions or take actions in the representation that the lawyer reasonably believes to be required by law or an order of a tribunal."

LAW OFFICES OF
MICHAEL S. ROSS

Honorable Kenneth M. Karas
January 16, 2020
Page 19

- Comment [5] to Rule 1.6 further provides that "lawyers in a firm may, in the course of the firm's practice, disclose to each other information relating to a client of the firm, _unless the client has instructed that particular information be confined to specified lawyers_." (Emphasis added.)

Comment [5] to Rule 1.6 (quoted, in part, above) is particularly instructive because it provides that a lawyer must honor a client's request that "particular information be confined to specified lawyers" within a single law firm – seemingly regardless of whether other attorneys at that law firm are working on the client's matter and whether or not there is co-counsel involved in that matter. In my view, Comment [5] further supports the view that a client may direct counsel to withhold certain information from co-counsel. My view of the language in Comment [5] is consistent with a recent law review article discussing situations where a single client is represented by two lawyers. _See_ Professor Stephen C. Sieberson,[28] _Two Lawyers, One Client, and the Duty to Communicate: A Gap in Rules 1.2 and 1.4_, 11 U.N.H. L. REV. 27, 35 (2013). Professor Sieberson, in discussing "Scenario 1" in which Lawyer 1 and Lawyer 2 are co-counsel in a matter because of the matter's size or complexity, posits that the client controls what confidential information Lawyer 1 can share with Lawyer 2. In particular, Professor Sieberson pointedly observed that the limiting language of Comment [5] to Rule 1.6 of the American Bar Association Model Rules of Professional Conduct[29] seemingly applies to co-counsel in different firms:

"Once [Lawyer 2] has been associated as co-counsel for the client, _unless the client specifically instructs [Lawyer 1] to withhold certain information from [Lawyer 2]_, the sharing of information with [Lawyer 2] will not violate Rule 1.6."

Sieberson, _Two Lawyers, One Client_, 11 U.N.H. L. REV. at 35 (footnote omitted; emphasis added).

This quote is followed by a footnote that reads:

---

[28]Professor Sieberson is a Professor of Law at Creighton University School of Law, where he focuses his teachings on Professional Responsibility, International and Comparative Law, and Corporate Law. He has taught widely on matters relating to ethics and professional responsibility. _See_ https://law.creighton.edu/faculty-directory-profile/702/stephen-sieberson (last accessed: Jan. 15, 2020).

[29]Comment [5] to Model Rule 1.6 is substantially similar to Comment [5] to New York's Rule 1.6.

Law Offices Of
Michael S. Ross

Honorable Kenneth M. Karas
January 16, 2020
Page 20

> "MRPC R. 1.6 cmt. 5 (1983) generally permits lawyers within a firm to share client information with each other, although such sharing can be limited if 'the client has instructed that particular information be confined to specific lawyers.' _This concept would seem to apply as well to co-counsel in different firms_."

Sieberson, *Two Lawyers, One Client*, 11 U.N.H. L. Rev. at 35 n.21 (emphasis added).

Thus, Professor Sieberson is expressing the same view I have set forth above. Given Mr. Tartaglione's clear instruction to Mr. Barket not to disclose certain information to co-counsel, Mr. Barket was not permitted to make the disclosures to his co-counsel. Such disclosure would violate Rule 1.6. Although there is no case law directly on point, in the past, lawyers have been disciplined for disclosing confidential information, purportedly for the benefit of the client, in violation of a client's instructions and/or without client consent. See In re Pressly, 628 A.2d 927, 929 (Vt. 1993) (attorney for wife in divorce case reprimanded for disclosing to husband's lawyer, in violation of wife's express instructions, her suspicion that the husband was abusing their child, as part of wife's attorney's effort to convince husband's attorney to cooperate with continuing supervised visitation); In re Mandelman, 514 N.W.2d 11, 12 (Wis. 1994) (lawyer violated Rule 1.6 when he asked other lawyers for help on several client matters and transferred client files without seeking clients' consent); see also Texas Committee on Professional Ethics, Opinion 673 (Aug. 2018) (opining that, in the context of seeking advice about a client's case on an Internet forum, an attorney "may not reveal confidential information protected by the lawyer-client privilege without the client's express, informed consent," and, furthermore, "may not reveal unprivileged confidential information for the benefit of the client if the client has expressly instructed the lawyer not to do so."). In sum, it is clear that attorneys may not unilaterally choose to reveal confidential information, even for the benefit of the client, against the client's *express* directive.

In sum, Curcio Counsel is incorrect in her assertion that Mr. Barket was obligated to reveal to co-counsel all of the information he has obtained during the course of the representation.

### F.   CONCLUSION.

As demonstrated above:

* Mr. Barket had both express and implied authority pursuant to Rule 1.6(a) to speak to the press about information which Mr. Tartaglione possessed in connection with Mr. Epstein's attempted suicide and his ultimate suicide, and was fully authorized to make those statements to the press; and

LAW OFFICES OF
MICHAEL S. ROSS

> Honorable Kenneth M. Karas
> January 16, 2020
> Page 21

> • Mr. Barket was bound by Rule 1.6 to follow Mr. Tartaglione's directive not to share with his co-counsel all of the information he learned in the case.

Again, as I said earlier, this letter is not intended to serve as a comprehensive response to the Report; rather, its purpose is to provide the Court with an overview of key issues, which in my view, provide a broad and supportive view of Mr. Barket's ethical conduct in this matter.

Respectfully submitted,

Michael S. Ross

Att.

As of January 16, 2020

## RESUME

## MICHAEL S. ROSS

J.D., New York University School of Law, 1974

B.A., Rutgers University, 1971

Principal in:

Law Offices Of Michael S. Ross
One Grand Central Place
60 East 42nd Street
Forty-Seventh Floor
New York, New York 10165
Telephone (212) 505-4060
Facsimile (212) 505-4054
Email "michaelross@RossLaw.org"

Formerly a principal partner in the law firms of LaRossa & Ross, from 1998 through November of 2001; LaRossa, Mitchell & Ross, from 1986 through 1998; and LaRossa, Cooper, Axenfeld, Mitchell & Bergman from 1984 through 1986.

Practice concentrated in the areas of the representation of attorneys in ethics and professional responsibility matters, as well as criminal law.

Assistant United States Attorney, Southern District of New York, Criminal Division; May, 1978 through November, 1981.

Assistant District Attorney, Kings County; August, 1974 through May, 1978.

Adjunct Professor, Benjamin Cardozo Law School; having taught courses over the years in Trial Practice, Appellate Advocacy, Judicial Administration and Professional Responsibility courses (1979 through the present) and having served as Faculty Advisor of the Cardozo Law School Moot Court Program from 1978 through 2004. Currently teaching Litigation Ethics (Fall and Spring Semesters). Co-founder in 1983 and Executive Director/Team Leader (1984 through 2012) of the Law School's annual two week Intensive Trial Advocacy Program ("ITAP"). Currently an instructor at the program and evidence lecturer for the program's students.

Adjunct Associate Professor, Brooklyn Law School; teaching Professional Responsibility (2005 – to the present [Fall, Spring and Summer Courses]).

Listed in Martindale-Hubbell's "Bar Register Of Preeminent Lawyers" (status as "AV Preeminent Rated Lawyer" with primary practice

Resume of Michael S. Ross

areas listed as "Attorney Discipline"; "Professional Liability"; and "Criminal Practice").

Listed in "Super Lawyers" – New York Edition – in the field of Civil Litigation Defense.

Listed in "Best Lawyers in America" – in the practice area of Ethics and Professional Responsibility Law.

Listed in Who's Who In American Law.

Recipient, "Ethics Practitioner of the Year Award," Institute of Jewish Humanities (2007).

Recipient, "Educator of the Year Award," Institute of Jewish Humanities (2017).

Recipient, "Service to the Society Award" from the Legal Aid Society of the City of New York, 2010 Pro Bono Awards Presentation.

Member, Continuing Legal Education Advisory Board, New York County Lawyers Association (2003 to present).

Member, New York State Bar Association Committee on Technology and the Legal Profession. (2017 to present).

Member, Ethics Institute Advisory Board, New York County Lawyers' Association (2008 to present).

Member, Committee on Professional Discipline of the New York State Bar Association (1991 through 1994; 1998 to 2004; 2005 to present).

Member, Committee on Professional Discipline of the Association of the Bar of the City of New York (various terms).

Member, Committee on Professional Discipline (more recently named Committee on Professionalism and Professional Discipline), New York County Lawyers Association (1992 to present).

Member, Special Committee on the Unlawful Practice of Law, New York State Bar Association (2005).

Member, Committee on Mass Disaster Response (which addresses, in part, the manner in which lawyers attempt to solicit clients after mass disasters), New York State Bar Association (2000 to present).

Member, Task Force On Lawyer Advertising, New York State Bar Association (2005 to 2007).

Resume of Michael S. Ross

Member, New York State Continuing Legal Education Board (Chair, Subcommittee on Pro Bono Credits; Chair, Subcommittee on Internet Issues). Among other things, the Board addresses the accreditation of continuing legal education providers in the State (appointment by the Presiding Justice of the Appellate Division, First Department - 2000 to 2005 [having served two consecutive terms]).

Member, Special Committee on Procedures for Judicial Discipline of the New York State Bar Association (2001).

Section Liaison of the American Bar Association Criminal Justice Section to the American Bar Association Standing Committee on Ethics and Professional Responsibility (1994-1997).

Member, American Bar Association "Criminal Justice Council" – the twenty member policy making body of the ABA's Criminal Justice Section (1990 through 1993).

Member, New York Council of Defense Lawyers (1987 through present); former member of the Board of Directors (1989 through 1992).

Former Chairperson, Association of the Bar of the City of New York, Committee on Criminal Advocacy (1988-1990).

Former Chairperson, American Bar Association "Grand Jury Committee" (1988 through 1990); Vice-Chairperson (1987-1988).

Member, American Bar Association Special "Criminal Justice In Crisis Committee" (1988 through 1990).

Member, American Bar Association Special Nine Member "Committee On Criminal Justice In a Free Society" (1987 through 1988).

Member, New York State Association of Criminal Defense Lawyers; former member of Board of Directors (1987-1989).

Member, New York City Bar Association Subcommittee on "U.S. Sentencing Commission Guidelines" (1986 and 1987).

Member, National Order of the Barristers (elected in 1981).

CourtTV Live Guest On-Air Commentator, on forty-two occasions between 1999 and 2006.

Bloomberg 1130 Radio Live Guest, "The Money Show," discussing how the public can deal with lawyer misconduct, May 15, 2002.

Resume of Michael S. Ross

Lecturer, "The Disciplinary Process In The First Judicial Department," presented as part of the mandatory continuing legal education for newly admitted attorneys in the Appellate Division, First Judicial Department, October 18, 2017. (The video of this presentation is now part of the required viewing for all newly admitted attorneys in the First Judicial Department.)

Lecturer at monthly swearing-ins of all new attorneys in the Appellate Division, First Judicial Department, speaking on the topic of "The Ethical Issues Facing Newly Admitted Attorneys," (1999 through 2010; and May 4, 2016).

Instructor at National Institute of Trial Advocacy ("NITA"), National Program in Boulder, Colorado (July 2000).

Instructor, National Institute of Trial Advocacy ("NITA") Building Trial Skills Program, Boston, Ma. (December 8, 9 and 10, 2019).

Lecturer, "Ethical Issues In Aggressive Litigation," National Institute of Trial Advocacy ("NITA"), Building Trial Skills Program, Boston, Ma. (December 9, 2019).

Instructor at NITA, Northeast Region held at Hofstra Law School in: 1980; 1981; 1982; 1983; 1984; 1985; 1986; 1987; 1988; 1989; 1990; 1991; 1992; 1993; 1994; 1995; 1996; 1997; 1998; 1999; 2000; 2001; 2002; 2003; 2004; 2005; 2006; 2007; 2008; 2009; 2010; 2011; 2012; 2013; 2014; 2015; 2016; 2017; 2018; and 2019.

Lecturer, "Ethical Issues In Aggressive Litigation," National Institute of Trial Advocacy ("NITA") Northeast Regional Program at Hofstra Law School, August 6, 2019 (and at each of the previous annual programs since 1998).

Panelist, "When the Lawyer is Obliged to Turn Against His Client," New York State Bar Association General Practice Section & Committee On Professional Discipline, Continuing Legal Education Ethics Program, Annual Meeting of the New York State Bar Association, New York City, January 28, 2020.

Lecturer, "Ethics: 2018-2019 Update," Continuing Legal Education Program sponsored by the New York State Academy of Trial Lawyers (New York City [September 27,2019]); (Long Island, New York [September 29,2019]); (Brooklyn, New York [November 15, 2019]);(Westchester, New York [November 8, 2019]).

Panelist, "The Attorney Client Privilege in the Age of Corruption Investigations," Continuing Legal Education Program sponsored by the Criminal Advocacy Committee of the Association of the Bar of the City of New York, June 30, 2019.

Resume of Michael S. Ross

Panelist, "25 Trial Issues That Keep You Up In The Middle Of The Night," Continuing Legal Education Program sponsored by the New York State Trial Lawyers Institute, June 17, 2019.

Lecturer, "Conflicts Of Interest For Appellate Court Attorneys," Continuing Legal Education sponsored by the Appellate Division, First Judicial Department, June 7, 2019.

Lecturer, "Hot Topics In Ethics 2019," Continuing Legal Education Program sponsored by the New York State Academy of Trial Lawyers; Albany, New York (April 3, 2019); Syracuse, New York (April 3, 2019); Rochester, New York (April 4, 2019); Buffalo, New York (April 4, 2019); Brooklyn, New York (May 22, 2019); and Westchester, New York (May 23, 2019).

Panelist, "Professional Discipline: A Year In Review," Continuing Legal Education Program sponsored by the Professional Discipline of the Association of the Bar of the City of New York, March 28, 2019.

Lecturer, "Legal Malpractice 2019: Attorney Discipline and Risk Management for Lawyers," Continuing Legal Education Program sponsored by the Law Practice Management Committee and the Committee for Continuing Education of the New York State Bar Association, New York City, March 25, 2019.

Panelist, "Annual Ethics Update 2019," Continuing Legal Education Program sponsored by the Queens County Bar Association, February 27, 2019.

Panelist, "The Ethical Obligations of a Lawyer to Learn the True Facts," New York State Bar Association General Practice Section & Committee On Professional Discipline, Continuing Legal Education Ethics Program, Annual Meeting of the New York State Bar Association, New York City, January 15, 2019.

Instructor, National Institute of Trial Advocacy ("NITA") Building Trial Skills Program, Boston, Ma. (December 9, 10 and 11, 2018).

Lecturer, "Ethical Issues In Aggressive Litigation," National Institute of Trial Advocacy ("NITA"), Building Trial Skills Program, Boston, Ma. (December 11, 2018).

Lecturer, "A 2018 Ethics Update: An Analysis Of Key Decisions And Opinions," Continuing Legal Education Program sponsored by the Appellate Division, Third Judicial Department, Albany, New York, October 25, 2018.

Panel Moderator, "Ethics for Corporate Counsel 2018," Continuing Legal Education Program sponsored by the New York State Bar

Association Corporate Counsel Section and the Continuing Legal Education Committee, November 30, 2018.

Lecturer, "Ethics: 2017-2018 Update," Continuing Legal Education Program sponsored by the New York State Academy of Trial Lawyers (New York City [September 21,2018]); (Long Island, New York [September 28,2018]); (Brooklyn, New York [November 2, 2018]);(Westchester, New York [November 16, 2018]).

Lecturer, "Raising The Bar: Creating An Ethical And Inclusive Workplace," Continuing Legal Education Program sponsored by the New York State Academy of Trial Lawyers (Plainview, New York [June 28, 2018]; Brooklyn, New York [September 12, 2018]).

Lecturer, "Ethical Concerns for Cross-Examination," Cross to Kill 2018 Continuing Legal Education Program sponsored by the New York State Association of Criminal Defense Lawyers, New York, New York(May 4, 2018).

Lecturer, "2018 Ethics Update For Criminal Law Practitioners," Continuing Legal Education Program sponsored by the Kings County Criminal Bar Association, February 15, 2018.

Moderator and Panelist, "Law Firm Cyber Protection: Everything You Wanted To Know," New York State Bar Association Commercial & Federal Litigation Section Continuing Legal Education Ethics Program, Annual Meeting of the New York State Bar Association, New York City, January 24, 2018.

Panelist, "Whistleblowers, Reporting Up, and the Professional Rules of Conduct," New York State Bar Association Business Law Section & Corporate Counsel Section Continuing Legal Education Ethics Program, Annual Meeting of the New York State Bar Association, New York City, January 24, 2018.

Moderator and Panelist, "Loose Lips and Emailing Lawyers: The Ethics of Protecting Client Confidences," Continuing Legal Education Program sponsored by the New York State Bar Association General Practice Section and the Committee on Professional Discipline, Annual Meeting of the New York State Bar Association, New York City, January 23, 2018.

Instructor, National Institute of Trial Advocacy ("NITA") Building Trial Skills Program, Boston, Ma. (December 11, 12 and 13, 2017).

Lecturer, "Ethical Issues In Aggressive Litigation," National Institute of Trial Advocacy ("NITA"), Building Trial Skills Program, Boston, Ma. (December 13, 2017).

Lecturer, "Ethics: 2016-2017 Update," Continuing Legal Education Program sponsored by the New York State Academy of Trial Lawyers (New York City [October 13, 2017]); (Long Island, New York [October 27, 2017]); (Brooklyn, New York [November 3, 2017]); (Westchester, New York [November 17, 2017]).

Instructor, National Institute of Trial Advocacy ("NITA") LEAP (New York City metropolitan area consortium of public interest organizations) Teacher Training Program, New York City, October 2, 2017.

Lecturer, "Ethics Update For Criminal Law Practitioners," Continuing Legal Education Program sponsored by the Queens Law Associates (Criminal Defender Group), July 10, 2017.

Panelist, "Injustice and Ethics," Continuing Legal Education Program for Appellate Court Attorneys, sponsored by the Appellate Division of the Supreme Court, Second Judicial Department, June 28, 2017.

Panelist, "Injustice and Ethics," Continuing Legal Education Program sponsored by Stroock & Stroock & Lavan, LLP, June 12, 2017.

Panelist, "A 2016-2017 Ethics Update: A Review Of Key Cases And Ethics Opinions," Continuing Legal Education Program sponsored by the Queens County Bar Association, May 10, 2017.

Panelist, "Legal Malpractice 2017: Attorney Discipline and Risk Management for Lawyers," Continuing Legal Education Program sponsored by the New York State Bar Association Continuing Legal Education And Practice Management Committee, New York City (March 24, 2017) and Melville, New York (March 31, 2017).

Lecturer, "Hot Topics In Ethics 2017," Continuing Legal Education Program sponsored by the New York State Academy of Trial Lawyers Syracuse, New York (March 8, 2017); Rochester, New York (March 9, 2017); Buffalo, New York (March 9, 2017); New York City (April 5, 2017); Long Island, New York (April 6, 2017); and Brooklyn, New York (April 20, 2017).

Panelist, "Current Ethics Issues In Commercial Litigation," Continuing Legal Education Program sponsored by the Commercial and Litigation Section of the New York State Bar Association, New York State Bar Association Annual Meeting, New York City, January 25, 2017.

Lecturer, "Ethical Issues In Aggressive Litigation," National Institute of Trial Advocacy ("NITA"), Building Trial Skills Program, Boston, Ma. (December 8, 2016).

Resume of Michael S. Ross

Lecturer, "Recurring Ethical Issues For Criminal Defense Attorneys: Superstar Trial Seminar 2016," Continuing Legal Education Program sponsored by the New York State Association of Criminal Defense Lawyers, Rochester, New York(December 2, 2016).

Instructor, National Institute of Trial Advocacy ("NITA") Building Trial Skills Program, Boston, Ma. (December 7 and 8, 2016).

Lecturer, "Ethics: 2015-2016 Update," Continuing Legal Education Program sponsored by the New York State Academy of Trial Lawyers (New York City [September 3, 2016]); (Long Island, New York [September 30, 2016]); (Brooklyn, New York [November 4, 2016]);(Westchester, New York [November 18, 2016]).

Panelist, "Common Disciplinary Problems and How to Prevent Them: Use of Client Funds and Escrow Accounts," Continuing Legal Education Program for the Manhattan District Attorney's Office, sponsored by the Policy Committee of the Grievance Committee for the First Judicial Department, November 16, 2016.

Panelist, "Understanding Potential Liability With Respect To Quickly Developing And Changing Social Media Landscape: Best Practices For Making Sure That Attorneys Don't End Up With Clients They Never Intended To Represent And The Ethics Of Using Social Media In Jury Selection, Monitoring And Investigation," American Conference Institute Forum on Lawyers' Professional Liability/Legal Malpractice, New York City, October 24, 2016.

Panelist, "New York's New Statewide Disciplinary Rules," Continuing Legal Education Program sponsored by Brooklyn Law School's Center For Criminal Justice, October 29, 2016.

Panelist, "Ethical Issues Arising From The Panama Papers Incident," Continuing Legal Education Program sponsored by the Federal Bar Council, Federal Bar Council Fall Bench and Bar Retreat, Skytop Lodge, Skytop, Pa. October 21, 2016.

Panelist, "Defending the Indefensible: Navigating the Strategic and Ethical Landscape of Defending Clients Who Have Engaged in Indefensible Conduct;" Continuing Legal Education Program sponsored by the Tort, Trial and Insurance Practice Section of the American Bar Association ("ABA"); ABA Annual Meeting, San Francisco, Ca. (August 5, 2016).

Lecturer, "Nuts & Bolts Part I: The Ethics Of IOLA Accounts," Continuing Legal Education Program sponsored by the Asian American Bar Association of New York, June 22, 2016.

Resume of Michael S. Ross

Panelist, "A 2015-2016 Ethics Update: A Review Of Key Cases And Ethics Opinions," Continuing Legal Education Program sponsored by the Queens County Bar Association, May 11, 2016.

Lecturer, "2016 Ethics Update For Criminal Law Practitioners And An Introduction To The New State-Wide Uniform Disciplinary Procedures," Continuing Legal Education Program sponsored by the Appellate Division, First Department, Assigned Counsel Plan, March 24, 2016.

Panelist, "The Disciplinary Process And Sanctions In The First Judicial Department," Continuing Legal Education Program sponsored by the Policy Committee of the Departmental Disciplinary Committee for the First Judicial Department, March 16, 2016.

Lecturer, "2016 Ethics Update For Criminal Law Practitioners," Continuing Legal Education Program sponsored by the Kings County Criminal Bar Association, March 10, 2016.

Moderator, "Implementation Of Uniform Rules and Sanctions As Proposed by the Commission On Statewide Attorney Discipline," Continuing Legal Education Program sponsored by the New York State Bar Association General Practice Section and the Committee on Professional Discipline, Annual Meeting of the New York State Bar Association, New York City, January 26, 2016.

Lecturer, "Ethical Considerations In Investigations Utilizing Deception," Continuing Legal Education Program sponsored by the National Attorney General Training And Research Institute, Miami, Fla., December 8, 2015.

Lecturer, "Ethical Issues In Aggressive Litigation," National Institute of Trial Advocacy ("NITA"), Building Trial Skills Program, Boston, Ma., December 7, 2015.

Instructor, National Institute of Trial Advocacy ("NITA") Building Trial Skills Program, Boston, Ma. (December 6 and 7, 2015).

Panelist, "A Continuing Legal Education Evening On American and Talmudic Law: Ethical Yet Effective Practice," Continuing Legal Education Program sponsored by the Jewish Legal Society, December 3, 2015, 2015 (Armonk, New York).

Lecturer, "Ethics: 2014-2015 Update," Continuing Legal Education Program sponsored by the New York State Academy of Trial Lawyers (New York City [September 25, 2015]); (New Hyde Park, New York [October 2, 2015]); (Brooklyn, New York [November 13, 2015]);(West Harrison, New York [November 20, 2015]).

Page 9 of 45

Lecturer, "The Legal Aid Lawyer – A Review Of Conflict Of Interest and Related Principles," Continuing Legal Education Program sponsored by the Legal Aid Society of the City Of New York, September 16, 2015.

Lecturer, "The Ethical Use Of Deception And Interference In The Political Process," Continuing Legal Education Program sponsored by the National Attorney General Training And Research Institute, Philadelphia, Pa., June 10, 2015.

Instructor, National Institute of Trial Advocacy ("NITA") LEAP (New York City metropolitan area consortium of public interest organizations) Teacher Training Program, New York City, May 18, 2015.

Moderator and Panelist, "Exploring Attorney Client Privilege Among General Counsel," Continuing Legal Education Program sponsored by the Commercial and Federal Litigation Section, New York State Bar Association Spring Meeting (Sagamore, N.Y.), May 16, 2015.

Lecturer, "A Fresh Look At The Law Of Retainer And Fee Sharing Agreements," Continuing Legal Education Program sponsored by the New York State Academy of Trial Lawyers, April 22, April 23, May 13 and May 14, 2015 (Albany, New York; Syracuse, New York; Rochester, New York; Buffalo, New York).

Panelist, "A 2014 Ethics Update," Continuing Legal Education Program sponsored by the Queens County Bar Association, April 29, 2015.

Panelist, "The Lawyer's Duty to Check His/Her Facts," Continuing Legal Education Program sponsored by Stroock & Stroock & Lavan, LLP, March 11, 2015.

Panelist, "Sanctions in Criminal and Civil Proceedings and the Implications for Ethics and Professional Discipline," Continuing Legal Education Program sponsored by the General Practice Section & Committee on Professional Discipline, New York State Bar Association Annual Meeting, February 23, 2015.

Lecturer, "A 2014 Ethics Issue Review," Continuing Legal Education Program sponsored by the Appellate Division, Third Judicial Department, Albany, New York, January 23, 2015.

Lecturer, "New York's New Contingent Fee Retainer Rule," Continuing Legal Education Program sponsored by the New York State Academy of Trial Lawyers, January 21, 2015, Brooklyn Bar Association, Brooklyn, New York.

Lecturer, "Ethical Issues In Aggressive Litigation," National Institute of Trial Advocacy ("NITA"), Building Trial Skills Program, Boston, Ma., December 8, 2014.

Speaker, "Aiding and Abetting Claims Against Professionals," DRI Professional Liability Seminar, New York City, December 4, 2014.

Instructor, National Institute of Trial Advocacy ("NITA") Building Trial Skills Program, Boston, Ma. (December 7 and 8, 2014).

Panelist, "Disciplinary Actions:  What To Do When You Receive The Notice From Your State Bar," American Conference Institute Forum on Legal Malpractice Litigation/Legal Malpractice, New York City, November 19, 2014.

Lecturer, "Important Issues In Ethics And Criminal Law," Continuing Legal Education Program sponsored by the Suffolk County Criminal Bar Association, October 30, 2014.

Panelist, "Juror Misconduct," Continuing Legal Education Program sponsored by the Federal Bar Council, Fall Bar Council Fall Retreat Presentation, Inn at Pocono Manor, October 26, 2014.

Lecturer, "Important Ethical Issues for Federal Practice," Continuing Legal Education Program sponsored by the New York State Association of Criminal Defense Lawyers, October 24, 2014.

Panel Moderator, New York State Bar Association Corporate Counsel Section's Fall Continuing Legal Education Ethics Program, October 23, 2014.

Lecturer, "A Critical Update:  New York's New Contingent Fee Retainer Rule," Continuing Legal Education Program sponsored by the New York State Academy of Trial Lawyers, (October 1, 2014 [New York City] and May 15, 2014 [Plainview, New York]).

Lecturer, "Hot Topics In Ethics: 2013-2014", Continuing Legal Education Program sponsored by the New York State Academy of Trial Lawyers, (New York City, Brooklyn; Buffalo; Syracuse; Rochester, Albany; Plainview; April - June 2014).

Panelist, "A 2013-2014 Ethics Update," Continuing Legal Education Program sponsored by the Queens County Bar Association, May 8, 2014.

Panelist, "Interacting With The Media In High-Profile Cases," Continuing Legal Education Program sponsored by the Winston & Strawn law firm, April 29, 2014.

Resume of Michael S. Ross

Lecturer, "2014 Ethics Update For Criminal Law Practitioners," Continuing Legal Education Program sponsored by the Kings County Criminal Bar Association, February 28, 2014.

Panelist, "Common Disciplinary Problems and How to Prevent Them," Continuing Legal Education Program sponsored by the Policy Committee of the Departmental Disciplinary Committee for the First Judicial Department, January 9, 2014.

Lecturer, "Emerging Ethical Issues For the Criminal Defense Practitioner," Federal Practice for the State Practitioner, Continuing Legal Education Program sponsored by the New York State Association of Criminal Defense Lawyers, October 4, 2013.

Lecturer, "The Ethics Of Reporting Attorney Misconduct; Correction Of fraud By Clients And Others; and Fee Sharing," Continuing Legal Education Program sponsored by the United States Department Of Homeland Security, Office Of The District Counsel, July 23, 2013.

Panelist, "Ethics and the Municipal Practitioner," Thirteenth Annual Municipal Law Institute, Practicing Law Institute, July 12, 2013.

Panelist, "Legal Malpractice," Continuing Legal Education Program for Principal Law Clerks in the First and Second Judicial Departments, sponsored by the Appellate Division, First Judicial Department, June 25, 2013.

Panelist, "Ten Important Keys For A Criminal Practitioner To Understand In Order To Avoid Ethical Difficulties," Continuing Legal Education Program sponsored by the New York Women's Bar Association, June 18, 2013.

Lecturer, "Ethical Conflicts," Webcast sponsored by the Federal Bar Council, June 12, 2013.

Panelist, "The Role of Empathy in Judicial Decision Making," sponsored by the New York County Lawyers' Association," May 2, 2013.

Lecturer, "Ethical Issues in Civil and Criminal Litigation," Continuing Legal Education Program for Court Attorneys, Principal Law Clerks and Law Secretaries, sponsored by the Appellate Division, Second Judicial Department, Brooklyn, New York, April 24, 2013.

Lecturer, "Ethics: 2012-2013 Update," Continuing Legal Education Program sponsored by the New York State Academy of Trial Lawyers (Brooklyn, New York [June 5, 2013]; New York City [June 6, 2013]; Buffalo [April 10, 2013]; Syracuse, New York

Resume of Michael S. Ross

[April 9, 2013]; Rochester, New York [April 10, 2013]; Albany, New York [April 9, 2013]; Plainview, New York [June 13, 2013]).

Panelist, "A 2011-2012 Ethics Update," Continuing Legal Education Program sponsored by the Queens County Bar Association, February 20, 2013.

Lecturer, "Ethics and Lawyer Civility," Continuing Legal Education Program sponsored by the Torts, Insurance and Compensation Law Section and Trial Lawyers Section, New York State Bar Association Annual Meeting, New York City, January 24, 2013.

Lecturer, "The Seven Dangerous Ethical Challenges," Continuing Legal Education Program sponsored by the Appellate Division, Third Judicial Department, Albany, New York, December 5, 2012.

Lecturer, "Ethics/Mandatory Reporting Laws In A Multi-Disciplinary Practice," Continuing Legal Education Program sponsored by the Life Care Planning Law Firms Association, Cleveland, Ohio, October 12, 2012.

Panelist (and drafter of Program Hypotheticals), "America's Got Ethics," Continuing Legal Education Program sponsored by the Federal Bar Council, Fall Bar Council Fall Retreat Presentation, Skytop, Pa., September 23, 2012.

Lecturer, "A 2012 Ethics Update," Continuing Legal Education Program sponsored by the New York State Academy of Trial Lawyers," (New York City [September 21, 2012], Hauppage, New York [September 28, 2012]); Brooklyn, New York [November 16, 2012]); and Westchester, New York (November 30, 2012).

Panelist, "Balancing Duty To Clients With Duty Of Candor To Courts," United States Immigration Court, Southern District of New York Annual Judges Training Program, July 23, 2012.

Panelist, "The Business of Criminal Law:  Retainer Agreements," Continuing Legal Education Program, New York State Association of Criminal Defense Attorneys, July 11, 2012.

Lecturer, "2012 New York Ethics Update," Continuing Legal Education Program sponsored by the Kings County Law Secretaries Association, June 12, 2012.

Speaker, "Ethical Pitfalls Facing The Newly Admitted Lawyer," Orientation Program for Newly Admitted Attorneys, sponsored by the Appellate Division, Second Judicial Department, June 8, 2012.

Panelist, "The Interface Between Legal Malpractice Actions And Disciplinary Proceedings," 38th American Bar Association

National Conference On Professional Responsibility, Continuing Legal Education Program, Boston, Ma., May 31, 2012.

Lecturer, "The New Ethical Tererain: The Ethical Challenges Of Electronic Data," Continuing Legal Education Program sponsored by the Benjamin N. Cardozo School of Law, May 30, 2012.

Lecturer, "15 Ethical Scenarios Attorneys Must Know," Continuing Legal Education Program sponsored by LawLine, May 22, 2012.

Panelist, "Inequitable Conduct Before And After The AIA" and "Conflicts Arising In Patent Litigation," The New York Intellectual Property Law Association Annual Meeting Program, Continuing Legal Education Program, May 22, 2012.

Lecturer, "Ethical Pitfalls In Padilla C.P.L. Section 440 Proceedings," Continuing Legal Education Program conducted by New York County Defender Services, May 17, 2012.

Lecturer, "When The 'Rubber Hits The Road': How Ethical Principles Relating To Conflict And Candor Can Collide," Continuing Legal Education Program, National Academy of Elder Law Attorneys Annual Conference, Seattle, Washington, April 28, 2012.

Lecturer, "Bridge The Gap Program: The Seven Dangerous Ethical Challenges," Continuing Legal Education Program sponsored by the Benjamin N. Cardozo School of Law, April 22, 2012.

Lecturer, "The Seven Dangerous Ethical Challenges," Continuing Legal Education Program sponsored by the New York State Academy of Trial Lawyers, (Syracuse, New York [April 17, 2012]; Brooklyn, New York [April 19, 2012]; Buffalo [April 25, 2012]; Albany, New York [April 17, 2012]; New York City [May 21, 2012]).

Panelist, "Addressing Bar Admission Issues After Law School Graduation," The New York Bar Admission Process," New York University School of Law, April 13, 2011.

Lecturer, "Ethics in Criminal Law: A 2011-2012 Ethics Update," Continuing Legal Education Program sponsored by the Kings County Criminal Bar Association, March 29, 2012.

Panelist, "Ethics And Professional Misconduct: An Ethics Update 2010-2011," Continuing Legal Education Program sponsored by the Puerto Rican Bar Association, March 7, 2012.

Panelist, "The Ethics Of Aggressive Lawyering," Continuing Legal Education Program sponsored by The Jewish Lawyers Guild and Stroock & Stroock & Lavan, LLP, February 28, 2012.

Resume of Michael S. Ross

Lecturer, "A 2010-2011 Ethics Update," Continuing Legal Education Program sponsored by the New York State Academy of Trial Lawyers," (New York City [September 23, 2011], Plainview, New York [September 24, 2011]) and Brooklyn, New York [November 18, 2011]).

Lecturer, "Cutting Edge Ethics Issues For 2011," Continuing Legal Education Program sponsored by LawLine, November 29, 2011.

Lecturer, "A 2010-2011 Ethics Update," Continuing Legal Education Program sponsored by the Queens County Bar Association, November 16, 2011.

Lecturer, "Ethical Issues in Connection With An Attorney's Handling Of Potentially False Documents," Continuing Legal Education Program sponsored by the National Academy of Elder Law Attorneys, National Aging and Law Institute, Boston, Ma. November 11, 2011.

Panelist, "Best Practices for Solo and Small Firm Practitioners," Convocation on Lawyer Independence Challenges and Best Practices Continuing Legal Education Program sponsored by the New York State Judicial Institute on Professionalism in the Law and Hofstra Law School, November 4, 2011.

Panelist, "Public Forum on Judicial Independence," sponsored by the New York County Lawyers' Association," November 2, 2011.

Lecturer, "What Every Attorney Must Know About Ethics," and Panelist, "The Deadly Dozen: Twelve of the Most Common Mistakes Lawyers Make When Dealing With Clients," Continuing Legal Education Program sponsored by the Practicing Law Institute, October 4, 2011.

Panel Moderator, "Ethics Panel – Annual Seminar – Criminal Law, Procedure and Evidence," Continuing Legal Education Program sponsored by Brooklyn Law School, September 17, 2011.

Lecturer, "What Every Attorney Must Know About Ethics," and Panelist, "The Deadly Dozen: Twelve of the Most Common Mistakes Lawyers Make When Dealing With Clients," Continuing Legal Education Program sponsored by the Practicing Law Institute, August 11, 2011.

Lecturer, "Ethical Issues Relating To Candor By Attorneys," Continuing Legal Education Program sponsored by the United States Department Of Homeland Security, Office Of The District Counsel, July 26, 2011.

Lecturer, "Top Ten Ethical Tips for Practicing Law in New York," Continuing Legal Education Program sponsored by the Appellate

Division, First Department, Assigned Counsel Plan, May 9, 2011.

Lecturer, "Bridge The Gap Program:   New York New Rules Of Professional Conduct – A Critical Key To Litigating Ethically And Avoiding Pitfalls," Continuing Legal Education Program sponsored by the Benjamin N. Cardozo School of Law, April 17, 2011.

Presenter, "New York New Rules Of Professional Conduct – A Critical Key To Litigating Ethically And Avoiding Pitfalls," Continuing Legal Education Program sponsored by LawLine, April 12, 2011.

Panelist, "Crossing the Line:   When Sharp Practice Becomes Unethical," Continuing Legal Education Program sponsored by the Medical Malpractice Committee of the Association of the Bar of the City of New York, April 7, 2011.

Lecturer, "Hot Topics in Ethics: Litigation and Conflicts," Continuing Legal Education Program sponsored by the New York State Academy of Trial Lawyers, (Brooklyn, New York [March 3, 2011]; New York City [March 3, 2011]; Buffalo [March 9, 2011]; Syracuse, New York [March 10, 2011]; Rochester, New York [March 10, 2011]; Albany, New York [March 11, 2011]; Plainview, New York [March 17, 2011]).

Panelist, "Addressing Bar Admission Issues After Law School Graduation," The New York Bar Admission Process," New York University School of Law, February 7, 2011.

Lecturer, "What Every Attorney Must Know About Ethics," and Panelist, "The Deadly Dozen: Twelve of the Most Common Mistakes Lawyers Make When Dealing With Clients," Continuing Legal Education Program sponsored by the Practicing Law Institute, January 3, 2011.

Lecturer, "The Ethics Of Dealing With Possibly Fraudulent Documents," Continuing Legal Education Program sponsored by the New York State Bar Association Elder Law Section, 2010 Fall Section Meeting, White Plains, New York, October 30, 2010.

Lecturer, "What Every Attorney Must Know About Ethics," and Panelist, "The Deadly Dozen: Twelve of the Most Common Mistakes Lawyers Make When Dealing With Clients," Continuing Legal Education Program sponsored by the Practicing Law Institute, October 5, 2010.

Panelist, "Or Else:   Blackmail, Extortion, Threats and Damage Control In Negotiations," Continuing Legal Education Program sponsored by the Federal Bar Council, Fall Bar Council Fall Retreat Presentation, Lenox, Massachusetts, October 3, 2010.

Lecturer, "A 2009-2010 Ethics Update," Continuing Legal Education Program sponsored by the New York State Academy of Trial Lawyers," September 24 and September 25, 2010 (New York City and Plainview, New York).

Lecturer, "What Every Attorney Must Know About Ethics," and Panelist, "The Deadly Dozen: Twelve of the Most Common Mistakes Lawyers Make When Dealing With Clients," Continuing Legal Education Program sponsored by the Practicing Law Institute, August 12, 2010.

Lecturer, "New York's New Rules of Professional Responsibility: The First Year's Shake Out," Continuing Legal Education Program sponsored by the Benjamin N. Cardozo School of Law, May 23, 2010.

Panelist, "The Dissection and Treatment of Ponzi Schemes in the Post-Madoff Word," Continuing Legal Education Program sponsored by the Federal Bar Council, United States Courthouse, Eastern District Federal Courthouse, Central Islip, New York, May 13, 2010.

Lecturer, "Legal Fees and Disputes," Continuing Legal Education Program sponsored by the New York State Academy of Trial Lawyers," March 23, 2010 (Rochester, New York and Buffalo, New York).

Panelist, "Representing Clients in Federal and State Criminal Tax Investigations: Defense Strategies and Prosecution Initiatives Every Attorney Needs to Know," Continuing Legal Education Program sponsored by the Association of the Bar of the City of New York, March 11, 2010.

Lecturer, "Legal Fee Disputes: Old Issues, New Rules," Continuing Legal Education Program sponsored by the New York State Academy of Trial Lawyers and the Brooklyn Bar Association," March 10, 2010.

Panelist, "Addressing Bar Admission Issues After Law School Graduation," The New York Bar Admission Process," New York University School of Law, February 1, 2010.

Lecturer, "Legal Fees and Disputes," Continuing Legal Education Program sponsored by the New York State Academy of Trial Lawyers," January 27, 2010 (Syracuse, New York and Albany, New York).

Lecturer, "What Every Attorney Must Know About Ethics," and Panelist, "The Deadly Dozen: Twelve of the Most Common Mistakes Lawyers Make When Dealing With Clients," Continuing Legal Education Program sponsored by the Practicing Law Institute, January 19, 2010.

Resume of Michael S. Ross

Lecturer, "Legal Fees and Disputes," Continuing Legal Education Program sponsored by the New York State Academy of Trial Lawyers," December 2, 2009 (Plainview, New York) and December 7, 2009 (New York City).

Panelist, "Decoding The New Rules Of Professional Conduct: The Changes That Matter," Continuing Legal Education Program sponsored by the Federal Bar Council, United States Courthouse, Southern District of New York, Central Islip, New York, December 3, 2009.

Lecturer, "New York's New Ethical Rules Effective April 1, 2009," Continuing Legal Education Program sponsored by the Queens County Bar Association, November 17, 2009.

Lecturer, "The 2009 Ethics Update," Continuing Legal Education Program sponsored jointly by the New York State Academy Of Trial Lawyers and the Brooklyn Bar Association, October 14, 2009.

Panelist, "The Attorney Disciplinary Process in Federal Court," Continuing Legal Education Program sponsored by the American Bar Association Section of Real Property, Trust and Estate Law (October 7, 2009).

Lecturer, "Ethics Update – 2008," Continuing Legal Education Program sponsored by the New York State Academy Of Trial Lawyers, October 2, 2009 (New York City) and October 3, 2009 (Smithtown, N.Y.).

Lecturer, "What Every Attorney Must Know About Ethics," and Panelist, "The Deadly Dozen: Twelve of the Most Common Mistakes Lawyers Make When Dealing With Clients," Continuing Legal Education Program sponsored by the Practicing Law Institute, September 21, 2009.

Panelist, "Defending Immigration Removal Proceedings 2009 – Ethical Issues in Removal Proceedings," Continuing Legal Education Program sponsored by the Practicing Law Institute, August 18, 2009.

Lecturer, "What Every Attorney Must Know About Ethics," Continuing Legal Education Program sponsored by the Practicing Law Institute, August 13, 2009.

Panelist, "What Every Attorney Must Know About Ethics," and "The Deadly Dozen: Twelve of the Most Common Mistakes Lawyers Make When Dealing With Clients," Continuing Legal Education Program sponsored by the Practicing Law Institute, August 13, 2009.

Resume of Michael S. Ross

Lecturer, "New York's New Ethical Rules Effective April 1, 2009 As They Relate To Criminal Law Practitioners," Continuing Legal Education Program sponsored by the Appellate Division, First Department, Assigned Counsel Plan, May 18, 2009.

Panelist, "Decoding The New Rules Of Professional Conduct: The Changes That Matter," Continuing Legal Education Program sponsored by the Federal Bar Council, Central Islip, New York, May 14, 2009.

Lecturer, "New York's New Ethical Rules Effective April 1, 2009 As They Relate To Assigned Criminal Counsel," Continuing Legal Education Program sponsored by Brooklyn Defender Services, April 28, 2009.

Lecturer, "Ethics for Criminal Defense Attorneys," Criminal Advocacy Institute: Criminal Defense Practice, Continuing Legal Education Program sponsored by the New York County Lawyers Association, April 23, 2009.

Lecturer, "New York's New Ethical Rules Effective April 1, 2009 As They Relate To Assigned Criminal Counsel," Continuing Legal Education Program sponsored by District Council 37 (AFSCME) Municipal Employees Legal Services, New York University School of Law, April 7, 2009.

Lecturer, "Ethics Update: Need-to-know Information about New York's New Ethical Rules Effective April 1, 2009 As They Relate To Assigned Criminal Counsel," Continuing Legal Education Program sponsored by the New York State Defenders Association, New York University School of Law, February 28, 2009.

Lecturer, "Ethics In Litigation," Bridge The Gap Continuing Legal Education Program sponsored by the Association of the Bar of the City of New York, February 27, 2009.

Lecturer, "Ethics Update: New York's New Ethical Rules Effective April 1, 2009," Continuing Legal Education Program sponsored by the Kings County Chapter Of The American Inns of Court, Kings County Supreme Court, February 24, 2009.

Panelist, "Private Conduct: Should It Be Subject To Discipline?" Continuing Legal Education Program sponsored by the New York State Bar Association Committee on Professional Discipline for the State Bar's Annual Meeting, New York City, January 28, 2009.

Lecturer and Panelist, "What Every Attorney Must Know About Ethics," and "The Deadly Dozen: Twelve of the Most Common Mistakes Lawyers Make When Dealing With Clients," Continuing

Legal Education Program sponsored by the Practicing Law Institute, January 20, 2009.

Panelist, "Confronting Ethical Issues Arising in Criminal Law Practice – The Search for Truth, Zealous Advocacy v. Zealous Ethics in Criminal Law," Continuing Legal Education Program sponsored by the New York County Lawyers Association, November 19, 2008.

Panelist, "Managing Complex Litigation 2008: Ethical Issues Arising In Settlements," Continuing Legal Education Program sponsored by the Practicing Law Institute, November 11, 2008.

Lecturer, "What Every Attorney Must Know About Ethics," Continuing Legal Education Program sponsored by the Practicing Law Institute, October 7, 2008.

Lecturer, "Conflicts Of Interests: Thinking 'Inside The Box' On Issues Of Informed Consent And Multiple Representation," Continuing Legal Education Program sponsored by the Columbian Lawyers Association, October 7, 2008.

Lecturer, "Ethics Update – 2008," Continuing Legal Education Program sponsored by the New York State Academy Of Trial Lawyers, September 27, 2008 (New York City) and September 28, 2008 (Melville, N.Y.).

Lecturer, "Ethical Issues Relating To Judicial Recusal And Conflicts Of Interest In New York State," Continuing Legal Education Program sponsored by the Association Of Justices Of The Supreme Court Of The State Of New York, September 19, 2008 (West Point, New York).

Lecturer, "What Every Attorney Must Know About Ethics," Continuing Legal Education Program sponsored by the Practicing Law Institute, August 14, 2008.

Panelist and Moderator, "Ethics In Litigation:  A 2008 Update," Continuing Legal Education Program sponsored by the New York State Trial Lawyers' Association, July 30, 2008.

Lecturer,"Professional Responsibility Fundamentals: Common Ethical Issues In Litigation," Bridge The Gap Continuing Legal Education Program sponsored by the Association of the Bar of the City of New York, May 13, 2008.

Panelist, "Ethical Considerations In Litigation: A 2008 Update," Continuing Legal Education Program sponsored by the Queens County Bar Association, May 7, 2008.

Lecturer, "Ethical Issues Relating To The Attorney Client Privilege," Continuing Legal Education Program sponsored by

Resume of Michael S. Ross

the United States Department Of Homeland Security, Office Of The District Counsel, March 13, 2008.

Panel Moderator and Lecturer, "Ethical Bounds Of Aggressive Litigation – a 2007 Update," Continuing Legal Education Program sponsored by the New York County Lawyers' Association, February 26, 2008.

Panelist, "Addressing Bar Admission Issues After Law School Graduation," The New York Bar Admission Process," New York University School of Law, February 11, 2008.

Lecturer, "The Ethics Of Negotiation," Continuing Legal Education Program sponsored by the New York State Bar Association Joint Trial Lawyer/Torts Insurance Law Sections (Annual Meeting Program), January 31, 2008.

Panelist, "The Ethics Of Witness Preparation," Continuing Legal Education Program sponsored by the New York State Bar Association Commercial and Federal Litigation Section (Annual Meeting Program), January 30, 2008.

Lecturer, "Conflicts Of Conflicts: 'Thinking Inside The Box' on Issues of Informed Consent and Multiple Representation," Continuing Legal Education Program sponsored by the Appellate Division, First Department, January 28, 2008.

Panelist, "Should Lawyers Be Constrained By The Truth?" Continuing Legal Education Program sponsored by LawLine, December 21, 2007.

Lecturer, "What Every Attorney Must Know About Ethics," Continuing Legal Education Program sponsored by the Practicing Law Institute, December 12, 2007.

Lecturer, "Ethics Update 2007 – The Changing Face of the Attorney-Client Privilege," Continuing Legal Education Program presented under the auspices of the New York State Office of the Attorney General for members of the New York State Legislature, December 7, 2007.

Panel Moderator, "Prosecution And Defense Ethics In Criminal Cases, A 2007 Update," Continuing Legal Education Program sponsored by Brooklyn Law School, December 1, 2007.

Lecturer, "Ethics for the Criminal Law Practitioner – A 2007 Update," Continuing Legal Education Program Sponsored by the Kings County Criminal Bar Association, November 27, 2007.

Lecturer, "How To Deal With An Ethics Or Grievance Complaint and Ethics Update – 2007," Continuing Legal Education Program

Sponsored by the New York City Small Claims Arbitrators' Association, October 23, 2007.

Lecturer, "What Is 'Effective Counsel' In A Criminal Case?" Continuing Legal Education Program sponsored by the Appellate Division, First Department, October 16, 2007.

Panel Moderator and Lecturer, "Critical Issues, Fresh Ideas, Best Practices: The Changing Face Of The Attorney-Client Privilege," Continuing Legal Education Program sponsored by the Corporate Counsel Section of the New York State Bar Association, October 12, 2007.

Lecturer, "Ethical Issues That Arise In Criminal Practice: What Is 'Effective Counsel'?" Continuing Legal Education Program sponsored by the Appellate Division, First Judicial Department and the New York County Lawyer's Association, October 11, 2007.

Lecturer, "Ethics Update – 2007," Continuing Legal Education Program sponsored by the Brooklyn Bar Association, October 10, 2007.

Lecturer, "Ethics Update – 2007," Continuing Legal Education Program sponsored by the New York State Academy Of Trial Lawyers, September 28, 2007 (New York City) and September 29, 2007 (Huntington, N.Y.).

Lecturer, "Ethics For The Younger Attorneys," Continuing Legal Education Program sponsored by the New York State Trial Lawyers' Association, September 25, 2007.

Lecturer, "Ethics Update – 2007," Continuing Legal Education Program sponsored jointly by the New York State Academy Of Trial Lawyers and the Brooklyn Bar Association, August 20, 2007.

Panelist, "Pressures from the Commission on Judicial Conduct," a Continuing Legal Education Program sponsored by the New York County Lawyers' Association Task Force on Judicial Independence, New York University School of Law, June 14, 2007.

Panelist, "Ethical Considerations In Litigation," Continuing Legal Education Program sponsored by the Queens County Bar Association, May 9, 2007.

Lecturer, "Current Ethics Events: New Attorney Advertising Rules-The Fallout From Hewlett Packard," Continuing Legal Education Program sponsored by the National Employment Lawyers Association, May 4, 2007.

Lecturer, "Ethics Issues In The Zealous Representation Of Mentally Impaired Clients - a Program For Mental Hygiene Legal Services," Continuing Legal Education Program sponsored by the New York State Judicial Institute, April 25, 2007 and May 2, 2007.

Lecturer, "Understanding New York's New Advertising Rules For Attorneys," Continuing Legal Education Program sponsored jointly by the New York State Academy Of Trial Lawyers and the Brooklyn Bar Association, April 11, 2007.

Lecturer, "Ethical Issues Arising In Criminal Practice," Continuing Legal Education Program sponsored by the Appellate Division, First Department, March 28, 2007.

LawLine.Com televised program, entitled: "The Judicial Disciplinary Process," (appeared with Robert Tembeckjian, Chief Counsel of the New York State Commission on Judicial Conduct), March 28, 2007.

Lecturer, "Defense Ethics In Criminal Cases," Continuing Legal Education Program sponsored by Brooklyn Defender Services, March 27, 2007.

Panelist, "Understanding the Boundaries & Effectively Representing Your Client," Bridge The Gap Continuing Legal Education Program sponsored by the Association of the Bar of the City of New York, March 12, 2007.

Panelist, "As Much Dirt As Possible: The Corporate Mole, The Lawyer, And The Consequences," 2007 Mid-Year Meeting, Association of Professional Responsibility Lawyers, February 9, 2007, Miami, Florida.

Panelist, "Addressing Bar Admission Issues After Law School Graduation," New York University Law School, February 7, 2007.

Lecturer, New York Judicial State Institute, "Criminal Ethics Issues Update (2007)," Continuing Legal Education Program for court attorneys, January 8, 2007 and January 11, 2007.

Panelist, "Ethics For Criminal Defense Lawyers (2007)," Continuing Legal Education Program sponsored by the New York Criminal Bar Association and the Legal Aid Society, January 8, 2007.

Panel Chair and Lecturer, "Ethics for Litigators: Real Problems of Everyday Practice," Continuing Legal Education Program sponsored by the Practicing Law Institute, December 18, 2006.

Panelist, "Ethics And New York's No-Contact Rule," Continuing Legal Education Program sponsored by the Practicing Law Institute, December 18, 2006.

Resume of Michael S. Ross

Lecturer, "Ethics In Litigation," Practicing Law Institute Continuing Legal Education Bridge The Gap Program, December 13, 2006.

Lecuturer, "Defense Ethics In Criminal Cases," Continuing Legal Education Program sponsored by Brooklyn Defender Services, December 12, 2006.

Panelist, "Ethics For Real Estate Lawyers," Continuing Legal Education Program sponsored by the New York State Bar Association, December 6, 2006.

Panel Moderator, "Prosecution And Defense Ethics In Criminal Cases," Developments In Criminal Law, Criminal Procedure And Evidence Continuing Legal Education Program sponsored by Brooklyn Law School, December 2, 2006.

Lecturer, New York Judicial State Institute, "Ethics Issues Relating To Judicial Recusal In New York State," Continuing Legal Education Program for court attorneys from civil, criminal and family courts throughout New York State; September 27, 2006 [Rochester, N.Y.].

Lecturer, "The Attorney-Client Privilege In The Litigation Process," Continuing Legal Education Program sponsored by Fordham University School of Law, November 28, 2006.

Panelist, "Everyday Ethical Challenges In The Practice Of Law," Continuing Legal Education Program sponsored by the Association of the Bar of the City of New York, November 21, 2006.

Panelist, "Ethics Issues Relating To Judicial Recusal In New York State," 19th Annual Appellate Term, First and Second Judicial Departments, Judicial Educational Seminar, Continuing Legal Education Program sponsored by the New York State Judicial Institute, November 20, 2006.

Lecturer, "Ethical Considerations In Matrimonial Litigation," Continuing Legal Education Program sponsored by the New York Family Law, American Inn of Court, Nassau County Bar Association, November 15, 2006.

Panelist, "Ethical Pitfalls in Medical Malpractice Litigation," Continuing Legal Education Program sponsored by the Medical Malpractice Committee of the Association of the Bar of the City of New York, September 20, 2006.

Panel Moderator and Lecturer, "Critical Issues, Fresh Ideas, Best Practices: Second Corporate Counsel Institute," Continuing Legal Education Program sponsored by the Corporate Counsel

Section of the New York State Bar Association, October 13, 2006.

Lecturer, "Blueprint For Building Your Own Practice 2006: Ethical Considerations For The Single Practitioner"; Continuing Legal Education Program sponsored by the New York County Lawyers' Association, October 13, 2006.

Panelist, "Ethics Update 2006: Recent Decisions," Continuing Legal Education Program sponsored by the Brooklyn Bar Association, October 11, 2006.

Panelist, "Ethical Pitfalls in Medical Malpractice Litigation," Continuing Legal Education Program sponsored by the Association of the Bar of the City of New York, September 20, 2006.

Lecturer, "Ethics And Professionalism: What Every Lawyer Must Know About Ethics," Continuing Legal Education Program sponsored by the Practicing Law Institute, August 21, 2006.

Lecturer, Summer College for District Attorneys, "Prosecution Ethics," Continuing Legal Education Program sponsored by the New York State Prosecutor's Training Institute, August 16, Syracuse, New York.

Lecturer, Annual Basic Course for Prosecutors, sponsored by the New York State Division of Criminal Justice Services; lectured on "Practical Aspects of Evidence at Trial"; Syracuse, New York; August 16, 2006 (previously delivered this same lecture each year from 1978 on).

Lecturer, "How to Avoid Ethical Problems in Your Day-to-Day Practice," Bridge the Gap 2: A Program for Newly Admitted Attorneys Second-Year Program for Newly Admitted Attorneys, Continuing Legal Education Program sponsored by the New York County Lawyers' Association, August 4, 2006.

Lecturer, "Ethical Challenges In Litigation," Continuing Legal Education Program sponsored by the New York Lawyers' Association American Law Academy, July 24, 2006.

Lecturer, New York State Judicial Institute, Summer Judicial Seminar, "Laying Proper Foundations In Civil Cases," July 19, 2006.

Lecturer, "Ethics Update 2006: Ethics In Advertising," Continuing Legal Education Program sponsored by the New York State Academy Of Trial Lawyers, July 12, 2006, Huntington, New York.

Panelist, "Functions and Procedures of the Grievance Committees," Continuing Legal Education Program sponsored by the Appellate

Divisions First and Second Department for their court staff, June 20, 2006.

Program Coordinator, "Prosecutorial Misconduct and the Disciplinary System," National Conference on Professional Responsibility, a Continuing Legal Education Program sponsored by the American Bar Association, Vancouver, British Columbia, June 2, 2006.

Lecturer, "Ethics For New Trial Attorneys," Continuing Legal Education Program sponsored by the New York State Trial Lawyers' Association, May 10, 2006.

Panelist, "Ethics Update 2006: Proposed Changes To The Lawyer Advertising Rules," Continuing Legal Education Program sponsored by the Brooklyn Bar Association, May 3, 2006.

Lecturer, "Second-Year Program for Newly Admitted Attorneys," Continuing Legal Education Program sponsored by the New York County Lawyers' Association, April 28, 2006.

Lecturer, "Ethics for the Criminal Law Practitioner," Continuing Legal Education Program Sponsored by the Kings County Criminal Bar Association, April 25, 2006.

Panel Member, "Watch Out! Ethical Perils and Pitfalls Facing Small Firm Practitioners," Continuing Legal Education Program sponsored by the Association of the Bar of the City of New York, April 5, 2006.

Lecturer, "The Disciplinary Process from Respondent's Point of View," Continuing Legal Education Program sponsored by The Departmental Disciplinary Committee For The First Department, Committee Member Orientation Program, March 31, 2006.

Panel Moderator, "The Disciplinary Process: How It Works," Continuing Legal Education Program sponsored by the Association of the Bar of the City of New York, March 16, 2006.

Panel Moderator and Lecturer, "Ethical Bounds Of Aggressive Litigation," Continuing Legal Education Program sponsored by the New York County Lawyers' Association, March 15, 2006.

Lecturer, "Ethics In Litigation: A 2006 Update," Continuing Legal Education Program sponsored by Fordham University School of Law, March 15, 2006.

Panel Member, "Lawyers in the Dock: When Does Good Lawyering Become Criminal Conduct?" Continuing Legal Education Program sponsored by the Association of the Bar of the City of New York, February 16, 2006.

Case 7:16-cr-00832-KMK    Document 641-3    Filed 07/02/26    Page 41 of 295

Resume of Michael S. Ross

Lecturer, "Ethical Issues Arising In Criminal Practice," New York County Lawyer's Association Twenty-Eighth Annual Criminal Trial Advocacy Institute, Continuing Legal Education Program, First Department, January 26, 2006.

Panel Chair and Lecturer, "Ethics for Litigators: Real Problems of Everyday Practice," Continuing Legal Education Program sponsored by the Practicing Law Institute, December 21, 2005.

Lecturer, "The Attorney-Client Privilege In the Litigation Process," Continuing Legal Education Program sponsored by Fordham University School of Law, November 15, 2005.

Lecturer, New York State Institute, "Ethics Update," Continuing Legal Education Program for court attorneys from civil, criminal and family courts throughout New York State; September 28, 2005 [Rochester, N.Y.]; November 1, 2005 [Saratoga, N.Y.]; January 10, 2006 [White Plains, N.Y.]; March 7. 2006 [Uniondale, N.Y.]; and April 4, 2006 [Uniondale, N.Y.].

Lecturer, "Emerging Issues In Attorney Ethics: A Judicial Perspective," Legal Education Program sponsored by the Appellate Division, First Department, for Appellate Court Attorneys, November 15, 2005.

Lecturer, "The Attorney-Client Privilege In The Litigation Process," Continuing Legal Education Program sponsored by Fordham University School of Law, November 15, 2005.

Lecturer, "Professional Ethics – Recent Litigation Developments," Continuing Legal Education Program sponsored by the Columbian Lawyers' Association, November 9, 2005.

Lecturer, "Ethical Issues Arising In Criminal Practice," Continuing Legal Education Program sponsored by the Appellate Division, First Department, October 24, 2005.

Panel Moderator and Lecturer, "Critical Issues, Fresh Ideas, Best Practices: First Corporate Counsel Institute," Continuing Legal Education Program sponsored by the Corporate Counsel Section of the New York State Bar Association, September 23, 2005.

Panelist, "Ethics Roundtable 2005," Continuing Legal Education Program sponsored by the New York State Trial Lawyers Institute, September 16, 2005.

Panel Moderator and Lecturer, "Emerging Issues in Litigation Ethics," Continuing Legal Education Program sponsored by the New York County Lawyers' Association, September 14, 2005.

Page 27 of 45

Resume of Michael S. Ross

Lecturer, "How to Avoid Pitfalls in Your Day-to-Day Practice," Continuing Legal Education Program sponsored by the New York County Lawyers' Association, August 12, 2005.

Panelist, "Ethics for Law Firm Practitioners: Managing Attorney Trust Accounts and Attorney Trust Accounts and Law Office Recordkeeping," Continuing Legal Education Program sponsored by the Practicing Law Institute, August 10, 2005.

Lecturer, "Ethical Challenges In Litigation," Continuing Legal Education Program sponsored by the New York Lawyers' Association American Law Academy, July 25, 2005.

Lecturer, "The Corporate Counsel Forum – Managing The Attorney-Client Relationship In The Corporate Counsel Setting," Continuing Legal Education Program sponsored by American Lawyer Media (May 12-15, 2005).

Lecturer, "What To Do When The Commission On Judicial Conduct Comes Calling," Continuing Legal Education Program sponsored by the Association of Judges of Hispanic Heritage, May 10, 2005.

Panel Moderator and Lecturer, "Emerging Ethical Issues For The Corporate Lawyer," Continuing Legal Education Program sponsored by the New York County Lawyers' Association, May 5, 2005.

Lecturer, "Ethical Pitfalls In Criminal Defense," Continuing Legal Education Program sponsored by the New York State Association of Criminal Defense Lawyers, April 22, 2005.

Lecturer, "Bridge the Gap 2: A Second Year Ethics Program for Newly Admitted Attorneys," Continuing Legal Education Program sponsored by the Practicing Law Institute, April 29, 2005.

Lecturer, "Ethics In Litigation: A 2005 Update," Continuing Legal Education Program sponsored by Fordham University School of Law, April 21, 2005.

Lecturer, "Ethics Update 2005," Continuing Legal Education Program Sponsored by the Brooklyn Bar Association, April 13, 2005.

Lecturer, "The Ethical Limits Of Zealous Representation – A View From Corporation Counsel's Office," In-House Continuing Legal Education Program conducted by the Corporation Counsel of the City New York, March 21, 2005.

Panelist, "Lynn Stewart: The Verdict And Its Implications," Brooklyn Law School, February 17, 2005.

Lecturer, "Ethical Dilemmas For the Civil and Criminal Litigator: A 2005 Practical Review," Continuing Legal Education Program

sponsored by the Appellate Division, First Department, February 7, 2005.

Panelist, "Current Issues In Professional Discipline – 'A Lawyer's Conundrum' – What To Do With Inadvertently Disclosed Information?" Continuing Legal Education Program sponsored by the Committee On Professional Discipline, 128th Annual Meeting of the New York State Bar Association, January 26, 2005.

Panelist, "General Ethics Pitfalls In Litigation," Continuing Legal Education Program sponsored by the Committee On Landlord Tenant Proceedings, 128th Annual Meeting of the New York State Bar Association, January 27, 2005.

Panel Moderator, "Prosecutorial Misconduct and the Disciplinary System," Continuing Legal Education Program sponsored by the Association of the Bar of the City of New York, January 19, 2005.

Lecturer and Panel Moderator, "Ethical Bounds of Aggressive Litigation – A Year 2004 Update," Continuing Legal Education Program sponsored by the New York County Lawyers' Association, January 12, 2005.

Lecturer, at In-House continuing legal education program for the Wilens & Baker lawfirm, and addressed the issue of "Litigation Ethics," November 23, 2004.

Lecturer, "The Role Of Defense Counsel," United States Department of Justice Training Program For Dutch Counsel, New York University Law School, November 17, 2004.

Lecturer, "Ethics In Litigation: A 2004 Update," Continuing Legal Education Program sponsored by Fordham University School of Law, November 16, 2004.

Lecturer and Panel Moderator, "Designing Ethics Programs: What Is Ethics And Professionalism? How Do You Weave It Seamlessly Into A Substantive Program?" Accredited Provider Conference, sponsored by the New York State Continuing Legal Education Board, New York State Judicial Institute, White Plains, New York, November 4, 2004.

Lecturer, "Litigation Ethics: A 2004 Practical Review," Continuing Legal Education Program sponsored by the New York State Academy of Trial Lawyers, October 30, 2004 (Long Island) and October 16, 2004 (New York City).

Panel Moderator and Lecturer, "Emerging Ethical Trends For Corporate Counsel – A Year 2004 Update," Continuing Legal Education Program sponsored by the Corporate Counsel Section of the New York State Bar Association, October 29, 2004.

Resume of Michael S. Ross

Lecturer, "Blueprint For Building Your Practice – Ethical Issues," Continuing Legal Education Program sponsored by the New York County Lawyers' Association, October 22, 2004.

Lecturer, "Professional Ethics: A 2004 Practical Review," Continuing Legal Education Program sponsored by the Appellate Division, First Department, October 19, 2004.

Lecturer, "Recent Developments In Litigation Ethics: A 2004 Update," Continuing Legal Education Program Sponsored by the New York City Small Claims Arbitrators' Association, October 7, 2004.

Panel Moderator and Lecturer, "Ethics For Corporate Counsel – A Year 2004 Update," Continuing Legal Education Program sponsored by the New York County Lawyers' Association, September 22, 2004.

Panelist, "Everyday Ethical Challenges in the Practice of Law," Continuing Legal Education Program sponsored by the Association of the Bar of the City of New York, September 20, 2004.

Panelist, "Ethics In Litigation," Continuing Legal Education in-house program at the U.S. Commodity Futures Trading Commission, New York City Office, July 29, 2004.

Lecturer and Panel Moderator, "Emerging Issues In Litigation Ethics," Continuing Legal Education Program sponsored by the New York County Lawyers' Association, July 22, 2004.

Panelist, "What is Fraud and Why Does It Matter?," 2004 National Conference on Professional Responsibility, Plenary Session, June 4, 2004, Naples, Florida.

Panelist, "Confidentiality and Current, Former, Prospective Clients: It's Not Just About Crowded Elevators Any More," 2004 National Conference on Professional Responsibility, June 4, 2004, Naples, Florida.

Lecturer, "What Every New Attorney Must Know About Ethics," Practicing Law Institute Continuing Legal Education Bridge The Gap Programs; May 26, 2004 (and previous dates, including August 23, 2000; January 2, 2001; May 29, 2001; July 25, 2001; July 25, 2001; August 22, 2001; October 8, 2001; November 30, 2001; January 2, 2002; April 10, 2002; August 29, 2002; November 25, 2002; May 27, 2003; and November 24, 2003).

Lecturer, "Protecting The Record: The Respondent's Point Of View," Continuing Legal Education Program sponsored by The Departmental Disciplinary Committee For The First Department (Refresher Course for Referees), April 29, 2004.

Resume of Michael S. Ross

Chair and Panel Moderator, "Bridge The Gap 2: How To Avoid Ethical Pitfalls In Your Day-to-Day Practice," Continuing Legal Education Program sponsored by the New York County Lawyers' Association, April 16, 2004.

Lecturer, "Confronting Possible Client Fraud: Is 'Don't Ask, Don't Tell' An Ethically Acceptable Approach," Continuing Legal Education Program Sponsored by the Brooklyn Bar Association, April 14, 2004.

Lecturer, "Recent Developments In Criminal Litigation Ethics And Fee Regulations," Continuing Legal Education Program Sponsored by the Kings County Criminal Bar Association, April 1, 2004.

Lecturer, "Addressing Client Fraud: The Permissible Bounds Of Advocacy," Continuing Legal Education Program sponsored by the United States Department Of Homeland Security, Office Of The District Counsel, (two part presentation) March 24 and April 27, 2004.

Lecturer, "Competency of Government Attorneys In The Face Of Excessive Caseloads: The Individual Attorney's Duties," Continuing Legal Education Program sponsored by the United States Department Of Homeland Security, Office Of The District Counsel, February 24, 2004.

Lecturer, 27th Annual Criminal Trial Advocacy Institute, sponsored by the Appellate Division, First Department and the New York County Lawyers' Association; "Practical Aspects of Evidence at Criminal Trials"; February 21, 2004 (previously delivered this same lecture on a yearly basis from 1982 on).

Lecturer, "Recent Developments In Litigation Ethics," Continuing Legal Education Program Sponsored by the New York City Small Claims Arbitrators' Association, February 18, 2004.

Lecturer and Panel Moderator, "Ethical Bounds of Aggressive Litigation -- A Year 2002 Update," Continuing Legal Education Program sponsored by the New York County Lawyers' Association, January 21, 2004.

Lecturer, "Recent Developments In Criminal Litigation Ethics And Fee Regulations," Continuing Legal Education Program sponsored by the Appellate Division, First Department, Office Of Special Projects, December 15, 2003.

Lecturer, Seventeenth Annual Appellate Terms' Education Seminar, speaking on "Ethics 2003 Primer: Ethical Highlights - The Year In Review and A Contemporary Overview of the Limits To Aggressive Litigation," St. John's University School of Law, December 1, 2003 (and previously delivered annual updates at

the Appellate Term's annual conferences on November 20, 2002, January 8, 2002 and November 29, 2000).

Lecturer, "Litigation Pitfalls for the New Practitioner," Continuing Legal Education Program sponsored by the New York University School of Continuing And Professional Studies, November 22, 2003.

Lecturer, "Ethics Update 2003: Significant Decisions And Impending Changes," Continuing Legal Education Program sponsored by the Brooklyn Bar Association, November 12, 2003.

Lecturer, "Professional Ethics -- Recent Litigation Developments," Continuing Legal Education Program sponsored by the Columbian Lawyers' Association, November 5, 2003.

Lecturer, "Ethics For Corporate Counsel – A Year 2003 Update," Continuing Legal Education Program sponsored by the Corporate Counsel Section of the New York State Bar Association, October 27, 2003.

Lecturer and Program Moderator, "Ethics For The Transactional Lawyer," Continuing Legal Education Program sponsored by the New York County Lawyer's Association, September 17, 2003.

Lecturer, "Bridge The Gap II" Ethics Program, Practicing Law Institute, August 18, 2003 (and multiple other dates).

Panel Moderator, "Ethics For The Entertainment Lawyer," Continuing Legal Education Program Sponsored by the Association of the Bar of the City of New York, June 11, 2003.

Lecturer, "Legal Ethics In Corporate Transactions," Bridge the Gap Continuing Legal Education Program sponsored by the Association of the Bar of the City of New York, May 28, 2003.

Lecturer, "Ethics For Corporate Counsel – A Year 2003 Update," Continuing Legal Education Program sponsored by the New York County Lawyers' Association, April 23, 2003.

Lecturer, "Conflicts Of Interests In The Immigration Context: Issues For Government Attorneys," Continuing Legal Education Program sponsored by the United States Department Of Homeland Security, Office Of The District Counsel, April 22, 2003.

Lecturer, "Emerging Issues In The Field Of Conflicts Of Interests For The Criminal Practitioner," Continuing Legal Education Program Sponsored by the Brooklyn Criminal Bar Association, February 27, 2003.

Panelist, "Ethics For The Busy Lawyer: Avoiding Ethical Dilemmas In Your Law Practice," Continuing Legal Education Program

Resume of Michael S. Ross

sponsored by the New York County Lawyers' Association, February 26, 2003.

Lecturer, "The Duty of Zealous Advocacy And Its Limits: Basics For Newly Admitted Attorneys," Continuing Legal Education Program sponsored by Fordham University School of Law, February 25, 2003.

Lecturer, at In-House Continuing Legal Education program for Freshfields Bruckhaus Deringer, LLP, entitled: "Ethics For The Transactional Lawyer – A Year 2003 Update," January 23, 2003.

Lecturer, "Recent Developments In The Field Of Attorney Candor In Litigation," Continuing Legal Education Program sponsored by the United States Department Of Homeland Security, Office Of The District Counsel, January 28, 2003.

Lecturer, "The Attorney-Client Privilege: Is It Alive And Well?" Continuing Legal Education Program sponsored by the Appellate Division, First Department, Office Of Special Projects, December 9, 2002.

Panelist, "Clarence Darrow: Crimes, Causes and the Courtroom," Continuing Legal Education Program sponsored by the New York County Lawyers' Association, October 26, 2002.

Lecturer, "Ethics For Corporate Counsel – A Year 2002 Update," Continuing Legal Education Program sponsored by the Corporate Counsel Section of the New York State Bar Association, October 25, 2002.

Panelist, Ethics Panel following the dramatic presentation entitled "Impeach Justice Douglas!" Continuing Legal Education Program sponsored by the New York County Lawyers' Association, October 25, 2002.

Lecturer, "Ethical Considerations in Aggressive Trial Lawyering," Continuing Legal Education Program sponsored by Law Journal Seminars/American Lawyers Media, entitled Litigation Summit, The New York Hilton Hotel, October 15, 2002.

Lecturer, "Emerging Issues In The Field Of Conflicts," Continuing Legal Education Program Sponsored by the Brooklyn Bar Association, October 9, 2002.

Lecturer and Panel Moderator, "Ethical Bounds of Aggressive Litigation – A Year 2002 Update," Continuing Legal Education Program sponsored by the New York County Lawyers' Association, September 18, 2002.

Lecturer and Panel Moderator, "Emerging Challenges In Ethical Issues For The Corporate Lawyer," Continuing Legal Education Program sponsored by the New York County Lawyers' Association, June 26, 2002.

Speaker, "New York State Judicial Institute On Professionalism In The Law:  Summit on the Internet and the Practice of Law: Charting a Course for the Twenty-First Century," speaking on the issues of "On-Line Attorney Referral Service:  Partnering With Non-Attorneys and Fee-Splitting Among Attorneys," Fordham University School of Law, June 18, 2002.

Lecturer, "An Ethical Perspective for General Counsel," Continuing Legal Education Program sponsored by Law Journal Seminars/American Lawyers Media, entitled General Counsel Conference, The St. Regis Hotel, June 15, 2004 (previously spoke at the same program in June 2001 and June 2003).

Lecturer, "Recent Developments in Criminal Litigation Ethics," Continuing Legal Education Program sponsored by the Appellate Division, First Department and the Criminal Justice Coordinator's Office, April 22, 2002.

Lecturer, "Ethical Conduct In The Workplace," Practicing Law Institute Program entitled "The Law Library 2002," April 10, 2002.

Lecturer, "Civility and Professionalism," Continuing Legal Education Program sponsored by the Brooklyn Bar Association, April 10, 2002.

Panelist, "The Disciplinary Process:  How It Works," Continuing Legal Education Program sponsored by the Committee on Professional Discipline of the Association of the Bar of the City of New York, April 9, 2002.

Panelist, "Ethics - When Your Case Is On The Line," Continuing Legal Education Program sponsored by the New York County Lawyers' Association "American Inn of Court" Program, April 4, 2002.

Lecturer and Panel Moderator, "Ethical Bounds Of Aggressive Litigation -- An Update on Developments," Continuing Legal Education Program sponsored by the New York County Lawyers' Association, April 3, 2002.

Panelist, "An Ethics Roundtable For 2002," Continuing Legal Education Program sponsored by the New York State Trial Lawyers Institute, March 22, 2002 (previously served as panelist for this program in March 2001).

Resume of Michael S. Ross

Panelist, "Clarence Darrow:  Crimes, Causes and the Courtroom," Continuing Legal Education Program sponsored by the New York County Lawyers' Association, March 18, 2002.

Lecturer, "Ethics and the Criminal Law Practitioner – Avoiding Ethical Pitfalls," Continuing Legal Education Program sponsored by the New York State Defenders Association, March 16, 2002.

Lecturer, "Avoiding Ethical Pitfalls:  Basics for the New Practitioner," Continuing Legal Education Program sponsored by Fordham University School of Law, March 13, 2002.

Lecturer, at ten In-House continuing legal education programs for Kaye Scholer LLP, entitled: "Ethics In Aggressive Litigation"; "Ethics In Complex Litigation"; "Ethics In Transactional Lawyering"; "Ethical Issues In Aggressive Discovery"; and "Ethical Issues In Aggressive Lawyering" (November 2006; December 2006; March 2003; February 2003; December 2000; May 2001; January 2002).

Lecturer, "Ethics and the Criminal Practitioner," Continuing Legal Education Program sponsored by the Criminal Law Section and the Committee on Continuing Legal Education of the New York State Bar Association, November 16, 2001.

Lecturer, "Ethics For Corporate Counsel," Continuing Legal Education Program sponsored by the Corporate Counsel Section of the New York State Bar Association, October 25, 2001.

Lecturer and Panel Moderator, "Bridge The Gap Ethics:  What Every Practicing Lawyer Must Know," Continuing Legal Education Program sponsored by the Association of the Bar of the City of New York, October 22, 2001.

Lecturer, "Ethics For Lawyers In The 21st Century:  Ethics And The Internet," Continuing Legal Education Program sponsored by the New York University School of Continuing And Professional Studies, October 6, 2001.

Lecturer, "How [Not] To Commit Malpractice With Your Computer," Continuing Legal Education Program at "LegalTech," sponsored by Law Journal Seminars/American Lawyers Media, the ABA Law Practice Management Section and other entities; New York Hilton (September 25, 2001).

Lecturer, "Emerging Ethical Issues In Aggressive Litigation," Continuing Legal Education Program sponsored by the Suffolk County Bar Association, September 22, 2001.

Lecturer and Program Moderator, "Ethics For The Transactional Lawyer," Continuing Legal Education Program sponsored by the New York County Lawyer's Association, November 7, 2001.

Lecturer, "Emerging Ethical Issues In Litigation," Continuing Legal Education Program sponsored by the New York City Law Department, September 5, 2001.

Lecturer, "Avoiding Ethical Pitfalls," New York County Lawyers' Association "Bridge The Gap Program: A Program For Newly Admitted Attorneys," August 10, 2001.

Lecturer, "Avoiding Ethical Pitfalls," Association of the Bar of the City of New York "Bridge The Gap Program," June 14, 2001.

Lecturer, "Aggressive Lawyering," Continuing Legal Education Program sponsored by the Brooklyn Bar Association, April 11, 2001.

LawLine.Com televised program, entitled: "The Disciplinary Committee," (appeared with Thomas Cahill, Chief Counsel of the Departmental Disciplinary Committee for the First Judicial Department), April 8, 2001.

Lecturer, "Ethics In Litigation: Aggressive Litigation Tactics," Continuing Legal Education Program sponsored by the Appellate Division, First Department and the Criminal Justice Coordinator's Office, April 2, 2001.

Lecturer, "Ethics and Professionalism," Continuing Legal Education Program sponsored by Law Journal Seminars/American Lawyers Media, entitled <u>Civil Litigation – A View From The Bench And The Bar</u>, The New York Hilton, March 23, 2001.

Lecturer, "Protecting The Record: The Respondent's Point Of View," Internal Training Course For Referees Of The Departmental Disciplinary Committee For The First Department, March 15, 2001.

Lecturer, "Limits to Aggressive Litigation," Continuing Legal Education Program sponsored by the General Practice, Solo and Small Firm Section, New York State Bar Association Annual Meeting, January 24, 2001.

Lecturer, "Avoiding Ethical Pitfalls," New York County Lawyers' Association "Bridge The Gap Program," December 1, 2000.

Panelist, Symposium entitled "The Cooperating Witness Conundrum: Is Justice Obtainable?" held at the Benjamin N. Cardozo School of Law, addressing the issue of "Proposal for Change – Internal and External Disciplinary Systems," November 30, 2000.

Lecturer, "Recurring Ethical Issues Facing Attorneys During Their Careers," Orientation Program For Candidates For Admission To The Bar, sponsored by the Office of the Committee on Character and Fitness, Appellate Division, First Department, October 24, 2000; November 14, 2000; December 5, 2000; January 9, 2001; and March 27, 2001.

Lecturer, "Ethics and the Internet," Continuing Legal Education Program sponsored by the Brooklyn Bar Association, November 8, 2000.

Panelist, "Ethics In Litigation," speaking on the topics of "Is Deceit Acceptable In The Litigation Process," and, "Offering Questionable Testimony And Documents," Continuing Legal Education Program sponsored by the Appellate Division, First Department, October 16, 2000.

Lecturer, "Ethics In Aggressive Litigation: The Rules of Engagement," sponsored by Law Journal Seminars/American Lawyers Media, New York Hilton Hotel, October 5, 2000.

Panelist, "Ethical Considerations in Public Sector Law," American Bar Association Annual Convention For Year 2000, sponsored by the A.B.A.'s Government & Public Sector Lawyer Division, July 7, 2000, Warwick Hotel, New York City.

Panelist, "Ethical Problems Facing Prosecutors," American Bar Association Annual Convention For Year 2000, sponsored by the A.B.A.'s Criminal Justice Section, July 7, 2000, New York Hilton Hotel, New York City.

Panelist, "Ethical Issues On The Internet," Meeting Of The New York State Association Of Disciplinary Attorneys," May 18, 2000.

Lecturer, "The Internet Effect On Ethical Obligations Of The Law Firm To Its Clients: Confidentiality And The Internet," sponsored by Law Journal Seminars/American Lawyers Media, New York Hilton & Towers, May 16, 2000.

Lecturer, "The Internet Effect On Ethical And Managerial Functions That Effect Law Firms Internally," sponsored by Law Journal Seminars/American Lawyers Media, New York Hilton & Towers, May 9, 2000.

Program Chair, "Civil Trial Practice: Firefights In The New Millennium," Continuing Legal Education Program sponsored by Law Journal Seminars/American Lawyers Media; also lecturing at that program on the subject of Ethical Considerations in Trial Lawyering and on the issue of Effective Motions In Limine; The New York Hilton & Towers, May 1 and May 2, 2000.

Resume of Michael S. Ross

Lecturer, "The Respondent's Perspective On The Disciplinary Process In The First Department," Internal Training Course For Referees And Panel Members Of The Departmental Disciplinary Committee For The First Department; April 11, 2000.

Panelist, "Basic Legal Ethics Program," speaking on the topic of "Avoiding Ethical Pitfalls In The Area Of Legal Fees," Continuing Legal Education Program sponsored by the Appellate Division, First Department; March 27, 2000.

Lecturer, "Ethics and Professionalism," Continuing Legal Education Program sponsored by Law Journal Seminars/American Lawyers Media, entitled Civil Litigation - A View From The Bench And The Bar, The New York Hilton & Towers; March 21, 2000.

Lecturer, "Understanding The Ethics Terrain," Practicing Law Institute Continuing Legal Education Bridge The Gap Program; February 21, 2000.

Lecturer, "How Not To Commit Malpractice With Your Computer," Continuing Legal Education Program at "LegalTech-ABA Small Firm Track series," sponsored by Law Journal Seminars/American Lawyers Media, New York Hilton & Towers; January 25, 2000.

Lecturer, "Avoiding Ethical Pitfalls," Marino Institute for Continuing Legal Education Program sponsored by the New York Criminal & Civil Courts Bar Association; December 7, 1999.

Lecturer and Demonstration, "Summations," Hofstra Law School Advanced Trial Seminar; December 2, 1999.

Lecturer, "Ethical Challenges For The Experienced Lawyer," Legal Education Program sponsored by St. John's University Law School; October 14, 1999.

Lecturer, "Avoiding Ethical Pitfalls Facing Experienced Practitioners," Continuing Legal Education Program sponsored by Law Journal Seminars/American Lawyers Media, New York Hilton, May 11, 1999 and October 4, 1999.

Lecturer, St. John's Law School, Continuing Legal Education Program on the "Client Fraud Exception To The Attorney-Client Privilege,"; April, 1999.

Panelist, 1998 New York State Bar Association Annual Meeting, Panel sponsored by the Committee on Professional Discipline, "New Rules Governing Lawyers,"; January 29, 1998.

Panelist, Association of Professional Responsibility Lawyers, American Bar Association 1996-1997 Houston, Texas Mid-Year Meeting, "Constitutional and Ethical Implications of Using Law

Firm Personnel as Confidential Informants in Disciplinary Investigations,"; January, 1997.

Panelist, Pace University School of Law, Center for Continuing Education, "Pitfalls In Client Billing In The 1990's," (March, 1997) (sponsored by the Westchester County Women's Bar Association).

Panelist, along with New York Court of Appeals Chief Judge Judith Kaye, at New York Press Club Foundation "Fourth Annual Conference on Journalism," Program on "The Impact of Television in the Courtroom," Columbia University; November 1996.

Lecturer, Brooklyn Bar Association Continuing Legal Education Program; "Pre-trial Hearings and Motions--The Wade Hearing"; 1995.

Instructor, Legal Aid Society Criminal Defense Division Trial Advocacy Program; 1986 through 1994.

Lecturer, Criminal Trial Advocacy In the Federal Courts Course, sponsored by the United States District Court, Eastern District of New York and the Brooklyn Bar Association; "Federal Sentencing Guidelines"; November, 1993.

Symposium moderator at Program entitled:  "Should The Exclusionary Rule Be Scrapped?"; New York City Association; October, 1996.

Symposium moderator at Program entitled: "Are Prosecutors Really Subject To The Traditional Enforcement Of Ethical Rules?"; New York City Bar Association; June, 1994.

Lecturer at New York State Association of Criminal Defense Lawyers Program Entitled:  "Cross-Examination To Kill" – The Cross-Examination Of A Fingerprint Expert"; June, 1994.

Panelist, at U.S. Department of Justice First Annual Conference of Professional Responsibility Officers, Washington, D.C., "Private Bar Perspective"; October, 1994.

Symposium moderator at Program entitled:  "Confronting Client Fraud in 1990's:  Disasters in the Making"; New York County Lawyers' Association; June, 1993.

Instructor at U.S. Attorney General's Advocacy Institute, Advanced Advocacy Courses, on the topic of "The Ethics of Defending and Prosecuting Cases"; 1989-1990.

Panelist, Benjamin N. Cardozo School of Law Forum entitled:  "The Pregnancy Police: Prosecution of Maternal Substance Abuse"; April, 1992.

Resume of Michael S. Ross

Lecturer, Cornell Law School Seminar on "Abuses In The Government's Application Of The RICO Statute"; April, 1992.

Panelist, New York School Symposium entitled, "The United States Supreme Court In The 1990's"; February, 1992.

Panelist, WNYC Radio Program on the topic of "Grand Jury Abuse,"; January 13, 1992.

Lecturer, New York State Bar Association Continuing Legal Education Program on "Evidence and the Trial of a Criminal Case" (New York City, Albany, Tarrytown and Rochester, 1991).

Moderator, New York Council of Defense Lawyers Sentencing Program - "Advocacy With the Prosecutor"; October, 1991.

Lecturer, New York County Lawyers' Association Forum on "Forfeiture Laws: An Overview For the Federal and State Practitioner"; January, 1991.

Lecturer, Criminal Trial Advocacy in the Federal Courts Program, sponsored by the United States District Court for the Eastern District of New York and the Appellate Division, Second Department: "Plea Bargaining and Cooperation Under the New Sentencing Guidelines"; November, 1990.

Sponsored Association of the Bar of the City of New York Public Forum entitled: "When Criminal Advocates Talk To The Press: On And Off The Record After Gentile"; April, 1992.

Chaired Association of the Bar of the City of New York public forum entitled: "Are Federal Prosecutors Exempt From Professional Rules of Ethics?"; March, 1991.

Panelist, American Bar Association Program Entitled: "Blasting Into the 90's: Hot Issues In Criminal Law Practice -- The Grand Jury Witnesses of the 90's . . ." November, 1990 (Washington, D.C.).

Lecturer, American Law Institute's Seminar on "The Federal Sentencing Guidelines," Washington, D.C.; April, 1989.

Lecturer, Federal Bar Association (Philadelphia Chapter), Criminal Law Committee Seminar on "Federal Sentencing Guidelines," Philadelphia, Pa.; June, 1989.

Lecturer, Federal Courts Committee, Brooklyn Bar Association on "How To Practice Law and Not Lose Your Fees"; January, 1990.

Lecturer, Criminal Law and Procedure Course, sponsored by the Appellate Division, Second Department and the Brooklyn Bar Association; 1984; 1986; and 1988.

Page 40 of 45

Guest lecturer since 1981 at special programs and classes at various law schools, including Cornell Law School, Brooklyn Law School, St. John's Law School, New York Law School, Hofstra Law School and John Jay College of Criminal Justice, speaking on criminal law and ethics issues.

Appeared in half-hour interview on CSPAN, on the topic of Grand Juries — their operations and possible abuses (Washington, D.C.; February 26, 1998).

Participant in nationally syndicated program, "American Journal," in mock jury selection for O.J. Simpson trial; September, 1994.

Panelist in the nationally broadcast CBS program "Nightwatch," and discussed the government's attempts to compel attorneys to disclose information concerning their clients; February 1990.

Participant in the Legal Aid Society's Consulting Colleague Program (the "Mentor Program"); 1989-1990.

Testified before Congress' Federal Courts Study Committee on Long Range Planning For the Federal Judiciary; January, 1990.

Testified before the New York State Senate and Assembly Committee on Codes, Joint Legislative Hearings, in connection with "Forfeiture Under New York State Law: A Five Year Assessment"; August, 1989.

Testified before the New York State Law Enforcement Council in connection with proposed amendments to New York State's forfeiture laws; February, 1989.

Testified as expert witness before the House of Representatives, Committee on the Judiciary, on behalf of National Association of Criminal Defense Attorneys in connection with amendments to Federal law governing grand jury practice; June, 1987.

Lecturer at New York Women's Bar Association, Litigation Skills Committee meeting on "Appellate Practice"; November, 1987.

Lecturer, National Network For the Right to Counsel's "Conference on Defending the Right to Counsel"; November, 1986.

Panelist, Citizen's Crime Commission of New York City, "The Proposed State RICO Statute"; May, 1986.

Lecturer, Criminal Law Institute, St. John's Law School; "Seeking Forfeiture of Attorney's Fees, A New Weapon For the Assault Upon Organized Crime"; March, 1986.

Resume of Michael S. Ross

Lecturer, Nassau Academy of Law White Collar Crime Program; "The Defense of Criminal RICO Cases"; January, 1986.

Lecturer at In-House Training programs since 1978 for various local prosecutors' offices including the Brooklyn District Attorney's Office, the Staten Island District Attorney's Office, etc.

Lecturer, New York County Criminal Bar Association Continuing Education Lecture Series; lectured on "Defense Perspectives on Court Ordered Electronic Surveillance"; February, 1982.

Instructor and lecturer at U.S. Attorney General's Advocacy Institutes on Public Corruption (San Diego, 1979; New Orleans, 1980); Grand Jury Practice (Denver, 1981; Chicago and Washington, D.C., 1982); and Economic Fraud (Atlanta, 1981; Chicago, 1982).

Lecturer, N.Y. State Division of Criminal Justice Services Seminar on Economic Crime; lectured on "Grand Jury Practice and the Search for Documentary Evidence"; March, 1981.

Instructor, N.Y. City Corporation Counsel "Trial Techniques Program"; February, 1981.

Instructor, N.Y. State Attorney General's Training Program; lectured on "The Acquisition of Evidence at the Grand Jury Stage"; January, 1980.

Lecturer, N.Y. State Division of Criminal Justice Services Seminar on Scientific Evidence and Expert Testimony; lectured on "The Utilization of Expert Testimony at Trial"; April, 1980.

Lecturer, N.Y. State Division of Criminal Justice Services Seminar on the Prosecution and Defense of Rape Cases; lectured on "The Acquisition and Use of Physical Evidence At a Rape Trial"; May, 1979.

Lecturer, N.Y. City Annual Criminal Justice Training Program for Law Students; lectured on "Lineups, Identification Procedures and Electronic Eavesdropping"; 1979 and 1980.

## PUBLICATIONS

Authored various articles and monographs to accompany the Continuing Legal Education Programs as described above.

Co-authored "Defending The Indefensible: Navigating The Strategic And Ethical Landscape Of Defending Clients Who Have Engaged In Indefensible Conduct," American Bar Association *Tort, Trial &*

*Insurance Practice Law Journal*, Volume 52, Issue 3 — Spring/Summer 2017.

Editorial Consultant, The New York Rules Of Professional Conduct: Rules And Commentary, (Winter 2012) Oxford University Press, Edited by the New York County Lawyers' Association Ethics Institute.

Co-authored chapter entitled "Client and Witness Perjury," in the American Bar Association, Section of Litigation, book entitled Litigation Ethics: Course Materials For Continuing Legal Education, (2000).

"How Not To Commit Malpractice With Your Computer," Legal Tech Newsletter, Vol. XVIII, Number 6 (September 2000) and Vol. XVIII, Number 7 (October 2000) (A Two-Part Series) (Published by American Lawyer Media).

"Strategic Moves To Defend White Collar Fees: Is A 'Good' Fee In A White Collar Case Always Really 'Good'," A.B.A. Criminal Justice Magazine, Summer 1999 (Cover Article), Vol. 14, No. 2, pp. 4, et seq.

Authored chapter entitled "Evidentiary Issues and Objections," in New York Criminal Practice (2d ed. 1998), published by the New York State Bar Association.

"Cooperating with Federal Authorities: Operating on the Outer Limits," A.B.A. Criminal Justice Magazine, Summer 1997 (Cover article), Vol. 12, No. 2, pp. 4, et seq.

"Ethics Column: Alternative Forums for Ethics Disputes," A.B.A. Criminal Justice Magazine, Spring 1996, Vol. 11, No. 1, pp. 42, et seq.

"Ethics Column: Defense — A Decade of Litigating Dangerously: Time to Replace Rhetoric with Reason," A.B.A. Criminal Justice Magazine, Fall 1994, Vol. 9, No. 3, pp. 36, et seq. (co-authored with Sheldon Krantz).

Authored various "amicus" briefs on behalf of the American Bar Association's Criminal Justice Section, the Association of the Bar of the City of New York Criminal Advocacy Committee and the New York County Lawyer's Association Committee on Professional Discipline in connection with issues relating to attorney subpoenas, attorney fee forfeiture and attorney discipline issues.

Authored the original American Bar Association 1988 attorney subpoena resolution and supporting report; and in 1989, authored the original Model Rule of Professional Conduct (i.e., Rule 3.8[f]), adopted in 1990 (later repealed), which

Resume of Michael S. Ross

required prior judicial approval of prosecutorial subpoenas to attorneys.

Monograph, Practical Evidentiary Problems at Trial; 1978 through 2002 editions of Manual for Basic Course for Prosecutors (published by the New York State Division of Criminal Justice Services).

Monograph, Practical Aspects of Evidence at Trial; 1995 through 2002 editions of New York County Lawyers' Association Continuing Legal Education Manual For Annual Program On Criminal Trial Advocacy.

Article, "The Forfeiture of Attorney Fees in Criminal Cases: A Call For Immediate Remedial Action," The Record of the Association of the Bar of the City of New York, Vol. 41, No. 4, pp. 469525 (May, 1986).

Monograph, Issuance of Subpoenas Upon Lawyers In Criminal Cases: A Defense Attorney's Perspective (March, 1985); published and distributed by the Association of the Bar of the City of New York.

Monograph, Special Considerations in the Utilization of Title III Electronic Surveillance in Official Corruption and Fraud Cases (April 1982); published and distributed nationally by U.S. Attorney General's Advocacy Institute.

Monograph, Constitutional and Statutory Privileges Before Federal Grand Juries (April, 1982); published and distributed nationally by U.S. Attorney General's Advocacy Institute.

Article, "Robbins v. California and the Standards For Searching and Seizing Packages," Search and Seizure Law Report, Vol. 8, No. 9 (September, 1981).

Monographs, New York State Grand Jury Practice and the Search For Documentary Evidence and Multiple Representation at the Grand Jury Stage (February, 1981); published and distributed throughout N.Y. State by N.Y. State Division of Criminal Justice Services.

Monograph, The Utilization of Expert Testimony At Trial (June, 1980); Reprinted in Manual for Basic Course for Prosecutors (N.Y. State Division of Criminal Justice Services).

Monograph, The Constitutional Acquisition Of Evidence From the Defendant and Its Use At Trial (April, 1979); Reprinted in Handbook on Scientific Evidence and Expert Testimony (N.Y. State Division of Criminal Justice Services).

Resume of Michael S. Ross

Monograph, <u>Evidentiary Aspects Of the Preparation and Trial Of a Rap Case</u> (April, 1979); Reprinted in <u>Sex Offense Manual</u> (N.Y. State Division of Criminal Justice Services).

Monograph, <u>Electronic Surveillance and the Grand Jury</u>, (April, 1978).

## SUPPLEMENTARY BACKGROUND INFORMATION

### ADDITIONAL LEGAL EDUCATION

National College of District Attorneys, Houston, Texas; Criminal Trial Advocacy Course (June, 1977).

Cornell Institute on Organized Crime (August, 1976).

### EDUCATIONAL HONORS

Law School:

Note and Comment Editor, <u>New York University Review of Law and Social Change</u>

International Moot Court Team; Runner-up, International Moot Court Regional Competition (Harvard, 1972)

Undergraduate:

Phi Beta Kappa
Omicron Delta Pi - National Honorary Economics Society
Tau Kappa Alpha - National Honorary Forensics Society
Henry Rutgers Scholar Program (Honors Program)

Graduated with "Honors"
Graduated with "Distinction" from the Department of Economics
Dean's List: 1968-71

Page 45 of 45

# EXHIBIT B

# EXHIBIT B



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------

UNITED STATES OF AMERICA,      :    **AFFIDAVIT OF**
                                     :    **WILLIAM FLANAGAN**

    -against-                :

                                     :    16-CR-832 (KMK)

NICHOLAS TARTAGLIONE,      :

           Defendant.      :
--------------------------------

STATE OF FLORIDA      )
                    : ss.:
COUNTY OF PALM BEACH   )

1. My name is William Flanagan and I am a licensed Private Investigator in the state of New York.

2. I have worked with Bruce Barket on several matters over the course of the last 5 years.

3. On July 28, 2019, Bruce contacted me to request my assistance in obtaining hand writing exemplars for Jeffrey Epstein.

4. I made several attempts to locate some exemplars but unfortunately, after several attempts, my efforts were unsuccessful.

5. After several hours I contacted Bruce to let him know that I was unable to obtain the exemplars.

_____
**WILLIAM FLANAGAN**

Sworn to me this 15 day of January, 2020
in the County of Palm Beach, State of Florida

_____
Notary Public

EVELYN RENTA
MY COMMISSION # GG 079609
EXPIRES: March 6, 2021
Bonded Thru Notary Public Underwriters

# EXHIBIT C

# EXHIBIT C



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - -

UNITED STATES OF AMERICA,　　　　　:　　**AFFIDAVIT OF JAY SALPETER**

　　　　　　　　　　　　　　　　　　　　　:

　　-against-　　　　　　　　　　　　　　:

　　　　　　　　　　　　　　　　　　　　　:　　16-CR-832 (KMK)

NICHOLAS TARTAGLIONE,　　　　　　　:

　　　　　　　　　　　　　　　　　　　　　:

　　　　　　　　　Defendant.　　　　　　　:

- - - - - - - - - - - - - - - - - - - - - - - - - - - -

STATE OF NEW YORK　　　）

　　　　　　　　　　　　　　　: ss.:

COUNTY OF NASSAU　　　　）

1. My name is Jay Salpeter and I am a licensed Private Investigator (11000041048) in the state of New York.

2. I have worked with Bruce Barket on several matters over the course of the last 25 years.

3. On July 29, 2019, Bruce contacted me to request my assistance in obtaining hand writing exemplars for Jeffrey Epstein.

4. I made several attempts to locate an exemplar and was met with negative results.

5. Within several hours of his initial request, I contacted Bruce to let him know that I was unable to obtain the exemplars.

JAY SALPETER

Sworn to me this _15_ day of January, 2020
in the County of Nassau, State of New York

Notary Public

LENSKA RODRIGUEZ
NOTARY PUBLIC, State of New York
No. 01RO6147462
Qualified in Suffolk County
Commission Expires June 5, _2022_

# EXHIBIT D

# EXHIBIT D



## Bruce Barket

| | |
|---|---|
| **From:** | Adam Johnson <a10johnson@bop.gov> |
| **Sent:** | Friday, August 09, 2019 1:54 PM |
| **To:** | Bruce Barket; Stephanie Scannell |
| **Subject:** | Re: Epstein investigation |

Hi Bruce,

It is my understanding that the investigation has concluded and that no charges, disciplinary or otherwise, are being filed against your client. I hope this helps.

Also, I have notified the Duty Officer and Captain, and will notify the Lieutenants that you plan to visit first thing Sunday morning.

Thank you,
Adam

>>> Bruce Barket <bbarket@barketepstein.com> 8/9/2019 1:00 PM >>>
Adam,

Good afternoon. Any update on the investigation regarding Epstein's suicide attempt?

Bruce A. Barket, Esq.
Barket Epstein Kearon Aldea & LoTurco, LLP
666 Old Country Road , Ste. 700
Garden City, NY 11530
(516) 745 1500 [P]  (516) 745 1245 [F]
www.barketepstein.com

This transmittal may be a confidential attorney client communication or may otherwise be privileged or confidential. If it is not clear that you are the intended recipient, you are hereby notified that you have received this transmittal in error; any review, dissemination, distribution or copying of this transmittal is strictly prohibited. If you suspect that you have received this communication in error, please notify us immediately by telephone or email and immediately delete this message and all its attachments

1

# EXHIBIT E

# EXHIBIT E



## Bruce Barket

| | |
|---|---|
| **From:** | Swergold, Jason (USANYS) <Jason.Swergold@usdoj.gov> |
| **Sent:** | Thursday, January 09, 2020 11:12 AM |
| **To:** | Bruce Barket; Aida Leisenring; Tony Ricco; BRUCE KOFFSKY; kenneth@kjmontgomerylaw.com; michael@mbachlaw.com; John Diaz |
| **Cc:** | Comey, Maurene (USANYS) |
| **Subject:** | Tartaglione - Additional Information re Discovery Requests |

All –

1 – We have been informed by MCC that if you would like to inspect the makeshift rope from the July 23, 2019 incident (a picture of which was contained in the report you reviewed at our office), you can arrange to do so by contacting Nicole McFarland, the new legal counsel at MCC. You will not be allowed to take photographs of the rope.

2 – We have been informed that in the course of its investigation into Mr. Tartaglione's contraband cellphone, BOP created forensic reports of the phone and SIM card. We have not obtained or requested copies of these reports. If you would like to review the reports, please let us know. In that case, in light of earlier claims of privilege raised by Mr. Barket, we will ask BOP to provide the reports to a walled off team of AUSAs to review for privileged materials. That walled off team of AUSAs will coordinate producing the reports to you and will work with you to determine what, if any, portions of the report can be provided to the case AUSAs

3 – We have been informed by BOP that apart from the photographs contained in the materials you reviewed at our office regarding the July 23 incident, no other pictures or videos were taken from inside the Tartaglione/Epstein cell.

4 – We have received additional information from BOP regarding the video outside of the Tartaglione/Epstein cell, and we will be filing a letter with the Court shortly. As stated in the letter, the video that we have is available for review at our office at your convenience.

Jason M. Swergold
Co-Chief, Narcotics Unit
United States Attorney's Office
Southern District of New York
One Saint Andrew's Plaza
New York, New York 10007
Tel: (212) 637-1023
jason.swergold@usdoj.gov

1

# EXHIBIT F

# EXHIBIT F



**Bruce Barket**

From:                           Bruce Barket
Sent:                           Wednesday, December 04, 2019 3:00 PM
To:                             'BOBBI C STERNHEIM'
Cc:                             Aida Leisenring
Subject:                        RE: Tartaglione

Bobbi,

I was able to meet with Nick yesterday.  Nick has made it crystal clear to me that while I may disclose certain confidential information concerning his texting using the contraband phone – and I will disclose that information below – I am not authorized to disclose the contents of the messages.  I should also say here that it is my current understanding that whatever information is provided to you will be shared with the entire defense team notwithstanding Nick's repeatedly stated desire that confidential information not be circulated in a manner that it will be available to Mr. Ricco.  I understand that you view your role as *Curcio* counsel as requiring disclosure of such information to all counsel, including Mr. Ricco, but it is important that you understand that I believe that I must follow the directives of Nick in limiting disclosure of confidential information as dictated by the confidentiality mandate of Rule 1.6.  I also understand that eventually, Judge Karas may have to resolve the disclosure issues.

With the above caveat as background, Nick has authorized me to make the following disclosures to you with the understanding that these *specific and limited* disclosures will be shared by you with the defense team and maybe in the report to the judge.

Nick used the contraband phone (516 708 5275) to contact me and Ms. Leisenring as follows.

1. Nick sent a total of 10 text messages to Ms. Leisenring from May 12, 2019 to May 17, 2019 and one other on June 22, 2019. Most of the messages were no more than a few words.  Ms. Leisenring did not solicit or respond to the messages.       2

2. He sent me one text message on June 2, 2019 near midnight which I did not see until the next day and initially did not realize was from Nick.  At 5 am, I responded that I did not recognize the number.  Later on June 2nd, I realized it was Nick texting me and I sent a short response in 5 separate texts consisting of no more than a few words. Nick then sent a two word response and that ended the exchange. To the best of my knowledge, he did not text me before or after that.

3. He called Aida 3 times from the phone from May 16–May 18, 2019.  Those calls were unsolicited by Ms. Leisenring.

4. I do not believe that Nick ever called me but I can't be sure, as I do not have detailed call records.

## REDACTED - PRIVILEGED

With respect to the Epstein note, I cannot provide this to you based upon Nick's specific instructions to me that I not share that note with you or anyone outside my firm other than my firm's Professional Responsibility Counsel, Michael Ross. I want to emphasize that yesterday Nick again stated to me in the strongest possible terms that he is opposed to me or you providing the note to anyone.  For that reason, I would like to discuss with you how the *Curcio* process will address any potential conflict arising from the note while protecting Nick's right to keep his communications to his lawyers private and maintain his confidences. As I made clear in court, my firm's outside Professional Responsibility

1

Counsel, Michael Ross, is consulting with me on this issue and he has advised me that we should proceed lock-step and not make any disclosures against Nick's wishes without a Court directive. Mike is available to speak to you directly about his views on the matter.

Finally, I would like to speak to you about the open ended request you made for any other material relevant to the *Curcio* inquiry. As you know, there have been many assertions by Mr. Ricco concerning the scope and subject matter of your inquiry, and in order to properly provide you with relevant information, I need to get some specific guidance from you as to what you believe the specific *Curcio* issues are.

Bruce A. Barket, Esq.
Barket Epstein Kearon Aldea & LoTurco, LLP
666 Old Country Road , Ste. 700
Garden City, NY 11530
(516) 745 1500 [P]  (516) 745 1245 [F]
www.barketepstein.com

This transmittal may be a confidential attorney client communication or may otherwise be privileged or confidential. If it is not clear that you are the intended recipient, you are hereby notified that you have received this transmittal in error; any review, dissemination, distribution or copying of this transmittal is strictly prohibited. If you suspect that you have received this communication in error, please notify us immediately by telephone or email and immediately delete this message and all its attachments

# EXHIBIT 30

# ANTHONY L. RICCO

*Attorney At Law*
20 VESEY STREET, SUITE 400
NEW YORK, NEW YORK 10007

TEL. (212) 791-3919   FAX. (212) 964-2926
EMAIL: tonyricco@aol.com

STEVEN Z. LEGON
OF COUNSEL

January 21, 2020

## TO BE FILED *EX PARTE* AND UNDER SEAL

## BY EMAIL

Hon. Kenneth M. Karas
United States District Court Judge
Southern District of New York
The Hon. Charles L. Brieant Jr.
Federal Building and Courthouse
300 Quarropas Street
White Plains, New York 10601-4150

> Re: *United States v. Nicholas Tartaglione*,
> Docket No. 16 Cr. 832 (KMK)

Dear Judge Karas:

This letter is written in response to the submission filed by Attorney Barket dated January 16, 2020, wherein he disputes the facts contained in the *Curcio* report and seeks to preclude disclosure of the *Curcio* report to the government.[1]   In order to persuade the court, Attorney Barket asserts his view of the facts – a view that is inconsistent with the facts as known to the

---

[1]    By letter dated January 14, 2020, the undersigned counsel, who are not the subject of the *Curcio* inquiry, recommended disclosure of the *Curcio* report to a government conflict or firewall team, and not to the prosecution team until a penalty phase verdict has been reached or a future order of this court. Attorney Barket's letter fails to acknowledge or address this distinction.

1

undersigned counsel. Indeed, Attorney Barket's statements appear to misrepresent events, take them out of context, omit facts, or outright falsely claim what is known to have occurred.

The undersigned counsel are constrained to file this letter but do so in the discharge of our duty to protect Nicholas Tartaglione's right to conflict-free counsel, and in the fulfillment of our obligation to ensure that this court is not improperly influenced by statements in violation of New York Rules of Professional Responsibility Rule 4.1, and New York Rules of Professional Responsibility Rule 3.3(a)(a) and Rule 8.4(c), (d), (e)(1) & (2). All the undersigned counsel are united in our view that the *Curcio* report accurately sets forth the conduct of Attorney Barket as observed by the undersigned counsel, and as memorialized in several Basecamp posts, emails and text messages.

In the view of the undersigned counsel, the January 16, 2020 submission filed by Attorney Barket is another event in a disturbing pattern of conduct which has been engaged in by him to conceal his true participation in events that has necessitated the appointment of *Curcio* counsel in the first place.

The undersigned counsel are of the view that a full fact finding hearing, with sworn testimony, may be required to resolve material factual issues in dispute, and all of the undersigned counsel are prepared to submit sworn statements by affidavit or in court if this Court believes appropriate and necessary to ensure a full and complete record of the conflicts at issue in this case.

The Government's participation in the *Curcio* hearing through use of a firewall team protects Nicholas Tartaglione's right to confidentiality from the prosecution's trial team, while at the same time ensures that the court's decisions are the result of a full record with input by all parties, including all parties to any potential appeal of the court's decisions in this death authorized case.

2

It is also significant that Attorney Barket previously asserted strong opposition to the appointment of *Curcio* counsel and an inquiry into his conduct.[2]  This position was taken although the District Court's failure to fulfill this obligation, once it is alerted to a possible conflict, would constitute *per se* reversible error.  *See United States v. Levy*, 25 F.3d 146, 153-154 (2d Cir. 1994).  Had this court been persuaded by Attorney Barket's misleading and false assertions in his August 18, 2019 letter opposing the appointment of *Curcio* counsel, the truth of his conduct as accurately memorialized in the *Curcio* report would not have been revealed in the first instance, and in the event of a conviction and/or death sentence in this case, his concealed conduct could not have been raised on direct appeal and might never have been revealed at all.[3]

It is likewise disturbing that after an extensive and thorough inquiry which took place over the past few months and which resulted in *Curcio* counsel identifying a series of improper actions taken by Attorney Barket, Attorney Barket continues to attempt to improperly influence the integrity and outcome of the *Curcio* inquiry.  Such conduct is unprecedented in federal death penalty litigation.  There is likewise no prior precedent that the undersigned can find where the facts underlying the conflict as described by *Curcio* counsel have been challenged by the counsel subject to the inquiry; particularly not in a federal death penalty case.  Great care must therefore

---

[2]    As the court may recall, by letter dated August 18, 2019, Attorney Barket opposed the appointment of *Curcio* counsel in this case, and in order to persuade the court made several factual assertions attesting to, and assuring the court of his adherence to professional standards and ethics.  At the time of the submission of the August 18, 2019 letter, Attorney Barket has concealed from the undersigned counsel his direct participation in the removal of the Epstein note, and had made several statements in team meetings, and in Basecamp posts, emails and text messages, attributing the removal solely to actions of attorney John Weider.   Suffice it to say, had the undersigned been aware of Attorney Barket's direct involvement, such knowledge would have certainly impacted our discussions with Resource Counsel and the Executive Director of the Federal Defenders of New York and the urgency of the course of action to be taken.

[3]    It is also significant that Attorney Barket instructed Nicholas Tartaglione not to reveal information about the Epstein note, outside of his presence - a fact that he now denies through his false claim that he made no effort to interfere with the *Curcio* process.  However, on the date of the appointment of *Curcio* counsel, Attorney Barket informed two of the undersigned attorneys that he instructed Nicholas Tartaglione not to disclosure anything about the Epstein note if he is not present.

be exercised in fashioning a remedy that first and foremost protects Nicholas Tartaglione's right to confidentiality in the *Curcio* process; his right to retain private, conflict-free, counsel of choice; and the need to ensure the integrity of these capital proceedings.

A *Curcio* hearing is not a process designed to protect the conduct of lawyers. To the contrary the purpose of the *Curcio* inquiry is to fully explore, not conceal, the details of the conduct of counsel and determine whether the conduct results in a conflict that can be waived or necessitates discharge irrespective of the defendant's willingness to waive. There is no prejudice to the defendant, however, by proceeding with a conflict or firewall team – no prejudice that we know of and none that has been identified by Attorney Barket.

As has been discussed in prior submissions, this court will need to make a determination of whether the identified conflicts are waivable, *see United States v. Perez*, 325 F.3d 115, 125 (2d Cir. 2003), as well as whether Attorney Barket's conduct, even if waivable, warrants his disqualification as counsel, *see United States v. Fulton*, 5 F.3d 605, 611 (2d Cir. 1993). In order to make such a determination in this case we believe a full evidentiary hearing is required, particularly since Attorney Barket has challenged the factual accuracy of the *Curcio* report and has offered contrary facts - facts which are disputed by all undersigned counsel.

## The Submission of the Ethics Opinion Serves to Shield Improper Conduct of Counsel

In addition to the above, the undersigned feel compelled to address the submission, as an exhibit, of a legal brief written by independent counsel retained to represent Attorney Barket and his law firm.

In response to the order of this court dated January 8, 2020, Attorney Barket concludes that the *Curcio* report should not be disclosed to the government under any circumstances. In order to persuade the court to reach such a determination, Attorney Barket has, as stated above,

4

misrepresented events and has set forth misleading and false statements of facts material to the *Curcio* inquiry.  Attorney Barket has also attacked the accuracy and reliability of *Curcio* report submitted to the court by Attorney Sternheim.

In support of his position, Mr. Barket submits a lengthy brief authored by Michael Ross, a highly respected attorney, who has been retained by the Barket firm.  Mr. Ross asserts facts and reaches conclusions, however, based upon information supplied to him solely by Mr. Barket, the subject of the *Curcio* inquiry (and perhaps John Weider and others at the Barket firm involved with contraband at the Metropolitan Correction Center).

Attorney Sternheim, whose report is criticized by Attorney Barket, conducted several interviews with Nicholas Tartaglione at the Metropolitan Correctional Center and has also attended team meetings with all counsel.  In addition to Attorney Sternheim's attendance at team meetings, Attorney Sternheim has conducted interviews each undersigned attorney.  Attorney Sternheim also reviewed dozens of Basecamp posts, emails, and text messages, in order to corroborate each fact contained in the *Curcio* report involving the conduct of Attorney Barket.  *Curcio* counsel also gave *all* counsel multiple opportunities to provide her with any and all information that he or she believed relevant to the investigation of a conflict in this case.  This level of objective fact-finding provides the *Curcio* report with a chronology of events and supporting information that is not included in attorney Mr. Ross's ethics opinion.[4]

---

4       Mr. Ross did, at one point several months ago, offer to meet with learned counsel in an effort to better understand the allegations being made against his client, Attorney Barket.  Learned counsel declined this meeting as it is Mr. Tartaglione's interests that must be protected in a *Curcio* proceeding, not the lawyer subject to the conflict. Notably, at no point did Mr. Ross nor Attorney Barket inform the undersigned counsel, nor *Curcio* counsel, nor even capital Resource Counsel, that he was preparing a shadow "ethics" report to counter *Curcio* counsel's analysis.  The undersigned counsel are all of the view that filing of an opinion letter by Mr. Ross, Attorney Barket's own, personal, retained, ethics counsel, particularly one done in secret without prior notice, further demonstrates the divergence of his interests from that of Mr. Tartaglione.  Stated simply, Attorney Barket has put his interests first in an effort to protect his professional standing and exposure to disciplinary action and possible criminal prosecution.

Moreover, reliance on by Attorney Barket on Mr. Ross's report at this time and in this manner, raises the following questions, which we submit are relevant to whether the opinion offered by Mr. Ross is expressing a neutral view or is instead influenced and dominated by self-serving facts and a narrative supplied by his client, Attorney Barket:

1. When was ethics counsel retained by the Barket firm and for what purpose?

2. Was ethics counsel informed that Attorney Barket directly participated in the removal of the Epstein note from the Metropolitan Correctional Center? If so, when?

3. Was ethics counsel made aware that Attorney Barket did not inform or disclose to appointed capital counsel that he was directly involved in the removal of the Epstein note from the Metropolitan Correctional Center until August 23, 2019, after the appointment of *Curcio* counsel and nearly a month after the conduct occurred? If so, when, and how did he advise Attorney Barket in relation to whether he should withhold this type of information from appointed capital counsel?

4. Was ethics counsel made aware that prior to August 23, 2019, Attorney Barket had stated to the undersigned capital counsel that the only attorney involved in the removal of the Epstein note from the Metropolitan Correctional Center was John Weider? If so, when, and how did he advise Attorney Barket?

5. Was ethics counsel made aware that Attorney Barket had a team meeting and exchanged several emails and Basecamp posts with appointed counsel, wherein all appointed counsel were attempting to learn about the facts of what had occurred in relation to the Epstein note, so that we could accurately notify the court of this conduct? If so, when, and how did ethics counsel advise Attorney Barket?

6. Was ethics counsel made aware that appointed counsel were deeply concerned that Mr. Barket's statements to the press proclaiming that Nicholas Tartaglione had knowledge of the events related to the attempted suicide and suicide of Jeffrey Epstein could lead to ethical issues and other problems related to the removal of contraband (incriminating Nicholas Tartaglione and John Weider) and was material to an investigation of the attempted suicide and suicide? If so, when, and how did ethics counsel advise Attorney Barket to engage with his fellow counsel in this capital case?

6

7.    Was ethics counsel consulted and made aware that Mr. Barket objected to the decision of appointed counsel to bring the conflict issues to the attention of the court and to the request of appointment of *Curcio* counsel? If so, when and how did ethics counsel advise Attorney Barket to oppose or join that application?

8.    Was ethics counsel consulted and informed of the factual assertions set forth in the Barket letter which objected and opposed the appointment of *Curcio* counsel? If so, when and how did ethics counsel advise Attorney Barket?

9.    Was ethics counsel was made aware that at the time Attorney Barket objected to the appointment of *Curcio* counsel, and alternatively demanded an immediate same-day inquiry if *Curcio* counsel was appointed, that Attorney Barket had not informed appointed counsel nor *Curcio* counsel that he was directly involved in the removal of the Epstein note from the Metropolitan Correctional Center? If so, when and how did ethics counsel advise Attorney Barket?

10.    Was ethics counsel made aware that at the time Attorney Barket objected to the appointment of *Curcio* counsel and was demanding an immediate *Curcio* interview of Nicholas Tartaglione on the same day of *Curcio* counsel's appointment, Attorney Barket had previously instructed Nicholas Tartaglione not to discuss the Epstein note with anyone unless he is present? If so, when and how did ethics counsel advise Attorney Barket on the use of this tactic?

11.    Was ethics counsel made aware that after *Curcio* counsel was appointed, Attorney Barket approached appointed counsel and requested that appointed counsel not disclose to *Curcio* counsel the existence and removal of the Epstein note from the Metropolitan Correctional Center? If so, when, and what advice was provided on the use of this tactic?

12.    Was ethics counsel made aware that it was not until all of the above failed, that on August 23, 2019, Attorney Barket finally disclosed, for the first time, his direct involvement and participation in the removal of the Epstein note from the Metropolitan Correctional Center? If so, when and what advice was given to Attorney Barket in relation to the timing of the disclosure?

The answers to the above question, and others, help inform the court whether the brief filed by a highly respected ethics attorney is a neutral, unobjective, point of view that the court can rely upon to assist in a very critical decision in a death authorized case, or whether it is a document generated at the request of Attorney Barket to defend his conduct?

As the court can determine, Attorney Sternheim's *Curcio* report is thorough and comprehensive.    The motivation for Attorney Sternheim was not to advance the interest of a paying client, but rather, after being independently appointed by the court, to conduct an independent factual investigation so that the court could determine whether any attorney on the case was operating under a conflict of interest.  The *Curcio* report filed by Attorney Sternheim does not reach any legal conclusions on whether the conflicts present can be waived, but instead merely lays out the facts – as verified by her investigation – so that this Court may then reach its own conclusions.

### Conclusion

The bottom line is that this court must make a critical decision on whether Attorney Barket has engaged in conduct which can be waived.    One such issue raised by *Curcio* counsel is that Attorney Barket attempted to improperly influence the outcome of the *Curcio* inquiry.    Attorney Barket's response to prevent disclosure to the government contains misrepresentations and false information in relation to material facts related to his conduct.

The undersigned counsel have not set forth the exact statements made by Attorney Barket that are false or misleading, as this letter in not intended to set off an additional letter-debate.  The purpose of this letter is to advise the court, in its important decision as to whether the *Curcio* report should be disclosed to the government, that we believe Attorney Barket has made misrepresentations and made false statements related to facts material to the issue at hand.    We believe this has been done by Attorney Barket to prevent a full record on the issue of whether his conduct, as accurately set forth in the *Curcio* report, constitutes a non-waivable conflict resulting in his discharge as counsel in this case.

The above remarks have the full endorsement of the undersigned counsel of record, and we respectfully request that this letter be held *ex parte* and under seal to avoid revealing information that could adversely impact the defendant and prejudice his rights during the *Curcio* inquiry and his overall preparation for the capital trial.

Respectfully submitted,

*Anthony L. Ricco*

Anthony L. Ricco, Esq.

*Michael Bachrach*

Michael K. Bachrach, Esq.

*Bruce Koffsky*

Bruce D. Koffsky, Esq.

Kenneth J. Montgomery, Esq.
John Diaz, Esq.

ALR/jh

cc:    Defense counsel of record (Barket and Leisenring)

# EXHIBIT 31

# ANTHONY L. RICCO

*Attorney At Law*

20 VESEY STREET, SUITE 400
NEW YORK, NEW YORK 10007

TEL. (212) 791-3919  FAX. (212) 964-2926
EMAIL: tonyricco@aol.com

STEVEN Z. LEGON
OF COUNSEL

January 28, 2020

## TO BE FILED *EX PARTE* AND UNDER SEAL

## BY EMAIL

Hon. Kenneth M. Karas
United States District Court Judge
Southern District of New York
The Hon. Charles L. Brieant Jr.
Federal Building and Courthouse
300 Quarropas Street
White Plains, New York 10601-4150

Re: ***United States v. Nicholas Tartaglione***, Docket No. 16 Cr. 832 (KMK)

Dear Judge Karas:

This letter is a follow up to the correspondence sent to the court on January 23, 2020. Since that date, we have (1) served a so ordered judicial subpoena on the Bureau of Prisons (BOP) for the visiting logs, mail and telephone logs of Nicholas Tartaglione from January 16, 2020 to January 23, 2020; (2) have had the occasion to review the BOP protocols related to the policy for monitoring the outgoing mail of detainees.

## BOP Regulations on Correspondence

In order to protect the integrity of the BOP institutions and to ensure the safety of staff, inmates and the general public, the BOP has adopted specific regulations and policies to monitor the incoming and outgoing correspondences of inmates. See, BOP Policy Statement on Inmate Correspondence, 5265.14 and 28 CFR §540.10, *et seq.*

The BOP Policy Statement on Inmate Correspondence requires all inmate correspondence mailed out of the facility to contain the inmate's Register number. See, BOP Policy Statement

5265.14 (4)(d) at page 6 (which adopts 28 CFR 540.12(d)) and BOP Policy Statement 5265.14 (8) at page 13 (which adopts 28 CFR 540.16). In addition, outgoing mail is read to ensure, *inter alia*, compliance; that the inmate is abiding by institutional rules and protocols. See, BOP Policy Statement 5265.14 (4) at page 9 (which adopts 28 CFR 540.14).

Outgoing Mail Addressed To An Attorney or Legal Assistant

Outgoing mail addressed to an attorney or legal assistant stamped "legal mail" is permitted to be sealed by the inmate and is not opened and read by BOP staff. See, BOP Policy Statement 5265.14 (10) at page 14 (which adopts 28 CFR 540.18(c)(I) and See, BOP Policy Statement 5265.14 (11) at page 16 (which adopts 28 CFR 540.19). These rules also apply to a person whom the attorney of record has designated and attested to as a legal assistant, who may visit and correspond with the detainee under the attorney's supervision. See, BOP Policy Statement 5265.14 (11)(d) at page 16 (which adopts 28 CFR 540.19).

As indicated in our correspondence to the court dated January 23, 2020, the envelope which contained the Tartaglione letter was not properly addressed to Learned Counsel. First, neither the envelope nor the letter itself contains Nicholas Tartaglione's Register Number. The lack of a registration number is significant. Based upon the BOP regulations discussed above, an outgoing envelope without a Register number is rejected by BOP staff and not mailed.

As stated above, all outgoing correspondences, except those addressed to an attorney or an attorney's designated legal assistant, are read by BOP staff to ensure that the letter inside is being mailed to the addressee on the envelope, *inter alia*. See, BOP Policy Statement 5265.14 (4) at page 9 (which adopts 28 CFR 540.14). This means that without a Registration number, the Tartaglione letter and envelope, as presently written, would not have passed inspection. If an attempt to mail had been made without a Registration number, the correspondence would have been rejected and not permitted to be mailed out of the detention center. When this occurs, the detainee is advised of

2

the rejection of the outgoing correspondence, and is permitted an opportunity to appeal the adverse decision. 28 CFR 540.14(2)(d).

Further, there is substantial evidence that the Tartaglione correspondence was not actually mailed from the Metropolitan Correctional Center. The envelope does not contain a postmark from a Manhattan post office, where the Metropolitan Correctional Center is located.[1] To the contrary, the envelope is postmarked January 21, 2020 at 6:00 pm, from the MID ISLAND, NEW YORK, POST OFFICE, which is located in Suffolk County, New York. In view of the foregoing, it stands to reason that the Tartaglione correspondence was either physically removed from the Metropolitan Correctional Center or concealed in a correspondence mailed to another individual on Nicholas Tartaglione's mailing list. In either event, the goal of informing the media of the issues related to Learned Counsel, which are the subject of *ex parte* and sealed judicial proceedings, was the result of a concerted effort involving at least one or more individuals.[2]

Removal of Documents Through Visits at the Metropolitan Correctional Center

The judicial subpoena requests the disclosure of the visiting, mail and telephone logs from Nicholas Tartaglione on the dates of January 16, 2020 through January 23, 2020. The Tartaglione letter is dated January 18, 2020. Our past court conference was held on January 22, 2020. The Tartaglione correspondence dated January 18, 2020, is postmarked from a Post Office located in

---

[1]     As stated in our correspondence dated January 23, 2020, there is no outgoing mail service from BOP facilities on weekends and on federal holidays. See, BOP Policy Statement 5800.16, (3.16). Therefore rendering it impossible that the Tartaglione letter, dated January 18, 2020, was mailed from the Metropolitan Correctional Center until sometime on Tuesday, January 21, 2020; delivered that very same day; then addressed and mailed to my office; and delivered on the morning of January 23, 2020. It seems likely this letter was, therefore, smuggled out of the Metropolitan Correctional Center on or after January 18, 2020, and later addressed and deposited into a U.S. postal facility in Suffolk County on January 21, 2020. As a result, the undersigned have requested the visiting logs for that relevant time period.

[2]     The envelope clearly appears to have been addressed by one or more writers, as the handwriting which sets forth the return address, sans a BOP Register number, is clearly distinct from the handwriting of the individual who wrote the name and address of the addressee.

Suffolk County at 6:00 pm on January 21, 2020.    Therefore, the Tartaglione letter was, more than likely, physically removed from the Metropolitan Correctional Center during a visit and deposited into the U.S. mail system on Long Island, prior to the court conference on January 22, 2020.

Social Visits at the Metropolitan Correctional Center

All visitation at the Metropolitan Correctional Center is governed by strictly enforced BOP policy. See, BOP Visiting Policy, Statement No., 5267.09. These regulations are in place to protect the staff and detainees from harm, to prevent the introduction of contraband (cellular phones, drugs, weapons, etc.), which ensures "the safety, security, or good order the facility or protection of the public" from harm.    See, 28 CFR 510.1(h) and 28 CFR 553.12. These BOP rules are also in place to prevent improper unauthorized communications, and to ensure that detainees, and their counsel, comply with judicial protective orders, and other directives of the court, *inter alia.*

The Rules of Conduct For Social Visits

To prevent the exchange of documents, detainees are not permitted to bring with them for social visits any items - including papers and documents. The only item a detainee is permitted to possess during a social visit is his/her BOP issued identification card.    To enforce this policy, detainees are double searched before they are permitted to enter the social visiting area.    In addition, social visitors are also not permitted to bring into the Metropolitan Correctional Center any documents or papers and are also searched.    Additionally, the social visiting areas are heavily monitored.    Inmates and visitors are visually monitored by the staff present in the social visiting area, as well as by staff observing the social visiting area via surveillance camera.    The BOP policy is clear.    Detainees are specifically prohibited from exchanging documents during social visits.    BOP Visiting Policy Statement No., 5267.09 (21)(d) page 11.

In addition to the foregoing, and most significant. is the fact that Nicholas Tartaglione's social visits were suspended for an entire year, as a result of his possession and usage of a

contraband cellular phone (actual contact with his attorneys of record and, according to attorney Barket, at least one other lawyer whom he once claimed was retained to assist the Barket firm with the development of the defense.)   Based upon the information known to the undersigned counsel, there were no scheduled social visits for Nicholas Tartaglione from Saturday, January 18, 2020 (the date the letter was authored) through Wednesday, January 21, 2020 (the date that the letter was postmarked by a Long Island post office).    Therefore, in view of the stringent regulations in place in relation to social visits, and the fact that Nicholas Tartaglione's social visits have been suspended for one year, it is unlikely that the Tartaglione note was removed as a result of a social visit at the Metropolitan Correctional Center on any date from January 18, 2020 through January 21, 2020.

Legal Visitations

Legal visits on the other hand are entirely different than social visits, and are government by Policy Statement No. 5267.09.  See also, 28 CFR §§543.10 thru 543.16; 28 CFR §540.46.  Detainees are permitted to bring paperwork and documents into the room for legal visits.  Attorneys are also permitted to bring into the visiting area legal documents and papers.  Legal visits are not monitored and take place outside of the visual surveillance of BOP staff.

The BOP has prescribed regulations which set forth documents which an attorneys are permitted to exchange with a detainee, and the procedures for when, if ever, the attorney is permitted to remove documents from the Metropolitan Correctional Center.   Under BOP regulations, attorneys are permitted to review documents brought to the meeting by the detainee; however, the BOP maintains a strict policy on the removal of legal documents from the Metropolitan Correctional Center.   See, BOP Visiting Policy Statement No., 5267.09 (21)(d) page 11.[3]  Achieving the goals and success of the above BOP policy regulations is based upon the good

---

[3]      Detainees are prohibited from giving legal papers to the attorney or receive papers from the attorney to retain after the visit, absent compelling circumstances and prior authorization by unit team or Duty Officer. BOP Visiting Policy Statement No., 5267.09 (21)(d) page 11.

5

faith and integrity of the attorneys who request legal visits. However, there are attorneys who engage in prohibited conduct and violate the BOP rules which have been designed to ensure the integrity of BOP facilities and to protect the public from harm.

In addition to the foregoing, attorneys are not permitted to take out letters and documents to be delivered or mailed to third parties. See, BOP Visiting Policy Statement No., 5265.14 (6)(5)(d)(8) page 10 (prohibiting third party mailings). Attorneys should only have in their possession "legal documents" related to the detainee's case, or other documents which were lawfully in the detainee's possession in compliance with BOP rules and regulations - memoranda or other documents which have lawfully entered the detention center, documents which have been deposited in the law library for review or documents written by the detainee in relation to his or her case.[4]

In response to the order of the court requiring a response to Learned Counsel's letter to the court dated January 23, 2020, attorney Barket has responded and assured the court that neither he nor his associates visited Nicholas Tartaglione subsequent to court conference on January 22, 2020. The response, however, begs a question, since the relevant time period, here, is from January 18, 2020, the date of the Tartaglione letter, up until January 21, 2020 at 6:00 p.m., which is when the Tartaglione letter was postmarked by a post office located in Suffolk County, New York.

To obtain objective reliable information about the relevant time period, a judicial subpoena has been served upon the BOP, so that the court can have information about who was, in fact, visiting Nicholas Tartaglione - - not subsequent to our conference - - but from the time period of January 18, 2020 up to and including January 21, 2020, the date of the Tartaglione letter's postmark.

It stands to reason that if the purpose of the Tartaglione letter was merely to express his

---

[4]    For example, the so-called *Epstein* note removed from the MDC by counsel is contraband, because based upon the statements made by attorney Barket to his co-counsel during several meetings, and as represented in his own email exchanges and Basecamp posts, the *Epstein* note is not a "legal document," nor did the document come into Nicholas Tartaglione's possession in compliance with established BOP rules and regulations.

6

legitimate displeasure with his representation by Learned Counsel, he would have simply placed the letter in a sealed envelope, marked it "Legal Mail," and, in compliance with BOP regulations, simply mailed it directly to Learned Counsel, and sent a copy to his retained counsel or to the court, but that is not what happened here. The conduct must be viewed in context of the proceedings which proceeded the date of the Tartaglione letter.

On several prior occasions, the court has carefully explained to Nicholas Tartaglione and his retained counsel, that all of his concerns about issues with Learned Counsel would be addressed at the end of the *Curcio* inquiry. In fact, on ever since the application was filed for the appointment of *Curcio* counsel, retained counsel has repeated made an application, on behalf of the defendant, to have Learned Counsel Anthony Ricco removed from the case.[5] See, *Transcript*, October 28, 2019 (Sealed), page 28, line 6, pages 48-52.

The court directly addressed Nicholas Tartaglione and has taken time to explain to him, *inter alia*, that the purpose of these proceedings are to protect his rights and ensure proper representation. See, *Transcript*, September 17, 2019, pages 45 to 62. Notwithstanding these thoughtful expressions by this court, the Tartaglione letter dated January 18, 2020 was written in such a manner, and copied to the media, in a concerted effort, with the assistance of others, to put his views in the press, and to impose his will upon this court and the integrity of this process. This type of behavior is a pattern which has been adopted by retained counsel - - by his own words (in court on January 22, 2020) - - to engage the media and get Nicholas Tartaglione's views into the public forum. See, *Transcript*, January 21, 2020 (sealed), page 30, line 6 to 14).

As a result of this concerted activity, BOP protocols were again violated with the assistance

---

[5]    In fact, on January 21, 2020, after attorney Barket was unable to prevent the disclosure of the *Curcio* report to a government conflict or firewall team, he made an application, without any prior notice to anyone of his colleagues or the court nor the assertion of any articulated grounds, for the removal of all five appointed counsel. The court noted that this was the first time such that the application for the removal of counsel was extended to include all five appointed counsel.

7

of others. It is apparent that the original handwritten letter received at the office of Learned Counsel on the morning of Thursday, January 23, 2020, was the result of concerted activity. The individuals who have been involved in the removal of documents from the Metropolitan Correctional Center (either the Epstein note and/or the Tartaglione letter) are engaged in conduct which is, at a minimum, a violation of BOP policy, and such facts are detrimental to the interests of a death authorized defendant in the preparation and/or presentation of evidence at the penalty phase. The damage to Nicholas Tartaglione's ability to present *Skipper* evidence and to face additional powerful aggravating evidence at the penalty phases is enormous. Simply put, aiding and abetting this type conduct increases the risk of the imposition of a sentence of death in this case.

This continued concerted activity, in face of the court's admonitions, has placed in jeopardy the ability to present mitigating *Skipper* evidence, and opens up Nicholas Tartaglione to additional aggravating evidence in the government's direct case at penalty phase or in rebuttal. Sadly, we are involved in a *Curcio* inquiry, in the first place, because retained counsel rejected the sound cautionary advice of the undersigned counsel and Resource Counsel, and began litigating issues related to Nicholas Tartaglione in the media, *inter alia*.

This conduct has been so pervasive, that even during the pendency of the *Curcio* inquiry itself, retained counsel has continued raising issues related to development of Nicholas Tartaglione's penalty phase defense in media, including the nationally syndicated *60 Minutes* television news show. Following this lead, we now have the defendant, himself, engaging in the same conduct, although he was directed by the court not to engage in such activity - and he agreed not to. *Transcript* September 17, 2019 (Sealed), page 58, line 7 thru 10. Aiding and abetting this type of conduct, including the removal of contraband and retained counsels' communications via contraband cellular phone communications with retained counsel and his associates, serves to facilitate the defendant's involvement which is contrary to the legitimate goals for the representation of a defendant in a death authorized case.

8

Clearly this self-destructive conduct could not have taken place without the aiding and abetting of others, who have demonstrated no regard for the integrity of the protocols set forth by the BOP to protect detainees, BOP staff and the public; but also no regard for the integrity of these very serious capital proceedings. To date, this concerted conduct has persisted with self-serving impunity.

As attorneys appointed to protect the rights of the defendant in these capital proceedings, we have an obligation to investigate and prepare for both mitigating and aggravating evidence at the penalty phase. See, ABA Guideline 10.7; and *Rompilla v. Beard*, 540 U.S. 345 (2005). When that important effort, recognized by the ABA Guidelines and Supreme Court case authorities, is impeded by the conduct of third parties, including those whose sworn duty is to protect the rights of the defendant, the ability to properly prepare and protect Nicholas Tartaglione from possible execution is put in severe jeopardy. In this case, it simply seems that there is nothing that can be said or done to stop the continuation of this self-destructive behavior.

In addition to preparing for trial and the penalty phase in this case, the undersigned counsel has had to seek judicial intervention to protect the rights of Nicholas Tartaglione from the influences and conduct of individuals who have a conflict of interest, and who have engaged in conduct both to undermine the integrity of these proceedings, and to undermine those who have attempted to provide Nicholas Tartaglione with the high level of representation and legal advice that must be afforded a death authorized defendant.

The undersigned counsel are presently awaiting the return of the information requested from the BOP by a "so ordered" judicial subpoena. Hopefully, the visitation logs, mail logs and telephone logs will help identify those individuals who are aiding and abetting the violation of important BOP regulations and prejudicing the rights and interest of Nicholas Tartaglione. Upon receipt and review of those materials, the undersigned counsel shall further notify the court.

9

Undersigned counsel is deeply concerned that it was necessary to seek judicial intervention; however, the conduct engaged in by individuals in this case is unprecedented and foreign to the effective representation of a death authorized defendant. There is a need to ensure that an accurate, real time record of these events is memorialized for appellate review and post conviction capital litigation, if required. Again, since this is a death authorized case, the undersigned is of the view that an accurate record needs to exist regarding all aspects of the issue of counsel, and the integrity of these capital proceedings.

Finally, I respectfully request that this letter be held *ex parte* and under seal to avoid revealing information that could adversely impact the defendant and prejudice his penalty phase investigation and presentation.

Respectfully submitted,

*Anthony L Ricco*

Anthony L. Ricco, Esq.

ALR/jh

cc:   All defense counsel (including Barket and Leisenring)

10

# EXHIBIT 32

# ANTHONY L. RICCO

*Attorney At Law*
20 VESEY STREET, SUITE 400
NEW YORK, NEW YORK 10007

TEL. (212) 791-3919  FAX. (212) 964-2926
EMAIL: tonyricco@aol.com

STEVEN Z. LEGON
OF COUNSEL

February 3, 2020

## TO BE FILED *EX PARTE* AND UNDER SEAL

## BY EMAIL

Hon. Kenneth M. Karas
United States District Court Judge
Southern District of New York
The Hon. Charles L. Brieant Jr.
Federal Building and Courthouse
300 Quarropas Street
White Plains, New York 10601-4150

Re: *United States v. Nicholas Tartaglione*, Docket No. 16 Cr. 832 (KMK)

Dear Judge Karas:

This letter is submitted to seek an order directing the defense to disclose information requested by A.U.S.A. Margery Feinzig, the government conflict/firewall counsel, in relation to issues raised in the *Curcio* report.

## Background and Basis To Disclose Requested Infromation

During our conference on January 22, 2020, the court recognized and anticipated that the government conflict/firewall counsel would have follow up questions after reviewing the *Curcio* report. See, *Transcript* January 22, 2020 (unsealed), page 15, line 3 to 16. In fact, attorney Barket was the first to volunteer, and sought permission to provide a copy of the lengthy correspondence that he filed in response to the *Curcio* report directly to the government/firewall counsel. See, *Transcript* January 22, 2020 (unsealed), page 14, line 5 to 9. Appointed counsel expressed the view that all of the documents provided to *Curcio* counsel that were the source of the factual conclusions reached in the *Curcio* report should also be disclosed, upon request. See, *Transcript* January 22, 2020 (unsealed),

page 14, line 12. The court endorsed the view of both counsel for Nicholas Tartaglione, and added that further requests by A.U.S.A. Feinzig would be addressed upon application, as they arose. See, *Transcript* January 22, 2020 (unsealed), page 14, line 3 to 12.

Conflict/Firewall Counsel Has Made a Request For Additional Information

Having reviewed the *Curcio* report A.U.S.A. Margery Feinzig has a host of follow up questions, as we fully expected and discussed at our January 22, 2020 conference. See, *Transcript* January 22, 2020, page 15, line 5 to 12. In an effort to gain a full and comprehensive understanding of the facts and issues set forth in the *Curcio* report, A.U.S.A. Margery Feinzig has, to date, requested the following: (1) a copy of all correspondences that all defense counsel filed with the court in connection with the appointment of *Curcio* counsel, and the correspondences that all defense counsel filed with the court which addressed issues related to the *Curcio* inquiry, after the *Curcio* appointment; (2) all documents (Basecamp posts, emails and text messages) provided to *Curcio* counsel during the course of the *Curcio* inquiry; and (3) copies of the *ex parte* proceedings and sealed transcripts of court conferences held on August 21, 2019; September 17, 2019; October 21, 2019; November 20, 2019; December 18, 2019; and January 22, 2020.[1]

Identification and Review of Requested Information

Learned Counsel Michael Bachrach has identified twenty three correspondences filed with the court addressing issues related to the appointment of *Curcio* counsel and the *Curcio* inquiry. Those twenty three correspondences (including three letters which are purportedly from Nicholas Tartaglione) have been organized and can be made available to the court for review.

---

[1]    Over the past several days, undersigned counsel have reviewed the transcripts of the *ex parte* court proceedings held by the court on August 21, 2019; September 17, 2019; October 21, 2019; November 20, 2019; December 18, 2019; and January 22, 2020. Those transcripts are relevant to a resolution of the *Curcio* inquiry in this case, and provided *in toto* except as follows: September 17, 2019 (redacted at page 14, line 21 thru page 15, line 5); and January 22, 2020 (redacted at pages 2, line 5 to 12, line 14 to 16, and line 25 to page 3, line 9). Those redactions protect conversations concerning Jerry Tritz and case budgeting - - which are not at all related to the *Curcio* inquiry.

2

Appointed counsel is of the view that the twenty three correspondences filed with the court demonstrate, *inter alia*, a repeated pattern of conduct by retained counsel that served to improperly deter, thwart and undermine the *Curcio* inquiry. The correspondences are replete with misrepresentations and outright falsehoods of material facts related to the *Curcio* appointment and relevant to the *Curcio* inquiry. In addition, the correspondences also provide *prima facie* proof that retained counsel has advocated courses of action on various issues that advance retained counsel's own interests, and how they have, in fact, diverged from that of Nicholas Tartaglione, as death authorized defendant who must prepare for a penalty phase defense. As a result, all twenty three correspondences are relevant to the *Curcio* inquiry.

Recent Request To Discharge All Appointed Counsel and The Letter Mailed To Learned Counsel

The above view has been reinforced by the circumstances related to the startling statements made by attorney Barket in court during an *ex parte* and sealed proceeding on January 22, 2020, along with the timing of a correspondence that was received by Learned Counsel, purportedly authored by Nicholas Tartaglione, which was apparently smuggled out of the Metropolitan Correctional Center. In the correspondence (Tartaglione letter), the author (purported to be Nicholas Tartaglione) threatened that he was going to expose his issues concerning the discharge of Learned Counsel to the Daily News - - the same newspaper that attorney Barket claimed to have contacted him about issues which had only been disclosed in *ex parte* and sealed proceedings. See, Transcript November 21, 2019, at page 28, line 6 to 18.

During the January 22, 2020 conference, retained counsel made an astounding announcement. Without any prior notice to his professional colleagues in a death authorized case, and without articulating any basis in law or fact, attorney Barket announced that Nicholas Tartaglione was exercising his right under 18 U.S.C.§3003, and that he wanted each and every appointed counsel discharged. Not only did retained counsel request the removal of all qualified, hardworking counsel who have collectively dedicated thousands of hours, at public expense, to his

3

defense, but that Nicholas Tartaglione wanted all appointed counsel discharged immediately, and prior to the conclusion of the *Curcio* inquiry.[2] The caveat for the immediate discharge is significant, because apparently the only time when this extraordinary relief could have been discussed with Nicholas Tartaglione was on January 20, 2020, a date that is significant to the issues of who is responsible for aiding and abetting the removal of the Tartaglione letter from the Metropolitan Correctional Center - - again, in violation Bureau of Prisons rules and regulations.

To support such an extraordinary request, attorney Barket attempted to create an issue claiming an actual prejudice related to his effort to negotiate a withdrawal of the notice of intention to seek the death penalty. However, there was no prejudice. The truth concerning attorney Barket's conduct was memorialized in a series of emails initiated by attorney Barket on January 8, 2020, and concluded by the government on January 9, 2020.

The series of emails from those dates further demonstrates that attorney Barket engages in hidden conduct which does not serve the interest of a death eligible defendant. The email that attorney Barket sent to the government, without notice to any appointed counsel, to seek the withdrawal of the notice of intention to seek the death penalty, was later used by him to support the immediate discharge of all appointed counsel from the case. Attorney Barket claimed that the action of Learned Counsel prejudiced Nicholas Tartaglione. This was just another ploy to thwart the *Curcio* inquiry, and to eliminate counsel who have demanded that the representation of Nicholas

---

[2]    Having been unable to block the appointment of *Curcio* counsel, having failed in the attempt to convince appointed counsel to conceal the existence of the removal of the Epstein note (at a time when attorney Barket's involvement remained hidden from his co-counsel whom he was attempting to manipulate through the concealment of his actual involvement), and having now been unable to prevent the disclosure of the *Curcio* report to a government firewall team, attorney Barket announced that the defendant wanted all appointed counsel - - counsel who have expended thousands of hours of public funds towards developing his defense - - discharged from the case without any cause or reason, other than the defendant has the right to do so). I have since been informed, however, that attorney Barket wants to keep in place the C.J.A. budget and exercise his prowess over public funds.

4

Tartaglione comply with professional standards. Another attempt to thwart the pending *Curcio* inquiry failed. Retained counsel's manufactured prejudice was exposed by Learned Counsel, who demonstrated through the use of attorney Barket's statements in his own emails, that he has a total lack of knowledge on how to proceed, and that he attempted that to pull off this ruse lacking any knowledge of the important protocols in the U.S. Attorneys Manual (9-10.160). In addition, it was significant that retained counsel attempted to seek relief from the Department of Justice, without any consultation with any of the appointed Learned Counsel or with any our assigned Resource Counsel, who have both been an integral part of the development of the defense, and who participated in our prior presentation to the Department of Justice.

Attorney Barket's attempt to create prejudice, so that appointed counsel could be immediately discharged before the conclusion of the *Curcio* inquiry, only serves to demonstrate that as an attorney, he was again engaging in a course of conduct that certainly was against the best interest of capital authorized defendant. A genuine application to the Department of Justice seeking the withdrawal of the notice of intention to seek the death penalty, made without knowledge of the protocols in the U.S. Attorney's Manual (which prohibits successive applications), made without consultation with Learned Counsel or Resource counsel is, at minimum, conduct that deviates far below the standard of a qualified capital defense attorney - - conduct which is not in compliance with ABA Guideline 10.8.

The Tartaglione Letter (January 18, 2020)

Attorney Barket's argument to discharge all appointed counsel, apparently discussed with Nicholas Tartaglione during the legal visit of January 20, 2020, was followed up with a letter purportedly authored by Nicholas Tartaglione on January 18, 2020. The Tartaglione letter stated that Nicholas Tartaglione was going to inform the Daily News of his desire to have Learned Counsel *immediately* removed from the case.

5

Background and BOP Rules

First and foremost, on past occasions this court explained the process directly to both Nicholas Tartaglione and attorney Barket why the court was deferring the issue of the removal of Learned Counsel until the conclusion of the *Curcio* inquiry. See, Transcript September 17, 2019, pages 12-13 and 53. However, with the exception of the conference held on December 18, 2019, attorney Barket purposely raised the same issue - discharge attorney Learned Counsel. On each occasion the court responded by patiently explaining to both Nicholas Tartaglione and his retained the process, and explained that the defendant was not suffering any prejudice. In addition, the court also explained that Nicholas Tartaglione must refrain from writing to the press, and that such restraint was necessary to maintain the integrity of the system. See, Transcript September 17, 2019, page 13. This court said:

> We just have to make sure that the system maintains its integrity, so if there are representation issues, at some point that are going to have to be resolved, but the more immediate concern to me is he not write anybody that's going to publish his letters, which means he shouldn't be writing anybody in the media.

See, *Transcript*, September 17, 2019, page 13, line 5 to 10. The court directly addressed Nicholas Tartaglione and informed him "no more letters to the media," and that doing so was not "in his interest." See, Transcript September 17, 2019, pages 6, 12-13, 53 and 60

As the court is aware, Learned Counsel received a letter, purportedly written by Nicholas Tartaglione on January 18, 2020, while detained at the Metropolitan Correctional Center, but postmarked from a Long Island post office at 6:00 p.m. on January 21, 2020, threatening to take the issues of counsel, presently pending before the court, under seal, to the Daily News.[3] The question of

---

[3]    Our investigation to date has revealed the following: (1) there was no outgoing mail service from the Metropolitan Correctional Center on January 18, 2020 (Saturday), January 19, 2020 (Sunday) and January 20, 2020 (Monday, Dr. King's Birthday, a federal holiday had no mail service in or out of Metropolitan Correctional Facility; (2) Nicholas Tartaglione had no social visits at all on the dates from January 18, 2020 through January 21, 2020, the date the letter was postmarked at a Long Island post office; and (3) that the only person who visited Nicholas Tartaglione during the time period is attorney Bruce Barket, the attorney advocating for the immediate removal of all appointed counsel on January 22, 2020.

how the January 18, 2020, Tartaglione letter exited the Metropolitan Correction Center is first, based upon the premise that it was, in fact, Nicholas Tartaglione who authored the correspondence that bears his name and purported signature. When appointed counsel visually compares the handwriting on other letters purportedly authored by Nicholas Tartaglione on January 18, 2020 (along with envelop) with the handwriting of the three previously filed with the court, there is grave concern that these documents may have been authored by more than one writer. Appointed counsel is of the view that one or more individuals have influenced and aided and abetted Nicholas Tartaglione to participate in conduct that serves to shield or conceal a pattern of conduct of his retained counsel in relation to contraband at the Metropolitan Correctional Center, involving the removal of the Epstein note and the use of contraband cellular phone(s), but is absolutely divergent from Nicholas Tartaglione's critical interest which is his need to develop a record of conduct to support the presentment of positive *Skipper* evidence at the penalty phase, and to refrain from engaging in conduct which the government could use in aggravation on its direct case at the penalty phase or in rebuttal.

In the discharge of our professional responsibilities under the ABA Guidelines and Supreme Court case authorities, to investigate and prepare evidence for mitigation and potential aggravating evidence at the penalty phase, counsel have an obligation to fully investigate conduct claimed to be voluntarily engaged in by the defendant, which impacts the penalty phase; and to fully participate in proceedings that question whether any defense attorney (or an individual under his or her supervision) who is involved with the defense has been (or is currently) engaged in conduct that has resulted in a divergence of interests from Nicholas Tartaglione. See, *Rompilla v. Beard*, 545 US 374 (2005); ABA Guidelines 10.7, 10.8, 10.10.1, and 10.11.

What is clear, is that the arrival of an letter authored by Nicholas Tartaglione, in an envelope (with different handwriting from the letter inside) postmarked from a Long Island post office, is the

7

result of concerted effort with another to violate BOP rules and to engage in conduct which this court has specifically addressed and prohibited. Those who have engaged in such conduct cannot, with a straight face, claim that such conduct is in the interest of a defendant who is facing the possibility of a penalty phase. No. Trying to get appointed counsel out of way is in the interest of attorney Barket and those associated with his firm who, according to the *Curcio* report, have removed contraband from Metropolitan Correctional Center and have engaging in a pattern of surreptitious conduct violating BOP rules and regulations.

The *Curcio* report in this case has memorialized and finally exposed an alarming pattern of conduct; conduct which is denied by retained counsel; conduct that is inconsistent with statements that retained counsel has set forth in correspondences and has made on the record in relation to appointment of *Curcio* counsel and the *Curcio* inquiry. The *Curcio* report recognizes that attorney Barket has engaged in conduct in "*attempts to deter efforts to safeguard the legal interests of Mr. Tartaglione in this this death-authorized case.*" See, *Curcio* report, page 2. (double word appears in original text). The twenty three correspondences, along with the statements made by attorney Barket on the record, evidence the conclusion reached in the *Curcio* report, and therefore, the correspondences should be disclosed to the government firewall counsel.

Conclusion

There is no question that notwithstanding the ultimate decision to be made by the court on the issue of the conflict of counsel, it is imperative that there is an accurate, reliable record in this death authorized case, based upon the facts that actually took place, and not just the vitriolic self-serving statements made by attorney Barket - - an attorney whose interests long ago diverged from from the interests of Nicholas Tartaglione. The record in this case would be incomplete in the absence of permitting all parties, responsible for the record on appeal, to have a meaningful opportunity to

participate in the fact finding process and to weigh in on the legal issues presented by the *Curcio* report.

A firewall team has been put in place to protect Nicholas Tartaglione, as he should not have to suffer any prejudice as a result of being influenced and following the advice provided by a conflicted attorney. As a result of the review of the correspondences and documents filed, appointed counsel is of the view that the twenty three correspondences do not disclose or divulge any information that prejudices Nicholas Tartaglione, which is not protected by government conflict/firewall counsel.[4]

In addition, the undersigned counsel are of the view that the sealed transcripts of the *ex parte* proceedings which took place on August 21, 2019; September 17, 2019; October 21, 2019; November 21, 2019; and January 22, 2020 can be provided to the government conflict/firewall counsel, as those proceedings contain statements and representations made by attorney Barket in relation to the events which are the subject and findings in the *Curcio* report, including the findings that attorney Barket has made statements and representations to both *Curcio* counsel and to the court, to deter or thwart the *Curcio* inquiry.[5] See, *Curcio* report at pages 2, 7, 10, 11, 12 and 13.

As stated above at the court conference on January 22, 2020, both retained counsel and appointed counsel requested and/or acknowledged that it would be important to provide directly to

---

[4]      The letters, purportedly filed by Nicholas Tartaglione, express his displeasure with Learned Counsel through the use of accusations, derogatory language, and sarcastic tone. In addition, while the correspondences filed by counsel briefly touched upon scheduling matters, the correspondences do not divulge the particulars of any defense strategy decisions. The correspondences by counsel have, in fact, discussed the conduct of retained counsel in relation to the *Curcio* inquiry, but only to the extent that is necessary for the court to make an informed decision for the appointment of *Curcio* counsel; and afterwards, whether retained counsel and/or others associated with his law firm have thwarted or attempted to thwart the *Curcio* inquiry itself. As stated in court, the *Curcio* inquiry is not designed to protect the conduct of counsel. See, *Transcript*, January 22, 2020 (sealed), at page 9. To the contrary, the *Curcio* inquiry is a judicial remedy designed to expose whether an attorney has been engaged in conduct that has created a conflict of interest, and to protect the rights of the defendant. *Id.*

[5]      There was a conference on December 18, 2019, however, appointed counsel does not have a copy of that transcript. We shall order the transcript and review it upon receipt, but rather than waiting for the arrival of the December 18, 2019 transcript, we believe it appropriate to move forward with those transcripts which are in our possession.

9

the government conflict or firewall counsel a copy of the those documents (Basecamp posts, emails and text messages) that were provided to *Curcio* counsel and were utilized in reaching the factual conclusions set forth the *Curcio* report and correspondences that were filed after the *Curcio* report was filed. See, *Transcript* January 22, 2020, page 14, line 5 to page 15, line 12. The court specifically provided authorization for defense counsel to directly provide the government with correspondences that were "*submitted afterwards and in direct relation to the report.*" See, *Transcript* January 22, 2020, page 15, line 3 to 7. The court also anticipated that A.U.S.A. Feinzig would have additional requests for information and documentation as the she moved forward with her review of the *Curcio* report. See, *Transcript* January 22, 2020, page 15, line 8 to 12.

As a result of the foregoing, the undersigned request that the court authorize the defense to provide the following to the government conflict/firewall counsel:

(1) a copy of all the correspondences that all defense counsel filed with the court in connection with the appointment of *Curcio* counsel and the correspondences that all defense counsel filed with the court, which addressed issues related to the *Curcio* inquiry, after the *Curcio* appointment; (2) all documents (Basecamp posts, emails and text messages) provided to *Curcio* counsel during the course of the *Curcio* inquiry; and (3) copies of the *ex parte* proceedings and sealed transcripts of court conferences held on August 21, 2019; September 17, 2019; October 21, 2019; November 20, 2019; December 18, 2019; and January 22, 2020.

The undersigned is painfully aware that the court has been inundated with an avalanche of letters from both from the government and defense counsel, often seeking guidance and directions. All counsel are aware of the exhaustive appellate and post conviction processes that accompany capital litigation. Therefore, we all appreciate the need for an accurate record regarding all aspects of the issue of counsel raised by Nicholas Tartaglione directly and through his counsel, which is the subject

10

of the pending *Curcio* inquiry. In this way, we ensure the integrity of these capital proceedings, and honor our commitment to a level of professionalism, excellence and integrity that is required for the representation of a defendant facing the death penalty.

Finally, I respectfully request that this letter be held *ex parte* and under seal to avoid revealing information that could adversely impact the defendant and prejudice his penalty phase investigation and presentation.

Respectfully submitted,

*Anthony L Ricco*
Anthony L. Ricco, Esq.

*Bruce D. Koffsky*
Bruce D. Koffsky, Esq.

*Michael Bachrach*
Michael Bachrach, Esq.

Kenneth J. Montgomery, Esq.
John Diaz, Esq.

ALR/jh

cc: All defense counsel (including Barket and Leisenring)

11

# EXHIBIT 33

# ANTHONY L. RICCO

*Attorney At Law*

20 VESEY STREET, SUITE 400

NEW YORK, NEW YORK 10007

TEL. (212) 791-3919  FAX. (212) 964-2926

EMAIL: tonyricco@aol.com

STEVEN Z. LEGON
OF COUNSEL.

February 9, 2020

## TO BE FILED *EX PARTE* AND UNDER SEAL

## BY EMAIL

Hon. Kenneth M. Karas
United States District Court Judge
Southern District of New York
The Hon. Charles L. Brieant Jr.
Federal Building and Courthouse
300 Quarropas Street
White Plains, New York 10601-4150

Re: *United States v. Nicholas Tartaglione*, Docket No. 16 Cr. 832 (KMK)

Dear Judge Karas:

Attorney Barket has previously complained to the court that he could not consent to disclosure to the government conflict/firewall counsel of Basecamp posts, emails and text messages provided to *Curcio* counsel during the *Curcio* inquiry, without first having an opportunity to review a list of those documents. The court has issued an order on February 6, 2020, which states that attorney Barket should be provided with a list of the documents, before such documents are provided to the government conflict/firewall counsel.

Although the government conflict/firewall counsel has informed appointed counsel via a telephone call on February 6, 2020, that *at this juncture*, the government is not requesting the disclosure of the Basecamp posts, emails and text messages provided to *Curcio* counsel, based upon that same conversation with A.U.S.A. Margery Feinzig, it would be, nevertheless, prudent to compile such a list, as it is extremely likely that such a request will be forthcoming.

Summary of Materials

There were several troubling incidents involving the statements and conduct engaged in by attorney Barket and others, working at his direction, that provided the basis of the undersigned counsel's request for the appointment of *Curcio* counsel. In addition, after the appointment of *Curcio* counsel, attorney Barket engaged in conduct which provided the basis of the conclusion in the *Curcio* report that he attempted "*to deter efforts to safeguard legal interests of Mr. Tartaglione in this this death authorized case.*" See *Curcio* Report, dated December 30, 2019, page 2, first paragraph. The factual conclusions set forth in the *Curcio* report, are completely corroborated and memorialized by the defense team's Basecamp posts, emails and text messages which were provided to *Curcio* counsel during the course of the *Curcio* inquiry. On the other hand, attorney Barket, the subject of the *Curcio* inquiry, has attacked the factual findings set forth in *Curcio* report.

The court should be aware that the Basecamp posts, emails and text messages that were provided to *Curcio* counsel, upon request by *Curcio* Counsel, are a sampling of the dozens of other Basecamp posts, intra-team emails and text messages related to the conduct which led to the appointment of *Curcio* counsel, and the conduct of attorney Barket, which continued, even after the appointment of *Curcio* counsel. The court should be aware, that although attorney Barket claims he needs a list in order to make a decision, attorney Barket is an actual participant in each of the team's Basecamp posts, and has authored, initiated or participated in all of the intra-team emails and initiated all of text messages, related to his conduct, which were provided to *Curcio* counsel.

The Basecamp posts, emails and text messages are a "real time" chronology which memorializes the conduct subject to the *Curcio* inquiry, and the manner by which attorney Barket not only concealed critical information from appointed counsel, but also, how he attempted to deceive *Curcio* counsel and the court.[1] The Basecamp posts and statements made by attorney Barket in his

---

[1]    For example, compare the Basecamp post of August 17, 2019, with the email exchange on August 18, 2019 at 7:48 a.m. and 8:05 a.m., and the Barket initiated text messages of August 18, 2019 at 1:18 p.m. and 1:44 p.m., with the conclusions reached in the *Curcio* report at pages 6 through 7.

2

emails and text messages demonstrates how his interests and strategy decisions diverged from that of the best interests of Nicholas Tartaglione, a death authorized defendant.

Finally, the Basecamp posts, emails and text messages reveal that all appointed counsel and Resource Counsel cautioned and advised attorney Barket against engaging in conduct which violates New York Rules of Professional Conduct, ABA guidelines and Supreme Court case authorities on the proper representation of a death authorized defendant; taking action in relation to the conduct of John Weider; and repeatedly cautioning attorney Barket that his conduct was putting in jeopardy Nicholas Tartaglione's ability to present evidence at the penalty phase, and that his conduct, including concealing information from *Curcio* counsel, *inter alia*, could potentially result in his discharge from the case.

The Basecamp posts and emails also memorialize attorney Barket's words rejecting the sound advice he was given by experienced capital counsel, and his intention, as he stated - - to "exploit" the circumstances of the Epstein attempted suicide/suicide - - and that he proceeded to do just that in the media. See, Basecamp post of August 10, 2019 and the *Curcio* report at pages 5 and 6.

The Basecamp Posts Provided To *Curcio* Counsel

The following is a list of the Basecamp posts provided to *Curcio* counsel upon request:

1. July 24, 2019 at 1:49 p.m. (Advising team of the Epstein attempted suicide)

2. July 25, 2019 at 11:12 a.m. (Recent events impact prison adjustment)

3. July 27, 2019 at 2:52 a.m. (Development of presenting *Skipper* evidence in jeopardy)

4. July 31, 2019 at 5:54 p.m. *et seq.* (Stop speaking to the press)

5. August 9, 2019 at 6:44 a.m. (Expressing concern that counsel maybe disqualified)

6. August 9, 2019 at 2:46 p.m. (Barket announcing defendant has been cleared)

7. August 10, 2019 at 10:24 a.m. (Epstein Note, Exploiting Suicide & Press)

8. August 11, 2019 at 11:32 a.m. (Barket sees an opportunity on Epstein suicide)

3

9. August 13, 2019 at 7:45 a.m. (The Abandoned Professional Ethics and Confidentiality)

10. August 15, 2019 at 5:42 a.m., et seq. (Stop speaking to the Press about Epstein)

11. August 15, 2019 at 11:23 p.m. (Ricco discusses meeting with Nicholas Tartaglione)

12. August 16, 2019 at 11:48 p.m. (Memorializing conference call on Barket media statements & Epstein attempted suicide/suicide)

13. August 17, 2019 at 9:32 a.m. (Cautioning team members on conduct of John Weider)

14. August 19, 2019 at 11:52 p.m. (Barket posts: first *post Curcio* letter from Tartaglione)

15. August 21, 2019 at 6:58 a.m. (*Curcio* appointment: inadvertent or purposeful conduct)

16. September 6, 2019 at 6:58 a.m. (Prison adjustment can be salvaged with patience)

17. September 14, 2019 at 10:33 a.m. (Explaining scheduling of mitigation development)

## Emails Provided To *Curcio* Counsel

The following is a list of email exchanges between attorney Barket and one or more of the undersigned counsel, on the subjects relevant to the *Curcio* inquiry, which were provided to *Curcio* counsel.

1. August 17, 2019 at 8:46 a.m. (Impact of conduct on presenting *Skipper* evidence)

2. August 17, 2019 at 11:39 a.m. (Barket "no need for *Curcio* appointment)

3. August 18, 2019 at 7:48 a.m. (Barket Tell me what I did)

4. August 17, 2019 at 1:43 p.m. (Discussing John Weider's Removal of Epstein Note)

5. August 18, 2019 at 8:05 a.m. (No further delay, *Curcio* request will be filed)

6. August 18, 2019 at 11:38 a.m. (Leisenring attempts to delay filing)

7. August 18, 2019 at 11:38 a.m. (Barket requests a list of his own media statements)

8. August 22, 2019 at 1:00 a.m. (Informing *Curcio* counsel of the Epstein note)

9. August 22, 2019 at 6:30 a.m. (Counsel violating NY Rules of Professional Conduct)

10. August 22, 2019 at 6:57 a.m. (*Curcio* counsel shall be informed of the Epstein note)

4

11.     September 20, 2019 at (Barket wants to be the person to explain Epstein to the Court)

12.     September 20, 2019 at (Epstein matter should be presented to Judge Karas by *Curcio* counsel - not the attorney with the conflict-who concealed facts and opposed a *Curcio* appointment and inquiry)

Selected Text Messages From Attorney Barket to Assigned Counsel:

The following are the text messages that the undersigned counsel provided to *Curcio* counsel during the course of the *Curcio* inquiry. Although the following text messages were initiated by attorney Barket, it is the undersigned counsel who, upon request, provided text messages to *Curcio* counsel. The following is a list of attorney Barket's own text messages:

Text Message No. 1

1.     On July 29, 2019, Anthony Ricco received a text message from attorney Barket and attorney Barket's junior partner, Aida Leisenring, stating, "*Tony something has come up. Do you have time to chat later today, say after 6:00*'? In connection with this text message, at approximately 6:00 p.m. that day, attorney Barket called Anthony Ricco and told him that John Weider had just provided him a note (or a copy of a note) purporting to be a suicide note written by Jeffrey Epstein, which Nicholas Tartaglione gave to John Weider. Attorney Barket stated that Nicholas Tartaglione said that he found the note inside of one of Nick's books. At that time, attorney Barket concealed his involvement with the removal of the note from appointed counsel, and later misled both *Curcio* counsel and the court. Attorney Barket did not revealed his participation until August 23, 2019.

Text Message No. 2

2.     On August 2, 2019, Anthony Ricco received another text from attorney Barket stating, "*Nick says they put him back in the same cell after the incident and left all of Epstein's belongings in there, including medication glasses and books*". This text was sent in response to Anthony Ricco challenging attorney Barket on how the note could have been found in Nick's book, since attorney Barket had

5

previously stated in court that Nick's books had been taken away. On August 2, 2019, Barket explained that the note was found in Epstein's book, which was left behind. Attorney Barket later changed his story again, on September 17, 2019, returning to his original claim that the note was in Nicholas Tartaglione's book. See, *Curcio* report, page 7.

Text Message No. 3

3. On August 18, 2019, attorney Barket sent a text to Anthony Ricco at 1:18 p.m. stating *"I do no want people thinking that I am hiding things from them."* This statement was just more duplicity by attorney Barket, as we later learned on August 23, 2019, after the appointment of *Curcio* counsel, that attorney Barket was, in fact, *hiding* from all appointed counsel his direct involvement in the removal of the Epstein letter from the Metropolitan Correctional Center. See, *Curcio* report, page 7.

3(a). On August 18, 2019 at 1:44 p.m., Anthony Ricco responds to attorney Barket's text message, and states that he declines attorney Barket's invitation to call to have a discussion about attorney John Weider, and directs attorney Barket to the August 17, 2019, 1:43 p.m. email that Anthony Ricco had previously sent to the entire team discussing the ethical problems associated with John Weider's removal of the Epstein note from the Metropolitan Correctional Center. See, *Curcio* report, page 11. At that time, attorney Barket continued to conceal his direct participation in the removal of the Epstein note. See, *Curcio* report, page 7.

Text Message No. 4

4. Appointed Counsel Michael Bachrach provided *Curcio* counsel with information related to a screen shot of a text message from a contraband cellular phone. Screen shots of text messages sent by Tartaglione to his wife were in the possession of attorney Leisenring. During our mitigation investigation, attorney Leisenring provided them to attorney Bachrach, who immediately forwarded the screen shots to all appointed counsel and, after *Curcio* counsel's appointment,

6

forwarded them to *Curcio* counsel as well. The text message contained a communication of threats to Nicholas Tartaglione's wife (who Tartaglione was accusing of infidelity).

As attorney Barket is aware, there were many more text messages exchanged between attorney Barket and the appointed counsel related to attorney Barket's conduct. The foregoing is the complete list of the text messages that appointed counsel disclosed to *Curcio* counsel. However, appointed counsel cannot provide attorney Barket with a list of his own associates' text messages, because those text messages have never been provided to appointed counsel, notwithstanding three written requests for their disclosure. See, *Curcio* report, page 11.

Despite multiple a specific request from *Curcio* counsel, attorney Barket refused to provide *Curcio* counsel with the text messages exchanged between Nicholas Tartaglione and Bruce Barket, Aida Leisenring, and/or John Weider. This was memorialized in an email dated December 4, 2019 that attorney Barket sent to *Curcio* counsel.

## Text Messages - Miscellaneous Issues

On July 22, 2019, attorney Barket stated to this court on the record, in support on an assertion of privilege to prevent the government from reviewing the text messages on a cellular phone seized from Nicholas Tartaglione, that there were text messages on the cellular phone between Tartaglione and attorneys who were members of the defense team. As stated above, notwithstanding three written requests made by appointed counsel, attorney Barket and attorney Leisenring have not disclosed to appointed counsel the text messages between them and Nicholas Tartaglione. See, *Curcio* report, page 11. Attorney Barket has also failed to disclosure the text messages between Nicholas Tartaglione and John Weider, the attorney whom Barket claimed was retained to assist with the development of the defense. See, *Curcio* report, page 11.

## Court Transcripts and Correspondence From Tartaglione Provided to *Curcio* Counsel

1.    Appointed Counsel provided *Curcio* counsel with the May 13, 2017 letter, purportedly

authored by Nicholas Tartaglione and written to attorneys Anthony Ricco and Mark De Marco, instructing both Anthony Ricco and Mark De Marco not to engage in any conversations with any court appointed investigators or experts; not to engage in any discussions concerning stipulations; not to speak to any prosecutors; not to make any decisions; not to attend any meetings; and that we were to simply do what attorney Barket - - an attorney with zero capital experience - - instructed us to do. Nicholas Tartaglione was, in fact, requesting that attorney De Marco and I become "straw appointments" as a conduit for the public funding or the plans of a retained attorney who had no experience whatsoever representing a death authorized defendant.

2.      Appointed Counsel provided *Curcio* counsel with a letter, purportedly authored by Nicholas Tartaglione on August 15, 2019.  This letter was posted on August 19, 2019, after attorney Barket spent three days trying hard to dissuade appointed counsel from seeking the appointment of Curcio counsel.   Attorney Barket's response was to go to the Metropolitan Correctional Center and obtain a letter (posted dated to August 15, 2019) stating that all counsel should follow attorney Barket's lead, and if any attorney has a conflict with him, that attorney should leave his case.  It is significant that the letter dated August 15, 2019, was removed from the Metropolitan Correctional Center by attorney Barket during a counsel visit on August 19, 2019.   It is ironic that Attorney Barket has denied removing from the Metropolitan Correctional Center, the January 18, 2020, letter authored by Nicholas Tartaglione again seeking the removal of Anthony Ricco from the case and threatening to take the matter to the Daily News.  It has not escaped notice that upon subpoena of BOP records there was no other legal visit, nor any record of a legal mailing from January 18, 2020 through January 23, 2020.  The only person to visit Nicholas Tartaglione during this time period is Bruce Barket, the attorney subject to the *Curcio* inquiry.

3.      Appointed Counsel provided *Curcio* counsel with a copy of the transcripts of the

8

March 29, 2018 *ex parte* proceeding, wherein attorney Barket vigorously attempted to have attorneys Anthony Ricco and Mark De Marco removed from the case. It was during this attempt that appointed counsel brought to the attention of the court the May 13, 2017 letter.

4.    Appointed Counsel also provided *Curcio* counsel with the various letters filed by Nicholas Tartaglione with court or mailed to appointed counsel, seeking the removal of appointed counsel from the case. This includes a letter dated March 28, 2018 (filed with the court) and the most recently the Tartaglione letter dated January 18, 2020 (mysteriously removed from the Metropolitan Correctional Center and delivered to Anthony Ricco after the *Curcio* report was concluded).

5.    Appointed Counsel also provided *Curcio* counsel with a Memorandum dated September 23, 2019 (4:23 a.m.), which was authored by Anthony Ricco and addressed to Nicholas Tartaglione (along with exhibits, Basecamp posts and emails), which demonstrated and outlined the hard work that had been devoted to his defense, and also demonstrated exactly how Anthony Ricco actually reported to team members regarding their August 15, 2019 meeting together. The Memorandum and exhibits expose the empty claims advanced by attorney Barket seeking the removal of experienced Learned Counsel. As the court is aware from the application made by attorney Barket during the court proceedings on January 22, 2020, attorney Barket is now seeking the removal of all appointed counsel from the case.

Assertion of Privilege or an Opportunity to Seek Discovery in Relation to Pending *Curcio* Inquiry

In his letter requesting a list of information, attorney Barket claims that he is seeking "*a detailed record of potentially privileged defense emails, text messages and [B]asecamp posts being turned over to the Government, even to a firewall team, to preserve Mr. Tartaglione's record for any future appeal.*" Barket letter at 2. This raises two questions: What privilege is he referring to? And who's privilege is he suggesting could be invoked?

Since a firewall attorney is being relied upon there is no privilege that Nicholas Tartaglione

9

could assert, specifically because the firewall itself is designed to prohibit disclosure of the material to any individual outside of the firewall, i.e., any prosecutor who would then be able to use the material against Nicholas Tartaglione. Since the purpose of the firewall is to prohibit that from happening, Nicholas Tartaglione's interests are protected and any invocation of privilege would be moot. Additionally, if such a disclosure to the government firewall counsel were against the interest of Nicholas Tartaglione, appointed counsel would not have made the application. That *Curcio* counsel, who has been copied on all applications, has not objected to appointed counsel's application supports the conclusion that Nicholas Tartaglione will not be prejudiced by disclosure.[2]

The only individual not protected by the firewall that could have an interest to hindering disclosure of the evidence underlying the *Curcio* inquiry, is the attorney subject to that inquiry, in this case Bruce Barket, and his associates working on his behalf. Is attorney Barket suggesting that he might claim privilege over the materials? If so, that would seem to present an additional source of conflict. See, *United States v. Scala*, 266 Fed.Appx. 41, 45 (2d Cir. 2008) (affirming decision to disqualify counsel of choice, specifically the attorney in that case - none other than attorney Bruce Barket, holding that when defense counsel invokes his own Fifth Amendment privilege, a conflict exists that requires disqualification of that counsel).

Although appointed counsel is aware that attorney Barket is already in possession of all the information he requested (a fact not known to this court), appointed counsel has taken on the hard

_____

[2]    Nicholas Tartaglione is, in fact, prejudiced by attorney Barket's decision to withhold critical information from appointed counsel and *Curcio* counsel. While attorney Barket is demanding a list of his own communications, he fails to notify that the court that he has flatly refused to provide the text messages that he, his associate and John Weider had with Nicholas Tartaglione via a contraband cellular phone to *Curcio* counsel, and that he has refused to provide *Curcio* counsel with a copy of the Epstein note or it's whereabouts. This pattern of concealing critical information, while at the same time making misleading representations to the court, under the guise that he, as the retained counsel of choice, is the protector of the interests of Nicholas Tartgalione continues with impunity. The court should be aware, that appointed counsel has complied with every single request for information made by *Curcio* - without failure.

work of indexing and organizing all the Basecamp posts, emails and text messages (many of which were initiated by attorney Barket himself). In this way, we agree with attorney Barket that an entire record will be made (sans the information the attorneys subject to the *Curcio* inquiry have decided to withhold from *Curcio* counsel).

While a great deal of time has been devoted to indexing and organizing the above information, appointed counsel remains aware that in this death authorized case, an accurate record is required - particularly in view of attorney Barket's claims that appointed counsel is interfering with the conduct, behavior and litigation decisions of Nicholas Tartaglione's counsel of choice.

Conclusion

During the course of the *Curcio* inquiry, attorney Bobbi Sternheim conducted extensive interviews with Nicholas Tartaglione, and discussed with him many issues related to his representation, including his complaints about appointed counsel. In addition, during the course of the *Curcio* inquiry, attorney Bobbi Sternheim conducted extensive interviews with all counsel in this case. Those interviews were conducted in group meetings, and in individual sessions with counsel.

As the court can readily glean from the extensive lists and categories of information set forth above, *Curcio* counsel's investigation was extremely thorough, as *Curcio* counsel reviewed an avalanche of Basecamp posts, emails, text messages, transcripts of past court appearances and the timing of various correspondences purportedly authored by the defendant.

Throughout the *Curcio* inquiry, *Curcio* counsel often sought the views and opinions of all counsel to explain the context of the various Basecamp posts, emails, text messages and correspondences. Upon information and belief, attorneys Barket, Leisenring or Weider have not provided to *Curcio* counsel any text messages that attorney Barket claims are in his possession related to their exchanges via a contraband caller phone with Nicholas Tartaglione. In addition, according to

11

the *Curcio* report, attorney Barket and his associates refused to provide *Curcio* counsel with a copy of the Epstein note, when requested. See, *Curcio* report, page 7.

Indeed, Mr. Barket has acknowledged to *Curcio* counsel via a December 4, 2019 email that he possesses additional communications that are relevant to the *Curcio* inquiry but that he would not disclose. As such, Mr. Barket is already in possession of not merely all of the electronic evidence against him but additional evidence as well that he has refused to disclose notwithstanding the repeated requests of Learned Counsel and *Curcio* counsel. To state now that he needs an itemization of those communications, appears to the undersigned as yet another attempt by him to evaluate the weight of the evidence *against him*, not his death authorized client. This was a tactic engaged in by attorney Barket in connection with the application for the appointment of *Curcio* counsel, and later during each step of the *Curcio* inquiry. Attorney Barket continues to engage in a divergence that *Curcio* proceedings are designed to safeguard against.

Indeed, as the attorney subject to the *Curcio* inquiry, Mr. Barket is *the last person* that should be discussing the evidence and allegations with the defendant although he continues to do so. As the *Curcio* inquiry has proceeded, and more of the conduct that attorney Barket attempted to conceal is exposed, he has intensified the demand for the removal of all counsel that has complied with Second Circuit and Supreme Court case authorities to ensure that Nicholas Tartaglione is not represented by a conflicted counsel.

Notwithstanding the foregoing, with the filing of this letter, attorney Barket now has a list of the Basecamp posts in which he participated, as well as his own emails and text messages that were provided to *Curcio* counsel during the course of the *Curcio* inquiry. As stated above it has taken appointed counsel several hours to assemble an index of attorney Barket's own statements, nonetheless, attorney Barket now has the list he claimed he needed to protect the interest of Nicholas Tartaglione.

12

As stated in our letter of February 7, 2020, the government is presently withholding the request for the Basecamp posts, emails and text messages until it first has an opportunity to review the *ex parte* proceedings and the correspondences filed in relation to the *Curcio* appointment and *Curcio* inquiry. Given that the Basecamp posts, emails and text messages involve the disclosure of information which would normally have the protection of the attorney/client privilege, the government's measured approach is entirely reasonable. However, all parities have had discussions about the "universe of materials" relied upon to reach the conclusions in the *Curcio* report during the court proceedings (January 22, 2020, pages 14 and 15). These discussions have continued, in general terms, between appointed counsel and A.U.S.A. Margery Feinzig. In addition, attorney Barket, and his associates, have already filed a letter attacking the factual conclusions set forth in the *Curcio* report. Therefore, based upon the foregoing, it is not unreasonable to conclude that the likelihood of a request for documents of one or more of the above categories will be forthcoming. Therefore, the above list has been generated to prevent the unwarranted delay of the *Curcio* proceedings.[3]

It is the hope of appointed counsel that court will find the above lists helpful to resolve the issue of whether attorney Barket has performed his duties as counsel for Nicholas Tartaglione under a conflict of interest; a conflict which has influenced the courses of action decided upon, the advice that attorney Barket has provided to Nicholas Tartaglione and the representations that he has made to this court.

There is no question that the Basecamp posts, emails, and text messages - - documents authored, and in many instances initiated by attorney Barket, will provide the court with a "real time"

---

[3]     An index and compendium of the Basecamp posts, emails and text messages has been compiled and is available for the court to review at this time or in the future. Also, substantial redactions will be required of the September 23, 2019 Memorandum and exhibits, as those materials detail specifics and budgetary issues related to the development of Nicholas Tartaglione's defense.

13

assessment of his actual conduct, not just the assertions and assurances made by him in court and on the record.[4]

Finally, I respectfully request that this letter be held *ex parte* and under seal to avoid revealing information that could adversely impact the defendant and prejudice his penalty phase investigation and presentation.

Respectfully submitted,

*Anthony L Ricco*
Anthony L. Ricco, Esq.

Bruce D. Koffsky, Esq.
Michael Bachrach, Esq.
Kenneth J. Montgomery, Esq.
John Diaz, Esq.

ALR/jh

cc:  All defense counsel (including Barket and Leisenring)

---

[4]    During the court proceedings on August 21, 2019, attorney Barket assured the court that nothing happened to require the appointment of *Curcio* counsel; that , the everything was "straightforward" and "clean" and, therefore, could be concluded today; and that "we all can move beyond it." See, *Curcio* report, page 4. Unbeknownst to appointed counsel (and more significantly, to the court), at the times these assurances were being made to the court, attorney Barket was concealing his involvement in the removal of the Epstein note, a violation of BOP rules, and that he had instructed Nicholas Tartaglione not to discuss or disclose the Epstein note to anyone, unless he (attorney Barket) was present. A review of the "real time" Basecamp posts, emails and text messages listed herein prevents this type of deception to the court from continuing in this case, and demonstrates - - in a case where a defendant risks the imposition of a death sentence - - there is a profound divergence of interest, and that retained counsel has, apparently with the assistance of a retained an ethics counsel, has engaged in a purposeful disregard for the integrity the court proceedings designed to protect the rights of a capital defendant. See, *Curcio* report, page 2.. It is for all of these reasons that appointed counsel is of the view that the Basecamp posts, email and text messages are relevant to the *Curcio* inquiry in this case, and should be provided to the government conflict/firewall counsel and the court - if required and/or requested.

14

# EXHIBIT 34



BARKET EPSTEIN KEARON ALDEA & LoTURCO, LLP

666 OLD COUNTRY ROAD, SUITE 700
GARDEN CITY, NEW YORK 11530
516.745.1500 • [F] 516.745.1245
WWW.BARKETEPSTEIN.COM

ADDITIONAL OFFICES:
EMPIRE STATE BUILDING, NY, NEW YORK
HUNTINGTON, NEW YORK
ALL MAIL TO GARDEN CITY ADDRESS

*Ex Parte and Under Seal*

March 2, 2020

**via Email**
Hon. Kenneth M. Karas
United States District Court
Southern District of New York
300 Quarropas Street
White Plains, NY 10601

Re:    Response to Letters Concerning Removal and Third-Party Mailing
of Letter dated January 18, 2020.

Dear Judge Karas,

This letter is in response to Anthony Ricco's letters dated January 23, January 28, February 3, and February 9, 2020, implying and/or explicitly alleging that I "smuggled" a letter written by Mr. Tartaglione on January 18, 2020 and mailed it to Mr. Ricco in violation of the BOP rules.[1]    Among other statements, Mr. Ricco's February 3rd letter states that his

---

[1] While beyond the scope of this letter, which is limited to addressing and disproving Mr. Ricco's factual assertions, it is also notable that Mr. Ricco's account of the substance of the BOP Rules is also inaccurate. Contrary to his assertion, several Rules explicitly permit inmates to receive documents from their legal representatives during visits (*see, e.g.,* MCC Institutional Supplement 5267.06(M) stating that an "attorney will be authorized to provide a reasonable (not to exceed four inches) amount of legal materials to the inmate at the conclusion of the attorney visit"), and *all are silent* with respect to pretrial inmates giving handwritten notes or letters to the attorney.

The cites in Mr. Ricco's letters purporting to hold a contrary view are either inapplicable or simply do not exist. For example, Mr. Ricco claims that "BOP Visiting Policy Statement No. 5267.09(21)(d), at P. 11" stands for the proposition that "Detainees are prohibited from giving legal papers to the attorney or receive (sic) papers from the attorney to retain after the visit, absent compelling circumstances and prior authorization by unit team or Duty Officer" (*see* January 28, 2020 Letter, P. 5). But Subsection (21)(d) *does not appear to exist* in 5267.09, and no

"investigation to date has revealed ... that the only person who visited Nicholas Tartaglione during the time period [January 18, 2010 through January 21, 2020] is attorney Bruce Barket." *See* Letter of Anthony Ricco dated February 3, 2020, P.6, footnote 3. Further, his letter dated February 9th states: "It has not escaped notice that upon subpoena of BOP records there was no other legal visit, nor any record of a legal mailing from January 18, 2020 through January 23, 2020. The only person to visit Nicholas Tartaglione during this time period is Bruce Barket, the attorney subject to the *Curcio* inquiry." *See* Letter of Anthony Ricco dated February 9, 2020, P.8. Like so many other accusations Mr. Ricco has made, these allegations are not true.

As I indicated on January 24, 2020, in my letter to this Court, neither I, nor anyone associated with my law firm, received the January 18th letter from Mr. Tartaglione, or mailed it to Mr. Ricco.

After Mr. Ricco first suggested I "smuggled" the letter by Mr. Tartaglione out of MCC, I inquired who, if anyone, visited Mr. Tartaglione, and removed and mailed the letter. I learned that Kymberly Tinsley met with Mr. Tartaglione on January 18, 2020. Ms. Tinsley confirmed this to me during a brief telephone call on January 27, 2020. She also stated that she did not mail the letter to the *Daily News*. I then subpoenaed the MCC visiting log for January 18th and for the application for Ms. Tinsley to be permitted legal visits. Thereafter, I learned the following:

> (1) A review of the BOP visitor log, provided to us by the BOP pursuant to our subpoena for the records, shows that a "Kymberly Tinsley" visited Mr. Tartaglione on January 18, 2020. *See* Attachment A, BOP Visitor Log.
>
> (2) Ms. Tinsley is a paralegal employed by the Law Office of Dennis Biancanello. *See* Attachment B, Affidavit of Kymberly Tinsley, and Attachment C, BOP visitor application and accompanying documents.

---

such language appears on Page 11 *or anywhere else* in this policy statement – which is entirely silent on inmates providing documents to their attorneys.

Indeed, as a matter of practice, this is not only permitted but quite common. Ms. Sternheim, for instance, obtained and removed a document from Mr. Tartaglione during her visit with him in this case and distributed it to the team via email on September 16, 2020. Interestingly, Mr. Ricco did not feel compelled to report her to the tribunal for "smuggling" out a document.

Thus, I respectfully request that Mr. Ricco provide the Court and counsel with a copy of the apparently non-existent subsection that he cites in his attempt to not only implicate me in wrongdoing, but, more disturbingly, to implicate his own client.

(3) Mr. Tartaglione apparently retained the Law Office of Dennis Biancanello[2] some time prior to 2020. On November 5, 2019, Mr. Biancanello requested permission from the Bureau of Prisons for his paralegal, Ms. Tinsley, to enter MCC so she could visit and correspond with Mr. Tartaglione "regarding certain legal matters." *See* Attachment C. To be clear, it is my understanding that Mr. Biancanello has been retained for matters other than the charges pending before this Court.

(4) Ms. Tinsley visited Mr. Tartaglione on January 18, 2020, and "took" from him a "letter to mail to The Law Office of Anthony Ricco." On January 19, 2020, she "googled Mr. Ricco's address" and addressed the envelope and "placed it in the mail." *See* Tinsely affidavit, Attachment B, and her parking receipt dated January 18, 2020 for the parking lot near MCC, Attachment D.

(5) Ms. Tinsley did not advise anyone in my office that she received or mailed the letter until I asked her on January 27, 2020. *See* Attachment B.

Thus, it seems that Mr. Ricco grossly misstated what the BOP records and his investigation actually revealed and did so in a manner designed to denigrate me and attack my credibility before this Court. In that regard, I respectfully request a copy of Mr. Ricco's subpoena and the BOP records to which Mr. Ricco refers that allegedly demonstrate that I was the only individual that visited Mr. Tartaglione during that time period -- a factual assertion we now know to be false.

This information concerning the false accusation made against me is representative, I respectfully submit, of the true state of the facts concerning the many unwarranted accusations which have been made in this case. It is important for this Court to know the truth and to know how easily false accusations can be made in a case where there is friction among counsel. The taint of the accusations has painted an unfair picture for the Court, *Curcio* Counsel, and the Government. Mark Twain is said to have given birth to the adage that "a lie will fly around the whole world while the truth is getting its boots on."[3] That is regrettably true here. Mr. Ricco wrote no less than four letters all signed by other appointed counsel implying that I removed this letter and mailed it. It took weeks to obtain the records to disprove this one false allegation.[4]

---

[2] Until the issue of his letter arose, I had no idea that Mr. Tartaglione retained another lawyer, nor that Ms. Tinsley had been approved for legal visits as a paralegal and had visited Mr. Tartaglione in that capacity. Ms. Tinsley, who regularly attends the court appearances, approached our office last summer asking to work as a paralegal on Mr. Tartaglione's case. After meeting with her, we denied her request.

[3] Ironically, according to a 2017 *NY Times* article "That Wasn't Mark Twain: How a Misquotation Is Born", the original quote was authored by Jonathan Swift.

[4] Of course, none of this would have been necessary if Mr. Ricco had simply asked me or appointed counsel had asked Mr. Tartaglione about the letter before writing to the Court. Indeed, given that his allegations also had the

There are additional accusations which Mr. Ricco has made that will be addressed at a time and in a manner consistent with the Court's directives and in a manner that will protect Mr. Tartaglione's right to confidentiality.

I believe the information above should be disclosed to the firewall Assistant United States Attorney, Margery Feinzig, who received the same false accusations against me. The integrity of the *Curcio* inquiry, and Mr. Tartaglione's constitutional right to his counsel of choice and to conflict-free appointed counsel are at stake. Accordingly, in this death-authorized case, the record must be preserved for appeal.

I respectfully request that like Mr. Ricco's letters, and for the same reasons, this letter too be held *ex parte* and under seal.

Thank you for your time and consideration.

Respectfully submitted,

_____/s/Bruce Barket_____
Bruce A. Barket

cc:    *via electronic mail:*
       Anthony Ricco, Esq.
       Michael Bachrach, Esq.
       Bruce Koffsky, Esq.
       Kenneth Montgomery, Esq.
       John Diaz, Esq.

---

of exposing wrongdoing by a client, common sense and caution should have led him and the other appointed counsel to first determine the facts before making the allegations.

# EXHIBIT A

# EXHIBIT A

| DATE | Print NAME | Signature | Inmate | Reg # | Time |
|---|---|---|---|---|---|
| 1/17 | | | | | 1 |
| 1/17 | | | | | 1 |
| 1/17 | | | | | 1 |
| 1/17 | | | | | 1:40 |
| 1/17 | | | | | 1:40 |
| 1/17 | | | | | 1:53 |
| 1/17 | | | | | 1:55 |
| 1/17 | | | | | 2- |

| DATE | PRINT NAME | SIGNATURE | INMATE | Reg # | TIME |
|---|---|---|---|---|---|
| 1/18 | | | | | 11:15 |
| 1/18 | | | | | 11:5 |
| 1/18 | | | | | 6:13 |
| 1/19 | | | | | 12:5? |
| 1/18 | | | | | 12:2 |
| 1/19 | | | | | 12:15 |
| 1/18 | | | | | 1:00 |
| 1/18 | | | | | 3pm |
| 1/18 | | | | | 3pm |
| 1/18 | Kimberly Tion | | Tarrytown | 08514 054 | 5:00 |
| | | | | | 5:55 |
| 1/18 | | | | | 6:15 |
| 1/19 | | | | | 11:15 |
| 1/19 | | | | | 11:5 |
| 1/19 | | | | | 11 |
| 1/20 | | | | | 1:25 |
| 1/19 | | | | | 152 |
| 1/19 | | | | | 2:20 |
| 1/20 | | | | | 10:45 |

# EXHIBIT B

# EXHIBIT B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X

UNTIED STATES OF AMERICA,

                                    **AFFIDAVIT**

       - against -              16-CR-832 (KMK)

NICHOLAS TARTAGLIONE,

----------------------------------------------------------------X

I, **Kymberly Tinsley**, swear and affirm the following:

1.  I am the paralegal for the Law Office of Dennis Biancanello.

2.  On January 18, 2020 I traveled to the Metropolitan Correctional Center to meet with Nicholas Tartaglione.

3.  At the conclusion of the meeting, I took a letter to mail to The Law office of Anthony Ricco.

4.  On January 19, 2020, I googled Mr. Ricco's address. I addressed the envelope and placed it in the mail box.

5.  I did not advise anyone in the Law office of Bruce Barket that I received the letter, or that I mailed it.

6.  I was contacted by Bruce Barket on or about January 27, 2020, and asked if I mailed a letter to The Law office of Anthony Ricco. At that time I advised that I mailed the letter to Mr. Ricco.

                                    _____
                                    Kymberly Tinsley

Sworn to before me this 24th
day of February 2020

_____
Notary Public

KATHERINE LOPEZ
Notary Public, State of New York
Registration #01LO4813290
Qualified In Nassau County
Commission Expires Sept. 30, 20__

# EXHIBIT C

# EXHIBIT C

BP-S0660.012
MAR 99                                    NCIC CHECK COFRM

U.S. DEPARTMENT OF JUSTICE                                    FEDERAL BUREAU OF PRISONS

AUTHORIZATION FOR RELEASE OF INFORMATION
NCIC (National Crime Inforention Center) CHECK

I hereby authorize a representative of the Federal Bureau of Prisons to obtain any information
on my criminal history background.  I understand that this check must be done before I am
allowed to enter/serve at any Bureau facility.  I also understand that refusal to provide
all necessary information may result in 1) denial of entry into a Bureau facility and 2) denial
of volunteer/contract status.

1. Name (Last, First, Middle)    Tinsley, Kymberly, Ann

2. Address (Street address) (City, State, County, Zip Code)

3. Home Telephone Number (Area Code, Number)

4. Aliases/Nickname: Not Applicable

5. Citizenship (List the country you are a citizen of): United States

6. Social Security Number:

7. Date of Birth (Month, day, year):

| 8a. Sex:f | 8b. Race: |
| 8c. Height: | 8d. Weight: |
| 8e. Color of Eyes: | 8f. Color of Hair: |

9. Place of Birth (City, State, County   (List city, county and country if outside the
   U.S.A)

| 10. The above listed information is true and correct. | 10a. Date    November 5, 2019 |

PRIVACY ACT NOTICE

Authority for Collecting Information: E.O. 10450; 5 USC 1303-1305; 42 USC 2165 and 2455; 22
USC 2585 and 2519; and 5 USC 3301

Purposes and Uses: Information provided on this form will be furnished to individuals in order
to obtain information regarding activities in connection with an investigation to determine
(1) fitness for Federal employment, (2) clearance to perform contractual service for the Federal
Government, (3) security clearance or access.  The information obtained may be furnished to
third parties as necessary in the fulfillment of official responsibilities.

Effects of Non-disclosures: Furnishing the requested information is voluntary, but failure
to provide all or of part the information may result in lack of further consideration for
employment, clearance or access, or in the termination of your employment.

(This form may be replicated via WP)

Law Office of Dennis Biancanello
64 Hilton Ave
Hempstead, NY 11530
516-567-7049

November 5, 2019

Stephanie Scannell- Vessella
Staff Attorney, CLC New York
Metropolitan Correctional Center
150 Park Row
New York, NY 10007

Re: Application for Paralegal Entry

Dear Ms. Scannell-Vessella:

I'm an attorney licensed to practice in the State of New York, Registration No. 3952249. My firm has been retained by Nicholas J. Tartaglione, who is currently being held at Metropolitan Correctional Center, Federal Registration Number 78514-054.

I'm writing this letter to request permission for my paralegal Kymberly Tinsley to enter MCC to visit and correspond with Mr. Tartaglione on my behalf regarding certain legal matters.

Ms. Tinsley's duties on my behalf will be including but not limited to: a liaison for me by meeting with Mr. Tartaglione to intake pertinent information, answer questions etc, delivering documents requiring Mr. Tartaglione's signature, drafting legal documents, and correspondence. Ms. Tinsley will also be responsible for all follow up.

Kymberly Tinsley is a graduate from ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Arts Degree. She has been employed as a Paralegal, collectively for 13 years. I have worked with her on numerous cases over the years. During that time she has been reliable, professional and a huge asset. Ms. Tinsley is also a Certified Mediator with 6 years mediation experience. She has superior negotiation skills, her legal knowledge, and legal experience is extensive.

If you require any further information, or have any questions, please do not hesitate to contact the undersigned.

Very Truly Yours,

Dennis Biancanello



METROPOLITAN DETENTION CENTER
100 29ᵀᴴ STREET
BROOKLYN, NEW YORK-11232
(718) 840-4200

METROPOLITAN CORRECTIONAL CENTER
150 PARK ROW
NEW YORK, NEW YORK 10007
(646) 836-6300

Dear Sir/Madam:

We are in receipt of your request that you, or a person whom you employ or supervise, be allowed to visit and correspond in relation to legal matters with Nicholas J. Tartaglione Federal Register Number 78514-054.

In order for such visiting or correspondence to be conducted, we must request that you, or your employee or your student, complete and sign the enclosed questionnaire. Please type the questionnaire, and ensure that all sections are completed. In addition, we must request that the sponsoring attorney execute the Attorney's Statement at the end of the questionnaire. Please return the form upon completion, either by regular or overnight mail. You may also return completed applications electronically by emailing them to BRO/LegalVisit@bop.gov.

APPLICATIONS WILL NOT BE ACCEPTED IN THE FRONT LOBBIES OF THE INSTITUTIONS.

The information supplied on this questionnaire may be used for investigative purposes in determining whether to grant this request to visit and correspond with inmates. ████████████ ████████████████████████ from the date of receipt. It is your responsibility to contact the Legal Department to ascertain whether you, your employee/student will be allowed to visit or correspond with the above-referenced inmate.

Upon approval, the applicant's admittance to enter will expire (1) one year from the applicant's date of approval. It is the applicant's responsibility to reapply upon expiration.

## GENERAL

This information is provided pursuant to Public Law 93-579, the Privacy Act of December 31, 1974.

## PURPOSES & USES

The information you supply may be used as a basis for an investigation regarding your correspondence with Nicholas J. Tartaglione Federal Register Number 78514-054.

In the process of conducting the investigation, the Bureau of Prisons may disclose the information to federal, state, or local law enforcement agencies.

## EFFECTS OF NONDISCLOSURE

You are not required to supply the information requested on the attached questionnaire. If you do not furnish the information requested, the processing of your request will be suspended, and you will receive no further consideration. If you furnish only part of the information required, the processing of your request will be attempted; however, it may be significantly delayed. If the information withheld is found to be essential to processing your request properly, you will be so informed, and your request will receive no further consideration unless you supply the missing information. Although no penalties are authorized for failure to supply the requested information, failure to supply the information could result in your not being considered for or allowed admittance to the institution or correspondence privileges with the inmate in question.

PARALEGAL  [X]          MITIGATION SPECIALIST (See Page 11) [ ]

INTERPRETER [ ]          OTHER          [ ]

PRIVATE INVESTIGATOR (See Page 10)  [ ]

APPLICATION TO ENTER AN INSTITUTION OR CORRESPOND WITH A FEDERAL PRISONER AS THE REPRESENTATIVE OF A LICENSED ATTORNEY.

This form has three parts:

1. Questionnaire: This questionnaire is to be completed by each paralegal, legal assistant, clerk, student, interpreter, mitigation specialist or private investigator who seeks to enter an institution of the Federal Bureau of Prisons to visit or correspond with a federal prisoner as the representative of a licensed attorney. ███████████████████████████████████ ████████████████████████████████████████████████

2. Certification: Each person seeking to enter a federal institution to visit or correspond with a federal prisoner ████████████████████ which follows the questionnaire.

3. Attorney's Statement: The licensed ████████████████████████ the sponsoring statement. This application will not be processed if the Attorney's Sponsoring Statement is not signed.

4. NCIC Check: This application will not be processed if the ████████████████████.

## QUESTIONNAIRE

NOTE: Answer all questions. If a question does not apply to you, write "Not Applicable" in the space provided for the answer.

Name: Kymberly A. Tinsley

   A: Any alias or other name ever used: No

    Name: Not Applicable       When Used: Not Applicable

Social Security Number: █████████

Date of Birth: █████████      Place of Birth: New York

Sex: Female        Race: █████████

Present Residential Address 144 Pidgeon Hill Rd, Huntington Station, NY 11746

Length of time at this address: 7 years

Home telephone number: 631-418-7079

List all residential addresses (including street and number, city and state) for the last five (5) years and dates you resided at each address:

| Addresses | Dates |
|---|---|
| ███████████████████████████████ | 2012 to present |

Present Place of Employment: Law Office of Dennis Biancanello, Esq.

Employer's business address: 64 Hilton Ave, Hempstead, NY 11530
Name of immediate supervisor: Dennis Biancanello, Esq

Employer's telephone number: ▄████████

Dates of Employment: August 2019 to present

**And**

Present Place of Employment: Law Office of Lewis Edelstein Esq, P.C

Employer's business address: 300 Garden City Plaza, Suite 450, Garden City, NY 11530
Name of immediate supervisor: Lewis Edelstein Esq

Employer's telephone number: 516-228-3355

Dates of Employment September of 2012 to present

List all previous employers for the past five (5) years, including employers' addresses and dates of your employment with each employer:

| EMPLOYER | ADDRESS | DATES OF EMPLOYMENT |
|---|---|---|
| ███████████████████████████████████████████████ | | |
| ███████████████████████████████████████████████ | | |

List all schools, universities, or other educational institutions attended from grade 10 to present (this should include any and all legal training that you have received):

**SCHOOL**                    **ADDRESS**                    **DEGREE & DATE RECEIVED**

███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████

a) Paralegal applications require the applicant A) be a law school graduate B) provide a copy of their paralegal certificate or C) have a minimum of (6) months experience as a paralegal AND provide a copy of a letter from the sponsoring attorney stating the applicant's duties.

b) Interpreter applicants are never authorized to operate on their own, as hired by an inmate or as hired by anyone other than the inmate's attorney of record. Interpreters can only enter the institution accompanied by the attorney of record or a pre-approved legal professional.

Have you ever been convicted of ANY criminal offense? No

If so, complete the following. You may exclude any convictions for minor traffic violations (fine of $150.00 or less)

**OFFENSE**        **DATE OF CONVICTION**        **NAME & LOCATION OF COURT**

Not Applicable

_____

_____

_____

_____

Have you ever been confined in any jail, prison or penal institution? NO  If so, complete the following:

**Type of Institution**              **Location**              **Dates of Confinement**
(State, Federal, Municipal County)

Not Applicable

_____

_____

Have you ever been charged with a criminal
circumstances and legal disposition of the

Not Applicable

Have you ever been denied permission to visit
Federal Bureau of Prisons (social or legal)?

plicable

.....Applicable

Are you a relative of or have a 'social relationship
MDC/ MCC? If yes, explain relationship.

Are you currently on,
federal institution?

No

## STATEMENT OF APPLICANT

I certify that I am authorized to act as the legal representative of _Dennis Biancanello_

who is a licensed member of the bar of the State of _New York_

I request that I be allowed to interview and correspond with _Nicholas J. Tartaglione_

Federal Register Number _78514-054_, who is confined at the MCC.

I am aware of my responsibility as a representative of the above-named attorney and certify that I am able to meet this responsibility. I am also aware of the Bureau of Prisons' Policy on Inmate Legal Activities and certify that I am able to and will adhere to the requirements of this policy. I pledge to abide by Bureau of Prisons regulations and institution guidelines. I hereby certify that all of the information contained in this questionnaire is true and correct to the best of my knowledge. Furthermore, I understand that all information contained in this questionnaire may be investigated and verified through the use of federal, state and local authorities.

Applicant's printed name: _Kymberly A. Tinsley_

Applicant's signature: _Kymberly A. Tinsley_

Date Completed: _November 5, 2019_

[redacted]

## STATEMENT OF SPONSORING ATTORNEY

I hereby certify that I am a licensed member of the bar of the State of New York

and that I employ or supervise Kymberly A. Tinsley

I authorize Kymberly A. Tinsley to represent me and    request that my

representative she be allowed to interview and correspond with  Nicholas J. Tartaglione

Federal Register Number 78514-054 , who is currently confined at  MCC New York, I further

certify that Kymberly A. Tinsley is aware of the responsibility of her role as my representative

and is able to meet this responsibility. I pledge that I will supervise my representative's activities.

I accept personal and professional  responsibility for all acts of my representative which affect

the institution, its inmates or staff.

Attorney's printed name   Dennis Biancanello

Address: 64 Hilton Ave, Hempstead, NY 11530

Telephone Number: 516-567-7049

Signature:

Date Completed:  November 5, 2019

## PRIVATE INVESTIGATOR APPLICANTS

The following visiting procedures will be applied to Private Investigators entering the institutions:

Private Investigators on the approved list will be permitted to enter the institution without the accompaniment of their sponsoring attorney.

Private Investigators will be required to submit a statement of sponsoring attorney as well as a copy of their Private Investigator's License EACH TIME THEY WANT TO VISIT ON BEHALF OF AN ATTORNEY OTHER THAN THE INITIAL SPONSORING ATTORNEY.

Your admittance to enter will expire one year from the date of your approval or upon the expiration of your private investigators license (whichever comes first).

Private Investigators will be permitted to bring pre-approved interpreters, if necessary.

Please be advised that it is the responsibility of the Private Investigator to make her/his sponsoring attorney aware of the above procedures. The enclosed Sponsoring Statement form can be reproduced locally.

## MITIGATION SPECIALIST

The following visiting procedures will be applied to Mitigation Specialists entering this institution:

Mitigation Specialists on the approved list will be permitted to enter the institution without the accompaniment of their sponsoring attorney.

Mitigation Specialists will be required to submit a letter from the sponsoring attorney EACH TIME THEY WANT TO VISIT ON BEHALF OF AN ATTORNEY.

A letter (written from the attorney) must be produced for each inmate that the mitigation specialist needs to visit. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

Mitigation Specialists will be permitted to bring pre-approved interpreters, *if* necessary.

Mitigation Specialists must schedule visits by sending the date and time of the visit along with a copy of the signed letter. The email should include the inmate's full name and register number. The request needs to be directed to the respective Legal Department for the institution you need to visit.

For ▓▓▓▓▓▓▓▓▓ all e-mails should be addressed to BRO/LegalVisit@bop.gov

For ▓▓▓▓▓▓▓▓▓ all requests should be faxed to 646-836-7665.

Please be advised that it is the responsibility of the Mitigation Specialist to make her/his sponsoring attorney aware of the above procedures. The enclosed Sponsoring Statement form can be reproduced locally.

Have you ever been charged with a criminal offense? If yes, please briefly summarize circumstances and legal disposition of the case.

No

Have you ever been denied permission to visit or correspond with an inmate by an institution within the Federal Bureau of Prisons (social or legal)?    NO

      If so, state the institution(s), inmate(s) and date(s) of denial.    Not Applicable

Are you a citizen of the United States? _Yes_

      If not, give the name of the country of which you are a citizen or subject:  Not Applicable

      Alien Registration Number:  Not Applicable
      Passport Number: ▬▬▬▬

Are you a relative of or have a 'social relationship with the inmate(s) you are seeking to visit with at the MDC/ MCC? If yes, explain relationship.

No

Are you currently on, or seeking to be placed on the social visiting list of any inmate(s) housed at a federal institution?

No

Page 6 of 11

# EXHIBIT D

# EXHIBIT D



2:04                                                      ..ıl 5G

Done                        19 of 19

170 Park Row Parking Corp.
170 Park Row
New York, NY 10038
(646) 609-6934
DCA License  2045155
Main Office (212) 736-7171

TINSLEY/KYNBERLY

VISA
CARD#  ********____
ENTRY: CHIP

DATE  01-18-2020
TIME  08:00:21 PM

AMT  $    17.74

2

# EXHIBIT 35



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*United States Courthouse*
*300 Quarropas Street*
*White Plains, New York 10601*

March 3, 2020

**BY HAND – To Be Filed Under Seal**

Honorable Kenneth M. Karas
United States District Judge
United States District Court
300 Quarropas Street
White Plains, New York 10601

> Re:    *United States v. Nicholas Tartaglione*
>         **S4 16 Cr. 832 (KMK)**

Dear Judge Karas:

We have been asked to provide the Government's view with respect to potential conflicts in the representation of Mr. Tartaglione by Bruce Barket, Esq. As set forth below, we have not identified any unwaivable conflicts. However, we have identified potential waivable conflicts that may arise. Accordingly, we respectfully request that the Court hold a *Curcio* hearing so that the Court can determine whether the defendant wishes to waive any such potential conflicts. In addition, we respectfully submit that a limited inquiry is appropriate to assess issues related to Mr. Barket's communications with the press.

## Background

As the Court is aware, the defendant has retained Mr. Barket and his law firm to represent him in this matter. In addition, because this is a death penalty case, the Court has appointed several attorneys to represent the defendant as Learned Counsel. Upon the request of Learned Counsel, the Court appointed Bobbi Sternheim, Esq., to explore whether Mr. Barket is subject to any actual or potential conflicts with the defendant and to represent the defendant in any *Curcio* proceedings. After interviewing the defendant and reviewing defense materials, Ms. Sternheim issued a report (the "Report"), *ex parte* and under seal, which described three areas that possibly raise conflict issues but did not specifically identify actual or potential conflicts between the defendant and Mr. Barket. The Report's three areas of concern are: (1) Mr. Barket made statements to the press indicating that the defendant had information about Jeffrey Epstein's suicide and conditions at the Metropolitan Correctional Center ("MCC"); (2) Mr. Barket assisted in removing a note from the MCC that Epstein appears to have written before his first suicide attempt (the "Epstein Note" or "Note"); and, (3) Mr. Barket and another lawyer at his firm

communicated with the defendant over a contraband cellphone, which MCC staff later seized from the defendant.

We have reviewed the Report, a response submitted by Mr. Barket (the "Response"), and submissions to the Court and transcripts of Court conferences that defense counsel provided to us, which are listed in Anthony Ricco's February 2, 2020 letter to the Court. We have also discussed the issues addressed in the Report with Ms. Sternheim. We have specifically decided not to obtain and review internal communications among defense counsel (texts, emails, and basecamp communications) in order to avoid intruding further into attorney-client privileged material and because we have determined a review of those communications would not alter our analysis. Based on our review of all these materials and our conversations with Ms. Sternheim, we respectfully request the following as to each of the identified areas of concern.[1]

## Areas of Concern Raised

### A. Statements to the Press

According to the Report, Mr. Barket has made various statements to the press. The statements related to conditions at the MCC and threats MCC personnel purportedly made against the defendant. They also involved denials of allegations that the defendant assaulted Epstein, mention that the defendant and Epstein had an amicable relationship while sharing a cell, and assertions that the defendant has information pertaining to Epstein's attempted suicide and death. The Report suggests that these statements could be used as adoptive admissions adverse to the defendant's interest during the penalty phase of this case, including by negatively affecting presentation of evidence of positive prison adjustment. The statements could also create the potential for Mr. Barket to be questioned regarding Epstein's suicide and death. The Report further suggests that certain statements may have contained attorney-client privileged material. (Report at 3).

We respectfully request a brief *Curcio* inquiry of the defendant into his consent to Mr. Barket's disclosure of information to the press. Based on our review of some of the statements, it does not appear that Mr. Barket necessarily disclosed attorney-client privileged information. In any event, Mr. Barket has asserted that the defendant authorized him to speak to the press and the Report indicates that the defendant is willing to waive the privilege to the extent it is implicated. Thus, we request that the Court advise the defendant that Mr. Barket has made statements to the press, which could have at least three negative effects on the defendant: First, Mr. Barket may have disclosed attorney-client privileged material. Second, Mr. Barket's statements could be used against the defendant and negatively affect the penalty phase of this case, including by undermining evidence of positive prison adjustment. Third, Mr. Barket's statements could lead to questioning of both Mr. Barket and the defendant by authorities about Epstein's suicide and death. After advising the defendant of these possible consequences of Mr. Barket's statements to the press, we further request that the Court ask the defendant whether he authorized Mr. Barket's disclosures to the press, as described in the Response (Response at 10-

---

[1] The Report discusses the applicable legal standard relating to conflicts and *Curcio* hearings. (Report at 13-16).

11), waived the attorney-client privilege as to any statements that may have implicated it, and agrees to waive any post-conviction argument, on appeal or otherwise, based on any potential conflict arising from those disclosures.

## B. The Epstein Note

As recounted in the Report and Response, the defendant found the Epstein Note, which appears to contemplate suicide, in a book in his cell, after Epstein attempted suicide and was removed from the cell, and after MCC staff searched the cell and presumably failed to discover the Note. The defendant told Mr. Barket about the Note and Mr. Barket instructed him to give it to the next lawyer who came to visit him. Mr. Barket contacted another attorney on the team and that attorney met with the defendant and removed the Note from the MCC.[2] The main concern is that Mr. Barket assisted in the removal of the Note, which may have violated MCC rules, and then failed to disclose the note to authorities, which may have other negative consequences for the defendant and Mr. Barket.[3] Thus, there could be a conflict between Mr. Barket and the defendant if early disclosure of the Note was in the defendant's best interest and Mr. Barket decided not to disclose it (and continues to withhold it from co-counsel and the Government) because he was concerned he would be subject to investigation for assisting in its removal.

The Report—which identified the Epstein Note as "the crux of concern regarding conflict" (Report at 10)—cites various potential reasons why it was in the defendant's interest to disclose the Note, which give rise to the implication that Mr. Barket's failure to disclose it was to protect his own interests and not in the best interests of his client. For example, the Report avers that the Note was relevant and material to investigations into Epstein's suicide attempt and subsequent successful suicide that this Office, the MCC, and other agencies were conducting. Thus, the Report suggests, the Note's removal and non-disclosure to investigators amounted to the withholding of relevant evidence and made Mr. Barket and other members of the defense team potential witnesses in those investigations. The Report also observes that MCC staff could potentially argue that if the defense had disclosed the Note, they would have decided to keep Epstein on suicide watch, which could have prevented his death. Thus, the Report suggests that the decision not to turn over the Epstein Note could subject the defendant and Mr. Barket to wrongful death allegations and civil suits, as well as potential criminal liability for obstruction of justice. (Report at 9-10).

In connection with the defendant's case, the Report suggests that the failure to disclose the Epstein Note was not in the defendant's interest and could negatively affect the penalty phase. By contrast, disclosure of the Epstein Note to the Government could expose Mr. Barket to investigation by this Office and professional disciplinary authorities, creating a potential

---

[2] The Report considers the Note to be "contraband," but we do not think it falls clearly within that category. Its removal from the MCC may have been a violation of MCC rules but that also does not appear to be clear-cut.

[3] There is also concern that Mr. Barket failed to inform co-counsel about his involvement in the removal of the Note from the MCC and that he did not want the defendant to disclose the Note to Ms. Sternheim.

conflict between the defendant and Mr. Barket. Further, the Report suggests Mr. Barket became an unsworn witness to events material to evidence that could be presented in the penalty phase concerning the defendant's prison adjustment. (Report at 9). In sum, the Report concludes that disclosure to the Government of the Epstein Note and the circumstances surrounding its removal invited a serious potential conflict between the defendant and counsel. (Report at 8-10).

The Sternheim Report recounted a reasonable explanation, which was in the interest of his client, for why Mr. Barket [and presumably the defendant] had a lawyer remove the Note from the MCC, rather than provide it to MCC authorities immediately. According to the Report, prior to telling Mr. Barket about the Note, the defendant informed an MCC officer about the Note and expressed the concern that if he gave it to MCC staff, they might not properly safeguard it. Apparently, the MCC officer tacitly agreed. (Report at 7). Further, Mr. Barket's Response to the Report explained why he did not turn over the Note to authorities immediately after he had it removed from the MCC. According to Mr. Barket, he made the strategic decision to try to verify that Epstein had written the Note, prior to turning it over to any authorities. (Response at 5). There can be little doubt that if he had turned over a Note claiming it to be an Epstein suicide note and it turned out not to have been written by Epstein, there would almost certainly have been negative consequences for his client. Thus, there appear to be reasons that are consistent with the defendant's interests, for removing the Note from the MCC and not immediately turning it over to authorities.

While Mr. Barket has not explained why he continues to withhold the Epstein Note from co-counsel and the Government, other than the implication that his client does not want him to do so, the Note appears to have little value to the defense, given the timing of the events surrounding Epstein's attempted suicide and suicide. First, it seems unlikely that early disclosure of the Note would have prevented Epstein's death or had a material impact on the investigations surrounding his attempted suicide and later death. By the time the defendant discovered the Note and gave it to his lawyer, Epstein had already tried to kill himself. Epstein's attempted suicide was likely to be a far more substantial warning that he might try to kill himself again than the Note he wrote before that attempted suicide. Thus, it does not seem likely that the Note would have changed anyone's decision to take Epstein off suicide watch, a controversial decision that ultimately led up to Epstein's successful suicide. However, the fact that the Note does not appear to be a significant piece of evidence in any investigation of Epstein's death does not foreclose the possibility that an investigation would take place or that lawsuits could be filed and that Mr. Barket's and the defendant's interests could diverge. For example, in administrative or civil litigation, including wrongful death litigation, the defendant could take the position that he relied on Mr. Barket's legal advice and Mr. Barket – not the defendant – was at fault for not disclosing the Note. Mr. Barket could argue that his client refused to authorize him to release it.

Further, to the extent it has been suggested that there could be a criminal investigation of Mr. Barket relating to Mr. Barket's involvement in the removal of the Epstein Note, which could create a conflict between the defendant and Mr. Barket, this Office has determined that the facts, as presently known, do not support such an investigation. However, the Report also suggests Mr. Barket could be subject to disciplinary proceedings relating to the Note's removal from the MCC and his failure to disclose it sooner. In that circumstance, Mr. Barket could have an incentive to blame the defendant, thereby creating divergent interests between the two of them.

In addition, under these circumstances, consciously or otherwise, Mr. Barket could seek the goodwill of the Office for his own benefit, which may not always be in the best interest of the defendant.

In light of these potential conflicts related to the Epstein Note, the Government respectfully requests that the Court advise the defendant of these potential conflicts and determine whether the defendant wishes to waive any conflicts arising from the above matters knowingly and voluntarily.

In connection with the penalty phase of this case, as noted above, the Epstein Note appears to have limited value to the defense. In theory, turning it over promptly may have helped in the determination that Epstein had attempted suicide and not that the defendant had assaulted him. But that fact was established a short while later. Turning over the Epstein Note prior to Epstein's death might also have supported an argument in the penalty phase that the defendant tried to save Epstein's life. The defendant already has a more compelling argument to that effect, though, since he found Epstein after his first suicide attempt and alerted MCC staff (and Mr. Barket's apparent strategic judgment was to verify the Note's authenticity first). Thus, whatever evidentiary value the Epstein Note has for the penalty phase – possibly in arguing that Epstein and the defendant had a warm relationship – it does not appear that the timing of the disclosure of the Note will have much, if any, impact. Moreover, it appears unlikely that the Note will become a significant factor in the penalty phase, but if the defense decides to present it, an "unsworn witness" issue may arise. In that circumstance, it seems that the parties could address Mr. Barket's role then, by, among other things, the use of stipulations or the participation of one of the several other attorneys participating in the defense.

## C. The Contraband Cellphone

Finally, it has been suggested that there might be a criminal investigation relating to the source of the contraband cellphone that was seized from the defendant, which could potentially create a conflict between the defendant and Mr. Barket. This Office has determined that the facts, as presently known, do not support such an investigation. Thus, we do not believe there is an actual or potential conflict between the defendant and Mr. Barket in connection with the defendant's possession and use of the cellphone.[4]

---

[4] The Report also cites a failure by Mr. Barket to share text messages with the defendant on a contraband cellphone with Learned Counsel. Although it notes potentially applicable ethical guidelines, the Report does not identify how—if at all—that disagreement among counsel presents a conflict issue, and we do not believe that it warrants *Curcio* inquiry beyond that described above.

## Conclusion

In sum, as set forth above, we have not identified any unwaivable conflicts in connection with Mr. Barket's representation of the defendant. However, we have identified potential conflicts that may arise in connection with the handling of the Epstein Note. Accordingly, we respectfully request that the Court hold a *Curcio* hearing so that the Court can determine whether the defendant wishes to waive any such potential conflicts. In addition, we respectfully submit that a limited inquiry is appropriate to assess issues related to Mr. Barket's communications with the press. We will be prepared to provide a proposed series of questions for the Court to ask the defendant should the Court decide to hold a *Curcio* hearing.

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney

By: _Margery B. Zenny_

Margery B. Feinzig/Ilan T. Graff
Assistant United States Attorneys
(914) 993-1903/(212) 637-2296

cc: Bruce A. Barket, Esq. (By email)
Anthony L. Ricco, Esq. (By email)
Michael K. Bachrach, Esq. (By email)
John A. Diaz, Esq. (By email)
Bruce D. Koffsky, Esq. (By email)
Kenneth J. Montgomery, Esq. (By email)
Bobbi C. Sternheim, Esq. (By email)

# EXHIBIT 36

X200304tartaglioneAllC    Conference

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
UNITED STATES OF AMERICA

             v.                        16 Cr. 832 KMK

NICHOLAS TARTAGLIONE,

          Defendant.

------------------------------------x

                             United States Courthouse
                             White Plains, N.Y.
                             March 4, 2020
                             2:10 p.m.

Before:

             THE HONORABLE KENNETH M. KARAS,

                                  District Judge

                    APPEARANCES

GEOFFREY S. BERMAN
     United States Attorney for the
     Southern District of New York
MAURENE COMEY and JASON SWERGOLD
     Assistant United States Attorneys

BRUCE BARKET
AIDA LEISENRING
ANTHONY L. RICCO
JOHN DIAZ
MICHAEL BACHRACH and
BRUCE KOFFSKY
   Attorneys for Defendant Nicholas Tartaglione

ALSO PRESENT:  BOBBI C. STERNHEIM, Curcio Counsel
               DAVID RUHNKE, Resource Counsel
               TANYA GREENE, Resource Counsel

        SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
                    (914)390-4053

2

X200304tartaglioneAllC   Conference

(In open court)

THE DEPUTY CLERK:  In the matter of the United States of America v. Nicholas Tartaglione.

Counsel, please state your appearances for the record.

MR. SWERGOLD:  Good afternoon, your Honor.  Jason Swergold and Maurene Comey for the government.  We also have Assistant US Attorneys Margery Feinzig with respect to the *Curcio* issue and AUSA Thomas John Wright with respect to the contraband cellphone privilege issue.  He's the wall assistant on that, your Honor.

THE COURT:  I understand.

MR. SWERGOLD:  Thanks.

THE COURT:  Good afternoon to you all.

MS. COMEY:  Good afternoon, your Honor.

MR. BARKET:  I think they're just trying to catch up to our numbers.

THE COURT:  Yes.

MR. BARKET:  Bruce Barket and Aida Leisenring for Mr. Tartaglione.

MR. RICCO:  Anthony Ricco, a little under the weather, but here.  And I just want to note at the back table we have Resource Counsel David Ruhnke, and we also have Resource Counsel Tanya Greene, who has been with the case since the beginning, but I think this may be her first appearance

3

X200304tartaglioneAllC    Conference

here.

THE COURT:  Welcome.

MR. RICCO:  And of course, *Curcio* counsel Bobbi Sternheim.

MS. STERNHEIM:  Good afternoon.

MR. DIAZ:  John Diaz appearing for Nicholas Tartaglione.

MR. BACHRACH:  Michael Bachrach, also under the weather, here for the defendant.

MR. KOFFSKY:  Good afternoon, your Honor.  Bruce Koffsky.

THE COURT:  Not under the weather?

MR. KOFFSKY:  Not.

THE COURT:  Not yet.

MR. KOFFSKY:  Fit as a fiddle.

THE COURT:  Under the weather has a whole new meaning these days.  Good afternoon.  Please be seated, everybody.

I don't even know where to begin.  So I guess we'll just see if there's any plain vanilla updates from the government and go from there.

MR. SWERGOLD:  If you're looking for the plain vanilla updates, I guess I would say, recognizing the outstanding *Curcio* issue and that everything is being held in abeyance, for the record, the government is requesting a trial and we request a trial date.

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

4

X200304tartaglioneAllC    Conference

Putting that aside, we've asked AUSA Wright to be here because although we do not know the substance of it, we understand there may be some dispute regarding what, if any, portions of the contraband cellphone can be shared with the trial team, so there's that issue.

There's obviously the *Curcio* issue, and that's, from the government's perspective, those are the only items we're aware of that we need to affirmatively raise.

THE COURT:  So there's been no discovery developments or anything of the kind?

MR. SWERGOLD:  Nothing related to -- I can't remember if we produced anything after the last conference.  Certainly, within the last two months, there's been some discovery produced with respect to penalty phase requests.  Nothing with respect to any guilt phase evidence.

THE COURT:  Okay.  All right.  Thank you.

Mr. Barket.

MR. BARKET:  Ours aren't vanilla.

THE COURT:  Sorry?

Then turning to the other issues, I guess there was -- I think the most recent letter, Mr. Ricco, was from you, where you had thrown out the possibility of allowing parties to brief the *Curcio* issues.

I know Ms. Feinzig had, in her submission, talked about maybe submitting some proposed questions, which I sort of

5

X200304tartaglioneAllC   Conference

took to be in the category of briefing or basically written submissions that would address the contours of the hearing, which I think makes sense, but only if everybody is willing to do it expeditiously. I don't know if you want to add anything to that.

And then, Mr. Barket, of course, I'll be happy to entertain your response.

MR. RICCO: Judge, nothing to add to it. We've been preparing for today, so we could have the submissions to the Court very expeditiously.

THE COURT: Okay. All right. I assume, Ms. Feinzig, you can do the same.

MS. FEINZIG: Yes, your Honor.

THE COURT: Okay.

Mr. Barket.

MR. BARKET: Same for us.

THE COURT: So is a week enough time to submit whatever people want to submit, whether it's legal stuff on the contours of this proposed questions? Does that give everybody enough time?

MR. RICCO: Yes.

THE COURT: I don't want people to be reckless, either. I don't want speed to be at the expense of thoroughness.

MR. BARKET: In terms of questions, a week is plenty

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

6

X200304tarLaglioneAllC    Conference

of time.

THE COURT:  Okay.

MR. BARKET:  Can I suggest that we perhaps set a --
today is Wednesday -- so an interim date of Monday where
everybody can kind of swap proposed questions to each other?

THE COURT:  Sure.

MR. BARKET:  And then hopefully, settle in on some
rough set of things, questions the Court will actually ask.

THE COURT:  Okay.  And then, to the extent, and I
don't know, Ms. Feinzig, your letter wasn't clear on this
because you did not have Mr. Ricco's letter at the time you
wrote yours, whether a week is enough time to the extent you
want to add legal analysis to whatever it is he's going to be
proposing.

I'm looking at you, Mr. Ricco, and you, Ms. Feinzig.

MS. FEINZIG:  I think it's enough time for the
government, your Honor.

MR. RICCO:  That's enough time, Judge.

THE COURT:  All right.  And I think what would be
helpful in your letter is a suggestion as to how long you think
this might take.  I don't think it should take more than a day.
I think it should take less than that, but I'm not going to
schedule a bunch of other cases, just because I want to be
optimistic that we'll get it done in a couple hours.  So the
ERISA world will have to wait for their cases to be heard.

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

7

X200304tartaglioneAllC    Conference

MR. RICCO:  My sense is the inquiry that needs to happen will take a day.

THE COURT:  Okay.  I figured a day would be what we would block out.  I don't think we would need more than that.

MR. BARKET:  No, Judge.

MR. RICCO:  Okay.

THE COURT:  All right.  Other issues people want to raise?

MR. WRIGHT:  With respect to the wall privilege review, as your Honor I believe is aware, there was a contraband cellphone that was seized that was forensically searched by the Bureau of Prisons, resulting in two extraction reports: one that related to the cellphone itself, one that related to a SIM card in the cellphone.

Those reports are each of approximately 20 pages. The government provided them to all counsel at the end of January.  And I asked counsel at that time to convey whether they intended to claim any privilege over any of it.

I understand, your Honor, that Mr. Barket views that there may be a privilege that he wishes to assert here on behalf of his client.  The government's view, your Honor, is that there is nothing here over which a privilege could be asserted, with the exception of, quite literally, nine text messages that appear in the extraction report for the SIM card.

I am not assigned to this case in its substance.  I'm

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914) 390-4053

8

X200304tartaglioneAllC    Conference

not in a position to assess whether or not those are privileged. They do not appear facially to be of a nature of a communication that could be, but I defer to counsel if there's a privilege they wish to assert.

With the exception of that, your Honor, there simply is no communication in these reports that could possibly be privileged. There is an issue that was raised, I think fairly, by Mr. Barket, and that is that the extraction reports refer to a number of files that exist on the cellphone and the SIM card.

After speaking with people in the BOP, as well as our own forensic analysts, it appears that these are files that are not reflective of user activity, but rather system files that come with any kind of computer or any chip or processing unit of a computer in order to allow it to work. We are, however, taking the steps to acquire the cellphone. It's now in New York. It is available if counsel would like to look at it.

With that said, I don't think that there's any reason why these two extraction reports, which do capture all of the data on the phones that can be rendered into plain English with dates and times or numbers, communications of which there are just nine text messages, I don't think there's any assertion of privilege that could lie there. And if Mr. Barket thinks otherwise, I would ask him to assert the privilege now.

THE COURT: So with respect to these two extraction reports as you're calling them, I obviously haven't seen them,

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

9

X200304tartaglioneAllC    Conference

so what's on them?  I gather there are nine -- is it separate text communications or a total of nine communications?

MR. WRIGHT:  There are, on the SIM cards report, which is approximately 20 pages long, there are nine text messages, as in one text from a user to the phone or from the phone to a user, that's one text of which there are nine. There are then records of contacts on the phone; calls in and out, which, I think, again, by their nature, are not something over which privilege could be asserted.

THE COURT:  Uh-huh.

MR. WRIGHT:  And for that reason, I think it would be productive, and I think this exercise is at its natural end, for counsel to assert a privilege if they see one, and if they do, we'll respond and argue to the Court.

THE COURT:  Mr. Barket.

MR. BARKET:  Simple from my perspective, Judge.  I want to see the whole before I articulate a position on the part.  So I haven't seen the report.  I've seen the text messages.  I want to see the phones and the files, the system files, there's a dozens, I think, of -- what was the phrase you used to describe those?

THE COURT:  System files.

MR. WRIGHT:  -- system files, your Honor, in the sense they're not reflective --

THE COURT:  -- of the usage of the phone.

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

10

X200304tartaglioneAllC    Conference

MR. BARKET:  Our expert looked at that and said I can't tell from looking at this whether they're simply system files or they represent substance that can be extracted, so in other words, whether or not there could be text messages.  And we'd like to look at the phone and the SIM card.  And at the end of that, we'll have seen the whole and I can articulate a position as to the part, which is the reports that they want to hand over.

MR. WRIGHT:  As I said, your Honor, we're happy to do that.  We've taken the steps.  We have the phone, which I confirmed earlier today.  I'm happy to have a forensic analyst on behalf of the defense analyze it in the presence of our own experts and staff.

With that said, there is absolutely no bearing whatsoever of what those system files are with respect to an assertion of any privilege over these reports.  As I had posited to counsel in our discussion of the issue, there could be a recording that is hiding amidst these files, perhaps, let's hypothesize, that is a recording of a literal conversation between the defendant and his counsel in which there is a request for legal advice that is provided regarding the heart of this case.  If that were the case, there's still nothing about these reports that would be privileged since they do not in any way betray anything about these files other than a file name that is incomprehensible to any lay or expert --

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

11

X200304tartaglioneAllC    Conference

layperson or expert on the issue.

So I would like to make the extraction reports available to the government --

THE COURT:  Except that one of the reports contains the substance of the text messages, right?

MR. WRIGHT:  That's correct, your Honor.

THE COURT:  Yes.

MR. WRIGHT:  And if counsel is prepared to assert a privilege over those texts, there's certainly no access to additional material that I think bears on those texts.  If they are a request or a provision of legal advice in some way that I don't perceive, assert a privilege and we'll respond to it.

THE COURT:  So the proposal is to turn over the two extraction reports, which your point is, even if there's, somewhere buried in the phone, some conversation, you're not turning over the phone itself to the prosecution team; you're turning over the extraction reports and we'll have a conversation about the text messages.

So either the whole report gets turned over or a redacted version that takes out the text messages will get turned over, right?

MR. WRIGHT:  And your Honor, again, if counsel has a view that these text messages --

THE COURT:  No, I understand that.  I'm saying, that's what we're left with, is either both reports in their

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

12

X200304tartaglioneAllC    Conference

entirety get turned over, or one report that has the text messages may get redacted, but we'll wait and see what the privilege assertion is.

MR. WRIGHT:  Precisely.

THE COURT:  Okay.

Mr. Ricco.

MR. RICCO:  Judge, on this issue, I think the prudent thing is reflected in Mr. Barket's request.  I've had an opportunity -- Mr. Barket has used the word "our expert."  I don't know who that person is.  But the defendant services computer litigation support unit, which assists us in capital trials, I've had the occasion to discuss this issue with them, and they have given me a program called Cellbright.  And that program will oftentimes reveal text messages that are in those hidden files, that it does have it, that is not unreasonable to think that there may be something in them.

THE COURT:  Okay.

MR. RICCO:  So I can understand why one would be reluctant to weigh-in on the issue of privilege without having an opportunity --

THE COURT:  It would just be a question of weighing-in on what's in the extraction reports.  The fact that there might be other data that could be extracted from the phone is why precisely the phone should be made available to you and to others and their experts.

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914) 390-4053

13

X200304tartaglioneAllC   Conference

MR. RICCO:   I don't disagree with that.

THE COURT:   That's all I'm saying.

MR. RICCO:   I don't know -- I didn't -- I'm not aware of the context of those communications, so I don't know whether or not there is text information embedded in the device that does relate to one or more of those conversations.

Now I don't disagree with the government.  These text messages, on their face, I don't know any privilege that would support them.

THE COURT:   Whatever it is, and we can agree to a process by which Mr. Barket can assert the privilege and evaluate it --

MR. RICCO:   Yes.  And Judge, this --

THE COURT:   Let me just finish.

MR. RICCO:   Go ahead.

THE COURT:   I think what we're talking about here is the disclosure of the reports themselves.  So even if the phone might have other data that could itself be privileged, the prosecution team isn't going to see that in the first instance anyway.

MR. RICCO:   Judge, I don't want to change the point, but I just want to finish my point.

THE COURT:   Go ahead.  Finish your point.  And then I'll hear from Mr. Barket.

MR. RICCO:   This process to review these files takes

14

X200304tartaglioneAllC    Conference

about an hour, Judge.

THE COURT:  Okay.  Gotcha.  You're talking about having the text person exploit the phone, takes about an hour.  That's the program you were mentioning?

MR. RICCO:  Yes.  Basically that it inputs those files into this program, and that program then prints out information.

THE COURT:  Presumably that program would have been available to BOP and they would have used that program, but maybe I'm naive.

MR. WRIGHT:  That's correct.  Again, I think out of respect, and given the nature of the proceedings, we are permitting every avenue here to be exhausted.  All files and data that on these cellphones can be rendered into meaningful English language or numbers that have meaning was done by running this program.

With that said, it's important to take every precaution.  Certainly not proposing to do anything with this phone with respect to my colleagues who are assigned to this case, that the reports themselves, your Honor, there simply is no basis over which to assert privilege over them, except with the possible respect to those text messages.  And I think if that were the case, I think Mr. Barket and learned counsel would have straightforwardly made that claim with respect to them.  So at this time, I do respectfully ask to turn the

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

15

X200304tartaglioneAllC    Conference

reports over.

THE COURT:  Okay.  Mr. Barket.

MR. BARKET:  I didn't know it was only an hour.  And our expert is indeed our expert.  It's the person or the company that we've been --

THE COURT:  Be that as it may --

MR. BARKET:  What I said at the beginning, I just want to look at the whole before I --

THE COURT:  But this has got nothing to do with whether the reports themselves contain privileged information.

MR. BARKET:  It actually --

THE COURT:  No, it doesn't, it doesn't.  It just doesn't.  Either the texts are privileged or they're not.  I don't know how the other data could at all be privileged, but whatever it is, if there's something in the phone itself that could be privileged, you certainly should have an opportunity to see that, but the proposal isn't to turn the phone over to the prosecution team; it's to turn the reports over.

MR. BARKET:  I understand, Judge.

THE COURT:  Okay.

MR. BARKET:  I don't disagree with anything that anybody said.  And ultimately, and maybe even quickly, we'll get to exactly that point.  My position is, I'm not asserting privilege over these text messages that have been disclosed.

I do -- in a perfect world, from Mr. Tartaglione's

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

16

X200304tartaglioneAllC   Conference

perspective, I would not like these text messages delivered to the government, in a perfect world.  I get that I don't live in that world.

THE COURT:  In perfect world, he wouldn't have used the phone.

MR. BARKET:  Well, yeah.

So part of our obligation is to try and develop a meritorious argument as to how those text messages could be privileged.  And I have a thought on it, an idea on it.  It's to -- I don't have enough information to assert it, but I don't know why we would need to do that first.  If it's -- everything's available.  We have an expert that's already being paid for through this process, through the courts, who is available to examine the phone.  Let us look at the phone, the whole, first.  And if we can't assert a privilege, which may very well be, then we don't assert the privilege and we say that.

If we do develop an argument to assert the privilege and the material has already been turned over to the government, then it's too late.

THE COURT:  You definitely get a chance to argue why information in the reports themselves is privileged and shouldn't be turned over to the prosecution team, but the reports say what they say, and the text messages that are in those reports say what they say.

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914) 390-4053

X200304tartaglioneAllC    Conference

I don't know.  I guess from the government's perspective, what's the rush?  If this isn't going to take very long to do, whether it's an hour or a day, Mr. Wright, I'm not sure why that matters from the prosecution team's perspective.

MR. WRIGHT:  We're happy to proceed as the Court prefers.  I think the attorney/client privilege is a multifaceted and complex area of the law.  With that said, it is not infinitely elastic and there are arguments that can be made that are within the zone of reason and possibility.

If these text messages are what concern the parties, I would propose in that case redacting them and providing the balance of the report, which I think if I understand counsel correctly, I don't think that there's any claim that any of that remainder of the report could present an issue.

THE COURT:  Right.  But if the prosecution team gets a redacted report tomorrow and then it turns out there's litigation over the text and it turns out they're not privileged and counsel have an opportunity to have their own experts exploit the phone and the prosecution team gets the reports two weeks from now, what's the prejudice to the government?

MR. WRIGHT:  I'm in the strange position of not knowing the significance of, for instance, the call logs or the --

THE COURT:  I understand you may not know the

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914) 390-4053

18

X200304tartaglioneAllC    Conference

significance of the call logs.  I guess I'm trying to understand, what's the significance of the timing of discovery of the significance of the call log?

MR. WRIGHT:  I take your point, of course.  I think because I'm in a place of ignorance as to the possible significance of the contacts or the lists of calls to numbers, I don't know whether receiving that information now, given that we're in the context of requesting a trial date, could be material to the government.

THE COURT:  The trial date request has been a proforma thing that the government has done at every conference, which everybody understands why they're doing that. The trial date hasn't been set.  It's not going to be set. Even if we set the trial date tomorrow, the trial won't happen anytime in the immediate future because there's a whole bunch of motion practice to be done, among other things.

MR. WRIGHT:  Again, coming from a place of ignorance and not knowing what the investigative value of these messages are and what the investigative lengths that might be needed to exploit their value for the government lawfully, I'm in a position of certainly wanting to respect the possible claim of a privilege and would redact the report, but I just don't see how any of the remainder of it could in any theory of privilege be privileged, and given my role, would seek to provide it to the government.

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914) 390-4053

19

X200304tartaglioneAllC    Conference

THE COURT:  And it may very well be it's a role you would gladly be done with, if you could.  But I think if we say to the defense, we'll give you two weeks, get your expert access to the phone, give you a chance to write something if you want to assert a privilege, I don't see how that's going to prejudice the prosecution team, especially since we don't have a trial date.  And whether it takes an hour or it takes a day, I don't think you're going to need more than two weeks to get the data and then explore what privilege can be asserted.

Does that seem fair, Mr. Barket?

MR. BARKET:  Absolutely.

THE COURT:  Mr. Ricco, you okay with that?  You might want to go faster, but you don't have a problem with that?

MR. RICCO:  I'm not interested in going faster. There may be proposed questions with respect to *Curcio*, but we can do left hand/right hand at the same time.

THE COURT:  No, I mean I do recognize that, quite apart from whether or not the report has privilege information -- or reports -- quite apart from whether the reports have investigative leads for the prosecution team or not, the reports are going to be relevant to the *Curcio* inquiry, but again, I think Mr. Barket's point is well-taken that if he thinks that exploring the other data on the phone that may not have made its way into the reports could help inform an analysis of whether or not there's a privilege, then

20

X200304tartaglioneAllC    Conference

he should be entitled to that.

MR. RICCO:  Judge, I wholeheartedly agree with that.

THE COURT:  And it may be that then you'll be submitting supplemental questions depending on what happens to the reports.

Have you seen the reports, Ms. Feinzig?  You haven't, right?

MS. FEINZIG:  No.

THE COURT:  Right.

So they're walled-off from not only the prosecution team, but also the government's other wall.

MS. FEINZIG:  But I don't see any reason why I should be walled-off from the content of the phone.

THE COURT:  Well, if it's attorney/client privilege, then --

MS. FEINZIG:  Theoretically, the other information I've reviewed was attorney/client privilege.  I'm not saying it's necessary; it just might move things along faster in terms of the questions that we propose for the *Curcio*, but also, it can wait and I can supplement.

THE COURT:  Okay.

MR. BARKET:  I, speaking just for the lower L part of the table here, don't have a problem with -- and I thought the Court ordered this on January 22nd, but if not, then with Mr. Wright sharing the reports with Ms. Feinzig, the same --

21

X200304tartaglioneAllC    Conference

because the same -- I've got no problem with that.

THE COURT:  Mr. Ricco, you don't have a problem with that, do you?

MR. RICCO:  None whatsoever.

THE COURT:  Okay.

There you go, Mr. Wright.  You finally get a friend in this case.

MR. WRIGHT:  Shared.

THE COURT:  You're no longer alone.  All right.

Next?

MR. BARKET:  Are you still looking for vanilla, Judge, because I'm still all out of that.

THE COURT:  What's that?  No, I get it.  There's no more vanilla.

MR. BARKET:  There were a few things that we brought up last time that we're attending to.  Visiting the jail, as you might have read, is an issue these days.  So I have a note -- I received a note yesterday from counsel to the MCC, Ms. McFarland, I believe, who said that, give us the names of the people you want to view the cells and evidence, we'll get to that, but not until after the current situation has resolved.

If you don't know, the jail has been locked down for a week for some security investigation, rumors of which I've heard, I'm reluctant to repeat in open court, but so the jail

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

22

X200304tartaglioneAllC   Conference

has been locked down for a week.  Nobody -- no movement, no legal visits, no social visits.

THE COURT:  Is there an expectation as to how long that will continue?

MR. BARKET:  Actually, not a good one, because I was looking for a social visit for his family on Thursday, tomorrow, yesterday, and I was told unlikely that we're going to resolve things by then.  And from -- the first time I saw Mr. Tartaglione was today in about ten days, two weeks.  And my understanding is that they're still locked down and that's not going to change for a bit.

THE COURT:  Do you have any idea, Mr. Swergold, how long?

MR. SWERGOLD:  Your Honor, I don't.  So the record is clear, it's been locked down since Thursday.  So I know when Mr. Barket says he hasn't seen his --

THE COURT:  So, February 27th?

MR. SWERGOLD:  Yes.  When he says he hasn't seen his client in ten days to two weeks, not all of that is because of the lockdown.  All I can say is that, yes, we are aware that the MCC is dealing with a serious security issue.  We are monitoring it.  We are in regular contact with the MCC.  And we also understand that Chief Judge McMahon is aware of the issues and is monitoring it and is in contact with respective institutional players within the system.

23

X200304tartaglioneAllC    Conference

MR. RICCO:  For what it's worth, Judge, the investigation is expanding, not contracting.

THE COURT:  So it may be a while?

MR. RICCO:  Yes.

THE COURT:  All right.  Well, I mean, I'm not sure what's to be done about it now, Mr. Barket, but obviously if -- the longer it goes, maybe the more problematic it would be. And I'm sure MCC understands the urgency to try to do whatever they're going to do, but at the same time, allow for visits as soon as they can, and I'm sure the Chief Judge is more than an advocate for that point, so I'm not going to get in her way.

Other issues.

MR. RICCO:  Judge, I did have one issue.  It's a purely *ex parte* defense.  It's one of the prongs of the letter, very simple and narrow issue, and I would not want to do that in the presence of the government or any of the firewall counsel at this time, but of course the letter recognizes, based upon your Honor's ruling, the information would be provided to firewall counsel and we made that request as a part of the letter.

THE COURT:  Yes.  I think there's a couple things we need to discuss *ex parte*.  So, what we could do is tentatively schedule the next conference to be the *Curcio* hearing, tentative in the sense that we'll see how things play out with privilege assertions and anything else that comes out up.  So

24

X200304tartaglioneAllC    Conference

because everybody seems to think that a day is what's going to be necessary, we're going to have to find a date that works for everyone.

The complication for us is we actually have a trial scheduled in April that we think is going to go, but you know...

Does Thursday, April 30th, work for everybody?

MR. SWERGOLD:  Just for clarity, is there anything that's going to happen at this that would require Ms. Comey and I to be here, or is it purely a *Curcio* hearing where I imagine we would not be present?

THE COURT:  Well, there might be other issues we could address.

MR. SWERGOLD:  Okay.

THE COURT:  So you can hang out in your offices in the building, and if we need you, we'll call you.

Is that okay?

MR. SWERGOLD:  No, we're just trying to figure out if we need to come up or not.

THE COURT:  If issues come up -- if we finish the *Curcio* hearing and it turns out there are other things we need to address, it would be useful to have one of you here.

Is that okay?

MR. SWERGOLD:  Okay.

MR. BARKET:  I guess you've exhausted the dates

25

X200304tartaglioneAllC   Conference

between --

THE COURT:  Yes.

MR. BARKET:  -- the 11th?

THE COURT:  We were hoping to find out if this trial was going to go or not, but we just don't know at this point, so we have to assume it is.

MR. BARKET:  I hate to suggest such a thing, but is it possible to take a day off from the trial?

THE COURT:  No, I'm not going to do that.

MR. BARKET:  Okay.

THE COURT:  Jurors and trials --

MR. BARKET:  Just asking.

MS. COMEY:  Your Honor, on April 30th, I expect to be on trial, and AUSA Swergold will be out of the state.  If your Honor needs one of us available, we would ask for a different date unless your Honor can excuse our presence.

THE COURT:  I mean, it's really up to you.  For the Curcio hearing, you're obviously unnecessary and, frankly, not invited, don't take it personally, and it could be that if there are other issues we need to address, we can schedule another conference and we can just do that.  Otherwise, I don't want to delay it.  Obviously, there's an anxiousness to get this done.

MS. COMEY:  Yes, your Honor.  We would rather have the date scheduled sooner with the understanding that we may

X200304tartaglioneAllC   Conference

not be able to be available.

THE COURT:  All right.  That's fine.

Is there anyone who can't do that day otherwise?

(No response)

All right.  We'll say on that the 30th, we'll start at 10:00.  So I guess in light of that, I think it might make sense for the question submission deadline to get kicked back again until we resolve the phone issue; that way, there's just one set of questions with everything taken into consideration.

Does that make sense?

MR. BACHRACH:  I'm sorry.  I was going to say on the last point briefly, if your trial goes away, then could we possibly revisit an earlier date?

THE COURT:  Yes.  Sure.  So why don't we say, then, that the submission with the proposed questions and any other legal guidance you want to provide -- well, let me ask you this, Mr. Barket.

Do you think you need the full two weeks to deal with the phone analysis and the privilege assertion?

MR. BARKET:  The expert's from one of the Carolinas, I forget which one, so it's just really scheduling.  But it seems like we have -- I'll do it, obviously, as quick as I can.

THE COURT:  No.  That's fine.

MR. BARKET:  So two weeks is, I hope, more than enough time.  If we can get it done quicker, that's great.

27

X200304tartaglioneAllC    Conference

THE COURT:  Why don't we say this?  Why don't we say, then, that the written submissions with the questions/legal guidance we'll kick to March 27th.  That gives you your two weeks to get the phone issue -- get the phone analyzed and have a privilege conversation.

If it turns out you're not going to assert a privilege, then the March 27th deadline should be easy.  If it turns out that if you do assert the privilege, then we'll just have to deal with it.

MR. BARKET:  Right.  Okay.  And then exchange questions a week before that on the 20th?

THE COURT:  Sure.  Okay.  I'll get to speedy trial clock in a second.

Is there anything else -- I know we have some *ex parte* things to discuss.  We'll do that, but is there anything else for the prosecution team before we excuse them?

Mr. Swergold.

MR. SWERGOLD:  Not from the government.  Thank you.

MR. BARKET:  Not from --

THE COURT:  Not from defense.

The clock is already stopped because of the motions that are pending, but any other objection to excluding time from now until April 30th of this year?

MR. BARKET:  No.

THE COURT:  Okay.  Then I'll prospectively exclude

28

X200304tartaglioneAllC   Conference

time from today until April 30th of this year, independently finding it's in the interest of justice to do so.

As I said in addition to the motions, in addition to this being a complex case, there are questions of representation that have to be resolved by way of a *Curcio* hearing. And so the interest of justice from this exclusion outweigh Mr. Tartaglione's and the public's interest in a speedy trial. The finding is made pursuant to 18 U.S.C. Section 3161(h)(7)(A).

If we could now clear the courtroom of the prosecution team and everybody who is not otherwise affiliated with the defense team or -- I think, Ms. Feinzig, you're gone, too, for now. If we need you, we'll call you.

MS. FEINZIG:  Thank you.

MR. WRIGHT:  Thank you, your Honor.

THE COURT:  You want to keep her here?

Hang on, Ms. Feinzig.

MR. BARKET:  It's up to Mr. Ricco.

MR. RICCO:  No. I don't think it's an issue. I set forth in the letter, I think at the end of the issue --

THE COURT:  You may want to disclose.

MR. RICCO:  -- we'll share a letter with her, send her request, built in.

MS. FEINZIG:  A request for a letter that was already submitted?

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

29

X200304tartaglioneAllC    Conference

MR. RICCO:  Yes.  Today.

MS. FEINZIG:  Oh, okay.

MR. RICCO:  Yes, that's what I'm talking about.

THE COURT:  Okay.

(Pages 30 through 67 sealed by order of the Court)

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

30

X200304tartaglioneAllC    S E A L E D

* * * * *

(SEALED; in open court)

THE COURT:  So, everybody who is left in here is part of the defense team, correct?

MR. RICCO:  Yes.

THE COURT:  Mr. Ricco.

MR. RICCO:  Yes, Judge.  Very narrow issue.

During the course of the *Curcio* inquiry, it was expanded to include the cellphones, and that meant the text messages.  *Curcio* counsel requested the text messages that counsel had said on the record that they had and that they sought, but refused to turn those text messages over to *Curcio* counsel.  Appointed counsel has never seen those text messages and we've asked for them on several occasions.

The *Curcio* process has put in protections for Mr. Tartaglione, both by way of *Curcio* counsel, now the added protection that there's a firewall counsel.  I know of no legal reason why those messages should not be turned over to *Curcio* counsel and/or appointed counsel in connection with the *Curcio* issues that have to be framed and questions posed.

The persons who were engaged in this behavior should not be allowed to keep those messages hidden while we are proposing questions about the subject of it without any knowledge whatsoever.  It doesn't make any sense.  And of particular concern is that there's a component to this

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914) 390-4053

31

X200304tartaglioneAllC    S E A L E D

proceeding, and that was set forth in the *Curcio* report, and that is that there was an attempt to influence the outcome of these proceedings. And so in the absence of some legal reason why those messages should not be turned over, we're requesting that they be turned over.

THE COURT: I thought we had just agreed to a schedule where the phone's going to be made available to the defense to have an expert analyze it to see whether or not there are any hidden files, which might include text communications, that themselves could be asserted as privileged; and that after that, there will be given an opportunity to the defense to assert the privilege of either anything else that's found on the phone or, at a minimum, the texts that are in the report; and then if there's no privilege asserted, or if a privilege is asserted, but it's deemed to be not a valid assertion, then the reports get turned over to everybody.

MR. RICCO: Judge, a slightly different issue.

THE COURT: Okay.

MR. RICCO: The text messages that I'm referring to and the text messages that Ms. Sternheim requested are text messages that lawyers said they've already seen and have. So if something is found on the phone, that's -- we don't know if that's the same and/or something else.

THE COURT: Right.

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

32

X200304tartaglioneAllC   S E A L E D

MR. RICCO:  We can look, find that -- they look like system files to me, Judge.  But let's assume they come back and they're systems files, then what are these text messages that you've been making these representations about?

THE COURT:  Well, but there are text messages in the reports themselves, right?  There's nine --

MR. RICCO:  Those are not the text messages that Ms. Sternheim requested and were not turned over.  In other words --

THE COURT:  Do we know that?  Can't they just be that they're -- if I text something, right, to Yishai, then the text shows up on my phone and his, so you can get it from either one of us.

MR. RICCO:  I'll tell you we know that, because the representation was made that the communications was between the user of the text phones and lawyers, and none of those text messages are with lawyers.

MR. BARKET:  I can help on this.

THE COURT:  Yes.

MR. RICCO:  Hold on.

MR. BARKET:  I've seen the --

MR. BACHRACH:  To clarify this, none of the text messages that Mr. Wright was talking about today were to counsel, so that's the distinction.

THE COURT:  Okay.

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914) 390-4053

33

X200304tartaglioneAllC    S E A L E D

MR. BARKET:  I have the benefit of having seen both bodies.  So the text messages that are on this report are not with anybody on the defense team.

THE COURT:  Okay.

MR. BARKET:  The text messages that Mr. Ricco is referring to are, I guess, three sets of text messages that we've described before: a series of text messages to Ms. Leisenring that were never responded to --

THE COURT:  Text messages from whom to Ms. Leisenring?

MR. BARKET:  From the phone to Ms. Leisenring.  In my view, I viewed them, she's viewed them.  They clearly come from Mr. Tartaglione.

THE COURT:  Okay.  And they come from which phone?  From the same phone?

MR. BARKET:  Yes, from the same phone.

THE COURT:  Okay.

MR. BARKET:  There's apparently a series of text messages between Mr. Tartaglione and Mr. Wieder.  I've never seen those, and my understanding is they no longer exist on Mr. --

THE COURT:  Who is the person who just walked in?

MR. RICCO:  Oh, that's a member of the team.

THE COURT:  Okay.  No problem.  Just want to make sure.

34

X200304tartaglioneAllC    S E A L E D

MR. BARKET:  Text messages between or to Mr. Wieder and Mr. Tartaglione, I've never seen those.  I've asked Mr. Wieder about those months ago.  He said they don't exist. He didn't save them.  They were gone.

THE COURT:  What do you mean, he didn't save them?  I mean, you don't have to save a text.

MR. BARKET:  I asked him for them.  When this issue arose, I said do you have those text messages.  He said, no, I didn't save them, they're gone.

THE COURT:  Okay, but that's not a credible statement because texts don't self-delete.

MR. BARKET:  He may have deleted them.

THE COURT:  Well, then, that's a different statement than he didn't save them.

MR. BARKET:  I'm not saying it is or it's not.

THE COURT:  I want to meet this Wieder fellow some day.

MR. BARKET:  I'm sorry, Judge?

THE COURT:  I want to meet this Wieder fellow some day.  You think I'm kidding?

MR. BARKET:  You probably will get the opportunity to do that.

THE COURT:  Yeah, I will, because that's not --

MR. BARKET:  I'm not standing by it.  I'm not endorsing it.

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914) 390-4053

35

X200304tartaglioneAllC    S E A L E D

THE COURT:  I know.

MR. BARKET:  I'm just reporting what was told to me when I said I want the text messages.

THE COURT:  I'm just reacting to what was told to you, not because I doubt what you're saying.  I'm just curious as to this "I didn't save them" thing.  Okay.

MR. BARKET:  There is, I forget the number, but there was a single text message to me that came in at about midnight one night.  I responded to that not knowing who it came from.  There was nothing in the content that immediately drew my attention that it was from Mr. Tartaglione.  Later that day, I, for whatever reason, went back to it and said this is from my client.  I sent two or three very short responses, and that's it.  So those texts -- and that's the totality of text messages that went to and from me, and I preserved -- I shouldn't say preserved them, but I never deleted them, I didn't swap out my phone, get a new phone.  They're still here.  Same for Ms. Leisenring.  I don't know what she does with her phone routinely, but we still have those text messages to her that she never responded to.  So, those are the text messages that Mr. Ricco is referring to.

THE COURT:  None of those appear on the report.

MR. RICCO:  Right.

MR. BARKET:  None of those are on the report from Mr. Wright.  Those text messages are to and from other

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914) 390-4053

36

X200304tartaglioneAllC    S E A L E D

individuals, one of which, just because it's - why not tell you - it's from, to Kim Tinsley who has been the subject of some discussion --

THE COURT: Yeah, I read about her.

MR. BARKET: -- the last few weeks. So that's the text messages. Mr. Ricco wants us to disclose them to him.

MR. RICCO: No --

MR. BARKET: Our view is -- it's not our view. Mr. Tartaglione has specifically and repeatedly told us not to. The material that's contained in the text messages, at least the ones between -- at least the ones on Ms. Leisenring's phone and my phone are classically privileged, embarrassing. Personally, it doesn't matter to me if they get disclosed or not, but I understand why Mr. Tartaglione has taken the position that he doesn't want that material disclosed to others, and there's been so many letters that have gone back and forth.

We specifically wrote to *Curcio* counsel and asserted this privilege on behalf of Mr. Tartaglione and we spoke to her about it as well and said our view, both my view as a lawyer and my view consulting with Mr. Ross, is that we're not free to disclose those text messages; that Mr. Tartaglione has the right to tell me X and tell me I cannot tell Ms. Leisenring X even though we're on the same team. And that was part of the substance of the consultation I had or our firm has had with

37

X200304tartaglioneAllC    S E A L E D

Mr. Ross because issues like this have come up.

So my view is that we don't have the authority, the ability to turn over those text messages while Mr. Tartaglione continues to assert a privilege over them, which, knowing what's in them, I understand why he's doing it, but that's the bottom --

THE COURT:  To be clear, something can be deeply embarrassing but not privileged.

MR. BARKET:  This is both.

THE COURT:  Okay.

MR. RICCO:  I just want to make a very simple record about this.

The representations that the Court is being asked to rely upon comes from the subject of the *Curcio* inquiry.  The *Curcio* counsel wanted to objectively review material in connection with the case.  Mr. Barket at one time in court said that he didn't believe that these text messages were relevant and the Court said no, I disagree.  They are relevant.

Judge, the problem here is we don't know what's really happening here.  And I would just say this to you, your Honor.  At one point, the government said that the phone that was seized could not text.  That's what you were told --

THE COURT:  Yeah.

MR. RICCO:  -- on the 21st -- the 22nd of July, but there was a problem because a lawyer was in the courtroom

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914) 390-4053

38

X200304tartaglioneAllC    S E A L E D

saying that he received text messages and he wanted them protected. At the time those statements were made, there had been no requests for the appointment of *Curcio* counsel. We were light years away from these issues, but once *Curcio* counsel was appointed in this case, a *Curcio* inquiry continued. And that inquiry continued with Mr. Wieder based upon the representations made -- I don't know Mr. Wieder. I don't know if the representations that were made as to his role in any of this in fact happened. I don't know him. I've never had a discussion with him, your Honor. We're taking all of those representations, it's almost like "Trust me, you don't have to worry about this." And Judge, at this juncture, I am concerned about proceeding in that way.

So if there is some legal reason why this information is not shared with your own lawyers, let's hear it. If there's a legal reason why that information shouldn't be shared with *Curcio* counsel and ultimately the Court that has to make an adjudication of the facts here of whether or not folks' interests have diverged in such a way that it impacts whether or not counsel can remain on the case, and that means taking a look at what was said back and forth between the defendant on a contraband cellphone.

Judge, aside from that --

THE COURT: Let's pause there. How do you propose to unravel the mystery?

39

X200304tartaglioneAllC   S E A L E D

MR. RICCO:  The text messages that have been seen that Mr. Barket says he, quite frankly, is not concerned about, at first instance, they should be turned over to *Curcio* counsel, and they certainly should be turned over to the lawyers on the case.  He doesn't lose any privilege or protection by turning it over to us.  We're his lawyers. There's no separate privilege.

THE COURT:  Well, except there's a pending application from the person that's asserting the privilege to have you removed as his lawyers.

MR. RICCO:  So then they should be turned over to *Curcio* counsel, and in that way, everything will be protected. We don't have a problem with that.  Otherwise, Judge, this is one of these issues that, at the end of the day, the judge -- the Court is going to have to make adjudications with respect to fact.  What was communicated via the phone?  Are those communications such that they support a waiver or was there something about those communications that show, in connection with them, and in relation with other evidence, that we see a divergence of interests here, that lawyers are acting in a way to protect themselves and getting the defendant to go along with it, but the real thing is that they're really protecting themselves.

Now I don't know, Judge, but I do know that the fact that we don't have our own client's text messages is

40

X200304tartaglioneAllC   S E A L E D

astounding; the fact that they weren't turned over to *Curcio* counsel is equally so.

And secondly, Judge, as death penalty lawyers, we are responsible for investigating and developing potential *Skipper* evidence, that is, positive prison evidence. We're also responsible for investigating and developing any potential adverse evidence at the penalty phase. That's our obligation. That's a Supreme Court obligation on us. Whether or not the defendant wants it or likes it is a separate issue as to our obligation to prepare.

Well, what our client is saying over the text messages goes to the heart of *Skipper* evidence; and therefore, we're being told, as capital counsel, I'm not giving you the information that you need to do your job. And that, to me, is a position that no reasonable responsible defendant would say, hey, I want that. And that, to me, if that's the position, then that would be a factor that the Court would take into consideration as to whether or not you really have a voluntary waiver here.

So to me, it's either one or the other, but there are consequences to both -- to either decision.

THE COURT: Okay.

MR. BARKET: I actually agree and I sympathize with his position to some extent, that from -- if I can kind of put myself in his shoes for a moment, I understand what he's

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914) 390-4053

41

X200304tartaglioneAllC   S E A L E D

saying, so I think I get this.

To take the first question that he asked repeatedly, which is legal basis and there's not a separate privilege, that's, in our view, exactly wrong.  There is.

What I just said before, and I think we articulated it at least in the letter in response to *Curcio* counsel, was, both us and Mr. Ross is that, indeed, the implied and express authority we would have to share the information, and we normally would with co-counsel, is removed when the client says do not do that.  I no longer have the express authority, and I certainly don't have implied authority.  So we're not free to do that legally, and the privilege is his to assert.  And once he does that, our hands are tied, we're out of the equation, other than to continue to press forward his legal position.

If that's wrong, if Mr. Ross is wrong and our analysis of the rules are wrong that the privilege, once you disclose it to one lawyer, you have no ability to stop that lawyer from telling other people in the team, you can't assert that separate privilege, well, then Mr. Ricco's position - What's the legal basis for this? - has more merit and it falls to the question your Honor asked, which is, well, he's also asked for you to be removed, so there's that wrinkle.

But I don't think, respectfully, that that analysis by Mr. Ross and by our office is wrong.  I think it's exactly right.

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

42

X200304tartaglioneAllC    S E A L E D

MR. RICCO:  Judge, one point.

THE COURT:  Hang on.  My turn.

To the extent that I appointed Ms. Sternheim to represent Mr. Tartaglione's interests in making sure he has conflict-free counsel, how is it she can do her job in advising Mr. Tartaglione and otherwise do the job that she's been appointed to do if she doesn't have all of the facts?

MR. BARKET:  That's where two principles are kind of butting heads, and I understand that, which is why I said I partially --

THE COURT:  But I'm not interested in Mr. Tartaglione's consent here because to the extent you don't have actual or apparent authority, that's not disputed here. The question is whether that should rule the day.

MR. BARKET:  Well, that's something, Judge, I would respectfully suggest that we proceed cautiously with because we're talking about the attorney/client privilege, a client we've had relationship with for over three years now.  When these text messages were exchanged, it was two-plus years.  So he told us things and said I don't want that shared with other people.

If we come and we go through this process and a Court then says, well, I understand that you relied upon the privilege, Mr. Tartaglione, I understand that it's privileged and I understand you don't want it shared, but you know what,

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914) 390-4053

43

X200304tartaglioneAllC    S E A L E D

we're going to do it anyway, that's a pretty serious leap.  And I'm not saying the Court shouldn't do it or wouldn't do it or it wouldn't be legally sound principle to do it; it's just not something we should do in haste.

THE COURT:  No one here is suggesting we do anything in haste.

MR. BARKET:  And in that regard, and with respect to Ms. Sternheim, this was one of the issues that were raised in the report that we questioned, because her reasoning for wanting to see the substance of the text messages was that it could impact the Epstein episode, if you will, and of course, chronologically that's impossible.  So when you look at the timing of the text messages, you begin to see how --

THE COURT:  There's no point wasting time on that point because I think there are other reasons why these text messages would be relevant, quite apart from the Epstein matter.  They go to -- there's the whole issue of the use of the contraband phone to begin with, that's number one; and number two, there is the issue about the waivability of the actual and apparent conflicts and whether or not it's a voluntary waiver.  You're giving me the furrowed brow, but that's a fact.  And that is something that's going to be at the heart of any *Curcio* inquiry, as it is in every *Curcio* inquiry.

MR. BARKET:  I'm sorry.  I'm referencing a remark you made earlier.  I'm never playing poker with anybody.

44

X200304tartaglioneAllC   S E A L E D

THE COURT:  I understand.

MR. BARKET:  It's just not one of my skill sets.

Because of the timing of when the text messages took place, it predates all discussions of all of this.  It can't relate to the waiver.  It can't relate to the *Curcio* matters.  It can't relate to Epstein.  It can't relate to any of it.  It took place, at the latest, before he was in the box for the phone, which was July 3rd.  He didn't meet Mr. Epstein until July 5th or 7th or something.  So these text messages were communications, some of them go back -- I think some of them go back to May.  In fact, we gave the dates.  Some of them were in May.

THE COURT:  Yes.

MR. BARKET:  So when you're looking at how this might affect a *Curcio* and whether or not you should breach the privilege here, if you will, I think you should take into account the timing of it, because the -- I mean, unless we're all psychic, we weren't discussing Epstein, waivers, *Curcio*, conflict-free, anything of that.

THE COURT:  I get that, Mr. Barket.  Anything that predates the beginning of the *Curcio* inquiry by definition would not have involved a conversation about the *Curcio* inquiry.  That's not my point.

Mr. Ricco, you seemed anxious a minute ago.

MR. RICCO:  I'm sorry.

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914) 390-4053

45

X200304tartaglioneAllC   S E A L E D

THE COURT:  Go ahead.

MR. RICCO:  I just really had a very simple point, and your Honor really picked up where I am with this.

My experience, Judge, is a defendant, when the Court appoints Curcio counsel, the defendant has an opportunity to meet with Curcio counsel.  The purpose is to determine whether or not there are conflicts, whether or not they can be waived, and that means finding out what's happening.

The defendant, when he meets with Curcio counsel, doesn't say, well, I don't want to speak to you and I'm not going to speak to you, but if the defendant does say that, then those are facts that the Court will ultimately consider when deciding whether or not there's a conflict-free advice that has led to a waiver here.

When a defendant says, well, I'm going to talk to you, but what do you want to talk about, well, I'm not going to talk to you about the text messages from a cellphone, a contraband cellphone, because as capital counsel, the use of the cellphone itself is problematic for the preparation and development of the defense.  And the preparation and the development of the defense should be free from the influences of lawyers who may be engaging in activity with the defendant over the phone that helps us decide how we handle those issues at the hearing, and that's what we have here.

So if the defendant's ultimate position is I don't

X200304tartaglioneAllC    S E A L E D

want the Court to see them, I don't want anyone to see them, then I think it's a factor that the Court takes into consideration. Why would we be posing a bunch of questions around something that the defendant is telling the Court do what you gotta do, but I don't want you to have them, and that's basically what we have here.

And I, based on the experience that I've had in this case, I cannot and could not have ever prepared, could have never made an application for a *Curcio* appointment in this case had I relied upon representations that were made, because what happens in each situation, subsequent to decisions being made, we find out facts and information that we were not aware of, that are extremely relevant to those applications that were being made at that time.

So we're heading towards a *Curcio* hearing. I agree, we should be moving very cautiously. No one has done anything other than that. I don't see how the refusal to turn these text messages over to *Curcio* counsel can in any way be a factor that helps this Court positively decide whether or not there's a knowing and voluntary waiver here and/or whether or not the defendant has received conflicted advice in connection with the development of his defense at every stage.

THE COURT: Well, it seems to me that there are two options: one is, whether or not there's a legal basis for me to order that the substance of the texts be turned over to *Curcio*

47

X200304tartaglioneAllC    S E A L E D

counsel or not.  Those are our two options.  And I think everybody agrees that that is something that should not be done in haste, just like nothing in this case should be done in haste.  Nothing in any case should be done in haste.

So if you want to brief it, Mr. Barket, go ahead and brief it.  If you want to explain to me why you think it would be improper for this material to be turned over to *Curcio* counsel, I will very carefully consider that position.

MR. BARKET:  Sure.  It's not going to take me long.  We've essentially already done it.  It's simply Mr. Tartaglione's assertion on the privilege and the rules surrounding that.

THE COURT:  Right, but I think what you haven't done is address Mr. Ricco's point, which is the implications of the assertion of that privilege on the finding of a knowing and voluntary waiver of any conflicts, not that I have found there are conflicts at this point, but it would go to that issue potentially.

MR. RICCO:  I'm sorry --

MR. BARKET:  I take his point in that regard.  And as I said before, and I won't repeat myself, but if the text messages were in September, that may be a greater concern than if they were in May for obvious reasons.  But we'll -- I'll brief it to the extent that we can.  Take a few days to do it.  I'll get you something in a week.

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914) 390-4053

48

X200304tartaglioneAllC   S E A L E D

THE COURT:  A week.  That's fine.  Sure.  Thank you.

MR. RICCO:  Judge, just so you know, this is totally sealed.  The Court should know that based upon the representations that were made in court on July 21st --

MR. BACHRACH:  22nd.

MR. RICCO:  -- 22nd, as appointed counsel, we had even considered providing the Court with a judicial subpoena for those text messages from that phone.  We thought about that.  We discussed that with our Resource Counsel.  We discussed that with the Project.  And, we were told that taking a step like that was unprecedented, that lawyers in preparation -- this is way before, Judge, the *Curcio* issue, but just in terms of preparing for the penalty phase, it was important for us to know, one, that the defendant was using the text -- contraband phone, which we did not know; and two, what in the heck are they talking about, because we, at that point, the 22nd, we were obligated to investigate those facts, to gather the information, to determine how that impacted our ability to present *Skipper* evidence on behalf of the defendant and/or prepare for negative aggravating evidence either directly or in rebuttal.  So we had considered that, but in an excess of caution, we decided against that and we then pursued the path of just asking for them, and we did ask for them over several months.  They were not turned over to us.  However, not entirely, because there were members of the team, investigators

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

49

X200304tartaglioneAllC   S E A L E D

that did have one or two text messages, and they turned those over to us ten minutes after we asked for them. And so, we were even more concerned.

When *Curcio* counsel was appointed and we requested that the *Curcio* issue expands to include the cellphones, that was in our minds, we don't know if there was an earlier reason why *Curcio* shouldn't should have been appointed in this case. We just don't know, Judge, and I don't understand why we don't know.

I'm concerned with what we don't know because it directs -- it's directly related to our obligation to investigate and prepare, but we have *Curcio* counsel. And defendant doesn't want any of the lawyers who are asking questions, who are working to prepare it, that's his right, but *Curcio* inquiry is a different matter. And at the end of the day, I'm repeating myself, the Court is going to have to resolve very important issues about waiver here.

And I can't imagine, Judge, how any factual adjudication can be made with respect to the cellphone in the absence of the text messages. We can be as wrong as the word is spelled wrong on that and the only person that would know it are the people who saw the text messages, and if they decided they wanted to keep them to the side, keep them to the side. We don't know if that's something that's in their best interest or in the defendant's best interest. And that is something

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

50

X200304tartaglioneAllC    S E A L E D

that *Curcio* counsel was concerned about and *Curcio* counsel was rebuffed. She didn't get them.

MR. BARKET: It's worth highlighting one contradiction with what was just said.

He just asserted that they had no idea that the cellphone was being used and that other members of the defense team having – not related to Barket Leisenring – investigators retained by them, mitigation specialists retained by them, that was the first I've heard that there they were ignorant to the use of the cellphone prior to when he was caught with it. So I'll have to go back and look, because he'd been using it to communicate with other members of the appointed team.

MR. RICCO: Judge, that's not --

THE COURT: Let him finish. Let him finish and then I'll let you respond.

MR. BARKET: So I hesitate -- I'm not going to say that there were communications about it, written communications, but there were certainly verbal communications, because I know that the use of a cellphone in my mind was quite troubling. It was very troubling to me because I predicted, going to get caught, it's going to be a problem. I gave very specific instructions to people in my office that I have control with, do not communicate with him over it, don't talk to him over it, don't take calls, don't exchange text messages, don't do that. He's going to get caught. The phone is going

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914) 390-4053

X200304tartaglioneAllC    S E A L E D

to get caught.  They're going to analyze it.  Forensically they're going to pull it out.  I don't want to have that problem.

I wasn't thinking so much of *Curcio* or conflict.  I was thinking of rules, violating the MCC rules.  I won't give clients a pen when I go in there.  I won't give them a legal pad because I don't want to get barred from the facility.  I don't want to have that problem.

So, that I think was openly discussed among all of us because we weren't the only ones receiving these text messages. They were.

THE COURT:  I got it.

MR. RICCO:  I don't know who "they" is.

Let's just be clear.  Anthony Ricco has never had a text communication with Nicholas Tartaglione.  John Diaz has never had text communication with Mr. Tartaglione.  Michael Bachrach has never had a text interaction with Mr. Tartaglione. And Bruce Koffsky has never had a textural interaction with Mr. Tartaglione.  The first time I was aware that he had a cellphone is when he got caught.

Now because of what Mr. Barket says, you're right, we were concerned, which is why we posted to all team members the following post:  Whoever on the team has been communicating with Mr. Tartaglione by text, please inform me of it immediately and provide me with the screen shots of the text

52

X200304tartaglioneAllC    S E A L E D

messages.

Every member of the team responded, including Ms. Cahill, who is in the back. The mitigation experts responded. None. The lawyers responded. None. Our investigator said that he had, he thought, one text message with Mr. Tartaglione. I said, Jim, please send me that screen shot. He sent it within ten minutes.

The text messages that we never got was that the lawyers, Leisenring, Wieder and Barket, never responded to it. They just ignored the request. We're going to leave it.

Time goes by. We have the *Curcio* counsel. We have Mr. Epstein's death. Are we alarmed and concerned about this type of information? Yes, Judge, because the use -- the possession of the cellphone is problematic for preparing for a capital trial. The possession and the use of it is even more problematic. And I don't think that Mr. Barket really understands the great danger to Mr. Tartaglione.

MR. BARKET: That's just offensive.

THE COURT: You know what? I didn't let him interrupt. Don't interrupt, okay? You'll get a chance to respond.

MR. RICCO: Let me say this. The person who is subject to harm here is Mr. Tartaglione. If his lawyer is saying I told the defendant don't do it and he did it anyway, that's problematic for the defendant at the penalty phase,

53

X200304tartaglioneAllC   S E A L E D

because the way penalty phase evidence comes out is that the government argues that the defendant manipulates individuals, and therefore, they're a threat and that they sometimes manipulate their lawyers.

So when Mr. Barket says, well, I told him don't do it and he did it anyway, that's a statement that's very damaging to Mr. Tartaglione and very damaging, Judge, to how we would then, how we would then prepare for that in terms of *Skipper* evidence and the aggravating evidence, because now we have a different situation.

And if you compound that with a situation where the Court says to the defendant I don't want something done and something happens and the lawyers say, well, I didn't know anything about it, I told the defendant don't do it, and now we have another situation where something happens, these events in the way they're articulated in the courtroom reflect the fact that it is the defendant who is now in the greatest harm from this situation, and we are then required to develop a defense to it. We have to develop why this is happening. And this is what we're required to do whether the defendant says I don't want it or not.

So if, at the end of the day, Mr. Tartaglione takes the position I don't want *Curcio* counsel to see these text messages, which, in fact, he's saying I don't want the Court to even see them, then I know that *Curcio* counsel explained the

54

X200304tartaglioneAllC    S E A L E D

consequences of that to Mr. Tartaglione, I know that because it's in the report.  And if that decision stands, then there are consequences to it, and those consequences, Judge, go to the detriment of Mr. Tartaglione.

MR. BARKET:  I actually do understand that, and I don't know what Mr. Ricco just heard, but I thought what I said was I told people in my office do not communicate with him that way.  I've never said I told Mr. Tartaglione that.

If you go back through the court appearances, and on June 22nd, your Honor pushed me and said I would hope you would have told him not to do it, and I said, Judge, all I'm going to tell you is what I tell inmates generally.  I'm not going to talk about what happened with me and Mr. Tartaglione. *Curcio* counsel might recall the same conversation, and I may have even written it in an e-mail.  I understand exactly that point, and I've understood it all along.

I don't want the government to stand up in the penalty phase, assuming we get there, and say he was doing this despite the fact that his lawyer told him not to.  And I've been -- I hope, I've certainly been aware of it in my mind and I hope I've been disciplined enough not to have said that.  If I just said it now, I misspoke, but I thought I was saying that I told people in my office don't do it under any circumstances. Don't communicate that way.

I understand the development of this *Skipper*

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914) 390-4053

55

X200304tartaglioneAllC    S E A L E D

evidence.  I understand how this could play itself out to the detriment of Mr. Tartaglione later on.  I -- the development of the *Skipper* evidence and the larger point of how to defend the penalty phase and the work on that has not just been done by the long portion of the table here by appointed counsel.  It's been done by our firm as well.  We have spent thousands of hours getting to know our client, getting to know his family and digging into his background and trying to develop evidence that will help him at the penalty phase.

So, I just -- when somebody says I don't understand or he doesn't get this, it riles me a bit because I've spent countless hours figuring out and addressing it and trying to walk a cautious path in the face of what sometimes are inflammatory allegations.

THE COURT:  All right.  So, I think we stick to the plan.  You were going to write a letter, Mr. Barket, in a week.

If anybody wants to respond, whether it's appointed counsel, *Curcio* counsel or anybody else, just let me know and how much time you think you're going to need.  We should keep it to hopefully no more than a week if anybody wants to respond.

Is there anything else?

MR. RICCO:  No, Judge.

THE COURT:  Anything else, Mr. Barket?

MR. BARKET:  Yes, Judge, briefly.

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

56

X200304tartaglioneAllC   S E A L E D

I had a chance to review the letter that was sent this morning by Mr. Ricco. I think for the most part we can respond to that later on in the context of this. I don't need to kind of go --

THE COURT: Yeah, because the sealed vault is going to get a little lonely.

MR. BARKET: I counted this morning when I came in. I think we're up to 37 *ex parte* communications. So, but the one point that I would raise is that we, in the course of this January 18 letter, did some work on this and obviously relatively quickly found out and then we were able to corroborate how that letter ended up getting sent to Mr. Ricco.

And so we received Mr. Bachrach's response yesterday, but there were two parts to our submission on that: one was that they were factually wrong about the implication that I had done it and the statements that Mr. Barket was the only person in the facility during that relevant time, which, obviously, were material, were wrong, and the record has now been corrected by us.

The other thing that we pointed out in a footnote was that the citations by appointed counsel to supposed BOP regulations that specifically prohibit attorneys from exchanging documents with clients is something that we've been looking at for quite some time and we've cited, both in our most recent letter and our response to the *Curcio* letter, what

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

57

X200304tartaglioneAllC   S E A L E D

we believe is the controlling MCC guidelines which specifically permit attorneys to give documents to clients up to four inches and are silent as to whether or not clients can give documents to attorneys, but my -- so we articulate that.

So Mr. Ricco has cited to other guidelines, and we looked for them. We couldn't -- we found what purports to be his citation. It doesn't exist in the way that he quoted it. And, again, these are regulations and policy statements. And I'm not pretending that we're experts at this in the sense of kind of digging into this, but we really have looked because it's obviously a key point, not only for the letter on the 18th, but it's obviously related to the Epstein note. And I would note that firewall counsel said it was not entirely clear that removal was in itself improper, and that's a critical point. If it was improper, then there may be more in depth inquiry.

So a simple, long way of asking, if Mr. Ricco has this or appointed counsel have it, can they just copy it and provide it to -- not give us the cite because we obviously read the cites in the letters and went looking for it and came up with -- I actually have the documents here that we printed out from his cites -- they don't have that information in it, but it could be that the way it gets published, the way it gets printed, the way it is online, maybe he has access to something that we don't. I just want to see what it is that he's been

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

58

X200304tartaglioneAllC   S E A L E D

referring to and just give us a copy of it.

MR. RICCO:  If he asked for it, I would be happy to give it to him.

THE COURT:  He just did.

MR. RICCO:  We'll give him whatever he wants.

THE COURT:  All right.

MR. RICCO:  But there's an interesting point here that escapes a person who doesn't prepare for death penalty proceedings.

Mr. Barket stands up and touts his letter.  He says, I couldn't have done it, I'm not involved in it, but the fact of the matter is that the Court instructed that this activity not happen.  If the lawyers were involved in it, that's one issue.  If Mr. Barket wasn't involved in it, that's good for Mr. Barket, but Judge, guess who it's bad for? Mr. Tartaglione.

And as his capital lawyers, just like the text messages, we have to prepare for a defendant who, hearing instructions as to what should not happen, apparently being told by counsel not to do but does it anyway, and I don't believe, in my opinion, that Mr. Barket is aware of that subtle but serious nuance, because what the government argues at the penalty phase is that the defendant manipulates lawyers and the system to accomplish his goals, and we have to prepare for that.

59

X200304tartaglioneAllC   S E A L E D

So, it's interesting. I'm happy that this is one less thing that Mr. Barket has to deal with, if true. And I say "if true."But with respect to what that event means, it means we have another situation where, according to Mr. Barket, the defendant is involved in activity that is prohibited by the Bureau of Prisons; that is, giving a letter to a person to take out of the jail to mail from another location with the return address as if it was mailed from the jail.

We'll do our best to get Mr. Barket the citations that says that the Bureau of Prisons does not permit that type of activity to go on, but as lawyers who are responsible for representing Mr. Tartaglione, we recognize how dangerous that position is that was just expressed by Mr. Barket.

MR. BARKET: I think I just heard the person who accused Mr. Tartaglione of violating BOP regulations in a letter to the Court presiding over the death penalty suggest that we did that. We did not.

We were -- if what should have happened here had happened, that if counsel, when he received the letter, had contacted one of the appointed counsels had gone to see Mr. Tartaglione or somebody had asked us what happened here, how did this take place, we would have, as the defense team, done the investigation, could have subpoenaed all the records without laying -- basically outing Mr. Tartaglione in the course of doing so.

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

60

X200304tartaglioneAllC   S E A L E D

THE COURT:  Yes, except that when the letter gets sent, it purports to have also been sent to "The Daily News," and if you're a lawyer who gets that letter, you're now radioactive, and if it turns out it does get sent to "The Daily News" and "The Daily News" reports that the letter was sent to a lawyer and then a court can be upset by that.  I mean, there's all kinds of implications.

I think we're looking at this in hindsight as to what we know apparently didn't happen thankfully, which is that it didn't get sent to "The Daily News," but I'm not sure really sure --

MR. BARKET:  I agree wholeheartedly.  The point is, the investigation should take place before the allegations.  So we should try to figure out what happened before you write letters to the Court --

THE COURT:  Well, but part of how counsel wanted to figure out what happened was a subpoena, which they needed to get Court ordered.

MR. BARKET:  But the Court ordered subpoena for visiting records would have been signed without much ado.  We do that all the time.  We would have submitted a letter that said -- the same way I did.  I didn't give any explanation.

THE COURT:  It was obvious to me.

MR. BARKET:  You already knew.  It could have been done -- it could have been done more circumspectly.  And that,

61

X200304tartaglioneAllC    S E A L E D

when Mr. Ricco says that we don't get this and we don't understand this, that was my reaction when I saw Mr. Tartaglione's lawyers accusing him of violating BOP regulations to the Court.

And just to be clear what I'm asking for with respect to the policy. It's not third-party mailing. I understand that it would be problematic for a defendant to, let's say -- this didn't happen here, but let's say send a letter to an attorney or a paralegal that really was a letter -- because that goes out sealed from the jail.

THE COURT: Yes.

MR. BARKET: And then have that letter really be a letter to an accomplice or a co-defendant or somebody like that so that they'd be able to communicate with people they weren't permitted to communicate with. I understand that. That's not what I'm asking, and that's not what the quote supposedly said.

What the quote said was it's improper and prohibited for an attorney and a client to meet and exchange documents. That's the policy. And that's what -- we couldn't find -- that's what apparently firewall counsel for the government couldn't find but Mr. Ricco asserts is true in his -- in several letters, but in his January 28 letter, footnote 3 --

THE COURT: Right, but what did happen here apparently according to the affidavit you submitted is, somebody who purports to be a paralegal working with a lawyer

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

62

X200304tartaglioneAllC    S E A L E D

who is not representing Mr. Tartaglione on this case was being used to send a letter, at least on the face of it, to a lawyer who is representing Mr. Tartaglione on this case and to a newspaper.  So, you know...

MR. BARKET:  Not a good thing.

THE COURT:  No.

MR. BARKET:  I agree wholeheartedly.

THE COURT:  It's not going to help the *Skipper* side of things.

MR. BARKET:  It won't help it at all.

THE COURT:  Right.

MR. BARKET:  I wish the investigation, if you will, or the kind of fact finding that went on would have went on prior to it - no offense to your Honor - but being disclosed to the Court.

MR. RICCO:  I think --

THE COURT:  Let Mr. Barket finish.

MR. BARKET:  Something that we -- and I didn't -- I'm glad that it came up in some ways, but I had -- I didn't frankly know about Ms. Tinsely's legal visits.

THE COURT:  "Legal" in quotes, right?

MR. BARKET:  I'm sorry, no offense to Mr. Tartaglione or to Ms. Tinsley, I don't know, but that was -- that was --

THE COURT:  Yeah.

MR. BARKET:  That's -- I think it speaks for itself,

63

X200304tartaglioneAllC    S E A L E D

right?

THE COURT:  Yes.

MR. BARKET:  Especially for somebody who came to my office and asked me to put her into that role and I said no.

THE COURT:  Yes.  She's another person I'm looking forward to meeting.

MR. BARKET:  You actually have seen her.  I think she's --

MR. RICCO:  She's here.

THE COURT:  I haven't had a chance to meet her, though, or cross-examine -- excuse me -- question her.

MR. RICCO:  I just want to say this.  I think we're a little involved in much ado about nothing.

I would say to your Honor that you nailed it.  When we saw that this letter was going to "The Daily News," Judge, from the face of the envelope, we could see it was not mailed from the MCC, period.  We wanted your Honor to have notice of that before your Honor picked up the newspaper the next day and said did any of you know about this and what did you do.

There was enough from the face of the letter itself that was clear to any experienced lawyer that a fraud had taken place here.  And so, the fact finding process is not finished. No.  The relationship between Ms. Tinsley and that lawyer and other lawyers connected to this case, Judge, that fact-finding process is not finished.

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914) 390-4053

64

X200304tartaglioneAllC    S E A L E D

THE COURT: Yeah.

MR. RICCO: And that's all we have to say, Judge. We did our best.

THE COURT: Is there anything else?

MR. BARKET: Mr. Tartaglione is again expressing his desire to terminate the representation from appointed counsel, but I understand that's pending with the Court. Leave it there.

THE COURT: Yes.

MR. BARKET: There is an open -- Ms. Leisenring reminds me, I don't know --

THE COURT: The record should be clear, I shook my head "yes" that that is pending, the outcome of the *Curcio* inquiry.

Go ahead.

MR. BARKET: The allegation or the implication, the allegation that the letter on the 18th was sent or coordinated by our office, was given to firewall counsel in one of those letters that we agreed to provide. Both myself and Mr. Bachrach asked that the subsequent letters also be disclosed to her.

THE COURT: That's going to be granted. The letters have come in so fast and furious, among the letters from the other 500 cases that we get, that I just haven't had time to memo-endorse that one. I wanted to read them thoroughly before

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914) 390-4053

65

X200304tartaglioneAllC    S E A L E D

today and some of them came in --

MR. BARKET:  Today.

THE COURT:  Yes, like a couple of hours before the conference.

So I agree with you, Mr. Barket, and I don't think there's any disagreement among appointed counsel either, that based on completeness and fairness, firewall counsel should get all the letters that relate to this issue.

MR. BARKET:  That's fine.  She apparently didn't mention it in her letter to the Court, so it may be --

THE COURT:  Which I think shows why maybe the U.S. Attorney's Office had the wisdom to ask her to be firewall counsel.

MR. BARKET:  Like you said, for completeness, we'll wait for the endorsement.

THE COURT:  Yes.  It's forthcoming.  I absolutely agree with you that she should get all the letters.

Anything else?

MR. RICCO:  No.

THE COURT:  Okay.  Enjoy the rest of the day.

MR. RICCO:  Thank you.

THE COURT:  Let me just say that transcript of this portion of the proceeding should be sealed as it continues to discuss very sensitive defense information.  It should not be made available to the public because that could certainly

SABRINA A. D'EMIDIO – OFFICIAL COURT REPORTER
(914) 390-4053

66

X200304tartaglioneAllC    S E A L E D

jeopardize Mr. Tartaglione's interest for all the reasons that counsel have mentioned; the same with the prosecution team.

I don't know what you want to do about the firewall counsel getting this portion --

MR. BARKET:  I'm sorry?

THE COURT:  About the firewall counsel getting this.

MR. BARKET:  I don't have a problem.

MR. RICCO:  He doesn't, but I do, because a part of the discussion about preparation for *Skipper* is something that Ms. Feinzig has already told me she's not interested in those issues.  So when we get the transcript, I'll propose a redacted copy to the Court and to Mr. Barket to be turned over to firewall counsel, because there are certain aspects of attorney strategy that Ms. Feinzig has made clear that she does not want to have any involvement in.

MR. BARKET:  I haven't had any private communications with her at all.  So when Mr. Ricco says 'she's told me,' the only thing I have is a few e-mails from her and the letter that she sent to the Court, which I didn't memorize it, but I thought it referenced or referred to *Skipper* evidence.  What she's not interested in is the bickering that's reflected in the base camp posts, which --

THE COURT:  Is another sign of the wisdom of asking for a firewall counsel.

MR. BARKET:  Right.

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

67

X200304tartaglioneAllC    S E A L E D

MR. RICCO:  Yes.  And we've redacted some of the transcripts, not with respect to the substantive issue.

THE COURT:  All right.  I'll give you a chance to propose redactions.  Bounce them off to Mr. Barket.

MR. RICCO:  Right.

THE COURT:  But otherwise, the transcript should be sealed, except copies can be made available obviously to retained counsel, appointed counsel and *Curcio* counsel and those working with them.

MR. BACHRACH:  Your Honor, on that issue, because I know there are sometimes delays in the E-Voucher system, could the court reporter be authorized to provide appointed counsel with copy of the transcript not simply on an expedited basis, but as soon as it's ready even if the E-Voucher process hasn't been completed, because sometimes, for whatever reason, through the clerk's office, it just delays and it can be a week or two before she gets a final approval.

THE COURT:  Okay.  That's fine.

MR. RICCO:  Thank you.

THE COURT:  We're adjourned.

Thank you, Marshals.

(Adjourned)

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

# EXHIBIT 37

# Improper/Prohibited/Unlawful Removal of Documents From MCC

From: Tony Ricco

Date: Thu, 5 Mar 2020 at 9:07am

During the court proceedings yesterday, attorney Barket requested that he provided with the authority which prohibits attorneys or paralegal from the improper removal of documents from the MCC.

The many citations set forth in our submission to the court dated January 28, 2020 are accurate, and clearly support the view that an attorney (or paralegal) is absolutely prohibited from engaging in the following conduct: (1) the removal from the MCC of a letter addressed to an attorney of record, threatening to the Daily News on matters under seal, and doing so, when the court has directed that such press contact should not be made. (2) For the attorney to purposefully remove such a letter from the MCC, and later place the letter in an envelop that the attorney or paralegal has prepared to the give the impression that the letter was, in fact, mailed by the defendant from the MCC and deposit in the mail for delivery - when the attorney/paralegal is aware that it was not mailed from the MCC, and the attorney/paralegal hides their truthful involvement. I fully stand by the voluminous citations to the BOP Policy Statements and CFR as set forth in our January 28, 2020 letter to the court. Those authorities absolutely preclude the conduct set forth above - with the following amendment. Policy Statement No. 5267.09 has been amended with a new citation 5267.09A.

In addition to the authorities set forth in the January 28, 2020 letter, the above conduct (that is the removal of the January 18, 2020 threatening to go to the Daily News - when the court prohibited such conduct and fraudulently depositing such in the mail for delivery), may be, that is: may be, subject to the following criminal statutes:  18 USC 371; 18 USC 1791 and 18 U.S.C. 1349; 18 USC 1001.

Finally, the above authorities are my view. Let's be clear what this issue in this case is clear and what it is not. The issue is whether the person(s) who engaged who engaged in conduct that led to in the improper removal of contraband from the MCC, or who engaged in the improper removal of any other document (January 18, 2020 letter) did so in violation of established BOP rules. Whether those individuals can point to any legal authority, BOP Policy and Regulation that authorizes or permits the engagement in such conduct?  The fact that those who engaged in such conduct have a disagreement with attorney (not involved) on the specific rule or specific criminal statute at play is, perhaps, to be expected. There are several individuals subject to the pending *Curcio* inquiry, and others yet to be identified, who now have to come up with a justification or lawful explanation for their conduct. The issue in this case is not the legal views and citations relied upon by counsel who brought to the attention of the court **clearly prohibited** conduct. I believe that the court is absolutely clear on that matter.

However, if an attorney claims he or she wants legal advise, guidance or an applicable authority, I remain happy to fulfill any good faith request - that's my job as Learned Counsel. However, let's be clear it is not the opinion of the attorneys nor their hired experts that shall ultimately control the adjudication of the underlying facts by Judge Karas.

With that caveat made clear, attorney Barket has my response to his comment in court yesterday related to the applicable BOP Rules and Regulations and Statutes that precludes the kind of conduct engaged in for the removal and subsequent mailing of the January 18, 2020 letter. This view of course is based upon the information I presently have available to me. My view may change should we later discover (as we always do in this case) the presence and involvement of others in setting up these so-called legal visits that led to the removal on January 18, 2020. Our inquiry is far from over, it is ongoing.

Finally, it is important to remember all appointed counsel and Resource Counsel had the view (and cited authorities) that these matters related to Nicholas Tartaglione should have never been the subject of press interviews - in the first place. Had that sound advise been followed and adhered to Nicholas Tartaglione's case would not have been burdened by this *Curcio* inquiry. In fact, during this entire representation, very thoughtful and thorough memoranda, citations to ABA Rules, Supreme Court authorities, DOJ, BOP Regulations, along with ethical rules have been generously provided by all appointed counsel and Resource Counsel.

Therefore, my advice to all counsel remains: Maintain integrity in your professional dealings with your colleagues, follow the ABA Guidelines, Supreme Court Authorities, and all related Rules and Regulations when representing a death authorized defendant and you will fulfill your high professional obligation to serve the interest of a death authorized defendant.



## Bruce Barket Thu, 5 Mar at 1:30pm

I asked for a copy of the citation in footnote 3 from your January 28th letter. (I may have mistakenly referred to another letter in court) The footnote is copied here:

*"Detainees are prohibited from giving legal papers to the attorney or receive papers from the*

*attorney to retain after the visit, absent compelling circumstances and prior authorization by unit team or*

*Duty Officer. BOP Visiting Policy Statement No., 5267.09 (21)(d) page 11."*

Please provide a copy as an attachment.

Thank you



## Tony Ricco Sat, 7 Mar at 6:26am

BOP Program Statement 5267.06, Visiting Regulations, requires wardens at each BOP facility to establish a visiting schedule for their institution.  The institutional rules by Wardens promulgated by BOP 5267.06 are varied and have been often modified, rescinded, amended many times over the years.  Each institution's visiting regulations can be found on its home page on the Bureau's website, http://www.bop.gov. Although institutions might have unique procedures, all required compliance with BOP 5267 or an updated iteration - for example 5267.06 or 07 or 09 (an iteration cited in the January 28, 2020 letter to the court.

Presently, an attorney visiting the MCC is guided by the various iterations of the 5267.  Presently, an attorney (not a paralegal, investigator, mitigation specialist or interpreter) will be authorized to provide a reasonable amount of legal materials to the inmate at the conclusion of the attorney visit (not to exceed four inches)  See, BOP Policy Statement 5267.06F. At the conclusion of the legal visit, each inmate is escorted to a designated processing area and strip searched.  The Unit Officer is permitted to *"Inspect all legal material the inmate may have in his possession for contraband."*

There are many other rules related to an attorney's conduct, and the exchange of materials and they are set forth in the voluminous iterations of 5257.  Some are set forth in a sequential post.

**Distraction Issues/Attempts To Change The Focus of The *Curcio* Inquiry.** According to the *Curcio* report submitted to Judge Karas on December 30, 2019, the serious conflict issues relevant to the *Curcio* inquiry in this case includes the conduct of attorneys who participated in the removal of contraband from the MCC (not the introduction of legitimate legal documents into the MCC during an attorney visit); communications via a contraband cellular phone(s); statements made to the press, and whether any there were purposeful attempts made by counsel to *deter* (that is improperly influence) the efforts of safeguard the legal interest of the capital authorized defendant in this case.

There is no BOP policy which authorizes an attorney to remove contraband from the Metropolitan Correctional Center. There is no BOP policy which permits attorneys to communicate with detainees via contraband cellular phones. There is no authority which permits any attorney to improperly deter the efforts to safeguard the legal interest of a capital defendant.

The attorneys who (1) did not participate in the removal of contraband from the Metropolitan Correctional Center; (2) did not communicate via cellular phones; (3) who did not make statements to the press; (3) did not participate, or otherwise join a request to engage in conduct to purposefully deter the safeguarding of the rights of the capital authorized defendant shall remain focused on the real issues, as we (1) prepare a brief of an outline of the issues for the *Curcio* hearing; and (2) prepare potential questions to be posed to the defendant via *Curcio* counsel and the court in relation to the upcoming *Curcio* hearing.

Program Statements and their objectives are, as stated above, updated often and are voluminous.  If any attorney is not sure whether the version they are referring to is the most recent one, contact the Office of Documents Control Systems at 202-307-2998.



## Bruce Barket Sat, 7 Mar at 10:02am

Do you think we haven't noticed that you have not provided a copy of the document you claimed exists in your January 28th letter, footnote 3.

*"Detainees are prohibited from giving legal papers to the attorney or receive papers from the*

*attorney to retain after the visit, absent compelling circumstances and prior authorization by unit team or*

*Duty Officer. BOP Visiting Policy Statement No., 5267.09 (21)(d) page 11."*

If this cite is accurate, please attach a copy.  If does not you have an ethical obligation to correct the record before the court.



## Tony Ricco Sat, 7 Mar at 10:48am

I am not expending anymore of the publics' money on your request. If you want any further information or documentation, either you, or any person at your firm can simply Google: BOP Visiting Policy Statement No., 5267.09 and go to page 21(d) page 11 or contact the Documents Systems Control Unit.

I have already provided all the information for a *good faith* request for the information you requested. You wanted the citation, you have it. Anything more, I consider a distraction from the real issues and an attempt to divert from the serious behavior of attorney(s) whose conduct is, in fact, the subject a pending unprecedented *Curcio* inquiry and upcoming *Curcio* evidentiary hearing.

The legal issues and conduct of those attorneys have been clearly set forth in the December 30, 2019. To the extent that one or more of the attorneys is attempting to fashion potential testimony or some explanation, those attorneys shall have an opportunity to do so either under oath or upon declaration pursuant to 28 USC 1791 on or before April 30, 2020. All counsel are required to be truthful and honest in relation to their behavior in relation to any case, but especially so, when a defendant's life is a risk in a death authorized case.



## Bruce Barket Sat, 7 Mar at 10:56am

In court I asked for a copy of the document you claim exists. You told the judge "all he had to do was ask.' to which the judge said "he is asking" and indeed I have, over and over again. The cite is wrong and as I think we all know now, no such document exists.



## Donna Aldea Sat, 7 Mar at 11:04am via email

The problem is, I have done the search and pulled 5267.09 on the bop website for MCC. It is not voluminous. It is less than 20 pages long. Page 11 does not contain the language you cite, nor does the rest of the document. Moreover, this protocol does not contain any section 21(d). Further, I've read all of the visiting and attorney visit protocols adopted by MCC, and they appear to be entirely silent on the issue of whether a lawyer can take a document from an inmate and remove it from the facility.

Perhaps I'm missing something — and, if so, I'm happy to be corrected. It's quite simple, really. Please attach the document you are quoting — with the subdivision you have cited — so we can all read it.

Thank you.

Donna Aldea
Partner
Head of Appellate and Post-Conviction Litigation
Barket Epstein Kearon Aldea & LoTurco, LLP
666 Old Country Road, Suite 700<x-apple-data-detectors://1/0>
Garden City, NY 11530<x-apple-data-detectors://1/0>
516.745.1500<tel:516.745.1500> | 516.780.2137<tel:516.780.2137> (C) |
516.745.1245<tel:516.745.1245> (F)
daldea@barketepstein.com<mailto:daldea@barketepstein.com>
www.barketepstein.com<http://www.barketepstein.com/>

This transmittal may be a confidential attorney client communication or may otherwise be privileged or confidential. If it is not clear that you are the intended recipient, you are hereby notified that you have received this transmittal in error; any review, dissemination, distribution or copying of this transmittal is strictly prohibited. If you suspect that you have received this communication in error, please notify us immediately by telephone or email and immediately delete this message and all its attachments

On Mar 7, 2020, at 10:49 AM, Tony Ricco <notifications@rubensteinlaw.basecamphq.com> wrote:



### Tony Ricco Sat, 7 Mar at 2:53pm

Why can't this entire firm find a public BOP document. I really have my doubts about whether this is a good faith request.

The Basecamp medium has memorialized a tremendous effort to enlighten all counsel on the ABA Capital Standrds, United States Supreme Court and Second Circuit case authorities, DOJ Protocols, various stautes related to Professional Conduct and ethics.

The posts are thoughtful, well researched and presented

The post also memorialize the tone and quality of the responses to such posts. The fact that the same person who has ignored and rejected the spund advice provided by appointed counsel and resource counsel thinks that a public BOP document does not exits, he is again entilted to yet another self serving opinion.



1220

## Tony Ricco Sat, 7 Mar at 3:10pm

Just Google. You will find that there are voluminous itteratioms, of interlocking and interconnecting, BOP documents related to the conduct of visitors to a BOP facility. For example, if a lawyer is trying to look ba j and have his conduct correspond with the information listed on a particular website, that's a huge mistake. You will find several basic prohibitions and protocals not listed but are none the less applicable. I cannot help attorney Barket with his conduct, or the conduct of any attorney associated with his firm, at the MCC nunc pro tunc.

The Curico inquiry and hearing will be about the conduct of the attorneys at the jail involving contraband and other related matters.



## Bruce Barket Sat, 7 Mar at 3:30pm

Your cite is wrong, as anyone who has checked has seen.

It could be an honest mistake and perhaps there is such a policy cited elsewhere, but I doubt it. If it did exist, learned counsel would have produced it by now.



## Donna Aldea Sat, 7 Mar at 4:24pm via email

Frankly, what I find so silly here is that we've wasted 100 times longer writing back and forth on this than it would have taken to just attach the cited section. Personally, I'm not interested in exchanging insults or professing superiority to anyone. I have no ulterior motives. I am simply trying to find a cited document so that I can read it. Whatever it says, and whatever conclusions that language requires, will not be altered by any arguments we make in this post.
I agree that normally, a citation should be sufficient. The problem is, the cited protocol is on the BOP website for MCC, but it does not contain any of the cited language on page 11 or elsewhere; nor does it have a section 21(d). So clearly, if I may lighten the mood a bit, "that is not the droid we're looking for." Would someone — anyone —be kind enough, without commentary, to just attach the cited protocol? Or perhaps a link to it? I really just want to read it. In all seriousness, a cite is useless if it does not sufficiently enable a reader to find the cited source. If this comes from a protocol as adopted by a facility other than MCC, then that must be stated so that the reader can locate the document.
I am not playing games here. I've been an Appellate attorney for over 20 years. I have tried to follow this cite and find this document, and I cannot. Please just provide a link or a copy of it. Thank you.

Donna Aldea
Partner
Head of Appellate and Post-Conviction Litigation
Barket Epstein Kearon Aldea & LoTurco, LLP
666 Old Country Road, Suite 700<x-apple-data-detectors://1/0>
Garden City, NY 11530<x-apple-data-detectors://1/0>
516.745.1500<tel:516.745.1500> | 516.780.2137<tel:516.780.2137> (C) |
516.745.1245<tel:516.745.1245> (F)
daldea@barketepstein.com<mailto:daldea@barketepstein.com>
www.barketepstein.com<http://www.barketepstein.com/>

This transmittal may be a confidential attorney client communication or may otherwise be
privileged or confidential. If it is not clear that you are the intended recipient, you are hereby
notified that you have received this transmittal in error; any review, dissemination, distribution
or copying of this transmittal is strictly prohibited. If you suspect that you have received this
communication in error, please notify us immediately by telephone or email and immediately
delete this message and all its attachments

On Mar 7, 2020, at 3:30 PM, Bruce Barket <notifications@rubensteinlaw.basecamphq.com> wrote:

# EXHIBIT 38



**BARKET**EPSTEIN

BARKET EPSTEIN KEARON ALDEA & LoTURCO, LLP

866 OLD COUNTRY ROAD, SUITE 700
GARDEN CITY, NEW YORK 11530
516.745.1500 • (F) 516.745.1245
WWW.BARKETEPSTEIN.COM

ADDITIONAL OFFICES:
EMPIRE STATE BUILDING, NY, NEW YORK
HUNTINGTON, NEW YORK
ALL MAIL TO GARDEN CITY ADDRESS

*Ex Parte and Under Seal*

March 13, 2020

**via Email**
Hon. Kenneth M. Karas
United States District Court
Southern District of New York
300 Quarropas Street
White Plains, NY 10601

> Re: *Ex Parte Letter Regarding Nicholas Tartaglione's Attorney-Client Privileged Communications with Attorneys Bruce Barket and Aida Leisenring*

Dear Judge Karas:

I am writing, pursuant to the Court's direction, in support of Mr. Tartaglione's right, based upon the attorney-client privilege, to maintain specific communications that he had with me and Ms. Leisenring insulated from disclosure to the Court and all other counsel in the case. We respectfully submit that these communications fall squarely with the classic bounds of the attorney-client privilege. Ordering their disclosure over Mr. Tartaglione's explicit objections would violate one of the most basic tenets of our adversarial system: that a client's communications with his lawyer are sacrosanct and will not be revealed unless the client permits it or disclosure is otherwise mandated by law.

As the Supreme Court observed in *Upjohn Co. v. United States*, 449 U.S. 383, 389-90 (1981), the purpose of the privilege is to encourage "full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice," based upon a recognition that "sound legal advice or advocacy serves public ends and ... depends upon the lawyer being fully informed by the client." As we demonstrate below, there is no lawful basis to compel disclosure of Mr. Tartaglione's communications with my firm.

1

I recognize and respect the Court's obligation to ensure that the defendant receives a fair trial (*United States v. Jones*, 381 F.3d 114, 121 [2d Cir. 2004]), to make certain that the trial is "conducted within the ethical standards of the profession," and to ensure that proceedings "appear fair to all who observe them." *See Wheat v. United States*, 486 U.S. 153, 160 (1988). But I respectfully maintain that under the circumstances presented here, and with these guiding principles in mind, compelling disclosure of Mr. Tartaglione's communications with me and Ms. Leisenring will not advance these interests.

## **Factual Background**

By way of background, Mr. Tartaglione apparently had been using a cell phone (516-708-5275) while incarcerated at the MCC in the spring of 2019. To the best of our knowledge, his communication with our firm from this phone is as follows:

1. Mr. Tartaglione sent a total of 10 text messages to Ms. Leisenring between May 12, 2019 and May 17, 2019 and one additional message on June 22, 2019. Most of the messages were no more than a few words. Ms. Leisenring did not solicit or respond to a single one of these messages.

2. Mr. Tartaglione sent me one text message on June 2, 2019, near midnight, which I did not see until the next morning, and which I initially did not even realize was from Mr. Tartaglione. At approximately 5:00 a.m., I responded that I did not recognize the number. Later that day, I realized that the text was from my client, and I sent a short response, split into five separate texts sent in immediate series, consisting of no more than a few words each. Mr. Tartaglione then sent a two-word response. To the best of my knowledge, he never texted me before or after that exchange.[1]

To the best of my knowledge, Mr. Tartaglione's communication with John Weider from this phone is as follows:

1. Upon information and belief, John Weider[2] also received text messages from the contraband cell phone. However, Mr. Weider's cell phone was cracked and replaced on July 23, 2019. The text messages from the contraband phone did

---

[1] Our firm has preserved all of the text messages referenced in paragraphs 1 and 2.

[2] John Weider is not a member or an employee of my firm, and never has been. He has represented Mr. Tartaglione for several years in connection with various transactional matters; and that representation predated Mr. Tartaglione's arrest and has continued since. Pursuant to Mr. Tartaglione's request, in October of 2018, Mr. Weider signed the protective order governing the discovery in this case, allowing him access to it. While he has not played any formal role in the defense, he has been consulting with Mr. Tartaglione about this case since it was commenced.

2

not transition to Mr. Weider's new cell phone. The old cell phone was traded in when the new phone was obtained.[3]

There is no question that these text messages are privileged communications, which, as explained below, fall squarely under the protections of Rule 1.6. Further, the assertion of the privilege was initially made by all counsel, appointed and retained, shortly after the phone was discovered.[4] In fact, on July 3rd, the date we learned the contraband cell phone was seized, appointed counsel and retained counsel all agreed that the attorney-client privilege and martial privilege should be promptly asserted. In fact, appointed counsel drafted the letter asserting a privilege, which I signed (*See* attached docket entry 131, filed July 19, 2019).

### An Attorney's Duty of Confidentiality

Irrespective of Learned Counsel's and *Curcio* Counsel's view, Mr. Tartaglione has a right to insist that his confidential communications with my firm not be disclosed to them, even though they, too, are counsel of record for Mr. Tartaglione. Absent some exception to the confidentiality mandate, all counsel are ethically obligated to respect Mr. Tartaglione's request to maintain the confidentiality of his communications with my firm. And that confidentiality mandate extends to Mr. Tartaglione's right to insist that I not share with Learned Counsel or *Curcio* Counsel his communications with my firm.

A defense lawyer's duty to maintain confidentiality is governed by Rule 1.6 which provides that a lawyer may not reveal information that a client has requested be kept confidential unless disclosure is required by the Rules, some other law or court order. Specifically, Rule 1.6 provides, in relevant part, as follows:[5]

> "(a) A lawyer shall not knowingly reveal confidential information, as defined in this Rule, or use such information to the disadvantage of a client or for the advantage of the lawyer or a third person, unless:
>
> (1) the client gives informed consent, as defined in Rule 1.0(j);

---

[3] I learned this new information from Mr. Weider after March 4, 2020, when the Court asked for a clarification to my statement that I had been told the messages "were not saved."

[4] Any assertion that appointed counsel did not know prior to July 22, 2019 that Mr. Tartaglione used the cell phone to text members of the defense team is belied by several emails and Basecamp posts discussing the texts.

[5] The discussion that follows concerning confidentiality is drawn heavily (and at times *verbatim*) from a letter drafted by Michael Ross, Esq., an attorney whose practice focuses on attorney ethics, which was attached to our submission to the Court on January 18, 2020 in response to the *Curcio* report.

3

> (2) the disclosure is *impliedly authorized to advance the best interests of the client and* is either *reasonable under the circumstances* or customary in the professional community; or
>
> (3) the disclosure is permitted by paragraph (b).
>
> 'Confidential information' consists of information gained during or relating to the representation of a client, whatever its source, that is (a) protected by the attorney-client privilege, (b) likely to be embarrassing or detrimental to the client if disclosed, or (c) *information that the client has requested be kept confidential.* 'Confidential information' does not ordinarily include (i) a lawyer's legal knowledge or legal research or (ii) information that is generally known in the local community or in the trade, field or profession to which the information relates" (emphasis added).

Where, as here, the client has expressly instructed his lawyer *not* to disclose specific confidential information, the lawyer no longer possesses implied authority within the meaning of Rule 1.6(a)(2) to reveal such information, even for the purpose of advancing the client's interests. This principle is reflected in the *Restatement (Third) of the Law Governing Lawyers* (2000) ("*Restatement*"), Section 60 (and its related Commentary), which is similar in substance to Rule 1.6. Section 60(1)(a) provides that:

> "(1) Except as provided in §§ 61-67, during and after representation of a client:
>
>> (a) the lawyer may not use or disclose confidential client information as defined in § 59 if there is a reasonable prospect that doing so will adversely affect a material interest of the client *or if the client has instructed the lawyer not to use or disclose such information*" (emphasis added).

The duty of confidentiality is NOT driven only by the consideration of "adverse effect" on the client. Comment c(ii) to Section 60 makes that point clearly:

> "Even in the absence of a reasonable prospect of risk of harm to a client, use or disclosure is [] prohibited if the affected client instructs the lawyer (*see* § 21[2])[4] not to use or disclose information. Such a

---

[4]*Restatement*, Section 21, provides: "As between client and lawyer: (1) A client and lawyer may agree which of them will make specified decisions.... The agreement may be superseded by another valid agreement. (2) A client may instruct a lawyer during the representation, subject to the requirements stated in §§ 22, 23, and other provisions of this Restatement. (3) Subject to Subsections (1) and (2) a lawyer may take any lawful measure within the scope of representation that is reasonably calculated to advance a client's objectives as defined by the client, consulting

4

direction is the client's definition of the client's interests (*see §
16[1]*),[5] which controls (*see § 21[2]*). *Such an instruction may also
limit a lawyer's implied authority to use or disclose confidential
client information to advance a client's interests.* ... However, client
limitations on a lawyer's authority do not alter a lawyer's
obligations under § 63[6] (using or disclosing confidential client
information when required by law or court order) (*see § 23*).[7]"

Moreover, the unofficial Comments to Rule 1.6 address an attorney's duty to "confine"
confidential information upon a client's request, and further support the view that attorneys may
not disclose information to co-counsel when explicitly instructed by the client not to disclose such
information. Specifically:

- Comment [2] to Rule 1.6 explains that, "*in the absence of the client's
  informed consent,* or except as permitted or required by these Rules,
  the lawyer must not knowingly reveal information gained during
  and related to the representation, whatever its source" (emphasis
  added).

- Comment [5] to Rule 1.6 provides that, "*[e]xcept to the extent that
  the client's instructions or special circumstances limit that
  authority,* a lawyer may make disclosures of confidential
  information that are impliedly authorized by a client...." (emphasis
  added).

- Comment [5] to Rule 1.6 further provides that "lawyers in a firm
  may, in the course of the firm's practice, disclose to each other
  information relating to a client of the firm, *unless the client has*

---

with the client as required by § 20. (4) A client may ratify an act of a lawyer that was not previously
authorized."

[5]*Restatement*, Section 16(1) provides: "To the extent consistent with the lawyer's other
legal duties and subject to the other provisions of this Restatement, a lawyer must, in matters within
the scope of the representation: (1) proceed in a manner reasonably calculated to advance a client's
lawful objectives, as defined by the client after consultation."

[6]*Restatement*, Section 63, provides: "A lawyer may use or disclose confidential client
information when required by law, after the lawyer takes reasonably appropriate steps to assert
that the information is privileged or otherwise protected against disclosure."

[7]*Restatement*, Section 23, provides: "As between client and lawyer, a lawyer retains
authority that may not be overridden by a contract with or an instruction from the client: (1) to
refuse to perform, counsel, or assist future or ongoing acts in the representation that the lawyer
reasonably believes to be unlawful; (2) to make decisions or take actions in the representation that
the lawyer reasonably believes to be required by law or an order of a tribunal."

> *instructed that particular information be confined to specified lawyers*" (emphasis added).

Here, Comment [5] to Rule 1.6 (quoted, in part, above) is particularly instructive because it provides that a lawyer must honor a client's request that "particular information be confined to specified lawyers" within a single law firm – seemingly regardless of whether other attorneys at that law firm are working on the client's matter and whether or not there is co-counsel involved in that matter. Comment [5] further supports the view that a client may direct counsel to withhold certain information from co-counsel; which is also consistent with a recent law review article discussing situations where a single client is represented by two lawyers. *See* Professor Stephen C. Sieberson,[8] *Two Lawyers, One Client, and the Duty to Communicate: A Gap in Rules 1.2 and 1.4*, 11 U.N.H. L. REV. 27, 35 (2013) (emphasis added). Professor Sieberson, in discussing "Scenario 1" in which Lawyer 1 and Lawyer 2 are co-counsel in a matter because of the matter's size or complexity, posits that the client controls what confidential information Lawyer 1 can share with Lawyer 2. In particular, Professor Sieberson pointedly observed that the limiting language of Comment [5] to Rule 1.6 of the American Bar Association Model Rules of Professional Conduct[9] seemingly also applies to co-counsel in different firms:

> "Once [Lawyer 2] has been associated as co-counsel for the client, *unless the client specifically instructs [Lawyer 1] to withhold certain information from [Lawyer 2]*, the sharing of information with [Lawyer 2] will not violate Rule 1.6."

Sieberson, *Two Lawyers, One Client*, 11 U.N.H. L. REV. at 35 (footnote omitted; emphasis added).

This quote is followed by a footnote that reads:

> "MRPC R. 1.6 cmt. 5 (1983) generally permits lawyers within a firm to share client information with each other, although such sharing can be limited if 'the client has instructed that particular information be confined to specific lawyers.' *This concept would seem to apply as well to co-counsel in different firms.*"

Sieberson, *Two Lawyers, One Client*, 11 U.N.H. L. REV. at 35 n.21 (emphasis added).

Thus, given Mr. Tartaglione's clear instruction not to disclose certain information to co-counsel, our firm is not ethically permitted to make disclosures to Learned Counsel -- nor to *Curcio*

---

[8]Professor Sieberson is a Professor of Law at Creighton University School of Law, where he focuses his teachings on Professional Responsibility, International and Comparative Law, and Corporate Law. He has taught widely on matters relating to ethics and professional responsibility. *See* https://law.creighton.edu/faculty-directory-profile/702/stephen-sieberson (last accessed: Mar. 12, 2020).

[9]Comment [5] to Model Rule 1.6 is substantially similar to Comment [5] to New York's Rule 1.6.

Counsel, who, as a lawyer also assigned to represent Mr. Tartaglione, is situated no differently from the vantage point of the rule. Accordingly, this Court should not order such disclosure, as it would be a direct violation of Rule 1.6.

Nor is it relevant, from the standpoint of the rule or its underlying purpose, that the disclosure might benefit Mr. Tartaglione. In the past, lawyers have been disciplined for disclosing confidential information, purportedly for the benefit of the client, in violation of a client's instructions and/or without client consent. *See In re Pressly*, 628 A.2d 927, 929 (Vt. 1993) (attorney for wife in divorce case reprimanded for disclosing to husband's lawyer, in violation of wife's express instructions, her suspicion that the husband was abusing their child, as part of wife's attorney's effort to convince husband's attorney to cooperate with continuing supervised visitation); *In re Mandelman*, 514 N.W.2d 11, 12 (Wis. 1994) (lawyer violated Rule 1.6 when he asked other lawyers for help on several client matters and transferred client files without seeking clients' consent); *see also Texas Committee on Professional Ethics*, Opinion 673 (Aug. 2018) (opining that, in the context of seeking advice about a client's case on an Internet forum, an attorney "may not reveal confidential information protected by the lawyer-client privilege without the client's express, informed consent," and, furthermore, "may not reveal unprivileged confidential information for the benefit of the client if the client has expressly instructed the lawyer not to do so."). In sum, it is clear that attorneys may not unilaterally choose to reveal confidential information, even for the benefit of the client, against the client's *express* directive.

Mr. Tartaglione, therefore, has the right to insist that the communication he conveyed to me and Ms. Leisenring not be disclosed to anyone else. Given his position, we are obligated to comply with his instructions; and we respectfully submit that Learned Counsel and *Curcio* Counsel are also obligated to follow that directive.

## **Balancing Conflicting Interests**

Once the court is advised of the possibility of a conflict of interest, the court is obligated to "investigate the facts and details of the attorney's interests to determine whether the attorney in fact suffers from an actual conflict, a potential conflict, or no genuine conflict at all." *United States v. Levy*, 25 F.3d 146, 153 (2d Cir.1994). As part of this obligation, "[t]he trial court must evaluate the interests of the defendant, the government . . . and the public in view of the circumstances of the particular case and perform a 'balancing test' to determine if there is either an actual conflict or a serious potential for conflict requiring disqualification." *United States v. Falzone*, 766 F.Supp. 1265, 1272 (W.D.N.Y.1991) (citing *U.S. v. James*, 708 F.2d 40, 44 [2d Cir.1983]). Here, the Court appointed *Curcio* counsel, has received a report from *Curcio* counsel, the government has weighed--in and has scheduled a *Curcio* hearing, where Mr. Tartaglione's asserted willingness to waive any potential conflicts in the case will be subject to thorough inquiry. To the extent that the Court is now being called upon, *prior to the hearing*, to weigh and decide between two competing interests -- namely, Mr. Tartaglione's right to maintain the confidentiality of certain privileged communications with my firm, and *Curcio* Counsel's request for disclosure of that same information -- the Court should, *at this juncture*, protect the privileged communications and deny *Curcio* Counsel's and Learned Counsel's request.

7

First, *Curcio* Counsel's articulated need for the messages was "whether the text messages related to Epstein, mitigation evidence supporting positive prison adjustment and/or classification or aggravating evidence subject to disclosure to and use by the Government during its penalty phase rebuttal" (*Curcio* Report pages 11-12).    Of course, because the texts predate Mr. Tartaglione meeting Epstein by nearly two months, they cannot, and conclusively do not, relate to Epstein. *Curcio* Counsel's speculation on how the privileged communication might be relevant to the penalty phase does not identify any possible conflict.

It is also important to note that the text messages predated the initial request for the appointment of *Curcio* counsel by nearly three months; although all the relevant facts were known by Learned Counsel no later than July 22, 2019.   Neither Mr. Tartaglione's use of the phone nor the substance of the text messages were part of the initial scope of *Curcio* Counsel's inquiry.   It was not until November 5, 2019 that Learned Counsel requested that *Curcio* Counsel's inquiry include the use of the contraband cell phone and the text messages.   It remains unclear how the substance of the text messages are relevant to any possible conflict and, indeed, the Government's firewall counsel indicated that neither the use of the phone nor the text messages pose any conflict or potential conflict.   Further, the Government is not seeking disclosure of the messages.

There is no question that *Curcio* Counsel and Learned Counsel, over the objection of Mr. Tartaglione, believe that appointed counsels, rather than my firm, are solely responsible for the defense at the penalty phase, and that they should be making critical strategic decisions -- even those decisions that would directly impact the guilt phase of the trial.   This deeply flawed assumption accounts for their complaints that without the text messages, Mr. Tartaglione's penalty-phase defense is being inhibited or not properly prepared and, by extension, that Mr. Tartaglione's interests are not being protected. But, as I have said repeatedly, my firm is not Mr. Tartaglione's lawyer for only half the case. We are his lawyers for the *entire case*, including the penalty phase, should there be one; and we are actively preparing his defense having full knowledge of the substance of the text messages sent to us. Mr. Tartaglione's choice of our firm does not create a possible conflict simply by virtue of the fact that we, and not appointed counsel, are preparing Mr. Tartaglione's defense.

Next, *Curcio* Counsel's position -- that she is entitled, over the objection of Mr. Tartaglione, to have access to his communications with me and my firm – vastly exceeds *Curcio* Counsel's role, and attacks the principle of the attorney-client privilege.   The role of *Curcio* Counsel is to identify possible conflicts and advise the client in order to help protect the client from conflicted representation.   That role does not include the power to overrule a client's right to maintain confidentiality over his communications.   Were that the case, the Court would be creating a fundamentally new exception to the attorney-client privilege -- one unsupported by statute, ethical rule or case law.   Here, just as the Court should not compel Mr. Tartaglione to waive his right to confidential communications with his lawyers, the Court should not indirectly accomplish that goal by compelling disclosure of text communications to *Curcio* Counsel simply because *Curcio* Counsel made the request, without logical or legal foundation.

One final observation is order.   Mr. Ricco, who has often clashed with me, has repeatedly and unfairly cast my efforts to protect Mr. Tartaglione's confidentiality as evidence that I and my firm engaged in misconduct.   Such allegations are patently false.   Mr. Tartaglione has made his

8

own decision – and a vocal and repeated one at that – to discharge Mr. Ricco and to prevent disclosure of his confidential information to appointed Counsel and *Curcio* counsel, whom he simply does not trust. My efforts to honor Mr. Tartaglione's wishes are not proof that I or my firm engaged in misconduct. Rather, as explained above, I am simply honoring my ethical obligation to adhere to Mr. Tartaglione's explicit instruction pursuant to Rule 1.6 that his confidences not be disclosed to Mr. Ricco, *Curcio* Counsel or any other appointed counsel.

## Conclusion

At bottom, this Court is confronted with a specific assertion of privilege by a client, who has issued an express direction that confidential communications with two of his lawyers not be disclosed to anyone else – including his other attorneys. *Curcio* Counsel's request for that information based on pure speculation, founded on her clearly erroneous and temporally impossible claim that the communications might relate to Epstein, fails to articulate any reasonable possibility of a conflict. Respectfully, the Court should protect Mr. Tartaglione's attorney-client privilege, and deny *Curcio* Counsel's request.

I respectfully request that this letter be filed *ex parte* and under seal, as it relates to matters of defense strategy and matters related to counsel's representation.

Respectfully submitted,

_____/s/Bruce Barket_____
Bruce A. Barket
Aida Leisenring

cc:    *via electronic mail*
       (all co-counsel)

9



**BARKETEPSTEIN**

BARKET EPSTEIN KEARON ALDEA & LoTURCO, LLP

666 OLD COUNTRY ROAD, SUITE 700
GARDEN CITY, NEW YORK 11530
516.745.1500 • IFI 516.745.1245
WWW.BARKETEPSTEIN.COM

ADDITIONAL OFFICES:
EMPIRE STATE BUILDING, NY, NEW YORK
HUNTINGTON, NEW YORK
ALL MAIL TO GARDEN CITY ADDRESS

July 19, 2019

**By ECF**

The Honorable Kenneth M. Karas
United States District Court Judge
Southern District of New York
300 Quarropas Street
White Plains, NY 10601-4150

> *Re: United States v. Nicholas Tartaglione,*
> *16 Cr. 832 (S-4) (KMK)*

Dear Judge Karas:

We represent Defendant Nicholas Tartaglione in the above referenced matter. It has come to our attention that the Bureau of Prisons ("BOP") recently confiscated a cellular telephone that had been found in Mr. Tartaglione's cell in violation of the institutional rules of the Metropolitan Correctional Center ("MCC"). Because we have a good faith basis to believe that privileged material exists within the communications stored on that telephone, we write to respectfully request that certain procedures be immediately undertaken to ensure that privileged material does not inadvertently fall into the hands of the Government's trial team in the case.

At the outset we respectfully request that the Government be directed to refrain from accessing the phone absent a search warrant. Second, assuming *arguendo* a valid basis to search the phone exists and that a search warrant is or has been issued, then we ask that the following procedures be put in place: (1) the Government designate a filter team (also referred to as a taint, conflict, or wall team), separate from its trial team, to be the only members of the United States Attorney's Office to receive copies of the contents of that cellular telephone without further authorization from this Court; (2) that defense counsel be provided with all communications extracted from that telephone (e.g., text messages and any attachments thereto) at the same time such communications are provided to the Government's filter team; and (3) that a briefing schedule be set to litigate any claims of privilege that will be raised by the defense in relation to such material.

With respect to scheduling, and again assuming *arguendo* that a valid basis for a search exists and that a search warrant is issued, we propose the following schedule:

The Honorable Kenneth M. Karas
July 19, 2019
Page 2 of 3

- Deadline for simultaneous disclosure of cell phone extractions to the defense and the Government's filter team: August 19, 2019

- Defense privilege log due: September 3, 2019

- Government response to defense claims of privilege due: September 17, 2019

- Defense reply to Government response due: September 24, 2019.

As this Court is aware, the use of a designated filter team, like the one suggested here, is a "common procedure" in this District. United States v. Ceglia, Docket No. 12 Cr. 876 (VSB), 2015 WL 1499194, at *1 (SDNY March 30, 2015); see also United States v. Budovsky, Docket No. 13 Cr. 368 (DLC), 2016 WL 386133, at *9 n.24 (SDNY January 28, 2016) (noting use of filter team during review of defendant's MCC emails and telephone recordings to ensure that the Government's trial team "did not have access to communications between [the defendant] and his counsel") United States v. Sattar, Docket No. 02 Cr. 395 (JGK), 2003 WL 22137012, at *16 (S.D.N.Y. Sept. 15, 2003) (discussing review of the defendant's MCC telephone calls, explaining, "Use of the taint team ensures that members of the Government Trial Team are not exposed to potentially privileged material."), aff'd sub nom., United States v. Stewart, 590 F.3d 93 (2d Cir. 2009).

In Celgia, Judge Broderick described the procedures that had been agreed to by the parties and that we submit would be appropriate here:

> Pursuant to an agreement between the Government and Ceglia, through Ceglia's counsel at the time, the documents subject to these claims of privilege were produced to Ceglia and to the Wall AUSA. The Wall AUSA is an Assistant United States Attorney in the Southern District of New York who is not part of the Ceglia prosecution team. The Wall AUSA, separately and independently from the Ceglia prosecution team, reviewed the potentially privileged documents to determine whether the Government would engage in litigation to attempt to defeat the claim of privilege and obtain the documents. The Wall AUSA is prohibited from communicating any information related to the potentially privileged documents to any member of the Ceglia prosecution team.

Ceglia, 2015 WL 1499194, at *1 (internal docket references omitted).

While the use of a filter team is not appropriate when it would insure to the defendant's detriment, see In re Search Warrant for Law Offices Executed on March 19, 1992, 153 F.R.D. 55, 59 (SDNY 1994) ("reliance on the implementation of [an ethical] Wall, especially in the context of a criminal prosecution, is highly questionable and should be discouraged. The appearance of Justice must be served, as well as the interests of Justice. It is a great leap of faith

The Honorable Kenneth M. Karas
July 19, 2019
Page 3 of 3

to expect that members of the general public would believe that any such [ethical] wall would be impenetrable; this notwithstanding the honor of an AUSA"); United States v. Kaplan, No. 02 CR. 883 (DAB), 2003 WL 22880914, at *12 (S.D.N.Y. Dec. 5, 2003) ("*disapproving* [of] the Government's use of an ethical wall ... before any challenge to those determinations can be raised by a Defendant and determined by a court") (emphasis in original), here the use of a Government filter team for purposes of litigating the defendant's privilege claims is the only way – short of denying a search warrant over the seized telephone – to ensure any level of protection for Mr. Tartaglione in this instance. And counsel notes that we know of no cases in this District where the use of a filter team has been proposed or consented to by the defense and then refused by the Government or rejected by the court.

Accordingly, Defendant Nicholas Tartaglione, by and through counsel, respectfully request that the Government be directed to refrain from accessing the cellular telephone seized from the defendant's cell, absent a search warrant. Defendant further requests, assuming *arguendo* a valid basis to search the phone exists and that a search warrant is or has been issued, that that the following procedures be put in place: (1) the Government designate a filter team, separate from its trial team, to be the only members of the United States Attorney's Office to receive copies of the contents of that cellular telephone without further authorization from this Court; (2) that defense counsel be provided with all communications extracted from that telephone (e.g., text messages and any attachments thereto) at the same time such communications are provided to the Government's filter team; and (3) that the briefing schedule outlined above be set to litigate any claims of privilege that will be raised by the defense in relation to such material.

As always, we thank Your Honor for his time and consideration.

Respectfully submitted,

/S/

Bruce A. Barket
Aida F. Leisenring
Anthony L. Ricco
Bruce D. Koffsky
*Attorneys for Defendant Nicholas Tartaglione*

—On the brief—
Michael K. Bachrach

cc:     All counsel of record (by ECF)

# EXHIBIT 39

## Aida Leisenring

| | |
|---|---|
| **From:** | Feinzig, Margery (USANYS) <Margery.Feinzig@usdoj.gov> |
| **Sent:** | Wednesday, March 18, 2020 8:29 AM |
| **To:** | Bruce Barket |
| **Cc:** | Aida Leisenring; bkoffsky@snet.net; johnadiazlaw@gmail.com; mbach2000@yahoo.com; ken@kjmontgomerylaw.com; bsternheim@mac.com; slegon@aol.com; tonyricco@aol.com; Graff, Ilan (USANYS) |
| **Subject:** | RE: US v. Tartaglione, Docket No. 16 Cr 832 (KMK) |

Sure. Based on our reading of the sealed transcript from the last conference and conversations we have had with Tony and Michael, we think there may be additional information that we don't have right now that will likely be included in appointed counsel's submission. We think it would be much more efficient for us to have that information as well as counsel's view of the issues before we submit our proposed questions and guidance. We would like to avoid possible delays that could occur (*i.e.* additional submissions) because we do not have all the information we need to address the issues.

---

**From:** Bruce Barket <bbarket@barketepstein.com>
**Sent:** Wednesday, March 18, 2020 8:02 AM
**To:** Feinzig, Margery (USANYS) <MFeinzig@usa.doj.gov>
**Cc:** Aida Leisenring <aleisenring@barketepstein.com>; bkoffsky@snet.net; johnadiazlaw@gmail.com; mbach2000@yahoo.com; ken@kjmontgomerylaw.com; bsternheim@mac.com; slegon@aol.com; tonyricco@aol.com; Graff, Ilan (USANYS) <IGraff@usa.doj.gov>
**Subject:** Re: US v. Tartaglione, Docket No. 16 Cr 832 (KMK)

Good morning,

I am not sure. Do you have time for a call to discuss or can you give us an idea of your thinking?

Bruce A. Barket
Barket, Epstein, Kearon, Aldea & LoTurco
666 Old Country Road (700)
Garden City, NY 11530
Barketepstein.com
(516) 287 7230

> On Mar 18, 2020, at 7:56 AM, Feinzig, Margery (USANYS) <Margery.Feinzig@usdoj.gov> wrote:

> Good morning,
> Is there any objection from retained counsel to the Government's requesting that the Court modify its order to allow us to file our *Curcio* submission after the defense counsel file theirs?
> Thanks,
> Margery

> Margery B. Feinzig

Assistant United States Attorney
U.S. Attorney's Office for the Southern District of New York
300 Quarropas Street, White Plains, New York 10601
T: 914.993.1903 / Email: margery.feinzig@usdoj.gov

**From:** tonyricco@aol.com <tonyricco@aol.com>
**Sent:** Tuesday, March 17, 2020 2:23 PM
**To:** Feinzig, Margery (USANYS) <MFeinzig@usa.doj.gov>
**Cc:** aleisenring@barketepstein.com; bbarket@barketepstein.com; bkoffsky@snet.net; johnadiazlaw@gmail.com; mbach2000@yahoo.com; tonyricco@aol.com; ken@kjmontgomerylaw.com; bsternheim@mac.com; slegon@aol.com
**Subject:** US v. Tartaglione, Docket No. 16 Cr 832 (KMK)

AUSA Feinzig:

Attached please find the **full** unredacted version of the transcript from the March 4, 2020 court conference. I have also separately attached pages 48 and 49, which have **redactions**. There was a disagreement as to some counsel on the motive for the redactions.

In order to move forward towards preparing for the *Curcio* hearing, and given the fact that you are, in fact, a firewall counsel, the unredacted full version has been provided. As you can see on pages 48, beginning at line 7, there are *brief* references to strategy discussions made and actions taken by Learned Counsel. To the extent that any of the issues related to this *Curcio* inquiry become the subject of any future litigation (appellate or 2255) you have been provided with the pages 48 and 49 in redacted form. In this way, we have a full more robust record.

If you have any questions, give me a call.

By the way, if you write to the court to modify the court's order so that the government will file its outline of the proposed *Curcio* issues for the hearing, after defense counsel submission(s) on March 27, 2020, there is no objection to such a request by the appointed attorneys.


Tonyricco

cc: Bobbi Sternheim (*Curcio* counsel)

2

# EXHIBIT 40

May 5, 2020

## AFFIRMATION OF AIDA FERRER LEISENRING

I am a Partner at Barket, Epstein, Kearon, Aldea & LoTurco, LLP. I write this affirmation in response to appointed counsel's Pre-Hearing Memorandum[s] dated April 9, 2020 and corrected version dated April 20, 2020. The facts submitted in this affirmation are not exhaustive, nor does this affirmation contain any facts that would be duplicative of facts asserted in any Curcio-related filings by Mr. Barket. It merely addresses certain facts relevant to assertions by appointed counsel in the above-referenced memorandums. For example, in said memo, Mr. Ricco stated that Mr. Barket read him the contents of the Epstein note over the phone on July 29, 2019. In fact, I read Mr. Ricco the contents of the note during a separate telephone call later that evening. However, whether Mr. Barket or I read the contents of the note to Mr. Ricco is irrelevant so such a fact would not be included in this affirmation.

The following is based upon information and belief and a review of my cell phone and cell phone records:

### CONTRABAND PHONE

1.      I received a text message from (516) 708-5275 for the first time on Sunday, May 12, 2019 at 9:52 AM. I had never received a text message before from this number. I did not reply. Thereafter, I received *incoming* texts from this same number on the following dates:

- May 14: 2 texts
- May 16: 1 text
- May 17: 6 texts
- June 22: 1 text

2.      In addition, I received 2 incoming phone calls from (516) 708-5275 on May 16 and 1 incoming phone call from the same number on May 18, 2019.

3.      All the above-referenced text messages were mostly brief. Two of the above texts were merely a single "?" character. The June 22nd text appeared to be a duplicate of a text sent on May 16, leading me to believe that perhaps it was a data/ network issue. I never responded to any of the above-referenced texts. *See* attached Redacted Text Screen Shots.

4.      I never solicited or encouraged phone communications from this number. I never saved this number in my contacts to specify who the caller was.

5.      I told Mr. Tartaglione not to contact me with the contraband phone. I told him I would not communicate with him through the contraband phone. I also told him not to possess or use a contraband phone to contact anyone. I submit this information with the understanding that it will not be disclosed to the prosecuting Assistant US Attorneys, but will be shared only with the government Wall Counsel for the sole purpose of assessing conflict issues.

1

6.        On July 3, 2019, after we discovered that the BOP confiscated a contraband phone from Mr. Tartaglione, I sent Mr. Bachrach 5 screen shots I had obtained of text messages that I presumed were all from the contraband phone to Mr. Tartaglione's wife. One of those screen shots, however, is of a text message from Gerry Tartaglione to Tartaglione's wife and not from (516) 708-5275[1]. I had not noticed it previously, even though it was apparent in the image of the text. In a telephone conversation and email to Curcio counsel on December 12, 2019, I indicated the error. As Curcio counsel had told me she was looking for this specific text mentioning "Bruce," I assumed she learned of it from appointed counsel and that she would convey to them the true author of that text, Gerry Tartaglione.

7.        The Pre-Hearing Memorandum of April 9, 2020 alleges that during a July 11, 2019 meeting with Anthony Ricco, Michael Bachrach, Kenneth Montgomery, Tanya Greene (Resource Counsel) and an intern I stated that Mr. Tartaglione had texted me and that I "had responded on 'three of four' occasions." *See* Pre-Hearing memorandum at 36. I never stated that I responded to text messages from the contraband phone, nor would I have said that, as I had not. In any case, screenshots of these messages demonstrate the assertion is untrue. Moreover, the memo generated by Mr. Bachrach and Mr. Diaz summarizing the July 11 meeting fails to mention that I ever stated that I had responded to Mr. Tartaglione's text messages. Given appointed counsel's present argument, one would think that information would be present in the July 11 memo.

8.        Mr. Ricco's Pre-Hearing Memorandum asserts that during an October 23, 2019 basecamp discussion regarding strategy on how to approach the contraband phone in a penalty phase my post "failed to acknowledge that Tartaglione had also texted with her, Wieder, and possibly other attorney's [sic] associated with the Barket law firm" and that Bachrach believed that my "omission" was "intentional" or "the product of conscious avoidance" and that this led Bachrach to believe that I may have a conflict with respect to the contraband phone." *See* April 9, 2020 Pre-Hearing Memorandum at 43. I was neither intentionally omitting nor consciously avoiding the fact that I received communications from the contraband phone. By appointed counsel's own time-line in their Pre-Hearing Memorandum of April 9, 2020, I had already admitted to appointed counsel in a basecamp post dated July 3, 2019 that Mr. Tartaglione had contacted me on the contraband phone and I allegedly told appointed counsel that I had responded to texts at a July 11, 2019 meeting (which, as stated above, is untrue). Appointed counsel misstates my state of mind with respect to this email I posted on Basecamp. The division between retained and appointed counsel was pronounced since the inception of the team's formation. I believed Mr. Bachrach and Mr. Barket to be in 'heated agreement' about what counterarguments to make with respect to the contraband phone, and I was simply pointing that out to be diplomatic. It did not occur to me to re-state that Mr. Tartaglione had contacted me on the contraband phone because we were in the midst of strategizing counterarguments to aggravators such as that Mr. Tartaglione did not use the phone to solicit his loved ones to commit crimes, but rather to maintain emotional bonds. It did not occur to me that I would have to gratuitously assert that Mr. Tartaglione also did not solicit me to commit a crime. To be clear, he did not.

---

[1] This is the text that begins: "U piece of crap ni don't give a damn if u call. Bruce we have someone watching why is your dogtrainer car there n u do t answer iwant the truck back ni will charge u with fraud niw" [sic].

EPSTEIN NOTE

9.      On or about July 27, 2019, I was informed by Mr. Barket that Jeffrey Epstein had left a "suicide" note for Mr. Tartaglione. Later that day, Mr. Barket sent me a photo of the note and asked me if I could find handwriting samples of Mr. Epstein on the internet to authenticate it. I spent part of that day looking for samples of Epstein's handwriting but did not find any other than numbers written on a chalkboard in a picture taken of Mr. Epstein from when he taught math. Based on conversations with Mr. Barket and our law partner Donna Aldea on July 28, 2019 it was clear that no one intended on doing anything with the note until it was authenticated. We discussed how, if authenticated, the note could be used to help exonerate Mr. Tartaglione of the allegation that he assaulted Epstein, but had no intention of acting without thinking the entire matter through. I was only convinced of the note's authenticity when I saw a 60 Minutes episode in January of 2020 that featured other handwritten notes purported to be written by Epstein.

10.     Mr. Ricco writes that during a July 29, 2019 telephone conversation between Mr. Barket and Ricco and I, Mr. Barket stated his intention of taking the Epstein note to the press. At no time did Barket state an intention to take the note to the press during the call. *Id.* At 14.

11.     During that July 29 telephone call with Mr. Ricco, Mr. Ricco suggested to Mr. Barket and me that we do not share information about the note's existence with other team members. Although I found that curious, I assumed the suggestion was made to prevent an inadvertent leak of this information, given that the defense team had so many members. After all, if the press reported there was a "suicide note" and that note ended up being forged, that information could negatively impact Mr. Tartaglione.

12.     Mr. Ricco claims that during an August 23, 2019 meeting with appointed counsel and Curcio counsel I told other team members that I specifically recalled Mr. Ricco "telling Barket not to disclose Barket's involvement [with the note] to the Government." *Id.* At 30. That is incorrect, and Mr. Ricco possibly misheard me. I stated that Mr. Ricco told Mr. Barket and me not to tell other *appointed counsel* about the note's *existence*, as I indicated above. I never claimed that Mr. Ricco told retained counsel not to disclose his "involvement" with the note to the government.

/s/ Aida F. Leisenring
Aida Ferrer Leisenring, Esq.

3

# EXHIBIT 41

## AFFIDAVIT OF BRUCE BARKET

I am Bruce Barket, a partner at Barket, Epstein, Kearon, Aldea and LoTurco, LLP., and have been retained to represent Nicolas Tartaglione in the matter before the Court.  I am providing this affidavit for the Court's consideration as it rules on appointed counsel's attempt to disqualify our firm.  While I will address many of the issues raised by appointed counsel, I will not address every point made.

1.  The hybrid representation of Mr. Tartaglione by this group of appointed counsel and our law firm has been difficult.  It would be easy for one group to blame the other, but the predictable cross allegations would not be useful.  Clearly, the attempt to work together for the benefit of our client, which our firm entered in good faith, failed. The acute problems are only the most recent and visible in a long history of tension, disagreements, and a lack of coordination.

2.  By way of some background, appointed counsel have inaccurately asserted that they have not "thwarted or countermanded the strategic decisions of retained counsel" (Corrected Pre-Hearing Memorandum at page 95) and state that the only example of a decision with which they interfered was my attempt to revisit the decision by the Government to seek the death penalty  (Corrected Pre-Hearing Memorandum at page 56-60). They go so far as to claim that no other examples exist.  In fact, there are numerous examples, some dating back to the beginning of the case.  I will briefly summarize a few here:

    a.  We needed to retain and consult with a medical examiner.  In March of 2017, I spoke with Michael Baden who agreed to review the autopsy reports of the victims at CJA rates. I told Mr. Ricco about my desire to retain Michael Baden in an email. He ignored me and without consulting me at all, hired another doctor on a Saturday evening.  *See* Exhibit A, Barket email outlining this event.

    b.  The issue of speaking to the press did not begin in 2019 with the Epstein matter. It has been a long-standing point of contention.  Since the inception of the case, Mr. Tartaglione has been concerned that the press on his case has been one-sided and prejudicial.  He has repeatedly asked me to be more vocal and more aggressive in defending him publicly.  Mr. Ricco has repeatedly said to me that "we (capital defense lawyers) never speak to the press." I would have made more public statements earlier in the case rebutting the horrible press reports, the majority stemming from the Government announcing the indictment and arrest, but given the emphatic opposition by appointed counsel, I yielded.

    c.  In March of 2018, when Mr. Tartaglione first asked to remove Mr. Ricco from his defense team, I communicated an issue of timing of our submission to the Government of our mitigation packet. We had just learned of the Government's change in theory and I wanted to find out more details about our client's role. Mr. Ricco wanted to submit our packet immediately, without taking the new information into account.  That dispute was so significant that it led to Mr. Tartaglione seeking Mr. Ricco's removal.

1

d. Retained counsel's view of the content of the submission was rejected, albeit in my view incorrectly, by learned counsel. On this point, we yielded to their experience dealing with the DOJ and withdrew arguments we believed to be meritorious from the submission. The submission we filed failed to convince the DOJ not to authorize the case. While I know good arguments do not always carry the day, in this instance, we knew the client and the case better and should have insisted that we structure the arguments as we thought best. Again, we yielded, to our regret.

e. In August of 2019, I sought the possibility of disclosing Mr. Tartaglione's knowledge of the Epstein incident and of the guards' conduct to broker deauthorization and an acceptable plea agreement in exchange for Mr. Tartaglione's cooperation with the investigation into Epstein's suicide and the conditions at the MCC. Mr. Ricco not only rejected the idea and refused to assist me in this endeavor, he wrote an email that was mocking in its tone. *See* Ex. B, Emails dated August 20 and 21, 2019.

f. My request to reargue the DOJ's decision to seek the death penalty was, as the Court was made aware, obstructed. On this issue, Mr. Ricco not only interfered with my work, he used my email to assert that I did not know the guidelines to seek to revisit the decision. As he pointed out, we *had* discussed those guidelines—he provided them to me several months earlier. That I chose to raise the issue in the manner I did, asking the line assistants for help, was not done out of ignorance. It was an attempt to start a conversation with the only people within the DOJ who would speak to me. If I simply formally started the process, I would have lost any opportunity to engage in the conversation.

g. Of course, my view that press allegations that Mr. Tartaglione assaulted Mr. Epstein should be publicly rebutted resulted in Mr. Ricco filing a request for *Curcio* counsel and accusing me of unethical and immoral conduct in a basecamp post. *See* Ex. C, Ricco Basecamp post dated August 13, 2019.

h. In January of 2020, the Government offered to stipulate to mitigating facts surrounding Mr. Epstein's attempted suicide in order to resolve the issue of the missing video recording our firm had requested (*see* January 22, 2020 Transcript at 46-49). I sought to pursue that stipulation as quickly as possible, recognizing it as a unique opportunity. Mr. Ricco refused to even discuss it with the Government and, because the the Government (understandably) would not negotiate with co-counsel at odds, Mr. Ricco effectively thwarted my work on behalf of Mr. Tartaglione.

i. Lastly, Appointed Counsel, through their conduct, seem to have taken the view that the liability phase is solely the responsibility of Retained Counsel, and that Learned Counsel and all other Appointed Counsel are in charge of the penalty phase. This, in my view, is and has been counterproductive and ill-serves our client. Requests for help by me have been ignored. *See* Ex. D, Basecamp posts dated September 9, 2019 and September 13, 2019, as examples.

3. Of course, the merits and success of any of the strategic decisions is not the point; although, in my view, the record so far establishes that the course retained counsel has set has proven

2

helpful. The critical factor is that Mr. Tartaglione receives effective representation from the lawyer he chooses, and that his chosen lawyer be permitted to make strategic decisions even if, at times, those decisions run counter to the advice of Learned Counsel.

4. The statements I made to the press concerning Jeffery Epstein's attempted suicide in the early morning hours of July 23, 2019 were a defining event in the tensions described above. I first learned of the incident when Mr. Tartaglione called my cell phone in the early evening of that same day. I was at home, and he informed me what took place.

5. Sometime after 10:00 p.m. on July 24, 2019 I received a call from Channel 4 NBC news telling me they were going to air a story during their 11:00 p.m. newscast stating that "law enforcement sources" were reporting that Mr. Tartaglione assaulted Jeffrey Epstein. I believed this to be false and I told them so. I argued that if they ran that story, they would be running a false account of what took place, but I did not tell them what Mr. Tartaglione told me about the incident. They still aired the story as the lead to their 11:00 p.m. newscast but it did not portray our client as negatively as I initially was told it would and it included our denial of any wrongdoing. This was the first report by any media outlet of the incident.

6. I took note of the fact that the source, according to the journalist, was "law enforcement" and recalled that only 2 days prior I had complained in open court about the conditions at the MCC and named a guard who threatened Mr. Tartaglione if his lawyer continued to complain.

7. Shortly after that report was broadcast, the New York Post ran a similar story online. I do not recall speaking to the Post that evening, and I am not quoted. Appointed counsel imply that the New York Post story was the first to run. That is incorrect. The New York Post online story cited by appointed counsel at page 10 of their Revised Pre-Hearing Memo, has a time stamp of 11:19 p.m. shortly after the NBC broadcast.

8. On July 25, 2019, numerous press articles were surfacing, and I received multiple calls from members of the media. Almost all the inquires asked about the allegation that Epstein was assaulted by Mr. Tartaglione. There was no doubt in my mind that this account had to be countered. Without telling any reporter or member of the media what Mr. Tartaglione told me, I stated emphatically that Mr. Tartaglione had behaved appropriately and even admirably. I also mentioned that the two cellmates got along well. This is information I learned apart from any conversations I had with Mr. Tartaglione. There are only two SHU legal visiting rooms at the MCC. Every time I visited Mr. Tartaglione, I saw one or more of Mr. Epstein's lawyers and we often spoke while we were waiting for our clients to be brought down. There were several instances when I saw Mr. Tartaglione and Mr. Epstein interact in person. They clearly got along.

9. I did not initiate media, reach out to the media, or in any way cause the media to become interested in the events between Epstein and Tartaglione. I merely responded to calls made to me and commented on stories that I was confident were going to run with or without my comments.

10. On the evening of July 25, 2019, I visited Mr. Tartaglione. We discussed the Epstein incident in detail, as well as how staff at the MCC handled the incident, and press reports on the topic. As he had done numerous times in the past, he again authorized me to make any statement to the media that I believed to be in his best interests. We also discussed the

3

views of Appointed Counsel who were vehemently opposed to making any statements to the press. I recall Mr. Tartaglione asking me, "You aren't going to listen to them, are you?" On this point, Mr. Tartaglione and I agreed: the false story that he assaulted Epstein had to be countered. I believed then it was in his best interest to do so, and 10 months later, having repeatedly considered my actions in light of the numerous accusations of Assigned Counsel, I still believe I did what was appropriate, ethical, and in the best interests of my client. Unlike other disagreements where I yielded to Learned Counsel, here I did not.

11. I next saw Mr. Tartaglione at 8:00 a.m. on July 27, 2019. Before entering the MCC, I spoke to John Weider and learned that he was likely going to visit Nick later that day. When I met with Mr. Tartaglione, we discussed several things and he suddenly recalled that Epstein left him what could be described as a suicide note, but he forgot to bring the note down from his cell. We asked the guards to let him go back and retrieve an item he forgot, but were told "no."

12. I questioned Mr. Tartaglione for details about where the note was found, what it was, how he knew it came from Epstein, and other related information. He told me that he found the note in one of his [Tartaglione's] books. I told him to give it to the next lawyer who visited him. I expected that to be Mr. Weider, but it could have been any of the lawyers.

13. When I left, I texted Mr. Weider and asked him to call me. I explained what to expect and asked him to accept the note and give it to me when I saw him.

14. Later that day, Mr. Weider texted me a copy of the note. I changed my mind about taking possession of it. If it was authentic, I did not want to be in the chain of custody. I asked Mr. Weider to keep it in a safe. He agreed, and to the best of my knowledge it remains there to date. I have never seen the original note.

15. My purpose in having the note removed from the MCC was:
    a. To authenticate it. I needed to know if it was authentic before making any decisions as to how to use it, if at all. I also anticipated that Epstein might deny that he drafted it, even if he was the author.
    b. To preserve it. The MCC has been notorious for taking an inmate's personal property, even important legal documents, and not returning it.

16. After receiving the copy of the image of the note electronically, I forwarded a copy to Ms. Leisenring. We immediately began to discuss ways to determine if the note was written by Mr. Epstein.

17. The next day, June 28, 2019, both Ms. Leisenring and I spoke with Donna Aldea, one of our law partners, and the three of us discussed ways to authenticate the note by trying to locate an exemplar of Epstein's hand writing. At 2:20 on July 28th, I sent the following text to Ms. Aldea and Ms. Leisenring "The more I consider our options, the one I keep coming back to is: **authenticate** and hold until every other party shows their hand." (emphasis added).

18. In addition to looking for handwriting exemplars ourselves, I asked two investigators (William Flanagan and Jay Salpeter) to help. We previously filed affidavits from each investigator along with our response to the initial *Curcio* report.

19. Appointed counsel assert that my intention in removing the note was to "exploit" "the situation in the press." (*see* Revised Memorandum at footnote 2 at page 15, page 19, and

4

footnote 20 at page 84-85) This is a blatant distortion of the record and nothing short of a deliberate attempt to deceive the Court. They have taken a comment I wrote on August 10, 2019 -- after Epstein killed himself -- and cited it as if I was speaking about the note, which I was not. In the August 10th comment I stated that I wanted to exploit the suicide to help our client because, as I wrote, "[The suicide] validates so much of what he (sic) have said about the MCC, about what happened with Nick and Epstein and about Nick's character and his truthfulness. I want to exploit it, we should exploit it, our client deserves to have it exploited. The only question I have is how best to exploit it, for Nick and to further shine the light on the horror of that hell-hole." (*See* Basecamp post dated August 10, 2019, DX 15)

20. I never said or implied that I wanted to use the Epstein note in the press. To the contrary, I carefully guarded the information. In fact, in a text exchange with Ms. Leisenring on July 27th she remarked about what chaos would be caused if the press found out about it and wrote "Could you imagine if the media had this. (sic)" and I replied, "I know front page." To which, she responded, "Every publication" and I ended the exchange with "That's not where my head is. **I want to be sure the investigation clears Nick.**"

21. Regardless of Appointed Counsel's claim that they never heard me mention my desire to authenticate the note (as I will detail below, I never spoke to any of them about the note at all prior to August 15, 2019, except Mr. Ricco), the record proves I did try to authenticate the note within hours of reading a copy of it. Within minutes of receiving the note, Ms. Leisenring and I began to conduct internet searches for Epstein's handwriting. The next day, another partner joined the search and I recruited investigators to help, as their affidavits prove.

22. The proposition that I removed the note to exploit it in the press is absurd and false. I never disclosed it to the media, despite knowing its value to the media. What mattered was its value to my client. If authentic, as it turned out to be, it is corroborating evidence that Epstein was suicidal at a time when there were false stories being floated that Mr. Tartaglione had assaulted Epstein.

23. I also knew the importance of the attempted suicide and Mr. Tartaglione's conduct immediately thereafter. If Mr. Tartaglione acted to save Epstein's life by alerting the guards to his condition after Epstein tried to hang himself, that would be powerful mitigation on the penalty phase. In contrast, if he was found to have assaulted a cellmate, that would be damning evidence used to justify his execution.

24. On July 29, 2019 Ms. Leisenring and I spoke with Mr. Ricco by phone to advise him of the Epstein note and discuss our options. I told him about what happened with Mr. Tartaglione at the MCC two days prior, and that John Weider was the next lawyer in the MCC to see Mr. Tartaglione, was given the note by Tartaglione during his visit, and provided me with a copy. Ricco asked me how Mr. Tartaglione could have found the note in his book, when I had said in Court on July 22nd that he had no books. I explained that Ricco misunderstood what I had said in court— not that Mr. Tartaglione had *no* books, but that he had no *new* books. I can't understand why this error is still being repeated now when the transcript and emails to the facility clearly establish that I was complaining that

5

Mr. Tartaglione wasn't being given *new* books that were sent to him, and when I clarified this point to Mr. Ricco repeatedly.

25. The call lasted for about 30 minutes with Mr. Ricco doing most of the talking. We agreed that we did not have any duty to disclose the note to anyone, particularly considering our inability to authenticate it.

26. The most striking part of the July 29, 2019 call with Mr. Ricco was that Mr. Ricco asked me and Ms. Leisenring not to disclose the existence of the note to anyone else on the team. Of course, it is my decision to make. I found the request unusual, and even commented in text messages to Mr. Leisenring during the call that it was odd that he was creating a "firewall" in the team, but I agreed to abide by his request. Indeed, I agreed that due to the sensitive nature of the note, the fewer the number of people who knew about the note, the lower the chances of a "leak." Accordingly, I never spoke to any other Appointed Counsel until August 15th. I know that Mr. Ricco has denied telling us not to disclose the note to other counsel, for reasons that aren't clear to me. But all counsel will agree that prior to August 15th, neither I nor Ms. Leisenring spoke to any other Appointed Counsel about the note. In a telephone conversation I had with Michael Bachrach over press statements, on August 15, 2019, he finally revealed to me that he knew about the note but was told by Mr. Ricco not to discuss it with me. Further, during the call itself, I was texting Ms. Leisenring and I mentioned the unusual request in my contemporaneous text to her.

27. It is my understanding that later that evening Mr. Ricco and Ms. Leisenring spoke without me on the phone and Ms. Leisenring read Mr. Ricco the note. The next day, Mr. Ricco called me twice in the early evening and we spoke for a total of about 40 minutes. I answered a series of questions he had about the note and its discovery and about why Mr. Weider kept possession of it. I told him that I would have taken it myself, but Mr. Tartaglione didn't bring it down to the visiting room. I indicated that was fortuitous because I would not be a witness in the chain of custody if that ever became relevant.

28. According to Appointed Counsel's Revised Pre-Hearing Memo, it appears that the next day on July 30, 2019, and contrary to his directives to us, Ricco told other counsel about the note, and Appointed Counsel met and discussed the note without inviting me or Ms. Leisenring, or even telling us that they were meeting. They claim that they had questions about the note and where it was found, yet they never asked us about either, nor visited Mr. Tartaglione to ask him themselves.

29. Meanwhile, all Appointed Counsel pretended not to know about the note while in our presence. On August 2nd to August 6th the entire team was in California for an extensive conference, which included several hours-long private sessions where we explicitly talked about mitigation, about Epstein's attempted suicide, and about Mr. Tartaglione's role, and where it would be expected that the note would come up if co-counsel knew about it. In line with Mr. Ricco's request, we did not discuss the note with co-counsel. Oddly, they did not mention it to us, even though, unbeknown to us, they all knew about it from Mr. Ricco.

30. The irony that Assigned Counsel are now accusing us of concealing information from them is shocking.

31. Mr. Weider is a long-time friend of, and lawyer to, Mr. Tartaglione. He has been visiting Mr. Tartaglione since the arrest. He does not work for our firm in any capacity and never has. In October of 2018, he signed the protective order at Mr. Tartaglione's request so he would be able to review the discovery and discuss the case with Mr. Tartaglione. I don't recall if I told Appointed Counsel about this at the time or not. The best way to describe Mr. Weider's role in the case is as a family doctor who has a patient with a serious illness who is then treated by a specialist. He is no longer the treating physician, but the patient feels comfortable with his family doctor and goes back to him from time to time about the serious illness. Mr. Tartaglione initially consulted with Mr. Wieder about this matter before Mr. Tartaglione retained me.

32. On August 10, after Mr. Epstein committed suicide, the media again called, and after speaking to Ms. Leisenring and Appointed Counsel, all of whom (including Ms. Leisenring), advised me not to comment, I decided that failing to take advantage of this situation would be doing a disservice to my client. The basecamp posts from the morning of August 10, 2019 accurately reflect the tenor or the debate. (Exhibit DX 15)

33. After much debate n Basecamp and on the phone with at least Ms. Leisenring (I may have spoken to one or more of the appointed counsel), I wrote the following in response to Mr. Ricco telling me not to speak to the press "I am sorry, I respect your experience and your opinion but I we just don't agree here. I am going to say something." (*See* Basecamp post dated August 10, 2019, DX 15, at 11:19 a.m.)

34. Mr. Ricco's response here is revealing. Rather than arguing the merits of commenting or not, he accuses me of immoral and unethical behavior simply because my strategic decision differed from his. He states, "you are absolutely wrong, professionally, ethically and morally to do this." (*See* Basecamp post dated August 10, 2019, DX 15) at 11:38 a.m.)

35. I saw his point strategically, although I disagreed, but morals and ethics were not at play. He carried the baseless allegation of immorality and unethical behavior forward, which is what led us, 10 months later, to this hearing.

36. It was my view that if done tactfully, we could indeed "exploit" the suicide to help establish that Epstein was safe with Mr. Tartaglione, that Mr. Tartaglione did not assault Epstein, that Epstein did indeed attempt suicide on July 23rd, that Mr. Tartaglione was instrumental in saving his life that night, and that the MCC is poorly run by guards, some of whom simply don't care and don't do their jobs and then lie about it. It was an opportunity to rebut some of the bad press from the false reports that Nick was this hulking murderous thug who assaulted another inmate, and to shine more light on a facility that needed vast improvements. If changes occurred, our client would have benefited from the improved conditions.

37. The exchange ended later that day with Mr. Montgomery, writing "You (sic) right Bruce, you are retained counsel and you have the client's best interest and you have the last word. We have moved on."

38. Apparently, Mr. Ricco did not agree with Mr. Montgomery. On August 13th, without speaking to me or to Mr. Tartaglione, Mr. Ricco wrote a lengthy post on basecamp entitled **"Abandonment of Professional Ethics and Confidentiality"** (Emphasis in the original).

7

39. In that post, Mr. Ricco baselessly accused me of a variety of ethical breaches. The post and my response is attached as Exhibit C.

40. After making these allegations, Ricco went to see Mr. Tartaglione on August 15th. It was one of the very few times that Mr. Ricco had met with him over the last 3 years, so the visit was an unusual occurrence to Mr. Tartaglione. It was that meeting that Mr. Tartaglione complained about on the record and in numerous letters to the Court and to counsel. I was not present, but Ricco's account of what was said, the length of the meeting, and even the tone was disputed by Mr. Tartaglione, who sensed Mr. Ricco visited him in order to manipulate him into stating something negative about Barket, not to advance his case.

41. Mr. Tartaglione wrote a letter dated August 15th after he met with Mr. Ricco, and explained that I was the lawyer he wanted to make decisions on his case. (*see* Appointed Counsel's Exhibit DX 94)

42. I received the letter written by Mr. Tartaglione on August 18th, a Sunday morning, when I met with him at the MCC. He had written it shortly after his meeting with Mr. Ricco on the 15th. I scanned and emailed it to all the lawyers the next day, once I was in my office with a scanner. Apparently, the August 15th meeting with Mr. Tartaglione was not as productive as Mr. Ricco described to the team in his August 15th basecamp post.

43. On the point that I have manipulated Mr. Tartaglione into distrusting appointed counsel, I have not. Appointed counsel have decided not to visit Mr. Tartaglione and have, as a result, not developed any relationship with him at all. This is despite the ABA guidelines 10.5 directing counsel in a capital case to meet regularly with their client. This is not to say that every lawyer should spend as much time with Mr. Tartaglione as our firm has spent, but how can they as a group or as individuals prepare a mitigation case when they haven't bothered to get to know the man they represent? How can they get to know him if they never see him or speak to him?

44. Mr. Tartaglione doesn't trust them or like them because despite all the lip service about client centered representation, they haven't seen him collectively more than 6 times in 3 and 1/2 years. Frankly, they don't know their client and they don't know the intricate details of evidence the government has against him. Mr. Tartaglione is an intelligent man, who understands the criminal justice system. You can't walk in to see him unprepared and try to pretend you know his case. He will see right through you. If appointed counsel really wonders why their relationship with Mr. Tartaglione has failed, it is because they never built one.

45. Blaming me for their lack of effort over 3 years in meeting with and getting to know the man the Government wants to execute is appalling.

46. I spent weekend mornings, weekday nights, meeting with Mr. Tartaglione. We have reviewed every detail of the discovery alone and with him. Our firm knows this case and we know our client. He trusts us not because we are clever or charming. He trusts us because he has seen us hundreds of times, discussed the details of the evidence with him, and because he has seen us fight for him with Government, with the BOP, and at times with each other. This is basic work one has to do in the representation of any client, but particularly one facing the death penalty.

8

47. On September 23, 2019, Mr. Ricco asked me to deliver a lengthy memo to Mr. Tartaglione, which purported to clarify Mr. Ricco's work on behalf of his client. By the time I received the email request with the attachment, I was halfway into NYC. I turned around, went to back to my Long Island office and printed out the memo and delivered it to Mr. Tartaglione, as Mr. Ricco requested. *See* Ex. E, Ricco Email thanking Barket for delivering letter to Tartaglione.

48. I want to briefly address the contraband cell phone. As I have said in Court, I have never encouraged a client in any jail to communicate with me on a contraband phone and I certainly did not do that here. To the contrary, when the issue has arisen in the past, I have been abundantly clear that I won't take the calls, won't exchange texts, and do not want any client communicating with me via any method that is not approved by the facility housing the client.

49. Please note that I have, to this point, never disclosed what I told Mr. Tartaglione about his use of the phone. I am reluctantly going to do so now based on advice from ethics counsel that I am free to do so because appointed counsel have accused me of a crime (*See* NY Rules of Professional Conduct 1.6(b)(5) (i)). More importantly, I do so only because this is a sealed proceeding and the contents of this affirmation will not be given to the government's trial team. I would note that it is quite troubling to be forced to reveal confidences to the court and to a federal prosecutor, even firewall counsel, to dispel allegations of criminality that Appointed Counsel have made and that they know are false.

50. Once I learned of Mr. Tartaglione's use of the phone, I told him in the strongest terms to stop and to discard the phone. I warned him that he would get caught, that he would be severely punished, and that it would harm his penalty phase defense. I also told him not to contact me on the phone. He did on one date. We spoke shortly after that, and he never did so again.

51. The text messages at issue are the messages Mr. Tartaglione sent to me and Ms. Leisenring via the contraband phone found in his cell.

52. Of course, I can't force a client to refrain from using a contraband phone. I advised the client on the law and the consequences of breaking the law. In this instance, everyone on the team knew of this problem. Other team members received calls and/or texts from the same contraband phone.

53. I disclosed to the court and to *Curcio* Counsel all that I am free to disclose about the text messages themselves, and the number of times I received a text message from the phone number on the phone that was seized. That number is 516 708 5275. According to the BOP, that is the number for the contraband phone seized from Mr. Tartaglione's cell.

54. The list of names found in the phone which Appointed Counsel refer to as a "call log" is not that at all. It is a "contact list." Neither myself nor Mr. Leisenring are on the contact list, but I would expect to be on the call log if there is one that goes back to the point in May and early June when we received the unsolicited texts/calls. In any event, I saved the texts on my phone and can see the number the text messages came from. I would be happy to share that with anyone who wants to see it.

55. It should be clear to any fair-minded person that I did not in anyway encourage Mr. Tartaglione's use of the cell phone. It would have made my life much easier had I actively

9

participated in its use. I could have saved countless hours driving to the MCC. Instead, there is one very brief exchange on June 3, 2019. He never texted me or called me before or after that. If I was an active participant in his use of the cell phone, my name and number would have been in the list of contacts and there would be numerous texts, not just one.

56. Appointed counsel also falsely assert that I am withholding the text messages, as if I am free to disclose them. Mr. Tartaglione has explicitly instructed me not disclose the contents of the text messages. I do not have a personal preference one way or the other, but I am obligated to abide by my client's wishes.

57. Once the phone was discovered, the entire team made a joint decision to seek to protect any text messages found on the phone. We drafted a joint letter asserting a privilege without naming the privilege.

58. I don't ever recall any discussion with appointed counsel about their new-found theory that the marital privilege applies, but the attorney client privilege does not.

59. I disclosed to the Court, appointed counsel, and *Curcio* counsel that the communications took place. I have withheld the substance of the text because I have been instructed to by my client. I spoke to him in the last few days and again discussed the issue. He reiterated his decision to keep them confidential.

60. I do not want to debate my intentions with respect to the various legal positions I took over the dozens of letters to the Court seeking to expand the *Curcio* inquiry, attacking my integrity, accusing me of unethical behavior, and even accusing me of federal crimes. The positions I took speak for themselves. I made the arguments that I believed were in the best interests of my client.

61. The proposition that I tried to deceive the Court or counsel is simply false. Every single fact Appointed Counsel has now used to try and separate Mr. Tartaglione from his lawyer was provided to them by me. I told them about the text messages. I told them about the Epstein note. The statements made to the press were obviously not done in secret. And, the positions I took concerning the *Curcio* process I did with letters to the Court or statements on the record.

62. The most ironic statement in their 150 page submission is that but for the Court appointing *Curcio* counsel the Court would not have known of these issues. The truth is that but for me telling Appointed Counsel and the Court about the text messages and me telling Mr. Ricco about the note and my "personal involvement" in its removal, no one would have known anything. These facts are a product of my candor. As I told Mr. Ricco in an email when we were debating whether there was a conflict with my statements to the press: "I can state that I want Karas to hear the entire matter. I am not worried about my credibility and nothing said will negatively impact Nick. **My credibility should be based on my word and my conduct, not what the judge doesn't know about my conduct** (*see* Ex. F, Barket email dated August 17, 2019 at 11:40 a.m. emphasis added)

63. Although I did not believe the issue of the press statements merited a Curcio counsel, the matter became a distraction and I yielded. As it became clear that Appointed Counsel were suggesting that I committed a crime I agreed to expand the inquiry to include the Epstein Note. The record concerning my position of expanding the inquiry to include the

10

contraband cell phone, which all parties knew about since at least early July of 2019, from the letters I wrote to the Court on the subject.

64. Finally, I want to clear up any confusion about Michael Ross. We initially engaged him in early 2019, long before any of the events at issue here, to address an ethical issue that arose. Once the possibility of a *Curcio* inquiry was raised, we again sought his advice because our response to the various allegations touched on matters of client confidences. I wanted to be sure we were doing exactly what we should do and not do anything that would harm our client's legal interests. Mr. Ross has read all of the filings related to the *Curcio* inquiry and of course I spoke to him at length about the facts.

Dated: Garden City, New York
       May 5, 2020

Bruce Barket, Esq.

11

# EXHIBIT A

## Bruce Barket

| | |
|---|---|
| **From:** | Bruce Barket |
| **Sent:** | Sunday, March 26, 2017 10:54 AM |
| **To:** | 'tonyricco@aol.com' |
| **Cc:** | msdlaw@aol.com |
| **Subject:** | RE: ME |

Tony,

First, let's recall the events that led us to this point.

1. During our call on Friday I highlighted the Government's intention to return the bodies to the families on March 31st and expressed a desire to have a ME review the reports and advise us if a secondary Autopsy would be helpful. I also highlighted the fact that for Matin Luna no method of death was listed, although it was characterized as a homicide.
2. You indicated that preventing the bodies from being returned promptly to the families could raise problems when we try to reach out to them. I acknowledged that point. We agreed we had to move quickly.
3. I suggested that you and I coordinate the consult with an expert. For reasons that are not clear you told me to contact an ME separately and that if possible you would arrange a call with anyone you located
4. That day I contacted one expert who said he did not have the time, given our constraints
5. Yesterday I reached Dr. Baden who agreed to a review of the reports and to discuss with us whether or not a secondary autopsy was in his view appropriate.
6. I immediately sent you an email (3:24 p.m.) . (You apparently received my email because you sent me a note on a separate matter at 7:19 p.m. asking me to call you on that, but I was already at dinner with my wife and friends)
7. I did not hear from you on that issue until 9:49 p.m when you announced you had, without any consultation with me or even the courtesy of acknowledging my note about Dr Baden, retained Dr. Taff.

I did not commit CJA funds without consulting you. I wrote to you and instead of receiving my input you unilaterally selected an ME. We are supposed to work together, to speak, to consult and make decisions together. It is entirely possible that this case will not be authorized and that I will be trying it as a non-death penalty case. In fact that is the goal of our mitigation team. As such, experts who may testify at a trial should be people I approve of and think will best serve Nick. At the very least, I want to be consulted on who we are retaining.

I was stunned that you retained an expert without so much as a word from me or to me about the selection. This was particularly shocking because I wrote to you earlier in the day and you knew that Dr Baden had agreed to an initial review.

Your lengthy lecture about the protocols did not address my central concern; that you and Mark ignored Nick's retained counsel on a critical selection of an expert, a selection Nick and I will have to live with if the case is not authorized. I can't fathom why you think that process is/was appropriate. As of now I do not know why you think Taff is best for Nick.

The awkwardness I referred to is not whether CJA would pay Taff or Baden or paying Baden for his input. It is that you and Mark went ahead on this critical point without so much as a word from me, the lawyer Nick chose to represent him.

I remain willing to meet with you or talk on the phone, if you do not want to meet. Communication between counsel is crucial. It has lapsed here despite my repeated requests to meet, work together and discuss strategy and decisions. I want your experience and talent for our client. If the court did not appoint you and pay your fees, I would have sought

1

out the expertise of someone like you. Your view that I don't get that death is different is just wrong. Before I met you or received a single note from you I read all the materials you later sent, as I noted at the time.

I want to work with you for the benefit of our client. But that means you have to speak to me, consult with me on major decision and meet with me.,

Let me know how you want to proceed

Bruce A. Barket, Esq.
Barket, Marion, Epstein & Kearon, LLP
666 Old Country Road , Ste. 700
Garden City, NY 11530
(516) 745 1500 [P]  (516) 745 1245 [F]
www.barketmarion.com

This transmittal may be a confidential attorney client communication or may otherwise be privileged or confidential. If it is not clear that you are the intended recipient, you are hereby notified that you have received this transmittal in error; any review, dissemination, distribution or copying of this transmittal is strictly prohibited. If you suspect that you have received this communication in error, please notify us immediately by telephone or email and immediately delete this message and all its attachments

**From:** tonyricco@aol.com [mailto:tonyricco@aol.com]
**Sent:** Sunday, March 26, 2017 7:13 AM
**To:** Bruce Barket
**Cc:** msdlaw@aol.com
**Subject:** Re: ME

Bruce:

CJA funds are not going to used to pay any financial arrangement you have apparently, on your own, made with Dr. Baden.  Your decision to retain the services of Dr. Baden without consulting capital counsel.  You were previously advised not to do this, if your decision involves the use of CJA *public funds*.

You have no authority to retain the services of any expert with CJA funds and were specifically told not to do so and was also informed of the CJA protocols.  Less than four weeks ago, you said that you would not agree to any financial arrangement with any experts without first running it by appointed capital counsel.  It sounds like that was not followed.

You apparently reached some arrangement with Dr. Baden without consulting with me or Mark.  This was done, even though you were specifically told that I would also be speaking to a Forensic Pathologist and that you were to get back to me, if you found someone that was interested so that we would not duplicate efforts.  You went ahead and apparently retained Dr. Baden anyway.

Had you asked me, I would have informed you that In capital cases, greater consideration is given to which experts are selected as consulting, teaching and/or testifying experts.  These decisions are, in some cases, vetted with Resource Counsel but always upon consultation with learned counsel.  You choose not to avail yourself of the considerable experience that capital counsel has with these critical matters.  Rather than report back as requested, rather than follow the protocols for retaining experts as previous explained, you apparently went ahead and retained Dr. Baden. And, now you are expressing concerned with which expert will best serve this case?  Those concerns are usually expressed before, not after you retain a particular expert - as we have done with other experts you have suggested.

As retained counsel, you have the authority to hire any expert of your choosing without consulting with learned counsel. I have served and am currently serving as private counsel on death eligible cases and fully understand that there are some circumstances were *private money* is used to pay for expert or other investigative services. If you want to use *private money* to retain experts or anyone else, without first consulting with capital counsel, that is your prerogative - though unwise in the absence of having capital experience.  However, in this case, it was made clear to you how experts were to be appointed with the use of *public funds* under the Criminal Justice Act and, in particular, the manner in which we were going to proceed in this case.

2

Though not advised, you have an absolute right as private counsel proceed in any manner you believe serves the best interest of Mr. Tartaglione, but not with the use of CJA public funds, and again you were told not to do so. You have no authority to expend CJA *public funds* in the manner in which you have proceeding with Dr. Baden. If you believe you have an issue to take up with the court, then do so. I will arrange for an appointment with Judge Karas to address this matter first thing Monday morning, if you need additional guidance on the matter of how *public funds* are to be used retain experts in this case.

How we shall proceed with retaining experts with CJA funds is guided by the protocols established by the SDNY and 2d Circuit Court of Appeals and the Judicial Conference CJA Guidelines (which were provided to you by me in emails on January 2 and January 5, 2017). The method and process of how to this Team would proceed with the appointment of experts with CJA funds has been previously set out to you via conversation and through a series of emails on February 27 and 28, 2017. Those are the protocols that Mark De Marco and I are "duty bound" to follow when retaining experts with the use of *public funds* under the Criminal Justice Act. And, it is the expectation of the court that all counsel shall comply with the CJA protocols – especially in federal capital cases.

This is a death eligible case and litigating "*death is different.*" Learning how to understand, develop and present mitigation, which includes the manner and use of experts, must always be guided by how the death penalty is litigated. I found your views on mitigation, and your decision to memorialize those views in an email, as troubling as your decision not to follow the instructions that were discussed to avoid duplication of time and resources in consulting with a Forensic Pathologist. Your views overall views on mitigation must comport with the ABA standards for the representation of capital eligible defendants, 18 USC 3593 and Supreme Court authorities such as *Wiggins v. Smith*, 539 US 510 (2003). Judge Karas, has exercised his discretion under 18 USC 3005 and the Judicial Conferences' CJA Guidelines to appoint experienced capital counsel to represent Mr. Tartaglione, through the use of CJA public funds, to ensure that his representation in this at risk death eligible case, (which includes the development of mitigation and the selection and use of experts), is in compliance with those very same ABA standards and Supreme Court case authorities.

CJA funds are going to pay for the appointment of Dr. Mark Taff, a well experienced Forensic Pathologist, who has been previously appointed to work on federal cases under the Criminal Justice Act, and who has also agreed to work at the rates, (along with a proposed number of hours as required by the protocols as set forth in Appendix E) prior to his appointment and the beginning of any work on the case. Experts who are to paid by public funds under the Criminal Justice Act are **not** permitted to begin work without an agreement of the hourly rate and proposed number of hours. This is fundamental to capital representation under the CJA Guidelines.

I understand that you feel "awkward." However, you put yourself in that position. To prevent this type of situation with experts, this matter was previously and fully discussed so that there would no problems. You said that you understood and that you would be so guided. I have no objection to utilizing any individual, vendor and/or expert that you believe brings a benefit to the case, as I have have previously demonstrated. But, as a privately retained counsel, you must follow the protocols for the Team as set forth by capital counsel, and the court's protocols and CJA Guidelines whenever CJA public funds are in issue.

Tonyricco

-----Original Message-----
From: Bruce Barket <bbarket@barketmarion.com>
To: tonyricco (tonyricco@aol.com) <tonyricco@aol.com>; Mark S. DeMarco <MSDLaw@aol.com>
Sent: Sat, Mar 25, 2017 11:42 pm
Subject: ME

I am asking that no request for funds for a particular ME be requested until we resolve which ME can best serve Nick's interests. I don't want this current disagreement to spill out of our camp and into the court.

Bruce A. Barket, Esq.
Barket, Marion, Epstein & Kearon, LLP
666 Old Country Road , Ste. 700
Garden City, NY 11530
(516) 745 1500 [P]  (516) 745 1245 [F]

3

www.barketmarion.com

This transmittal may be a confidential attorney client communication or may otherwise be privileged or confidential. If it is not clear that you are the intended recipient, you are hereby notified that you have received this transmittal in error; any review, dissemination, distribution or copying of this transmittal is strictly prohibited. If you suspect that you have received this communication in error, please notify us immediately by telephone or email and immediately delete this message and all its attachments

# EXHIBIT B

## Bruce Barket

| | |
|---|---|
| **From:** | tonyricco@aol.com |
| **Sent:** | Wednesday, August 21, 2019 6:02 AM |
| **To:** | Bruce Barket; bkoffsky@snet.net; michael@mbachlaw.com; ken@kjmontgomerylaw.com; johnadiazlaw@gmail.com |
| **Cc:** | Aida Leisenring; Danielle Muscatello; Donna Aldea |
| **Subject:** | Re: next step |

Bruce:

Really.   Are you aware that DOJ has a protocol for deauthorization?  They are included in the materials sent to you early on in this case.   Are you aware of the process that the DOJ employs to sign up a witness, who has an actually pending authorized death penalty case?

Has this been the strategy behind these press statements?    It is rare that the DOJ signs up a witness who have stated in the press and/or publically that the person is a witness.   The government generally does not announce it's witnesses.

In addition and more significant, you can expect that the person with a pending authorized death penalty case, would, in order to be deemed a credible witness, be required to accept responsibility for the pending charges as a predicate, and if accepted as a witness - to plead guilty.

I am not too familiar with the "he has nothing to loose" theory of moving forward with this proposition.   We have four authorized murders that we are facing in this case.   Ill advised moves, could cost Nicholas Tartaglione his life.

The first thing that has to happen, is to obtain a waiver.   Secondly, have you considered how that waiver impacts or influences Nicholas Tartaglione's attractiveness as a witness.

Finally, has any government prosecutor or federal investigator reached out to you about this?   Most, if not all, the defendants and staff on the unit on both dates have either been subpoenaed and/or retained counsel or has had CJA counsel appointed.   If you have not heard from anyone, the absence of such an overture should send a strong signal.

I do not recall, in the history of modern death penalty litigation that a capital authorized defendant has offered to become a witness to a crime in jail, becoming subject to a interview and debriefing (in which he will be required to *tell all*, so that an assessment can be made as to his/her credibility to  be signed up).   But, I am sure you have thought through this idea.

Tonyricco

------Original Message------
From: Bruce Barket <bbarket@barketepstein.com>
To: tonyricco (tonyricco@aol.com) <tonyricco@aol.com>; bkoffsky@snet.net <bkoffsky@snet.net>; Michael Bachrach (michael@mbachlaw.com) <michael@mbachlaw.com>; ken@kjmontgomerylaw.com <ken@kjmontgomerylaw.com>; john diaz (johnadiazlaw@gmail.com) <johnadiazlaw@gmail.com>
Cc: Aida Leisenring <aleisenring@barketepstein.com>; Danielle Muscatello <DMuscatello@barketepstein.com>; Donna Aldea <DAldea@barketepstein.com>
Sent: Tue, Aug 20, 2019 3:57 pm
Subject: next step

I am planning on writing the Justice Department in an attempt to get them to trade authorization for Nick's full cooperation into Epstein's death and the overall manner in which MCC is run and the conditions of the facility.  Others can offer evidence about the facility, but only Nick knows what happened on the 23rd of July and before.  He has a good deal of information about Epstein and his past and state of mind.

1

I know this is a long shot, but we have nothing to lose. All they can say is "no" but in so doing they will fail to have interviewed the key witness in Epstein's first attempt.

Hopefully, people can weigh in here and help. I won't have time today to circulate a draft but I plan on writing to Barr.

Bruce A. Barket, Esq.
Barket Epstein Kearon Aldea & LoTurco, LLP
666 Old Country Road , Ste. 700
Garden City, NY 11530
(516) 745 1500 [P] (516) 745 1245 [F]
www.barketepstein.com


This transmittal may be a confidential attorney client communication or may otherwise be privileged or confidential. If it is not clear that you are the intended recipient, you are hereby notified that you have received this transmittal in error; any review, dissemination, distribution or copying of this transmittal is strictly prohibited. If you suspect that you have received this communication in error, please notify us immediately by telephone or email and immediately delete this message and all its attachments

# EXHIBIT C

**Tartaglione (SD NY) Team Lang & Kaboski, LLP**

# Abandonment of Professional Ethics and Confidentiality

From: Tony Ricco
Date: Tue, 13 Aug 2019 at 7:45am

The purpose of this post is to advise all team members of the consequences of the public disclosure of statements made by Nicholas Tartaglione during interviews.

Yesterday, the media quoted an attorney in this case, who decided to disclosure information possessed by Nicholas Tartaglione in relation to Jeffrey Epstein suicide.  During the media interview with the attorney, the attorney is quoted as to having stated that he interviewed Nicholas Tartalione since the appaent suicide.  The attorney then proceeded to disclose to the media what Nicholas Tartaglione heard or did not hear on the morning of the apparent suicide, *inter alia*.  In so doing, the attorney has violated the attorney client privilege thereby exposing Nicholas Tartaglione (and the attorney) to a compelled disclosure of the entirety of the conversation.  Apparently, the attorney was fully aware of the rules related to such disclosure and its consequences, before making such a statement.  However, for the remainder of the team. I want to everyone else to understand the basic principles of law related to any information provided by Nicholas Tartaglione during an interview.  Understanding of those laws are of critical importance to the effective representation of Nicholas Tartaglione in this authorized death penalty case.

At common law, communications made in confidence between attorney and client were held confidential as a matter of the attorney's code of honor (see, Richardson, Evidence § 410 [Prince 10th ed]). New York's attorney-client privilege as codified at CPLR §4503(a) protects against disclosure of a "*confidential communication made between the attorney or his or her employee and the client in the course of professional employment*" and "*confidential.*" See, *People v. Harris*, 57 N.Y.2d 335, 342 (1982).

The attorney-client privilege protects confidential communications between attorneys and clients concerning legal advice. An attorney may *rely* on this privilege to prevent the discovery of materials and communications that would otherwise be available to an adversary. The attorney-client privilege has been expressed both statutorily, CPLR 4503, and under the Federal Rules of Evidence; Rule 501, Rule 502(a)(1).

However, the purposeful disclosure of information discussed during the confidential conversation, unquestionably waives the privilege. When there is a disclosure of a confidential communications a waiver of the privilege is affected as to **all related communications regarding the same subject matter**. (See, *In re Grand Jury Proceedings*, 219 F.3d 175 [2d Cir. 2000]; *In re Sealed Case*, 877 F.2d 976 [D.C. Cir. 1989]).

The concept is also embodied in the Code of Professional Responsibility binding attorneys **to keep private** the confidential communications and secrets of their clients on pain of professional discipline, including loss of their license to practice law (see, DR 4-101 [22 NYCRR 1200.19]; 22 NYCRR 1200.6 Rule 1.6. (Confidentiality of Information);see also, EC 4-4.

Notwithstanding the sound advice of experienced capital counsel, our Resource Counsel and from the Project itself for counsel to refrain from public interviews/statements or alternatively to float comments on the Jeffrey Epstein suicide by Resource Counsel before hand, an attorney decided to join the media frenzy to "exploit" the Jeffrey Epstein suicide. In so doing, the attorney has made statements which violate several governing statutes, established court rules and the New York Rules governing professional conduct.  The result?  Counsel has potentially subjected Nicholas Tartaglione (and himself) to a compelled disclosure to **all related communications regarding the same subject matter.**

As a result of this disclosure of confidentiality, if have two requests (1) Michael can you please step up your effort to obtain all public statements made by counsel to the media and the court by counsel and prepare a team memo on the subject; and (2) for all attorneys and team members to refrain from public statements related to the Jeffrey Epstein suicide. To the extent that such a statement is desired, to float the statement by Learned Counsel or our Resource Counsel.

Those with capital experience understand how much we protect the defendant from any type of compelled interview in course of developing a capital defense (i.e., Rule 12.2). Counsel has made several statements to the media in relation to the Jeffrey Epstein suicide which has put Nicholas Tartaglione at risk in the penalty phase. In the absence of an understanding how evidence is presented at the penalty phase, statements have been made and will apparently continue.

Therefore, if there is some remedy that is being sought to benefit Nicholas Tartaglione, **it is requested that the remedy is reduced to a written application and filed with the court** (under seal if necessary) - *not litigated in the public media*.



**Bruce Barket Tue, 13 Aug 2019 at 8:53am**

As always Tony, your posts are thoughtful.  A few points

1. Although I am not accustom to Basecamp and it proper use, it seems unfortunate for it to be used to attack co counsel.  I don't know of any violation of any rule of professional conduct by any member of the team.  If I thought there was a violation, I would first address the matter privately with the lawyer to be sure I knew all the facts and had learned that lawyers perspective and thoughts before accusing the lawyer on a platform with nearly 20 members. But, I don't fault any lawyer for proceeding in a manner they think best.

2.  Gathering the media quotes by counsel is of course a good idea and my office regularly collects all media on every case we handle.  Here, I think it is particularly important to collect the media containing the leaks of false allegations about our client in relation to the Epstein attempted suicide and his death. Given the quantity of media it is a good idea to have someone else gather the stories as well so as not to miss anything. Mike, feel free to call me if you need help with this.

3.  Please recall that this "frenzy" began with a false leak that our client assaulted Epstein a few weeks ago.  The outlet quoted unnamed law enforcement sources and personal a the mcc.  All of our public comments were in response to that leak or addressed the conditions generally at the MCC, which I hope now receive scrutiny by the pubic and by investigators.  Sealed filings won't change the culture of that place nor improve the conditions for the people detained there.

4.  I am eager to get help on how best to address the media frenzy to achieve goals for Nick.  While I have read all the comments indicating that we should not say anything, I disagree.  I would, however, be interested in input from others on what to say and how to say it.

5.  Of course I am acting in order to achieve goals for Nick, but I don't think I should lay out those goals nor the strategy here.  We haven't in the past gone into that level of detail and I have been chastised at times for writing too much.  I would be happy to discuss all of this or anything else with anyone who wants to talk to me.  I am available for a call and can drive into NYC later today for a meeting if people want to spend a few minutes constructively working towards our common goals.

Happy to hear from anyone.



**Kenneth Montgomery Tue, 13 Aug 2019 at 1:39pm via email**

That MSNBC article I just read is incredibly harmful on many fronts. No doubt about it.



**Bruce Barket Tue, 13 Aug 2019 at 1:43pm**

Share the link and please make sure Mike gets it.



**Kenneth Montgomery Tue, 13 Aug 2019 at 1:44pm via email**

Sometimes the you don't say can be more important than the things you say.
I also have never seen an attorney offer to proffer their death authorized
client via the media. Particulrly on an active investigation.



**Kenneth Montgomery Tue, 13 Aug 2019 at 1:52pm via email**

I also think the story can have an adverse affect on the client's safety
from other prisoners.



**Bruce Barket Tue, 13 Aug 2019 at 3:35pm**

Kenny,

I did not speak with MSNBC.  Happy to read the article if you post the link. I don't have
time to search for it today.



**Kenneth Montgomery Tue, 13 Aug 2019 at 3:41pm via email**

Sorry, NBC.

https://www.nbcnews.com/news/us-news/nearby-inmate-heard-nothing-when-jeffrey-epstein-died-lawyer-sa...

Sent from kjmontgomerylaw.com

>



**Bruce Barket Tue, 13 Aug 2019 at 4:41pm**

I had not seen this.  Thanks.  I wonder if this is the same article Tony referred to.  I think
Nick will be fine with other inmates, as he was when the guards called him out following
my complaints in Court.  And I agree that the strategy of speaking to press is as much
about what to withhold as it is about what to say.  There is a lot about this case and
about representing Nick that I have never seen before. It's one of the benefits of having
so many talented lawyers.  Hopefully, nearly everything will be something at least one
person on the team has seen before.

# EXHIBIT D

Tartaglione (SD NY) Team Lang & Kaboski, LLP

# liability phase work

From: Bruce Barket
Date: Mon, 9 Sep 2019 at 8:28am

The part of the "agenda" we did not get to during our Friday meeting was the part where I intended to ask for volunteers to take charge of some areas of developing our theory of defense on the building "books" for cross on each witness.

If anyone is interested here are the suggested areas and witnesses.  Please add to the list.  This is just a few items that I know we are going to need work on.

a.    Crime scene

        i.    Manure in the grave site

i.    Cadaver Dogs hit on manure pile on farm

ii.    Could the bodies have been hidden in the manure until the backhoe was fixed?

        ii.    Cadaver/drug Dog hit on Nick's truck

i.    Motion to exclude

a.    Drug/cadaver dog

        i.    Not a different signal

b. Phone record analysis

c. DNA

d. alternate suspects/building ties between conspirators apart form Nick

f. the criminal activity of the victims, including the cartel connection.

g.  Motions (Mike B?)

--getting in the video of Biggs at the gym
--getting the details of the Brady evidence
--other??

e. defense evidence

I.    Defense evidence (to date)

a.    Dumpster

b.    Backhoe

c.    Pine Bush

d.    Parrot/pizza

e.    Alibi

D. Witnesses

a.    Sullivan

        Co-conspirators in Florida

b.    Cruz, Marcos (Aida)

c.    Biggs (Bruce B.)

d.    Dominic

e.    Mike Tartaglione

f.    Vertag Tartaglione

g.    Private investigator

h.    Claudia Colegio

i.    Belfa Benitez

j.    Relatives of victims

        some have relevant information about their disappearance

    mitigation?
k. Gerard Benderoth

---



**Bruce Barket Mon, 9 Sep 2019 at 11:39am**

I forgot A few things

1. Car sales
2. Steroid sales

---



**Bruce Barket Fri, 13 Sep 2019 at 2:15pm**

Hey, another opportunity to volunteer to work on the liability part of the case.  If no one else is going to take on this work, our firm will handle it. I know the roster for lawyers is up in the air, sort of.  But we are all still Nick's lawyers until we aren't and this work has to be done.

In either respect, we will continue to engage with the mitigation and the penalty phase.

# EXHIBIT E

## Bruce Barket

| | |
|---|---|
| **From:** | tonyricco@aol.com |
| **Sent:** | Monday, September 23, 2019 8:03 AM |
| **To:** | Bruce Barket; bcsternheim@mac.com |
| **Cc:** | Aida Leisenring; bkoffsky@snet.net; johnadiazlaw@gmail.com; mbach2000@yahoo.com; kenneth@kjmontgomerylaw.com |
| **Subject:** | Re: You Mentioned That You Are Visiting Mr. Tartaglione This Week |

Thank you for turning around to print the letter out and to deliver it to Nicholas Tartaglione, who is obviously extremely frustrated but for reasons not related to any action or inaction by me.   The memorandum is self explanatory, and sets forth everything.

Tonyricco


------Original Message------
From: Bruce Barket <bbarket@barketepstein.com>
To: 'tonyricco@aol.com' <tonyricco@aol.com>; bcsternheim@mac.com <bcsternheim@mac.com>
Cc: Aida Leisenring <aleisenring@barketepstein.com>; bkoffsky@snet.net <bkoffsky@snet.net>;
johnadiazlaw@gmail.com <johnadiazlaw@gmail.com>; mbach2000@yahoo.com <mbach2000@yahoo.com>;
kenneth@kjmontgomerylaw.com <kenneth@kjmontgomerylaw.com>
Sent: Mon, Sep 23, 2019 7:41 am
Subject: RE: You Mentioned That You Are Visiting Mr. Tartaglione This Week

Of course I will give him the letter.  I was already on my way to MCC but turned around to print it.

We ordered the transcript from the 17th but have not received it.  Can you please identify the "Inaccurate statements" you have referred to in several emails and basecamp posts?

Bruce A. Barket, Esq.
Barket Epstein Kearon Aldea & LoTurco, LLP
666 Old Country Road , Ste. 700
Garden City, NY 11530
(516) 745 1500 [P]  (516) 745 1245 [F]
www.barketepstein.com


This transmittal may be a confidential attorney client communication or may otherwise be privileged or confidential. If it is not clear that you are the intended recipient, you are hereby notified that you have received this transmittal in error; any review, dissemination, distribution or copying of this transmittal is strictly prohibited. If you suspect that you have received this communication in error, please notify us immediately by telephone or email and immediately delete this message and all its attachments

From: tonyricco@aol.com [mailto:tonyricco@aol.com]
Sent: Monday, September 23, 2019 7:25 AM
To: bcsternheim@mac.com
Cc: Aida Leisenring; Bruce Barket; bkoffsky@snet.net; johnadiazlaw@gmail.com; mbach2000@yahoo.com;
tonyricco@aol.com; kenneth@kjmontgomerylaw.com
Subject: You Mentioned That You Are Visiting Mr. Tartaglione This Week

Bobbi;

What day are you visiting Mr. Tartaglione?   Please advise.   Mr. Barket has indicated that he will be visiting Nicholas Tartaglione today.

1

As you are aware, Nicholas Tartaglione, out of frustration, stated that he would not visit with me at the MCC (a terrible mistake). Judge Karas has asked Nicholas Tartaglione to re-think or further consider his application, advocated by Mr. Barket, for the removal of the most experienced capital counsel from his case.

Consistent with Judge Karas' recommendation to Nicholas Tartaglione, I have provided him with a memorandum, along with Basecamp posts which is contrary to every statement made by him on the record, and advocated by attorney Barket. My concern is that this death authorized defendant receives *conflict free* advice on all matters related to counsel, and in particular to statements made by the defendant on the record. My concern also includes counsel's responsibility to correct misstatements and inaccurate statement on the record in court proceedings. 22 NYCRR 1200, Ethical Rule 3.3.

I have asked attorney Barket to deliver the memorandum to Nicholas Tartaglione, if for some reason he declines to do so, I have advised him that I would provide a copy to *Curcio* counsel for delivery.

I am going to hold off, sending it now, but will await attorney Barket's decision before sending the document and exhibits to you. However, the memorandum informs Nicholas Tartaglione that he should discuss matters in the memorandum with you as *Curcio* counsel, as they relate directly to matters relevant to the *Curcio* inquiry, and/or that he should forward the memorandum and the attached documents to the court, to help the court accurately understand the representations and advocacy that is taking place around the issues related to counsel.

Tonyricco

2

# EXHIBIT F

## Bruce Barket

| | |
|---|---|
| **From:** | Bruce Barket |
| **Sent:** | Saturday, August 17, 2019 11:40 AM |
| **To:** | tonyricco@aol.com |
| **Cc:** | Aida Leisenring; Bruce Koffsky; Michael Bachrach; john diaz; ken@kjmontgomerylaw.com |
| **Subject:** | Re: The Letter To The Court |

No need.

Once you file, I will articulate my view in a Separate letter.

I can state that I want Karas to hear the entire matter. I am not worried about my credibility and nothing said will negatively impact Nick. My credibility should be based on my word and my conduct, not what the judge doesn't know about my conduct.

I am confident that no violation of the rules of professional conduct occurred and that there not a conflict real or Potential. Thus, there is no need for any inquiry by independent counsel or the court. But, as you have often counseled me, every lawyer should do what they think is right.

I respect everyone's view and would never fault anyone acting in good faith for doing what they believe they are required to do under the rules.

You mentioned information you gained from various sources which you view as important on the issues you placed before us. Please share it.

I continue to get calls from the media and I am planning on contacting the prosecutors in charge of the investigation into Epstein's death.

Withholding information may result in me doing something I otherwise would not have done or not doing something I should have.

Bruce Barket
Barket, Epstein, Kearon, Aldea & LoTurco
666 Old Country road
Garden City, NY 11530
(516) 745 1500 - O
(516) 287 7230 - M
Barket Epstein.com

On Aug 17, 2019, at 9:13 AM, "tonyricco@aol.com" <tonyricco@aol.com> wrote:

> That's fine, I will put in that you object to the application. Let me know - I am okay either way.
>
> Tonyricco
>
> -----Original Message-----
> From: Bruce Barket <bbarket@barketepstein.com>
> To: tonyricco@aol.com <tonyricco@aol.com>
> Cc: Aida Leisenring <aleisenring@barketepstein.com>; bkoffsky@snet.net <bkoffsky@snet.net>;

1

johnadiazlaw@gmail.com <johnadiazlaw@gmail.com>; ken@kjmontgomerylaw.com
<ken@kjmontgomerylaw.com>; mbach2000@yahoo.com <mbach2000@yahoo.com>
Sent: Sat, Aug 17, 2019 9:09 am
Subject: Re: The Letter To The Court

Damn, you caught me just before I left.

I don't think we are going to join you on this application. But I will reflect more on it as I ride.

Perhaps you can share the information you received.

Bruce Barket
Barket, Epstein, Kearon, Aldea & LoTurco
666 Old Country road
Garden City, NY 11530
(516) 745 1500 - O
(516) 287 7230 - M
Barket Epstein.com

On Aug 17, 2019, at 9:03 AM, "tonyricco@aol.com" <tonyricco@aol.com> wrote:

> Based upon my conversation with counsel for two witnesses interviewed by federal
> investigators after our conference meeting yesterday, coupled with the information that I
> have been become aware of, we need to get ahead of this, and in a hurry - before we are
> on the receiving side of a government application.
>
> Let's set the narrative and demonstrate our ethics, if we can.
>
> Tonyricco
> <Curcio letter (DRAFT)A.docx>